UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


| | | |
|---|---|---|
| CONNOR B., by his next | ) | |
| friend, ROCHELLE VIGURS, | ) | |
| ET AL., | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | C.A. No. 10-cv-30073-MAP |
| | ) | |
| DEVAL L. PATRICK, ET AL., | ) | |
| Defendants | ) | |


MEMORANDUM AND ORDER REGARDING
DEFENDANT PATRICK'S MOTION TO DISMISS AND
DEFENDANTS' MOTION TO DISMISS
(Dkt. Nos. 17 & 18)

January 4, 2011

PONSOR, D.J.

## I. INTRODUCTION

Plaintiffs bring this proposed class action on behalf of all children who have been (or will be) placed in the custody of the Massachusetts Department of Children and Families ("DCF") as a result of a state juvenile court order adjudicating them in need of "care and protection" due to abuse or neglect by their parents. Plaintiffs challenge certain facets of the foster care system in Massachusetts

and seek injunctive relief under provisions of the United

States Constitution and under the federal Adoption

Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 670

et seq. ("AACWA").

Presently before this court are a motion to dismiss

filed by Defendant Patrick (Dkt. No. 17) and a joint motion

to dismiss on behalf of all Defendants (Dkt. No. 18). For

the reasons discussed below, Defendants' motions will be

denied.

## II. FACTS

The six named Plaintiffs -- Connor B., Adam S., Camila

R., Andre S., Seth T., and Rakeem D. -- are children who

were transferred into DCF custody as a result of abuse or

neglect by their parents. DCF may obtain custody over a

child in a number of ways, including a "care and protection"

proceeding instituted pursuant to Mass. Gen. Laws ch. 119,

§§ 24-26, which targets children who suffer parental neglect

or abuse. Plaintiffs bring this action on behalf of all

children who enter DCF's foster care custody as a result of

such proceedings. Notably, the action does not involve

children over whom DCF has obtained custody through other

means, such as children in need of services ("CHINS") under Mass. Gen Laws ch. 119, §§ 39E et seq., or children in DCF custody pursuant to a voluntary placement agreement signed by their parents.

Defendants, all sued in their official capacities, are Angelo McClain, DCF Commissioner; Judyann Bigby, Secretary of the Massachusetts Executive Office of Health and Human Services ("EOHHS"), which oversees DCF; and Governor Deval Patrick.

Plaintiffs allege that approximately 8,500 children in DCF custody are exposed to severe potential harm, including: abuse and neglect by foster care parents; movement from one foster home to another with damaging frequency; placement in foster homes ill-suited to address their particular needs; languishing for years without permanent placement and then "aging out" of DCF custody without a permanent family or adequate preparation for adult life; and a lack of essential services, including sibling visitation and adequate medical, dental, mental health, and educational services. (Dkt. No. 1, Compl. ¶¶ 164 - 214.)

Plaintiffs allege that these harms result from systemic

3

deficiencies within DCF, including failure to maintain an adequately staffed and appropriately trained child welfare workforce; failure to properly manage foster care placements; failure to properly develop and implement case plans and service plans for foster children and their families; and failure to access available federal funding. (Dkt No. 1, Compl. ¶¶ 215 - 298.)

Plaintiffs bring this class action seeking an equitable remedy to these alleged failures in the Massachusetts foster care system. The complaint comprises four counts. Counts I, II, and IV allege violations of Plaintiffs' rights under the United States Constitution, namely, Plaintiffs' substantive due process rights under the Fourteenth Amendment; Plaintiffs' liberty interests, privacy interests, and associational rights under the First, Ninth, and Fourteenth Amendments; and Plaintiffs' procedural due process rights under the Fourteenth Amendment. Count III alleges multiple violations of the Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 670 et seq. ("AACWA").

Plaintiffs seek injunctive relief requiring DCF to

implement the following reforms:

1. Decrease caseworker caseloads;

2. Improve caseworker training;

3. Comply with recommendations of qualified professionals to improve essential services for the Plaintiff class;

4. Increase monitoring by caseworkers of the Plaintiff class;

5. Provide adequate visitation for the Plaintiff class with their parents and siblings;

6. Prepare timely case plans and case reviews;

7. Maintain a quality assurance system consistent with national standards;

8. Ensure that an adequately staffed and trained contract monitoring unit is created within the state's central office for purposes of overseeing and managing the purchased services of the agency; and

9. Pay foster care reimbursement rates as set forth in the AACWA.

(Compl., Prayer for Relief (e).)  In addition, Plaintiffs

ask that the court appoint a neutral expert to oversee the implementation of these reforms.  (Id.)

### III. DISCUSSION

Defendants now move to dismiss all four counts in the complaint.  Although Defendant Patrick filed a separate motion to dismiss (Dkt. No. 17), his arguments run parallel with those offered by the other Defendants in their joint motion to dismiss (Dkt. No. 18).  The court will therefore address Defendant Patrick's arguments in the context of the joint motion to dismiss.

In addition to attacking the sufficiency of Plaintiffs' allegations, Defendants offer three threshold arguments: (1) Plaintiffs lack standing; (2) the court should abstain from hearing the case pursuant to Younger v. Harris, 401 U.S. 37 (1971); and (3) the doctrine of sovereign immunity bars all claims as to Defendant Patrick.  The court will address these issues before turning to the sufficiency of the complaint's factual allegations supporting Plaintiffs' constitutional and statutory claims.

### A. Standing.

In accordance with Article III of the United States

Constitution, a plaintiff must have standing to bring a claim before a federal court.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561 (1992).  To satisfy Article III's standing requirement, a plaintiff must assert (1) an injury in fact that is (a) concrete and particularized and (b) actual or imminent; (2) a causal connection between the above injury and a defendant's conduct; and (3) a likelihood that judicial relief will redress the above injury.  Id. In cases involving requests for injunctive relief, the plaintiff must satisfy an additional requirement by alleging an immediate threat of future injury.  See City of Los Angeles v. Lyons, 461 U.S. 95, 111 (1983).  While the plaintiff bears the burden of establishing standing, "at the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim."  Lujan, 504 U.S. at 561 (internal citation and quotation marks omitted).

Defendants challenge Plaintiffs' standing on two grounds: (1) Plaintiffs fail to establish a causal

connection between the harms suffered and the systemic deficiencies alleged; and (2) Plaintiffs cannot prove an immediate threat of future injury.

    1.  <u>Causal Connection</u>.

    Defendants' principal contention is that Plaintiffs fail to "establish a link between the systemic class relief that they seek and any actual harm allegedly suffered by the six named plaintiffs." (Dkt. No. 29, Defs.' Reply Mem. at 16.) Defendants highlight several alleged systemic deficiencies recited in the complaint, including unmanageable caseloads and infrequent contact between social workers and the Plaintiff class. Because these claims amount to "generalized complaints of institutional mismanagement," they argue, Plaintiffs cannot satisfy the element of causation. (<u>Id.</u> at 24 (citation omitted).)

    Defendants' arguments are unpersuasive. Under the second prong of the <u>Lujan</u> test, a plaintiff need not allege that the defendant's conduct was the proximate cause of the plaintiff's injuries, but merely that the injury was "fairly traceable" to the challenged action of the defendant. <u>Lujan</u>, 504 U.S. at 590; <u>see also</u> <u>Focus on the Family v.</u>

Pinellas Suncoast Transit Auth., 344 F.3d 1263, 1273 (11th
Cir. 2003) ("Importantly, in evaluating Article III's
causation (or 'traceability') requirement, we are concerned
with something less than the concept of 'proximate cause.' .
. . [E]ven harms that flow indirectly from the action in
question can be said to be 'fairly traceable' to that action
for standing purposes.").  The alleged misconduct at issue
here includes an understaffed and improperly trained
workforce, infrequent contact between children and
caseworkers, an inability to provide children with basic
health and educational services, failure to develop and
implement case plans, and a lack of resources due to DCF's
inability to secure federal funding.  (Dkt. No. 1, Compl. ¶¶
215 - 298.)  Assuming all of Plaintiffs' allegations to be
true, as the court must at this stage, it is at least
arguably clear that the harms suffered by children in DCF
custody are fairly traceable to these systemic failures
within DCF.

Contrary to Defendants' assertions, Plaintiffs need not
prove with specificity at this stage how every harm suffered
by every named Plaintiff relates to a particular defect in

the system.  Cf. Lewis v. Casey, 518 U.S. 343, 357 ("The general allegations of the complaint in the present case may well have sufficed to claim injury by named plaintiffs, and hence standing to demand remediation, with respect to various alleged inadequacies in the prison system . . .").  Defendants' arguments may have greater force if, after discovery, it becomes clear that a named Plaintiff cannot link the harm he or she suffered to a particular action or inaction by DCF.  In response to a threshold motion to dismiss, however, such a finding would be premature.

    2.   Immediate Threat of Future Injury.

    Defendants correctly observe that, due to the nature of the relief sought, Plaintiffs cannot establish standing by relying on past injury alone.  Where a complaint requests prospective injunctive relief, the plaintiff must allege an immediate threat of future injury.  See Lyons, 461 U.S. at 111 (holding that plaintiff lacked standing to bring claim seeking to enjoin the use of "chokeholds" by police officers because plaintiff did not establish a policy of using this technique and, thus, its future use was merely speculative).  "Past exposure to illegal conduct does not in itself show a

present case or controversy regarding injunctive relief
. . . if unaccompanied by any continuing, present adverse
effects." <u>O'Shea v. Littleton</u>, 414 U.S. 488, 495-96 (1974)
(holding that plaintiffs lacked standing to bring claim
against county magistrate for illegal bond setting,
sentencing, and jury fee practices because none of the named
plaintiffs were serving illegal sentences or awaiting
trial).

Citing <u>Lyons</u> and <u>O'Shea</u>, Defendants argue that
Plaintiffs lack standing because they have not established
an imminent threat of future injury.  Assuming <u>arguendo</u> that
Plaintiffs suffered past harms while in DCF custody,
Defendants suggest that these harms are unlikely to reoccur.

This case is clearly distinguishable from the cases
Defendants rely upon.  Here, Plaintiffs allege, unlike the
plaintiffs in <u>Lyons</u> and <u>O'Shea</u>, that Defendants maintain
policies and practices that continue to harm them.  Given
that Plaintiffs remain in DCF custody and have not been
placed in permanent homes, they may fairly argue that they
suffer ongoing harm resulting from the alleged systemic
failures within DCF.  It is well established that

allegations of ongoing harm satisfy Article III's standing requirement.  See County of Riverside v. McLaughlin, 500 U.S. 44, 51 (1991) (contrasting Lyons "in which the constitutionally objectionable practice ceased altogether" and holding that plaintiffs had standing because they alleged "a direct and current injury" resulting from an unlawful detention).  Thus, because they assert an ongoing injury fairly traceable to Defendants' allegedly unlawful conduct, Plaintiffs have standing to bring their claims.[1]

B.  Abstention.

The Supreme Court has identified several discrete circumstances that require federal courts to abstain from adjudicating a case.  Here, Defendants argue that abstention is appropriate under Younger v. Harris, 401 U.S. 37 (1971).

In Younger and its progeny, the Supreme Court prohibited federal courts from interfering with pending

---

[1] Other federal courts applying Lujan to class actions similar to this one have reached the same conclusion.  See, e.g., 31 Foster Children v. Bush, 329 F.3d 1255, 1266 (11th Cir. 2003); Clark K. v. Guinn, Civ. No. 2:06-cv-1068, 2007 WL 1435428, at *5 (D. Nev. May 14, 2007); Dwayne B. v. Granholm, Civ. No. 06-13548, 2007 WL 1140920, at *3-4 (E.D. Mich. April 17, 2007); Carson P. v. Heineman, 240 F.R.D. 456, 512-13 (D. Neb. 2007).

state judicial or administrative proceedings.  See id.;
Huffman v. Pursue, Ltd., 420 U.S. 592 (1975); Moore v. Sims,
442 U.S. 415 (1979); Juidice v. Vail, 430 U.S. 327 (1977).
Although Younger involved a state criminal proceeding, the
Supreme Court has extended the doctrine to two types of
state civil proceedings: (1) quasi-criminal or "coercive"
state civil proceedings brought by the state as enforcement
actions against an individual; and (2) state civil
proceedings brought "uniquely in furtherance of the
fundamental workings of a state's judicial system."  Rio
Grande Cmty. Health Ctr. v. Rullan, 397 F.3d 56, 69 (1st
Cir. 2005).

        The Court later refined the Younger analysis in
Middlesex County Ethics Commission v. Garden State Bar
Association, holding that Younger applies to (1) an ongoing
state judicial proceeding involving the federal plaintiff
that (2) implicates important state interests and (3) that
provides an adequate opportunity for the federal plaintiff
to assert federal claims.  457 U.S. 423, 432 (1982).  The
first Middlesex prong implicitly includes a requirement that
the federal proceeding interfere with an ongoing state

proceeding.  See Rossi v. Gemma, 489 F.3d 26, 35 (1st Cir.

2007) (observing that courts must first consider the

"threshold issue of interference" before moving on to the

balance of the Middlesex test); see also 31 Foster Children

v. Bush, 329 F.3d 1255, 1275-76 (11th Cir. 2003) (citing

several cases recognizing this implicit requirement and

following their lead).

As discussed below, Younger is inapplicable here

because this case does not involve the type of state

proceeding that would require abstention and because the

Middlesex factors have not been satisfied.

1.   Nature of the State Proceeding.

Defendants argue that this class action will interfere

with ongoing judicial proceedings in Massachusetts juvenile

courts.  However, these juvenile court cases do not fall

within either of the two narrow exceptions in which the

Supreme Court extended Younger to civil proceedings.  As

noted, the Supreme Court has applied Younger outside of the

criminal context only to "coercive" enforcement actions

against an individual and to proceedings brought "uniquely

in furtherance of the fundamental workings of a state's

14

judicial system," such as the state's contempt process or its method of enforcing judgments.  See Rio Grande, 397 F.3d at 69 (discussing numerous examples of each).  This case involves neither.

Defendants suggest that Plaintiffs' claims implicate ongoing proceedings involving the termination of parental rights ("TPR" or "care and protection" proceedings), whereby juvenile courts place children in state custody due to abuse or neglect by their parents.  Presumably, then, this case would fall under the category of coercive enforcement actions warranting abstention.  See Moore v. Sims, 442 U.S. 415, 425-26 (1979) (holding that abstention was appropriate under Younger where parents filed suit in federal court challenging ongoing TPR proceedings in a Texas state court).

However, Defendants' argument fails to appreciate that Plaintiffs' claims relate only to alleged injuries suffered while in DCF custody.  TPR proceedings are the means by which Plaintiffs enter DCF custody, and Plaintiffs expressly state that they are not challenging any aspect of those proceedings in this case.  As explained below, state law greatly circumscribes the role of juvenile courts once DCF,

an executive agency, takes custody of a child.  Where, as
here, the state court proceeding is limited to a review of
executive action, the Supreme Court has made clear that
Younger abstention is inappropriate.  See New Orleans Public
Serv., Inc. v. Council of City of New Orleans, 491 U.S. 350,
368 (1989) (holding that Younger does not apply to a "state
judicial proceeding reviewing legislative or executive
action" because "[s]uch a broad abstention requirement would
make a mockery of the rule that only exceptional
circumstances" justify abstention); see also Rio Grande, 397
F.3d at 70 (holding that Younger did not apply where state
proceeding challenged executive action, namely, a failure by
Puerto Rico's Secretary of Health to reimburse plaintiffs
for services provided to Medicaid patients).

    2.  Applying the Middlesex Factors.

Application of the Middlesex factors further
illustrates why Younger and its progeny do not require
abstention here.

    a.  Interference with an Ongoing State Proceeding.

First, Defendants fail to show how the present case
would interfere with ongoing state proceedings.  Defendants

argue that the requested injunctive relief, such as determining the propriety and safety of placements, the adequacy of services, the frequency of visitation, and the appropriateness of DCF's plans to achieve permanency for each child, "necessarily must be addressed in the ongoing proceedings by Juvenile Court judges, who are vested with the authority and the obligation to render determinations and issue orders on each of these issues." (Dkt. No. 20, Defs.' Mem. at 59-60.)

Defendants' argument misapprehends the nature of Plaintiffs' claims. As support for their contention that this case threatens to constrain state juvenile courts, Defendants highlight several cases that are clearly inapposite. These authorities fall into two categories: (1) child-in-need-of-services("CHINS") cases; and (2) termination-of-parental-rights ("TPR") cases.

Under Mass. Gen. Laws ch. 119, § 39E, parents may petition a juvenile court to label their child a "child in need of services," at which time the court can help rectify problems such as the child's obstinance at home or truancy at school. The role of juvenile courts is expanded

considerably in a CHINS case.  See In re Angela, 833 N.E.2d 575 (Mass. 2005) ("Unlike most other commitment proceedings, where the person is committed to the care of an agency of a department of the State . . . [in a CHINS case] the Juvenile Court retains control over the treatment of the child who is adjudicated a CHINS and the dispositional order is revisited periodically.").

The same is true for TPR cases.  See Mass. Gen. Laws ch. 119, § 26 (describing the direct role of the courts in determining a child's fate in TPR proceedings); see also Adoption of Gregory, 747 N.E.2d 120, 128-29 (Mass. 2001) (affirming juvenile court's decision to terminate parental rights); Adoption of Daisy, 934 N.E.2d 252 (Mass. App. Ct. 2010) (same).  Plaintiffs concede that "TPR proceedings may thus be entitled to Younger deference," (Dkt. No. 26, Pls.' Mem. at 26 n.19), but correctly observe that Defendants have failed to show how the relief requested in this case would in any way interfere with either a TPR or a CHINS proceeding.

As noted previously, Plaintiffs' claims do not implicate the proceedings themselves, only the aftermath of

the proceedings.  In stark contrast to the discretion

afforded juvenile courts in TPR and CHINS proceedings,

Massachusetts law greatly restricts the juvenile courts'

discretion once a child is placed in DCF's permanent

custody.  In fact, the Massachusetts Supreme Judicial Court

("SJC") has made clear that DCF controls the fate of these

children and that the juvenile courts play a very limited

oversight role:

> When [DCF] is granted permanent custody of a
> child, it has <u>virtually free rein</u> to place that
> child in a foster home of its choosing, to decree
> whether, how much, and what sort of family
> visitation there should be, and to decide whether
> to have the child adopted.  This discretion is
> subject only to a petition for review which cannot
> be filed more than once every six months.

<u>Care & Protection of Three Minors</u>, 467 N.E.2d 851, 861

(Mass. 1984) (emphasis added).  In other words, "'the courts

play a minimal role in exercising the state's care and

protection policy.  The real locus of decision making is

within [DCF]. . . .'"  <u>Id.</u> (quoting Catherine E. Campbell,

<u>The Neglected Child</u>, 4 Suffolk U. L. Rev. 631, 645-646

(1970)).

    In <u>Care & Protection of Isaac</u>, 646 N.E.2d 1034 (Mass.

1995), the SJC more clearly defined the limited role that
juvenile courts play once DCF obtains permanent custody,
holding that courts do not have authority to overrule a
residential placement decision made by DCF unless the judge
finds that the decision was arbitrary or capricious and
amounts to an abuse of discretion.  In so holding, the SJC
observed that Mass. Gen. Laws ch. 119 "contain[s] no general
grant of authority to a judge to enter an order intended to
be in a child's best interests."  Id. at 609.  Thus, "when a
child is placed in the permanent custody of the department,
decisions related to normal incidents of custody, by the
terms of §§ 21, 26, and 32 are committed to the discretion
of the department," and the juvenile court may only "offer
guidance to the department concerning a child's residence."
Id.

The scope of state courts' discretion is critical to
the Younger analysis.  Multiple federal courts facing nearly
identical challenges to state foster-care systems have
reached disparate conclusions regarding the applicability of

<u>Younger</u>.[2]  The case of <u>Carson P. v. Heineman</u>, 240 F.R.D. 456, 529 (D. Neb. 2007), illustrates how differences among states in the power afforded juvenile courts over foster-care children affect these outcomes:

> As noted by <u>Kenny A.</u>[<u>v. Perdue</u>, 218 F.R.D. 277, 286 (N.D. Ga. 2003)], "under Georgia law, once the juvenile court grants legal custody of a child to DFCS, the court is powerless to order DFCS to give physical custody of the child to any particular foster parent or otherwise restrict the actual placement of the child."  In <u>Kenny A.</u>, the juvenile court's authority over the state social service department was very limited, and the federal court could arguably assist that juvenile court by issuing orders against the state agency,

_____

[2] Several federal courts have held that <u>Younger</u> requires abstention under similar circumstances.  <u>See, e.g.</u>, <u>31 Foster Children v. Bush</u>, 329 F.3d 1255 (11th Cir. 2003), <u>cert denied</u>, 540 U.S. 984 (2003); <u>J.B. v. Valdez</u>, 186 F.3d 1280 (10th Cir. 1999); <u>Joseph A. v. Ingram</u>, 275 F.3d 1253 (10th Cir. 2002);  <u>E.T. v. George</u>, 681 F. Supp. 2d 1151 (E.D. Cal. 2010); <u>Carson P. v. Heineman</u>, 240 F.R.D. 456 (D. Neb. 2007); <u>Laurie Q. v. Contra Costa County</u>, 304 F. Supp. 2d 1185 (N.D. Cal. 2004).

Other courts have held that <u>Younger</u> does not apply.  <u>See, e.g.</u>, <u>LaShawn A. v. Kelly</u>, 990 F.2d 1319, 1322-23 (D.C. Cir. 1993); <u>L.H. v. Jamieson</u>, 643 F.2d 1351 (9th Cir. 1981); <u>Clark K. v. Guinn</u>. No. 2:06-cv-1068, 2007 WL 1435428 (D.Nev., May 14, 2007); <u>Dwayne B. v. Granholm</u>, 2007 WL 1140920 (E.D. Mich. Apr. 17, 2007); <u>Olivia Y. ex rel. Johnson v. Barbour</u>, 351 F. Supp. 2d 543, 567-68 (S.D. Miss. 2004); <u>Kenny A. v. Perdue</u>, 218 F.R.D. 277, 286 (N.D. Ga. 2003); <u>Brian A. v. Sundquist</u>, 149 F. Supp. 2d 941 (M.D. Tenn 2000); <u>Baby Neal v. Casey</u>, 821 F. Supp. 320, 331-33 (E.D. Pa. 1993), <u>rev'd on other grounds</u>, 43 F.3d 48 (3d Cir. 1994).

> orders that the juvenile court itself was
> powerless to enter. Such is not the case in
> Nebraska.

Id. (citations omitted). Highlighting, in contrast, the "expansive scope of authority" afforded juvenile court judges in Nebraska to "decide the appropriate placement for children in [state] custody," Carson P. held that Younger abstention was appropriate. Id. at 527.

This class action is closer to Kenny A. and its sister cases in which federal courts found Younger inapplicable because the plaintiffs sought to enjoin actions taken by an executive agency, not the courts. See, e.g., Kenny A. v. Perdue, 218 F.R.D. 277, 286 (N.D. Ga. 2003) ("[T]he declaratory and injunctive relief plaintiffs seek is not directed at [plaintiffs'] review hearings, or at Georgia's juvenile courts, juvenile court judges, or juvenile court personnel," but rather "at executive branch defendants to remedy their alleged failures as plaintiffs' custodians."); Dwayne B. v. Granholm, Civ. No. 06-13548, 2007 WL 1140920, at *6 (E.D. Mich. April 17, 2007) ("The relief sought here is not directed at the juvenile courts. It is directed at the [Michigan] executive branch," and therefore

"[d]efendants' claim that there are ongoing judicial proceedings is misleading."); Brian A. v. Sundquist, 149 F. Supp. 2d 941, 957 (M.D. Tenn 2000) ("Plaintiffs seek injunctive relief against the [Tennessee] Department of Children's Services, not the courts" and, therefore, "nothing about this litigation seeks to interfere with or enjoin" the state proceedings).

As described above, once a child is placed in DCF custody, Massachusetts law severely restricts the role of juvenile courts.  Unlike in CHINS or TPR cases, the courts' authority is limited to periodic, highly deferential review of DCF's decisions.  Any indirect impact this case has on the juvenile courts is slight and fails to rise to the requisite level of interference articulated by the First Circuit.  See Rio Grande, 397 at 69 (citing Gilbertson v. Albright, 381 F.3d 965, 977-78 (9th Cir. 2004)) ("Interference is . . . usually expressed as a proceeding that either enjoins the state proceeding or has the 'practical effect' of doing so.").  Because Plaintiffs' requested relief threatens to impose limitations on DCF, not the juvenile courts, Younger is inapplicable.

b.   <u>Important State Interests</u>.

The second <u>Middlesex</u> factor, requiring that the state proceedings implicate important state interests, is easily satisfied here.   <u>See</u> <u>Petition of Dep't of Public Welfare to Dispense with Consent to Adoption</u>, 381 N.E.2d 565, 572 (Mass. 1978) (holding "state's interest in protecting the welfare of children" constitutes a compelling state interest).   The only remaining question, then, is whether the state proceedings provide an adequate opportunity for Plaintiffs to assert their federal claims.   <u>See</u> <u>Middlesex</u>, 457 U.S. at 432.

c. <u>Adequate Opportunity to Assert Federal Claims</u>.

The final requirement under <u>Younger</u> is that the federal plaintiffs had an adequate opportunity to present their federal claims in the state proceeding.   <u>See</u> <u>Middlesex County Ethics Comm'n</u>, 457 U.S. at 432.   Defendants emphasize that Massachusetts courts have the authority to hear federal constitutional and statutory claims.   It does not matter, they argue, whether the juvenile courts represent a natural or proper place for bringing those federal claims.   What matters is that the courts could, in theory, hear those

24

claims, and Plaintiffs chose not to avail themselves of an
opportunity to present them.  In support, Defendants quote
Moore v. Sims, in which the Supreme Court stated that
"abstention is appropriate unless state law clearly bars the
interposition of the [federal statutory] and constitutional
claims." 442 U.S. 415, 425-26 (1979).

Defendants' reliance on this language in Moore is
flawed for several reasons.  First, Defendants overlook a
later clarification in Moore, which states that "the only
pertinent inquiry is whether the state proceedings afford an
adequate opportunity to raise the constitutional claims."
Id. at 430. (emphasis added).  Second, Moore was decided
before Middlesex, and Middlesex repeatedly observes that the
state forum must present an "adequate opportunity" to
present the federal claims.[3]  See Middlesex County Ethics
Comm'n, 457 U.S. at 432 (emphasis added).  Third, several

-----

[3] Defendants' reliance on Juidice v. Vail, 430 U.S. 327
(1977) is similarly misplaced.  Juidice employs slightly
different phrasing, asking whether the plaintiffs were
given "an opportunity to fairly pursue their constitutional
claims in the ongoing state court proceedings."  Id. at 337
(emphasis added).  It is unclear how, if it all, this
language alters the analysis.  In any event, Juidice, like
Moore, was decided before Middlesex.

federal courts of appeals interpreting this line of case law have noted that adequacy is, indeed, a central consideration.  For instance, the United States Court of Appeals for the D.C. Circuit explained that courts must consider not only whether it was theoretically possible for the plaintiffs to raise their federal claims in the state proceeding, but also whether the state proceeding provided an "inadequate or inappropriate forum" for pursuing those claims.  <u>LaShawn A. v. Kelly</u>, 990 F.2d 1319, 1322 (D.C. Cir. 1993).  Holding that the D.C. family court system was an inadequate forum for class-action plaintiffs to present a challenge to the D.C. foster-care system, the court explained that the state proceedings "contemplate issues centering on the care of a child by his or her parent" and, thus, "are not suitable arenas in which to grapple with broad issues external to the parent-child relationship." <u>Id.</u> at 1322-23 (citations and quotation marks omitted).

Although not addressing this issue head-on, a Ninth Circuit opinion reflected a similar understanding of <u>Younger</u>, holding that abstention was inappropriate where the plaintiffs' claims were "not of a sort that would be

presented during the normal course of a state proceeding."
L.H. v. Jamieson, 643 F.2d 1351, 1354 (9th Cir. 1981). The
Tenth and Eleventh Circuits, while ultimately affirming the
district courts' decisions to abstain under Younger, also
focused their analyses on whether the state proceeding
offered an adequate forum for the plaintiffs to present
their federal claims. See J.B. v. Valdez, 186 F.3d 1280
(10th Cir. 1999); 31 Foster Children v. Bush, 329 F.3d 1255
(11th Cir. 2003).

Like the plaintiff class in LaShawn A., Plaintiffs here
also bring a "multifaceted request for broad-based
injunctive relief based on the Constitution and on federal
. . . statutory law." 990 F.2d at 1323. Although
Defendants maintain that Plaintiffs in theory can assert
federal claims in state juvenile courts, they fail to
explain how those courts present an adequate forum for
Plaintiffs' claims. In fact, Massachusetts juvenile courts
are tasked with handling difficult questions of family law
on an ad-hoc basis, not with crafting broad-based injunctive
relief that could potentially revamp an executive agency.
They cannot and do not afford Plaintiffs an adequate

opportunity to seek relief for the systemic failures alleged in the complaint.  Thus, abstention is inappropriate.

C. <u>Sovereign Immunity</u>.

Defendant Deval Patrick, as Governor of Massachusetts, argues that the doctrine of sovereign immunity precludes all claims against him.  Specifically, Defendant Patrick asserts that Plaintiffs have failed to establish a sufficient connection between any actions taken by him and the harms alleged.  The argument is unpersuasive.

The Eleventh Amendment generally bars suits in federal court against unconsenting states.  See <u>Rosie D. ex. rel. John D. v. Smith</u>, 310 F.3d 230, 234 (1st Cir. 2002).  However, in <u>Ex Parte Young</u>, 209 U.S. 123 (1908), the Supreme Court recognized a narrow exception for claims seeking prospective injunctive relief against state actors.  <u>Ex Parte Young</u> allows federal courts, "notwithstanding the absence of consent, waiver or evidence of congressional assertion of national hegemony, [to] enjoin state officials to conform future conduct to the requirements of federal law."  <u>Rosie D.</u>, 310 F.3d at 234 (holding that Eleventh Amendment did not bar Medicaid beneficiaries from seeking

prospective injunctive relief in federal court) (citations and quotation marks omitted).  As long as the state official "has some connection with the enforcement of the act," that official is an "appropriate defendant."  Shell Oil v. Noel, 608 F.2d 208, 211 (1st Cir. 1979).  "It is a question of federal jurisdictional law whether the connection is sufficiently intimate to meet the requirements of Ex parte Young."  Id.

Here, in addition to his general executive and budgetary authority, Governor Patrick has direct supervisory authority over Defendant Bigby, the Secretary of the Massachusetts Executive Office of Health and Human Services, who develops and implements DCF policies and programs.  See Mass. Gen. Laws ch. 6A, § 16.  Defendant Patrick also approves the appointment of the DCF Commissioner, Defendant McClain.  Mass. Gen. Laws ch. 18B, § 6.

Defendant Patrick concedes, moreover, that in 2008 the state legislature codified an executive order creating the Office of the Child Advocate, "who is appointed by and reports directly to the Governor" and is charged with reviewing "[DCF's] programs and procedures" and resolving

"complaints relative to the provision of services to
children by an executive agency." (Dkt. No. 20, Defs.' Mem.
at 48 (quoting Mass. Gen. Laws ch. 18C, §5).)
Significantly, Defendant Patrick's issuance of the executive
order initially establishing the Office represents direct
involvement in the ongoing maintenance of the state child
welfare system.

　　The fact that on a daily basis Defendant Patrick plays
a somewhat detached, supervisory role is inconsequential.
See Papasan v. Allain, 478 U.S. 265, 282 n.14 (1986)
(holding that Eleventh Amendment did not bar suit against
secretary of state responsible for "general supervision" of
the administration of public school land funds by local
school officials); Futernick v. Sumpter Twp., 78 F.3d 1051,
1055 n.5 (6th Cir. 1996) (rejecting as "ridiculous"
defendants' argument that "only the officer with immediate
control over the challenged act or omission is amenable to §
1983"). Certainly, Defendant Patrick has "some connection"
with the enforcement of DCF policy, and that connection is
"sufficiently intimate" to remove him from the Eleventh
Amendment's shield of sovereign immunity. Shell Oil, 608

F.2d at 211.  Therefore, Defendant Patrick's Motion to
Dismiss (Dkt No. 30) will be denied.

D.    <u>Plaintiffs' Constitutional Claims (Counts One, Two, and
      Four)</u>.

     A complaint is subject to dismissal under Rule 12(b)(6)
if, after accepting all well-pleaded facts as true and
drawing all reasonable inferences in favor of a plaintiff,
the court determines that it "fails to state a claim upon
which relief can be granted."  <u>Edes v. Verizon Commc'ns,
Inc.</u>, 417 F.3d 133, 137 (1st Cir. 2005); Fed. R. Civ. P.
12(b)(6).  To survive a motion to dismiss, a complaint must
contain "sufficient factual matter" to state a claim to
relief that is both actionable as a matter of law and
"'plausible on its face.'"  <u>Ashcroft v. Iqbal</u>, 129 S. Ct.
1937, 1949 (2009) (quoting <u>Bell Atlantic Corp. v. Twombly</u>,
550 U.S. 544, 570 (2007)).  "Threadbare recitals of the
elements of a cause of action, supported by mere conclusory
statements, do not suffice."  <u>Id.</u>  "Dismissal for failure to
state a claim is appropriate if the complaint fails to set
forth 'factual allegations, either direct or inferential,
respecting each material element necessary to sustain
recovery under some actionable legal theory.'"  <u>Gagliardi v.
Sullivan</u>, 513 F.3d 301, 305 (1st Cir. 2008) (quoting <u>Centro
Medico del Turabo, Inc. v. Feliciano de Melecio</u>, 406 F.3d 1,

31

6 (1st Cir. 2005)).

    1.    Substantive Due Process (Count I).

    The Due Process Clause of the Fourteenth Amendment
provides that "[n]o State shall . . . deprive any person of
life, liberty, or property, without due process of law."
U.S. Const. amend. XIV, § 1.  To establish a substantive due
process violation, a plaintiff must first show a deprivation
of life, liberty, or property.  DeShaney v. Winnebago County
Dep't of Social Servs., 489 U.S. 189, 196 (1989).  The Due
Process Clause generally confers no affirmative right to
governmental aid, even when such aid may be necessary to
protect life, liberty, or property interests.  Id.  However,
a narrow exception exists for situations involving a
"special relationship" between a plaintiff and the state.
Id. at 200.  "[I]t is the State's affirmative act of
restraining the individual's freedom to act on his own
behalf -- through incarceration, institutionalization, or
other similar restraint of personal liberty -- which is the
'deprivation of liberty' triggering the protections of the
Due Process Clause."  Id.

    The Supreme Court has found such a relationship between

the state and incarcerated prisoners, <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976), and between the state and involuntarily committed mental patients, <u>Youngberg v. Romeo</u>, 457 U.S. 307 (1982).  In <u>DeShaney</u>, however, the Supreme Court declined to find a special relationship between the state and children in the custody of private actors, such as their parents. Significantly, though, the Supreme Court noted that its holding might well differ if the plaintiffs suffered abuse at the hands of agents of the state, such as foster parents. <u>DeShaney</u>, 489 U.S. at 201 n.9 ("Had the State by the affirmative exercise of its power removed [the plaintiff] from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect.").

        Although the First Circuit has not squarely addressed this issue, <u>see</u> <u>J.R. v. Gloria</u>, 593 F.3d 73, 80 (1st Cir. 2010) (assuming <u>arguendo</u> that such a special relationship exists between foster children and the state), courts have found, with apparent unanimity, that such a relationship exists in the foster-care context.  <u>See, e.g.</u>, <u>Yvonne L. v.</u>

N.M. Dep't of Human Servs., 959 F.2d 883, 892-94 (10th Cir.
1992); Norfleet v. Ark. Dep't of Human Servs., 989 F.2d 289,
291-292 (8th Cir. 1993); K.H. v. Morgan, 914 F.2d 846, 851
(7th Cir. 1990); Taylor v. Ledbetter, 818 F.2d 791, 795
(11th Cir. 1987); Doe v. New York City Dep't of Social
Servs., 649 F.2d 134, 141-42 (2nd Cir. 1981); J.R. v.
Gloria, 599 F. Supp. 2d 182, 194-95 (D. R.I. 2009); Eric L.
ex rel. Schierberl v. Bird, 848 F. Supp. 303, 307 (D. N.H.
1994).

This court agrees. The rationale of Youngberg, in
which the court found a special relationship between the
state and involuntarily committed mentally ill patients,
applies with equal force here: "If it is cruel and unusual
punishment to hold convicted criminals in unsafe conditions,
it must be unconstitutional [under the Due Process Clause]
to confine the involuntarily committed -- who may not be
punished at all -- in unsafe conditions." 457 U.S. at 315-
16. Likewise, it must be unconstitutional for the state to
take custody of abused and neglected children, arguably more
vulnerable than the plaintiffs in both Estelle and
Youngberg, and fail to make adequate efforts to ensure their

safety.  The fact that a state's foster care system, no
matter how deficient, arguably represents an improvement on
the abused child's prior living conditions does not diminish
this entitlement.  As the Seventh Circuit aptly explained,
"[o]nce the state assumes custody of a person, it owes him a
rudimentary duty of safekeeping no matter how perilous his
circumstances when he was free."  K.H., 914 F.2d at 849.

        Two questions remain: (1) what are the contours of this
right? and (2) what standard of culpability applies?  The
Supreme Court offered helpful guidance as to the first
question in Youngberg.  There, the Court observed that
individuals placed involuntarily into state custody are
entitled to "conditions of reasonable care and safety,
reasonably nonrestrictive confinement conditions, and such
training as may be required by these interests."  Youngberg,
457 U.S. at 324.  In other words, a state violates the Due
Process Clause when it "fails to provide for [the
plaintiff's] basic human needs -- e.g., food, clothing,
shelter, medical care, and reasonable safety."  Deshaney,
489 U.S. at 200 (citing Youngberg).

        The question here is whether the Supreme Court's

articulation of this right encompasses the following list of entitlements set forth by Plaintiffs in Count I of the complaint: (a) the right to "protection from unnecessary harm" while in state custody; (b) the right to a living environment that protects foster children's physical, mental and emotional safety and well being; (c) the right to services such as safe and secure foster care placements, appropriate monitoring and supervision, placement in a permanent family, and adequate medical, dental, psychiatric, psychological, and educational services; (d) the right to treatment and care "consistent with the purpose of the assumption of custody by DCF;" (e) the right not to be maintained in custody "longer than is necessary to accomplish the purposes to be served by taking the child into custody;" (f) the right to receive care, treatment and services determined and provided through the exercise of accepted professional judgment; and (g) the right to be placed in the least restrictive environment according to a foster child's needs.  (Dkt. No. 1, Compl. ¶ 303.)

Defendants do not challenge that the Constitution protects the rights discussed in subsections (a) through (d)

of Count I.  (Dkt. No. 20, Defs.' Mem. at 77.)  Indeed,

Youngberg's guarantee of reasonable care and safety clearly

contemplates those rights.  See Youngberg, 457 U.S. at 324.

Defendants do, however, question Plaintiffs' entitlement to

the rights listed in subsections (e), (f), and (g).

     At this stage in the litigation, the court cannot say

categorically that Plaintiffs have no rights to the

protections sought in subsections (e), (f), and (g).  As

noted, these protections include the right to remain in

state custody no longer than necessary under the

circumstances, the right to receive care and treatment in

accordance with accepted standards of professional judgment,

and the right to be placed in the least restrictive

environment.  (Dkt. No. 1, Compl. ¶ 303.)  Accepting

Plaintiffs' allegations as true, this court finds it easily

conceivable that Defendants' failure to provide the above

services deprived Plaintiffs of "conditions of reasonable

care and safety" and "reasonably nonrestrictive confinement

conditions" to which they are entitled.  See Youngberg, 457

U.S. at 324; see also Marisol A. v. Giuliani, 929 F. Supp.

662 (S.D.N.Y. 1996) ("This Court is satisfied that the right

to be free from harm encompasses the right alleged by plaintiffs to appropriate conditions and duration of foster care."). But see Eric L. ex rel. Schierberl v. Bird, 848 F. Supp. 303, 307 (D. N.H. 1994) (dismissing claims relating to stability in foster care because complaint "pleads no facts tending to establish that DCYS's placement of children with successive foster parents is so devoid of justification as to give rise to a [Due Process] violation").

To be clear, this decision does not imply that a blanket entitlement exists in all cases to the above protections; rather, it merely recognizes that Plaintiffs may, through discovery, show that the denial of these protections deprived them of reasonable care and safety. While "not every deviation from ideally safe conditions constitutes a violation of the [C]onstitution," Santana v. Collazo, 714 F.2d 1172, 1183 (1st Cir. 1983), the Constitution does require the state to make reasonable efforts to meet the basic needs of these children and keep them reasonably free from harm.  Youngberg, 457 U.S. at 324.

The final question concerns the standard of culpability the court must apply in assessing these alleged violations.

Defendants argue that Plaintiffs must plausibly allege "conscience-shocking" conduct as described in <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 846 (1998), while Plaintiffs urge the court to abandon the <u>Lewis</u> standard and apply the "professional judgment" standard set forth in <u>Youngberg</u>.

<u>Youngberg</u> and <u>Lewis</u> are not mutually exclusive. In <u>Youngberg</u>, the Supreme Court held that decisions made by professionals are "presumptively valid" and give rise to liability "only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." <u>Youngberg</u>, 457 U.S. at 323. In adopting this professional judgment standard, the Court distinguished <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976), which applied an arguably more stringent "deliberate indifference" standard in the context of prisoners' rights, holding that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to

punish."[4]  <u>Id.</u> at 321-22.

　　Twenty years later, in <u>County of Sacramento v. Lewis</u>,
the Court modified the substantive due process analysis: "in
a due process challenge to executive action, the threshold
question is whether the behavior of the governmental officer
is so egregious, so outrageous, that it may fairly be said
to shock the contemporary conscience."  523 U.S. at 847 n.8.
<u>Lewis</u> took pains to explain that the deliberate indifference
and professional judgment standards remain good law, serving
as more precise articulations of the broader "shocks-the-
conscience" rule.  <u>See</u> <u>id.</u>  "Rules of due process are not
. . . subject to mechanical application in unfamiliar
territory" and, thus, "[d]eliberate indifference that shocks
in one environment may not be so patently egregious in
another."  <u>Id.</u> at 850.  In other words, deliberately
indifferent behavior does not always and necessarily shock

_____

　　[4] It is far from obvious, however, that the
professional judgment standard creates an appreciably lower
hurdle for plaintiffs in this foster care case.  In some
instances it is true that the decision to apply one standard
or the other might affect the outcome, but in this context
the decision seems to matter little.  <u>See, e.g.</u>, <u>Yvonne L.
v. N.M. Dep't of Human Servs.</u>, 959 F.2d 883, 894 (10th Cir.
1992) ("As applied to a foster care setting we doubt there
is much difference in the two standards.").

40

the conscience, but it <u>may</u> shock the conscience under

certain circumstances.  <u>See</u> <u>J.R. v. Gloria</u>, 593 F.3d 73, 80

(1st Cir. 2010).[5]  <u>Youngberg</u> also "can be categorized on

much the same terms."  <u>Lewis</u>, 523 U.S. at 852 n.12.  Thus,

to draw out this comparison, a substantial departure from

accepted professional judgment may shock the conscience

under some circumstances but not others.

_____

    [5] Although <u>J.R.</u> involved a § 1983 claim arising out of
alleged abuse suffered by children in foster care, the court
there applied the deliberate indifference standard.  <u>J.R.</u>,
593 F.3d at 73.  However, <u>J.R.</u> is distinguishable for
several reasons.  First, neither of the parties apparently
raised the issue of <u>Youngberg</u>'s professional judgment
standard, and, therefore, the court never addressed
<u>Youngberg</u>'s applicability.  Second, <u>J.R.</u> only involved
allegations of abuse within a foster <u>home</u>, whereas this case
centers on alleged systemic failures within DCF. (Dkt. No.
1, Compl. ¶¶ 164 - 214.)  Third, the abuse of the plaintiffs
in <u>J.R.</u> was perpetrated by a third party, not the foster
parents themselves, thus making the case more comparable to
<u>Deshaney</u>.  593 F.3d at 73.  Fourth, and finally, the
plaintiffs in <u>J.R.</u> sought damages, not injunctive relief,
which involves different considerations.  <u>See, e.g.</u>, <u>K.H. v.
Morgan</u>, 914 F.2d 846, 851 (7th Cir. 1990) ("[T]here might of
course be broader liability in an injunctive suit against
[state] officials . . . ."); <u>LaShawn A. v. Dixon</u>, 762 F.
Supp. 959, 996 n.29 (D. D.C. 1991) (noting that a deliberate
indifference standard "may be warranted [in damages claims]
due to the chilling effect that an unfavorable judgment may
have on municipal policymakers"); <u>accord</u> <u>Kenny A. v. Perdue</u>,
No. 1:02-cv-1686, 2004 WL5503780, at *4 (N.D. Ga. Dec. 13,
2004); <u>Braam ex rel. Braam v. State</u>, 81 P.3d 851, 858-59
(Wash. 2003).

Plaintiffs, then, are incorrect in suggesting that
Lewis does not apply to this particular substantive due
process claim.[6]  As the First Circuit unequivocally stated,
"the shocks-the-conscience test . . . governs all
substantive due process claims based on executive, as
opposed to legislative, action."  Martinez v. Cui, 608 F.3d
54 (1st Cir. 2010) (emphasis in original).

In sum, to establish a substantive due process claim,
Plaintiffs must show that Defendants' conduct represented a
substantial departure from accepted professional judgment,
which deprived them of conditions of reasonable care and
safety, and that such conduct shocks the conscience.  Here,
Plaintiffs have alleged that Defendants abdicated their duty
to use professional judgment by placing Plaintiffs in foster
homes that presented known risks of harm, failing to monitor
these improper placements, shuttling them among foster
families without any hope of finding a permanent home,
preventing visitation with parents and siblings, and failing

_____

[6] One of the lead cases relied upon by Plaintiffs,
Braam ex rel. Braam v. State, 81 P.3d 851 (Wash. 2003), in
fact reaches the same conclusion as this court.  Id. at 859-
60.

to provide various forms of essential treatment.  (<u>See</u> Dkt.
No. 1, Compl. ¶¶ 164 - 214.)  Plaintiffs further allege that
these failures resulted in great physical, mental, and
emotional harm to the Plaintiff class.  (<u>Id.</u>)

Although Defendants argue that such conduct cannot
possibly rise to the level of conscience shocking, this
court strongly disagrees.  Moreover, all that is required
here is that Plaintiffs demonstrate a plausible entitlement
to relief.  <u>See</u> <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949
(2009).  Notwithstanding Defendants' arguments to the
contrary, these serious allegations of misconduct, if
proven, may entitle Plaintiffs to relief for a violation of
their substantive due process rights.  Accordingly,
Defendants' motion to dismiss will be denied with respect to
Count I.

2.    <u>The Right to Familial Integrity (Count II)</u>.

In Count II, Plaintiffs allege that Defendants deprived
them of liberty, privacy, and associational rights protected
by the First, Ninth, and Fourteenth Amendments.  (<u>See</u> Dkt.
No. 1, Compl. ¶ 305.)  More specifically, Plaintiffs allege
that DCF failed to make appropriate use of kinship

placements (<u>id.</u> ¶¶ 249-53), that DCF failed to "sustain family ties and support reunification" (<u>id.</u> ¶¶ 277-78), and that DCF failed to provide sufficient visitation with siblings and parents (<u>id.</u> ¶¶ 198, 285).

The Supreme Court has recognized a right to familial integrity derived from the broad right to association under both the First Amendment and the Ninth Amendment's reservation of rights to the people. <u>Roberts v. United States Jaycees</u>, 468 U.S. 609, 617-20 (1984); <u>Santosky v. Kramer</u>, 455 U.S. 745, 753 (1982); <u>see also</u> <u>Stanley v. Illinois</u>, 405 U.S. 645, 651 (1972) ("The integrity of the family unit has found protection in the due process clause of the Fourteenth Amendment . . . and the Ninth Amendment."). Federal courts disagree about whether the right to familial integrity is implicated when a state's foster care system inhibits interactions between children and members of their immediate family. <u>See, e.g.</u>, <u>Kenny A. v. Perdue</u>, 218 F.R.D. 277, 296 (N.D. Ga. 2003) (right implicated); <u>Charlie H. v. Whitman</u>, 83 F. Supp. 2d 476, 513 (D. N.J. 2000) (right not implicated); <u>Marisol A. v. Giuliani</u>, 929 F. Supp. 662 (S.D.N.Y. 1996)(right not

implicated); <u>Eric L. v. Bird</u>, 848 F. Supp. 303, 307 (D.N.H. 1994) (right implicated); <u>Aristotle P. v. Johnson</u>, 721 F. Supp. 1002, 1006 (N.D. Ill. 1989) (right implicated).

Not surprisingly, the critical factor distinguishing these cases is how broadly the court construes the right at issue. The courts dismissing such claims held that the right to familial integrity is only implicated when the state denies children <u>any contact</u> with family members, <u>see, e.g.</u>, <u>Charlie H.</u>, 83 F. Supp. 2d at 513, while other courts have determined that the right is implicated when children are denied <u>any meaningful contact</u> with family members, <u>see, e.g.</u>, <u>Kenny A.</u>, 218 F.R.D. at 296. This court finds the latter description more consistent with constitutional requirements. The narrow articulation set forth in <u>Charlie H.</u> and its sister cases would appear to preclude, for example, a claim by a plaintiff who has been allowed to visit one of his ten siblings once every five years. This standard is far too stringent. Because Plaintiffs here allege that they have been denied any meaningful contact with parents or siblings, Defendants' motion to dismiss will be denied with respect to Count II. Further analysis may be

appropriate once discovery is completed.

    3.   <u>Procedural Due Process (Count IV)</u>.

    When examining procedural due process claims, courts must take two steps: "the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." <u>Gonzalez-Fuentes v. Molina</u>, 607 F.3d 864, 886 (1st Cir. 2010) (quoting <u>Ky. Dep't of Corr. v. Thompson</u>, 490 U.S. 454, 460 (1989)). Defendants argue that the Eleventh Amendment bars this claim, that the cited statutes do not create protected interests, and that existing procedures were in any event sufficient.

    a.   <u>Stated-Created Property Interest</u>.

    As an initial matter, Defendants argue that the Eleventh Amendment bars this claim because it is grounded in state-created rights. (Dkt. No. 20, Defs.' Mem. at 107-08). Defendants rely on <u>Pennhurst State School and Hospital v. Halderman</u>, 465 U.S. 89 (1984), which held that the Eleventh Amendment prohibits federal courts from ordering state officials to conform their conduct to state law. <u>Id.</u> at

46

104.

　　Defendants correctly observe that state law determines
whether a person has a constitutionally protected property
interest.  See Bd. of Regents v. Roth, 408 U.S. 564, 577
(1972) ("Property interests, of course, are not created by
the Constitution.  Rather, they are created and their
dimensions are defined by existing rules or understandings
that stem from an independent source such as state law . . .
.").  However, even though courts must look to state law to
define the interest underlying a procedural due process
claim, the ultimate issue is one of federal law.  See, e.g.,
Hamm v. Latessa, 72 F.3d 947, 954 (1st Cir. 1995) ("[T]he
question of whether a state law creates a liberty interest
protected by the Due Process Clause is clearly one of
federal constitutional law . . . .");  Henry Paul Monaghan,
Of "Liberty" and "Property", 62 Cornell L. Rev. 405, 435
(1977) ("The difference between the existence of an interest
-- a matter of state law -- and its significance -- a matter
of federal law -- is firmly established . . . .").  Thus,
Pennhurst does not prevent federal courts from hearing a
procedural due process claim simply because state law

defines the property interest at stake.  See, e.g., Williams v. Commonwealth of Ky., 24 F.3d 1526, 1543-44 (6th Cir. 1994); Brian A. v. Sundquist, 149 F. Supp. 2d 941, 953 (M.D. Tenn. 2000); Strauss v. Drew, 739 F. Supp. 1231, 1233 (N.D. Ill. 1990).

   b.   Property Interests.

   Mere expectations, abstract needs, and desires are not sufficient to create a property interest subject to procedural due process safeguards.  Roth, 408 U.S. at 577. Rather, to have a constitutionally protected interest, a plaintiff must have a "legitimate claim of entitlement" to it.  Id.  This determination largely depends on the amount of discretion state law provides the decisionmaker to grant or deny the benefit.  See Beitzell v. Jeffrey, 643 F.2d 870, 874 (1st Cir. 1981).  Less discretion creates a greater likelihood that the statute confers a constitutionally protected interest.  Id. ("[T]he more circumscribed . . . the government's discretion (under substantive state or federal law) to withhold a benefit, the more likely that benefit constitutes 'property' . . . .").  Two factors indicating limited discretion are "the repeated use of

48

explicitly mandatory language" and "specific substantive predicates" creating guidelines for the official's decision. Hewitt v. Helms, 459 U.S. 460, 472 (1983), abrogated by Sandin v. Connor, 515 U.S. 472 (1995).[7]

Plaintiffs cite several Massachusetts statutes -- Mass. Gen. Laws ch. 119, §§ 23(c), 26B, 32, and 110 Code Mass. Regs. 7.124 -- which, they argue, confer various protected property interests. Specifically, Plaintiffs assert rights to (a) "placement of children in private families; early and periodic screening, diagnostic and treatment standards; [and] individualized health care plan[s]" under Mass. Gen. Laws ch. 119, § 32; (b) a "medical passport" under 110 Code Mass. Regs. 7.124; (c) "sibling visitation" under Mass. Gen.

---

[7] The Supreme Court later abrogated Hewitt, but only insofar as it applied to prison regulations. See Sandin v. Connor, 515 U.S. 472, 482-84 (1995) (noting the "undesirable effects" of Hewitt on prison management and ultimately condemning "the search for a negative implication from mandatory language in prisoner regulations"); see also Hamm, 72 F.3d at 954 (describing this "tectonic" shift). In fact, the Court noted the continuing vitality of Hewitt in other contexts. See Sandin, 515 U.S. at 482 (observing that Hewitt's methodology "may be entirely sensible in the ordinary task of construing a statute defining rights and remedies available to the general public").

Laws ch. 119, § 26B; and (d) "placement with relatives,
other adult persons who have played significant positive
roles in the child's life, and any minor siblings or half-
siblings" under Mass. Gen. Laws ch. 119, § 23(c). (Dkt. No.
1, Compl. ¶ 309.)

Defendants' motion does not challenge (nor does it
expressly concede) Plaintiffs' assertion that they have
rights to early and periodic screening, diagnostic and
treatment standards, individualized health care plans, and
medical passports, as set forth in Mass. Gen. Laws ch. 119,
§ 32 and 110 Mass. Code Regs. 7.124. (See Dkt. No. 20,
Defs.' Mem. at 111-12.) Defendants' silence in the face of
the mandatory language employed in the cited statutes speaks
volumes. See Mass. Gen. Laws ch. 119, § 32 (stating that
DCF "shall insure that every foster child upon entry into
the foster care system shall be screened and evaluated under
the early and periodic screening, diagnostic and treatment
standards established by Title XIX of the Social Security
Act") (emphasis added); see also 110 Mass. Code Regs. 7.124
(mandating that DCF "shall implement a program of
utilization of a 'medical passport' for all children in

substitute care") (emphasis added).  Clearly these statutes create property interests subject to protection under the Constitution's due process clause.

As to the remaining property interests asserted under Count IV, Defendants argue that the relevant statutory provisions do not create such entitlements because they are conditioned on a determination by DCF that the action is in "the best interests of the child."  Under Mass. Gen. Laws ch. 119, § 26B, for instance, DCF "shall, whenever reasonable and practical and based upon a determination of the best interests of the child, ensure that children placed in foster care shall have access to and visitation with siblings . . . ."  While such provisions vest significant discretion in DCF, the court is not persuaded by Defendants' arguments.

Grants of discretion, even broad discretion, to a decisionmaker are not inevitably dispositive of a due process claim.  In fact, on at least two occasions the Supreme Court has found that state law created a constitutionally protected interest despite vesting "very broad discretion" in state officials.  <u>Bd. of Pardons v.</u>

Allen, 482 U.S. 369, 382 (1987); Greenholtz v. Nebraska

Penal Inmates, 442 U.S. 1, 13 (1979).  Given that Allen and

Greenholtz involved parole statutes, they are not,

admittedly, directly controlling.  See Greenholtz, 442 U.S.

at 12 ("Whether any other state statute provides a

protectible entitlement must be decided on a case-by-case

basis.").  The Court's reasoning, however, is instructive.

In Allen, one regulation at issue required that parole

"shall be ordered" if certain conditions are met, including

a condition that parole is in "the best interests of

society."  482 U.S. at 376 (quoting Mont. Code Ann. § 46-23-

201 (1985)).  Concluding that these regulations created a

constitutionally protected interest, the Court reiterated

its earlier holding in Greenholtz that such discretion was

"not incompatible with the existence of a [protected]

interest . . . when [specific action] is required after the

Board determines (in its broad discretion) that the

necessary prerequisites exist."  Id. (emphasis in original).

While this case arises in a different context, the

critical issue is markedly similar.  The relevant provisions

of Massachusetts state law mandate that children in DCF

custody "shall be placed in private families," Mass. Gen.

Laws ch. 119, § 32 (emphasis added), that DCF "shall . . .

ensure that [such] children shall have access to and

visitation with siblings," Mass. Gen. Laws ch. 119, § 26B(b)

(emphasis added), and that DCF "shall immediately commence a

search to locate any relative of the child or other adult

person who has played a significant positive role in that

child's life," Mass. Gen. Laws ch. 119, § 23(c) (emphasis

added).  While these provisions are conditioned on the

looser requirement that such action be in the "best

interests of the child," e.g., Mass. Gen. Laws ch. 119, §

26B(b), once this prerequisite is met the law requires DCF

to take the above actions.

In addition, although the "best interests" standard is

somewhat vague, it is a far cry from laws that provide

"unfettered discretion" to state officials.  See, e.g., Olim

v. Wakinekona, 461 U.S. 238, 249 (1983) (finding no

protected interest where regulation provided "unfettered

discretion" and decisionmaker could "deny the requested

relief for any constitutionally permissible reason or for no

reason at all").  Rather, it presents children in DCF

custody with an assurance that the state will provide the above benefits as long as those benefits reflect the child's best interests.  Assuming that children have a significant interest in growing up in a private home rather than an institution, and in maintaining ties with their parents and siblings -- assumptions that are virtually self evident -- a decision not to provide these benefits requires considerable evidence of countervailing risks of harm.  In reality, then, these statutes limit DCF's discretion much more than a cursory reading might suggest.

In sum, Plaintiffs' asserted interests under Mass. Gen. Laws ch. 119, §§ 32, 26B, and 23(c) are more than abstract needs or desires; they are legitimate claims of entitlement. See Roth, 408 U.S. at 577; see also Jones-Booker, 16 F. Supp. 2d at 58-60 (finding that plaintiff had a legitimate entitlement to compensation under Federal Employees Compensation Act ("FECA") because FECA mandated that "the United States shall pay compensation" unless the injury or death fell within one of three exceptions).  These interests are therefore subject to protection under the due process clause.

c.   <u>What Process is Due</u>.

The final step in the due process analysis requires
this court to determine whether the state has provided
sufficient procedural safeguards before depriving Plaintiffs
of these protected interests.  It is too early to resolve
this issue.  Discovery will give the parties the opportunity
to produce evidence and to argue the antecedent issue of
whether a deprivation in fact occurred.  Only at that time
will the court be able to make an informed decision about
the sufficiency of the state's pre-deprivation process.
<u>See, e.g.</u>, <u>Marisol A. v. Giuliani</u>, 929 F. Supp. 662
(S.D.N.Y. 1996) ("Whether, as defendants argue, state law
affords plaintiffs a mandatory review procedure which would
satisfy due process and whether plaintiffs have been
deprived of that process are matters better left for
trial.").  Since the court is not now in a position to make
such a fact-bound decision, Defendants' motion to dismiss
will be denied with respect to Count IV.

E.   <u>Plaintiffs' Statutory Claims under the AACWA (Count
     III)</u>.

Section 1983 provides a cause of action against any

person acting under color of state law who deprives a person

of "rights, privileges, or immunities secured by the

Constitution and laws." 42 U.S.C. § 1983. However, "[n]ot

all violations of federal law give rise to § 1983 actions:

'[the] plaintiff must assert the violation of a federal

_right_, not merely a violation of federal _law_.'" <u>Rio Grande</u>

<u>Cmty. Health Ctr. v. Rullan</u>, 397 F.3d 56, 72 (1st Cir. 2005)

(quoting <u>Blessing v. Freestone</u>, 520 U.S. 329, 340 (1997))

(emphasis in original). Such a right must be "unambiguously

conferred" by the statutory provision at issue. <u>Id.</u> at 72-

73. The Supreme Court has laid out a three-part test to

determine whether a provision creates a "right" that is

enforceable under § 1983. Courts must consider (1) whether

the provision contains "rights-creating language"; (2)

whether the provision had an aggregate as opposed to an

individualized focus; and (3) whether the statute contains

another enforcement mechanism through which an aggrieved

individual can obtain review.[8]   <u>Gonzaga Univ. v. Doe</u>, 536

---

[8] <u>Gonzaga</u> refined the earlier three-part test set forth
in <u>Blessing</u>, which considered: (1) whether Congress intended
that the provision in question benefit the plaintiff; (2)
whether the right supposedly protected by the statute is
vague and amorphous so that its enforcement would strain

U.S. 273, 287-90 (2002) (holding that a provision of the
Family Educational Rights and Privacy Act did not create a
privately enforceable right). "This test is merely a guide,
however, as the ultimate inquiry is one of congressional
intent." Rio Grande, 397 F.3d at 73.

The AACWA, which constitutes Parts B and E of Title IV
of the Social Security Act, is a federal spending statute
under which the federal government reimburses states for
expenses incurred in administering foster care and adoption
services.  Funding is conditioned upon the state satisfying
a series of requirements imposed by the Act, which includes
submitting a state plan for the provision of foster care and
adoption assistance approved by the Secretary of Health and
Human Services.

Defendants assert that Count III, which alleges
multiple violations of the AACWA, should be dismissed
because the AACWA does not confer private rights.  More

_____

judicial competence; and (3) whether the provision
unambiguously imposes a binding obligation on the States.
Blessing, 520 U.S. at 340.  The First Circuit acknowledged
this distinction and followed the language used in Gonzaga.
See Rio Grande, 397 F.3d at 73.  This court, then, will do
the same.

specifically, they argue that (1) the Act is generally unenforceable because it merely encourages states to take certain actions to receive federal funding; and (2) the specific provisions relied on by Plaintiffs fail the test set forth in Gonzaga University v. Doe, 536 U.S. 273 (2002). For the reasons discussed below, this court holds that the Act does create privately enforceable rights in the cited provisions.

    1.   General Enforceability of the AACWA.

Defendants first argue that the Act is generally unenforceable because it ties federal funding to substantial conformity with state plan requirements and allows states to improve their operations before funding is withheld.  Thus, Defendants reason, the statute only creates "system-wide goals" as opposed to rights.  (Dkt. No. 20, Defs.' Mem. at 99.)

This argument is foreclosed by Lynch v. Dukakis, 719 F.2d 504 (1st Cir. 1983), in which the First Circuit considered a nearly identical class action brought by children in the Massachusetts foster care system under the then-newly instituted AACWA seeking relief for alleged

failures of DCF (then "DSS") to comply with case plan and review obligations.  In Lynch, the First Circuit rejected the defendants' argument that "the existence of the Secretary's power to withhold federal funds from states precludes individual enforcement of rights against the states."  Id. at 510-11.  The court then expressly held that the AACWA confers an enforceable right to a case plan documenting the steps taken to identify and secure a permanent home.  Id.  Thus, the fact that the AACWA requires states to comply with its regulations in order to receive federal funding does not preclude a finding that the statute also confers privately enforceable rights.[9]

---

[9] Defendants attempt, unsuccessfully, to bolster this argument by relying on the Supreme Court's decision in Suter v. Artist M., 503 U.S. 347 (1992).  In Suter, the Supreme Court held that Section 671(a)(15), a single provision of the AACWA (not at issue here) providing that "reasonable efforts shall be made to preserve and reunify families," did not create a private right of action because it was too vague.  Id. at 363.  Suter also contained dicta implying that the AACWA as a whole might not be privately enforceable because of the statute's requirement that states prepare and file a "plan," which conditioned federal funding on substantial compliance with the plan.  See id. at 358.

Two years later, concerned that "Suter v. Artist M. affects . . . the enforceability of [AACWA]" and that it "could result in the elimination of the ability of beneficiaries of the State plan titles of the Social Security Act, primarily children and families, to sue to

## 2.  Applying the Gonzaga Test to Individual Provisions of the AACWA.

Plaintiffs assert two rights under the AACWA: (1) a right to a case plan containing documentation of the steps taken to identify and secure a permanent home pursuant to 42 U.S.C. §§ 671(a)(16)[10] and 675(1)(E); and (2) a right to foster care maintenance payments paid to foster care providers pursuant to 42 U.S.C. §§ 671(a)(1), 671(a)(11), 671(a)(12), 672(a)(1), and 675(4)(A).

With respect to Plaintiffs' asserted right to a case plan, Section 671(a)(16) reads as follows:

---

enforce the Act's requirements," H.R. Rep. No. 102-631, at 300, Congress unequivocally responded by enacting what has become known as the "Suter fix," an amendment to the Social Security Act that disclaimed any intent to foreclose private rights of action under the AACWA and the other "State plan" titles of the Social Security Act.  See 42 U.S.C. § 1320a-2 (stating that provisions of the Social Security Act are "not to be deemed unenforceable because of [their] inclusion in a section of the Act requiring a State plan or specifying the required contents of a State plan").

[10] Although § 671(a)(16) does not appear in the complaint, Plaintiffs' briefs make it clear that they are asserting a right to an individualized case plan under § 671(a)(16) in conjunction with § 675(1)(E), which merely defines the term "case plan."  The absence of this provision in the complaint appears to be a simple oversight, which Defendants do not challenge in their briefs and which this court need not concern itself with here.

In order for a State to be eligible for payments
under this [statute], it shall have a plan
approved by the Secretary which . . .

> (16) provides for the development of a case plan
> (as defined in section 675(1) of this title) for
> each child receiving foster care maintenance
> payments under the State plan and provides for a
> case review system which meets the requirements
> described in section 675(5)(B) of this title with
> respect to each such child.

42 U.S.C. § 671(a)(16).  Section 675(1)(E) then defines

"case plan."[11]

With respect to Plaintiffs' asserted right to foster

care maintenance payments, §§ 671(a)(1),671(a)(11), and

671(a)(12) read as follows:

> In order for a State to be eligible for payments
> under this [statute], it shall have a plan
> approved by the Secretary which . . .

---

[11] "The term 'case plan' means a written document which
includes at least the following: . . . In the case of a
child with respect to whom the permanency plan is adoption
or placement in another permanent home, documentation of the
steps the agency is taking to find an adoptive family or
other permanent living arrangement for the child, to place
the child with an adoptive family, a fit and willing
relative, a legal guardian, or in another planned permanent
living arrangement, and to finalize the adoption or legal
guardianship. At a minimum, such documentation shall include
child specific recruitment efforts such as the use of State,
regional, and national adoption exchanges including
electronic exchange systems to facilitate orderly and timely
in-State and interstate placements."  42 U.S.C. § 675(1)(E).

(1) provides for foster care maintenance payments in accordance with section 672 of this title and for adoption assistance in accordance with section 673 of this title;

. . . .

(11) provides for periodic review of the standards referred to in the preceding paragraph and amounts paid as foster care maintenance payments and adoption assistance to assure their continuing appropriateness;

(12) provides for granting an opportunity for a fair hearing before the State agency to any individual whose claim for benefits available pursuant to this part is denied or is not acted upon with reasonable promptness.

42 U.S.C. §§ 671(a).  Section 672 contains similar language, stating that "each State with a plan approved under this part shall make foster care maintenance payments" if certain conditions are met.  42 U.S.C. § 672(a)(1).  Section 675(4)(A) defines "foster care maintenance payments."[12]

---

[12] "The term 'foster care maintenance payments' means payments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, reasonable travel to the child's home for visitation, and reasonable travel for the child to remain in the school in which the child is enrolled at the time of placement. In the case of institutional care, such term shall include the reasonable costs of administration and operation of such institution as are necessarily required to provide the items described in the preceding sentence."  42 U.S.C. § 675(4)(A).

Federal courts are divided as to whether the AACWA creates privately enforceable rights to either a case plan[13] or foster care maintenance payments.[14]  As noted, the First Circuit in Lynch held that the AACWA confers an enforceable right to a case plan under § 671(a)(16) containing the elements required in § 675(1) -- two provisions at issue here.  However, the second of these two provisions, § 675(1), was amended in 1997 to add subsection (E), which is

_____

[13] A majority of courts has found that the AACWA establishes a privately enforceable right to a case plan. See, e.g., L.J. v. Massinga, 838 F.2d 118, 124 (4th Cir. 1988); Lynch, 719 F.2d at 512; Clark K., 2007 WL 1435428, at *10; Kenny A., 218 F.R.D. at 292;  Jeanine B. ex rel. Blondis v. Thompson, 877 F. Supp. 1268, 1283-84 (E.D. Wis. 1995); B.H. v. Johnson, 715 F. Supp. 1387 (N.D. Ill. 1989). But see 31 Foster Children, 329 F.3d at 1271-72; Carson P., 240 F.R.D. at 544; Olivia Y., 351 F. Supp. at 562; Charlie H., 83 F. Supp. at 489.

[14] A majority of courts also has found that the AACWA establishes a privately enforceable right to foster care maintenance payments.  See, e.g., Cal. State Foster Parent Ass'n v. Wagner, 624 F.3d 974, 980 (2010); C.H. v. Payne, 683 F. Supp. 2d 865, 877 (S.D. Ind. 2010); Cal. Alliance of Child and Family Servs. v. Allenby, 459 F. Supp. 2d 919, 925 (N.D. Cal. 2006); Mo. Childcare Ass'n v. Martin, 241 F. Supp. 2d 1032, 1040-41 (W.D. Mo. 2003); Kenny A., 218 F.R.D. at 292; LaShawn A., 762 F. Supp. at 989. But see D.G. v. Henry, 594 F. Supp. 2d 1273, 1278 (N.D. Okla. 2009); Carson P. v. Heineman, 240 F.R.D. at 540-41.

the particular subsection Plaintiffs rely upon in this litigation. Thus, although the right to a case plan was clearly upheld in Lynch, the First Circuit did not squarely address the right Plaintiffs are now asserting, which requires this court to conduct an independent analysis.[15]

Each of the above provisions satisfies the first Gonzaga factor. As noted, the first Gonzaga factor requires "rights-creating language," which consists of "mandatory, rather than precatory, terms." 536 U.S. at 295 (quoting Blessing, 520 U.S. at 340-41). Additionally, the rights should be "phrased in terms of the persons benefitted . . . with an unmistakable focus on the benefitted class" and contain "individually focused terminology." Id. at 284 (quoting Cannon v. Univ. of Chicago, 441 U.S. 677, 691 (1979)) (emphasis in original).

Such language is readily discernible in the above-cited

---

[15] While the provisions at issue in Lynch are not identical to the provisions at issue here, this distinction is ultimately inconsequential. Section 675(1) merely lists the elements that constitute a "case plan" under the other sections of the Act, and the Gonzaga analysis, as explained in text, is unaffected by the differences in these elements.

provisions.  For instance, each provision expresses a clear mandate by using the term "shall."  <u>See, e.g.</u>, 42 U.S.C. § 671(a)(16) (requiring that states "<u>shall</u> have a plan approved by the Secretary which . . . provides for the development of a case plan (as defined in section 675(1) of [AACWA]) for each child receiving foster care maintenance payments under the State plan") (emphasis added); 42 U.S.C. § 672(a)(1) (requiring that "each State with a plan approved under this part <u>shall</u> make foster care maintenance payments on behalf of each child") (emphasis added).

Each of the cited provisions similarly discusses how the state must distribute benefits to <u>each child</u>.  <u>See, e.g.</u>, <u>id.</u> (requiring that states "shall have a plan approved by the Secretary which . . . provides for the development of a case plan (as defined in section 675(1) of [AACWA]) <u>for each child</u> receiving foster care maintenance payments under the State plan . . . .") (emphasis added); 42 U.S.C. § 672(a)(1) (requiring that "each State with a plan approved under this part shall make foster care maintenance payments <u>on behalf of each child</u>") (emphasis added).  Plainly, these directives are both couched in mandatory terms and are

unmistakably focused on the benefitted class, _i.e._, foster
children.

The second <u>Gonzaga</u> factor also favors a finding that
the AACWA creates privately enforceable rights; the cited
provisions indisputably have an "individualized," rather
than "aggregate," focus.  See <u>Gonzaga</u>, 536 U.S. at 288.
Provisions with an aggregate focus "speak only in terms of
institutional policy and practice" and "are not concerned
with whether the needs of any particular person have been
satisfied."  <u>Id.</u>  The fact that these provisions are
"embedded within the requirements for a state plan" does not
transform them into an institutional policy.  See <u>Rio
Grande</u>, 397 F.3d at 74 ("The mere fact that all the Medicaid
laws are embedded within the requirements for a state plan
does not, by itself, make all of the Medicaid provisions
into ones stating a mere institutional policy or practice
rather than creating an individual right.").  Moreover, as
observed above, the AACWA provisions repeatedly refer to
"each child," thus illustrating an individualized focus.
See <u>Cal. State Foster Parent Ass'n v. Wagner</u>, 624 F.3d 974,
980 (2010) (distinguishing AACWA from statute at issue in

<u>Gonzaga</u> and stating that § 672 of the AACWA, which provides
for foster care maintenance payments, "focuses squarely on
the individuals protected, rather than the entities
regulated").

These provisions also satisfy the third <u>Gonzaga</u> factor
because the AACWA does not contain an alternative
enforcement mechanism. In <u>Gonzaga</u>, the Supreme Court noted
that students and parents who suspected a violation of the
Family Educational Rights and Privacy Act could file written
complaints with a federal review board, thereby triggering
an investigation and the possibility of relief. 536 U.S. at
288. In contrast, Congress provided for no individualized
federal review mechanism in the AACWA. <u>See</u> H.R. Rep. No.
102-631, at 365 ("[T]here is no procedure . . . by which
program beneficiaries can trigger a [Department of Health
and Human Services] investigation or compliance proceeding
for a State's failure to have a plan that meets the State
plan requirements or to administer such a plan in accordance
with such requirements."). While Defendants argue that the
AACWA establishes a "comprehensive review and enforcement
infrastructure" by requiring periodic review to determine

which states are in substantial conformity with the Act,
(Dkt. No. 20, Defs.' Mem. at 98), this purely institutional
review process is not the same as an individualized
enforcement mechanism.  See Lynch, 719 F.2d at 510-11
(holding that "nothing in the language or structure of Title
IV-E suggests that Congress meant section 671(b) [which
provides for periodic review by the Secretary] to be an
exclusive remedy"); 31 Foster Children v. Bush, 329 F.3d
1255, 1272 (11th Cir. 2003) (holding that the Act "contains
no mechanism by which aggrieved individuals can enforce its
provisions").

        In sum, application of the Gonzaga factors makes it
clear that Congress intended to create privately enforceable
rights to individualized case plans and foster care
maintenance payments under the AACWA.  Accordingly,
Defendants' motion to dismiss will be denied with respect to
Count III.

## IV. CONCLUSION

        For the foregoing reasons, Defendant Patrick's Motion
to Dismiss (Dkt. No. 17) and Defendants' Motion to Dismiss
(Dkt No. 18) are hereby DENIED in their entirety.  Due to

time constraints, the hearing on the Motions to Dismiss left inadequate time for argument regarding Plaintiffs' pending Motion for Class Certification (Dkt. No. 2). The clerk will set a date for further argument on this motion.

It is So Ordered.

/s/ Michael A. Ponsor
MICHAEL A. PONSOR
U. S. District Judge