## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CONNOR B., by his next friend, ROCHELLE VIGURS, et al., individually and on behalf of all others similarly situated, <br><br>        Plaintiffs, <br><br> v. <br><br> DEVAL L. PATRICK, in his official capacity as Governor of the Commonwealth of Massachusetts, et al., <br><br>        Defendants. | C.A. No. 1:10-cv-30073 (WGY) |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs, a certified class of approximately 7500 children in the foster care custody of the Massachusetts Department of Children and Families ("DCF"), bring this suit under 42 U.S.C. § 1983 alleging that chronic structural failings within the DCF foster care system expose them to imminent and ongoing risk of physical and psychological harm.  These unconstitutional harms arise from, among other things, repeated moves among often-inappropriate foster placements, abuse and neglect in those placements, long delays in finding permanent families for children (if they are found at all), and the failure to provide, or timely provide, needed basic services, including medical and mental health care and sibling and parent visitation.

In seeking partial summary judgment, Defendants disregard evidence of these harms, and their systemic underpinnings, collected during twenty months of discovery.  Defendants also disregard precedent, and the law of this case, establishing the right of the class to seek prospective injunctive relief to ameliorate the risk of harm when not every class member has already suffered actual physical or psychological injury.  As fully set forth below, genuine issues of material fact preclude summary judgment and require trial on the merits.

1

## I. GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON PLAINTIFFS' PROCEDURAL DUE PROCESS CLAIM

Count IV avers that Defendants engage in a pattern and practice of depriving Plaintiffs of state-created property rights without due process. Plaintiffs intend to prove: (1) they possess legally cognizable property interests which are being deprived by the state, and (2) the procedural safeguards attending these deprivations are constitutionally insufficient. *González-Fuentes v. Molina*, 607 F.3d 864, 886 (1st Cir. 2010) (citing *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)). Contrary to Defendants' arguments, significant deprivations do in fact exist, and the existing procedures are insufficient.

### A. Plaintiffs Are Systematically Deprived of State-created Property Rights

The District Court has determined in this case that Plaintiffs possess "legitimate claims of entitlement" to: (a) regular visitation with siblings, (b) timely and regularly updated medical passports, (c) diligent searches for kin caretakers, and (d) medical screenings in accordance with Early Periodic Screening, Diagnosis, and Treatment ("EPSDT") standards.[1] *Connor B. v. Patrick*, 771 F. Supp. 2d 142, 165-67 (D. Mass. 2011).[2] Ample evidence demonstrates a pattern and practice within DCF of depriving Plaintiff Children of these entitlements: DCF fails to assure that sibling visits consistently take place, Pls.' Statement of Add'l Facts in Supp. of Their Opp'n to Defs.' Mot. for Partial Summ. J. ("PSAF") ¶¶ 1-17; children in DCF custody are routinely denied timely and/or updated medical passports, *id.* ¶¶ 18-31; DCF often fails to undertake timely and diligent searches for kin, *id.* ¶¶ 32-43; and upon entry into foster care, children are consistently denied timely medical screenings, *id.* ¶¶ 44-56. These widespread

---

[1] With respect to Mass. Gen. Laws ch. 119, § 32, Plaintiffs will present evidence on EPSDT screenings, not placement with private families.
[2] *See United States v. Moran*, 393 F.3d 1, 7 (1st Cir. 2004) ("[A] legal decision made at one stage of a criminal or civil proceeding should remain the law of that case throughout the litigation, unless and until the decision is modified or overruled by a higher court.").

deprivations cannot reasonably be characterized as the result of mere negligence or mistake.

### B. Defendants Fail to Provide Adequate Notice of These Deprivations or a Meaningful Opportunity to be Heard

DCF regulations provide for fourteen-day advance written notice "if the Department intends to deny, reduce, or terminate services." 110 CMR 8.01; *see also* PSAF ¶ 57.[3] Nevertheless, DCF fails to provide prompt written notice when services are disrupted. Instead, DCF expects the child's counsel to determine through independent inquiry whether any such disruption has taken place, however long that may take. PSAF ¶¶ 62-66. The essence of due process is the requirement that "a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it." *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976) (internal quotation omitted).[4] Here, DCF fails to provide pre-deprivation notice or, where pre-deprivation notice is impractical, timely post-deprivation notice.

Even were DCF providing the required notice, it lacks the capacity to provide a "meaningful" hearing.[5] DCF regulations provide that a fair hearing "shall be scheduled to be held within 90 calendar days from receipt of a request." 110 CMR 10.10; *see also* PSAF ¶¶ 67-70. This rarely occurs. Due to a backlog that accumulated years ago without abatement, requests for a fair hearing routinely sit idle for six months or longer. PSAF ¶¶ 71-78.

In the absence of timely fair hearings, no substitute form of process of any "probable value" exists to assure children a meaningful opportunity to be heard. *Mathews*, 424 U.S. at 335. The review mechanisms identified by Defendants are manifestly insufficient: the "72-hour

---

[3] Each of the above entitlements constitutes a "service" under DCF regulations. PSAF ¶¶ 58-61.
[4] *Mathews* sets out a tripartite balancing test to be applied to procedural due process claims. *Mathews*, 424 U.S. at 335. Courts have clarified that "a showing of a likelihood of irreparable harm resulting from the lack of a pre-deprivation hearing is a private interest which countervails *any* public interest in streamlined administration." *Kahn v. United States*, 753 F.2d 1208, 1219 (3d Cir. 1985).
[5] *See Raper v. Lucey*, 488 F.2d 748, 753 (1st Cir. 1973) ("It is elementary that due process . . . requires the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" (quoting *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970))).

Hearing" typically occurs before the child's out-of-home care service plan has been prepared and, in any event, is focused on the circumstances of the child's removal from the parental home, not the child's service plan, PSAF ¶¶ 83-84; the "Permanency Hearing" occurs only once a year and is focused on the appropriateness of the child's permanency plan, not the service plan, *id.* ¶¶ 79, 82; and the "Foster Care Review" occurs once every 6 months and, therefore, provides no meaningful safeguard from deprivations occurring in the interim, *id.* ¶¶ 79-81.[6]

Where irreparable harm might result from the deprivation, due process considerations require pre-deprivation process. *See Goldberg v. Kelly*, 397 U.S. 254, 261 (1970).[7] That very circumstance exists here where the subject entitlements are prophylactic measures designed to protect children from recognized forms of harm. PSAF ¶¶ 86-97. For example, child medical needs and emergencies often arise unexpectedly such that the absence of a medical passport or timely health screenings may cause irreparable harm. *Id.* ¶¶ 86-87. Likewise, the absence of regular visitation threatens irreparable harm to sibling bonds as young children predictably grow apart. *Id.* ¶¶ 88-90.[8] Indeed, acknowledging this threat of irreparable harm, DCF regulations call for fourteen-day pre-deprivation notice, hearing within ninety days, and a stay of service disruption pending review. *Id.* ¶¶ 57, 69-70. Nevertheless, not only does DCF fail to comply with its pre-deprivation fair hearing process, but it provides no alternative means for prompt post-deprivation review.

---

[6] The "abuse of discretion" motion and grievance process are also ineffective as procedural safeguards. *See* Statement of Undisputed Facts in Supp. of Defs.' Partial Mot. for Summ. J., Dkt. No. 211 ("DSUF") ¶¶ 38-40, 52. The meaningfulness of these reviews is entirely dependent on notice of a deprivation being provided to the child's lawyer – who is only required to meet quarterly with their child client – in a timely way. PSAF ¶ 66. Additionally, the grievance process is not available for any complaint that could appropriately be the subject of a fair hearing. *Id.* ¶ 85.

[7] Pre-deprivation notice is particularly appropriate where, as here, the deprivations are not "random and unauthorized," but rather are those "that the state could be expected to anticipate." *Wayfield v. Town of Tisbury*, 925 F. Supp. 880, 887 (D. Mass. 1996) (internal quotation omitted).

[8] Pursuant to Mass. Gen. Laws ch. 119, § 26B(b), children in the custody of DCF due to a substantiated allegation of abuse or neglect may file a petition for sibling visitation in the court committing the child to the custody of DCF. Aside from the initial establishment of a visitation plan, the right to submit any such petition depends on timely notice of the denial of sibling visits.

## C.  Plaintiffs Need Not Show Actual Injury to Every Class Member

Defendants argue that Plaintiffs cannot advance a procedural due process claim absent proof that "actual injury" has occurred to every class member.  Mem. of Law in Supp. of Defs.' Mot. for Partial J. as a Matter of Law, Dkt. No. 210 ("Defs.' Br.") at 4-5 (citing *D.G. v. Yarbrough*, No. 08-CV-074, 2011 WL 6009628 (N.D. Okla. Dec. 1, 2011)).  This is not the case. For example, in *L.H. v. Schwarzenegger*, 519 F. Supp. 2d 1072, 1086 (E.D. Cal. 2007), plaintiffs won summary judgment based on a showing that the flawed procedural scheme, including the absence of prompt hearings, would effect a due process violation whenever applied.  That plaintiff class, as here, included both children already subjected to the deprivation of a liberty interest and children *at risk* of such deprivation in the future.  *See id.* at 1074.

The *D.G.* case is materially distinguishable.  In *D.G.*, plaintiffs did not come forward with facts establishing a pattern and practice of deprivations or defects in Oklahoma's scheme of procedural safeguards.  Thus, the court found that deprivations had only been shown with respect to "specific children," and that Plaintiffs "do not claim, nor do they provide evidence, that all members have been denied an appropriate level of process."  2011 WL 6009628, at *18.  Here, Plaintiffs proffer substantial evidence demonstrating defects in the Commonwealth's scheme of procedural safeguards, such that all children in DCF foster care are uniformly exposed to due process violations.  Additionally, the *D.G.* court noted that a plaintiff must demonstrate that the due process deprivation was caused by affirmative policies or "by acquiescence in a long-standing practice or custom."  *Id.* at *17.  Here, the evidence shows Defendants' knowledge of and acquiescence in a pattern and practice of depriving children of their property interests without due process.[9]

---

[9] The *31 Foster Children* decision is inapplicable because it addresses Article III standing in a class action in which certification had not occurred.  In adjudicating the "injury in fact" requirement, the court observed, "An allegation of

Finally, citing to *Daniels v. Williams*, 474 U.S. 327 (1986), and *Parratt v. Taylor*, 451 U.S. 527 (1981), Defendants suggest that the deprivations here are the result of negligence, and therefore, cannot give rise to a procedural due process claim. Defs.' Br. at 8 n.9. However, as the Supreme Court found in *Logan v. Zimmerman Brush Co.*:

> This argument misses *Parratt*'s point. In *Parratt*, the Court emphasized that it was dealing with "a tortious loss of . . . property as a result of a random and unauthorized act by a state employee . . . not a result of some established state procedure." Here, in contrast, it is the state system itself that destroys a complainant's property interest, by operation of law, whenever the Commission fails to convene a timely conference—whether the Commission's action is taken through negligence, maliciousness, or otherwise.

455 U.S. 422, 435-36 (1982) (alteration in original) (quoting *Parratt*, 451 U.S. at 541); *see also Zinermon v. Burch*, 494 U.S. 113, 136-39 (1990) (finding *Parratt* inapplicable when deprivation was foreseeable); *Wayfield v. Town of Tisbury*, 925 F. Supp. 880, 887 (D. Mass. 1996) (denying summary judgment where deprivation is one the state could "be expected to be able to anticipate").[10]

Thus, under applicable law and given the ample evidentiary proffer made by Plaintiffs here, Defendants are not entitled to summary judgment on Count IV.[11]

---

future injury satisfies this prong of standing so long as the alleged injury is 'imminent' or 'real and immediate' and not merely 'conjectural' or 'hypothetical.'" *31 Foster Children v. Bush*, 329 F.3d 1255, 1265 (11th Cir. 2003). The court found that one named plaintiff had standing to bring a procedural due process claim because he had averred a deprivation. In contrast, the certified Plaintiff class here includes thousands of children who have been, and continue to be, deprived of entitlements as a result of an ongoing pattern and practice within DCF. *See also City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) (contrasting the isolated incident of a single police officer placing plaintiff in a chokehold to circumstances in which a pattern and practice creates an ongoing and real threat of harm).

[10] The *Gutierrez* decisions arise from a consumer class action for money damages under Federal Rule of Civil Procedure 23(b)(3). *Gutierrez v. Wells Fargo & Co.*, No. C 07-05923, 2010 WL 1233810 (N.D. Cal. Mar. 26, 2010); *Gutierrez v. Wells Fargo & Co.*, No. C-07-05923, 2009 WL 1247040 (N.D. Cal. May 5, 2009). Unlike the instant case in which Plaintiffs seek solely prospective injunctive relief, "actual injury" had to be proven there so that appropriate money damages could be fixed for each class member.

[11] Citing *Germany v. Vance*, a Section 1983 individual damages case, Defendants also seek to apply a "reckless or callous indifference" standard to Plaintiffs' procedural due process claim. 868 F.2d 9 (1st Cir. 1989). Courts, however, have applied a lesser standard in constitutional cases seeking solely injunctive relief, such as the instant case, where the chilling effect on public service caused by exposure to money damages is absent. *See LaShawn A. v. Dixon*, 762 F. Supp. 959, 996 n.29 (D.D.C. 1991) ("This is not a case . . . in which the plaintiff seeks money damages. In such cases, a deliberate indifference standard may be warranted due to the chilling effect that an unfavorable judgment may have on municipal policymakers. Plaintiffs in this case seek injunctive relief only."),

## II.    GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON PLAINTIFFS' FAMILY ASSOCIATION CLAIM

Plaintiffs assert that their rights to familial integrity under the First, Ninth, and Fourteenth Amendments are violated through Defendants' systematic denial of meaningful visitation with their parents and siblings and Defendants' systematic failure to place children with their siblings who are in foster care.  This Court has held that the right to familial integrity encompasses the right of foster children to maintain "meaningful contact with parents [and] siblings."  *Connor B.*, 771 F. Supp. 2d at 164.[12]  Furthermore, Massachusetts law and DCF policy provide for siblings to be placed together, regular sibling visits, and monthly parental visits, unless not in the child's best interests.[13]  PSAF ¶¶ 1-3, 98-99, 101-102; *see also id.* ¶ 100.

Nonetheless, Defendants routinely separate siblings in foster care and fail to assure meaningful contact with siblings and parents for large numbers of children in DCF foster care. A review of DCF case files by Plaintiffs' expert the Children's Research Center ("CRC") reveals that during the period under review, only 26.8% of a cohort of children were placed with all of their siblings in foster care, and more than a quarter were *never* placed with *any* of their siblings.[14]  *Id.* ¶ 108; *see also id.* ¶ 109.  This same review showed that more than half of these children had *no* visits with their siblings in foster care and just 37.6% had monthly visits with their parents.  *Id.* ¶¶ 14, 112; *see also id.* ¶¶ 15, 17, 110, 113-114.

Defendants have long been aware of DCF's poor performance in the areas of sibling

---

*aff'd sub nom.*, *LaShawn A. v. Kelly*, 990 F.2d 1319 (D.C. Cir. 1993); *see also K.H. v. Morgan*, 914 F.2d 846, 851 (7th Cir. 1990) ("[T]here might of course be broader liability in an injunctive suit against [state] officials.").

[12] This holding is in accord with the weight of authority.  *See Kenny A. v. Perdue*, 218 F.R.D. 277, 296-97 (N.D. Ga. 2003); *Brian A. v. Sundquist*, 149 F. Supp. 2d 941, 956 (M.D. Tenn. 2000); *Eric L. v. Bird*, 848 F. Supp. 303, 307 (D.N.H. 1994); *Aristotle P. v. Johnson*, 721 F. Supp. 1002, 1005-07 (N.D. Ill. 1989); *R.C. v. Hornsby*, No. 88-D-1170-N, slip op. at 10-12 (N.D. Ala. Apr. 19, 1989) (attached hereto as Exhibit A).

[13] Plaintiffs do not assert that their associational rights are violated when DCF does not provide visits or placement with siblings after a determination that visitation or placement is not in the child's best interests.  Accordingly, *Weller v. Department of Social Services*, 901 F.2d 387 (4th Cir. 1990), is not relevant.  *See* Defs.' Br. at 10.

[14] This data is from a cohort of children who entered DCF foster care between July 1, 2009 and June 30, 2010.

placement and parent and sibling visitation.  *Id.* ¶¶ 12-13, 115-122.  DCF officials further admit

that DCF's shortage of foster homes willing to accept sibling groups creates a barrier to placing

siblings together.  *Id.* ¶¶ 123-124.  Yet Defendants have put in place no mechanism to either

track the extent to which children are placed with their siblings and the frequency with which

parental and sibling visits are being provided, or to implement plans to facilitate sibling

placements and sibling and parent visits.  *Id.* ¶¶ 5-6, 8-11, 13, 125-130; *see also id.* ¶¶ 111, 131.

Defendants' failure to inform themselves about whether they are meeting their fundamental

responsibilities to Plaintiffs and to address this issue evinces a disregard for Plaintiffs' rights and

cannot shield them from liability.  *See Alsina-Ortiz v. Laboy*, 400 F.3d 77, 82 (1st Cir.

2005) (discussing liability where "the official culpably ignores or turns away from what is

otherwise apparent").  Accordingly, there is a triable issue whether Defendants have a pattern or

practice of failing to ensure that Plaintiffs' familial relationships are maintained, and Plaintiffs

are entitled to proceed to trial on this count.[15]

     Defendants erroneously contend that Plaintiffs' claims fail because Defendants did not, as

a matter of established policy, disrupt Plaintiffs' familial relationships "intentionally and without

justification."  Defs.' Br. at 9.  As an initial matter, there is no requirement that a *policy* of

disrupting family relationships be in place to give rise to a familial association claim, and none

of the cases Defendants cite holds otherwise.[16]  Nor have Defendants proffered any justification

---

[15] Defendants attempt to evade liability by contending that a majority of class members have not been deprived of this right because "a plurality of individuals reviewed [had] no siblings" and "many more . . . live with their siblings."  Defs.' Br. at 10.  It is of no moment that Defendants' failures may not have harmed *all* children in DCF custody.  The gravamen of Plaintiffs' claim is that Defendants' patterns and practices expose all children in custody to a risk of harm.  Children who live with their siblings in one placement may be separated from them in another.  A child who has no siblings when he enters custody may become a big brother while in foster care.  Defendants' argument flies in the face of the very purpose of an injunction, which is to prevent a party from suffering imminent harm.  Moreover, this Court can fashion relief tailored to the particular harm shown without a risk of unduly benefitting any individual children.  *United Parcel Serv., Inc. v. Flores-Galarza*, 318 F.3d 323, 337 (1st Cir. 2003).

[16] In *Aristotle P. v. Johnson*, a class of children in foster care successfully challenged a policy and practice of not placing siblings together.  721 F. Supp. 1002, 1005-07 (N.D. Ill. 1989).  The court had no need to decide, and so did not address, whether the existence of such a policy was a prerequisite to constitutional liability.  *See id.*  Generally, a

for the fact that such large proportions of children in DCF foster care are deprived of meaningful relationships with siblings and parents.  Finally, Defendants are incorrect that they must intentionally deprive children of their familial association rights.  Defendants import this requirement from a Tenth Circuit case seeking damages where the challenged state action had the *incidental* consequence of interfering with a family relationship.  *See id.* (citing *Griffin v. Strong*, 983 F.2d 1544, 1548 (10th Cir. 1993)).  However, the First Circuit has rejected claims based upon such indirect action, *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 563 (1st Cir. 1988), and Plaintiffs make no such claim here.  Rather, *direct* action and inaction by DCF separates Plaintiff children from their siblings while in foster care and prevents contact with their parents and siblings.  Accordingly, the culpability standard set out in *Griffin* is inapplicable,[17] as is *D.G.*, 2011 WL 6009628, at *16-17, a district court case that relied exclusively on *Griffin*.[18]

Moreover, even if such a showing of intent or knowledge were required, Plaintiffs have put forward sufficient evidence to meet this standard.[19]  Defendants are well aware of the importance of maintaining children's family relationships and the negative consequences of their practices of severing those relationships.  PSAF ¶¶ 88-90, 102-107.  Several courts have found that familial association claims asserted by children in foster care are susceptible to classwide relief and survive summary judgment where, as here, there was evidence of a pattern or practice of disrupting family relationships.  *See, e.g.*, *Kenny A. v. Perdue*, No. 1:02-cv-1686, 2004 WL 5503780, at *7-8 (N.D. Ga. Dec. 13, 2004); *see also Aristotle P.*, 721 F. Supp. at 1005-07.[20]  The

---

constitutional violation can be shown through a policy *or* practice that leads to the challenged deprivation.  *See D.G.*, 2011 WL 6009628, at *17 (citing *Jett v. Dall. Ind. Sch. Distr.*, 491 U.S. 701, 737 (1989)).

[17] *Griffin* is further distinguishable because it was an action for damages under Section 1983, and the culpability standard is higher in damages cases.  *See supra* note 11, *infra* pp. 16-17.

[18] In addition, *D.G.* is against the weight of authority, *supra* note 12, and erroneously required each plaintiff suffer actual harm, which is not required, *see supra* note 15.

[19] Similarly, should the Court analyze the familial association rights at issue here under the rubric of Substantive Due Process, Plaintiffs' evidence meets any relevant standard.

[20] None of the cases that Defendants cite stands for the proposition that an individualized inquiry is required for each

failure of DCF officials to recruit foster homes that can accommodate sibling groups, and their failure to put in place a system to track family visits and sibling placements[21] in the face of studies showing widespread failures to comply with policy, establishes Defendants' culpability.

## III. THERE ARE GENUINE ISSUES OF MATERIAL FACT PRECLUDING ENTRY OF SUMMARY JUDGMENT ON COUNT III OF THE COMPLAINT

The Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 670 *et seq.* ("AACWA"), creates privately enforceable rights to adequate foster care maintenance payments and individualized case plans. *Connor B.*, 771 F. Supp. 2d at 172.

### A. DCF Pays Inadequate Foster Care Maintenance Payments

Under AACWA, states, like Massachusetts, that accept federal funds for their foster care systems must make foster care maintenance payments to foster parents that "fully cover" statutorily-identified categories of expenses. *C.H. v. Payne*, 683 F. Supp. 2d 865, 879 (S.D. Ind. 2010) (citing 42 U.S.C. § 675(4)(A)); *see also* 42 U.S.C. § 671(a)(1). AACWA requires states to adopt a methodology for calculating payments that "take[s] into consideration the actual costs of providing the enumerated items." *C.H.*, 683 F. Supp. 2d at 879; *see also Mo. Child Care Ass'n v. Martin*, 241 F. Supp. 2d 1032, 1045 (W.D. Mo. 2003); *Cal. Alliance of Child & Family Servs. v. Allenby*, 589 F.3d 1017, 1021 (9th Cir. 2009). Defendants have failed to meet this requirement and are not entitled to summary judgment on this claim.

From 2004 until 2012, DCF's foster care maintenance rates were frozen at the levels calculated in 2004 by the United States Department of Agriculture ("USDA") for expenditures by families on children. PSAF ¶ 132. In 2008, the Massachusetts legislature passed a law

---

child who contends that Defendants violated his rights to familial association. Defs.' Br. at 10. In fact, *Aristotle* permitted a classwide claim to survive a motion to dismiss and did not mention, let alone require, such an individualized inquiry. 721 F. Supp. at 1005-07. Defendants also cite *Fitzgerald v. Williamson*, 787 F.2d 403 (8th Cir. 1986), for this proposition, but *Fitzgerald* was an individual damages action and so did not address the level of proof for a classwide claim seeking injunctive relief. *See* note 11 *supra.*

[21] Unlike DCF, the agency in *D.G.* had a system for tracking family visitation. *D.G.*, 2011 WL 6009628, at *16 (noting that the agency had records "from 2008 to 2010 reflect[ing]" the percentage of required visits completed).

requiring that DCF "subject to appropriation, provide assistance to foster care families which includes maintenance payments at the daily rate recommended and periodically adjusted by the [USDA]."[22]  Mass. Gen. Laws ch. 119, § 23(h); PSAF ¶ 133.[23]  In 2009 and 2010, DCF acknowledged that its still-frozen maintenance rates fell between 17% and 24% below then-current USDA guidelines, and that foster parents "go unreimbursed" for excess costs.  PSAF ¶ 136; *see also id.* ¶ 137.

It was not until March 2012, when this litigation was clearly heading toward trial and Plaintiffs' AACWA claim had been upheld on a motion to dismiss, that DCF implemented a rate increase.  *Id.* ¶ 139.  However, this one-time "fix" for state FY 2013 does not entitle Defendants to summary judgment on Plaintiffs' AACWA claim, as Plaintiffs are entitled to DCF's *ongoing* compliance with AACWA.  Defendants have offered no facts indicating that maintenance rates will be maintained at the new 2012 level.[24]  In addition, Defendants make statements suggesting that, absent specific legislative appropriation, rates will not increase with inflation to match USDA levels going forward.  *See* DSUF ¶¶ 61, 69; *see also* PSAF ¶ 140.  Thus, another lengthy "freeze" may be forthcoming.  The failure to apply an inflationary adjustment to maintenance rates has been found to violate AACWA.  *Allenby*, 589 F.3d at 1022-23.

Defendants' recent attempt at voluntary cessation of eight years of underpayments does not deprive the Court of its ability to provide a remedy to Plaintiff Children.  "It is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'"  *Friends of the Earth, Inc. v. Laidlaw*

---

[22] The phrase "subject to appropriation" provides no legal excuse for noncompliance with AACWA; AACWA does not permit states to exempt themselves from the law if sufficient funds have not been allocated to maintenance payments.  *See Allenby*, 589 F.3d at 1022.

[23] The law also required the Child Advocate to develop a comprehensive plan with "an estimate of the expenditure necessary to implement an annual adjustment to" maintenance rates.  Mass. Gen. Laws ch. 18C, § 11(d)(23); PSAF ¶ 134.  The Child Advocate, who reports directly to the Governor, has failed to meet this requirement.  PSAF ¶ 135.

[24] Similarly, "recompense" payments made prior to the 2012 rate increase were retroactive, subject to DCF's discretion and not made pursuant to any long-term strategy to match USDA guidelines.  PSAF ¶ 138.

*Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000); *see also Adams v. Bowater, Inc.*, 313 F.3d 611 (1st

Cir. 2002) ("[W]here a defendant is unwilling to give any assurance that the conduct will not be

repeated, a natural suspicion is provoked that recurrence may well be a realistic possibility.").

Furthermore, there is a genuine question of fact as to whether the rates implemented in

March 2012 "fully cover" the cost of the items required by AACWA.  DCF bases the new 2012

rates on USDA's report for 2010.  PSAF ¶ 145.  Thus, by the date of trial, maintenance rates will

be three years out of date.  In addition, DCF's rates fail to fully cover all categories of expenses

required by AACWA, such as school supplies, child care when not provided through DCF, and

personal incidentals.  *Id.* ¶¶ 141-158; *see* 42 U.S.C. § 675(4)(a).

## B.  DCF Fails to Provide Foster Children with Adequate Case Plans

Plaintiffs have also raised genuine issues of fact that Defendants have failed to develop

adequate case plans for children in foster care as required by AACWA.  *See* 42 U.S.C.

§ 671(a)(16); PSAF ¶ 172.[25]  The CRC review found that service plans[26] were missing in 15% to

35% of the children's files reviewed.  PSAF ¶ 159.  Even when DCF provides service plans to

children in foster care, there is a question of fact as to whether those plans comply with

AACWA.  According to the CRC report, as well as the expert report of Dr. Lenette Azzi-

Lessing, when service plans were present in the case files, they often lacked information required

under AACWA, including child and parent services, independent living services, and child-

---

[25] Defendants incorrectly apply a "deliberate indifference" standard to Plaintiffs' statutory claims, based entirely on one court's discussion of the standard for *substantive due process* claims.  *See* Defs.' Br. at 11, 13; *B.H. v. Johnson*, 715 F. Supp. 1387, 1398 (N.D. Ill. 1989).  In fact, courts have not required a showing of deliberate indifference in order to obtain injunctive relief again state officials for violations of AACWA under Section 1983.  *See E.C. v. Sherman*, No. 05-0726, 2006 WL 6358376, at *35-36 (W.D. Mo. Aug. 4, 2006) (finding success on the merits of AACWA claim despite defendants' "assertion of an 'intent' not to do what the challenged provision and [agency] policy both say to the contrary"); *see also Lynch v. King*, 550 F. Supp. 325, 336 (D. Mass. 1982), *aff'd sub nom.*, *Lynch v. Dukakis*, 719 F.2d 504 (1st Cir. 1983).  Even if a showing of culpability were required, evidence that DCF has been well aware of its poor performance on providing timely service plans raises a triable issue of fact.  *See* PSAF ¶¶ 168-171.
[26] DCF uses the term "service plan" and "case plan" interchangeably.  *See* Defs.' Br. at 13 (stating that DCF regulations list items that should be included in "case plans" and citing to regulations governing "service plans").

specific recruitment efforts.  *Id.* ¶¶ 160-162, 164-165; *see also id.* ¶ 163; 42 U.S.C. §§ 675(1)(B), (D), (E).  In addition, DCF policy does not require service plans to include a plan for ensuring a foster child's educational stability, as required by AACWA.  PSAF ¶¶ 166-167; 42 U.S.C. § 675(1)(G).  DCF's own management reports reflect that it consistently fails to complete timely service plans.  PSAF ¶¶ 168-171.

Defendants are incorrect that AACWA's case plan requirement is only applicable to children who are Title IV-E "eligible."  Defs.' Br. at 13.[27]  States that accept federal funds under AACWA must develop a plan for child welfare services that includes assurances that the state is operating a case review system "for each child receiving foster care" and describes standards for "caseworker visits for children who are in foster care" that are focused on case planning.  42 U.S.C. §§ 622(a), (b)(8)(A)(ii), (b)(17); PSAF ¶ 173.  This requirement applies to all children in foster care, and federal law defines "foster care" to include children in a state's care regardless of federal matching funds.  45 C.F.R. § 1355.20; PSAF ¶¶ 174-175.

## IV.    GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON PLAINTIFFS' SUBSTANTIVE DUE PROCESS CLAIM

### A.  DCF's Systemic Failures Harm Children

Abundant evidence speaks to the severity of harm, and risk of harm, caused to children in DCF foster care by the systemic deficiencies alleged in the Complaint.  Defendants acknowledge that "Plaintiffs clearly have the right to be free from legally-proscribed harm," but seek partial summary judgment because the right is "'not without boundaries.'"  Defs.' Br. at 18-19.  Beyond stating, without authority, that emotions like "anxiety" and "frustration" are outside this boundary, *id.* at 18, Defendants propose no guidepost to determine what type(s) or intensity of

---

[27] It is irrelevant that some children are adopted or reunified, *see* Defs.' Br. at 13 n.12, because AACWA requires case plans to contain items beyond permanency efforts.  *See supra* § III.B.  Furthermore, Plaintiffs need not show actual injury to every class member.  *See E.C.*, 2006 WL 6358376, at *1-2 (granting permanent injunction on AACWA claim where there was a "risk of harm" to plaintiff children); *see also supra* § I.C and note 15.

emotional harm constitutes constitutional injury—rendering unclear what ruling they seek.

Instead, Defendants ignore *harm* and isolate specific DCF *practices*, arguing "there is no

constitutional right to an adoption or to placement stability." *Id.* at 20. But harm, not the

underlying practice, is the touchstone of substantive due process. There are material facts in

dispute as to the harm to Plaintiffs caused by frequent placement moves and languishing in foster

care; Defendants are incorrect that Plaintiffs allegations are "conclusory." [28] *Id.* at 19.

### 1. *Frequent Moves Between Foster Homes Are Damaging*

DCF has repeatedly admitted that multiple placement moves traumatize children and

cause lasting harm.[29] PSAF ¶¶ 178-181. Dr. Azzi-Lessing, in her report, states, "Broken

attachments, repeatedly severing ties with caregivers, siblings, friends, schools and teachers,

extended families and neighborhoods, are detrimental to children's cognitive and emotional

development. This often has a profound, harmful effect on children's ability to form and

maintain healthy relationships, and to succeed in school and in life." *See id.* ¶ 183. Plaintiffs'

experts will testify to the long-term impact of placement and educational instability, including

social, emotional, and behavioral problems, and the effective loss of four to six months of

academic progress each time a child changes schools. *Id.* ¶¶ 183-189.

Defendants miss the point in arguing that individual placement moves can represent good

social work practice, and complaining that Plaintiffs rely only on "statistical evidence of the

number of placements individuals have experienced."[30] Defs.' Br. at 20; DSUF ¶ 12. DCF does

---

[28] Defendants do not dispute that abuse or neglect of a child, by foster caretakers or after being unsafely returned home from DCF care, is constitutional "harm," or that Massachusetts has one of the highest rates of maltreatment in care of any state. *See* Compl. ¶¶ 164-167, 183-188; PSAF ¶ 177. Nor could they. *See Yvonne L. v. N.M. Dep't of Social Servs.*, 959 F.2d 883, 892-93 (10th Cir. 1992). DCF's fundamental obligation is to protect children from abuse or neglect, and it is uncontested that DCF violates children's rights when, instead of protecting them, it places them at risk of further maltreatment.

[29] Approximately one in four placement moves entails a mid-year change in schools. PSAF ¶ 182.

[30] Good social work practice cannot support the plethora of "lateral" placement moves (from one foster placement to another of exactly the same type) experienced by children in DCF care. *See* PSAF ¶¶ 196-197.

not simply move children from one placement to another: it does so with considerably greater frequency than the vast majority of other states.  PSAF ¶¶ 190-194.  For many children, this involves six or more placement moves.  *Id.* ¶ 195.  Defendants supply no explanation for this disparity, which has persisted, and even worsened, over the last fifteen years. *Id.* ¶ 198.  DCF has repeatedly admitted it must do something about its poor performance, which stems from an inadequate array of foster placements and poor matching of children to placements, among other things.  *Id.* ¶¶ 198-201.  Plaintiffs' experts concur.  *Id.* ¶¶ 202-203.  Thus, whether or not DCF has a "policy of arbitrary placement changes causing severe distress," Defs.' Br. at 20, there are triable issues of fact as to whether it has engaged in a pattern and practice of excessive, unnecessary placement changes that cause harm.

### 2.  *Long Stays in Foster Care and "Aging Out" Are Damaging to Children*

In the aggregate, DCF takes significantly longer than all but a handful of states to achieve adoptions, or find other forms of permanency, for children who cannot be returned home.  PSAF ¶¶ 204-207.  As a result, over 1000 children in DCF care have remained in foster care custody for four years or more, and nearly as many "age out" without a permanent family as are adopted. *Id.* ¶¶ 208-210.  DCF's performance on certain permanency measures has deteriorated steadily since 2009, and DCF officials admit they lost focus on adoption.  *Id.* ¶¶ 211-212.

Children who spend years in DCF custody are subject to the harmful consequences of growing up without the parental support or other dependable adult connections needed for healthy growth and development.  *Id.* ¶ 213.  Extended stays in foster care cause behavioral and emotional problems for children, *id.* ¶¶ 214-218, and children who spend years in foster care are also subject to continuing risk of maltreatment by foster caretakers and multiple placement moves, *id.* ¶¶ 219-220.  Ultimately, children who "age out" of foster care are far more likely than their peers to experience bad outcomes, including unemployment, homelessness, and dependence

on public assistance. *Id.* ¶¶ 221-222.

> 3. *The Failure to Maintain Family Connections and the Failure to Provide Needed Services is Damaging to Children*

The loss of family connections, described in section II *supra* harms children and therefore violates children's substantive due process rights as well as their familial association rights. It delays and reduces the likelihood of safe reunification, *id.* ¶¶ 102, 106-107, and compounds the earlier trauma of maltreatment and home removal, *id.* ¶¶ 88-90, 103.

Defendants do not appear to seek summary judgment on DCF's failure to provide essential medical, mental health, independent living, and other services to children in its care when needed. In the event Defendants' vague request for a ruling limiting the scope of harm to be addressed at trial is intended to include that facet of Count I, Plaintiffs' Statement of Additional Facts demonstrates there are triable issues of fact regarding the harms flowing from DCF's failure to provide these services. *Id.* ¶¶ 223-231.[31]

## B. Plaintiffs Must Show a "Substantial Departure from Accepted Professional Judgment" That Shocks the Conscience

To prevail on a substantive due process claim, "Plaintiffs must show that Defendants' conduct represented a substantial departure from accepted professional judgment, which deprived them of conditions of reasonable care and safety, *and* that such conduct shocks the conscience." *Connor B.*, 771 F. Supp. 2d at 163. Defendants attempt to modify this ruling by citing cases involving the more stringent standards applied to Section 1983 damages claims,[32]

---

[31] Defendants' assertion that all class members "must have been harmed in essentially the same way," Defs.' Br. at 19 n.16 (quoting *M.D. v. Perry*, 675 F.3d 832, 845 (5th Cir. 2012) (vacating and remanding class certification)) is irrelevant to the scope of Plaintiffs' due process rights, and has been rejected twice by this Court in connection with class certification. *Connor B. v. Patrick*, 272 F.R.D. 288, 295 (D. Mass. 2011); *Connor B. v. Patrick*, 278 F.R.D. 30, 33-34 (D. Mass 2011).

[32] *See* Defs.' Br. at 14-15, 15 n.13 (citing *Cummings v. McIntire*, 271 F.3d 341 (1st Cir. 2001) (pedestrian shoved by police officer); *Cnty. of Sacramento v. Lewis*, 523 U.S. 833 (1998) (motorcycle passenger killed in high-speed chase); *J.R. v. Gloria*, 593 F.3d 73 (1st Cir. 2010) (failure to remove two children from abusive foster home); *Gottlieb v. Laurel Highlands Sch. Dist.*, 272 F.3d 168 (3d Cir. 2001) (high school student pushed by assistant

where there is concern for the "chilling effect that an unfavorable judgment may have on municipal policymakers," *LaShawn A.*, 762 F. Supp. at 996 n.29, and cases brought by prisoners,[33] whose "conditions of confinement are designed to punish," *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982) (cited in *Yvonne L. v. N.M. Dep't of Social Servs.*, 959 F.2d 883, 894 (10th Cir. 1992)).[34]  This Court already recognized that a damages case "involves different considerations,"[35] and that foster children are "arguably more vulnerable" than the prisoner plaintiffs in *Estelle v. Gamble*, 429 U.S. 97 (1976).  *Connor B.*, 771 F. Supp. 2d at 160, 162 n.5.

Thus, in an action for injunctive relief in the foster care context, it is unnecessary that official conduct be brutal, "offend even hardened sensibilities," "be offensive to human dignity," or display "stunning evidence of arbitrariness and caprice" to give rise to constitutional liability. *See* Defs.' Br. at 14-15 (internal quotation omitted).  To the contrary, "whether conduct is actionable . . . will depend upon the context," *Cummings v. McIntire*, 271 F.3d 341, 344 (1st Cir. 2001), and as this Court found, "a substantial departure from accepted professional judgment may shock the conscience under some circumstances but not others,"  *Connor B.*, 771 F. Supp. 2d at 163.  Accordingly, foster children are "'entitled to more considerate treatment and conditions' than criminals." *Yvonne L.*, 959 F.2d at 894 (quoting *Youngberg*, 457 U.S. at 321-22).[36]  It is the law of the case that harm caused by "placing [children] in foster homes that presented known risks of harm, failing to monitor these improper placements, shuttling

principal); *White v. Rochford*, 592 F.2d 381 (7th Cir. 1979) (children left alone in car on cold evening after arrest of their uncle); *Christiansen v. City of Tulsa*, 332 F.3d 1270 (10th Cir. 2003) (police standoff resulting in self-inflicted gunshot wound)).  This Court distinguished *J.R.* on several other grounds as well.  *Connor B.*, 771 F. Supp. 2d at 162 n.5.

[33] *See* Defs.' Br. at 14 (citing *Farmer v. Brennan*, 511 U.S. 825 (1994) (transgender prisoner placed in general population); *Chance v. Armstrong*, 143 F.3d 698 (2d Cir. 1998) (inadequate dental care in prison)).

[34] The only case cited by Defendants involving prospective injunctive relief is *Winston v. Children and Youth Services*, 748 F. Supp. 1128 (E.D. Pa. 1990).  The issue in that case was whether a biweekly parental visitation policy—one well within currently accepted child welfare standards of care—shocked the conscience. *Id.* at 1135.

[35] *See also supra* note 11.

[36] *See also LaShawn A.*, 762 F. Supp. at 996 ("As the *Youngberg* decision recognizes, the rights of a person in the civil custody of the state are greater than the rights of a person in the state's criminal custody."); *Kenny A.*, 2004 WL 5503780, at *3 (same).

17

[children] among foster families without any hope of finding a permanent home, preventing

visitation with parents and siblings, and failing to provide . . . essential treatment" can shock the

conscience. *Connor B.*, 771 F. Supp. 2d at 163. Nor must Plaintiffs demonstrate an *intent* to

harm children. *See* Defs.' Br. at 14. Official acts falling within a "middle range" of

culpability—"more than negligence but less than intentional conduct"—may be actionable under

the Fourteenth Amendment. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1988) (internal

quotation omitted). Defendants' reliance on *Christiansen v. City of Tulsa*, 332 F.3d 1270 (10th

Cir. 2003), is misplaced, as the defendants' duty there arose under the state-created danger

theory, while the claims here arise from Plaintiffs' "special relationship" with the State arising

from custody. *Connor B.*, 771 F. Supp. 2d at 160.[37]

### C. The Scope of Plaintiffs' Substantive Due Process Rights Includes the Psychological and Emotional Harms Alleged Here

Defendants misconstrue the Complaint in stating that Plaintiffs seek to establish

additional liberty interests to particular child welfare outcomes and practices—such as placement

stability, adoption, or adequate foster care maintenance rates. Plaintiffs' claims arise from the

*harm* inflicted on children by DCF's abysmal performance in these areas, as described in section

IV.A *supra*.[38] Plaintiffs do not seek "optimal" care, Defs.' Br. at 19, but protection from

unnecessary physical and emotional harm and the risk of being subjected to that harm.[39]

---

[37] *See also DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989) ("[W]hen the State takes a person into its custody . . . , the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.").

[38] *See Connor B.*, 771 F. Supp. 2d at 161 ("To be clear, this decision does not imply that a blanket entitlement exists in all cases to the above protections; rather, it merely recognizes that Plaintiffs *may*, through discovery, show that the denial of these protections deprived them of reasonable care and safety.").

[39] Defendants' suggestion that certain rights referenced in the Complaint are "precatory, not substantive," Defs.' Br. at 16, 16 n.15, is contrary to the law of the case. Count I of the Complaint, Dkt No. 1 ¶ 303, alleges deprivations of seven categories of rights, six of which, labeled (b) through (g), Defendants challenge as "more expansive" than recognized by the law. Defs.' Br. at 16. However, this Court already ruled that "*Youngberg's* guarantee of reasonable care and safety clearly contemplates" the protections enumerated in ¶ 303(a)-(d), and that it is "easily conceivable" that it contemplates the protections sought in ¶ 303(e)-(g). *Connor B.*, 771 F. Supp. 2d at 161. Defendants' invocation of *Black v. Beame* is inapposite, as the substantive due process question there was whether

Defendants' assertion that "[n]ot all . . . emotional distress rises to the level of a constitutional injury" (*id.* at 19), and suggestion that Plaintiffs seek relief from "anxiety, frustration, disappointment, impaired self-esteem, anger, and sorrow," *id.* at 18, trivializes the harms discussed above.[40] "Children are by their nature in a developmental phase of their lives and their exposure to traumatic experiences can have an indelible effect upon their emotional and psychological development and cause more lasting damage than many strictly physical injuries." *B.H. v. Johnson*, 715 F. Supp. 1387, 1395 (N.D. Ill. 1989).

Consistent with this Court's rulings, other courts have found that the harms poorly performing foster care systems subject children to constitute constitutional injury. The Seventh Circuit has held that the state is constitutionally required "to take steps to prevent the child from deteriorating physically or psychologically," *K.H.*, 914 F.2d at 851, and the D.C. Circuit has held that the rights of children in foster care "extend[] to safety from psychological and emotional harm," *LaShawn A.*, 762 F. Supp. at 993.[41]

More specifically, there is ample authority recognizing that the harms stemming from the following practices may fall within the protections of substantive due process:[42] (1) placement

---

"anything in the Constitution requires the state to *affirmatively* maintain" a family's unity by providing more public assistance than was already being provided. 419 F. Supp. 599, 605 (S.D.N.Y. 1976) (emphasis added). The nine plaintiff children in that case were not in state custody: four had been voluntarily placed in foster care by their mother, and there was no allegation that they were harmed. The other five children remained at home. *Id.* at 602, 606. It was the importance of maintaining the family's integrity that the court referred to as a "laudable sociological view," not the importance of protecting children from harm while in state custody. *Id.* at 607.

[40] In arguing that Plaintiffs must show a higher level of harm, Defendants again inappropriately rely upon individual actions for damages. *See supra* note 11; Defs.' Br. at 19 (citing *Abeyta v. Chama Valley Indep. Sch. Dist.*, 77 F.3d 1253 (10th Cir. 1996) (psychological abuse by a teacher); *Neal v. Fulton Cnty. Bd. of Educ.*, 229 F.3d 1069 (11th Cir. 2000) (excessive corporal punishment)). *Del A. v. Roemer*, 777 F. Supp. 1297 (E.D. La. 1991), is contrary to the weight of authority in this area.

[41] *See also Marisol A. v. Giuliani*, 929 F. Supp. 662, 675 (S.D.N.Y. 1996) (foster children have "right to be free from unreasonable and unnecessary intrusions into their emotional well-being"), *aff'd*, 126 F.3d 372 (2d Cir. 1997).

[42] In their attempt to narrow Plaintiffs' rights, Defendants omit the full ruling in *Sheila A. v. Whiteman*. The court indeed found that "[t]here is no inherent constitutional right in foster care to a normal childhood, sibling visitation, case planning, reunification plan, [or] stable placement"; however, the court stated: "[W]hether or not the children in foster care . . . are being unreasonably and unnecessarily harmed as a class, by the policies or operations of [the child welfare agency] in a demonstrable way, is a matter of fact. The absence or mismanagement of these kinds of programs may be part of the plaintiff's proof to show exposure to known danger or substantial departure from

19

instability, *Kenny A.*, 2004 WL 5503780, at \*4; (2) unnecessarily long stays in foster care, *E.C. v. Sherman*, No. 05-726-cv-W-SOW, 2006 WL 1307641, at \*37 (W.D. Mo. May 9, 2006); *Marisol A. v. Giuliani*, 929 F. Supp. 662, 676 (S.D.N.Y. 1996);[43] (3) the inadequate provision of essential services such as medical care, *Norfleet v. Ark. Dep't of Human Servs.*, 989 F.2d 289, 293 (8th Cir. 1993); *Kenny A.*, 2004 WL 5503780, at \*4; *Charlie H. v. Whitman*, 83 F. Supp. 2d 476, 507 (D.N.J. 2000); and (4) failure to maintain family connections, *Marisol A.*, 929 F. Supp. at 676-77.  Nor must Plaintiffs establish that any of these practices *individually* causes harm that violates Plaintiffs' substantive due process rights; the violation "is to be tested by an appraisal of the totality of facts."  *Lewis*, 523 U.S. at 850 (internal quotation omitted).

Substantive due process is a broad right, deeply dependent on the facts.  *Sheila A. v. Whiteman*, 913 P.2d 181, 187 (Kan. 1996) ("[W]hether or not the children in foster care in Kansas are being unreasonably and unnecessarily harmed . . . is a matter of fact" (internal quotation omitted)).  There are sufficient facts in dispute here that Plaintiffs should be allowed to present their evidence of harm at trial.

## CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied in its entirety.

---

professional standards or judgment . . . ."  913 P.2d 181, 187 (Kan. 1996).

[43] Defendants cite *Clark K. v. Guinn*—which found plaintiff foster children did not have this right—for the proposition that the "right to freedom from harm is not without boundaries."  No. 2:06-CV-1068, 2007 WL 1435428, at \*15 (D. Nev. May 14, 2007).  However, this Court declined to rule categorically that Plaintiffs have no right to this protection.  *Connor B.*, 771 F. Supp. 2d at 161.  As demonstrated in section IV.A *supra* and in Plaintiffs' Statement of Additional Facts, there are triable issues of fact as to the degree of harms caused by DCF's failures to provide, or timely provide, permanency for children in its care.

DATED:  December 24, 2012                    Respectfully submitted:


By: */s/ Marcia Robinson Lowry*
     Marcia Robinson Lowry, *admitted pro hac vice*
     Sara Michelle Bartosz, *admitted pro hac vice*
     Laurence D. Borten, *admitted pro hac vice*
     Jessica Polansky, *admitted pro hac vice*
     Rachel Brodin Nili (BBO# 666227)
     Elizabeth Pitman Gretter, *admitted pro hac vice*
     Sarah T. Russo, *admitted pro hac vice*
     CHILDREN'S RIGHTS
     330 Seventh Avenue, Fourth Floor
     New York, New York 10001
     Phone: (212) 683-2210
     Facsimile: (212) 683-4015
     *mlowry@childrensrights.org*
     *sbartosz@childrensrights.org*
     *lborten@childrensrights.org*
     *jpolansky@childrensrights.org*
     *rnili@childrensrights.org*
     *egretter@childrensrights.org*
     *srusso@childrensrights.org*


By: */s/ Jonathan D. Persky*
     Daniel J. Gleason (BBO# 194900)
     Mary K. Ryan (BBO# 435860)
     Jonathan D. Persky (BBO# 666651)
     NUTTER MCCLENNEN & FISH, LLP
     Seaport West
     155 Seaport Boulevard
     Boston, MA 02210-2604
     Phone: (617) 439-2000
     Facsimile: (617) 310-9000
     *dgleason@nutter.com*
     *mryan@nutter.com*
     *jpersky@nutter.com*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on December 24, 2012, this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

<u>*/s/ Marcia Robinson Lowry*</u>
Marcia Robinson Lowry