**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CONNOR B., by his next friend, ROCHELLE VIGURS, et al., individually and on behalf of all others similarly situated,<br>Plaintiffs,<br>v.<br>DEVAL L. PATRICK, in his official capacity as Governor of the Commonwealth of Massachusetts, et al.,<br>Defendants. | C.A. No. 1:10-cv-30073 (WGY) |

**DEFENDANTS' TRIAL BRIEF**

Defendants[1] respectfully file this brief in accordance with this Court's Pretrial Order and with Local Rule 16.5(F). Plaintiffs pursue this suit on behalf of all individuals who are currently or will be in the custody of the Massachusetts Department of Children and Families ("DCF") as a result of abuse or neglect. This class represents approximately 7,400 of the 35,000 children and 68,000 individuals who receive services from DCF. Plaintiffs challenge nearly every aspect of the Massachusetts foster care system and allege that Defendants are liable for violating constitutional and statutory rights of all class members. Plaintiffs seek to try Defendants based upon what amounts to a strict liability standard, relying on the erroneous premise that failure to meet aspirational goals, and a failure to provide certain individuals with the optimal level of care, at all times, and on every front, is sufficient to meet their burden of proving constitutional and statutory violations. In contrast to Plaintiffs' sweeping allegations, the evidence will show that Defendants consistently, and proactively, exercise professional judgment and adequately and appropriately respond to the needs of the children in DCF custody. In the very complex and

[1] Massachusetts Governor Deval L. Patrick, Secretary of the Executive Office of Health and Human Services JudyAnn Bigby, and DCF Commissioner Angelo McClain, all in their official capacities.

challenging field of child welfare, not only do Defendants constantly strive to improve their system and find innovative and effective ways to provide services to Massachusetts families, in many instances they exceed their own extremely high internal measures and goals, as well as those of the child welfare community. Under the auspices of comprehensive federal government oversight by the US Department of Health and Human Services and its Child and Family Services Review process, DCF continually strives to improve its practices, regularly achieving successes, as reflected in outcome measures. While not a perfect system (as no child welfare system is, or can be), DCF is comprised of a caring, dedicated, experienced and professional staff who seek to effect positive changes in the population they serve, and, by any measure, regularly succeed in those efforts.

Since the appointment of Defendant Angelo McClain as Commissioner, DCF has successfully developed and implemented a 21st-century practice model for providing foster care services. Under Commissioner McClain's leadership, the agency has adopted practices focused on maintaining families, reducing the number of children who must enter foster care, and promoting permanency and kinship relationships, in accordance with a modern approach to the provision of foster care services. Commissioner McClain and DCF administrators have accomplished these feats in the face of obstacles beyond their control - an obstinate Union and repeated budget cuts from a cash-strapped Legislature operating in a recession-plagued economy. In response to these budgetary pressures, and in the midst of instituting a contemporary practice model, the DCF administration restructured the agency so that funding curtailment would have minimal impact on the services provided to families across the state, and on the operations and functions of its staff. The evidence simply does not support a finding that Defendants exhibit conscience shocking behavior that deprives the members of the Plaintiff Class of their basic

human needs, nor does Defendants' conduct remotely approach such prohibited behavior. Ultimately, Plaintiffs' broad-based class action does not present disputes of constitutional import warranting the judiciary substituting its judgment for that of the Legislature, and administering an overhaul of an entire agency of the Commonwealth.

I. Plaintiffs Bear The High Burden Of Establishing That Defendants' Conduct Causes Class-Wide Deprivation of Their Substantive Due Process Right In A Manner Which Shocks the Judicial Conscience

Plaintiffs allege that Defendants – through deliberate indifference or the absence of professional judgment – are liable for systemic deficiencies that subject all members of the Plaintiff Class to harm or the imminent risk of harm. Compl. ¶¶ 299-303. The Constitution does not impose liability in every instance in which Defendants fall short of the optimal level of care. *Society for Good Will to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239, 1250 (2d Cir. 1984); *Marisol A. v. Giuliani*, 929 F.Supp. 662, 675 (S.D.N.Y. 1996). Defendants have a constitutional duty to provide for class members' basic human needs - food, clothing, shelter, medical care, and reasonable safety. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 201 (1989). Only executive action causing harm so egregious as to shock the conscience may constitute a violation of substantive due process. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847, n. 8 (1998); *Martinez v. Cui*, 608 F.3d 54, 64 (1st Cir. 2010); *see also Cummings v. McIntire, 271* F.3d 341, 344 (1st Cir. 2001) (holding that the standard is "deliberately [ ] set high to protect the Constitution from demotion to merely a font of tort law").

Here, the evidence will show that the Massachusetts foster care system is well within constitutional standards, and appropriately provides for the children in its care. Even more, the evidence will demonstrate that the intent and the actions of DCF's senior staff, in particular those of Commissioner McClain, are the very antithesis of conscience-shocking, which is the

extremely high evidentiary bar that Plaintiffs must meet to establish their various claims. Even if perfection was attainable, Plaintiffs do not meet their burden by simply showing instances where the optimal level of care is not achieved. This is particularly true where such shortfalls do not approach constitutional deprivations and are not attributable to any policy or custom of Defendants exhibiting deliberate indifference or a substantial departure from professional judgment. *Battista v. Clarke*, 645 F.3d 449, 454 (1st Cir. 2011). Far from abdicating professional judgment, DCF, under the direction of Commissioner McClain, has developed a system that can self-identify issues, self-correct, and exercise the requisite flexibility to meet the needs of a complex client base.

For example, far from exhibiting deliberate indifference or systemically exposing the Plaintiff class to imminent risk of abuse or neglect, DCF has developed and implemented an entirely new practice model, called the Integrated Case Practice Model ("ICPM"), elements of which are intended to increase the protections afforded to its most vulnerable population, and promote the safety of that population while in DCF's custody. The ICPM comprehensively restructures the way that DCF staffs its cases and approaches its casework – it represents a positive change in the very culture of the agency on an extremely broad scale. The ICPM effectively streamlines a child's progression through the system and is intended to better assist the assigned workers in identifying a goal for each child, and working toward meeting that goal. One critical element of the ICPM is the Short Term Stabilization plan, which is designed to ensure that children's needs are identified and addressed early on, resulting in fewer out-of-home placements, and increased stability for children. Additionally, under Commissioner McClain's direction, DCF has developed a new safety and risk assessment tool to aid its workers in ensuring the safety of children in its care – in fact, two of the coaches who helped to distribute

and implement that tool in the field were so effective that they were recruited by Children's Research Center, Plaintiffs' own expert in this case.

DCF also consistently strives to prevent unnecessary movement between foster homes. Due to factors that are largely outside of any child welfare system's control, such as the availability and willingness of independent citizens to open their homes to foster children, this goal is a constantly moving target, and one that most systems struggle with nationally. Recognizing that often the most successful placement, resulting in the least disruption to children, is frequently a kin placement, Commissioner McClain's administration has implemented the Kinship First Initiative, which is designed to make placement with kin a priority of the agency, and particularly the front-line workforce.  On its own initiative, DCF also commissioned a study by an independent third party to assess its strengths and weaknesses in the area of placement stability, thus allowing the agency to best allocate its resources and pursue improvement in that area. Moreover, in an effort to better utilize available foster homes, and in recognition of the need for flexibility in addressing the very individualized needs of each child that comes into its care, DCF has expanded its waiver program to allow more families, especially kin families, to serve as foster parents, where appropriate.  Finally, DCF makes placement decisions under the oversight of, and in conjunction with, the Massachusetts Juvenile Court, which both approves child-specific placements and works with DCF to develop goals for the children in its care, and to ensure that, whenever possible, those goals are met.  The Juvenile Court also plays a significant, and decisive, role in ensuring that foster children receive and are allowed visits with their siblings and family members whenever feasible and safe for all parties involved.  In this regard, DCF works with the Juvenile Court, and within the ambit of its mission to strengthen families, to ensure that the bonds of familial association are bolstered at every

opportunity.

DCF has also implemented several initiatives and is participating in a series of pilot programs to enhance the services it provides to the children in the Plaintiff class. For example, DCF was chosen to receive a “trauma grant” from the federal government, which provides funding to the agency on a variety of programs all aimed at addressing the trauma that many of the children have suffered at the hands of their biological families prior to ever coming in to DCF’s care. It is DCF’s hope, and intent, that addressing this trauma will help to resolve many of the issues and challenges that can arise, through no fault of the agency or its employees, and sometimes prevent a particular child from successfully progressing through the child welfare system.

While the above represents only a small portion of the evidence that DCF will present to rebut Plaintiffs’ claims, it illustrates the significant obstacles that Plaintiffs will face in trying to meet their burden – obstacles that Plaintiffs will simply be unable to breach. Not only do these facts reveal an agency that has made significant strides in the past 7 years alone, a critical aspect of the story is the fact that DCF has implemented these changes, both large and small, under the watchful eye of the federal government through the Administration of Children and Families (“ACF”), the oversight agency that monitors state child welfare systems. ACF periodically reviews every child welfare agency in every state through a process known in the industry as the Child and Family Service Reviews (“CFSR”), which is designed to help ensure that states achieve positive outcomes for children and families. Through this process, ACF identifies both strengths and weaknesses of each state’s system. By its own admission, the standards against which ACF measures the states during the CFSR process are set deliberately high, essentially ensuring that no state can possibly meet the established benchmarks (indeed, since the review

process began in 2001, no state has passed at the initial stage, and every state reviewed has had to develop what is known as a Program Improvement Plan).  The purpose of such lofty standards is not to measure against perfection, and then castigate any agency or system that fails to achieve those goals.  Rather, the purpose is to provide every state with a goal so as to motivate the states toward constant and consistent improvement.

A state's child welfare system is not constitutionally broken merely because it fails to meet the goals or benchmarks inherent in the ACF review process, and the federal government does not simply condemn the agency as broken, walk away and withdraw federal funding if this happens.  Instead, it works closely in partnership with the agency to develop a Program Improvement Plan ("PIP") designed to assist the agency in making demonstrable advances in areas identified as needing that improvement.  Then, over the next few years as the agency implements that plan, ACF measures the progress of the state to ensure compliance with the plan, and to ensure that the plan is capable of effecting targeted improvement in the identified areas.  The motivation for compliance with the PIP is strong – if a state fails to comply, or if its PIP fails to achieve the identified goals, then the agency loses federal dollars, significantly hindering its ability to provide services to its clients, particularly in these already challenging economic times where many of the state programs have, and continue to endure necessary budgetary constraints.  As the evidence will show, Massachusetts has successfully met the requirements of its PIP, and demonstrated improvement in any areas identified by the federal government as needing the same.  That is to say, whatever inevitable deficiencies or weaknesses may exist within the system, they are weaknesses known to both DCF and its federal oversight body, and are being monitored and targeted for improvement by both entities.

As is indicated by the above preview of only some of the evidence that will be presented

by Defendants during the course of this trial, the Plaintiffs cannot meet or come close to meeting their burden of demonstrating that the child welfare system in Massachusetts is constitutionally deficient, or that its leadership is deliberately indifferent to the needs of the population of children it serves, or to any risk of harm to that population.

## II. With Regard To The Additional Counts, Plaintiffs Will Similarly Be Unable To Meet The High Burden Of Establishing A Constitutional Or Statutory Injury Attributable To A Policy Or Custom Of The Defendants

Plaintiffs' procedural due process, familial association, and statutory claims rely on the same predicate allegations as their substantive due process claims. Under these additional theories of liability, not only must Plaintiffs establish the requisite culpability on the part of Defendants, but also that the members of the Plaintiff Class suffered actual injury to a protected right. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 41, 49 (1st Cir. 2009). Here, the evidence will show that Plaintiffs cannot meet their burden of showing a class-wide injury caused by a policy or custom of Defendants having the force of law. *Bd. of Cnty. Comm'rs. v. Brown*, 520 U.S. 397, 404 (1997).

In the context of procedural due process, Plaintiffs must establish that (1) the class members possessed a protected life, liberty, or property interest; (2) a state actor deprived plaintiff of that interest; and (3) the procedures attendant upon that deprivation were constitutionally insufficient. *Gonzalez–Fuentes v. Molina*, 607 F.3d 864, 886 (1st Cir. 2010). As with substantive due process, a deprivation must contain some element of abuse of governmental power, not just a lack of due care of an official causing unintended injury. *Davidson v. Cannon*, 474 U.S. 344, 347 (1986) (holding that where an official "is merely negligent" no procedure is constitutionally required). Here, the evidence will show that Defendants' endeavor to provide the services in question to all class members in a timely manner, and thus for the vast majority of

class members, the alleged interests have not been impacted in the least. Furthermore, DCF seeks to expeditiously rectify any shortfalls upon notice, and there exists no evidence that Defendants seek to deprive class members of the alleged interests. Lastly, DCF and the Massachusetts Juvenile Court provide a robust procedural system to adequately address issues of sufficiency of services and care for those in foster care custody.

With regard to familial association, Plaintiffs must establish that the class has been denied meaningful contact with siblings or parents, *Connor B. v. Patrick*, 771 F.Supp.2d 142, 164 (D. Mass. 2011), caused by a policy or custom that Defendants directly aimed at those relationships with knowledge of the adverse effects. *D.G. v. Yarbrough*, No. 08-CV-074, 2011 WL 6009628 at *16 (N.D. Okla. Dec. 1, 2011). Far from establishing this requisite level of culpability, causation, or harm, the evidence will show that Defendants have employed numerous policies to promote and maintain familial relationships and stability.

Finally, the evidence will show that Defendants more than substantially comply with the Adoption Assistance and Child Welfare Act. 42 U.S.C. § 1320a-2a(a). Defendants' multi-faceted reimbursement system covers the mandated categories under §§ 672(a)(1) and 675(4)(A), and in fact, in 2012, DCF was able to formally increase its Foster Care Maintenance rates that it pays to foster families to the suggested rate for middle-income families by the USDA, thus rendering claims under this portion of the statute moot. In addition, the policies and practices of the agency provide for the case plan documentation required under the statute.

## **CONCLUSION**

Because the evidence will show that Defendants exercise sound, professional judgment in providing the complex care and services necessary to serve the children in DCF custody and their respective families, and are certainly far from deliberately indifferent to the needs of that

population, Plaintiffs simply cannot meet their high burden in this case, and a verdict in favor of the Defendants is warranted.

Respectfully submitted,

THE HON. DEVAL L. PATRICK, GOVERNOR,
SECRETARY JUDYANN BIGBY, AND
COMMISSIONER ANGELO MCCLAIN,

By their attorneys,

MARTHA COAKLEY
ATTORNEY GENERAL

/s/ Liza Tran________________
Liza Tran, BBO # 646818
Assistant Attorney General
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
Phone: (617) 963-2920
Facsimile: (617) 727-3076
liza.tran@state.ma.us

**CERTIFICATE OF SERVICE**

I, Liza Tran, Assistant Attorney General, hereby certify that I have this day, January 18, 2013, served the foregoing upon all parties by electronic mail.

/s/ Liza Tran ________