# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

CONNOR B., by his next friend, ROCHELLE
VIGURS, et al., individually and on behalf of all
others similarly situated,

               Plaintiffs,

   v.

DEVAL L. PATRICK, in his official capacity as
Governor of the Commonwealth of Massachusetts,
et al.,

           Defendants.

C.A. No. 1:10-cv-30073 (WGY)

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR JUDGMENT ON THE RECORD

Plaintiffs have failed to meet the extremely high burden of proving conscience-shocking behavior required to prevail in this case.[1] At best, Plaintiffs have demonstrated that the Massachusetts foster care system is not perfect. But the Constitution does not mandate a system perfectly free from undesirable outcomes. *Marisol A. v. Giuliani*, 929 F.Supp. 662, 675 (S.D.N.Y. 1996). Indeed, no foster care system is perfect. What is more significant is that, at the close of Plaintiffs' case, the evidence shows that the Massachusetts system is run by experienced professionals who have implemented reasonable strategies and initiatives that have resulted in positive outcomes and consistent, system-wide improvement for the children in its care. Thus, the Massachusetts foster care system is well within constitutional standards. *See e.g.*, *MacIssac v. Town of Poughkeepsie*, 770 F.Supp.2d 587, 598 (S.D.N.Y. 2011) ("Courts careful to exceed their constitutional authority, must be wary of ordering equitable relief in § 1983 cases where the practical effect . . . is the structural reformation of a[n] . . . agency.") (Young, J.).[2]

---

[1] The standard is "deliberately [ ] set high to protect the Constitution from demotion to merely 'a font of tort law.'" *Cummings v. McIntire*, 271 F.3d 341, 344 (1st Cir. 2001).

[2] Indeed, Plaintiffs' demand for long-term, full-scale oversight of agency decision-making is likely to cost tens, if not hundreds of millions of dollars, with no proof that it will actually benefit foster children, 99.3 percent of whom do not experience abuse or neglect while in care. *See Braam v. Wash.*, 150 Wash.2d 689, 697 (2003) (noting that the estimated cost of a similar request for equitable relief was $60.4 million).

It is easy to play on a court's "natural sympathy," *DeShaney v. Winnebago Cnty. Dept. of Soc. Servs*, 489 U.S. 189, 202-203 (1989), and criticize an agency – as Plaintiffs have done here – by comparing its performance to indisputably high best practice guidelines and pointing out, without any context, arguably poor performance on isolated outcome measures, or even by graphically detailing the experiences of a few children who have suffered as a consequence of their time in care. However, doing so ignores the complexity of decision-making involved in an agency that serves a varied population that is "at-risk" before they even come into contact with the Massachusetts Department of Children and Families ("DCF"). Despite the many successes DCF achieves, it is natural to focus only on the failures, no matter how few and no matter the context. Nonetheless, it is revealing that – of a population of 7,400 children – Plaintiffs only identified six named plaintiffs, and only highlighted the stories of three, providing no analysis of the experiences of the remaining 99.9% of the children in DCF's care. Plaintiffs simply cannot prove class-wide harm of a constitutional scope by extrapolating from isolated cases or allegedly poor outcome data.[3] While there may be States that are constitutionally and statutorily deficient, and in need of full-scale overhaul and long-term, third-party oversight, Plaintiffs simply have not proven that Massachusetts is one of them.

**I.   Argument**

    **A.   Defendants are Entitled to Judgment on Count I (Substantive Due Process) Because Plaintiffs Have Not Established that Defendants Deprive the Class of Their Basic Human Needs Through Action Shocking to the Judicial Conscience.**

        1.   <u>Plaintiffs Have Failed to Prove Conscience-Shocking Behavior.</u>

        Plaintiffs' substantive due process rights are violated only by the most egregious and

---

[3] As recently as Apr. 12, 2013, a Court of Appeals vacated a liability finding of 6 years earlier, holding that even proof of systemic deficiencies, or that all class members have suffered a violation of the same provision of law, may be insufficient to sustain a broad class action. *DL v. Dist. Of Columbia*, No. S. 11-7153, 12-7042, 2013 WL 1489471 (D.C. Cir. Apr. 12, 2013). The Court held that plaintiffs must link a precise policy or practice affecting all class members in near-identical fashion to a common harm remediable through a single injunction. *Id.* According to the Court, as bad as they may be, disparate failures to achieve even legally-mandated objectives – as opposed to a single policy that bridges all class-members' claims – will not satisfy Rule 23. *Id.*

arbitrary of official conduct. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998). Plaintiffs must show not only that the class was deprived of a protected right, but that Defendants' actions shock the conscience, *Martinez v. Cui*, 608 F.3d 54, 64 (1st Cir. 2010), and were the "moving force" behind the deprivation. *Polk Cnty. v. Dodson*, 454 U.S. 312, 326 (1981). Conscience-shocking behavior demonstrates an abuse of power so "brutal and offensive" that it does not comport with "traditional ideas of fair play and decency." *Lewis*, 523 at 847.

Federal courts have developed various articulations of the "shocks the conscience" standard to inform their inquiries into whether the conduct in question is sufficiently outrageous. *Cummings v. McIntire*, 271 F.3d 341, 344 (1st Cir. 2001). The two articulations most prominently utilized in the foster care context are (1) deliberate indifference – drawn from Eighth Amendment precedent – and (2) the abdication of professional judgment. *Connor B. ex rel. Vigurs v. Patrick,* 771 F.Supp.2d 142, 162 (D. Mass. 2011). As Judge Ponsor concluded in this litigation, "professional judgment" does not entitle Plaintiffs to "an appreciably lower hurdle" than deliberate indifference, and "in this context the decision [between which articulation to apply] seems to matter little." *Id.* at 162 n.4.[4] Both standards are deferential, recognizing the "need to give latitude to administrators who have to make difficult trade-offs as to risks and resources." *Battista v. Clarke*, 645 F.3d 449, 453 (1st Cir. 2011).

Regardless, whether exhibiting deliberate indifference or an abdication of professional judgment, the ultimate inquiry is whether the executive action shocks the judicial conscience. *Martinez*, 608 F.3d at 64. This burden is extremely high, requiring "stunning" evidence of

---

[4] *See also Battista v. Clarke*, 645 F.3d 449, 453 (1st Cir. 2011) (applying both formulations); *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008) (treating the two standards as equivalent); *Nicini v. Morra*, 212 F.3d 798, 810 (3d Cir. 2000) (noting that "in the foster care context, most of the courts of appeals have applied the deliberate indifference standard"); *Ketchum v. Marshall*, No. 90-F-1627, 1992 WL 111209, at *2 (10th Cir., May 19, 1992) (applying deliberate indifference standard to committed individual's claim that he was over-prescribed anti-psychotic medication); *Doe v. N.Y.C. Dep't of Soc. Servs.*, 649 F.2d 134, 141 (2d Cir. 1981) (applying deliberate indifference to a claim for failing to adequately supervise foster care placements).

"arbitrariness and caprice" that extends beyond "[m]ere violations of state law, even violations resulting from bad faith" to "something more egregious and more extreme." *J.R. v. Gloria*, 593 F.3d 73, 80 (1st Cir. 2010). The known risk of harm is not conclusive; so long as the balancing judgments are within the realm of reason and made in good faith, the officials' actions are not deliberately indifferent or beyond "reasonable professional limits." *Battista*, 645 F.3d at 454.

There is no bright line standard for what constitutes accepted professional judgment in the world of child welfare. It is a complex, challenging task, and different experts have different theories. Plaintiffs critique DCF performance by comparison to either "best practice" guidelines of non-governmental agencies, or their experts' subjective opinions[5] of how a foster care agency ought to run.[6] But, *optimal* courses of treatment as determined by an expert, including "best practices," are not evidence of accepted professional judgment used to determine whether constitutional *minimums* have been violated. *Id.* (holding that the optimal level of care is not required); *Braam v. Wash.*, 150 Wash.2d 689, 708 (2003) (finding that best practice standards, including the Child Welfare League of America's ("CWLA"), are not evidence of accepted professional judgment in the field of child welfare). Similarly, neither Federal nor State regulations, nor even agency policy, equate to constitutional minimum requirements. *See J.R.*, 593 F.3d at 80. Even the Administration for Children and Families ("ACF") which administers

---

[5] Even where Plaintiffs' experts characterized Defendants' actions as departures from standards of care, the question is not resolved simply because their expert has recited the requisite legal terms of art. *Patten v. Nichols*, 274 F.3d 829, 844 (4th Cir. 2001); *see also Young v. City of Mt. Rainier*, 238 F.3d 567, 577 (4th Cir. 2001). This is particularly true for Cathy Crabtree, whose last day of testimony was comprised of a litany of conclusory opinions that DCF departs from professional judgment in a variety of ways, without any context or analysis, and without even opining that these alleged departures were substantial. *See generally* Crabtree, March 1, 2013.

[6] *See, e.g.*, American Academy of Child and Adolescent Psychiatry (AACAP) Position Statement on Oversight of Psychotropic Medication Use for Children in State Custody: A Best Principles Guideline, Ex. 17 and Bellonci, Jan. 24, 2013, pp.36:2-42:15; Child Welfare League of America (CWLA), Ex. 114; Testimony regarding the Council on Accreditation (COA) and National Association of Social Workers (NASW), Jones, Feb. 6, 2013, pp. 126:2-15; 127:1-14; Testimony regarding the CWL and COA, Crabtree, Feb. 28, 2012, pp. 33:5-39:24; 63:3-64:8; 77:9-78:22; 82:3-83:7; 89:15-91:4; 107:3-109:19; National Conference of State Legislatures, Exs. 1091, 1095 and 1096 and Crabtree, Feb. 28, 2013, pp. 59:6-62:14; 118:24-120:11, Mar. 1, 2013 , pp. 11:18-13:24; American Public Human Services Association, Ex. 1093 and Crabtree, Feb. 28, 2013, pp. 100:1-103:3.

the Child and Family Services Review ("CFSR") that monitors State child welfare agencies, recognizes that the CFSR benchmarks were set deliberately high in an effort to spur improvement while allowing flexibility in a field that does not lend itself to universal solutions.[7]

In child welfare, professional judgment is evidenced not through near-perfect outcome percentages or rote, mathematical equations that attempt to calculate risk of harm. Instead, the exercise of professional judgment is evidenced by an agency that is able to identify areas needing improvement, develop and implement reasonable plans aimed at improvement, and sustain and build on areas of improvement over time. See e.g., McClain Depo., May 25, 2012, pp. 44:3-45:2. Although Plaintiffs' management expert Cathy Crabtree opines, without any explanation or analysis, that DCF is unable to properly construct these necessary "pillars" for a successful child welfare system, her summary conclusions are belied by the cumulative testimonial and documentary evidence before this Court proving not only that DCF is able to capitalize on its strengths, but also that it is mindful of the few areas needing improvement, and has developed and implemented initiatives to strengthen those areas.[8]

---

[7] The CFSR was designed with an understanding and expectation that most states will fall short of those benchmarks, and strict achievement of those benchmarks is therefore not required. *See Cal. Alliance of Child & Fam. Servs. v. Allenby*, 589 F.3d 1017, 1022 (9th Cir. 2009); Executive Summary, Final Report: Massachusetts Child and Family Services Review (Feb. 21, 2008), Ex. 110 ("The Administration for Children and Families (ACF) has set very high standards of performances for the CFSR review. . . .The focus of the CFSR process is on a continuous quality improvement; thus, standards are set high to ensure ongoing attention to the goal of achieving positive outcomes for children and families with regard to safety, permanency and well-being. It should be noted, however, that states are not required to achieve these standards through their PIP."); Jones, Feb. 7, 2013, pp. 63:25-65:10.

[8] *See, e.g.*, **General agency development:** 2012-2015 DCF Strategic Plan, Aug. 2012, Exhibit 7; **Maltreatment in Care:** Jones, Feb. 7, 2012, pp. 115:16-116:8 (Ex. 1088) (admitting that the absence of maltreatment in care has improved)**;** U.S. Department of Health & Human Services Administration for Children and Families, Children's Bureau, Child Maltreatment 2010, Ex. 1088; Jones, Feb. 15, 2013, pp. 14:21-17:14 (Ex. 587) (admitting that DCF exceeded PIP goal for Maltreatment in Care in FY2008); Jones, Feb. 7, 2013, p. 68:16-23 (admitting the rate of maltreatment in general population is almost twice the rate of maltreatment in DCF care); **Trauma Initiative:** Wentworth Depo., Dec. 29, 2011, pp. 222:17-223:8 (describing the implementation of trauma-specific evidence-based treatments), 224:6-225:4 (describing the five-year, $683,000 per year grant to develop trauma-specific treatments and training); **ICPM:** Jones, Feb. 7, 2013, pp. 109:16-110:19 (discussing ICPM); Nisenbaum Depo., Apr. 4, 2012, pp. 60:8-24, 94:4-95:2 (describing the ICPM as a response to the PIP's call for a practice model);

2.  <u>Plaintiffs Have Failed to Prove the Class Has Been Deprived of Basic Human Needs</u>

A state violates the Due Process Clause when it fails to provide for basic human needs

such as "food, clothing, shelter, medical care, and reasonable safety." *Connor B.,* 771 F. Supp.

2d at 160. Plaintiffs claim the right to additional "entitlements"[9] that the Constitution does not

impose a duty to provide, no matter how laudatory they may seem. *See Black v. Beame*, 419 F.

Supp. 599, 607 (S.D.N.Y. 1976). The Due Process Clause does not mandate that Defendants be

absolute guarantors of safety and well-being, *Youngberg v. Romeo,* 457 U.S. 307, 320 (1982),

nor does the Constitution require any of Plaintiffs' other claimed entitlements.[10] In particular,

care provided through the exercise of "accepted professional judgment" is not an independent,

substantive right, but instead is a reflection of the "shocks the conscience" standard to be applied

---

**Kinship First Initiative:** Jones, Feb. 7, 2013, pp. 110:20-111:8 (admitting that the kinship first initiative is "fabulous"); Crabtree, Mar. 1, 2013, p. 8:8-9 (commending DCF's efforts to seek kin first); Fitzsimons Depo., Sept. 28, 2011, pp. 39:14-40:4 (discussing increase in kin placements over time); Fitzsimons Depo., Sept. 28, 2011, pp. 134:19-135:10 (explaining the connection between kinship placements and reduced reentry in care); Gambon Depo., Oct. 18, 2011, p. 264:7-23 (explaining kinship first as a calculated effort to address placement stability within the first 90 days of placement); Nisenbaum Depo., Apr. 4, 2012, pp. 176:2-177:18 (addition of Kinship First to the PIP); Nisenbaum Depo., Apr. 4, 2012, pp. 192:7-194:1 (describing efforts to promote and facilitate Kinship First); **Caring Together/Joint Procurement Initiative:** Nisenbaum Depo., Apr. 4, 2012, pp. 205:12-206:11 (explaining that the initiative will present better opportunities to "concretize" standards of care, as well as move toward a performance-based contracting system); Wentworth Depo., Dec. 29, 2011, pp. 30:10-32:8, 203:6-219:11.
**Interagency Restraint and Seclusion:** Jones, Feb. 7, 2013, pp. 113:16-114:10; Wentworth Depo., Dec. 29, 2011, pp. 225:5-227:16 ("So for me it's this approach towards more trauma-informed care and trauma-specific treatment that's going to help us to reduce that reliance on medication.")
**PIP Completion**: Letter from Joseph J. Bock to Angelo McClain re: conclusion of CFSR PIP program, July 12, 2012, Ex. 758; Nisenbaum Depo., Apr. 4, 2012, pp. 10:1-11:10 (DCF submitted its final PIP Quarterly Report for the second round program improvement plan); DCF PIP Quarterly Report, Quarter Eight, July through Sept. 2011, Ex. 593 (showing completion of all action steps and benchmarks); May 17, 2005 ACF PIP completion letter from Wade F. Horn, Ph.D., Assistant Secretary for Children's and Families to Governor Romney, Ex. 122.
**Intake Homes:** Gambon Depo., Oct. 18, 2011, p. 225:1-14 (describing development of Intake Foster Homes); **Oversight processes for psychotropic medications:** Bellonci, Jan. 25, 2013, pp. 89:15-90:23(discussing Rogers Process working group); Bellonci, Jan. 25, 2013, pp. 91:3-93:17 (conceding that DCF's strategic plan calls for sufficient monitoring and oversight); Bellonci, Jan. 25, 2013, p. 97:11-21 (discussing MCPEP Training); Garinger, Feb. 15, 2013, pp. 122:24-125:17 (testimony regarding Implementation Group Chaired by OCA and Angelo); **Caseloads**: Caseload/Weighted Caseload Report, July 2012, Ex. 967 (showing an average statewide weighted caseload ratio of 15.7 for the period August 2011 – July 2012); Nisenbaum Depo., Jan. 13, 2012, pp. 110:16-111:8 (testimony regarding efforts to reduce caseloads)
   [9] These claims include rights to (1) a living environment that protects foster childrens' well-being; (2) services that prevent harm; (3) care consistent with the purpose of DCF custody; (4) maintenance in custody no longer than is necessary; (5) care provided through the exercise of accepted professional judgment; and (6) placement in the least restrictive placement. Compl. ¶ 303 (b-g).
   [10] *See also Soc. For Good Will to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239, 1248 (2d Cir. 1984) (finding no right to a "least restrictive placement"); *Marisol A. v. Giuliani*, 929 F.Supp.662, 675-76 (S.D.N.Y. 1996) (finding no requirement for the State to release individuals from custody the moment it is no longer necessary).

in determining a violation of a substantive due process claim generally. *Bailey v. Pacheco*, 108 F. Supp. 2d 1214, 1222 (D.N.M. 2000). Plaintiffs have failed to prove that Defendants deprived the Plaintiff Class of constitutionally protected rights in a manner that shocks the conscience.

      a.  <u>Reasonable Safety</u>

The evidence shows that Defendants do not place the class at an unreasonable risk of harm. In particular, for the year ending September 30, 2011 – the most recent reporting period for which ACF has released data – DCF's rate of the "absence of maltreatment in care" was 99.3%. Jones, Feb. 7, 2013, pp. 107:3-108:7; CFSR Scorecard, 12-month Period: Oct. 1, 2010 to Sept. 30, 2011, Ex. 74.[11] This means that 0.7% of individuals in DCF care experience a substantiated case of abuse or neglect. While DCF senior staff repeatedly state that DCF's goal is the absolute absence of abuse and neglect,[12] DCF is not placing the class at a constitutionally unreasonable risk of harm where 99.3% of the children in the class are safe in its care.[13] Plaintiffs seek to compare Massachusetts to federal standards set deliberately high, and to States that narrowly define "abuse" and "neglect" requiring a higher burden of proof to substantiate a claim. Jones, Feb. 7, 2013, pp. 69:16-83:7, 92:12-100:2. These States naturally find fewer substantiated cases, but this does not necessarily correlate to a safer system. By defining abuse and neglect more inclusively than other States, Massachusetts has established a system that substantiates incidents of potential abuse and neglect that would not even spur an investigation in other States, thus resulting in an arguably safer environment for children albeit also guaranteeing a lower comparative ranking on this measure. See id. at pp. 77:13-83:13. Further, when you compare the rate of maltreatment for children in Massachusetts generally to the rate for

---

[11] DCF's most recent CFSR Scorecard that contains data through the fact cutoff date lists the absence of maltreatment in care percentage as 99.2%. Ex. 74.

[12] McClain Depo., May 25, 2012, p. 81:13-24; Roche Depo., May 23, 2012, pp. 131:14 – 132:8.

[13] This is true irrespective of whether the percentage is 99.1% or 99.2% - the point is that anywhere in the range of less than 1% of maltreatment in care cannot shock the judicial conscience.

children in custody, individuals in foster care are actually twice as safe. Id. at p. 68:16-23.

      b.  <u>Placement Stability</u>

Plaintiffs have not shown a substantive due process violation with regard to placement stability because they have not produced evidence that DCF employs a system of unjustified placement moves. Absent such evidence, the reasons for such moves "cannot be assumed to be frivolous." *Eric L. v. Bird*, 848 F. Supp. 303, 307 (D.N.H. 1994) (citing *K.H. v. Morgan,* 914 F.2d 846 (7th Cir.1990)).[14] There are myriad reasons why a move may be beneficial and/or warranted – such as the return to biological parents, a move to a less restrictive or more permanent setting, or a move to a pre-adoptive home or kin placement.[15] Freitag, Jan. 30, 2013, pp. 120:24-122:15; 124:16-125:5. In other instances, unforeseen events may necessitate a move, such as a foster family becoming incapable or unwilling to continue as foster parents, or a change in a child's behavior requiring a different level of care. Ex. 1066, Table 10. Plaintiffs have not shown that Defendants' "placement of children with successive foster parents is so devoid of justification as to give rise to a substantive violation." *Eric L.*, 848 F.Supp. at 307. Far from exhibiting deliberate indifference or an abdication of professional judgment, the evidence shows that DCF has implemented policies, and a case practice model, to promote placement stability and reduce the likelihood that a move will be necessary. *See supra* note 8.

      c.  <u>Psychotropic Medications</u>

Plaintiffs have not proven that the administration of psychotropic medication in the Commonwealth violates Plaintiffs' constitutional rights. Plaintiffs' expert, Dr. Christopher Bellonci, testified that DCF's system was deficient because it failed to meet "ideal" standards

---

[14] To the extent that Plaintiffs have argued or implied that children having to change schools constitutes a due process violation, there is no constitutional guarantee to educational stability. *Richards v. City of New York*, 433 F. Supp. 2d 404, 422-23 (S.D.N.Y. 2006). Moreover, even if there were, there are often sound geographic reasons for changes in educational settings. Sullivan, Feb. 6, 2013, pp. 94:5-95:18.

[15] These reasons account for 56.2% (248 of 441) of the placement moves in the entry cohort (120 due to placement with biological parents, 54 with other kin, 17 moves to less restrictive, 41 moves to more permanent placement, and 16 to preadoptive home). Ex. 1066, Table 10.

and did not conform to the policies he personally devised and advised other states to follow. Jan. 24, 2013, pp. 36:2-42:15; 83:23-85:2. As noted above, best practice standards and personal opinions do not constitute accepted professional judgment in the field for purposes of constitutional analysis.[16] Furthermore, the medications in question are only given pursuant to a prescription, Id. at p. 2:19-22, and Dr. Bellonci conceded that he could not say either that any physician was acting inappropriately in their prescribing practices or that the medications were harming the three children whose case files he reviewed, or children in the system as a whole. Id. at pp. 116:12-117:9, 118:18-23, 135:16-23. Dr. Bellonci also testified that the rate of prescription of psychotropic medications to foster children in Massachusetts is well within the range of rates for foster children in other States. Id. at pp. 127:15-130:17; Ex. 1063.

Further, Dr. Bellonci acknowledged that the field of child psychiatry is evolving, and thus so are the oversight and monitoring methods. Jan. 24, 2013 at p. 31:1-11. Finally, despite testifying for two days on direct examination about the various ways DCF fails to appropriately monitor and oversee the issuance of psychotropic medications, Dr. Bellonci admitted during cross examination that Massachusetts has established an inter-agency steering committee to address this issue and is currently implementing the exact type of monitoring and oversight that he advocated for during his direct examination. Id. at pp. 91:3-93:17.

d. Caseloads

Without any basis, Cathy Crabtree testified that the caseloads of DCF workers were very high. Feb. 28, 2013, p. 99:16-25. Even if true, which Defendants do not concede, Ms. Crabtree's opinion was based on a comparison of DCF's policy and performance to best practice standards set by the CWLA and the Council on Accreditation ("COA"), which cannot represent the totality

---

[16] However, even if such standards apply, Dr. Bellonci admitted, and the GAO report confirms, that DCF meets at least 13 of the 19 practice guidelines established by AACAP. Bellonci, Jan. 25, 2013, pp. 37:14-39:17.

of accepted professional judgment in the field. Id. at p. 33:5-9; *Braam,* 150 Wash.2d at 708.

Regardless, the evidence establishes that DCF's caseload is set at 18 families per worker,

pursuant to the collective bargaining agreement, and DCF has obtained workload studies from

sister States to continue to monitor the appropriateness of this ratio. Feb. 28, 2013, pp. 45:20-

46:1.[17] Further, DCF management reports demonstrate that the actual average caseload carried

by workers has consistently been below this 18-to-1 ratio, and has precipitously declined over

the last four years.[18] Even by comparison to COA and CWLA, DCF's actual caseloads of

approximately 16 families per worker do not substantially depart from these so-called "best

practices," much less professionals standards.[19]

### B. Plaintiffs Have Failed to Establish That Defendants Violate Their Rights To Familial Association as Alleged in Count II.

The right to familial association is implicated when an agency denies a foster child

"meaningful contact" with family members. *Connor B.,* 771 F. Supp. 2d at 164. However, not

every statement or act that results in an interference with this right is actionable. *Griffin v.

Strong*, 983 F.2d 1544 (10th Cir. 1993); *Valdivieso-Ortiz v. Burgos*, 807 F.2d 6, 8 (1st Cir.

1986). Plaintiffs must prove that the actions of DCF's leadership are directly aimed at their

relationships, with knowledge that the conduct will adversely affect those relationships. *Cortes-

Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 563 (1st Cir. 1988); *D.G. v. Yarbrough*, No. 08–

CV–074, 2011 WL 6009628 at *16 (Dec. 1, 2011).

---

[17] DCF ongoing workers carry a "mixed" caseload, meaning that they work with both intact families and with individuals placed in care. Crabtree, Feb. 28, 2013, pp. 38:24-39:5. No laws or regulations prohibit the use of mixed caseloads, and Ms. Crabtree acknowledged there is no reason a state cannot employ them. Id. at pp. 39:6-14.

[18] The statewide ratio of cases per worker declined from 18.09 in July '08 to 16.60 in July '09; 16.26 in July '10; and 15.38 in July '11; 15.17 in July '12. Monthly Caseload/Weighted Caseload Reports, Ex. 967.

[19] For children in care, CWLA and COA advocate 15 and 18 children per worker, respectively. Feb. 28, 2013, pp. 35:13-19; 36:19-37:1. For intact families, they advocate 17 or 18 families per worker respectively. Crabtree, Feb. 28, 2013, pp. 38:1-39:24.

In *D.G. v. Yarbrough*, in which a class of foster children (also represented by Children's Rights, Inc.) brought a virtually identical suit against the Oklahoma Department of Human Services ("ODHS"), the court granted summary judgment for the defendants, despite the fact that over a three year period foster children completed only 12-15% of the scheduled visits with their biological parents and were routinely separated from siblings in custody. *Id.* at 16. The court found that because the plaintiffs failed to provide evidence of a policy or standard operating procedure implemented by the leadership of ODHS aimed at denying those children meaningful contact with their family members, with knowledge of the adverse effect, the defendants' conduct at most amounted to a failure to adequately supervise the workers, and did not rise to the level of a constitutional violation. *Id.* Furthermore, the court found that the plaintiffs did not show an actual deprivation of the right to the vast majority of the class; evidence that *individual* children could show violations did not establish a class-wide deprivation of familial rights. *Id.*

Here, the pivotal evidence presented during Plaintiffs' case in chief related to DCF's alleged denial of familial visitation or sibling placement is the statistical data provided in tables developed by Children's Research Center ("CRC").[20] However, to the extent the data from the CRC studies accurately reflects the class as a whole, it actually proves that a large portion of the class has no siblings with whom they could be placed.[21] For members of the cohorts with siblings in custody, the data shows that the vast majority were placed with at least one sibling or

---

[20] To the extent that Plaintiffs' expert Dr. Azzi-Lessing testified to her concerns related to issues of familial visitation for the five named plaintiffs, she conceded that she did not assess the issue on a systemic level and that her findings are limited to the information contained in the pages of the files provided to her relative to those five children, a subset that represents less than one tenth of one percent of the plaintiff class. Feb. 5, 2013, pp. 94:14-96:16. Even within this small subset, Dr. Azzi-Lessing frequently reached divergent conclusions related to the appropriateness of visitation with each child's family, underscoring the individualized circumstances under which such decisions must be made. Feb. 4, 2013, pp. 69:18-71:3, 103:5-104:12.

[21] The CRC study tables show that 59.9% (145 of 242) of the entry cohort and 55.8% (135 of 242) of the two year cohort did not have siblings in care. Ex. 1070, Table 1; Ex. 1066, Tables 8, 37. Also, 25.5% (62 of 242) cases of the entry cohort and 7.8% (19 of 42) of the two-year cohort have no siblings at all. Ex. 1065, Table C13.

11

there was a documented reason why they were not.[22] Furthermore, while DCF policy provides for monthly visitation, and only when in the best interest of the child, the Juvenile Court may order more or less frequent visitation than provided in those policies.[23] Regardless, fostering siblings in separate placements or missing a monthly visit does not equate to a denial of meaningful contact, and is thus not a per se constitutional violation, irrespective of whether missing a monthly visit is a technical violation of DCF policy. *See Charlie H. v. Whitman*, 83 F. Supp. 2d 476, 513-14 (D.N.J. 2000); *Baby Neal v. Casey*, 821 F. Supp. 320, 336 (E.D. Pa. 1993).

Plaintiffs' reliance on outcome measures contained in the CRC data tables to support their claim is misplaced. Those tables provide no insight into the variety of reasons, specific to any given class member, why a visit may not have been documented or provided even if such visits were deemed in the best interest of the child. These reasons include safety concerns, geographic barriers, unforeseen weather events, permanency goals, and lack of cooperation from family members – none of which support a finding that Defendants are constitutionally liable. The CRC data tables also ignore the impact of Juvenile Court oversight on visitation with biological family members. Moreover, Plaintiffs' experts testified that even in cases where DCF and/or the Juvenile Court has determined that it is in the best interest of a child to have contact with members of their biological families post-removal from those homes, facilitating such visits may be fraught with obstacles entirely outside of DCF's control.[24]

---

[22] The entry cohort 64.9% (63 of 97) and in the two-year cohort 62.6% (67 of 107) were placed with at least one sibling or had a documented reason. Ex. 1070, Table 1. Additionally, Plaintiffs do not assert the associational rights of children are violated when DCF does not provide visits or placement with siblings after a determination that visitation or placement is not in the child's best interests. Pls.' Opp. To Defs.' Mot. For Summ. J. at p. 7, n. 13.

[23] M.G.L. c. 119 § 26B(b), Ex. 180 ("The court or the Department shall, whenever reasonable and practical and based upon a determination of the best interests of the child, ensure that children placed in foster care shall have access to and visitation with siblings . . ."); DSS Policy #86-011, p. 263-64, Ex. 2.

[24] Lessing, Feb. 6, 2013, pp. 27:11-33:10 (conceding, with respect to Adam S. and Camila R., that an adoptive or biological parent's opposition to visit with biological siblings would "present an obstacle" to sibling visitation and, with respect to Andre S., that sibling visitation would not have been appropriate because it would not have been in the best interests of the siblings).

**C.   Plaintiffs Have Failed To Prove That Defendants Violated Plaintiffs' Procedural Due Process Rights As Alleged in Count IV.**

A plaintiff claiming a procedural due process violation must establish that (1) he possessed a protected life, liberty, or property interest; (2) a state actor deprived him of that interest; and (3) the attendant procedures were constitutionally insufficient. *Gonzalez–Fuentes v. Molina*, 607 F.3d 864, 886 (1st Cir. 2010). Plaintiffs have not proven these elements.

1.   Plaintiffs Have Not Identified Constitutionally Protected Property Interests.

Before the Court need even consider the adequacy of the process afforded, there must be sufficient evidence to establish that Plaintiffs have actually been deprived of a protected interest. *31 Foster Children v. Bush*, 329 F.3d 1255, 1267 (11th Cir. 2003); *D.G.*, 2011 WL 6009628 at *17. Here, Plaintiffs allege in their Complaint that Defendants deprive "each Plaintiff child" of his/her due process rights with respect to interests in: (1) early and periodic screening, diagnostic and treatment standards, and individualized health care plans; (2) medical passports; (3) sibling visitation; and (4) the right to be considered for placement with relatives and other adult persons who have played significant positive roles in the child's life. (Compl. ¶ 309). Plaintiffs have not met their burden of establishing that any of these benefits are constitutionally protected property interests. While it is true that Plaintiffs have an "abstracted need or desire" for these benefits, more is required in order to trigger a due process claim. *See Roth v. Board of Regents*, 408 U.S. 564, 577 (1972). Plaintiffs have not demonstrated that the statutes and regulations they reference allegedly giving rise to these "interests" amount to anything more than administrative mechanisms the Commonwealth imposes on itself to oversee and plan for the placement and care of foster children. *Del A. v. Roemer*, 777 F. Supp 1297, 1320 (E.D. La. 1991). As such, they are nothing more than a means to an end of benefitting children rather than actual protected due process interests granted to the children in its care. *Id.*

2. <u>Plaintiffs Have Not Established Class-Wide Deprivation.</u>

Even if Plaintiffs have established that one or more of these benefits are constitutionally protected, they have not proven that there has been class-wide deprivation of any of them. In fact, Plaintiffs' expert data proves that large portions of the class have not experienced any actual deprivation. With respect to early and periodic screening, diagnostic and treatment standards, Plaintiffs have not provided any evidence to support the notion that children are being denied screening and treatment. In addition, medical passports were timely provided for 52.1% of placements for the entry cohort and 73.7% of placements for the two-year cohort. Ex. 1065, Table C37. Similarly, with regard to sibling visits, Plaintiffs' data proves that large segments of the class either do not have siblings, were placed with their siblings, or visited their siblings in accord with either DCF policy or an order of the Juvenile Court. *See supra* notes 20, 21. Finally, with respect to placement with kin, in a majority of the cases CRC reviewed individuals were either placed with kin or there was a documented justification for a non-kin placement. Ex. 1065, Table C24. While certain class members may have "individual claims for violation of their procedural due process rights . . . it is impossible [ ] for the class as a whole to establish . . . a procedural due process claim because most children's procedural due process rights have *not* been violated." *D.G.*, 2011 WL 6009628 at *18 (emphasis in original).

3. <u>Even if Plaintiffs had Proven a Class-Wide Deprivation, They have Failed to Prove that Defendants Provide Inadequate Procedural Safeguards.</u>

Even assuming Plaintiffs have proven the requisite class-wide deprivation of a protected right, Plaintiffs must still prove that the Commonwealth has not afforded adequate procedural safeguards.[25] *Goldberg v. Kelly*, 397 U.S. 254 (1970). Contrary to Plaintiffs' contentions, the

---

[25] Due process is a "flexible concept that varies with the particular situation." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990). Typically, to determine what procedural protections the Constitution requires in a particular case, the Court weighs several factors, including the private interest affected by the official action, the risk of an erroneous deprivation of such interest through the procedure used, the probative value, if any, of additional or

evidence before the Court is that the four "rights" Plaintiffs have identified are in fact protected

by both DCF policy and the Juvenile Court system, and there is no evidence to support Plaintiffs'

claim that additional process is required. Even if Plaintiffs could show a deprivation of these

rights, the evidence before the Court is that the alleged deprivations are, at best, incidents which

are random and attributable to events outside of DCF's control. Additional pre-deprivation

process is not required, therefore, because it would not prevent or redress a deprivation that is not

the function of predictable government action. *Parratt v. Taylor*, 451 U.S. 527, 541 (1981); *see*

*also Davidson v. Cannon*, 474 U.S. 344 (1986); *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).

The evidence is that DCF policy provides for medical screenings and passports, and that

failure to give them to children in particular circumstances is the result of isolated error contrary

to DCF policy. Peel Depo., Feb. 8, 2012, pp. 86:9-87:23; 110 C.M.R. 7.124; M.G.L. c. 119 § 32.

Pre-deprivation procedures are only required, or even possible, when a deprivation is pursuant to

an "established state procedure," and thus is known or predictable.[26] Since DCF "cannot predict

precisely when the loss will occur," it cannot provide pre-deprivation procedures. *See Parratt*,

451 U.S. at 541; *Hudson v. Palmer*, 468 U.S. 517, 521 n.2 (1984).

Likewise, DCF policy encourages sibling visitation and kinship placement when

appropriate. M.G.L. c. 119 § 26B(b), Ex. 180; 110 C.M.R. 7.128; DSS Policy #86-011, pp. 263-

64, Ex. 2; M.G.L. c. 119 § 23(c). However, determinations about visitation and placement are

highly individualized and there are many reasons why a sibling visit or a kin placement is not

feasible. For example, DCF's efforts to facilitate a sibling visit may be unsuccessful if one of the

---

substitute procedural safeguards, and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Id. citing Mathews v. Eldridge*, 424 U.S. at 335. While this portion of the motion focuses primarily on the safeguards in place and, thus, the low risk of erroneous deprivation, Defendants note that Plaintiffs have not provided any evidence to negate the Government's strong interest in allocating its resources in the manner currently provided.

[26] The Supreme Court has held that it is impossible to provide pre-termination proceedings where the specific loss of property is not predictable. *Zinermon,* 494 U.S. at 128-30; *Parratt v. Taylor*, 451 U.S. 527, 541 (1981) *overruled in part by Daniels v. Williams*, 474 U.S. 327, 331-32 n.13 (1986).

siblings refuses the visit, or if the adoptive parents of one sibling refuse the visit, something that cannot possibly be predicted. *Supra* note 24. Similarly, with respect to kin placements, DCF cannot force relatives to act as foster parents. The undisputed evidence is that DCF makes every effort to place children with kin as early and frequently as possible, as evidenced by the Kinship First Initiative and DCF's emphasis on kin placements to ensure better stability. *Supra* note 8.

Plaintiffs do not meet their burden merely by presenting statistics and management reports reflecting that sibling visits did not occur or kinship placements were not made. Plaintiffs have not proven, or even argued, that DCF's policies authorize deprivations of protected interests, or that any DCF senior staff member has explicitly authorized deviation from those policies allowing such deprivations. *See generally* DCF Policies, Ex. 1. Thus, departure from those policies by DCF employees, even where intentional, could only amount to the sort of "random, unauthorized conduct" that does not give rise to a procedural due process claim as long as the Commonwealth provides an adequate post-deprivation remedy. *Hudson*, 468 U.S. at 532-33.

Here, the judicial and administrative hearings available to each child provide more than adequate means of redress. Indeed, with respect to the initial placement of children – which includes initial decisions about kinship placement and sibling visitation – the children are provided with a hearing in the Juvenile Court. It is undisputed that the Juvenile Court oversees and guides the removal and placement of children taken into DCF's care as a result of instances of abuse or neglect and, as such, the class population has the benefit of all of the attendant procedural safeguards provided by the Juvenile Court.[27] For example, upon placing a child in

---

[27] M.G.L. c. 119 §§ 26, 27 (Ex. 183) (Procedure at hearing; order of commitment; petition to dispense with parental consent to adoption; reimbursement of Commonwealth; petition for review). The Juvenile Court has "a broad mandate to act in furtherance of a child's welfare," and its grant of jurisdiction empowers it "to use the necessary means to exercise and enforce that jurisdiction." *Custody of a Minor (No. 1)*, 385 Mass. 697, 704 (1982).

DCF's custody – that is, before any alleged deprivation can occur – the Juvenile Court may define the frequency of sibling visitation or placement with kin "based upon a determination of the best interests of the child[.]" M.G.L. c. 119, § 26B(b). Each child is entitled to appointed counsel to represent them at that hearing. M.G.L. c. 119, § 29. Moreover, children are specifically provided an opportunity to appeal orders regarding sibling or grandparent visitation to the Massachusetts Appeals Court within 30 days of entry of the order. M.G.L. c. 119, § 26B (b, d). The Juvenile Court thus provides a meaningful opportunity for the child to be heard on sibling visitation.[28]

But that initial hearing is only the beginning of a multi-layered judicial and administrative process designed to protect the best interests of children in DCF's care. For example, the Juvenile Court also conducts an annual permanency hearing to review the permanency plan for when (i) the child will be returned to the parent; (ii) the child will be placed for adoption and the steps DCF will take to free the child for adoption; (iii) the child will be referred for legal guardianship; (iv) the child will be placed in permanent care with relatives; or (v) the child will be placed in another permanent planned living arrangement. M.G.L. c. 119, § 29B. At the permanency hearing, the Juvenile Court is broadly empowered to "make any appropriate order as may be in the child's best interests, including, but not limited to, orders with respect to the child's care or custody." M.G.L. c. 119, § 29B, 3rd para. Likewise, any DCF determination regarding placement, frequency of visitation, medical services, and educational needs are subject to review *at any time* in the Juvenile Court for "abuse of discretion" or "legal error," through a motion made pursuant to M.G.L. c. 119, § 21.

---

[28] To the extent that children are placed on an emergency basis prior to appearing in court, a hearing before the Juvenile Court Judge occurs within 72 hours of any such emergency placement. M.G.L. c. 119 §§ 24-26.

DCF provides additional administrative safeguards. For example, DCF conducts "foster care reviews" every six months, where a child, parent, guardian and custodian can raise issues concerning the sufficiency of services being provided under the child's service plan, and/or seek additional services. 110 C.M.R. 6.10(2). The child, the child's attorney or guardian ad litem, the parents, the social worker and his supervisor, the foster parents or other substitute care provider, and "other individuals important to the child or family" are invited in writing to participate in the foster care review. 110 C.M.R. 6.10(4). The same parties also have an opportunity to challenge the outcome of that review by seeking a fair hearing. 110 C.M.R. 10.06.

In addition to that opportunity, a child receiving services from DCF may challenge the termination, reduction, or suspension of services, also by seeking a fair hearing. 110 C.M.R. 10.06. Fair hearing decisions are then subject to judicial review in Massachusetts Superior Court, pursuant to M.G.L. c. 30A, § 14. For other services or benefits-related issues, including a challenge to the sufficiency of services that DCF is providing, the child may file a grievance with DCF. *See* 110 C.M.R. 10.37-10.39. Simply put, DCF provides significant process and protections for the Plaintiff class, and Plaintiffs have failed to prove – or even really argue – that there has been a class-wide deprivation of any constitutionally protected interest that can be remedied by additional process beyond the protections already in place.

**D.  Plaintiffs Have Failed to Establish that Defendants Violate the Adoption Assistance and Child Welfare Act ("AACWA") as Alleged in Count III.**

Plaintiffs have alleged that Defendants perpetuate systemic violations of the AACWA in the following two ways: (1) by failing to provide adequate foster care maintenance ("FCM") payments that cover every expense of each child; and (2) by failing to provide adequate case plans as required by the 42 U.S.C. § 671 (a)(16). See Pls.' Opp. To Defs.' Mot. For Summ. J., pp. 10-13. With respect to the FCM rate, Plaintiffs' claims are mooted by the undisputed

evidence that Massachusetts has increased its rate to meet the rate set by the United States Department of Agriculture ("USDA"), and thus DCF adequately reimburses foster parents for the federally estimated costs of child-rearing in the urban Northeast region. McClain Depo. at pp. 150:15-151:23; Crabtree, Mar. 1, 2013, p. 23:10-21. With respect to the allegation that DCF fails to provide adequate case plans, it appears as though Plaintiffs have abandoned their prosecution of those claims given the lack of any evidence presented regarding a violation of this portion of the statute. Regardless, the undisputed evidence proves that DCF meets the requirements of AACWA with respect to the provision of case plans.

    1.   <u>The Undisputed Evidence Proves that DCF's FCM Rate Complies with the AACWA.</u>

The AACWA requires a State to provide foster care maintenance payments to "cover the costs" of enumerated categories of expenses associated with foster care in order to receive federal reimbursement. 42 U.S.C. §§ 671(a)(1), 672(a)(1), 675(4)(A). The statute grants States the flexibility in choosing a method to provide for the enumerated expenses, and States need only operate in "substantial conformity" with the statute's requirements. 42 U.S.C. § 1320a-2a(a); 45 C.F.R. §§ 1355.39, 1356.71(c)(5); *Cal. Alliance of Child and Fam. Servs. v. Allenby*, 589 F.3d 1017, 1023 (9th Cir. 2009). Massachusetts uses the USDA estimates published yearly in *Expenditures on Children By Families* to set the basic FCM rate. M.G.L. c. 119, § 23(h). The evidence is undisputed that at least as of March of 2012, Massachusetts meets the USDA estimates for the cost of raising children in the Commonwealth. McClain Depo. at pp. 150:15-151:23; Crabtree, Mar. 1, 2013, p. 23:10-21.

Presumably in light of this fact, Plaintiffs' claim appears to have morphed to rest solely on Ms. Crabtree's misguided testimony that there is no guarantee that DCF's ability, or willingness, to set its FCM rate at the USDA estimates will continue going forward. Crabtree, Mar. 1, 2013, pp. 23:25-24:6. Thus, Plaintiffs seem to argue that DCF's reimbursement system,

while sufficient currently, fails to give foster parents adequate assurances that the FCM rates will continue to meet foster parents' future expenses.[29] Id. This argument demonstrates a distinct lack of understanding as to how, and who, sets the FCM rate, See McClain Depo. pp. 149:3-151:23, and also is irrelevant to whether there exists a current, ongoing violation of the statute – liability cannot be found on the theory that DCF might violate the statute at some point in the future. *Green v. Mansour*, 474 U.S. 64, 72 (1985).

 2.  Plaintiffs Have Not Proven that Defendants Fail to Provide Adequate Case Plans.

 The AACWA requires that Defendants provide case plans in accordance with the statute, including in particular documentation of the steps the agency takes towards permanency with respect to any child for whom the goal is adoption or placement in a permanent home. 42 U.S.C. § 675(1). DCF provides "service plans" pursuant to its regulations which include most, if not all, of the elements of a case plan as required by the AACWA. 110 C.M.R. 6.03(1), 6.04(7). The statute makes clear that states need only be in substantial conformity to receive various types of federal funds. 42 U.S.C. § 1320a-2a(a). The evidence presented makes clear that Defendants are in substantial conformity with the requirement that they provide case plans. Plaintiffs own statistical study, while flawed, found a service plan for 65% of the two-year cohort and for 85.4% of the entry cohort who had been in care for at least 31 days. Ex. 1065, Table 55a, Table 28a. In fiscal year 2012, on average, DCF completed 83.5% of service plans. Ex. 67.

## CONCLUSION

 For the reasons stated above, the Court should grant judgment in favor of Defendants on all counts.

---

[29] To the extent Plaintiffs claim Defendants must reimburse foster parents for every expenditure incurred, their claim must fail as the AACWA does not require that States cover the "every dime spent." *Allenby*, 589 F.3d at 1022.

Respectfully submitted,

THE HON. DEVAL L. PATRICK, GOVERNOR,
SECRETARY JUDYANN BIGBY, AND
COMMISSIONER ANGELO MCCLAIN,

By their attorneys,

MARTHA COAKLEY
ATTORNEY GENERAL


/s/ Liza Tran_____
Liza Tran, BBO # 646818
Assistant Attorney General
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
Phone: (617) 963-2920
Facsimile: (617) 727-3076
liza.tran@state.ma.us



**CERTIFICATE OF SERVICE**

I, Liza Tran, Assistant Attorney General, hereby certify that I have this day, April 30,
2013, served the foregoing document upon all parties by electronic mail.


/s/ Liza Tran_____