```
 1                  UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS
 2
                                        Civil Action
 3                                      No. 10-30073-WGY

 4    * * * * * * * * * * * * * * * * * * * * * *
                                                 *
 5    CONNOR B., by his next friend, ROCHELLE    *
      VIGURS, et al., individually and on behalf *
 6    of all others similarly situated,          *
                                                 *
 7            Plaintiffs,                         *
                                                 *  BENCH TRIAL
 8    v.                                          *   (Volume 1)
                                                 *
 9    DEVAL L. PATRICK, in his official capacity *
      as Governor of the Commonwealth            *
10    of Massachusetts, et al.,                  *
                                                 *
11            Defendants.                         *
                                                 *
12    * * * * * * * * * * * * * * * * * * * * * *

13            BEFORE:  The Honorable William G. Young,
                               District Judge
14    APPEARANCES:

15            NUTTER, McCLENNEN & FISH, LLP (By Daniel J.
         Gleason, Esq. and Jonathan D. Persky, Esq.), World
16       Trade Center West, 155 Seaport Boulevard, Boston,
         Massachusetts 02210-2699
17            - and -
         CHILDREN'S RIGHTS (By Sara M. Bartosz,
18       Esq., Laurence D. Borten, Esq., Sarah Russo, Esq.
         Rachel Brodin, Nili, Esq. and Jessica E. Polansky,
19       Esq.), 330 Seventh Avenue, Fourth Floor, New York,
         New York 10001, on behalf of the Plaintiffs
20
              OFFICE OF THE MASSACHUSETTS ATTORNEY
21       GENERAL (By Liza Tran, Jason B. Barshak and
         Jeffrey T. Collins, Assistant Attorneys General),
22       One Ashburton Place, Boston, Massachusetts 02108,
         on behalf of the Defendants
23
                                        1 Courthouse Way
24                                      Boston, Massachusetts

25                                      January 22, 2013
```

# I N D E X

Opening Statement by Ms. Bartosz . . . . . . . . . . 5

Opening Statement by Ms. Tran . . . . . . . . . . . 16


**WITNESS:**          **DIRECT**   **CROSS**    **REDIRECT**    **RECROSS**


LAUREN JAMES

  By Mr. Gleason    28

  By Ms. Collins              73

CHRISTOPHER BELLONCI

  By Ms. Bartosz   111



|  | **FOR** | **IN** |
| **EXHIBITS:** | **I.D.** | **EVID.** |

   1060    Letter  . . . . . . . . . . . .92

   1061    Letter  . . . . . . . . . . . .92

   1062    Jensen Table  . . . . . . . . . .130

1          **THE CLERK:** All rise. The United States District

2   Court is in session, you may be seated.

3          Now hearing Civil Matter 10-30073, B. Connor, et

4   al. v. Patrick, et al.

5          **THE COURT:** Good morning.

6          **COUNSEL:** Good morning, your Honor.

7          **THE COURT:** Let me say a few things at the outset

8   and we'll get going.

9          First, unfortunately, my wife and I have to attend

10  a funeral tomorrow morning and we will not sit tomorrow

11  morning. We'll just sit today and then we'll go until

12  Thursday. I'm sorry, but I really must attend this funeral

13  with my wife.

14         Second, in the final pretrial conference mention

15  was made of anecdotal testimony, and I indicated that I was

16  receptive to receiving such testimony, and so I am. That

17  does not suspend the rules of evidence as to relevance. And

18  also, while I am receptive to receiving such testimony, I'm

19  also sensitive, though we've allocated at the outside 40

20  trial days here, to cumulative testimony. And my rough

21  sense of what's cumulative is about three witnesses on any

22  one point. Obviously, I won't hold rigorously to that, but

23  I'm telling you that's my sense.

24         Likewise, as I get into this there's going to be

25  expert testimony. And you people have prepared for it and

1    I'm grateful.  But the normal procedure I follow is one

2    expert on any particular issue, and that to me is a salutary

3    rule.

4            All right.  Let's start and now we'll, because I

5    should be calling you all by name, let's have counsel

6    introduce themselves once more, and then we'll move on to

7    opening statements.

8            **MS. BARTOSZ:**  Good morning, your Honor.  Sara

9    Bartosz from Children's Rights on behalf of the plaintiff

10    class.

11            **THE COURT:**  Your last name?

12            **MS. BARTOSZ:**  Bartosz.  B A R T O S Z, your Honor.

13    That Z can be tricky to say, but it's S Z.

14            **THE COURT:**  Bartosz.  Yes.

15            **MR. BORTEN:**  Good morning, your Honor.  Laurence

16    Borten, also for the plaintiffs.

17            **MR. GLEASON:**  Your Honor, Dan Gleason from Nutter,

18    McClennen & Fish, for the plaintiffs.

19            **MS. RUSSO:**  Good morning, your Honor.  Sarah Russo

20    from Children's Rights, also on behalf of the plaintiffs.

21            **THE COURT:**  All right.  And for the Commonwealth?

22            **MS. TRAN:**  Good morning, your Honor.  Liza Tran,

23    Assistant Attorney General, on behalf of the defendants.

24            **MR. COLLINS:**  Good morning, your Honor.  Jeffrey

25    Collins, Assistant Attorney General, on behalf of the

1    defendants.

2         **MR. BARSHAK:**  Good morning, your Honor.  Jason

3    Barshak, Assistant Attorney General, on behalf of the

4    defendants.

5         **THE COURT:**  Thank you.

6         Very well.  I am ready.  So, let's start with

7    opening statements.  Ms. Bartosz.

8         **MS. BARTOSZ:**  Thank you, your Honor.  And good

9    morning.

10        Your Honor, plaintiffs are a class of children who

11   now are or will be in the foster care custody of the

12   Commonwealth of Massachusetts.  Currently there are

13   approximately 7,500 children in state foster care.  The

14   substantial majority of these children came into foster care

15   as innocent victims and entering state custody they really

16   did nothing more than to endure abuse or neglect in their

17   family homes, and, Judge, these children for too long and

18   far too frequently have suffered additional repeated harms

19   once in state foster care.

20        That's what this case is about from plaintiffs'

21   perspective and that's what brings us here, Judge.

22        **THE COURT:**  What, from your point of view, is the

23   duty of the state when, for beneficent reasons, it removes a

24   child from the care, perhaps inattentive or worse care of

25   the natural family, into foster care, then what do you posit

1    is the state's duty?

2         **MS. BARTOSZ:**  Thank you, Judge.

3         And, your Honor, the duty is to protect the

4    children from additional harm, and that duty arises from the

5    Fourteenth Amendment of the Constitution.  It's a

6    substantive due process right that has been recognized by

7    numerous circuit and district courts throughout the country

8    in cases similar to this and other cases.  And it is a

9    right, Judge, that derives from a line of cases beginning

10   with the Estelle case, a Supreme Court case about prisoners

11   in custody, and those thoughts follow through other Supreme

12   Court jurisprudence, the Youngberg case which addressed the

13   situation of adults in mental health custody.  And those

14   custodial special relationship cases, Estelle, Youngberg,

15   have been applied in the foster care context, Judge.  And of

16   course, as I say, district courts and circuit courts have

17   recognized, as has this district court at motion to dismiss

18   in this case and law of the case, that the substantive due

19   process rights exist, that there's a special relationship

20   between the state and the child when the child is removed

21   into the custody of the state.

22        That duty, your Honor, is to maintain the child

23   safe from harm.  And I will talk throughout this --

24        **THE COURT:**  But it cannot be that the state is held

25   to -- what's -- I understand the duty, and you argue the

1    duty flows from the custodial care.

2         **MS. BARTOSZ:**  That's correct, Judge.

3         **THE COURT:**  And like people in mental institutions,

4    like inmates, the child, because the child is a minor,

5    doesn't get to say where he or she will go, the state,

6    standing in the position of the parent, makes that

7    determination.  And so I can see the analogy.

8         So what -- if the duty is to protect against

9    additional harm, what is the standard of care?  It must be

10   something higher than negligence.

11        **MS. BARTOSZ:**  Yes, Judge, in fact, it is.  And we

12   do have in a constitutional case such as this as plaintiffs

13   a burden of proof that is elevated from simple negligence,

14   that's to be sure.  In briefing the motion to dismiss before

15   this Court when the case was previously in the Springfield

16   District Court, that issue was addressed also in a ruling

17   and the standard, the culpability standard for the

18   substantive due process claim was articulated, as follows,

19   after the parties briefed it fully.  Plaintiffs must show

20   that DCF in its handling of the cases of these children and

21   in its management of the foster care system has

22   substantially departed from accepted professional judgment

23   and those departures must be shown to shock the conscience.

24   That is the standard that was articulated by Judge Ponsor in

25   his ruling on the motion to dismiss, and it is that standard

1    that we have proffered to the Court in our summary judgment

2    briefs and also in the final pretrial memorandum in the

3    proposed issues of law, or the statement of the issues of

4    law from plaintiffs.

5        THE COURT:  That's different than the deliberate

6    indifferent standard for prisoners.

7        MS. BARTOSZ:  It is, Judge.  And the case law on

8    that, Judge, recognizes that, and it began with the

9    Youngberg case, if the state takes custody of an individual,

10   an adult or a child, and there's not incarceration and there

11   isn't a punitive aspect to the custodial relationship, there

12   aren't Eighth Amendment issues in play, then --

13       THE COURT:  And deliberate -- you'll forgive my

14   interruptions.  I need to learn here.

15       And deliberate indifference prescinds from the

16   Eighth Amendment.

17       MS. BARTOSZ:  Deliberate indifference is an

18   articulated standard from the Supreme Court.  It was

19   implied, applied, I should say, Judge, in the prison context

20   in the Estelle case, and it has been applied actually beyond

21   the prison context in other cases triggered by a custodial

22   relationship between a citizen and a state.  But, Judge,

23   most typically it's applied then in damages cases where

24   there's the issue of perhaps monetary compensation coming

25   from a state official.  There is case law coming from, the

1    Kenny A. case in Georgia which we've cited in briefs, and

2    Judge Ponsor made note of this, there's a line of cases that

3    applies a culpability standard in cases simply seeking

4    injunctive relief that is calibrated to address.  We don't

5    have the individual immunity issues.  We don't have the

6    policies in play, the social issues in play of getting

7    people to serve in government which, of course, we all want

8    and we do not want to dissipate that.  But in injunction

9    cases that risk isn't there and the standard has been

10    calibrated often to professional judgment.  Sometimes,

11    stated simply, is there a departure from accepted

12    professional judgment.  In briefing this case, Judge, the

13    district court in looking at that case law and as well

14    looking at case law in the First Circuit that's touched upon

15    the child welfare custodial area articulated the standard in

16    the way I said, a substantial departure from professional

17    judgment that shocks the conscience, and that is the

18    standard that plaintiffs are prepared to apply in putting on

19    their proofs.

20         **THE COURT:**  And what you seek is injunctive relief?

21         **MS. BARTOSZ:**  Injunctive relief only, Judge.  The

22    case which we will put on, and, Judge, I'll advise the

23    Court, apprise the Court it will largely come from live

24    witnesses in the form of experts.  And there's going to be

25    three kinds of experts here, Judge.  One set of experts,

1    which we expect to call this week, is a set of experts that

2    can talk about harm to children.  What does that mean in

3    foster care.  And the plaintiffs will not here assert that

4    any slight, any injury, any wound that happens to a child in

5    foster care must be the fault of DCF or somehow is elevated

6    to a constitutional dimension.  We'll, we'll provide expert

7    testimony about the relationship and the milieu of foster

8    care and what are the harms, what are the risk of harms that

9    are attendant to that.

10           And those experts, Judge, will be, one, Dr. Lenette

11   Azzi-Lessing.  She's a tenured professor at the Wheelock

12   School of Social Work here in Boston.  She has looked

13   painstakingly at the case files of five of the named

14   plaintiffs, and she has examined the case practice in those

15   files against the policy and procedures of the Department of

16   Children and Families and against accepted standards of

17   professional judgment and child welfare case management.

18   She's determined one, Judge, that there's been substantial

19   departures from professional judgments in the practice in

20   those cases, but she's also able to assist the Court in

21   understanding what is this harm to a child, what does that

22   mean in the context of foster care.  And she will, using

23   evidence from these named plaintiff cases, I'm sorry,

24   Judge, point out the kinds of harm that can occur.  Abuse

25   and neglect in care in a foster home, just like it might

1    have occurred in a family home, or did occur in a family

2    home to trigger removal into foster care in the first place,

3    that is occurring in Massachusetts according to federal data

4    at a rate that places the Commonwealth in the bottom quarter

5    of state performers in the country.  Ms. Lessing found that

6    in a child, one named plaintiff who was sexually abused in a

7    foster home, another child who was the victim of physical

8    abuse in a fight club in a group home, abuse and neglect,

9    fundamental harm.

10              Another harm that will --

11         **THE COURT:**  But how high does Massachusetts have to

12    be?  Is that -- is it somehow how the state is ranked in

13    this federal data?

14         **MS. BARTOSZ:**  The federal data, Judge, is based on

15    a national draw of data that reflects what are states doing

16    from coast to coast, the 50 states, well, actually there's

17    52 jurisdictions with Washington and Puerto Rico, what are

18    they doing in their actual performance.  And the federal

19    government pulled in that data and set standards that said

20    at the 75th percentile of that performance level we know

21    what's achievable, we're drawing the line where 25 percent

22    of the class has met it and elevated it, we're going to

23    strive to and we're going to assess states against that 75th

24    percentile.  And there's data that shows that, what the 50th

25    percentile is in that practice, what the 25th percentile is.

1        In abuse and care, since this current administration took

2        office, the evidence will show in the abuse and neglect data

3        they're in the bottom quarter.  And I can point to other

4        harm elements in that data where that's similarly true.

5             **THE COURT:**  Well, does that mean that every state

6        that's below the 75th percentile is violating the

7        substantive due process of its children in foster care?

8             **MS. BARTOSZ:**  Moving to the second set of experts

9        and jumping ahead a little bit, Judge, the answer to that

10       question in our evidence here is this is not a system, the

11       evidence will show, where there's simply occasional mistakes

12       and oversight, the kind of human errors that are going to

13       occur.  And the plaintiffs here, Judge, do not seek a

14       perfect system.  The plaintiffs here know that cannot occur.

15            **THE COURT:**  About five more minutes, Ms. Bartosz.

16            Go ahead.

17            **MS. BARTOSZ:**  Okay.  What the plaintiffs will show

18       here, Judge, through another set of experts, Cathy Crabtree,

19       who's in senior management in the Tennessee child welfare

20       system for a number of years, and Arburta Jones, who served

21       in senior management in the New Jersey foster care system,

22       these two experts have focused in on what does DCF look like

23       as an organization in terms of its structures, its capacity,

24       things like caseworker caseloads.  Does a caseworker handle

25       a caseload that allows them to do their job, to apply the

1    policies and procedures timely, or are they overloaded.  Ms.

2    Crabtree looked at that and determined the caseloads are

3    excessive and not based on credible workload studies.  There

4    are other structural issues like that.  Has the state

5    acquired, recruited, licensed enough foster homes so the

6    kids may be properly matched to homes suited to their needs.

7    When that doesn't occur, Judge, kids go through frequent

8    traumatic repeat moves between places.

9            The state, back to the federal measure, Judge, has

10   consistently performed in the bottom ten states in the

11   country, DCF has, in terms of the frequency of the number of

12   placement moves.

13           So, what connects up the harm and the departure

14   from professional judgment in a way that shocks the

15   conscience is that it's not a system that's been built so

16   that the structures are in place that you can rely upon,

17   that the capacity in workloads and foster care array and

18   contract monitoring, oversight of private providers who

19   handle some 40 percent of these kids in private placements,

20   those structures haven't been built and the absence of those

21   structures departs from accepted professional standards that

22   are identified by Ms. Crabtree, she will talk about it, and

23   Ms. Jones will talk about it with the focus on the key

24   elements of a safety net, licensing, visitation of children

25   in their homes, contract monitoring, quality assurance.

```
 1              These experts will demonstrate that harm's going to

 2       happen in any endeavor in life, Judge.  We understand that

 3       as plaintiffs.  But, when you haven't built the safety net

 4       to catch that harm that reasonably can be caught and you see

 5       numbers that consistently place this system at the bottom of

 6       the barrel in performance and you see not one or two but

 7       hundreds and thousands of kids suffering the kind of

 8       physical or emotional trauma that the children in this

 9       system suffer, it shocks the conscience that the state year

10       after year doesn't reduce the caseloads, doesn't build the

11       contract monitoring capacity, doesn't recruit the homes for

12       the teenagers or the medically fragile in sufficient number.

13              THE COURT:  But I understand their position to be,

14       in part, that while you may well have identified severe

15       problems, that today they are being addressed and

16       improvements are being made such that it would be

17       improvident for the Court to micromanage or intervene.

18              What do you say to that?  Are we not improving here

19       in Massachusetts?

20              MS. BARTOSZ:  There are improvements being made in

21       certain respects, but those improvements, those initiatives

22       do not reach the core deficiencies in the agency.  They

23       bypass these initiatives.  For example, what's called the

24       kinship initiative, and the state has briefed that to the

25       Court.  Those initiatives don't bring in additional workers
```

1    or reduce caseloads.  They don't address the placement or

2    recruitment.  They don't address contract monitoring.

3            I guess the way I would respond to the Court's

4    question is, as follows.  Good policy, an initiative, good

5    intentions, we want it all to be there, of course.  But that

6    alone doesn't make a foster care system one that meets

7    professional standards.

8            What's important is you have the structures and the

9    capacity beneath it to be able to take those policies, those

10   initiatives, those intentions and implement them, make them

11   real.  And if you don't have workers with the time, if you

12   don't have the right mix of homes, if you don't have an

13   ability to assess yourself through quality assurance and

14   find the trouble signs and fix them, if your capacity is so

15   depleted in those areas, as we'll show through our evidence

16   from state business records, deposition testimony, our

17   experts, then it shocks the conscience and children are

18   harmed.

19           **THE COURT:**  I understand I'm interrupting.  Take a

20   minute and just sketch very briefly, what's the third

21   category of experts?  Your time's pretty much up.

22           **MS. BARTOSZ:**  The third category of experts, Judge,

23   is plaintiffs retained the Children's Research Center from

24   Madison, Wisconsin.  This is an organization that

25   specializes in juvenile issues and child welfare issues.

1    It's been around through the National Council on Crime &

2    Delinquency for some hundred years.  They've come in and

3    read 484 case files, DCF case files, and drawn data to show

4    what is going on in this system in terms of conformance or

5    not with policy and practice in case files.  And that looked

6    at issues such as are caseworkers making their monthly

7    visits to children in the homes, a critical aspect of

8    safety.  Let's see these homes, know what's going on.

9    Issues like that, Judge.

10    **THE COURT:**  I'm just going to say it back to you.

11    This will address, however good the policies may be, this is

12    evidence those policies are not and despite good intentions

13    cannot be carried out in the field.

14    **MS. BARTOSZ:**  That's absolutely true, Judge.

15    **THE COURT:**  All right.

16    **MS. BARTOSZ:**  And not just that evidence.  But

17    management reports from DCF as well will show you, their

18    monthly statistical operations reports, what have you, will

19    address that very point.

20    **THE COURT:**  All right.  Ms. Tran?

21    **MS. BARTOSZ:**  Thank you, your Honor.

22    **MS. TRAN:**  Good morning, your Honor.

23    Defendants' position is that the evidence will show

24    that DCF actually has a successful foster care system run by

25    an experienced and dedicated staff and has in fact been

1    steadily making improvements the past six years.

2         **THE COURT:**  But what do you say to these really

3    rather abysmal rankings here?  Massachusetts prides itself,

4    I thought, on better social services than the bottom

5    quarter.

6         **MS. TRAN:**  My response to that and defendants'

7    response to that will be that the notion that DCF is in the

8    bottom quarter is actually misleading.  That is actually not

9    true if you look underneath those numbers.

10        So, what those numbers are is in essence the

11   percentage of the abuse of maltreatment in care of kids.

12   And the national standard for that percentage, the

13   acceptable standard is 99.68 percent, which means the

14   national standard says it's good enough if 99.68 percent of

15   the time kids are not being harmed when they're in your

16   care, they suffer no abuse or neglect.

17        Massachusetts has over the past few years ranged

18   from 99.1 percent and 99.3 percent.  And, in fact, in 2012

19   was at 99.2 percent for the absence of maltreatment in care.

20   That means that what we're talking about is a .4 percent

21   differential between where Massachusetts ranks and the

22   national standard.  Okay.  So we're talking about .4 percent

23   between those two things.  That means that 99.2 percent of

24   the time all the kids that Massachusetts takes into its care

25   are safe, it's only .8 percent that are at risk.  Nobody is

1    suggesting that .8 percent is good enough, that we shouldn't

2    strive for a hundred percent, or that the agency doesn't

3    concern itself with that .8 percent.  But if you're looking

4    at it from a legal perspective and from a professional

5    judgment perspective, how can a system that attains

6    99.2 percent of safety for the kids in its care be anything

7    but successful.

8            **THE COURT:**  Is the proper standard here a

9    substantial departure from professional judgment which

10   shocks the conscience?

11           **MS. TRAN:**  The proper standard is that the conduct

12   shocks the conscience.  The defendants suggest that the

13   proper articulation of that standard is the deliberate

14   indifference standard.  And the case law that pertains to

15   the prisoners cases and et cetera are --

16           **THE COURT:**  Who -- I didn't hear the plaintiffs say

17   that.

18           **MS. TRAN:**  I'm sorry, the --  I'm sorry, your

19   Honor, the defendants.

20           **THE COURT:**  You say.

21           **MS. TRAN:**  We say.

22           **THE COURT:**  I've got it.

23           **MS. TRAN:**  But that both of those are actually mere

24   articulations of the shock the conscience standard, that

25   really what they are are different ways to articulate.  And

1    this is what Judge Ponsor actually ruled in his papers in

2    the motion to dismiss, that both of those are just

3    articulations of what amounts to conscience shocking

4    behavior.  But it is the defendants' position that for the

5    reasons that it states in its papers that the deliberate

6    indifference standard is the one that applies.

7          The other issue with these numbers that they're

8    putting forth, the plaintiffs are absolutely going to say

9    over and over again how we're in the bottom quarter on the

10   rankings when you rank states by comparison.

11         There's another problem with that besides the fact

12   that we're really talking about an extremely high percentage

13   of success.  And the other problem is that the way that data

14   is gathered is to essentially take the cases that are

15   substantiated as abuse and neglect in the state and count

16   them up.  And they do that across the states.  The problem

17   with comparing that data is that across the states there's

18   no uniform definition for what constitutes abuse and

19   neglect.  So if you have a state like Massachusetts that

20   casts a wide net, that has a low threshold for

21   substantiating abuse and neglect allegations, the purpose of

22   which is to make sure more kids are safe rather than less,

23   to make sure they investigate more of the claims rather than

24   screen them out at the outset, if you have a state that does

25   that it will by definition have a larger population of

1    children that appear to be at risk of abuse and neglect.

2    That's actually not true if you look under the statistics

3    and understand that the reason it does is because it has a

4    lower definition, a lower threshold for what it

5    substantiates.  But because some other states have an

6    extremely high bar, when you rank that data in order

7    comparing state across state it tells you nothing about the

8    actual performance of the state.

9         **THE COURT:**  How do we match up in terms of

10   caseload, for example?

11        **MS. TRAN:**  In terms of caseload Massachusetts is

12   doing well and it's doing better.  If you look at the data,

13   and we'll present evidence of the data of, the oversight

14   data by ACF, by the federal government in terms of its

15   reviews, you'll see consistent improvement in Massachusetts

16   on most all of its numbers.  In fact, you're going to hear

17   evidence of all kinds of improvement by DCF, that they have

18   not only developed and planned but implemented to success

19   with actual demonstrable improvement in the numbers that

20   they've reached in terms of going forward.  They might not

21   be at the CFSR standard, they might not be at the gold

22   standard, but they are making headway in that direction.

23   And that's really what is important here, is whether they

24   are at a point where they can keep kids reasonably safe and

25   they're continuing to improve.  You don't change a child

1    welfare agency on a dime.  You can't do that quickly, a snap

2    of a finger.  It's a lot of moving parts and you have to

3    implement a broad strategy.  And that's what DCF has done

4    under the direction of Commissioner McClain here.

5         **THE COURT:**  I understand that's your position, and

6    I understand that this Court's role is limited to enforcing,

7    if you will, a constitutional and statutory standard.  I

8    guess, and I'll say it straight out, I'm concerned by budget

9    issues.  The fact that you say you have these plans and

10   you're moving in the right direction, how, how are we going

11   to be assured of that in times of straitened budgets and

12   across-the-board budget cuts?

13        **MS. TRAN:**  We have a few things to say about that,

14   your Honor.  First of all, it's not only how many resources

15   you have, but it's how you allocate those resources that

16   makes a big difference.  So simply hiring a slew of social

17   workers isn't going to solve the problems that plaintiffs

18   perceive.  You have to utilize those resources in the most

19   effective way.  And part of what Commissioner McClain has

20   done and his senior staff had done over the last six years

21   is to develop a case practice model that allows for the

22   streamlining of its resources in order to more effectively

23   manage cases with the resources that they have at hand.

24   They have also restructured the entire agency so that it can

25   absorb any potentially continuing budget cuts and still

1    provide those services to the children in its care.  That is

2    in fact what, what Commissioner McClain did when he devised

3    the structural changes was to think about, because it was on

4    the cusp of those pending budget cuts, the first round of

5    them, which happened around 2009, was to think if I'm going

6    to have to make these big cuts now, what if I have to

7    continue to make them going forward.  How can I structure

8    the system in such a way that it can absorb that impact and

9    still provide the best level of service.  And that is what

10   they've done.  You will hear evidence about that.

11              THE COURT:  And what has been the effect of that?

12              MS. TRAN:  I'm sorry, what's that, your Honor?

13              THE COURT:  What has been the effect of these

14   structural changes?

15              MS. TRAN:  The effect has been, the effect has been

16   that they have been able to provide services to children to

17   keep them safe with fewer caseworkers by targeting those

18   caseworkers in a more directed fashion.  They have developed

19   and implemented a short term stabilization model that allows

20   for families to be stabilized while investigations are

21   happening or to be safe while the cases are proceeding

22   through the system, and to target those cases that can more

23   quickly and efficiently be provided services to reunify and

24   strengthen families and get them out of the system so they

25   can utilize their longer term services to focus more on the

1    children that are going to be in the system for a longer

2    period of time.

3            They are actually negotiating with the union now,

4    you will hear evidence about, negotiating with respect to

5    the caseloads and the ways in which they can allocate the

6    caseloads to reduce the number of cases every social worker

7    has within the proper context.  I mean, in the social, in

8    the child welfare world you weight cases.  Not every case

9    takes the same amount of time and energy, much like in the

10   legal world.  Okay.  So, what they are looking to do is to

11   weight them in the appropriate way so that the caseloads

12   reduce and they can utilize their existing current staff and

13   still be able to provide those services to children.  And

14   the numbers reflect that they have been successful at that.

15   Despite massive budget cuts, they've been able to keep 2,000

16   more children between 2009 and 2011, 2,000 more children

17   home safely with their families through utilizing these

18   programs.  That's 2,000 kids that haven't had to come into

19   care, and that means that that's less attention diverted

20   from the kids that have had to come into care because

21   they're not stretched as thin.  They've been able to lower

22   the percentage of kids that go into group homes by utilizing

23   these programs.  They've been able to increase the

24   percentage of kids that are kept safe in their care.  All of

25   this is demonstrable and we will present evidence of this in

1    our case in chief, and it will even come in in plaintiffs'

2    own case.

3           THE COURT:  Would it be helpful in this

4    institutional litigation for the Court to draw some lines

5    here?

6           MS. TRAN:  When you say draw lines, I'm not sure

7    what you mean by that.

8           THE COURT:  I'm not either.  No, I mean,

9    transparency is always good I think in the judiciary and I'm

10   groping here.  And I'll be candid about it.  I've heard in

11   other context this, we're going to streamline, we're going

12   to reorganize, we're going to, through efficient and

13   intelligent management, we're going to do more with less and

14   absorb budget cuts and the like.  You could look at agency

15   after agency that says that.  You could look at the Judicial

16   Conference of the United States, a third branch of

17   government, which says precisely that, and within some

18   parameters that's possible.  But to use the contrary

19   rhetoric that the plaintiffs will use, at some stage you're

20   cutting muscle.  You're not shedding fat, you're cutting

21   muscle.

22          I wonder if a declaration of minimal standards,

23   minimal constitutional standards is helpful in this context,

24   or would that straitjacket policy makers?

25          MS. TRAN:  Honestly, the answer to that probably

1  would depend on what that declaration is.  I mean, even in

2  the context of this case and how to present it to your Honor

3  we've struggled with ways to limit the universe of what you

4  have to look at and understand to really be able to make

5  this assessment.  And I think from a policy making position

6  there are the same problems.  There's so many moving parts

7  to this kind of system that it's, that to some degree if you

8  build a really small box the system can't operate

9  functionally within that box.  You'll hear Commissioner

10  McClain tell you all the time, and he'll testify that

11  the point is to build a box big enough to allow the system

12  to be flexible in responding to the needs of the client

13  population, not to try to force the system into the same box

14  which is what plaintiffs really want to do.

15      **THE COURT:**  But some, there seem to be some

16  commonalities.  Case weighting, for example, that seems to

17  be sensible.  And in another context, which I'll keep

18  separate, but I understand the concept of case weighting.

19  Caseload is a concept that has been used in like agencies,

20  legal service agencies.  You used that analogy yourself.

21  The caseload on a particular professional, that seems to me

22  an accepted measure.

23      I imagine I'm going to be forced to immerse myself

24  in that and one would think have to grapple with the minimal

25  acceptable.  This is a court.  This is not --

1          **MS. TRAN:**  Understood.

2          **THE COURT:**  -- a super child welfare agency.  And

3    while I'll hear from skilled professionals, and devoted

4    professionals throughout, and I'll say now, a Court must be

5    diffident and must defer to the people who have to make the

6    tough choices, and at the same time must be vigorous to

7    ensure that constitutional rights of the class members here

8    are secured.  I'm groping, and I admit it.

9          **MS. TRAN:**  And I understand that, your Honor.  And,

10   in fact, you know in the last two years that we've had to

11   learn about the world of child welfare, we've groped

12   similarly.

13          The problem in part is the nature of the work that

14   they do.  So, there are a lot of -- there will be a lot of

15   evidence and you'll hear differences of opinion about what

16   is the acceptable measure, what is the acceptable number

17   that we have to work from, and then what you need to talk

18   about.  So, for things like caseload, what is the range of

19   caseloads that would be, quote, unquote, acceptable in the

20   professional child welfare world.  But that just starts the

21   conversation.  Those numbers begin that conversation.

22   Because when there is, is variation from that number there

23   are reasons why.  And some reasons could be evidence of

24   problems in a system and some reasons could be evidence of

25   other things.  And sometimes it is acceptable to deviate

1    from those standards for a variety of reasons, largely

2    because of the varied needs and the flexibility that you

3    need to deal with the population of kids you're dealing

4    with.  As plaintiffs have recognized, this is a population

5    of kids that have been traumatized.  No one simple solution

6    is easy.  And they've been traumatized before they ever came

7    into our care.  So the ways you have to approach them and

8    the different things you need to do and the policies you

9    need to have in place to deal with that, they don't lend

10   themselves to a simple answer.  That's part of the reason

11   why nationally there's not one uniform definition for

12   something like abuse and neglect, because each state has

13   different challenges that it faces and so the federal

14   government has recognized the need to allow for some

15   flexibility.  That doesn't mean that states don't clamor for

16   and look for something more uniform.  But it's not really,

17   this area doesn't lend itself to that.

18           **THE COURT:**  Thank you.

19           All right, let's get going.  Call your first

20   witness.

21           **MR. GLEASON:**  We call Lauren James to the stand,

22   please.

23           **THE COURT:**  She may be called.

24           **MR. GLEASON:**  Thank you, your Honor.

25           **THE COURT:**  While she is coming in, I think the

1    clerk has told you, I need a folder or some compendium of

2    the agreed upon exhibits here.  And Thursday will be soon

3    enough.

4              **MR. GLEASON:**  Fine.

5              **MS. BARTOSZ:**  Thank you, Judge.

6              **THE COURT:**  Since we're not sitting tomorrow.

7              **THE CLERK:**  Can you please remain standing and

8    raise your right hand.

9              Do you solemnly swear the testimony you are about

10    to make in the matter now pending before this Court will be

11    the truth, the whole truth, and nothing but the truth, so

12    help you God?

13              **THE WITNESS:**  Yes, I do.

14              **THE COURT:**  You can be seated.

15                        LAUREN JAMES

16                   **DIRECT EXAMINATION**

17    **BY MR. GLEASON**

18    **Q**   Ms. James, you know me as Dan Gleason, I met you the

19    other day?

20    **A**   Yes.

21    **Q**   Okay.  I'm going to ask you some questions and then the

22    other side will ask some questions as well.

23    **A**   Sure thing.

24    **Q**   What is your date of birth?

25    **A**   May 11th, 1988.

1    Q    And I should start with your full name?

2    A    Lauren Ashley James.

3    Q    Lauren Ashley James?

4    A    Yes.

5    Q    I'll call you Ms. James?

6    A    Sure.

7    Q    Are you married?

8    A    No.

9            THE COURT:  How old are you now, ma'am?

10           THE WITNESS:  I'm 24.

11           THE COURT:  Thank you.

12   Q    And could you tell us the highest level of schooling

13   that you've attained in terms of a degree?

14   A    I have a GED, as well as having taken some college

15   courses.

16   Q    Okay.  And when did you get your GED?

17   A    I received it when I was 18.

18   Q    Eighteen.  Thank you.

19           And what have your college courses, not detail,

20   just what types of things are you interested in for college

21   study?

22   A    I'm into art and design, fashion design mainly.

23   Q    Okay.  And that's where your focus is?

24   A    Yes.

25   Q    Now, you have been in the foster system in the past,

1  have you not?

2  A   Yes.

3  **Q**   I'm going to ask you some questions about that --

4  A   Okay.

5  **Q**   -- okay, first of all.

6       My understanding is that your first experience

7  with -- well, let me ask you this.  Where were you born?

8  A   In Salem, Massachusetts.

9  **Q**   And who was -- who did your family consist of when you

10  were an infant?

11  A   When I was an infant, it was my mother and father.

12  However, my father left when I was, before I turned four.

13  **Q**   Okay.  And turning your attention to age eight.  Did

14  there come a time when you were put into temporary foster

15  care?

16  A   Yes.

17  **Q**   Okay.  And do you recall in between the ages of eight

18  and eleven being at times in foster care on a temporary

19  basis and at times at home with your mother?

20  A   Yes.

21  **Q**   Okay.  We're not going to focus on that time period, but

22  I want to ask you about this time.

23       When was the last time you lived in the home with

24  your mother?

25  A   It was when I was eleven years old.

1    Q   Okay.  And what happened when you were eleven that

2    brought you out of the home at that time?

3    A   I was sent to a foster home.

4    Q   Okay.

5    A   When I was at the end of the fifth grade, the last three

6    weeks.

7    Q   Okay.  We'll speak about that in a minute.  But do you

8    have any sense of how many foster homes you've been in since

9    the time you went to that one?

10    A   I believe it's been 14 foster homes.

11    Q   Okay.  Now, I would like to talk to you briefly about

12    the home that you went into at the time when you were

13    eleven.

14    A   Sure.

15    Q   Okay.  The family name of those, of that family was

16    what?

17    A   It was Medeiros.

18    Q   M E D E I R O S?

19    A   Something to that effect, yes.

20    Q   And where was that foster home located?

21    A   It was in Gloucester, Massachusetts.

22    Q   And do you know approximately how long you stayed in

23    that home?

24    A   It was from, like I said, during the last three weeks of

25    the fifth grade until about the beginning of August.

1    **Q**    About nine weeks in all?

2    A    Yes.

3    **Q**    Okay.  Were you the only child in that placement at the

4    time?

5    A    No, there were several there, foster children in the

6    home.

7    **Q**    And over the course of the nine weeks how did it work?

8    Were there times when you were alone there and times when

9    there were others?  Or how -- what was the flow of foster

10   children?

11   A    Well, there's always foster children coming in and out

12   of the home temporarily.  Sometimes I did have my own space,

13   sometimes I would share it with the other children.

14   **Q**    And when you say you would share with the other

15   children, did you have a room in the home to sleep in?

16   A    Yes.

17   **Q**    And did you share that room with other children?

18   A    Yes.

19   **Q**    Okay.  And just some sense of the numbers of children

20   that shared that home on and off over the time period we're

21   talking about?

22   A    It depended on the situation.  But at times there were

23   three or four people in my bedroom there.

24   **Q**    Okay.  And you shared rooms.  Did you have to share beds

25   or not?

1   A    Sometimes, yes.

2   Q    Were there other children in the home besides foster

3   children?

4   A    Yes, there were.  I don't know if I should call them

5   children or teen-agers.  But there were other, other

6   children there that were their own children as well as

7   adopted.

8   Q    Okay.  And were they there throughout or were they in

9   and out over time that you were there?

10  A    They were in and out, I would say.  Although adopted

11  children stayed there, but their own children were in and

12  out of the home.

13  Q    Okay.  What was the language of the family when you were

14  there?

15  A    The family spoke Portuguese.

16  Q    Okay.  Now, I assume at least some members of the family

17  also spoke some English?

18  A    Yes.  Yes.

19  Q    Would you describe to us who you remember was able to

20  speak English and how well you could communicate through

21  English?

22  A    I remember the foster mother's daughter, Carla, spoke

23  English, and in terms of communicating with the foster

24  mother, I remember it being extremely difficult.

25  Q    Was Carla there all the time or some of the time?

```
 1    A    I, I would say some of the time.  Yeah.

 2    Q    Did you talk, did you get opportunities to talk to Carla

 3    about things you can remember?

 4    A    The only thing that I can remember speaking to her about

 5    was doing housework as well as religious things.

 6    Q    We don't need detail.  What do you mean by religious

 7    things?

 8    A    I just mean she would talk to us about, about

 9    Christianity.

10    Q    Okay.  And did you go to school when you were there?

11    A    Yes, I did have to switch schools.

12    Q    And this was when you were in eighth grade did you say?

13    A    In fifth grade.

14    Q    Fifth grade.

15         And how, how many weeks or whatever of school were

16    you in at the new place when you left?

17    A    I was switched for the last three weeks of fifth grade,

18    about.

19    Q    Now, did the family, that is, the parents and whatever

20    natural children they have and any biological children, have

21    times together at all, or was there no communal

22    opportunities?

23         THE COURT:  I'm not sure I understand the question.

24         MR. GLEASON:  That's badly stated.

25
```

1           **THE COURT:**  Was the foster --

2     **Q**   Were there times when the family would gather with the

3     foster children?  Natural family with the foster children?

4     A    It wasn't really a family structure.

5     **Q**   Well, describe it in your words, please, if you can.

6     A    Excuse me?  Just describe the family --

7     **Q**   The family structure.

8     A    -- dynamics in the home?

9     **Q**   How you perceived, how you perceived the family, how you

10    related to it.

11    A    Well, there was the foster mother who I don't know her

12    name.  The only time I ever saw her really was when I was

13    folding laundry in her room.  The children were always doing

14    housework.  That was what I was doing during most of my stay

15    there.  We would -- I don't remember eating every day there.

16    In fact, the last weekend I stayed there, I remember having

17    just one meal that weekend.  However, they would have us

18    clean up after them after meals.  And just in general, a lot

19    more than normal cleaning.

20    **Q**   Just to focus on a couple of things you've just said and

21    ask for some clarity.

22    A    Yes.

23    **Q**   You mentioned folding laundry.

24    A    Sure.

25    **Q**   Okay.  That was a job that you did?

1    A    Sure.

2    Q    Was there any other job that you can recall, chores or

3    jobs that were given to you?

4    A    Well, the most disturbing one was just that they had six

5    chihuahuas, and because it was our job to clean the house,

6    we did have to pick up after them.  And, you know, just in

7    terms of cleaning the floor, it wasn't cleaning the floor

8    with a mop, it was getting down on your hands and knees and

9    scrubbing the floor.

10   Q    And were you the only child being asked to do those kind

11   of chores or did everybody have some responsibility?

12   A    No, it was everyone.

13   Q    Okay.  And when you said you didn't -- well, let me ask

14   you about the food, how food worked in the family, meals

15   being served or access to food.

16   A    Well, it's important to understand that not just in this

17   foster home but in a lot of foster homes the food is limited

18   and we don't have access to the refrigerator.

19   Q    You mean the rule is you can't go in by yourself, you

20   have to ask permission?

21   A    Yes.

22   Q    And can you ask permission?

23   A    To be quite honest, I don't know if I felt comfortable

24   in doing that.

25   Q    So, I'm gathering that you had some concern that you

1   still remember about how much food you were getting?

2         **MR. COLLINS:**  Objection.

3  **Q**   Am I right or not?

4         **THE COURT:**  Well, no, I'm going to allow that.

5   Overruled.

6  **A**   Excuse me, can you repeat the --

7           **THE COURT:**  At what -- let's ask it this way.

8           In that foster home --

9         **THE WITNESS:**  Uh-huh.

10         **THE COURT:**   -- what concerns did you have about

11  being fed?

12         **THE WITNESS:**  Well, I was very stressed out about a

13  number of things.  So, food wasn't my main concern.  But

14  when my mother noticed that I had gone from 100 pounds to

15  73 pounds, she was extremely concerned.

16  **Q**   Now, three weeks in Gloucester's school system probably

17  wasn't enough to make friends, but could you tell us what,

18  how that, those three weeks went for you?

19         **MR. COLLINS:**  Objection.

20         **THE COURT:**  Overruled.

21  **A**   Those three weeks were very difficult.  Because first of

22  all, I'm in a new home.  I don't know anybody in Gloucester.

23  I didn't really get to make any friends.  However, I did win

24  a student award for being new outstanding student.  But I

25  didn't get to make friends that I could keep during the

1    summertime.

2    Q    Okay.  And I think you said you left in early August?

3    A    Yes.

4    Q    Can you tell us how that assignment ended and how you

5    left, how you came to leave the placement?

6    A    Well, I was extremely stressed in the home and I was

7    aware of the foster parent's, the foster mother's attitude,

8    and I just sort of assumed that if I had done one thing

9    wrong they would send me back to DCF.  So, I put a bureau in

10   front of my door and waited for them to call DCF so that I

11   could leave because I couldn't stand it any longer.

12   Q    I take it that's how you ended up leaving?

13   A    That's how I ended up leaving after that weekend, on

14   Monday they sent me away.

15   Q    All right.  Now, we're not going to be going through all

16   of your placements obviously, but I would like to move you

17   now to another placement and ask you some questions.  And

18   that's the placement with the Herrick family.

19   A    Sure.

20   Q    Do you recall that?

21   A    Yes.

22   Q    Can you tell us how you came to be placed with the

23   Herrick family?

24   A    Well, I was in sixth grade and Mrs. Herrick was my math

25   teacher.  And she was somehow aware that I was not being

1    cared for and that I was leaving my foster home and didn't

2    have anywhere to go.  So, she offered to get to know me and

3    take me in her home.

4    **Q**    Okay.  And who was in -- who were the members of the

5    Herrick family when you joined, when you joined it?

6    **A**    When I joined there was Mrs. Herrick and Glenn Herrick,

7    her husband.  And then they had a daughter and son, Susie

8    and Tim.

9    **Q**    Okay.  And so we have the framework, what were the time,

10   what was the time period that you stayed with the Herricks?

11   **A**    I stayed there from April of 2000 until March of 2002.

12   **Q**    And your ages at that time?

13   **A**    I was 11 to 13.

14   **Q**    And how did the Herricks -- do you have memory of how

15   they related to you, how they considered the relationship,

16   long-term or otherwise?

17   **A**    Yes.  Well, they would constantly tell me that they were

18   my new family now and that I needed to forget about my old

19   family.  And when my mom would come visit the home they

20   would make fun of my family, they would make fun of even the

21   car she drove, they would just talk very badly about them

22   and tell me constantly that they didn't care about me.  And

23   when my mother passed away from suicide they were not very

24   supportive of that.

25          **THE COURT:**  When -- I'm not sure I understood.  Did

1    you say that the Herricks would say that your mother and her

2    family didn't care about you?

3              **THE WITNESS:**  Yes.

4              **THE COURT:**  All right.

5              **THE WITNESS:**  Yes.

6    **Q**    Well, I'll ask you some more questions about that if you

7    would.

8              First of all, was this a guardianship relationship

9    that they were --

10   A    Eventually they decided to take guardianship, yeah.

11   **Q**    You mean a long-term relationship as you understood it?

12   A    Yes.  A lifelong as I understood it at the time.

13   **Q**    All right.  And putting aside for the moment the issues

14   with your mother and how they said you were to think about

15   that relationship, what about materially, how did they, what

16   was your life like?

17   A    They were the only family who ever purchased things for

18   me.  They purchased new furniture and some clothing and I

19   felt welcome in that respect.

20   **Q**    And you mentioned reactions that they shared with you

21   when your mother died.

22   A    Yes.

23   **Q**    And when was that?

24   A    In December 2000.

25   **Q**    And how did she -- what did you learn about her death?

1    A    I learned that she jumped over the Beverly/Salem Bridge.

2    Q    And was this in December of that year?

3    A    Yes.

4    Q    How close to Christmas vacation?

5    A    It was about week away.

6    Q    Did she have a funeral?

7    A    Yes.

8    Q    Was she waked?

9    A    Yes, after the funeral.

10    Q    She was waked after the funeral?

11    A    Yeah.

12    Q    And geography again, where were the Herricks located?

13    A    In Wenham.

14    Q    And where was the funeral?

15    A    In Lynn, Massachusetts.

16    Q    Did you -- did the Herricks help you at that time with

17    respect to grieving or going to the funeral?

18    A    I went to the funeral, but I did not go to the wake.

19    And I felt everything was very brief.  They only gave me two

20    days off from school.  And they weren't very supportive of

21    my grieving.

22    Q    At the -- was there a church service?

23    A    Yes.

24    Q    Church service that you were at?

25    A    Yes.

1    **Q**    Did they attend it?

2    A    Yes.  Yes.

3    **Q**    So they took you there and attended the church service?

4    A    Yes.  Yes.

5    **Q**    Did they sit with you?

6    A    No.

7    **Q**    Who did you sit with?

8    A    So, I believe I was sitting with an uncle or something.

9    I don't really remember exactly, but I believe I was sitting

10   with my uncle.

11   **Q**    All right.  Were there flowers that you brought?

12   A    The thing is that I wanted to bring my mom's favorite

13   flowers, and I asked them to please go back and get them to

14   bring to her funeral because I had forgotten them, and they

15   would not go back and get them.

16   **Q**    You mean you were at the funeral when you remembered the

17   flowers or was that --

18   A    No, we were in the car.

19   **Q**    Okay.  And you don't understand why they refused, or did

20   you talk about it at all?

21   A    I just knew that they didn't like my family.

22   **Q**    Did you -- we'll get into your brothers later, but you

23   had a brother named Matthew?

24   A    Yes.

25   **Q**    Is that right?  He's the closest to you in age?

1    A    Yes.

2    **Q**    And did he -- was he in some other care, some other

3    foster care situation at the time?

4    A    Yes.

5    **Q**    And did he attend the funeral?

6    A    Yes.

7    **Q**    Okay.  Were your other brothers able to get to the

8    funeral?

9    A    I don't think they were there.

10   **Q**    The two of you.

11          In terms of what you mentioned earlier in

12   conversations with the Herricks where they said, you know,

13   your mother is, whatever they, however they described it, or

14   you're our kids now, could you give us a little better

15   flavor of how those conversations went, what you were being

16   told about your parents, if anything, by these, by the

17   Herrick family?

18   A    I was told that they didn't care about me and that the

19   Herricks were my new family, and that I was to forget about

20   my old family.

21          And the way I found out about how my father passed

22   away was, I was crying at the kitchen table about my mother,

23   and they were yelling at me for crying.  And as they did

24   that they said:  Do you even know how your father passed

25   away?

1        **MR. COLLINS:**  Your Honor, objection; move to

2   strike.

3        **THE COURT:**  He's not offering it for the truth.

4   He's offering it for the fact that this is what they said, I

5   assume.

6        **MR. GLEASON:**  Absolutely, your Honor.

7        **THE COURT:**  I'm not taking it for the truth.  So

8   limited, your objection is sustained.  It will be limited.

9   This is no evidence of facts.

10        So what did they say then, ma'am?

11        **THE WITNESS:**  Well, they said:  Do you even know

12   how your father died?  And I said I thought he had a heart

13   attack.  And they said yes, but that's because he killed

14   himself because he didn't want you.

15   **Q**   When how did that relationship terminate?

16        **THE COURT:**  I'm not understanding.  How did this --

17   **Q**   How did this --

18        **THE COURT:**  -- period of foster --

19   **Q**   How did this foster, foster relationship come to be

20   closed?

21   **A**   It was at the end of my eighth grade year.

22   **Q**   Okay.  And you've told us that there was, you understood

23   there was a guardianship relationship in place.

24   **A**   Yes.

25   **Q**   How did that come to terminate?  Did somebody ask for

1    it, or suggest it?  Or how did it come?

2    A    Well, what happened was Glenn Herrick got very sick and

3    during his sickness he did not want anymore stress in the

4    house and they just considered me another stressor.  Because

5    I wasn't -- you know, I was very depressed and under a lot

6    of stress myself.  So they didn't want me in the house

7    anymore.

8    Q    And so, what happened next?  I assume you left the

9    house, but where did you go?

10   A    They drove me to the DCF office and dropped me off and

11   my social worker was looking for a home for me.  That's when

12   I told her that a friend of mine had a mom who took in

13   foster kids on an emergency basis and that maybe I could go

14   there.

15   Q    That's what happened?

16   A    And that's what ended up happening.

17   Q    Okay.  Have you in the course of these 14 placements

18   ever been placed with someone who was a family member, a

19   maternal family member?

20   A    Yes.  Yes.

21   Q    Could you tell us who that was?

22   A    Well, I stayed with my grandmother for the last part of

23   eighth grade to finish the MCAS testing.  And then at one

24   point I stayed with my third cousins for a few months.  And

25   then I stayed with my great aunt and uncle for a few weeks.

1    Q    All right.  Well, just so we can give context here, when

2    did you leave the Herrick house?  I have it as March 22nd,

3    '02.  Is that correct?

4    A    Yes.  Yeah.

5    Q    Okay.  And now directing you to May 3rd, '02, is that

6    when your maternal grandmother brought you in for a short

7    time?

8    A    Yes.

9    Q    Okay.  And you were fourteen at the time?

10   A    Yes.

11   Q    And you said that was because, having something to do

12   with MCAS?

13   A    Yes.

14   Q    Could you explain that again, how your grandmother came

15   to get you, take you in and what the, what happened there?

16   A    Well, I was sent to another random home and I was very

17   scared there.  And I really didn't want to go back there.

18   And I called her and told her.  And I think because they

19   didn't have, DCF didn't have anywhere to put me, and because

20   MCAS testing was so important in terms of high school

21   placement, that she wanted to keep me for those last weeks

22   of school.

23   Q    And where was your grandmother living?

24   A    She was living in Lynn, Massachusetts.

25   Q    In a home?

1    A    In a, in a retirement community where there's assisted

2    living available.  And unfortunately, that meant that I was

3    only allowed to stay up to two weeks, however, they extended

4    my stay for six weeks.

5    **Q**    So you were living in an adult residential home?

6    A    Right.  I was sleeping on her couch.

7    **Q**    Okay.  And you knew that it was going to be six weeks

8    when you went in?  Or you knew it was two weeks and then it

9    was extended to six?

10    A    I mean, I knew that, but I secretly hoped that there

11    would be a way for it to be longer.

12    **Q**    And how did you do on the MCAS?

13    A    I did very well.

14    **Q**    And how did you get to school?

15    A    My grandmother actually had to drive an hour there and

16    an hour back twice each day, so it was about four hours for

17    her.

18    **Q**    Did anyone at, now called the DCF, the Department of

19    Social Services at the time, talk to you about what they

20    were going to do to find you a new permanent home?

21    A    There wasn't a lot of discussion of that.  I was always

22    telling them that I wanted a permanent family.  But there

23    was no discussion or meetings with any potential families.

24    **Q**    How did the transition from your grandmother to wherever

25    you went next occur; would you describe that?

1    A    Well, my grandmother told me that I would be leaving

2    very shortly, in a matter of a day or two, to go to a house

3    in Milton called the Cheries.

4    Q    Did you learn that from your social worker or from your

5    grandmother?

6    A    From my grandmother.

7    Q    And when were you going to be moving to the Cheries?

8    A    In a very short time.  I cannot recall whether it was

9    just a day or a number of days.  But it was a very short

10   time.

11   Q    Okay.  And how were you, if you were, how were you

12   acclimated to the Cheries before you got there?  I mean, did

13   you get any information about them?

14   A    No.

15   Q    You knew it was in Milton?

16   A    Yeah.

17   Q    Did you know where Milton was?

18   A    I looked it up because I didn't know where it was.

19   Q    What's the origin, national origin of the Cherie family?

20   A    They're Haitian.

21   Q    Okay.  And what was the time period you were with the

22   Cherie family?

23   A    I was there from the beginning of the summer until

24   October of that same year, the very end of October.

25   Q    My notes show 6-27-02 to 12 -- 11-22-02.  Is that -- you

1    said October.

2    A    November 22.

3    **Q**    That would have been November 22.

4    A    No, that's not correct.

5    **Q**    That's not correct.  Okay.  You remember it as late

6    October?

7    A    I actually remember quite clearly, it was the third week

8    of October.

9    **Q**    Now, this was a placement with a specialized foster

10    home?

11    A    It was, yes, from a specialized foster care agency.

12    **Q**    And did that mean you had more than one social worker?

13    A    Yes, that meant I had a social worker through that

14    agency as well as DCF.

15    **Q**    Okay.  And when you got to the home were you shown where

16    you were going to be sleeping?

17    A    Yes.

18    **Q**    And what was -- where was that?  What did it look like?

19    A    It was upstairs in the nursery.

20    **Q**    What do you mean by the nursery?

21    A    It was an actual nursery with baby decorations.

22    **Q**    What happened the first day you went to this new home?

23    A    Well --

24    **Q**    How did you spend that day?

25    A    Well, because the rules of the specialized foster home

1    are not, a foster child is not allowed to be home alone, so

2    I had to actually go to work the first day with the foster

3    father because there was no one there to, to be there.

4    Q    So basically you were at the office or wherever he was

5    all day?

6    A    Right.  Yeah.

7    Q    And then what -- it's the beginning of the summer now,

8    you're just out from school, right?

9    A    Right.

10   Q    What was the next -- how was the summer spent?

11   A    They put me in a, in a YMCA program during the day.  And

12   if there was ever a time where they weren't home when I was

13   at the YMCA program, I spent it with the foster father's

14   brother who lived in a town a few towns away.

15   Q    And how much time did you spend with the brother at the

16   brother's home?

17   A    Yeah.  I remember spending many weekends there.  Just

18   any time I wasn't at the YMCA program.

19   Q    Okay.  Now, in a general sense, I'm just asking, we

20   don't have to get into a lot of detail, but how did you, if

21   you could, keep in touch with your friends that you had

22   been, you know, you had been with the last year or in recent

23   years?

24   A    That's the thing, I wasn't keeping up with, with my

25   friends.  It was very painful.

1    Q    And this was the year you were going to be moving to

2    high school?

3    A    Yes.

4    Q    And what did you find out and when about the

5    arrangements that were going to be made for high school?

6    A    I just knew I was going to Milton High School, and that

7    was it.

8    Q    Did you have an opportunity to meet anybody who was

9    going to Milton High School that summer?

10   A    Yes, I met one girl who was going there.  So that was

11   helpful.

12   Q    And how did that relationship go over time?

13   A    It was actually nice.  I actually enjoyed Milton and

14   making friends there.  I found it actually to be a good high

15   school.  I was happy to be back in school.

16   Q    How would you describe how the Cheries related to you

17   over time?  Familial type activities or use of the Internet,

18   things like, things like, teenager type interests?

19   A    I mean, the main family activity that we did was going

20   to church.  There wasn't really a lot of family activities

21   beyond that.  There was very little honest communication

22   between us because of language barrier but also because I

23   really didn't feel part of the family.  I didn't feel

24   welcome.  I felt just that they weren't considerate of

25   myself at all.

1    **Q**    And you went to Milton High School in the fall?

2    A    Yes.

3    **Q**    Could you walk there?

4    A    Yes, actually.

5    **Q**    Okay.  And what did you do after school in that year?

6    A    Well, I wasn't allowed again to go home because there

7    was nobody there.  So I had to go to the library after

8    school.  I also wasn't allowed to go over friends' houses

9    unless they had a criminal record check background.

10   **Q**    So did you spend much or any time with friends at their

11   houses?

12   A    Well, eventually due to, you know, different things.

13   But eventually I did break the rules and do that.  But I was

14   spending a lot of time at the library before that.

15   **Q**    Did you ever have friends over to the Cherie home?

16   A    Well, one time I did bring a friend there and I was so

17   embarrassed, I just brought them in for five minutes and

18   left.

19   **Q**    What was the family language?

20   A    They spoke Creole.

21   **Q**    Okay.  They also spoke English?

22   A    They spoke English, but they only spoke English to me,

23   they spoke Creole all the rest of the time.

24   **Q**    Could you tell us the food situation there in terms of

25   what rights you had to get food or how the family meals went

1    or --

2    A    I just, I remember that school breakfast and school

3    lunch were the meals that I could rely on.  There wasn't

4    necessarily consistent meal time.  But, you know --

5    Q    When you say consistent meal time, how was dinner

6    handled?

7    A    It wasn't like a family dinner necessarily.  And one of

8    the rules I found extremely weird was that I wasn't allowed

9    to drink during my meals, and that if I did drink, I wasn't

10   allowed to take big gulps because that wasn't ladylike.

11   Q    And did you make your own dinner meals or sometimes you

12   did and didn't?

13   A    No, I didn't make any meals there or do any shopping or

14   anything like that.

15   Q    Did you have adequate clothes for high school in your

16   mind?

17   A    In my mind, no, but I did have clothing.

18   Q    Did they buy you clothing?

19   A    Yes, with a clothing allowance.

20   Q    Okay.  And what was your state of mind or state of

21   anxiety during that time period?

22           MR. COLLINS:  Objection.

23           MR. GLEASON:  I'm going to withdraw it.

24           THE COURT:  Withdrawn.

25   Q    How were you feeling about that placement in the latter

1    part of, you know, of the placement, towards the time when

2    you finally left?

3    A    I felt, I felt scared.  I felt used, violated,

4    disrespected.  I mean, I did not feel like a real child.

5    Q    Did you talk to anyone about that?

6    A    I'm not really sure.  I thought that I couldn't because

7    of how powerless I felt in general.  But I, I talked to my

8    friends about it.

9    Q    And what was the next step in your, in your foster home

10   journey?

11   A    Well, as I was telling a friend of mine about it, he

12   told his mother, I think thinking his mother could help

13   personally, but then his mother just told DCF that I was

14   very depressed and in a very bad situation.  And that's when

15   they sent me to a week long evaluation center the last week

16   of October.

17   Q    Now, I would like to ask you a few questions about how

18   you were prepared for and how you felt about the moves.

19   We've touched a little bit on it, but I want to be a little

20   more specific.

21        How were you typically informed by DCF of when you

22   would be moving and where you would be moving to?

23   A    It depended on the situation, but there wasn't a lot of

24   time.  Sometimes, you know, I would come home from school,

25   print out my homework and have to move right after to a new

home.

Q    And when you say you moved, what type, what did you have
to take with you when you moved?

A    Anything I could pack up within the amount of time that
I had.  Sometimes I only had an hour to pack all of my
belongings, and if I didn't have luggage they went in
plastic bags.

Q    And how was -- how did these moves affect you in terms
of keeping up with friends?

A    You can't keep up with friends because you're not
really, it's not a focus.  I mean, I wasn't allowed to keep
up with friends.

Q    Do you know how many schools or school districts, or do
you have an idea you could give the Court about how many
different places you were in in terms of school districts
and schools?

A    Over five, over seven, perhaps.

Q    I would like to ask you briefly about the caseworker
visits while you were --

A    Okay.

Q    -- in foster care.

        Just describe for us what's it like.  How often
does it occur?  How long do they go on?  If you can
generalize for us.

A    Foster care placement in general?

1    Q    Yes, your meeting with your foster care social worker.

2    A    Oh.  The meetings are usually half an hour to an hour.

3    And they bring a packet called the service plan and there

4    are goals in the service plan and you have to check off or

5    sign that you're doing the goals of the department.  And

6    that's the meeting.

7    Q    What about talking about yourself or your feelings or

8    anything, is that, is that part of this type --

9    A    I suppose that's part of it, but really it doesn't

10   matter because they can't do anything about it, if that

11   makes sense.

12   Q    Well, just in terms of discussions, you get a chance to

13   discuss, or do you, in your own experience did you discuss

14   goals or -- I know there was a form for goals, but, I mean,

15   issues that were coming up and needs?

16          MR. COLLINS:  Objection.

17   A    I don't --

18          THE COURT:  I'm going to sustain that.

19          MR. GLEASON:  Yes.

20          THE COURT:  Ask a question.  Let me ask this

21   question.

22          MR. GLEASON:  I don't like it, your Honor.  I

23   didn't like it either.

24          THE COURT:  You would meet with a social worker.

25          THE WITNESS:  Uh-huh.

1          THE COURT:  And that would take a half an hour to

2    an hour.

3          THE WITNESS:  Sure.

4          THE COURT:  And I hear you say you have the sense

5    they couldn't do anything about it.  About what?  About what

6    types of things?

7          THE WITNESS:  About where I was placed, you know.

8    About, about what was going on in the home.

9          THE COURT:  How, how did you come to believe that?

10         THE WITNESS:  Because they always said there's not

11   enough foster homes.

12         THE COURT:  And that's -- you'd ask it.

13         THE WITNESS:  I knew this somehow.  Like, it was

14   something that, you know, I couldn't be in this situation.

15   They would think that I was complaining about nothing

16   almost, or that it wasn't enough to move me, you know.  Even

17   if I told them my feelings and everything, we didn't have a

18   close enough relationship, you know, they didn't quite

19   understand what it was, how it was affecting me.

20         THE COURT:  And that's how you felt?

21         THE WITNESS:  Yes.

22         THE COURT:  That there was nothing they could do to

23   get you into another home.

24         THE WITNESS:  I mean, it's not just how I felt,

25   that's what they were telling me as well, you know.  So it

1    was really reinforced by that.

2            THE COURT:  And if I'm following what you said, you

3    would say often, I'd like to go to a permanent place?

4            THE WITNESS:  All the time, yes.

5            THE COURT:  Go ahead, Mr. Gleason.

6    BY MR. GLEASON

7    Q    Okay.  Now, turning to your, your blood family, your

8    brothers and sisters?  Your brothers?

9    A    Sure.  Yes.

10   Q    Okay.  Starting with your parents, your mother and

11   father died, both died?

12   A    Yes.

13   Q    We talked about that.  At what age, at what age were you

14   without any parents?

15   A    By age twelve and-a-half.

16   Q    Okay.  And at that time could you just tell us the names

17   of your siblings and the ages, their current ages?

18   A    Their current ages -- there's Matthew, Christopher and

19   Andrew, Nicholas.  And Matthew is 23, Christopher's 19, and

20   Andrew's 18, and Nicholas is 13.

21   Q    Were you, in any of these placements of which we've

22   spoken a few, but not all of them obviously, were you ever

23   placed with a sibling?

24   A    Only, no, only one time I was placed with my brother for

25   a week and-a-half at, at a home, the first time we were ever

1    in a foster home.

2    Q    Did you ever raise with the social workers the goal of,

3    realistic or otherwise, of having all five of the kids

4    together, or at least some of them?

5    A    They said there was never any way that a foster family

6    would take all five of us.

7    Q    Did you have opportunities to visit with your siblings

8    while you were in foster care?

9    A    Not many opportunities, but, yeah, there were.

10   Q    Well, let's talk about what you do remember.  Were there

11   any times, were there any times where -- well, how often in

12   a year would you, in the best years would you get together

13   with, be able to get together with family?  Siblings?

14   A    To my -- how I remember is it was very infrequent.  In a

15   good year it could have been once or twice, maybe up to

16   three or four times.  But I remember specific times meeting

17   with my brothers.  So, it wasn't like a constant visitation

18   schedule.

19   Q    And where did these visits take place?

20   A    They mostly took place in the DCF office.  But there

21   were two family visits in which it took place outside of the

22   office.

23   Q    Okay, let's talk for a minute about the ones that took

24   place in the office.

25   A    Sure.

1    **Q**   What was the facility and how did that, how did those

2    arrangements work?

3    A    Well, they take you down to the DCF office and you walk

4    into a lobby and there's mirrored glass all over the place.

5    And there are a few chairs and a table and a linoleum floor

6    and they have family visits in two different rooms there, in

7    the lobby.

8    **Q**   Okay.  And you get as much time as you need or is there

9    a time limit?

10   A    There's usually like, it's like an hour or two hour time

11   limit.  And it all depends on what the schedule is for the

12   rooms.  Sometimes they would have to be held outside the

13   room in the lobby area because another family was using the

14   room.

15   **Q**   All right.  And then you said you had some opportunities

16   outside of that context to have family reunions or meetings

17   with some of your siblings.  Could you describe what you

18   remember?

19   A    Yes.  After my mother passed away, I remember getting

20   together with my brothers.  I remember my brothers, seeing

21   three of my brothers seeing their father, because my brother

22   Matthew and I have a different dad.  And they were allowed

23   to see him once a year.  So I remember that being part of

24   the visit.  And then I remember going to like a Domino's or

25   something like that.

1    **Q**    Did you raise, or ask the social workers that you were

2    working with for more visits, or to try to arrange more

3    visits or why you couldn't see them more often?

4    A    I would ask them why I couldn't see them more often,

5    because somehow I became aware that my brothers were

6    visiting each other without me.  And I asked my social

7    worker why that was and she said that I told her I didn't

8    want to see my brothers.

9    **Q**    Did you do so?

10   A    I told her it was really hard to see my brothers, that

11   it's extremely painful to see them for such a short time and

12   then have to leave them.

13   **Q**    Do you know where your brothers are now?

14   A    No, not all of them.  No.  I heard that one of them just

15   had to leave their foster home.  The third mother that has

16   gone sick on him, close to death.  I've heard my brother

17   Christopher's in an autism center, who has, he has no

18   socialization skills.  He's being treated like he's mentally

19   retarded when he's not.  And he's not learning any skills.

20          Anyway, and then my brother Matthew lives in

21   Hollister, California.  And my brother Nicholas is in an

22   adoptive home.

23   **Q**    Did you, did you call any social workers about trying,

24   recently about trying to reach those, reach out to some of

25   those brothers?

1    A    Well, it's hard, but I did this summer have the courage

2    to call Jim Leonardi, which is my brother's social worker,

3    and ask him to please have my brothers contact me.  I gave

4    them my e-mail, my phone number, et cetera.  The hard -- I

5    did get in touch with my brother, Christopher, however, it

6    was very difficult, as I still haven't heard from him, and

7    I've been asking him to call me since August.

8    Q    Briefly now, we're almost at the end of this

9    examination.  I would like to ask you about medications,

10   psychotropic medications that you remember --

11   A    Okay.  Sure.

12   Q    -- being prescribed.

13        Do you know when you started to be prescribed

14   psychotropic medications?

15   A    Yes, when I was young, about age six after my mother

16   dying.

17   Q    And what do you remember about what went on then?

18   A    I remember them saying because my father had bipolar

19   that I was predisposed to it and that I needed to be on

20   Lithium.

21   Q    And you began taking it at six years old?

22   A    Yes.  Six or seven.

23   Q    Six or seven.

24   A    To the best of my knowledge.

25   Q    Okay.  Do you recall an assignment to the St. Franciscan

1    Children Center?

2    A    Yes.  Yes, I would, I would be at these hospitals for up

3    to two weeks at a time because that's the longest that they

4    can take you.  Sometimes four days because that's the

5    longest they can take you.  And they were doing tests of

6    medications on me to see what made my behavior better, until

7    they realized that it was the environment causing my

8    behavior problems.

9    Q    How often have you been, when you were in foster care

10   were you on those types of medications?

11   A    Yes.

12   Q    How often?

13   A    All the time.

14   Q    How many medications at a given time?

15   A    Lots of different medications, up to five, possibly more

16   at a time.

17   Q    And were these being prescribed by different therapists

18   or different medical --

19   A    It just depended on where I was living because every

20   place that I moved I had to change a psychiatrist,

21   therapist, et cetera.

22   Q    And how did the medications make you feel?

23   A    Absolutely dreadful, and I tried to refuse to take them

24   as much as possible.

25            THE COURT:  Could you be any more specific when you

 1    say they made you feel dreadful?

 2            THE WITNESS:  Okay.  Sure.  Definitely.

 3    Definitely.  I --

 4            THE COURT:  You tell me.

 5            THE WITNESS:  Yeah.  Well, what happens is you're

 6    forced to take the medication.  You're told that you have,

 7    you know, this disorder.  And then you take it and it

 8    consumes you, it feels like there's a weight on you, you

 9    can't think as clearly.  It's very frustrating, it's very

10    irritable.  And then what happens is they say, oh, this

11    child has hyperactivity disorder, let me give her an ADD

12    medicine.  So they give me that.  However, because that's a

13    medication that makes you very hyper, I couldn't sleep at

14    night.  So then they would give me the Trazodone.  But the

15    Trazodone wasn't strong enough to counteract the other

16    medications.  On top of that, I'm on possibly a number of

17    different medications called Lithium, Depakote, all these

18    different kinds, and they, you know, nobody has done any

19    real studies on how they interact with each other and how

20    they --

21            MR. COLLINS:  Objection, your Honor.

22            THE WITNESS:  Or to my knowledge, to my personal

23    knowledge.

24            THE COURT:  Actually, again, I will strike out the

25    business no one has done any studies.

1         THE WITNESS:  Sure.  Sure.  But that's not, that's

2    not necessarily my business to say.  I just want to say

3    that.

4         THE COURT:  I just have to do, I just have to do

5    what I have to do.  I asked you to tell ME.  Let me say it

6    back to you to see if I understand.

7         The medicine that they wanted you to take makes you

8    feel like you're under a weight, it makes you feel dull, and

9    it's hard to get your thoughts in the normal order.

10        THE WITNESS:  Sure.

11        THE COURT:  And then, at least as you experienced

12   it, in essence to perk you up they give you an attention

13   deficit disorder medicine that, as I used the word, makes

14   you feel hyper and that made it hard for you to sleep.

15        THE WITNESS:  Sure.  Yeah.

16        THE COURT:  Is that accurate?

17        THE WITNESS:  Yes.

18        THE COURT:  I need to know what, how you felt.

19        And it made you feel jittery?

20        THE WITNESS:  Yes.  Yeah.

21        THE COURT:  And then what, if there was other

22   feelings.

23        THE WITNESS:  Just being forced to take something

24   that you know you feel better off of because you refused to

25   take it before and you felt better.  And then having someone

1    forcing you to take it, threatening you that you'll have to

2    go to a mental hospital or that you'll be kicked out of your

3    foster home if you don't take it.  That's sort of -- that's

4    exactly how it goes.

5              **THE COURT:**  Thank you.

6              Go ahead, Mr. Gleason.

7    **Q**   Was there a time when you felt depressed, I think is the

8    word you used for me, when you had a medication at 14 that

9    caused you to gain weight?

10   A   Well, yes.  When I was 14, I was sent to a new

11   psychiatrist who wanted to put me on a new medication that

12   had just come out, and unfortunately I noticed within three

13   to four weeks I gained 45 pounds.  And I still have scars

14   from it all over my body.

15   **Q**   Turning now to the last part of your stay in foster care

16   as a charge, the independent living and aging out process.

17   When did you and DCF -- what did you do with DCF to try to

18   prepare for life after, life at 18?

19   A   Right.  DCF has a workbook that they wanted me to fill

20   out with lessons on how to become an adult.

21   **Q**   A workbook?

22   A   Yes.

23   **Q**   Well, what did you do with the workbook?

24   A   I thought that it wasn't necessary.  I considered the

25   workbook just another worksheet, math worksheet, and I

1    didn't think that it was preparing me at all.  I think I

2    needed real, real preparations.  Someone to teach me how to

3    drive, teach me how to shop, teach me how to cook.  Basic

4    things.

5    **Q**   Who was your foster parent in this time period when you

6    were preparing for adult, the next step?

7    A   Well, at the time I didn't have a foster parent, they

8    called her an independent living partner.  And her name was

9    Leona Turgeon.

10   **Q**   What did you understand independent living partner to

11   designate or to mean?

12   A   Well, Leona told me that we were roommates.

13   **Q**   How old was she, approximately?

14   A   I'm not sure.  She's, she's a middle-aged woman.

15   **Q**   And where did you live when you were living with Ms.

16   Turgeon?

17   A   I lived in Westford, Massachusetts.

18   **Q**   How long were you there?

19   A   I was there for about two years.

20   **Q**   Was this another specialized foster home?

21   A   It was, yes, specialized, it was under a different

22   organization, Harbor School.

23   **Q**   So it was a private provider as well?

24   A   Yes.  Yes.

25   **Q**   You had two sets of social workers, did you?

1    A    Yes.

2    Q    What did Ms. Turgeon do, if anything, to help you with

3    this transition to, call it adulthood?

4    A    She didn't really do much.  I, I did learn a little bit

5    about driving from my high school boyfriend's parents, but I

6    didn't finish learning.  She never did anything to really

7    help me prepare.

8    Q    Did you ever shop for food with her or talk about

9    budgets or --

10    A    We never really talked about --

11    Q    -- talk about money?

12    A    -- that kind of stuff, no.

13    Q    What did you talk to her about, if anything?

14    A    That's a hard question to answer, I'm afraid.  But, you

15    know, basically she considered me her roommate.  And she

16    told me the reason why I was staying in her house was so

17    that I could learn that I could never rely on anybody but

18    myself.

19            THE COURT:  So that you could learn?

20            THE WITNESS:  That I could learn that I was never

21    to rely on anybody but myself.

22    Q    Did you visit that home before actually moving in?

23    A    I visited it once, yes.

24    Q    And did you talk to your social worker or therapist

25    about it?

1    A    Yeah.  After I got back, I talked to the therapist about

2    it.  I told him that, what happened, and that I didn't find

3    it very friendly or welcoming, but that I had nowhere else

4    to go, and that was my only choice.

5    Q    Did Ms. Turgeon supply, give you any material things?

6    Clothes or other things you might need?

7    A    Well, I mean, there is a clothing allowance that I was

8    allowed to spend at this point.  And for Christmas I did get

9    a dress form because I was going to study at Parsons.

10   Q    Did she buy you a backpack?

11   A    Yeah, she did get me a backpack.  But when I asked her

12   if she could get me a backpack, she said, oh, that's a good

13   question, because I don't have to get you a backpack, but I

14   will.

15   Q    What did you have to eat the first night you moved in?

16   A    She said, oh, I don't want to make, I don't want to make

17   it any different from how we normally work, here's a peanut

18   butter and jelly sandwich on a paper plate.  And that's what

19   I ate for dinner.

20   Q    And what did you observe about how she spent her time?

21   Was she working, or how did she --

22   A    Well, yes, she worked.  And then she came home.  She

23   walked the dogs for several hours.  She did things like

24   tanning and nails and taking care of herself in that way.

25          I had a memory this morning that I recalled where

1    she went to the Outback Restaurant and brought me with her

2    and ordered food for herself and ate it in front of me.

3    **Q**    You turned 18 in your junior year of high school?

4    **A**    Yes.  It was supposed to be my senior year.  However,

5    because I switched so many schools they made me stay back a

6    year.

7    **Q**    And you were living at the time with the Turgeon

8    roommate?

9    **A**    Yes.  Yes.

10   **Q**    Okay.  And so you didn't get full credit for some year

11   that you were moving around and therefore you --

12   **A**    Well, yeah, because I moved from -- just in my freshman

13   year there were so many disruptions that they did not want

14   to count my credits at Westford Academy.  It was their

15   choice to count my credits or not and they didn't want to.

16   So they wanted me to repeat the year.

17   **Q**    And did you talk to Leona about what would happen when

18   you turned 18?

19   **A**    Yes.  She said I was welcome to stay after I turned 18,

20   which I was relieved because I did not want to be homeless

21   obviously.  I had no idea what I was going to do.  However,

22   of course, I wanted to leave DSS because I had such a bad

23   experience.  So I stayed there and, you know, said I have to

24   finish this high school, because of course I don't want to

25   be a high school dropout.  But what happened was she was

1    dating another guy at the time and she was also selling the

2    house.  So, she's in the process of selling the house that

3    I'm staying in.  So, you know, I ended up visiting Maine for

4    a weekend and decided that I couldn't go back to the house,

5    that it was just too much.  I really needed to get out of

6    that situation, get a job, start a life.  And when I went

7    back to go get my belongings, she promised me that the locks

8    would be off the door from the realtor, but they weren't.  I

9    couldn't even get through the door.  And she wasn't home and

10   I couldn't reach her.  So I actually had to climb over the

11   fence and go through the doggie door in order just to get my

12   belongings and get out.

13   **Q**   All right.  You went to Maine, and is that where you got

14   your GED degree?

15   A    Yeah, I got my GED right away so then it would be fresh

16   in my memory.

17   **Q**   And where do you live today?

18   A    Today I'm in Brooklyn, New York.

19          **MR. GLEASON:**  No further questions, your Honor.

20          **THE COURT:**  Mr. Collins, do you wish to inquire?

21          **MR. COLLINS:**  Yes, I do, your Honor, thank you.

22          **THE COURT:**  You may.

23          **MR. COLLINS:**  I have a couple of documents that

24   I'll be going over with the witness.  So, if it's okay, I'll

25   do that through the podium.

1          THE COURT:  That's fine.  Have you got copies for

2    me?

3          MR. COLLINS:  Yes, I do, your Honor.

4          MR. GLEASON:  And I would just flag this issue,

5    your Honor.  There's a protective order on documents from

6    her social worker file, which is fine to use them, but I

7    just would like to ask that they be physically part of the

8    impoundment order, covered by the impoundment order.

9          THE COURT:  The documents -- well, maybe this will

10   deal with it.  Exhibits in this case are exhibits for the

11   Court, the fact finder.  I'm not sharing the exhibits in

12   this case with anyone.

13         MR. GLEASON:  That's fine.

14         THE COURT:  When the case is over the exhibits will

15   be returned.  And since you have them, if it's necessary to

16   put together a file for appeal that may be done.

17         MR. GLEASON:  Thank you.

18         THE COURT:  And that's how we'll treat all

19   documents.  The documents -- exhibits are for me.  I'm the

20   fact finder here.  They'll be in my custody.

21         Go ahead.

22         MR. COLLINS:  Thank you, your Honor.

23         THE COURT:  Are these admitted in evidence?

24         MR. COLLINS:  Not yet, your Honor.

25         THE COURT:  All right.

1          **MR. COLLINS:**  They will be.

2          **THE COURT:**  Well, is there any objection to them?

3          **MR. COLLINS:**  Actually I don't know, your Honor.

4          **MR. GLEASON:**  I don't know what the basis -- I

5    would like to see them.

6          **THE COURT:**  Well, I would expect you to get

7    together on these matters to save some time.

8          **MR. GLEASON:**  We just got these last night, your

9    Honor.

10          **THE COURT:**  Very well.  We'll proceed in the

11   ordinary course.  Go ahead.  But I expect you to get

12   together and mark documents.  Now, you get a day off

13   tomorrow.  I want all the documents marked either for

14   identification or in evidence.

15          **MR. GLEASON:**  We've been working under that

16   assumption, your Honor.

17          **THE COURT:**  I'm sure you have.  Go ahead, Mr.

18   Collins.

19          **MR. COLLINS:**  Certainly, your Honor, thank you.

20                    **CROSS-EXAMINATION**

21   BY MR. COLLINS

22   **Q**   Good, good morning still, Ms. James.  My name is Jeffrey

23   Collins, I'm an Assistant Attorney General, and I have some

24   questions for you this morning.

25   A   Okay.  Very well.

1    Q    I just want to be clear, you are not a member of the

2    plaintiff class in this case, correct?

3    A    No, I wasn't asked.

4    Q    Thank you.

5         And, in fact, you turned 18 in 2006, correct?

6    A    Sure.  Yes.

7    Q    So, all of the care that you've been talking about here

8    today in your testimony was all care that was received prior

9    to the year 2006?

10   A    Sure.  Yeah.

11   Q    You testified that you are 24 years old now?

12   A    Yes.

13   Q    You live in New York City?

14   A    Yes.

15   Q    You live on your own?

16   A    Yes.

17   Q    You pay rent?

18   A    Yes.

19   Q    And since you were 18 you've worked quite a bit; isn't

20   that fair to say?

21   A    Yes.

22   Q    You've worked in both retail?

23   A    Yes.

24   Q    And you've worked at a number of your own businesses,

25   correct?

1    A    Sure.  Yeah.

2    Q    Would you, would you right now please, if you would,

3    describe for us your work history since turning 18?

4    A    Sure.  I turned 18.  I never had a job before or any job

5    experience.  I went into a store, an Army Navy store that I

6    was familiar with, and I was hired there.  After spending

7    some time there, I went to work at a jewelry store where I

8    quickly became manager.  Spent about a year there.  Then I

9    went to work at a bed and breakfast.  And I spent some time

10   there.  However, at that point I was really hoping to

11   further my education and moved back to Massachusetts to get

12   the tuition waiver in order to go to school.  So, I was

13   doing that.  And in that process I had, you know, a few

14   brief jobs but nothing, you know, because I was focusing on

15   the school portion.

16   Q    And you said that you worked in a jewelry store.

17   A    Sure.

18   Q    And quickly became the manager.

19   A    Uh-huh.

20   Q    Was that the jewelry store in Maine?

21   A    Yes.  Yeah.

22   Q    And if I'm not mistaken you were largely running that

23   business by yourself as the manager?

24   A    Yeah.  Yes.  I learned how to run a store alone.

25   Q    And so that would have been right around 2006 shortly

1    after you turned 18, in fact, I think you were 19.

2    A    Yes.  Yeah.

3    **Q**    You talked about some of the retail positions that

4    you've held.  Can you talk a little bit about -- I know

5    you've -- strike that.

6          You've had a number of your own businesses?

7    A    Sure.  Yeah.

8    **Q**    That you've created and run, correct?

9    A    Well, there were, there were starts of businesses.

10   There were -- ah, you know, I work in vintage clothing and

11   clothing designs.  So it was basically collections of

12   vintage pieces as well as pieces I designed and altered that

13   I would sell through the Internet, as well as to stores like

14   Urban Outfitters.

15   **Q**   So, if you could, let's just back up a little bit, I

16   want to understand a little bit more about these businesses

17   and how you went about creating them.

18         These were online sales businesses?

19   A    They were online.  There's a site called Etsy.com where

20   a lot of artisans put their, their work.  And I was taking

21   vintage articles as well as articles I had made and

22   photographing them and putting them online.

23   **Q**    You said articles that you made.

24   A    Sure.  Yeah.

25   **Q**    What types of things did you make?

```
 1    A    I sew.  So I made clothing.

 2    Q    You made clothing?

 3    A    Yes.

 4    Q    And you would take and make that clothing and then --

 5    you actually created a website for your business items, or

 6    your business, correct?

 7    A    Yeah.  Yeah.

 8    Q    And you would put those items up on your website and

 9    sell them?

10    A    Yes.  Yes.

11    Q    To various outfits?

12    A    Yes.

13    Q    In fact, at one point you were selling these items all

14    the way out in Los Angeles; is that correct?

15    A    Yes.  Yes.

16    Q    Is there any other businesses -- we've talked about your

17    fashion businesses that you've had.  Is there any other

18    businesses that you've worked on yourself?

19    A    No.  These are what I like to do for work.

20    Q    All focused in the fashion industry?

21    A    Well, for now, yes.

22    Q    That's your passion?

23    A    That's one of my main passions, yes.

24    Q    And are you still working on your own designs and

25    clothing lines and businesses and websites to this day?
```

1    A    Well, yes.  I would like to.  I am working as much as I

2    possibly can.  I did have a sale over the most recent

3    Christmas break where I presented a very small collection.

4    However, I have not had the time or, you know, everything

5    put into place to create a portfolio that I can show to

6    interested professionals.

7    Q    Are you still running your own website?

8    A    I have a website, but I'm not running it at this time.

9    Q    Are you still putting items up for sale when you like on

10   the website?

11   A    Not at this time, but I plan to in the near future.

12   Q    With respect to, just going back with respect to the

13   retail positions that you've held since you turned 18.  Have

14   you described for us all of the retail jobs that you've held

15   since 18?

16   A    Not each and every single one, but in general, yes.

17   Q    Which, which other ones have you had since you've turned

18   18 that you haven't talked about yet?

19   A    I worked in a vintage store in Greenwich Village.

20   Q    In New York?

21   A    Yes.

22   Q    Any others?

23   A    Not that I can quite recall at this time.

24   Q    Okay.  And with respect to the number of jobs that

25   you've held, not working for yourself, but in the retail

1    industry, you've never been subject to any discipline or any

2    reprimands at these jobs, correct?

3    A    No, I don't think so.

4    **Q**    In fact, you have all, what you would call very good

5    references from these jobs, correct?

6    A    Well, they were good references before they became aged

7    references that are not really professional to use at this

8    time.

9    **Q**    But were you to seek a reference from any of these

10   positions they would be good references?

11   A    Oh, well, yes.  Yes.

12   **Q**    Ms. James, I want to talk to you a little bit now about

13   your life prior to coming into DCF custody.  And I'm going

14   to ask you some questions that I recognize might be

15   difficult, and I apologize in advance for that, and I will

16   do my best to move through these as quickly as I can.

17        **THE COURT:**  Why don't we --

18   A    I really appreciate that.

19        **THE COURT:**  Why don't we take the morning recess

20   rather than get into it and then break, because it's about

21   time for the recess.  We'll take a recess --

22        **THE WITNESS:**  Thank you.

23        **THE COURT:**  -- now for one-half hour.  We'll recess

24   for one-half hour and resume.  We'll recess.

25        **THE CLERK:**  All rise.

1          THE WITNESS:  Thank you very much.

2          (Recess.)

3          THE CLERK:  All rise.  The United States District

4     Court is back in session, you may be seated.

5          THE COURT:  Go ahead, Mr. Collins.

6          MR. COLLINS:  Thank you, your Honor.

7               CROSS-EXAMINATION (Cont'd)

8     BY MR. COLLINS

9     Q   Ms. James, again I'm going to talk to you a little bit

10    now about your life before entering foster care.

11    A   Sure.

12    Q   Your father, your biological father had bipolar

13    disorder, correct?

14    A   He was diagnosed with that, yes.

15    Q   And in 1993 he committed suicide?

16    A   He committed suicide in 1994.

17    Q   1994.  Thank you.

18              And he was at times in a state psychiatric

19    hospital, correct?

20    A   Yes.

21    Q   And at the time that he committed suicide you were five

22    years old?

23    A   Yes.  It was two days before my sixth birthday.

24    Q   And in 1996 your mother was admitted into a psychiatric

25    hospital.  Yes?

1    A    Yes.  Although I was not aware of it at the time.

2    Q    And at that time you were eight years old?

3    A    Yes.

4    Q    And as we heard from your testimony earlier, at

5    that point when your mother went into hospitalization you

6    went into the care and custody of, at that time, the

7    Department of Social Services?

8    A    Yes.

9    Q    And that was for approximately 20 days or so?

10    A    Approximately, yes.

11    Q    And after those 20 days you returned home to your

12    mother?

13    A    Yes.

14    Q    Now, at some point did your mother remarry?

15    A    No.  She was never married.

16    Q    And at some point, though, she came to live with another

17    man by the name of Rick Marquis?

18    A    Yes.

19    Q    And Mr. Marquis was father to your brothers,

20    Christopher, Andrew and Nicholas, correct?

21    A    Yes.

22    Q    And Mr. Marquis lived with you?

23    A    Periodically, yes.

24    Q    You and your mom.

25         And Mr. Marquis was a violent man, correct?

1    A    At times, yes.

2    Q    He was abusive?

3    A    At times, yes.

4    Q    And you witnessed this violence as a child, correct?

5    A    Yes.

6    Q    Was he ever violent towards you?

7    A    There were occasions, yes.

8    Q    And how old were you at that time?

9    A    This, this happened throughout my childhood.

10   Q    In 1997, sometime in 1997 you returned to the care and

11   custody of the department after your, after you were

12   physically abused while in your mother's care, correct?

13   A    No, that's not correct.

14   Q    Well, at some point in 1997 you did return to DCF

15   custody?

16   A    Yes.

17   Q    And at some point in 1997 you were hospitalized?

18   A    At some point, yes.

19   Q    In a psychiatric hospital?

20   A    Yes.

21   Q    The Franciscan Children's Hospital?

22   A    Yes.

23   Q    And that was for about two weeks?

24   A    Uh-huh.

25   Q    And that was during a time where you had actually

1    threatened to burn down your mother's home, correct?

2    A    I do not remember making that threat, no.

3    Q    And at some point after you were hospitalized in the

4    care of DCF custody in 1997 you returned back to your home

5    and back to your mom, correct?

6    A    Yeah.

7    Q    And then in approximately January of 1998 you were back

8    in DCF custody after another situation at home with your

9    mother?

10   A    I would say so, yes.  I don't remember exact dates, but

11   yes.

12   Q    Okay.  And if you recall you remained in DCF care and

13   custody until about June of 1998?

14   A    Okay.

15   Q    And at that point you again went back home to your

16   mother.  Yes?

17   A    Okay.  Yes.  I, I, like I said, have trouble recalling

18   the ins and outs.

19   Q    Certainly.

20   A    And dates and specifics.  But, yes, there was a lot of

21   returning back and forth home to my mother's house.

22   Q    Back and forth during a time where your mother was not

23   able to care for you and she was being hospitalized herself.

24   Yes?

25   A    No, she was able to care for my younger brothers.  There

1    were times where she was hospitalized.  However, you know,

2    she, she wasn't being hospitalized during that entire time.

3    Q    Certainly.  Absolutely.  There were periods of time

4    where she was in and out of hospitalization?

5    A    Sure.  Yeah.

6    Q    And during those periods of time you were in and out of

7    foster care?

8    A    Sure.  But that wasn't directly correlated.

9    Q    In September -- and I recognize that you can't

10   necessarily recall these exact dates.  So if I say a date

11   and it's wrong or you can't recall, please tell me that.

12   A    Okay.

13   Q    But in September of 1998 you were hospitalized again,

14   correct?

15   A    Perhaps, yes.

16   Q    And this was after you pushed your little brother down

17   the stairs?

18   A    I do not recall that.

19   Q    And then in December of '98 you returned back home to

20   your mother again?

21   A    Sure.  If that's what your records indicate then

22   perhaps, yes.

23   Q    And during this time you were refusing to go to school,

24   you were afraid to leave your mother at home; isn't that

25   right?

1    A    After my first destruction, where I was taken away from

2    home at school is where they took me away first.  So I was

3    afraid to return back to school in fear that they would take

4    me away again.  And I thought spending time with my mother

5    was more important.  However, at the time they considered

6    that bad behavior rather than a separation anxiety disorder

7    which is what it was.

8    Q    And in May of 1999 you were again back in DCF custody

9    and care, correct?

10   A    Yes.

11   Q    Now, during this time from, let's say approximately 1995

12   or '96 through 1999, the Department of Children and

13   Families, then DSS --

14   A    Yes.

15   Q    -- they were providing services to your family, correct?

16   A    Yes.

17   Q    And to your mother as well?

18   A    Yes.

19   Q    Services that were intended to assist, to try to

20   stabilize your family.  Yes?

21   A    They were intended to do so.  However, they were

22   extremely insensitive services.

23   Q    And the intent was to stabilize your family so that you

24   could remain at home with your family, with your brothers

25   and your mother?

1    A    I, I would say that that would be everyone's goal, yes.

2    Q    In December of 2000 your mother committed suicide?

3    A    Yes.

4    Q    And at that point you were 12 years old?

5    A    Uh-huh.

6    Q    And of course at that time you went back into DCF care

7    and custody?

8    A    Yes.  Well, I was already in DCF care.  I was not living

9    at home with my mother when she died.

10   Q    Is it fair to say that you blame DCF at least in part

11   for your mother's death?

12   A    I don't blame anyone for my mother's death but my

13   mother.  The fact is that my mother spent the first four

14   and-a-half years of her life in foster care as a biracial

15   child who was not able to be adopted at that time.  Because

16   of that abuse she endured.  She passed it on as a cycle to

17   her family.  So, with that cycle, I have inherited things

18   that I despise and that the Department of Children and

19   Families has not truly helped to, to fix, to help mend.

20   Q    And if we could, just briefly, I would like to talk to

21   you a little bit about the mental health issues that you,

22   yourself, have experienced.

23   A    Sure.

24   Q    You have received multiple diagnoses throughout your

25   childhood?

1    A    Yes.

2    Q    One of those is bipolar disorder?

3    A    Yes.

4    Q    You've also received a diagnosis of opposition defiant

5    disorder?

6    A    I don't recall that, but I suppose, yes.

7    Q    Attention deficit hyperactivity disorder?

8    A    Yes.

9    Q    I'm not going to get the pronunciation of this right,

10   but trichotillomania is something that you've experienced.

11   Yes?

12   A    That is something that I've experienced, however, it was

13   not diagnosed.

14   Q    And what do you understand trichotillomania to be?

15   A    I understand it to be when someone is stressed and

16   they're so stressed that they pull out chunks of their hair.

17   Q    And, in fact, you were at one point pulling your own

18   hair out.  Yes?

19   A    Yes, in the transition from fifth to sixth grade, I

20   ended up pulling a large chunk of my hair out and nobody

21   noticed, or if they did notice, but they didn't do anything

22   about it.

23   Q    And you've also been diagnosed with PTSD?

24   A    Yes.

25   Q    As well as reactive detachment disorder?

1   A   I was not aware of that, but okay.

2   Q   You threatened to commit suicide more than once.  Yes?

3   A   I have felt that I have, I have a very hard life and

4   that it's very hard to live life, but I do not want to kill

5   myself and I did never, I would never threaten to actually

6   kill myself.

7   Q   In fact, in June of 2002 through October of 2002 you

8   were hospitalized again because you had threatened to harm

9   yourself?

10  A   No, that is not why I was hospitalized.  I -- that is

11  not, no.

12  Q   You spoke earlier about your time in the care of the

13  Cherie family.

14  A   Sure.  Yes.

15  Q   The family that you were staying with in Newton.  I'm

16  sorry, Milton?

17  A   Yes.

18  Q   And I believe you said you were there from approximately

19  the summer of 2002 through the winter of 2002?

20  A   Through the fall.

21  Q   Okay.  That was a specialized program for you, correct?

22  A   Correct.  That's what it was called.

23  Q   And that was a program where given your needs you had to

24  be supervised?

25  A   I -- yes.  Sure.

1    Q    And there were a number of things that you testified to

2    earlier that you did not like about the Cherie home.   Yes?

3    A    There were things that were, were very difficult to

4    endure, yes.

5    Q    And I know you talked about some of those things on your

6    direct examination.   I want to talk about a couple things

7    that you didn't talk about.   And one is you were, you didn't

8    like the fact that when you were in that home you couldn't

9    use the computer or the Internet.   Yes?

10   A    Well, yes, because I wanted to maintain communication

11   with my friends.

12   Q    And you weren't always allowed to watch television?

13   A    No.

14   Q    You had to go to bed early at times?

15   A    All of the time, yes.

16   Q    And your foster parents in that home were rather strict.

17   Yes?

18   A    I don't know whether they were just strict or cold.

19   It's hard to really put an actual adjective to it.

20   Q    During the time that you've been in, that you were in

21   DCF custody, it's fair to say that your goals changed

22   multiple times?   And what I mean by that is you started out

23   with the goal of adoption.   Yes?

24   A    I wasn't aware of that.   I mean, I always expressed

25   wanting to be adopted, but I am not sure exactly what the

1    service plan goal indicated at that time.

2    Q    Is it fair to say that you, yourself, were torn with the

3    idea of being adopted?

4    A    Well, because of my experience with the Herricks, of

5    course, I wanted to be adopted, however, I wanted someone to

6    respect my natural family as well.

7    Q    In fact, in 2006, I'm sorry, in 2004, when you were 16,

8    your goal changed to independent living.  Yes?

9    A    Yes, it did.

10   Q    And that's when you went to move with Ms. Turgeon in

11   Westford?

12   A    Yes.

13   Q    And that was specifically a situation designed to be an

14   independent living program for you?

15   A    Yes.  Although at the time I thought I was going to a

16   real foster home.

17   Q    And you stayed with Ms. Turgeon from approximately 2004

18   through 2006?

19   A    Yes.

20   Q    And during this time you attended high school at

21   Westford Academy?

22   A    Yes.

23   Q    And you did well at Westford Academy, correct?

24   A    Not really, no.

25   Q    In your sophomore year you were awarded the Christian

1    Herter Scholarship, weren't you?

2    A    Well, yes.

3    Q    Do you remember that?

4    A    Yes.

5    Q    And that scholarship was to pay for half of your tuition

6    for all four years at a state school?

7    A    Yes.

8    Q    In May of 2006 you turned 18, correct?

9    A    Yes.

10   Q    And at that point you were no longer required to be in

11   custody of the department.  Yes?

12   A    Yes.

13   Q    But you asked to stay in the custody of the department,

14   didn't you?

15   A    Well, yes.  I needed to finish high school.

16   Q    You wanted to stay with Ms. Turgeon in an independent

17   living situation and finish at Westford Academy?

18   A    Yes.

19   Q    And so you applied for what's known as voluntary

20   services from the department.  Yes?

21   A    Yes.

22   Q    And you understand that it's within DCF's discretion

23   whether or not to accept you into their program for those

24   services given that you're now 18 and an adult?

25   A    Oh, sure.  Yes.

1    Q    And, in fact -- well, they're not required to accept you

2    for voluntary services, it's discretionary?

3    A    I suppose that's correct.

4    Q    And, in fact, to gain those services you actually wrote

5    a letter to the department asking and advocating for

6    yourself to be accepted for services.  Yes?

7    A    Oh, yes, I remember the letter.  It stated that I wanted

8    to stay in DCF so that I could receive the tuition waiver to

9    go to school and other scholarships that may be associated.

10             MR. COLLINS:  And, your Honor, at the break I did

11   have a conversation with counsel and there is no objection

12   to what I believe has been numbered Exhibit 1060.  So at

13   this time I would like to --

14             THE COURT:  And that's the letter.

15             MR. COLLINS:  That is, that is one of the letters,

16   yes.

17             THE COURT:  Dated 11-17-2008?

18             MR. COLLINS:  Actually the other one, your Honor.

19             THE COURT:  The other one.

20             MR. COLLINS:  That is correct.

21             THE COURT:  To whom it may concern, undated.

22             MR. COLLINS:  That is correct, your Honor.

23             THE COURT:  1160?

24             MR. COLLINS:  1060.

25             THE COURT:  1060.  Exhibit 1060 in evidence.

```
 1              (Exhibit marked in evidence.)

 2         MR. COLLINS:  By my very tentative count.  And

 3    so --

 4         THE COURT:  Well, you give me pause there.  Now

 5    it's marked Exhibit 1060; it's in evidence.

 6         Go ahead.

 7         MR. COLLINS:  Thank you, your Honor.  And we're

 8    going to try to pull this up.

 9         THE COURT:  And the next one is 1061?

10         MR. COLLINS:  That's correct, your Honor.

11         THE COURT:  All right, that's admitted, Exhibit

12    1061.

13         MR. COLLINS:  Thank you.

14              (Exhibit marked in evidence.)

15    Q    Just a minute, Ms. James.  You should, and momentarily,

16    have on your screen a copy of the letter, and I know we're

17    working to make that happen.

18         THE COURT:  She has the hard copy.

19         MR. COLLINS:  Oh, okay.  And does your Honor have a

20    copy as well?

21         THE COURT:  I don't know as I need it.  She's going

22    to give it back to me.  Go ahead.  It's not long.

23         MR. COLLINS:  Okay.  All right.

24    Q    Ms. James, showing you what's been marked as Trial

25    Exhibit 1060.  Do you have that in front of you?
```

1    A    Yes.

2    Q    This is one of the letters that you wrote to DCF seeking

3    voluntary services?

4    A    Yes.  Yes.

5    Q    And if you would look at the letter, I'm looking at the

6    last sentence of the first paragraph.  It says:  I still

7    need to be involved with DSS in order to ensure my future is

8    as successful as possible.

9         Did I read that right?

10   A    Yes.

11   Q    And if we look down to the next paragraph, it says, or I

12   should say you say:  Although enduring continuous struggle

13   with the department, I realize there are some advantages.

14        Yes?

15   A    Yes.

16   Q    And you go on to say later in that paragraph, do you see

17   about three-quarters of the way down:  My independent living

18   skills have reached the level where I can achieve so much on

19   my own and have little room for improvement.

20        Do you see that there?

21   A    Where?

22   Q    It's the second to last sentence in the middle

23   paragraph, starting with the word "My."

24   A    Yes.  Ah --

25   Q    Did I -- did you write --

1    A    My living, my independent living skills have reached --

2    Q    Did you write that?

3    A    I suppose I did.  I know that this letter was, was, was

4    written by me.  However, I received help from DSS because

5    they told me, you know, it needs to be, it needs to be

6    perfect.  You don't want to say all of your bad experiences.

7    So I thought I would start out by saying that, you know, I

8    did have some bad experiences, but the only good thing about

9    being in DSS is that you can get the tuition waiver and go

10   to school and that I felt like I was ready to, to do that.

11   Q    You wrote this letter?

12   A    Yes.

13   Q    The next sentence, it says, if you would follow me, or

14   you say:  I have worked very hard and believe that the

15   chance to sign on to stay with the department while I'm

16   still receiving an education is clearly necessary.

17   A    Yes.

18   Q    You wrote that?

19   A    Yeah.

20   Q    And then you close with:  Thank you for this chance and

21   the opportunity to remain with the department in hopes that

22   my opportunities in terms of education and living

23   independently will be expanded.

24        Yes?

25   A    Yes.  Uh-huh.

1    **Q**   You were 17 years old when you wrote this letter.  Yes?

2    A   Yes.

3    **Q**   And ultimately as a result of this application DCF

4    accepted you back into care to receive voluntary services?

5    A   Yes.

6    **Q**   And these services for you included things like ongoing

7    case management by a social worker.  Yes?

8    A   Yes.

9    **Q**   Medical insurance?

10   A   Medical insurance.

11   **Q**   Dental insurance?

12   A   Uh-huh.

13   **Q**   Individual and group therapy?

14   A   No.

15   **Q**   Those weren't available to you?

16   A   No.

17   **Q**   Transportation provided by the department?

18   A   No.

19   **Q**   Financial assistance from the department?

20   A   They paid me the stipend that they would pay a foster

21   parent which is $18 and some cents per day.

22   **Q**   Which was paid to go towards your room, your rent and

23   room and board and things like that?

24   A   Sure.  Yes.  Well, I guess.

25   **Q**   I'm sorry?

1    A    Yes.  I would assume.

2    Q    And of course that approximates to about $500 a month?

3    A    Yes.

4    Q    You were also given a clothing allowance?

5    A    Yes.

6    Q    And they assisted you in employment searches and the

7    like?

8    A    No.

9    Q    And you remained voluntarily with the department until

10   approximately 2006 when you decided to move to Portland,

11   Maine.  Yes?

12   A    Yes.

13   Q    And at that time you were 18 years old?

14   A    Yes.

15   Q    You moved out of state so your case by definition had to

16   be closed with the department.  Yes?

17   A    Yes.

18   Q    And you went to live in Portland on your own?

19   A    Not on my own.

20   Q    You were living with a boyfriend?

21   A    I was living with a friend, yes.

22   Q    A friend.  Okay.

23        But you weren't living with a family member or a

24   foster family or anything like that?

25   A    No.

1    Q    And you were in Portland for approximately two years?

2    A    Yes.

3    Q    And during that time you found work?

4    A    Yes.

5    Q    In fact, it was during that time that I believe you

6    testified earlier you were the manager of a store, a store

7    in which you were running the business by yourself?

8    A    Sure.  Yes.

9    Q    And you had your own apartment in Portland?

10   A    For a very brief period.

11   Q    And you attended the Maine College of Art there.  Yes?

12   A    I took one class there on fashion illustration.

13   Q    And in 2009 you came back to Massachusetts?

14   A    Yes.

15   Q    And in two thousand -- that's when you were -- you were

16   20 years old at that point?

17   A    Yes.

18   Q    And your case had been closed with the department, but

19   you again sought to come back into the care and custody of

20   DCF.  Yes?

21   A    Yes.

22   Q    To receive those voluntary services that we talked

23   about.  Yes?

24   A    Uh-huh.

25   Q    Again, no requirement that the department accept you?

1    A    Again, I'm not aware that there's no requirement that

2    they accept me.  I just thought it was basic common

3    consideration and common sense that they accept any foster

4    child back into their care.

5    Q    And again in seeking those voluntary services from the

6    department you wrote another letter?

7    A    I suppose I would have, yes.

8    Q    Okay.

9         THE COURT:  And I'm showing her Exhibit 1061.  If

10   she'll give me back 1060.

11        THE WITNESS:  Oh, sure.

12   Q    And, Ms. James, I don't, I don't know if you can see it.

13   I can't necessarily read it.  But it's been pulled up on the

14   screen if you want to try to look at it there as well.

15   A    My screen isn't active, but I can read it.  That's fine.

16   Q    I just want to make sure that everyone has a copy.

17   A    Oh.  Thank you.

18        MR. COLLINS:  Shall I proceed, your Honor, or shall

19   I --

20        THE COURT:  You may.

21   Q    So you've been shown what's been marked as Exhibit 1061.

22   Do you recognize this as the second letter that you wrote to

23   the department seeking voluntary services?

24   A    Yes.  Yep.

25   Q    And you say here -- give me one second.

1    A    Oh, wow.  Sorry.  Excuse me.

2    Q    The third paragraph down.

3    A    Uh-huh.

4    Q    Do you see the, I believe it's the third sentence that

5    starts with, "My brother Matthew"?

6    A    Yes.  Would you like me to read it and explain?

7    Q    No, that's okay.

8    A    Okay.

9    Q    I'm just going to ask you a question about it.

10        You were inspired by your brother Matthew to apply

11   for DCF services at this time.  Yes?

12   A    At that time, yes.

13   Q    And you say here:  My brother Matthew was my largest

14   inspiration for writing to you as he is enrolling in school

15   this winter and is living on his own with help from the

16   department.

17        You wrote that?

18   A    Yes.

19   Q    And I'm going back up now to the top paragraph, the last

20   sentence.  You tell the department:  At this point, I feel

21   that the department has a lot to offer and would like to

22   take advantage of any services available.

23        You wrote that?

24   A    Yes.

25   Q    And then into the next paragraph you say:  Since out of

1  the department's care, I have successfully found steady

2  jobs, apartments, and have also enrolled in several college

3  courses.  I have also opened an online vintage clothing

4  store.

5        You wrote that?

6  A   Yes.

7  Q   And as a result of this application DCF again accepted

8  you into their care and custody for voluntary services.

9  Yes?

10  A   Yes.

11  Q   And, again, those were the services that we talked about

12  earlier, medical and dental insurance, a monthly stipend of

13  $500, those things?

14  A   Yes.

15  Q   And at that time you had reconnected with the area

16  office, the department's area office in Lowell, correct?

17  A   Yes.

18  Q   And during that time you had your own apartment in

19  Lowell?

20  A   For, for a brief period, yes, I did.

21  Q   And you attended Middlesex Community College, took some

22  courses there?

23  A   Yes.

24  Q   And, in fact, you used a tuition waiver that's available

25  to foster children to pay for your tuition expenses.  Yes?

1    A    At Middlesex, yes.

2    Q    Yes.  Correct.

3          And then at one point you decided to move on from

4    Middlesex and pursue your passion, if you will, in fashion

5    design and you enrolled at the Massachusetts Art College?

6    A    Yes, that was the plan originally was to refresh my sort

7    of learning experience with a few community college classes

8    and then move on to bigger and better courses.

9    Q    And you applied and were accepted at Mass. Art.  Yes?

10   A    Yes.

11   Q    And you eventually stopped attending Mass. Art because

12   you felt that the program was not that professional and not

13   that good quality; isn't that right?

14   A    That's untrue.  I stopped attending because they

15   wouldn't accept the tuition waiver.  I was promised that,

16   because it was a state school, and in fact it's the only

17   state art school in the country, that they would accept a

18   hundred percent of my tuition waiver.  However, just two

19   weeks after going there, although I did not appreciate the

20   quality of the classes, I was planning on attending them

21   anyway so I could use these credits and then transfer to a

22   school more suited to my needs.  However, because they only

23   accepted 50 percent of the tuition waiver, I was not able to

24   make up that extra 50 percent.

25   Q    And how old were you when you were enrolled in courses

1    at Mass. Art?

2    A    I was 21.

3    **Q**    And you applied for those courses for yourself?

4    A    Yes.

5    **Q**    And, in fact, you at some point learned that there was

6    no tuition waiver because you had enrolled in graduate level

7    courses instead of courses at the bachelor's level?

8    A    I don't believe they were graduate level, however, they

9    were continuing education courses.  And I was told by my

10   social worker that it was my fault for not doing enough

11   research into that matter and that he helped me as best as

12   he could.

13   **Q**    And once you found out that there was no tuition waiver

14   because of the level of courses you applied for a

15   scholarship along with your caseworker to cover the tuition,

16   correct?

17   A    It wasn't a scholarship to cover the tuition.  I believe

18   I had plans or had already applied for the scholarship when

19   I thought I was getting the tuition waiver because,

20   unfortunately, the tuition waiver doesn't cover things like

21   basic costs, art supplies, books, et cetera.

22   **Q**    In any event, you won that scholarship?

23   A    Of course, yeah.

24   **Q**    And part of that scholarship did go to pay part of the

25   expenses for the tuition?

1    A    I'm not sure if it ever did.

2    Q    And after you attended the Mass. College of Art you then

3    decided that you wanted to attend the Parsons School of

4    Design.  Yes?

5    A    Well, I, I just wanted to attend fashion school.  I've

6    wanted to attend Parsons School of Design since I was eleven

7    years old, so this was just an opportunity I thought that I

8    might need to apply, yes.

9    Q    And Parsons has in fact an agreement with this?

10   A    Yes.

11   Q    And so, Parsons is in New York City?

12   A    Yes.

13   Q    So you moved to New York City?

14   A    Yes.

15   Q    That was in 2010?

16   A    Yes.

17   Q    And at that time you were 21, 22 years old?

18   A    I was 22.

19   Q    And that was your decision to go to New York City and to

20   attend Parsons?

21   A    Yes.

22   Q    And to --

23   A    I had spoken with my social worker.  Excuse me for

24   interrupting.

25   Q    That's fine.

1    A    I had spoken with my social worker, and I asked if I

2    would still remain in the custody of the department while I

3    was in school.  He said that I would remain until I was 24

4    years old because they made special exceptions for people

5    who were in school and working at that.  And that if I kept

6    my permanent address in Massachusetts that I would still

7    receive scholarships associated with foster children in

8    order to attend.

9    Q    And so you moved to New York?

10   A    Yes.

11   Q    And you found an apartment there?

12   A    Yes.  With help from several friends.

13   Q    And since the time that you've been in New York you have

14   done some traveling.  Yes?

15   A    Not exactly.  But yes, I have traveled outside of New

16   England since that time.  Yes.

17   Q    At one point --

18   A    And New York.

19   Q    -- you went west and traveled to Oregon to visit some

20   friends.  Yes?

21   A    No, that's not true.  But I did travel to Oregon.  I was

22   simply discovering other cities since I had never been

23   outside of Massachusetts and New York.

24   Q    And in addition to your travel to Oregon you also

25   traveled to Wisconsin?

1    A    That was part of the journey, yes, home, yes.

2    Q    And during the time that you were in New York, I

3    recognize you're still in New York, but during this time you

4    still were being contacted by a DCF social worker?

5    A    No.  No.  I, I -- two days before I turned 22, I got a

6    letter that said I wasn't allowed to be in DCF custody

7    anymore.  And it was really confusing because, you know, I

8    had just applied to Parsons, I have a whole plan to go, and

9    they just surprised me with this letter.  So we had a court

10   hearing in which my social worker wasn't there, of course,

11   but someone representing him had claimed that they had told

12   me and that I had been aware the entire time that I wouldn't

13   be able to be in DCF custody past 22.  So, this really kind

14   of flustered my plans a lot.

15   Q    And it's your testimony that the DCF worker told you

16   that the cutoff, if you will, was 24 and not 22?

17   A    Yes.

18   Q    I want to just go back for a second to a point that I

19   wanted to clarify from your earlier testimony.

20         I believe you testified -- well, I'm talking about

21   the subject of medication.

22   A    Sure.

23   Q    And when you started to take medications for your

24   conditions.  And I believe you said that you started to take

25   medications when you were six years old, correct?

1    A    Yes.  After my father died.

2    Q    That, of course, was before you ever went into the

3    department's custody?

4    A    Yes.

5    Q    And staying on this subject of the medications --

6    A    Sure.

7    Q    -- with you, or that were prescribed for you, I believe

8    you testified that you were on a number of medications over

9    a period of time?

10   A    Yes.

11   Q    And now, of course, these medications are prescribed to

12   you by doctors and psychiatrists, right?

13   A    Yes.  Various doctors and psychiatrists.

14   Q    These are not medications that are being prescribed to

15   you by the Department of Children and Families?

16   A    No.  However, because they had no parents to talk to,

17   the only reference they had was a social worker at the

18   Department of Children and Families.

19   Q    Because a social worker has legal custody of you as a

20   foster child?

21   A    Yes.

22   Q    You're out of DCF's care now.  Yes?

23   A    Yeah.

24   Q    Are you taking any medications today?

25   A    No.

1    Q    Just jumping back real quick, going back to your time in

2    New York.  You were talking about your travel and your time

3    at the Parsons School.  It was right around this time in

4    2010 that you were introduced to the plaintiffs' counsel

5    which is Children's Rights, Inc.  Yes?

6    A    Yes.

7    Q    And that would have been sometime around August or

8    September of 2010?

9    A    Yes.  Yeah, I believe it was September.

10   Q    That was after the lawsuit was filed in this case in

11   April of 2010?

12   A    I wasn't aware of that, but yeah.

13   Q    And since that time, since being introduced to

14   Children's Rights, you've talked with lawyers at Children's

15   Rights on several occasions.  Yes?

16   A    Yes.

17   Q    You've been in regular contact with them?

18   A    Yes.

19   Q    You've spoken to at least three different lawyers there.

20   Yes?

21   A    Yes.

22   Q    And you've met with these lawyers many times since

23   moving to New York City.  Yes?

24   A    On several times, yes.

25   Q    They've taken you out to lunch and things like that?

1    A    Oh, sure.  Yeah.

2    Q    And you've talked with them at length about this case?

3    A    Not at length.  I've talked with them about my

4    experience at length, but not really the case itself.  Just

5    more of what we're hoping to expose and accomplish with this

6    case.

7    Q    All right.

8         MR. COLLINS:  Your Honor, I don't have anymore

9    questions.

10        I would like to place on the record, renew

11   defendants' motion to exclude Ms. James' testimony which --

12        THE COURT:  We'll take that up at the close of the

13   plaintiffs' case.

14        MR. COLLINS:  Thank you, your Honor.

15        THE COURT:  So, I'm not denying it.  We'll take it

16   up at the close of the plaintiffs' case.

17        Nothing further for this witness, Mr. Gleason?

18        MR. GLEASON:  No, your Honor.

19        THE COURT:  You may step down, thank you.

20        (Whereupon the witness stepped down.)

21        THE COURT:  Call your next witness.

22        MS. BARTOSZ:  Your Honor --

23        THE COURT:  Yes.

24        MS. BARTOSZ:  -- with the Court's permission, the

25   plaintiffs will call Dr. Christopher Bellonci to the stand.

 1          THE COURT:  He may be called.

 2          THE CLERK:  If you could remain standing and raise

 3    your right hand.

 4          Do you solemnly swear the testimony you are about

 5    to make in the matter now pending before this Court will be

 6    the truth, the whole truth, and nothing but the truth, so

 7    help you God?

 8          THE WITNESS:  Yes, I do.

 9          THE CLERK:  You can be seated.

10          THE COURT:  Is this witness called as an expert?

11       MS. BARTOSZ:  Yes, your Honor.

12          THE COURT:  And his report?

13       MS. BARTOSZ:  Your Honor, I'm proffering to the

14    clerk Exhibit G2.

15          THE COURT:  Thank you.

16          The witness had Exhibit 1061 before her on the

17    stand.  I don't see it now.  So, you best find another one

18    that I can put in the record.  But we'll go ahead.

19          MR. COLLINS:  Your Honor, I can hand up 1061.

20          THE COURT:  That's fine.  Yes.  Thank you.

21          MR. COLLINS:  That's the to whom it may concern

22    only, I believe?

23          THE COURT:  No.

24          MR. COLLINS:  That was the other one.

25          THE COURT:  That was --

1          **MR. COLLINS:**  The dated one.

2          **MR. GLEASON:**  The one with the blank on the right

3    side.

4          **THE COURT:**  Yes.  Thank you, Mr. Collins.

5          **MR. COLLINS:**  You're welcome.

6          **THE COURT:**  And go ahead, Ms. Bartosz.

7          **MS. BARTOSZ:**  Thank you, Judge.  And I misspoke, I

8    read G2 and it's actually GZ for the record.  I misspoke and

9    I apologize for the record.

10         **THE COURT:**  I see it, and that's fine.

11         **MS. BARTOSZ:**  May I proceed, Judge?

12         **THE COURT:**  You may.

13                   CHRISTOPHER BELLONCI

14                **DIRECT EXAMINATION**

15   BY MS. BARTOSZ

16   **Q**   Doctor, could you please state your full name for the

17   record?

18   A   Christopher Bellonci.

19   **Q**   And for the court reporter, can you spell your last

20   name?

21   A   B -- as in boy -- E L L O N C I.

22   **Q**   Where do you reside, Dr. Bellonci?

23   A   Jamaica Plain, Massachusetts.

24   **Q**   And where do you currently work?

25   A   At Tufts University Medical Center.

1    **Q**   Do you have a title there at Tufts?

2    **A**   I'm both an attending psychiatrist at the hospital and

3    an assistant professor at the medical school.

4    **Q**   Can you in general terms briefly describe what your

5    duties are as a clinical psychiatrist at Tufts?

6    **A**   I both teach the child psychiatry fellows at Tufts.  I

7    have a clinical practice.  I participate in research largely

8    in the domain of foster care and particular interest in

9    psychotropic medications.  I have some consultation

10   contracts including around psychotropic medications for

11   children in the foster care system.  And I spend about

12   25 percent of my time at Walker.

13   **Q**   What is Walker?

14   **A**   Walker is a multi-service agency in Needham,

15   Massachusetts, where I've been for about 18 years, and it

16   serves a population from three to 18 in various forms.  It

17   has about 30 residential beds.  So children between the ages

18   of five and 13 that live in Needham on the campus, another

19   55 day students, and it also has a therapeutic high school

20   consulting division that I've also worked through.

21   **Q**   You just testified that Walker is a multi-service

22   organization.  In your employment with Walker, are you

23   focused on particular segments of those services, or do you

24   have a more wide-ranging role?

25   **A**   I've had various roles over the 18 years that I've been

```
 1    there.  So when I started in 1995, I was a staff
 2    psychiatrist working primarily with the students in the
 3    residential program and in the day school.  Since I've been
 4    at Tufts the last three years, that role has been limited
 5    more to supervision.  A nurse practitioner took over my
 6    direct caseload.  Less administrative responsibility.  I was
 7    medical director for a long period of that time, now I'm a
 8    senior psychiatric consultant.  And I also spend time at the
 9    high school which is called Beacon in Watertown, consulting
10    with the staff there about some of the children.  And then I
11    also work with the Tufts psychiatry fellows that rotate
12    through one of the programs at Walker, it's one of their
13    primary in-patient training rotations.
14    Q    Doctor, how do you share your time currently between
15    your employment responsibilities at Walker and the
16    responsibilities that you have at Tufts Medical Center?
17    A    Walker buys back about 25 percent of my time from Tufts.
18    So I spend -- typically today would be the day that I would
19    be out there.  And the rest of the time as I outlined is
20    spent at the medical center.
21    Q    For how long have you been employed at Walker?
22    A    I started at Walker in 1995 and had continuous full-time
23    employment until I started at Tufts three years ago.
24    Q    There's never been a break in your Walker employment and
25    three years ago than a transition from full-time to
```

1    part-time?

2    A    Correct.

3    **Q**    We'll talk a bit more about Walker down the road apiece.

4    But I would like to walk through your educational background

5    for the moment, and starting with undergraduate.

6              Where did you perform your undergraduate studies?

7    A    Boston University.

8    **Q**    And when did you undertake that course of studies?

9    A    1980 to 1984.

10   **Q**    Did you have a particular major you pursued at BU?

11   A    Biology.

12   **Q**    Any minors?

13   A    I was interested in political science but didn't get the

14   full amount.

15   **Q**    After you received your bachelor's degree from BU what

16   was the next step in your educational history?

17   A    I went to medical school at the University of Texas

18   Health Sciences Center an San Antonio.

19   **Q**    And for how long were you enrolled at the medical school

20   in Texas?

21   A    From 1984 to 1988.

22   **Q**    What was the nature of your studies there?

23   A    General medicine.

24   **Q**    Following your medical education in Texas what was the

25   next step in your education process?

1   A    Internship and adult residency in Philadelphia at Albert

2   Einstein Medical Center; and then child psychiatry

3   fellowship at McLean Hospital, part of the Harvard medical

4   system.

5   Q    Can you describe generally what you were involved in

6   during your internship and residency at Albert Einstein?

7   A    After medical school, to become a child psychiatrist you

8   first do adult psychiatry training.  So I sent three years

9   learning how to be an adult psychiatrist, and then left

10  after three years and did a two year fellowship at McLean

11  for child psychiatry.

12  Q    Was the McLean fellowship the first time that you placed

13  real focus on child psychiatry?

14  A    I actually was allowed, because they knew that I was

15  interested in child psychiatry when I went to Einstein, they

16  allowed me to do my primary care in pediatrics.  So I

17  actually spent a couple of months doing general pediatrics,

18  I did a rotation in the emergency room, doing pediatric

19  emergency room.  I had a month long developmental and

20  behavioral pediatric rotation, child neurology.  So they

21  tracked me in that direction, and I actually did even pick

22  up some child cases during my adult training.

23  Q    What was the nature of your fellowship at McLean?

24  A    It was a two year long child psychiatry fellowship.

25  Pretty standard.  We had, at the time I was there it was

1    still a McLean only program.  In the second year it became

2    combined with Mass. General.  And over that time Harvard

3    also initiated Harvard-wide curriculum training.  So, I was

4    actually taking didactics in both development and then

5    psychopathology with all the other trainees in the Harvard

6    system.  So, at Children's Hospital and at Cambridge

7    Hospital and McLean/Mass. General.

8    Q    And you got me with that word didactics.  And maybe the

9    Court understands, but what do you mean by didactics?

10   A    Lectures.

11   Q    During your fellowship at McLean were you involved in

12   direct counseling work with adolescents or children?

13   A    Oh, absolutely, both from an inpatient setting and an

14   outpatient setting, I consulted to a residential group home

15   for children that were funded to be there through the

16   Department of Mental Health, and I also took a year long

17   school consultation elective.

18   Q    What was involved in the elective?

19   A    I was interested in doing preventive mental health.  And

20   at the time there was a lot of focus on gay and lesbian

21   adolescents who had an increased risk of suicide.  And so I

22   was interested in how to develop a school based prevention

23   model for that population.  So I was working at the Lincoln

24   Sudbury Regional High School both with the administration

25   and the student population, the Gay-Straight Alliance that I

1    was consulting to, and did a fair bit of work in that

2    regard.

3    Q    During your fellowship in McLean did you encounter and

4    provide any counseling services to children who were DCF or

5    perhaps then DSS involved?

6    A    Yes.

7    Q    And you understood by DCF I'm referring to the

8    Massachusetts Department of Children and Families?

9    A    Yes.

10   Q    And DSS was its predecessor named the Department of

11   Social Services?

12   A    Yes.

13   Q    How frequently did you have interaction with DSS or DCF

14   that involved you?

15   A    It was probably through that group home consultation.  I

16   don't know that I had that many outpatients that were DSS

17   involved at the time in my training.  But certainly once I

18   was out of training, I was working at a community mental

19   health center in Brighton/Allston where I was seeing

20   children who were involved with the child welfare system,

21   and then certainly once I started at Walker in 1995.

22   Q    When did you complete your fellowship at McLean?

23   A    I was at McLean from 1991 to 1993.

24   Q    What was the next step in your medical progression, your

25   education progression?

1    A    I was asked to stay on and become part of the faculty at

2    McLean and Mass. General teaching school consultation, and

3    that came with a clinical instructor at Harvard Medical

4    School appointment.  They had me placed through subcontract

5    to the Italian Home for Children in Jamaica Plain where I

6    worked with a short-term hospital based program called the

7    Community Based Acute Treatment or Acute Residential

8    Treatment, largely funded by Medicaid, and also involving a

9    good number of youth who were DCF involved.  That was half

10   time.  And then I also was at Brighton/Allston mental health

11   center, community health center.

12   Q    At the Brighton/Allston community mental health center

13   did you have interaction with youth or children who were DCF

14   or DSS involved?

15   A    Some, yes.

16   Q    And would you give the rough numbers of children that

17   fit that classification at that time?

18   A    You're asking me to go back 20 plus years.  It was maybe

19   10 to 20 percent of my outpatient practice there.

20   Q    You held an academic position as part of your fellowship

21   associated with Harvard University?

22   A    Yes.  And then when I was faculty, I was a clinical

23   instructor.

24   Q    So, can you describe the association you had with

25   Harvard and what was involved specifically with the clinical

1    instruction you were performing?

2    A    I would work with the child psychiatry fellows in the

3    McLean/Mass. General combined program teaching them school

4    consultations.  So I would actually take them out to public

5    school sites and private school sites that I had set up.

6    There were assigned readings.  We would have a seminar.  We

7    would talk about what we were observing, and giving them a

8    taste for what public schools could do in terms of serving

9    children with mental health needs.

10   Q    When did you complete your fellowship?

11   A    1993.

12   Q    And that was a fellowship completed through McLean, or

13   was there a second fellowship after the McLean fellowship?

14   A    No, to become a child psychiatrist it's a two year

15   fellowship after you've completed your adult psychiatry

16   training.  So that was 1991 to 1993.

17   Q    Following your fellowship, following completion of the

18   fellowship what did you do next?

19   A    That was when I was hired half time at McLean to both

20   teach school consultation and they subcontracted me to the

21   Italian Home for Children, and the other half I was spending

22   at Brighton/Allston community mental health center doing

23   outpatient practice.

24   Q    Do you have board certifications, Dr. Bellonci?

25   A    I do.

1   Q    What board certifications do you have?

2   A    I'm board certified in adult psychiatry as well as board

3   certified in child and adolescent psychiatry.

4   Q    And where do you carry licensure?

5   A    In Massachusetts.

6   Q    Any other states?

7   A    I had a training license when I was in Philadelphia for

8   my adult psychiatry.

9   Q    Have you practiced child and adolescent psychiatry since

10  completion of your fellowship?

11  A    Yes.

12  Q    For how many years have you been engaged in clinical

13  practice as a child and adolescent psychiatrist at this

14  point?

15  A    Twenty years.

16  Q    You first accepted employment at Walker in 1995?

17  A    Correct.

18  Q    Can you describe how that position came to your

19  attention and how you secured that employment?

20  A    Sure.  The executive director at the Italian Home for

21  Children, a man named Chris Small, who was known not to be

22  particularly fond of child psychiatrists, had been talking

23  to his brother, Rick Small, who was the executive director

24  at Walker.  And Rick Small was intrigued to find a child

25  psychiatrist that Chris liked.  And Rick was in the process

1    of opening up his own acute residential treatment unit at

2    Walker and was needing a child psychiatrist.  Interestingly

3    enough, he had been consulting with a former supervisor of

4    mine at McLean, and that allowed me to know even when I was

5    in training about Walker.

6            So, for the first time Walker hired its own child

7    psychiatrist.  Prior to that they were contracting with

8    places like McLean to obtain their psychiatric consultation.

9            So, I went to Walker full-time.  I left McLean.  I

10   left the community mental health center, and I continued to

11   do some work at the Italian Home for Children, but under

12   subcontract from Walker rather than from McLean.

13   Q   For how long did you work both at Walker and the Italian

14   Home?

15   A   It was somewhere around four years of overlap.  And it

16   just began to be too much for one person.  There was

17   probably five or six of me doing what I was doing alone at

18   one time.

19   Q   During those four years were you reporting to one of the

20   Small brothers at each one of these institutions?

21   A   Primarily it was Rick Small at Walker who I was under

22   the direct employ.  Initially for the first three years, I

23   was a staff psychiatrist at both programs, involved both at

24   the residential and the school based programs, as well as

25   both of their ARTs and -- that's it.

1  **Q**   You just referred to an ART.  Can you describe for the

2  record what that is?

3  A   It stands for Acute Residential Treatment.  It's

4  primarily a program developed to be more of a community

5  based setting rather than having children, particularly

6  young children, have to go to psychiatrist inpatient

7  settings.  The children could go to these programs.  So

8  they're typically coming directly from an emergency room.

9  Sometimes they're being stepped down from a psychiatric

10 inpatient setting to the acute residential treatment center.

11 ART is the older term.  Currently they're called Community

12 Based Acute Treatment.

13 **Q**   Or CBAT?

14 A   Yes.

15 **Q**   When you interviewed for a position at Walker, the

16 organization at that point in time was looking to open up an

17 acute residential treatment unit?

18 A   Correct.  And the Italian Home already had one.

19 **Q**   What was your involvement developing that residential

20 treatment unit at Walker?

21 A   It was pretty substantive.  I helped to design the

22 milieu.  I helped to think about the programming.  I helped

23 them to think about the clinical staffing.  I've had several

24 years' experience at the Italian Home's ART.  So I was able

25 to help transition that knowledge to Walker.

1    Q    Does Walker still run an acute residential treatment

2    unit?

3    A    Yes.

4    Q    The same unit that you helped to put together?

5    A    Yes.  And it's the unit that the child psychiatry

6    fellows from Tufts now rotate through.

7    Q    Do you continue to have involvement with that acute

8    residential treatment unit today?

9    A    Yes, it's where I would be today.

10    Q    That's where you would be working today were you not

11    here?

12    A    Correct.

13    Q    And generally what is the client population at Walker?

14    A    Roughly about a third of our children are involved in

15    the Department of Children and Families or in state custody.

16    About a third or -- so that population is largely a

17    traumatized population with mental health and mental health

18    needs as well.  About a third are children on the autism

19    spectrum, typically higher functioning autism or Asperger

20    syndrome.  And another third are children presenting with

21    major mental illness at very young ages, who might be

22    referred by the Department of Mental Health.

23    Q    Do you have a rough estimate of how many, what

24    percentage, what number of children served by Walker are DCF

25    involved?  And let's put a time frame on that, over the last

1    12, 24 months.

2            THE COURT:  I thought, I thought he just did that.

3    Am I following?  It's about a third, isn't it?

4            THE WITNESS:  Well, it's -- in the residential

5    program it's probably about half.  But overall, I think a

6    third is a good estimate, yes.

7    Q    You provide direct counseling to DCF, DCF involved youth

8    at Walker currently?

9    A    Not directly at Walker, no.  I did up until my

10   transition three years ago.  I supervise the nurse

11   practitioner that is providing that direct service work both

12   on CBAT, which does see a significant number of DCF children

13   as well as on the residential and day program.

14   Q    Over what period of years during your employment at

15   Walker did you provide direct counseling service to DCF

16   involved youth?

17   A    From 1995 until 2010.

18   Q    Rough numbers, how many total DCF involved youth do you

19   think you've counseled over that stretch of time?

20   A    Hundreds.

21   Q    Would you interact with these children, and I'm talking

22   about the DCF involved youth, would you interact with their

23   caseworkers?

24   A    Yes.

25   Q    In general terms as you dealt with these hundreds of

1    children, what was the interaction that you would have or

2    pattern of interaction, if there was one, with DCF

3    caseworkers?

4    A    The process for children, particularly on the

5    residential side entering into Walker, we would get a

6    referral packet which would be provided by DCF if they were

7    funding the residential portion, and then the local school

8    district who would be providing their educational support.

9    That would include any of the records that DCF had

10   available.  It could include past psychiatric consultation,

11   discharge summaries, it would include outpatient notes,

12   whatever they had in their system.  We would ask for

13   everything that we could get.

14        I would review what was often a very thick packet

15   of information about these children, working my way through

16   the whole packet, and begin to formulate my thinking about

17   what was going on for that child.

18        I would then interview the child, do a psychiatric

19   interview, including a mental status exam.  I would try to

20   talk with anybody that had been involved in that child's

21   life up until that point, if the parents were available and

22   I had permission to speak with them, I would do that.  I

23   would certainly talk with the child's caseworker.  I would

24   talk with the pediatrician if I could find the pediatrician,

25   past treaters, anybody that kind of touched the life of this

1    child, I would try to get information from.  Or I would ask

2    the social worker assigned to the case to try to obtain that

3    information.

4          It allowed me to get a broad picture of who this

5    child is and try to begin to understand their behavior.

6    Because if they were coming to Walker it meant that many of

7    the other interventions that had been attempted to address

8    whatever behavioral issues are that they were being referred

9    for me to help with had not been successful.

10   Q    When you first met DCF involved children were there some

11   children who came to you already being administered one or

12   more psychotropic medications?

13   A    The majority of the time, the majority of the time it

14   was multiple medications.

15   Q    What is a psychotropic medication?

16   A    A psychotropic medication, which I would use

17   interchangeably with a psychiatric medication, is a

18   medication being used for a primary, primary emotional or

19   behavioral focus.

20   Q    Is there a distinction between the term psychotropic

21   medication and antipsychotic medication?

22   A    Yes.

23   Q    What is that distinction?

24   A    Antipsychotic medications are just one class of

25   psychotropic or psychiatric medications.

1   **Q**   Did you during your employment at Walker meet children

2   who at the time you first engaged with them were already

3   being administered a form of antipsychotic medication?

4   A   Yes.

5   **Q**   How frequently does that occur?

6   A   It's certainly become increasingly frequent over time.

7   We weren't prescribing a lot of antipsychotic medications

8   when I was first training in the '80's.  And it's a class of

9   medication that has seen an exponential increase in its

10  utilization over the last decade or more.

11  **Q**   For what kind of conditions or behaviors or diagnoses

12  typically will a child or youth be prescribed an

13  antipsychotic medication?

14  A   Antipsychotic medications are approved for psychotic

15  conditions like schizophrenia or for the manic state of a

16  bipolar disorder.  There is, depending on which

17  antipsychotic medication we're talking about, may have

18  approval for teen-agers.  I'm not aware that any of them are

19  actually approved for latency age in younger children, so

20  roughly children under age ten.

21          **THE COURT:**  Just so I can follow the terms.

22          **THE WITNESS:**  Yes.

23          **THE COURT:**  None are approved for children under

24  ten.

25          **THE WITNESS:**  That's my understanding, yes.

1              THE COURT:  And that's what you call a latency --

2              THE WITNESS:  Yes.

3              THE COURT:  -- period in development?

4              THE WITNESS:  Right.

5    Q    Are you familiar with the term off label utilization?

6    A    Yes.

7    Q    What does that refer to?

8    A    The psychiatric medications like all medications have to

9    be developed by the pharmaceutical company.  The

10   pharmaceutical company tests for safety and efficacy of

11   those medications.  What they're testing for in terms of

12   safety is the medication safe for the population it's going

13   to be used for.  In terms of efficacy, they have to identify

14   what is it that they're going to promote this medication's

15   use for, what's the condition.  So, if it's in the case of

16   an antipsychotic, a psychotic disorder, they would need to

17   show the FDA that this medication is effective for that

18   condition.

19             Off label means that you're using the medication

20   either for an indication for which the FDA has not given the

21   medication approval, or for a population that has not been

22   tested specifically with this medication prior to its

23   approval by FDA.

24             THE COURT:  And I've run into the term in other

25   cases and I understand that a physician, because physicians

1    prescribe, a physician is empowered to make that

2    determination on a case-by-case basis.  Is that how you

3    understand it?

4         **THE WITNESS:**  Absolutely.  In pediatrics generally,

5    you know, there's an estimate that half of the medications

6    that we use in clinical practice are being used off label

7    because they've not been tested specifically for this age

8    group or for some of the indications we're using it.

9         **THE COURT:**  And again just to follow up, but

10   through clinical experience and practice it sounds to a

11   physician that this might work and you try it out and if it

12   does you use it.

13        **THE WITNESS:**  Yeah, there's a significant amount of

14   research that happens after the approval process at the FDA.

15   And I have a chart in my report that kind of summarizes the

16   state of the knowledge base for psychiatric medications for

17   children and adolescents, both in terms of safety and

18   efficacy.

19   **Q**   The Jensen table?

20   **A**   Yes.

21   **Q**   And do you have your report in front of you?

22   **A**   I don't.

23   **Q**   Dr. Bellonci, I would ask that you look at Exhibit GZ.

24   And first of all, when you've had a chance to look at that,

25   can you identify it for the record?

1    A    I'm sorry, I wasn't --

2         **THE COURT:**  He asked you to identify it.  Take a

3    look at it -- she asks you to identify it.  Take a look at

4    it and tell me what it is.

5         **THE WITNESS:**  It's my report.

6         **THE COURT:**  That's what the question was.  Go

7    ahead.

8         **MR. COLLINS:**  And where's this Jensen table in

9    there?

10        **THE WITNESS:**  It's one of the appendices.

11        **MR. COLLINS:**  Your Honor?

12        **THE COURT:**  Yes.

13        **MR. COLLINS:**  If I could, we do not have, just so

14   you know, we do not have agreement that the reports

15   themselves are coming into evidence.

16        **THE COURT:**  I didn't think so.  That's why it was

17   marked for identification.  So, I suppose that this Jensen

18   table, which I've now found, it's Exhibit C, page 32, is

19   not, on this foundation, admissible.  I'm aware of it.

20        Go ahead, Ms. Bartosz.

21        **MR. COLLINS:**  No, your Honor, I just want to be

22   clear, I wanted to just make that distinction because -- we

23   don't have an objection to the, to the appendix as an

24   exhibit.  I just wanted to make the distinction, to be clear

25   on the distinction that the report is not admissible.

1              THE COURT:  I'm clear.  I thought I said that.  But

2        you have no objection to the table?

3              MR. COLLINS:  No objection to the table.

4              THE COURT:  Well, let's -- and you would like the

5        table in the record?

6              MS. BARTOSZ:  Yes, your Honor.

7              THE COURT:  Let's admit the table.  And what, the

8        next letter numbers are 1062?

9              THE CLERK:  Yes.

10             THE COURT:  Correct?

11             THE CLERK:  Yes.

12             THE COURT:  It's admitted, Exhibit 1062 in

13       evidence.

14             (Exhibit marked in evidence.)

15       Q   Dr. Bellonci, you have appendix C from your report open

16       now, the Peter Jensen Table of Scientific Knowledge vs.

17       Frequency of Use?

18       A   Yes.

19       Q   Can you describe what appears in this table and what it

20       means?

21       A   Sure.  It summarizes the state of the scientific

22       knowledge base by Dr. Jensen, who's a well-known child

23       psychiatrist, formerly at the National Institutes of Mental

24       Health, now at the main institute, and he uses a chart to

25       identify what the evidence supports in terms of what we know

1    about specific classes of medications for children and

2    adolescents, both in terms of safety and efficacy.

3           The key that you need to understand is that A is

4    two or more randomized control trials.  B is one randomized

5    control trial or mixed results in two or more randomized

6    control trials.  And the C, which doesn't actually say it

7    here, it's case reports or open label trials.

8    Q    Are those trials that you're referring to now trials

9    that involved a certain age category of individuals?

10   A    It would be children and adolescents.

11   Q    What is that age range?

12   A    He collapsed them all.  So it would include the full

13   spectrum.

14          **THE COURT:**  And that's people under age 18?

15          **THE WITNESS:**  Yes.

16          **THE COURT:**  I just don't see here, and I've

17   probably missed it, I understand what NAMCS is.  What do the

18   initials NDTI stand for in this chart, if you know.

19          **THE WITNESS:**  It's another, I don't know the

20   specifics, but it's another national database summarizing

21   the frequency of utilization of these medications.  So that

22   the two right hand columns are two different databases to

23   show how frequently these medications are being used in

24   children and adolescents and you can see that there's some

25   differences on the first database you're looking at.

1    **THE COURT:**  And just roughly, and I'll start with

2    the rough understanding --

3    **THE WITNESS:**  Sure.

4    **THE COURT:**  -- the match after the colon up at the

5    top, it says a mismatch, but as he ranks this, the best

6    match is the use of stimulants in ADHD and the worst match

7    is the use of Lithium to control aggressive conduct.

8    **THE WITNESS:**  Yeah.  I think what he --

9    **THE COURT:**  Well, is that right?

10    **THE WITNESS:**  That is correct, yes.

11    **THE COURT:**  Yes.  All right.

12    **THE WITNESS:**  I'm not sure what he means by

13    mismatch.  My purposes in including it as an exhibit was the

14    numbers of C's, just to highlight the dearth of research

15    that we have supporting the utilization of these

16    medications.

17    **THE COURT:**  So your point is wherever there's a C

18    those are case reports?

19    **THE WITNESS:**  Yes, that's the lowest research

20    standard.

21    **THE COURT:**  Go ahead.

22    **Q**   Does the C in this chart indicate to you that if you

23    were to administer the child that particular drug or one of

24    the indications here that there's some greater, perhaps risk

25    associated with that than if there were an A or a B?

1          **MR. COLLINS:**  Objection.

2          **THE COURT:**  Sustained.  Won't you ask him.

3    **Q**    What is the significance of a C in this report in terms

4    of any risk that the administration of a drug may have

5    vis-a-vis the child?

6    A    It means we don't have a lot of data.  A randomized

7    control trial is considered the gold standard in research.

8    I actually think an A is even a relatively low threshold of

9    only two randomized controlled trials that show a positive

10   response or that the medicine is safe considering the volume

11   of children that are on these medications particularly in

12   the foster care system.

13          Children are very suggestible.  So, these research

14   studies are difficult because you get a very high placebo

15   response rate.  And so an openly label trial is particularly

16   problematic, that's what the C indicates, because you can

17   have a lot of children who will have the symptoms that you

18   tell them in the open label trial the medicine is meant to

19   address.  That also works for side-effects.

20          **THE COURT:**  The reason, one of the reasons I

21   sustained the objection was her question introduced the

22   concept of risk.  And you must correct me, but I don't read

23   this chart that way.  It tells you what the quality of

24   research data is for these various conditions.

25          Have I read the chart correctly?

1      THE WITNESS:  Yes, that would have actually been my

2   response that, I couldn't answer that question.  It's, it's

3   an absence of data and not a positive evidence of the risk

4   of that medicine.

5      THE COURT:  But a perfectly competent physician

6   with clinical observation of a child could given the data

7   available be well within the bounds of medical propriety to

8   prescribe off label Lithium for aggressive conduct, for

9   example?

10      THE WITNESS:  Yes.  I actually think clinical

11   practice in child psychiatry is research studies with N's of

12   1 so that --

13      THE COURT:  I don't know that.

14      THE WITNESS:  Each time we're prescribing for a

15   child that we're essentially doing --

16      THE COURT:  A research study and N means the number

17   1.

18      THE WITNESS:  Correct.

19      THE COURT:  And that has, if I'm following you,

20   little probative value but more than zero.

21      THE WITNESS:  Yes.  And it also puts upon the

22   prescriber the burden of being able to gather quite a bit of

23   data both to support the indication for the medication but

24   also then to monitor for efficacy the response to the

25   medication and side-effects safely.

1    **Q**    Doctor, the first two columns in the Jensen table here

2    are the column marked category and then a column marked

3    indication.  Do you see that?

4    **A**    Yes.

5    **Q**    And for each category of prescription medication there

6    is just to the right of it indication that that prescription

7    might be applied to.

8    **A**    Correct.

9    **Q**    Does it indicate -- is this -- do you have an

10   understanding as to how exhaustive this list of indications

11   is intended to be here in the Jensen table?

12   **A**    I think it's meant to be inclusive.

13   **Q**    Inclusive.  And what do you mean by inclusive?

14   **A**    That it represents the indications that these

15   medications have for those conditions.

16   **Q**    So, for example, the first item in the category column

17   is stimulants, and the first indication is a single

18   indication of ADHD.  Does that indicate that stimulants have

19   only been indicated for utilization in connection to a

20   diagnosis of ADHD?

21            **MR. COLLINS:**  Objection.

22            **THE COURT:**  Sustained.  Won't you ask him.

23   **Q**    What does that mean, Doctor, stimulants as a category

24   and an indication of ADHD?

25   **A**    It means that stimulants are approved for attention

1  deficit hyperactivity disorder, specifically in children and

2  adolescents, because again this is specific to children and

3  adolescents.

4       The only other indication that I can think of for

5  stimulants would be a condition like narcolepsy, a sleep

6  disorder.  I believe it's got approval, stimulants have

7  approval for that as well.

8       **THE COURT:**  You said are approved.  But jump down

9  here to central adrenergic --

10      **THE WITNESS:**  Adrenergic.

11      **THE COURT:**  -- agonists.  That apparently is being

12  prescribed for ADHD but without your term the gold standard.

13  Have I read it right?

14      **THE WITNESS:**  Yes.  Central adrenergic agonists are

15  actually blood pressure medications that we're now using in

16  child psychiatry.  So, when we started using them for ADHD

17  and Tourette's disorder, or tic conditions, tic disorders,

18  they had already been on the market and approved for the

19  treatment of blood pressure.  And the pharmaceutical

20  companies that make those medications did not go back and

21  get specific indications for ADHD.  So post-marketing, after

22  it was approved and available, that would be an off label

23  indication that started being used.

24       Since that time two new agents, long-term acting

25  agents, central adrenergic agonists have been approved and

1    were the first ones to actually have specific indications

2    for ADHD typically as a second line agent, meaning after

3    stimulants have been tried and there were either

4    side-effects or were not effective.  Or in addition to a

5    stimulant you would have a central adrenergic agonist.

6    Q    Doctor, the next column over this table is a column with

7    a heading level of supporting data.  Do you see that?

8    A    Yes.

9    Q    And there are entries for efficacy, short-term and

10   long-term, and then entries for safety short-term and

11   long-term.

12          Can you describe the difference between efficacy

13   and safety?

14   A    Yes.  Efficacy means does the medication treat, is there

15   evidence to show that the medication works for the condition

16   that it's being used.  Safety means is the medication safe

17   for use in children and adolescents.  Is there, is there

18   research that support that.

19   Q    Do you use this Jensen table in your clinical practice?

20   A    I use it when I'm educating, teaching.  I use it

21   generally to talk about the risks and benefits of a

22   medication when I'm getting informed consent from a parent

23   or guardian.  I don't typically pull out the chart to say

24   this is what an A, B and C means.  But in more general terms

25   I talk about both what we know and about the medication, its

1    specific indication and efficacy for that indication in

2    children and adolescents, what we know about safety as well

3    as what we don't know because I think that's an important

4    part of the informed consent conversation.

5    **Q**    Are you familiar with the term contraindication?

6    A    Yes.

7    **Q**    What does that mean?

8    A    That means there's actual evidence that the medicine

9    should not be used, either for that condition or because of

10    safety concerns.

11    **Q**    Are there contraindications with respect to

12    administration of multiple psychotropic medications?

13    A    There's very little data to support the use of multiple

14    medications.  And so every time you add in an additional

15    medication you're adding in an additional unknown about the

16    potential impact of the two medications working alongside of

17    each other.

18    **Q**    We'll come back to Walker, Doctor, and I would like to

19    continue through your career trajectory for a time, okay?

20    A    Sure.

21    **Q**    Are you familiar with an organization called the Child

22    Welfare League of America?

23    A    Yes.

24    **Q**    And have you worked with that organization?

25    A    Yes, I was on the mental health advisory board of the

1   Child Welfare League of America for about a decade.  I also

2   worked in a joint initiative between Child Welfare League of

3   America and the American Academy of Child and Adolescent

4   Psychiatry that was an initiative of the president of AACAP,

5   which is AACAP, the acronym for American Academy of Child

6   and Adolescent Psychiatry.  It was a two year initiative

7   back in about 2002 that was tasked to develop best practices

8   for mental health services for children in the foster care

9   system.

10  **Q**   What is the CWLA?

11  A   It's a national advocacy organization and educational

12  organization, I suppose, membership service organization

13  representing child welfare agencies both in terms of state

14  child welfare agencies and providers of services to children

15  in the child welfare system.  So that can include foster

16  care providers, programs like Walker, which is a member of

17  the Child Welfare League of America, when I was involved

18  with it.

19  **Q**   Did you come to be affiliated or working with CWLA

20  through your employment at Walker?

21  A   Yes.  Dr. Small at Walker wanted me on the mental health

22  advisory board.  Prior to that I had been on the residential

23  advisory committee of the Child Welfare League of America.

24  **Q**   What was your role with the mental health advisory board

25  at CWLA?

1    A    At the time we were looking at the impact of managed

2    care organizations coming into the child welfare system and

3    the Medicaid systems and trying to understand and influence

4    positive outcomes for children in the child welfare system

5    through that process.  But more globally, it was meant to be

6    a resource within the Child Welfare League and to its member

7    agencies providing technical knowledge, including scientific

8    presentations, workshops at the national meeting, articles

9    about mental health and behavioral health needs of children

10   in the child welfare system.

11   Q    When did you first join the mental health advisory

12   board?

13   A    I would have to refer back to my CV, but if you want I

14   can look that up.

15   Q    Is that document attached to your report?

16   A    Yes.

17   Q    Please turn to the CV.

18   A    It's appendix E.

19   Q    And referring to appendix E, does your curriculum vitae

20   refresh your recollection to when you first became involved

21   with the CWLA mental health advisory board?

22   A    Yes.  1997.

23   Q    And for how long did you remain involved with that

24   board?

25   A    Thirteen years.

1   Q   During your involvement with the mental health advisory

2   board, did you become involved in drafting any guidelines?

3   A   I presented on the issue of psychiatric medications for

4   children in the child welfare system at their national

5   conference.  I did not develop any guidelines through the

6   mental health advisory board, but that joint group between

7   Child Welfare League and the American Academy of Child and

8   Adolescent Psychiatry developed both of the principles

9   statement about working with youth who have mental health

10  and behavioral health needs in foster care, and then also

11  screening and assessment guidelines.

12  Q   What was your involvement in the development of those

13  guidelines?

14  A   I was actively involved in both processes.  It was a two

15  year process.  We were meeting regularly.  We were having

16  conference calls.  We were e-mailing various drafts of the

17  documents.  I was particularly focused on the screening and

18  assessment document.  There was different workgroups within

19  the committee that was working on that.  And I was

20  particularly working on what kinds of screening assessments

21  were indicated entering into care and then what was the

22  period of seeing and having follow-up evaluations, mental

23  health evaluations.

24  Q   When you refer to entering into care, are you speaking

25  about entering into foster care?

1    A    Entering into state custody.  I don't use foster care

2    and state custody equivalently.  But yes.

3    Q    You earlier referred to AACAP as an acronym.

4    A    Yes.

5    Q    And what does that acronym stand for or refer to?

6    A    The American Academy of Child and Adolescent Psychiatry.

7    Q    Have you in your career been involved with AACAP?

8    A    Yes.

9    Q    When did that begin?

10   A    When I was still in training at McLean and perhaps even

11   when I was doing my adult psychiatry training in

12   Philadelphia.  They knew that I was going to be a child

13   psychiatrist.  It really consolidated my last couple of

14   years in medical school.  So even when I did my adult

15   training, I knew that I wanted to go on to child psychiatry

16   training.  AACAP is the professional organization

17   representing child and adolescent psychiatrists in America.

18   And so they have a national annual meeting and various

19   committees that I've been involved in.

20   Q    Can you identify the committees that you've been

21   involved in?

22   A    The first committee I was involved in was during my

23   first year at McLean and that was a homosexual issues

24   committee.  I was involved in that committee for five years.

25   I then worked with the residential treatment committee from

1    1988 to 2002.  I was a delegate at the assembly of regional

2    councils representing the New England Council of Child and

3    Adolescent Psychiatry from 2002 to 2003.  So AACAP has both

4    state and/or regional associations, and they act as almost

5    kind of a house of representatives of AACAP in its

6    governance.

7           I was on the foster care task force as I mentioned

8    from 2001 to 2003.  I was on the membership committee from

9    2001 to 2004.  And I've been on the quality issues committee

10   since 2008 through to the present.

11   Q   Have you drafted any guidelines or written documents for

12   AACAP?

13   A   Yes.

14   Q   What publications, or what drafting have you done for

15   AACAP?

16   A   I was the co-author of the practice parameter with a

17   very clunky title.  It was the practice parameter on the

18   management -- give me one minute -- practice parameter for

19   the prevention and management of aggressive behavior in

20   child and adolescent psychiatric institutions with special

21   reference to seclusion and restraints.

22   Q   Thank you.

23           And generally what does that practice parameter

24   involve?

25   A   It was meant to be a guideline for all mental health

1    practitioners working with children and adolescents and help

2    to think about how to address aggression in the context of

3    psychiatric facilities.  I was representing the residential

4    issues committee that I was on at the time and worked with

5    the primary author, Kim Masters, who was primarily working

6    in an inpatient setting.  I wanted to make sure that the

7    parameter represented both milieus, an inpatient milieu and

8    a residential milieu.  And we wanted to have it focus on the

9    ways that you can prevent the need for secluding or

10   restraining a child, all of the things that come before

11   actually having to do that extreme intervention.

12   Q    AACAP publishes the practice parameters?

13   A    Yes.

14   Q    What is the intended purpose of publishing a practice

15   parameter?

16   A    At this point almost all the medical disciplines have a

17   process where they develop clinical guidelines that are

18   meant to be the definition of the standard of care for the

19   field around a specific issue.  So a lot of the AACAP

20   guidelines practice parameters are focused on the treatment

21   and assessment, or assessment and treatment of specific

22   conditions, like attention deficit hyperactivity disorder,

23   bipolar disorder.  There are also parameters like the one

24   that I co-authored that are more about the art of the work,

25   if you will.  Recently, I was the shepherd for a practice

1    parameter on working with lesbian and gay, bisexual and

2    transgender youth.  There's one in development actually on

3    working with children in the foster care system.

4    **Q**   Are you still involved with AACAP?

5    A   Yes.

6    **Q**   What is your current involvement?

7    A   Well, I'm both a member of AACAP and I'm on the quality

8    issues committee that writes the practice parameters.  And

9    I've been very involved in working with AACAP around issues

10   relating to foster care.

11          So, for instance, I represented AACAP when congress

12   was having testimony in support of the Fostering Connections

13   Act, so I testified before that committee in May of 2008.

14   **Q**   How much time in a given year do you devote to your

15   AACAP work?

16   A   That's difficult to quantify.  The greatest bulk of my

17   time is spent on the quality issues committee.  That meets

18   three times a year.  Prior to the meeting we get several of

19   these rather dense practice parameters to review.  It takes

20   me about an hour per practice parameter to review.  We

21   review anywhere on average half a dozen.  So that's six

22   hours leading up to the meeting.  We meet for a day

23   and-a-half twice a year, and then at the annual meeting for

24   half a day.  So that's, you know, roughly a week.  Around

25   foster care issue it's relatively ad hoc.  So there will be

1    sometimes a document that AACAP is producing that they may

2    want my feedback on.  There was a recent document that came

3    out about community based use of psychiatric medications

4    that I gave some responses to.  The quality issues committee

5    is one of the committees that AACAP vets some of their

6    public documents through.  Right now we've been very

7    involved in coding issues.  So the billing codes changed as

8    of January 1st which has a great many number of child

9    psychiatrists frustrated.

10   **Q**   Does AACAP provide consultation in any way to public

11   child welfare agencies?

12   A   No.  AACAP sponsored a day long institute at its most

13   recent annual meeting.  So we actually had the head of the

14   Administration for Children, Youth and Families, Brian

15   Samuels, at the federal level present at that institute.  I

16   was one of the presenters along with about seven or eight of

17   us in a day long training available to child psychiatrists

18   who were attending the meeting.

19        **THE COURT:**  Excuse me.  What's the institute, for

20   children, you said children and --

21        **THE WITNESS:**  Administration of Children, Youth and

22   Families.

23        **THE COURT:**  Yes.  What is that?

24        **THE WITNESS:**  ACYF.  It would be the federal

25   equivalent of --

1              THE COURT:  DCF?

2              THE WITNESS:  Yes.  It's part --

3              THE COURT:  And what does it do?

4              THE WITNESS:  It is the --

5              THE COURT:  I asked because it seems that this type

6    of care is state, primarily a state function.

7              THE WITNESS:  But funded through Title IV-E funds.

8              THE COURT:  I see.

9              THE WITNESS:  So it's Block Grant dollars.  And

10   attached to those Block Grant dollars are certain

11   expectations about outcomes.  So the big three are safety,

12   permanency and well-being.  Well-being was added roughly in

13   the 1990's.

14             THE COURT:  And this is the federal agency that

15   administers those Block Grants?

16             THE WITNESS:  Yes.  As well as, basically has a

17   report card for states called the Child and Family Services

18   Reviews.  So each state is assessed on how close they are to

19   achieving the outcomes around safety, permanency and

20   well-being.

21   Q   DCF is part of the federal executive branch department,

22   Health and Human Services?

23   A   Correct.

24   Q   And is ACYF a part of a unit of Health and Human

25   Services called the Children's Bureau?

1    A    No.

2    Q    No.

3    A    ACYF is under ACF.  It's taken me a long time to learn

4    the alphabet soup of federal governance.  So, the

5    Administration of Children and Families.  And then ACYF is

6    Administration of Children, Youth and Families.  The

7    difference, don't ask me.

8              And that's all under Health and Human Services.

9    The Children's Bureau, as I understand it, is part of

10   SAMHSA, the Substance Abuse and Mental Health Services

11   Administration.  That is a part of the federal government

12   that deals specifically with mental health and substance

13   abuse disorders.

14   Q    I asked you about AACAP and consultation with public

15   child welfare agencies.  Putting that aside for a moment,

16   have you individually consulted with any child welfare

17   agency within a state?

18   A    Yes.

19   Q    Can you describe that consultation or what was involved

20   in that consultation?

21   A    The first consultation -- there's been many.  But the

22   first consultation was with the state of Tennessee through

23   my connection on the Child Welfare League of America's

24   mental health advisory board.  The child -- Tennessee had

25   been sued by a law firm called Children's Rights.  And

1    Tennessee had settled that case.  As a condition of the

2    settlement of that case the state agreed to establish a

3    director of mental and behavioral health services.  The

4    woman they hired, Dr. Tricia Henwood, is a psychologist.

5    She, as a condition of her employment, wanted the state to

6    hire a consulting child and adolescent psychiatrist to help

7    her to think through the medical side of the medical and

8    behavioral services that she was going to oversee.  The

9    state did not want to hire somebody within Tennessee, for

10   their own reasons, and had been working with the Child

11   Welfare League.  So, called the Child Welfare League asking

12   for a recommendation of a child and adolescent psychiatrist.

13   Given my work with the Child Welfare League, the Child

14   Welfare League called me and under subcontract from the

15   Child Welfare League, I spent a year consulting in

16   Tennessee, several years, but the first year rewriting,

17   working with a group, rewriting the policies around

18   psychotropic medication, as well as behavioral management of

19   children within the foster care system in Tennessee.

20   **Q**   Did Children's Rights play a role in your retention by

21   the state of Tennessee?

22   A   I was working for the state as they were responding to

23   the settlement agreement that they had established with

24   Children's Rights.

25   **Q**   So to be clear, you were retained by the state of

1    Tennessee, not by Children's Rights?

2    A    Correct.

3    **Q**    What was your scope of work for the state of Tennessee?

4    A    The first year I was working with a colleague from the

5    Child Welfare League.  I was kind of the clinical consultant

6    to both the workgroup writing the policies regarding

7    behavior management, so that would include issues around the

8    seclusion of children in state custody, restraint of

9    children in state custody, by their provider, contracted

10   providers, orientation psychiatric settings, as well as

11   writing really for the first time because they didn't really

12   have much in the way of psychotropic medication policies.

13   There were a number of policies that we developed over the

14   course of that year, everything from where to store

15   medication to the distribution of the medication, informed

16   consent process for the psychiatric medication, as well as

17   regulations around the PRN use of medications, meaning as

18   needed, and emergency medications.

19          I then left.  That contract ended.  We wrote the

20   policies that were being implemented.  I got a call about a

21   year later that they wanted me to come back now and help

22   them to train the workforce within the Tennessee Department

23   of Children and Families on the new policies, as well as be

24   a resource for training materials for the foster care

25   providers within the state.  I did that for about 18 months,

1  left again.  And they called me again about an issue that I

2  had raised a concern for them around their serious incident

3  reporting process, which at the time consisted of a provider

4  faxing a report that literally would spew out the other end

5  of the fax machine in Nashville 24 hours a day falling on

6  the floor on the weekends.  And I said I think that might be

7  a problem because there might be something that you need to

8  respond to in real time that's falling on the floor.  And

9  they wanted me to come back and help to develop a system

10 that was a little tighter.

11 **Q**   You say that, you testified that your work in Tennessee

12 involved development of policies related to the utilization

13 of psychotropic medications on children in Tennessee's

14 foster care system?

15 A   Correct.

16 **Q**   Were policies ultimately formulated as part of your work

17 for Tennessee and put into practice?

18 A   Yes.  Many.

19 **Q**   Okay.  With respect to the oversight and monitoring of

20 psychotropic medications to children in foster care were

21 policies directed?

22 A   Yes.

23 **Q**   Can you describe the elements of those policies?

24 A   The state of Tennessee had prior lawsuits that guided

25 their consent process.  So, in Tennessee the consenting

1  authority is the biological parent unless parental rights

2  have been terminated.  If parental rights have been

3  terminated, or if they're not able to get the parent on the

4  phone or in the session with the child psychiatrist or the

5  prescriber, then it defaults to nurses that were in

6  geographic distribution throughout the state.  There are

7  about twelve regional health unit nurses that would then be

8  the consenting authority.  And I wanted to empower the

9  worker who was often bringing the child to the appointment

10  with the prescriber to be able to ask questions and engage

11  in a true informed consent process with the prescriber.  And

12  so, I wrote a series of medication monitoring guidelines

13  that were meant to not to restrict the prescriber's

14  utilization of psychiatric medications.

15          I want to be clear that I think psychiatric

16  medications are very helpful for children and adolescents.

17  I prescribe psychiatric medications.  I've seen dramatic

18  responses to psychiatric medications.  But given what I've

19  talked about in the Jensen table about what we know and

20  don't know about safety and efficacy of these medications

21  for children and adolescents, I felt it was really

22  critically important that the person giving that consent, or

23  the person representing that child at the clinical encounter

24  be able to enter into an informed dialogue with the

25  prescriber.  So, I wrote a series of medication monitoring

1    guidelines, actually encouraged them to convene a stakehold

2    of their prescribers to write it.  And they resisted that.

3    And I pushed back and eventually I wrote it literally on a

4    plane going back to Boston.  Because they're not terribly

5    controversial.  It was things like if the child is on three

6    or more psychiatric medications that should least encourage

7    a conversation between the person representing the child at

8    the clinical encounter and the prescriber why do we need to

9    add a third or fourth or a fifth psychiatric medication.  Or

10   two or more medications from the same class.  So, for

11   instance, why would a child be on two antipsychotics at the

12   time when there's really no research to support that

13   practice.

14          These weren't medically trained people, but they

15   were reasonable people who I felt with training and with

16   these guidelines would feel empowered to engage in a true

17   and informed consent process with the prescriber.

18   **Q**   Let's step back for a moment from Tennessee and its

19   foster care system and focus on a term you've been using

20   here, informed consent process.

21          What is the informed consent process?  Is that

22   something that's exclusive to this foster care setting or is

23   it more general than that?

24   A    No, it's, it's much more general than that.  It applies

25   to all the children that I work with, whether I'm talking to

1    a parent or whether I'm talking to a guardian who has

2    authority to give consent to a medication.  My --

3             **THE COURT:**  Go ahead.

4    A    Okay.  My job as a prescriber --

5             **THE COURT:**  Go ahead.

6    A    My job as a prescriber is to give the information about

7    what I think is going on in terms of the child's mental

8    health needs.  So that can include what I would call a

9    bio-psychosocial formulation.  What are the biological

10   contributions, the psychological and the social

11   contributions.  What's the, what's the history, the family

12   history of this child in terms of their parents, their

13   grandparents and aunts and uncles, mental health history.

14   It's a way of knowing whether there's a genetic

15   predisposition to mental illness, whether or not there was

16   alcohol or substances used during the pregnancy that can

17   predispose to learning and behavioral challenges.  Whether

18   there was any trauma during the pregnancy or immediately

19   following the pregnancy, which is typically the case in the

20   foster care population.

21            And all of that pulled together informs me about

22   why the child might be behaving the way that they are and

23   what kind of treatment would be indicated.

24            **THE COURT:**  All right.  I'm sorry, I didn't mean to

25   interrupt you.  Were you finished?

1              **THE WITNESS:**  I can be.

2              **THE COURT:**  All right, since you can be.  Let's

3    stop there.  And you may step down.

4              We'll stop taking testimony today.  We'll resume on

5    Thursday.  I regret the inability to sit tomorrow and I

6    apologize that if that causes you any inconvenience.  So

7    we'll sit Thursday, Friday.  As you know from the final

8    pretrial conference, Monday and Tuesday, I'll take care of a

9    jury waived case that's older than this one, and then we'll

10   be back again Wednesday of next week and we'll continue.

11             At the end of the first day of trial, the

12   plaintiffs have used up two hours and 15 minutes, and the

13   defense, one hour and 15 minutes.

14             We'll stand in recess in this case until Thursday

15   at 9:00 a.m.  We'll recess.

16             **THE CLERK:**  All right.

17             (Adjournment.)

18

19

20

21

22

23

24

25

1                    **C E R T I F I C A T E**

2

3

4          I, Donald E. Womack, Official Court Reporter for

5    the United States District Court for the District of

6    Massachusetts, do hereby certify that the foregoing pages

7    are a true and accurate transcription of my shorthand notes

8    taken in the aforementioned matter to the best of my skill

9    and ability.

10

11

12

13

14              /S/ DONALD E. WOMACK 5-7-2013
                 _____
15                 DONALD E. WOMACK
                 Official Court Reporter
16                 P.O. Box 51062
            Boston, Massachusetts 02205-1062
17                 womack@megatran.com

18

19

20

21

22

23

24

25