```
 1                 UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MASSACHUSETTS
 2
                                        Civil Action
 3                                      No. 10-30073-WGY

 4    * * * * * * * * * * * * * * * * * * * * * *
                                               *
 5    CONNOR B., by his next friend, ROCHELLE  *
      VIGURS, et al., individually and on behalf *
 6    of all others similarly situated,         *
                                               *
 7            Plaintiffs,                       *
                                               *  BENCH TRIAL
 8    v.                                        *  (Volume 2)
                                               *
 9    DEVAL L. PATRICK, in his official capacity *
      as Governor of the Commonwealth          *
10    of Massachusetts, et al.,                 *
                                               *
11            Defendants.                       *
                                               *
12    * * * * * * * * * * * * * * * * * * * * * *

13            BEFORE:  The Honorable William G. Young,
                            District Judge
14    APPEARANCES:

15            NUTTER, McCLENNEN & FISH, LLP (By Daniel J.
          Gleason, Esq. and Jonathan D. Persky, Esq.), World
16        Trade Center West, 155 Seaport Boulevard, Boston,
          Massachusetts 02210-2699
17                 - and -
              CHILDREN'S RIGHTS (By Sara M. Bartosz,
18        Esq., Laurence D. Borten, Esq., Sarah Russo, Esq.
          Rachel Brodin, Nili, Esq. and Jessica E. Polansky,
19        Esq.), 330 Seventh Avenue, Fourth Floor, New York,
          New York 10001, on behalf of the Plaintiffs
20
              OFFICE OF THE MASSACHUSETTS ATTORNEY
21        GENERAL (By Liza Tran, Jason B. Barshak and
          Jeffrey T. Collins, Assistant Attorneys General),
22        One Ashburton Place, Boston, Massachusetts 02108,
          on behalf of the Defendants
23
                                        1 Courthouse Way
24                                      Boston, Massachusetts

25                                      January 24, 2013
```

**I N D E X**

**WITNESS:**          **DIRECT   CROSS    REDIRECT    RECROSS**

CHRISTOPHER BELLONCI, Resumed

   By Ms. Bartosz    3

   By Mr. Collins          105

                                          **FOR        IN**

**EXHIBITS:**                              **I.D.    EVID.**

    1063 Tufts Study  . . . . . . . . . . . . 129

1          **THE CLERK:**  All rise.  The United States District

2     Court is now in session, you may be seated.

3          Now hearing Civil Matter 10-30073, B. Connor, et

4     al. v. Patrick, et al.

5          **THE COURT:**  Good morning.  And if you would remind

6     the witness.

7          **THE CLERK:**  I would like to remind you that you are

8     still under oath.  You have to say yes.

9          **THE WITNESS:**  Yes.

10          **THE COURT:**  You have to say something.

11          **THE WITNESS:**  Okay.

12          **THE COURT:**  All right.  You may continue.

13          **MS. BARTOSZ:**  Thank you, your Honor.

14          CHRISTOPHER BELLONCI, Resumed

15          **DIRECT EXAMINATION** (Cont'd)

16     BY MS. BARTOSZ

17     Q   Good morning, Dr. Bellonci.

18     A   Good morning.

19     Q   Welcome back.

20     A   Thank you.

21     Q   When we left off on Tuesday of this week, Dr. Bellonci,

22     we were talking about your consultation with the state of

23     Tennessee in relation to its foster care system.

24          Do you recall that?

25     A   Yes.

1    **Q**   And you had identified in talking about that

2    consultation some recommendations that you made with respect

3    to providing guidelines to caseworkers working with children

4    in relation to the utilization of psychotropic medications.

5              Do you recall that?

6    A   Yes, it was actually part of the revamping of their

7    informed consent policy amongst other policies that I was

8    part of the workgroup that was developing those policies.

9    **Q**   And specifically with respect to that issue, guidelines

10   to caseworkers, what recommendations did you make to revamp

11   the informed consent process in Tennessee?

12   A   There were a number of monitoring guidelines that

13   actually got embedded into their policy statement and it

14   included and was meant to empower the caseworker to engage

15   in a truly informed consent dialogue with the prescriber.

16            **THE COURT:**  Let me, having reflected a little bit

17   on this, ask a couple of questions.

18            **THE WITNESS:**  Yes.

19            **THE COURT:**  These medications don't get given to

20   anyone, child, adolescent, adult, without a prescription.

21   Isn't that right?  The medicines we're talking about?

22            **THE WITNESS:**  Yes.

23            **THE COURT:**  And that in my mind creates a

24   presumption that the physician prescribing them believes

25   they have benificent, or at least a reasonable medical

1    assurance of benificent effects as opposed to bad

2    side-effects.

3         THE WITNESS:  Yes.  As a medical practitioner it's

4    my responsibility to do a risk-benefit analysis about any

5    recommendation and to inform the persons making that

6    decision about whether to consent to taking that

7    recommendation.

8         THE COURT:  And as a nonphysician I thought, think

9    that the prescription procedure, I get a presumption that

10   the physician is making that analysis when he or she

11   prescribes.

12        THE WITNESS:  Yes, in child psychiatry there's a

13   great breadth of opinions about the use of psychiatric

14   medications given the dearth of the research as I outlined

15   in the Jensen chart.

16        THE COURT:  Sure.  So, in this case, and as I

17   understand it in your consulting work in Tennessee, we're

18   dealing with children which under our legal system don't

19   have the right to make these choices for themselves because

20   we think an adult should make the choice, not any adult, we

21   think the parent should make the choice.  You're with me so

22   far?

23        THE WITNESS:  Yes.

24        THE COURT:  But, of course, in a foster care

25   system, for reasons, the case specific reasons, the state is

1    in the position of the parent.  And as I understand it your

2    recommendations had to do with empowering the state employee

3    to engage the physician in making a wise choice.

4            THE WITNESS:  Yes, just as I would with a parent.

5            THE COURT:  All right.  The problem here -- do I

6    understand this to be the problem.  Medicine -- some things

7    aren't going to work out, there's going to be bad

8    side-effects and the like.  But that doesn't seem to be the

9    thrust of the issues in this case.  What we don't want, put

10   aside the legal framework, but trying to grapple with

11   reality, we don't want these powerful medications prescribed

12   to children simply to dumb them down and quiet them down

13   because you can handle them easier.

14           That's the concern, isn't it?

15           THE WITNESS:  That is one of the concerns, yes.

16           THE COURT:  We want to be sure that with such

17   powerful medications when they are prescribed they're being

18   prescribed for those beneficent effects that a physician in

19   good faith believes will help the child.

20           THE WITNESS:  Exactly.  When you're working with a

21   population that has been traumatized by default by coming

22   into the child welfare system, either because they've been

23   removed from their family, removed from their community,

24   their school, or because of the reasons for removal, because

25   they've been abused or neglected by their parents, trauma

1    can look like so many different things.  And what a lot of
2    these medications seem to be targeting and the concerns
3    being raised by some people are that the medications are
4    being used to suppress the aggression which is actually the
5    product of their lived experience and not because they've
6    got a psychotic disorder and not because they've got a
7    bipolar disorder.  These are non-benign interventions.
8    These are interventions that carry lifetime risks of
9    diabetes and heart disease.  So it's both the informed
10   consent process.

11          THE COURT:  When you say interventions, these
12   medical interventions --

13          THE WITNESS:  These medications.

14          THE COURT:  -- are not benign.

15          THE WITNESS:  Yes, exactly.  Particularly the class
16   of antipsychotics.  But all the psychiatric medications.

17          So there's a process I think that needs to happen
18   at the consent to make sure that it truly is an informed
19   process, and the alternatives.  Because we also have
20   evidence based psychosocial interventions, therapies, trauma
21   focused cognitive behavioral therapy for one.  That is very
22   effective and would have a much more benign side-effect
23   profile than something like a antipsychotic.  And are those
24   therapies being utilized first before you go to a medication
25   intervention as best practice would, would warrant.

1        And then once the child is on the medicine, in

2   order for me to be able to monitor side-effects and know

3   whether or not that risk-benefit ratio, is the medicine

4   working, or is the medicine causing side-effects and are the

5   benefits outweighing the side-effects, I need more data

6   coming in.

7        So, I need the child welfare system acting as the

8   parent to bring that data in so I can make that estimation

9   and give back my medical opinion about what's in the child's

10  best interest.

11       I also need a lot of data about the past

12  experience.  So what else has already been tried.  How many,

13  how many of these medicines have already been tried.  And in

14  the plaintiff files there were evidence where the provider

15  couldn't get that information from DCF for months.  And in

16  one case talks about putting a child on an antipsychotic or

17  considering an antipsychotic called Abilify saying as far as

18  I can tell this child's never been on it, when in fact when

19  you dig through the entire record, at the age of six this

20  child had been on that medication.

21       So, I can't do my job if I'm not getting the

22  information that's necessary and that I would expect a

23  reasonable parent to be able to provide me.  That's all I'm

24  asking for from DCF, is the same thing that I would expect

25  from a reasonable parent.

1          And then once a child's on a medicine then we've

2     got monitoring and oversight responsibilities, and we also

3     need to have a data trail.  And we need to make sure that

4     these medicines are being, are not being used in lieu of

5     other less intensive interventions.  That also means that

6     DCF needs to have evidence based practices available to them

7     in the workforce.

8          **THE COURT:**  Go ahead, Ms. Bartosz.

9          **MS. BARTOSZ:**  Thank you, your Honor.

10    **Q**   Dr. Bellonci, let's step away from Tennessee for a

11    second and follow up on this line of thought that you and

12    the Court have been discussing here.  And you've been

13    focused on this issue of informed consent.  Yes?

14    **A**   Yes.

15    **Q**   How many sides are there to the informed consent

16    process?

17    **A**   I'm not sure I understand your question.

18    **Q**   You as the doctor, the prescriber, have a role to play?

19    **A**   Yes.

20    **Q**   Is there another role, another player in the informed

21    consent process?

22    **A**   Yes.  I mean, my job is to give the person who is

23    authorized to give consent, whether that's the parent or

24    whether that's the state in the case of child welfare, the

25    information that they need to make their own informed

1  choice.  That's the informed part of the informed consent.

2  I can't put a child on a medicine without the consent of

3  their parent or guardian.  As the judge points out it's --

4  you know, obviously I'm making a medical recommendation.

5  But typically I'm making multiple options, that there's not

6  just one thing.  It's not like the child comes to me and

7  they've got strep throat and the protocol is they're going

8  to be on amoxicillin.  That's just not where child

9  psychiatry is.  There are so many different opinions,

10  particularly in Massachusetts where there's a lot of

11  divergence of practice where we have institutions that are

12  promoting the use of antipsychotic medications and where

13  there's been kind of a leading edge of the diagnosis of

14  juvenile bipolar disorder as a means of understanding

15  impulsive aggression in children.  Over the last decade the

16  diagnosis of juvenile bipolar disorder has gone up

17  tenfold -- no, I"m sorry, 40 fold.  A 400 percent increase

18  over the last ten years in the diagnosis of this condition.

19  When you combine that happening -- and the primary treatment

20  of this condition is an antipsychotic medication.  So, not

21  surprisingly, we're seeing exponential growth in this class

22  of medications.  When you combine that with the foster care

23  population, these children are being moved around, there's

24  placement disruptions, they've been traumatized, you know,

25  it's, it's not surprising that they behave in some of the

1    ways that they do.

2            What I've seen over the course of my 20 years in

3    hundreds of, of cases working with children within child

4    welfare in Massachusetts, has been an increasing utilization

5    of antipsychotic medications, particularly the psychiatric

6    medications broadly, to treat what I think are fundamentally

7    the byproduct of these children's lived experiences.  And if

8    that's what the state wants to do then okay.  I disagree

9    with that.  But I at least would then expect that the state

10   is engaging in a truly informed conversation about the

11   potential risks of those medications over the long-term, and

12   that they then have a mechanism for monitoring side-effects.

13   They're not following their own guidelines around monitoring

14   and oversight.

15   Q    Doctor, and now discussing in your last response the

16   role of the prescriber in the informed consent process, you

17   used the term recommendation, that you make recommendations

18   from time to time about prescription medications,

19   psychotropic medications.  Did I hear that correctly?

20   A    Yes.

21   Q    And why do you use that term recommendation?  Don't you

22   give orders?

23   A    No.

24   Q    Can you explain that?

25   A    When you bring your child to the doctor you want the

1    doctor to tell you what their best medical opinion is about

2    what's wrong with your child.  That's based on the

3    information you've provided to the doctor about the history

4    of the illness, the past history, family history.  So I get

5    information about, you know, genetic risk factors.  In child

6    psychiatry I want to know about this child pre-conception.

7    You know, I want to know what is the father's genetic

8    history, what's the mother's genetic history, what happened

9    in the pregnancy, what toxic exposures, was there aggression

10   or trauma to the mother during the child's development, that

11   can have an impact on the child's development.  Were they

12   smoking.  Were they drinking.  Were they using drugs.  Were

13   they ill.  Were they on medications.  All of this informs

14   the developing brain of the child.

15          The child's then born and born into a social milieu

16   with trauma and factors that impact the development from

17   there, and then on and on.  So I want to know about the

18   developmental history, when did language acquisition start,

19   when did motor skills, what's the status of those

20   developmental abilities and disabilities.  When did, when

21   did somebody first become aware there was something wrong

22   with this child.  What interventions were then tried.

23   Psychosocial interventions.  Medication interventions.  What

24   was the response to those trials.  What were the

25   side-effects of those trials.

1              When I'm meeting a parent they can give me that

2    information.  Rarely when I'm meeting with a DCF worker or

3    someone representing a child who's in state custody do I get

4    that information.  And that's a problem.  Because then I

5    can't tell you as the parent or as the state in an informed

6    way from the prescriber's side what, what I think needs to

7    happen.  And it's my job to then tell you when you're

8    bringing your child to me what's my medical opinion about

9    what the problem is and what's my medical opinion about the

10   options of responses.  Those may be, even if I'm not

11   providing that service, a therapy, a particular evidence

12   based therapy, it may include a medication, it may include a

13   range of medications.  Rarely is there just one answer to a

14   clinical problem.  And then it's really up to the values and

15   judgment of the person giving the consent to provide that

16   information.

17              So you start hearing about the complexity when

18   we're talking about child psychiatric conditions.  Child

19   psychiatry is different than other branches of medicine in

20   terms of what we know.  And that was my point in including

21   the Jensen chart.  That really highlights for me I think

22   what we don't know.  And it's important that part of the

23   disclosure is also about what we don't know.  So that

24   somebody can use their own judgment in a value system in

25   making the best informed decision for their child.

1          And when you then take it to a state child welfare

2     system, many state child welfare systems are choosing to

3     embed into that informed consent process a medical opinion,

4     because of the complexity.

5     Q   In discussing here the informed consent process from the

6     perspective of a child and adolescent psychiatrist such as

7     yourself, a prescriber.  Yes?

8     A   Yes.

9     Q   Can you describe -- and let's put foster care aside for

10    a moment and talk about a parent bringing their child to a

11    psychiatrist such as you.

12         What's the role of the parent in, in the informed

13    consent process?

14    A   I like nothing better than when a parent is asking

15    questions.  It lets me know that I'm doing my job of giving

16    them the information to be an informed consumer of health

17    care.  And so, it also lets me know whether or not they're

18    understanding what I'm trying to communicate and convey to

19    them.

20         I have the same conversation with the child by the

21    way.  Because the other part, there's consent and then

22    there's assent.  I also think it's critically important that

23    children in the child welfare system understand why they're

24    being put on these medications.  You know, I think Lauren

25    talked about her experience.  That's not a unique

1    experience.  I can't tell you how many youth from the foster

2    care system who then age out at 18 immediately stop their

3    psychiatric medications because they never understood why

4    they were on them in the first place, because nobody had

5    really taken the time to talk to them about that.

6    **Q**    And while we're on the topic of assent and not consent,

7    is there an age for a child or a youth that triggers for you

8    where you start to involve the youth or child in the assent

9    that you're talking about?

10   A    I mean, I, I get assent from a five year old.  Now,

11   obviously the conversation I'm having with a five year old

12   is very different than a conversation I'm having with a 15

13   year old.  But we actually -- I had a staff person at Walker

14   who did a study, she was in graduate school, where she

15   actually looked at and surveyed the children I work with --

16   you know, Walker is a population of five to 13 year olds. --

17   asking them the question do you understand, you know, tell

18   me why you're taking medicine if you're taking medicine.

19   And if you had the choice to not take medicine would you

20   still take it.  And 95 percent of those children said they

21   would still take it.

22        So, I felt very gratified in my practice.  Because

23   I spend a lot of time talking with the children about why

24   they're on this medicine, what this medicine's meant to do,

25   and the fact that this medicine doesn't take care of their

1    behavior, they're still responsible for their behavior.

2    It's critically important that the concept of locus of

3    control remains with the child, that they're responsible for

4    their behavior.  The medicine may, may delay the reaction

5    time in which they make a bad choice, but bad choice is

6    still theirs.  The medicine is going to stop them from being

7    able to make a bad choice.

8           You know, so that assent process is part of what we

9    call psycho-education.  It's part of informing the consumer

10   of the health care about their condition, their

11   responsibility for helping in health promotion, helping

12   themselves get well, and what role the medicine is meant to

13   play in that.  Often medicines are a catalyst to change in

14   child psychiatry.  They're not the cure.  We don't have

15   those in child psychiatry.  It's not like an antibiotic and

16   then you're done.

17   Q    Still focusing on a circumstance in which a child is

18   presented to you for care and you're there as the prescriber

19   and the child is in their family home and still in the

20   custody of their birth parent.  In that situation, when you

21   make a recommendation, Dr. Bellonci, with respect to a

22   particular drug that might be administered to the child,

23   what is the role of the parent at that time when you make

24   the recommendation in this informed consent process?

25   A    They, they need to make a decision in the best interest

1   of their child.  You know, I tell parents I'm, I'm an expert

2   in child psychiatry.  You're an expert in your child.  You

3   know, I can't make this decision for you.  There are so many

4   unknowns about these medications and the long-term

5   side-effects, and even in terms of what we know about safety

6   in this age group, again referring back to the Jensen chart.

7   How many C's were on there for long-term and short-term

8   safety, for specific and various classes of medications.

9   And I've had parents say no.  And I will say great.  You

10  know, I'm still available to you because I don't just do

11  medications.  These are some other things that I think you

12  should consider trying.  If you see this trajectory of, of

13  problem behaviors or problem conditions continue, I would

14  suggest we revisit the conversation.  I'm fine with that.

15  You know, they need to be making the decision about what's

16  in the best interest of their child.  That's not my

17  responsibility as a child psychiatrist.  I can't do it.

18  **Q**    You've spoken, starting on Tuesday, about some of your

19  experience, Doctor.  You went to Texas medical school, there

20  were internships, fellowships, you're at Tufts Medical

21  Center in Boston.  Shouldn't the parents in this informed

22  consent process just defer to you?

23  A    God no.

24  **Q**    Why not?

25  A    I do consider myself to be a good doctor.  And I will

1    provide my recommendation.  I may even say, rarely, if this
2    were my child this might be what I would do, or if you asked
3    me, you know, amongst the options that I'm providing to you
4    what would I, what would I prefer or what would I highlight
5    as the most likely.  But I would also use the information
6    that all of that education has accrued to try to kind of
7    prioritize.  Sometimes I can even give statistics.  You
8    know, I can say, you know, X number or X percent of children
9    benefit from this medicine and X percent of children will
10   have this side-effect.  Because they want to know, you know,
11   what, what am I facing.  And I can give, you know, with
12   whatever literature is available.

13         The problem is that the further you go out in terms
14   of some of the treatment options.  So ADHD and stimulants,
15   we've got lots of data that show the stimulants are very
16   effective, long-term, maybe they carry some risk for height
17   and weight.  Over the long-term there's been some concerns
18   about cardiac risk factors.  So we check heart rates and
19   blood pressures, and if there's a history of sudden cardiac
20   death you get an EKG.  I walk them through all of that.
21   When we start getting out into the use of antipsychotics in
22   children, or even in the case of some anti-convulsants, many
23   of which are not even shown to be effective for the
24   conditions that we're using them in adults, let alone in
25   children, then, then I'm on shakier and shakier ground and I

1    have less science to inform my recommendation.

2          And, you know, that's, that's changing.  You know,

3    science is catching up.  But science is not where the

4    practice is right now.  And that's the, that's the mismatch,

5    that's the disconnect that the Jensen chart was meant to

6    highlight because that's why the informed consent process is

7    so critically important.

8          You know, and the last thing that the state should

9    be doing after stepping in and taking a child from their

10   parent is to then expose them to the potential of more harm.

11   And that's, you know, that's where the, the AACAP guidelines

12   from 2005 --

13   Q    We'll get to that, Doctor.

14   A    Okay.

15   Q    And let me for a second still focus on this circumstance

16   we're talking about where the child's presented to you by

17   their birth parent who still has custody, okay?

18   A    Yes.

19   Q    And we've talked now about your role as a prescriber in

20   making recommendations, we've talked about the role of the

21   parent and hearing that and providing consent based on what

22   you've told or advised them on risks and --

23          **MR. COLLINS:**  Objection, your Honor.

24          **THE COURT:**  Yes.  I think there's --

25          **MS. BARTOSZ:**  I'll withdraw it and start again,

1    Judge.

2            **THE COURT:**  I think the question's gotten away from

3    you.  Ask a question.

4            **MS. BARTOSZ:**  Thank you, Judge.

5    **Q**    Once a parent has provided consent to your

6    recommendation, do they continue to have a responsibility in

7    this informed consent process?

8    A    Oh, absolutely.

9    **Q**    Can you describe what that is?

10   A    So, I've done my assessment, I've gathered information

11   from multiple sources.  Not just the parent.  I'll call the

12   school.  I'll speak to the pediatrician.  I want to know

13   whoever's involved in this child's life, I want to get some

14   information.

15           There are things that parents are really good at

16   reporting and there are things that teachers are really good

17   at reporting and that makes my understanding and my

18   formulation of what the problem is and then my

19   recommendations are going to be that much more effective.

20           Once we've done that process, I make a

21   recommendation, if it's included medication, we've done the

22   risk and benefit discussion, what are the potential

23   side-effects, what can we expect to see, what's the time

24   line when they would see it, then we need to see whether or

25   not we're right.  You know, the formulation is a scientific

1    hypothesis about what's going on.  That scientific

2    hypothesis then has to be tested by the intervention.  That

3    was my reference to N of 1 Tuesday.

4            So, then you're gathering data.  So you need a data

5    stream, you know.  Typically when I'm meeting with a parent

6    or guardian they can be that information source.  I may use

7    standardized assessment instruments to gather data from

8    other sources such as the school.  If I'm not doing the

9    therapy and somebody else is providing the therapy, I'm in

10   communication with the therapist and getting that

11   information.  So that I can have data to inform or refute my

12   hypothesis, which is my formulation, which includes my

13   diagnosis, which then informs treatment recommendations.

14           So I may find that the recommendation I made around

15   a medication that the parent then consented to actually

16   isn't helping, or is causing side-effects that are

17   intolerable enough that even if we're seeing some benefits

18   the medication trial should be stopped.  And ultimately

19   it's, you know, I'm not experiencing the side-effect, so

20   it's the child in conversation and the parent observing the

21   child that determines whether or not again the side-effects

22   are so intolerable.  You know, that's, that's such a

23   subjective thing that I can't, I can't make that call.

24           So, we have follow-up appointments at a frequency

25   that makes sense given the intervention.  And I'm constantly

 1    reassessing what I think is going on, my hypothesis, my

 2    formulation, diagnoses, and that's also informing my

 3    treatment recommendations.  So it's a constant, you know,

 4    iterative process, informed by data as objective as one can

 5    get.

 6  **Q**    You say that this ongoing process informs your ongoing

 7    decision making.  Let me ask you this question.

 8         Are there times during the ongoing process of

 9    communication between you and child and birth parent that

10    you make a recommendation to withdraw the use of the

11    medication?

12  A    Sure.  Absolutely.

13  **Q**    Can you describe typical circumstances that might lead

14    to that, if there are typical circumstances.

15  A    Yeah.  You know, I don't always get it right, sadly.

16    And so -- or maybe I don't have all the information to have

17    made the right recommendation.  So as new information comes

18    in, including the response to intervention, that will inform

19    my ongoing treatment recommendations.

20         **THE COURT:**  I'm having trouble with this, not

21    because I don't understand the witness, he's very

22    articulate, but because it seems somewhat ad hominem.  This

23    is how he does it, and he tells me why and I can follow it.

24    One, that's hardly the test here.  Where are we going to get

25    to some professional standards here and when are we going to

1    get to some analysis, if he's done an analysis, and I see

2    from his report he has, of what Massachusetts does or fails

3    to do.

4         It's your case to try and I'm listening, I hope

5    attentively, but I'm listening to one physician's practice.

6    All right.  That doesn't inform me too much about the issues

7    in this case.

8         You go ahead.

9         **MS. BARTOSZ:**  Thank you, Judge.

10   **Q**   Dr. Bellonci, let's return to the issue of state foster

11   care systems.  You've consulted with Tennessee.

12   A   Yes.

13   **Q**   You've spoken -- quickly, to finish up on that

14   discussion for now.  Beyond reforms you recommended in terms

15   of caseworker guidelines, were there other reforms that you

16   recommended to the state of Tennessee in relation to the use

17   of psychotropic medications with children in foster care?

18   A   Well, that first year long consultation resulted in half

19   a dozen or more policies around psychotropic medication, as

20   mundane as storage and distribution.  Consent was one.  I

21   can't even recall all the various iterations because there

22   were different policies for a child that was in foster care

23   versus residential treatment, et cetera.

24   **Q**   Have you worked with states other than Tennessee?

25   A   Yes.

1   **Q**   Can you describe -- and I'm talking about state foster

2   care systems, you understand that?

3   A   Yes.

4   **Q**   Can you describe your experience?

5   A   I was a consultant for the Annie E. Casey Foundation

6   which is a large foundation dedicated to improving the lives

7   of children in the child welfare system.  They had me

8   working with some state and county jurisdictions that were

9   expressing concerns about psychotropic medication practices.

10  So, I went to a county in North Carolina.  I was sent to

11  Florida to talk with the workgroup that was responding to

12  Gabriel Myers' suicide.  He's a seven or eight year old boy

13  who committed suicide when he was in the Florida child

14  welfare system.  I had conversations with the state of Ohio.

15          I went back to Casey and said, you know, if we're

16  going to try to address these concerns on a county by

17  county, state by state basis, this is going to take the rest

18  of my life.  Couldn't we come up with a different mechanism

19  for doing this by kind of making Casey the clearing house, a

20  national resource for psychotropic medication policies and

21  practice for the child welfare system.

22  **Q**   Did something come of that suggestion?

23  A   Yes.  They convened a full day meeting, a bunch of us

24  got together, they took two years, and then they released,

25  since Casey was a foundation, they don't do practice, so

1    they funded a multi-state psychotropic medication quality

2    improvement collaborative.  And I'm the clinical consultant

3    to that.  There were 27 states that applied.  So I got to

4    see all of those applications.  In the applications the

5    states talk about what their child welfare consent process

6    was, what their data management system was, how, you know

7    what access did they have to know what medications the

8    children that were in state custody were taking.  And six

9    states have been selected.  So I'm working with the states

10   of Rhode Island, New York, New Jersey, Vermont, Illinois and

11   Oregon.

12              I was also part of a multi-state study called the

13   Tufts Multi-State Study that --

14   Q   We'll get to that in a moment Doctor.  Okay?  Focusing

15   on this collaborative that came about in your discussions

16   with Casey.

17              Does that collaborative have a name?

18   A   The Psychotropic Medication Quality Improvement

19   Collaborative.

20   Q   PMQIC?

21   A   Yes.

22   Q   When was that collaborative formed?

23   A   Roughly started in March of last year.  And it's a three

24   year long collaborative.

25   Q   Do you anticipate having a role with that collaborative

1    over those three years?

2    A    Yes, I'm under contract.

3    **Q**    Okay.  Who are you under contract with?

4    A    It's called Center for Health Care Strategies.

5    **Q**    And what is your role as a contractor relative to this

6    collaborative?

7    A    I'm providing clinical consultation to the six states in

8    the collaborative.  I provide -- I've provided lectures.

9    I've provided documents.  I've, I've reviewed the research

10   literature and helped to inform some of the decisions as the

11   states are trying to think about how they want to address

12   the concerns around psychotropic medication for the children

13   in their state care.  You know, each state is coming up with

14   its own response.  As, you know, the judge pointed out, it's

15   a state mandate to take care of the children within their

16   state child welfare system.  And so, each state is coming up

17   with different responses.  There are some commonalities, but

18   each state is going to approach it differently.

19        So, I'm informing them about what other states are

20   doing.  I'm informing them about what the research says

21   about psychiatric medication.  Again, kind of what we know,

22   what we don't know, helping them to think about what kinds

23   of oversight they might want to consider.  I've provided

24   monitoring guidelines.  That document in my report actually

25   came from the document I produced for that, for that PMQIC

1    initiative.

2              **THE COURT:**  So you're implementing this clearing

3    house idea?

4              **THE WITNESS:**  Exactly.  And putting it into

5    practice.  And then I also had the data workgroup.  So,

6    we're defining the terms that we're then going to be

7    measuring over the course of this three year collaborative.

8    **Q**    Thank you.

9              Last Tuesday, Doctor, you made reference to

10   congressional testimony that you've given.

11   A    Yes.

12   **Q**    Can you describe when you gave congressional testimony

13   and the nature of that testimony, or subject of that

14   testimony, I should say.

15   A    It was in 2008.  It was trying to remember the

16   Subcommittee of the House, Ways and Means Committee.  It was

17   something like in security.  It was a committee of congress

18   that deals with child welfare.  Congressman McDermott, who

19   is a child psychiatrist from Washington State, and

20   congressman from Washington State, was convening the

21   hearing, he was head of the committee and it was in support

22   for the Fostering Connections Act.  And congress wanted to

23   know why was there such a discrepancy between rates of

24   children on psychiatric medication in child welfare versus

25   Medicaid and the general population.

1   **Q**   Did you discuss that issue in your testimony?

2   A    I did.

3   **Q**   What did you inform congress?

4   A    Well, in the five minutes I had to explain what is a

5   very complex issue, I tried to express that there is

6   diversity of practice, that they should be concerned about

7   some of the prescribing rates, that it's hard to point to a

8   specific number and say this number should concern you

9   versus a different number, because my experience has been

10  that within that population there are children that are

11  likely being under prescribed or under treated, meaning

12  perhaps not getting other therapies rather than medication,

13  or over prescribed and over medicated.

14       The point being that states really need to be

15  thinking about how they're going to address their

16  responsibility to protect kids from harm by overseeing the

17  holistic mental health services that those children are

18  being provided.  It's part of that well-being requirement

19  that was added in the 1990's.

20  **Q**   The requirement you testified to on Tuesday?

21  A    Yes.

22  **Q**   Were you the only physician on the panel before this

23  congressional committee that you testified to in 2008?

24  A    They had several hearings.  But the one that I attended,

25  I was the only child psychiatrist.  But I was sitting next

1    to a representative of the American Academy of Pediatrics,

2    Dr. Laurel Leslie.

3    **Q**    Had you met Dr. Laurel Leslie before?

4    A    I had not.

5    **Q**    Where does Dr. Laurel Leslie reside?

6    A    About a block away from me in Jamaica Plain.

7    **Q**    Where does Dr. Laurel Leslie work?

8    A    At Tufts Medical Center.

9    **Q**    Did you get to know Dr. Laurel Leslie in meeting her at

10   the congressional system?

11   A    Yes.  The hearing kept getting interrupted by votes.

12   So, congress people were coming in and out and we kept

13   adjourning and then restarting.  So we had a lot of down

14   time.  So, she and I were chatting and comparing our shared

15   interests and where are you.  In Massachusetts.  Oh, where

16   in Massachusetts.  Down the block.  So that led to

17   ultimately a collaboration where we had shared interests in

18   how states are responding to the challenge of overseeing

19   their mental health care of the children in state custody.

20   She and I got together at J.P. Licks a couple of times and a

21   partnership was formed.

22          I started working with her.  She's a health service

23   researcher.  So she knows the research world much better

24   than I.  I consider myself primarily a clinician.  And I was

25   able to inform her research with my clinical experience.

1    She wrote me into a couple of her grants and that led to the

2    Tufts Multi-State Study.

3    **Q**   Is that the collaboration that you had with Dr. Leslie,

4    the Tufts Multi-State Study?

5    A   Well, that was the embodiment of the collaboration.

6    Ultimately she helped to recruit me to Tufts Medical Center

7    where I'm now employed for the last three years.

8    **Q**   What was the Tufts Multi-State Study?

9    A   Dr. Leslie got a grant to survey the states around

10   consent and oversight and monitoring of psychotropic

11   medications.  She also asked questions about screening

12   assessment.  She asked questions about what level of concern

13   there was.  She asked questions about where the consenting

14   authority was housed within the child welfare system.  And

15   so it was really one of the first national examples we had

16   of how different states are responding to this issue.  Most

17   states were reporting that they were quite concerned about

18   the issue of psychotropic medication, sometimes because

19   there had been a particularly bad outcome around a child in

20   their state, sometimes it was the result of a lawsuit,

21   sometimes it was the result of legislative action, sometimes

22   it was just quality improvement.  But in all cases there was

23   a particular focus on this issue and a patchwork of

24   responses in terms of how they were thinking about consent,

25   oversight of the mental health services the children were

1    receiving, and then monitoring of the psychotropic practices

2    within their jurisdiction.

3    **Q**    Did you and Dr. Leslie publish a paper or a report?

4    A    Yes.

5    **Q**    When was that published?

6    A    Well, the report was disseminated through the Tufts

7    Clinical and Translational Sciences Institute.  So it was

8    disseminated through the web.  Papers based on that study

9    are still being published.  There was a -- there's probably

10   been two papers already that have come out as a result of

11   that.  Some are still in press.

12   **Q**    Are you familiar with the group referred to as the

13   Rogers Working Group?

14   A    Yes.

15   **Q**    What is that?

16   A    The Rogers Working Group was established to look at the

17   current consent process in Massachusetts.  So, in

18   Massachusetts for antipsychotic medications it's called

19   Rogers because that was the case law in adult court that

20   determined that antipsychotics as a class of medications,

21   and this is probably established law from 30 years ago, was

22   extraordinary treatment.  And so somebody could not be

23   compelled to take an antipsychotic unless they were

24   determined to be incompetent as I understand it.  I'm not a

25   lawyer.  And the state when that ruling came down, it went

1      all the way up to the state Supreme Court that confirmed

2      that antipsychotics were extraordinary treatment, the state

3      then determined that children by virtue of being minors are

4      incompetent, and if they're in state custody then the state

5      would also need to obtain judicial approval for

6      antipsychotic medications.  So we have this threshold for

7      consent for an antipsychotic, one class of psychiatric

8      medications, where it requires judicial review.  A guardian

9      ad litem is assigned.  Reports are generated.  As a

10     prescriber, I have to fill out an affidavit.  Sometimes I

11     even have to appear in court and explain to the judge why

12     I'm making this recommendation.

13             And then for every other psychiatric medication, I

14     call up the child welfare worker and I get consent over the

15     phone.

16             **THE COURT:**  Let me see if I understand this.

17             You're telling me that in Massachusetts -- well,

18     you're not telling me that every time a psychotropic

19     medication is prescribed some judge has to sign off on it?

20             **THE WITNESS:**  Just on antipsychotics in

21     Massachusetts.

22             **THE COURT:**  Well, Massachusetts is my concern here.

23             **THE WITNESS:**  Yes.

24             **THE COURT:**  You're telling me that as you

25     understand the law before a psychotropic -- an

1    antipsychotic --

2            **THE WITNESS:**  Yes.

3            **THE COURT:**  -- psychotropic medication can be

4    prescribed a judge has to sign off on it?

5            **THE WITNESS:**  Yes.

6            **THE COURT:**  Thank you.

7            **THE WITNESS:**  There are other jurisdictions where

8    every psychiatric medication has to be approved by a judge.

9    California has that.

10   **Q**   When was the Rogers Working Group convened?

11   A    I think it was roughly the -- I mean, I came to Tufts in

12   January of 2010.  And within months I was working with Dr.

13   Leslie and the Office of the Child Advocate, Gail Garinger,

14   who was convening this workgroup.  And that continued right

15   up until the end of 2011, at least in terms of my active

16   involvement.

17   **Q**   Who convened the Rogers Working Group?

18   A    Gail Garinger who's the child advocate of the state of

19   Massachusetts.

20   **Q**   And did the Rogers Working Group have a particular

21   purpose or mission?

22   A    It was meant to look at how well the consent process was

23   working both in terms of the Rogers and the requirement for

24   judicial approval, but also more broadly psychotropic

25   medications in general.  Because there was -- from a child

1    psychiatric perspective it doesn't make a lot of sense to me

2    that there's this differential threshold, that somehow

3    antipsychotics are treated so differently than

4    antidepressants, anticonvulsants being used for mood

5    stabilization, blood pressure medicine being used for ADHD,

6    stimulant medications, all the other medications that we

7    use, it's not as though those medications don't also carry

8    risks, and that that same informed consent conversation

9    doesn't still need to occur with a high degree of

10   engagement.

11            So, you know, from a medical perspective the

12   consent process really doesn't make sense, and Massachusetts

13   is the only state in the country that has this differential

14   approval process for just one class of psychotropic

15   medications.

16   **Q**   In your work on the Rogers Working Group, did that group

17   make findings or determinations with respect to the Rogers

18   process as it's now being implemented?

19   A    Yes.  Dr. Leslie got some court improvement funds to

20   actually do a survey of stakeholders within the Rogers

21   process.  So, she talked to some of the judges, she talked

22   with the GALs, she talked with representatives of foster

23   care, she talked to foster care youth, she had focus groups

24   throughout the state, and kind of pulled all that together

25   in a report.  Judge Garinger also got the Northeastern

1    University law students to do a study where they did a

2    similar kind of a process, including looking at what the

3    legal mandates were.  They kind of looked at what the

4    national landscape looked like, and all of that was

5    informing the recommendations of the Rogers Working Group.

6    Q    Have there been any recommendations made to reform in

7    some ways one or more of the Rogers process?

8    A    Yes.  One of the main recommendations, and this was

9    actually coming from the GALs and judges was that they

10   really wanted more medical input into the Rogers process.

11   Interestingly enough, the GALs and the judges were concerned

12   that if the judicial approval process went away that there

13   was nobody that was going to be protecting the best interest

14   of the children in child welfare.  So they were reluctant to

15   let go of the judicial oversight until they knew what they

16   were transitioning to.  So that was one of the clear

17   recommendations, that the child psychiatrists who were also

18   a stakeholder group being discussed wanted the Rogers

19   process to go away and felt that it was onerous, that it

20   wasn't really, it didn't make medical sense to them, and why

21   would they need a judge to, you know, make an approval of

22   their treatment recommendations.

23   Q    To your knowledge or understanding are any Rogers

24   Working Group recommendations currently under

25   implementation?

1    A    Not to my knowledge.

2    Q    Doctor, you've been retained as an expert by the

3    plaintiffs in this case?

4    A    Yes.

5    Q    When were you first contacted by the plaintiffs?

6    A    It was around March of last year.

7    Q    Who contacted you?

8    A    I believe it was Jessica or yourself.

9    Q    You ultimately agreed to provide consultation as an

10   expert?

11   A    I took some time thinking about what that meant, but I

12   did.

13   Q    Are you being paid for your work in this case?

14   A    I am.

15   Q    What is that compensation arrangement?

16   A    It's $450 an hour for document review, report writing

17   and testimony.

18   Q    How did you arrive at that compensation arrangement?

19   A    I'm doing it through my employment at Tufts Medical

20   Center so I asked my chairman what I was supposed to charge.

21   Q    What did you understand the scope of your work as an

22   expert to be when you agreed to the retainer?

23   A    My understanding was that you wanted me to use my

24   experience working with this population, my knowledge of the

25   research, my knowledge of other state child welfare

1   practices around psychotropic medication and mental health

2   services, to review plaintiff files, to see whether or not

3   they were meeting the standard of care within Massachusetts,

4   and then to generate an opinion about that.

5   **Q**   And have you performed that work?

6   A   I have.

7   **Q**   And have you generated opinions?

8   A   Yes.

9   **Q**   And have you reflected those opinions in a report?

10   A   Yes.

11   **Q**   And is that report the document that we provided to you

12   last week Exhibit GZ?

13   A   On Tuesday, yes.

14   **Q**   I'm sorry, on last Tuesday.

15       Before we talk about the findings you've made,

16   Doctor, I would like to focus now on the issue of the

17   informed consent process that we talked about earlier today

18   involving you and a birth parent and change the

19   participants.  I would like to talk about the informed

20   consent process when you are the prescriber and on the other

21   side of that relationship is the Department of Children and

22   Families with a child who's in foster care custody.

23       Do you understand where we are here?

24   A   Yes.

25   **Q**   In performing your work in this matter, did you identify

1    the standard of care in that informed consent circumstance?

2    A    Yes.

3    Q    Where did you draw the standard of care from?

4    A    There are multiple sources.  My knowledge of other state

5    practices around consent.  So that was informed by the Tufts

6    study, from my work with various states as a consultant, my

7    review of the literature and the research and going back to

8    AACAP, the American Academy of Child and Adolescent

9    Psychiatry, which had a guideline that was promulgated in

10   2005.

11          **MS. BARTOSZ:**  May I approach the witness, Judge?

12          **THE COURT:**  You may.

13   Q    Dr. Bellonci, I would like to present you now with

14   Exhibit 17.

15          **MS. BARTOSZ:**  For the Court?

16          **THE CLERK:**  Thank you.

17   Q    Dr. Bellonci, I've presented you with Exhibit 17.  Have

18   you seen this document before?

19   A    Yes.

20   Q    Can you identify it?

21   A    It's the AACAP position statement on oversight of

22   psychotropic medication use for children in state custody, a

23   best principles guideline.

24   Q    Is this the document you just referred to in your

25   testimony?

1    A    Yes.

2    **Q**    When was this document published by AACAP?

3    A    2005.

4    **Q**    Does Exhibit 17 address the issue of informed consent

5    between a prescriber and a consenting authority with respect

6    to a child in foster care, in state foster care?

7    A    I would say that it talks more broadly about the role of

8    the child psychiatrist and the role of the state in terms of

9    oversight of psychiatric treatment for children in state

10   custody.

11   **Q**    Do you rely upon Exhibit 17 as a basis for identifying

12   the standard of care in relation to children in foster care

13   and the use of psychotropic medications?

14   A    It's one of the pieces that I rely upon for that

15   standard of care.

16   **Q**    Okay.  Can you identify within the AACAP guidelines the

17   standard of care?

18   A    Well, what I would like to highlight from the document

19   is the comment that the state has a duty to perform this

20   protective role for children in state custody, and the

21   sentence that appears right before when it's defining what

22   the duty is, it talks about, unlike mentally children from

23   intact families, these children, referring to children in

24   state custody, often have no consistent interested party to

25   provide informed consent for their treatment, to coordinate

1    treatment planning and clinical care, or to provide

2    longitudinal oversight of their treatment.  And then it goes

3    on to affirm that the state has this responsibility.

4          Those are the three bedrocks that I think we should

5    be discussing about children in state custody.  So it's the

6    informed consent, which we've been talking about.  Then it's

7    to coordinate treatment planning and clinical care, which is

8    that oversight of mental health services, not just specific

9    to psychotropic medication.  But that's the data stream

10   after we've decided to do a medication intervention, how are

11   we monitoring.  And then providing longitudinal, they use

12   the term oversight of their treatment.  I'm calling that

13   monitoring.  So that's the ability for the state in the

14   aggregate and in the child specific to be able to say on any

15   particular time this is what this child is taking.  You

16   know, in Massachusetts the state just doesn't have that

17   ability.

18         So, if a new alert comes out that Paxil is

19   dangerous to children, the state couldn't readily generate a

20   list of which children in our care are on that medicine in

21   order to then inform the prescriber or alert the foster

22   parent what to look for related to the risk factors

23   associated with that medication.

24         You know, if a parent can't tell me what

25   medications they're giving to their child that would be

1    considered neglect, and yet that's daily occurrence in the

2    Commonwealth.

3    **Q**    You talked about the three pieces of this duty that

4    AACAP has set forth, informed consent, clinical oversight,

5    and monitoring.  I've got those three pieces right?

6    A    Yes.

7    **Q**    What does AACAP have to say with respect to the first

8    item, informed consent?

9    A    Well, it goes on to describe some of the basic

10    principles and then has actual standards for, that are meant

11    to kind of put meat on the bones of those basic principles.

12    So, if I can just kind of go through what some of the basic

13    principles are that are outlined.

14    **Q**    Please, Doctor.

15    A    The first principle that's discussed is that every youth

16    in state custody should be screened and monitored for

17    emotional and/or behavioral disorders.  And that youth who

18    do appear to have some kind of symptom in the

19    emotional/behavioral domain should have a comprehensive

20    psychiatric evaluation, if indicated, a bio-psychosocial

21    treatment plan.  That's what I have been outlining before.

22    Youth in state custody who require mental health services

23    are entitled to continuity of care, effective case

24    management, and longitudinal treatment planning.

25             Youth in state custody should have access to

1    effective psychosocial, psychotherapeutic and behavioral

2    treatments, and, when indicated, pharmacotherapy.

3             THE COURT:  Well, with all respect, I can read

4    this.  And I am reading it.

5             What strikes me is that the bold, over on page 2,

6    the principles, you've got some rankings.  Minimal, one

7    might equate in the terms of this case to, if that's not

8    done that's a substantial deviation from professional

9    judgment.  Recommended, we'll think about, maybe you have

10   more to say about it.  Ideal, it's going to be hard, I

11   express no opinion, but sort of going to be hard for me to

12   impose as a judge on a state something that even the

13   professionals in the field call ideal.

14            Having said that, my question is, the ranking is

15   intentional by AACAP in this guideline; is that right?

16            THE WITNESS:  Yes, and the ranking was from 2005.

17            THE COURT:  All right.

18            THE WITNESS:  So it is an emerging field.  So,

19   whether or not the guild would feel the same way about those

20   rankings in 2013 I think is an open question.

21            THE COURT:  But given your work on this case and

22   having some knowledge about how courts work and the legal

23   framework, you know that she's going to be asking you about

24   an appropriate standard of professional judgment.  So when

25   you look around for standards this is one of the things you

1    find and now you're evaluating it for me.

2              THE WITNESS:  Yes.

3              THE COURT:  That's what's going on, right?

4              THE WITNESS:  Yes.

5              THE COURT:  All right.  Go ahead, Ms. Bartosz.

6              THE WITNESS:  I think that, you know, I think

7    you're exactly right.  That, you know, that there's a

8    bedrock and then there are things that might be more

9    aspirational.  I mean, as an advocate for children, I would

10   love for Massachusetts to be the best in caring for the

11   children in state custody.  I think there's a minimal

12   standard that I took to evaluate current practice.  That's

13   the lens that I evaluated kids' files that I reviewed and

14   the lens upon which I was reflecting on my 20 years of

15   experience working with this population.  And that's what

16   drove my findings.

17             THE COURT:  But just so I'm clear on the document,

18   which is admitted in evidence, these bold face rankings in

19   brackets, they're in the actual documents, that's not your

20   view of them?

21             THE WITNESS:  No, no, this is not my document.

22             THE COURT:  I understand.

23             THE WITNESS:  Yes.

24             THE COURT:  It's AACAP's document as of 2005.

25             THE WITNESS:  Correct.  And that was part of

1    my point that this isn't just my one opinion.  You know, I

2    wanted to embed my, my experience which, you know, just as

3    anybody else, I have my biases, within the bedrock of the

4    Guild of Child Psychiatry.  And I didn't just stop there.  I

5    mean, then I asked, well, you know, this is just what child

6    psychiatrists are saying.  Who's the child psychiatrist to

7    tell the state what they need to be doing with the kids that

8    are in their care.  I mean, the federal government also has

9    promulgated guidelines and recommendations tied to the IV-E

10   dollars that fund child welfare.  I mean, the state could

11   decide to ignore what the federal government expectations

12   are, but then they have to forgo IV-E money, apropos the

13   conversation around health care.

14           **MS. BARTOSZ:**  May I approach, your Honor?

15           **THE COURT:**  Of course you may.

16   **Q**   Doctor, I'm going to present you with Exhibit 825.

17           Doctor, you have what's been marked as Exhibit 825.

18   A    Yes.

19   **Q**   Can you identify this document?

20   A    It was an information memorandum that came out of the

21   Administration for Children and Families in April of 2012.

22   **Q**   You see on the top of this document the Administration

23   of Children and Families.  ACF is part of the United States

24   Department of Health and Human Services?

25   A    Correct.  And I did make a mistake.  There's apparently

1    more than one Children's Bureau.  I was asked about the

2    Children's Bureau on Tuesday.  I associated that to SAMHSA,

3    but apparently there's also a Children's Bureau within ACF.

4    Q    Has HHS through ACF addressed the three pieces of the

5    AACAP standard that you identified, informed consent,

6    oversight, clinically, and monitoring?

7    A    Yes.  That was what some of the hearings were about

8    around the Fostering Connections.  So the first piece

9    building off of that well-being requirement that was added

10   in the 1990's was the Fostering Connections Act.  In that

11   act there was a recommendation establishing medical homes

12   for children and also oversight of any needed prescription

13   medications.  But it sadly didn't have much tooth when it

14   got into the regulatory phase.  And so, this administration

15   went back and passed the Child and Family Services

16   Improvement and Innovation Act.  My best recollection is

17   that that was passed in the fall of 2011.  And whereas the

18   law had previously required that the plan address, quote,

19   oversight of prescription medications, that was from the

20   Fostering Connections law, this new provision built on that

21   requirement by specifying that the plan must include an

22   outline of, quote, protocols for the appropriate use and

23   monitoring of psychotropic medication.

24          So, in addition, this law required that health care

25   oversight and coordination plan outline specifically how

1    health needs identified through screenings, meaning mental

2    health screenings in this case, will be monitored and

3    treated, including emotional trauma associated with a

4    child's maltreatment and removal from home.

5          So with the amendments made in Public Law 112-34,

6    it now became a statutory requirement that oversight of

7    psychotropic medications be explicitly addressed in the

8    health care oversight and coordination plan that states

9    needed to provide to the federal government to ensure that

10   they were in compliance with this new requirement.

11        **THE COURT:**  I pompously pointed out that I could

12   read.  And while that's true, I have now, through

13   inattention, missed where you're reading from now.  And it's

14   over on?

15        **THE WITNESS:**  Page 2.

16        **THE COURT:**  Page 2.  Yes, I see it.

17        **THE WITNESS:**  In the bold, child and family

18   services.

19        **THE COURT:**  And this is how it describes that

20   legislation.

21        **THE WITNESS:**  Correct.

22        **THE COURT:**  Thank you.

23        **THE WITNESS:**  It also has some great background

24   information throughout the document.

25   **Q**    Doctor, did you draw upon sources other than Exhibit 17

1    and Exhibit 825 in identifying the standard of care to be

2    applied to a child welfare system or foster care agency in

3    its oversight of the use of psychotropic medications?

4        THE COURT:  Hold that question in mind, but let me

5    slip this in.

6        So this bulletin we're just talking about, this

7    came out in 2012 and it's the agency implementation of the

8    congressional enactment, the law, which goes into effect in

9    2012 and forward.

10       THE WITNESS:  Correct.

11       THE COURT:  Yes.

12       THE WITNESS:  I mean, there were components in 2008

13   in the Fostering Connections law.  But it never really

14   specified.  So I think the language that they're using in

15   this information memorandum is that it now became a

16   statutory requirement.  In 2008 there was a general mention

17   of oversight of all prescription medicines, but in the

18   implementation, the regulatory teeth, it never really got

19   embedded.

20       THE COURT:  Now, Ms. Bartosz's question, she'll put

21   it again.

22       MS. BARTOSZ:  Thank you, Judge.

23       THE WITNESS:  I've got it.

24       THE COURT:  All right.  You can answer it.  I have

25   it in mind.

A    So, I wanted to first see, well, what was the world of

child psychiatry saying about this AACAP guidelines 2005.

What was the federal government saying about this.  Then we

got the informational memorandum.  Then what did I know from

my wealth of knowledge about other state practices.

Because, again, I think your question, Judge, is, you know,

where does Massachusetts fall in that.  It was informed by

my knowledge of Massachusetts own policies and procedures.

So, one of the questions I asked myself when I was

reviewing this, in reflecting on the questions that you

asked me to answer, was, you know, is Massachusetts

following its own policies and procedures.  So, how do those

policies, and are those policies and procedures adequate to

protect kids from harm.  And what did then the case files

illuminate for me.  What was my experience of 20 years

working with this population.  And how did that, how was

that reflected by my awareness of the research both about

the efficacy and safety of these medications, but also

approaches in oversight and monitoring, what other states

were doing.

Q    Let's talk about this issue of other states or the topic

of other states for a moment.

When the federal government published Exhibit 825,

this ACF information memoranda, were the concepts of

clinical oversight and monitoring brand-new to child welfare

1    agencies across America?

2    A    No, not at all.  No, this has been a concern growing

3    over the last, certainly the last decade, I would say maybe

4    even the last 15 years.  Part of it is the emerging thought

5    about the role of child welfare.  You know, it's shocking to

6    me that in 2013, reflecting back, that permanency and safety

7    were the only mandates for state child welfare agencies from

8    the federal perspective.  But the thought that well-being

9    was a requirement for state child welfare agencies being a

10   novel idea until the 1990's seems really odd to me now.  You

11   know, and child welfare agencies are still catching up, I

12   think, to that mandate.  And the federal government frankly

13   is catching up to what that meant.  You know, that was the

14   appropriate Adoption and Safe Families Act under the Clinton

15   administration, added well-being as a new requirement.

16            The notion that when a state steps in to care for a

17   child that they also be responsive for the well-being of

18   that child as a novel concept seems just, frankly, bizarre.

19   So, you know, we are -- you know, this is an emerging area

20   of law.  This is an emerging area of child welfare practice.

21   And in the meanwhile it's also happening at a time when

22   there's been exponential growth in the utilization of these

23   psychiatric medications for children, particularly looking

24   at aggression for which this is a population ripe for

25   utilization.  So when you ask, you know, what did I tell

1    congress.  One of the things I tried to explain to congress

2    is that this is almost a perfect storm of potential hazard.

3    You've got children that by virtue of being in child welfare

4    have access to Medicaid.  So they have access to health

5    care.  They by virtue of being traumatized, neglected,

6    abused, are going to be pretty angry young people, who are

7    not always going to express that anger appropriately.  We've

8    got a dearth of practitioners trained in evidence based

9    practices.  So the very things that I'm recommending,

10    there's not a lot of people who are actually available, let

11    alone for a Medicaid reimbursement rate, so the workforce

12    issue is a problem.  And you've got ready access to

13    psychotropic medication with a growing belief that these are

14    medications that can be used or should be used in this

15    population, but with a dearth of evidence to support that

16    utilization rate.

17          So, we have a growing problem in terms of the

18    numbers of children on psychiatric medications.  In the

19    state of Texas one in five children in that state in 2007,

20    best data that we've got available to us, were taking

21    antipsychotic medication.  I can't justify that when the

22    incidence of bipolar disorder and schizophrenia is one

23    percent.  Why are 20 percent of children on antipsychotic

24    medication.

25    **Q**    Doctor, before congress acted as reflected in

1    Exhibit 825 in this information memorandum, were state child

2    welfare systems across America or any systems implementing

3    informed consent, clinical oversight, and longitudinal

4    monitoring pieces?

5            **MR. COLLINS:**  Objection.

6            **THE COURT:**  Ground?

7            **MR. COLLINS:**  Leading.

8            **THE COURT:**  In my discretion, overruled; he may

9    answer it.

10   A    Yes.

11   **Q**    In the course of your work in this area, have you become

12   familiar with state practices in that regard between, let's

13   say this time frame, 2005 when the AACAP guidelines we've

14   talked about were published and 2011 when congress passed

15   the law you discussed?

16   A    Even before.

17   **Q**    Even before 2005?

18   A    The state of Illinois has a process that goes back 18

19   years, also the result of a class action lawsuit.  In that

20   jurisdiction the child welfare agency has contracted with an

21   academic medical center, the University of Illinois-Chicago.

22   All of the consents go through UIC which has a team of child

23   psychiatrists and nurses who approve, they don't approve,

24   they make a recommendation for approval.  The authority for

25   consent still lies within Illinois child welfare.  But they

 1    run it through and get the expert consultation from UIC's

 2    team.  They can turn around a request in eight hours.  And

 3    what's unique about that system is that they also, they're

 4    not just playing sheriff over the prescription, you know,

 5    whether or not the child gets the, gets the medication.

 6    They're also able to afford consultation to the prescribing

 7    community.  And they also even have a funded inpatient unit

 8    for, specifically dedicated for children in the child

 9    welfare system.

10           So, they're in a partnership with that prescriber

11    rather than in a controversial or adversarial relationship.

12    And knowing the head of that program, Dr. Naylor, and having

13    talked with him about that he finds that --

14           **MR. COLLINS:**  Objection, your Honor.

15           **THE COURT:**  Yes, sustained as to what he may have

16    said.

17           **MR. COLLINS:**  I --

18           **THE COURT:**  A point that I should know, but I need

19    it in my notes.  When did this concept of well-being come

20    into play?

21           **THE WITNESS:**  1990's.

22           **THE COURT:**  The regulatory -- in the 1990's.

23           **THE WITNESS:**  It was ASFA, the Adoption and Safe

24    Families Act.

25           **THE COURT:**  All right.  Thank you.

```
 1    A    So Illinois is one example.  Connecticut would be
 2    another example.  They have a very similar --
 3              MR. COLLINS:  Objection, your Honor.
 4              THE COURT:  No, what's the problem with that?
 5              MR. COLLINS:  We're straying outside of the bounds
 6    of Dr. Bellonci's report, there's no --
 7              THE COURT:  Oh, where, where is it in the report?
 8    Q    Dr. Bellonci, have you identified the state of
 9    Connecticut in your report in the reliance and considered
10    materials appended to your report?
11    A    I thought I did.  I mean, it's certainly --
12              THE COURT:  No, his question is a technical one.
13    And I do mean to hold people to their reports.
14              Why don't you go on, Ms. Bartosz, and someone can
15    bring it to your attention if it's there --
16              THE WITNESS:  I mean --
17              THE COURT:  -- and come back to it.  No, I'm
18    sustaining it.
19              THE WITNESS:  Okay.
20              THE COURT:  And she'll go on.
21              THE WITNESS:  Okay.
22    Q    Doctor, you had identified the name Michael Naylor?
23    A    Yes.
24    Q    Who is Michael Naylor?
25    A    He's a child psychiatrist at University of Illinois in
```

1    Chicago.

2             **MS. BARTOSZ:**  May I approach, your Honor?

3             **THE COURT:**  You may.

4    **Q**   Doctor, I'm presenting you with Exhibit II.  Doctor, can

5    you identify Exhibit II?

6    A   Yes, it's an article written by Dr. Michael Naylor

7    entitled "Psychotropic Medication Management for Youth in

8    State Care, Consent, Oversight and Policy Considerations."

9             **MR. COLLINS:**  Objection, your Honor.

10            **THE COURT:**  Well, she hasn't offered it yet.

11            **MR. COLLINS:**  Well, we're going down the road of

12   Illinois as well and there's nothing in the report on

13   Illinois either.

14            **THE COURT:**  Well, well, I'm not going to let them

15   characterize it if that's true, or speak to it beyond the

16   report.  I don't know that will prevent this from getting in

17   evidence if she could lay a foundation for it.  But he's not

18   going to say anything about it.  Perhaps it comes in as a

19   learned treatise.

20            But you go ahead, Ms. Bartosz.

21   **Q**   Doctor, are you familiar with Exhibit II?

22   A   Yes.

23   **Q**   Was Exhibit II among the materials that you relied upon

24   in formulating your findings in this case?

25   A   Yes.

1    **Q**    And did you provide Exhibit II with your report to the

2    parties?

3    **A**    Yes.

4    **Q**    What reliance did you place on Exhibit II in formulating

5    your opinions?

6    **A**    It outlined for me in a very clear way the landscape of

7    oversight, consent and policy considerations.  Dr. Naylor

8    did a similar study --

9            **MR. COLLINS:**  Objection.

10            **THE COURT:**  Grounds?

11            **MR. COLLINS:**  Your Honor, we're getting into the

12    report.  I believe he's --

13            **THE COURT:**  Well, no, that's right.  Unless it's in

14    this report, and you people are going to have to be

15    absolutely photographic memory of the report, you've got a

16    staff there, they can be working now.  But unless he says it

17    in the report the state can't be expected to meet it, and

18    vice versa, with the state's experts.  I'm strict on that.

19    It's clear from the moment I had this case that's the way

20    we're doing it.  And so, sustained without prejudice to your

21    pointing out what's in the report.  He sticks to the report.

22            **MS. BARTOSZ:**  Thank you, your Honor.

23    **Q**    Doctor, you testified earlier that in performing your

24    work in this matter you looked at Massachusetts policy with

25    respect to informed consent, clinical oversight and

1    monitoring, correct?

2    A    Yes.

3    **Q**    And that's policy with respect to the use of

4    psychotropic drugs for children in DCF foster care.  Yes?

5    A    Yes.

6    **Q**    What did you identify the Massachusetts policy to be?

7    A    In regards?

8    **Q**    First of all, let's say informed consent, that first

9    piece.

10   A    In the case of antipsychotics, if I'm making the

11   recommendation for utilization of an antipsychotic in care

12   of a child who's in state custody, I have to let DCF know.

13   They request a judicial hearing when a GAL is typically

14   assigned.  I'll have a conversation with the GAL who will

15   ask for me to write my recommendations in an affidavit.

16   That affidavit along with the GAL report goes to a judge.

17   The judge then makes a determination.  I usually will have

18   to specify dosage guidelines and any alternative

19   antipsychotics that I want to consider for the use of a

20   child.  If I'm making a recommendation for a psychotropic

21   medication other than an antipsychotic then I just speak to

22   the child welfare worker.

23          **THE COURT:**  And that's how this Rogers legal

24   requirement is in fact implemented; is that right?

25          **THE WITNESS:**  Correct.

1          **MS. BARTOSZ:**  May I approach, Judge?

2          **THE COURT:**  You may.

3   **Q**   Dr. Bellonci, I'm now going to present you with

4   Exhibit 243.  Dr. Bellonci, can you identify Exhibit 243?

5   **A**   Yes.  It's the Code of Massachusetts Regulations 110 CMR

6   11.14, medical authorizations for antipsychotic drugs.

7   **Q**   Did you review Exhibit 243 in the course of your work in

8   this case?

9   **A**   Yes.

10  **Q**   And have you identified this particular exhibit in your

11  report?

12  **A**   Yes.

13  **Q**   What is -- well, strike that.

14          Does Exhibit 243 pertain to the Rogers process

15  you've testified to?

16  **A**   Yes.

17  **Q**   Do you see on page 1 of Exhibit 243 a list of 18

18  antipsychotic drugs?

19  **A**   Yes.

20  **Q**   Are there more than 18 antipsychotic drugs in the

21  marketplace today?

22  **A**   Yes.  Most of the most highly prescribed medications

23  actually don't appear on this list.

24  **Q**   What are some of those?

25  **A**   Aripiprazole.  Brand name Abilify.  Risperidone.  Brand

1    name Risperdal.  Seroquel.  Generic name quetiapine.

2    Geodon.  Zyprexa.  Both brand names.

3            These are so-called second generation

4    antipsychotics.  Most of the medications that are listed

5    here are first generation antipsychotics.

6    Q    To your knowledge, has the Massachusetts Code of

7    Regulations been updated to address the second generation of

8    antipsychotics?

9    A    Not that I'm aware of.

10            **MS. BARTOSZ:**  Your Honor, may I approach?

11            **THE COURT:**  You may.

12    Q    Dr. Bellonci, I'm going to present you now with

13    Exhibit 823.  Doctor, are you familiar with Exhibit 823?

14    A    Yes.

15    Q    And did you review and rely upon this document in

16    formulating your findings in this matter?

17    A    Yes.

18    Q    And did you identify this document in your report?

19    A    Yes.

20    Q    What reliance did you place on Exhibit 823?

21    A    It defines the routine medical care for children in

22    state custody, including psychiatric assessment, evaluation

23    or treatment.

24    Q    And if you turn to page 3 of this exhibit, you see a

25    heading called consent?

1    A    Correct.

2    **Q**    Did you consider that portion of this exhibit in

3    formulating your opinions?

4    A    It just codifies what I was describing earlier.  So the

5    first document you gave me talks about the Rogers process

6    specifying that for antipsychotic drugs this needs judicial

7    approval, and this is the default for all other psychiatric

8    medications because they're considered routine medical care.

9    **Q**    In your experience, does Exhibit 823 apply to second

10    generation antipsychotics that do not appear in the

11    regulation that's been marked as Exhibit 243?

12    A    No.  It would be my understanding that second generation

13    antipsychotics would still be adhered to under CMR 11-14.

14    They have language right before the list that says such

15    antipsychotic drugs shall include, but not, shall not be

16    limited to.  Understanding that these are, this is an

17    evolving field and new medications are going to come online.

18    So, even though the medications didn't specifically appear

19    there, I've always understood that anything that is in the

20    antipsychotic class needs judicial approval.

21            **THE COURT:**  And that's how you've behaved --

22            **THE WITNESS:**  Absolutely.

23            **THE COURT:**  -- I take it.  Yes.

24            **MS. BARTOSZ:**  Your Honor, may I approach once more?

25            **THE COURT:**  Of course.

1    Q    Doctor, I'm now going to present you with Exhibit 833.

2         Doctor, can you identify what is Exhibit 833?

3    A    This is also Code of Massachusetts Regulation defining

4    the medical passport.

5    Q    Is this a document that you relied upon in formulating

6    your findings in this case?

7    A    Yes.

8    Q    And did you refer to it in your report?

9    A    Yes.

10   Q    Doctor, can you describe for the Court, please, what a

11   medical passport is in the Commonwealth of Massachusetts and

12   in relation to youth in DCF foster care?

13   A    The medical passport was meant to be a document that was

14   portable.  That's the passport part.  That would be the

15   living record of pertinent and available medical, dental and

16   mental health treatment and problem list for the child.  It

17   would include things like their allergies.  It was meant to

18   be kept current at each point so whenever a provider saw a

19   child they were to complete an encounter form that would

20   then inform the medical passport, with the idea that, I

21   mean, this is, this is exactly what I as a practitioner

22   want.  I want a medical passport that actually has both the

23   history of treatment, the current problem list, what

24   medications the child's on, what their allergies are.  And

25   it probably doesn't have as much detail as I need in terms

1    of what are the specific side-effects and benefits of the

2    medication regimen that the child is coming to me on, but it

3    at least would be a great start.

4    Q    You had identified earlier three pieces or elements of

5    the standard of care as you see it, an informed consent

6    element, a clinical oversight element, and a monitoring

7    element.  Does the medical passport as described in

8    Exhibit 833 relate to one or more of those elements of the

9    standard of care?

10   A    Yes.

11   Q    Can you elaborate, please, Doctor?

12   A    The medical passport would be a tool for the department

13   to provide their statutory requirement of clinical

14   oversight.  It could also be a way to communicate that

15   oversight and their role in loco parentis about their

16   understanding of this child's needs, both health and

17   behavioral health, to the treater, and it could inform a

18   monitoring capacity if it was embedded in some kind of a

19   database that could then also do analytics, you know, where

20   you can pull a report based on the medical passport, how

21   many, how many of the children are on psychiatric

22   medication, how many are on three or more psychiatric

23   medications, how many are on two or more psychiatric

24   medications of the same class.  So it could interface with

25   those monitoring guidelines that I had discussed earlier.

1    **Q**    For a prescriber such as yourself when a child in foster

2    care is presented to you for care, what does a medical

3    passport look like?  From time to time does it come to you

4    in some intangible way?

5    A    In my 20 years of working with this population, I saw

6    medical passport approximately three or four times.  And

7    that's not an unusual experience.  And I can talk about the

8    plaintiff files as well where there were, there were no

9    medical passports, or when there were medical passports they

10   were blank.  They didn't include known allergies.  They

11   didn't include current psychiatric medications that I was

12   also able to find at other places in the record that the

13   child was currently taking.  They are pretty universally

14   understood to not be being utilized in practice as required.

15   And in my review of the depositions of the state child

16   welfare officials they openly concede that medical passports

17   are really not where they need to be in terms of practice.

18   **Q**    What do the medical passports provide for you, in the

19   four, five, six, or whatever small number of instances that

20   it is that you can recall that they were presented to you,

21   what information did they provide, Doctor, and in what form?

22   A    Well, you know, one of the points of this best

23   principles guideline of AACAP, it talks about the disjointed

24   care that children in child welfare receive.  So, the

25   children that move from foster home to foster home are also

1    moving from provider to provider.  In the case of some of

2    the named plaintiffs one had 27 different placements.  It

3    becomes very hard to coordinate care when there are that

4    many movements of a child from location to location,

5    community to community, provider to provider, inpatient to

6    outpatient, residential to outpatient to inpatient.

7            The medical passport if used properly could

8    actually be the data source to collect the accumulated

9    knowledge of what this child's treatment history has been

10   and that would be incredibly powerful for me when I'm

11   assuming care of this child to be able to know, well, what

12   has been tried, what has worked, what hasn't worked.  What

13   has the accumulated understanding of this child's

14   psychiatric condition been.  What are some adverse effects

15   based on their medical history that I need to be aware of.

16   Some of our psychiatric medications are contraindicated for

17   certain health conditions.  None of that was available in

18   the plaintiff files, and rarely has that been available to

19   me as a clinician working with this population.

20   Q   In the absence of the medical passport, how do you

21   generate a knowledge base as a prescriber in relation to a

22   child that you're providing care to?

23   A   I spend hours.  I request every discharge summary from a

24   hospital that this child may have been.  I have to

25   actually -- I can't request it.  The state has to request

1    it.  I mean, I'm -- I need the state to do what a parent

2    does in providing me the history of their child.  I need

3    that to be done in as an efficient way as possible.  You

4    know, for, for a practitioner I get to bill one hour for a

5    diagnostic assessment.

6            **THE COURT:**  By who?

7            **THE WITNESS:**  By Medicare.  The funding source for

8    children in the child welfare system.  It's a virtually

9    undoable task if I don't have the information provided to me

10   in an efficient manner.  I'm only as good as the information

11   I'm given.  And my fear is that I, I inadvertently could be

12   causing harm if I don't know that a medication that I'm

13   considering recommending to the department has already been

14   tried and determined to cause some side-effect or not have

15   been effective.  We're wasting critical time in the care of

16   this child going down blind pathways.  In one of the

17   plaintiff files there was documentation by the prescriber

18   that he didn't have the access to the information, and then

19   was considering medication that the child, assuming that

20   child had not been on it because he couldn't find it in the

21   record or didn't have access to the record, that the child

22   had indeed been tried on it previously and determined, I

23   guess, to not be effective.

24   **Q**   Doctor, you noted in your testimony a moment ago that

25   some of the named plaintiff files you reviewed indicated

1    multiple placement moves for a particular child.  Have you

2    treated children over your 20 years of practice that are DCF

3    involved who similarly presents to you having had a history

4    of multiple placement moves?

5    A    Absolutely.  That was more the norm than the exception.

6    Q    Can you describe if that creates any challenge in terms

7    of you as a prescriber developing a full medical clinical

8    history?

9    A    It certainly makes it more complicated because there's

10   that many more data sources that I need to get information

11   about and from.  That's the complexity of that oversight

12   requirement for state child welfare systems.

13   Q    Have you had over the course of your 20 years of

14   experience practicing in the Commonwealth of Massachusetts

15   children that you care for who are in DCF foster care who

16   you follow over a period of time longer than two, three,

17   four, five months?

18   A    Oh, yeah.

19   Q    How long can be the duration typically that you follow a

20   particular child under your care?

21   A    When I was doing --

22          MR. COLLINS:  Objection, your Honor.

23          THE COURT:  Grounds?

24          MR. COLLINS:  This is not in the report either.

25          MS. BARTOSZ:  Your Honor, the report discloses that

1    the doctor is drawing upon his 20 years of experience and --

2        **THE COURT:**  Well, it may be.  But everything has to

3    be in the report.  Sustained.  But I'll allow that one

4    question.  We're not thinking about it.  It's in the

5    exercise of my discretion.

6        As you do your practice, what's the range of your

7    care for a child, in time?

8        **THE WITNESS:**  Walker is a relatively unique

9    setting.  So, I'm seeing children who have failed outpatient

10   treatment, have typically had multiple hospitalizations and

11   are coming to me already on multiple medications.  So, to

12   get to Walker, particularly because we're focused on such a

13   young population age, five to 13, we're kind of the last

14   card in the Rolodex of severity for mental health issues.

15   And we're expensive.  And so, the state's not going to

16   quickly come to the conclusion that a child needs to be at

17   Walker either in the residential service or in the school.

18        Given that, I'm already seeing a bit of an outlier

19   by its sample admittedly in the child welfare system.  The

20   average length of stay at Walker when I started was about 18

21   months on the residential side.  It could be multiple years

22   because sometimes they would stabilize and be able to live

23   in a foster home but still come to school at Walker.  So --

24        **THE COURT:**  So recognizing that your experience at

25   Walker is an outlier, your answer to my question is 18

1    months, but it could be years?

2              **THE WITNESS:**  Yes.

3              **THE COURT:**  Go ahead, Ms. Bartosz.

4              **MS. BARTOSZ:**  Thank you, Judge.

5              Your Honor, may I approach with my hands pretty

6    full here.

7              **THE COURT:**  Go ahead.

8    Q    Doctor, I'm going to present you with Exhibit 1.

9              **THE COURT:**  I have one.  I can put my hands on one.

10             **MS. BARTOSZ:**  Thank you, Judge.

11   Q    Doctor, can you identify Exhibit 1?

12   A    It's the DCF case practice policy and procedures manual.

13   Q    And, Doctor, I'm going to ask you to turn to a

14   particular page of Exhibit 1, that's page 301.

15             **MR. COLLINS:**  Which page?

16             **MS. BARTOSZ:**  301.

17             **MR. COLLINS:**  Thank you.

18             **MS. BARTOSZ:**  And it's not, for clarity, not the

19   Bates stamped designation with the DCF prefix but rather the

20   number in the center bottom of the page.

21             **THE COURT:**  Center bottom of the -- thank you.

22             **MS. BARTOSZ:**  Yes.

23   Q    Have you found page 301, Doctor?

24   A    Yes.

25   Q    Doctor, did you review and rely upon appendix A,

1    Guidelines for Medical Passport Review in formulating your

2    findings in this case?

3    A    Yes.

4    Q    And did you refer to this particular portion of the

5    policy manual in your report?

6    A    Yes.

7    Q    Doctor, is it your understanding that -- well, what is

8    your understanding of this medical passport policy?

9    A    It outlines the process for the department to populate

10   the medical passport and then the protocol for how the

11   passport is supposed to be used in an ongoing basis

12   monitoring the child's mental and physical health needs.

13   Q    And the foster care, or this particular guideline, if

14   you look at the top left corner, does it have a revision

15   date?

16   A    It says effective September 5th, 2007.

17   Q    And, Doctor, does the medical passport policy address

18   the issue of present medications?

19   A    I believe so, but I'm not finding it, where you're

20   directing me.

21   Q    Doctor, can you look -- if I can help you out on

22   page 301.

23   A    Is there more than 301?

24   Q    Here.

25        **MS. BARTOSZ:**  Your Honor, I want to make sure that

1  we're all situated on the same page here.

2         **THE COURT:**  Well, I'm on a page that begins

3  guideline from medical passport review.

4         **THE WITNESS:**  I was on a different page.  I'm now

5  on that page.

6  **Q**   Okay.  Have you reviewed this page in formulating your

7  findings in this case?

8  **A**   Yes.

9  **Q**   And this particular portion of the policy manual

10  addresses the medical passport?

11  **A**   Yes.

12  **Q**   Doctor, does the policy address the issue of present

13  medications?

14  **A**   Yes.

15  **Q**   What is your understanding of the DCF policy in terms of

16  present medications and listing them or not in a medical

17  passport?

18  **A**   They are to be listed.

19  **Q**   Doctor, as you used the terms informed consent, clinical

20  oversight, or longitudinal monitoring, does the

21  Massachusetts policy with respect to a medical passport

22  touch upon each and every one of those elements of the

23  standard of care?

24         **MR. COLLINS:**  Objection.

25         **THE COURT:**  Grounds?

1          **MR. COLLINS:**  Leading.

2          **THE COURT:**  Yes, sustained, on that ground.  You

3     can ask him how it relates to the --

4     **Q**   How does the medical passport --

5          **MS. BARTOSZ:**  Thank you, Judge, I'm sorry for

6     interrupting.

7          **THE COURT:**  Go ahead.

8     **Q**   Dr. Bellonci, how does the medical passport policy

9     before you relate, if at all, to the standard of care you've

10    articulated?

11    A   It would not document consent as I understand it.  The

12    presumption would be that if the child is on the medication

13    in DCF custody that consent has been provided.  But that's

14    not made exclusive.  It would be a tool towards the

15    oversight function.

16         **THE COURT:**  And you think that because the

17    regulations deal with the matter of consent and you presumed

18    that the regulations are being followed, and if you have a

19    passport you presume that where the medications are detailed

20    in that passport that they are compliant with the

21    regulations.

22         **THE WITNESS:**  Yes, but I have to say it's all

23    hypothetical because I've never actually had a passport

24    provided to me that was current and in my review of the

25    plaintiff files that was the case as well.  So, it's

1    theoretically the tool, and it's supposed to be under

2    Massachusetts regulations the tool, that the state is using

3    for this function.

4        THE COURT:  Your point is that the regulations -- I

5    don't mean to put words in your mouth, but I'm trying to

6    understand.  These regulations mesh and mesh nicely and they

7    set out a perfectly, I won't say perfect, but they set out a

8    cognizable and sensible policy.  Your issue is that the

9    regulations bear little, if any, relationship to reality.

10        THE WITNESS:  It would be a reasonable way to

11    address the oversight function.  It wouldn't answer the

12    question of how is informed consent being documented.

13        THE COURT:  It's time for the morning recess and

14    I'm going to take a recess.

15        You may step down, sir.

16        (Whereupon the witness stepped down.)

17        THE COURT:  But before I leave the bench, I have

18    this issue.  I recognize that when we had our pretrial we

19    discussed that a variety of data would be put in this record

20    by way of deposition and we talked about my learning curve

21    and how I would get on top of that data.

22        Now, I was told that the plaintiffs thought they

23    could rest after a presentation spanning ten days.  And then

24    we're going to take some time because as we discussed one

25    imagines that the defense will mount a concerted attack.

1    And we've, we've said that I would wait for that while I'm

2    doing to other things, unless those things fail in which

3    case the defense is going to start presenting their case.

4         All of that made sense to me.  But I thought there

5    was a premium on getting these depositions into my hands.

6    And I thought Tuesday morning I'd have a pile of

7    depositions, and I don't have them yet.

8         When am I going to get the depositions that we've

9    been discussing?

10         **MS. BARTOSZ:**  Your Honor, plaintiffs' counsel have

11    been working with the counsel for the defendants through

12    this process and there's been efforts made to get a

13    facilitative rolling process to get these to you.  We have

14    prepared today here, your Honor, six deposition transcripts

15    that we have designated, the portions highlighted in yellow.

16    There's been objections placed by the Attorney General.

17         **THE COURT:**  So you have six ready to go.

18         **MS. BARTOSZ:**  We have six ready to go, more will be

19    coming, Judge.

20         **THE COURT:**  That's my only question, because it's

21    to both sides' interests that I get up to speed.  Whatever

22    merit potentially a defense motion might have, it simply

23    cannot be acted upon until, despite all the good legal

24    resources I have, until I am master of the factual record.

25    That's the only fair way for the plaintiffs.  So everyone

1    should cooperate to get these in my hands and I'll do my

2    best.

3          And thank you.  That's fine.  I just want to know

4    they're coming so I can -- this is the front burner on my

5    discharge of my duties.  I just want to --

6          **MS. BARTOSZ:**  I appreciate that, Judge.  And we'll

7    continue to work with the Attorney General to move that case

8    and that process.

9          **THE COURT:**  Fine.

10         **MS. BARTOSZ:**  Judge, as a quick housekeeping

11   matter, can I ask what record we should make as to when

12   these are submitted to you?  Should we make a record here in

13   court?

14         **THE COURT:**  Why should -- do we have to?  Just so

15   long as -- I'll make my endorsements on objections, and

16   those at least we'll keep custody of, and I would think that

17   would be a sufficient record.

18         **MS. BARTOSZ:**  Thank you, Judge.

19         **THE COURT:**  Let's not add expense to an already

20   expensive procedure.  I want everyone to have a record to

21   which reference can be made.  But let's do it as simple as

22   possible.

23         **MS. BARTOSZ:**  Thank you, Judge.

24         **THE COURT:**  We'll recess for one-half hour.  We'll

25   recess.

 1          **THE CLERK:**  All rise.

 2          (Recess.)

 3          **THE CLERK:**  All rise.  The United States District

 4    Court is back in session, you may be seated.

 5          **THE COURT:**  Having just glanced at one of those

 6    depositions, so I'm clear, what's marked, what's highlighted

 7    in yellow is the designated portion?

 8          **MS. BARTOSZ:**  Yes, Judge.

 9          **THE COURT:**  And if there are objections or counter

10    designations, how do I know about them?

11          **MS. TRAN:**  On the side in the margins there will be

12    objections and there's a key that we've provided for

13    reference that will have what the numbers or letters mean.

14          **THE COURT:**  Thank you, Ms. Tran.  All right.

15          **MS. BARTOSZ:**  And, your Honor, there may be places

16    where an objection was asserted and if plaintiffs elected in

17    their review to try to ease the Court's review as much as we

18    could, that we would withdraw that particular designation, I

19    think we just X'd it out.

20          **THE COURT:**  Thank you.  I'm sure I'll become

21    familiar with it.

22          **MS. BARTOSZ:**  Okay.

23          **THE COURT:**  My quick glance posed only those

24    questions.

25          And while we're on this topic, the simple way, as I

1    complete my review, because the record is important, I will

2    simply announce at the beginning or end of a session or

3    sometime, I will say I have reviewed the deposition of X

4    dated Y.  And I will have made my notations on it and that

5    will show you that I have acted on that deposition and so

6    we'll have a record of which depositions I have reviewed

7    that are part of the record.

8            All right, let's go ahead.

9            **MS. BARTOSZ:**  Thank you, Judge.

10               **DIRECT EXAMINATION** (Cont'd)

11   BY  MS. BARTOSZ

12   **Q**   Dr. Bellonci, I now present you with Exhibit 16.  Can

13   you identify Exhibit 16, please, Doctor?

14   A   It was the U.S. Government Accountability Office report

15   that came out in December of 2011 entitled "Foster Children

16   Health and Human Services Guidance Could Help States Improve

17   Oversight of Psychotropic Prescriptions."

18   **Q**   When was this report published by the Government

19   Accountability Office?

20   A   December 2011.

21   **Q**   Did you review this report, Doctor, in formulating your

22   opinions in this matter?

23   A   Yes.

24   **Q**   Did you rely upon this document in identifying the

25   standard of care?

1    A    Yes.

2    **Q**    Did the federal government address the 2005 AACAP

3    guidelines in this GAO report?

4    A    Yes.  The GAO report used the best principles guidelines

5    statement to review the five states that they surveyed in

6    this report for their conclusions.

7    **Q**    Did the federal government take issue with the AACAP

8    standards in any way in this report?

9    A    No.

10                **MR. COLLINS:**  Objection.

11                **THE COURT:**  Well, I'll sustain it because the

12    document speaks for itself.  But we'll see what the document

13    says.

14    **Q**    Doctor, are you familiar with utilization rates in

15    relation to psychotropic medications in the Commonwealth of

16    Massachusetts?

17    A    Yes.

18    **Q**    Can you please share your knowledge in that regard?

19    A    The GAO worked with the states to determine what the

20    utilization rates were for each of the states that they

21    looked at and Massachusetts was the highest of the five

22    states in the report, just under 40 percent of children in

23    the child welfare system in Massachusetts were being

24    prescribed a psychotropic medication.

25    **Q**    Beyond the utilization rates reflected in the GAO

1    report, have you an understanding of other reports or

2    studies reflecting utilization rates?

3    A    Yes.

4    Q    Can you identify, can you identify those, please?

5    A    There have been several surveys and attempts at getting

6    at the utilization rate to try to understand the

7    variability.  Dr. Leslie's research shows a range of 13 to

8    52 percent.  So a low of one state reporting 13 percent of

9    their children on psychotropic medication, a high of

10   52 percent.  And that was also part of the Tufts research

11   agenda and resources that informed my opinion.  So that

12   would put Massachusetts at a 40 percent utilization rate, at

13   the higher end compared to other states in the nation.

14   Q    Now, Doctor, you've testified that you reviewed files

15   relating to some of the named plaintiffs in this case?

16   A    Yes.

17   Q    Can you describe the review process that you undertook?

18   A    I was initially provided two of the case files meaning

19   all of the records that DCF had on two of the six named

20   plaintiffs and then a third was added.  So in total I

21   reviewed half of the named plaintiffs complete DCF files.

22   That included any records that they had by providers serving

23   that child, as well as the complete family printout which is

24   the caseworker data entry living log of work that the worker

25   is doing in regards to the child.  It really is meant to be

1    and what I asked for was everything that the state had about

2    this child, I wanted to be able to review.  It ended up

3    being a total of 26 banker boxes.  And that allowed me to

4    see what the child welfare department was seeing in terms of

5    their oversight of psychotropic medication.  I was also

6    looking for where consent was being discussed and what

7    facility that allowed the Commonwealth in terms of

8    monitoring.  So, those three core concepts.  I reviewed the

9    files through the lens of those as well as my knowledge of

10   what other states had in terms of oversight and monitoring

11   and consent processes and what the literature and what the

12   standard was based on the AACAP standards that were then

13   endorsed by the GAO and what the HHS was promoting.

14   Q    Doctor, one of the files you reviewed related to a named

15   plaintiff Connor B.?

16   A    Yes.

17   Q    Did you make findings as a result of your review of

18   Connor B.'s case file?

19   A    Yes.

20   Q    Can you please share those findings with the Court?

21   A    In regards to what aspect?

22   Q    Identify your findings, please, and I will -- well,

23   please identify the findings you made generally, Doctor.

24   A    I found issues with all three plaintiff files.  And they

25   informed, along with my experience of working with this

1    population, my overall findings.  So are you referring to my

2    overall findings?

3    **Q**    Right now just to findings you made with respect to the

4    named plaintiff files themselves, and I was starting with

5    the Connor B. file.  Did you review that file and did you

6    within your report conclude certain findings you made in the

7    course of that review?

8    A    Yes.

9    **Q**    Okay.  Can you identify those findings, please?

10    A    So Connor B. was one of the --

11        **MR. COLLINS:**  Your Honor?  Is the witness reading

12    from a report, I'm just wondering.

13        **THE COURT:**  No, he's -- you're observing him.  So

14    long as it's in his report, I have no problem with his

15    telling us what he's derived.  Overruled.

16    A    Two of the --

17        **THE COURT:**  I should -- you have the right to look

18    at anything he's looking at in your cross-examination and

19    you may, but now we're in direct.

20        **MR. COLLINS:**  No, I understand, your Honor.  The

21    reports are not in evidence.  So if the witness is reading

22    from the report --

23        **THE COURT:**  Oh, I understood the gravamen of

24    your --

25        **MR. COLLINS:**  Okay.

1          **THE COURT:**  -- objection, and I'm watching him.

2     Overruled.

3          **MR. COLLINS:**  Thank you, your Honor.

4          **THE COURT:**  Go ahead.

5     A    Two of the three named plaintiffs, Connor B. and, I

6     believe it was Adam S., were on antipsychotic medications at

7     some point during the time that they were in DCF custody.

8     So, I was looking to see whether or not the Rogers process

9     as outlined previously was being adhered to.  I, frankly,

10    expected that that would be the case since this is the

11    highest level of standard, that psychiatrists know that

12    they're supposed to be completing Rogers and the judges

13    involved, and that would seem to get people's attention.

14    But I was frankly surprised to find that in both instances

15    there were times when the child was on a medication either

16    in excess of the approved dose of the medication.  So, in

17    Connor B. there was an eleven month period where he was

18    prescribed Risperdal at a dose of three milligrams when the

19    limit by judicial order was two milligrams.  And it took

20    eleven months before that error was discovered.  Despite the

21    involvement of the GAO, despite the Court order and despite

22    the psychiatrist's apparent knowledge or DCF's knowledge of

23    what the dose limit was.

24          And in the case of Adam there was a period when

25    his -- there are actually two periods when the Rogers was

1    elapsed.  So, the first period was a five month long period

2    when he was being administered antipsychotic medications

3    essentially without an act of Rogers approving that

4    utilization.  And then again seven years later, Adam was

5    again, there was a period of time where his Rogers had

6    lapsed and DCF acknowledged in a motion to the Court that

7    the doctor had been treating Adam apparently with Risperdal

8    on emergent basis, but it wasn't clear that the affidavit

9    was current.  That was just in terms of the antipsychotic

10   medications.

11           I then --

12   **Q**   Go ahead, Doctor.

13   A   I then tried to look at, for the non-antipsychotic

14   medications, again, what was the evidence that an informed

15   consent conversation had occurred.  And almost without

16   exception the record was silent about informed consent.

17   There were periods where there was some documentation in

18   Family Net that Doctor X recommended or prescribed

19   medication Y.  But no mention typically of side-effects or

20   what to be watching out for, how to know whether or not this

21   medicine was effective.  And in one case the record was

22   silent for Andre S. for a five year period in terms of any

23   mention of psychotropic medication.  The one time after five

24   years when the medication was, a medication was discussed

25   was to note that there actually had been a medication error

1    for the medication Wellbutrin where he had been given a

2    higher dose or actually had missed a dose for a period of

3    time.

4           What was even more striking about that was that

5    there had been no mention that Wellbutrin had ever been

6    approved.  Wellbutrin is an antidepressant medication that's

7    approved for the use of depression, and Andre S. actually

8    had not been diagnosed with that condition.

9           So, the record was silent, there was no mention of

10   the informed consent conversation, what the risks or

11   side-effects of that medication might be.  When it is

12   mentioned it's being used for an indication that the child

13   didn't even have diagnosed.  This was consistent with my

14   clinical experience and raised concern about whether or not

15   Mass. DCF was meeting the guidelines and recommendations

16   that were then endorsed by the federal government.  And

17   there was quite an apparent discrepancy between what I

18   determined standard of care and where Mass. DCF policies

19   were and those were confirmed in the case file reviews.

20   Q   Did you in reviewing the case files address the issue of

21   medical passports?

22   A   Yes.

23   Q   Did you make any findings in that respect?

24   A   Yes.  In the case of Adam S. the medical passport was

25   printed on November 4th of 2004.  It was blank with no

1    medications listed.  It wasn't updated again until

2    April 17th of 2008, and the second page was missing from

3    that record.  The only additional medical passports in the

4    record are from June 22nd, 2011 and April 4th of 2012.  He

5    had been determined, Adam, to have an allergy to bee stings.

6    And so I --

7              **MR. COLLINS:**  Your Honor, I'm going to object

8    again.

9              **THE COURT:**  Grounds?

10             **MR. COLLINS:**  The witness is reading from his

11   report.

12             **THE COURT:**  Overruled.

13   A    So he was meant to be carrying an EpiPen which is, you

14   know, if he has an acute allergy, actually stick the EpiPen

15   right in and that reverses a potential life-threatening

16   condition.  Something that his caretakers would need to

17   know.  And again the passport was silent on that.

18             In the case of Connor B., the first time a passport

19   shows up in his record is April 4th, 2012.  Andre S. had a

20   passport that was printed on September 4th, 2001 with none

21   known noted under medical and behavioral conditions.  This

22   was a boy who was actively being treated for post-traumatic

23   stress disorder and attention deficit hyperactivity

24   disorder.  He had actually been psychiatrically hospitalized

25   for those conditions.  No medications are listed, even

1    though at the time he was taking Zoloft, Ritalin, Clonidine

2    and Trazodone on that date.

3           And it just became clear that DCF was not utilizing

4    the medical passport as the regulations required, and again

5    supported my, my concern about the ability for DCF to

6    adequately monitor, oversee and communicate the child's

7    current clinical needs, current medications, current

8    allergies, current physical conditions to the provider in a

9    way that is incumbent upon the parent or loco parentis in

10   order for me to be able to do my job.  That was certainly

11   consistent with my clinical practice.  As I mentioned in 20

12   years of practice I saw maybe three or four medical

13   passports.

14          The process for information getting into the

15   medical passport is supposed to be the encounter form.  I

16   saw maybe two encounter forms.  I was asked to complete

17   encounter forms on two occasions.  I never saw an encounter

18   form in any of the records.  My understanding of the way the

19   encounter form is supposed to work according to the policy

20   and procedures manual is that the encounter form is the tool

21   to get the clinical information into the passport.

22          **THE COURT:**  Who fills it out?

23          **THE WITNESS:**  The physician.  It's actually got

24   multiple copies.  So you get to keep one as the physician,

25   the second copy goes to DCF.  The social worker is supposed

1    to bring that and either data entry in the information from

2    that handwritten encounter form into the Family Net or into

3    the medical passport vehicle.  That was clearly not, not

4    happening.  There were no copies of these encounter forms

5    provided to me despite asking for all the record.  There was

6    no discussion about encounter forms.  And again, the

7    depositions support and acknowledge that encounter forms are

8    not being used as regulation requires.  And medical

9    passports are not being used as regulations require.

10   **Q**    You just referred to depositions.  What do you mean by

11   that?

12   A    Dr. Russell Livingston, who's the psychiatrist for DCF,

13   says in his deposition very clearly that passports are not

14   being utilized.  Jan Nisenbaum talks about medical passports

15   not being used.  And Marilyn Chase talks about the inability

16   of DCF to be able to tell you what medications, or if you're

17   looking for some of these red flag markers, DCF lacks the

18   ability to be able to run reports based on certain red flag

19   conditions.  That really was confirming what was already in

20   evidence based on my file review and my clinical experience.

21   **Q**    Thank you.

22           Doctor, have you formulated opinions with respect

23   to whether or not DCF departs from accepted standards of

24   professional judgment in its administration of psychotropic

25   medications or oversight of the use of psychotropic

1    medications for children in its custody?

2    A    Yes.

3    **Q**    Can you identify the first such opinion?

4    A    My first finding was that DCF lacks an adequate

5    psychiatric monitoring and oversight system that would meet

6    a standard of care for such monitoring and oversight for

7    children in the foster care system.

8    **Q**    Have you formed that opinion to a reasonable degree of

9    certainty in the field of child and adolescent psychiatry?

10    A    Yes.

11    **Q**    And in reaching that opinion did you also rely upon the

12    experience you've had dealing with state foster care

13    systems?

14            **MR. COLLINS:**    Objection.

15            **THE COURT:**    Grounds?

16            **MR. COLLINS:**    Leading.

17            **THE COURT:**    Oh, she may have that.    The foundation

18    is leading.

19    A    I articulate the basis for my opinions which included

20    both my 20 years' experience working with this population;

21    my review of the case files, three of the six; my knowledge

22    of what other states are doing in this regard; my

23    understanding of the AACAP position; my understanding of the

24    federal government's position; and my understanding of the

25    research and literature in this regard.    All of those became

1    components in forming my opinion.

2    **Q**    Is there particular deposition testimony that you based

3    this opinion on, this first finding on?

4    A    I wouldn't say I based it upon.  But the depositions

5    really just supported and confirmed my own conclusions.  I

6    had already spent time well before I got the depositions

7    reading these case files, reflecting on my clinical

8    experience and reviewing the literature, much of which I had

9    already known, but specific to this, to this case.

10        There was then testimony provided primarily by Dr.

11    Livingston but also by Ms. Nisenbaum that only confirmed

12    that I wasn't missing something.  You know, I don't work for

13    DCF.  I work with DCF.  I did extensive work with the Rogers

14    Work Group over the course of a year.  Dr. Livingston was

15    part of that work group.  Jan Nisenbaum came to at least one

16    meeting that I was at.  I just want to make sure there

17    wasn't something that was either just not in the files or

18    just out of my awareness.  And so the depositions only

19    supported the conclusions that I was already coming to.

20        In the case of DCF lacking adequate monitoring and

21    oversight, I started with, you know, thinking about the GAO

22    report.  So the federal government found that Massachusetts

23    utilization of this class of medications, psychotropic

24    medications were the highest in the five states that they

25    studied and --

1          **THE COURT:**  But apparently according to

2    Dr. Lindsay's studies, not the highest throughout the United

3    States.

4          **THE WITNESS:**  The range was 13 to 52 percent.

5          **THE COURT:**  Right.

6          **THE WITNESS:**  So on the higher end, but not the

7    highest.

8          And there was, there was some methodological

9    problems with the GAO report, primarily in comparison of the

10   foster care to the non-foster care population.  And Dr.

11   Livingston was asked, you know, what was the response to the

12   GAO report within DCF.  And his response was that he would

13   be surprised if anyone, senior management or senior staff

14   themselves, were surprised that there's an issue with

15   prescribing practices for children in foster care.

16         You know, he was asked is there any reason to doubt

17   that foster care children were prescribed medications at a

18   rate that's nearly 20 times higher than the non-foster care

19   children.  And his response was no, no reason to doubt that.

20         Working with the Rogers Working Group, we tried to

21   look at what did the, what did DCF know about the numbers of

22   kids on antipsychotics.  We couldn't get that information

23   from DCF.  We asked the Court how many active Rogers do you

24   have.  We couldn't get that information from the Court.  We

25   were just trying to, you know, in some total was the number

1    about the same.  Even if we weren't comparing child to

2    child.  And we couldn't get that information.  So, even in

3    the condition where the consent process requires judicial

4    approval, there's no check and balance to even make sure

5    that those Rogers are being adhered to.

6              **THE COURT:**  Well, let me press that a little bit.

7              You're not faulting DCF for that if you can't get

8    records from the Massachusetts court system?

9         **THE WITNESS:**  I'm faulting DCF for that because

10   ultimately DCF is the parent of these children.  They have a

11   responsibility to know that the process, the Rogers process

12   is actually being adhered to.  They can get the information

13   from Medicaid about whether or not a child was on

14   antipsychotics.  They don't need the judiciary to tell them

15   that.  They could then confirm through their own records

16   whether or not the Rogers is active.

17             **THE COURT:**  So my understanding of your testimony

18   is that from your review of case files you can't tell

19   whether the DCF officials know whether the Rogers is active

20   or not?

21             **THE WITNESS:**  Yeah, it's even worse than that.

22             **THE COURT:**  Why?

23             **THE WITNESS:**  Well, because in my review of the

24   case file records there were clear examples, two for two,

25   when there were errors in, the child was on medication that

1    was not approved by the Rogers.

2        **THE COURT:**  And if I've been following you've

3    testified to that.

4        **THE WITNESS:**  Yes.

5        **THE COURT:**  All right.

6        **THE WITNESS:**  And then I was thinking, well, what

7    is the capacity for DCF to even know whether or not the

8    Rogers process was being adhered to.  And they don't have

9    that capacity.  So, whether it's the judiciary's

10   responsibility or DCF's responsibility, the end result is

11   that children are being put on antipsychotic medications

12   that have not been properly approved of and consented for.

13   And this is antipsychotics.  We've got judges involved.

14   When I looked at the non-antipsychotic medication and what

15   evidence there was for consent being provided there was

16   none.  I mean, there was just no -- there was no -- none of

17   the things that I talked about, the going through informed

18   consent, appeared anywhere in, the Family Net findings would

19   be the place where one would look for this information.

20       So, maybe it's happening.  Maybe the provider's

21   writing as I do.  You know, I talk about my risks and

22   benefits conversation.  But that wasn't showing up, even in

23   the provider records that DCF did have.

24       So, the records were, you know, silent about

25   informed consent for non-psychotropic medication.  And

1    that's problematic.  I think, I mean, DCF has to record how

2    many times the worker is doing a visit with their child on a

3    caseload.  They're supposed to be see them monthly.  They

4    are supposed to be documenting sibling visits.  They're

5    supposed to be documenting all sorts of things.  Why would

6    we not require them to document consent for psychiatric

7    medication which carry significant potential side-effect

8    burden.  That would seem to be something that you would want

9    in a system.  You would want to make sure that people are

10   doing their job.  And the requirement is and the policies

11   state that they're to be entering in information about these

12   medications into Family Net.

13           The problem I have with Family Net is also that you

14   can't search it.  You know, it's, it's not -- it doesn't

15   serve the function of monitoring.  And that prevents you

16   from being able to oversee the psychiatric medications,

17   again going back to those three pillars.

18   Q    Doctor, have you formed an opinion as to whether or not

19   the absence of information regarding informed consent in DCF

20   records exposes children to a risk of potential harm or

21   injury?

22   A    Yes.

23   Q    What is your opinion?

24   A    It goes back to the statement that AACAP makes.  The

25   state has a duty to perform its protective role for children

1    in state custody.  Unlike mentally ill children from intact

2    families, these children have no consistent interested party

3    to provide informed consent, coordinate treatment, planning

4    and clinical care and provide longitudinal oversight.  DCF

5    is right, right there in terms of lacking that capacity.

6         There was documentation in the record that one of

7    the named plaintiffs that I reviewed during psychological

8    testing actually had medication administered while they were

9    in the testing session.  Forty-five minutes later the

10   reporter notes that, the psychologist notes that the child

11   is basically falling asleep.  And elsewhere in the record

12   there was documentation that the child was taking naps after

13   school or there was some other supporting documentation that

14   the child seemed to be perhaps sedated by the medication.

15        There were numerous points as I'm reading these

16   case file records where I'm, I'm -- the record seems to be

17   screaming out for some kind of a response from some care

18   taking authority to say, wait a minute, we should be asking

19   why this isn't working.

20        I mean, these are very complicated young people.

21   They come into care with all sorts of risk factors.  Genetic

22   risk factors, exposure to intrauterine drugs and alcohol,

23   multi-generational violence, poverty, inter-familial

24   violence, exposure to domestic violence.  Things are stacked

25   against them.  I'm not faulting DCF for the fact that these

1    children didn't all get better and didn't all live happily

2    ever after.  I'm faulting DCF for not having properly

3    overseen the care that these children were getting that in

4    and of itself exposes these children to the risk of harm.

5            There were specific types of therapies that were

6    recommended that were not adhered to.  Trauma focused

7    cognitive behavioral therapy for one.  Diagnoses that kind

8    of came and went leading to various medication interventions

9    that did seem to carry, and the case files talked about some

10   side-effects that the children are having.  It's not just

11   the presence of an actual side-effect, but it's the absence

12   of knowing whether or not the medication and the potential

13   risk that these medications were exposing the children to

14   were warranted.  So it's both of those things that compelled

15   me to my conclusion that these children were not being

16   protected from harm.

17   Q   Dr. Bellonci, have you formulated an opinion with

18   respect to DCF's conformance or not with its own policies

19   and regulations, the regulations and policies you identified

20   earlier?

21   A   Yes.

22   Q   And what is your opinion in that regard?

23   A   The DCF fails to adhere to its own regulations regarding

24   both informed consent and documentation of such and

25   monitoring and oversight of those medications once approved.

1    **Q**    Would you identify the basis for that finding?

2    A    DCF is supposed to be using the medical passport.  The

3    medical passports were not current, did not have information

4    about active medications, did not have the correct

5    information about diagnoses, did not include allergies.  DCF

6    was not using encounter forms that were meant to import data

7    into the medical passport.  DCF lacked any ability to

8    monitor the medications that they were consenting to the

9    children of the Commonwealth taking.

10   **Q**    Did you base that finding on any statements made by DCF

11   officials in deposition transcripts you reviewed?

12   A    It was both based upon my review of the case files, my

13   clinical experience, and confirmed by or supported by the

14   depositions.

15           Dr. Livingston appears to concede to DCF's failure

16   to adhere to the standard of care saying my best

17   understanding is there's an expectation that all

18   psychotropics that a child is on are recorded in a running

19   fashion on Family Net.  But there are many cases where that

20   doesn't happen.  Jan Nisenbaum, who's the deputy

21   commissioner for clinical practice and program operations at

22   DCF was asked:  Are all prescription medications that a

23   child is prescribed to be input into Family Net?  That's the

24   hope, she responds, but the reality is we do not often get

25   those medications, changes in medications entered into

1    Family Net.  I wanted to make sure is there something else

2    besides Family Net, some other database that's being used as

3    a medication recordkeeping system, ideally one that reports

4    around some of these risk factors that I've discussed.

5            She was asked:  Does DCF, separate and apart from

6    Family Net, have a system of records for documentation to

7    assure itself that for any given child in its foster care

8    custody DCF is aware of all drugs that the child is being

9    prescribed and administered at any given point in time?  She

10   replies:  Family Net would be the only location other than

11   paper words that would exist in the area office or sometimes

12   doctors on occasion will fax over information about a recent

13   medical exam that the child had or changes in prescriptions

14   and that those would get filed in the paper documents within

15   the child's case record.  But outside of those two sources,

16   there would not be any other location.

17           So I just wanted to make sure that I had everything

18   that DCF had.  And apparently I did.  Because I had both the

19   paper records that included some of the discharge summaries,

20   included some clinical information, clinical notes provided

21   by the provider, as well as reviewing the entire Family Net.

22   **Q**   Dr. Bellonci, are you familiar with the term or phrase

23   second opinion capacity?

24   A   Yes.

25   **Q**   How do you use that phrase?

1    A    Second opinion would be like anybody else, any other

2    branch of medicine.  Your first opinion is the opinion that

3    you are going to see for treatment, for evaluation, for

4    determination of what's wrong, and treatment

5    recommendations.  Often people will seek a second opinion

6    either because they've got concerns about the intervention

7    being recommended or they don't fill that the diagnosis is

8    accurate.  So, it's an effort to provide additional

9    information to inform treatment decisions.

10   **Q**    Do you have an understanding in your review of

11   literature, deposition testimony, named plaintiffs files and

12   your experience working with DCF over the years as to

13   whether or not DCF has structures within it that would

14   provide a second opinion capacity?

15   A    Yes.

16   **Q**    What is your understanding in that regard?

17   A    That they do not have the provisions for second opinion

18   capacity.  Up until Dr. Livington's hire, I'm not terribly

19   sure how long it's been, maybe four years, they actually had

20   no psychiatrist within DCF.  Dr. Livington, who I have great

21   respect for, is a child and adolescent psychiatrist who's

22   working part-time, I know it's more than half, less than

23   full, for over 7,000 children in the state custody.  There's

24   no way that he can be used as someone to provide a second

25   opinion capacity in the rigorous way in which I would hope

1    that it would be utilized.  I mean, you can, you can do this

2    in a way so that you can prioritize reviews.  Obviously you

3    can't have a psychiatrist at DCF second-guessing every

4    medication that's being prescribed for a child in DCF.  That

5    is not at all what I'm saying is the standard of care.  I'm

6    not too concerned about stimulants for ADHD.  I'm concerned

7    about children on multiple medications.  I'm concerned about

8    children on two medicines from the same class that there's

9    no literature to support that being done.  I'm concerned

10   about dosages in excess of clinical guidelines.  I'm

11   concerned about medications being prescribed for conditions

12   that the child doesn't have.  I'm concerned about whether

13   the child is being prescribed medications in lieu of

14   psychosocial therapies.  These are all things that DCF can

15   and should be doing.  And then somebody should be talking

16   with the prescriber about why that's occurring.  I'm not

17   even saying that, you know, cut off the access to the

18   prescription.  All I'm really asking for is is it an

19   informed conversation between DCF and loco parentis and the

20   prescriber who's making those treatment recommendations and

21   treatment decisions.

22        That can be done in a way that could even save the

23   Commonwealth money in terms of the prescription costs of

24   these medications.  These are very expensive medications.

25   Psychotropics are accounting for half or more of Medicaid's

1    pharmacy budget.  Not just for children, including adults.

2    The GAO talks about a figure of $250 million or something

3    being spent on psychotropics just in the Commonwealth.  Why

4    don't we use some of the potential cost savings if as a

5    result of a quality improvement initiative children end up

6    on less medication.  I don't know that that's going to be

7    the case and I don't want to promise that.  But in other

8    jurisdictions where that has been implemented there has

9    actually been significant cost savings on the pharmacy

10   budget to Medicaid.  How about redirecting those resources

11   into rigorous consent, oversight and monitoring function.  I

12   can't promise it's going to be budget neutral, but it would

13   certainly ensure that DCF is doing its requirement around a

14   protective role as outlined in AACAP guidelines, as

15   supported by ACF, federal government guidelines, and as

16   endorsed in the GAO report.  I mean, the GAO's conclusion is

17   right there in the title.  They told HHS at the federal

18   level guidance could improve, could help states improve

19   oversight of psychotropic medications.  The GAO basically

20   said, hey, HHS, you need to be doing something about this.

21   And lo and behold four months later comes the informational

22   memorandum.

23   **Q**    You testified a moment ago, Doctor, that you're not

24   suggesting that every single prescription of a psychotropic

25   medication to a child should undergo a second opinion

1    review.  Did I hear you correctly?

2    A   Yes.

3    **Q**   Have you made findings with respect to when that second

4    opinion capacity ought to be in place?

5    A   That was the basis for my including appendix D,

6    psychiatric medication tracking parameters.  These are some

7    of the red flags that I'm recommending to other states that

8    I consult with.  We're actively using this document in the

9    PMQIC process.  I've shared this when I was on the Rogers

10   Working Group.  When I was volunteering essentially to help

11   the Commonwealth try to respond to this urgent need around

12   monitoring and oversight of psychotropic medications.  These

13   are frankly not terribly controversial.  These are -- these

14   were written by me.  But they show up in other state

15   monitoring guidelines.  They were informed by my work in

16   Tennessee and are embedded into their oversight regulations.

17   Texas has similar standards.  They do the cutoff at five or

18   more.  I think if you're just talking about having a

19   conversation with a prescriber you should start at a lower

20   number.  But okay.  Start with five or more and then work

21   down to four or more and then three or more.  They show up

22   in New York state which also incorporated what I developed

23   for Tennessee.  So, you know, they're appearing in multiple

24   areas.  And, you know, they're not meant to be prescriptive.

25   I don't, I don't want to as a child psychiatrist hinder the

1    free practice of other child psychiatrists.  All I'm asking

2    for is that there really be a conversation about is this

3    medication indicated, can something else work that may carry

4    less side-effect, particularly given the unknowns about many

5    of these medications.  How do we know it's still indicated.

6    Who's watching that.  Who's getting the data back to the

7    doctor.  How do we know that the benefits are outweighing

8    the side-effects.  All the kinds of things that I expect a

9    reasonable parent to be able to do when I'm in a dialogue

10   and conversation and a treatment alliance.  I need the state

11   to be able to do that.  However they want to structure, I

12   need that in order to be able to do my job.  Without that

13   the risk is that kids are being harmed.

14   **Q**   You've identified appendix B.  And, Doctor, just to be

15   clear on the record that's pages 30 and 31 of your report,

16   Exhibit GZ?

17   A   Yes.

18   **Q**   And you've identified that exhibit as listing red flags?

19   A   Yes.

20   **Q**   What do you mean by that term?

21   A   These would be practices that would be considered

22   outliers.  Now, in truth, looking at it now, not all of them

23   characterize outliers because they include things like

24   number of percent of children on psychiatric medication, by

25   custody status, or by specific class of medication.  Some of

them are more red flags around specific cutoffs, like three

or more psychiatric medications or wherever.  You know,

again I even include in that, wherever you want to set the

cutoff for review, set some cutoff, have some review

capacity.  Number of percent of children prescribed

psychotropic medications at dosages above FDA guidelines.

Or convene a stakeholder committee as some jurisdictions

have done, with prescribers to say there are no FDA

guidelines for this particular medication at this age

because we're off label.  But that doesn't mean you can't

get a group of providers together in a room to say this is

what we think is reasonable, this is what we're comfortable

with you managing us.

　　　　　So you can, you can develop your own red flags.

The problem in Massachusetts is even if they developed red

flags they wouldn't have any capacity to monitor the red

flags because they can't get the data.

**Q**   How do you know that?

A   Because it doesn't exist.  They would have to, to review

every Family Net, every page of every Family Net, because

there's no way to extract the data from Family Net.

**Q**   In your review of deposition testimony provided to you,

did state officials talk about the issue of red flag

capacity or the ability to track psychotropic medication

utilization?

1    A    Yes.

2    Q    Did you reference those depositions in your report?

3    A    Yes.

4    Q    Did you base your findings in part upon your review of

5    those depositions?

6    A    It just confirmed what I already knew.  But yes.

7    Q    Please share what you found, Doctor.

8    A    Marilyn Chase, Assistant Secretary for Children, Youth

9    and Families in the executive office of Health and Human

10   Services --

11            MR. COLLINS:  Objection.

12            THE COURT:  You're starting out like you're going

13   to tell us what someone else said.  Her question was what

14   did you find?

15            THE WITNESS:  In my reading of the deposition?

16   Q    Did you place reliance on deposition --

17            THE COURT:  Well, she's withdrawing it apparently.

18            MS. BARTOSZ:  I'll withdraw the question.  I'm

19   sorry.

20            THE COURT:  Now she'll ask another question.

21            MS. BARTOSZ:  I will withdraw the question.

22            THE COURT:  All right.  And just so we're clear,

23   the fact that experts may rely on hearsay that experts in

24   the field would rely upon, which is the rule, doesn't create

25   another exception to the rule against hearsay and make that

1    hearsay admissible.  So, we go with the experts, we go in

2    the sense that we receive in evidence the expert's views.

3          Go ahead.

4    **Q**   Can you identify the deposition testimony that you

5    reviewed in relation to whether or not there's any red flag

6    capacity within DCF?

7    A   Yes.

8    **Q**   What are those deposition passages?

9    A   Marilyn Chase said she knows that DCF does not have the

10   capacity to monitor in the example two or more psychotropic

11   medications.  Jan Nisenbaum talked about DCF not having

12   access to information about which children are receiving

13   multiple psychotropic medications.  But they don't have good

14   current information in their electronic files about children

15   or of any way to aggregate the number of children, for

16   example, under five which is another cutoff, another red

17   flag who have been prescribed psychotropic medication.

18          **MR. COLLINS:**  Objection.

19          **THE COURT:**  Well, I'm going to let that stand.  The

20   objection wasn't timely.

21   **Q**   Doctor, do you have an opinion as to whether or not the

22   absence of a red flag capacity exposes children to a risk of

23   harm?

24   A   Yes.

25   **Q**   Do you hold that opinion to a reasonable degree of

1    certainty as a child and adolescent psychiatrist?

2    A    Yes.

3    **Q**    Would you state the basis for that opinion?

4    A    Well, the opinion is that without that capacity, DCF

5    can't know that children aren't coming to harm.  Without

6    that capacity, when a new alert comes out about a risk

7    factor, they don't know which children in their care are

8    taking that medication.  How can you oversee the potential

9    risks of a medication if you don't even know which children

10    are taking that medication, or having a database that can

11    deliver that information up in a timely way.

12         They don't have the resources in terms of child

13    psychiatric expertise, even if they generated the review.

14    So it's a failure of having an IT system capacity to be able

15    to know what meds kids are on at any one time.  I mean, that

16    alone, you know, if I was working with a parent who couldn't

17    tell me what meds their child is on that's neglect.  And

18    this is the state child welfare agency that's supposed to be

19    treating kids who have already been neglected and now

20    they're coming into care and they're being further

21    neglected.  That's not, that's not meeting the standard of

22    care.  It's not acceptable, but for this I'll say it's not

23    meeting the standard of care.  And it prevents the DCF from

24    being able to then give the clinical information that as a

25    medical practitioner I need to be able to do my job in the

1     service of this child's mental health needs.

2            **MS. BARTOSZ:**  May I have a moment, your Honor?

3            **THE COURT:**  You may.

4            **MS. BARTOSZ:**  Your Honor, that completes the

5     plaintiffs' direct examination.

6            **THE COURT:**  Mr. Collins, any questions?

7            **MR. COLLINS:**  Thank you, your Honor.

8                         **CROSS-EXAMINATION**

9     **BY  MR. COLLINS**

10    **Q**    Good afternoon, Dr. Bellonci.

11    A    Hello.

12    **Q**    You are an Assistant Professor at Tufts Medical School,

13    correct?

14    A    Yes.

15    **Q**    And the highest academic rank is what's known as

16    Professor, yes?

17    A    Correct.

18    **Q**    The next academic rank down from Professor is Associate

19    Professor.  Yes?

20    A    Correct.

21    **Q**    And the rank down from there, which is where you are

22    now, is Assistant Professor.  Yes?

23    A    Yes, although the papers have been submitted for my

24    Associate Professorship.

25    **Q**    But you have not attained the rank of Associate

1    Assistant Professor.  Associate Professor?

2    A    Correct.

3    Q    And the rank down from associate, I'm sorry, Assistant

4    Professor is what's known as the rank of Instructor.  Yes?

5    A    Yes.

6    Q    And that is the rank that you remained at for 14 years

7    following your studies?

8    A    It was probably more like ten years.  There was a period

9    of time when I wasn't affiliated with an academic medical

10    center.

11    Q    If we look at your resume which you should have in front

12    of you, I believe.  Do you have that?

13    A    Yes.  You can go on.

14    Q    It's appendix E to your report.

15    A    Page number?

16    Q    Hold on one second.

17    A    Thirty-seven.  I have it.

18    Q    You have it.

19          And actually I'm focusing now on page 40, if you

20    would.

21    A    Yeah.

22    Q    Do you see where you write peer-reviewed scientific

23    articles?

24    A    Yes.

25    Q    You have served as the primary author on only two

1    peer-reviewed articles published in a medical journal.  Yes?

2    A    Correct.

3    Q    And this is largely why you remain at the rank of

4    Assistant Professor now 20 years after completing your

5    training.  Yes?

6    A    No.

7    Q    Doctor, you testified earlier, much earlier, actually on

8    Tuesday, about your work with the American Academy of Child

9    and Adolescent Psychiatry.  Yes?

10   A    Correct.

11   Q    And the number of committees that you have worked on

12   there?

13   A    Yes.

14   Q    Or I should say with the, with AACAP?

15   A    Yes.

16   Q    And one of those committees is the quality issues

17   committee.

18   A    Yes.

19   Q    You're a member of that committee?

20   A    I am.

21   Q    And Dr. Heather Walter is the co-chair of that

22   committee.  Yes?

23   A    Yes.

24   Q    You also mentioned today that you have performed some

25   work on the, what's known as the state's Rogers Working

1    Group.  Yes?

2    A    Yes.

3    Q    You ceased your involvement with the Rogers Working

4    Group when you were hired by plaintiffs' counsel in this

5    case.  Yes?

6    A    The timing was about the same, but it wasn't actually a

7    result of being hired by Children's Rights.  The Rogers

8    Working Group essentially petered out.  Recommendations were

9    made, nothing was being acted upon those recommendations.

10   And I never got a call about another meeting.  I didn't know

11   whether or not because, that was because of my involvement

12   with Children's Rights or not.  But I don't think so because

13   I don't think the state knew that at the time.

14   Q    Doctor, do you recall being deposed in this case back in

15   November of 2012?

16   A    Yes.

17   Q    And that was a situation where you and I sat in a room

18   for a number of hours and I asked you a whole host of

19   questions?

20   A    For eight hours on my 50th birthday.  I remember it

21   well.

22   Q    I don't know if it was eight, but it was a number.

23   A    10:00 in the morning until 6:00 at night.

24   Q    And you were under oath in that proceeding.  Yes?

25   A    Yes, as I am now.

1      **MR. COLLINS:**  All right.  Can we pull up the

2   deposition on the screen, if you would.  And in particular I

3   would like to go to page 60 of Dr. Bellonci's deposition.

4   A    It still has my CV on it.

5   Q    Just give us a moment, Doctor, if you would.  We're

6   pulling it up on the screen now.

7        Okay.  Do you have the, the screen in front of you

8   where line 1 says:  Here in Massachusetts?

9   A    Yes.

10  Q    Okay.  And I'm going down now to line 3, and I would

11  like you to, I would like you to read along with me silently

12  while I read it aloud.

13  A    Okay.

14  Q    And I'm at line 3.  The question was:  Did you at

15  any point ever ask anyone to speak -- did you at any point

16  ever ask anyone to speak with anyone from either DCF EOHHS

17  or the governor's office?

18        And the answer that you provided was:  Once I was

19  contacted by Children's Rights, I stopped any work in

20  support of the state's initiative to try and address, in

21  other words, I stopped my work on the Rogers Working Group,

22  it would not be appropriate for me to continue that.

23        Did I read that right?

24  A    Yes, you did.

25        **MS. BARTOSZ:**  Your Honor, I object, it's not

1    impeaching.

2              **THE COURT:**  What?

3              **MS. BARTOSZ:**  I object.  It's not impeaching.

4              **THE COURT:**  Overruled.

5              **MR. COLLINS:**  I'm sorry, I didn't hear the

6    objection, your Honor.

7              **THE COURT:**  She objected on the ground that it was

8    not impeaching.  Overruled.

9              **MR. COLLINS:**  Okay.

10             **THE COURT:**  Which is not a determination that it is

11   impeaching, only that it seems appropriate

12   cross-examination.

13             Go ahead.

14             **MR. COLLINS:**  Thank you, your Honor.

15   **Q**   You testified earlier that you were hired by Children's

16   Rights in this case in March of 2012.  Yes?

17   A    March, April, yeah.

18   **Q**   And you've been hired as an expert before to assist in

19   litigation in other cases.  Yes?

20   A    Yes.

21   **Q**   In fact, in four other cases?

22   A    Yes.

23   **Q**   One in Montana?

24   A    Yes.

25   **Q**   One in Oregon?

1    A    Yes.

2    Q    One in Texas?

3    A    Yes.

4    Q    And one in Pennsylvania?

5    A    Yes.

6    Q    And those were the years 2009-2010 time frame?

7    A    Different time frames depending on which case you're

8    referring to, but yes.

9    Q    But your work in those cases was not in providing an

10   opinion, as here, on informed consent and oversight

11   monitoring policies for the use of psychotropic medications

12   for children in foster care custody?

13   A    Correct.

14   Q    I want to talk to you a little bit about the methodology

15   that you used in your review.  You testified earlier that

16   you conducted a review of case files and based on your

17   experience you provided an assessment of certain things with

18   respect to the Massachusetts child welfare system?

19   A    I provided a medical opinion.

20   Q    And as part of that opinion you assessed certain aspects

21   of the Massachusetts child welfare system?

22   A    Yes.

23   Q    One of those was an assessment of the prescribing

24   practices of psychotropic medications for kids in foster

25   care?

1   A    Yes.

2   Q    Another was the assessment of the informed consent,

3   monitoring and oversight policies for the use of

4   psychotropic medications for children in DCF care and

5   custody?

6   A    Yes.

7   Q    And another was an assessment of the quality of care

8   that is received by foster children in DCF custody?

9   A    Yes.

10  Q    Now, in performing those assessments and reaching your

11  opinions and conclusions as you have you did not interview

12  or speak with anyone from the Department of Children and

13  Families, correct?

14  A    Can you repeat the question?

15  Q    In performing the assessments that you did in reaching

16  your opinions and conclusions as you have in this case, you

17  did not speak or, you did not interview or speak with anyone

18  at the Department of Children and Families?

19  A    No.  I had access to the depositions and had been

20  working with the Rogers Working Group which included a

21  number of the people that would have had that information or

22  the information that I was looking for.  Once I was

23  contracted with Children's Rights, I didn't feel that it was

24  appropriate for me to have that contact.

25  Q    So, you never at any point sought out or asked to speak

1    with anyone in preparing your opinions and your report at

2    the Department of Children and Families?

3    A    Correct.

4    Q    And you didn't interview or speak with anyone at the

5    Executive Office of Health and Human Services?

6    A    Not once I was contracted by Children's Rights, no.

7    Q    And in this effort to assess the system, the

8    Massachusetts child welfare system, and in reaching your

9    opinions and conclusions as you've arrived at them here in

10   this courtroom?

11   A    No, as I stated, I relied upon my 20 plus years working

12   with this population, the plaintiff files, my knowledge of

13   the standard of care.

14   Q    Understood, Doctor.  You didn't, you didn't speak with

15   anyone at EOHHS, correct?

16   A    I did not.

17   Q    Okay.  And you mentioned Marilyn Chase earlier.  Marilyn

18   Chase works for the Executive Office of Health and Human

19   Services.  Yes?

20   A    Yes.

21   Q    And you understand that Governor Patrick has been named

22   as a defendant in this case.  Yes?

23   A    Yes.

24   Q    And in reaching your opinions and conclusions here you

25   didn't speak with or interview anyone in the governor's

1    office --

2    A    No.

3    Q    -- correct?

4         And you didn't seek to or even make any attempts to

5    make that contact?

6    A    No, I felt the depositions were adequate.

7    Q    And in opining as you have on the prescribing practices

8    in Massachusetts and on the informed consent and monitoring

9    and oversight policies and practices and on the quality of

10   care, and whether kids are protected, you also reviewed some

11   DCF case files.  Yes?

12   A    Yes.

13   Q    And, in fact, you reviewed three DCF case files.  Yes?

14   A    Yes.

15   Q    And the three case files that you reviewed were Andre

16   S., Adam S. and Connor B.  Yes?

17   A    Yes.

18   Q    Three of the names plaintiffs in this case?

19   A    Yes.

20   Q    And you'd agree with me that there are any number of

21   kids in DCF care that are prescribed psychotropic

22   medications.  Yes?

23   A    Yes, apparently 40 percent of them.

24   Q    You're basing that on the GAO report?

25   A    Yes.

Q    And yet you reviewed just three files.   Yes?

A    Yes.

Q    And those were three files that were specifically
selected by plaintiffs' counsel.   Yes?

A    Yes.

Q    You didn't participate in the decision as to which files
would be reviewed, did you?

A    No.

Q    And you never asked to review any more than three files?

A    We discussed reviewing more.   We started with two.   Part
of this was the limitation of my having a full-time job
while being asked to do this and the limitations of --

Q    You never asked to review more than three files,
correct, Doctor?

A    Correct.

Q    And I believe you testified earlier that what you
reviewed were what you call, what you've identified as DCF
case files.   Is that right?

A    I reviewed what DCF had, any information they had about
the three named plaintiffs.   So that included any prescriber
records, any hospital discharge summaries, any psychological
test reports that were in their possession, as well as the
Family Net filings, they were all printed out.   It's a
database.

Q    You identified these as DCF case files in your report;

1    isn't that right?

2    A    Yes, and I'm explaining what my understanding was.

3    **Q**    You've answered the question.  Thank you.

4         These DCF case files do not contain the full

5    prescriber records for these children, do they?

6    A    No.  That's part of the problem.

7    **Q**    And, of course, by prescribers we're talking

8    about third-party providers, doctors and the like,

9    psychiatrists, that have seen these children and have

10   prescribed medications among other things for these

11   children.  Yes?

12   A    Yes.

13   **Q**    Those files were available to you, weren't they?

14   A    No.

15   **Q**    Well, did you ask to see them?

16   A    We had a discussion about it, and it was my

17   understanding that the state was having difficulty getting

18   that information from the providers.

19   **Q**    Did you seek to review them?  Did you ever affirmatively

20   ask either anyone at DCF or plaintiffs' counsel to see them?

21   A    As I said, we had a conversation.  Ultimately I decided

22   that for the purposes of rendering my opinion it was

23   adequate for me to know what did DCF have available to them

24   in terms of trying to answer the question were they

25   providing adequate informed consent, were they providing

1    adequate oversight, and were they providing adequate

2    monitoring.

3    **Q**    Doctor, did you ask the question of anyone at DCF or

4    plaintiffs' counsel, can I see the full prescriber records?

5    A    I asked plaintiffs' counsel.  We had that conversation.

6    **Q**    And what was the response?

7    A    That was where I learned that there was some difficulty

8    in getting those records from the providers.  I reflected on

9    that and determined that that was not an essential element

10    for me to be able to form my medical opinion.

11    **Q**    Now, as a doctor surely you have at times sought out a

12    medical release of information from, let's say a patient, to

13    be able to have medical records of that patient released

14    from other institutions.  Yes?

15    A    Yes, that would be standard practice.

16    **Q**    And did you seek a release from anyone in this case to

17    be able to review those full prescriber records?

18    A    No, I wasn't doing a psychiatric evaluation.  So I

19    wouldn't approach this like these were my patients, or I was

20    entering into a treatment relationship with them.

21    **Q**    But you reviewed, you did a review of the quality of

22    care of these children, didn't you?

23    A    I did a review of what DCF knew about the quality of

24    care of these children.  It wasn't --

25    **Q**    Well, you have made comments here today about the,

1    you've questioned whether a certain physician should or not

2    have prescribed this medication or that medication or

3    whether it was appropriate for a child to be on four versus

4    five medications.  You've opined about that?

5    A   I've raised the question of whether or not the state had

6    the information necessary for them to ensure that to a

7    reasonable standard they knew why these children were on

8    these medications and that the medications were indicated.

9    Q   So you weren't calling into question that practice --

10   A   What practice?

11   Q   -- necessarily.

12          The types of medications that were prescribed to

13   certain individuals or the amount or level of medications

14   that were prescribed to individuals --

15   A   There are rare --

16   Q   Let me just finish the question.

17   A   Okay --

18   Q   -- to individuals.  You were simply saying it raised

19   some questions in your mind.  Do I have that right?

20   A   There are rare times when I've had children on five or

21   more medications.  The point isn't about whether or not,

22   four or more, five or more, two or more is medical

23   malpractice.  That's not what I was being asked to opine

24   about.  I would welcome a conversation about why I would be

25   prescribing each and every medication that I'm prescribing

1    to a child in care.

2              So, I wanted to know what, what did DCF have

3    available to them in their records that would answer the

4    question of whether or not they had adequate information to

5    ensure that these children were being protected from harm by

6    virtue of the medications that they were taking in DCF care.

7    **Q**   In doing your assessment and opining as you have here

8    today and on Tuesday, you didn't interview or examine any of

9    the three children whose files you reviewed, correct?

10   A    Correct.

11   **Q**   And you didn't talk to any of their social workers,

12   correct?

13   A    Correct.

14   **Q**   And you did not speak with any of their social workers'

15   supervisors at DCF, correct?

16   A    Correct.

17   **Q**   And you didn't talk to any of their pediatricians?

18   A    Correct.

19   **Q**   You talked to none of their treating psychiatrists?

20   A    Correct.

21   **Q**   And you didn't talk to any of their nurses and you

22   didn't talk to any of their teachers?

23   A    Correct.  They were not my patients.

24   **Q**   I want to now talk to you, we started a little bit of a

25   discussion about what exactly your opinion was with respect

```
1    to the prescribing practices as you've seen it and as you've

2    opined on them here in Massachusetts, so I want to get into

3    a little bit more with you now.

4              I want to be clear, you're not opining that

5    children in foster care in Massachusetts are being over

6    prescribed psychotropic medications, correct?

7    A    I'm opining that we don't know the answer to that

8    question and that's the problem.

9    Q    So, you're not opining that kids in foster care in

10   Massachusetts are being over prescribed psychiatric

11   medications, correct?

12   A    I'm opining we don't have the answer to that question.

13   Q    That's no.  Or yes?

14   A    I'm not sure it's either.

15   Q    Is it your opinion, Doctor, that children in

16   Massachusetts are being over prescribed psychiatric

17   medications?

18   A    Quite possible.

19   Q    You don't know?

20   A    No, and nor does the state.  That's the problem.

21   Q    But what you are saying, what your testimony was was

22   that Massachusetts has one of the highest, or I believe you

23   said on the higher end of the spectrum.  Yes?

24   A    Yes, we don't have state by state --

25   Q    And you base that on the GAO study, correct?
```

1    A    Not just the GAO study.

2    Q    The GAO study forms part of your opinion when you're

3    reaching that conclusion?

4    A    The GAO study had Massachusetts as the highest of the

5    five states surveyed.  There's other information and data

6    that I have access to that form that opinion.

7    Q    And the GAO report was, as you've just alluded to, was a

8    five state study, correct?

9    A    Correct.

10   Q    It wasn't all 50 states?

11   A    Correct.

12   Q    And of course Massachusetts was one of those states?

13   A    Yes.

14   Q    And that report was based -- first of all, it was a 2011

15   report, correct?

16   A    Yes.

17   Q    And even though it was a 2011 report it was based on

18   2008 data, correct?

19   A    Yes.

20   Q    Now, before we get into the report itself, I just want

21   to make sure that you and I are in agreement about

22   something.  There are problems you'd agree with the

23   methodology of this report, correct?

24   A    Yes.

25   Q    The GAO study was limited to data on children that were

1    enrolled in a Medicaid fee for service prescription program

2    for psychotropics.  Yes?

3    A   Yes.

4    Q   And, in fact, in Massachusetts only 72 percent of the

5    kids -- I'm sorry.  In Massachusetts only 72 percent of

6    foster care children are covered by fee for service.  Yes?

7    According to the study.

8    A   I don't have that at my fingertips, but I will accept

9    that, yes.

10   Q   Which would mean that the other 28 percent are covered

11   by managed care, correct?

12   A   There's a subset that's fee for service and then the

13   others are in the managed care behavioral carve outs for

14   Medicaid.

15   Q   Yes.

16        So, bottom line is that the study didn't look at

17   the entire foster care population, correct?

18   A   In Massachusetts?

19   Q   Yes.

20   A   Yes.

21   Q   Right.  That's the GAO study.

22        MR. COLLINS:  Can we pull up the GAO report,

23   please.

24   Q   Actually do you have -- you have a paper copy in front

25   of you?

```
1    A    I do.  Yes, we --

2    Q    Okay, perfect.

3    A    Just tell me what page.

4    Q    We can do that.  Would you turn to page 34, please.

5    A    I'm there.

6    Q    Okay.  You're faster than I am.

7              We're looking at appendix I, correct?

8    A    Yes.

9    Q    It talks about objectives, scope and methodology of the

10   report.  Yes?

11   A    Yes.

12   Q    Would you turn attention to the second paragraph.  And

13   I'm looking at the last statement of that paragraph, it

14   says:  The audit was limited to data on children in a

15   Medicaid fee-for-service prescription or carve-out program

16   for psychotropic drugs and may not generalize to other

17   states or populations.

18              Did I read that right?

19   A    Yes.

20   Q    The study is also limited for comparing both foster care

21   and non-foster care children, correct?

22   A    Yeah, I think that's actually the bigger limitation.

23   Yes.

24   Q    Okay.  And I don't know if you recall these numbers.

25   But they stated that only 42 percent of non-foster care kids
```

1    were in fee-for-service.  Does that sound right to you?

2    A    I'll accept that.

3    Q    So, the study looked at an even smaller population of

4    those children, correct?

5    A    Sure.

6    Q    Doctor, it's no surprise to you that foster children

7    have a higher prescription rate than non-foster care

8    children, correct?

9    A    Correct.

10   Q    In fact, children in foster care are known to have

11   significant developmental and mental health challenges.

12   Yes?

13   A    Yes.

14   Q    They are more likely to carry heavier genetic risk for

15   mental illness?

16   A    Yes.

17   Q    They're more likely to have been exposed to drugs and

18   alcohol in utero?

19   A    Yes.

20   Q    And they're more likely to have been raised in social

21   milieus that fail to meet their basic needs.  Yes?

22   A    Yes.

23   Q    And given these risk factors it's not surprising that

24   children in foster care are prescribed psychiatric

25   medications at a rate in excess of the general population.

1    Yes?

2    A    That's the question.  That was the question I was posed

3    to by congress.  It would seem to be a rational connection

4    that with higher prevalence in incidents of mental health

5    challenges there would be higher utilization.  Whether or

6    not the current utilization rates are justified by those

7    risk factors that you've identified is the question.  And as

8    I've testified within those numbers, my clinical judgment or

9    medical opinion would be that there are children that are

10   being prescribed medications, psychotropic medications that

11   may not be warranted or may be in excess of what's needed,

12   as well as the population that's probably being underserved

13   in terms of their mental health needs.

14   Q    Doctor, that's your own statement, isn't it?  Given

15   these risk factors it's not surprising that children in

16   foster care are prescribed psychiatric medications at rates

17   in excess of the general population or even those in the

18   Medicaid system who are not in foster care.

19   A    I think that's what I just said.

20   Q    Well, you have your report in front of you, right?

21   A    I do.  But I've just stated it again, so.

22   Q    You're agreeing with me?

23   A    Absolutely.

24   Q    Okay.  You made reference to other states' studies with

25   respect to the use of psychotropic medications.

1          Do you remember that testimony?

2     A   Yes.

3     **Q**   And it's true that other state studies show roughly the

4     same psychotropic prescribing rate that the GAO report came

5     up with for Massachusetts; isn't that right?

6     A   Meaning are there any other states that had a similar

7     prescribing rate?

8     **Q**   Well, meaning there are other state studies that have

9     actually concluded that other states have the same

10    psychotropic prescribing rate that the GAO came up with from

11    Massachusetts?  For Massachusetts?  In other words -- strike

12    that.  Let me put it this way.

13          Other studies show that other states have the same

14    psychotropic prescribing rate as Massachusetts.  Yes?

15    A   There's a range of prescribing rates.  So, I mean, in

16    truth, counselor, the literature is not very well developed

17    in that regard.  There's no requirement currently for a

18    state to report what its current prescribing rate is.

19    **Q**   Doctor, that's not my, that's not my question.  My

20    question was, are there other state studies that you've

21    seen, even that you've participated in, that show that other

22    states have about the same prescribing rate of psychotropic

23    medications for children in foster care as Massachusetts?

24    A   There are other state studies.  One would be the Ruben

25    study.  That specifically was looking at antipsychotic

1    medications.  Unfortunately, Massachusetts was not part of

2    that.  Even though they did a national database there was

3    problems with the Massachusetts data so they were excluded.

4    **Q**    Your own study, the one that you participated in and

5    that you testified to earlier, the Tufts study, the

6    Multi-State Study on Psychotropic Medication Oversight in

7    Foster Care.

8    A    Yes.

9    **Q**    Do you recall that study?  Yes?

10   A    Yes.

11   **Q**    September of 2010.

12   A    Yes.

13          **MR. COLLINS:**  Can we pull that study up.

14   **Q**    I believe you were handed a copy -- you were not handed

15   a paper copy of that?

16   A    Of the Tufts study?

17   **Q**    Yes.

18   A    No.

19   **Q**    Okay.  Well, let me -- do you see it on your screen?

20   A    I do.

21   **Q**    Are you able to read it?

22   A    Any chance of enlarging it?

23   **Q**    Sure.  I also have a -- I'm going to be handing a paper

24   copy to the judge as well, so I can, I can provide you with

25   a copy.

```
 1   A   That would be better.  It breaks down a little bit.

 2           MR. COLLINS:  Your Honor, may I approach?

 3           THE COURT:  Of course.

 4   Q   Doctor, showing you what's been marked as Exhibit ID for

 5   identification purposes.  I ask you to take a look at that.

 6   A   Yes.

 7   Q   Do you recognize this document?

 8   A   I do.

 9   Q   What is it?

10   A   It's the Tufts Multi-State Study on Psychotropic

11   Medication Oversight in Foster Care, and it's the report of

12   that study.

13   Q   And if I look at the list of names in the left-hand

14   column, four down, I see Christopher Bellonci.

15   A   That would be me.

16   Q   That's you.  So you participated in this study, correct?

17   A   Correct.

18   Q   These were part of your findings?

19   A   Yes.

20           MR. COLLINS:  Your Honor, I would move to, move

21   into evidence Exhibit ID.

22           THE COURT:  Any objection?

23           MS. BARTOSZ:  No objections, your Honor.

24           THE COURT:  It's admitted then as Exhibit 1062.

25           THE CLERK:  63.
```

1              **THE COURT:**  63.  In evidence.  ID for

2     identification.

3              (Exhibit marked in evidence.)

4     **Q**   Doctor, would you look at the second paragraph down from

5     the bolded headline that says:  What is this study about?

6     A   Yes.

7     **Q**   It says here:  Over the past decade, psychotropic

8     medication use in youth has increased 2 to 3 fold and

9     polypharmacy has increased 2.5 to 8 fold.

10             Did I read that right?

11    A   Yes.

12    **Q**   And it says here:  Estimated rates of psychotropic

13    medication use for youth in foster care, however, are much

14    higher ranging from 13 to 52 percent than those for the

15    general youth population.  Yes?

16    A   Yes.

17    **Q**   And if you turn to page 4 at the top of the page where

18    it says Findings?

19             **THE COURT:**  Let me interrupt just to be clear that

20    I'm conceiving of this as apples and apples.

21             The 40 percent rate to which you testified out of

22    the GAO study, are they looking at roughly the same

23    demographic as the, I take it this is the backup for this

24    study to which you've already referred the range of 13 to

25    52 percent.

1          Poor question.  Does the 40 percent match the 13 to

2    52 percent?

3          **THE WITNESS:**  It's not the same methodology.  It

4    wasn't the same research study.  And actually this Tufts

5    study wasn't a utilization study.  So if you see there's a

6    bibliographical reference 3 to 8 supporting that 13 to

7    52 percent.  And if you go to the reference list on page 23,

8    those were the sources of that 13 to 52 percent.  So, the

9    Tufts study itself was not meant to answer the question of

10   utilization rate.  That was background information to inform

11   the other questions that we were asking in the study.

12   **Q**   Well, Doctor, if you would turn to page 3.

13   A   Yes.

14   **Q**   It says:  Methods.  How was this study conducted.  It

15   says:  Phone surveys were conducted with key informants in

16   state child welfare and affiliated agencies in March of 2009

17   and January 2010.  Respondents included -- do you see that

18   whole paragraph there?

19   A   Yes.

20   **Q**   That's information that's being provided by the state.

21   Yes?

22   A   Yes.

23   **Q**   That's the same type of research and basis for the GAO

24   report, it's information being provided by the states.  Yes?

25   A   Yeah, but you'll see that it doesn't ask, it doesn't say

1    we asked them what their utilization rates were.  We already

2    knew that most of the states couldn't even give us that

3    data.  And in order to do a utilization survey we would have

4    to have a very different methodology than what we did here.

5    We wouldn't have just surveyed states and said just tell us

6    what percent of children are on psychotropic medications and

7    taken that at face value.

8    Q    But yet it's one of your findings in the report, 13 to

9    52 percent?

10   A    It's a reference in the report referencing other studies

11   where those methodologies were applied.

12   Q    Do you have any reason to doubt that the 13 to

13   52 percent is inaccurate or unreliable, in your own study?

14   A    Well, we're referencing other people's studies.

15   Q    I understand that.

16   A    Right.

17   Q    But you've also now published your own study with those

18   numbers so clearly --

19   A    It's as good as --

20   Q    Well, let me ask.  You're not walking away from these

21   numbers, are you?

22   A    It's the data we've got.  I'm trying to highlight that

23   there's a problem in getting accurate data, just as you're

24   highlighting there's a problem with the GAO report getting

25   accurate data.  The methodologies are challenging in trying

1    to compare even how we're defining what child is foster

2    care.   It gets into complicated Medicaid coding issues which

3    if you want me to go into I can.

4    **Q**   No, I just want to know if it's your, if it's your

5    opinion here today that the 13 to 52 percent that you've

6    included in your study you would consider to be unreliable

7    or inaccurate?

8    A   I would not call it unreliable.  I think it's, it's the

9    state of the science that we have on utilization rates, I'll

10   accept that.

11   **Q**   Okay.  And just so we're clear, I started to make

12   reference on page 4, Findings, 47 of the 50 states and the

13   District of Columbia participated in this study.  Yes?

14   A   Yes.

15   **Q**   Are you aware of three prior Medicaid studies -- and by

16   prior I mean prior to the GAO report -- Medicaid studies of

17   foster care youth in other states where rates ranged from 26

18   to 40 percent?  Studies by a Dr. Julie Zito?

19   A   I'm aware of the study that Dr. Zito published in Texas.

20   Is that what you're referring to?

21   **Q**   I'm wondering if you're aware of three studies published

22   by Dr. Zito in which the conclusion was reached that other

23   states ranged from 26 to 40 percent of psychiatric

24   medication use on foster children?

25   A   I would need to see the reference.

1    **Q**    You don't know?  Okay.  As you sit here.

2    A    That specific study and that specific numbers, no, ring

3    any bell.  I know that the results from her Texas study

4    where there was also high utilization rate.

5    **Q**    And, in fact, her Texas study which you cite in your

6    report -- Yes?

7    A    Yes.

8    **Q**    -- that study found somewhere between 30 and 40 percent

9    of children, foster care children on psychotropic

10   medication.  Yes?

11   A    The Texas study?

12   **Q**    Yes.

13   A    No, the Texas study found somewhere in the low 30

14   percentile of children in Texas state custody were on

15   psychotropic medication, and of those that were on them

16   maybe another third were on three or more.  Texas is

17   definitely one of the high utilization states.

18   **Q**    If we could pull up Dr. Bellonci's deposition again.

19        And specifically I'm referring to page 110.  Bear

20   with us, Doctor.  We're still learning the technology.

21   A    That's fine.

22        **THE COURT:**  For centuries we tried cases without

23   this technology.

24        **MR. COLLINS:**  That was my thought.

25   A    Do you have a hard copy of my deposition?

1   **Q**   That's where I'm headed.

2   A   Okay.

3   **Q**   I have my copy.  We did bring it up earlier so I know

4   it's possible.

5          **THE COURT:**  Well, why don't you inquire from up

6   here.

7          **MR. COLLINS:**  Okay.  I'm happy to do that.  Let me

8   just --

9          **THE COURT:**  If we're going to have to wait for it.

10          **MR. COLLINS:**  Yes, your Honor.

11   A   There it is.

12          **THE COURT:**  All right.

13   **Q**   Here we go.

14          I'm looking at line 3.  Do you see that there?

15   A   Yes.

16   **Q**   Your answer says:  Julie Zito, the reference right

17   above, Psychotropic Medications for Youths.  She also did a

18   study of Texas and found somewhere around 30 to 40 percent

19   of children were on psychotropic medications.

20          Did I read that right?

21   A   Yeah, that's what I just conceded.

22   **Q**   Thank you, Doctor.

23   A   I think the accurate number was somewhere around

24   34 percent.

25   **Q**   You would agree with me that what the GAO did in their

1    study was an imperfect way of trying to compare and get a

2    snapshot on the five states they studied.  Yes?

3    A    I mean, they used the same methodology across the five

4    states.  So, in that way it was actually better than some of

5    these other studies where they used, looked at single state

6    reports.  And you can look at Julie Zito's study that found

7    what she found in Texas, but that wouldn't necessarily have

8    been the same methodology that Susan dosReis did in her

9    study or that Dave Rubin is doing in his study.

10           One of the things that I'm going to do this

11   afternoon is get on a call with the PMQIC and define our

12   data terms.

13   Q    Doctor, my question was more direct than that.

14   A    Okay.

15   Q    You would agree with me that what the GAO did was an

16   imperfect way of trying to compare and get a snapshot of the

17   five states they studied.  Yes?

18   A    I'm not sure I would agree with that, no.

19           **MR. COLLINS:**  Can we go to page 121 of Dr.

20   Bellonci's deposition.

21   A    If it would be helpful, I --

22   Q    We'll wait for the transcript.

23   A    Okay.

24   Q    And would you look at line 13.

25   A    Yes.

1    Q    And your answer to my question:  I see what you're

2    saying.  GAO came up with an imperfect way of trying to

3    compare and get a snapshot of the five states that they were

4    asked to study based on five senators that requested the

5    report.

6            Did I read that right?

7    A    Yes, you did.

8    Q    In fact, the report itself says, and if you would turn

9    to page 1 of the GAO report.

10   A    Yes.

11   Q    Well, I say page 1.  It's the next page after the cover

12   page, which actually does not have a number on it.

13   A    I know where you are.

14   Q    Do you see that?

15   A    Yes.

16   Q    It has a gray column to the left?

17   A    Yes.

18   Q    Okay.  I'm looking at the second line under the heading

19   that says:  What the GAO Found?

20   A    Yes.

21   Q    Do you see that there?

22   A    Yes.

23   Q    And the report says:  The higher rates do not

24   necessarily indicate inappropriate prescribing practices,

25   but according to research, experts consulted, and certain

1    federal and state officials, could be due in part to foster

2    children's greater mental health needs, greater exposure to

3    traumatic experience, experiences, and the challenges of

4    coordinating their medical care.

5            Did I read that right?

6    A    You did.

7    Q    So the GAO study actually went out of its way to say

8    that these rates don't necessarily indicate that there are

9    inappropriate prescribing practices going on in any of the

10   five states studied, including Massachusetts.  Yes?

11   A    Yes, and I thought I conceded that as well.

12   Q    In your own --

13           THE COURT:  Again trying to follow.  So you're --

14   you look at this data but concede that you can't tell

15   whether in any particular case a physician is acting

16   inappropriately or that the medications provided are

17   actually doing harm.  Your point is you can't tell those

18   things?

19           THE WITNESS:  And the state can't tell those

20   things.

21           THE COURT:  And from that, I mean, I was listening,

22   you, you, yourself, as a testifying witness here, you opine

23   that there's, because they can't tell that's a substantial

24   deviation from accepted practice which carries the potential

25   of harm.

1          Is that -- have I got it?

2          **THE WITNESS:**  Yes.

3          **THE COURT:**  That's what you say.  And even though

4     in any particular case you don't know whether there's been

5     actual harm to that child.

6          **THE WITNESS:**  Correct.

7          **THE COURT:**  Go ahead, Mr. Collins.

8          **MR. COLLINS:**  Thank you, your Honor.

9     **Q**   Doctor, I want to just cite one more statistic here and

10    then we'll move on --

11    A    Okay.

12    **Q**   -- with respect to, and when I say statistic, I'm

13    talking about statistic with respect to the use, percentage

14    of rates of the use of psychotropic medications.  And that

15    is the one from your own testimony before congress which you

16    talked about earlier.  Yes?

17    A    Yes.

18    **Q**   Before, I believe it was the Subcommittee of the Ways

19    and Means Committee, where you testified that studies

20    indicate that 60 to 85 percent of the children being served

21    by a child welfare system meet criteria for psychiatric

22    diagnosis.  Yes?

23    A    There's different statistics out there, but I won't --

24    50 to 75 percent, 50 to 85 percent, yes.  Particularly if

25    you include developmental disorders.

1    Q    That was your testimony?

2    A    Yes.

3    Q    You'd agree with me that the onset of disorder more

4    often than not predates entering into foster care for most

5    of these foster care children?

6    A    That's a very interesting question.  I don't know that

7    we actually have data to answer that question.

8    Q    Do you -- I'm not asking whether you have data.  I'm

9    asking whether you agree with me in your clinical experience

10   and your experience over a number of years at the Walker

11   School whether you'd agree that the onset of disorder more

12   often than not predates entry into foster care?

13   A    I mean, by the time I saw them at Walker they were

14   already in care.  Part of the challenge in answering that

15   question is I would need the historical information to know

16   whether or not they had been diagnosed prior to --

17         THE COURT:  But I think his question is I think a

18   little more simple.

19         THE WITNESS:  Okay.

20         THE COURT:  At least to my mind.

21         He's saying given all your clinical practice and

22   given all your study, even with that, you're unable to say,

23   and I guess he's asking whether you know, whether in most

24   cases the need for these medications, the problems which

25   give rise to the need for these medications predate their

1    acceptance into Massachusetts foster care programs.

2              Is that your question, Mr. Collins?

3         **MR. COLLINS:**  Yes, your Honor.

4         **THE COURT:**  Well, then I at least heard it right.

5    I understand that question.  And if you know, I'm interested

6    in your answer.  If you don't know, I'll know that.

7         **THE WITNESS:**  I think the risk factors predate the

8    entry into care.  I think the plaintiffs are making the case

9    that additional risk factors happen subsequent to the entry

10   into care.  The risk factors are primarily around trauma,

11   but also the genetic risk factors for mental illness,

12   obviously that would predate care.  Exposure to drugs and

13   alcohol, that would predate care.  The trauma that led to

14   DCF removing the child predated care.  Whether or not the

15   child had been diagnosed prior to entry into care and

16   treatment provided to that child, that we don't have good

17   data on.  So, that's the piece that I was stuck with.

18        **THE COURT:**  All right.

19        **THE WITNESS:**  But the precursors absolutely are

20   there.  And it's not, you know, I mean, the plaintiffs will

21   make whatever case they're going to make about what happens

22   once they're in care and whether they're being further

23   harmed in terms of abuse or neglect.  But the precursors

24   that I'm focused on are there before their entry into care.

25   **Q**   In any event, Doctor, I believe your testimony earlier

1    was this.  You would agree that psychiatric medications can

2    be and in fact are very helpful for children?

3    A    Oh, emphatically, yes.

4    Q    And in some cases they are life saving for children?

5    A    Yes.

6    Q    And while only some psychotropics, I believe your

7    testimony was while only some have been studied for

8    approval, prescribers, including yourself, rely on empirical

9    evidence of safety and efficacy to prescribe those

10    medications to children.  Fair statement?

11    A    Yes, and that's what the Jensen study was meant to

12    highlight.  The current state of that research.

13    Q    In fact, you, yourself, have prescribed medications that

14    have not been tested for safety and efficacy in children to

15    children?

16    A    Oh, absolutely.  I testified that, you know, roughly

17    45 percent of what we're using in children, if you include

18    pediatricians, are off label.

19    Q    And you don't want the outcome of your work here, your

20    testimony, in this case, to be that children are not given

21    access to appropriate mental health services including

22    psychiatric medication.  Yes?

23    A    Yes.

24    Q    In fact, when working with states on this issue you

25    don't try to help them manage to a lower number --

1    A    No.

2    Q    -- of medication use, correct?

3    A    Correct.

4    Q    All right.  I want to talk with you now, I know there

5    was considerable testimony earlier about the informed

6    consent process.

7    A    Okay.

8    Q    And I want to get into that with you now.

9         First of all, I just want to be clear, the Rogers

10   process that you referred to, and you referred to the

11   obligation of the state with respect to the Rogers process.

12   We're talking about the Commonwealth in general, not just

13   DCF in terms of that process of approving antipsychotic

14   medications for children in DCF care.  Yes?

15   A    Can you ask the question again?

16   Q    Sure.  The Rogers process --

17   A    Yes.

18   Q    -- you understand that to be a situation or process by

19   law, where by law a physician who is going to prescribe an

20   antipsychotic medication to a child in DCF care cannot do so

21   until a court, in parlance, signs off.  Yes?

22   A    Well, it's not -- I've never heard of a doctor being

23   tried for not having gotten consent for prescribing an

24   antipsychotic.  If that's what you mean.  I mean --

25   Q    No, that's --

1          **THE COURT:**  That's not his question.

2     **Q**   That's not it.

3          **THE COURT:**  This is not what sanctions there may

4     be.  This is just, is that how you understand the protocol.

5     And what I get from his question --

6          **THE WITNESS:**  Yes.

7          **THE COURT:**  -- he's trying to emphasize, well,

8     look, Massachusetts has, has and indeed by force of law, to

9     the extent that judicial declarations carry the force of

10    law, has a pretty thorough protocol for the prescribing of

11    these antipsychotic medications.  And he's asking you don't

12    you agree with that.  And if that wasn't his question, I'll

13    ask it.

14         You agree with that, don't you?

15         **THE WITNESS:**  I do.  There's some tradeoffs.

16         **THE COURT:**  Well --

17         **THE WITNESS:**  But yes.

18         **THE COURT:**  -- this is his chance to ask questions.

19         **MR. COLLINS:**  That was my question, your Honor,

20    much more artfully put.

21         **THE COURT:**  You don't have to say that.  They don't

22    object to the judge's questions, that's the thing.

23         **MR. COLLINS:**  All right.  And I just wanted to make

24    that point clear because --

25         **THE COURT:**  Well, excuse me.  It's -- now you've

1     taken us up until one o'clock and I'm going to stick to my

2     time.

3            So we're clear at the end of two days of trial, the

4     plaintiff has used up one day, one hour, 20 minutes; the

5     defense has used up two hours, ten minutes.

6            I want to be as transparent as I can on the

7     schedule.  We'll sit tomorrow.  We won't sit Monday or

8     Tuesday so I can do that short jury waived case.  We'll sit

9     Wednesday and Thursday, but if I did not make it clear, not

10    Friday.  We will sit the five days of the next week, the

11    week of the 4th of February.

12           Now, in view of what the plaintiffs have said to me

13    that's ten days.  So, at that time I will be interested to

14    see whether the plaintiffs are about ready to rest.

15           All right.  We'll recess until nine o'clock

16    tomorrow morning.  We'll recess.

17           **THE CLERK:**  All rise.

18           (Adjournment.)

19

20

21

22

23

24

25

1                    **C E R T I F I C A T E**

2

3

4          I, Donald E. Womack, Official Court Reporter for

5    the United States District Court for the District of

6    Massachusetts, do hereby certify that the foregoing pages

7    are a true and accurate transcription of my shorthand notes

8    taken in the aforementioned matter to the best of my skill

9    and ability.

10

11

12

13

14              /S/ DONALD E. WOMACK 5-7-2013
                _____
15                  DONALD E. WOMACK
                 Official Court Reporter
                     P.O. Box 51062
16          Boston, Massachusetts 02205-1062
                 womack@megatran.com

17

18

19

20

21

22

23

24

25