```
 1                UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
 2
                                      Civil Action
 3                                    No. 10-30073-WGY

 4   * * * * * * * * * * * * * * * * * * * * * *
                                                *
 5   CONNOR B., by his next friend, ROCHELLE    *
     VIGURS, et al., individually and on behalf *
 6   of all others similarly situated,          *
                                                *
 7           Plaintiffs,                         *
                                                *  BENCH TRIAL
 8   v.                                          *   (Volume 3)
                                                *
 9   DEVAL L. PATRICK, in his official capacity  *
     as Governor of the Commonwealth            *
10   of Massachusetts, et al.,                   *
                                                *
11           Defendants.                         *
                                                *
12   * * * * * * * * * * * * * * * * * * * * * *

13           BEFORE:  The Honorable William G. Young,
                          District Judge
14   APPEARANCES:

15           NUTTER, McCLENNEN & FISH, LLP (By Daniel J.
         Gleason, Esq. and Jonathan D. Persky, Esq.), World
16       Trade Center West, 155 Seaport Boulevard, Boston,
         Massachusetts 02210-2699
17               - and -
             CHILDREN'S RIGHTS (By Sara M. Bartosz,
18       Esq., Laurence D. Borten, Esq., Sarah Russo, Esq.
         Rachel Brodin, Nili, Esq. and Jessica E. Polansky,
19       Esq.), 330 Seventh Avenue, Fourth Floor, New York,
         New York 10001, on behalf of the Plaintiffs
20
             OFFICE OF THE MASSACHUSETTS ATTORNEY
21       GENERAL (By Liza Tran, Jason B. Barshak and
         Jeffrey T. Collins, Assistant Attorneys General),
22       One Ashburton Place, Boston, Massachusetts 02108,
         on behalf of the Defendants
23
                                    1 Courthouse Way
24                                  Boston, Massachusetts

25                                  January 25, 2013
```

1                           **I N D E X**

2
    **WITNESS:**            **DIRECT   CROSS    REDIRECT    RECROSS**
3

4   CHRISTOPHER BELLONCI, Resumed

5       By Mr. Collins            3

6   LENNETTE AZZI-LESSING

7       By Ms. Bartosz    102

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE CLERK:  All rise.  The United States District

 2    Court is now in session, you may be seated.

 3              THE COURT:  Good morning, counsel.  And if you

 4    would remind the witness.

 5              THE CLERK:  I would like to remind you, Doctor,

 6    that you're still under oath.

 7              THE WITNESS:  Yes.

 8              THE COURT:  Mr. Collins, you may continue.

 9              MR. COLLINS:  Thank you, your Honor.

10              CHRISTOPHER BELLONCI, Resumed

11              CROSS-EXAMINATION (Cont'd)

12    BY MR. COLLINS

13    Q    Good morning, Dr. Bellonci.

14    A    Good morning.

15    Q    As I said yesterday, we're going to get into the

16    informed consent process.  But before I do that, I just want

17    to touch upon one issue and it's this issue of psychotropic

18    medications.

19              Would you agree with me in essence that a

20    psychotropic is any medication that has an effect on

21    function and behavior?

22    A    Function would seem to be too broad.  I would say

23    emotional function and behavior.

24    Q    Okay.  And to be clear, psychotropics are things like

25    Depakote and Lithium, those are psychotropic medications?
```

1    A    Depakote is actually an anticonvulsant.  It's a

2    medication that's approved for seizure disorders.  We're

3    using it in child psychiatry and adult psychiatry for mood

4    disorders like bipolar disorder.  So it has multiple

5    functions.

6    Q    So you don't classify Depakote as a psychotropic.

7    A    It would be -- it is used as a psychotropic, but it's

8    also used as an anticonvulsant.

9    Q    I guess what I'm asking is when we talk in this room

10   about psychotropic medications, and you testified earlier

11   about the medications with Connor B., Andre S. and Adam S.?

12   A    Yes.

13   Q    At least one of them was prescribed Depakote.  Are we

14   talking about a psychotropic medication in that context?

15   A    It's being used for psychotropic indication, so yes.

16   Q    Benadryl is also classified as a psychotropic

17   medication?

18   A    Not typically.  It's an antihistamine.  It's used for

19   allergies; occasionally people use it for sedation.

20   Q    I know what they use for.

21        THE COURT:  Well, you're asking questions,

22   respectfully.

23        MR. COLLINS:  Yes.

24        THE COURT:  It's not testimony.

25        MR. COLLINS:  Understood.

1          **THE COURT:**  So ask him a question.

2     **Q**    The question is not what the medications are used for.

3     The question is whether when we talk about that term

4     psychotropic medications, whether we're including under the

5     umbrella of that term things like Depakote and Lithium.

6     Yes?

7     A    Lithium, unquestionably.  It has no other function than

8     a psychiatric function.  The problem in answering your

9     question for Benadryl and for Depakote is that they have

10    other functions besides a psychiatric function.  Benadryl

11    actually really would not be considered a psychotropic by

12    most people.

13    **Q**    So, it's your testimony that in your field Benadryl is

14    not considered in any context or defined as a psychotropic

15    medication?

16    A    I think that's actually true, yes.

17    **Q**    I want to move on to -- actually, do you, same answer,

18    for example, if the medication Ambian is listed for a foster

19    child, you would not consider that a psychotropic

20    medication?

21    A    No, Ambian is a psychotropic medication.  I mean, part

22    of what defines psychotropic is its purpose, you know.  It's

23    complicated because some of these medications we're taking

24    from other fields of medicine, like the anticonvulsants or

25    the alpha agonists, adrenergic agonists like Clonidine and

1    Tenex, which are blood pressure medicines, but we're using

2    for ADHD.

3    Q    And so when we see something like Clonidine listed in,

4    for example, Andre S's or Adam S's medical chart that in all

5    likelihood is being used to lower blood pressure?

6    A    No.  In all likelihood it probably is being used for

7    behavioral indication, but we need to know what the

8    indication is.

9    Q    Well, when you, when you reviewed Adam S's file --

10   A    Yes.

11   Q    -- did you note whether Clonidine was being used as a

12   blood pressure lowering medication or for something else?

13   A    No, it seemed to be being used for psychiatric purposes

14   and I considered it that.

15   Q    I want to talk to you about informed consent now.  We

16   talked yesterday about the Rogers process and how that's

17   used for the administration of antipsychotics.  I want to

18   talk to you today about non, non-antipsychotics and the

19   informed consent process.

20   A    Okay.

21   Q    And you'd agree with me that that is very much an

22   interactive process?

23   A    What do you mean by interactive?

24   Q    Well, interactive in the sense that there are a number

25   of players who have a role in the informed consent process?

1    A    Yes.

2    Q    Including but not limited to the prescriber?

3    A    Yes.

4    Q    The foster parent?

5    A    The foster parent has an interesting role because they

6    don't actually have consenting authority.

7    Q    Do they have a role?

8    A    They have a role in providing background information

9    since they're the care taker of the child about the

10   condition, but not in terms of giving consent.

11   Q    Sure.  But again we're talking about the informed

12   consent process, we're not just talking about the consent

13   process.  Yes?

14   A    Yeah, but the informed consent process is typically

15   being engaged with the consenting authority.  So, the foster

16   parent certainly has a role in the psychiatric assessment

17   that informs the recommendations that I would make to the

18   consenting authority.  The foster parents should be involved

19   in at least giving input about their opinions, but they

20   don't have a consenting role.

21   Q    But they have a role in the informed consent process?

22   A    As I was defining informed consent process, the informed

23   part is informing the consenting authority.  So, I mean, I

24   don't want to split hairs.  I think the more people involved

25   in those conversations the better.  But when it comes down

1    to consenting foster parents have no role.

2    Q    Understood.

3            My question is slightly different.  I'm not talking

4    only about the consent process.  I'm talking about the

5    informed consent process which contains an information piece

6    wherein the prescriber is gathering a whole host of

7    information such that the prescriber can provide information

8    to the consenting authority.  Yes?

9    A    I would consider that the psychiatric evaluation that

10   involves the foster parent giving the information and being

11   informed about some of the recommendations.  When I'm

12   talking about informed consent, I'm talking about my

13   responsibility to give the information to the consenting

14   authority for them to be able to make a decision.  So that's

15   why I'm cleaving that off there.

16           So I would say that no, when it comes to informed

17   consent the parties are the provider and the person who's

18   authorized to give the consent.  My role is to give that

19   consenting authority the information that they need to make

20   an informed choice.

21   Q    So your testimony is the foster parent has no role?

22   A    In informed consent?

23   Q    Yes.

24   A    Yes.

25   Q    And so am I right in saying as well then, with your

```
 1    definition of that process of informed consent, that the

 2    child's past prescribers and the child's pediatricians also

 3    have no role in your view?

 4    A   Correct.

 5    Q   But nonetheless the prescriber does have a role --

 6    A   Absolutely.

 7    Q   -- in fact, a responsibility in that process?

 8    A   Yes.

 9    Q   And, in fact, according to the American Medical

10    Association the discussion is for the prescriber both an

11    ethical obligation and a legal requirement spelled out in

12    the statutes and case law in all 50 states.  Yes?

13    A   I'm not aware of that, but I'll accept that.

14    Q   You don't know that?

15    A   No.

16    Q   Let's talk about the informed part for a minute.

17    A   Okay.

18    Q   You give information to the consenting authority.  Yes?

19    A   As a prescriber?

20    Q   Yes.

21    A   Yes.

22    Q   We're talking about the informed consent process.

23    A   Yes.

24    Q   Okay.  And for a non-foster parent, for a non-foster

25    child that could be either a parent, biological parent or
```

1    guardian?

2    A    Yes.

3    Q    And for a foster child we're talking about DCF, the

4    Department of Children and Families?

5    A    For the non-antipsychotic medications, yes.

6    Q    Yes.  I started out this testimony by saying we're

7    talking right now about the non-antipsychotic informed

8    consent process.

9    A    Just confirming that, yes.

10   Q    Okay.  And with respect to your informing DCF in that

11   process we're typically talking about a DCF worker.  Yes?

12   A    Typically, yes.

13   Q    And you mentioned a moment ago to give this information,

14   to be able to inform the consenting authority you do what's

15   called a biopsychosocial formulation?

16   A    I do a biopsychosocial formulation to formulate my

17   thinking about what is going on for the child --

18   Q    Is that a yes?

19   A    -- that leads to a treatment plan that leads to

20   recommendations and then the recommendations are what I'm

21   communicating.  Yes.

22   Q    Yes.

23        And to do this you gather information from various

24   sources.  Yes?

25   A    Yes.

1    Q    Those sources can include the child's pediatrician?

2    A    Yes.

3    Q    And fair to say that -- and again now we're in the, I'm

4    talking about the DCF foster child context.

5    A    Okay.

6    Q    You would go to the foster child's pediatrician to

7    gather information?

8    A    Yes.

9    Q    And often that child has a constant pediatrician, even

10   if they're removed from their home and have had more than

11   upon placement.  Yes?

12   A    I'm not sure I have data to say that that would occur

13   often.

14         **MR. COLLINS:**  Okay, can we pull up Dr. Bellonci's

15   deposition.  I'm sorry.  Page 136.

16   Q    Do you see that on the screen, Doctor?

17   A    Yes.

18   Q    Line 3.  If you'll read silently with me while I read

19   aloud.

20         The answer to your question is that more often than

21   not what I end up doing is taking children off these

22   medications often having to do it blindly.  So I will ask

23   whoever is closest to that child, knows the history of that

24   child.  I will reach out to the pediatrician.  Often this

25   child still may have a constant pediatrician in their life

```
1    even if they were removed from their family case and gone,

2    gone foster home to foster home.

3              Did I read that right?

4    A   Yes, you did.

5    Q   That was your testimony?

6    A   Uh-huh.

7    Q   In gathering this information from various sources you

8    also talked to past prescribers.  Yes?

9    A   Yes.

10   Q   Child psychiatrists?

11   A   Yes.

12   Q   Nurse practitioners?

13   A   Whoever was prescribing, yes.

14   Q   The DCF social worker we've talked about.

15   A   Yes.

16   Q   Guardian ad litem if there's one involved.

17   A   Yes.

18   Q   This is quite an undertaking for you.  Yes?

19   A   Yes.

20   Q   But it's your responsibility as a prescriber.  Yes?

21   A   Well, my responsibility is to get the information.  The

22   information could be more efficiently delivered up to the

23   prescriber if DCF was actually keeping current records of

24   what treatment this child has had in the past.  That would

25   actually save the prescribers quite a bit of time.
```

1    Q    It's actually what you refer to as a written standard of

2    care in the AACAP practice parameter.  Yes?

3    A    What?

4    Q    This responsibility of gathering information such

5    that --

6    A    Oh, absolutely.

7    Q    -- you can make an informed consent recommendation to

8    the consenting authority.

9    A    Yes.

10   Q    It's a standard of care in the AACAP practice parameter.

11   Yes?

12   A    Yes.

13   Q    And in particular it's listed in the practice parameter

14   known as the Use of Psychotropic Medication in Children and

15   Adolescents.  Yes?

16   A    I believe so.

17   Q    I just want to talk a little bit about practice

18   parameters, Doctor.  The AACAP practice parameters.

19          Those are what I believe you testified to earlier

20   are the clinical guidelines for practitioners.  Yes?

21   A    Yes.

22   Q    These are different than the AACAP best principles

23   guideline that you spoke about on your direct examination.

24   Yes?

25   A    Yes.

1    Q    The practice parameters are based on research.  Yes?

2    A    To the extent that there is research for the topic that

3    the parameter's addressing, yes.

4    Q    And there is by and large in each of those practice

5    parameters on each of the individual disorders that are

6    listed.

7    A    We would like to think so, yes.

8    Q    And those practice parameters also involve critical

9    reviews of the existing literature.  Yes?

10   A    Yes.

11          MR. COLLINS:  Can we pull up -- thank you.  You're

12   fast.

13   Q    Doctor, do you see on your screen the practice

14   parameters that we're speaking about?

15   A    I do.  It's quite small.

16   Q    Okay.  Can you --

17   A    That's better.

18          MR. COLLINS:  Counsel, do you have objection to the

19   practice parameters --

20          (whereupon counsel conferred.)

21          MR. COLLINS:  It was on our exhibit list.

22          MS. BARTOSZ:  No, I don't.

23          MR. COLLINS:  Okay.  What is the next number

24   marked?  Your Honor, may I approach?

25          THE COURT:  You may.

1          **MR. COLLINS:**  Your Honor, this is joint exhibit or

2     uncontested exhibit No. 1064.

3     **Q**   Can you read that now, Doctor?

4     A    Yeah, I think so.

5     **Q**   Okay.  So, anyway you've seen this program practice

6     parameter before.  Yes?

7     A    Yes.

8     **Q**   You've used it in your practice?

9     A    Yes.

10    **Q**   And this contains what we know to be 13 best principles.

11    Yes?

12    A    They're usually called recommendation or principles,

13    yes.

14    **Q**   And if we can turn to page 965 at the bottom.

15    A    May I have a copy?

16    **Q**   The bottom right hand corner.

17    A    May I have a copy?

18    **Q**   It's coming up on your screen.

19    A    I would like to be able to see the larger context of the

20    document.

21         **THE COURT:**  He would like to look at it.  That

22    makes sense to me.  Don't we have another copy.

23         **MR. COLLINS:**  Sure.

24         **THE COURT:**  Is this the copy -- you're asking about

25    this regulation?

1           MR. COLLINS:  This is -- no, this is, this is an

2    AACAP practice parameter, your Honor.

3           THE COURT:  All right.

4           MR. COLLINS:  1064.

5           THE COURT:  Well, the 1064 that I've been happened

6    is 110 CMR 1100.

7           MR. COLLINS:  Then I have handed you the wrong

8    document.

9           THE COURT:  Well.  But you know, elegant as these

10   electronic things are, his plant is mine as well.  I wear

11   glasses.  And they're not a fashion statement.  So, having a

12   hard copy that I can look at closely is helpful.

13          MR. COLLINS:  May I approach, your Honor.

14          THE COURT:  Of course.

15          MR. COLLINS:  I'll take that back, my apologies.

16          THE COURT:  But what about one for him?

17          MR. COLLINS:  That's what I'm working on, your

18   Honor.

19          THE COURT:  Well, here it is.  There.  I've just

20   given him mine.

21          MR. COLLINS:  Okay.

22          THE COURT:  Now, let's go from there.

23          MR. COLLINS:  All right, your Honor.

24          THE WITNESS:  Thank you.

25   Q    Doctor, would you turn to page 965 in the bottom right

1    hand corner.

2    A    Yes.

3    Q    So, we're talking here about these being what you have

4    referred to, this undertaking of gathering information from

5    the various sources, as a written standard of care in this

6    AACAP practice parameter.  Yes?

7    A    Yeah, I'm not sure if it was in this one or the

8    psychiatric assessment of children and adolescents.  But it

9    does appear in one of the practice parameters.

10   Q    And if you look -- do you principle 3 there?

11   A    Yes.

12   Q    It says:  The prescriber is advised to communicate with

13   other professionals involved with the child to obtain

14   collateral history and set the stage for monitoring and

15   side-effects during medication trial.  Yes?

16   A    Yes.

17   Q    And if we turn to the next page, 966, do you see

18   principle number 5 in the left hand column?

19   A    Yes.

20   Q    It says:  The prescriber develops a plan to monitor the

21   patient short and long term.

22          That's a standard for prescribers as well.  Yes?

23   A    Yes.

24   Q    And then if we turn to the next page, principle 6, it

25   says:  Prescribers should be cautious when implementing a

1     treatment plan that cannot be appropriately monitored.

2              That is also a standard for prescribers?

3     A    Yes.

4     Q    And it's fair to say that you do this for all children.

5     Yes?

6     A    Yes.

7     Q    Gathering this information, whether they be in DCF

8     foster care or non-foster care children?

9     A    Correct.

10    Q    And for DCF foster care children, we talked a little

11    yesterday about you as the prescriber can simply get a

12    release, a release of information signed by DCF, and you can

13    forward that to other institutions and prescribers to be

14    able to get the medical record you need.  Yes?

15    A    Yes.

16    Q    And after you gather all of this information, Doctor, on

17    the child, and you're satisfied that you've gotten all the

18    necessary information and that you're adequately informed,

19    in the situation of a foster child you inform the legal

20    guardian, the DCF social worker.  Yes?

21    A    Inform them of what?

22    Q    We're talking about the informed consent process.

23    A    Right.

24    Q    Your role is to inform in the informed consent process.

25    Yes?

1    A    Yes, I'm just trying to understand your question.

2    Q    The question was, do you then, after gathering all of

3    that information, go to the legal guardian and begin the

4    process of informed consent?

5    A    Yes.

6    Q    You provide them with information?

7    A    Yes.

8    Q    And then you make a recommendation for treatment?

9    A    Yes.

10   Q    And at that point you seek or obtain the necessary

11   consent that is needed to be able to prescribe a medication

12   if in fact that is the course of treatment?

13   A    Yes.

14   Q    Fair to say that you won't recommend a medication until

15   you're satisfied that you've gotten all of this information,

16   all the information you need to be able to make a sound

17   recommendation?

18   A    Well, as I mentioned in the deposition, I'm often in the

19   situation, particularly at Walker, where I'm receiving

20   children already, who have already been started on

21   medications.  So, I'm in a bind there because somebody else

22   has made the decision to initiate the medication trial.  I'm

23   inheriting those medications and the care of that child.

24   It's not uncommon that after I gatherer that information I

25   either have remaining questions about why that medication

1    was started, whether there was side-effects or whether

2    anybody can tell me that the child benefited from that

3    medication.  So then I'm really in a bind.  Because the

4    child's already on the medication, my responsibility is to

5    do no harm, and I don't have the information to know whether

6    or not to continue the medication that the child is coming

7    in on.

8    Q    Is there a situation that you have been in where you

9    have recommended a medication where you didn't have enough

10   information to be able to feel comfortable that that's the

11   right recommendation?

12   A    No.

13   Q    So, is it fair to say then that you won't recommend a

14   medication until you've gotten all of the information, until

15   you're satisfied that you've gotten the information that you

16   needed to be able to make that recommendation to the

17   consenting authority?

18   A    Yes.

19   Q    It's also fair to say that you won't prescribe the

20   medication until you've gotten consent from the consenting

21   authority.  Yes?

22   A    Yes.

23   Q    Until you've had that informed conversation with the DCF

24   social worker?

25   A    Yes.  There are allowances for emergencies.  But yes.

1    Q    And you in your practice have gotten consent in this

2    informed consent process from a social worker a number of

3    times.  Yes?

4    A    Many.

5    Q    You have to before you prescribe the medication?

6    A    Yes.

7    Q    And after this whole process of informed consent when

8    you've gathered information, you've made your recommendation

9    and you've gotten your consent, you make a record of it.

10   Yes?

11   A    Correct.

12   Q    You document it?

13   A    Yes.

14   Q    That's another one of your responsibilities as a

15   prescriber.  Yes?

16   A    Yes.

17   Q    In fact, it's a standard of care again within the AACAP

18   practice parameter?

19   A    I don't know if it's been made that explicit.  But yes.

20   Q    Would you turn to page 968 of the AACAP practice

21   parameter that we've just been looking at.

22   A    I'm sorry, Judge, I handed that to you.  Where is it on

23   the page?

24   Q    Page -- are you on page 968?

25   A    Yes.

1    **Q**    Do you see principle number 8?

2    A    Yes.

3    **Q**    It says:  Complete and document the assent of the child

4    and consent of the parent before initiating medication

5    treatment and at important points during the treatment.

6    Yes?

7    A    Yes.

8    **Q**    And you do that?

9    A    Yes.

10    **Q**    It's also your responsibility under the AACAP practice

11    parameter as a prescriber to develop a plan to monitor the

12    patient.  Yes?

13    A    Yes.

14    **Q**    And the practice parameter also says that the prescriber

15    should be cautious when implementing a treatment plan that

16    cannot be appropriately monitored.  Yes?

17    A    Yes.

18    **Q**    You're mindful of that when you're, when you're

19    prescribing medication?

20    A    Absolutely.

21    **Q**    And you do this as well --

22    A    Yes.

23    **Q**    -- as part of your practice?

24            Now, I know we talked a little bit earlier about

25    the role of the foster parent in this process and your

1    testimony is that the foster parent has no role.

2    A    In the informed consent process.

3    Q    Correct.

4    A    They certainly have a role in the monitoring.

5    Q    Were you aware that DCF can delegate all or part of the

6    process of health, of health care procurement pursuant to

7    their own regulations?

8    A    I wasn't aware that foster parents can give consent to

9    medications, no.

10    Q    That's not my question.  My question was, are you aware

11    that DCF can delegate all or part of the process of health

12    care procurement.

13    A    Does that include consent?

14         **THE COURT:**  I guess I don't understand the question

15    either.  The DCF can delegate all or part of the --

16         **MR. COLLINS:**  Health care.

17         **THE COURT:**  -- health care process of --

18         **MR. COLLINS:**  Let me --

19         **THE COURT:**  What does it mean.

20         **MR. COLLINS:**  Why don't, why don't I -- well, I

21    guess what I'm asking the doctor is whether or not he's

22    aware of that.  We've been talking here about the

23    regulations and you've referred to regulations at DCF and

24    how, at least certain of them, you felt that DCF was

25    violating.  And I'm wondering if you're aware of the

```
 1    regulation that talks about DCF being able to delegate the

 2    health care procurement process.

 3              THE COURT:  Well, I'm not, so maybe we ought to

 4    start there.

 5              MR. COLLINS:  Sure.

 6    Q    Are you aware of that regulation, Doctor?

 7              THE COURT:  Well, is there such a regulation?  I'm

 8    asking you as an officer of the Court so I can follow.

 9              MR. COLLINS:  Yes, there is, your Honor.

10              THE COURT:  Where is it.

11              MR. COLLINS:  I can pull it up.

12              THE COURT:  Why don't you.  What's the citation

13    here?

14              MR. COLLINS:  It is 110 CMR 7.126, your Honor.  And

15    I am grabbing a paper copy now.

16              Yes.  This is agreed upon Exhibit No. 69.  May I

17    approach, your Honor?

18              THE COURT:  Of course.  And the number, you told it

19    to me, it is what?

20              THE CLERK:  69.

21              MR. COLLINS:  7.126.

22              THE COURT:  But the exhibit number, I'm sorry.

23              MR. COLLINS:  Oh, I'm sorry, Exhibit No. 69.

24              THE COURT:  Sixty-nine.  Thank you.  This is

25    helpful.  So 7.126.
```

1          **MR. COLLINS:**  Yes, your Honor.

2     Q    Do you have that, Doctor?

3     A    I believe so, yes.

4     Q    Do you see that up on the screen?

5     A    Yeah.

6     Q    And I'm looking at the last sentence of the paragraph.

7     Do you see that there?  It says:  The social worker may

8     delegate all or part of the process of health care

9     procurement to the --

10    A    It just disappeared.

11    Q    You just went blank, correct?

12    A    Yes.

13    Q    Okay.

14    A    I've got a hard copy.  Go ahead.

15    Q    Okay.  Do you see the last line there?

16    A    Yes.

17    Q    I'll let you read that, and you let me know when you're

18    finished.

19    A    I'm ready.

20    Q    Okay.  Were you aware of this regulation?

21    A    No, I still don't know what it means.  I've never, ever

22    been told by a social worker that a foster parent had the

23    authority to give consent to medications.

24    Q    In any event, the foster parent does hold considerable

25    information about their foster child's medical history,

1    medical treatment, that's fair to say.  Yes?

2    A    I think it's case by case depending on how long the

3    child's been in the foster home.

4    Q    Well, you've seen that, though?  You've seen the foster

5    parent who has a medical history of a child, you've talked

6    with the foster parent who has information about the medical

7    history of the child.  Yes?  In your practice?

8    A    There -- certainly.  Yes.  I mean, typically when the

9    child's been there for months or years, absolutely.

10   Q    And when it's necessary in this information gathering

11   process that you undertake you gather this information from

12   the foster parent.  Yes?

13   A    It's one of the sources.

14   Q    The same way that you would from a child's biological

15   parent, a non-foster care child, non-biological parent.

16   A    Well, typically the biological parent has a longer

17   experience of their child than the foster parent.  So, some

18   foster parents have foster children living with them for

19   most of the child's life, and then the foster parent should

20   be a great resource for that information.  Often the foster

21   parents don't have any more information than I do and have

22   often expressed similar frustration in not having more

23   information.

24   Q    That's not my question.  My question is in those

25   situations --

1    A    My answer is it's variable.

2    Q    In those situations as you've testified where you do

3    gather information from foster parents who do have that,

4    your role, you gather that much in the similar way that you

5    would gather from a biological parent?

6    A    Yes, my approach is the same.

7    Q    Okay.  Biological parents don't always have all of the

8    information either, correct?

9    A    Yes.

10    Q    Fair to say that it's rare, if ever, that a parent comes

11    in with a child's entire medical file?

12    A    I wouldn't say that, certainly not, not ever.  And I'm

13    not even sure that it would be rare.  I mean, it would

14    depend on how involved the child's treatment had been.  But

15    most parents can tell me both what the child is currently

16    taking certainly, can tell me why they're on the medication,

17    can tell me what they've observed in terms of side-effects

18    or benefits, and can tell me typically what other meds the

19    child has been on and what their responses to those meds

20    have been.  I mean, I have some parents that come in and

21    it's all typed up with dates.  And I have other parents that

22    have to, you know, go back to their records and see what

23    they've got.  Sometimes I have to ask them to pull the

24    record from the pharmacy that they've worked with.

25    Q    And sometimes you have to go outside of that process and

1    do some information gathering of your own?

2    A   Well, even if the parent is giving me that information,

3    I would go through same process that you've outlined.

4    Q   Again, whether it's a foster child or a non-foster

5    child?

6    A   Yes, the approach is the same; the ability to get the

7    information is different.

8    Q   And you mentioned this monitoring process when we talked

9    earlier about the AACAP guideline, I'm sorry, the AACAP

10   practice parameter that talks about prescriber's

11   responsibility to monitor along the way.

12          You see yourself as having a role in that

13   monitoring process.  Yes?

14   A   The child is not living with me.  So I need the people

15   who are caring for that child to deliver that information,

16   whether it's the foster parent or residential provider, the

17   inpatient unit in the case of DCF children, ideally the case

18   worker, or the biological parent.

19   Q   You see yourself as having a role in that process of

20   monitoring the child that's on this medication?

21   A   Absolutely.

22   Q   And part of that is making an assessment on the

23   potential benefits of the medication and seeing whether they

24   outweigh the potential side-effects?

25   A   Yes.

1   Q    That's an interactive process that you participate in as

2   a prescriber?

3   A    Yes.

4   Q    And, in fact, it's yet another principle in the AACAP

5   practice parameter that the prescriber reassesses the

6   patient if the child does not respond to the initial

7   medication trial as expected, correct?  Principle number 11?

8   A    Yes.

9   Q    I want to move on now to the monitoring and oversight

10  process of psychotropic medications, and you have testified

11  about that.  And you've talked about a standard of care.

12  Yes?

13  A    Yes.

14  Q    And whether or not the state is meeting the standard of

15  care for monitoring and oversight.  Yes?

16  A    Yes.

17  Q    And when you use that term standard of care, what you

18  mean is what you call the reasonable parent standard.  Yes?

19  A    No, I think it's much broader than that.  It refers to

20  all the issues that we talked about yesterday -- it was

21  yesterday, right -- that informed my standard of care.  So,

22  that includes the AACAP guidelines around psychotropic

23  medication for children in the child welfare system, it

24  includes my knowledge of other state approaches to this, it

25  includes the literature that I've documented in the

1    appendices of my report.  So it's much broader than just

2    that, yes.

3         MR. COLLINS:  Can you pull up the deposition,

4    page 92.

5    Q   Doctor, I'm looking at line 16.  Do you see that on your

6    screen?

7    A   Yes.

8    Q   You say:  When I talk about the minimum standard of

9    care, I'm really talking about and opining on what that

10   reasonable parent standard or how that reasonable parent

11   standard would be applied to a child welfare agency and

12   their role as loco parentis.

13        You said that, yes?

14   A   Yes.

15   Q   Reasonable parent standard as you use it, that's a term

16   that you coined.  Yes?

17   A   I'm not sure that I've seen it in the literature, so

18   I'll say yes.

19   Q   In fact, you haven't seen it written anywhere?

20   A   I wouldn't go that far.  But I can't point to where I

21   might have seen it.

22        MR. COLLINS:  Can we go to page 93 of the

23   deposition.

24   Q   First line:  I have not seen it written.

25        Do you see that there?

1    A    Yeah, I think I just said that.  Okay.

2    Q    Not in any medical journal that you're aware of?

3    A    Again, I don't know where it appears in my memory so I

4    can't reference it.  I don't think it's a foreign concept.

5    Q    It's not in any textbook?

6    A    I can't say that.

7    Q    Not in any type of law or federal regulation.

8    A    Not that I'm aware of.

9    Q    It's not in any state law or regulation, either?

10    A    Not that I'm aware of.

11    Q    Doctor, that's because there is no universally accepted

12    minimal standard for monitoring and oversight of

13    psychotropic medication in the field; isn't that right?

14    A    Well, let's go to the best principles guideline.  Best

15    principle guideline from AACAP clearly talks about the need

16    and actually the protective role, the duty of states to

17    provide informed consent, coordinate treatment planning and

18    clinical care, and provide longitudinal oversight of their

19    treatment.  And then we could talk about some of their

20    specific guidelines that undergird that broader statement.

21    Q    My question was a little more specific and I want

22    to point out to you a particular word.  There's no

23    universally accepted minimal standard, minimal standard for

24    monitoring and oversight of psychotropic medications in the

25    field.  Yes?

1    A    I'm just trying to see what specifically the AACAP

2    guidelines call for around oversight.

3    Q    Well, certainly you're aware that the AACAP guidelines

4    that you're referring to talk about minimal, recommended and

5    ideal standards.  Yes?

6    A    They rate them, yes.

7    Q    So wouldn't that by definition be not minimal standards?

8    A    Well, it depends.

9    Q    It's talking about ideals.

10    A    Well, it depends on which, which one you're referring

11    to.  Where are you in the document?

12    Q    Doctor, I'm just talking generally right now, as to

13    whether or not there is a universally accepted minimal

14    standard overall for the monitoring and oversight of

15    psychotropic medications.  And you have referenced us in

16    saying that you believe that there are to the AACAP best

17    principles guidelines.  And I'm saying there are guidelines

18    in there that are ideals.  Yes?

19    A    They're rated ideal.  I see what you're saying.  Yes.

20    So, it says establish a program administered by child and

21    adolescent psychiatrists to oversee the utilization of

22    medications for youth in state custody, and the rating on

23    that recommendation is ideal.

24         So, I just want to make the point that it wasn't

25    like I just made this up out of thin air.  It does exist.

1    The rating that AACAP assigned to it was an Ideal standard

2    as opposed to a minimal standard.  I see what you're saying.

3    **Q**   And, you know, that's because as you've testified this

4    is really an evolving area in your field; isn't that right?

5    This whole --

6    **A**   Well, I don't know --

7    **Q**   -- notion of standards for the oversight and monitoring

8    of psychotropic medication, it's evolving?

9    **A**   Well, the whole field of child psychiatry is evolving,

10   so the oversight would also be evolving as that changes,

11   yes.

12   **Q**   That was your testimony?

13   **A**   Yes.

14   **Q**   And, in fact, the U.S. Department of Health and Human

15   Services has provided only limited guidance to the states;

16   isn't that right?

17   **A**   Well, I don't know that they've provided limited

18   guidance.  I mean, I was one of the people that did the

19   webinars in support of their Child and Family Services

20   Improvement Innovation Act.  I was very clear about what I

21   would recommend.  They haven't required it if that's what

22   you mean.  But they have provided guidance and have put a

23   number of us before states with our recommendations for what

24   we think would be in the best interest of children.

25        **MR. COLLINS:**  Can we pull up --

1    Q    Do you have up there Exhibit No. 16, the GAO report?

2    A    Yes.

3    Q    D you still have that there?

4         **MR. COLLINS:**  Can we pull that up.

5    Q    Obviously, the GAO report is a document that you rely on

6    in giving your opinion.  Yes?

7    A    Yes.

8    Q    Would you turn to page 18 of the GAO report.

9    A    Yeah.

10    Q    And do you see the second paragraph down from the table

11    at the top?

12    A    Yes.

13    Q    It says:  HHS has provided limited guidance to the

14    states on how to improve their control measures to monitor

15    psychotropic drug prescriptions for foster children.

16          Yes?

17    A    Well, this was written before all the work that HHS did

18    as a result of this GAO report.  This GAO report's title is:

19    HHS Guidance Could Help States Improve Oversight in

20    Psychotropic Medications.  As a result of this, HHS then

21    moved on this and provided some of that guidance, including

22    myself representing ACF and giving a webinar to states in

23    how to implement --

24    Q    This report --

25    A    -- their guidelines.

1    Q    This report was published in December of 2011.  Yes?

2    A    Yes.

3    Q    So this goes to the point that this is an evolving

4    field.  Yes?  Evolving area in your field?

5    A    Well, this report was published in 2011.  Fostering

6    Connection started talking about psychotropic meds in 2008

7    and AACAP started talking about it in 2005.

8    Q    Doctor, you have relied on this report in opining on

9    whether or not you feel that DCF has adequate oversight and

10    monitoring of psychotropic medications.  Yes?

11    A    It's one of the sources that I have relied upon.

12    Q    And if you look at the next line there it says:  Without

13    formally endorsing specific oversight measures for states to

14    implement, HHS conducts state reviews and provides other

15    online resources including the AACAP a guidelines to help

16    states improve their programs.  Yes?

17    A    Yes, that's what the report says.

18    Q    And if you turn over to page 19, two sentences up from

19    the first paragraph you see the paragraph, a sentence that

20    starts, after footnote 38, while HHS makes a variety?

21    A    Yes.

22    Q    It says:  While HHS makes a variety of resources

23    available to states developing oversight programs for

24    psychotropic drugs, it has not endorsed any specific

25    guidance.

1          Did I read that right?

2  A    At the time that this was published, yes.  That's true.

3  Q    In the absence of HHS endorsed guidance the states have

4  developed varied oversight programs that in some cases fall

5  short of AACAP's recommended guidelines.  Yes?

6  A    Yes, and Massachusetts was one of those.

7  Q    I want to talk to you now about, a little more in

8  specifics about the AACAP best principles guideline.  And

9  that is Exhibit 17.  Do you have that up there.

10  A    I do.

11  Q    Okay.  These are exactly that, Doctor, right?  They're

12  guidelines?

13  A    Yes.

14  Q    They're not based on extensive research the way that the

15  AACAP practice parameters are, correct?

16  A    Well, it's a different process.  I'm not sure that I

17  would say there's no research to support what this

18  guidelines say.

19  Q    And, in fact, the process for this was a small group of

20  people got together at AACAP, formed a committee and put

21  together these best principles guideline?

22  A    And it was voted on an approved by the council that is

23  the governing body of the American Academy of Childhood

24  Adolescent Psychiatry, it wasn't just a little cabal of

25  child psychiatrists who got this through.

1    **Q**   And the GAO report that we just looked at, these

2    principles that are in here, these are what the GAO report

3    tracked for states for the five states that were studied.

4    Yes?

5    **A**   Yes, they essentially endorsed that these are reasonable

6    principles to hold states to.

7    **Q**   And you would agree with me that these are again

8    guidelines, they're not requirements?

9    **A**   You're asking my personal opinion?

10    **Q**   Yes.

11    **A**   I actually think that they're quite reasonable even in

12    terms of the ideal standards.

13    **Q**   I'm not asking you if you think they're reasonable.  I'm

14    asking --

15    **A**   I thought you just asked me my opinion.

16    **Q**   I asked you your opinion as to whether or not they are

17    requirements.

18    **A**   I don't think that was your question.  But if you're

19    asking me if I believe that they're requirements of states.

20    I mean, I think AACAP is trying to encourage best practices.

21    I think AACAP has given room for states to move from minimal

22    standards to ideal standards.  Clearly if it's minimal then

23    that would be a requirement from AACAP's perspective.  I

24    believe if it's recommended then it's obviously something

25    that AACAP would recommend a state adopt.

1    **Q**    Doctor, I'm not asking about AACAP's state of mind.  I'm

2    asking, you're here opining in this case, and I'm asking you

3    what your opinion is about this document and whether you

4    hold the opinion that these are requirements for states?

5            **THE COURT:**  Well, you know, when you ask him that

6    that goes beyond his expertise.  Isn't, isn't that my turn,

7    whether it's got the force of law or whether it is like an

8    industry standard which could be used in a negligence

9    evaluation.  We are groping for standards here.  But I think

10   I can sort out what has the force of law and what does not.

11   And what AACAP happens to say doesn't have the force of law.

12           Interestingly, the regulations that are promulgated

13   by this agency, at least as to its officers, one would

14   imagine do have the force of law.  So, I can figure out what

15   is the legal requirement and you needn't ask him.  He says

16   that these recommendations are reasonable, that's his

17   opinion.  So, let's ask him questions that are appropriate

18   to his expertise.

19   **Q**    Doctor, in fact, it's your testimony that the GAO report

20   was meant to highlight the gaps between best practice and

21   current practice in the five states it studied.  Yes?

22   **A**    You're reading from my report, I take it?

23   **Q**    That's a statement that you made in your report?

24   **A**    Okay.  I'll stand by that.

25   **Q**    Okay.  And what you're talking about in terms of best

1    practice in that sentence are the AACAP guidelines.  Yes?

2    A   Where are you?

3    Q   Page 4 of your report.  In the first full paragraph

4    after the bulleted point at the top.

5    A   Yes.

6    Q   What you're referring to there for best practice is the

7    AACAP guidelines, right?

8    A   Yes.

9    Q   And then you go on to say:  Not every state can or

10   should be expected to meet best practice standards.

11           That's your testimony, right?

12   A   Yes.  It goes on to say my review for this report was

13   not based on best practice standards but practices that are

14   either already part of DCF guidelines or necessary to meet

15   minimal standards for foster care.

16   Q   Doctor, do you have -- you have the AACAP guideline in

17   front of you.  Yes?

18   A   Yes.

19   Q   Can you turn to page 2.

20   A   I'm there.

21   Q   Right under the heading of Best Principles Guideline

22   Number 1, it says:  State child welfare agencies, the

23   juvenile court, or other state or county agencies empowered

24   by law to consent for treatment with psychotropic

25   medications, in consultation with child and adolescent

1    psychiatrists, should establish policies and procedures.

2    Right?

3    A    Yes.

4    Q    That's a suggestion?

5    A    Well, and then there's minimal standards that go beyond

6    it which would be more than a suggestion.

7    Q    It says should establish policies and then it lists

8    minimal, recommended and ideal, it should establish those

9    three.

10            THE COURT:  What are we reading from now.

11            MR. COLLINS:  Page 2 of the AACAP --

12            THE COURT:  Fine.

13            MR. COLLINS:  -- principles guideline, your Honor.

14            THE COURT:  Yes.

15            MR. COLLINS:  Exhibit No. 17.

16            THE COURT:  Thank you.

17    Q    Again, the language there from AACAP is that they should

18    establish what they call something that's minimal, something

19    that's recommended, and something that's ideal.  The way

20    it's written?

21    A    Yes.

22    Q    And in this document, anyway, in this document, anyway,

23    I believe they total up nine best principles, but in your

24    review of the GAO report they break that down and it adds up

25    being about 19 of best principles.  Yes?  Do have I that

1    right.

2    A    I'll accept that.

3    Q    And according to the GAO report that you relied on

4    Massachusetts has either fully or partially implemented 13

5    of the 19 best principles.  Yes?

6    A    Well, the GAO report determined that.  But as I

7    mentioned in my deposition, I have concerns with some of the

8    responses by the state in terms of whether or not they're

9    actually doing what they reported to the GAO they're doing.

10              **THE COURT:**  But, I can read the report, but you

11    agree that the report said they've implemented 13 out of 19?

12              **THE WITNESS:**  Yes.

13    Q    A report that you cite in your expert report and you

14    base your opinions on?

15    A    One of the sources.  I also base my opinion on the 20

16    years of experience, the depositions from people within DCF,

17    and other sources that I've discussed.

18    Q    And of the six -- so 13 of 19 you agree with me?

19    A    Yes.

20    Q    And of the six that were, that the GAO found were not

21    implemented, only one was what AACAP calls a minimal

22    standard.  Yes?

23    A    Yes.

24    Q    And that was the standard of establishing a mechanism to

25    obtain assent for psychotropic medication management for

1    minors when possible.

2    A    Yes.

3    Q    And as we talked earlier this is actually a

4    responsibility according to the AACAP practice parameter of

5    the prescriber to establish a mechanism for assent, for

6    obtaining assent?

7    A    Well, the prescriber certainly has a role.  I don't

8    think it's the exclusive role.

9    Q    When we looked at that AACAP principle number 8, it says

10   to complete and document the assent of the child and consent

11   of the parents for initiating medication treatment.  Right?

12   A    Yes.

13   Q    And of the six best principles that the GAO report found

14   that Massachusetts had not implemented, five of them were

15   ideal standards.  Yes?

16   A    Yes.

17   Q    I want to talk to you a little bit now about the medical

18   passport for DCF.

19   A    Okay.

20   Q    I know your testimony was that you don't see them much,

21   but you've seen them in your practice.  Yes?

22   A    I have.

23   Q    And, in fact, you found medical passports for each of

24   the three children whose DCF case files you reviewed.  Yes?

25   A    I believe so.

1    **Q**   And you need to refer back to your report?

2    A   Yeah, I'm looking now.

3    **Q**   Okay.  If you go to pages 8 to 9.

4    A   Thank you.

5        So, Adam S, Connor B.  Is there a reference to

6    Andre S?

7    **Q**   If you go to page 9.

8    A   I think it was just Adam S and Connor B.  Oh, there's

9    Andre S.  Okay.

10   **Q**   So you found medical passports for each, in each of the

11   three files related to the three kids that you reviewed.

12   Yes?

13   A   I mean, if you count a blank passport as finding a

14   passport, then yes.  I mean --

15   **Q**   Well, even if you don't count the blank you still

16   found -- you're talking about Adam S.  Yes?

17   A   Yes.

18   **Q**   And even if you don't find or count the blank as you say

19   was 11/4/04, you say here it was updated on 4/7/08 although

20   the second page is missing.  And then you say the only

21   additional medical passport in the record is from 6-22 and

22   4/4/12.  So, even if you don't count the empty you still

23   found three others?

24   A   Yes, it was interesting because --

25   **Q**   Is that a yes?

```
1    A    I'm answering the question.

2    Q    You've answered the question.   Thank you.

3    A    It appeared that several of the --

4    Q    Doctor --

5    A    -- plaintiff files had medical passports that --

6    Q    -- you would not --

7             THE COURT:  Wait.  Wait.  Wait a minute.  Now,

8    look, you know how this is done, both of you.  You cut the

9    witness off in his answer.  If you think he's going on

10   beyond the question you can control that.  But you have to

11   ask me.  It doesn't help me nor the court reporter if you

12   both talk at the same time.

13            Now, put a question, Mr. Collins.

14   Q    Even including the 11-4-04 medical passport that you say

15   was blank in the file, you still found three other medical

16   passports in the file.  Yes?

17   A    Yes, all occurring on the same date April 4th of 2012.

18   Q    And, of course, you would not in your review of the

19   files, the DCF files, which is what you reviewed, yes, in

20   these cases?

21   A    Yes.

22   Q    -- you would not have seen medical passports that were

23   held by the foster parents, correct?

24   A    I suppose not.  I don't know why DCF wouldn't have a

25   copy of that or have copies of the encounter forms that
```

1    they're required to keep on file.  And there wasn't a single

2    encounter form in any of the plaintiffs' records.

3    **Q**    If the medical passport form is being held by the foster

4    parents --

5    A    Yes.

6    **Q**    -- because you didn't talk to any foster parents, or

7    interview any foster parents or ask for any of their

8    records, you wouldn't have seen a medical passport that's

9    being held in their custody.  Correct?

10    A    I suppose not, no.

11    **Q**    And as we saw earlier in the 110 CMR, DCF can delegate

12    all or part of the health care procurement process.

13    A    Yes.

14         **MR. COLLINS:**  And can we pull up, can you bring

15    that 110 CMR back up because I want to make reference to

16    another section.

17         If we could pull up 110 CMR 7.127.

18    **Q**    So, this is the next section down.  Do you have that,

19    Doctor?

20    A    It's too small to read right now.

21         **MR. COLLINS:**  Can you blow that up.  Okay.

22    A    That's good.

23    **Q**    So the next section down from the 7.126 that we just

24    referred to, it says the social worker may delegate, the

25    7.127 now talks about responsibilities of substitute care

1   providers.  And that would be foster parents.  Yes?

2   A   If you say so, sure.

3   Q   Well, I'm asking you if you know.  Have you reviewed

4   these regulations?

5   A   I'm not sure I'm familiar with these regulations, no.

6   Q   But you would agree with me that a foster parent is a

7   substitute care provider?

8   A   They could be.  Sometimes it's the contractual agency

9   managing the foster home.  So, I'm not sure if it means the

10  foster parent versus the social worker working in the foster

11  care agency.  That's typically what I think of as substitute

12  care.

13  Q   Well, obviously earlier it talked about delegating the

14  health procurement process to substitute care providers

15  and/or biological parents, so it's referencing parents in

16  that delegation.

17  A   But where is substitute care provider defined?

18  Q   I don't have that in front of me right now.

19        Let's, let's go on to 7.127 and perhaps we can

20  revisit the definition of substitute care provider.

21  A   Okay.

22  Q   It says in the 7.127 it is the policy of the department

23  that substitute care providers, at the request of the social

24  worker, will assume responsibility for the provision of

25  health care services.  And then it says substitute care

1    procedures will, and you see number 3 there, hold the

2    child's medical passport and request written documentation

3    for medical providers for inclusion in the passport.

4            Do you see that?

5    A    I do.  And I was never asked to provide written

6    documentation for the hundreds of children in DCF care that

7    I've worked with.

8    Q    Did you see it as your responsibility to do that as a

9    provider without being asked?

10   A    I saw it as my responsibility to document the consent on

11   my end, but this is their requirement, not mine.

12   Q    So, you didn't feel as though as a physician that you

13   had a proactive duty to provide that information but rather

14   to sit back and wait to be asked?

15   A    No, frankly, I don't even know that anybody would have

16   known what to do with these encounter forms.  It's just not

17   a standard part of their practice despite their policies.

18   Q    Now, you'd agree with me that -- if we could turn

19   actually to 7.124 of the regulations, which is the page

20   prior.

21           This is the section entitled Medical Passport.

22   Yes?  Do you see that?

23   A    Yes.

24   Q    And I'm starting at the second sentence:  The medical

25   passport shall record pertinent and available medical,

1    dental, mental health development data about the child.

2    Right?

3    A    Yes.

4    Q    Then it guess on to say department social workers and

5    medical providers shall, shall each complete relevant

6    portions of the passport.

7            Were you aware of that requirement of you as a

8    medical provider.

9    A    To?

10   Q    Do as it says there, complete relevant portions of the

11   passport.

12   A    No.

13   Q    You testified earlier that the medical passport for you

14   as a provider is a helpful tool in doing your job.  Yes?

15   A    Well, it's meant to be, and if utilized could be.  But

16   it has not --

17   Q    In fact, in fact, I believe your exact testimony was if

18   used as designed it's a great start?

19   A    Absolutely.

20   Q    But as we, as we talked about earlier in terms of the

21   information gathering undertaking that you, the information

22   gathering process that you undertake, your job wouldn't end

23   with this medical passport even if used as designed?

24   A    No.

25   Q    This is just one piece --

1    A    Yes.

2    Q    -- of the puzzle.

3    A    I think a critical piece.  But yes.

4    Q    And of course the regulations say that it only contains

5    pertinent and available data?

6    A    Yes, that's what it says.

7    Q    There's other data that you need that's not captured

8    even in the ideal medical passport?

9    A    Well, I mean, if it's the ideal medical passport then it

10    would contain what I would want to have.

11    Q    You would stoop there?

12    A    No.

13    Q    You would still have to interview the child, right?

14    A    Yes.

15    Q    Speak to the child?

16    A    Absolutely.  Yes.

17    Q    You'd still have to talk to the DCF social worker?

18    A    Yes.

19    Q    All of that stuff that we talked about earlier?

20    A    Yes.  The medical passport is meant to be a tool to

21    address the issue of the complexity of the experience of

22    these children in child welfare.  They've had multiple

23    placements, multiple providers, been on multiple medications

24    with multiple treatment recommendations.  There needs to be

25    some way of tracking that, and the medical passport can be a

1    tool in support of that goal.

2    Q    Thank you, Doctor.

3    A    You're welcome.

4    Q    I want to move on now to talk about the subject of a

5    tracking system --

6    A    Okay.

7    Q    -- on behalf of a child welfare agency, on behalf of

8    DCF.  You've talked about that --

9    A    Yes.

10   Q    -- in your testimony as well as in your report.  Yes?

11   A    Yes.

12   Q    And, in fact, if your report on page 8 you testified,

13   you say that DCF has no dedicated automated recordkeeping

14   system to track medications of children.

15   A    Yes.

16   Q    Yes?

17   A    Yes.

18   Q    But according to the AACAP guidelines this sort of

19   automated recordkeeping system to track, that's an ideal

20   standard, isn't it?

21   A    The specific mention -- where are you in the AACAP

22   practice standards.

23   Q    Well, let's just -- I mean, without looking at the

24   guideline would you, would you agree with me that that is an

25   ideal standard.

1    A    No.

2    Q    Okay.  So let's go to the AACAP best principles practice

3    guideline.

4    A    Yes.

5    Q    And I'm looking at, they're not numbered, but the second

6    page, number 2.  Do you see that there?

7    A    I do.

8    Q    And this of course is Exhibit 17.  Looking at 2(b) it

9    says:  State child welfare agencies, the juvenile court, et

10   cetera, et cetera, should design and implement effective

11   oversight procedures that (b) establish a program

12   administered by child and adolescent psychiatrists to

13   oversee the utilization of medications for youth in state

14   custody.

15            Do you see that there?

16   A    I do.

17   Q    And then it says ideal.  Yes?

18   A    Yes.  And this was written in 2005.  And then if you

19   look at what the Public Law 112-34 calls for, the federal

20   government is saying that this new provision builds on this

21   requirement by specifying that state plans must include an

22   outline of protocols for the appropriate use and monitoring

23   of psychotropic medications.  That wouldn't seem to be

24   ideal.

25   Q    Well, the public law says that you just have to put

1    forth a plan.

2    A    So what is the state's plan?

3    Q    Unfortunately, Doctor, I'm the one who gets to ask the

4    questions.

5    A    Okay.  Sorry.

6    Q    The public law simply states that the Commonwealth has

7    to put north a plan.  Yes?

8    A    Yes.

9    Q    Do you know if it's done that.

10   A    I believe they submitted a plan.

11   Q    You're not sure.

12   A    I'm not sure, no.  I'm not sure that it's been publicly

13   available.

14   Q    Have you asked anyone to see it?

15   A    I did not, no.

16   Q    And nonetheless, this being an ideal standard as

17   promulgated by AACAP --

18   A    In 2005.

19   Q    -- nonetheless, according to the GAO report,

20   Massachusetts has partially implemented this guideline.

21   A    And that's the part that I don't quite understand what

22   they're pointing to in support of that.

23   Q    Nonetheless, the GAP report says that Massachusetts has

24   partially implemented this guideline.

25   A    Apparently Massachusetts told the GAO that they had

1    partially implemented that guideline.  I'm not aware of any

2    ability to do monitoring.  And the depositions by the people

3    who would be in the role of being responsible for

4    implementing that say that they don't have that capacity.

5    So, I'm a little confused about what they mean when they say

6    partially implemented.

7    **Q**   Sure.

8          Now, fair to say that case workers, DCF case

9    workers, they can track the medications that the children

10   that they're responsible for are on.  Yes?

11   A   I don't know what their mechanism would be to do that.

12   I didn't see any indication of that in the case file

13   records.

14   **Q**   But they can do it as case workers, as human beings,

15   they can track the medications that their children are on.

16   Yes?

17         **THE COURT:**  I guess I don't understand the

18   question.

19   **Q**   In other words, managing a file for a child, they can

20   use their mind and be cognizant of what medications each of

21   the children that they're responsible for are on.

22         **THE COURT:**  Presuming that the medication is noted

23   in the file, I guess.  Is that your question?

24   **Q**   Whether it's noted in the file or not.  If they're

25   accompanying the child to a doctor's visit and they're

1    sitting there and they're talking to the doctor, presumably

2    if they're a good social worker they can know in their heads

3    whether or not a kid's on certain medication at a certain

4    time.

5    A    They have 20 or 30 children on their caseload.

6              **THE COURT:**  No, no.  But conceptually?

7              **THE WITNESS:**  Theoretically?  Yes.

8              **THE COURT:**  All right.

9    **Q**    And they do?

10             **THE COURT:**  Well, how can --

11   **Q**    In your experience.

12             **THE COURT:**  All right.

13   **Q**    In your experience.  In the hundreds of kids that you've

14   treated at the Walker School, you've experienced social

15   workers that have come in and been able to have this

16   conversation with you about what type of medication the

17   kid]s on.  What their medical history is, et cetera, et

18   cetera.  That's not an unusual occurrence you?

19   A    I'd say it's an unusual occurrence if somebody can

20   actually tell me why they're on these medicines, what

21   side-effects they've had, what benefits they've had, what

22   history of medications they've had and what side-effects

23   they had on those and why the medication was stopped or

24   started.  I'd say that actually is not typical.

25   **Q**    In your experience?

1    A    That was what you asked.

2    Q    Isn't it true that again in your experience that some

3    social workers are with -- sorry, some kids have the same

4    social worker for years on end.  Yes?

5    A    Yes.  Although the average duration of a social worker

6    nationally is about 18 months.  So, I'm not sure that that

7    would be typical.

8    Q    What's the average duration of a social worker in

9    Massachusetts?

10    A    I'm not sure.

11    Q    And, in fact, Adam S whose file you reviewed, he's been

12    with his current social worker for a number of years.  Yes?

13    A    I believe so.  And he's the one that didn't document the

14    Wellbutrin or any medication in the file record for five

15    years, I believe.

16    Q    How long has Adam's current social worker been with him?

17    A    I don't know.

18          THE COURT:  Well, for some time is what you

19    understand from the record?  Years?

20          THE WITNESS:  I'm just referencing my notes.  I

21    believe he's the one that had a consistent worker for years,

22    yes.

23    Q    Do you know how often Adam and his social worker meet?

24    A    I know the requirement is monthly.

25    Q    Do you know how often Adam and his social worker meet?

1    A    No.

2    Q    Do you know Adam's social worker's name?

3    A    I would not without being able to look back at the case

4    file record.

5    Q    In addition to social workers being able to track

6    medications in the manner that we've just talked about, the

7    social workers supervisors can do the same thing.  Yes?

8    A    Yes.  I misspoke.  It was Andre S who had the five year

9    period without documentation, it wasn't Adam S.

10    Q    Thank you.

11    A    You're welcome.

12    Q    Do you know how frequently case workers meet with their

13    supervisors to discuss their cases?

14    A    I don't.  That wasn't part of the scope of my opinion.

15    Q    And you talked yesterday about this notion of red flags

16    and there being -- you have a list of red flags in appendix

17    B to your resume, right?

18    A    Yes.

19    Q    And this notion of that there are these red flags and

20    folks should be looking out for them as they're going along

21    and carrying for their children and monitoring their

22    children, right.

23    A    That's a proposal, yes.

24    Q    Social workers and their supervisors can do this sort of

25    red flagging that you speak about.  Yes?  In their, in their

case management practices?

A    They can on a case-by-case basis if they obviously are
tracking what medications the child in their care is on.  It
wouldn't allow for that aggregate.  It's a two prong piece.
So, I'm calling for case-by-case red flag monitoring, but
also being able to report that in the aggregate so that you
can do a quality improvement.

Q    And the fact is you don't, you don't know whether social
workers and their supervisors at DCF are doing this type of
red flagging and whether through that it's triggering a
conversation that they're having with the children's
prescribers.  Isn't that right?

A    I believe it was Marilyn Chase who said she knows that
they don't have that capacity.

Q    But as you sit here, not having talked to a DCF social
worker or supervisor, you don't know whether or not that's
going on.

A    As I sit here do I know whether or not -- I'm sorry, can
you repeat the question?

Q    Do you know whether or not that practice is occurring in
DCF?

A    What is?

Q    The practice of social workers and supervisors in their
daily duties and obligations, whether they're sitting there
and red flag monitoring their kids' files such that they

1    can, you know, be cognizant of those red flags and then

2    going on and having conversations with doctors or medical

3    providers?

4    A    No, no, I would not an able to know that.  I'm not privy

5    to their conversations or present when they're happening.

6    What I can tell you is that from my review of the case file

7    records there was no indication that anything like that was

8    happening, there was no indication that any changes occurred

9    in the treatment, there's no indication that concerns were

10   being raised.  None of that was being documented in Family

11   Net.  None of it seemed to be evidenced by a change in

12   course in treatment recommendations.  The provider records

13   that were in the file never talked about DCF raising a

14   concern about medication and the medication being stooped as

15   a result of that concern.  So, at least the record is silent

16   on it.

17   Q    And it's fair to say that with that testimony, if you

18   didn't see it in the file on a written document you assume

19   that it didn't happen?

20   A    Well, there also wasn't any positive indication that DCF

21   was engaging in a concern or conversation.  There was never

22   a second opinion requested.  These were not successful life

23   experiences.  These were not successful treatments.  And one

24   would think a reasonable parent might have requested a

25   second opinion.

1    **Q**    But my question was in terms of your review, because you

2    didn't speak with anyone from DCF, you take the notion if

3    it's not in writing it didn't happen?

4    A    Yes, I think that's fair to say.

5    **Q**    Just real quickly, back to the appendix B of your

6    report.  That's a, that's a list of red flags that you

7    created.  Yes?

8    A    Yes.

9    **Q**    You'd agree with me that the truth is in practice there

10    is no universal agreement on what constitutes a red flag?

11    A    I mean, they're certainly in use in many jurisdictions.

12    They're, they're embedded into the policy statement in

13    Tennessee over monitoring and oversight.  Illinois is using

14    red flags.  Connecticut is using red flags.  Texas is using

15    red flags.  There's many jurisdictions that are using red

16    flags.  They may not all be the same red flag, but

17    surprisingly there's quite a bit of consistency between

18    them.

19    **Q**    There's variation among the states as to what

20    constitutes a red flag?  There's no universal agreement?

21    A    Well, I mean, there's argument over whether or not

22    somebody should be monitoring children that are on three or

23    more.  In Texas they increased it to five or more.  When

24    we're only talking about a red flag generating a

25    conversation between the prescriber and the consenting

1    authority, you know, I think a lower threshold makes sense.

2    But there isn't a lot of question about two or more

3    medications from the same class that's consistently showing

4    up because there's no literature to support the utilization

5    of two or more, at least, you know, particularly for

6    antipsychotics.

7    **Q**    Do you have --

8    A    Children under five or under six is a pretty standard.

9    Making sure that you're following your own consent process

10    is pretty standard.  Dose guidelines above FDA, pretty

11    standard.  So, I think there is a consensus at least around

12    what some of the red flags should be.

13    **Q**    Do you have your report from Tufts in front of you,

14    Exhibit No. 1063?

15    A    I don't have the stamp on it, but it's the multi-state

16    study?

17    **Q**    Yes.

18    A    Yes, I do.

19    **Q**    The Tufts Multi-State Study on Psychotropic Medication.

20    A    Yes.

21    **Q**    All right.  Can you turn to page 7.

22    A    I'm there.

23    **Q**    And do you see table 1 there, it says red flag markers?

24    A    Yes.

25    **Q**    And then it has a list of one, two --

```
1    A    Yes.
2              THE COURT:  There's no objection, but I note this
3    document's not in evidence, that's why it doesn't have a
4    number.  Shall it be in evidence?
5              MR. COLLINS:  I moved it into evidence yesterday,
6    your Honor.
7              THE COURT:  And you --
8              MR. COLLINS:  And it should have been marked 1063.
9              MS. BARTOSZ:  Your Honor, there was no objection.
10             THE COURT:  1063?
11             MR. COLLINS:  Yes.
12             THE COURT:  Thank you.
13             MS. BARTOSZ:  Yes, Judge.
14             THE COURT:  All right.  I'll treat it in evidence
15   1063.
16             MR. COLLINS:  Thank you.
17   Q    So, Doctor, you see there on table 1 there are about ten
18   red flag markers?
19   A    Yes.
20   Q    And of the 48 states that participated in your study, we
21   can see in the right hand column there the number of states
22   that endorsed these red flags in terms of percentages
23   fluctuates rather widely, doesn't it?  From 17 percent to
24   47 percent?
25   A    Yes.
```

1    Q    Now, we've talked about social workers being able to in

2    the daily course of their duties being able to track the

3    medications that kids are on and their supervisors.  Foster

4    parents are also able, and while they may not have perfectly

5    documented records, they're certainly able to track the

6    medications that their children are on.  Yes?

7    A    Well, I'm not sure what you mean by track.  I would

8    assume that they know what medicines they're giving the

9    children in their care.

10   Q    And they do that in your experience.

11   A    Yes.

12   Q    And if they didn't, if a DCF social worker or a foster

13   parent didn't do that sufficient, didn't keep track of the

14   medications that their child was on and they couldn't tell

15   you when they come in to see you as their physician, as

16   their psychiatrist, what meds the kids were on, your

17   testimony yesterday was you would consider that neglect.

18   A    Yes.

19   Q    And if you encountered that situation where there was

20   neglect, as a mandated reporter you would have to file

21   what's known as a 51A report on that social worker or on

22   that foster parent.  Yes?

23   A    I don't know that there's a mechanism for filing a 51A

24   against a DCF worker.

25   Q    You don't know if you can do that or not?

```
1    A    I don't.

2    Q    As a mandated reporter?

3    A    No.  I always understood that that was something that a

4    lawyer would do, something called abuse of discretion, but

5    not that there's a mechanism for filing a 51A against DCF.

6    Q    So you don't believe that as a mandated reporter you

7    have an obligation to file a 51A on a neglectful social

8    worker that has appeared in front of you and doesn't know

9    what medications their child is on?

10   A    That wouldn't be the mechanism that I would go about,

11   no.

12   Q    What about for a foster parent?

13   A    If I had concerns about a foster parent I would probably

14   speak to the DCF social worker.

15   Q    Isn't it your responsibility as a mandated reporter if

16   you see neglect on behalf of a foster parent to report that?

17   A    It's certainly, it's certainly to report it.  Whether or

18   not I would use a 51A mechanism or whether I would talk to

19   the DCF social worker to try to understand why this

20   situation is occurring.  It's complicated when DCF itself is

21   the offending authority.

22   Q    In your mind?

23   A    Yes.

24   Q    And you've treated hundreds of kids at the Walker

25   School.
```

```
1    A    I have.

2    Q    How many times have you filed a 51A on a DCF social

3    worker?

4    A    None.

5    Q    How many times have you reported a DCF social worker to

6    the authorities as a mandated reporter as having been

7    someone who, in your opinion, was being neglectful?

8    A    I mean, that wouldn't be how I would go about trying to

9    effect change in a system.  I mean, the problem is --

10   Q    Doctor.

11   A    -- that this is institutionalized.

12              MR. COLLINS:  Your Honor?

13              THE COURT:  Well, I'll give him this instruction.

14         Most of his questions are framed so that

15   grammatically they can be answered yes or no.  This is

16   cross-examination.  Now, if a full, honest and complete

17   answer is yes or no then that's how you testify.  You may

18   always say you don't remember, you don't know, and you may

19   say you can't answer that yes or no.  But you can't just

20   launch off giving your views about that issue.  The attorney

21   who put you on the stand will have chance to ask you other

22   questions in light of the questions he's asking.

23         Now, that's how we do it, and when requested I'll

24   enforce that.

25              THE WITNESS:  That's helpful.  Thank you.
```

1       **THE COURT:**  All right.

2   **Q**   I'll repeat the question, Doctor.

3           You have never filed a 51A report on a DCF social

4   worker?

5   A   Yes.

6   **Q**   And you've never as a mandated reporter reported a DCF

7   social worker to any authority as having been neglectful?

8   A   I can't answer that question yes or no.

9   **Q**   Have you ever picked up the telephone and called a

10  police department and reported a DCF social worker as being

11  neglectful?

12  A   No.

13  **Q**   Have you ever picked up the telephone and called a

14  district attorney's office and reported a DCF social worker

15  as being neglectful?

16          **THE COURT:**  Well, I don't think we're going to

17  limit it to telephonic communications, are we?

18          **MR. COLLINS:**  Okay.  Certainly.  He's talking about

19  such, at least I understand the thrust of the question, have

20  you ever made any oral or communicated in any way data

21  comparable to the form 51A to a public authority?

22          **THE WITNESS:**  No.

23  **Q**   How many times have you filed a 51A for neglect against

24  a foster parent?

25  A   For any reason?

1  Q    For a situation -- we're talking about a situation where

2  the foster parent comes in --

3  A    Uh-huh.

4  Q    -- and they're not able to communicate to your

5  satisfaction the medical history or the medications that

6  their child is currently on, and you've made the

7  determination that that is neglect.  How many times have you

8  had that situation where you've reported or filed a 51A on a

9  foster parent?

10 A    None.

11 Q    You started to mention in response to one of my

12 questions the notion of second opinion capacity, and I want

13 to talk to you a little bit about that now.

14 A    Okay.

15 Q    You mentioned Dr. Russell Livingston a couple of times

16 in your testimony.

17 A    Yes.

18 Q    He is the medical director for psychiatry at the

19 Department of Children and Families.  Yes?

20 A    Yes.

21 Q    He's available for consult to DCF social workers who

22 have questions regarding psychiatric medications that

23 children may be prescribed or the provider may be

24 recommending.  Yes?

25 A    Yes.

1    Q    And equally, Dr. Livingston has available to him

2    resources where he can seek a second opinion.   Yes?

3    A    I can't answer that yes or no.

4    Q    Dr. Livington can pick up the telephone and call another

5    doctor or another colleague and seek a second opinion.   Yes?

6    A    Yes.

7    Q    Doctors do that a fair amount?   You do that in your

8    practice?

9    A    Yes.

10   Q    DCF also has what's known as mental health specialists

11   that are available for a consult in each of their regions.

12              Are you aware of that?

13   A    Yes.

14   Q    DCF social workers, supervisors, case workers also have

15   available to them psychiatrists who are available for

16   consult at their sister agency, the Department of Mental

17   Health.   Yes?

18   A    Yes.

19   Q    When I use the acronym MCPEP do you know what I'm

20   talking about?

21   A    Can you spell it.

22   Q    M C P E P.   Let me just -- the Massachusetts Child

23   Psychiatry Education and Consultation Project.   MCPEP.

24   A    Yes.

25   Q    You know what I'm referencing?

1    A    Yes.

2    Q    There are two components to the MCPEP project, education

3    and consultation.  Yes?

4    A    Yes.

5    Q    And for foundational purposes the MCPEP -- let me ask

6    you this.  What is your understanding of what the MCPEP

7    program is?

8    A    It was a pilot in 2010 in the Boston area.  Dr. Walter

9    and Dr. Dimarso from, not the Boston Medical Center, Boston

10   Children's, were doing some training around psychotropic

11   medication for foster parents, I believe some judges, as

12   well as child welfare workers within DCF.

13   Q    And I apologize if I just asked you this.  I can't

14   remember.  You're aware that there are two components,

15   there's an education component and a consultation component

16   to that?

17   A    Correct.  Yes.

18   Q    And for the consultation component, through this program

19   there has been made available to community based child

20   psychiatrists in the Boston area for consult?

21   A    Yes.

22   Q    DCF case workers, social workers can turn to these folks

23   and get consultations?

24   A    That was my understanding of the program.  I don't know

25   what the utilization of it was.

1  Q   I want to just revisit very briefly, because we talked

2  agent bit about this public law and its requirement for

3  states to have plans with respect to monitoring and

4  oversight of a psychotropic medication.  Yes?

5  A   Yes.

6  Q   You know what I'm referring to?

7  A   I do.

8  Q   And we had -- bear with me a second.  We had moved into

9  evidence yesterday with counsel for the plaintiffs, Exhibit

10  No. 825, the Administration for Children and Families

11  Information Memorandum.

12         Do you have that?

13  A   I do.

14  Q   And this, of course, is the document that talks about

15  this plan that's now being required by the federal

16  government.  Yes?

17  A   Yes.

18  Q   And if you could turn to page 2, please.

19  A   I'm there.

20  Q   This plan, this is a new 2012 requirement.  Yes?

21  A   Well, the law --

22  Q   As of the year 2012.

23  A   The law was passed in 2011.  The states needed to have

24  their plans to the federal government by the end of June of

25  2012.

```
 1              THE COURT:  Forgive me, what document now are we
 2     talking about?
 3              THE WITNESS:  It's this one.
 4         MR. COLLINS:  I'm sorry.
 5         THE COURT:  Yes.  Thank you.
 6         MR. COLLINS:  Exhibit 825, your Honor.
 7         THE COURT:  Thank you.
 8         MR. COLLINS:  And we're on page 22?
 9         THE COURT:  Thank you.
10     Q    And, in fact, the bullet point at the top there, there
11     are sort of three paragraphs, if I go down, do you see where
12     it says states and tribes need to address?
13     A    I'm sorry, where are you?
14     Q    Page 2.
15     A    Oh.
16     Q    And the bullet point at the top.  And I'm in the, I
17     guess what you would call the third paragraph down.
18     A    Yes.
19     Q    It says states and tribes will need --
20     A    Right, that's what I see.
21     Q    Okay.  States and tribes will need to address how they
22     are responding to these new requirements in their Annual
23     Progress and Services Reports which are due on June 30,
24     2012.
25     A    Correct.
```

1    Q    And I believe you testified that you don't know whether

2    the state has submitted that plan?

3    A    I believe they submitted a plan.  I said I didn't see

4    it.

5    Q    And you're familiar with this notion of federal IV-E

6    funding for states.  Yes?

7    A    Yes.

8    Q    And when the federal government is funding states with

9    respect to their child welfare programs there's a review

10   process, isn't there?  They monitor what the state's doing

11   to make sure that they're giving their money for good

12   reasons.  Yes?

13   A    The child and family services review, yes.

14        **MS. BARTOSZ:**  Your Honor, I'm going to object.

15   This is now going beyond the scope.

16        **THE COURT:**  Oh, I'm not troubled by that.

17        **MS. BARTOSZ:**  Okay.

18        **THE COURT:**  In fact, I favor general examination so

19   we'll only have to see a witness once.  However, it does

20   seem to be beyond the scope, so he's required to take him as

21   though on direct examination.  That's his choice.  But he

22   may proceed.

23   Q    Do you know, do you know if Massachusetts does not meet

24   its requirement here to submit the plan, to have submitted

25   the plan on June 30, 2012, whether the federal government

1    would withhold funding, IV-E funding from the state?

2        **THE COURT:**  That goes, respectfully, that goes

3    beyond his expertise.  That's a legal question.  And I mean

4    him no disrespect, but what he thinks about that is not

5    going to be conclusive of the matter.

6    Q   Let me ask it this way.  Do you know whether the federal

7    government withheld funding from Massachusetts for not

8    having submitted a plan on June 30, 2012?  An appropriate

9    plan?

10   A   I don't know that.

11   Q   Doctor, you have opined here about quality of care that

12   the three named plaintiffs received from DCF.  Yes?

13   A   Yes.

14   Q   And, in fact, you have questioned some of the care

15   decisions that were made in those cases.  Yes?

16   A   Yes.

17   Q   You've implied if not out right stated that the care in

18   some instances was substandard.  Yes?

19   A   At least it would raise questions.

20   Q   So it's not your testimony that these children have

21   received substandard care?

22   A   There were certainly questions that I would raise based

23   on my review of the files about the quality of the care that

24   these children received.

25   Q   But there's nothing that you've seen that would

1    establish to your mind definitively that these children have

2    received substandard care?

3    A    There were concerns about the medications and whether or

4    not they were appropriately indicated based on the diagnoses

5    and the lack of evidence that the children were getting,

6    evidence based psychosocial interventions that might have

7    been more appropriate and included the need for some of

8    these medications s.

9    Q    You did not reach the substantive conclusion in your

10   mind that these children have received substandard care?

11   A    I think based on that I would say that they, that the

12   care was questionable.

13   Q    My question is very direct.

14   A    Okay.

15   Q    It's whether you came to the conclusion that these

16   children have received substandard care.

17   A    I would say yes.

18   Q    Yes, they have?

19   A    Yes.

20   Q    And that was based on your review of the files?

21   A    Yes.

22   Q    And that's a solution that you reach even factoring in

23   what I believe you have testified to which is that there's

24   wide variation in the field of child psychiatry in terms of

25   prescribing practices.

1    A    Yes.

2    Q    And I want to be clear, wide variation within the field,

3    but within the standard of care?

4    A    Yes.

5    Q    And if I understand your testimony here, from that

6    determination that these three children have received

7    substandard care in DCF custody, you have then extrapolated

8    that out to the whole and you've opined about the quality of

9    care of foster kids as a whole in DCF custody.  Yes?

10   A    No.

11   Q    You don't do that?

12   A    I can't answer that yes or no.

13   Q    You don't -- you have not provided an opinion here

14   today, or in any of the days that you've testified, that DCF

15   children as a whole receive substandard care.  That's not

16   your opinion?

17   A    That is my opinion.

18   Q    So you've taken from the review of three files of three

19   children, you've extrapolated that out and you've made the

20   determination that all kids in DCF care receive substandard

21   care?

22   A    No.

23   Q    I want to talk to you a little bit about, in particular

24   now some of the treatment of each of the three children

25   whose fils you reviewed, Adam S, Andre S and Connor B.

1    Okay?

2    A    Okay.

3    Q    And with respect to Adam S, you have testified, it's in

4    your report that he was treated with what you call powerful

5    psychotropic medications.  Yes?

6    A    Yes.

7    Q    Those included Risperdal, Depakote, Clonidine, Zyprexa,

8    Adderall, Focalin, Ritalin.

9    A    I'm sorry, where are you reading from?

10          THE COURT:  He asked you from where you were

11    reading.

12          MR. COLLINS:  Unfortunately, your Honor, this is

13    one of the instances that I didn't write down the page

14    number so I'm searching for it in the document.

15    A    I think it might be page 10, third paragraph.

16          THE COURT:  Of your report?

17          THE WITNESS:  Yes.

18          THE COURT:  Thank you.

19    Q    One, two, three.  Yes.  He was prescribed the following

20    medications.

21    A    Yes.

22    Q    Okay.  Thank you, Doctor.

23          And, let's see, I don't want to have to go through

24    the whole list again.  So, pick up with Focalin, Ritalin,

25    Celexa.  You see, you see those listed there?

1    A    Yes.

2    Q    And actually you conclude with Benadryl.  Yes?

3    A    I do.

4    Q    Adam S wasn't on all of these medications at once,

5    correct?

6    A    No.

7    Q    These were medications that were given to him over the

8    course of his treatment, which was eight years?

9    A    Yes.  There were certainly times when he was on

10   combinations, but not all of these at once.

11   Q    And the reason we have so many listed here, Doctor, is

12   because during the course of that eight year treatment, as

13   doctors are apt to do, there are trials of medications to

14   see what works and what doesn't.  Yes?  You noted that from

15   the file?

16   A    I can't answer that yes or no.

17   Q    You've reviewed the file?

18   A    Yes.

19   Q    And in the file there's an indication that there are

20   trial medications that are being used to try to treat Adam

21   S?

22   A    Yes.

23   Q    To see what works and to see what doesn't?

24   A    Yes.

25   Q    And that's not uncommon in particularly complex cases

1    like Adam's.  Yes?

2    A    Yes.

3    Q    Adam's is a complex case, isn't it?

4    A    Sure.

5    Q    You say here in the paragraph above:  Over the course of

6    his treatment he was diagnosed with PTSD, ADHD, reactive

7    attachment disorder, major depression, mood disorder,

8    bipolar disorder, conduct disorder, and learning

9    disabilities.  Right?

10   A    Yes.

11   Q    And if you'll turn to page 12 of your report.

12   A    Yes.

13   Q    Top paragraph, third line down.  I'm sorry, second line.

14   Third line down.  You say he was also seen as presenting

15   with abuse reactive behaviors and would frequently react to

16   misperceptions of threats that also resulted in

17   self-injurious behaviors as well as threats and aggression

18   towards others.

19            Yes?

20   A    Yes.  I'm not sure if I'm saying that or if I'm quoting

21   from the psych test report.

22   Q    Either way, this is what was going on with Adam S.

23   A    That was the observation in the record, yes.

24   Q    You don't have any reason to doubt the accuracy of that,

25   do you?

1    A    Well, it was, it was the impressions of, I think in this

2    case Dr. Crider.

3    Q    Did you have any, in reviewing the entire file, have any

4    reason to --

5    A    No.

6    Q    -- question the validity of that?

7    A    I wasn't, I wasn't there.  But no.

8    Q    You don't necessarily take issue with Adam having been

9    treated this way and being prescribed these medications, do

10    you?

11    A    I do.

12    Q    You take issue with the decision of his treating

13    physicians over the course of his entire eight year

14    treatment to prescribe and try these various medications?

15    A    I can't render an opinion on that.

16    Q    On your direct testimony you also, I believe, talked

17    about a Rogers order lapse in Adam's situation with that.

18    Yes?

19    A    Yes.  With Adam.

20    Q    Actually if you would go to page 7 of the report you

21    talked about this --

22    A    Yes.

23    Q    -- in the top paragraph.  And in this situation where at

24    least as you discovered in the file that there was a Rogers

25    order lapse, counsel for DCF had notified Adam as his

```
 1    treating physician of the obligation to file an updated
 2    affidavit in treatment plan but the physician failed to do
 3    so.  Yes?
 4    A   Yes.
 5            THE COURT:  Are you about done with this witness?
 6    I ask not through disinterest --
 7            MR. COLLINS:  Sure.
 8            THE COURT:  -- but it's time for the break.  And if
 9    you're about done --
10            MR. COLLINS:  No.  I get -- if by about done --
11            THE COURT:  Yes.
12            MR. COLLINS:  Okay.
13            THE COURT:  We'll take the morning recess.  We'll
14    recess for one-half hour.  We'll recess.
15            THE CLERK:  All rise.
16            (Recess.)
17            THE CLERK:  All rise.  The United States District
18    Court is back in session, you may be seated.
19            THE COURT:  Go ahead, Mr. Collins.
20            MR. COLLINS:  Thank you, your Honor.
21                CROSS-EXAMINATION (Cont'd)
22    BY MR. COLLINS
23    Q   Doctor, when we broke we were talking about the, from
24    your review of the files that Rogers orders had lapsed.
25    A   Yes.
```

1    **Q**   And I had read for you on page 7 your reference or

2    statement, counsel for DCF had notified Adam's treating

3    physician to file an updated affidavit and treatment plan

4    but that the physician failed to do so.  Right?

5    A   Yes.

6    **Q**   This is the doctor's obligation, right, to file this

7    affidavit?

8    A   Yes.

9    **Q**   And in this case, the situation of Adam S, that Rogers

10   order was eventually renewed, wasn't it?

11   A   I believe so, yes.

12   **Q**   And that's because Adam S needed to stay on that

13   medication, those medications, didn't he?

14   A   That was the recommendation of the prescribing

15   physician, yes.

16   **Q**   I want to move now to some of the specific mentions of

17   yours with respect to Connor B's treatment.

18   A   Okay.

19   **Q**   And you say that Connor B got during his psychiatric

20   hospital stay medications that were not approved for PTSD.

21   Yes?

22   A   Where are you in the report?

23   **Q**   I'll have to find it.  Do you remember making that

24   statement?

25   A   I would like to be able to see where I made it.

1   **Q**   Well, let's just -- I don't have the specific reference,

2   but let's -- you recall in your review of the file that you

3   questioned whether or not during the psychiatric stay that

4   he had that Adam was being prescribed medications that were

5   not approved for PTSD.  Yes?

6   A   Adam or Connor B?

7   **Q**   I'm sorry, Connor B.  Do you have a recollection of

8   that?

9   A   I still would like to see where I expressed that opinion

10  in my report.

11  **Q**   Okay, I understand you would like to see it.  But my

12  question is do you have a recollection in doing your review

13  and in doing the report and opining in this case, as you sit

14  here, do you have a recollection of questioning whether Adam

15  was given medications that were not appropriate for his

16  diagnosis of PTSD?

17  A   Are we talking about Adam or Connor.

18  **Q**   I'm sorry, Connor B.

19          **THE COURT:**  But your question did say Adam.

20          **MR. COLLINS:**  No, I understand.

21          **THE COURT:**  Now focusing him on Connor B.

22          **MR. COLLINS:**  Yes, Connor B, that's my mistake.

23          **THE COURT:**  Do you have the question in mind?

24          **MR. COLLINS:**  I'm sorry?

25          **THE COURT:**  I'm asking the witness, do you have the

1    question in mind with respect to Connor B?

2          **THE WITNESS:**  I don't.

3          **THE COURT:**  He'll ask it again.

4    **Q**    In doing your review of Connor B's medical file and in

5    writing your report as you have in this case and in opining

6    on this case as you have over the last couple of days, do

7    you recall questioning the administration of certain

8    medications that were not approved in your opinion to Connor

9    B. for his diagnosis of PTSD?

10   A    Yes.

11   **Q**    And these medications were Depakote, Zoloft, Celexa,

12   Geodon, Abilify and Risperdal.  Is that what you concluded.

13   A    And Adderall.

14   **Q**    Okay.  Doctor, these represent classes of medications

15   that in the AACAP practice parameter for the treatment of

16   PTSD have been suggested to be reasonable treatment options;

17   isn't that correct?

18   A    No.

19   **Q**    Adam -- I'm sorry, Connor B was also diagnosed with

20   ADHD, wasn't he?

21   A    I believe so, yes.

22   **Q**    And bipolar disorder?

23   A    I'm not sure if he was at the time that you're

24   referencing.

25   **Q**    You don't know?

1    A    My recollection is that the primary diagnosis was PTSD.

2    This is during -- this was when he was six years old.

3    Q    Yes.  During his hospital stay.

4    A    Yes, it's my understanding that the diagnosis was PTSD.

5    Q    And that he had a secondary diagnosis of ADHD.  Yes?

6    A    I'll accept that, yes.

7    Q    Clonidine, Concerta, Focalin and Adderall all have

8    strong empirical support and FDA approval for the treatment

9    of ADHD, don't they?

10    A    Yes.

11    Q    Now, as a child psychiatrist yourself and a psychiatrist

12    in general in your field, you don't just treat the

13    diagnosis, right?  You treat also what's called target

14    symptoms?

15    A    Yes.

16    Q    And Connor B, who was hospitalized at this time, had

17    some pretty severe symptoms, didn't he?

18    A    Yes.

19    Q    Symptoms that might be in this wide range that we've

20    talked about, variability in prescribing practices, symptoms

21    that might be within the reasonable standard of care

22    responsive to these medications.  Yes?

23    A    There might be.

24    Q    And that's why he was given these medications?

25    A    I don't know that.

1    Q    You base at least in part your statement that these

2    medications were not approved for PTSD on the Jensen table

3    that you talked about much earlier in your testimony.  Yes?

4    A    Correct.

5    Q    And if you could please pull up the Jensen table in your

6    report.  I believe it's appendix C.

7    A    Do you have the page number?  I've got it.  Thirty-two.

8    Q    Thirty-two.

9    A    Yes.

10   Q    This chart, appendix C, known as the Jensen table, table

11   3, this was published in 1999, wasn't it?

12   A    No, it was undated.  I think the one that I'm quoting

13   from here has a date of about 2010.

14   Q    Do we see that here in this table?

15   A    No, but it's from a document called Mental Health Best

16   Practices for Children in the Foster Care System.  It was a

17   Casey funded reach institute consensus meeting that I was

18   part of and oversaw the psychopharmacology work group.  I

19   specifically asked Peter to update it from the earlier one

20   that you're mentioning.

21   Q    You're saying you specifically asked Mr. Jensen to

22   update it and then he published it in 2010 you're saying?

23   A    Dr. Jensen.  And it may have even been more recent than

24   2010.  It was in a tool kit that was meant to support the

25   recommendations that came from that consensus meeting that I

1    think was in 2010.  I could look in my CV if you want to

2    know the exact date?

3    **Q**    Was this done -- is this -- you say it was done at your

4    request?

5    **A**    Well, when he was developing the tool kit he had asked

6    me to work with him on supporting tools to --

7    **Q**    Right now I'm just asking the question, did you say it

8    was done at your request?  Was that your testimony?

9    **A**    Yes.

10   **Q**    Okay.  And was that -- did he then publish that in a,

11   for lack of a better way to put it, a widely circulated

12   journal or publication.

13   **A**    I believe so, yes.

14   **Q**    What was the name of that publication.

15   **A**    The Child Welfare League publication.  The journal of

16   the Child Welfare League.

17   **Q**    I'm sorry, I didn't hear the last.

18   **A**    The journal of the Child Welfare League.

19   **Q**    Journal of the Child Welfare League?

20   **A**    Yes.

21   **Q**    You would agree with me that there has been considerable

22   other research with respect to the treatment of diagnosis

23   like PTSD, ADHD, bipolar and really all of the psychiatric

24   disorders since the original publication of the Jensen

25   table.  Yes?

1    A    By original you're referring to 1999?

2    Q    Yes.

3    A    Yeah, that's why I asked him to update it.

4    Q    And that includes most of the AACAP practice parameters

5    that have been published in terms of updating that research?

6    A    I'm not sure I understand your question.

7    Q    Well, the AACAP practice -- you're aware that there are

8    AACAP practice parameters that are published for virtually

9    every psychiatric disorder.  Yes?

10   A    Yeah, I'm on the committee that publishes, that writes

11   them.

12   Q    And so it's fair to say that in publishing those there's

13   been a considerable amount of research that has gone into

14   that and then as a result these publications come out?

15   A    Yes.  And we try to update them periodically.

16   Q    I want to turn to Andre S now.

17   A    Okay.

18   Q    And you testified, and I believe it's in your report as

19   well, that there was no mention of Andre S's psychiatric

20   medications and dictation from November of 2001 to April of

21   2006.  Yes?  Do you recall that testimony?

22   A    I don't.  I'm trying to find it in my report.  I've got

23   it.  Okay.

24   Q    So yes?

25   A    Yes.

1    **Q**    You reviewed Adam S's entire case file.  Yes?

2    A    Yes.

3    **Q**    Do you recall where Adam was during this period?

4    A    I believe he was at St. Ann's.  A residential program.

5    **Q**    Okay.  And being in that residential program, St. Ann's,

6    fair to say that this is a facility that is overseeing his

7    treatment and care.  Yes?

8    A    Yes.

9    **Q**    And fair to say that they're monitoring his medications.

10   Yes?

11   A    Well, they're providing clinical treatment.

12   **Q**    Fair to say that they're monitoring his medications?

13   A    I can't answer that yes or no.

14   **Q**    They're certainly documenting his treatment during that

15   period of time.  Yes?

16   A    I would assume so, yes.

17   **Q**    Well, did you see any, any evidence of that in your

18   review of the entire file?

19   A    Evidence of the medications that he was taking during

20   that time?

21   **Q**    Them documenting his treatment during that time.  Did

22   you see any evidence in the case file of that?

23   A    I believe I had the records, yes.

24   **Q**    And part of that documentation of his medical treatment

25   included documenting the medication he was on?

1    A    I believe so.  That's how I knew that he was taking the

2    Wellbutrin.

3    Q    Now, you as a prescriber, if Andre S were to come to you

4    at some point after being at St. Ann's and you were then to

5    become his treating psychiatrist you could very easily

6    request a release of information from DCF and get all of

7    Andre S's records from St. Ann's.  Yes?

8    A    I could, yes.

9    Q    In fact, you do that at times?

10    A    I do.

11    Q    Do you, do you recall the testimony in the conclusion in

12    your report that DCF is failing to ensure kids range of

13    services?  Foster children range of services.  Do you recall

14    that?

15    A    Yes.

16    Q    And what you were talking about here at least in part

17    was evidence based therapies.  Yes?

18    A    Yes.

19    Q    You're not saying that DCF doesn't make attempts to

20    provide children in their care with these evidence based

21    therapies, are you?

22    A    In the three case file records there were specific

23    recommendations for therapies that it did not appear that

24    the children had received.

25    Q    And what about in your clinical experience.  Has it been

1    your clinical experience that DCF makes no attempt to

2    provide foster children who needed these evidence based

3    therapies?

4    A    In my clinical experience, I have seen that, where they

5    did not provide the evidence based practices.

6    Q    That wasn't my question.

7    A    Okay.

8    Q    My question is, in your experience you've seen DCF make

9    attempts to provide evidence based therapies to children in

10   its care that have been determined to need those evidence

11   based therapies?

12   A    Ever?  Yes.

13   Q    And you agree with me that there is a shortage of people

14   trained in evidence based psychosocial interventions such as

15   trauma focused CBT, combative behavioral therapy, or other

16   evidence based practices.  Yes?

17   A    Yes.

18   Q    Including a shortage in this state?

19   A    Yes.

20   Q    And I believe it's part of your report in your testimony

21   that these children are lacking other -- let me ask you.

22          Is it your testimony that children are lacking in

23   other services, or is it just what you call these evidence

24   based services, therapies?

25   A    Well, it's the evidence based therapies that I think are

1    the ones that we want to prioritize.  I'm not sure what

2    other therapies.  I mean, that was my main focus.

3    **Q**    Well, DCF children get -- they're on Mass. Health.  Yes?

4    A    Yes.

5    **Q**    Medicaid.

6    A    Yes.

7    **Q**    And they are provided a number of services under what's

8    called the CBHI, Children's Behavioral Health Initiative.

9    Yes?

10    A    They're eligible for them, yes.

11    **Q**    Well, in fact, you've seen in your clinical experience,

12    not only are they eligible, they've actually participated in

13    a number of services provided by CBHI.  Yes?

14    A    Some children have, yes.

15    **Q**    That includes outpatient treatment?

16    A    Yes.

17    **Q**    Intensive care coordination?

18    A    It can, yes.

19    **Q**    In-home therapy?

20    A    Yes.

21    **Q**    Mobile crisis intervention?

22    A    Yes.

23    **Q**    Therapeutic monitoring?

24    A    Mentoring.

25    **Q**    Family partnerships?

```
 1    A    Yes.

 2    Q    And even more intensive services such as partial

 3    hospitalizations.

 4    A    That's just eligible.  That's not part of CBHI but

 5    that's -- yes.

 6    Q    These are services that are available to these children?

 7    A    Through Medicaid, yes.

 8    Q    Crisis intervention and stabilization?

 9    A    Yes.

10    Q    And inpatient hospitalization?

11    A    Yes.

12    Q    I want to now talk to you about your knowledge of what I

13    will call DCF's present efforts in the realm of the

14    monitoring and oversight of psychotropic medications.  Okay?

15    A    Okay.

16    Q    What efforts, if any, are you aware of either currently

17    or over the last year that DCF has made to improve its

18    monitoring and oversight of psychiatric medications?

19    A    Well, I know that we had many conversation at the Rogers

20    Working Group about what DCF's current capacity was.  At

21    that time, so this would take us through late 2011, DCF

22    lacked the ability to, for instance, know what, which of

23    their children were taking antipsychotics.  They were not

24    able to --

25    Q    I'm sorry, Doctor, I don't mean to cut you off.  But I
```

```
1    think I heard you say through 2011?

2    A    Yes.

3    Q    Okay.  My question was currently or within the last

4    year.  What awareness do you have with respect to those

5    efforts?

6    A    I'm aware that there is a group working on efforts.

7    Q    In this time frame?

8    A    Yes.

9    Q    What do you mean by this group?

10   A    I said a group.

11   Q    What do you mean by a group?

12   A    There's a group representing, Dr. Harper from the

13   Department of Mental Health, Dr. Livington from the

14   Department of Children and Families, and I'm not sure which

15   other participants there are.  But they basically inherited

16   what we had created or started at the Rogers Working Group

17   as I understand it.

18   Q    Are you part of this group?

19   A    I am not.

20   Q    What, what efforts or action steps is this group

21   undertaking.

22   A    I don't know that anything has been actioned.

23   Q    Because you simply just don't know?

24   A    No, I'm just not aware of it.

25            MR. COLLINS:  Can you pull up the 2012 Exhibit 7.
```

1    Thank you.

2              May I approach, your Honor?

3              **THE COURT:**  You may.

4    **Q**   Doctor, we've pulled up on the screen Exhibit No. 7

5    which is an agreed upon exhibit in this case.

6              Do you see that there?

7    **A**   I do.

8    **Q**   And it is the Department of Children and Families

9    2012-2015 Strategic Plan.

10             Have you seen this document before?

11   **A**   I have not.

12   **Q**   You weren't provided a copy of this document for your

13   review?

14   **A**   No.

15   **Q**   Would you turn to page 2, please.

16             Do you see the table of contents there, Doctor?

17   **A**   I do.

18   **Q**   And you see how there's Section II called the Look Back,

19   Section III, a Look Forward.

20   **A**   Yes.

21   **Q**   Section IV is conclusions.  Do you see that there?

22   **A**   I do.

23   **Q**   And under Section III we have strengthening performance

24   management and improvement.  Do you see that there?

25   **A**   I do.

1           **MR. COLLINS:**  Can we go to Page 13.

2   **Q**   Do you see the Strategic Goal 4.0 that I just

3   referenced?

4   A   Yes.

5   **Q**   And if we can now turn to the next page, page 14.  Do

6   you see there it says 4.2, Strategic Objective, CQI and

7   Performance Management?

8   A   Yes.

9   **Q**   Okay.  Go to page 15.

10          And do you see section 4.2.4?

11  A   If you can blow that up that would help.  Okay.

12  **Q**   It says:  Strengthen oversight processes for

13  psychotropic medications for children in foster care.

14          Do you see that?

15  A   I do.

16  **Q**   Actually let me back up, Doctor.  I'm sorry, Robert.  If

17  we go to the first page of the document again.

18  A   Can I just have a copy?

19          **THE COURT:**  Here.

20          **THE WITNESS:**  Thank you.

21  A   Go ahead.

22  **Q**   Do you see the first page where it says at the bottom of

23  this document is dated August of 2012?

24  A   Yes.

25  **Q**   Okay.  So going back to page 15 now.

1    A    Okay.

2    Q    It says here:  An inter-agency steering committee has

3    been established to develop and implement a cross-agency

4    effort to monitor psychotropic medications of children in

5    foster care.  Specific action steps include the following.

6    Development of management reports to be prepared by

7    MassHealth to assist DCF in monitoring potentially

8    problematic prescribing practices.  DCF to establish

9    internal process for review of management reports and

10   contact with prescribers related to outlier prescribing

11   practices and identification of other cross-agency

12   strategies to support effective authorization processes.

13          Did I read that right?

14   A    Yes.

15   Q    This is exactly the type of monitoring and oversight

16   that you are advocating for, isn't it?

17   A    Yes.

18   Q    Are you aware aside from the work group that you just

19   mentioned, are you aware of any other efforts within the

20   last year where DCF has actively working towards, let's say

21   further achievement of the AACAP best principles guideline?

22   A    Well, I know that Massachusetts sent a team to the

23   Because Minds Matter meeting in Washington, D.C. this

24   August.  I'm aware of this inter-agency steering committee,

25   it's the one that I was referring to.

1    Q    And the Because Minds Matter conference, you were at

2    that as well.  Yes?

3    A    I was one of the presenters, yes.

4    Q    And very briefly if you would just tell us what the

5    purpose of that conference was?

6    A    It was to -- it was the federal government's effort to

7    support states developing their monitoring and oversight

8    plans.

9    Q    And I know you said you're not a member of the

10    inter-agency group that you spoke about.  Are you aware that

11    that group is headed by commissioner Angelo McClain?

12    A    I'm not.

13    Q    Are you aware of any efforts by DCF to incorporate

14    recommendations of the Rogers Working Group at present?

15    A    I believe that as I said this group kind of was handed

16    off the Rogers Working Group recommendations.

17    Q    And are you aware of any work that's being done, any

18    action steps that are being taken to incorporate those

19    recommendations into practice?

20    A    The only way I can answer that is from the provider

21    perspective nothing has changed.

22    Q    Are you aware of efforts that are under way to

23    incorporate or to implement some of the recommendations of

24    the Rogers Work Group?

25    A    Dr. Walter has a list of action items that DCF was

1    working on based on a conversation that she had with Jan

2    Nisenbaum.

3    **Q**    I'm not asking about Dr. Walter.  I'm asking about you.

4    And my question is --

5    A    Well, that's --

6    **Q**    -- are you aware of any efforts that are under way,

7    under way, action steps that have actually been taken to

8    implement some of the recommendations of the Rogers Working

9    Group?

10    A    No.

11    **Q**    You left the Rogers Working Group in March of 2012 when

12    you were hired by plaintiffs' counsel.

13    A    No, the Rogers Working Group stopped meeting as far as I

14    know.  It morphed into this inter-agency steering committee.

15    **Q**    Well, do you recall us revisiting your deposition

16    testimony wherein you said that you didn't think it would be

17    appropriate to continue your work with the Rogers Work Group

18    because you had been hired by plaintiffs' counsel?

19    A    All of those things were happening simultaneously, so I

20    don't know that -- I mean, I didn't -- I wasn't invited to a

21    meeting that I had to say I can't do it because I'm working

22    with Children's Rights.

23    **Q**    Are you aware of an effort under way by the Commonwealth

24    by DCF to develop with MassHealth a system for identifying

25    problematic psychotropic practices, red flags, that would be

1    followed by DCF review and intervention?

2    A    I believe there's been a group even predating this

3    inter-agency steering committee and the Rogers Working Group

4    at DMH that under Dr. Harper's leadership has been looking

5    at that issue for a number of years.

6    Q    That's not my question, Doctor.  Again, my question is

7    very specific.

8    A    Okay.

9    Q    My question is whether you're aware of actual efforts

10   that are under way?

11   A    Efforts to --

12   Q    Actual action steps that are under way to develop with

13   MassHealth a system for identifying problematic psychotropic

14   practices, these red flags?  My question is not whether

15   there's been a discussion in the past.

16   A    No.

17   Q    You're unaware?  You're unaware?

18   A    I'm unaware.

19   Q    Are you aware of efforts that are under way or action

20   steps to increase training for DCF case workers around

21   identifying problematic psychotropic prescribing practices

22   and reporting these to the regional mental health managers

23   for discussion and intervention?

24         MS. BARTOSZ:  Your Honor, objection.  And I don't

25   want to waive plaintiffs' position with respect to a prior

1    Court order in this case.  This case is under an order that

2    for liability purposes in this hearing the evidence cutoff

3    date will be August 15th of 2012.  There's no time frame in

4    this question and I don't know what period of time Mr.

5    Collins is speaking about.

6          **THE COURT:**  All right.  In light of that order he

7    can rephrase it.

8    Q   Are you aware of any efforts within the last year?  Same

9    question.  Are you aware of efforts that are under way or

10   action steps that have been taken within the last year.

11   A   I'm sorry, you have to repeat whole question.

12   Q   Efforts to increase training for DCF case workers around

13   identifying problematic psychotropic prescribing practices

14   and reporting these to the regional mental health manager

15   for discussion and intervention.

16         **MS. BARTOSZ:**  Your Honor objection.  I have the

17   same concern.

18         **THE COURT:**  Well, prior to that date.  I'll amend

19   it.  Prior to the cutoff date.

20   A   I'm aware of the MCPEP program.

21   Q   Which is training?

22   A   Yes.  And consultation.

23   Q   Are you aware of -- and the same time frame for all

24   these questions until I indicate otherwise.

25   A   Okay.

1    **Q**    Are you aware of efforts or action steps under way

2    encouraging DCF case workers to access available

3    consultation from identified psychiatrists in each of the

4    DCF regions?

5    A    I'm aware that that was an option available to them,

6    yes.

7    **Q**    Are you aware that there are efforts under way, in the

8    same time frame, and action steps being taken to clarify the

9    role of the DCF case worker in the process of informed

10   consent for psychotropic prescribing?

11   A    Yes.

12   **Q**    Again, much of this aligns with what you would like to

13   see happening.  Yes?

14   A    Yes.

15   **Q**    Doctor, we started out earlier in our discussion,

16   correct me if I'm wrong, you and I agreeing that 50 to

17   85 percent of children in child welfare present with

18   emotional behavioral disorder or psychiatric conditions.

19   Yes?

20   A    Yes.

21   **Q**    And you have opined in this case that Adam S, Andre S

22   and Connor B are not what in your opinion would be

23   considered success stories.  Yes?

24   A    Yes.

25   **Q**    But you've also said that that's not necessarily the

1    failure of DCF, right?

2    A    Yes.

3    **Q**    You've worked with a lot DCF workers over the years.

4    Yes?

5    A    Yes.

6    **Q**    At the Walker School?

7    A    Yes.

8    **Q**    Social workers, case workers, et cetera?

9    A    Yes.

10   **Q**    And based on that experience, Doctor, from what you've

11   seen you have no doubt that DCF workers want to do and in

12   fact strive to do what is in the children's best interest,

13   correct?

14   A    Yes.

15           **MR. COLLINS:**  Your Honor, aside from renewing the

16   defendants' Daubert motion, motion in limine with respect to

17   Dr. Bellonci's testimony, to exclude that testimony, I have

18   no more questions at this time.

19           **THE COURT:**  Well, so the record is clear, the

20   motion, I allow you to renew it, I deny it.

21           And thank you.  You're done.  There's nothing

22   further for this witness?

23           **MS. BARTOSZ:**  No, your Honor.

24           **THE COURT:**  You may step down, thank you.

25           (Whereupon the witness stepped down.)

```
 1            THE COURT:  Call your next witness.
 2            MS. BARTOSZ:  Your Honor, plaintiffs call Dr.
 3   Lenette Azzi-Lessing to the stand.
 4            THE COURT:  She may be called.  If there's a
 5   report, may I have a copy.
 6            MS. BARTOSZ:  Your Honor, I'm proffering to the
 7   bench Exhibit GY, Dr. Lessing's report.
 8            THE COURT:  Thank you.
 9            MS. BARTOSZ:  And may I provide a copy of the
10   report to Dr. Lessing as well?
11            THE COURT:  You may.  Let's get her sworn.
12            THE CLERK:  Can you please stand and raise your
13   right hand.
14            Do you solemnly swear the testimony you are about
15   to make in the matter now pending before this Court will be
16   the truth, the whole truth, and nothing but the truth, so
17   help you God?
18            THE WITNESS:  I do.
19            THE CLERK:  You can be seated.
20            THE WITNESS:  Thank you.
21                  LENETTE AZZI-LESSING
22                  DIRECT EXAMINATION
23   BY MS. BARTOSZ:
24   Q    Would you please state your name for the record?
25   A    Yes.  It's Lenette Azzi-Lessing.
```

1   Q   Where do you reside, Dr. Lessing?

2   A   Bristol, Rhode Island.

3   Q   What's your current employment?

4   A   Wheelock College.

5   Q   Where is Wheelock College located?

6   A   Wheelock College is located in Boston.

7   Q   What's your position at Wheelock College?

8   A   I'm an associate professor in the master's in social

9   work program.

10  Q   For how long have you been employed at Wheelock College.

11  A   Six and-a-half years.

12  Q   Have you held a variety of positions over that time?

13  A   I was initially hired as an assistant professor and then

14  promoted to associate professor.

15  Q   Have you come under tenure review?

16  A   Right.

17  Q   What was the outcome of that review?

18  A   I was awarded tenure.

19  Q   When did that take place?

20  A   Last March.

21  Q   Dr. Lessing, I would like to give the Court a sense of

22  your background, and let's begin with your education.

23          You have a master's degree?

24  A   Right, a master's degree in social work.

25  Q   Where you obtain that master's degree?

1   A    Washington University in St. Louis.

2   Q    Can you describe what was involved in the course work

3   required to attain a master's degree?

4   A    Master's degree in social work particularly requires 60

5   hours of course work, including two, two years of internship

6   in social service setting of some sort.

7   Q    When did you receive your master's?

8   A    December 1980.

9   Q    Did you pursue further education beyond the master's

10  level?

11  A    Yes.  I took several courses in an MBA program at the

12  University of Rhode Island, and I also completed a Ph.D. in

13  human development and family studies at the University of

14  Connecticut.

15  Q    University of Connecticut, a particular campus?

16  A    Storrs.

17  Q    Is there a particular part of the University of

18  Connecticut that you were enrolled in for the Ph.D.?

19  A    Right.  In the human development and family studies

20  department.

21  Q    For purposes of -- well, in pursuing your Ph.D. were you

22  required to prepare a dissertation?

23  A    Yes, I was.

24  Q    Can you talk about that dissertation, what it addressed?

25  A    Sure.  My dissertation was groundbreaking in terms of

1    addressing the importance of conducting thorough needs

2    assessment before developing family support programs, and it

3    was particularly targeted toward low income families, those

4    that might be at risk for child abuse and neglect or other

5    poor outcomes, and I developed a methodology for

6    interviewing families in a community to determine what

7    services and programs and service linkages might be the most

8    desirable to include in family support programs.

9    Q    You just used the term groundbreaking.  What do you mean

10   by that?

11   A    Well, that's not what is typically done.  Programs are

12   developed and launched into communities unfortunately

13   without much regard for the makeup of that community, the

14   potential needs and desires of the family in that community.

15   And I was essentially putting together the, the research and

16   technology on needs assessment methodology with family

17   support service planning in preparing my dissertation.

18   Q    When you refer to family support services where are

19   those services delivered, as least as you contemplated it in

20   your dissertation work?

21   A    Primarily in the home, and primarily in the home of low

22   income families with young children.

23   Q    Children still with their birth parent or guardian?

24   A    Primarily children, not exclusively, but primarily

25   children with their birth parents, yes.

1    Q    When did you receive your Ph.D.?

2    A    1996, I believe.

3    Q    What was your first job, Dr. Lessing, in the field of

4    social work?

5    A    My very first job was after my undergraduate program, I

6    was hired to coordinate a Big Brothers/Big Sisters program,

7    a volunteer program in a county in, rural county in Ohio in

8    which I worked with a caseload of children and families who

9    were involved with the child protective system in Ohio.

10           The way that the Big Sisters/Big Brothers program

11   was set up there was that all of the cases were child

12   protective cases, open child protective cases.

13   Q    And by open child protective cases are you indicating

14   that the children are in foster care custody or not yet in

15   foster care custody.

16   A    Not in foster care custody.  These were children living

17   with at least one parent where there was enough risk

18   indicated in the case that it was open to child protective,

19   the county child protective services.

20   Q    Who was your employer?

21   A    Again, it was a small organization called Big

22   Brothers/Big Sisters.  And it was, the director of the

23   organization was actually a supervisor in the county child

24   protective program, so I reported to him.

25   Q    Did you carry a caseload?

1    A    I did.

2    Q    Can you describe how large a caseload?

3    A    I would say probably 20 to 25 children and their

4    families.  And, you know, part of what I did was work with

5    the volunteers who were matched with those children and

6    their families.  Part of what I did was recruiting new

7    volunteers and putting them through screening process and

8    matching them with some of the children.  And part of what I

9    did was some case work with the children and the families

10   themselves in terms of if they had a need for, I don't know,

11   a piece of equipment or better housing or, you know, maybe

12   summer camp for the child, something like that, of linking

13   them with those kinds of services.

14   Q    For how long did you work with the Big Brothers/Big

15   Sisters program?

16   A    A year and-a-half to two years.  And then I, I left the

17   area to pursue my master's degree in St. Louis.

18   Q    What was your next job in the field of social work?

19   A    Paid employment or internship?

20   Q    Let's start with the next in line chronologically

21   whether it was paid or not.

22   A    Okay.  When I was an MSW student in the graduate school

23   in Washington University in St. Louis, I did two nine month

24   field placements, approximately 20, 25 hours a week.  One

25   was with an organization called Lutheran Social Services in

1    which I worked in the adoption unit and worked with a birth

2    mother who was expecting a baby and was planning to place

3    that baby for adoption.  I also got involved in helping to

4    screen and prepare adoptive parents.

5         My second field placement was at an organization

6    called Center for Family Mental Health which was in an inner

7    city, very low income community in St. Louis where I

8    provided mental health services to children and adults.

9    Q   And you said you provided the mental health services.

10   Were you providing direct social work care to children?

11   A   Yes.  Direct social work care to children and families,

12   and a few single adults.

13   Q   Can you describe generally for the Court the nature of

14   the care that you were providing during that period of time?

15   A   Sure.  Typically a comprehensive assessment assessing

16   the functioning of the person or the, or the child, the

17   family, the adult, looking at family systems, looking at

18   social supports, looking at whether the basic needs of the

19   family or the child or the adult were being met,

20   occupational issues, contacting schools to get collateral

21   information about how children were functioning in school.

22   So conducting a thorough assessment and developing a

23   treatment plan in collaboration with the client and/or

24   family, and then implementing that treatment plan in terms

25   of delivering mental health services, usually weekly

1    counseling.

2    **Q**    What kind of -- what was the array of mental health

3    services that you might include in the treatment plan during

4    this period of time?

5    A    Primarily I was using task centered treatment and

6    behavioral, cognitive behavioral methods of therapy.  Task

7    centered is a model of psychotherapy that had eventually

8    evolved into something that's called solution focus therapy

9    right now.  And it's about, you know, dealing very much in

10   the present and collaborating with individuals and families

11   in producing the kinds of outcomes that are desired in

12   therapy.

13   **Q**    This was the second placement that you had during the

14   course of your master's work?

15   A    Yes.

16   **Q**    For how long were you working for the Center for Family

17   Health Systems?

18   A    The Center for Family Mental Health, about nine months.

19   And the same with Lutheran Social Services, nine months.

20   **Q**    What was your first social work related position or

21   employment after you completed your master's work?

22   A    After I completed my master's, I began employment at

23   Charlton Memorial Hospital in Fall River, Massachusetts.

24   **Q**    What was your position there?

25   A    I was a medical social worker and Charlton was in the

process of absorbing another hospital, so I was actually

working in two hospital settings.  I worked with, in an

oncology department with cancer patients mainly in the final

stages of life, and I also worked as the OB/GYN social

worker on the maternity units in both facilities.

**Q**    Were you providing direct services to clients at that

time?

A    Yes, I was.

**Q**    Can you generally describe the nature of those services?

A    Sure.  With the oncology patients a lot of it was

support, listening to their concerns, working with families,

helping families understand what the patient was going

through, helping the medical staff understand some of the

patients' concerns or worries, what the patient might need.

With the OB/GYN units, the two maternity units, I mostly was

called when the nursing staff or the medical staff, the

physicians had a concern related to the well-being of a

mother and/or baby that was beyond the medical.  For

instance, if we had a young single mother coming in to

deliver a baby then I would interview her, make sure that

she had a place to live, make sure that she had social

supports, you know, whether she was going to live with her

parents or out on her own, making sure what we had follow-up

services in place, visiting nurse, and those kinds of

services.  Making sure that she had information about

1    educational and vocational opportunities, those kinds of

2    things.  But also mainly ensuring that the infant would be

3    well cared for when it left the hospital.

4            Sometimes my work involved contacting what was then

5    called DSS, the Massachusetts Department of Social Services

6    which is now called DCF.  And if I had serious concerns

7    about whether the child would be well cared for when leaving

8    the hospital with the mother, I would contact DCF and file a

9    report and then collaborate with DCF in terms of planning

10   for discharge of the mother and the baby.

11   Q   When you say you would file a report in those instances

12   with then DSS, was there a particular kind of report you're

13   referring to?

14   A   Yeah, it's what's called a 51A which is a report of

15   suspected child abuse and neglect.

16   Q   Are you familiar with the term mandated reporter?

17   A   Yes.

18   Q   Were you a mandated reporter at this point?

19   A   Yes, it was my understanding that I was a mandated

20   reporter as a social worker.

21   Q   And by the way, at this time were you a licensed social

22   worker?

23   A   Not yet.  No, there was, there was no such thing as a

24   licensed socia worker in Massachusetts or Rhode Island at

25   that time.

1   Q    Did there come a time where you secured licensure as a

2   social worker?

3   A    Yes.

4   Q    When was that?

5   A    I couldn't tell you exactly.  It's probably about 20

6   years ago, maybe a little bit longer.  But I was among the

7   first group of social workers in Rhode Island because I was

8   working and living in Rhode Island at the time.  I was among

9   the first group of social workers to be licensed in Rhode

10  Island.

11  Q    For how long did you work at Charlton Memorial Hospital?

12  A    Almost two years.

13  Q    Have you identified at this point the nature of the work

14  that you participated in in those two years?

15  A    Yes, pretty much.  The other thing that I did I guess

16  that I haven't mentioned is, I used to oversee a prenatal

17  class, one session of the prenatal classes that expected

18  parents would take at the hospital.  And it was my job to

19  help prepare parents for the social and emotional impact of

20  having a new baby in the home.

21  Q    Following your approximately two years at Charlton where

22  did you take on your next employment?

23  A    I was hired by an organization in Rhode Island called

24  Cranston Community Action Project.  And this was an

25  organization that had a health center, a Headstart program,

1    some basic social service programs that got at meeting

2    people's basic needs for housing and heat in the wintertime,

3    food and so forth.  And the agency had just gotten a grant

4    to set up a Comprehensive Emergency Services program.  This

5    was a contract with Rhode Island DCF to develop essentially

6    a differential response program for families that came to

7    DCF's attention but the level of risk, it didn't necessarily

8    warrant DCF opening a case on these families.

9    **Q**    Generally what is involved in a differential response

10   program?  What does what term refer to?

11   A    Well, again, it's identifying, it's the public child

12   welfare agency identifying families where there is concern

13   and there is some level of risk for abuse and neglect to the

14   child and children, but providing these families with an

15   alternative of coming fully and formally into the system and

16   instead referring the families to a community based

17   organization that would have a sufficient array of services

18   to ensure that the children are kept safe and that whatever

19   problems brought the family to the attention of child

20   protective services that those problems could be

21   successfully resolved so that the case did not end up in the

22   child protective system.

23   **Q**    To be clear, when a child or family is receiving

24   attention through a differential response program, in that

25   instance is the family intact and the child in the home or

1    is the child removed into some foster care or other state

2    custody.

3              **MS. TRAN:**  Objection.

4    A    No, in general --

5              **THE COURT:**  Wait a minute.  Ground?

6              **MS. TRAN:**  Leading.

7              **THE COURT:**  Sustained on those grounds.

8    **Q**   Can you describe whether the family is intact or

9    separated when a differential response program is in place?

10   A    Well, in the differential response program that I worked

11   in at Cranston Community Action, all of the families that

12   were referred to us were intact in that there was at least

13   one parent in the home caring for the child.  Now, sometimes

14   removal of the child or having the child out of the home for

15   a short period of time was desirable.  And so, we had to

16   develop our own foster homes.  We had one or two foster

17   homes at any given time that DCF would license for us, and

18   we used those foster homes mostly for respit in terms of

19   when it seemed like it would be good for the parent and

20   child to have a break from one another.  Then we would use

21   our own foster homes for respit care.

22              But all of the cases that were referred to us would

23   be intact in terms of least one parent in the home with the

24   child.

25   **Q**   Did you as a social worker perform work related to this

1    differential response or diversion program?

2    A    Yes, a small amount of direct service.  My role

3    primarily was to establish the program, to hire the staff,

4    to supervise the staff, to oversee the recruitment and

5    development and licensing of the foster home, to oversee the

6    24 hour hot lines that we had available, 24 hour emergency

7    services to the families that we were serving, and to make

8    sure that all the components of the program were working

9    together and were working effectively.  But periodically I

10   took a case, you know, that I would work, work on that.  I

11   would go to the home, do an assessment and collaborate with

12   the family in terms of resolving some of the conditions of

13   risk in the home.

14   **Q**    What was the nature of the assessment that you would

15   conduct when you did go to family homes?

16   A    Well, again, similar to those that I've described in

17   other setting.  Essentially, a very comprehensive

18   assessment.  You know, what are the strengths that the

19   family has, what are the resources and supports, what are

20   some of the deficits and difficulties, what are the

21   conditions that pose risk.  You know, are there things like

22   domestic violence, substance abuse going on.  You know,

23   how's the child doing in school or in Headstart.  What's the

24   level of supervision children are receiving.  How functional

25   are the parents.  Really a comprehensive assessment.

1    Q    When you secured information about all of the matters

2    you just addressed, what would you do with it?

3    A    Well, once again, collaborate with the family and

4    developing a service plan with specific goals and objectives

5    and a plan for meeting those goals and objectives in terms

6    of the kinds of services that we would provide, what the

7    family could expect from us and what we expected from the

8    family.

9    Q    How were families referred to the Cranston Community

10   Action program?

11   A    They were referred by Rhode Island DCF.  The screening

12   unit would get the, the call, the report of child abuse and

13   neglect or risk of abuse and make a determination that the

14   family was in need of some services, but did not necessarily

15   require being opened by the state agency.  And so they would

16   contact us and provide information about, about the family.

17   Q    Was the Cranston Community Action program under contract

18   with the state child welfare agency?

19   A    Yes, it was.

20   Q    For how long did you work at the Cranston Community

21   Action program?

22   A    I worked there for approximately two years.  And in that

23   time I also supervised the social worker that was assigned

24   to the Headstart program that the agency ran.  I also

25   supervised the director of the counseling program and

1    substance abuse program that the agency ran, and a social

2    worker based at the agency's health center.  So I

3    essentially supervised the social service staff at Cranston

4    CAP.

5    Q    What services were provided at the agency through the

6    mental health and substance abuse program?

7    A    It was primarily adult outpatient counseling for adults

8    with mental health problems like depression, anxiety, work

9    related problems, relationship related problems, and also

10   for adults who were affected by substance abuse.

11   Q    From time to time were these adults part of a family

12   with an open case file with the Rhode Island child welfare

13   agency?

14   A    Some of them were, yes.  And some of them were adults in

15   cases that we had in the CES program where they would get

16   their mental health services from the agency's mental health

17   program and we would be providing the family based services.

18   Q    When you say CES that's short for the Comprehensive

19   Emergency Services program?

20   A    Correct.

21   Q    What was your next position?

22   A    I went to work at Community Counseling Center in

23   Pawtucket, Rhode Island.

24   Q    Can you describe generally the services provided through

25   the Community Counseling Center?

1     A    The services that the agency provided, the full range?

2     **Q**    Yes.

3     A    Okay.  When I arrived at Community Counseling Center

4     they provided a range of mental health services to adults,

5     including adult community support, primarily for adults who

6     had been de-institutionalized.  These are adults that had

7     been in the state psychiatric hospital and other psychiatric

8     facilities and were learning to live in the community,

9     usually in group home kinds of settings.

10     There was, besides a group home for, for those

11     individuals, there was also home based services if they were

12     living with their family members.  Some of them were able to

13     live independently and receive case work services.  There

14     was adult outpatient counseling and adult substance abuse

15     counseling similar to what I described at Cranston Community

16     Action.  Emergency services, 24 hour capability to screen

17     adults on an emergency basis, either in the hospital or at

18     the center itself.  And a walk-in assessment emergency

19     services as well.

20     There were no children's services at Cranston

21     Community Action at the time, and I was hired to establish

22     those services.

23     **Q**    And did you establish those services?

24     A    Yes, I did.

25     **Q**    Please describe what efforts you made in that regard?

1    A    Okay.  One of the services that I had written a grant

2    for and received funding for was a Comprehensive Emergency

3    Services program, a CES program, very similar to that which

4    I oversaw at Cranston Community Action.  We developed

5    children's outpatient services, which were services where

6    children who were having difficulty in school or difficulty

7    at home or both or exhibiting some behavior problems,

8    children who may have been physically abused or there was a

9    suspicion of sexual abuse, kids of all ages who may have

10   been suicidal or concern about suicide risk, would come into

11   the agency and be assessed and evaluated and receive

12   outpatient counseling.  Again which often involved their

13   families, typically involved their families and also

14   collateral contacts with schools and other organizations

15   which the child and family would be involved in.

16          Under contract with DCF, we also developed in-home

17   services.  And these programs operated primarily to help

18   children who were at risk for psychiatric hospitalization or

19   residential care, remain safely at home.  And so this was

20   master's level social workers going into the home,

21   determining what was needed, diagnosing the child and then

22   creating the service plan and working with the family to

23   implement that service plan in order to keep the child safe

24   and attend to their well-being while they were in the home.

25          We also developed an alternative program for

1    adolescents who were in the public school system but whose

2    behavior was so severe and disruptive that they could not be

3    maintained in special ed. classrooms in the local public

4    schools.  And so, we hired our own special education faculty

5    and a couple of socia workers, counselors, and that team

6    provided an alternative school program as well as additional

7    social service and social support programs to those, to

8    those youths.

9           Children's emergency services, 24 hour availability

10   to assess and screen children and adolescents who may be in

11   crisis and may be at risk for suicide as well.

12          We also on a fee-for-service basis with DCF in

13   Rhode Island would evaluate, would undertake short term

14   evaluations of children and parents that were involved in

15   that system and write a report and sometimes recommendation.

16   Q    Those fee-for-service situations, what typically were

17   the issues that got you involved in the case?

18   A    DCF wanting additional information in terms of how the

19   parent was functioning, how the child was functioning, maybe

20   an assessment of the parent-child relationship to see if it

21   was a good relationship that should be supported, and very

22   often an assessment to determine whether abuse or neglect

23   was occurring, and most often in terms of the abuse neglect

24   cases to screen for child sexual abuse.

25   Q    How long did it take before you got the children's

1    services program that you were hired to build, how long did

2    it take until you got that up and running with actual case

3    referrals coming in?

4    A    Different periods of time.  I mean, over the four years

5    that I was there, by the time I left all of the programs

6    that I described were running and fully functional.  But

7    they, you know, they came up in waves in terms of the

8    funding that that was available and the amount of time it

9    took to put those programs together.  But, you know, at the

10   time that I was hired, Community Counseling Center was

11   really under a great deal of pressure from state department

12   of mental health to develop children's services because it

13   was out of compliance in terms of being a fully

14   comprehensive community mental health center.  So, services

15   came up probably a little quicker than they typically would

16   have given, you know, that kind of pressure on the

17   organization.

18   Q    During your employment at Community Counseling Center

19   did you supervise any staff.

20   A    Yes, I did?

21   Q    What staff did you supervise?

22   A    You know, I would say that by the time I left there were

23   probably 30 or more staff that were under my area of

24   responsibility, maybe a little more than that.

25         I began by supervising direct service staff myself,

1    people doing direct work with children and families.  And

2    then as our programs grew and we promoted people to be

3    managers and supervisors or we hired managers and

4    supervisors, the managers and supervisors reported to me and

5    the line staff reported to them.

6    Q   Beyond supervising the staff that you described during

7    your employment at Community Counseling Center, did you

8    perform direct services --

9    A   Yes.

10   Q   -- for children and families?

11   A   Yes.  And especially in the earlier years before the

12   program had fully grown and I had the time to do that.

13   Q   Can you describe the nature of the direct services that

14   you provided.

15   A   Yeah.  When I first came to the agency, because we had

16   no children's services, I had close to a full case load of

17   children and their families.  So, again, delivering

18   outpatient mental health services, doing assessments of

19   children who were being referred by DCF, writing reports,

20   really a whole range of service delivery.  And that tapered

21   off over time, you know, as we, as we became more fully

22   staffed and organized ourselves differently, there was less

23   and less time for that.

24   Q   In those instances where you were providing direct

25   services, Dr. Lessing, was there a particular age range of

1    your clients?

2    A    No, not really.   I mean, they were, they were children.

3    You know, children coming in as sort of the identified

4    patient.   So I worked with children as young as maybe three

5    years old and as old as 17.

6    **Q**    What are the range of mental health issues that you

7    encountered in your direct services work?

8    A    Everything from school problems, whether it was, you

9    know, what looked like school phobia, poor performance in

10   school, suspected attention deficit disorder, children who

11   might have had a conduct disorder, oppositional and defiant

12   behavior at home, or at school, bedwetting, nightmares,

13   children who have been traumatized, children who were being

14   physically abused, sexually abused, children whose parents

15   were engaged in some sort of domestic violence or substance

16   abuse, really a full range.

17            The communities that we served were among the

18   lowest income in the state.   Very diverse in terms of the

19   ethnicity of the families involved.   And there was a lot of

20   need in the community.   So, it was really, really a mix of

21   children and families living in quite challenging

22   situations.

23   **Q**    What was the range of mental health services you

24   provided or referred to children that you provided direct

25   services to?

1    A    That I provided personally?

2    Q    Yes.

3    A    Again, it was a combination of short term evaluation

4    work primarily for DCF that meant meeting with the child

5    and/or any, meeting with the child and also meeting with

6    family members, whatever family members might be available,

7    interviewing the DCF worker, talking with others who might

8    be involved with the case, visiting nurse, Headstart,

9    preschool, the school department, teachers, guidance

10   counselors, and then putting together an assessment that

11   talked about the child's strengths, the child's

12   vulnerabilities, what I saw going on and what I recommended

13   in terms of service delivery for that particular child.

14          Other cases, the counseling cases, more assessment

15   of the child and the family.  Again, contacts with

16   collateral schools and other entities that had contact with

17   the child and/or the family, and then collaborating with the

18   family to develop a service plan and then implement that

19   plan through outpatient counseling.

20   Q    How were child clients referred to the Community

21   Counseling Center?

22   A    It came from a whole range of sources, from state

23   agencies like the DCF, from schools, and a lot of

24   self-referrals in terms of parents looking for assistance in

25   parenting of children.

1    **Q**    Did the Community Counseling Center have a contract to

2    provide services for the Rhode Island Department of

3    Children, Youth and Families?

4    A    Yeah, we had a few contracts.  One of them was for an

5    intensive home based program that we established when I was

6    there.  And again, this was designed to help keep youths out

7    of residential care by providing intensive in home services

8    and the CES program, the Comprehensive Emergency Services

9    program that I just described, was also under contract with

10   the Department for Children and Families.

11   **Q**    In your work at the Community Counseling Center, did you

12   interact with Rhode Island DCYF?

13   A    Yes, I did.

14   **Q**    Can you describe the nature of those interactions?

15   A    Well, certainly when we were given a case by DCF to do

16   an evaluation, you know, one, one of the first procedures

17   was to talk with whichever DCF staff was involved with the

18   case and get their perspective and find out what their goas

19   were for the evaluation, what kind of information were they

20   looking for, you know, what that were their concerns and so

21   forth.  And then once the evaluation was prepared, you know,

22   it would be submitted to DCF.

23        Other ways is if a family came in for services or a

24   child came in for services and we learned that they were

25   involved with DCF or had been involved with DCF then we

1    would immediately ask for a release of information so that

2    we could talk with DCF and coordinate with them.

3            And sometimes, actually quite often we would be

4    working with a child and family that was noting linked to

5    DCF and information that we would uncover in the process of

6    an evaluation and assessment or ongoing services would

7    warrant that we would as mandated reporters contact the DCF

8    and file a report of suspected, of suspected child abuse and

9    neglect or high risk for child abuse and neglect.

10   **Q**   In Child welfare departments, Dr. Lessing, are you

11   familiar with the term risk assessment?

12   A    Yes.

13   **Q**   And what is risk assessment?

14   A    Risk assessment is a process by which professionals

15   examine a situation in which a child is living and

16   determines the degree to which that child can be safe and

17   his or her well-being protected in that setting; taking a

18   look at potential threats to the safety and well-being of a

19   child, and looking for potential resources to support safety

20   and well-being, and making a decision in terns of whether

21   that is a safe setting for that child to be in, whether it's

22   a biological home or whether it's a substitute setting.

23   **Q**   During your employment at either Cranston Community

24   Action program or the Community Counseling Center in

25   Pawtucket, did you become involved in conducting risk

1    assessments?

2    A    Yes.

3    Q    Can you describe your experiences?

4    A    Well, again, in the CES program, our work was to

5    determine and monitor the level of risk of all of the

6    children that were on the caseload.  And so this meant, you

7    know, continually assessing parents' ability to care for

8    their children, to keep them safe, and the level of risk to

9    which it appeared likely that the parent may harm the child

10   or neglect the child in a way that harm might come to the

11   child.

12           At Community Counseling Center, our home based

13   programs were doing the same thing, and really in all of the

14   cases that we got there was risk assessment because these

15   were families living in difficult circumstances, many of the

16   parents were under a great deal of stress and had low levels

17   of education, difficult economic situations, and so we were

18   sort of constantly assessing to make sure that children were

19   in safe and supportive settings as much as, as much as we

20   could possibly do given, you know, the circumstances of our

21   involvement with the child or with the family.

22   Q    Were any of the clients that you served at Community

23   Counseling Center clients who had already been subject to

24   abuse or neglect in a family home?

25   A    Yes.

1    **Q**    About what percentage of your clients fell into that

2    category?

3    A    I don't know that I could hazard an estimate.  It's far

4    removed.  But it was not uncommon, you know, I can say that.

5    Sometimes we dealt with adults who had grown up in and out

6    of foster care and group care.  Sometimes we were working

7    with families that were either still open to DCF or had been

8    open to DCF in the past.  It was not uncommon.

9    **Q**    For how long were you at the Community Counseling

10   Services?

11   A    Four years.

12   **Q**    What did you do next?

13   A    Well, just by way of a little bit of background, while I

14   was at Community Counseling Center, one of, one of our

15   greatest frustrations and mine personally was that so many

16   of the resources that the state had to utilize for the

17   well-being of children were being used up by children at the

18   far end of the spectrum.  And by that I mean older children

19   whose problems had been developing for many years but who

20   now needed residential care, needed very expensive

21   comprehensive home based care.  Rhode Island at the time was

22   placing a lot of children in out-of-state care which was

23   hugely expensive and certainly produced some hardships for

24   the children and families participating in that care.  And

25   so many of the children that we were working with at

1    Community Counseling Center, especially the really tough

2    adolescents with whom we did not have a very good success

3    rate, for whom the prognosis was not very good, so many of

4    those children that, you know, came to our attention had

5    records that began when they were very young.  Some of them

6    at the preschool level of when they first became involved

7    with Headstart, some of them even earlier than that where a

8    visiting nurse or a Headstart teacher saw that this was

9    perhaps a young mom that was overwhelmed in trying to care

10   for one or two young children, didn't have much support, or

11   maybe a mother who was in a domestic violence situation and

12   trying to care for a couple of children.  And the family

13   would be referred to services, but unless they came

14   consistently, unless they had the right insurance, unless

15   the right services were, you know, cued up and ready for

16   them, most of these families had fallen through the cracks

17   and didn't surface again until the child's behavior and

18   other problems were, were very serious and disturbing and at

19   times seemed to be intractable.

20          And so, I left my position at Community Counseling

21   Center and worked with a group of people to form a

22   501(c)(3), a private nonprofit organization called the Rhode

23   Island Center for Children at Risk, with the mission of

24   providing more comprehensive, appropriate services to

25   families with very young children who were already beginning

1    to struggle, with the express goal of preventing things from

2    getting worse and preventing poor outcomes for the children

3    and those families.

4    **Q**    You were a founder of the 501(c)(3)?

5    A    Yes, I was the founder.

6    **Q**    Did it have a name?

7    A    It was called the Rhode Island Center for Children at

8    Risk.   Yes.

9    **Q**    Who originally came up with the thought or the idea of

10    creating thea Rhode Island Center for Children at Risk?

11    A    It was my idea.   And I, I engaged a few people.   One of

12    them actually was at the time the Rhode Island child

13    advocate who I knew.   Another was two legislators that I

14    knew who were very strong advocates for children, children's

15    mental health and children's well-being.   And they formed

16    the initial board along with my former employer from

17    Cranston Community Action and the Commissioner of Human

18    Services, the welfare commissioner essentially of Rhode

19    Island also joined the board.   And they and a few other

20    folks who I may not remember right now, formed the founding

21    board of the Rhode Island Center for Children at Risk.

22    **Q**    Did the Rhode Island Center for Children at Risk have a

23    particular program model?

24    A    The program model that I had in mind was comprehensive

25    home based, community based, and was less about taking a

1    model that works somewhere with someone and trying to

2    implement it with these families and more about finding out

3    what the families wanted and needed and delivering services

4    based on that principle.

5    **Q**    Who developed that program model?

6    A    I, I did.  Based on some pieces of other, of other

7    programs that I saw operating in other parts of the state.

8    This was a time when the awareness of the fact that we

9    needed to be doing more for young children who were clearly

10    in trouble began to rise in the US.

11    **Q**    Did you have to seek funding --

12    A    Yes.

13    **Q**    -- to launch this 501(c)(3).

14    A    Yes.  And I was unpaid executive director for a long,

15    long period of time.  And during that time in order to earn

16    a living I became employed by Rhode Island College and

17    taught as a full-time professor of social work in the

18    master's in social work program for four years.

19    **Q**    And where is Rhode Island College?

20    A    In Providence.  And because I didn't have a Ph.D. and

21    was not pursuing a tenure track, I wasn't required to

22    publish, I wasn't required to do a lot of things that tenure

23    line faculty have to do.  And so that provided me with a

24    great deal of freedom and flexibility to concentrate on the

25    development of the agency those four years.

1   **Q**   Did you land funding to launch the 501(c)(3)

2   organization?

3   A   Yes.

4   **Q**   Can you describe the process that led to that?

5   A   Well, starting out with very, very small pieces of

6   funding.  Our first grant I think was $8,000 from the

7   Children's Trust Fund of DCF.  The second grant was $6,000 I

8   think from the Citizens Foundation in Rhode Island.  And

9   then working collaboratively with DCF, I developed a model

10  program for working with open DCF cases, families that were

11  open to DCF and involved in DCF's system, largely because of

12  parental substance abuse.  This is about the time when the

13  so-called crack babies entered the public consciousness.

14  Crack cocaine was very readily available in poor urban

15  neighborhoods and child protective systems all over the

16  country were experiencing an influx of cases with, with

17  mothers, largely with mothers who tested positive for crack

18  cocaine when they delivered the baby and these babies coming

19  into care.  So, we developed an approach and working very

20  comprehensively with these families.  My agency was too

21  small a budget and capacity-wise to, to be awarded a large

22  federal grant, and so I worked collaboratively with

23  colleagues within DCF's administration, had the blessing of

24  the commissioner, and the grant was submitted by DCF, it was

25  funded by the Administration for Children, Youth and

1    Families, and DCF once it was awarded that grant

2    subcontracted it to my agency.

3    **Q**    To be clear, when you refer to DCF you're referring to

4    Rhode Island DCF?

5    A    Rhode Island DCF, which has been DCF, DCYF, DCF, and now

6    it's back to DCYF.

7            **THE COURT:**    And if I'm following your testimony,

8    all this experience is in Rhode Island so far?

9            **THE WITNESS:**    Yes.  Uh-huh.  Although when I taught

10   at Rhode Island College School of Social Work, I had a

11   number of students who worked for DSS, which is what DCF in

12   Massachusetts used to be.  So I had a number of students

13   that worked for DCF particularly in the Fall River and New

14   Bedford offices.  So I got to learn more about DCF's

15   practices through working with those students.

16   **Q**    For how long did you work with the 501(c)(3) named Rhode

17   Island Center for Children at Risk?

18   A    Four years.

19   **Q**    How large was the Rhode Island Center for Children at

20   Risk in terms of budgets and staff at the end of those four

21   years?

22   A    At the end of those four years it was about a half

23   million dollars, $500,000.  Staff, eight, eight, nine staff

24   people close to full-time, maybe a few of those part time.

25   And a small army of student interns.

1    Q    At the tail end of those four years, can you describe

2    what programs were being delivered by Rhode Island Center

3    for Children at Risk?

4    A    Sure.  There was a small, too small home based program,

5    you know, whatever funding would allow, where we would send

6    a master's level social worker in the home of a young child

7    who had been identified by the Central Falls school

8    department, the teachers there, they were running a special

9    preschool program for children that were identified as

10    having fairly significant emotional or behavioral problems.

11    Most of these were four year olds.  And so the teachers

12    would refer those kids and their families to us and our

13    social workers would go out and identify what the family

14    needed and desired and collaborate again with the treatment

15    plan to meet those needs.  The lion's share of our funding

16    and our work was, you know, what was called Project Connect,

17    and this was the program that worked with families affected

18    by substance abuse who were in the DCF system.

19    Q    What was the typical location for service delivery in

20    the Project Connect program?

21    A    In both programs it was in the family's homes and these

22    were in very low end income neighborhoods.

23    Q    Who was your next employer?

24    A    My next employer was -- well, actually what happened is

25    there was an opportunity to merge the Rhode Island Center

1    for Children at Risk into an organization called Children's

2    Friend and Services.  Children's Friend and Services had

3    been operating in Providence since 1834 and was providing

4    some similar and some different services than what the

5    Center for Children at Risk was providing.  It had

6    constructed a new headquarters in the low income part of

7    Providence, south Providence, and its executive director was

8    retiring after many years of services.  And so, my board and

9    I proposed to Children's Friend board that we merge the two

10   entities together and go under the name of Children's

11   Friend, which is a short name of Children's Friend and

12   Services, and essentially combine services and programs, and

13   I would serve as its executive directory of the agency which

14   in fact happened, and I served in that capacity for 13

15   years.

16   Q    When did the merger take place.

17   A    1994.

18   Q    And at the time of the merger what position did you

19   hold?

20   A    I was the executive director of Rhode Island Center for

21   Children at Risk, and then I became the executive director

22   of the integrated organization Children's Friend.

23   Q    For how long did you serve as executive director?

24   A    Thirteen years.

25   Q    In terms of staff and funding, how large was this

1    combined organization?

2    A    Children's Friend had maybe 26, 28 staff at the time.

3    And so with the combination with the Center for Children at

4    Risk staff, we had about 35, 36 staff, maybe a little bit

5    mere.

6    Q    Can you describe the program offerings of the combined

7    entity Children's Friend?

8    A    We had a home based program that I described for young

9    children which we were calling Project Giant Step.  We had

10   Project Connect working with the substance abuse affected

11   families in the DCF system.  Children's Friend had am

12   adoption program that was many decades old, one of the

13   oldest adoption programs in the country, mostly placing

14   infants for adoption and working with prospective adoptive

15   parents primarily, infertile couples looking to adopt.

16   Children's Friend had a small network of foster homes that

17   it used for when birth parents placed their babies with the

18   agency prior to the child being placed in a pre-adoptive

19   home.  And some of those foster, foster care slots were open

20   to DCF.  Children's Friend's specialization at the time in

21   terms of its foster care slots for DCF were children with

22   complicated medical needs.  There was, there was a lot of

23   attention to those particular needs for the children that

24   were placed in those foster homes.

25           Children's Friend also ran a family day care

1    network.  These were licensed family day care providers

2    particularly in low income urban neighborhoods, and many of

3    them Spanish speaking, and the agency oversaw the licensing.

4    DCF licensed those foster homes, I mean those day care

5    homes, but Children's Friend oversaw the licensing process,

6    made sure that the families kept their licenses up, provided

7    training on a regular basis, both group training in the

8    agency and home based support and consultation and

9    monitoring of those family day care providers.

10           At that time, Children's Friend also held the

11   contract in Rhode Island for the center that trained family

12   day care providers.  Actually family day care providers and

13   people who worked in formal day care centers were trained by

14   Children's Friend at that time.

15           There was also outpatient mental health services

16   available through Children's Friend and a home based program

17   for families with young children called Right Start.

18   **Q**   You testified, Dr. Lessing, that the network of foster

19   homes operated through Children's Friend was small when you

20   began at the organization.

21   A    Yes.  Uh-huh.

22   **Q**   Did that evolve over time?

23   A    Yes, it did.  Yes.

24   **Q**   Describe that?

25   A    Well, we expanded that primarily at DCF's request

1   because DCYF was continually looking for safe foster homes.

2   And again, our specialization was young children and

3   particularly those that had advanced medical needs, some of

4   them technologically dependent.  And so, we looked to

5   recruit more foster homes than were in our network when I

6   initially found it and have those homes licensed, prepared

7   and supported to take care of kids at DCF with placements.

8   **Q**   Are you familiar with the term child placing agency?

9   A   Yes.

10  **Q**   And what does that term refer to?

11  A   It's, at least in Rhode Island it was a licensing

12  category that would be given to an organization that DCF

13  licensed to oversee foster homes and to basically make

14  decisions about placing children in those foster homes.

15  **Q**   During your 13 years as its executive director was

16  Children's Friend a licensed child placing agency?

17  A   Yes, it was.

18  **Q**   Focusing for a time on the foster care program that

19  Children's Friend operated.  How did Children's Friend

20  develop its pool of foster homes?

21  A   I don't know how the initial pool had been developed

22  because I wasn't there at the time that that was developed.

23  But after I took over the agency, we became engaged in

24  recruiting good foster parents.  So, you know, we used

25  media, we used churches.  We would send staff to go out and

1    talk to church groups, to talk to parent groups at schools.

2    You know, a whole variety of venues.  And once we had

3    someone who was interested in becoming a foster parent, we

4    would begin screening them and then we would work with DCF

5    to get them trained and licensed by DCF, and then we would

6    provide support in terms of, you know, whatever kind of

7    assistance they might need, and if they got overwhelmed in

8    caring for the children that were placed with them we would

9    send a social worker social worker out and provide support

10   and help that way as well.

11   Q    How were children referred to Children's Friend foster

12   homes?

13   A    By DCF workers?  DCF would contact the director of our

14   foster care program at Children's Friend, describe the

15   child, what needs they had, and then the, the manager or

16   director of foster care services would look at our cadre of

17   foster homes and see whether there might be an opening for a

18   child and assess the fit and then get back to DCF and

19   coordinate the placement of that child in that particular

20   foster home.

21   Q    You just used the phrase assess the fit.  Are you

22   referring to placement matching?

23   A    Yes, just making sure that what particular foster home

24   could provide would meet the needs of that particular child.

25   Q    How did Children's Friend perform placement matching?

1   A   Learning as much as possible about what the child

2   needed, and then again looking at our cadre of foster

3   parents and those with available opening and making an

4   assessment in terms of whether that foster placement could

5   meet that child's needs.  Sometimes it meant contacting the

6   foster parent who might have an opening and giving a

7   description of the child and his or her needs and talking it

8   through with the foster parent, talking it through with the

9   rest of the adoption/foster care team to determine and make

10  a decision in terms of, you know, whether this might be a

11  good fit to meet this particular child's needs.

12  **Q**   Are you familiar with an entity named the Council on

13  Accreditation?

14  A   Yes.

15  **Q**   What do you understand that to be?

16  A   The Council on Accreditation is a national organization

17  that promulgates standards regarding various aspects of

18  practice for agencies like Children's Friend that serve

19  children and families.  The council's primary function is to

20  accredit organizations which essentially is a way in which

21  state agencies and private funders, federal funders can

22  identify organizations that meet a certain high standard

23  regarding their practices and procedures.

24  **Q**   Was Children's Friend accredited by COA?

25  A   Yes, it was when I, when I arrived and it maintained its

1    accreditation through my departure.

2    **Q**    Are you familiar with an organization called the Child

3    Welfare League of America, or CWLA?

4    A    Yes, I am.

5    **Q**    Was Children's Friend a member of that organization?

6    A    Yes.  Children's Friend was a founding member of the

7    Child Welfare League of America when it came into existence

8    more than a hundred years ago.

9    **Q**    Did Children's Friend during your 13 year tenure there

10    provide mental health counseling services.

11    A    Yes.

12    **Q**    Can you describe that program?

13    A    Well, when I first got to Children's Friend the mental

14    health counseling services were quite traditional, meaning

15    that the cases was primarily adults and the work was long

16    term and at times unfocused.  And so, part of my work as the

17    new director was to reshape that program and to make it more

18    child oriented and to make it more comprehensive to ensure

19    that the clinicians in that program were working not only

20    with the child and a parent, for instance, but with the

21    school with DCF, the cases open to DCF.  And, you know, as

22    I've described other services that I've been involved in

23    initiating, making sure that that comprehensive approach was

24    implemented, and also that there be more accountability in

25    that, in that program which we inserted.

1    Q    Are you familiar with the term permanency planning as

2    it's used in the child welfare field?

3    A    Yes, I am.

4    Q    What does that term refer to?

5    A    My understanding of permanency planning is that it is

6    the critical work that anyone involved in child welfare

7    practice engages in as soon as a child is removed from his

8    or her biological home.  And it has to do with ensuring that

9    the child doesn't remain in substitute care a day longer

10    than is absolutely necessary, and that a permanent setting,

11    preferably always a permanent family setting, is identified

12    for that child, whether it is reunification with biological

13    family members, whether it's a kinship placement with

14    relatives, or whether it's an adoption placement, long term

15    guardianship placement, but that permanency planning is

16    about being proactive and ensuring that once children come

17    into care that they leave temporary care as soon as possible

18    for a permanent setting.

19    Q    During your tenure at Children's Friend did the agency

20    have involvement in permanency planning --

21    A    Yes.

22    Q    -- as you just defined that term?

23    A    Yes.

24    Q    Can you describe that, please?

25    A    Well, initially it was in the foster care program.  We

1    felt that we had an important role to play with the children
2    DCF placed in our foster homes and helping DCF, essentially
3    supporting DCF's work in assessing what kind of family that
4    child would best thrive in.  And working with biological
5    parents sometimes, working with our own foster parents, and
6    being in touch with adoptive parents, prospective adoptive
7    parents that might be interested in adopting one of the
8    children that are in that foster home.
9            Eventually we wrote and received a federal grant, a
10   the federal demonstration grant to work with DCF on cases of
11   other children who were not necessarily our foster children
12   but were at risk for drifting in the foster care system.
13   This program was called the Partners in Permanency program,
14   and it was about, sort of as the name says, partnering with
15   DCF, sometimes biological parents, sometimes prospective
16   adoptive parents, sometimes foster parents that might be
17   open to considering adopting the child that they were
18   fostering and doing whatever it took to help move that child
19   to permanency.
20   **Q**    A partner in permanency?
21   A    Partners in permanency.
22   **Q**    Partners in permanency.  I'm sorry?
23   A    It's hard to pronounce, I know.
24   **Q**    That was funded through federal dollars?
25   A    Yes.

1    Q    How did you access those federal dollars?

2    A    By writing a grant proposal and having DCF and other

3    community based agencies write letters of support and

4    memoranda of agreement in terms of how we would collaborate

5    together if funded.

6    Q    How were children referred to the Partners in Permanency

7    program.

8    A    By DCF staff.  Sometimes line workers and sometimes

9    supervisors.

10   Q    You've testified briefly already here about the Child

11   Welfare League of America --

12   A    Uh-huh.

13   Q    -- in relation to Children's Friend.  Have you

14   individually had involvement with the CWLA?

15   A    Yeah, I, I knew of CWLA and used their materials and

16   resources for a long time in my teaching and other work, but

17   didn't have direct contact with the organization until I

18   came to Children's Friend.  And because Children's Friend

19   was a member of the Child Welfare League of America then I,

20   then I got to know the organization much better.  I for a

21   number of years attended its annual conferences.  And very

22   quickly after joining Children's Friend joined the Child

23   Welfare League of America's national committee on family

24   support.  I think it's, it was last called, it had a couple

25   of different names, but I think it was last called their

1    national committee on prevention, protection and family

2    support.  Within a couple of years of joining that committee

3    I became co-chair of the committee and served as co-chair

4    throughout my years at Children's Friend and beyond.  And

5    then in the past, I would say probably within the past two

6    years, no, no longer than the past two years, Child Welfare

7    League essentially changed its committee structure and now

8    has two national commissions, one on child protection,

9    basically on child welfare practice, and another one on

10   child welfare policy.  And I participate on both of those

11   commissions at this time.

12   **Q**   Can you describe what's involved in your work on the

13   child protection commission?

14   A   Child protection and the child policy commissions are

15   both still sort of finding their footing.  But the work that

16   we are focused on is really setting standards.  Child

17   Welfare League has always has long been in the process of

18   setting and establishing standards for protection of

19   children, in care of children in child welfare type

20   organizations.

21          When I first became involved with the Child Welfare

22   League they were very much in partnership with the Council

23   on Accreditation which accredited our agency.  And so child

24   welfare from my vantage point, my understanding was that

25   Child Welfare League took the lead in developing standards

```
 1    of practice that COA then the Council on Accreditation would
 2    utilize for its accrediting work.  Over time, the two became
 3    separated in their work.  And so --
 4              THE COURT:  All right.  I'm sorry.
 5              THE WITNESS:  -- to be --
 6              THE COURT:  No, no objection.  I just wondered if
 7    you had perhaps finished your answer.
 8              THE WITNESS:  Oh.  Okay.
 9              THE COURT:  You have.
10              THE WITNESS:  Yes.  Okay.
11              THE COURT:  All right, we'll stop.  You may step
12    down.
13              (Whereupon the witness stepped down.)
14              THE COURT:  Let me say that the procedure for
15    submitting and reviewing these depositions is in my judgment
16    in fine shape.  I understand the objections.  And so we may
17    be clear, where I have sustained the objections I have
18    crossed matters out and initialed it; where I have not, the
19    objection is overruled.
20              Thus far, I have reviewed, and they are part of the
21    record, the following depositions and exhibits.  The
22    30(b)(6) deposition of the Massachusetts Department of
23    Children and Families by Terrence M. Flynn taken Tuesday,
24    September 22, 2011, and the deposition of Russell Livingston
25    taken Friday, January 8, 2012.
```

```
 1              The current, at the end of the third day of trial,
 2       the current elapsed time, the plaintiff has used up one day,
 3       two hours and 30 minutes, and the defense has used up one
 4       day and one hour.
 5              We'll -- yes, Mr. Gleason.
 6              MR. GLEASON:  Could I just ask -- for a moment,
 7       your Honor?
 8              THE COURT:  Yes.
 9              MR. GLEASON:  Given the schedule changes from this
10       week and last, we find ourselves in a little bit of a
11       witness bind.  We discussed it with the defendants.  So, we
12       would like to suspend with this witness at this time and
13       bring our next scheduled witness onto the stand on
14       Wednesday.
15              THE COURT:  And that's perfectly right.  I
16       appreciate the courtesy.  It's something I think I'll be
17       able to follow, and I hope you will do that.
18              We will recess then in this case until 9:00 a.m.
19       next Wednesday.
20              MS. BARTOSZ:  Thank you, Judge.
21              THE COURT:  We'll recess.
22              THE CLERK:  All rise.
23              (Adjournment.)
24
25
```

```
 1                    C E R T I F I C A T E

 2

 3

 4        I, Donald E. Womack, Official Court Reporter for

 5   the United States District Court for the District of

 6   Massachusetts, do hereby certify that the foregoing pages

 7   are a true and accurate transcription of my shorthand notes

 8   taken in the aforementioned matter to the best of my skill

 9   and ability.

10

11

12

13

14            /S/ DONALD E. WOMACK 5-7-2013
             _____
15                 DONALD E. WOMACK
                Official Court Reporter
                   P.O. Box 51062
16           Boston, Massachusetts 02205-1062
                 womack@megatran.com
17

18

19

20

21

22

23

24

25
```