```
 1                UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
 2
                                        Civil Action
 3                                      No. 10-30073-WGY

 4   * * * * * * * * * * * * * * * * * * * * * *
                                                *
 5   CONNOR B., by his next friend, ROCHELLE     *
     VIGURS, et al., individually and on behalf  *
 6   of all others similarly situated,           *
                                                *
 7            Plaintiffs,                        *
                                                *  BENCH TRIAL
 8   v.                                          *  (Volume 4)
                                                *
 9   DEVAL L. PATRICK, in his official capacity  *
     as Governor of the Commonwealth            *
10   of Massachusetts, et al.,                   *
                                                *
11            Defendants.                        *
                                                *
12   * * * * * * * * * * * * * * * * * * * * * *

13            BEFORE:  The Honorable William G. Young,
                              District Judge
14   APPEARANCES:

15            NUTTER, McCLENNEN & FISH, LLP (By Daniel J.
          Gleason, Esq. and Jonathan D. Persky, Esq.), World
16        Trade Center West, 155 Seaport Boulevard, Boston,
          Massachusetts 02210-2699
17                 - and -
          CHILDREN'S RIGHTS (By Sara M. Bartosz,
18        Esq., Laurence D. Borten, Esq., Sarah Russo, Esq.
          Rachel Brodin, Nili, Esq. and Jessica E. Polansky,
19        Esq.), 330 Seventh Avenue, Fourth Floor, New York,
          New York 10001, on behalf of the Plaintiffs
20
              OFFICE OF THE MASSACHUSETTS ATTORNEY
21        GENERAL (By Liza Tran, Jason B. Barshak and
          Jeffrey T. Collins, Assistant Attorneys General),
22        One Ashburton Place, Boston, Massachusetts 02108,
          on behalf of the Defendants
23
                                        1 Courthouse Way
24                                      Boston, Massachusetts

25                                      January 30, 2013
```

<u>**I N D E X**</u>

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

RAELENE FREITAG

   By Mr. Borten    3

   By Mr. Barshak       122

| EXHIBITS: | FOR I.D. | IN EVID. |
|---|---|---|

   1066 Tables . . . . . . . . . . . . . . . . .76

1          **THE CLERK:**  All rise.  The United States District

2    Court is in session, you may be seated.

3          **THE COURT:**  Good morning, counsel.  I acknowledge

4    receipt of more depositions that I am to review and read,

5    but I cannot say I will put anymore on the record.

6          Now, you're going to call another witness and I'm

7    prepared for that.  The witness may be called.

8          **MR. BORTEN:**  Yes, your Honor.  Plaintiffs calls Dr.

9    Raelene Freitag.

10          **THE COURT:**  He may be called.  She may be called.

11          **THE CLERK:**  Will you please remain standing and

12    raise your right hand.

13          Do you solemnly swear the testimony you are about

14    to make in the matter now pending before this Court and Jury

15    will be the truth, the whole truth, and nothing but the

16    truth, so help you God?

17          **THE WITNESS:**  I do.

18          **THE CLERK:**  You can be seated.

19                    RAELENE FREITAG

20                  **DIRECT EXAMINATION**

21    **BY MR. BORTEN**

22    **Q**   Good morning, Dr. Freitag.  Would you please state your

23    full name for the record?

24    A   It's Raelene Freitag.  I'll spell that for the court

25    reporter.  It's R A E L E N E.  Freitag, F R E I T A G.

1              MR. BORTEN:  Your Honor, I'm proffering to the

2     Court the expert report by Dr. Freitag and her associate,

3     Dr. Johnson.

4              THE COURT:  Thank you.

5              MR. BORTEN:  It's been previously marked as GW.

6              THE COURT:  GW.  Thank you very much.

7              MR. BORTEN:  You're welcome.

8     Q    Dr. Freitag, by whom are you employed?

9     A    By the National Council on Crime and Delinquency.

10    Q    And can we refer to that going forward as NCCD?

11    A    Yes.

12    Q    Okay.  And what is your title at NCCD?

13    A    I'm the director of the Children's Research Center.

14    Q    And what is the Children's Research Center.

15    A    Children's Research Center is a division within the

16    NCCD.

17    Q    And can we refer to the Children's Research going

18    forward as CRC?

19    A    Yes.

20    Q    How long have you been director of CRC?

21    A    I've before director for approximately six or so years.

22    Q    And how long have you been employed at CRC or NCCD?

23    A    About 16 years.

24    Q    Dr. Freitag, where did you get your undergraduate

25    degree?

1    A    From Concordia College in Seward, Nebraska.

2    Q    And when was that?

3    A    1977.

4    Q    And what was your major?

5    A    Sociology.

6    Q    Did there come a time when you began doing social work

7    after your studies at Concordia.

8    A    Yeah, I actually became aware that I wanted to go into

9    social work my last year of undergraduate work and took

10   course work there, and I began actually doing social work in

11   1983.

12   Q    And where was that?

13   A    That was in Louisiana.  I worked for the YMCA, ran a

14   domestic violence program and mental health crisis line.

15   Q    And since that time have you been doing social work in

16   one capacity or another?

17   A    Yes.

18   Q    Did you at some point obtain a social work degree?

19   A    Yes, I pursued a master's degree and was awarded that

20   degree in 1987.

21   Q    And where did you obtain that degree?  An MSW?

22   A    An MSW.

23   Q    Where did you obtain your MSW?

24   A    From the University of Wisconsin, Milwaukee.

25   Q    Did a time come when you began working specifically in

1    the area of child welfare?

2    A    Yes.  I became a child protection worker in 1985.

3    **Q**    And who did you work for at that point?

4    A    For the Jefferson County, Department of Human Services

5    in Wisconsin.

6    **Q**    What was your title when you started working for the

7    county?

8    A    I was an intake worker.

9    **Q**    And could you describe what an intake worker does, at

10    least in Jefferson County?

11    A    Yes, that title at the time, it was a fairly small rural

12    setting, and so as an intake worker we did everything from

13    answer the phone when somebody called in to make a report

14    all the way through the investigation, making decisions

15    about whether children needed to be removed from their home,

16    whether there needed to be an open case, whether we needed

17    to file a petition before the Court and working toward the

18    jurisdictional -- sorry, I'm losing my word -- working up to

19    the point of ongoing case work.

20            **THE COURT:**  Jumping ahead for a minute.  This

21    outfit that you work for now, tell me again what it is?

22            **THE WITNESS:**  The National Council on Crime and

23    Delinquency.

24            **THE COURT:**  And respectfully, what is that?

25            **THE WITNESS:**  Yes.  It's a 100 plus year old

1    nonprofit organization that's committed to helping to

2    develop just and equitable social service systems.  We work

3    primarily, the whole organization works primarily in the

4    areas of criminal justice, juvenile justice, and child

5    protection.  The Children's Research Center is primarily the

6    division that does the work in child protection.

7              **THE COURT:**  Thank you.

8    **Q**  And just to be clear, when you talk about taking reports

9    in your capacity as an intake worker you were referring to

10   reports of child abuse and neglect?

11   **A**  Yes, we did, of course, child abuse and neglect and

12   investigated those reports.

13   **Q**  How long were you an intake worker?

14   **A**  I was an intake worker for, I believe it was about a

15   little over a year and then was promoted to supervisor of

16   that unit.

17   **Q**  And what were your duties as supervisor of the intake

18   unit?

19   **A**  So we had a staff of about nine who did the child

20   protection work and also some bits of adult protection work

21   and juvenile delinquency intake, and I supervised all of

22   their work.

23   **Q**  When did you receive your Ph.D.?

24   **A**  1997.

25   **Q**  And where did you get it from?

1    A    That was also at the University of Wisconsin, Milwaukee?

2    Q    And what was your area of specialization.

3    A    The Ph.D. is in an area called urban studies, which is a

4    multi-disciplinary area, and I had a specialty within that

5    in social service delivery systems.

6    Q    And did you write a dissertation in connection with your

7    Ph.D.?

8    A    I did.

9    Q    And what was the subject of your dissertation?

10   A    I was examining, it was called "The Peril and Promise of

11   19th Century Child Protection."  I was applying theories of

12   organizational development and looking at how the child

13   protection system was organized then and looking at

14   comparisons to how it's organized now.

15   Q    Moving on to your work at NCCD and CRC.  How many people

16   does NCCD employ?

17   A    There are approximately 100 employees in the overall

18   organization.

19   Q    And where does NCCD have offices?

20   A    Our main office is in Oakland, California.  We have a

21   second office in Madison, Wisconsin, which is where I work.

22   And we do have staff who work remotely out of home offices

23   throughout the country.

24   Q    Okay.  Could you describe more specifically the mission

25   of the Children's Research Center?

1    A    Yes.   The Children's Research Center promotes the

2    overall mission at NCCD, but in particular we apply it to

3    child protection work, and our main emphasis is helping

4    jurisdictions to develop systems that help make the best

5    decisions for families, make the best use of resources to

6    achieve the best outcomes.

7    **Q**    Has the mission of CRC evolved -- well, first of all,

8    when was CRC created within NCCD?

9    A    It was created in about the mid-1990's.

10   **Q**    What were the circumstances of that event?

11   A    The fundamental issues, NCCD had a long tradition of

12   working with adult corrections and juvenile justice and was

13   constantly seeking what are the things that as a society

14   that we can do to help prevent those delinquency and

15   criminal behavior, and it became very clear that one of the

16   very important things that can be done is to help children

17   grow up without abuse and neglect and respond appropriately

18   to abuse and neglect.

19         Secondarily to that was a methodology that we used

20   in our juvenile justice and adult corrections work where

21   decision support systems that were research based that help

22   to focus an agency's resources on the highest risk families

23   so that we would have the best opportunity to reduce

24   recurrence.   And we were asked by the state of Alaska to see

25   whether that same approach could work in child protection.

1    We didn't know initially whether it would, but we began

2    partnering in the state of Alaska to try that.  It appeared

3    to work quite well, and so from there we launched into

4    bringing this work into child protection.

5    Q    And the work you're referring to is a decision support

6    system?

7    A    Yes.

8    Q    And could you describe for the Court what, in a little,

9    with a little more precision what a decision support system

10   is?

11   A    Yes.  If you think of the work of a child protection

12   worker, a lot of it involves decision making.  They have to

13   decide, you know, whether to remove a child from their home,

14   once removed whether to return; whether to open a case,

15   whether to close a case; what should be the focus of a

16   service plan; where should we focus our intervention.  Those

17   decisions are notoriously difficult to make, not just for

18   child protection workers, but just the way our brains work,

19   these are complex decisions to make.

20          We've long practiced and the research that I'm

21   reading recently really supports the notion that when you're

22   making complex decisions like that, relying solely on

23   intuition, even highly honed intuition based on education

24   and experience, is extraordinarily complex.  And so, the

25   best that we're learning is that building research based

1    decisions support tools that help guide through those

2    decisions bring to bear what's the most important

3    information to look at and help lead through that decision

4    process helps to lead to more reliable and accurate

5    decisions.  And so we've been building those systems for now

6    almost 30 years.

7    **Q**    Is there a particular decision support system that CRC

8    has developed over the years?

9    A    The approach that we use has a label on it of structured

10   decision making.  And in essence our, our notion is we're

11   not committed to one thing, we're committed to finding the

12   best thing that current technology and research will allow

13   us to have.  And so at this point our notions are captured

14   in a model called the structured decision making system.

15   **Q**    How is NCCD funded?

16   A    Our resources come primarily through three streams.  The

17   first which makes up most of Children's Research Center

18   work, is direct contracts with jurisdictions who hire us to

19   come in and under contract with the scope of work assist

20   them in one, with one or more aspects of helping to develop

21   and customize a decision support system, implement it, help

22   assure quality use of it, and in more recent years we've

23   discovered that we can't just teach how to fill out a form,

24   that it's really essential for us to teach the fundamental

25   practice skills around it and to work in an organizational

```
1    level for data driven organizations and bringing the best of

2    implementation science to helping to make sure that change

3    actually happens in an organization, it's not management by

4    mail.

5    Q    So you're talking about the work you do with

6    jurisdictions and I take it that you get compensate for

7    your --

8    A    Yes, we do.  They would decide which bit of that whole

9    arc that we can do for them, which bits do they want to us

10   do for them, and we would be contracting with them to do

11   that, that bit of work.

12           Our second main funding stream would be through

13   grants.  We have applied for and have been awarded a number

14   of local and federal grants to do specific projects.

15           A third funding stream would be through

16   foundations.  When there's work to be done and a

17   jurisdiction doesn't have funds sometimes a foundation will

18   support it.  And so those are the three primary sources of

19   revenue.

20   Q    As director of Children's Research Center how many CRC

21   staff members report directly or indirectly to you?

22   A    We have a relatively matrix organization.  So in my

23   direct report stream there are about 14 people that we

24   loosely refer to as our field staff.  They're folks like me

25   who go out and work directly with the organizations on the
```

1    tasks that I just described.

2    Q   Are there other NCCD employees who contribute to the

3    work of CRC but who do not, are not within your reporting

4    umbrella?

5    A   Yes, there are.  Our field staff are not primarily

6    researchers.  And so there is a research division within

7    NCCD that reports to a different director.  We rely on them

8    extensively.  One of the hallmarks of our work is the

9    combination of our field staff who understand the practice

10   and our research staff who understand the research and are

11   kind of cross training and working together.

12          We also have a technology division.  Sometimes our

13   work requires the development and maintenance of web based

14   systems.  And we also have an administrative staff that

15   helps us with productions of reports and manuals and so

16   forth.

17   Q   So what are the qualifications of the field staff that

18   you've described within CRC?

19   A   Most of us have a master's degree either in social work

20   or in related fields.  Some have Ph.D. in a related field.

21   And we look for folks who have direct experience in child

22   welfare or closely related fields who can add to our,

23   depending on the particular project, the particular niche we

24   need to fill.

25   Q   Are there other projects that CRC is engaged for besides

1    the implementation of the strategic decision making, SDM

2    model?

3    A    It's structured decision making.

4    **Q**    Structured --

5    A    Yes.

6    **Q**    -- decision making product you talked about.

7    A    Yes.  As I mentioned, more recently we've worked

8    extensively to bring on board folks who can help to develop

9    and train and coach the practice skills around that.  You

10   can't just give a list of ten questions to a worker or to a

11   family and think that you're going to get a good assessment

12   of a family.  You need to be build good engagements with the

13   family, help the family participate, have good interviewing

14   skills, good planning skills.  You have to know a lot about

15   a lot of different things, substance abuse, mental health,

16   child development.  And so we've brought in folks who really

17   have a lot of those practice skills so that we can do the

18   best assessments we can.

19            We also work in an area called safe measures which

20   supports the notion of data driven decision making at an

21   organizational level.  And essentially what safe measures

22   does is, every state has a statewide information system and

23   into that computer system every time a worker works on a

24   case they enter certain amounts of information.  And these,

25   these came about probably about in the range of 15 years

1    ago, the federal government really wanted all states to

2    develop these sorts of systems, and they're really quite,

3    they really brought the field forward amazingly well.  But

4    one of the things that we noticed early on was that there's

5    a lot of information going in but not a lot of actionable

6    information coming out.  And so some of our staff developed

7    something called safe measures which is essentially just a

8    web based user interface for that system.  It lays on top

9    and creates screens that a worker or supervisor/manager can

10   go to and look at things, like on my caseload the standard

11   is I have to visit every child once a month.  Here are my

12   children, here's my current month.  Who have I seen, who

13   have I not seen.  So that's what safe measures does on a

14   large variety of measures, and in the states that have that

15   we will help work on training and learning how to use that

16   and to use it effectively.

17   **Q**   And have you done work relating to the safe measures

18   system?

19   A    Yes, I have.

20   **Q**   And what jurisdictions have you worked in?

21   A    I've worked -- I'm trying to think if I've worked in any

22   other states.  I think I've worked just in California on

23   safe measures.

24   **Q**   Now, when you first were employed by NCCD and CRC what

25   was your title?

1    A    I was hired with a title of senior research associate.

2    Q    What were your duties as is senior research associate?

3    A    I worked primarily with the development and

4    implementation of SDM systems and as senior research

5    associate I reported to a senior researcher who was

6    responsible for the project and I was given tasks on the

7    project to complete.

8    Q    Did there some a time when you were promoted from that

9    position?

10   A    Yes, I believe after about a year and-a-half or so.

11   Q    And what did you become at that point?

12   A    So I was promoted to senior researcher.

13   Q    How did your responsibilities change at that point?

14   A    So, I was now responsible for a complete project and

15   making sure that the complete project was completed rather

16   than working on just an individual task.

17   Q    And how long were you a senior researcher?

18   A    Probably in the area of five or six years.

19   Q    And what happened then?

20   A    I was promoted to associate director of the Children's

21   Research Center.

22   Q    And was there a change in your duties at that point?

23   A    In some ways, yes and in some ways, no.  We're still a

24   fairly small organization and so no matter how high up the

25   chain you go you still do direct work.  And so I continued

1   to manage projects, but also acquired responsibilities for

2   the overall operations of the Children's Research Center

3   making, participating in more management and strategic

4   decisions.

5   **Q**   And I think you said you became director six years ago.

6   How did your duties change at that point?

7   A   The balance between field work and management shifted

8   just a little bit, although I still continue to manage a

9   number of projects and work directly on projects.  But as

10  our staff has grown and the whole organization has grown,

11  the responsibilities for strategic direction and management

12  of operations have grown, so I do a larger share of that as

13  well.

14  **Q**   Dr. Freitag, in the course of your 16 years at the

15  Children's Research Center, how many United States

16  governmental jurisdictions have you done work with either on

17  strategic -- structured decision making or other CRC

18  projects?

19  A   I've done work in about 15 states ranging from small

20  bits on someone else's project to the state of California,

21  I've been managing the entire project for all of the 15

22  years that I've been there.

23  **Q**   Have you done work for jurisdictions outside the United

24  States?

25  A   Yes, I have.  I've done work in several Canadian

1    provinces, in several Australian states and one territory.

2    In Taiwan.  And will be about to start a project in

3    Singapore.

4    Q   Is one of the American jurisdictions you've worked for

5    the Department of Children and Families in the Commonwealth

6    of Massachusetts.

7    A   Yes.

8    Q   And what was the nature of your work for Massachusetts

9    DCF?

10   A   They had asked us to work with them to bring a portion

11   of the structure decision making project into Massachusetts

12   and the specific portion included the safety assessment and

13   the risk assessment and the risk reassessment.  Those are,

14   the safety assessment and the risk assessment would both be

15   used during the investigation or assessment phase of a case

16   and the risk reassessment would be used to close a case in

17   in-home services.  We did, we did not do any work with any

18   of the portions that would apply to foster care.

19   Q   And when did you work in Massachusetts?

20   A   It was approximately five to six years ago.

21   Q   For how long?

22   A   I would say about a year and-a-half.

23   Q   Now, in the course of your work with various

24   jurisdictions and the CRC contracts, do you become familiar

25   with the policies and laws governing social work practice in

1    the child welfare area --

2    A    Yes.

3    **Q**    -- in those jurisdictions?

4    A    Yes, that's usually one of the very first deliverables

5    that we do is, we can't come in and bring in system-wide

6    structured decision making without having some understanding

7    about the policies and procedures that exist in the

8    jurisdiction because we have to fit them together.  The same

9    with safe measures.  Safe measures is constructed around the

10   policies and standards for the jurisdiction.

11   **Q**    Can you describe the extent to which you found that the

12   policies, practices or laws relating to child welfare case

13   work vary among the jurisdictions you've become familiar

14   with?

15            **MR. BARSHAK:**  Objection.

16            **THE COURT:**  Why is that relevant.

17            **MR. BARSHAK:**  And it's not in the report.

18            **THE COURT:**  No, no, I'm asking their counsel.

19            **MR. BORTEN:**  I wanted the witness to explain her

20   familiarity across the country with the kind of policies

21   we'll be talking about here.

22            **THE COURT:**  Well, my instinct is she's probably

23   very familiar.  But the fact is that's a matter for counsel

24   and ultimately the Court.  I'm not accepting someone, an

25   expert on laws of other jurisdictions.  And in all candor, I

1    think we're concerned only with the laws of the United

2    States, the Constitution of the United States, and we may be

3    concerned with the laws of Massachusetts.

4         Sustained.

5    Q    Dr. Freitag, how did CRC's engagement by Children's

6    Rights to do work relating to this litigation come about?

7    A    We were contacted by Children's Rights with a request to

8    participate in this case reading project.  The request came

9    to my desk and we arranged to meet with Children's Rights.

10   I included Dr. Kristen Johnson from the research teams.  I

11   knew that research would be heavily involved in this

12   project.  We met, discussed what the project would look

13   like, talked about our qualifications, and we made a

14   decision that we would agree to do the work.

15   Q    At that point when you agreed to take the engagement,

16   what did you understand the purpose of the engagement to be?

17   A    It was my understanding that our role would be to

18   measure practice in the state of Massachusetts for children

19   in foster care and determine the extent to which standards

20   were met or not met.

21   Q    And how would you measure practice within the state of

22   Massachusetts?

23   A    This was going to be done through a case reading

24   process.

25   Q    Were you involved in the decision to accept the

1    engagement?

2    A    It was fundamentally my decision, yes.

3    Q    Did you communicate with anyone in DCF about the

4    engagement in light of your prior work for the agency?

5    A    I did attempt to reach out to Jan Nisenbaum who I had

6    worked with.  We had not been engaged for a couple of years

7    at that point.  But I knew them and had a good relationship.

8    I wanted to let her know so she didn't hear from someone

9    else that we had accepted this, because I knew that they may

10   not be all that happy about it.  But I wanted to have an

11   opportunity to let her know that we had done that and why.

12   I was able to leave a voice message but that's the only

13   communication that we had.

14   Q    Prior to this engagement has CRC done work relating to

15   other lawsuits brought by lawyers at Children's Rights?

16   A    Yes.

17   Q    How many?

18   A    There were two jurisdictions, the County of Milwaukee

19   and the State of Michigan.

20   Q    Who engaged you in the Milwaukee litigation?

21   A    Children's Rights.

22   Q    And who engaged you in the Michigan litigation?

23   A    It's my understanding that the Michigan project was a

24   joint retention by both the defense and the plaintiff.

25   Q    Were you personally involved in either of the Michigan

1    or the Milwaukee engagements?

2    A   I was not.

3    Q   Is it your understanding that those were both case

4    record reviews generally similar to the case record review

5    that you did in this case?

6    A   Yes.

7    Q   Have you personally undertaken case record reviews

8    similar to the one that was performed here in the Connor B

9    litigation?

10   A   I do case record reviews on an ongoing basis for a

11   variety of purposes.

12   Q   And with whom among your colleagues at CRC and NCCD have

13   you worked on those case record reviews generally.

14   A   It depends on the scope and level of the review what

15   we're trying to do.  Some of our case record reviews are

16   really designed to help strengthen practice at the worker

17   level and are not particularly designed to be hugely

18   rigorous.  For those, I would work on my own on those.  We

19   have a fairly established practice for doing that.

20          The more rigorous we need to be, the more it's

21   going to affect an agency level decision.  For example, when

22   we start getting to a level of methodology that is, that

23   requires a degree of rigor then we always engage our

24   research team.

25   Q   And did you work with someone from your research team on

1    this project?

2    A   Yes, I worked with Dr. Kristen Johnson.

3    Q   Had you worked with Dr. Johnson on other case record

4    reviews that you've done for CRC?

5    A   Yes, she predates me at CRC, so for the past 16 years

6    I've worked extensively with her.

7    Q   Were you personally compensated for your work on the

8    Children's Rights engagement here?

9    A   No, I draw a salary and my salary is the same whether we

10   work on this project or not.

11   Q   And how was CRC compensated for this case record review?

12   A   Through a contract with Children's Rights.

13   Q   And how much compensation was paid?

14   A   There were two buckets s of compensation.  One bucket

15   was essentially a pass-through.  We needed to temporarily

16   hire a number of case readers to construct this.  And so the

17   largest pot of money went to the reimbursement for those

18   case readers and the travel costs related to them.  That

19   amounted to under, close to $500,000.

20          Our work for our staff that covered everything from

21   the original high level methodology questions up until what

22   we're doing now, our compensation for that was, I believe

23   just under $200,000.

24   Q   Were you involved in the negotiation of the compensation

25   to be paid to NCCD?

1    A    Yes.

2    **Q**    What is a case record review?

3    A    Very simply put, it's a process of looking at one or

4    more cases with a specific set of questions in mind,

5    gathering the information from those cases, and conducting

6    the analysis and making the report.

7    **Q**    And what records or what cases did you review here in

8    this case record review?

9    A    In this record review --

10            **MR. BARSHAK:**  Objection.

11            **THE COURT:**  Grounds?

12            **MR. BARSHAK:**  I'm not sure whether he's asking her

13    personally or CRC in general.

14            **THE COURT:**  Well, he directed it.  Do you have

15    personal knowledge so that you can answer the question.

16            **THE WITNESS:**  Yes.

17            **THE COURT:**  Yes.  She can tell us what they did, of

18    her own knowledge.

19            How many records did you review?

20            **THE WITNESS:**  I did not personally review.

21            **THE COURT:**  My question was as poor as counsel's

22    question.

23            **THE WITNESS:**  Yes.

24            **THE COURT:**  To your knowledge, how many records did

25    CRC review in this project?

1          THE WITNESS:  A total of 484 that were divided into

2     two cohorts.

3          THE COURT:  And what was the division designed to

4     illustrate?

5          THE WITNESS:  We made a choice early on to create

6     two cohorts.  One cohort consisted of children who had

7     entered foster care in the state of Massachusetts in a 12

8     month window beginning on July 1st of 2009 through June 30th

9     of 2010.  That particular cohort was designed to help us get

10    a view toward the most recent practice in the state of

11    Massachusetts for children who did not have prior

12    experience, they had just entered during that period of

13    time.

14          The limitation of looking at that cohort was that

15    that only gave us a 30 month window in which to follow them.

16    So we would not have any knowledge of what happens to

17    children who are in care for a longer period than that.  And

18    so we constructed a second cohort specifically selected of

19    children who on July 1st of 2009 had already been in care

20    for two years or more.  So that combination gave us the

21    ability to see the experience of children in foster care in

22    the state of Massachusetts regardless of how long they had

23    been in care.

24    Q    Now, Dr. Freitag, why didn't you just take a sample of

25    children from the entire pool of children in DCF care during

1    that 30 month window that you reviewed?

2    A    We definitely considered that as an option and that has

3    been done before.  The questions that get raised around that

4    kind of approach, and legitimately so, are that there is a

5    potential, not a certainty, but a potential that the single

6    cross-section could oversample children who had been in care

7    for a very long period of time.  If, if you look at a

8    cross-section, the children coming in and staying and begin

9    to accumulate, whereas children coming in for a short period

10   of time come and go.  And so, if you look at a single

11   cross-section there's a chance that the proportion of

12   children who are short stayers in foster care might be not

13   representative of the whole sample.

14          That could disadvantage our view of the department

15   because it's more common to see more struggles with the

16   children who are the long stayers.  And so to avoid that

17   potential bias we opted for the two cohort approach.

18   Q    Now, you mentioned a representative sample.  Generally

19   speaking, how does one get a representative sample?

20   A    There are well defined approaches.  And I want to be

21   very clear I'm not a statistician, I'm not a methodologist.

22   Through the course of my work at Children's Research Center,

23   my education, I know enough about this to be able to work

24   effectively to make sense of this.  But I would not want to

25   become an expert at the granular nuances of the statistical

1    procedures for this.

2          **THE COURT:**  But you think these 484 records are a

3    representative sample.

4          **THE WITNESS:**  Yes.

5    **Q**   Specifically -- withdrawn.

6          Were you initially provided at the time of CRC's

7    engagement with any background materials from Children's

8    Rights in order to begin planning the case record read?

9    A   Yes, there were a series of documents that we were

10   provided over a period of time initially.  We had an

11   opportunity to view the named plaintiff cases.  And then we

12   were provided electronic copies of the policies and

13   procedures and regulations.  And I forgot, the first thing

14   that we looked at was the actual complaint itself and then

15   the named plaintiff cases.

16   **Q**   So, what use did you make of the complaint?

17   A   From the complaint, the main thing that we look for were

18   what were the main allegations.  We needed to know that so

19   that we knew where did we need to construct a question for

20   our study.

21   **Q**   And what use did you make of the named plaintiff files

22   that were provided?

23   A   They were extraordinarily helpful for us in the

24   beginning to understand how case files were constructed,

25   what kinds of materials we would expect to find, how they

1    would be organized so that we could create a case reading

2    instrument that would be efficient.

3    **Q**   And why did you use the named plaintiff files for that?

4    A    For that purpose.

5    **Q**   I mean, why not use some other files?

6    A    Oh, because they were available.  They were the first

7    case files that we were able to see.

8    **Q**   Were the named plaintiff files ultimately included in

9    the files to be reviewed for the case record read?

10   A    No, they were not.

11   **Q**   Can you outline for the Court in general terms the

12   activities involved from beginning to end in the case record

13   read process?

14   A    Certainly.  So, we began with the identification of, so,

15   what were the allegations, which of those allegations could

16   we respond to through the course of case reading.  From each

17   of those allegations we needed to construct what was our

18   actual measurement question.  So, for example, the

19   allegation is that children in foster care abused or

20   neglected at an alarming rate, that's not our case reading

21   question.  Our case reading question is to what extent are

22   children in foster care abused or neglected.

23         Once we identified the main case reading questions

24   then we needed to boil it down to, so what kind of facts

25   could we look for that we would expect to see in a case

1    record that might help us to measure that question.  And

2    then testing that against what do we actually find in a case

3    file, working to construct it then from the list of

4    questions, in what order would a case reader expect to find

5    these things to make it efficient, and so working through

6    that process to create the case reading instrument.

7         In this instance, then once we had the case reading

8    instruments developed and approved, we converted it to a web

9    based system so that the case readers instead of marking

10    things down on paper could put it into a web based system

11    and that avoided, for one thing, a second person

12    transcribing the information, which increases the

13    possibility of error, and also trying to interpret what did

14    somebody write on that page, did they mark that or not.  So

15    this helps to increase our confidence in the information

16    that got put in.

17         As that was being built, we set about developing

18    the training materials and selecting and getting the case

19    readers on board.  As the case reading began it was a matter

20    of over a period of about four months, on a daily basis

21    getting the, getting the case readers out to the right

22    locations and getting case reading done.  Be available to

23    address any questions that came up.

24         At the end of the information gathering period of

25    the case reading then it got turned over to the analysts for

1    creating the tables in the appendix and then into the

2    writing phase where we took the raw data and told the story

3    of what that data involved, and that led us to the report.

4    Q    And the report you're referring to is Exhibit GW sitting

5    on your desk there?

6    A    Yes.

7    Q    Who managed this process?

8    A    I was the overall manager for the project.

9    Q    What steps did you take in managing the project?

10   A    I was most heavily involved in the beginning in the

11   initial high level thinking about the approach involved in

12   managing each step along the way to make sure that it was

13   getting done and everybody was getting what they needed to

14   get done what they needed to get done, and then at the end I

15   participated as a coauthor of the report.

16   Q    Now, you've already discussed the two cohorts.  Did you

17   read the files of each cohort in the same way?

18   A    Yes.

19   Q    You used the same instrument?

20   A    Yes.

21        THE COURT:  Well, he's using the pronoun you.  You

22   supervised it.  You may have done some of it, and I take

23   your answer to mean the process by which each cohort was

24   reviewed was the same.  Is that accurate?

25        THE WITNESS:  Yes.  Thank you for the

1    clarification.  I was taking the you as the royal you.

2    Q    Now, turning your attention to the front cover of

3    Exhibit GW.  Do you see the subtitle, quote, A Longitudinal

4    Study of Two Cohorts?

5    A    Yes.

6    Q    What did you mean by longitudinal in this context?

7    A    We were describing that -- we did not do a

8    cross-sectional study.  A cross-sectional study would be

9    pull a sample, here's this day or this month, tell us what

10   they look like on that day.  We actually followed both

11   samples for a total period of 30 months.  We selected them

12   here and said what happens to them over time.  And so, we

13   considered that to be a longitudinal study.

14   Q    Dr. Freitag, were you personally involved in identifying

15   the particular files, the particular children who were the

16   subject of the case record read?

17   A    I was not.

18   Q    Who did that?

19   A    Dr. Kristen Johnson.

20   Q    Was she assisted by anyone?

21   A    She consulted with Dr. Erik Nordheim of the University

22   of Wisconsin, Madison.

23   Q    And what was the scope, or what is your understanding of

24   the scope of Professor Nordheim's involvement?

25   A    He was an expert, is an expert in statistical

1  procedures, particularly sampling.  And so, he was consulted

2  by Dr. Johnson on the sampling procedure.

3  **Q**   Who engaged Professor Nordheim?

4  A   That was Children's Rights.

5  **Q**   Were you involved in identifying Professor Nordheim or

6  selecting him as a statistics expert?

7  A   No, I did not know him.

8  **Q**   And was CRC involved in it?

9  A   No, I don't, I don't believe that Dr. Johnson knew him

10  either.

11  **Q**   How big was -- withdrawn.

12      Do you have an understanding of the consideration

13  that went into choosing the sample size, the 242 from each

14  cohort?

15  A   Yes, I wouldn't be an expert at the equations involved

16  but the principles involved would be that you need to

17  identify what's the size of the overall universe of all

18  cases that meet the group that you're attempting to study

19  and figuring out what's the right proportion of those that

20  you need to study, and that proportion is influenced by the

21  kind of question you're asking and the confidence level that

22  you're striving to, what confidence level will you accept.

23  **Q**   And when you talk about the confidence level, confidence

24  in what?

25  A   Confidence that the, the results that you found in the

1    sample that you read are representative of the whole

2    population.

3    Q    In this case the two cohorts?

4    A    Yes.  Each of the two cohorts, so each was separate.

5    Q    Were you involved in selecting the case readers

6    personally?

7    A    I had some involvement in that.  As the process

8    unfolded, we had originally selected a few case readers who

9    had worked for us before in that capacity.  As we got closer

10   and saw the time constraints and the speed at which the

11   records would need to be read, we realized we needed to have

12   more hands on deck on a given day and so some additional

13   case readers were hired.  For that I helped to solicit names

14   but was not involved in meeting them.  I did not know them

15   advance.

16   Q    And how many case readers were ultimately engaged?

17   A    We had 14.

18            THE COURT:  Why did the time constraints change?

19            THE WITNESS:  I believe it was about the deadlines

20   that were set for the case and for, the deadlines at which

21   the case reading needed to be completed.

22            THE COURT:  When did you find that out?

23            THE WITNESS:  Not too long before we were getting

24   ready to start.

25            THE COURT:  But when in chronological time?

1              **THE WITNESS:**  It, it -- this was an evolving

2      process.  So, I would have to reconstruct exactly.  But we

3      actually started in February.  We were originally scheduled

4      to start several months earlier than that.

5              **THE COURT:**  You started in February 2012?

6              **THE WITNESS:**  2012, yes.  So we were originally

7      scheduled to start earlier than that.  And we also

8      originally thought that we may be able to do this through

9      electronic, you know, secure websites so obviously people

10     could read from different locations, we would not

11     necessarily have to travel to offices.  So we had a

12     different concept originally for how many case readers we

13     would need and who we would need, and how many we would need

14     to have at any one time.  When the time frame for reading

15     the nearly 500 cases was condensed, we needed to have more

16     people on any given day to accomplish that.

17             **THE COURT:**  Thank you.

18     **Q**    Who was Anita Peters?

19     A    Anita Peters was the first case reader that we hired.

20     And we actually ended up having her serve in the capacity of

21     a supervisor of the case reading.  Anita Peters was, through

22     quite a happy coincidence, had recently moved to Madison,

23     Wisconsin and had come to us, so she was familiar with our

24     work because she had been an administrator in the state of

25     Michigan.  And so she came to us and let us know that she

1   was, you know, looking for work.  It happened to be at a

2   time that we realized we were going to need additional case

3   readers.  And so I talked to her about that possibility.

4   And she impressed me substantially with her knowledge of

5   policy and procedure of the operations of child welfare,

6   large public child welfare agencies, and particularly she

7   worked in the area of permanency and adoptions and so she

8   looked like she would be a very good asset to the project.

9   So we hired her initially to do case reading.  And then in

10  the run-up to the case reading, we felt that she would make

11  an excellent on-site supervisor.  So, in addition to reading

12  some cases she also supervised the on-site work of the case

13  reading.

14  **Q**   Beyond that smaller number of readers you identified

15  initially, where did the remaining readers come from?

16  A    The small group that we had identified initially, most

17  were retired child welfare managers who came from Wisconsin,

18  and I believe Rhode Island.  The person from Rhode Island

19  had actually retired, an administrator in Rhode Island and

20  become a staff member of CRC for a while and subsequently

21  retired from there.  When we needed to add more and we

22  realized that we were going o have to be on-site at various

23  offices around Massachusetts, it looked like it would be a

24  very wise approach to look for retired folks from the

25  department in Massachusetts.

1          So, because of my previous work here, I knew a

2    number of people who I approached and said this is what

3    we're looking for.  We're looking for somebody who has time,

4    who knows the public child welfare system, who can be

5    objective.  Do you have anyone that you think might be

6    interested.  And so we generated a list of names, I provided

7    that to Anita, and she conducted interviews and made the

8    decision.

9    **Q**    Did you have any concerns about engaging former DCF

10   employees as case readers for this project?

11   A    It would only be a concern if there was somebody who had

12   either a real ax to grind or an unwillingness to, you know,

13   see objective facts in regards to where they lay.  So, as

14   long as we checked for that, it was actually a great

15   advantage to having retired DCF staff because they were very

16   familiar with how records were organized, they knew the

17   terminology extraordinarily well, they knew the policies as

18   well as anybody could know them.  And so, having them

19   on-site and in the room was actually a real asset and I

20   think helped us to get as accurate a picture as we could

21   get.

22          **MR. BARSHAK:**  Move to strike, your Honor; that's

23   not in her report.

24          **THE COURT:**  What do you say to that?

25          **MR. BORTEN:**  It certainly was testified to at

1    deposition.  I think the report goes to --

2            **THE COURT:**  Stricken.  You people understand my

3    order.  Everything must be in the report.  The answer is

4    stricken.

5            Go ahead.

6            **MR. BORTEN:**  Yes.

7    **Q**    What were the qualifications you required for case

8    readers?

9    A    As I mentioned, we looked for individuals who had

10    extensive child welfare background.  I believe we calculated

11    that the total years of experience of the 14 case readers

12    was in the neighborhood of 400 years of experience in public

13    child welfare.  And we looked for people who could be detail

14    oriented and could be objective.

15    **Q**    Now, during the case reading you mentioned that the read

16    was from July 1st, the period -- what period within the case

17    file did the readers inspect?

18    A    We looked at the case file from July 1st of 2009 until

19    December 31st of 2011.  There were a few exceptions where we

20    looked earlier.

21    **Q**    A few files or a few --

22    A    A few, a few questions that for every file we looked at

23    events prior to July 1st of 2009.

24    **Q**    New, you were doing the review in 2012.  Why didn't you

25    read the files through the date in 2012?

1    A    We did want to capture as recent practice as we could.

2    However, we, we know from our work in other jurisdictions

3    that there sometimes can be lag time between the time an

4    event happens and the time it gets put into the record.  So,

5    it's standard practice for us in producing a major report to

6    allow some time for the data in the record to catch up with

7    what actually happened.  If we don't do that you get a lot

8    of indications from the record that activities didn't take

9    place when in fact the only thing that hadn't taken place

10   yet was the entry into the record.  So, we thought that by

11   ending on December 31st and beginning the beginning of

12   February that gave some time for the very last things that

13   happened to be there in before we started the read.

14               **MR. BARSHAK:**  I move to strike; that's not in the

15   report.

16               **THE COURT:**  What's the answer?

17               **MR. BORTEN:**  I thought it was.  I'm sorry.

18               **THE COURT:**  Very well.  Stricken.

19   **Q**    Who performed the data analysis leading to the various

20   tables that are in the report?

21   A    Dr. Kristen Johnson did a vast majority of that work and

22   had the assistance of two of our analysts.

23   **Q**    And who drafted the report itself?

24   A    It was co-drafted by Dr. Johnson and myself.

25   **Q**    If you turn to appendix C in Exhibit GW.  What does that

1    consist of?

2    A    The appendix is, in essence that's our findings.  Every

3    question that was on the case reading tool that the case

4    readers pulled information out of the report, we present

5    that question exactly as it is and present every possible

6    category that they could have answered exactly as it is for

7    each cohort and named the number and the percentage that

8    fell into each category.  So it's just the raw date for

9    everything, nothing was held back.

10   Q    Why were some analyses included in the body of the

11   report as well as in the appendix?

12   A    There's, as you can see, there's over 80 tables in the

13   appendix, and not all of the tables are fundamental parts of

14   the story.  Some are supporting information.  And the things

15   that we wanted to bring forward told the main arc of the

16   story and also often required some additional explanation or

17   in many instances some additional sorting of that raw data.

18   So, for example, if you looked at a table for children who

19   are placed with their siblings, the raw data would include

20   options of yes, they were placed with their siblings all of

21   the time, some of the time, no, they were not placed with

22   their siblings.  There would also be a line item for they

23   didn't have any siblings that were placed.  And so if

24   that -- that was a fairly large percentage.  So if you look

25   at the percentages back there it could be misleading.  If

1    you looked at the percentage of children who were placed

2    with their siblings all of the time that percentage would be

3    quite small because the denominator includes all of the

4    children who didn't even have siblings to be placed with.

5    And so when we tell the story around this data in the front,

6    we make those adjustments for the reader so that we would

7    only look at the performance against the standard for the

8    children for whom that standard was applicable.

9              THE COURT:  Let me see if I -- if you turn to page

10   C79 and table C87.  It's probably one of the simpler tables.

11   I just want to see if I grasp at least what's presented

12   here.

13             That you had your readers check the paper file

14   against the electronic file to see how well the electronic

15   file captured the paper file or vice versa.  And I get the

16   impression that in the files of the DCF it captures it

17   pretty well.  Ninety percent of the time it's accurate.

18             Have I roughly understood this?

19             THE WITNESS:  Could you tell me again the table

20   you're referring to?

21             THE COURT:  I'm sorry.  Go to page C79.

22             THE WITNESS:  Okay.  Yes.

23             THE COURT:  Go to the last, which is the last

24   table, I think, table C87.

25             THE WITNESS:  Yes.

```
 1              THE COURT:  And the top of the table tells me what

 2    question was asked of the file reader.

 3              THE WITNESS:  Uh-huh.

 4              THE COURT:  And then I see the raw data that the

 5    file readers entered there.

 6              THE WITNESS:  Yes.

 7              THE COURT:  And I infer from that as a novice that

 8    apparently the paper and electronic files match pretty well?

 9              THE WITNESS:  There's a subtle nuance to that

10    question.  And the question is really was there anything

11    that contradicted.  It doesn't ask is there a perfect match.

12    So there could be some things in the paper file that weren't

13    in the electronic, some things that were in the electronic

14    and not the paper.  That we wouldn't consider a

15    contradiction.  We were looking for contradictions.

16              THE COURT:  Of course, I understand that.

17              But I interjected a normative idea here, and maybe

18    since I've asked about it you could speak to it.

19              That seems like a pretty good match, don't you

20    think, 90 percent?

21              THE WITNESS:  Well, one always hopes for a hundred

22    percent.  And I would rather see 90 percent than 70 percent.

23              THE COURT:  I once said to a courtroom deputy clerk

24    where we were less than a hundred percent, I said that's

25    good enough for government work, and she was horrified.  And
```

1    said:  Never say that to me, Judge, because it demeans my

2    professionalism.  So, of course, if you're going for a

3    hundred percent, 90 percent again as a novice looks to me

4    fairly good.  But go ahead.  Go ahead, counsel.

5              MR. BORTEN:  Thanks.

6              THE COURT:  To understand the chart, that's the

7    only reason I interrupted.

8              THE WITNESS:  Yes.

9              THE COURT:  All right.

10             THE WITNESS:  Yes.

11   Q    Dr. Freitag, could you please turn to table C37 in

12   Exhibit GW on page C19.  And I'm going to provide you with

13   what has been marked for identification as Exhibit PZ.

14             MR. BARSHAK:  May I have a copy?

15   Q    Is PZ a correct and accurate copy of table C37?

16             THE COURT:  Well, let me see we can cut to the

17   chase here.  Excuse me.

18             MR. BORTEN:  Sure.

19             THE COURT:  You want these tables in?

20             MR. BORTEN:  I would like to move the tables I've

21   presented.

22             THE COURT:  Any objection to the tables?

23             MR. BARSHAK:  Absolutely objection, your Honor,

24   because --

25             THE COURT:  What is it?

1          **MR. BARSHAK:**  It's part of the report.  So, just as

2     the parties have agreed that the report --

3          **THE COURT:**  I understand that.  That doesn't

4     mean -- one of the reasons I asked her, because I didn't

5     know what her operation was, if this operation was, for

6     instance, a government agency then it could well be that the

7     entire report even, though prepared for this litigation,

8     would be admitted under 803(8) as the government report,

9     with some limitations.  Well, she's not.  So of course the

10    report is hearsay.  But this looks like a summary of

11    voluminous data under 1006.  So, why shouldn't I take it?

12    So long as you have the underlying data and you can

13    cross-examine, it might be helpful to me to have these

14    tables.

15         So what's the objection if he proffers it under

16    1006?  The tables, not the report.  We'll hear what she has

17    to say about the report.  But just the tables.

18         **MR. BARSHAK:**  Sure.  If the tables were distinct

19    from the report then a proffer under 1006 would be

20    reasonable.  But in this case --

21         **THE COURT:**  Isn't that silly.  Here's a separate

22    piece of paper.  It's distinct from the report.

23         **MR. BARSHAK:**  In format, in a format, yes.  But

24    what they're doing is they are now taking portions of the

25    report which includes, in this case, table C37 and trying to

1    move that in.

2         THE COURT:  That's why I want it all.  Don't you

3    see?  That's why I would like to see table 87 which in my

4    untutored eye looks pretty good for you, as well as table 37

5    which may not.  I don't see any objection under 1060 to

6    accepting these tables as an exhibit.  But I'm happy to hear

7    you object.  Just tell me what the objection is.

8         MR. BARSHAK:  Your Honor, in the main part of the

9    report, the first 160 pages, there are tables, in appendix C

10   which we are now looking at there are tables.  So, this is

11   not, for example, a narrative report generally by an expert

12   in which there may be a few tables.  In this case the

13   essence of the report is tables.  So, in this case taking

14   those tables out and saying, well, now we'll put them into

15   evidence under 1006, that's no different than a submission

16   of part of the report which the parties have not agreed to.

17        THE COURT:  I'm not terribly troubled by that so

18   long as they meet the standards of 1006.  And I don't hear

19   you tell me that they don't.  So the tables are going to be

20   admitted.  We'll give them the next number which will be.

21        THE CLERK:  1065.

22        THE COURT:  All right.  So, appendix C, which is

23   the tables, is admitted in evidence Exhibit 1065 as a

24   summary of voluminous data.  Of course what weight it will

25   have may well be subject to examination.  So let's --

1          **MR. BARSHAK:**  And, your Honor --

2          **THE COURT:**  -- let's work from 1065 now, table C37.

3    That's what you want to ask about, right?

4          **MR. BORTEN:**  Yes.

5          **THE COURT:**  Go ahead.

6    Q    Dr. Freitag, what foster care case practices is

7    addressed in this table?

8    A    In this table we're measuring the extent to which

9    medical passports were provided to the placement home.

10   Q    What is a medical passport?

11   A    So, it's quite common in most jurisdictions that a child

12   in foster care is, that a medical passport is produced.

13   Medical passports usually contains information about any

14   diagnosis or medical condition the child has, any medication

15   that they're required to have, any appointments that are

16   necessary, are they up-to-date on immunizations.  It's in

17   essence the foster provider is going to be responsible for

18   the medical care of that child and needs to know are there

19   any things they need to be aware of.  And so, we wanted to

20   know to what extent were those passports provided according

21   to regulation.

22          **THE COURT:**  Now, now we come to matters that you've

23   been talking in this case.  And I'll tell you, see if I

24   grasp this correctly.

25          It looks like when you look at the entry cohort,

1    which is the ones that you've only been able to track for 30

2    months --

3              **THE WITNESS:**  Uh-huh.

4              **THE COURT:**  -- despite the centrality of this

5    passport to the system here, they're not doing terribly well

6    in getting the passports where they ought to go.  Doesn't

7    that follow?

8              **THE WITNESS:**  I seem -- what I'm trying to do is to

9    tell you the numbers --

10             **THE COURT:**  All right.

11             **THE WITNESS:**  -- and leave the judgment to you.

12             **THE COURT:**  All right.  Fine.  But when we look at

13   the two year cohort, people who have been in the system

14   longer by definition --

15             **THE WITNESS:**  Yes.

16             **THE COURT:**  -- tracked for 30 months but at least

17   in the system for the two years prior to that, by and large

18   lots more passports catch up with that kid in the

19   appropriate places.

20             **THE WITNESS:**  Yes, that's the observation I would

21   make, yes.

22             **THE COURT:**  Thank you.

23   **Q**   Dr. Johnson, I would like to give you a copy of Trial

24   Exhibit 2.

25   A   I'm Dr. Freitag.

1    **Q**    I'm sorry?

2    A    Excuse me.  I'm Dr. Freitag.

3    **Q**    Dr. Freitag, sorry.

4         I would like to give a keep of Exhibit, Trial

5    Exhibit 2.  Is there a particular policy, DCF policy you

6    considered in connection with the medical passport analysis?

7         **MR. BARSHAK:**  Counsel, do you have another copy of

8    Exhibit 2.

9         **MR. BORTEN:**  Yes.

10        **MR. BARSHAK:**  Thank you.

11        **MR. BORTEN:**  Does the Court have a copy?

12        **THE COURT:**  I have it.  It's right here.

13   A    Yes, we did locate, I'm not remembering off the top of

14   my head whether it was a policy or a regulation that

15   referred to medical passports and required that medical

16   passports be provided before or at the time of a placement

17   but allowing that if it was an emergency up to 30 days for

18   that passport to be provided.

19   **Q**    Could you turn to page DCFPOL393 using the numbers in

20   the lower right corner of Exhibit 2.

21   A    Did you say 3 9 --

22   **Q**    393.

23   A    Yes.

24   **Q**    Paragraph 2.

25   A    Yes.

1    Q    Do you see that?

2    A    Yes.

3    Q    Is that the policy you're referring to?

4    A    Yes.

5    Q    Is this a policy applied to all children in foster care?

6    A    Yes.  I'm not aware of any exceptions.

7    Q    How did CRC's case read determine whether or not a

8    medical passport was provided to the foster placement?

9    A    When they came to this question they were asked to look

10   anyplace in the record in order to complete answering this

11   question, either the electronic or the hard copy file, any

12   reference, whether it was in a dictation, whether there was

13   a copy of the medical passport that said this was given on

14   this date, anything at all that they could find that gave an

15   indication that the medical passport had been provided to

16   the placement home would turn it into a yes answer, and if

17   the date was provided we also looked at the date.

18   Q    Dr. Freitag, could you please turn to table C46 and C47

19   in Exhibit GW.

20   A    Yes.

21   Q    And I'm handing you what's been marked for

22   identification as Exhibits QA and QB.

23        THE COURT:    Well, if those are the charts that only

24   lards up the record.  Now I have 1065 which tells me what

25   the tables are, and I would just as soon not get more

1    letters in here and waste time.

2          **MR. BORTEN:**  So I would like to move into evidence

3    as 1066 QA and QB.

4          **THE COURT:**  No, no, no.  They're all in evidence.

5          **MR. BORTEN:**  So accumulate them as 1065?

6          **THE COURT:**  They're all 1065.

7          **MR. BORTEN:**  Okay.

8          **THE COURT:**  We don't need further denominations

9    because you can refer to it as table C47 in Exhibit 1065 and

10   all courts that deal with this will understand what we're

11   looking at.

12         **MR. BORTEN:**  So, your Honor, is it okay at the end

13   or another day we give you the pile of all the tables.

14         **THE COURT:**  I have them.

15         **MR. BORTEN:**  Okay.  Understood.

16   **Q**   So looking at table 46, C46 and C47, what foster care

17   practice is addressed here?

18   A    Both of these tables are measuring the extent to which

19   children in foster care are on antipsychotic or other

20   psychotropic meds.  Table 46 is just a simple yes or no.

21   But any time during the 30 month observation period a child

22   was one of those classes of medication that would constitute

23   a yes.  And in table 47, for those children for whom the

24   answer was yes, it provides additional detail of what was

25   the medication that was, that they were on.

1    **Q**   Was CRC able to determine whether two or more

2    medications were being simultaneously administered?

3    A   Generally not.  We did ask the question for each

4    medication that there's evidence the child was on it, what

5    was the date that that medication was first prescribed and

6    if it ended what date was that medication ended.  But those,

7    those were fields that you very rarely could find

8    information in the file about the start or the end dates of

9    a particular medication so we were not able to analyze that.

10             **THE COURT:**  Now, look over on table C47.  It's on

11   appendix page C25.  And down here by prescribed by you have

12   three categories, doctor, facility, or other.  I get the

13   impression from testimony we've received that doctors

14   prescribe these medications.  So, as you interpret for me

15   this table, what's the difference between doctor and

16   facility as your case readers determined it?

17             **THE WITNESS:**  It's my understanding in how they

18   would have directed would have been that we know exactly

19   that this was a doctor that prescribed this, that would go

20   there.  There can also be nurse practitioners who have

21   something in -- yes, nurse practitioners, I'm not sure if n

22   the state of Massachusetts psychologists have some

23   prescribing rights or not.  But there might be some

24   instances where it was other than a doctor or we didn't have

25   clarity about that.

1          THE COURT:  Well, I understand that for other.  So,

2     facility means someone other than an M.D.?

3          THE WITNESS:  Not necessarily.  But we knew that

4     someone from that facility prescribed it but we didn't

5     necessarily know who.

6          THE COURT:  So it could very well be a doctor

7     through the facility, but the records were not sufficiently

8     clear that you could identify the M.D. who was prescribing?

9          THE WITNESS:  That's my understanding, yes.

10         THE COURT:  Thank you.

11    Q    Dr. Freitag, did CRC find examples of very young

12    children who were administered psychotropic medications?

13    A    Yes, there were some.

14    Q    How many?  Is there something that would refresh your

15    recollection?

16    A    It is in the report.  I'm not recalling the exact

17    number.

18    Q    Do you want to try page 83.

19         THE COURT:  Now we're looking at the report

20    page 83.  Right?

21         MR. BORTEN:  Yes, your Honor.

22    A    So in a two year cohort seven of the children who are

23    prescribed such medications were age five or younger.

24    Q    What was the size of the sample of cases available to be

25    used for this analysis?

1    A    We looked at all 240 records for each cohort.

2    Q    And the prior table on medical passports, what was the

3    size of the sample you were able to use?

4    A    Can you remind me again the number of that table, I just

5    want to verify my memory.

6         **MS. BARTOSZ:**  C37.

7    A    Yes, we looked at -- it's a little bit different.  And

8    you'll find this through several of the tables.  We looked

9    at all 242 children but because the provision of the medical

10   passport to the placement home is supposed to happen at each

11   placement, and because each child had more than upon

12   placement, here we're looking at the total number of

13   placements.  In the entry cohort there was 675 separate

14   placement incidents for the 242 children, and for two hear

15   cohort there were 813 individual placement incidents that we

16   looked at.

17   Q    Dr. Freitag, could you please turn to table 7.  Table 7.

18   A    Yes.

19   Q    And that's on page 20.  What foster care case practice

20   is addressed here?

21   A    This table is examining the number of placements that an

22   individual child experiences during their time in care, at

23   least up until the point we end our study.  This table is

24   looking just at the entry cohort.  And what we're examining

25   is how often is the child not only removed from their home

1    and put in a new environment, but once there how often are

2    they moved from there to get into another new environment

3    and how long does that, how many times does the child

4    experience those disruptive moves.

5    **Q**    And what was the size of the sample of cases available

6    to be used for this analysis?

7    A    We looked at all 242 children in the entry cohort.

8    **Q**    Now, why did you break out the placement moves for the

9    various, quote, time and custody subgroups listed across the

10   top of the table?

11   A    We felt that we would tell a more accurate story because

12   children in the entry cohort might have been in care

13   anything from a day to up to 30 months.  The meaning of

14   being in a single placement would be quite different.  A

15   child who's only in a single placement but was in care for

16   less than eight days is a different story than a child who's

17   been in care for two years and has stayed in a single

18   placement.  On the other hand, a child who's had, you know,

19   four or more moves and has been in care for 24 months or

20   more, their experience of those moves is different than a

21   child who might have experienced four or more moves in 13

22   months.

23        **MR. BARSHAK:**  Move to strike, your Honor, the

24   rationale just stated, or any rationale for why it's broken

25   up like that is not in the report.

1      **THE COURT:**  All right, the rationale is stricken.

2      Go ahead.

3    **Q**  What is shown in the bottom half of the table where it

4    says certain types are excluded for the number of

5    placements?

6    A    In strict terms, every move is considered a placement

7    move.  And so, even the move that a child makes back to

8    their parents' home would be considered a move.  Even a move

9    that is made, we found by the child's father, and are

10   moving, even though he wasn't involved in the original

11   allegation, it looks like he would be a viable parent, we're

12   going to move the child to a parental home that was a

13   non-removal home.  Those would be moves that even though

14   they still have the element of change would be considered

15   likely in the best interest of the child.  And so, we

16   excluded those.  And a second category of things that we

17   excluded were things that would be largely considered

18   outside of the department's purview.  For example, if the

19   child is picked up for delinquent it's considered a

20   placement move but the child now goes into detention.  If

21   the child has to go into a mental health facility or a

22   hospital that would be considered a placement move.  But in

23   this table we wanted to tell the story of what are the moves

24   that are happening for children that are neither

25   presumptively in their best interest and neither

1    presumptively out of the department's control.

2    **Q**   Dr. Freitag, could you turn to table 36.

3              **THE COURT:**  On page?

4         **MR. BORTEN:**  77.

5              **THE COURT:**  Say again?

6         **MR. BORTEN:**  77.

7              **THE COURT:**  Thank you.

8    A    Yes.

9    **Q**   What is shown here?

10   A    This is essentially the same type of analysis, however,

11   this is the two year cohort.  All of these children would

12   have been in care for at least two years.  And so, we just

13   showed the whole cohort.  But we do break it down, on the

14   top you see all placement moves and on the bottom we

15   conducted similar exclusions taking out the kinds of moves

16   that would be presumptively in the child's best interest or

17   presumptively out of the agency's control.

18   **Q**   What was the size of the sample of cases available to

19   use for this table?

20   A    Well, we tend to look at all 242, but there were four

21   records that we felt did not have adequate data for us to

22   include them in the analysis.

23   **Q**   Dr. Freitag, could you turn to table 10 on page 24.

24   What aspect of foster care case practice is addressed here?

25   A    This is again in a similar vein looking at the movement

1    of children within foster care.  Here we're looking at the

2    end of placement and why did a particular placement end.

3    What reason was given for saying this, the time of the child

4    is spending in this place is going to come to an end.  Not

5    with regard to where are they going next, but why is this

6    one ending.

7            In the first column is the child count.  And so in

8    that column you would read that that to say of all the children

9    that we read for was there ever a time that they, for

10   example, returned home.  They might have done more than one

11   of those things and more than one of those reasons could

12   have applied for a single placement end.  But if a child

13   ever ended a placement to return home they would be counted

14   in that row.

15           The second group of columns is looking at each

16   individual placement end.  Again, because each child had

17   more than one placement come to an end you see the number is

18   much larger there.  So there would have been each individual

19   placement and how often was that reason given as why that

20   placement ended.

21   Q   And why did you examine the reasons found for the

22   placement ends?

23   A   To shed some light on what is contributing to, you know,

24   placement ends.  In some instance it's a desirable reason.

25   For example, the reason of returning home.  There's some

1    caution with is that a desirable reason to end placement or

2    not because you want to ensure that you're returning your

3    child home some assurances that the child will likely stay

4    safe when they go home.  But in general it would be

5    considered a good reason to end a placement.

6            There are some reasons that would be considered,

7    you know, you wish a placement wouldn't have to end for a

8    reason like this.  For example, the foster care placement is

9    unable to meet the needs of the child, or conflicts with

10   other children or foster parents.  And so, just explain all

11   the reasons that were given in the case record for why a

12   reason could end so that we could see what that practice

13   looked like.

14           **THE COURT:**  What does CA slash N mean?

15           **THE WITNESS:**  Sorry, child abuse and neglect.

16           **THE COURT:**  Thank you.

17   **Q**   How did -- withdrawn.

18           What was the size of the sample of cases available,

19   available to be used for this table?

20   A   We would have looked at all 242 records in this entry

21   cohort.  However, you see our child count number is 230.

22   We're looking at placement ends.  So, unless a child had a

23   placement end, we couldn't examine the reason for placement

24   end.

25   **Q**   Let me direct your attention to the seventh line quote

1    placed with relative/guardian.  Is that sort of move one

2    that you would consider as you phrased it advantageous?

3    A   Without question.  A child who may not have been

4    initially placed with a relative or guardian or who's going

5    to be placed with a relative or guardian, that would be

6    something would be desirable for that child.  The question

7    would be would it have been possible to have prevented a

8    move in order to achieve that placement with a relative or

9    guardian, why was child not there in the first place.

10   Q   And in that vein could you look at the table 4 on

11   page 15.

12   A   Yes.

13   Q   What does this show?

14   A   For all 242 children in the entry cohort they all

15   entered their first placement.  And so this table tells us

16   what that first placement was, what category it was in.

17   Q   And in looking at the first placement was there a DCF

18   regulation that you considered that addresses the initial

19   placement of the child?

20   A   Yes, there was.

21   Q   I would like to show you Trial Exhibit 554.  Is this the

22   regulation you considered, Dr. Freitag?

23   A   Yes, it is.

24   Q   And in particular what's the relationship between this

25   regulation and the analysis you did in table 4?

1    A   We wanted to include in the things we asked the case

2    reader to record the extent to which, so the regulation says

3    that the first priority should be placement with a kinship

4    family.  So we wanted to be sure that a we measured the

5    extent to which the first placement was with a relative.

6    The second -- and it turned out to be that the first

7    placement was with a relative for 15.3 percent of the first

8    placements.

9         **MR. BARSHAK:**  Your Honor, move to strike to the

10   extent that the witness was not accurately quoting the

11   regulation which obviously speaks for itself.

12        **THE COURT:**  No, I don't know if I need to strike.

13   I'll give no weight to something that does not adequately

14   quote the regulation.  But thank you.

15        Put your question counsel.

16   Q   Were you finished answering?

17   A   No, I don't think so.  So, the department shall consider

18   consistent with the best interest of the child the following

19   placement resources in the following order.  The first was

20   placement with a kinship family, and we found that occurred

21   in 15.3 percent of the first placements.  Second was

22   placement with a child's specific family.  And that would be

23   the third line down.  A child specific, a restricted child

24   specific unrelated caregiver for 2.9 percent of the

25   children.  C and D are placement in a family foster care.  C

1   being where the child was previously placed.  We didn't have

2   the information to separate that out so we looked at

3   placement in family foster care.  And that would include the

4   unrestricted family foster home in 47.5 percent and the

5   foster family home for intensive foster care 2.9 percent.

6              So those were the first four priorities.  And then

7   for those that land in those first four priorities we listed

8   out where those children were first placed.

9   Q    Does this regulation apply to all children entering

10  foster care?

11  A    Yes.

12  Q    And what was the size of the sample of cases available

13  to be used in this analysis?

14  A    We looked at all 242 children in the entry cohort and

15  each of them had a single first placement.

16  Q    Did you examine initial placements for the two year

17  cohort?  Did CR examine?

18  A    We did not.

19  Q    Why not?

20  A    By definition of the cohort, they had already been in

21  care for a minimum of two years and they could have been in

22  care for as much as almost 18 years by that point.  And

23  going back and looking at practice around first placements

24  that long ago wouldn't be informative for current practice.

25  Q    Dr. Freitag, could you turn to table C26a.

```
 1              THE COURT:  C twenty --
 2              MR. BORTEN:  C26a on page C15.
 3    A    Yes.
 4    Q    What aspect of child welfare practice does this
 5    illustrate?
 6    A    There are a few things that we looked at in conjunction
 7    with placement moves.  In general, the notion is that the
 8    less often a child has to move the better.  However, we know
 9    that sometimes moves have to occur.  So, we looked at are
10    there some things that are being done in preparation for
11    those moves that might ease the stress of that move for the
12    child.  One of those things would be a pre-placement move,
13    an opportunity for the child to meet the people they're
14    about to go live with, see the place they're about to go
15    live, even if the place that they're going to is back to the
16    home that they came from, were they just separated from that
17    place and had no contact and no opportunity to be there and
18    then, you know, quickly without any preparation to go there,
19    or did they have an opportunity to go there in advance and
20    get some opportunity to know this is what's happening, this
21    is where I'm going to go.
22              THE COURT:  As you started your answer you said
23    pre-placement move.  I assume you meant pre-placement visit
24    which is what that table deals with.
25              THE WITNESS:  Thank you.
```

1          THE COURT:  All right.

2          THE WITNESS:  Yes, pre-placement visit.

3          THE COURT:  All right.  And on these two tables, 25

4    and 26a, as I understand it, that's not really evidence that

5    the, 25 that the child was not informed, it's evidence that

6    it isn't documented, and same for a pre-placement visit, not

7    that it didn't occur, but there's no evidence of it.

8          THE WITNESS:  You're exactly right, your Honor.

9    And that's a fundamental notion that we applied throughout.

10   We did not want case readers to rely on conjecture, hope,

11   innuendo, but to reply to actual evidence on the notion that

12   the kinds of things that we were looking for were so

13   important that we would expect to see them documented.  And

14   that you can't run an organization on the hope that

15   something happened and it isn't documented.

16         MR. BARSHAK:  And, your Honor, just going back to

17   that prior question before your Honor's questions on that, I

18   am moving to strike the, again, the rationale behind table

19   C26a.  While she certainly can testify to what the data

20   says, nowhere in the report does it talk about the rationale

21   for why something was done.

22         THE COURT:  I'll strike it but it certainly seems a

23   reasonable inference.  But it's stricken to follow out my

24   rule on expert reports.

25         Go ahead.

1   **Q**   What was the size of the sample of cases available for

2   table C26a?

3   **A**   So this is one of the tables that for each of the

4   cohorts looks for all 242 children, how many actual

5   placements occurred and for the entry cohort there were 675,

6   for the two year cohort, 814.

7   **Q**   Dr. Freitag, could you turn to table C34 on page C19.

8   **A**   Yes.

9   **Q**   What does this reflect?

10  **A**   We did some examination to what extent did placement

11  changes impact various areas of the child's life, and we

12  looked at one of the very important issues for children is,

13  you know, consistent education and stability in their school

14  and peers even while their placements might be changing

15  underneath them.  And so we asked the question when this

16  placement occurred did the child need to move to a different

17  school at the same time.

18  **Q**   What was the size of the sample of cases available to be

19  used for table C34?

20  **A**   We looked at all 243 children, each sample resulting in

21  675 placement moves for the entry cohort and 814 for the two

22  year cohort.

23  **Q**   Did you also look at whether a child simply missed days

24  at school due to a placement move?

25  **A**   Yes, we did.

1    **Q**    And where is that reflected?

2    A    That would be the table immediately preceding that,

3    table C33 on page C18.

4    **Q**    Are you aware of any -- withdrawn.

5            Dr. Freitag, please turn to table C26b on page C16.

6    A    Yes.

7    **Q**    What foster care case practice is addressed here?

8    A    This table refers to placement with siblings.  The

9    relationship that a child has with their sibling can be a

10   very important relationship for them.  And in particular

11   children who have grown up together experiencing abuse or

12   neglect can sometimes have very profoundly deep

13   relationships with each other.  And so when they're placed

14   to what extents are they placed together so that they can

15   maintain that relationship and not have still another loss.

16   They're losing their parent, are they also losing their

17   sibling.

18           **MR. BARSHAK:**  Move to strike again, your Honor, as

19   going beyond the report.  She's characterizing her rationale

20   as opposed to just the date presented.

21           **THE COURT:**  Shouldn't I strike it?  It's stricken.

22           **MR. BORTEN:**  Ah --

23           **THE COURT:**  It's stricken.

24           **MR. BORTEN:**  Subject to -- I think there might be

25   something in the report.

1          **THE COURT:**  Well, then you've got to point it out

2     to me.  But for now it's stricken.

3     **Q**   Is there a DCF regulation you considered that addresses

4     the placement of siblings together?

5     A   Yes, there is.

6     **Q**   If you could look at Trial Exhibit 554 which you have.

7     A   Yes.

8     **Q**   Does that, does that regulation address the placement of

9     siblings together?  Subparagraph (4).

10    A   Yes.

11         **THE COURT:**  Help me out here on a more theoretic

12    basis.  Suppose they're not following their regulations, or

13    they're not following their regulations a hundred percent.

14    No organization follows their regulations a hundred percent.

15    And the deviation -- the regulation may be thought of as

16    establishing the operations norm, its required norm, not

17    some aspirational norm, but it never happens a hundred

18    percent because organizations never do that a hundred

19    percent.  None of that addresses the standard of substantive

20    due process that this Court must apply.  And if that's so,

21    while the raw data may be very helpful, we'll see, just

22    referencing the regulations doesn't seem to get you

23    anywhere.

24         What am I missing?

25         **MR. BORTEN:**  The data, which shows that it's not

1    just a matter of 90 percent, it's substantially less than

2    that.

3            THE COURT:  Well, I can take judicial notice of the

4    reg-- well, no, I'm not sure I can.  But let's be clear,

5    because it may save time.

6            I propose to take judicial notice of the

7    applicable -- they change over time -- Code of Massachusetts

8    Regulations.  No objection to that?

9            MR. BARSHAK:  No, your Honor.

10           THE COURT:  All right.  So having her refer to it I

11   don't think is particularly helpful.  You can use it in

12   briefs, you can argue from it and the like.  And if you say

13   the core is the data, well, I agree it is the data and we'll

14   see what we make of it.

15           Go ahead.

16           MR. BORTEN:  My certain, your Honor, is with the

17   entire report not in evidence, the reliance of CRC on

18   particular regulations won't be in the record.

19           THE COURT:  Well, I mean, I can't admit the report

20   absent agreement, and so I'm not.  You can address it.  I'm

21   not -- just don't think that's the way.  I've taken judicial

22   notice of the applicable CMR.

23   Q    Now, does CRC readers determine in each case, in each

24   case where siblings were separated whether or not DCF in

25   accordance with this regulation determined that placement

1   together, quote, would be contrary to the safety of the

2   child or siblings or otherwise not in the child's best

3   interest?

4   A   Yes, we did look in the record for any statements of any

5   kind that provided any reason of any kind for why siblings

6   were not placed together.

7   Q   And where is that analysis?

8   A   That would be in table C28 on page C17.

9   Q   And could you explain how table C28 relates to table

10  C26b?

11  A   Yes.  So, I'll refer back to table C26b.  If you look

12  at, to the first row, the 87 children who were put into a

13  placement with all siblings who were also placed, put that

14  aside for the moment, that happened exactly the way it

15  should.  And that's good.  The next row represents 41

16  children who had one sibling placed with them but at least

17  one, at least one who was placed with them but at least one

18  who was not.

19       THE COURT:  I've lost you.  What chart are you

20  reading from?

21       THE WITNESS:  I'm sorry.  Chart C26b at the top of

22  page C16.  Go back to --

23       THE COURT:  Now, now I'm with you.  Thank you.

24  A   Okay.  The third line down with be children who had

25  siblings who were placed but were not placed with any of

1   them.  You see 141 children in that group.  So, combining

2   the 141 and the 41 are children who, there was at least one

3   sibling who was not placed with them.

4        **THE COURT:**  Let me -- now, just to save time, I'm

5   saying, oh, I'll read the regulations and take judicial

6   notice of them.  But help me out here.

7        As you read these regulations they can't do that

8   unless that's in the best interest of the child.  Is that

9   right?

10       **THE WITNESS:**  I think the presumption is the other

11  way, that children should be placed with their siblings

12  unless there's a compelling reason not to.

13       **THE COURT:**  Okay.  So here we document a variety of

14  reasons, a variety of situations --

15       **THE WITNESS:**  Yes.

16       **THE COURT:**  Where children were not placed with

17  siblings.

18       **THE WITNESS:**  Yes.

19       **THE COURT:**  And the thing that immediately comes to

20  my mind is they don't have beds for them in that foster home

21  which is an issue in a wholly different but generally

22  related context, that's our basic problem where with

23  offenders we're trying to find someplace for appropriate

24  rehabilitation.  Now, the placement of siblings doesn't play

25  in here.  But we're always scrounging around trying to find

1      a bed as opposed to putting someone on the street.

2             **THE WITNESS:**  Yes.

3             **THE COURT:**  Now I've said enough.  You ask

4      questions.  Go ahead.

5             Well, let me just finish, not the thought, but I'll

6      put the question.

7             As these, as you read these regulations, the

8      availability of beds is not the calculus that the social

9      worker is supposed to go through?

10           **THE WITNESS:**  We actually made no distinction in

11     the quality of the reason.  We only looked for was a reason

12     given.  So, for example --

13           **THE COURT:**  My question is different.  And it's

14     something I I'm going to have to answer for myself.

15           **THE WITNESS:**  Uh-huh.

16           **THE COURT:**  When I read this regulation, do you

17     know, can you tell me whether the availability of a bed is,

18     in whatever appropriate term, is dealt with?

19           **THE WITNESS:**  I want to just read the regulation.

20     The regulation states unless doing so would be contrary to

21     the safety or well-being of the child or siblings.

22            **THE COURT:**  Where?  Just so I'm clear.

23           **THE WITNESS:**  That is on page, Exhibit 554, page 2,

24     paragraph 4.

25           **THE COURT:**  Thank you.  All right.  Thank you.

1          **THE WITNESS:**  Yes.  So, I will leave it to others

2     to make that question --

3          **THE COURT:**  I know.  I tried to get it from you,

4     but I'll have to get it for myself.  Thank you very much.

5     Go ahead.

6          **THE WITNESS:**  So our, our question was --

7          **THE COURT:**  Let him ask a question.  I'm -- I've

8     intruded too much.  Go ahead, counsel.

9     **Q**   What was the size of the sample of cases available to be

10    used for these tables?

11    A    So.  For table C26b which begins this analysis, again,

12    we used all 242 children.  For each child we looked at every

13    placement that they had.  So our sample is 675 placements

14    for the entry cohort, 814 for the two year cohort.  As we

15    move into table C28, we only examined those placements where

16    there were siblings who were also placed who were not placed

17    together, and so for the entry cohort there are 182 such

18    placements and for the two year cohort there were 302 such

19    placements.

20    **Q**   Dr. Freitag, please turn to table 13A on page 31.

21    A    Yes.

22    **Q**   What aspect of case practice does this table reflect?

23    A    This covers contact by workers with the child.

24    **Q**   Is there -- go ahead.

25    A    I'm sorry, I was just going to add the detail that the

1    first row measures the extent to which workers contacted the

2    child any place.  The second row covers contact with the

3    child, that the worker had with the child in the placement

4    home.

5    **Q**    And was there a DCF policy you considered that addresses

6    this practice?

7    A    Yes, there is.

8    **Q**    Could you please turn to page DCFP0L308 of Exhibit 2.

9          Have you found it?

10   A    Yes, I'm looking for the exact section of this that

11   forms the foundation of what we looked at.  I believe it was

12   the --

13   **Q**    In the middle band where it says policy?

14   A    Second, yes, under policy, the second paragraph there is

15   the fundamental standard that we looked at.

16   **Q**    And what's the standard?

17   A    The schedule of contacts should include at least monthly

18   visits by a social worker with the children, the children's

19   placement resource and the children's parents.

20         **THE COURT:**  Now, look at table 13A and see if I

21   understand this.  I ready this table as saying, we'll go up

22   to the top 227, that of those 227, 65 children had monthly

23   visits, 76 children had monthly visits at least

24   three-quarters of the time, 63 had monthly visits at least

25   half the time, 15 had monthly visits at least a quarter of

1    the time, and eight of them so far as the documentation

2    shows had monthly visits less than 25 percent of the months

3    studied.

4            Did I read it right?

5            **THE WITNESS:**  Essentially right.  It would be most

6    accurate to not only say at least 50 percent but it's a

7    range of 50 percent, 75 percent.

8            **THE COURT:**  Thank you.

9    **Q**   And what's shown in the second row of this table, Dr.

10   Freitag?

11   A    In the second row we examined the extent to which those

12   placements occurred in the placement home so that the worker

13   was able to not only see the child but also to see the

14   environment that the child is now living in and make sure

15   that that is a safe place.

16   **Q**   And is there any regulation or standard that you

17   considered in doing that analysis?

18   A    We did not find anything in the Massachusetts

19   regulations; however, there is federal guidance on that.

20           **THE COURT:**  Let me interrupt to say that I got

21   caught up in this and passed the normal time for a recess.

22   And I take it you're not about done with this witness?

23           **MR. BORTEN:**  We're getting there but I'll need more

24   time.

25           **THE COURT:**  A recess would be helpful.

1          **MR. BORTEN:** Yes.

2          **THE COURT:** Fine. We'll take a recess for one-half

3    hour. We'll recess.

4          **THE CLERK:** All rise.

5          (Recess.)

6          **THE CLERK:** All rise. The United States District

7    Court is back in session, you may be seated.

8          **THE COURT:** Go ahead, counsel.

9          **MR. BORTEN:** Your Honor, just to clarify are all

10   tables in the report in evidence or just the appendix?

11         **THE COURT:** Just the appendix is the Court's

12   ruling. That doesn't mean you couldn't get other tables in,

13   but I'm not expressing any opinion on that. But the

14   appendix C is Exhibit 1065.

15         **MR. BORTEN:** Okay, with that understanding, I would

16   like to move into evidence table 7.

17         **THE COURT:** Well, why don't you list them all.

18         **MR. BORTEN:** I'll find them. Table 7. Well, I

19   would like to move all of them in.

20         **THE COURT:** All right. Now -- and the grounds?

21         **MR. BORTEN:** Under 1006.

22         **THE COURT:** Now that I've suggested it

23   respectfully.

24         What's the objection to that, if the tables are

25   accurate reflections of the raw data? If it -- one that I

 1    can see is if the tables are argumentative, I would be

 2    hesitant to admit them.  But if all they are is an accurate

 3    reflection of the raw data the tables, not the report, I

 4    would think I should admit.

 5             MR. BARSHAK:  Your Honor, may I take a seek a

 6    little clarification from opposing counsel.  Tables mean

 7    both tables and figures or just the ones called tables.

 8             MR. BORTEN:  1234-S just the date tables, not the

 9    graphs.

10             MR. BARSHAK:  And which numbers specifically?

11             THE COURT:  Well, I can follow it.  They're called

12    tables and they have numbers.  Graphs are something else.

13             MR. BORTEN:  I think the last one is 62.  Tables 1

14    through 62.

15             MR. BARSHAK:  So not section 5?

16             MR. BORTEN:  Table 62 is at the end of Section 5, I

17    believe.

18             THE COURT:  What page is table 62 on if that's the

19    sticking point.

20             MR. BORTEN:  Page 163.

21             THE COURT:  Thank you.

22             MR. BORTEN:  And nothing else from -- wait a

23    minute.  That's table 61.

24             MR. BARSHAK:  Page 152.

25             THE COURT:  And they're tables 1 through 62, right?

1          **MR. BORTEN:**  Yes.

2          **THE COURT:**  Tables.

3          **MR. BORTEN:**  One through 60 are in parts 1 through

4    4 and tables 61 and 62 are in part 5.

5          **THE COURT:**  Any objection to any of those?  The

6    graphs are called figures, and it seems to be a uniformity

7    throughout.  This is a proffer of the tables.

8          **MR. BARSHAK:**  Your Honor, subject to the pending

9    motion in limine, including the Daubert, and reserving the

10   right to identify, say tomorrow, specific tables that may be

11   argumentative in nature, subject to that, then at this point

12   the defendant would not, just simply states an objection but

13   understands that they're likely to come in.  So,

14   objection --

15         **THE COURT:**  Your candor does you credit.

16   Overruled.  And to be specific, tables 1 through 62 are

17   admitted in evidence.

18         Now, the fact that they're admitted of course

19   doesn't mean the Court's going to give them weight or that

20   they're beyond cross-examination.  To the extent there's

21   some sort of Daubert motion it's overruled.  She's qualified

22   to give the testimony that she's given.  If you have

23   specific objections to questions make specific objections to

24   questions.

25         Now, the tables 1 through 62 in the report are

```
1    admitted in evidence Exhibit 1066 in evidence.

2              (Exhibit marked in evidence.)

3          MR. BORTEN:  Thank you, your Honor.

4              DIRECT EXAMINATION (Cont'd)

5    BY MR. BORTEN

6    Q   Dr. Freitag, we were looking at table 13B and I had

7    asked you is there a standard that you're aware of that

8    addresses visits by case workers to the child in the

9    placement setting.

10         THE COURT:  Say again the tables.

11         MR. BORTEN:  Table 13B?

12   A   I think you mean 13A.

13         THE COURT:  13A?

14         MR. BORTEN:  A, I'm sorry.

15         THE COURT:  Thank you.

16         THE WITNESS:  That's a part of --

17         THE COURT:  And having interrupted, your

18   reservation of right to make specific objection is

19   acknowledged by the Court.  That's my ruling.  But you can

20   make specific objection if you think something's

21   argumentative.

22         MR. BARSHAK:  Yes, counsel understands the general

23   objection is overruled and that's --

24         THE COURT:  That's how we're doing it.

25         MR. BARSHAK:  Thank you.
```

1          THE COURT:  Now we're on 13A, and ask your

2     question.

3     Q    What standard did you consider in analyzing child

4     contact with worker in placement homes which is the bottom

5     of table 13A.

6     A    Yes.  We did not --

7          MR. BARSHAK:  Objection to the term standard, your

8     Honor.  That's suggesting something that may not exist.

9          THE COURT:  Do you understand what he means?

10         THE WITNESS:  My understanding of what is meant is

11    just what we're measuring against.

12         THE COURT:  And I'll let her answer with that

13    understanding.  All right.  I am interested so explain it.

14    What were you measuring against?

15         THE WITNESS:  So, we did not find a particular

16    regulation in Massachusetts relating to whether or not

17    placements, visits with the child should be conducted in a

18    placement home.  However, we were aware of federal guidance

19    in that regard.

20         THE COURT:  So the bottom part of this chart,

21    figuring out how many were in the home for the reasons that

22    you stated, the standard against which you're measuring is

23    some sort of federal guidance.

24         THE WITNESS:  Yes.  And in essence the way this

25    information was collected by the case workers is that as

1    they went through the chart they would record any time they

2    saw a worker make a contact with anyone in any location, put

3    the date in for that, and then add the detail of who was

4    there and where were they contacted.  They were then able to

5    construct this table.  The process we had to go through to

6    construct this table is first to look to see during what

7    months was the child in care.  They would be only required

8    to visit the child in the months that the child was in care.

9    And then determined the total number of months the child was

10   in care and then determine what percentage of those months a

11   visit occurred.  That explains the top part.  The added

12   nuance to the second part is looking at whether that contact

13   occurred in the placement home for the reasons I had

14   mentioned earlier, the importance of seeing that place that

15   the child is living, making sure that it's safe and the

16   child is doing well there.  And there we found that for

17   25 percent of the children in the entry cohort every month

18   that they were in care there was a visit.  And you can see

19   that for the remainder of the children -- actually I would

20   say visit in the placement home.  And the remainder of the

21   children had less than that standard.  The standard that we

22   understood in the federal rule was that half of the visits

23   that happened should be in the home.  So, in essence

24   everybody 50 percent up would have met that standard.  But

25   the 17.5 percent that fell between 25 and 49.9 percent, 11

1    percent below 25 percent, and most concerningly the eight,

2    eight percent of the children that for all the months that

3    they were in placement there was no record that they had

4    ever been visited in that placement.

5            THE COURT:  We seem to have elided from guidance to

6    rule.  Do you think there's some federal rule or regulation

7    about visits in the home?

8            THE WITNESS:  Yes, actually there is.

9            THE COURT:  Fine.  What is it?

10           THE WITNESS:  I cannot remember the citation off

11   the top of my head.  Can I refresh my memory?

12   Q    Sure, it's on page 29.  It's on page 29.  At the top.

13   A    It's on page 29 of the top paragraph, there's a section

14   of the Social Security Act that states that half of all

15   visits should be in the placement setting.

16           THE COURT:  Thank you.  All right.

17   Q    Dr. Freitag, what did you do in the case of a child who

18   entered care in the middle of a month?

19   A    We took the most conservative --

20           THE COURT:  Let me interrupt simply because there's

21   so much data to grasp.

22           THE WITNESS:  Yes.

23           THE COURT:  Is it your contention -- your complaint

24   here insofar as it's statutorily vague is based on the

25   conduct of DCF in handling the Block Grant program, the

1    federal money which goes to DCF.

2         **MR. BORTEN:**  Well, with the correction it's not

3    solely Block Grant program, there's an entitlement component

4    to that.

5         **THE COURT:**  Thank you.  And of course I stand

6    corrected.

7         Is it your contention that this regulation, for

8    example, is somehow incorporated in that program and

9    entitlement so that you say they're required to follow it?

10        **MR. BORTEN:**  Yes.  The statute actually requires as

11   a condition of the --

12        **THE COURT:**  All right.  I haven't made that link

13   so, when she cites to this regulatory framework, wholly

14   apart from substantive due process now, at least your

15   contention is that failure to follow that regulation, were I

16   to find it, is a violation of the federal regulatory

17   framework upon which the money depends.

18        **MR. BORTEN:**  It is a violation, yes.

19        **THE COURT:**  Thank you.  Thank you.

20        **MR. BARSHAK:**  Your Honor, may I just clarify

21   something on that point?

22        **THE COURT:**  Yes.

23        **MR. BARSHAK:**  Okay.  The defendants' understanding

24   is that there's only two issues raised by plaintiffs

25   relative to that statutory claim, one of them dealing with

maintenance payments to foster parents, the other one

dealing with, as I believe documentation of steps towards

adoption.  Because the statutory claim in this case that has

been raised is just those two issues, regardless what the

interplay between federal and state may be, in this case

this issue regarding visitation is completely irrelevant.

        **THE COURT:**  Because it's not pleaded.

        **MR. BARSHAK:**  It's not pleaded, it's not part of

this case.

        **THE COURT:**  What do you say to that?

        **MR. BORTEN:**  Well, what I said was it's a violation

of the statute.

        **THE COURT:**  Not that --

        **MR. BORTEN:**  We do not have a claim pleaded.

        **THE COURT:**  You don't have a claim for it.

        **MR. BORTEN:**  But we believe it is a standard that

goes to the professional judgment component of the

substantive due process.

        **THE COURT:**  Oh, that I understand.

        **MR. BORTEN:**  Yes.

        **THE COURT:**  That I understand.

        **MR. BORTEN:**  And that's the relevance.

        **THE COURT:**  You don't have a statutory claim for

it.

        **MR. BORTEN:**  No, we do not assert a statutory

1    claim.

2            **THE COURT:**  But it is a standard.  I appreciate the

3    clarification, and I appreciate the fact that we all seem to

4    agree at least as to the framework, I'll deal with it.

5            Forgive the interruption/put a question to the

6    witness.

7            **MR. BORTEN:**  Sure.

8    **Q**   So, I was asking you what did you do in the case in

9    looking at these monthly visits for a child who, say, came

10   in on the 13th of the month?

11   A   And that happens quite often obviously.  So we had a

12   choice in how to deal with that.  And the choice we made

13   would be to give the benefit of the doubt to the department.

14   So, if there was a partial month and the visit was already

15   made then we would include that as an instance in which the

16   standard was met.  If there was a partial month and the

17   visit was not made, we would exclude that month from the

18   analysis because the entire month had not expired and so the

19   full opportunity to have made that visit wasn't yet gone.

20   **Q**   What was the size of the sample you had available to do

21   this analysis in table 13A?

22   A   So, we began with all two 242 children in the entry

23   cohort.  From that we excluded children who had been in

24   custody 30 days or less unless they had already had their

25   visit.  If they were in care less than 30 days and they had

1    their visit, they came in in care less than 30 days where

2    the visit hadn't happened yet, we didn't count that as a

3    visit was expected to not be made.  So that left us with 227

4    children.  And then in terms of contact with the worker in

5    the placement home, another 27 children were excluded

6    because their placement changed in the middle of the month

7    and so we applied the same rule for that.

8    **Q**    Dr. Freitag, would you turn to table 41 on page 87.

9            **MR. BARSHAK:**  I'm sorry, counsel, just repeat the

10   table number.

11           **THE COURT:**  41 on page 87.

12           **MR. BARSHAK:**  Thank you.

13   **Q**    What does this table show?

14   A    This is exactly the same analysis but in this instance

15   we're looking at the children in the two year cohort.

16   **Q**    And what was the sample size you considered in doing

17   this analysis?

18   A    There are 240 children for whom we were able to measure

19   contact of any kind in any location and 205 children for

20   whom we were able to measure the, whether or not the contact

21   occurred in the placement setting.

22   **Q**    And did you apply the same exclusion for partial months

23   that you did in table 13A?

24   A    Yes, we did.

25   **Q**    Dr. Freitag, could you please turn to table 13B.

1    A    Yes.

2    **Q**    What aspect of case work practices does this address?

3    A    This continues with the question of contact that the

4    worker is making, but in this instance we're measuring the

5    contact that the worker is having with the child's parents.

6    **Q**    And is there a policy that you considered in this area?

7    A    Yes.  The policy that we've already referred to as I

8    mentioned states that a minimum monthly contact applied to

9    both contact with the child and the parent.  And, and we

10   applied the same standard for this.  So if the child was in

11   care for 30 days or less and if contact with the parent has

12   already occurred we counted it; if the contact had not

13   occurred that, that family was excluded from the analysis.

14   So we had 226 children and we examined contact with their

15   parents, 37.6 percent every month that the child was in care

16   there was a worker visit with the parent.  And that's a good

17   thing.  And the remainder, there was less than that standard

18   including almost, almost 20 percent total in the group below

19   50 percent of the visits all the way down to none reported.

20   **Q**    Dr. Freitag, could you turn back to table 12.

21   A    Yes.

22              **THE COURT:**  On page?

23              **MR. BORTEN:**  On page 28.

24              **THE COURT:**  Thank you.

25              **MR. BORTEN:**  My apologies.

1    A    Yes.

2    **Q**    What foster care case practice is addressed here?

3    A    This is a more granular look at the first month that a

4    child spends in care.  And the slight difference in the

5    analysis here is that in the tables that we were just

6    looking at we were looking at the calendar month and the

7    child was in care in that calendar month looking whether a

8    visit occurred.  But as we mentioned sometimes children come

9    into care in partial months and that first 30 days in care

10   is particularly important.  The child has just had a perhaps

11   abuse or neglected, disruption with a removal from the

12   children, from their parents, the parents have experienced

13   removal from the children, the foster family has a new child

14   coming into their home, and so checking in within those

15   first 30 days is incredibly important.

16         So, what we did in this table is to take as our

17   starting point the day the child entered into care and

18   measure out 30 days from there, whether that was across the

19   calendar month or not, and record how often was the visit

20   with the child in column one, with the parent in column two,

21   and with the foster care provider in column three, how often

22   did that occur in that first critical month.

23         **MR. BARSHAK:**  Move to strike the part of the

24   testimony regarding rationale or reasons as opposed to just

25   describing what the data depicts, because it's beyond the

1    record.

2            **THE COURT:**  Sustained on that ground.

3    **Q**   Dr. Freitag, focusing on the third column here, worker

4    contact with provider, what do you mean by provider in his

5    context?

6    A   So that would be the foster parent or if it was a

7    relative, the relative, the person who's now taking

8    responsibility for the day-to-day care of the child.

9    **Q**   And was there a DCF policy that you considered in

10   connection with worker contact with the provider?

11   A   Yes, monthly contact with the provider is mentioned in

12   that same regulation that we've been referring to.

13   **Q**   What was the size of the sample of the cases available

14   used for this analysis of contacts in the first 30 days of

15   placement?

16   A   In the entry cohort we started with all 242 children.

17   There were 199 children who were in care at least 31 days

18   and so that was the group that we looked at here.  If they

19   had been in care less than 30 days or less, the time had not

20   elapsed to have been required to meet the standard.

21   **Q**   And did CRC examine whether a child was visited during

22   the first 30 days in custody or these other contacts took

23   place in the first 30 days of custody for children in the

24   two year cohort?

25   A   We did not.

1    **Q**    Why was that?  Why didn't you?

2    A    Similar to looking at the, the type of first placement,

3    that first 30 days in care for those children would have

4    been occurred anywhere from two to 18 years ago, and that

5    would not shed light on current practice.

6    **Q**    Dr. Freitag, could you turn to table 16 on page 38.

7    A    Yes.

8    **Q**    And what aspect of case practice does this table

9    address.

10    A    This table examines the extent to which a child who's

11    been placed in care has an opportunity to maintain

12    connections with their family or people who are important to

13    them from before they were placed.  So in row one is the

14    global assessment of was there an -- I'll interrupt my train

15    of thought here for a moment and say that the table is laid

16    out exactly the same way as the table we had previously

17    looked at for worker contacts with child, worker contacts

18    with parents.  So again the case reader would have listed

19    every single contact, who was there, what their relationship

20    was, and what the date was, and then in our analysis we

21    would have gone for each child and determined which months

22    were they in placement and did a visit of each one of those

23    types of occur in that month and then calculate the

24    percentages.

25            The first row examines the extent to which a child

1    in placement had a visit in months with anyone from their,

2    their parents, their siblings or even including anyone else

3    who was important to them, say a grandparent or an aunt or a

4    neighbor, someone from before they came into placement.  If

5    we found evidence that in that month they had visited any

6    one of those types of individuals that would be recorded and

7    shown in that first row.

8         The second row limits the analysis only to contact

9    between the child and the parent.  And the third describes

10   contacts that the child had with siblings who were also in

11   care.

12   Q   What was the number of cases you considered or were able

13   to consider in connection with the first two rows of this

14   table?

15   A   So again, we, we excluded children who were in care less

16   than 31 days.  And we had 194 children who we were able to

17   evaluate the first two visits with anyone and visits with a

18   parent.

19        **THE COURT:**  Excuse me, I've lost you.  Where are

20   you reading, what table?

21        **THE WITNESS:**  Oh, I'm sorry, table 16.

22        **THE COURT:**  Sixteen.  I'm sorry thank you.  Put

23   your question again, I'm sorry, I lost my train.

24   Q   What was the number of -- what was the size of the

25   sample cases available to CRC to be used for this analysis

1    in the first two rows?

2    A    Yes.  We analyzed records for 194 of the children in the

3    entry cohort for the first two rows.  For sibling visits we

4    limited our analysis to those children who had siblings in

5    care, and so, we looked at 148 children for sibling visits.

6    Q    And in the case of the sibling visits what did you do in

7    this table when siblings were actually living together?

8    A    Yes, we actually learned subsequently that we may have

9    included things as, and counted as favorably as a visit

10   occurring that maybe should not have been counted that way.

11   As I mentioned, the way the case reading table was

12   constructed, they would enter a date that a visit occurred

13   and who was there.  And if we saw that a sibling was there,

14   we counted it as a visit.  We later realized that we didn't

15   exclude siblings that were there because they were living

16   there.  And so, this table actually includes and counts as a

17   visit made when there was a family visit and it lists two

18   siblings being there even though they were actually living

19   together, so it was not really a visit.

20   Q    Was there a DCF policy you considered that is applicable

21   to the family visits that are addressed in this table?

22   A    Yes, there is.

23   Q    And is that one of the regulations we've looked at or

24   policies we've looked at?

25   A    I believe it's in this same -- I referred to DCF policy

```
 1    308 in the report.  And where should I be -- yes, we did

 2    look at that one before.

 3             So, our understanding was that the standard would

 4    be that this visit between the child and the parent and the

 5    child and the siblings would be as often as possible and in

 6    no case less than monthly.  And there is an, there is an

 7    exception that can be made.

 8    Q    Are you referring to the middle of the page where it

 9    says policy in the third paragraph?

10    A    Yes.

11    Q    And does this policy apply to all children in foster

12    care?

13    A    I'm not aware of any exceptions.  However, in a

14    particular case there can be a reason given for less

15    contact.

16    Q    Did CRC look in the record for reasons why contact might

17    not occur?

18    A    We did.

19    Q    Okay.

20    A    I believe we did.  I want to refresh my memory.

21    Q    Is that table C53 on page C29?

22    A    Yes.

23    Q    How did CRC go about determining the reason for no

24    contact between worker and sample child?

25    A    I'm sorry, I want to correct.  This is in reference to
```

1    reasons for no contact between worker and the sample child.

2    And so I want to correct my earlier statements.  That's what

3    I was testing in my memory.

4    Q    Okay.  So we don't have data on the reason for no

5    contact between child with family?

6    A    Not, not directly, no.

7    Q    Going back to table 16, was the methodology used here

8    the same for the other visitation measures?

9    A    Yes, it was.

10   Q    Dr. Freitag, could you please turn to table 22 on

11   page 49.

12   A    Yes.

13   Q    Generally what does this table, what area of case

14   practice does this table require?

15          **MR. BARSHAK:**  Your Honor, may I be heard?

16          **THE COURT:**  You may.

17          **MR. BARSHAK:**  Table 22 -- I expect the witness is

18   going to be discussing reunification and reentry, which by

19   definition brings in issues of what may have happened while

20   a child was not in state custody.  The defendants submitted

21   a motion in limine regarding excluding evidence of events

22   occurring while the child was not in state custody, in

23   essence stating that while there may be a special

24   relationship while the child is in the custody of DCF, once

25   the child leaves that custody that relationship does not

1    exist and as a result any evidence regarding what happened

2    outside of custody, including, for example, reentry or

3    reentry rates, that is not relative -- relevant to any

4    issues in this case.  I expect the witness may be going

5    there, so I do not have any issue with reunification effort,

6    but anything regarding reentry which not be allowed.

7            THE COURT:  All right.  What's the relevance of

8    reentry?

9            MS. BARTOSZ:  Children reenter care, your Honor.

10   Because they experience abuse in the home to which they were

11   returned by DCF.  And either Dr. Freitag and/or other

12   experts can testify to the significance of the efforts that

13   are undertaken while the child is in custody to ensure that

14   the child will be safe upon being returned to their parents.

15   So it is relevant.

16           THE COURT:  The objection overruled.  The testimony

17   is relevant.  It passes the minor test of relevance.  Query

18   what weight the Court will give to it.  And the defense is

19   right, it is the conduct of DCF that is the focus of the

20   inquiry here, not the conduct of others while the child is

21   not in the care of DCF.  But part of that care is properly

22   placing the child when it leaves the care, one would think.

23   And I will allow such evidence.

24           Go ahead.

25   Q    So, Dr. Freitag, you were about to explain generally

1    what area of case practice table 22 addresses.

2    A    Yes, this does in fact report a number of questions

3    related to the extent to which children once taken into care

4    are reunified and then the extent to which once reunified

5    those children to reenter care.

6    Q    So focusing your attention on the last row, what does,

7    what does that address?

8    A    That specifically measures the extent to which children

9    who were reunified did in fact reenter care during the

10   observation period.

11   Q    And what did you find?  What did CRC find?

12   A    We found that of the 125 children for whom a decision

13   was made that they could go home, 23, or 18.4 percent, did

14   return to care during the observation period.  I want to

15   point out this is not a standardized observation period.

16   So, the extent of follow-up time after the child went home

17   would vary anywhere from one to 30 months.  But we know that

18   nearly one in five of the children returned to care, we

19   don't know if they returned after one month, after a number

20   of months.

21   Q    What was the size of the sample of cases available to be

22   used for this table generally?

23   A    Again, we always begin with 242 children, but there were

24   only 125 who were reunified, and so we followed those 125

25   children.

1    Q    Now, did you do the same analysis for children in the

2    two year cohort?

3    A    I believe we did, but there were very few children in

4    that cohort who returned home.

5    Q    Dr. Freitag, would you please turn to table 55A on

6    page 115.

7    A    Yes.

8    Q    What aspect of child welfare case practice does table

9    55A address?

10   A    Well, it's our understanding that every child who has an

11   open case and certainly every child in care should have a

12   service plan.  And so we looked at all 242 children in the

13   two year cohort because they had already been in care for at

14   least two years, so all of them should have had at least one

15   service plan.  And we looked to see how many had any and

16   those that had some, how many did they have.

17   Q    Is there a DCF regulation that you considered in

18   connection with service plans.

19   A    Yes, there was.

20   Q    I'm bringing you Trial Exhibit 632.

21        THE COURT:  As it's always good to be transparent,

22   I now understand better what you or doing.  While, I said,

23   well, we're not concerned with the Massachusetts own

24   regulations, that is far too glib.  We are because they

25   certainly are some indication of the standard of

1    professional care that the very people in the field have

2    decided is appropriate.  And I see why you're doing it.  I

3    think I made the right legal ruling.  I will take judicial

4    notice of the regulations as a whole.  But go right ahead.

5              **MR. BORTEN:**  Yes.  And if I could add to what I had

6    said earlier, of course it's the numbers that matter, but

7    it's also we will have testimony from other experts about

8    the importance in terms of harm to children and complying

9    with --

10             **THE COURT:**  Judge Selya says a single rose does not

11   a summer make.  You're not resting yet.  Go ahead.

12   Q    So, what is this -- how did you apply this regulation to

13   the analysis you did in table 55A?

14   A    Well, this is quite clear.  Every family receiving

15   services from the department shall have a service plan and

16   so we just simply measured the extent to which we found

17   service plans.

18   Q    Does DCF also have a policy that you consider in

19   connection with service plans?

20   A    Yes, we do.  The policy supports this and explains when

21   the first service plan is due.

22   Q    Could you turn to page DCFPOL259 in Exhibit 2.

23   A    Yes.

24   Q    And this policy continues through page 269; is that

25   right?

1   A    There's quite a bit of supporting information but we

2   were focused just on the minimal standard that there should

3   be a service plan and it should have certain specific

4   components.

5   Q    And how many service plans should there be in a child's

6   file?

7               MR. BARSHAK:  Objection.

8               THE COURT:  Now, that was a normative question.

9   What's the ground of the objection?

10              MR. BORTEN:  I'll rephrase it.

11              MR. BARSHAK:  That it's calling almost for a,

12  calling for a quality assessment as opposed to a quantity.

13  Should be --

14              THE COURT:  What, you don't think she's not

15  qualified to give this?

16              MR. BARSHAK:  She's testified regarding her report

17  which in, well, which is a descriptive report.  It's not

18  about quality of things.  It's about what was there, what

19  was not there.  That's different than a question asking her

20  what should be in the file.

21              THE COURT:  It is, but if she says what she thinks

22  in the report, I'm going to let her testify because I think

23  she's qualified to say that.  And is it in the report?

24              MR. BORTEN:  The report looks at the number of

25  service plans found.  My question relates to connecting that

1    numerical count service plans with the policy, what the

2    policy requires.  So I'm happy to rephrase the question.

3              **THE COURT:**  All right, it's withdrawn.

4    Q   Does the policy speak to the number, the frequency or

5    number of service plans that should be created in the course

6    of a child's foster parents?

7    A   Frequency, yes.  The number would vary by individual

8    child depending on how long they had been in care.

9    Q   And what does the policy say?

10    A   So there should be an initial one developed within 55

11    days after the case was opened.  In some instances the case

12    may be opened for some period of time before he child comes

13    into care.  And following that, there would be a renewal

14    within six months, and then an annual after that.  So it

15    would depend on -- and there can be others, others in the

16    interim for various reasons.  But it was a bit tricky to try

17    to figure out exactly how many plans an individual child

18    should have.  It depends on were instances that should have

19    triggered an interim plan, for example.  So, we went with

20    just reporting were there any plans at all and just

21    describing how many were there.

22    Q   And in terms of were there any plans at all, what did

23    you find?  What did CRC find?

24    A   Well, in the two year cohort for the 242 children, more

25    than a third, 35.1 percent, we couldn't find a single plan.

1    Q    Now, could you turn to table 56 on the, on page 119.

2    A    Yes.

3    Q    What does this table show with respect to service plans?

4    A    So, in the policy it sets forth certain things that

5    should be in a service plan, and one of the things that

6    should be in there would be services in past, what, what is

7    this plan about, what, what services will be provided to the

8    parents, what services will be provided to the child.  And

9    we went, we looked inside the plans to see how often could

10   we find that there was indication that some service was

11   arranged for or set up or planned for a child and the same

12   thing for the parents.

13   Q    Is there a DCF regulation that addresses presence or

14   absence of service information in service plans?

15   A    It's the same regulation that we were looking at under

16   service plan components which is on DCF policy page 259, the

17   lower left hand speaks to services in the past, that a

18   component of the service plan would be services and past

19   which support achievement of change indicators, outputs and

20   goals to be provided and accomplished within the service

21   plan time frame.  And it does say that not every service

22   plan participant needs to have services.

23   Q    And is there also a regulation, this is the policy

24   manual, is there also a regulation that addresses that?  I

25   can show you Exhibit, Trial Exhibit 839.

1    A    Yes, this essentially covers the same information as the

2    policy and this would be focused on items number, item

3    number five, a listing of the services to be provided to

4    family members at the time by which the frequency at which

5    the service is to be provided.

6    Q    What were your findings about the presence of service

7    information and service plans.

8    A    For the, for child related services, in the two year

9    cohort, including all 242 children, just about a third of

10   the children had some kind of service at any one point at

11   any service plan throughout the time that we observed.  And

12   for families for the two year cohort ten, a little over

13   ten percent of the families had some type of service data in

14   their service plan.

15   Q    And what was the number of cases you were able to

16   consider in tables 55A and 56?

17   A    Well, we did look at all 242 children and some were

18   missing because there was no plan, others there was a plan

19   but within the plan there was no service data.

20   Q    And do the regulations and policies concerning service

21   plans apply to all children in foster care?

22   A    Yes.

23   Q    Could you please turn to tables 28A and 29 on pages 57

24   and 60.

25   A    I'm sorry, table --

1    Q    28A.

2    A    Yes.

3    Q    On 57.

4    A    Yes.

5    Q    We can start with that.  What does this show?

6    A    This is exactly the same analysis but for the entry

7    cohort.

8    Q    And what number of cases was available for you to

9    analyze in this table?

10    A    We excluded again the children who were in care for less

11    than, for 30 days or less, so we looked at 199 children.

12    Q    Why did you do that?

13    A    The regulation does allow up to 55 days to complete the

14    plan.  We felt that -- so, we included children in care for

15    31 days to 55 days because that second month, the plan would

16    already be due by the end of that second month.  So we

17    included them recognizing that there might be some children

18    who had gone home between day 31 and day 55 and perhaps even

19    though a plan would still be required for them, as long as

20    the case was open, it might not have been this foster care

21    worker responsible for that plan.  But children going, we

22    felt that that would be a very small number.  And we didn't

23    want to not pay attention to the plans that would have been

24    due in that, in that window.

25    Q    And what is --

1          **MR. BARSHAK:**  Objection; that statement is not in

2    the report.

3          **THE COURT:**  That we wanted to pay attention to?

4          **MR. BARSHAK:**  Anything regarding the 31 versus 55,

5    none of that is contained in the report.  The report --

6          **THE COURT:**  It's stricken.

7    **Q**   Would you turn your attention to table 29 on page 60.

8    A   Yes.

9    **Q**   And what does that show?

10   A   This is the parallel analysis that I've explained for

11   the two year cohort, again looking for child service data,

12   for the 199 children who are in care for 30 days or more.

13   **Q**   And could you look at tables 28C and 28D on pages 58 and

14   59.

15   A   28C and D?

16   **Q**   Yes.

17   A   Yes.  Okay.

18   **Q**   What aspect of the policies and regulations concerning

19   service plans does this address?

20   A   In table 28C, we describe whether the plan in fact

21   contained a plan for how often the child should visit the

22   parent, and if so what that plan was.  And then we also

23   looked to see whether there was a parent's signature on the

24   plan.

25   **Q**   And is the parent signature requirement addressed in DCF

1    policies and regulations?

2    A    Yes, it is.

3    Q    Do you need your memory refreshed?

4    A    Yes, I do.

5    Q    DCFPOL264.  At the bottom.

6         **MR. BARSHAK:**  Your Honor, objection, asking the

7    question about whether it is or is not in a policy.  She can

8    talk about the data.  Ultimately you'll be looking at the

9    policy and applying.

10        **THE COURT:**  He'll rephrase the question.  Put your

11   question.

12   Q    Is the policy contained in the page range that I had

13   earlier indicated, 259 to 269, the policy you were

14   considering looking at the requirement of a parent's

15   signature and the child signature for a mature child?

16   A    Yes, we knew, we knew that a parent's signature and a

17   child over the age of 14, that their signature was also

18   required on the plan.

19   Q    And could you please turn to table 55D on page 117.

20   A    Yes.

21   Q    And what does that show?

22   A    This is the same analysis for the two year cohort.

23   Q    For parents or for children?

24   A    Table 55C relates to parents.

25   Q    And 55D?

1    A    55D relates to the child's signature.

2    Q    And for the child's signature, what was the size of the

3    sample of cases you were able to consider?

4    A    In this instance the requirement applies for children

5    age 14 and above, and so that limited our sample to 214

6    children.

7    Q    Dr. Freitag, could you please turn to table C6 on page

8    C4.

9    A    Yes.

10   Q    And what aspect of foster care case practice is

11   addressed here?

12   A    This was simply descriptive information looking at each

13   cohort and for the cases that had closed before the end of

14   our observation period, so that we could measure the length

15   of time from column one from case opening to case closure,

16   and in column two, from custody start date to custody end

17   date, in other words, how long did the child spend in foster

18   care.

19   Q    Which of these two columns addresses how long the child

20   spent in foster care?

21   A    The furthest column to the right.

22   Q    The custody start to end.

23   A    Yes.

24   Q    And what does the case open to case close measure?

25   A    That would simply be the date that the case opened which

1    may be the same day the child came into custody, but it

2    could have preceded that.  It also could have -- usually

3    should not some much after.  And it might extend beyond the

4    end of the custody if the case is held open once the child

5    goes home for support services at home.

6    Q    Yes, so what happens in a case when there's no custody?

7    Why is the case opened?

8         **MR. BARSHAK:**  Objection.

9    A    There may be some instances --

10        **MR. BARSHAK:**  That's not in the report.

11        **THE COURT:**  The why, he says it's not in the

12   report.

13        **MR. BORTEN:**  It's not.  I mean, this is basic

14   social work expertise.

15        **THE COURT:**  It may be, but I require everything in

16   the report.

17        **MR. BORTEN:**  Okay.

18        **THE COURT:**  Sustained.

19   Q    Why -- withdrawn.

20        Looking at the two year cohort data, how many

21   children left custody during the observation period?

22   A    If you look at the row that says N in the two year

23   cohort group and follow all the way over to the right hand

24   column, there are 137 children who ended custody.

25   Q    And for those children in the two year cohort who left

1    custody during the observation period, what was the median

2    time that they spent in foster care?

3    A    Expressed in days, it's 1,887 days.  Expressed in years,

4    just over five years.

5    **Q**    So, what does that mean that the median time spent in

6    foster care for these children was just over five years?

7            **MR. BARSHAK:**  Objection.  That's calling for a

8    conclusion that's not in the report.

9            **THE COURT:**  If it's not she won't testify to it.

10   Is it there?

11           **MR. BORTEN:**  The meaning of the word median, I --

12           **THE COURT:**  I know he meaning of the word median.

13           **MR. BORTEN:**  Okay.

14           **THE COURT:**  Sustained.  Ask her another question.

15   **Q**    How about the 105 children not included among the 137 in

16   the two year cohort?

17   A    Those would have been children who were in care a

18   minimum of two years at the start.  We followed them for 30

19   months.  And they still had not gone home.  So we don't know

20   how long they had been in care up until that point, they

21   don't know when they'll go, but we know that a minimum of 55

22   months they are in care.

23   **Q**    Dr. Freitag, are you familiar with the term independent

24   living services?

25   A    Yes.

1    Q    What are independent living services?

2    A    In essence it's efforts to help a child who is starting

3    to get into their teenage years who the state has taken over

4    the responsibility for helping them to grow up and equipping

5    them with what they will need to survive as adults, they

6    know how to use a checkbook, do they know how to do a load

7    of laundry.

8    Q    Did CRC examine or look for evidence of independent

9    living services that were provided to children in DCF

10   custody?

11   A    Yes, we did look for some data pints related to that.

12   Q    And what children did you look for that information for?

13   A    We looked at children age 14 or older.

14   Q    Is there a DCF policy or regulation -- well, I'll

15   withdraw that.

16          Was there a DCF policy that relates to independent

17   living services that you considered in connection with this

18   aspect of the case record read?

19   A    Yes.

20   Q    And I'll direct your attention to page DCFPOL201 in

21   Exhibit 2.

22   A    Yes.

23   Q    Is this a policy you considered on page 201 through 204?

24   A    Yes, it is.

25   Q    If you turn to page, I'm sorry, to table 509 on

1  page 125.

2          **THE COURT:**  The page number again?

3          **MR. BORTEN:**  125.

4          **THE COURT:**  Thank you.

5  A    Yes.

6  Q    So what does this table address?

7  A    Well, before the age 14 or above there are certain

8  things that are supposed to happen and we looked to see the

9  extent to which we saw those things happen.  There is also

10  an exclusion that if the child has a severe disability they

11  would not be required to pursue these independent living

12  skills.  So of the 242 children in the two year cohort there

13  are 153 age 14 and above, there were 12 of those who had a

14  diagnosis of severe disability.  And so, the general sample

15  that we looked at for most of these was 141 children.

16  Q    Was one of the services you looked at what is know as

17  preparation for skills of daily living?

18  A    Are you referring to what's referred to often as the PIA

19  workbook.

20  Q    No.  I'm referring to the next page, the next to last --

21  I'm sorry, the next -- the item before that, sorry, on page

22  125?

23  A    Oh, I'm sorry.  Yes.  Yes, skills of daily living.

24  Q    And what did you find with respect to the provision of

25  those services?

1    A    Well, we actually didn't look at the provision of those

2    services.  We looked in the case plan.  The requirement is

3    that the case plan include instructions for how those skills

4    of daily living will be delivered.  So we just simply looked

5    in the case plan to see if it was in the case plan.  And we

6    found that for 62.4 percent of the children it was and for a

7    little over a third of the children it was not.

8    Q    And then you mentioned what, the PIA workbook.  Is that

9    the next item on this list?

10   A    Yes, it is.

11   Q    And do you have an understanding of what the PIA

12   workbook is from the policies you read?

13   A    I have some notion of it from what I could discern from

14   the policy.  It appears to be a self-guided workbook that's

15   designed through modules for the youth either on their own

16   or with the support of a foster parent or someone else or

17   the worker to work through to try to acquire some of these

18   independent living skills.

19   Q    And what did you find with respect to evidence of

20   completion of the PIA curriculum?

21   A    Well, our understanding of the regulation, it is

22   required for all youth age 14 and above with the exception

23   of those with disability which we did exclude.  And in

24   answering this question we instructed our case workers, our

25   case readers to look for any indication that a PIA workbook

1    was, it could be a case note, it could be a page from the

2    PIA workbook, it could be a contact note that says and I saw

3    the child's PIA workbook, anything at all that gave evidence

4    that it was being done.  And we found such evidence for 15.6

5    percent of the children.

6    Q   Dr. Freitag, could you turn to table 18 on page 42.

7    A   Yes.

8    Q   And tell us what aspect of child welfare case practice

9    does this address?

10   A   This addresses the extent to which children for whom the

11   state has taken responsibility to raise and keep them

12   experience abuse or neglect during the period that they are

13   in custody.

14               THE COURT:  Page number again of the chart?

15               THE WITNESS:  Forty-two.

16               THE COURT:  That's -- page 42.  Thank you.  I'm

17   sorry.

18   Q   And why did CRC examine this incidence of abuse or

19   neglect in foster care?

20               MR. BARSHAK:  Objection.  That's beyond the scope

21   of the report, what they -- what the data shows is one

22   thing.

23               THE COURT:  Well, I --

24               MR. BORTEN:  Your Honor, there's --

25               THE COURT:  I understand the objection.

1    **MR. BORTEN:**  Your Honor, on page 133 the report

2    addresses the significance of this particular practice area.

3    **THE COURT:**  Yes, she may testify in accordance with

4    the report.

5    **Q**   So, if you want to refer to page 133 or, you know, it's

6    there, just testify to the significance of this.

7    **A**   Okay.  I don't need to look that up.  My memory's quite

8    refreshed on that.  This is one of the most fundamental

9    issues in foster care.  That if the child has already

10   experienced abuse or neglect in their own home, now

11   experiences a separation from their own home, and in our

12   responsibility to care for that child abuse and neglect

13   happens again, that's a very significant adverse event for

14   that child.  And we know that it's not just the individual

15   events that happens to a child but it's the accumulation of

16   those events that set the child on a very, very adverse

17   trajectory.

18   **Q**   So looking at table 18 there are three different groups

19   of data here.  Could you explain what those are?

20   **A**   Yes.  So, the case readers were instructed to look in

21   the record and here we were very strict about what would

22   constitute evidence to go into this table.  They were

23   limited -- for example, you'll see that there are several

24   subcategories.  In order to say that there was a report they

25   had to find evidence of a 51A which is the state's record

1    that a report had been received for child abuse and neglect.

2    They had to see the actual report or a reference that such a

3    report existed.

4          In order to be considered investigated they had to

5    also determine that there was a 51B, which is the state's

6    form that is, when a decision is made that a report is

7    serious enough to warrant an investigation, then a 51B is

8    completed, and you look for that 51B or evidence that a 51B

9    existed.  In order to consider its substantiated that 51B

10   needed to be completed and say you have substantiated or

11   other evidence that there was a 51B that said that.

12         So, we really wanted to be sure that our case

13   readers were not making judgments here about whether

14   children were being abused or neglected, they relied on the

15   documentation of the state's decision about whether such

16   things happened.

17         So you'll see this is in three groups.  First, the

18   case reader would say that yes, we found indication that a

19   report came in while the child was in care.  Then we asked

20   the question who is the alleged perpetrator.  The first

21   group refers to instances in which the alleged perpetrator

22   was someone in the foster home.  That could be a licensed

23   foster home of a relative care provider, a family setting

24   that was a foster home.

25         **THE COURT:**  What, what first group?  I don't -- oh,

1    I see.

2              THE WITNESS:  Yes.  So it says alleged perpetrator,

3    it's individuals in the foster home.

4              THE COURT:  Yes.  That's the second bold header

5    there.

6              THE WITNESS:  Yes.  Yes.  So, everything here is an

7    allegation of abuse and neglect, and there are three

8    groups --

9              THE COURT:  No, I'm following that.  And then the

10   three subheads are alleged perpetrator in the foster home,

11   second group in the parental home, and in some institutional

12   staff.

13             THE WITNESS:  Exactly.

14             THE COURT:  All right, thank you.  Your question?

15             MR. BORTEN:  Yes.

16   Q    So, what is meant here by institutional staff?

17   A    That would, that would have been a child who was in

18   something other than a family foster setting, so it might be

19   a group home, a hospital, temporary shelter sort of thing,

20   but something with a staff rather than living with a family.

21   Q    So, from this can one obtain frequency with which

22   children were the subjects of substantiated incidents of

23   abuse or neglect in any foster placement?

24   A    Yes.  What you should do is to combine the alleged

25   perpetrator is an individual in the foster home and the

1    alleged perpetrator is institutional staff person.

2    Q    What was the number of instances of that?

3    A    So, reading down, looking at just the substantiated line

4    for both of those, for alleged perpetrator in the foster

5    home there were 22 children, .8 percent, and for

6    substantiated alleged perpetrator institutional, another two

7    children for .8 percent, so a total of 1.6 percent.

8    Q    And just to be clear, what is the time span over which

9    we're reporting these instances of substantiated abuse and

10    neglect in foster placements?

11    A    Yes.  Our observation period was 30 months overall.  But

12    not every child was in care for the full 30 months.  So we

13    were looking at reports that came in during the months that

14    the child was in care which could have ranged anywhere from

15    one to 30.

16    Q    And, in fact, if we turn to C6 on page C4 which is what

17    we've looked at previously.  For the entry cohort what was

18    median time in care for those who exit?

19    A    We looked at this table before so I won't explain it

20    again.  So, looking at the entry cohort median -- did you

21    say you wanted the median or the mean?

22    Q    The median.

23    A    Median.  So the far right column lets us know that half

24    of the children spent more than 262 days and half of the

25    children spent less than 262 days in care.

1    **Q**    Could you turn next to table 45 on page 97.

2    A    Yes.

3    **Q**    What does this table show?

4    A    This is exactly the same analysis for abuse and neglect

5    in care as we looked at for the entry cohort.  This is now

6    the two year cohort.

7    **Q**    And doing the same analysis, what did you find for the

8    frequency of abuse or neglect in foster care settings for

9    the two year cohort?

10    A    Following the same pattern, looking at alleged

11    perpetrators, individuals in the foster home substantiated,

12    there were six children, or two and-a-half percent, and the

13    institutional substantiation, another one child for .4

14    percent, so a total of seven children, 2.9 percent.

15    **THE COURT:**  Let me ask you this question, and

16    anyone can object to this if they want.  And I guess I'm

17    asking you as a skilled social worker.

18    For a child to be in state care and to be abused,

19    even one instance of course is unacceptable and tragic.  But

20    if any bureaucratic system, in any of the states, tribal

21    entities if you've dealt with them, this abuse such as this

22    occurs.  So, so far that's right, isn't it?  It's

23    unacceptable but --

24    **THE WITNESS:**  Yes.

25    **THE COURT:**  -- it occurs.

1           THE WITNESS:  Yes.

2           THE COURT:  And at least as I understand this

3     problem the determination to separate a child from its

4     natural parents and to have the state take, assume the care

5     and upbringing of the child, probably most often is because

6     the child has suffered abuse or neglect within the parental

7     home, I'm not saying by the parents --

8           THE WITNESS:  Yes.

9           THE COURT:  -- but within the parental home.

10          And isn't the fear that unless the state steps in,

11    everyone agrees that's big thing for the state to take a

12    child away from the factual parents, is the fear that if

13    they don't the abuse will continue.  And you're smiling, so

14    I get the sense that that is the fear, right?  I'm right on

15    that, am I not?

16          THE WITNESS:  You, you said it very well in saying

17    that's the fear.  But we don't always know if that's the

18    reality.

19          THE COURT:  Of course.  And you've got your

20    cohorts, and I understand how carefully you've gone about

21    this.  I guess -- and they skillfully are saying, well,

22    measured against the standard or that standard.  But beyond

23    the state care, state's care is the reality of the

24    heterogenous liberty loving independent population of our

25    citizens, most of whom are fine and some of whom are not

1    with respect to their children.

2         I guess just as a visceral reaction, I see these

3    figures, and of course they're unacceptable.  But that

4    doesn't mean that in the position that I must wrestle with I

5    step in to say something.  One imagines when we hear from

6    these people they're going to acknowledge it's completely

7    unacceptable and this is what they're doing about it.  And

8    yet I have sort of, in the wings of the stage, the situation

9    out in the public that the state has not accepted

10   responsibility for and wrestles with when they make the

11   really difficult determination to separate a child from its

12   natural parents.

13        **THE WITNESS:**  You've really hit on one of the

14   essential questions of public child welfare is at what point

15   do the odds tip the scale in favor of a removal from the

16   home to prevent from what we think might happen there to a

17   foster care which we know has adverse effects on a child

18   just because of the separation.

19        **THE COURT:**  Exactly.  Forget abuse.

20        **THE WITNESS:**  Exactly.  And so there's one very

21   important aspect of this that would be outside of the scope

22   of this and that's the decision about removing or not.  And

23   this --

24        **THE COURT:**  Outside the scope of this means outside

25   the scope of your report.

1              THE WITNESS:  Yes.

2              THE COURT:  But as a social worker when do the

3    odds, when do the odds tip?

4              THE WITNESS:  There is some very powerful research

5    that was actually done here out of MIT a couple of years ago

6    by someone who examined the impact on a child.  And what

7    this person did was to look at not the ones that it's

8    obvious that there isn't anybody that would doubt that that

9    child needed to be removed, but the ones where -- there's,

10   there's actually quite a bit of inconsistency in the removal

11   decision.  The same worker seeing the same set of facts

12   might remove, or one worker seeing one set of facts might

13   remove and the other one might not.  We know there's a lot

14   of bias in the removal decision because of misunderstandings

15   across, working across cultures.  So we know there's a group

16   of children that go into foster care that somebody else

17   might have made a different decision.  And what this MIT

18   scholar did, and I'm sorry I'm blanking on his name, was to

19   look at that group of children and follow them over a period

20   of time and looked at -- there's this group of children

21   where some, some workers might have placed them into foster

22   care and some workers might not have.  And quite naturally,

23   some of the children were in care and some were not.  But

24   they all had very similar circumstances.  And he followed

25   them over time and looked at outcomes such as did they

1    finish school, did they end up in the delinquency system.

2    Did they -- did the girls end up having early pregnancies.

3    And what he found was that for this group of children those

4    that stayed home actually did better than those that came

5    into care.

6         So one very important question is do we bring

7    children into care who could have, even though there's some

8    risk at home, is that, is taking that risk better than

9    causing the removal to care.

10        The second really critical aspect and the part that

11   I think is most relevant for what's at hand here, is that

12   once we have taken a child into care there are certain

13   things that we can do that reduce the chance that something

14   will happen.  There's, just as much as there's a range of

15   parents there's also a range of foster parents.  And how

16   much support do we give.  Are we checking with that foster

17   parent to see how are they doing.  Are we visiting the child

18   to ask how the child's doing.  Do we have a plan in place to

19   be sure that the child's needs are being met in that foster

20   care.  And so, the rate of abuse and neglect, while we know

21   that it would be an absolute miracle to have that go down to

22   zero, it isn't inevitable.  And so --

23        **THE COURT:**  I didn't suggest by anything that I

24   said that in a large bureaucratic system it's going to

25   happen, drawing the opinion that anyone involved in that

1    system could ever rest easy when it happens even to one

2    child.

3                **THE WITNESS:**  Yes.

4                **THE COURT:**  They can't.  And I'm not in any way

5    suggesting that they do.

6                Well, thank you.  All right.  I appreciate that.

7    Go ahead, ask your question.

8    **BY MR. BORTEN**

9    **Q**    Can you next turn to table C59 on page C36, Dr. Freitag.

10   A    Yes.

11   **Q**    And what did you look at that's reflected here?

12   A    This was one of the rare moments where we asked the case

13   readers to actually look back in the case record prior to

14   July 1st of 2009.  Because this is such an important

15   question, we didn't want to limit our scope just to the 30

16   months that we happened to select for our case reading.  We

17   really wanted to know of the children who were in care to

18   what extent did they experience abuse or neglect at any time

19   while they were in care.

20   **Q**    Okay.  Now, focusing on the two year cohort, what did

21   you find when you looked at their entire history going back

22   to coming into custody with respect to the incidents of

23   abuse or neglect in a foster care setting?

24   A    Yes.  And so, here we're looking at a placement setting.

25   And the top section we are asking just a straight up yes or

1    no, did it happen one or more times.  And of that a sample

2    of 240 children, there were two that we had difficulty and

3    so we, in determining the history and so our analysis was

4    you 240 children.  Of that, 43, or 17.9 percent, experienced

5    at least one abuse or neglect in foster care.

6    Q   And what is the bottom half of the table show?

7    A   Of those 43 children, how often did it happen.  And so

8    most of them prior to July of 2009, most of them, 27 of the

9    children experienced a single incident of abuse and neglect.

10   There are nine children experienced two, four children who

11   experience three and so on.

12   Q   Now, can we take the results from this table which is

13   July 1st, 2009 and back and combine that with the results of

14   table 45 which was July 1st, 2009 forward to arrive at an

15   overall estimate of the incidence of abuse or neglect for

16   these long stayers in the foster care system?

17   A   No, you couldn't do that without some reservation

18   because we don't know that these are unique children.  So.

19   For example, adding seven children to the 43, you would

20   think, so does that mean 50 children experienced abuse and

21   neglect at some point or another.  The answer would be

22   possibly not.  Because one of the seven children who

23   experienced abuse and neglect during our 30 month

24   observation period may have also been one of these children

25   who experienced abuse and neglect from prior to our

1    observation period, so we can't rule out any children.

2    Q    Dr. Freitag, could you turn to table C12 on page C8.

3    A    Yes.

4    Q    And what aspect of case practice does this table

5    address?

6    A    We counted how many different primary case workers

7    worked on a case from case opening up until the end of our

8    observation period.

9    Q    And what was the sample size you considered with respect

10   to this analysis?

11   A    All 242 children in each cohort.

12   Q    And what were your findings?

13   A    There were about a third of the entry cohort and about

14   ten percent of the two year cohort who had a consistent

15   worker all the way through.  And the range of workers went

16   up to six or more.  We stopped counting after six.  And

17   there were about one-fourth of the children in the two year

18   cohort who were, had had at least six different workers

19   during that time.

20   Q    And, Dr. Freitag, could you please turn to table 20B on

21   page 46.

22   A    Yes.

23   Q    And what aspect of case practice does table 20B address?

24   A    Our understanding of the policies that children in

25   foster care should have a meeting called the foster care

1   review at regular intervals throughout the life of a case,

2   and so we measured based on how long they had been in care,

3   how many would we have expect to have seen and compared that

4   to how many we actually saw.

5   Q   And did you come to an overall conclusion concerning the

6   number of foster care reviews that were expected versus the

7   number that actually took place?

8   A   Yes.  For, for over half, 58.3 percent of the children,

9   every review we expected to see we saw.  For a little over

10  40 percent of the children they were missing one or more of

11  the reviews that we expected to see.

12  Q   And just to be clear, the boxes that are shaded

13  represent the statistics for the cases where there were the

14  expected number of foster care reviews; is that correct?

15  A   That is correct.  Everything in the gray met the

16  standard and everything in the white did not.

17          MR. BORTEN:  I have no further questions, your

18  Honor.

19          THE COURT:  Counsel.

20                  CROSS-EXAMINATION

21  BY MR. BARSHAK

22  Q   Good morning, Dr. Freitag.  My name is Jason Barshak.

23          Doctor, you'd agree that placement can end for a

24  variety of reasons?

25  A   Yes.

1    **Q**    And that statement the placement can end for a variety

2    of reasons, that applies to both the sample for the entry

3    cohort and for the sample for the two year cohort?

4    A    Yes.

5    **Q**    One reason a placement ends can be that the child

6    returns home, right?

7    A    Yes.

8    **Q**    One reason for placement ending is that the child is

9    moved to a pre-adoptive or adoptive home, right?

10    A    Yes.

11    **Q**    In general, a child placement ending for a child's

12    return home would be considered in the best interest of the

13    child?

14    A    In general, yes.

15    **Q**    And in general, a placement ending for the child to be

16    moved to a pre-adoptive or adoptive home would be considered

17    in the best interest of the child?

18    A    Yes.

19    **Q**    One reason for a placement ending is a child is placed

20    with a relative or a guardian, correct?

21    A    Yes.

22    **Q**    And in general, that type of move would be considered in

23    the best of a child?

24    A    In general, with the caveat I testified to earlier.

25    Again, the same would be true for the pre-adoptive home.

```
 1    It's always good to get into those kinds of settings and we

 2    always want to strive to get children into those settings

 3    more quickly rather that requiring the placement move to

 4    achieve that.

 5    Q    And one reason for a placement ends is because of foster

 6    family problems unrelated to the foster child?

 7    A    Yes.

 8    Q    And one reason for a placement ends is that the child is

 9    moving to a less restrictive setting?

10    A    Yes.

11    Q    And one reason for a placement end is that the child is

12    moving from a temporary setting to a more permanent one?

13    A    Yes.

14    Q    One placement move that is typically considered

15    favorable is a move, is a placement to a relative, correct?

16    A    Yes, I've said that.

17    Q    And one placement move that is typically considered

18    favorable is a move to a less restrictive setting, correct?

19    A    I think I just said that, yes.

20    Q    And one placement move is typically --

21              THE COURT:  Wait.  Wait.  Excuse me.  Excuse me.  I

22    guess I've lost the concept of less restrictive setting.

23    Tell me what you mean by that?  What's expected.

24              THE WITNESS:  Certainly.  There are levels of care

25    that a child would be classified as requiring.
```

 1              THE COURT:  Right.  From reading these depositions

 2      there's something called intensive foster care.

 3              THE WITNESS:  Yes.  That would be one step up and

 4      there might be a group home, residential placements and so,

 5      and different types of residential placements.

 6              THE COURT:  And what's the most restrictive?

 7              THE WITNESS:  Well, for all the placements end

 8      reasons, the most restrictive would probably be a detention

 9      for delinquency.

10              THE COURT:  But that's under -- or is it -- under

11      DCF?  I thought that was --

12              THE WITNESS:  No, no, it's not.  But if the child

13      who's in DCF care is picked up for delinquency they would go

14      into a secure detention facility.

15              THE COURT:  DYS care.

16              THE WITNESS:  Yes.  I'm not familiar with all of

17      the acronyms for Massachusetts.

18              THE COURT:  Well, that's what I think anyway, and I

19      can be corrected.  I'm not talking about that.

20              THE WITNESS:  Yes.

21              THE COURT:  Within DCF, most restrictive to less,

22      least restrictive.

23              THE WITNESS:  So typically that would a range of

24      residential settings from setting that would have very

25      severe restrictions and very highly skilled staff and then

1    working its way down.  So I wouldn't want to testify beyond

2    that, that was not my earlier testimony.

3            THE COURT:  Of course not.  So intensive foster

4    care doesn't have anything to do with restrictiveness,

5    necessarily.

6            THE WITNESS:  I don't -- I want to be cautious here

7    because I'm not absolutely certain.

8            THE COURT:  Fine.

9            THE WITNESS:  But I don't think that that would

10   have been considered a restrictive setting.

11           THE COURT:  Fine.  Excuse me, Mr. Barshak, you go

12   right ahead.

13           MR. BARSHAK:  Thank you, your Honor.

14   Q   Dr. Freitag, you'd agree that for the sample for the

15   entry cohort, just under 50 percent, or 49.6 percent of the

16   children, had a placement setting end because the child

17   returned home?

18   A   Could you tell me which table you're referring to.  My

19   memory is not quite that good.

20   Q   Please turn to page 140 of the CRC report.  First

21   bullet point.

22   A   Yes.

23   Q   And you agree that other moves that would be typically

24   considered favorable include a move to an adoptive home,

25   placement with the relative or guardian, move to a less

1    restrictive setting, and move from a temporary to a more

2    permanent setting.  Correct?

3    A    Yes.

4    **Q**    And you'd agree that those reasons were given for moves

5    for 52.6 percent of the children in the sample for the entry

6    cohort?

7    A    Yes.  I want to be careful because when we were talking

8    earlier, we were talking about our unit analysis was moves

9    and here we're talking about children.  And so what this is

10   meaning is that 52 percent of the children had at least one

11   of those moves.  It doesn't preclude that they might have

12   other moves.

13   **Q**    So 52.6 percent of the children had at least one of

14   these typically considered favorable moves?

15   A    Yes.

16   **Q**    And do you agree that overall as of December 31st, 2011,

17   before the time of closure of the case, that 88.55 percent

18   of the children in the sample for the entry cohort were

19   living with either parents, relatives, kin, legal guardians,

20   or were adoptive?

21   A    I would need to refresh my memory.  What table are you

22   referring to?

23   **Q**    Can you please look at page 13 of the report.

24   Specifically the last sentence of top paragraph.

25   A    Yes.

1   **Q**    Now, CRC collected data on the service needs of the

2   children in the sample for the entry cohort, correct?

3   A    Yes.

4   **Q**    And CRC collected data on the service needs of the

5   children in the sample for the two year cohort, correct?

6   A    Yes.

7   **Q**    If you could turn to table 30 page 62 of the report.

8   A    Yes.

9   **Q**    Do you agree that one of the service needs for children

10   that was identified was mental health services?

11   A    Yes.

12   **Q**    And that CRC found that a referral for mental health

13   services was made for 82.6 percent of those children?

14   A    You would need to read the narrative around this table

15   to better understand this table.

16   **Q**    Is that -- have I correctly read, though, that for the

17   line service need identified mental health services, the N

18   was 23 and the referral made yes states 82.6 percent.

19           Did I read that correctly?

20   A    There's an N of 23 children for whom we found evidence

21   in the case record that someone had identified a mental

22   health service need, and for those 23 children 82.6 percent

23   had a referral.  Most of the time that we were able to say

24   yes, they identified a need was because we found that there

25   was a referral.

1    Q    So, you agree that for 23 children the entry cohort

2    sample a need for mental health services was identified?

3    A    That we find documentation for.

4    Q    And of those 23 children your report, reports that

5    referral was made for, a referral for mental health services

6    was made for 82.6 percent of those 23 children?

7    A    That is true.

8    Q    That's what the report states?

9    A    Yes.

10   Q    Okay.  And in that same table another service need was

11   for 49 of the children a need for individual or group

12   therapy was identified.  Correct?

13   A    We found documentation of such a need identified for 49

14   out of 242 children, yes.

15   Q    So when CRC was gathering data they determined that

16   there was a need for individual group therapy for 49 of the

17   children in the sample for the entry cohort, correct?

18   A    No, again, there's a very important nuance to the way

19   you're saying it compared to the way that we're reporting it

20   and the way we they analyzed it.

21        The issue at hand here is not whether once in the

22   record we found that someone had said there's a need for

23   this therapy and so here's a referral.  Most of the time we

24   identified that was a need for therapy because we found a

25   referral.  So there's a circular reasoning issue going on

1    here.  The bigger issue is out of 242 children who had been

2    abused or neglected and had come into foster care, does that

3    seem surprising as the number of children who might need

4    this type of service?

5    **Q**   But that's not in your report, correct?  What you just

6    said that something may be surprising, that's not in your

7    report, correct.

8    **A**   The exact description of how these numbers got here is

9    in fact in the report.

10   **Q**   Right.  But the report has a table 30, and you'd agree

11   table 30 is entitled Child Service Types and Referral

12   Information Entry Cohort.  You would agree with that,

13   correct?

14   **A**   Yes.  And if you look at the top paragraph it says --

15   **Q**   Dr. Freitag, please let me continue.

16   **A**   All right.

17   **Q**   And you agree on table 30 that the left column says

18   service need identified, correct.

19   **A**   Yes.

20   **Q**   The next column is the N, or the number of children that

21   that issue applied to, correct?

22   **A**   Yes.

23   **Q**   Then the next column is referral made.  And then count

24   and a percentage.  Tell me if I'm accurately reading from

25   this table.  Mental health services, N of 23, and the asked

1    percentage of 23 is 82.6.

2            Did I accurately read from that table?

3    A    Just now you did, but your previous question

4    mischaracterized the median services identified.

5            **THE COURT:**  All right, let's stop at this point.

6    It's about one o'clock you may step down.

7            (Whereupon the witness stepped down.)

8            **THE COURT:**  Let me say for the record that I have

9    reviewed the following three depositions and attached

10   exhibits.

11           The Rule 30(b)(6) deposition of Massachusetts

12   department of Children and Families, through Scott P.

13   Schofield on November 16th, 2011; the deposition of Joy

14   Cochran on April 13th, 2012; and the deposition of Berril E.

15   Domingo January 25th, 2012.

16           At the end of four days of trial, the plaintiffs

17   have used up two days, two hours, 15 minuets; the defense

18   has used up one day, one hour, 15 minutes.

19           We'll recess until 9:00 a.m. tomorrow morning.

20   We'll recess.

21           **THE CLERK:**  All right.

22           (Adjournment.)

23

24

25

1                    **C E R T I F I C A T E**

2

3

4          I, Donald E. Womack, Official Court Reporter for

5    the United States District Court for the District of

6    Massachusetts, do hereby certify that the foregoing pages

7    are a true and accurate transcription of my shorthand notes

8    taken in the aforementioned matter to the best of my skill

9    and ability.

10

11

12

13

14              /S/ DONALD E. WOMACK 5-7-2013
                 _____
15                    DONALD E. WOMACK
                    Official Court Reporter
                       P.O. Box 51062
16           Boston, Massachusetts 02205-1062
                   womack@megatran.com
17

18

19

20

21

22

23

24

25