<pre>
 1                   UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS
 2
                                         Civil Action
 3                                       No. 10-30073-WGY

 4    * * * * * * * * * * * * * * * * * * * * * *
                                               *
 5    CONNOR B., by his next friend, ROCHELLE   *
      VIGURS, et al., individually and on behalf *
 6    of all others similarly situated,         *
                                               *
 7              Plaintiffs,                      *
                                               *  BENCH TRIAL
 8    v.                                         *   (Volume 5)
                                               *
 9    DEVAL L. PATRICK, in his official capacity *
      as Governor of the Commonwealth           *
10    of Massachusetts, et al.,                  *
                                               *
11              Defendants.                      *
                                               *
12    * * * * * * * * * * * * * * * * * * * * * *

13              BEFORE:  The Honorable William G. Young,
                                 District Judge
14    APPEARANCES:

15              NUTTER, McCLENNEN & FISH, LLP (By Daniel J.
          Gleason, Esq. and Jonathan D. Persky, Esq.), World
16        Trade Center West, 155 Seaport Boulevard, Boston,
          Massachusetts 02210-2699
17              - and -
                CHILDREN'S RIGHTS (By Sara M. Bartosz,
18        Esq., Laurence D. Borten, Esq., Sarah Russo, Esq.
          Rachel Brodin, Nili, Esq. and Jessica E. Polansky,
19        Esq.), 330 Seventh Avenue, Fourth Floor, New York,
          New York 10001, on behalf of the Plaintiffs

20
                OFFICE OF THE MASSACHUSETTS ATTORNEY
21        GENERAL (By Liza Tran, Jason B. Barshak and
          Jeffrey T. Collins, Assistant Attorneys General),
22        One Ashburton Place, Boston, Massachusetts 02108,
          on behalf of the Defendants
23
                                       1 Courthouse Way
24                                     Boston, Massachusetts

25                                     January 31, 2013
</pre>

**I N D E X**

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

RAELENE FREITAG, Resumed

   By Mr. Barshak                3                        61

   By Mr. Borten      65                    51

KRISTEN R. JOHNSON

   By Mr. Barshak          119

| EXHIBITS: | FOR I.D. | IN EVID. |
|---|---|---|
| 1067 Appendix A . . . . . . . . . . . . . . . .86 | | |
| 1068 Appendix B . . . . . . . . . . . . . . . .94 | | |
| 1069 Table 3  . . . . . . . . . . . . . . 107 | | |
| 1070 Table 1  . . . . . . . . . . . . . . 112 | | |
| 1071 Tables 16 and 43b  . . . . . . . . . 113 | | |

1              **THE CLERK:**  All rise.  The United States District

2    Court is in session, you may be seated.

3              **THE COURT:**  And if you -- good morning.  If you

4    would remind the witness.

5              **THE CLERK:**  I would like to remind you that you are

6    still under oath.

7              **THE WITNESS:**  Yes.

8              **THE COURT:**  And Mr. Barshak.

9              **MR. BARSHAK:**  Good morning, your Honor.  Thank you.

10                 RAELENE FREITAG, Resumed

11              **CROSS-EXAMINATION** (Cont'd)

12   **BY MR. BARSHAK**

13   **Q**   Good morning, Dr. Freitag.

14   A   Good morning.

15   **Q**   Dr. Freitag, yesterday you mentioned a study by a person

16   who you called an MIT scholar examining the entry into

17   foster care certain children but you could not remember the

18   name.  Is that right?

19   A   That's correct.

20   **Q**   Was that person Professor Joseph Doyle of MIT?

21   A   I don't have a clear recollection one way or the other.

22   **Q**   Now --

23              **THE COURT:**  Before you get off that, I have to say,

24   for what it's worth, I would be very interested to see that

25   study.

1          You go ahead, Mr. Barshak.

2   **Q**   Dr. Freitag, the study by CRC in this case, you would

3   agree that CRC was not assessing the training of DCF case

4   workers, correct?

5   A   Definitively, not.

6   **Q**   And you agree that CRC was not assessing the training of

7   DCF supervisors in the study?

8   A   We were not.

9   **Q**   And you would agree that CRC was not assessing the

10  availability of foster homes in the study?

11  A   We were not.

12  **Q**   And you would agree that CRC was not assessing the

13  recruitment of foster homes in the study?

14  A   Correct.

15  **Q**   And you'd agree that CRC was not assessing payments or

16  the adequacy of payments to foster parents by DCF in the

17  study?

18  A   That is correct.

19  **Q**   And you would agree that CRC was not seeking to

20  determine if DCF's practices or policies were causing good

21  or bad outcomes for children in DCF custody, correct?

22  A   Yes.

23  **Q**   And you'd agree that CRC was not seeking to determine

24  whether medications prescribed for children in DCF custody

25  were appropriate or were not appropriate for the child's

1  mental health diagnosis?

2  A    Our responsibility was to provide the underlying data.

3  Q    So, CRC wasn't taking any position regarding whether or

4  not a medication that was prescribed for a child in DCF

5  custody was or was not appropriate for the child's mental

6  health needs?

7  A    We made no such conclusion.

8  Q    The study was review of case records, correct?

9  A    Yes.

10 Q    It was an objective study, right?

11 A    Yes.

12 Q    In the study if something was not in the record CRC

13 treated it as if it did not happen, correct?

14 A    Yes.

15 Q    Analyzing DCF's recordkeeping was not one of the

16 purposes of the study, correct?

17 A    It was not a purpose of the study.

18 Q    Okay.  Now, you'd agree that it's possible that children

19 were visited by case workers for which there was no

20 recording of that visit in the documents that CRC looked at?

21 A    It is possible.

22 Q    And you'd agree it's possible that parents were asked

23 about relatives for which there was no recording of that in

24 the documents that CRC looked at?

25 A    It is possible.

1    Q    And you'd agree that there could be other case practice

2    activity that occurred that was not recorded in the

3    documents as that CRC looked at?

4    A    It is possible.

5    Q    Reading case files is a complex task, right?

6    A    Yes.

7    Q    And there are limitations of case reading as a measure

8    of case practice, correct?

9    A    Yes, I state that in the report.

10    Q    And you'd agree that without following a case worker at

11    all times over the course of their work it is impossible to

12    state definitively that any particular standard was or was

13    not met.  You'd agree with that, correct?

14    A    Yes, I state that in the report.

15    Q    CRC did not conduct any interviews of current or former

16    DCF personnel for purposes of this study, correct?

17    A    That is correct.

18    Q    Dr. Freitag, can you please -- do you have the report in

19    front of you?

20    A    Yes, I do.

21    Q    Could you please take a look at page 13.  Are you on

22    page 13?

23    A    I've just arrived there, yes.

24    Q    In the sample for the entry cohort there were 242

25    children, correct?

1    A    Yes.

2    Q    And you'd agree that by December 31st of 2011 DCF had

3    closed 157 of the 242 cases for the sample in the entry

4    cohort?

5    A    Yes.

6    Q    And you would agree that at the time of the closure of

7    those 157 cases in the sample for the entry cohort that more

8    than 50 percent of those children were living with their

9    parents as of December 31st, 2011, or time of closure?

10   A    Yes, 36.9 had gone back to the home they were removed

11   from and 16.6 percent had gone to a different parent.

12   Q    So, when you add those two categories, 36.9 plus 16.6

13   you get approximately 53 percent?

14   A    Yes.

15   Q    Could you please turn now to page C28, and specifically

16   table C52.

17   A    Yes.

18   Q    You agree that one of the items that CRC collected data

19   on was whether a child who should have been receiving

20   special education services was receiving special education

21   services, correct?

22   A    Give me one moment just to refresh my memory on this.

23   Q    And specifically for the 2011-2012 school year.

24   A    Yes, that is correct.

25   Q    And you'd agree that for the 46 children in the sample

1   for the entry cohort who should have been receiving special

2   education services for the 2011 to 2012 school year, all 46

3   of those children were receiving special education services?

4   A   Yes.

5   Q   And you'd agree for the 125 children for the sample for

6   the two year cohort who should have been receiving special

7   education services for the 2011-2012 school year, 124 of the

8   125 were receiving special education services?

9   A   Yes.

10  Q   Please turn to page 49 of the report.

11          **THE COURT:**  Say again the page now.

12          **MR. BARSHAK:**  Page 49, your Honor.

13          **THE COURT:**  Thank you.

14  Q   Specifically table 22.

15  A   Yes.

16  Q   Dr. Freitag, you'd tried that CRC collected data

17  regarding reunification for children in the sample for the

18  entry cohort?

19  A   Yes.

20  Q   And you'd agree that for the sample for the entry cohort

21  125 children were reunified with their family?

22  A   Yes.

23  Q   And you'd agree that 85.6 percent of those 125 children

24  had a face-to-face contact with each adult residing in the

25  home prior to that child returning home?

1    A    Yes.

2    Q    Please turn to page 106.

3    A    Yes.

4    Q    Specifically table 49.

5          You'd agree that CRC also collected data regarding

6    reunification for children of the sample for the two year

7    cohort?

8    A    Yes.

9    Q    And for the sample for the two year cohort 29 children

10    were reunified with their family, correct?

11    A    Correct.

12    Q    And of those 29 children, 93.1 percent of them had a

13    face-to-face contact with each adult residing in the home

14    prior to the child returning home?

15    A    That is correct.

16    Q    Please turn to page C74.

17    A    Yes.

18    Q    Specifically table C85.

19          CRC collected data on 199 children in the sample

20    for the entry cohort to determine if there was evidence that

21    reunification services provided were inadequate, correct?

22    A    Yes, that is correct.

23    Q    And for 93 percent of those children there was no

24    evidence that the reunification services provided were

25    inadequate, correct?

1    A    I want to be very careful to understand this table, this

2    is not a judgment on the part of the case reader in

3    reviewing the entire scope of the record whether in their

4    professional opinion they were adequate; it was looking to

5    see whether there was, for example, a court ruling that they

6    had been inadequate.  And with that understanding, yes.

7    Q    You agree that the caption for table C85 states Evidence

8    of Concurrent Planning and/or Inadequate Reunification

9    Services.

10           Did I read that correctly?

11   A    Yes.

12   Q    And you'd agree that going down to the last horizontal

13   bold it states:  Any evidence that reunification services

14   provided were inadequate.

15           Did I read that correctly?

16   A    Yes, you did.  I just wanted to be sure that we

17   understand what evidence was considered in marking this.

18   Q    And you would agree that under the any evidence that

19   reunification services provided were inadequate, no was the

20   response for 96.2 percent for the sample in the two year

21   cohort?

22   A    Yes.

23   Q    Please turn to page C43.

24   A    I also want to just be clear that -- I'll just leave it

25   at that.  Yes.

```
 1              What page?

 2   Q    C43.

 3   A    Thank you.  Yes.

 4   Q    I apologize, it's table C43 on page C22.

 5   A    Yes.

 6   Q    You agree that CRC collected data on whether there was

 7   any evidence that medical or dental records were not kept

 8   up-to-date for the sample for the entry cohort, correct?

 9   A    That is correct.

10   Q    And for the sample for the entry cohort there was no

11   evidence of medical or dental records not being kept up to

12   date for 95 percent of the 242 children in the sample for

13   the entry cohort?

14   A    That is true.  Again, I want to, I think it's important

15   to understand that this doesn't mean that they were kept up

16   to date for 95, it just meant that we were looking for some

17   contradiction in the file, was there a piece of paper in a

18   medical document suggesting that an appointment happened and

19   it wasn't recorded.  We would need that kind of information.

20   Q    So you agree that the case readers were looking at the

21   file to see if there was any evidence that medical and/or

22   dental records were not kept up to date.  You'd agree with

23   that, correct?

24   A    Yes.

25   Q    And you'd agree that when the case readers were looking
```

1    at the file to see if there was any evidence that medical

2    and/or dental records were not kept up to date they marked,

3    the response for the entry cohort was no for 95 percent of

4    the sample.  Is that correct?

5    A   Yes, sir.

6    Q   And the response for the two year cohort was no for

7    93 percent of the sample; is that correct?

8    A   That is correct.

9    Q   In its analysis CRC analyzed time to adoption in two

10   stages, correct?

11   A   Yes.

12   Q   The first stage was time waiting to be placed in an

13   adoptive home, right?

14   A   Can you refer me to the table.  I want to be sure that

15   I'm recalling correctly.

16   Q   Take a look, please, at -- does page 142 refresh your

17   memory regarding this the specifics of the two stages that

18   were analyzed?  Bottom of page 142, perhaps on 143.

19         Actually a better thing would be first paragraph,

20   page 144.

21   A   Yes, that is correct.

22   Q   So to better understand what was influencing length of

23   time to adoption, CRC broke down time to adoption into two

24   phases, correct?

25   A   Yes.

1    Q    And the first phase was the time waiting to be placed in

2    an adoptive home, correct?

3    A    Correct.

4    Q    And the second phase was once in an adoption home the

5    time waiting for the adoption to become legally finalized?

6    A    That is correct.

7    Q    And you'd agree that the state juvenile courts play a

8    role in the time to the legalization of adoption?

9            MR. BORTEN:  Objection.

10   A    Yes.

11           THE COURT:  Grounds?

12           MR. BORTEN:  Speculation.

13           THE COURT:  No, overruled.

14   Q    And you'd agree that any delays by the juvenile courts

15   in the proceeding of an adoption case could affect the time

16   to the finalization of adoption?

17   A    Yes.  Yes.

18   Q    Please take a look at page C42.

19   A    Before moving on, there's a bit of clarification

20   regarding that, if I may.

21   Q    Was your prior, was your prior answer inaccurate, Dr.

22   Freitag?

23   A    Impartial.

24           THE COURT:  You may correct it.

25   A    Not impartial.  I'm sorry, partial.  It was partial.

1    **Q**    Please correct it.

2    A    It is true that in a logic model length of time from

3    placement in adoption to legal permanency is affected by

4    delays in court proceedings, and it's also true that delays

5    in court proceedings are sometimes because of the court and

6    sometimes because of departmental action.  So it's important

7    to understand that.

8    **Q**    Please take a look at -- strike that.

9         So, sometimes delays in a court proceeding are

10   caused by the court, correct?

11   A    Yes.

12   **Q**    Please take a look at page C42, table C68.

13   A    Yes.

14   **Q**    You agree that for the 42 children in the sample for the

15   entry cohort with a goals of adoption that the case file

16   review identified an adoptive family for 95.2 percent of

17   those children.

18   A    Yes.

19   **Q**    And you'd agree for the 123 children in the sample for

20   the two year cohort with a goal of adoption that the case

21   file identified an adoptive family for 79.7 percent of those

22   children.

23   A    Yes.

24   **Q**    Please turn to page -- strike that.

25         You testified yesterday regarding the percentage of

1    service plans that were signed by parents and by children

2    age 14 or older, correct?

3    A    Yes.

4    Q    You agree that participation by parents and children of

5    eligible age is a relatively new emphasis in child welfare?

6    A    It's a new old emphasis.  It had gone away for a period

7    of time and it's, within the past five years or so it's been

8    something that the field has recognized as quite important.

9    Q    So you agree that in the report you characterize it as a

10   relatively new emphasis in child welfare?

11   A    Yes.

12   Q    And the prior approach was a child welfare agency

13   dictating the service plans to the parents and children,

14   correct?

15   A    Yes.

16   Q    And you'd agree that the participation by parents and

17   children of a certain age is an important practice shift

18   from the prior approach of just dictating service plans?

19   A    All indications are that it is quite important.

20   Q    And Massachusetts is one of the first states leading

21   this important practice shift to the participation of

22   parents and children regarding service plans, correct?

23   A    Yes.

24   Q    And you agree that it takes time for a child welfare

25   system to make the culture shift to make participatory

1    planning a universal practice?

2    A    Yes.

3    Q    You'd agree that it takes time for a child welfare

4    system to make the culture shift to make any important

5    practice shift a universal practice?

6    A    Yes.

7    Q    Please look at page 62.

8    A    Yes.

9    Q    Specifically table 30.

10   A    Yes.

11   Q    You agree that the need for medical services was

12   identified for 27 of the children in the entry cohort

13   sample.  Correct?

14   A    We ended here yesterday, and so I want to be very, very

15   clear that it's important to read this table in conjunction

16   with the text above it and understand what is meant by

17   service need identified.

18   Q    So you agree that the report -- you agree that the

19   purpose of this study was CRC reviewing case files and

20   determining what was or was not in the case files?

21   A    Yes.

22   Q    That, as you testified earlier today, a purpose of this

23   study was not to analyze DCF recordkeeping, correct?

24   A    Yes.

25   Q    And that if something was not in the file then CRC

1    treated it as not happening?

2    A   Yes.

3    Q   And table 30 reflects what the case readers were able to

4    identify regarding service needs from looking at the files,

5    correct?

6    A   Yes.  And the place that they looked to see whether

7    there was a service need identified for each one of those

8    categories was primarily to find out was there a referral.

9    Q   So they looked at the file to determine whether or not a

10   service need was applicable for a particular child, correct?

11   A   Yes.  And they found that --

12   Q   So that's a, that's a yes to that question then?

13   A   Yes.

14   Q   And in looking at the file and looking at the documents

15   that they had they determined that for 27 of the children in

16   the entry cohort sample they identified the service need of

17   medical services for 27 of the children in that sample.

18   Correct?

19   A   I'm trying to avoid a misunderstanding coming out of

20   this table.

21   Q   Are you saying this table is incorrect?

22   A   I'm not saying the table is incorrect.  I'm saying that

23   your characterization of it is missing the importance of the

24   text above it.

25   Q   All right, I will rephrase the question, Dr. Freitag.

1              Tell me if I'm reading the table correctly.  Under

2    the column service need identified one of the columns, one

3    of the categories is medical services, correct?

4    A   Yes.

5    Q   And the N associated with medical services is 27,

6    correct?

7    A   Yes.

8    Q   And then the next column referral made, yes or no, you'd

9    agree that the table says that yes is a hundred percent of

10   the time.

11             Have I read the column correctly?

12   A   I have no -- there's no issue with your reading of the

13   numbers on the table.

14   Q   And that's all I'm doing, Professor.  Doctor, I'm sorry.

15   That's all I'm doing is going through the table.

16             And you'd agree going down in that same table that

17   there's a column that says service need identified

18   education.  Correct?

19   A   Yes.

20   Q   And the N for that is 37.  Correct?

21   A   Yes.

22   Q   And for referral yes or no, the yes the table says is a

23   percentage of 97.3.  Correct?

24   A   Yes.

25   Q   Okay.  Could you please take a look at page 121.

1    Specifically table 57.

2    A    Yes.

3    Q    You'd agree that table 57 regards the sample for the two

4    year cohort?

5    A    Yes.

6    Q    Okay.  And I'm just going to read part of the table to

7    see if I'm reading it correctly.

8          You agree that the left most column identifies in

9    one place mental health services, correct?

10   A    Yes.

11   Q    And the N for that was 12, correct?

12   A    Yes.

13   Q    And the percentage on the right regarding referrals says

14   100 percent, correct?

15   A    Yes.  And I'll add the same caution that you need to

16   read this table in conjunction with the text before it.

17   Q    But I'm reading the table correctly?

18   A    Yes.

19   Q    And going down the left column, one of the groupings

20   states individual/group therapy, correct?

21   A    Yes.

22   Q    And the N for that is 17.

23   A    Yes.

24   Q    And the corresponding yes/no, the yes is 94.1 percent,

25   correct?

1    A    Yes.

2    Q    Another item on the left hand column is medical

3    services, correct?

4    A    Yes.

5    Q    And the N is 11, correct?

6    A    Yes.

7    Q    And the corresponding yes for that for referrals, it

8    says 100 percent?

9    A    Yes.

10    Q    And another item on that table you agree is education,

11    correct?

12    A    Yes.

13    Q    And for that the yes associated with that column says

14    100 percent, correct?

15    A    100 percent of nine children, yes.

16    Q    Of nine children, 100 percent, correct?

17    A    Yes.

18    Q    Please take a look at page 64.  And specifically table

19    31.

20    A    Yes.

21    Q    You'd agree that this table is captioned Family Service

22    Type and Referral Information Entry Cohort.  Correct?

23    A    That is correct.  And again this table is --

24    Q    So did I read that correctly or did I not read that

25    correctly?

1    A    You read it correctly.  And please understand that text

2    on a table is very abbreviated, it's very important to read

3    the explanatory text around it as well.  This would begin at

4    the top of page 63.  So the understanding that that text is

5    understood and that the way the reader identified that there

6    was a service need it was primarily by seeing that there was

7    a referral.  So it would be quite surprising that when they

8    identified the need because the referral was present that

9    there would be then a referral for that need.  So, I just

10   want to be sure that that's understood.

11   Q    Yesterday you were asked to look at a lot of the tables

12   in the report, and you'd agree that one of the themes was

13   that if it's not in the record that it didn't happen.  That

14   was, that was how the case study was done?

15   A    Yes.

16   Q    You looked to see what was in the record and if it

17   wasn't in the record then it didn't happen.

18   A    That is correct.  And we did not ask our case readers to

19   interpret whether they thought a parent needed alcohol or

20   drug rehabilitation.  We needed to rely on evidence in the

21   record that there's a statement that the parent needed

22   drug/alcohol rehabilitation, and the statement that they

23   most often found was that a referral had in fact been made.

24   And so they concluded that there was a service need based on

25   a referral and then of course they would find that there was

1  in fact a referral for the identified need.  In rare

2  instances did they find other indications of a service need

3  and then look to see whether there was or was not a

4  referral.

5  Q    So, even though yesterday for all the tables every

6  characterization was based upon what a reader found or

7  didn't find in the report, and there was no qualifications

8  when that was addressed yesterday, now, even, now the method

9  has changed, it's not simply what was in the report but now

10  on cross-examination you're trying to go beyond what was

11  actually in or not in the report.

12  A    No, sir, it's just the opposite.  I'm trying to let you

13  know that the same rules were applied and you need to

14  understand those rules in looking at this table.

15  Q    And this study by CRC was to be an objective study,

16  correct?

17  A    Yes.

18  Q    Looking at table 31 you agree that one of the columns

19  under service need identified is alcohol/drug

20  rehabilitation, correct?

21  A    Yes.

22  Q    And the N for that is 75?

23  A    Yes.

24  Q    And the corresponding yes is 86.7 percent, correct?

25  A    Yes.

1    Q    Another column on the left is parenting skills training.

2    And you'd agree the N for that was 62, correct?

3    A    Yes.

4    Q    And the corresponding yes was 82.3 percent, correct?

5    A    Yes.

6    Q    And another column on the left was individual or group,

7    individual/group therapy and you'd agree that the N for that

8    was 56, correct?

9    A    Yes.

10    Q    And the corresponding yes was 85.7 percent?

11    A    Yes.

12    Q    And finally, there was another one entitled homemaker

13    services/parent aid, you would agree that the N for that was

14    18?

15    A    Yes.

16    Q    And that the corresponding yes for that was

17    89.9 percent, correct?

18    A    Yes.

19    Q    Now, yesterday, Dr. Freitag, you testified that for the

20    children in the sample for the entry cohort that the

21    combined rate of substantiation of abuse and neglect of

22    children in DCF custody in foster homes and in institutional

23    setting was 1.6 percent.  Correct?

24    A    May I refer to a table?

25    Q    If you would take a look at page, bottom of page 133.

1    Last bullet point.  And again the question is just, is

2    whether you testified yesterday regarding abuse and neglect

3    in a foster home or by a staff in an institutional setting.

4              Did you yesterday testify that each was .8 and that

5    when you combined those they were 1.6.

6    A    I would like to look at the table that I was referring

7    to yesterday to be clear.  This isn't that same table.

8    Q    Sitting there, do you recall which table was the table

9    that you relied upon yesterday regarding this discussion of

10   abuse and neglect of children in care in a foster home or an

11   institutional setting?

12   A    I don't have the number of the table in my head, but I

13   should be able to find it if you'll give me a moment.

14   Q    Counsel for plaintiffs has graciously told me that it is

15   table 18 on page 42.

16             **MR. BARSHAK:**  Thank you, counsel.

17   Q    And to make the question more direct, substantiation of

18   an alleged perpetrator of an individual in foster care was

19   .8 percent, correct?

20   A    That is correct.

21   Q    And for the substantiation for an alleged perpetrator be

22   an institutional staff person, again the percent was

23   .8 percent?

24   A    That is correct.

25   Q    And you'd agree .8 plus .8 is 1.6, correct?

1   A   Yes.

2   Q   The incidence of abuse or neglect in care that you were

3   testifying to yesterday occurred during an observation

4   period which was up to 30 months?

5   A   That is correct.

6   Q   CRC also calculated the rate at which children in the

7   entry cohort sample were substantiated for abuse or neglect

8   in foster home or in an institutional staff for the period

9   of the first 12 months of their placement, correct?  And I

10  would direct you to page 134, specifically third from the

11  last sentence.

12  A   Yes.

13  Q   So CRC calculated the rate at which children in the

14  entry cohort were substantiated for abuse and neglect in a

15  foster home or by institutional staff within the first 12

16  months of their placement, correct?

17  A   That is correct.

18  Q   And when CRC calculated that rate the rate for that

19  period was .83 percent, correct?

20  A   That is correct.

21  Q   And you agree that the federal measure regarding

22  maltreatment in care had a 12 month observation period,

23  correct?

24  A   That is correct.

25  Q   And you agree that in Massachusetts the vast majority of

1    children in foster care are not abused and are not

2    neglected?

3    A    Yes.

4    Q    Please turn to page 29.

5    A    Page 29?

6    Q    Yes, 29, please, of the report.

7    A    Yes.

8    Q    Looking at the second paragraph, in the context of

9    worker contact with child for the entry sample, for the

10   sample for the entry cohort, would you agree that overall

11   workers met contact standards 71.7 percent of the time?

12   A    Yes.

13   Q    Now, the analysis for worker contact with child

14   standards used by CRC for the entry cohort sample assumed

15   that every child should be visited at least monthly by the

16   case worker, correct?

17   A    Yes.

18   Q    And the study cited an excerpt from a DCF policy

19   regarding worker contact with children, correct?

20   A    Yes.

21   Q    And you'd agree that under that policy a DCF supervisor

22   can approve a less than monthly contact schedule for a

23   worker with a child, correct?

24   A    That is correct.

25   Q    And the study did not, the CRC study did not record data

1    on whether or not a supervisor approved a less than monthly

2    contact schedule for a worker with a child in the entry

3    cohort sample, correct?

4    A    Yes, we did record the reasons for no, no contact.

5    Q    Right.  You have, in appendix C --

6    A    Yes.

7    Q    -- you have, you have a table that talks about reasons

8    for no contact.  But you'd agree that there is no table

9    regarding whether or not a supervisor approved a less than

10    monthly contact schedule, correct?

11    A    Yes.

12    Q    Please turn to page 85 of the report.

13    A    Yes.

14    Q    Last sentence, first paragraph under number 2.  You'd

15    agree that regarding worker contact with children in the

16    sample for the two year cohort, that overall the workers met

17    the contact standards for contacting children in custody

18    71.2 percent of the time.

19    A    Yes.

20    Q    And like with the entry cohort sample analysis, the

21    analysis that CRC used regarding worker contact with

22    children in the sample for the two year cohort also assumed

23    that every child should be visited at least monthly by the

24    worker?

25    A    Yes.

1    Q    And again, in this part of the report regarding the two

2    year cohort, the study cited an excerpt from that same DCF

3    policy regarding worker contact with children?

4    A    Yes.

5    Q    The same policy that under that a supervisor can approve

6    a less than monthly contact schedule for a worker with a

7    child?

8    A    Yes.

9    Q    Please take a look at page 15.

10    A    Yes.

11    Q    Yesterday you testified about -- strike that.

12              Yesterday you testified regarding table 4 on

13    page 15, correct?

14    A    Yes.

15    Q    And you testified regarding a Massachusetts regulation

16    regarding the hiearchy or preferences regarding placement?

17    A    Yes.

18    Q    Now, you agree that one reason why a child may not be

19    placed with a kin -- you agree that there can be reasons why

20    a child cannot be placed with kin, correct?

21    A    Yes.

22    Q    And one reason that a child would not be placed with kin

23    is that the kin just does not want the placement?

24    A    Yes.

25    Q    And CRC collected data on whether the case file

1    contained documentation of justification of a placement

2    other than with a relation or kin, correct?

3    A    Can you refer me to a table or page?

4    Q    Please take a look at page C15, table C24.

5    A    Yes.

6    Q    You agree for the sample for the entry cohort there was

7    documentation of justification of a placement other than

8    with a relation or kin 81 percent of the time?

9    A    Yes.

10   Q    And you'd agree that for the sample for the two year

11   cohort there was documentation of justification of a

12   placement other than with relation or kin 90.1 percent of

13   the time?

14   A    Yes.  Again, as I mentioned yesterday, I want to be

15   clear that there was no judgment about whether what was

16   written in the report was an adequate justification, simply

17   if there was any statement at all, it was considered a

18   justification.

19   Q    And the readers in going through the report and looking

20   for any justification determined that there was such

21   documentation for 81 percent of the time for the entry

22   cohort sample and 90.1 percent of the time for the two year

23   cohort sample?

24   A    That is correct.

25   Q    You agree that a cohort is a group that meets certain

1    criteria selected for a study, correct?

2    A    Yes.

3    Q    And you'd agree that the entry cohort population does

4    not include every child in DCF custody as a result of abuse

5    and neglect?

6    A    That is correct.

7    Q    Only children in DCF custody as a result of abuse or

8    neglect who meet the particular criteria for the entry

9    cohort could be part of that cohort?

10   A    Yes.

11   Q    You'd agree that the two year cohort population does not

12   include every child in DCF custody as a result of abuse and

13   neglect?

14   A    Yes.

15   Q    And you'd agree that only children in DCF custody as a

16   result of abuse and neglect who meet the particular criteria

17   for the two year cohort could be in that cohort?

18   A    Yes.

19   Q    And you'd agree the children who entered DCF custody in

20   the two year window prior to July 1st, 2009 were not

21   eligible for either cohort?

22   A    That is correct.

23   Q    You agree that by selecting one child from families with

24   more than one child not every child in the entry cohort had

25   the same chance of being selected for the sample for the

1    entry cohort?

2         **THE COURT:**  I didn't understand that question.

3    Conceptually I -- try it again.

4         **MR. BARSHAK:**  Absolutely.  I think foundation will

5    be needed.

6    **Q**   Dr. Freitag, you agree that one of the steps in the

7    sampling process was identification of certain families?

8    A   Yes.

9    **Q**   And then after that step was done if there was one child

10   in that family then that child would go into the sample,

11   correct?

12   A   Yes.

13   **Q**   But if there was more an one child in that family only

14   one of the children from that sample would go, one of the

15   children from that family would go into the sample, correct?

16   A   Yes.

17   **Q**   So you'd agree that by selecting one child from a family

18   with more than one child that not every child had the same

19   chance of being selected for the sample for the entry

20   cohort?

21   A   I'm going to defer questions on sampling and probability

22   and statistics to the experts on that.

23   **Q**   You agree -- do you remember being deposed in this case

24   by me a few months ago?

25   A   Yes, I do.

1    Q    And you agree that at your deposition you did provide an

2    answer to that question?

3    A    I may have.  And as I testified earlier, or yesterday, I

4    have some sense of understanding of these sampling

5    procedures but not at a detailed level, and I'm not, not

6    feeling comfortable today speaking to that.

7    Q    At the deposition you felt comfortable addressing those

8    issues, but today you do not feel comfortable addressing

9    those issues.  Is that your testimony?

10   A    My knowledge about the sampling and statistical

11   procedures is much more transient than if I were an expert

12   in statistical procedures.  And so, if I've had a recent

13   conversation about it and it made sense to me, I would have

14   remember what that was.  I haven't had a recent conversation

15   about that and at the moment I would not want to speculate.

16   Q    Now, going to the case reading process.  You'd agree

17   that the case readers knew that there were related to a

18   lawsuit brought by CRI, Children's Rights, Inc. against DCF?

19   A    I'm sorry, could you say the question again?

20   Q    Sure.

21        The case readers were provided certain protocol to

22   read before the data collection, correct?

23   A    Yes.

24   Q    And you agree that the protocol referenced the lawsuit

25   brought by CRI against DCF, correct?

1    A    Yes.  I'm sorry, I'm more used to hearing CR.  But yes,

2    that is true.

3    Q    I understand, CRI versus CRC.

4         So, you agree that the case readers knew that their

5    work on this project related to a lawsuit by Children's

6    Rights, Inc. against DCF?

7    A    Yes.

8    Q    And you agree that the case readers knew that the study

9    they were conducting was being conducted on behalf of

10   Children's Rights, Inc.?

11   A    Yes.

12   Q    And you agree that a couple of readers in this case had

13   worked in the past for CRC on Children Rights, Inc. related

14   cases?

15   A    Yes.

16   Q    You agree that in this study by CRC no tests were

17   conducted to determine whether the entry sample was

18   statistically similar to the cohort population from which it

19   was drawn?

20   A    You would have to speak with Dr. Johnson about that.

21        **MR. BARSHAK:**  One moment, please.

22        Your Honor, may I approach?

23        **THE COURT:**  Yes, you may.

24        **MR. BARSHAK:**  Does your Honor want a copy of the

25   depo?

1          **THE COURT:**  It's up to you.  You may certainly

2     cross-examine using the deposition.

3          **MR. BARSHAK:**  All right.  We have an extra copy if

4     your Honor wants one.

5          **THE COURT:**  It's up to you.

6          **MR. BARSHAK:**  Okay.

7     **Q**   Dr. Freitag, you have in front of you your deposition

8     from the deposition that I conducted of you on December 4th

9     of 2012.

10    **A**   Yes.

11    **Q**   Please turn to page 104.

12    **A**   Yes.

13    **Q**   Well, the end of 103 and 104.  Please tell me if I am

14    reading this correctly.  And you'd agree with me that when

15    there's a reference to Exhibit 1 that that was the CRC

16    report?

17    **A**   Yes, I believe so.

18    **Q**   Okay.  Question:  Does the Exhibit 1 contain any --

19    page 104, sorry.

20          Question, line 12:  Does the report contain any

21    tests to determine whether the entry sample was

22    statistically similar in any manner to the cohort population

23    from which it was drawn?

24          Objection by Mr. Borten.

25          Answer:  Yeah, I think I pretty much summed it up

1    when I said there is no statistical test reported.

2            Did I read that correctly?

3    A   Yes, you did read it correctly.

4    Q   Thank you.

5            Following further on 104, the last question on that

6    page.  Question:  And does Exhibit 1 contain any test to

7    determine whether the two year sample was statistically

8    similar in any manner to the cohort population for which it

9    was drawn.

10           Objection by attorney Borten.

11           Answer:  No.

12           Did I read that correctly?

13   A   Yes, you did.

14   Q   Dr. Freitag, CRC decided for each sample that there

15   would be children from each DCF region in proportion to the

16   population size of the regions, correct?

17   A   Yes.

18   Q   And the phrase in proportion to the population size of

19   the regions, you'd agree that that means if there's X

20   regions and one region had 50 percent of the children in

21   custody then half of the children in the sample would be

22   from that region?

23           THE COURT:  Ask that again, please.

24   Q   That if there was, say, four regions and one of the four

25   regions had 50 percent of the children in custody that the

1    state had overall then half of the children in that sample

2    would be from that region that had 50 percent of the

3    children in custody.

4    A    And I want to be very clear that my knowledge of

5    sampling procedures is high level and that makes reasonable

6    sense to me, but I'm going to encourage that those kinds of

7    questions be directed toward our statistical expert.

8    Q    You'd agree that the study was attempting to measure the

9    extent to which a child in DCF custody, regardless of which

10   region the child was placed, was served according to state

11   standards, correct.

12   A    Yes.

13   Q    You did not believe that there was any different

14   standard for a case work practice by one DCF region versus

15   another?

16   A    That is correct, my understanding is that the policies

17   and procedures and regulations were statewide.

18   Q    And CRC did not conduct any analysis to determine

19   whether there were variations in case practice by DCF

20   regions?

21   A    We were not provided with any additional policies or

22   procedures other than what's been put into evidence.

23   Q    So, you'd agree that CRC in the study did not conduct

24   any analysis to determine whether there were variations in

25   case practice by DCF region?

1    A    That is correct.

2    Q    You'd agree on a general level, understanding some of

3    the caveats you've mentioned, that a confidence interval

4    slows how certain one is that the characteristics observed

5    in the sample are present in the population from which the

6    sample was drawn?

7    A    Yes.

8    Q    And you'd agree that the wider the confidence interval

9    the less certain one is that the characteristics observed in

10   the sample are present in the population from which the

11   sample is drawn?

12   A    Yes.

13   Q    You'd agree that a goal of this study was to generalize

14   characteristics of each sample, past and respective

15   populations from which it was drawn?

16   A    Yes.

17   Q    You'd agree that each time the stated N was less than

18   242 for a sample that the confidence interval would need to

19   be recalculated?

20   A    I wouldn't agree that it would need to be recalculated.

21   I would agree that it would be minimally different.

22   Q    Please take a look at page 65, line 9 of your

23   deposition.  Tell me if I'm reading this correctly.  And

24   this is a portion of an answer by you:  So, there's the --

25   the confidence interval and that range that applies to the

1    whole sample need to be recalculated for each time we had a

2    sample smaller than 199.

3              Question:  Did you mean each time you had a sample

4    smaller than 242.

5              Answer:  Yes.  Thank you.  Sorry.

6              Did I read that correctly?

7    A   You read it correctly, and I did not choose my word

8    well.

9    Q   And you'd agree that the farther the N goes away from

10   242 in a lower direction that the wider the confidence

11   interval becomes?

12   A   Yes.

13   Q   Please turn to page 54 of the report.

14   A   Yes.

15   Q   You agree that CRC collected data for the sample for the

16   entry cohort for children where a termination of parental

17   rights was granted and who had a goal of adoption to

18   determine whether the adoption was finalized.  Correct?

19   A   Yes.

20   Q   And the stated N or count for that item was 42, correct?

21   A   That is correct.

22   Q   And you agree that there are other examples in the

23   report where the stated N is less than 242, correct?

24   A   Yes.

25   Q   You agree that a confidence interval could have been

1  calculated for each item in the report, correct?

2  A   Yes.

3  Q   And you agree that the report does not display for each

4  item a confidence interval, correct?

5  A   We did not do ad hoc confidence intervals, that is

6  correct.

7  Q   So you agree --

8  A   Post hoc, I'm sorry.

9  Q   So you agree that CRC -- strike that.

10          So you agree that CRC did not calculate a

11  confidence interval for each item in the report?

12  A   That is correct, we did no post hoc analysis.

13  Q   You'd agree that within the first ten pages of the

14  report there is a discussion about inter-rater reliability,

15  correct?

16  A   Yes.

17  Q   And you're familiar, you're generally familiar with the

18  term inter-rater reliability, correct?

19  A   That is correct.

20  Q   And you'd agree that one uses inter-rater reliability

21  testing to see if more than one person looking at the same

22  information would evaluate it in the same way?

23  A   That is correct.

24  Q   And you agree that CRC chose to use as a measure of

25  determining inter-rater reliability testing what sometimes

1    is called percent agreement, percent agreement, and what is

2    sometimes called percent match?

3    A    Yes.

4    Q    And you agree that a lower percent match represents less

5    consistency?

6    A    Yes.

7    Q    And you agree that there's a correlation between a lower

8    percent match and the degree of accuracy in findings?

9    A    Yes.  Correlation, yes.

10   Q    And you'd agree that a lower overall percent match for

11   an instrument represents less reliability?

12   A    Yes.

13   Q    Yesterday you discussed some prior work that you had

14   performed with either the Massachusetts Department of

15   Children and Families or its predecessor, Department of

16   Social Services, correct?

17   A    Yes.

18   Q    For this line of questions, I'll just refer to it as

19   DCF, but please understand that I may be talking about DCF

20   or its predecessor, DSS.

21   A    Yes, that's fine, thank you.

22   Q    Okay.  You agree that in 2007 either CRC or NCCD entered

23   into an agreement with DCF regarding applying a portion of

24   CRC's structured decision making tools to DCF case practice?

25   A    Yes.

1    Q    And one of the tools was the safety assessment tool,

2    correct?

3    A    Yes.

4    Q    And one of the tools was the risk assessment tool,

5    correct?

6    A    Yes.

7    Q    And one of the tools was the risk reassessment tool,

8    correct?

9    A    Yes.

10   Q    Were you the project manager to that project?

11   A    Yes, I was.

12   Q    And during the time you were also the director of CRC?

13   A    I believe that I was.

14   Q    As part of that project CRC provided technical

15   assistance to DCF regarding policy modifications, correct?

16   A    Yes.

17   Q    And as part of this project CRC assisted DCF with the

18   development of an instruction manual regarding the tools?

19   A    Yes.

20   Q    And as part of this project CRC assisted DCF in what was

21   the design of a field test of the tools?

22   A    Yes.

23   Q    And as part of this project CRC assisted DCF with

24   developing training materials?

25   A    Yes.

1    Q    And you agree that in 2008 the contract was amended to

2    complete the field testing of the customized tools, correct?

3    A    I would double-check the year, but I have no' reason --

4    that seems about right.

5    Q    And you'd agree a new contract was signed in 2009

6    continuing the work toward implementing a new practice model

7    in the state of Massachusetts, correct?

8    A    I believe so.  I think at that point I was no longer

9    involved in the project so I would not have a lot of

10   information after that point.

11   Q    But you free that, if not you, CRC delivered training to

12   DCF staff regarding these tools in the fall of 2009?

13   A    That seems about right.

14   Q    And you agree that in 2010 there was a series of

15   contract amendments actually between either CRC or NCCD and

16   DCF to continue the technical assistance by CRC regarding

17   the finalization or updating of the instruction manual?

18   A    Yes.  My, my memory of individual contracts and

19   individual dates, I would need to be refreshed to be

20   absolutely sure.  But nothing that you're saying stands out

21   to me as being incorrect.

22   Q    And you'd agree that in 2010 CRC -- strike that.

23        You'd agree that as late as November and December

24   of 2010 CRC was performing work regarding updating the

25   manual to include the risk reassessment tool?

1    A    Yeah, I was no longer involved in the project at that

2    point so I would have no direct recollection of that.  But

3    it is possible.

4    Q    And you'd agree that in 2011, CRC continued to provide

5    occasional technical assistance to DCF regarding these

6    tools?

7    A    I don't believe that I've had any contact with DCF for a

8    long time.  If some of our staff did that's possible.

9    Q    Well, you agree that in January of 2012, after the

10   observation period of the study had been completed, you

11   communicated with DCF Assistant Commissioner Amy Kershaw

12   regarding some questions regarding the tools?

13   A    I have a vague recollection of receiving an e-mail in

14   regard to a recent decision to expand the use of the tools.

15   I don't recall any details about that communication.

16   Q    So, you're not -- so you agree that there was an e-mail

17   communication in 2012 between yourself and DCF regarding

18   these tools?

19   A    I have a vague recollection.  I would, yeah, I would not

20   dispute it.

21   Q    And you'd agree that the observation period for both

22   samples in this study was July 1st, 2009 to the earlier of

23   case closure for December 31st, 2011?

24   A    Yes.

25   Q    So you agree that the DCF case practice that CRC was

1    examining in this study was designed or implemented in part

2    by CRC?

3              **MR. BORTEN:**  Objection.

4    A    No.

5    Q    You'd agree that CRC collected data on DCF's efforts to

6    identify adoptive homes?

7    A    Yes.

8    Q    Please turn to page 52 of the report.

9    A    Yes.

10   Q    Specifically table 24.

11             You agree that for the sample for the entry cohort

12   CRC collected data on the 42 children who had a goal of

13   adoption and for whom the parental rights were terminated,

14   correct?

15   A    Yes.

16   Q    And CRC collected data on whether there was

17   documentation that the adoption worker conducted child

18   specific recruitment, correct?

19   A    Yes.

20   Q    And you agree that child specific recruitment was not

21   needed for eight of the 42 children because those eight had

22   already been placed with an adoption resource, correct?

23   A    Yes.

24   Q    And you agree that for those eight children living with

25   an adoption resource that a listing of those children on the

1    Massachusetts Adoption Resource Exchange would not be

2    needed?

3    A   That would be correct.

4    Q   But you agree that in reporting or presenting data

5    regarding evidence of children listed on the Massachusetts

6    Adoption Resource Exchange that it included all 42 children

7    as opposed to just 34 of the children?

8    A   Yes.

9    Q   Now, regarding the 42 children in the sample for the

10   entry cohort, you'd agree that an adoptive family had been

11   identified for 40 of them?

12   A   Yes.

13   Q   One of the items that CRC collected data on was the

14   percentage of foster care reviews that occurred within the

15   first six months of custody for the children in the entry

16   cohort sample, correct?

17   A   May I refer to a table?

18   Q   Page 45, table 20a.

19   A   Yes.

20   Q   And you'd agree that the first sentence of that page

21   above the table states DCF is required to conduct foster

22   care reviews every six months during the time a child is in

23   custody.

24   A   Yes.

25   Q   And you agree that on the previous page, page 44, that

1    CRC cites a Massachusetts regulation regarding timing for

2    foster care review.   Correct?

3    A   Yes.

4    Q   And you agree that the regulation requires DCF to

5    conduct a foster care review within six months after a child

6    is placed out of the home, correct?

7    A   Yes.

8    Q   And you agree that custody and out-of-home placement are

9    not the same, correct?

10   A   I believe that we were using those interchangeably.

11   Q   On page -- please go back to page 45, table 20a.  Do you

12   agree that in part table 20a examines children who had

13   foster care review within the first six months of custody.

14            Did I read that correct?

15   A   Yes.

16   Q   And the first sentence of that page:  DCF is required to

17   conduct foster care reviews every six months during the time

18   a child is in custody.

19            Did I read that correct?

20   A   Yes.

21   Q   Turning back to page 44 regarding the regulation, do you

22   agree that what is cited in the CRC report regarding the

23   regulation, section 6.10, I forget the, I forget before the

24   CMR, states that the department shall conduct a FCR, Foster

25   Care Review, within six months after a child is placed out

1    of the home and every six months thereafter for a child who

2    remains out of the home.

3              Did I read that correct?

4    A    Yes.

5    Q    So you agree that the language on page 45 uses the word

6    custody but the language on page 44 refers to a placement

7    out of home.  Is that correct?

8    A    Yes.

9    Q    And you agree that in the child welfare world custody

10   and placement are not the same?

11   A    One has to always be quite careful with the use of those

12   terms to make sure that you know what the person is

13   referring to with each of those because they can, they are

14   often used interchangeably and sometimes they have precise

15   separate meanings.

16   Q    You understand that the Massachusetts Department of

17   Children and Families that CRC had reviewed many policies

18   and spent four months collecting data on that custody and

19   out-of-home placement are not one and the same?

20   A    That may be.  In this table we were using custody to

21   refer to physical custody, which would be the same as that

22   of home placement.

23   Q    Does the table state physical custody or any other words

24   to suggest that the table is looking at only out-of-home

25   placement?

1    A    No.

2    Q    And you agree that a child can be in DCF custody but not

3    be in an out-of-home placement?

4    A    That is also true.  And when you put the two sentences

5    together it will lead you to an incorrect conclusion.

6    Q    So you agree that Johnny, for example, DCF obtains

7    custody of Johnny, say, on June 1st, but does not remove

8    Johnny from his home.  So you agree that if Johnny is home

9    he's in DCF custody, but by definition he's not in an

10    out-of-home placement as used by the regulation, correct?

11    A    As used by the regulation, correct.

12    Q    The regulation that you cited on the prior page before

13    table 20a.

14    A    Yes.  And table 20a uses the term custody

15    interchangeably with physical custody.

16    Q    Even though there's nothing in any part of the 165 plus

17    pages of the report, plus the roughly hundred pages of

18    appendix C, plus the other attachments that would suggest

19    that custody is being used interchangeably with out-of-home

20    placement, correct?

21    A    Yes.

22         **THE COURT:**  All right, let me just see if I have

23    these concepts.

24         Custody in the DCF is a determination that the DCF

25    may as the legal authority to exercise parental rights.

1          **THE WITNESS:**  Yes.

2          **THE COURT:**  Out-of-home placement means DCF has

3  found a place for the child to reside out of the natural

4  parents' home.

5          **THE WITNESS:**  That is correct.

6          **THE COURT:**  All right.  Go ahead.

7          **MR. BARSHAK:**  Thank you, your Honor.

8  **Q**   Please turn to page 101 of the report.

9          Are you on page 101, Dr. Freitag?

10  **A**   Yes.

11  **Q**   Thank you.

12          Would you agree that table 47a is the table for, in

13  part, children who have foster care review within the first

14  six months of custody for the two year cohort sample?

15  **A**   Yes.

16  **Q**   And you'd agree again at the top of that page it states,

17  as with the other sample, DCF is required to conduct foster

18  care reviews every six months during the time a child is in

19  custody.

20          Did I read that correctly?

21  **A**   Yes, I wasn't reading along with you but --

22  **Q**   I'll repeat just to make sure there's no confusion.

23          First sentence:  DCF is required to conduct foster

24  care reviews every six months during the time a child is in

25  custody?

1    A   That's correct.

2    Q   Did I read that correct.

3    A   Yes.  Yes.

4    Q   And you'd agree that on the prior page the report again

5    cites that same regulation which states that the department

6    shall conduct a foster care review within six months after a

7    child is placed out of the home and every six months

8    thereafter for a child who remains out of the home, correct?

9    A   That is correct.

10    Q   CRC was given a copy of the complaint filed in this case

11    before the development of the case survey instrument in the

12    data collection, correct?

13    A   That is correct.

14    Q   And the report on page 1 identifies some of the

15    allegations raised by plaintiffs in the complaint, correct?

16    A   Yes.

17    Q   And the report at various points includes or restates

18    various allegations from the complaint, correct?

19    A   That is correct.

20    Q   One of the allegations is that children are abused and

21    neglected in foster care at an alarming rate, correct?

22    A   That is correct.

23    Q   CRC is not taking a position on that allegation,

24    correct.

25    A   That is correct.

1    **Q**   And CRC is not taking a position on the other

2    allegations referenced in the study, correct?

3    A   That is correct.

4         **MR. BARSHAK:**  Other than to reserve the rights

5    regarding the Daubert motion, that may be more applicable

6    after Dr. Johnson or Professor Nordheim's testimony, I have

7    no further questions.

8         **THE COURT:**  Thank you.  But you've talked about

9    reserving rights.  I've denied the Daubert motion.  The

10   record's clear.  It's denied.

11        **MR. BORTEN:**  Your Honor?

12        **THE COURT:**  Any further questions?

13        **MR. BORTEN:**  A few.

14        **THE COURT:**  Go ahead.

15                    **REDIRECT EXAMINATION**

16   **BY MR. BORTEN**

17   **Q**   Dr. Freitag, turning to table 20b which attorney Barshak

18   was just -- I'm sorry table 20a which attorney Barshak was

19   just referring to.  You recall he pointed you to the

20   reference to custody in the paragraph above?

21   A   Yes.

22   **Q**   And then he referred you to the regulation which refers

23   to not living in the home on the prior page.

24   A   Yes.

25   **Q**   Did CRC as part of the case record review ask the

1    question of what a child's initial placement was at the time

2    they arrived in DCF custody?

3    A    Yes.

4    Q    And is that reflected in table 4?

5             THE COURT:  On what page .

6             MR. BORTEN:  Page 15.

7    A    Yes.

8    Q    And what percentage of children in the entry cohort were

9    still in their parental home at the time they entered DCF

10   custody?

11            MR. BARSHAK:  Objection.

12            THE COURT:  No, he may ask that.

13            MR. BARSHAK:  Just vague, the way it was said.

14            THE COURT:  Well, if she understands it she can

15   answer it.  I understand it.

16   Q    Let me ask -- let me rephrase it.

17   A    No.

18   Q    Sorry?

19   A    No.

20            THE COURT:  Well, how do you know that?  I mean,

21   you were looking at that chart.  So was I.  How do you know

22   that none were?

23            THE WITNESS:  Because we have a total of 242 in all

24   the categories listed and living with the removal home is

25   not one of them.

1          **THE COURT:**  Thank you.

2   **Q**   Dr. Freitag, could you explain the entry in the very

3   first row, parental home, non-removal?

4   **A**   A parental home non-removal would mean that there was,

5   the child's parents were not living together and the child

6   would have been removed from one parent but allowed to go

7   and live with the other noncustodial, previously

8   noncustodial parent.

9   **Q**   Thank you.

10          Dr. Freitag, could you please turn to table C24 on

11  page C15.  Do you recall attorney Barshak pointing you to

12  this table concerning the documentation of justification for

13  placement setting other than kin?

14  **A**   I'm sorry, I think I'm on the wrong table.

15  **Q**   C15, page C15, I'm sorry, table C24.

16  **A**   Yes.

17  **Q**   Is the denominator in the proportions represented here

18  the number of children or the number of total placements?

19  **A**   That would be the number of total placements.

20  **Q**   So when it says there was documentation of justification

21  for other than kin placement and it says yes, 81 percent,

22  that's 81 percent of placements, not children, right?

23  **A**   That is correct.

24  **Q**   And referring to -- withdrawn.

25          Now, several times attorney Barshak asked you about

1    the principle you stated or the assumption or the

2    recognition that for the purposes of this study if

3    something, an event is not in the file it didn't happen.

4    A    Yes.

5    Q    Why do you use that interpretation of events in a case

6    record review like this?

7    A    Certain essential actions regarding a case that are

8    central to meeting standards, central to meeting minimum

9    basic level of care, it's part of a professional standard, a

10   professional ethic even, to have timely recording of such

11   pieces of information.  So the responsibility is there to

12   make an accurate record.  And a department requires an

13   accurate record because you can't monitor how you're doing

14   if you have to rely on the hope that something is better

15   than what's in the record.

16        **MR. BARSHAK:**  Move to strike as calling for

17   speculation.

18        **THE COURT:**  No, that's her approach.  The motion to

19   strike's denied.  It's responsive.

20   Q    Dr. Freitag, you referred to a professional standard.

21   Are you referring to a social work professional standard?

22   A    Yes.

23   Q    And did you cite that standard in your report?

24   A    I did.

25   Q    Do you recall what that standard is?

1    A    Yes.  It's at the beginning of the summary section, I

2    believe.  I could find it quite quickly.  It's on page 132.

3    Q    Is that the box at the top client records?

4    A    Yes, it is.

5    Q    And it states that social workers should take reasonable

6    steps to ensure that documentation in the record is accurate

7    and reflects the services provided.  Is that correct?

8    A    Yes.

9    Q    And it contains another subsection that says:  Social

10   workers should include sufficient and timely documentation

11   in the records to facilitate the delivery of services and to

12   ensure continuity of services provided to clients in the

13   future.  Is that right?

14   A    Yes.

15   Q    How is it that recording events in a case record such as

16   the electronic Family Net system would facilitate the

17   delivery of services to children in DCF custody?

18   A    Well, for example, thinking about recording contacts, if

19   I make a contact and I don't record it then as a department

20   there's no way to, for a supervisor to say, for example, to

21   look across the family served by workers in my unit and

22   determine are there families who haven't been seen for 30

23   days, 60 days, 90 days.  If I make the assumption that my

24   workers have probably made those visits, they just didn't

25   write them down yet, then I have a degree of comfort that

1   allows me to not have a sense of urgency for going out and

2   visiting.  And if I accumulate that, I may go, a child may

3   go months without contact, all the while the supervisor

4   assuming that they're occurring, but having no way to check.

5   Q   And how is it that recording events in the case file

6   ensures continuity of services provided to clients in the

7   future?

8   A   Similarly, because we know that there are transitions

9   from worker to worker, if I've just received a new case file

10  and I look in that case file and see that there have not

11  been any visits for a few months, if I rely on the

12  assumption that there probably had been visits, I might not

13  have a sense of urgency for getting out there and making my

14  next visit.  Whereas, if I can rely on an accurate

15  documentation and I see that that child has not been seen in

16  nearly a month, then I know that I have a high sense of

17  urgency to go out and see it.  And contacts are extremely

18  important.  So not having an accurate record to rely on

19  makes it difficult to make sure that children and families

20  are in fact getting the services that they need.

21  Q   As part of the case record read, did you in fact look at

22  the extent to which children in DCF care had transitions

23  from one social worker to another?

24  A   Yes, we did.

25  Q   Do you recall what table that is?

1          MR. BARSHAK:  Your Honor, this is beyond the scope

2     of cross.

3          THE COURT:  It seems to be.  Sustained.

4          MR. BORTEN:  I would argue that in talking about

5     the importance of reporting information this is an essential

6     component of the understanding why treating not in the file

7     was not happening as --

8          THE COURT:  I've admitted the tables.  I think his

9     cross was more focused than that, and I adhere to my ruling.

10    The matter can be argued.

11         MR. BORTEN:  Okay.

12    Q    Now, do you recall that attorney Barshak several times

13    referred you to the table, table 30 concerning child needs

14    and child services provided?

15    A    Yes.

16    Q    And you referred in a number of your answers to the text

17    above the table.  Could you explain why the text above the

18    table is important in understanding table 30?

19    A    Yes.  I think it's, we had set up the case reading with

20    an effort to look in the case record to see, you know,

21    through some sort of comprehensive assessment that we knew

22    is required the extent to which service needs had been

23    identified and then measure the extent to which referrals

24    had been given for those referrals.  We found very rare

25    instances in which there's documentation of the need for,

1    for example, a mental health service other than the case

2    reader seeing that a referral had been made for mental

3    health services, therefore, they must have identified a

4    need.  And so, in looking at these tables it's really

5    critical to get the notion that there's circular reasoning

6    involved.  If I had a referral, I therefore infer that

7    there's a need, and then I measure how often there is a

8    referral for that need, that would be a hundred percent.

9    So, there were a few instances when they found additional

10   indication of a need, some of those also had referrals, some

11   of those did not.

12   **Q**   Do you recall attorney Barshak, Dr. Freitag, talking

13   about inter-rater reliability?

14   A    Yes.

15   **Q**   And at one point he talked about the relationship

16   between inter-rater reliability and lower accuracy for the

17   instrument?

18   A    Yes.

19   **Q**   Does one measure inter-rater reliability for an

20   instrument or does one measure it for some other unit?

21   A    Inter-rater reliability is an approach that's used for a

22   number of different things.  If I'm trying to develop a test

23   for psychometric properties, that I want independent

24   judgments of the raters to make sure that if left alone

25   those raters would reach an acceptable level of reliability

1       in answering the questions looking at the same information.

2               We, we were not set up to, we weren't trying to

3       test the psychometric properties of an instrument.  We were

4       trying to achieve reliable and accurate results into the

5       database.  And so, we measured inter-rater reliability and

6       actually used that to improve the process as we went on.  We

7       did not set up independent reviewers and sequester them in

8       individual rooms to test whether they could get to the same

9       answer.  In fact, we wanted them to talk with each other to

10      increase their understanding, their shared understanding as

11      they went.  With we did inter-rater reliability testing, if

12      there were some differences we would talk with the readers

13      about that to improve and get the most accurate result.

14      Q   Okay, I'm not sure you understand my question.  My

15      question was --

16      A   Apparently I did not.

17      Q   -- in analyzing inter-rater reliability on a test record

18      review such as this one would one calculate inter-rater

19      reliability for individual items or for the instrument as a

20      whole.

21      A   Oh, we looked at individual items.

22      Q   And is that what one would do in a case record review in

23      analyzing the accuracy of the instrument, look at the

24      inter-rater reliability of individual questions in the

25      instrument?

1    A    We didn't try to come up with an average inter-rater

2    reliability for the whole instrument.  We looked one item at

3    a time.

4    Q    And if the inter-rater reliability is low for one item

5    does that have any effect on the accuracy of another item

6    that is used in a different table?

7    A    Not at all.

8    Q    Did CRC report all of the results that it obtained as a

9    part of the case record review regardless of the inter-rater

10   reliability?

11   A    Yes.

12   Q    Dr. Freitag, could you turn to table, I'm sorry, to page

13   C28 and look at table C52.

14   A    Yes.

15   Q    Do you recall that attorney Barshak asked you about the

16   item within this table concerning whether a child is

17   receiving special education services for the 2011-2012

18   school year.

19   A    Yes.

20   Q    Now, the following question is did the child have an

21   educational advocate assigned.  Do you see that.

22   A    Yes.

23   Q    With respect to receiving special educational services,

24   what is the role of the education advocate for a child in

25   foster care?

1    A    I actually don't know.

2    Q    Thank you.

3         Do you recall attorney Barshak asked you with

4    respect to the two cohort design whether children who came

5    into care prior to July 1st, 2009 would be selected for

6    either cohort?

7    A    I think he asked specifically if they had come into care

8    within the two years prior to 2009 could be either cohort,

9    and I said no, they could not be.

10   Q    So your understanding of the question was that he was

11   only asking about children coming into care within two years

12   of July 1st, 2009?  Within two years prior?

13   A    Yes.

14            **MR. BORTEN:**  No further questions, your Honor.

15            **THE COURT:**  Nothing further for this witness, Mr.

16   Barshak?

17            **MR. BARSHAK:**  Very short recross.

18            **THE COURT:**  Go ahead.

19            **MR. BARSHAK:**  Thank you.

20                    **RECROSS-EXAMINATION**

21   **BY MR. BARSHAK**

22   Q    Dr. Freitag, attorney Borten was just asking you some

23   questions about the document, if something is not in the

24   record what effect that may have, and you used the

25   expression, I believe, you can't rely on hope.  But you

1    agree that in DCF, or if somebody was to assess DCF's

2    performance one wouldn't need to rely on hope if something

3    was not in the record hope that one would be able to talk to

4    the social worker, or the social worker's supervisor or

5    other persons, correct?

6    A    That would be a very difficult way of trying to run an

7    organization to have to talk to each individual worker about

8    each individual contact given the size of the organization,

9    I would think.

10   Q    But the question being, in Johnny's file there's no

11   record, say, of X.  You agree that if somebody wanted to

12   determine whether X had occurred that they can talk to the

13   social worker or the social worker's supervisor, you agree

14   that that would be an option that could be taken, correct?

15   A    It is an option, certainly.  Not particularly a good

16   one, but it is an option.

17   Q    And you agree that CRC did not conduct any interviews

18   for purposes of its study, correct?

19   A    That is correct.

20   Q    And you're aware that the federal government when

21   conducting its children family service reviews of all the

22   states that its process includes both a documentary review

23   and interviews, correct?

24   A    That is correct.

25   Q    And you agree that the federal government in its, I

1    believe it was in the one of the Federal Registers,

2    regarding that discusses how solely doing a documentary

3    review is not sufficient to get the proper picture?

4    A    I'm not familiar with that in a Federal Register, but I

5    wouldn't disagree that --

6              **MR. BARSHAK:**  No further questions.

7              **THE COURT:**  Nothing further, is there, Mr. Borten?

8              **MR. BORTEN:**  No.

9              **THE COURT:**  You may step down, thank you.

10              I think it's time for the morning recess.  We'll

11    take the morning recess for one-half hour.

12              Before I leave, are we going back to the witness

13    who was on the stand?

14              **MR. BORTEN:**  No, your Honor, we're going to call

15    another CRC witness.

16              **THE COURT:**  And that's fine.  We'll recess.

17              **THE CLERK:**  All right.

18              (Whereupon the witness stepped down.)

19              (Recess.)

20              **THE CLERK:**  All rise.  The United States District

21    Court is now back in session, you may be seated.

22              **THE COURT:**  Call your next witness.

23              **MR. BORTEN:**  Your Honor, plaintiffs call

24    Dr. Kristen Johnson.

25              **THE COURT:**  She may be called.

 1              THE CLERK:  Can you please remain standing and

 2      raise your right hand.

 3              Do you solemnly swear the testimony you are about

 4      to make in the matter now pending before this Court will be

 5      the truth, the whole truth, and nothing but the truth, so

 6      help you God?

 7              THE WITNESS:  I do.

 8              THE CLERK:  You can be seated.

 9              THE COURT:  Now, I take it this witness is the

10      co-author of this report that we have marked GW for

11      identification?

12              MR. BORTEN:  That's true, your Honor.

13              THE COURT:  And that's fine.  But I'm operating on

14      the general proposition one witness for one area of

15      expertise, and my guess, without knowing it, is you're

16      proffering her because she has more statistical expertise.

17              MR. BORTEN:  Research design and statistics.

18              THE COURT:  Research design and statistics.  And

19      how would you characterize Ms. Freitag?

20              MR. BORTEN:  Social work.

21              THE COURT:  Social work.  I simply -- wholly apart

22      from time limits or anything, we're not going to go over the

23      same thing twice.

24              MR. BORTEN:  No, your Honor.

25              THE COURT:  All right.  That's fine.

1          **MR. BORTEN:**  Understood.

2          **THE COURT:**  And of course you're welcome, and you

3    go ahead.

4                    KRISTEN R. JOHNSON

5                  **DIRECT EXAMINATION**

6    **BY MR. BORTEN**

7    **Q**   Dr. Johnson, could you state your fall name for the

8    record?

9    A    Kristen Robin Johnson.

10   **Q**   Dr. Johnson, do you have a copy of Exhibit GW with you

11   at the table there?

12   A    I do.

13   **Q**   Okay.

14          **MR. BORTEN:**  Your Honor, I would like to proffer in

15   addition a supplemental report Exhibit GU and a rebuttal

16   report GT.

17          **MR. BARSHAK:**  May I be heard, your Honor?

18          **THE COURT:**  Well, when he says proffer it, he's not

19   offering it in evidence.

20          **MR. BARSHAK:**  Understood.  But even at this point,

21   your Honor, may I be heard?

22          **THE COURT:**  You may.

23          **MR. BARSHAK:**  The deadline for expert disclosure in

24   this case was August 22nd for plaintiffs.  In November,

25   almost three months after that deadline, three documents

1    were submitted by plaintiffs to defendants.  Two of those

2    three have just been proffered.  One of them has been

3    characterized by plaintiffs as a supplemental to the August

4    report, one of them has been characterized as a rebuttal.

5    The defendants have a motion before the Court to strike any

6    reference to those reports.  The defendants do not believe

7    that any identification, proffer, testimony about or

8    anything regarding those reports is appropriate, and that

9    the only testimony for Dr. Johnson should be up to the time

10   when the 166 page report of August 22nd was submitted.

11        **THE COURT:**  All right, let me give you my reaction

12   here and I'll hear Mr. Borten if it doesn't suit.

13        One of the realities of this litigation is this

14   case was reassigned from my distinguished colleague, Judge

15   Ponsor, to me.  I think it's fair to say alone among the

16   judges of the district court, I am the most rigorous on

17   holding experts to what's in their reports.  People who

18   practice in this session of the Court know that everything

19   has to be in the report.  So it does seem to me that where

20   there are supplemental reports, I am likely to allow her to

21   testify to anything that is in GW, GU and GT.  I am less

22   willing to accept the tables in these supplemental reports

23   substantively.  It may be I'll have to look at them in

24   comparison to other tables.  But that is how I propose to

25   proceed.

1          You're before a different judge and I have been and

2     will be rigorous in excluding even from testimony anything

3     that's not in the report.  If that's how I go forward, Mr.

4     Borten, you're okay with that.

5          **MR. BORTEN:**  Yes, I would ask that after laying a

6     foundation for the tables, I would try to move them into

7     evidence for the substance.

8          **THE COURT:**  You can try but you'll understand my

9     skepticism because they're after the cutoff.  It's like

10    you're coming up with more evidence.  Now --

11         **MR. BORTEN:**  Well --

12         **THE COURT:**  -- the witness has been properly

13    disclosed.  They've had a chance to be at her.  And I'm

14    going to hold her to reports.  So, I'll take these reports

15    as the universe of things to hold her to.  Tables I've

16    received as substantive evidence.  Their weight, of course,

17    is ultimately to be determined, but I've received them as

18    evidence.  So I won't foreclose it but you know I'm

19    skeptical.

20         Go ahead.

21         **MR. BORTEN:**  Okay.

22    **Q**   Dr. Johnson, by whom are you employed?

23    A    The National Council on Crime and Delinquency.

24    **Q**   And what is your -- and may we call the National Council

25    and Crime Delinquency NCCD going forward?

1    A    Please.

2    Q    What is your title at NCCD?

3    A    Senior researcher.

4    Q    And how long have you been employed at NCCD?

5    A    Seventeen years.

6    Q    Have you always had the same title?

7    A    I have not.

8    Q    Could you briefly describe the positions you've held at

9    NCCD over the last 17 years?

10   A    In 1996 I was hired as a research associate.  In 1999 I

11   was promoted to senior research associate.  And in 2004 to

12   senior researcher.

13   Q    Can you describe any change in your duties generally

14   that took place as a result of those changes in title?

15   A    Certainly.  The changes in duty equate to more and more

16   independence and project management.  As a senior research

17   associate, I managed a program evaluation for the state of

18   Michigan evaluating the effectiveness of foster care

19   services.  And so that was part of the promotion to senior

20   researcher where I do much more grant writing, consultations

21   about translating research to practice, and managing

22   research, research projects.

23   Q    Dr. Johnson, when did you get your bachelor's degree?

24   A    1991.

25   Q    And what institution?

1    A    I received my bachelor's from the University of

2    Wisconsin, Madison, with the sociology department.  And part

3    of that program was a concentration in analysis and

4    research.

5    Q    Did you obtain a master's degree?

6    A    I did, from the La Follette Institute at University of

7    Wisconsin, Madison, in 1996.

8    Q    What was the focus of your master's degree.

9    A    The focus of that master's degree was policy analysis.

10   So it was part of my desire to move from conducting research

11   to also being able to apply it to practice.

12   Q    And when did you get your Ph.D.?

13   A    In 2010.

14   Q    From where?

15   A    The University of Wisconsin, Madison, the Department of

16   Human Development and Family Studies.

17   Q    Did you have any area of focus or minor area?

18   A    That's right.  I minored in prevention science.

19   Q    What is prevention science?

20   A    Prevention science is the study of how to prevent and

21   intervene to mitigate risks and solve social issues like

22   child maltreatment.  So, it is very were about program

23   evaluation, sustainability of effective practices to

24   intervene to improve child and family outcomes.

25   Q    And what was the subject of your dissertation for your

1    Ph.D.?

2    A    My dissertation came out of work we did in partnership

3    with some counties in California around increasing placement

4    stability.  So, we estimated and looked at predicters of

5    placement stability with the goal of being able to triage,

6    identify those placements that were most at risk of

7    undesirable placement changes in an effort to prevent those.

8    **Q**    Did you in the course of your studies, bachelor,

9    master's, Ph.D., take courses in statistics?

10   A    I did, during all three degrees.

11   **Q**    And how many, roughly.

12   A    Roughly, across the three degrees, I'd estimate eight.

13   Seven.  Yeah.  Eight.

14   **Q**    I'm sorry.  Is there any area of statistics that these

15   courses tended to center on?

16   A    Yes.  During my undergraduate education, I mentioned the

17   concentration in analysis and research, the focus of that

18   ma'am was to build research and analytical skills by pushing

19   undergraduates through the graduate series of statistical

20   courses.  So that was very much, it was a three course

21   foundation partnered with additional research courses.  In

22   La Follette, when I was with La Follette, I took a number of

23   additional courses to keep fresh with updates to the

24   literature.  And then when I was in graduate school, I was

25   focused more on topics that I had, that I had been exposed

1    to in practice.  So that for those statistical courses, I

2    concentrated more on structural equation modeling,

3    hierarchal data analysis, and the analysis of categorical

4    data.

5    Q   Did you in the course of your studies take courses in

6    social science research design.

7    A   I did.  Also during all three degrees.

8    Q   And was there any particular area of focus in that

9    course of studies?

10   A   Yes.  Then as an undergraduate I obtained a base

11   understanding of research design and took classes in

12   quantitative qualitative research methods.  At La Follette I

13   focused more on program evaluation and policy analysis.  And

14   then in graduate school, again, I focused on research

15   methods, but I wanted to build an understanding of

16   specialized program evaluations models, like regression

17   discontinuity design, ways of conducting research in fields

18   like child welfare that do not, fields related to families

19   and children that do not easily translate itself to

20   randomized control design.

21   Q   To what extent did your course work in research design,

22   or does it find application in the kind of case record

23   review that you performed for this case, for this

24   litigation?

25   A   Yes, I think both series of courses are directly

1    applicable to a project such as this.  Because -- well, for

2    example, one area is good questionnaire design.  We want to,

3    in order to collect reliable and valid data, we need valid

4    and reliable measures.  And so certainly the survey design

5    course work on what makes a good instrument, a good

6    question, how do we maintain stringent data collection

7    protocols, all of that course work would apply in a case

8    like this.

9    **Q**    Did you have any work experience between your bachelor's

10   degree and beginning graduate studies?

11   A    I did.  And I worked during the degrees.  Let's see --

12   **Q**    Could you describe that employment.

13   A    Sure.  After, after graduating in 1991, I worked at a

14   market research firm in Milwaukee and I managed and set up

15   data collection protocols for a data collection lab, a

16   survey lab.  Then, I worked there for two years, and then I

17   moved to an environmental research firm in Madison,

18   Wisconsin and conducted benefit cost analyses, cost

19   evaluation studies and program evaluations for, for the

20   federal government on some National Park research, PG&E,

21   things like that.  So, more with an environmental focus.

22   And then when I went back to La Follette I obtained a

23   position on campus with the Center for Addiction and

24   Education Studies through the University of Wisconsin,

25   Department of family medicine.

1    Q    After obtaining your master's degree where did you work?

2    A    After obtaining my master's degree, we had just finished

3    the family medicine, implementing and analyzing initial

4    results from a randomized control trial, and then I was, I

5    became aware of a position at NCCD and I was hired at NCCD

6    the same year that I graduated, 1996.

7    Q    And you've been at NCCD since then?

8    A    I have.

9    Q    I forgot to ask you, do you have any training or

10   education specifically relating to child welfare?

11   A    I do.  Both at La Follette and when I was studying for

12   my Ph.D., I took a member number of courses on child welfare

13   systems and family welfare systems, both nationally and

14   internationally, and then I took a number of courses

15   focusing on child maltreatment and, counseling and child

16   maltreatment.

17   Q    Can you generally describe the subject matter of the

18   work you've done at NCCD over the last 17 years?

19   A    In terms of subject matter, I think it's easiest to talk

20   about it in terms of four areas of work.  We have conducted

21   a number of workload studies for child welfare, juvenile

22   justice and adult correction agencies.  And those workload

23   studies, the aim is to examine practice and, and articulate

24   a rationale for workload that is based on the demand facing

25   the agency and in a way that allows them to meet basic

1    practice standards.

2         The next pool of studies would be risk assessment

3    studies.  And those are longitudinal studies examining the

4    risk factors for negative outcomes.  In child welfare that

5    would be child maltreatment, in juvenile for juvenile

6    justice agencies we're looking at risk factors for

7    delinquency, how to prevent delinquency.

8         Then there's another pool of work which are

9    evaluation studies and those include both impact evaluations

10   and process evaluations.

11       **THE COURT:**  I don't know what that means.

12   A   Impact evaluations are the study of impact.  For

13   example, if we have a program like home visiting program

14   where we are trying to prevent child maltreatment, it's a

15   study to examine the effectiveness of the program, were we

16   able to prevent child maltreatment in the way we hope

17   through designed.

18       **THE COURT:**  And you call that impact?

19       **THE WITNESS:**  I call that impact or outcome

20   evaluation.  And then, right, so often you see that we

21   conduct an impact evaluation and we see it's not effective.

22   The process evaluation we often do in partnership with the

23   impact or outcome evaluation to study implementation

24   fidelity.  We're saying, well, was the program implemented

25   as we designed it so that if we do not have the impact that

1    we identified, we understand why we did not.  So it's sort

2    of setting things along the way so that we know why things

3    worked and why they didn't work.

4            And then, you know, I think the last pool of

5    studies would be special studies.  Like I've also conducted

6    for other agencies child fatality reviews, a study of child

7    fatalities related to maltreatment.  Racial disparity

8    studies for child welfare agencies.  You know, special topic

9    examinations of that nature.

10   **Q**   Would you class --

11           **THE COURT:**  Just --

12           **MR. BORTEN:**  I'm sorry.

13           **THE COURT:**  The latter, where there may be racial

14   differences in the group studied, you're conducting a

15   special study to show that, quality of treatment, I would

16   imagine, something like that.

17           **THE WITNESS:**  Yes, exactly.  So, for example, the

18   last racial disparity study we conducted many states because

19   of the data system can look at disparities and measure them,

20   but what we were able to do was look at assessment

21   information.  And so, for example, one of our findings was

22   that controlling for the presence of substance abuse and

23   mental health issues on the part of the parent, and the

24   severity of those issues.  African-American children were

25   still more likely to go into foster care than were white

1    children, even among just those families with substance

2    abuse issues.

3            THE COURT:  And a special study about child death

4    while in foster care, what are you studying?

5            THE WITNESS:  Yeah.  The agency that asked us to do

6    that, they were concerned that they were missing risk

7    factors and so they wanted us to do a more thorough review

8    of child fatalities that resulted in maltreatment and near

9    child fatalities.  And then we also compared those cases to

10   a set of very serious cases that did not result in near

11   fatal harm or fatality.  And so it was a review to make sure

12   basically are workers assessing all of the factors that they

13   should be and what practice issues do we see in these pool

14   of cases.

15   Q   Would you classify the case record review that you did

16   here as a special study in that fourth category?

17   A   I would.

18   Q   Have you done other work related to litigation in which

19   Children's Rights was involved?

20   A   I have.  I conducted the sampling for the state of

21   Michigan case.

22   Q   And when was that?

23   A   Based on my recall, I want to say around 1995, 1996.

24   Q   And were you or was NCCD engaged by Children's Rights

25   for that?

1    A    That study, we were hired as an independent consultant

2    to the Court.  So, in that situation my understanding was

3    our goal was to report to the judge and to the Court and

4    both parties consulted on the research design.

5    Q    How many child, public child welfare agencies have you

6    done work for over your 17 years at NCCD, roughly?

7    A    I'd say roughly 18 to 20 in the United States and then

8    most recently three in Canada and two in Australia.

9    Q    At what point did you get involved in this project for

10   Children's Rights?

11   A    My recall is that the first time we were talking about

12   this study was around Labor Day, September of 2011.

13   Q    And at that time what did you understand the purpose of

14   the case record review to be?

15   A    We understood the purpose to be an examination of

16   practice in foster care in the state of Massachusetts around

17   some key points, including the, like reunification, you

18   know, ability or permanency of, the state's performance in

19   achieving permanency for children in foster care.  Placement

20   stability.  The occurrence of maltreatment in care.  And

21   those are the mains ones.  Oh, and visitation.  Visitation

22   with families.

23   Q    Were you personally compensated for your work on the

24   case record review here.

25   A    No.

1    **Q**   What aspects of the case record review in chronological

2    order were you personally involved in?

3    A   Overall, I'd say most aspects.  We started with study

4    design, which includes sample design, design of the

5    instrument, identification of the cohorts and what our

6    sample would look like, what measures.  So the study and

7    research design process.  And then I also was part of, well,

8    I was responsible for setting up the data collection

9    protocols, how we would ensure the validity and reliability

10   of the findings.  So, designing the protocols.

11          I trained the case readers and the case read

12   coordinators so everyone involved in data collection, I was

13   responsible for answering their questions, making sure that

14   things went as we desired.  And then data cleaning and

15   analysis and report writing.  Pretty much all stages.

16   **Q**   Let's talk about the sample design.  Was that the first

17   of steps that you just mentioned?

18   A   Yes.

19   **Q**   Okay.  Did you work with anyone on that?

20   A   Yes.  I worked with attorney Sara Bartosz and yourself

21   and then Professor Rick Nordheim consulted with us.

22   **Q**   And how did Professor Nordheim come to be involved?

23   A   Professor Nordheim was brought on by Children's Rights

24   attorneys as a specialist to consult and make sure our

25   methods met, met approval.  He provided -- may I elaborate?

1    Q    Please.

2    A    He provided a level of statistical expertise that, that

3    made us all more comfortable.

4    Q    And what was the exact scope of Professor Nordheim's

5    involvement?

6    A    He -- my understanding of his role is that he was there

7    to help ensure that the sample selection met the goals of

8    the study and that the study sample could be replicated.

9    Q    What do you mean the study sample could be replicated?

10   A    That his role and my questions to him concerned our

11   ability to show and ensure to the Court that the sample was

12   random.

13             MR. BARSHAK:    Move to strike; this is not in the

14   report.

15             THE COURT:    I'm going to sustain that; stricken.

16   Q    Were you involved in identifying or selecting Professor

17   Nordheim as a sampling expert?

18   A    No, I was not.

19   Q    What were the key features of the sample design in this

20   case record read?

21   A    I'd say the key feature, the first key feature of the

22   sample design would be the two different cohorts.  And then

23   additionally the fact that we sampled family cases and have

24   unique families and then unique children in families with

25   more than one child.  I think the fact that we sampled

1    proportionally by region is also worth mentioning.  Those

2    would be the three key points.  And that we studied

3    longitudinally, that we collected data over a long period of

4    time so that we can examine case outcomes.

5    **Q**    Were you also involved in simply picking the size of the

6    sample for each cohort?

7    A    I was, yes.

8    **Q**    So, let's go back to the decision to sample unique

9    families and then unique children within families.  What's

10   the significance of that decision?

11   A    Sampling unique families is very important, especially

12   when we're examining case outcomes like reunification or

13   foster care reentry.  Because the reason children are

14   removed from the home relates to parental issues.  And we

15   don't want case outcomes or an examination of case outcomes

16   to be biased in that families and parental issues are over

17   represented.  I have one child and you have three and we

18   treat those four cases the same and your issues have three

19   times the weight than mine does.  So, the reason it's so

20   important to sample unique families is because it gives us a

21   better picture of agency practices across unique families.

22   **Q**    Can you describe the process by which you first selected

23   the unique families and then selected a child from each

24   family?

25   A    Yes.  We had some meetings with the Attorney General's

1    office by phone, I believe, as well.  But part of the

2    identification was data limitation, right, that there was a

3    case I.D. that essentially served as a family identifier.

4    And so, our technical process was to select unique case

5    I.D.'s.  And then the child identifier is a person I.D.  So,

6    we first sampled families using case I.D. and then looked at

7    the number of children in care related to the sample of

8    unique families and among those families with more than one

9    child randomly selected a child.

10   Q   And when you made that selection what information did

11   you have other than the list of case I.D.'s for the entire

12   cohort?

13   A   In the file we received through you from DCF, there was

14   the case I.D., identifier person I.D., the region, so that

15   we could sample proportionally by region, and then there

16   were child demographics added, and in that field I was

17   interested to see about whether or not CPR had been

18   achieved, so I believe there was a yes/no field.

19          **MR. BARSHAK:**  I do not believe this is in the

20   report, your Honor.

21          **MR. BORTEN:**  Your Honor, table 1 in the report

22   lists for the cohort exactly the characteristics that Dr.

23   Johnson's talking about.

24          **THE COURT:**  That's an adequate answer, isn't it?

25   I'll let her testify.

1    **Q**    And one -- withdrawn.

2          Now, what were your considerations in deciding on

3    the sample size of 242 cases from the cohort?

4    A    When we choose a sample, we start with the research

5    question.  So what is our goal.  And in studies like this

6    where we're evaluating whether or not an agency met a

7    practice standard, we're often talking proportion, a

8    percentage of cases.  And so we start with the research

9    question which is what was the proportion of cases that met

10   this compliance.  And then --

11          **THE COURT:**  That met what compliance.

12          **THE WITNESS:**  So say, like reunification, if we

13   talk about the federal measure and we're looking at

14   reunification within a one year period, for example.

15          **THE COURT:**  I don't mean to drag this out.  So you

16   designed a study having certain compliance parameters in

17   mind.

18          **THE WITNESS:**  Yes.

19          **THE COURT:**  And then you wanted to get a large

20   enough sample that the data derived would be meaningful.

21          **THE WITNESS:**  Exactly.  Yes.

22          **THE COURT:**  Go ahead, Mr. Borten.

23          **THE WITNESS:**  And some of that -- can I keep going?

24   Some of that relates to the confidence in --

25          **THE COURT:**  I don't hear anyone objecting, so go

```
 1    ahead.

 2           THE WITNESS:  Good.  Good.  So what we want around

 3    that proportion, we assume a proportion of 50 percent

 4    because in the sampling equation it gives us the, the

 5    highest sample rate, right?  So if we assume compliance of

 6    30 or 70 percent we get a lower N size, we assume

 7    50 percent.  So we just assume for the purposes of deciding

 8    on the sample 50 percent, and then we want a confidence

 9    interval around that.  So that we can say when we are

10    extracting findings to a population that this finding is

11    generalized, say plus or minus six percent which was the

12    parameter we used in this instance.

13           And then if you remember back to the bell curve,

14    right, there's one factor in, and so you have, and so in

15    this instance we sampled such that we could be 95 percent

16    confident that the findings for the sample would be

17    generalizable to the population within plus or minus

18    six percent.

19    Q   Could you discuss the reason why you ultimately decided

20    to sample proportionally by region?

21    A   The briefest answer is it's just a good idea in that my

22    experience you can have regional differences.  It's not that

23    we thought there were regional differences here in

24    Massachusetts, but you can have factors that differ by

25    region, like service availability, the presence of
```

1    visitation centers, and these factors can impact practice.

2    And so we wanted to make sure that our findings were

3    representative.  So we determined that we should sample

4    proportionally by region so that we didn't have any regional

5    bias in our results.

6    Q    And how technically did you accomplish that proportional

7    sample.

8    A    We accomplished that by sorting and randomly selecting

9    within regions.  So, when we received the data we organized

10   the case I.D.'s and person I.D.'s by region and random

11   selection was actually by region, or within region.

12   Q    Now, the next component of this process you've talked

13   about was the design of the survey instrument.  Could you

14   please turn to appendix A of Exhibit GW.

15   A    Yes.

16   Q    And is that the survey instrument that you ultimately

17   used in this case record review?

18   A    It is.  It is a paper version.  The actual data

19   collection was a web based, very secure data collection

20   survey.  But this is a paper version of that web based

21   survey.

22   Q    Was this generated from the database that had the web

23   based version.

24   A    Yes.  This, this was generated from that database.

25   Q    And are you the author of the survey instrument?

1   A   Yes.  Other people consulted, but I'm the primary

2   author.

3         **MR. BORTEN:**  Your Honor, I move into evidence

4   appendix A of Exhibit GW.

5         **THE COURT:**  Any objection?

6         **MR. BARSHAK:**  Yes, your Honor.  Unlike the table,

7   this would not be a summary of evidence.

8         **THE COURT:**  Well, I don't think it is.

9         **MR. BARSHAK:**  And this is just part of the report

10  and the parties have not agreed that the reports come in.

11        **THE COURT:**  All right.  What's the -- why should I

12  admit it?

13        **MR. BORTEN:**  It's not hearsay, your Honor.  It's an

14  instrument that was used to collect the information.

15        **THE COURT:**  But I guess I don't understand why I

16  should admit it.  Why should I admit it?  Why is it

17  relevant?

18        **MR. BORTEN:**  It's evidence of the reliability of

19  what was done in the case record review.

20        **THE COURT:**  Why, because it's --

21        **MR. BORTEN:**  The questions are objective, they have

22  discrete answers and so on and so forth, and they can be

23  connected to the tables that are in evidence.

24        **THE COURT:**  Doesn't that meet the test of

25  relevance?

1          **MR. BARSHAK:**  If this wasn't part of an expert

2     disclosure, this was an independent document, then perhaps

3     yes.  But because this is part of the expert report --

4          **THE COURT:**  You seem to think much turns on that.

5     Respectfully, I don't.  Appendix A is admitted.  It's

6     Exhibit 1067 in evidence.  It's a relevant document.

7          (Exhibit marked in evidence.)

8     **Q**   Dr. Johnson, how did you go about deciding what

9     questions to ask in the review instrument?  What was that

10    process?

11    A   We started, or I started with a review of the complaint

12    so we could understand what issues were the focus of the

13    complaint.  We also reviewed some of the cases that were

14    provided to us that were the basis of the complaint.  And

15    then I spent significantly more time going over the policies

16    and procedures and regulations so I could understand what

17    standards DCF was holding itself to.  And that formed much

18    of the basis of the survey document.

19    **Q**   Now, looking at the survey document there are many

20    questions where there's a yes response, a no response, and

21    then a third response, unable to determine.  Can you explain

22    the rationale behind including that third choice?

23    A   It's first important for the Court to understand that we

24    hire the case read supervisors.  We have tended always to

25    hire child welfare case readers with significant field

1    experience so they understand the issues and we don't have a

2    knowledge gap.  So, the readers, all of them had significant

3    practice experience.

4          And then part of training is getting them to

5    understand, well, now you have all this experience, but

6    you're only allowed to score what's in the case file.

7    You're not allowed to read in or apply your clinical

8    judgment.  It's about what you find in the case file.  And

9    in my experience case readers have different levels of

10   comfort with saying yes, no, or no versus unable to

11   determine.  Right?  So, yes, it's in the file or, you know,

12   yes, the service plan is there.  That's easy.  And the

13   instructions in the data collection protocol instructed

14   people to, if it's not in the case files and you have

15   evidence that it's not in the case files score no.  But in

16   some circumstances case readers are very uncomfortable, they

17   feel like they're passing judgment on another worker, and so

18   it's easier for them to have the option of unable to

19   determine.

20         So, for example, if they wanted to see legal

21   documents and they couldn't find them, or if they found

22   contradictory evidence in the file, which didn't happen very

23   often, it was more often that files were missing portions of

24   information and they really wanted that, so t was easier for

25   them to score unable to determine.  So we always include

 1    that option and then ask them to comment on the state of the

 2    file at the end.

 3    **Q**    The next step you talked about was what you call the

 4    data collection protocol.  What were the components of the

 5    data collection protocol?

 6    A    The purpose of data collection protocols are to ensure

 7    that the data we collect are valid and reliable.  So that's

 8    the purpose of it.  What it involves is identifying for case

 9    readers and for case read supervisor and case read

10    coordinator and myself, because I don't always trust my

11    memory, so for all of us to have a basis and it starts with

12    what are the protocols of practice, how do you, for example,

13    choose the next sample case.  And then there's details like,

14    for example, six of the case readers were retired from

15    Massachusetts DCF and so they were instructed and part of

16    the data collection protocols were that they should not

17    score and review a case from their region, or if they knew

18    of the family or the worker or anyone associated with the

19    case they should simply move on and read a different case

20    from another region that they had no prior exposure to.

21        Also, the date collection protocols explain what

22    the terms mean and provide additional clarification on some

23    of the data collection items and establish parameters like

24    read from this date to this date.  So, it's very much about

25    defining the items for collection and making sure that

1    people answer accurately and consistently.

2         And then the other big piece would be the

3    reliability checks.  Children's Rights had asked us to

4    ensure the reliability of the data.  And we always do it in

5    the beginning, but we also looked at reliability randomly

6    throughout the course of the reading, and so the protocols

7    included a strategy for that.

8    Q   Was there also an issue with replacement cases?

9    A   Oh, yes.  Yes.  So, sometimes in our experience,

10   sometimes we can't access case, either because they couldn't

11   put their hands on it or it's a sensitive case and we are

12   not allowed to review it.  And so we sampled extra

13   replacement cases and current up the data collection

14   protocol was instructions for the case read coordinator

15   and/or supervisor of how to select that replacement case,

16   how to document it, things of that nature.

17   Q   Now, going back to the reliability, is his known as

18   inter-rater reliability?

19   A   Yes.

20   Q   And what were the steps taken during the case read to

21   prepare to assure and then assess inter-rater reliability.

22   A   In the beginning inter-rater reliability checks are

23   built into training.  Again, because they have, because the

24   case readers have so much child welfare experience, it's

25   important to teach them which pieces of their practice to

 1    hold onto during the reading and which not to.  So, as part

 2    of training, after training and going over the instrument

 3    and the requirements of the work, everyone read a case and

 4    then traded with someone else and read another case, and

 5    teams reviewed their findings with each other and then we

 6    discussed as a large group.  And what that allowed me to do

 7    was see which pieces of the data collection survey they were

 8    struggling with and provide clarification and then build

 9    that clarification into the data collection protocol.

10           So, that occurred during the first week to a week

11    and-a-half.  And then some readers started late and we

12    repeated the process, the training and reliability checks

13    with them.  So there was extensive review inter-rater

14    reliability during the first few weeks.  And then also in

15    week two and week three, I pulled the data and did some

16    additional checks and then got back to the readers.  So

17    there's a quality control piece that it serves in the

18    beginning.

19           On an ongoing basis, after the third week of data

20    collection, I set up protocols for the coordinator or the

21    supervisor to randomly select two to three cases per week

22    for a inter-rater reliability check.  And the case readers

23    did not get feedback on this.  This was to allow us to

24    report at the end of the study on reliability finding.  So

25    every week two to three cases were randomly selected and

1    then read by the first case reader and then read by when the

2    first case reader finished that case the next reader, with

3    time, read it again.  So those cases were read twice by two

4    different readers.

5    **Q**    Now, you mentioned the training of the case readers.

6    How did that take place?

7    A    The training was on-site in Brockton, Massachusetts at

8    an office, at a DCF office.  All of the case readings

9    occurred in DCF space.  And so that training was week long.

10   I want to say the majority, eleven case readers were there.

11   Three were trained later.  But the training started with a

12   review of the goals of the study.  I mean, it very much goes

13   through the data collection protocols that are in appendix

14   B.  And it started with here are the goals in the areas in

15   which we're reading, here are the parameters of the dates.

16   And then went through the survey instruments explaining to

17   them that what we're looking for -- part of training is that

18   I instill my face in them and say so, when you're answering

19   these questions I need you to be able to point to a place in

20   the file.  We're looking at evidence.  So, for example, if

21   you suspect that, you know, a service plan was completed but

22   you can't put your fingers on it then it's not sufficient

23   evidence.  We need evidence that something occurred.  In a

24   lot of cases --

25            **THE COURT:**  What do you mean you instill your face

1    on them?

2         **THE WITNESS:**  It has to do with accountability.

3    When they're reviewing dictation, I think sometimes people

4    with significant experience in child welfare can, it's hard

5    for them not to, it's hard for them to resist the urge to

6    interpret.  And so I want them to, it's easier, I think, for

7    them to think about me and to tell them when you're

8    documenting and writing notes about what you find you're

9    writing them to me.  I'll be reading them.  You know, it's

10   not someone, it's not an abstraction.  And so, part of the

11   training is about what does it mean to find evidence.  And

12   when we look in dication or the narrative, what does it mean

13   to say evidence.

14        So, for example, if there's a note in dictation

15   that says I as a social worker gave the foster parent all of

16   the documentation she needed, that is sufficient evidence

17   that she supplied them with education materials and the

18   medical passports.  So,a lot of the training is about what

19   is considered sufficient evidence.  And in dictation, you

20   know, it's more difficult, I think.

21        So, part of saying, part of being there is so that

22   I think it increases their accountability to know that when

23   they write notes, I will be reading them and then they

24   elaborate in open ended questions.  I will be reading them,

25   and then I'm also able to say can you please write those

1    notes in a way that I will understand.

2          And then another piece of training, right, is just

3    about how to be careful, that we are not making a mistake or

4    leaving something unanswered.  So, I ask them, you know,

5    once you're done reviewing the case, because some of these

6    are very long, right, if there's a family reunification or,

7    reunification or stabilization case then there might be an

8    adoption filter, so please when you're done reading take a

9    break, step away, and then come back and go through the

10   survey and make sure you have the information that needs to

11   be in there documented, and make sure that I can understand

12   your open ended explanation.

13   **Q**   How long did the training go on for?

14   A   A week formally, and then we also in the first few weeks

15   of the study we talked at least every other day by phone.

16   And then certainly on those Fridays that I mentioned in week

17   two and week three we had a conference call.  But they

18   regularly asked questions.  So the formal training was one

19   week, and then there was an additional two weeks of heavy

20   support, but I was always available for questions and

21   answers throughout the process.

22   **Q**   Were there any written training materials provided?

23   A   Yes, that would be the data collection protocols in the

24   GW, the big report.

25   **Q**   Could you turn to appendix B.

1    A    Yes.   Appendix B.   I'm there.

2    Q    Are those the training materials and the protocols

3    you've been talking about?

4    A    Yes.   This is an articulation of the data collection

5    protocols.   The overview is the introduction of the case to

6    them, case read protocols.   There's also supervisor case

7    read supervisor protocols that explain the selection of

8    replacement cases and also articulate their responsibility

9    because supervisors were asked to ensure the completeness of

10   surveys.   And so there's also an articulation of their

11   responsibilities.

12   Q    And you drafted all of the protocols and training

13   materials in appendix B?

14   A    I did.

15          MR. BORTEN:   Your Honor, I move appendix B into

16   evidence on the same grounds as appendix A, it's evidence of

17   the reliability of the process.

18          THE COURT:   You're moving it.   No objection?

19          MR. BARSHAK:   No objection.

20          THE COURT:   It may be received, Exhibit 1068 in

21   evidence.

22          (Exhibit marked in evidence.)

23   Q    Dr. Johnson, did you actually do any of the case

24   reading?

25   A    I did.   I read at least -- I read two or three cases the

1    first week of training, yes.

2    **Q**   How was the schedule of the case reading set?

3    A    It is my understanding that the schedule of the case

4    reading was set by the Attorney General's Office.  We were

5    told where to read and what to read when week by week.

6         **MR. BARSHAK:**  Objection; that's calling for

7    speculation, and it's not in the report.

8         **THE COURT:**  Well --

9    A    I can say for sure we didn't set the schedule.

10         **THE COURT:**  Yes, I think it's hearsay, so I'm going

11    to sustain it on that ground.

12    **Q**   Dr. Johnson, did you set the schedule for the case

13    reading?

14    A    No.

15    **Q**   Did anyone at CRC set the schedule for case reading?

16    A    No.

17    **Q**   Where were the files physically made available to CRC?

18    A    The files were made available, there were some paper

19    files and then some information was on a data CD and those

20    were in various DCF offices.

21    **Q**   Now, when you say some were in paper form and some were

22    on CD, you mean some children's files were in paper form and

23    some children's filed were on CD's?

24    A    Some information.  So, on B4, if you're looking at that

25    data collection protocol, there was some information in the

1   paper case files and then other pieces of information not in

2   the case file were provided on the CD.  So, for example,

3   dictation/narrative was not in the paper case file but it

4   was on the CD.  Private provider treatment plans were not

5   systematically in the paper case file but were provided on

6   the CD.

7   Q   So, Dr. Johnson, were the categories of information

8   contained in the paper files the same as the categories of

9   information found on the CDs?

10  A   No, they differed quite a bit.  There may have been some

11  overlap in some cases, but it was the exception, not the

12  rule.  So, you know, for example, there may be, there was a

13  worker, there were a few cases with some legal documents in

14  the paper case file but by and large case files did not have

15  legal documents in them.

16  Q   How were the readers monitored and supervised?

17  A   The readers were supervised by the case read supervisor,

18  so there was always someone on-site.  How we -- so, I

19  managed the data collection process, and then we hired a

20  case read coordinator who oversaw the scheduling,

21  financials, travel expense forms, and supervised daily

22  operations on-site.  When she was not available to be

23  on-site with the readers we also hired case read

24  supervisors, one of which was Don Mauer, who's a retired

25  child welfare supervisor and manager from Waukesha County,

1    Wisconsin, that I had worked with previously.  And Erin

2    Wicke Dankert is a CRC employee and she was another case

3    read supervisor.

4    **Q**    And who was the supervisor, not supervisor, the

5    coordinator you mentioned?

6    A    That was Anita Peters.

7    **Q**    Now, after the reading of the cases was completed what

8    happened next?

9    A    Well, once the reading was completed the readers entered

10   data into the web based survey that I mentioned and I

11   extracted that data from the web based survey and pulled it

12   into SPSS, which is a statistical software package, and that

13   is the package that we used to transform the findings and

14   analyze them.  Sometimes we needed to conduct

15   transformations, for example, contact data.  We collected

16   the dates of the visitations, the dates of contact between a

17   worker and the child.  And that information needed to be

18   transformed into monthly contact information.  So data

19   transformation and analysis occurred in SPSS which generated

20   the tables that led to the report.

21   **Q**    So the tables in the report came from SPSS?

22   A    Yes.

23   **Q**    You mentioned part of this process called data cleaning?

24   A    Yes.

25   **Q**    Is that right?  What is that?

1    A    Data cleaning involves -- well, the first step in data

2    cleaning is to take a look at the open ended question I

3    mentioned earlier about, you know, any issues related to

4    what you found in the files, any inconsistencies.  So,

5    reviewing open-ended, checking information that didn't make

6    sense, like often times people might transpose dates.  So, a

7    lot of data cleaning.  The most common issue for data

8    cleaning was looking up dates, comparing it to system data

9    that, for example, placement system date that we received

10   after starting data collection and then correcting those

11   dates.  And all of those data cleaning that we do we

12   document.  So, we are documenting how we proceed from raw

13   data through analyses, and that's part of creating a syntax

14   file or a program file.

15        **MR. BARSHAK:**  Motion to strike; there's no

16   discussion of data cleaning or cleansing in the report.

17        **THE COURT:**  I'll strike out so much as refers to

18   data cleansing.  Go ahead.

19   Q    Dr. Johnson, you talked about the inter-rate reliability

20   collection of data.  How did you do the actual analysis of

21   inter-rater reliability once you had that data?

22   A    In the beginning, in the first few, in the first three

23   weeks what I did was pull, draw the data out of the web

24   survey, pull it into SPSS and then compare cases.  So,

25   calculate inter-rater reliability results but also put the

1    cases next to each other and compare, and then contact the

2    readers and identify for them which elements of the data

3    collection we needed to concentrate more on and think about.

4             At the end of the report we did the same approach.

5    I pulled the data out of the web survey and made two files,

6    one for reporting, which included one record per case, and

7    then created a separate file for reliability analyses that

8    would have two records per case by different readers.  And

9    then we analyzed that data.

10   **Q**   For how many cases did you end up having inter-rater

11   reliability data?

12   A    Fifty-five.

13   **Q**   And then how did you once you had that measure

14   inter-rater reliability?

15   A    We always start with the simple approach to inter-rater

16   reliability which is percentage agreement.  So we start

17   always with percentage agreement.  And so that's what we do

18   in this case is looking for a given item of those 55 cases,

19   what proportion was agreement reached across the two raters.

20   **Q**   And was that done one by one for each variable?

21   A    It is, yes.

22   **Q**   And for what variables did you perform that percent

23   agreement calculation at the time of the submission of the

24   August 22nd report?

25   A    At the end of data collection, I conducted inter-rater

1    reliability analyses looking at percentage agreement for

2    eight variables.  And I picked variables that I was watching

3    from early weeks of the study, and then I picked a number of

4    other key variables, but I did concentrate on variables for

5    which, the variables that were answered for all of the cases

6    rather than a set group.  Right?  So I tended to pick like

7    whether or not there was a service plan or a comprehensive

8    assessment.  I also tend to look at inter-rater reliability

9    for that versus questions that only applied for a small

10   proportion of cases.

11   **Q**   And in looking at the percent agreement was there a

12   standard you applied to evaluate whether or not there was

13   sufficient inter-rate agreement, or reliability?

14   A   The standard I applied was 75 percent agreement which is

15   the equivalent of three out of four people agreed.  That was

16   a baseline threshold.

17   **Q**   Now, did you after the August 22nd report do further

18   inter-rater reliability analysis on other variables

19   contained in that 55 --

20        **MR. BARSHAK:**  Objection.

21   **Q**   -- files?

22        **MR. BARSHAK:**  This is an example of trying to go

23   beyond what is in the document submitted in August of 2012.

24        **THE COURT:**  Going on into GU or GT?

25        **MR. BARSHAK:**  Correct.  Going on into one of those

1    two, I forget which one --

2           **THE COURT:**  All right.

3           **MR. BARSHAK:**  -- but going beyond the date of the

4    Court order submission date of August --

5           **THE COURT:**  Well, I explained why I was going to

6    allow that.  And I am --

7           **MR. BARSHAK:**  So, objection.

8           **THE COURT:**  -- in the exercise of my discretion.

9    You may still object if it's not in either GW, GU or GT, but

10   if it's there I'm going to hear it.

11   A    I did conduct additional reliability analyses after

12   receiving a critique teak of our reports and research.

13   **Q**    And --

14          **THE COURT:**  Well --

15          **MR. BORTEN:**  Sorry.

16          **THE COURT:**  -- a critique.  Once you heard what

17   they were going to say you went back and you tried to

18   bolster things up more.

19          **THE WITNESS:**  No.

20          **THE COURT:**  I didn't mean that normatively, but it

21   came out that way, forgive me.  But in the real world, so

22   there's orders in the case.

23          **THE WITNESS:**  Uh-huh.

24          **THE COURT:**  Your documents come in through

25   attorneys, they're presented by the attorneys for the

1      plaintiffs.  Defense documents comes in.  You look them

2      over, don't you?

3               THE WITNESS:  I looked them over but I didn't

4      analyze because I didn't agree with the approach and the

5      method.  So I didn't get --

6               THE COURT:  Of, of them.

7               THE WITNESS:  Of their expert, yes.

8               THE COURT:  All right, fine.  Fine.  And then you

9      then did further work.

10              THE WITNESS:  Yep.

11              THE COURT:  And the further work is expressed here

12     in GT?

13              THE WITNESS:  Yes.

14              THE COURT:  All right.  Go ahead.

15     Q   And in this later analysis, how many variables of those

16     available in the, among the 55 cases did you look at?

17              THE COURT:  I guess --

18     A   In addition to --

19              THE COURT:  I guess I don't understand that

20     question.  Her base line was 75 percent.  And -- well,

21     you're on to something else, I guess.

22              MR. BORTEN:  Yes, withdraw the question.

23              THE COURT:  Okay.  And, and my understanding was

24     back there.  So, explain -- ask questions, and I guess I

25     don't understand.

1           **MR. BORTEN:**  Sure.

2  **Q**   We discussed how in the first inter-rater reliability

3  analysis you looked at certain variables, like whether a

4  case plan was present that you knew applied to every, all of

5  the 55 cases there was data available.

6  A   Yes.

7  **Q**   For both reads.

8  A   Uh-huh.

9  **Q**   And there were other variables you didn't look at

10 presumably because they weren't available in every case.

11 A   Exactly.

12          **MR. BARSHAK:**  Objection; leading.

13          **THE COURT:**  He is leading, and I will strike her

14 answer.  But I think I have a general idea of what she did.

15 Ask questions.

16 **Q**   So, in the later analysis did you now do the inter-rate

17 reliability analysis for all of the variables available?

18 A   Yes.

19 **Q**   And in your report did you find -- I'm sorry, withdrawn.

20          For how many variables did you find that the

21 inter-rater reliability fell short of your chosen 75 percent

22 standard?

23          **MR. BARSHAK:**  Your Honor, I believe the prior

24 answer was beyond what is in GT, although the witness's

25 voice went down and so I -- if I could hear that, if I could

1    have that prior answer read back.

2           THE COURT:  I don't think that's necessary.

3           MR. BARSHAK:  Okay.

4           THE COURT:  He's asking -- this is the question.

5    What variables did you look at in your further analysis of

6    inter-rater reliability?  That's my question.  All right.

7    What variables?  How many of them?

8           THE WITNESS:  All of them, after the fact.  After,

9    after the discoverable date, we later examined, I did,

10   inter-rater reliability on all variables and found, I'm

11   basing this on my recall, but roughly 35 variables, 35 to 40

12   variables did not meet that 75 percent threshold.

13          MR. BARSHAK:  Move to strike; that's not in the GT

14   document.

15          MR. BORTEN:  I agree.

16          THE COURT:  In the exercise of my discretion I'm

17   going to let that stand.  Candidly, I'm surprising to,

18   surprised that you're moving to strike it.  But maybe I

19   don't understand.

20          Go ahead.

21   Q   Dr. Johnson, would page 4 in GT refresh your

22   recollection as to the actual number of variables that fell

23   short of the 75 percent in addition healed, in the middle?

24   Bottom of the --

25   A   Yes.  Yes.

1    **Q**    -- third full paragraph.

2    A    So, if I could read this.  It says, I wrote:  Examining

3    and percent agreement showed that 35 variables had percent

4    agreement below 80 percent and 26 variables had percent

5    agreement below the 75 percent threshold.

6    **Q**    So 26 had -- I won't lead.

7         How many had a value below your chosen threshold.

8    A    Twenty-six.

9         **THE COURT:**  Out of 55?

10        **THE WITNESS:**  Well, no, the 55 cases.

11        **THE COURT:**  I'm sorry.  Out of how many variables?

12        **THE WITNESS:**  266 raw variables and then there were

13   an additional, when we transformed variables to look, for

14   example, at monthly performance or annual performance, so we

15   have a set of raw data that are about 266 and then that's

16   doubled or tripled by the time we've done the

17   transformation.  So, roughly 700 variables.  But I think, if

18   you're looking for a conservative estimate it would be 26

19   out of the 266.

20        **THE COURT:**  And that fell below reader to reader at

21   75 percent agreement.

22        **THE WITNESS:**  Yes.  Some of the examples include

23   things like whether or not the child is, you know, whether

24   or not there was evidence that the child was asked about

25   relative providers or possible relative providers.  You

1    know, where we found that information, it was in dictation

2    or narrative.  And so, my feeling is that that's part of why

3    it was below the reliability, it was hard to find.

4              **MR. BARSHAK:**  Objection; she's speculating.

5              **THE COURT:**  No, I'll let it stand.

6    **Q**   Dr. Johnson, did you provide the reliability files along

7    with your report in August, your original report?

8    A   Yes.  All the files.

9    **Q**   Okay.  And if you turn to page 5 of GT, table 3.  Does

10   that list all the variables for which the inter-rater

11   reliability was below either the 80 percent standard set by

12   defendants' expert or the 75 percent standard that you

13   prefer, that you used?

14   A   Yes.

15   **Q**   And was this data based on that enter inter-rater

16   reliability file that was provided with your report to

17   defendants in August?

18   A   Yes.

19             **MR. BORTEN:**  Your Honor, I move table 3 into

20   evidence under 1006.

21             **THE COURT:**  Do you object?

22             **MR. BARSHAK:**  No objection.

23             **THE COURT:**  Table 3 is admitted in evidence.  It's

24   table 3 -- well, I've got to have documents control myself

25   here.  Table 3 on page what?

1           **MR. BORTEN:**  Page 5 of GT.

2           **THE COURT:**  Of GT.  Table 3 on page 5 of GT is

3      admitted in evidence as Exhibit 1069.

4           (Exhibit marked in evidence.)

5      Q   Dr. Johnson, could you please turn to table 2 on page 12

6      of GW.

7      A   I have it.  It's on page 12.  Yes.

8      Q   Okay.  Now, there's a couple columns in the middle that

9      say sample.  Is that data the same as table 4 on page 15?

10     At least for the top half of the table.

11     A   Yes, it is.

12     Q   Now, what are you showing in the right side of table 2

13     where it says population?

14     A   What this table shows is a comparison of first placement

15     and number of placements settings for the sample cohort of

16     unique families compared to the population cohort data of

17     all children in that cohort from which we sampled, which is

18     not unique families.

19     Q   Now, where did you get the data in the last two columns

20     from?

21     A   The population data came from extracts provided for us

22     from DCF.  So this was data extracted from Family Net, from

23     their, from their management information system.

24     Q   Was this data contained in the files that you, that case

25     readers reviewed for the sample?

1    A    It was not.  It was provided to us in an extract after

2    the fact.  So the sample cohort, when we collected placement

3    data, we read from paper case files and what was on the CD,

4    and then the population data came from the data extract.

5    Q    Okay.  Could you please turn to table 34 on page 74.

6    No, withdrawn.

7            Table 35 -- I'm sorry, your Honor.  Table 60 on

8    page 130.

9            What does table 60 show?

10   A    Table 60 makes the same comparison but for the two year

11   cohort.  So, we are comparing placement data collected from

12   the paper case file review and what was on the CD to --

13           **THE COURT:**  I've lost you.  What page, excuse me.

14           **MR. BORTEN:**  Page 130.

15           **THE WITNESS:**  130.

16           **THE COURT:**  130.  Thank you.

17   Q    Well actually, Dr. Johnson, if I could refresh your

18   recollection, if you would turn to the bottom of page 129

19   and read the beginning of Section J.

20   A    The following information -- oh, thank you.  The

21   following information is based on Family Net data files

22   provided by DCF.  Some events occurred outside of the

23   observation period for, first placement and placement

24   settings.  None of the information was based on case file

25   reviews.

1          Thank you.

2  **Q**   So, turning back to table 60, could you explain what

3  this is?

4  A   We wanted to compare, because we started reading in

5  July 2009, we wanted to examine the first placement and

6  number of placement changes for the sample cohort of unique

7  families compared to the population cohort.  And so, this

8  table does rely on the placement data received from DCF for

9  both the sample and the population.

10 **Q**   Thank you.

11         Dr. Johnson, could you please turn to table 6 on

12 page 18.

13 A   I have it.

14 **Q**   What does this table show?

15         **MR. BARSHAK:**  Your Honor, just objection that since

16 the tables are already in evidence and this is the second

17 witness who's now --

18         **THE COURT:**  Yes, there's something to this.  I can

19 read this.

20         **MR. BORTEN:**  Your Honor, I just, as with Dr.

21 Freitag, there's some tables that will benefit from

22 explanation that's otherwise in the text of the report and

23 the connection to the regulations which is in the text of

24 the report.

25         **THE COURT:**  Well, I'm going to -- no one said you

1    couldn't do that. Your question was what does this table

2    show. It's not all that complex. So, won't you ask another

3    question.

4         **MR. BORTEN:** Sure.

5    **Q**    Dr. Johnson, in table 6 entitled Education Advocate

6    Assigned, was there a DCF regulation that you considered in

7    performing this analysis?

8    **A**    Yes. The regulation is that every child should have an

9    education advocate assigned. And this was articulated in

10   policy. So one of the standards that we looked for was was

11   there narrative or some, in some place was there

12   documentation of an education advocate assigned and who was

13   it. And so this table shows for what proportion of cases we

14   were able to find documentation regarding education advocate

15   and who was assigned to be that advocate.

16   **Q**    Thank you.

17        Would you please turn to table 8 on page 21.

18   **A**    I have it.

19   **Q**    This is the children placed with siblings. Do you see

20   that?

21   **A**    I do.

22   **Q**    Did you do further analysis of children placed with

23   siblings following the submission of the August 22nd report?

24   **A**    We did. We found, after the fact we found that we

25   generated this table and compared how often children were

1    placed with siblings and we did not exclude those with a

2    documented reason as to why not.  So we redid the analyses

3    looking at DCF placing children with siblings with those

4    cases with a documented reason why this should not happen

5    excluded.

6    **Q**   And did you disclose that analysis in Exhibit GU?

7    A   We did.  That was part of the supplemental data

8    analyses.

9    **Q**   And was that reflected in table 1 of GU?

10   A   Yes.

11   **Q**   And was this based on the same data that, database that

12   you used for the production of all the tables in GW?

13   A   Yes, it was the same database.

14   **Q**   And that database was provided along with GW in the

15   course of this litigation?

16   A   Yes.  We turned over all data files and program files.

17          **MR. BORTEN:**  Your Honor, I move table 1 into

18   evidence.

19          **THE COURT:**  Table 1 --

20          **MR. BORTEN:**  Of GU.

21          **THE COURT:**  -- of GU --

22          **MR. BORTEN:**  On page 1.

23          **THE COURT:**  -- into evidence.  All right, any

24   objection to that?

25          **MR. BARSHAK:**  No objection, your Honor.

1              **THE COURT:**  Table 1 of GU will be admitted

2    Exhibit 1070 in evidence.

3              (Exhibit marked in evidence.)

4    **Q**    Could you please turn, Dr. Johnson to table 16 on

5    page 38.

6    A    I have it.

7    **Q**    This is the table showing family visitation; is that

8    right?

9    A    Yes.  The frequency of visitation between the sample

10   child and any family, a kin, a parent, either parent or

11   sibling.

12   **Q**    Now,with respect to the sibling visits, did you do a

13   further analysis of sibling visits after the August 22nd

14   report was submitted?

15   A    We did.  After submitting this report, we wanted to do

16   an additional examination because we found that we had, when

17   siblings were placed together and when we looked at

18   visitation data and siblings were placed together, we noted

19   visitation as occurring.  So we looked at it additionally

20   and excluded those cases in which siblings were placed

21   together to see, okay, well, when we limit this look to

22   siblings not placed together then what does the data show.

23   **Q**    And is that analysis reflected on page 2 of GU in table

24   16 for the entry cohort -- I'm sorry, alternative view table

25   16 for the entry cohort and alternate view table 43b for the

1    two year cohort?

2    A    Yes.  So the alternate view of table 16 in GU represents

3    that collection, so the denominator is limited to siblings

4    not placed in the same location.

5    Q    And did you use the same database in creating these two

6    tables that you did in creating the original table?

7    A    Yes.

8    Q    And that database was provided in the course, along with

9    GW on August 22nd?

10   A    Yes.

11             MR. BORTEN:  Your Honor, I move the two tables on

12   page 2 of GU into evidence, alternate view table 16 and

13   alternate view table 43b.

14             THE COURT:  Any objection?

15             MR. BARSHAK:  No objection.

16             THE COURT:  They may be received, Exhibit 1071 in

17   evidence.

18             (Exhibit marked in evidence.)

19   Q    Could you turn to table 28a, service plan information on

20   page 57.

21   A    28a.  I have it.

22             THE COURT:  What page again?

23             THE WITNESS:  Fifty-seven.

24             THE COURT:  Thank you.

25   Q    Now, this table reflects the number of service plans

1    found for children.  And if you could please also turn to

2    page 7 in the report, the text.

3            MR. BARSHAK:  Counsel, can you repeat, please?

4            THE COURT:  Turn to page 7 in the report.

5            MR. BARSHAK:  Thank you.

6            THE COURT:  The text.

7    Q    I'm sorry, page 9.

8    A    Page 9.

9    Q    There's a set of bullet points.  And the first bullet

10   point, second sentence, it says:  Of the cases with one or

11   more service plans, some were missing an assessment and/or

12   description of child and/or family needs.

13           Do you see that.

14   A    Yes, I do.

15   Q    Does that refer to the service plans that were found in

16   table 28a?

17   A    Yes.  It's meant to convey the fact that in those cases

18   sometimes when we found a service plan other pieces of

19   information were missing.  So, it's an acknowledgment that

20   we may have found a service plan, but it doesn't mean that

21   the service plan contained all pieces that we would have

22   expected to see based on DCF policy.

23   Q    Okay.  And was there a way for you to find needs in the

24   cases where no service plans were found?

25   A    Child needs should also be part of the comprehensive

1    assessment, and sometimes we found that and sometimes we

2    didn't.

3    **Q**    When you didn't find it why was that?  Because they

4    weren't, an assessment wasn't there or because the

5    assessment didn't have the needs?

6    A    No, we very much --

7              **MR. BARSHAK:**  Objection; leading.

8              **THE COURT:**  Well, no, actually that's -- one of the

9    questions is not leading:  Why was that?  If she knows.  So

10   that objection is overruled.

11             Why was that?

12   A    Why was it that we did not find a comprehensive

13   assessment?  I'm not sure.  I should not speculate.  It was

14   not in the information provided to us.

15             **THE COURT:**  Go ahead, Mr. Borten.

16   **Q**    Now, turning to table 30 on page 62, child service type

17   and referral information.  Do you see the first column where

18   it says service need identified?

19             **MR. BARSHAK:**  Your Honor, this is cumulative.

20   There's a lot of this with Dr. Freitag yesterday on --

21             **THE COURT:**  I'm feeling that it is, Mr. Borten.

22             **MR. BORTEN:**  I don't think --

23             **THE COURT:**  Well, now, wait a minute, hear me.

24             **MR. BORTEN:**  I'm sorry.

25             **THE COURT:**  I am fine learning from her how the

1    tests were prepared and their reliability or lack thereof,

2    but now it seems the same type of examination that we had

3    with the previous witness.  What, what is she adding here?

4        MR. BORTEN:  Well, I did not ask Dr. Freitag about

5    this table and I would not have asked her the particular

6    question I'm about to ask because Dr. Freitag --

7        THE COURT:  Which is?  What is the particular

8    question?

9        MR. BORTEN:  Where the information about service

10   need identified would have been located in the file.

11       MR. BARSHAK:  Dr. Freitag addressed that on the

12   redirect.

13       THE COURT:  Well, I think that's a little

14   different.  I'll let her answer where, that one question.

15       Where did you get that data?

16       THE WITNESS:  Most often from the service plan.

17   Child needs may have been on a comprehensive assessment, but

18   most often from the service plan.

19   Q   Your answer would be the same for the list of service

20   needs in table 31?

21   A   Yes, that would be from the service plan.

22   Q   And the corresponding table for the two year cohort

23   also?

24   A   Yes.

25       MR. BORTEN:  Bear with me, your Honor.  I just want

1    to see if there are any methodological questions.

2         **THE COURT:**  Of course.  And that is the line I'm

3    following and that makes perfect sense.  You go right ahead.

4    **Q**   Dr. Johnson, could you please turn to table C37 on page

5    C19.

6    A    Table C37 on C19.  Yes.

7    **Q**   Yes.  Is the methodology or the -- in answering the

8    question was the medical passport provided, were the readers

9    required to find evidence of what was in the medical

10   passport as well before answering that question?

11        **MR. BARSHAK:**  That's not in the report, it's just a

12   table.

13        **THE COURT:**  If it's not in the report, I'm going to

14   sustain the objection.

15   **Q**   Dr. Johnson, was there any instruction in the

16   instructions, the written instructions concerning the

17   medical passport question here?

18   A    Yes.  The written instruction for identifying evidence

19   of a medical passport being provided and other fields was

20   not to assess the quality of the information but just to

21   look for evidence of whether or not it was provided and

22   when.  So, in general the instructions were to be as

23   objective as possible, is there evidence, yes or no, not to

24   evaluate the quality of the information or the accuracy of

25   the information, just whether it was present, yes or no.

1    **Q**    Turning to table C43 on page C22.  Any evidence that

2    medical and/or dental records were not kept up-to-date.

3    Were the readers instructed on what, how to answer this

4    question if there simply wasn't medical information in the

5    file?

6    A    So, table C43, evidence of medical and/or dental

7    records.  Well, in general the instructions are very

8    similar, right?  So we were looking for an indication of

9    medical or dental records, and we had, as part of the

10   protocol we had schedules by age.  And what we found, in

11   general what we found when we read were paper slips.  And so

12   if we could find appointments, we found the detail about the

13   appointments and what the purpose of the appointment was.

14   If we didn't find anything then their instruction was to

15   answer no, we didn't find that information.  And, you know,

16   the instructions were pretty thorough.  We again --

17        **THE COURT:**  No, I've got them all, don't I?  I

18   mean, I --

19        **THE WITNESS:**  Yes, you do.  And I think, you know,

20   we asked people to go through and make sure that we did a

21   full review of the file.  We wanted to make sure that we

22   weren't.  And we were giving workers in DCF the benefit of

23   the doubt.  So, we tried to review real thoroughly, and

24   medical information may not have been in the medical section

25   of the paper file, we would have also looked for it in other

1    sections of the file.

2    Q    And so if medical information wasn't there they answered

3    no to this question.

4    A    Yes, that is true.

5          MR. BORTEN:  Okay.  I have no further questions,

6    your Honor.

7          THE COURT:  Mr. Barshak, any questions for this

8    witness?

9          MR. BARSHAK:  Yes, your Honor.

10         THE COURT:  You may.

11                        CROSS-EXAMINATION

12   BY MR. BARSHAK

13   Q    Good afternoon, Dr. Johnson.

14   A    Good afternoon.  I should say again.  Good afternoon.

15   Sorry.

16   Q    Good afternoon.

17         You'd agree that the goal of the CRC study was not

18   to compare the performance of DCF with any national medians?

19   A    It was not our primary goal, that is true.

20   Q    Dr. Johnson, do you remember being deposed in this case,

21   a deposition that I conducted?

22   A    I do.

23         MR. BARSHAK:  May I approach, your Honor?

24         THE COURT:  You may.

25   Q    Dr. Johnson, do you have in front of you now a copy of

1    the deposition of you that was taken on November 30th of

2    2012?

3    A    Yes.

4    **Q**    Could you please turn to page 192.

5    A    Have I page 192.

6    **Q**    Okay.  Directing your attention to line 13, tell me if

7    I've read these correctly.

8              Question:  Okay.  The goal of the report was not to

9    compare the performance by the Massachusetts DCF with, say,

10   national median.

11             Answer:  Correct.

12             Did I read that correctly?

13   A    Yes, you did.

14   **Q**    And do you agree, Dr. Johnson, the goal of the study was

15   not to compare DCF performance with the performance of any

16   other state's child, any child welfare agencies from other

17   states?

18   A    That is true.  The primary goal was to care DCF

19   performance to its policies and regulations.

20   **Q**    If you could take a look again at page 192, line 17

21   please tell me if I'm reading this correctly.

22             Question:  The goal of the study was not to compare

23   Massachusetts performance, say, with the performance by

24   other states?

25             Answer:  Correct.

1              Did I read that correctly?

2    A    Yes.

3    Q    And it was not an objective of the study to determine if

4    the experiences of children in the sample for the entry

5    cohort were different than the experiences of children in

6    the sample for the two year cohort, correct?

7    A    That is correct.

8    Q    CRC did not conduct any interviews of current or former

9    DCF personnel for purposes of this study, correct?

10   A    That is correct.

11   Q    The study was not focused on the quality of case work,

12   correct?

13   A    That is harder to answer with one word.  I think it

14   depends on how we're assessing quality.

15   Q    Can you please take a look at page 144 of your

16   deposition.

17   A    I have it.

18   Q    I'm going to start reading on line 3 and then ask if you

19   I've read it correctly.

20            Question:  The study was focused on whether certain

21   things were present, not the quality of the things that were

22   present; is that correct?

23            Answer:  Yes.  I counseled Children's Rights that

24   we should focus on objective measures, as objective as

25   possible and to have case readers evaluate, as objective as

1    possible and to have case readers evaluate the quality of

2    visitation, the quality of case plans, for example, based on

3    available documentation was not advisable.

4         We could not -- you know, it would just be too

5    difficult; that we were in a better position to ensure the

6    validity of the data if we were just to report on what

7    evidence was available in existing data versus not.

8         Did I read that correctly?

9    A    You did.

10   Q    You would agree that it was not a goal of the project to

11   determine whether case practice was or was not causing

12   negative outcomes for children in the custody of DCF?

13   A    Could you repeat that, please?

14   Q    Sure.

15        Do you agree that the study was not seeking to

16   determine whether that DCF case practice was causing

17   negative outcomes for children in its custody?

18   A    I agree that the study could thought draw that

19   conclusion by itself, yes.

20   Q    So the goal of the study was not to determine whether

21   DCF case practice was or was not causing negative outcomes

22   for children in DCF custody, correct?

23   A    I do not think the study by itself can result in such a

24   conclusion.

25   Q    And you'd agree that without following workers during

1    their work it is not possible to state definitively that any

2    particular case practice standard was met?

3    A    I do not agree with that statement, no.

4    Q    Please turn to page 145 of your deposition.

5    A    I have it.

6    Q    Actually instead, if you could please turn to page 131

7    of the August CRC report.

8    A    That's the GW?

9    Q    Yes, the GW; this would be one dated August 2012?

10   A    Page 131?

11   Q    And one page 131, please, yes.

12   A    I have it.

13   Q    You're an author of this report, correct.

14   A    Yes.

15   Q    And you signed this report?

16   A    Yes.

17   Q    And you agree that in the second full paragraph

18   beginning on the fourth line it states:  Without following

19   workers all at all times over the course of their work with

20   the family, it is impossible to state definitively that any

21   particular standard was not met.

22           Did I state that correctly?

23   A    Yes, you read it correctly.

24   Q    And that's in the report that you signed?

25   A    Yes.

1    Q    Do you agree that in order to determine if a finding is

2    statistically significantly different from something else

3    that one would need to conduct a statistical test?

4    A    Yes, in order to know whether something statistically

5    differs, I would need to conduct a statistical test.  Yes.

6    Q    And you'd agree that there were no such statistical

7    tests performed in the August 2012 CRC study report?

8    A    Yes.

9    Q    You agree that the two cohorts combined do not include

10   every child in DCF custody as a result of a supported

11   allegation of abuse and neglect, correct?

12   A    Yes.

13   Q    You mentioned that one of the key points of the sample

14   design was proportioned by region, correct?

15   A    Yes.

16   Q    And CRC decided that for each sample there would be

17   children from each DCF region in proportion to the

18   population size of the DCF regions, correct?

19   A    Yes.

20   Q    Meaning that if there were six regions but one region

21   had 50 percent of the children in care, then half of the

22   children in the sample would be from that region, right?

23   A    Yes.

24   Q    At the time the CRC commenced its work, you didn't

25   believe that the number of placements of children was

1   affected by which region in DCF the child was in, correct?

2         **THE COURT:** Could you ask that question again.

3         **MR. BARSHAK:** Sure.

4         **THE COURT:** At the time you started your study you

5   didn't believe that what?

6   **Q**  When CRC commenced its work you didn't believe that the

7   number of placements per child would be dependent upon which

8   region in DCF that child was within?

9   A  It is more accurate to say I did not have evidence of

10   that. I held no beliefs at that time.

11   **Q**  At the time the CRC commenced --

12         **THE COURT:** Let me see if I follow. I hear your

13   testimony and I understand if. But I understood you to say

14   on direct, which seems to accord with logic, that if you

15   have a bureaucratic entity and you divide it up into regions

16   almost inevitably they're going to have somewhat difference

17   practices. It really makes no difference what the goal of

18   the operation is unless it's the most mechanistic goal,

19   though it appears, for instance, that McDonald's has

20   marvelous quality control and the McDonald's in one region

21   is roughly equivalent to the McDonald's in another. But

22   government agencies aren't like that. You divide them up,

23   you can promulgate all the regulations in the world, but

24   they're going to have different regional supervisors, it's a

25   bureaucracy, and so they're going to do certain things

1    differently.  That's not a normative statement, it's just a

2    observation of human nature which I thought you drew because

3    that's why you selected proportionally region by region.

4            Now, did I misunderstand your testimony?

5            THE WITNESS:  You did not.  But what I'm struggling

6    with is the reason why.  Why I did that is because it's good

7    practice and I didn't want any one region to be under

8    represented.  It was not because I held any fixed belief

9    that practice would differ.  I was more concerned that

10   practice was fairly represented across regions.  So, what

11   I'm struggling with is the reason why.

12           THE COURT:  I understand.

13           All right, we'll stop taking testimony at this

14   time.  Let me put on the record that I have reviewed the

15   30(b)(6) deposition of Paul G. Fitzsimmons taken September

16   28th, 2011.

17           You may step down, ma'am.

18           (Whereupon the witness stepped down.)

19           THE COURT:  We'll resume at nine o'clock on Monday,

20   the 4th of February.

21           Today, after five days of trial, the plaintiffs

22   have used up three days, 35 minutes; the defense has used up

23   one day, two hours and 55 minutes.

24           Now, we'll try 9:00 to 1:00 all five days next

25   week.  We'll be ten days into the trial.  I hope, but do not

1    require, that the plaintiffs will be in a position to rest

2    at the end of that tenth day.  In any event, we're going to

3    have to consider where we are at the end of that tenth day

4    because I have other trials as we discussed backing up.

5         MR. GLEASON:  Just on that, your Honor, we are

6    working hard on this, but I do not think we will be finished

7    at the end of next week.

8         THE COURT:  I'm not cutting you off --

9         MR. GLEASON:  I know you're not.

10        THE COURT:  -- in terms of time, but there's going

11   to be a break even so.

12        MR. GLEASON:  Okay.  That's what I wanted to

13   understand.

14        THE COURT:  I'll make this normative judgment as a

15   presider.  I think you could go faster.  And with respect to

16   the defense, given the nature of your direct, I don't think

17   their cross-examination has been excessive.  I don't

18   criticize.  I am trying to absorb this data as well as I

19   can.  We're just not going over the total amount of the

20   trial here and somewhere between 10 and 20 days, you butt up

21   against 20 days you're not going to have any time for

22   cross-examination of their witnesses.

23        MR. GLEASON:  We get that point.

24        THE COURT:  I understand.  All right.

25        MR. GLEASON:  Thank you, your Honor.

1          **THE COURT:**  Have a good weekend.  We'll recess

2     until 9:00 a.m. on Monday, the 4th of February.  We'll

3     recess.

4          **THE CLERK:**  All rise.

5          (Adjournment.)

6

7

8               **C E R T I F I C A T E**

9

10

11          I, Donald E. Womack, Official Court Reporter for

12     the United States District Court for the District of

13     Massachusetts, do hereby certify that the foregoing pages

14     are a true and accurate transcription of my shorthand notes

15     taken in the aforementioned matter to the best of my skill

16     and ability.

17

18

19

20

21          /S/ DONALD E. WOMACK 5-7-2013
            _____
22               DONALD E. WOMACK
             Official Court Reporter
23               P.O. Box 51062
          Boston, Massachusetts 02205-1062
24            womack@megatran.com

25