```
 1                   UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS
 2
                                          Civil Action
 3                                        No. 10-30073-WGY

 4    * * * * * * * * * * * * * * * * * * * * * *
                                                  *
 5    CONNOR B., by his next friend, ROCHELLE     *
      VIGURS, et al., individually and on behalf  *
 6    of all others similarly situated,           *
                                                  *
 7              Plaintiffs,                        *
                                                  *  BENCH TRIAL
 8    v.                                           *   (Volume 6)
                                                  *
 9    DEVAL L. PATRICK, in his official capacity  *
      as Governor of the Commonwealth             *
10    of Massachusetts, et al.,                   *
                                                  *
11              Defendants.                        *
                                                  *
12    * * * * * * * * * * * * * * * * * * * * * *

13              BEFORE:  The Honorable William G. Young,
                              District Judge
14    APPEARANCES:

15              NUTTER, McCLENNEN & FISH, LLP (By Daniel J.
          Gleason, Esq. and Jonathan D. Persky, Esq.), World
16        Trade Center West, 155 Seaport Boulevard, Boston,
          Massachusetts 02210-2699
17              - and -
                CHILDREN'S RIGHTS (By Sara M. Bartosz,
18        Esq., Laurence D. Borten, Esq., Sarah Russo, Esq.
          Rachel Brodin, Nili, Esq. and Jessica E. Polansky,
19        Esq.), 330 Seventh Avenue, Fourth Floor, New York,
          New York 10001, on behalf of the Plaintiffs
20
                OFFICE OF THE MASSACHUSETTS ATTORNEY
21        GENERAL (By Liza Tran, Jason B. Barshak and
          Jeffrey T. Collins, Assistant Attorneys General),
22        One Ashburton Place, Boston, Massachusetts 02108,
          on behalf of the Defendants
23
                                        1 Courthouse Way
24                                      Boston, Massachusetts

25                                      February 4, 2013
```

<u>**I N D E X**</u>

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

KRISTEN JOHNSON, Resumed

   By Mr. Barshak       3

   By Mr. Borten   33             30

ERIK V. NORDHEIM

   By Mr. Barshak      46

   By Mr. Borten           59

LENETTE AZZI-LESSING, Resumed

   By Ms. Bartosz   61


| EXHIBITS: | FOR I.D. | IN EVID. |
|---|---|---|

    1072 Appendices . . . . . . . . . . . . . .44

1              **THE CLERK:**  All rise.  The United States District

2     Court is now in session, you may be seated.

3              **THE COURT:**  And if you would remind the witness.

4              **THE CLERK:**  I would like to remind you that you are

5     still under oath.

6              **THE WITNESS:**  Thank you.

7              **THE COURT:**  Good morning, everyone.  And you may

8     continue.

9              **MR. BARSHAK:**  Good morning, your Honor, thank you.

10                KRISTEN JOHNSON, Resumed

11              **CROSS-EXAMINATION** (Cont'd)

12    **BY  MR. BARSHAK**

13    **Q**   Good morning, Dr. Johnson.

14    A   Good morning.

15    **Q**   Dr. Johnson, if I can direct your attention to the

16    August 2012 report by CRC.  Do you have a copy of that in

17    front of you?

18    A   Yes.

19    **Q**   You'd agree that the main body of that report is over

20    160 pages long, correct?

21    A   Yes.

22    **Q**   And you signed this report?

23    A   Yes.

24    **Q**   Correct?

25    A   Yes.

1    Q    And you would consider this to be a comprehensive

2    report, correct?

3    A    Yes.

4    Q    The report contains an introduction section, right?

5    A    Yes.

6    Q    And it has a section on methods, correct?

7    A    Yes.

8    Q    And in the methods section there's a subsection for

9    study design, correct?

10    A    Yes.

11    Q    And there's a subsection for case reader qualifications

12    and training, correct?

13    A    Yes.

14    Q    And there's a subsection for inter-rater reliability,

15    correct?

16    A    Yes.

17    Q    And there's a subsection for data collection and

18    analysis, correct?

19    A    Yes.

20    Q    And there's a subsection for --

21            THE COURT:  Excuse me.  Excuse me.  Just so I'm

22    clear I'm oriented, this is the document about which we've

23    been talking which we've marked as GW for identification?

24            MR. BARSHAK:  Yes.  Correct.

25            THE COURT:  Fine.  All right.

1          **MR. BARSHAK:**  Yes.

2          **THE COURT:**  You go right ahead.  I'm with you.

3     **Q**   So, just to repeat that last question perhaps.

4          So, there was a subsection on data collection

5     analysis, correct?

6     A   Yes.

7     **Q**   Okay.  And there was section regarding availability of

8     information, correct?

9     A   Yes.

10    **Q**   And then there was discussion regarding the entry cohort

11    sample, correct?

12    A   Yes.

13    **Q**   And then a discussion regarding the two year cohort

14    sample, correct?

15    A   Yes.

16    **Q**   And there were various qualifications in the report such

17    as that a comparison with federal data should be used, say,

18    for a rough context as opposed to direct comparisons,

19    correct?

20    A   Yes.

21    **Q**   Okay.  And you'd agree that nowhere in the report is

22    there a statement by CRC that CRC was not reviewing every

23    single piece of information relating to the children

24    sampled, correct?

25    A   Would you restate?

1    **Q**    Sure.

2            You agree that CRC was not to receive every single

3    piece of information relating to the children sampled for

4    purposes of the case record review, correct?

5            **MS. BARTOSZ:**  Objection.

6            **MR. BORTEN:**  Objection.

7            **THE COURT:**  Well, I understand the question but the

8    question's a little different than the first one he asked.

9    I understand it that nowhere in the report, he can correct

10   me, it's his question, I understand he's asking you that

11   nowhere in the report does it set forth expressly that as to

12   the children reviewed CRC did not have everything in the

13   records of the DCF pertaining to that child.

14           Let's see if that's the question.  Is that the

15   question, Mr. Barshak.

16           **MR. BARSHAK:**  I'll go with that question.

17           **THE COURT:**  All right.

18   A    That is correct.

19   **Q**    And you agree that CRC was not provided with what is

20   called the family resource files, correct?

21           **MR. BORTEN:**  Objection.  Your Honor there's an

22   order in this case directing defendant that they may not

23   rely in opposing the CRC study on any information not

24   provided to CRC for the purposes of the case record review.

25           **THE COURT:**  I don't know that they're relying on

1    it.  That order would not surprise me.  He's simply pointing

2    out the limitation of the study and only to that extent will

3    I consider the question because --

4            **MR. BORTEN:**  Thank you.

5            **THE COURT:**  -- I'm not surprised at such an order

6    and the order makes perfect sense and I enter orders that

7    are akin to that.

8            And that's right, Mr. Barshak, you just want

9    to point out the limitations of the study.  And we're not

10   going to hear anything about what's in the documents you

11   didn't provide.

12           **MR. BARSHAK:**  That is absolutely correct.

13           **THE COURT:**  Right.

14           **MR. BARSHAK:**  This is solely regarding limitations

15   of the study.

16           **THE COURT:**  All right.  So now he'll put the

17   question again after we've talked.

18   Q   Dr. Johnson, do you agree that CRC had -- well, strike

19   that.

20           You agree that CRC was not provided with what is

21   called the family resource file, correct?

22   A   Those are the foster procedure files, licensing files?

23   Q   Are you familiar with the term family resource files in

24   the context of the Massachusetts DCF?

25   A   No.

1    Q    Are you aware that plaintiffs' counsel did not require

2    DCF to provide for the case record review what is called the

3    family resource files?

4    A    I'm not aware of that, no.

5    Q    You agree that CRC was not provided with what is called

6    the adoption resource files, correct?

7    A    We had access to adoption case files.

8    Q    Are you, are you familiar with what is called the

9    adoption resource files in the context of the Massachusetts

10   Department of Children and Families?

11   A    No.

12   Q    Are you aware that the plaintiffs' counsel did not

13   require DCF to provide for purpose of the case record review

14   the family resource, I'm sorry, the adoption resource files?

15   A    No.

16   Q    Now, you agree that the study was focused on whether

17   things were present in the records review, correct?

18   A    Correct.

19   Q    So you agree that if a report states that something was

20   not in the record that means that that thing was not present

21   in the material reviewed by CRC, correct?  By CRC's readers,

22   correct.

23   A    Correct.

24   Q    CRC is not taking a position regarding whether DCF's

25   recordkeeping practice is adequate, correct?

1    A    Correct.

2    **Q**    You agree -- strike that.

3            The purpose of the study by CRC was not to collect

4    data on every aspect of DCF case practice, correct?

5    A    Yes.

6    **Q**    The purpose of the study was not to collect data on

7    every aspect of DCF case practice regarding children in its

8    custody as a result of abuse or neglect, correct?

9    A    Correct.

10   **Q**    The purpose of the study was to collect data on certain

11   aspects of DCF case practice regarding children in its

12   custody as a result of abuse or neglect?

13   A    Yes.  Correct.

14   **Q**    And the aspects of the case practice of DCF that CRC was

15   examining in its study was based upon either a review of the

16   complaint filed in this action or as a result of discussion

17   with plaintiffs' counsel, correct?

18   A    I'm not sure.  Could you restate?

19   **Q**    You agree that the CRC study was examining, trying to

20   collect data on certain aspects of DCF case practice

21   regarding children in its custody as a result of abuse or

22   neglect, correct?

23   A    True.

24   **Q**    And regarding those certain aspects of case practice,

25   CRC determined which aspects to collect data on based upon

1    in part a review of the complaint filed in this case?

2    A    And much more.  Yes.

3    Q    So you agree that in part the decision of what aspects

4    of case practice review was based upon review of the

5    complaint in this case?

6    A    Yes.

7    Q    And you'd also agree that in part the decision of what

8    aspects of case practice that CRC was to review was based

9    upon a discussion with plaintiffs' counsel?

10    A    We discussed it with them, but the decision but was

11    based on other factors more so than conversations.

12    Q    CRC did not talk to any foster parents for purposes of

13    collecting data to the study, correct?

14    A    Correct.

15    Q    And CRC did not conduct any interviews for purposes of

16    collecting data for the study, correct?

17    A    Correct.

18    Q    You agree that to collect reliable and valid data one

19    needs valid and reliable measures, correct?

20    A    Yes.

21    Q    And you agree that to collect reliable and valid data

22    one needs a good survey instrument, correct?

23    A    Yes.

24    Q    And you testified about three types of information that

25    formed much of the basis of the survey instrument in this

1    case, correct?

2    A    Yes.

3    Q    And one was the complaint in this lawsuit, correct?

4    A    Yes.

5    Q    And one was some of the cases of the named plaintiffs,

6    correct?

7    A    Yes.

8    Q    And one was policies and regulations regarding DCF,

9    correct?

10   A    Yes.

11   Q    And you agree that plaintiffs' counsel was the author of

12   the complaint filed in this case, correct?

13   A    Yes.

14   Q    And you agree that plaintiffs' counsel chose the

15   specific named plaintiffs for this case, correct?

16   A    Yes.

17   Q    And you agree that plaintiffs' counsel provided CRC with

18   the DCF policies and regulations that you reviewed for this

19   study, correct?

20   A    Yes.

21   Q    You personally trained the case readers, correct?

22   A    Yes.

23   Q    As you said, you instilled your face on the case readers

24   for accountability purposes, correct?

25   A    I tried, yes.

1    Q    And you agree that even if a case reader suspected that

2    some event had occurred but could not point to it in the

3    file that that was not sufficient evidence to you that the

4    event actually occurred, correct?

5    A    Correct.

6    Q    Now, many of the case readers had years of social work

7    experience, correct?

8    A    Yes.

9    Q    But you instructed the case readers not to use their

10   clinical judgments and interpretation when reviewing the

11   files, correct?

12   A    Yes.

13   Q    You testified on Thursday that CRC did not set the

14   schedule for the case reading, correct?

15   A    Yes.

16   Q    Now, you are not contending that CRC did not have enough

17   time to conduct a reliable and valid study, correct?

18   A    That is correct.

19   Q    You agree that one aspect of the sample design was the

20   generation of unique families for each cohort, correct?

21   A    Yes.

22   Q    And for that step of the process CRC received from

23   Professor Nordheim a list of unique families for each cohort

24   sampled, correct?

25   A    Yes.

1    Q    And Professor Nordheim to your knowledge used a

2    statistical software called R in generating the list of

3    families for each cohort sample, correct?

4    A    Yes.

5    Q    In generating the list of families Professor Nordheim

6    did not use a command of R called a set.seed command,

7    correct?

8    A    Yes.

9    Q    And the process by Professor Nordheim in generating a

10   list of families cannot be replicated because he did not use

11   the set.seed command, correct?

12   A    Yes, with the caveat that it depends on which definition

13   of replicability we are using.

14   Q    Dr. Johnson, could you please turn to page 126 of your

15   deposition.

16   A    I have it.

17   Q    I'm going to read starting with line 1.  Question:  And

18   would you agree that the process used by Professor Nordheim

19   in generating the list of families for each cohort cannot be

20   replicated because of his not using or not setting a seed

21   value?

22            Answer.  I understand that now.  At the time I did

23   not.  My -- at the time we sampled, my resolution to the

24   replicability issue was being able to provide to you the

25   case numbers or the row numbers of the data we selected,

1    right?  Which you cannot do when using the sample command

2    with SPSS.

3            So, at that time, I was comfortable that the sample

4    could be replicated because I could use -- I could

5    articulate those numbers in the Word document that we gave

6    to you.

7            Did I read that correctly?

8    A    Yes.

9    Q    Another aspect of the sample design was the selection of

10   unique children from unique families selected by Professor

11   Nordheim, correct?

12   A    Yes.

13   Q    If a family had one child you selected that child -- if

14   a family, if a family selected by Professor Nordheim had one

15   child, you selected that child for the sample, correct?

16   A    Yes.

17   Q    And if the family selected by Professor Nordheim had

18   more than one child you used statistical language R to

19   select one family from, one child from that family for the

20   sample, correct?

21   A    Yes.

22   Q    And in this process you did not set a seed value,

23   correct?

24   A    Correct.

25   Q    And you'd agree that by your not using a seed value one

1    cannot determine whether or not you were randomly selecting

2    the children from families of more than one child, correct.

3    A    Correct, with caveats.

4    **Q**    Can you please take a look at page 128 of your

5    deposition.

6    A    I have it.

7    **Q**    From line 11.  Question:  And would you agree that by

8    your using the sample command in R, as opposed to setting a

9    seed value in R, that one is not able to determine whether

10   you were randomly selecting the child or whether you were

11   not randomly selecting the child from families with more

12   than one child.

13           Objection by attorney Borten.

14           Answer:  I understand now that in order to

15   replicate the list one should use the set.seed command.

16   It's important to know that at the time I was comfortable

17   that the sample could be replicable because we saved out the

18   selection criteria that was generated in R, and if one

19   followed that criteria and ordered cases in the same way, we

20   would obtain a sample, the same sample.

21           Did I read that correctly.

22   A    Yes.

23   **Q**    Dr. Johnson, you agree that the response not applicable,

24   or NA, appears in some of the tables in the CRC report,

25   correct?

1    A    Correct.

2    Q    And you'd agree that time response unable to determine

3    appears in some of the tables in the CRC report, correct?

4    A    Yes.

5    Q    And you'd agree that 56 of the tables in the CRC report

6    have, 56 of the tables in the CRC report have a reference to

7    either unable to determine or not applicable or both,

8    correct?

9    A    I trust your count.  Yes.

10   Q    Yesterday, Dr. Johnson, sorry, last Thursday,

11   Dr. Johnson, you referenced table 28a on page 57 of the

12   report.  And please take a look at that page if you need to.

13   A    I have it.

14   Q    You'd agree that CRC collected data for the sample for

15   the entry cohort regarding number of service plans found

16   within the observation period, correct?

17   A    Yes.

18   Q    And CRC excluded 43 children from the sample for the

19   entry cohort who spent less than 31 days in custody for

20   purposes of that data collection, correct?

21   A    We collected the data for those cases, but because a

22   service plan was not required for those cases we excluded

23   them in analyses.

24   Q    Turning to page 56, please, of the report.  Under the

25   section service plans, this section includes 199 children in

1    the entry cohort who were in custody for 31 days or more and

2    does not include 43 cases of children who spent less than 31

3    days in custody.

4            Did I read that correctly?

5    A    Yes.

6    Q    So, for purposes of this analysis CRC excluded the 43

7    children in the sample for the entry cohort who spent less

8    than 31 days in custody, correct?

9    A    Yes.

10    Q    All the remaining -- strike that.

11            All of the other children in the entry cohort

12    sample were included in the analysis for this item, correct?

13    A    Correct.

14    Q    You agree that CRC cited on page 56 an excerpt of a DSS

15    policy regarding service plans, correct?

16    A    Correct.

17    Q    And you agree that the excerpt states in part initial

18    full plan development by assessment, slash, case management

19    worker within 55 working days after case opening for any

20    type of case.

21            Did I read the excerpt -- did I read a portion of

22    the excerpt in the CRC report correctly?

23    A    Yes.

24    Q    So you'd agree that instead of excluding all children

25    who are in custody for less than 55 working days for this,

1    for the analysis for this item, CRC only included children

2    who were in custody for less than 31 calendar days, correct?

3    A    Correct.

4    Q    Dr. Johnson, you agree that the goal of the CRC study

5    was to generalize characteristics of a sample back to the

6    cohort from which the sample was drawn?

7    A    Yes.

8    Q    And you'd agree that a confidence interval shows how

9    certain one is that the characteristic observed in the

10    sample is present in the population from which the sample

11    was drawn?

12    A    Yes.

13    Q    And you'd agree that the wider the confidence interval

14    the less certain one is that the characteristic observed in

15    the sample is present in the population from which the

16    sample was drawn, correct.

17    A    Yes, with the caveat that I would phrase it differently.

18    Q    You agree that confidence intervals are related to

19    sample size, correct?

20    A    Yes.

21    Q    And you'd agree that the sample size of 242 was selected

22    for both the entry cohort sample and for the two year cohort

23    sample for this study, correct?

24    A    Yes.

25    Q    The sample size of 242 was selected so that one could be

1    95 percent confident that the findings for the sample would

2    be generalizable to the population from which it was drawn

3    within a plus or minus of six percent, correct?

4    A    Assuming a proportion of 50 percent, correct.

5    Q    And one can describe this as a confidence interval with

6    a 95 percent confidence level and a maximum margin error of

7    six percent?

8    A    Yes, but I feel the term a priori is important.

9    Q    Before -- the report refers to one confidence interval,

10   correct?

11   A    Yes.

12   Q    And that confidence interval was selected before the

13   data collection, correct?

14   A    Yes.

15   Q    And your reference to a priori was, goes towards the

16   fact that that confidence interval was selected before the

17   data collection, correct?

18   A    To inform sampling, correct.

19   Q    You agree that if you have a sample of less than 242

20   then the confidence interval of 95 percent confidence level

21   and a maximum margin of error of six percent would not

22   apply, correct?

23   A    Yes.

24   Q    You agree that some of the items in the study applied to

25   less than 242 children, correct?

1    A    We collected items for all of the 242 children.  We did

2    not obtain responses for all of those children, correct.

3    Q    Please turn to page 21 of the CRC report.

4    A    I have it.

5    Q    CRC collected data for the sample for the entry cohort

6    regarding whether a child was placed with all siblings in

7    care, correct?

8    A    Yes.

9    Q    This item only applies to children with siblings in

10   care, correct?

11   A    Yes.

12   Q    And looking at table 8 on page 21, you'd agree that the

13   N for this item was 97?

14   A    Yes.

15   Q    And you'd agree that there are more examples in the

16   report where the stated N was less than a hundred?

17   A    Yes.

18   Q    And you'd agree that the percentage of items in the

19   report where the stated N is a hundred or less is

20   approximately 50 percent of the items?

21   A    I'm not sure.

22   Q    Please turn to page 54 of the report.

23   A    I have it.

24   Q    You agree that CRC collected data for the sample for the

25   entry cohort for children where a termination of parental

1    rights was granted and who had a goal of adoption to

2    determine whether adoption was finalized, correct?

3    A    Correct.

4    Q    And you'd agree looking at table 26 that the stated N

5    for that item was 42, correct?

6    A    Yes.

7    Q    And you'd agree that there are more examples in the

8    report where the stated N is less than 50, correct?

9    A    Yes.

10    Q    And you'd agree that the percentage of items in the

11    report where the stated N is 50 or less is approximately

12    33 percent of the items?

13    A    I cannot verify that without going and counting.

14    Q    CRC could have calculated for each finding a confidence

15    interval after data was collected, correct?

16    A    Correct.

17    Q    Toward the end of the data collection you had a

18    communication with Professor Nordheim regarding whether to

19    calculate confidence intervals for each of the findings once

20    data was collected, correct?

21    A    The conversation was about how, not whether.

22    Q    There were methodological issues and CRC wanted, that

23    CRC needed to sort out if confidence intervals needed to be

24    generated for the report, correct?

25    A    Yes.

1    Q    Those methodological issues were not resolved, correct?

2    A    Not in the time allotted, that is correct.

3    Q    So, you agree that the methodological issues were not

4    resolved, correct?

5    A    Correct.

6    Q    And you'd agree that confidence intervals were not

7    developed for each finding in the report after data was

8    collected, correct?

9    A    Yes.

10   Q    And you'd agree that CRC did not calculate confidence

11   intervals for any findings in the report after data was

12   collected?

13   A    Correct.

14   Q    Inter-rater reliability is a degree to which two readers

15   given the same information would reach the same conclusion

16   and score the same response for a particular item, correct?

17   A    Correct.

18   Q    Inter-rater reliability is a consideration when

19   attempting to generalize findings to a larger population,

20   correct?

21        THE COURT:  Ask that question again, forgive me.

22   Q    Inter-rater reliability is a consideration when

23   attempting to generalize findings to a larger population,

24   correct?

25   A    Correct.

1    **Q**    Inter-rater reliability is a consideration in

2    determining the accuracy of the findings themselves,

3    correct?

4    A    Correct.

5    **Q**    You chose percent agreement, sometimes called percent

6    match, as the measure of inter-rater reliability, correct?

7    A    Correct.

8    **Q**    There are other measures of determining inter-rater

9    reliability, right?

10    A    Yes.

11    **Q**    The CRC study does not have a 100 percent agreement on

12    every item, correct?

13    A    Correct.

14    **Q**    You testified that there were 266 raw variables in the

15    study, correct?

16    A    Approximately, yes.

17    **Q**    And after transforming the raw variables to look, for

18    example, at monthly performance, the number of variables

19    increased to roughly 700 variables, correct?

20    A    Correct.

21    **Q**    Now, you agree that the report states that the database

22    used for the study had more than 750 variables, correct?

23    A    Correct.

24    **Q**    CRC did not conduct inter-rater reliability analysis on

25    750 variables, correct?

1    A    Specify when?

2    Q    At any point CRC has not for this study conducted

3    inter-rater reliability analysis on 750 variables, correct?

4    A    Correct.

5    Q    And CRC did not conduct inter-rater reliability analysis

6    on the 266 raw variables as of the time that the August

7    report was submitted, correct?

8    A    Correct.

9    Q    Prior to finalization of the August report inter-rater

10    reliability analysis was conducted on eight variables,

11    correct?

12    A    Correct.

13    Q    You agree one of the variables was living arrangement,

14    correct?

15    A    Yes.  Correct.

16    Q    You agree one of the eight variables was primary

17    language, correct?

18    A    Yes.

19    Q    You agree one of the eight variables was kin request

20    placement correct?

21    A    I can't remember.  Could we -- we have a document that

22    goes through this.

23    Q    As you sit there now, do you remember what the other

24    variables that comprise the eight variables are that IRR

25    analysis had been conducted on prior to finalization of the

1    August report?

2    A    Some, not all.

3    Q    What are the other variables within the eight variables

4    that you remember that IR analysis was conducted on prior to

5    the finalization of the August report?

6    A    Whether or not a comprehensive assessment was found.  I

7    want to say number of siblings, but I'm not sure.

8    Q    Dr. Johnson, isn't it true that none of the eight

9    variables that inter-rater reliability now was conducted on

10   prior to the finalization report had to do with

11   comprehensive assessment?

12   A    I'm not sure that's true, no.  None?

13   Q    Isn't it true that the eight variables were the

14   following:  Living arrangement, primary language, kin

15   request placement, run away, on psychotropic meds, legal

16   custody ended, history sexually acting out, history physical

17   aggression.

18          Weren't those the eight variables that an

19   inter-rater reliability analysis was conducted on prior to

20   the finalization of the August 2012 report?

21   A    I'm not sure.  I would have to check the programs to be

22   certain.

23   Q    At the time that you signed the August 2012 report CRC

24   knew the percent agreement for those eight variables,

25   correct?

1    A    Correct.

2    Q    At the time that you signed the August 2012 report you

3    did not know the percent agreement for the other

4    approximately 258 of the 266 raw variables, correct?

5    A    Correct.

6    Q    The report states reliability findings for items

7    collected for all children regardless of cohort show that

8    percent agreement ranged from 75 percent to nearly

9    100 percent, with most items of obtaining 80 percent or

10   higher rates of agreement.  The report states that, correct?

11   A    Yes.

12   Q    And you'd agree that that statement in the report was

13   based on inter-rater reliability analysis of eight

14   variables, correct?

15   A    Yes.

16   Q    In October of 2012 you received a copy of the evaluation

17   of the CRC report by Dr. Shlomo Sawilowsky, an expert for

18   the defendants, correct?

19   A    Correct.

20   Q    You read Dr. Sawilowsky's report, correct?

21   A    Yes.

22   Q    After reading his report you conducted inter-rater

23   reliability analysis on additional variables, correct?

24   A    Yes.

25   Q    After reading his report you conducted inter-rater

1    reliability analysis on the remainder of the 266 raw

2    variables that you had mentioned, correct?

3    A    Yes.

4    Q    In performing the post-report submission analysis you

5    used inter-rater reliability data that CRC had collected

6    during the data collection phase of the project, correct?

7    A    Yes.

8    Q    CRC could have calculated a percent agreement for those

9    266 variables before submitting the August report but in

10   fact calculated a percent agreement on eight variables prior

11   to submitting the August report, correct?

12   A    Correct.

13   Q    When you were calculating a percent agreement for the

14   eight variables before submission of the August 2012 report

15   you treated a response of no as distinct from a response of

16   unable to determine, correct?

17   A    No, incorrect.

18   Q    For the eight variables on which inter-rater reliability

19   analysis was conducted prior to the submission of the

20   August 2012 report, is it your testimony that you treated a

21   response of no and the response of unable to determine at

22   the same or as distinct?

23   A    I'd have to check the programming to be sure.  Certainly

24   conceptually I had both approaches in my head.

25   Q    You agree that in conducting inter-rater reliability

1    analysis after receiving the Professor Sawilowsky report

2    that you treated no and unable to determine as the same?

3    A    Yes.

4    Q    Dr. Johnson, do you have -- strike that.

5         You submitted a report dated November 19th, 2012 in

6    this case, correct?

7    A    Yes.

8    Q    And in that report there was a page called table 3,

9    further analysis of agreement among measures reported in

10   table 2 of Dr. Sawilowsky's report, correct?

11   A    Correct.

12   Q    And that has -- and that table 3 is Exhibit 1069.

13        You'd agree that one of the columns in that report

14   is entitled percent match from Sawilowsky's report?

15   A    Yes.

16   Q    And you'd agree that one of the columns is entitled

17   percent match with criteria imposed, then parentheses, no

18   and unable to determine treated as equivalent, correct?

19   A    Yes.

20   Q    And in the column percent match with criteria imposed,

21   if there is a dash in that column you'd agree that that

22   means that the percent match was the same as, for that item,

23   as the percent match in the column entitled percent match

24   from the Sawilowsky report, for that item?

25   A    Correct.

1    Q    You agree that 41 of the variables in the column

2    entitled percent match from the Sawilowsky report have a

3    percent match or percent agreement of less than 75 percent,

4    correct?

5    A    I trust your math.  Correct.

6    Q    And you agree that 26 of the variables in the column

7    entitled percent match with criteria imposed with no and

8    unable determine are treated as equivalent have a percent

9    match of less than 75 percent, correct.

10   A    Correct.

11   Q    You agree that findings with list than 75 percent match

12   should be interpreted with caution, correct?

13   A    Correct.

14   Q    You agree that findings with less than 75 percent match

15   must be generalized with caution, correct?

16   A    Correct.

17   Q    CRI, so plaintiffs' counsel, was involved in the

18   decision to use two cohorts, correct?

19   A    Correct.

20   Q    CRI was involved in the development of the case survey

21   tool, correct?

22   A    Correct.

23   Q    And plaintiffs' counsel was involved in the selection

24   process of the six percent margin of error, correct?

25   A    Correct.

1    Q    Plaintiffs' counsel approved the six percent margin of

2    error, correct?

3    A    Correct.

4            MR. BARSHAK:  No further questions.

5            THE COURT:  Any redirect, Mr. Borten.

6            MR. BORTEN:  Yes.

7            THE COURT:  Proceed.

8                    REDIRECT EXAMINATION

9    BY MR. BORTEN

10   Q    Dr. Johnson, do you recall attorney Barshak asked you

11   whether one of the purposes of the case record read was to

12   evaluate the recordkeeping system of DCF?

13   A    Yes.

14   Q    Was, was the extent to which case workers placed

15   information into the recordkeeping system of relevance to

16   the CRC study and its results?

17   A    Yes.  It is also, I should volunteer if I may, it is

18   also of relevance to MASW standards, social work standards,

19   for the field given workers change and their transitions.

20   It's really,really important that what happens in a case be

21   reflected in case file notes and available to supervisors,

22   managers, quality assurance experts, and other workers

23   working on the case.

24           MR. BARSHAK:  Move to strike; that's not part of

25   the question whether it was relevant to the study.  That

1    part of the question no, move to strike, but everything else

2    starting from, I would like to volunteer was not asked.

3            **THE COURT:**  In the exercise of discretion I'll let

4    that stand.

5    **Q**   Dr. Johnson, do you recall attorney Barshak asked you or

6    cited deposition testimony you've given concerning your

7    understanding of whether one should use the set.seed command

8    in pulling a random sample.  Do you recall that?

9    A   Yes.

10   **Q**   When did you obtain, or how did you obtain the

11   understanding that one should do that?

12   A   I obtained that understanding through Dr. Sawilowsky's

13   critique of our reports and the expectations of what a court

14   and attorneys expected from a study.  So my definition of

15   replicability was much more grounded in research methods,

16   and after reading Dr. Sawilowsky's critique, I understood

17   what, what the Court was looking for and the Attorney

18   General's office perhaps.

19   **Q**   Is Doctor, or Professor Sawilowsky an attorney to your

20   knowledge?

21   A   No.

22   **Q**   How many years have you been doing quantitative research

23   in the child welfare field?

24           **MR. BARSHAK:**  Objection.

25           **THE COURT:**  Sustained; beyond the scope.

1   **Q**   In the course of your child welfare research have you

2   ever prior to this litigation been informed that one should

3   use a set.seed command in choosing a random sample?

4   A   No.

5   **Q**   Dr. Johnson, with respect to transformed variables

6   beyond the 266 raw variables, is any additional information

7   about the reliability of the study gained by looking at the

8   inter-rater reliability of the transformed variables?

9   A   No.

10   **Q**   Could you explain why you did not calculate inter-rater

11   reliability beyond eight variables in connection with the

12   August 22nd report?

13           **MR. BARSHAK:**   Not in the report, your Honor.

14           **MR. BORTEN:**   It's within the scope of the

15   cross-examination, your Honor.

16           **THE COURT:**   Yes, so it is.   But it's not in the

17   report.   Sustained.

18           Anything else for this witness?

19           **MR. BORTEN:**   No.

20           **THE COURT:**   You may step -- nothing else for this

21   witness, Mr. Barshak?

22           **MR. BARSHAK:**   No.   No, your Honor.

23           **THE COURT:**   You may step down, thank you.

24           (Whereupon the witness stepped down.)

25           **THE COURT:**   Call your next witness.

1          **MR. BORTEN:**  Plaintiffs will call Professor Erik

2     Nordheim.

3          **THE COURT:**  He may be called.

4          **THE CLERK:**  Please remain standing and raise your

5     right hand.

6          Do you solemnly swear the testimony you are about

7     to make in the matter now pending before this Court will be

8     the truth, the whole truth, and nothing but the truth, so

9     help you God?

10          **THE WITNESS:**  I do.

11          **THE CLERK:**  You can be seated.

12          **THE WITNESS:**  Thank you.

13                    ERIK V. NORDHEIM

14               **DIRECT EXAMINATION**

15     BY  **MR. BORTEN**

16     **Q**   Professor Nordheim, could you please state your full

17     name for the record?

18     A   Erik Vincent Nordheim.

19     **Q**   And where are you employed?

20     A   I'm a professor in the Department of Statistics at the

21     university of Wisconsin, Madison.

22     **Q**   And how long have you been a professor there?

23     A   I'm in my 36th year there.

24     **Q**   And where and when did you get your Ph.D.?

25     A   I got my Ph.D. actually in 1978, University of

1    Minnesota.

2    **Q**    Do you have an area of specialty within statistics?

3    A    I would view myself primarily as an applied

4    statistician.  I do a lot of collaborative work with a wide

5    range of scientists for many fields.  Probably in terms of

6    topical coverage, I would view myself as a bit more of a

7    generalist, but focusing on areas like linear models and

8    mixed models, things that are very commonly used in applied

9    statistics.

10    **Q**    Have you done collaborative work in the social sciences?

11    A    Yes, I have, particularly in the last few years I've

12    made a change in direction.  I've had a number of projects.

13    One, for instance, that has been ongoing is with some people

14    in the school of education where they're looking at the

15    effect of leadership in schools, and I helped conduct a

16    sample of schools within Florida meet certain constraints

17    and that research problem.

18         Another ongoing project is one with some

19    researchers in the Department of Sociology where they're

20    looking at the impact of the way questions are phrased, how

21    long they are, the complexity of the structure, how they're

22    read, the impact of things like that on various response

23    characteristics of the respondent.

24         And another one which, recent one in which I've

25    given a small amount of advice was something on fragile

1    families which is one where there was a cohort of unmarried

2    mothers and they followed them for various periods of time

3    to determine what impact the changing relationships perhaps

4    with male counterparts might have had on their lives and on

5    their children's lives.

6    **Q**    How many articles have you had published in refereed

7    journals, approximately?

8    A    Somewhere between 120 and 150.

9    **Q**    Have any of your recent projects in the social sciences

10   been published in peer-reviewed publications?

11   A    Not yet.  Basically the change to social science has

12   been relatively recent.  Most of the ones I cited are just

13   ongoing, but I anticipate that a number of these will appear

14   in the refereed publications in the near future.

15   **Q**    How did you come to be engaged as a sampling consultant

16   for the Children's Research Center case record review at

17   issue here?

18   A    Well, basically you contacted me as professor at the

19   university and asked me if I would meet with you to discuss,

20   to discuss this, and I said I would, and subsequent to that

21   I, you know, have been engaged by you to provide advice on

22   this matter.

23   **Q**    What compensation have you received in connection with

24   it?

25   A    My fee is $150 an hour.

1    **Q**    And approximately how many hours have you spent?

2    A    Oh, I would guess maybe 30 to 40 hour range.

3    **Q**    And what did you understand the scope of your work to be

4    on this project?

5    A    Primarily it was to give advice on the designing a

6    sampling plan by which you could obtain a number of case

7    records from the population of case records.  And so my

8    primary mission at the beginning was to help develop a

9    sampling plan that included the number of, the size of the

10   samples that you wanted to obtain.  And subsequent to that

11   you have asked me to make comments on a small number of

12   matters that have come up, such as a deposition by Professor

13   Sawilowsky.  But the primary, the primary, my primary goal

14   was to assist with the sampling plan.

15   **Q**    Were you involved in any specific decisions relating to

16   the sampling plan?

17   A    Yes.  In consultation with you and Dr. Johnson from CRC,

18   we came up with, I think an argument that would justify the

19   sample size that we used.  You had come to me with, I think

20   with the idea already that you were going to use the two

21   cohorts and that made sense to me.  And then I tried to

22   elicit as much information as I could about what your feels

23   were and how much precision you wanted, and based on that we

24   came up with a plan to determine the sample size.

25   **Q**    Were you involved in the decision to first choose a

1    random family and then choose a random child from families

2    with more than one children?

3    A    Yes, that's correct.  That was definitely certainly in

4    the elicitation phase.  I tried to ask a large number of

5    questions because those are very important issues in making

6    sure that we have a sound sample from which inference can be

7    drawn.

8    Q    Were you consulted in connection with the decision to

9    sample proportionally by region?

10             **MR. BARSHAK:**  Leading.

11             **THE COURT:**  Sustained.

12   Q    Okay.  Professor Nordheim, I'm going to hand you copies

13   of what's been marked as Exhibit HA and GX.

14             Could you identify these documents?

15   A    I guess the first one was GX, this was the original

16   report I prepared at your request in August of 2012 that the

17   front, the first few pages are the actual report and then

18   the appendices had to do with the database I had been given

19   from which I was to actually conduct the sample.  And then

20   some appendices related to that and my CV.  And then HA are

21   the comments that I prepared for you in response to a small

22   number of questions you asked me about Professor

23   Sawilowsky's report and his deposition.

24   Q    Okay.  So Professor Nordheim, what considerations go in

25   general into selecting a sample size in a study like this?

1          **MR. BARSHAK:**  Objection; that's not in his report.

2          **THE COURT:**  What do you say to that?

3          **MR. BORTEN:**  I believe it is.  Certainly --

4          **MR. BARSHAK:**  It's certainly not --

5          **THE COURT:**  Please.  Let him respond.  He can point

6   it out to me.

7          **MR. BORTEN:**  The report refers to a formula in a

8   textbook by someone named Lohr on page 3 of the report,

9   second paragraph.

10         **THE COURT:**  He may testify in accordance with the

11  report.  But that doesn't mean he can testify to the

12  formula.  He relied on some formula by this fellow.  If

13  that's what his position is, that's fine.

14         Go ahead from there.  I mean, is that right, you

15  relied on that formula?

16         **THE WITNESS:**  It was actually a woman.

17         **THE COURT:**  I stand corrected.  But upon her

18  formula you relied.

19         **THE WITNESS:**  It's a very standard form law.  It's

20  in all the --

21         **THE COURT:**  That may be but I have to hold you to

22  the report.

23         **THE WITNESS:**  That is true.  That is correct.

24         **THE COURT:**  And you relied on it?

25         **THE WITNESS:**  That is correct.

1          **THE COURT:**  Go from there, Mr. Borten.

2    **Q**   What variables does this formula include?

3    A    The primary --

4          **MR. BARSHAK:**  Objection.  The variables are not in

5    the report.

6          **THE COURT:**  Sustained.  He relied on the report.

7    He relied on the formula rather.  Now, my approach to this

8    must be clear by now.  Let's adhere to it.

9          Go ahead.

10         **THE WITNESS:**  Ah --

11         **MR. BORTEN:**  No.

12         **THE COURT:**  No, there's no question.  I sustained

13   it.  He'll ask another question.

14   **Q**   So the sample size of just over 240 was -- withdrawn.

15         Professor Nordheim, were you involved in selecting

16   the actual sample files?

17   A    I was.

18   **Q**   And what information were you provided with in

19   connection with selecting those files?

20   A    Dr. Johnson provided me with an Excel data file that

21   contained primarily the information in appendix A, except in

22   addition there was a sort of a row number in front.  But I

23   was basically given the information in appendix A based on

24   the prior agreement that we had that we would stratify by

25   region.  And the sample size, we had determined to meet that

formula which had been designed to meet some criteria in the

precision that we had agreed upon.  I then took those

numbers, used standard procedures that I normally use for

selecting samples, and I did so using the program R in a way

that I have used many times before and since.

THE COURT:  What does it mean to stratify by

region?

THE WITNESS:  Okay.  So basically we would have two

choices.  If we want to say a sample of 242 from a given

cohort, we could take the entire population of all families

in Massachusetts and randomly sample.  Then there's a slight

risk that we would over sample some geographical regions and

under sample other geographical regions.  So, in

stratification, what we would do is say okay, this region

has a certain percentage of the population so we'll give it

that percentage of the sample.  And then I would, I would

take and construct my sample from the population within each

region.

THE COURT:  Much like, if I could use an analogy,

our jury plan which is supposed to yield a group of jurors

that represent the population, is broken down by the census

list of each city and town and we summon proportionally to

the total percentage from each city and town the jurors to

make the pool that we need.

Is that --

1          THE WITNESS:  Yes, it is like that.

2     Q    Professor Nordheim --

3          MR. BORTEN:  Actually your Honor, Professor

4     Nordheim did talk about the effect of stratification in his

5     rebuttal report.

6     Q    So Professor Nordheim --

7          THE COURT:  I didn't hear any objection to that.  I

8     was just trying to figure out it was.

9          MR. BORTEN:  No, I'm referring to the earlier

10    objection.

11    Q    Professor Nordheim, what is the effect of the decision

12    to stratify proportionally by region on the determination of

13    the sample size?

14    A    Okay.

15         MR. BARSHAK:  Objection, your Honor.  That

16    information is contained solely in the November report as

17    opposed to the original report.

18         THE COURT:  Maybe so, but I'm going to let him

19    testify because he supplemented the report.

20         MR. BARSHAK:  Okay.

21         THE COURT:  And we've been over that.  Your rights

22    are saved.  He may so testify.

23    A    Okay.  One of the issues in sample size determination is

24    that when, in addition to having some understanding of the

25    degree of precision desired, one must have also some

 1    understanding of the underlying variability of the data.

 2    When we're dealing with proportion data, we're dealing with

 3    a distribution that's known as the binomial distribution and

 4    in that particular case it is known that the variance of

 5    that distribution changes with the actual proportion.

 6              As an example, if I tossed a fare coin a hundred

 7    times, I can probably get reasonably most of the time,

 8    between 40 and 60 heads.  But if it only has a five percent

 9    probability of coming up heads, the rage, the variability

10    will be much smaller, I might get between one and eleven

11    heads.  So, in order to determine sample sizes and cases

12    using the binomial, we always choose a probability of

13    success of .5 because that would be the most conservative,

14    that will give us the largest variability, that will give us

15    the largest possible sample size.

16              So, if we use the .5 for calculating the

17    variability then the formulas for calculating sample size

18    from a simple random or a stratified random sample are

19    almost identical.  The only reason why they're not exactly

20    the same, and I did check out the formulae, is you look at

21    the population size, which is something like 4,500, and the

22    difference in sample size would be something like the ratio

23    of 4,500 over 4,501, a trivial amount.

24              So, in answer to your question, the sample size

25    determination using stratification as opposed to simple

1    random sampling leads to virtually the same answer in terns

2    of the sample size required.

3    **Q**    Okay.

4    A    In this case 242.

5    **Q**    Now, Professor Nordheim, you also discussed in your

6    rebuttal report the effect of reducing the sample size.  In

7    considering questions here where, say, the sample size is

8    only 60, which is one quarter of 240, what effect did that

9    have on the confidence interval?

10   A    Okay.  So, basically there is an inverse relationship

11   between the width of a confidence interval and the sample

12   size.  And in this particular case, as you indicated, if the

13   sample size goes down by a factor of four, so it's

14   one-fourth as large as the initial one, that will double the

15   half width of a confidence interval.  So, with the sample of

16   size 60, I would now have a half width of my confidence

17   interval of twelve percent and obviously something between

18   60 and 240 will give us a confidence interval of half width

19   somewhere between six and twelve percent.

20   **Q**    Okay.  So, going back to the selection of the sample,

21   please turn to Appendix A in your first report.

22   A    Yes.

23   **Q**    What does appendix A show?

24   A    Appendix A is a listing of case I.D.'s for one of the

25   two cohorts stratified within region.  So, basically within

1    the -- I look at the very first entry.  So, for the Boston

2    regional office for this cohort, the first row of data would

3    be case I.D. number 2851727.

4    Q    Were you provided with any other information about any

5    case here other than what's in these two appendices at the

6    time you drew the sample or any later time?

7    A    No.  I mean, the data file I received had an additional

8    column out front which actually had just a number to

9    identify the row number.  But other than that, I had no

10   information about anything in any of these files.

11   Q    And turning to appendix, appendices C and D.  Do those

12   come --

13   A    Okay, I'm at appendix C.

14   Q    Do those appendices show the actual random numbers you

15   used to pick out the row numbers for the cases you selected?

16   A    Yes.

17        MR. BORTEN:  Okay, your Honor, I move appendices A

18   through D into evidence.

19        THE COURT:  Any objection?

20        MR. BARSHAK:  No objection.

21        THE COURT:  They may be admitted together as

22   Exhibit 1072.

23        (Exhibit marked in evidence.)

24   Q    Now, Professor Nordheim, can you explain the role of

25   what is called a seed in the process of generating random

1    numbers?

2    A    Okay.  When one accesses any random -- I'm not a

3    computer science expert, and they're the ones that are most

4    knowledgeable about seeds and how random numbers are

5    generated.

6            But in order -- there's some -- in some sense it's

7    not that within a computer we have something analogous to a

8    bucket full of billions and billions of balls and one

9    reaches in randomly and pulls out a ball, it's more complex

10   than that.  It's a sort of manipulation of numbers and

11   multiplying big numbers by other big numbers and then taking

12   out segments of the numbers in the middle, something like

13   that.

14           **MR. BARSHAK:**  Excuse me, but this is not in the

15   report.

16           **THE COURT:**  Well, it doesn't make any sense to me

17   either.  So, I think it's rather marginal.  We'll allow it.

18           I guess my question is, whatever that

19   mumbo-jumbo -- and I mean no disrespect.  You did it in

20   accordance with normal statistical procedures.

21           **THE WITNESS:**  That's correct.  But I think what

22   he's getting at, if I may.

23           **THE COURT:**  You may.

24           **THE WITNESS:**  There are two ways in which one can

25   set a seed.  One is if you use the types of commands I did

1    that automatically, the seed is set by the clock, the actual

2    time at which you enter that command.

3            There is another option which is possible where you

4    can actually set the seed.  So I can write in a number so

5    that that particular seed indicates where in the random

6    number generation the process starts.  In my professional

7    experience we use the clock.  And that's what I did here and

8    what's what I do in all of my other work.

9            **THE COURT:**  Proceed, Mr. Borten.

10           **MR. BORTEN:**  I have no further questions.

11           **THE COURT:**  Any questions for this witness?

12           **MR. BARSHAK:**  Yes, your Honor.

13           **THE COURT:**  Go ahead.

14                         **CROSS-EXAMINATION**

15   **BY  MR. BARSHAK**

16   **Q**   Good morning, Professor Nordheim.

17   **A**   Good morning, counsel.

18   **Q**   You agree that most of your publications are in the

19   fields of ecology, biology and botany, correct?

20   **A**   That's correct.

21   **Q**   You agree that you do not consider yourself to be an

22   expert in social and behavioral science research design,

23   correct?

24   **A**   That's correct.  Although I do have considerable general

25   experience in design in a wide range of areas which I do

1    feel is broadly applicable.

2    **Q**    But you agree that you do not have substantial

3    experience in social and behavioral science research design,

4    correct?

5    A    I think that's fair.

6    **Q**    You have no formal education in child welfare correct?

7    A    Correct.

8    **Q**    You have no formal training in compiled welfare,

9    correct?

10   A    Correct.

11   **Q**    You're not an expert in data collection instruments

12   relating to social behavioral sciences, correct?

13   A    That's correct.

14   **Q**    You agree that the goal of sampling is to generalize

15   characteristics of the sample to the population from which

16   the sample was drawn, correct?

17   A    I think the goal of sampling is to obtain according to

18   various criteria a sample that can, we can view as

19   representative of the populations that will allow us to make

20   inference for the questions of interest.

21          **MR. BARSHAK:**  May I approach, your Honor?

22          **THE COURT:**  You may.

23   A    Thank you, sir.

24   **Q**    Professor Nordheim, you agree that the goal of the CRC

25   study was to generalize characteristics of the samples back

1    to the cohorts from which the samples were drawn, correct?

2    A    Please rephrase.

3    Q    Do you agree -- strike that.

4          You agree that the goal of the CRC study that you

5    consulted on was to generalize the characteristics found in

6    the samples to the cohorts from which the samples were

7    drawn?

8    A    I would phrase it slightly differently.  The goal of the

9    study was to obtain information about the population.  An

10   important step was to choose a sample, to meet various

11   criteria, that would allow us to draw inference about

12   certain properties of the population.

13         The way you phrased it I think is, if you'll

14   forgive me, I'm afraid is a little bit narrower than I think

15   is appropriate.

16   Q    Do you remember being deposed in this case in November

17   of 2012?

18   A    I do.

19   Q    Can you please turn to page 96 of your deposition?

20   A    Okay.

21   Q    Looking at line 8.  Question:  Was the goal to

22   generalize characteristics of those sampled groups -- strike

23   that.

24         Question:  Was the goal to generalize

25   characteristics of those sample groups back to the cohorts

1      from which those samples were drawn?

2              Answer:  Yeah.

3              Did I read that correctly?

4      A    You read it correctly.

5      Q    You agree that a confidence interval shows how certain

6      one is that the characteristics observed in the sample are

7      present in the population from which a sample was drawn?

8      A    A confidence -- sorry, I was thinking about something.

9      Please rephrase.  Rather than my wanting to rephrase your

10     answer, please rephrase your question.

11     Q    You agree, you agree you're familiar with the term

12     confidence level, correct?

13     A    Oh, yes.  Yes.

14     Q    And you agree that a confidence interval shows how

15     certain one is that the characteristics observed in the

16     sample are present in the population from which the sample

17     is drawn?

18     A    Okay, I probably -- you're in the right direction.  I

19     probably would phrase, I would probably phrase things

20     slightly differently.  But maybe that would get into an

21     arcanity, so I'm willing to go with your wording.

22     Q    So, you're willing to accept what I just said?

23     A    Yes.

24     Q    You agree that if a confidence interval cannot be

25     calculated it is not proper to generalize the finding of a

1    sample to the population from which it was drawn, correct?

2    A    That a -- I don't think that is a correct statement.

3    But please rephrase it because, I mean, there were some very

4    specific wording you had in there.  That you cannot draw a

5    conclusion.

6    Q    Sure, I'll repeat to make sure that you --

7    A    Please.

8    Q    -- accurately hear the question.

9         The question is, you agree that if a confidence

10    interval cannot be calculated then it is not proper to

11    generalize the finding of a sample to the population from

12    which the sample was drawn?

13    A    Okay, so let me rephrase it.  So you're saying if the

14    confidence interval --

15    Q    Professor, are you able to answer that question yes or

16    no?

17    A    If I understand the question, I'm able to answer it,

18    yes.  But I want to make sure I understand it.  And the best

19    way for me, I guess, you'll have to pardon me, is what's I

20    learned about a professor, I would like to rephrase the

21    question as I heard it to make sure I'm understanding it

22    correctly.  And what --

23    Q    Professor, let me just repeat the question, but I want

24    to make sure that you hear correctly what I said, but I'm

25    then just going to ask, if you can, to answer the question

1    that is being asked.

2         **THE COURT:**  He's already said that he can answer it

3    if under his understanding he can understand answer your

4    previous question yes.

5         Now, I'm going to let him rephrase the question to

6    state his understanding, because it would be helpful to me.

7    And he may do so.

8    A   Okay.  So my understanding is that your question is that

9    go if I cannot calculate a confidence interval, I cannot

10   draw inference to the population.  And yes --

11        **THE COURT:**  And with, with that understanding --

12   **Q**   Do you agree -- yes.

13        With that understanding do you agree with that

14   statement or not.

15   A   I think that's too narrow a point of view.  So, no, I do

16   not.

17   **Q**   In the CRC study a confidence interval was stated before

18   the data, before the data collected, correct?

19   A   Correct.

20   **Q**   And the stated confidence interval had a 95 percent

21   confidence level and a maximum margin of error of

22   60 percent, correct?

23   A   That is correct.  And it was calculated under the

24   assumption that if we had all elements from all 242, that

25   the maximum width of a confidence interval would be 240 --

1    would be six percent, half width, it would be six percent.

2    Q    Maximum six percent in each direction.

3    A    In each direction.  That's the half width.  So

4    twelve percent would be the total width.  Correct.

5    Q    And earlier today when you made reference to a

6    twelve percent half width, that's twelve percent in each

7    direction, correct?

8    A    That's correct.

9    Q    The sample size for each sample for the CRC study was

10   242, correct?

11   A    That was the total sample size for each of the two

12   cohorts, correct.

13   Q    You agree that if you have fewer than 242 cases that the

14   confidence interval becomes wider than the confidence, than

15   the stated confident interval?

16   A    That is correct.  Although that could be mitigated in

17   part if the estimated proportion is well away from

18   50 percent.  If the estimated proportion is like ten percent

19   there will be some compensating narrowing of it.  But your

20   statement in general is true.

21   Q    And you agree that the farther below 242 cases one has

22   for an item, that the larger the difference between the

23   stated confidence interval and the resulting confident

24   internal for that item.

25   A    Well, the stated confidence interval was what we use for

1    sample size calculations only.  Bur you are correct that the

2    manifested confidence interval, the one we would actually

3    sustained from date from smaller sample sizes would in

4    general be wider, yes.

5    **Q**    After data collection each specific finding would have

6    its own confidence interval, correct?

7    A    Correct.

8    **Q**    And after data collection, CRC could have calculated a

9    confidence interval for each finding, correct?

10   A    I assume they could have, yes.

11   **Q**    You agree that you do not know how the plaintiff class

12   in this case is defined, correct?

13   A    That's correct.

14   **Q**    And you do not know whether the two cohorts combined

15   include or do not include everyone in the plaintiff class,

16   correct?

17   A    I do not know that for sure, no, that's correct.

18   **Q**    You were not involved in designing the criteria for the

19   cohorts, correct?

20   A    Correct.

21   **Q**    And you did not participate in the decision to have two

22   cohorts, correct?

23   A    I did not participate in the decision, although when

24   they first approached me they indicated that that was there

25   their plan and they asked me if I felt that that were

1    appropriate in designing a sample study and based on the

2    questions I asked, I found no reason to question that

3    decision.

4    Q    So, before meeting with you CRC was thinking in terms of

5    having two cohorts, correct?

6    A    That's my understanding, yes.

7    Q    You agree that one could have designed a study where a

8    single sample was taken from the population of all children

9    in the custody of DCF as a result of abuse or neglect,

10   correct?

11   A    It's possible, yes.

12   Q    And you agree that assuming that the population of

13   children in DCF custody as a result of abuse and neglect was

14   7,500, that the size of a single sample from that population

15   needed to achieve a confidence level of 95 percent and a

16   margin, and a maximum margin error of plus or minus six

17   percent would have been smaller than the sum of the two

18   samples of 242 used in this study?

19   A    Okay.  I am going to need to make a slight modification

20   in the way you phrased the question.  First of all, we very

21   deliberately, because of questions of independence, which I

22   can get into with you or your Honor, if you wish me to, on

23   independence, we sampled families, not children.  And so in

24   terms of sampling families, had we had a single cohort the

25   sample size to meet a six percent half width would have been

1  smaller than the sum of 242 plus 242.  Yes.

2  Q   One aspect of the sampling design was the generation of

3  unique families for each cohort, correct?

4  A   Correct.

5  Q   And for that step you provided CRC with the list of

6  unique families for each cohort sample, correct?

7  A   Correct.

8  Q   And you used a statistical software called R in

9  generating the list of unique families for each cohort

10  sample, correct.

11  A   Correct.

12  Q   And you did not use the set.seed command in R when

13  generating the list of numbers for families for each Cohort,

14  correct.

15  A   Correct.

16  Q   You were not asked to use a set.seed command, correct?

17  A   Correct.

18  Q   There was no discussion between yourself and CRC about

19  using a set.seed command, correct?

20  A   Correct.

21  Q   Using a set.seed command would not have changed the cost

22  of the study, correct?

23  A   Correct.

24  Q   Using a set.seed command would not have changed the time

25  to carry out the study, correct?

1    A    By a trivial amount, but effectively it would not have

2    changed the time.

3    Q    Using a set seed command would have made it possible for

4    someone else with the program R to repeat the same list that

5    you generated, correct?

6    A    Correct.

7    Q    Another aspect of the sample design was the selection of

8    unique children from the unique families that you had

9    selected, correct?

10   A    Correct.

11   Q    And if a family, if a unique family had one child that

12   child was selected for the sample, correct.

13   A    Correct.

14   Q    If a unique family had more than one child CRC selected

15   one child from that family for the sample, correct?

16   A    Correct.  That's my understanding.

17   Q    So you agree that not all children in the unique

18   families have the same chance of being selected for the

19   sample, correct?

20   A    That's correct.

21   Q    For example, an only child in a unique family would have

22   a greater chance of being selected for the sample than a

23   child with three siblings?

24   A    That's correct.

25   Q    The fact that not all children in unique families have

1    the same chance of being selected for a sample could have

2    been accounted for in the study.

3    A    Oh, yes.

4    Q    But you never discussed with CRC about making

5    adjustments for the fact that not all children in unique

6    families had the same chance of being selected for the

7    sample, correct?

8    A    I was not asked to participate in the data analysis, so

9    I'm not a hundred percent sure what they did, and I was

10   consulted on that matter at that time.

11   Q    You agree that the plaintiffs' counsel was involved in a

12   discussion leading to selection of the margin of error?

13   A    Meaning the half width of the confidence interval.

14   Q    Yes correct?

15   A    Yes, that was a three way or four way discussion among

16   myself, Mr. Barton, Mr. Bartosz, and Dr. Johnson.

17   Q    And you agree that the .06 half width was based on the

18   level of precision that plaintiffs' counsel thought was

19   appropriate?

20   A    I would say it was, it was not something they came in at

21   the beginning and said we're aiming at a .060.  I think it

22   ended up as being more open-ended.

23         The decision to come up with a sample size is based

24   on a combination of factors.  One is to achieve a certain

25   amount precision, but the other one would is also is sort of

1    practicality and cost.  I mean, in principle we could have

2    looked at every family.  But that would have been extremely

3    time consuming and costly and probably you would not have

4    netted that much more information.  I mine that's why in

5    general we sample.  So, after a lot of elicitation questions

6    on my part as to how much precision they wanted, also some

7    questions on practicality, we came up with a number .06 as

8    real figure in this case.

9    **Q**    Can you please turn to page 91 of your deposition.

10   A    Certainly Okay.

11   **Q**    Line three, question:  But ultimately the .06 was based

12   on the level of precision that plaintiffs' counsel thought

13   was appropriate?

14            Yes.

15            Mr. Borten:  Objection.  And again, I think it is

16   appropriate for a statistical consultant, I mean, you

17   certainly want to provide the tradeoff so that they're aware

18   of what the issues are, and say these are the kinds of

19   things that you might anticipate but ultimately I think a

20   good statistical consultant has to rely on the subject

21   matter specialist for what the appropriate half width is.

22            And then the answer continues:  Do you agree that

23   what I read, which was part of the full answer, was correct?

24   A    Yes.

25            **THE WITNESS:**  May I comment, add a little bit to

1    that, your Honor?

2        **THE COURT:**  Not at this stage.

3    **Q**    You relied upon CRC and CRI in part for what was the

4    appropriate half width margin of error, correct?

5    A    That's correct.

6        **MR. BARSHAK:**  No further questions.

7        **THE COURT:**  Any redirect?

8        **MR. BORTEN:**  Just one.

9                    **REDIRECT EXAMINATION**

10   **BY MR. BORTEN:**

11   **Q**    Professor Nordheim, you mentioned that you would like to

12   comment on that last question concerning your testimony on

13   page 91.  Please comment.

14   A    Yeah.  I mean basically, whenever I do statistical

15   consulting, you know, I provide, I ask lots of questions, do

16   a lot of elicitation, but ultimately the final decision in

17   all cases does have to rest with the subject matter

18   specialist.  But, I mean, this is at the end of discussions

19   of lots of tradeoffs and what sort of stuff.  But ultimately

20   if you had said nope, eight percent is enough, we would have

21   gone with that, four percent is enough, you know, I might

22   have argued, but it was ultimately your call.  And that's

23   kind of what I meant by saying that the subject matter

24   expert should have the final say.  But I do think I was

25   fully involved in all of the issues leading to that

1     decision.

2              MR. BORTEN:  No further questions.

3              THE COURT:  Nothing further for this witness?

4              MR. BARSHAK:  No questions.

5              THE COURT:  Hearing none, you may step down.

6              Call your next witness.

7              THE WITNESS:  Thank you, sir.  Shall I just leave

8     all these things here?

9              THE COURT:  They're take care of them.

10             THE WITNESS:  Thank you.

11             (Whereupon the witness stepped down.)

12             MR. BORTEN:  Your Honor, plaintiffs call

13    Dr. Lenette Lessing.

14             MS. BARTOSZ:  Good morning, your Honor.

15             THE COURT:  Good morning.  Now, the witness is

16    recalled.

17             MS. BARTOSZ:  We will recall Dr. Lenette Lessing

18    who was first on the stand last week, I believe on the 25th.

19             THE COURT:  Right.

20             THE WITNESS:  Good morning.

21             THE CLERK:  I would like to remind you, Doctor,

22    that you're still under oath.

23             THE WITNESS:  Okay.

24             THE COURT:  Ms. Barotsz.

25             MS. BARTOSZ:  Thank you, your Honor.

1        Your Honor, may I proceed the Court once again with

2    Exhibit GY which is Dr. Lessing's report?

3        **THE COURT:**  You may.

4            LENETTE AZZI-LESSING, Resumed

5        **DIRECT EXAMINATION** (Cont'd)

6    **BY MS. BARTOSZ**

7    **Q**    Welcome back, Dr. Lessing.

8    A    Thank you.

9    **Q**    Dr. Lessing, when we left off back on January 25th last

10   week you were talking about your professional experience

11   with the Child Welfare League of America.

12   A    Yes.

13   **Q**    I would like to pick up at that point with you today,

14   okay?

15   A    Okay.

16   **Q**    You were talking about practice committee within the

17   CWLA that you were associated with.  Please describe that

18   experience?

19   A    Well, I joined the committee probably in 1995-96 and

20   eventually became co-chair and I've co-chaired the committee

21   for the last several years.  And it was a Child Welfare

22   Colleague committee on prevention, permanency and family

23   support.  It's had a few different names over the years, but

24   essentially our charge was to examine and recommend best

25   practices for children and families within their own home,

1    getting services from private agencies as well as public

2    child welfare agencies.

3    **Q**    Thank you.

4         Beyond that work with the CWLA, have you had other

5    professional activities that involved the establishment or

6    review of policies or standards.

7    A    Yes.  My agency, Children's Friend, was accredited by

8    the Council of Accreditation and the council issued

9    standards both for public child welfare agencies and for

10   private agencies like mine.  And so, we all had to

11   understand the standards and ensure that the agency adhered

12   to those standards.

13   **Q**    Are you familiar with an organization called the

14   National Resource Center on In-Home Services?

15   A    Yes.

16   **Q**    What is that, Dr. Lessing?

17   A    That is a committee set up by the national center on

18   child abuse and neglect to look at, examine essentially and

19   disseminate information on appropriate practice and best

20   practice for children receiving in-home services.  And the

21   orientation is primarily toward children and families in the

22   child protective system, in the state child protective

23   systems.

24   **Q**    Have you worked with that organization?

25   A    Yes, I have.  I've been on the, the advisory committee,

1    the national advisory committee for three or four years now.

2    And we communicate by phon, e-mail and get together once a

3    year to, usually for a couple of days to review best

4    practices, to examine new developments in practice in

5    various parts of the country, and to advise the national

6    center on where it should focus its efforts and any new

7    research or approaches that are, that are sort of emerging

8    in the field.

9    Q    Dr. Lessing, have you published in the fields of social

10   work or child welfare?

11   A    Yes, I have.

12   Q    Can you describe your publications?

13   A    Well, I had a few publications that I co-authored in the

14   '90's that were accepted and published in peer-review

15   journals that was about our work at the agency with

16   substance abuse affected families who were involved in the

17   child welfare system.  The project that I started there,

18   Project Connect, had, had some good lessons to teach the

19   rest of the field because working with substance affected

20   families in a consistent and specialized way was still

21   relatively new.  It was still actually new during those

22   years.  And so our program was a demonstration project and

23   we wanted to share, you know, with the rest of the country

24   what we were finding and the kind of work that we were

25   doing.

1          I began publishing articles again once I reentered

2     the academic world at Wheelock College and have published on

3     working with highly vulnerable children and a variety of

4     settings including early care and education settings, day

5     care centers, early intervention, those kinds of programs,

6     as well as children getting home based services from a

7     formal home visiting program including those in the child

8     welfare system who are at risk for entering the child

9     welfare system.

10    Q    You just alluded to your time at Wheelock College.  I

11    would like to turn to now your professional employment in

12    academia, okay?

13    A    Okay.

14    Q    Let's start with your first academic appointment.  When

15    was and where was that?

16    A    My first academic appointment was at Rhode Island

17    College.  I was an assistant professor in the master's in

18    social work program there from 1988 to 1992.

19    Q    What course work did you teach there?

20    A    I taught clinical practice, crisis intervention, human

21    behavior in the social environment, and a child welfare

22    practice course.

23    Q    What was that practice course in child welfare; what did

24    that involve?

25    A    It was a semester long course focusing on the, sort of

1    the child welfare system from practice to research to

2    policy.  And so, it was, it provided students with an

3    introduction sometimes to the child welfare system,

4    applicable state and federal regulations, and then what the

5    research said about best practices for keeping children

6    safe, for obtaining permanency for children in the system,

7    looking at things like children who have been traumatized,

8    particularly around sexual abuse, physical abuse, and what

9    best practices were at that time for intervention with those

10   children and families.

11   Q    Let's turn now you to Wheelock College.  And can you

12   please remind the Court when you took on employment at

13   Wheelock and for how long you've been there?

14   A    Okay.  I took on part-time employment at Wheelock in

15   2006, the fall of 2006.  I taught a course on advanced

16   research methods there.  And then in 2007, January 2007, I

17   became a full-time employee of Wheelock.

18   Q    And you continue as a tenured professor there today?

19   A    Yes, I was awarded tenure this past March.

20   Q    Okay.  What course work have you taught as a professor

21   at Wheelock over the last two school terms?

22   A    Okay.  I've taught advanced research methods.  I've

23   taught practice with children and their families one and

24   part two.  I've taught human behavior in a social

25   environment.  I've taught social work leadership and

1    administration, and social policy practice.

2    **Q**    Can you more fully describe for the Court who's involved

3    in the courses social work practice with children and

4    families one and two?

5    A    Sure.  I should also indicate that I redesigned both of

6    those courses.  When I got to Wheelock I felt like they

7    needed some updating, and essentially have completely

8    redesigned them.

9         But the first practice course, practice with

10   children and their fair families one really helps students

11   get a good grounding in what we call clinical practice,

12   mental health practice.  So we cover how to engage

13   individuals in families and groups in therapy, how to do a

14   good assessment, how to negotiate with individuals, groups

15   and families around service plans for mental health, and

16   then we look at some modalities, mostly evidence based

17   mental health treatment procedures in that course.

18        In practice with children and families two, we then

19   apply those methodologies to a variety of child and family

20   situations.  So, we look at topics such as childhood trauma,

21   substance abuse, family substance abuse, children and

22   families in the child protective system, we look at applying

23   some of the models that we looked at in the first semester.

24   We examine how those models might be used in working with

25   families at risk for child abuse and neglect, families

1    already in the system, families needing some help in terms

2    of remaining in intact.  Also working with children and

3    families involved in the foster care system, and children

4    and families involved in the adoption process.

5    **Q**    During your employment at Wheelock, Dr. Lessing, have

6    you had opportunity to interact with the Department of

7    Children and Families in Massachusetts?

8    A    Yes, I have.

9    **Q**    Can you describe the professional interaction you've

10   had?

11   A    I got to know Amy Kershaw Shaw at DCF in Massachusetts

12   when I was doing some work looking at the infrastructure for

13   early childhood programs in Massachusetts.  At that time,

14   she was acting Director of the Department of Early Education

15   and Care.  And we began, she moved from that a position to

16   DCF, but we began a conversation about strengthening DCF's

17   capacity to serve infants, toddler, preschoolers, very young

18   children.  Because her role at DCF involves primarily that

19   of essentially taking her expertise with very young children

20   and looking to infuse that into the child protective system.

21   And in conversations with Amy she engaged me in planning a

22   two day conference for the commissioners of the New England

23   states child welfare commissioners and their key staff and

24   partners around improving services for very young children

25   in the child welfare systems in the New England states.

1          New England's commissioners, New England child

2     Welfare Commissioners Association was involved in that

3     planning as well as was representatives of the Casey

4     Foundation, and that training was held a couple of years

5     allege in New Hampshire and was again attended by a

6     delegation from the New England states.

7          I have also been involved or had contact with folks

8     at DCF around a new certificate program that Wheelock

9     College is offering, and that I initiated and developed in

10    early childhood mental health.  And there is, there are

11    currently some, some DCF mental health staff participating

12    in that certificate program right now.  And it's a, sort of

13    a collaboration between DCF and Wheelock.

14         I'm also -- I also have contact with folks from DCF

15    on an advisory board which is for a program called Connected

16    Beginnings that was initiated by the United Way and is now

17    over seen by Wheelock College.  And Connected Beginnings is

18    focused on providing early childhood mental health training

19    to individuals who care for young children in day care

20    centers and family day care programs.

21         **THE COURT:**  Forgive me, I'm not watching the time.

22    It is time for the morning recess.  We'll take the morning

23    recess at this time for one-half hour.  We'll recess.

24         **MS. BARTOSZ:**  Thank you, Judge.

25         **THE COURT:**  We'll recess for one-half hour.  We'll

1      recess.

2                    THE CLERK:  All rise.

3                    (Recess.)

4                    THE CLERK:  All rise.  The United States District

5      Court is back in session, you may be seated.

6                    THE COURT:  Go ahead, Ms. Bartosz.

7                    MS. BARTOSZ:  Thank you, your Honor.

8                    DIRECT EXAMINATION (Cont'd)

9      BY  MS. BARTOSZ

10     Q    Dr. Lessing, can you describe how you became involved as

11     an expert witness in this proceeding?

12     A    Yes.  Children's Rights staff members contacted me

13     sometime in 2010, I think it was summer, early fall of 2010,

14     and asked if I would consider working as an expert witness

15     on this case.  I considered it and continued to talk with,

16     with staff from Children's Rights and contracted to serve as

17     an expert witness in May 2011.

18     Q    Do you recall which Children's Rights attorneys reached

19     out to you?

20     A    Yes.  It was you.

21     Q    What did you understand the scope of the expert

22     consultation to be?

23     A    Well, I understood my charge to be reviewing, reading

24     and reviewing the named plaintiffs files and assessing the

25     degree to which basic minimum standards of acceptable case

1  work practice in child welfare were followed, including

2  DCF's policies and procedures, the degree to which they were

3  followed in conducting the case work outlined in those

4  records.

5  **Q**   So, is it that scope that you agreed to undertake?

6  A   Yes.

7  **Q**   Are you being paid for your work --

8  A   Yes.

9  **Q**   -- Dr. Lessing?

10        Can you describe the compensation arrangement that

11 you agreed to?

12 A   The compensation that we agreed to was $30,000 for the

13 review of the named plaintiffs' files and writing the

14 report, and then $150 an hour for work beyond that,

15 including preparing for the deposition and preparing for

16 testimony.

17 **Q**   We won't hold you to a precise number, but can you

18 describe for the number generally how many hours you

19 invested in the review and analysis of the named plaintiff

20 case files?

21 A   Several hundred hours.  I haven't calculated.  But most

22 of every weekday during the last summer I spent maybe six to

23 eight hours a week most weekdays reviewing the case records.

24 I had 22 boxes, banker's boxes of records and multiple

25 documents that weren't in any particular order, files that

1    were very confusing, and, and not organized in a consistent

2    way so it was very difficult to sort of trace the movement

3    of the case and sort out what had happened.  So it took a

4    great deal more time than I expected, but I would say

5    several hundred hours.

6    **Q**    Now, Dr. Lessing, did you develop and employ a

7    methodology in performing your work in this case?

8    A    Yes.

9    **Q**    Can you describe that methodology, please?

10    A    Well, I used the framework that is found in federal

11    child welfare policy and also within DCF's own policy

12    manuals which is evaluating the work that took place in

13    terms of its focus on an effectiveness on providing children

14    with safety, permanency and well-being.

15    **Q**    Let's stop there for a moment.  And you referred to

16    federal policy.

17    A    Uh-huh.

18    **Q**    What does the word safety mean as you use it in

19    association with that federal policy?

20    A    Well, safety means keeping children physically safe as

21    well as emotionally protected.  It means that when a child

22    is removed from the home that is based largely if not

23    entirely on the child's safety in that home or lack thereof

24    and that it be done in a way that the child experiences

25    greater safety once removed from the home than less in the

1    home.  It also means protection from not only physical abuse

2    of any sort but also protection from emotional abuse, from

3    trauma, from anything that would negatively impact a child's

4    well-being, mental health as well as physical health.

5    **Q**    What does the term permanency refer to as you used it?

6    **A**    Permanency refers to, stated simply, to have a family of

7    one's own that is expected to be permanent.  And it is the

8    ultimate goal for any children who are removed from their

9    homes in a child welfare setting.  So that means that a plan

10   is made as rapidly as possible to make the home that the

11   child was removed from sufficiently safe so that the child

12   could be returned there or that the child moves towards or

13   the state moves towards terminating parental rights and

14   finding an adoptive home for that child.  But it's also

15   about finding a permanent family for a child instead of

16   letting that child be in limbo and their fate uncertain.

17   **Q**    Does the term permanency any meaning in terms of the

18   foster homes that are provided by the state to a child taken

19   into custody?

20   **A**    Sure.  Permanency also means minimizing the number of

21   times that a child is moved from foster placement or group

22   or residential placement.  It means using placements very

23   strategically and very carefully so that there aren't

24   multiple moves because we know that multiple moves and

25   transitions disrupt children's ability to obtain permanency.

1    Q    And finally, what does the term well-being mean as you

2    used it in talking about this federal policy umbrella?

3    A    Sure.  Well, well-being goes beyond just keeping the

4    child safe and finding the child a permanent family, a

5    permanent home.  It has to do with promoting good mental

6    health and good physical health.  So, it means that the

7    child's physical needs are attended to, that there's primary

8    health care, that if the child has any disabilities that

9    those disabilities are addressed appropriately, and if the

10   child has any mental health problems that he or she receive

11   appropriate services in a very timely manner, and that good

12   physical and emotional health is supported throughout

13   practice with children in child welfare settings.

14   Q    Now, Dr. Lessing, you've made reference to accepted

15   standards of care in the child welfare field.  In performing

16   your work here how did you identify those standards?

17   A    Well, again, I used that framework of safety permanency

18   and well-being to look at the cases through a lens that was

19   informed by standards that I'm familiar with as established

20   by the Child Welfare League, by the Council on Accreditation

21   for Services for Children and their Families.  My

22   understanding and familiarity with the literature both in

23   books and peer review journals on appropriate practices in

24   compiled welfare.  My own direct work experience both as a

25   practitioner and as an agency administrator.  My teaching in

1    the area of child welfare practice.  And looking at DCF's

2    own standards and the Massachusetts regulation.

3    **Q**   Did you identify standards of care that are in written

4    form within the Commonwealth of Massachusetts.

5    A   Yes.

6    **Q**   Can you describe for the Court that set of standards?

7    A   Those standards of care are in the DCF policy and

8    procedures manuals and some are written into the

9    Massachusetts regulations.  They reflect the standards basic

10   minimum standards of accepted practice found in federal

11   policy as well as in the literature.

12   **Q**   Dr. Lessing, I'll ask that you focus your attention for

13   a moment on Exhibit 1 in evidence.  Can you identify

14   Exhibit 1?

15   A   This is a DCF case practice policy and procedures

16   manual.  It is labeled the Commonwealth of Massachusetts

17   Department of Children and Families until December 11th,

18   2008.

19   **Q**   Did you make use of Exhibit 1 in performing your work?

20   A   Yes, I did.

21   **Q**   Dr. Lessing, I would also ask at this point that you

22   direct your attention to Exhibit 2.  Can you identify

23   Exhibit 2, Dr. Lessing?

24   A   Yes.  It's another volume of, actually two volumes of

25   DCF case practice policy and procedures manual.  It is

1    undated.

2    Q    What do you understand Exhibit 2 to be?

3    A    Additional DCF policies and procedures.  I was informed

4    that DCF has not compiled a unified manual.

5             MS. TRAN:  Objection; not in the report.

6             THE COURT:  Well, it's also hearsay, so I'll strike

7    it.  But these --

8             MS. BARTOSZ:  I'll withdraw the question.

9             THE COURT:  -- documents are in evidence, Exhibits

10   1 and 2.

11            Go ahead.

12            MS. BARTOSZ:  Thank you.

13   Q    Dr. Lessing, did you make reference to Exhibit 2 in the

14   course of your work in this case?

15   A    Yes, I did.

16   Q    Beyond Exhibit 1 and 2, Dr. Lessing, did you make

17   reference to other standards within the Commonwealth of

18   Massachusetts in written form in the course of your work?

19   A    Yes, and those are the Massachusetts regulations

20   pertaining to DCF.

21   Q    Did you refer to any social work literature or research

22   in the course of your work?

23   A    Yes, I, I utilized a number of writings, publications in

24   child welfare work to support and reflect my opinions in a

25   range of areas.

1  Q    Setting aside for a moment the standard as that you

2  looked at, Dr. Lessing, what did you look at in terms of the

3  named plaintiff histories themselves, and I'm referring to

4  documentation.

5  A    Well, I reviewed all of the records of the five named

6  plaintiffs whose, whose records I had received and

7  essentially read, read every record of the files.

8  Q    How did you obtain the files of the named plaintiff

9  children?

10 A    They were sent to me by Children's Rights.

11 Q    In what form did you receive them?

12 A    Again, most of them were unbound in bankers boxes, in 22

13 such boxes.  I also was provided with an index of additional

14 documents that Children's Rights had obtained from third

15 party providers, usually private agencies in Massachusetts,

16 as well as from the juvenile court.  Although those records

17 were not, those records were not available for all of the

18 named plaintiffs.  So, I essentially utilized those records

19 as well.  And those were provided to me through an index

20 that I received electronically, those documents, outlining

21 the title of the documents, and I accessed those that

22 appeared to be relevant to my report.

23 Q    What do you mean by your access?

24 A    Well, I notified Children's Rights and asked for an

25 electronic copy of any of those additional documents that

1    appeared to be relevant to my report.

2    Q    And did Children's Rights respond to that request?

3    A    Yes, they provided all of the documents that I

4    requested.

5    Q    And did you review those documents?

6    A    Yes, I did.

7    Q    All of them?

8    A    Yes.

9    Q    Did you interview any of the named plaintiff children?

10   A    No, I did not.

11   Q    Were you given face-to-face access to any of those

12   children?

13   A    No, I was not.

14   Q    Dr. Lessing, before you conducted the review of the

15   named plaintiff files here as an expert witness, had you

16   conducted similar type case reads in the past?

17   A    Yes, somewhat similar.  In the 1980's when I was working

18   in Rhode Island, there was a death of a child in DCF custody

19   in Rhode Island and another state agency was putting

20   together a task force of social workers to review a sample

21   of case records from that agency in order to determine the

22   degree to which some of the difficulties that were, were

23   observed in the child death, that to determine the degree to

24   which practice was compliant again with standard acceptable

25   practices of child welfare and to ensure that children were

1    safe in the system.  And I participated in that record

2    review.

3           I have also been on at least four panels called by

4    the Rhode Island Child Advocate over the years to

5    investigate a death of a child in DCF custody in Rhode

6    Island.  And that involved reading the relevant case records

7    in each of those cases.

8           I'm also familiar with establishing a case record

9    review policy from the agency that I headed because we had a

10   quality assurance policy and quality assurance practices and

11   procedures where a sampling of case records would be pulled

12   on a regular basis and a committee of staff members would

13   review those records and determine if the services provided

14   were appropriate and sound.

15   Q   Dr. Lessing, in reviewing the named plaintiff files were

16   you seeking to formulate opinions as to DCF as a system as a

17   whole?

18   A   No, my charge was to formulate opinions regarding the

19   case work services that were provided to the five named

20   plaintiffs whose records I reviewed and the impact of the

21   case work upon these five children.  I did, however, in

22   writing my report come across a number of issues that stood

23   out to me as cutting across the five cases as well as

24   indicating that there were systemic deficiencies in DCF

25   practices, and I summarized those in a report attached to my

1    report on the five named plaintiffs regarding systemic

2    issues.

3    **Q**    Can you describe for the Court, Dr. Lessing, the named

4    plaintiff files that you reviewed in terms of the begin date

5    of the file to the end date of the file as you received it?

6    **A**    My understanding of the records that I received is that

7    I had received the records that dated back from when the

8    family first became involved with DCF, and then the end

9    dates varied, but all of them ended at some point in 2012, I

10   think anywhere from January to April depending on the case.

11   **Q**    Can you describe generally what process you applied or

12   undertook in reviewing each one of these named plaintiff

13   files?

14   **A**    Initially I had difficulty setting up a system because

15   again the case files were organized very differently from

16   one another and some of the case records contained a

17   information that others didn't or in a different format and

18   so forth.  So, I just began taking notes on the cases that I

19   read and then converting those notes into a summary of what

20   had happened in the cases, the key events that had occurred

21   in the case.  And after I had done that then I wrote an

22   assessment report on each of the cases and assessed the case

23   work practices, again going back to DCF's own policies and

24   procedures with regard to providing these children with

25   safety permanency and well-being.

1  **Q**   And the report that you generated, Dr. Lessing, is that

2  Exhibit GY?

3  A   Yes, it is.

4  **Q**   At this point I would like to focus your attention to

5  named plaintiff Connor B.  Did you read the DCF case file

6  for Connor B?

7  A   Yes, I did.

8  **Q**   And did you make a review of that case file with respect

9  to the issue of safety as you earlier defined it?

10  A   Yes.

11  **Q**   What findings did you make with respect to safety?

12  A   I would say that DCF not only didn't provide Connor with

13  safety, but they actually endangered Connor in a number of

14  ways.

15       When Connor was six years old and his sister was

16  four they were living with their mother who was involved

17  with a man who was a known perpetrator of sexual abuse.

18  This man had been known to DCF for sexually abusing his own

19  three-year-old.  DCF received a child abuse and neglect

20  complaint on Connor's family.  They went out and

21  investigated the complaint and they determined information

22  from their own records that this man was involved with the

23  family and probably in the household.  However, it took DCF

24  five weeks to act on that information and therefore they

25  left Connor and his four-year-old sister in the home with

1    access to this known perpetrator of sexual abuse to young

2    children when it --

3             MS. TRAN:  Objection, your Honor.

4             THE COURT:  Grounds?

5             MS. TRAN:  She's not providing an opinion, she's

6    providing a summary of the events of the named plaintiffs

7    which she gleans from the case records which contain a

8    significant amount of hearsay.  Her opinions are one thing,

9    the retelling of these children's case stories are not

10   properly documented with this witness.

11            THE COURT:  Well, doesn't that -- your point is

12   well taken, but it seems to me that that goes to the weight,

13   not the admissibility.  There's no doubt, I don't understand

14   as you challenge this, there's no doubt she reviewed this

15   mass of written records.  Through cross-examination I'm

16   drawing the inference that no actual interviews were done

17   with anyone, but she looked at a bunch of records.

18            Now, in order to understand her opinion it seems to

19   me I have to have the recitation.  But I think your

20   objection is valid to this extent.  I will understand -- to

21   the extent this witness gives a recitation this event

22   happened, that event didn't happen, here's what I'm hearing

23   and here's the only weight I will give it.

24            According to the records and her trained

25   background, she infers that this or that event happened and

1       then we're going to get to her opinion, she's already given

2       one, that in Connor B's circumstance the conduct actually

3       endangered him.

4              With that limitation, the defense is content,

5       aren't they?

6              **MS. TRAN:**  Understood, yes, your Honor.

7              **THE COURT:**  Yes.  And that's as much as you can

8       have, Ms. Barotsz.  Maybe I'll get all these records in

9       evidence, and I am working through depositions.  But

10      proceeding like this, that's how I'm going to treat it.  And

11      the plaintiffs are content?

12             **MS. BARTOSZ:**  Your Honor, if I can address the

13      point one step further.

14             **THE COURT:**  Go ahead.

15             **MR. BARSHAK:**  Plaintiffs anticipate moving the

16      named plaintiff files or at least excerpts from those files

17      into evidence either as admissions from DCF, the entries in

18      the record made by DCF case workers, what have you, to

19      capture their work, or documents for notice to DCF of

20      certain events in a home or in a child's life upon which

21      action may or may not be --

22             **THE COURT:**  Well, they can only react depending

23      upon how you proceed to try your case.  You've recalled the

24      witness.  Her objection makes perfect sense.  With the

25      matter before me, I've told you how I'm going to proceed.

1    Now, you go ahead and offer whatever you want whenever you

2    want.  But now you're into this sort of narrative an opinion

3    and I can follow that.

4             Are you content with my ruling is my question.

5         **MS. BARTOSZ:**  Yes, Judge, and with just alerting

6    the Court that there will come a time where we will move for

7    the admission of underlying records.

8         **THE COURT:**  And we'll deal with that when it comes.

9         **MS. TRAN:**  Thank you, your Honor.

10        **THE COURT:**  With that limitation, you go ahead and

11   ask your questions, Ms. Barotsz.

12        **MS. BARTOSZ:**  Thank you, Judge.

13   **Q**   Ms. Lessing, when did Connor, or can you relate now the

14   events on Connor coming into foster care custody, foster

15   care custody?

16   A    Once DCF determined that this known perpetrator was in

17   the home, was involved with Connor's mother, they removed

18   him from his home and placed him in a foster home, again

19   when he was six years old, and in this foster home were two

20   other foster children.  And one of them was a 17-year-old

21   boy that I will call TC, and according to the record TC had

22   been abused, sexually abused in another DCF foster home.

23   There was also according to the record a 16-year-old boy in

24   that foster home placed by DCF who had some type of

25   developmental disability.

1    **Q**    Can you describe the foster parents in that home as

2    reflected in the file.

3    A    Yes, the foster parents were an older couple, although I

4    didn't find exact ages.  The foster father was in a

5    wheelchair.  He was an amputee.  He had one of his legs

6    amputated so he wasn't able to climb stairs.  The foster

7    mother apparently had MS.

8          The sleeping arrangements for the children were

9    that the bedrooms of the three boys were upstairs in the

10   home and the foster parents slept downstairs.  So, the

11   17-year-old boy who had been sexually abused in another DCF

12   foster home was in a bedroom next to the 16-year-old foster

13   boy with a developmental disability and six-year-old Connor.

14   **Q**    Did the file reflect any action taken in relation to TC,

15   the 17-year-old?

16   A    Yes.  TC had had an assessment for a safe and

17   appropriate placement that DCF had commissioned and the

18   clinician doing TC's assessment, the 17-year-old's

19   assessment, found that TC was at risk for sexually abusing

20   younger children and had indicated that he should not be

21   left alone with younger children and that he may be behave

22   inappropriately because he wasn't at that time capable of

23   understanding what was appropriate behavior.  So --

24   **Q**    Did the file reflect a response to that information?

25   A    I don't know that I would characterize it as a response.

1   But essentially the foster parent, foster mother offered to

2   put alarms on the doors of the three boys as they slept

3   upstairs so that she would be alerted if TC left his room

4   and tried to enter the bedroom of either of the boys.  DCF

5   agreed to this procedure and according to the case records

6   the alarms were put on the doors.  However, the foster

7   mother decided as a reward for good behavior at some point

8   to allow TC to disable the alarm on his door.  At least one

9   DCF worker was aware that that had taken place, the

10  disabling of the alarm.

11  **Q**   Did the file reflect any information in relation to

12  alarms being placed on Connor's assigned bedroom door?

13  A   Yes.

14  **Q**   What was that information?

15  A   The file indicates that an alarm was placed on Connor's

16  door and an alarm was placed on Christopher's door.

17  However, according to the records, TC disabled the alarm on

18  Connor's door and entered his room and repeatedly raped him.

19  **Q**   You said repeatedly.  Did this take place over a one

20  night period?

21  A   No, Connor was in this home for, I think four to six

22  weeks, and it happened, according to Connor it happened on a

23  number of occasions.

24  **Q**   Did the file reflect how this became known to DCF?

25  A   It did.  I'm trying to -- I believe that Connor had

1    reported that at school.

2    **Q**    When the information became known does the file reflect

3    whether or not a 51A was submitted?

4    A    Yes.

5    **Q**    What is a 51A?

6    A    A 51A is a report of suspected child abuse or neglect.

7    **Q**    Does the file reflect, the Connor B file, whether TC

8    was, beyond Connor and the other children in the home, given

9    access to other children?

10   A    Yes.

11            **MS. TRAN:**  Objection.

12            **THE COURT:**  Grounds?

13            **MS. TRAN:**  Leading.

14            **THE COURT:**  Well, I'll let that stand.  But don't

15   lead this witness, Ms. Bartosz.

16   A    The file indicates that there were, I think the term is

17   several other boys who had been placed in that foster home

18   along with TC and prior to Connor getting there, arriving

19   there.

20   **Q**    Now, in assessing the facts you've just testified to,

21   did you look to DCF policies?

22   A    Yes.

23   **Q**    Can you please turn to Exhibit 1 and turn to page

24   DCFPOL167.

25            **THE COURT:**  Would you give the cite again.

1          **MS. BARTOSZ:**  Yes, Judge.  It's Trial Exhibit 1,

2     and the pages, the Bates stamp designation DCFPOL, and then

3     there's the date 708 and the number 167.

4     **Q**    Do you have that page, Dr. Lessing?

5     A    Yes, I do.

6     **Q**    Can you identify what is shown here?

7     A    It is the placement prevention and placement policy.

8     **Q**    Did you refer to this policy in reviewing Connor's B's

9     file?

10    A    Yes, I did.

11    **Q**    Can you describe how you applied this policy to the

12    information you found in Connor B's file?

13    A    Yes.  The second sentence says:  In any case in which

14    placement is contemplated it must first be determined that

15    the placement to which the child will be going is more

16    likely than the current situation to reduce serious harm or

17    substantial risk of serious harm.

18          And so, in applying that policy, it was clear to me

19    that DCF removed Connor from his biological home where there

20    was a threat of harm and placed him in a situation where the

21    threat of harm was even greater by placing him in this

22    foster home with a boy that DCF, a much older boy, that DCF

23    knew was at risk for abusing other children.  And that in

24    fact is what happened.

25    **Q**    Have you formed an opinion as to whether or not that set

1  of events conformed or failed to conform to this policy?

2  A   It failed to conform with the policy; it violated the

3  policy.

4  Q   Dr. Lessing, I would like to focus your attention to

5  Exhibit 166.

6       MS. BARTOSZ:   Your Honor, I'll proffer a copy to

7  the Court.  Counsel?

8  Q   Can you identify Exhibit 166, Dr. Lessing?

9  A   Yes.  This has the Code of Massachusetts Regulation

10  Title 110, Department of Social Services, and it's the

11  policy regarding out-of-home placements.

12  Q   Did you make reference to this policy in formulating

13  your opinions on the Connor B file?

14  A   Yes.

15  Q   Can you explain to the Court how you applied this policy

16  to the facts you've delineated here?

17  A   Well, this policy states that all out-of-home placement

18  decisions shall be made in the best interest of the child

19  based upon safety of the child and the child's individual

20  needs.  Placement decisions should be made in a manner

21  conducive to permanency planning and the safe and timely

22  return of children to their homes or their placement into a

23  new permanent setting.  It also indicates that the child's

24  individual needs, including those related to his or her

25  physical mental and emotional well-being, and the capacity

1    of the prospective foster parents or pre-adoptive parent to

2    meet those needs should be considered.

3    **Q**    Have you formed an opinion as to whether or not this

4    policy was met in the instance of Connor B?

5    A    The policy was violated.

6    **Q**    And what is the factual basis for that opinion?

7    A    Well, DCF placed Connor in a home where it was evident

8    that he would be in danger, physically and emotionally.

9    **Q**    Maintaining the focus right now on the issue of safety

10   as you described it earlier, have you made other findings on

11   that matter, safety, in your review of the Connor B case

12   file?

13   A    Yes, I was concerned to see that in the record that not

14   only did TC, a 17-year-old boy, who was at high risk to

15   sexually abuse other children, not only did he have access

16   to Connor and this the other 16-year-old, the 16-year-old

17   foster child with a developmental disability, the record

18   indicates that TC also had access to children who were being

19   cared for by the daughter of TC's foster mother.  The adult

20   daughter of TC's foster mother was also a license DCF foster

21   home and a licensed day care provider.  And TC had indicated

22   that on a number of occasions he had unsupervised access to

23   children in that foster home and in that family day care

24   serving as a babysitter essentially, and that he had contact

25   with Connor's four-year-old sister who was placed in the

1    foster home of Connor's foster morning's adult daughter.

2    And so, again that's a violation of safety of those children

3    in the other foster home.

4         Beyond that, Connor's multiple placements and

5    sudden changes in placements also affected his ability to be

6    safe.

7    **Q**    You're referring now to permanency as you described it?

8    **A**    Permanency and safety.  After Connor was removed from

9    the foster home in which he had been raped, and he was

10   removed very suddenly from that foster home without an

11   opportunity to say goodbye to the foster mother, he was

12   placed in night-to-night placement which had to be extremely

13   frightening to a six-year-old, but especially a six-year-old

14   who had just been so severely traumatized.

15   **Q**    Let me stop you there for a moment, Dr. Lessing.  You

16   used the term night-to-night placement.  Can you describe

17   what you mean by that term?

18   A    Night-to-night placement is a term given to foster

19   placements that are only used for a single night or a night

20   or two.  They are not intended to provide ongoing stable

21   care for children.  They're typically used when a state

22   agency has no another place to put a child.

23   **Q**    When was Connor placed into the night-to-night placement

24   you're referring to?

25   A    When he was removed from the foster home where TC had

1    raped him, he was placed in, I believe it was two different

2    night-to-night placement homes.

3            Next he was placed in a foster home with a

4    17-year-old foster boy, 16- or 17-year-old foster boy, an

5    adolescent.  This frightened and traumatized him and he was

6    removed from that foster home after he threatened the foster

7    morning with a knife and a fork.

8    Q    Over what period of time, if you recall, Dr. Lessing,

9    and refer to your report if you need to, please, did Connor

10   transition from the L home to the night-to-night placements

11   and then on to this home where there was the other teen boy.

12           **MS. TRAN:**  Objection.

13   Q    Teenager.

14           **MS. TRAN:**  Leading.

15           **THE COURT:**  No, no, I didn't hear it that way.  You

16   said when was this, is that your --

17           **MS. BARTOSZ:**  Over what period of time, yes, Judge.

18           **THE COURT:**  Over what period of time.  That's not

19   leading.

20   A    Connor was moved from the home where he was raped after

21   being there a few months.  Then he was placed in the

22   night-to-night placements for a night or two.  And then he

23   was in the -- let me make sure that I'm correct -- he was in

24   the foster home that had the adolescent.  If he was

25   night-to-night for four nights and then he was placed in the

1    home with the adolescent male for a very short time, I think

2    it was month or two, and then from there he went into an

3    acute care psychiatric hospital for four and-a-half months.

4    So, that's four, five placements in just a few months.

5    **Q**    Dr. Lessing, in reviewing the placement history you've

6    just described, did you refer to any policies or regulations

7    of DCF?

8    A    Yes.

9    **Q**    I focus your attention on Exhibit 826.  Can you identify

10   Exhibit 826 Dr. Lessing?

11   A    Yes, this is the Code of Massachusetts Regulation, Title

12   110, Department of Social Services Policy Around Principles

13   of Service.

14   **Q**    And how did you apply this policy to the placement

15   history you just described?

16   A    Well, this policy notes that in delivering service to

17   children and families, the department shall, one, seek to

18   ensure the safety of children, that it reflect the

19   understanding that every child needs stability and

20   permanency, that it recognizes substitute care is a

21   temporary solution and require the department and the parent

22   to direct their efforts towards reunification, and that as

23   soon as it's determined that reunification is not feasible

24   the department shall take swift action to implement another

25   permanent plan such as adoption or guardianship.

1   **Q**    And in your opinion how do the facts that you've set

2   forth on these placement moves conform or fail to conform

3   with that policy?

4   A    Well, the placement moves violated this policy again

5   because it continued to keep Connor unsafe.  His physical

6   safety was violated in the first foster home.  His emotional

7   safety was violated in the night-to-night placements in the

8   foster home where there was another adolescent boy.

9   **Q**    I'll stop you there for a moment.  Can you elaborate on

10  that.  How was Connor's emotional safety compromised by the

11  night-to-night placement?

12  A    Well, the mental health professionals that are

13  evaluating Connor at this time talk about the danger to

14  harm, that he was in a very fragile state after having been

15  raped in the foster home, that what he needed was stability,

16  that his mental health at that point was unstable which is

17  typical given the fact that he's a very young boy, he was

18  six years old when all of this happened to him,and he didn't

19  know what was going to happen next.  And so, moving from one

20  foster home to another to another in just a matter of days

21  had to be traumatic to him.

22          **MS. TRAN:**  Objection, your Honor.

23          **THE COURT:**  Grounds?

24          **MS. TRAN:**  One, she's not qualified to testify as

25  whether or not it had to be traumatic to him; two, what

1   she's now quoting to you are statements in the record from

2   third-party providers who are technically not DCF employees,

3   so it's hearsay upon hearsay; and three, again,

4   understanding your Honor's prior ruling, the summaries that

5   she's giving are, just to be clear, are not complete and

6   full summaries even, they are very skewed summaries.  So

7   it's difficult from an evidentiary perspective to allow her

8   to testify to the content of the documents when it is not

9   even really the content of the documents.

10          **THE COURT:**  Well, I've made a ruling that requires

11  me not to accept any of these things as factually accurate.

12  We'll see about that when the records are offered.  And to

13  the extent they have third-party hearsay, we'll deal with

14  that.

15          But as to your first concern, she's not qualified

16  to give the opinion that that had to be traumatic?  Do you

17  seriously contend that I need expert opinion on that point.

18          **MS. TRAN:**  No, your Honor, I don't think --

19          **THE COURT:**  If, if the underlying data is accurate.

20          **MS. TRAN:**  I don't think you need expert opinion on

21  that.

22          **THE COURT:**  I don't think so either.  I would think

23  that that would be horribly traumatic.  We'll let it stand.

24          Go ahead.

25  **Q**   Dr. Lessing, can you address the placement, the next

1    placement after the night-to-night placement and that

2    placement's conformance or not with the regulation you've

3    identified?

4    A    Sure.  Next, DCF placed Connor in a psychiatric

5    facility, Providence Hospital, and --

6    Q    I'm sorry, Dr. Lessing, I was actually addressing you to

7    the placement just before that that you had identified, the

8    placement with the teenage boy?

9    A    Oh, okay.

10    Q    Can you elaborate on that placement in relation to the

11    policy, or the record you've identified.

12    A    Oh, I'm sorry.  Yes, again, it's, it's -- one would

13    expect that if you placed a six-year-old boy in the home of

14    another adolescent foster child, a male foster child, that

15    he would be likely to feel unsafe.  And so, this policy

16    requires that DCF meet the safety needs of children but also

17    their own individual needs in deciding upon a foster

18    placement.  And like the night-to-night placements that had

19    to be frightening given that he was in one home one night

20    and the next home another night, and now in this third home,

21    actually fourth foster placement, that this, this would

22    have, one would expect that this would have been frightening

23    to him and certainly not meet his needs.

24            THE COURT:  And you say that, and I mean this with

25    utmost respect, this is not terribly complex.  If we accept

1    that he in fact was repeatedly raped by a teenage boy and

2    then a short time thereafter is placed with people who are

3    to him strangers and there is another teenage boy of roughly

4    the same age that's scary?

5              **THE WITNESS:**  Yes.  Absolutely.

6              **THE COURT:**  All right.

7              **THE WITNESS:**  Scary.

8    **Q**    Following that placement, Dr. Lessing, what did the

9    record reflect in terms of the next placement?

10   A    Well, after Connor threatened the foster mother with a

11   knife and fork, DCF hospitalized him at Providence Hospital

12   on a psychiatric unit and he was there for four and-a-half

13   months, I believe.  And at some point while he was at that

14   placement he spent time on a locked ward.  And this was,

15   this is of concern to me because, and it actually was a

16   concern to the treatment providers there because they felt

17   that a six-year-old boy did not belong on a locked ward at

18   the psychiatric facility.  But it was four and-a-half months

19   before DCF could find him another placement and removed him

20   from that facility.

21   **Q**    Were you able to identify in the file recommendations

22   made with respect to what that next placement ought to be?

23   A    Yes.  The Providence Hospital staff, including the

24   psychiatrist that was treating Connor, advocated very

25   strongly that DCF find an appropriate residential placement

1    for him.  They expressed concern that he had been moved so

2    many times that he had been severely traumatized, that they

3    wanted to make sure that the next time he moved it was a

4    situation in which, one, he would be stable and not moved

5    again for, you know, some time, and two, where his needs

6    could actually be met in terms of there being enough

7    therapeutic services to help him deal with the trauma, with

8    the uncertainty, with the, with the rape, everything that he

9    had been through, that he would get the right kind of

10   professional help.

11        **THE COURT:**  Well, do the records show why, if they

12   were so concerned, why they, they, the hospital personnel

13   put him in a locked ward?  Recognizing this is all hearsay?

14   Do the records say?

15        **THE WITNESS:**  The record seems to indicate, it

16   doesn't say, but it seems to indicate that that was the only

17   space they had for someone like this.  Because a psychiatric

18   hospital is typically not accustomed to dealing with a

19   six-year-old.

20   **Q**   Dr. Lessing, you referred to a residential placement in

21   your response to my question before the judge made inquiry.

22   Just for clarity of the record, what did you mean by that

23   term, residential?

24   A    A residential placement would be a facility placement

25   that was established to provide ongoing stability, safety

1    and mental health care for children of a specific age.  So,

2    some residential programs are set up to take children as

3    young as six, as young as Connor was, others take children

4    from, you know, older age groups.  But the whole focus of

5    residential care is really supposed to be providing

6    stability, safety and mental health services employed by

7    around-the-clock staff that had some degree of training in

8    providing mental health services.  They're usually staffed,

9    including pediatric psychiatrists, perhaps psychologists,

10   master's level social workers, bachelor level staff, maybe

11   psychiatric nurses, and then other, other maybe non-degreed

12   or bachelor degreed staff that have training in how to

13   promote safety and stability and well-being in children that

14   are placed in residential care.

15   **Q**   Did the file identify where Connor was next placed

16   following his hospitalization at the psychiatric hospital?

17   A   Yes.  After the psychiatric hospital he was placed in a

18   STAR program, which is an acronym that means a Short Term

19   Assessment Program.  And he remained there for one month

20   before he was moved to another STAR program, another Short

21   Term Assessment Program, where he remained for two

22   and-a-half additional months.

23   **Q**   Can I stop you for a moment, Dr. Lessing.

24   A   Yes.

25   **Q**   Can you described what a STAR program is?

1   A   My understanding of the STAR program from the records

2   and looking at the website for STAR programs in

3   Massachusetts, is that they're set to provide short term,

4   essentially psychiatric mental health assessment of children

5   so that a decision can be made in terms of where these

6   children can best receive the kind of care that they need.

7   Q   You used the term short term.  Is there a length of stay

8   associated with STARs?

9   A   Not, not that I'm aware of, no.  I mean, there may be,

10  but I'm not aware of it.

11  Q   You just testified that Connor was placed in one STAR

12  and then moved to another STAR placement.  What did the file

13  indicate with respect to that move?

14  A   That he had only been in the first STAR program for a

15  month, and apparently DCF needed another bed in that STAR

16  program.  And there's an indication in the record that there

17  were six babies at that STAR and that because of capacity

18  issues it was decided that Connor should move to another

19  STAR program in order to free up a bed for somebody else.

20  Q   Have you made a finding with respect to that placement

21  decision, and I'm referring the move from the first STAR to

22  the second STAR.

23  A   Uh-huh.

24  Q   What is that find?

25  A   That was harmful to Connor.  He was in -- he had gotten

1    out of the psychiatric hospital after four and-a-half

2    months.  He had been in this facility for a month.  They had

3    enrolled him in school.  He apparently was doing well in

4    school, was beginning to have a little bit of stability.

5    And then he was moved.  The movement, that he traveled two

6    hours a day to get to school.  He was bused two hours a day

7    to get to and from school.  And again, if we're talking

8    about trauma, if we're talking about safety, if we're

9    talking about his emotional well-being, every disruption

10   further harms all of those characteristics of this young

11   child.

12          I also want to note that he was not moved based on

13   his own needs.  He was moved based on administrative needs

14   in terms of needing a bed for another child.

15   Q   Dr. Lessing, please direct your attention back to

16   Exhibit 1, and I would like you to turn to pages 139 and

17   140.  And those are pages DCFPOL139.

18   A   You said 139 and 140?

19   Q   Yes.  So, to be clear it's the number after the prefix

20   after DCFPOL and then there's the date 7/08, then 139 and

21   140.

22   A   Okay, I have that.

23   Q   Did you make reference to this policy in the course of

24   your work on Connor B's file?

25   A   Yes.

1   **Q**   Can you describe how you applied this policy to the

2   Connor B file?

3   A   Yes.  It states that it's the ongoing casework and

4   documentation policy.  It's the policy of the department

5   that ongoing casework services be offered to all individuals

6   and families who at the conclusion of assessment have been

7   determined to be in need of department services.

8          It also talks about, or describes the importance of

9   having regular consultation and visits, regular contact with

10  children in DCF custody.

11         Towards the bottom of page 139, the following

12  policy establishes a minimum standard for frequency of

13  contacts and visitation.  The actual schedule of contacts

14  and visitation may vary from case to case and in many cases

15  may be more frequent than the required minimum standards.

16  **Q**   How did you apply this policy in relation to Connor's

17  foster care episode with DCF?

18  A   Well, I want to jump down just a little bit on that

19  page.

20  **Q**   Oh, I'm sorry.  I got ahead of you.

21  A   And add one more piece that I considered.  The schedule

22  of contacts should include at least monthly visits by a

23  social worker with the children, the children's placement

24  resource, and the children's parents.

25  **Q**   Did you apply this policy in making your review of

1  Connor's case file?

2  A   Yes, I did.

3  Q   Did you reach findings?

4  A   Yes.

5  Q   Can you please describe those findings?

6  A   Well, the policy was violated.  The two months that

7  Connor is in the foster home where he was sexually abused,

8  he was not visited by his DCF worker.  His DCF worker

9  visited in terms of picking him up from school and taking

10  him away after the rape by TC had been reported.

11  Q   And how did you determine that in your review of the

12  file?

13  A   When I read the record and looked at the dictation, it

14  was clear that there was no visitation documented between

15  Connor and his DCF worker once he was placed in that foster

16  home.

17  Q   You just referenced the term dictation in reviewing

18  these case files.  What was dictation?

19  A   Dictation of the notes that DCF case workers enter into

20  the case.  So, they provide information about the travel of

21  the case, what, what issues are being addressed, what

22  problems and concerns there might be in any given placement,

23  what DCF is doing to address those issues, and also it

24  documents the visits, the time that the DCF worker would

25  actually meet with the child, meet with the foster parents,

1    meet with the biological family in the case.

2    Q    I'm going to refocus you on the placement history you've

3    described for Connor.  Okay?

4    A    Okay.

5    Q    Dr. Lessing, did you review any social work research or

6    literature in assessing that placement history?

7    A    Yes, I did.

8    Q    Dr. Lessing, I'm going to direct your attention to

9    Exhibit JP.

10    A    Uh-huh.

11    Q    And also to Exhibit JG.

12              Can you first identify Exhibit JP?

13    A    Yes.  This is an article in the Journal of Child Abuse

14    and Neglect entitled:  Children and Youth in Foster Care:

15    Disentangling the Relationship between Problem Behaviors and

16    the Number of Placements.

17    Q    Did you rely upon this exhibit in reaching your findings

18    in this case?

19    A    Yes, I did.

20    Q    Can you identify Exhibit JG, please?

21    A    This is an article from the Journal of Children and

22    Youth Services Review, and it's entitled:  Former Foster

23    remember multiple placements:  A journey of loss and hope.

24    Q    Did you rely on this article in forming your findings in

25    this case?

1    A    Yes.

2    Q    Can you describe to the Court the reliance you placed on

3    those two papers?

4         MS. TRAN:  Objection, your Honor.  While the

5    articles are cited as a footnote in her report, her

6    explanation for her reliance to them is not part of the

7    report.

8         THE COURT:  Well, the report's not in evidence so

9    I -- but I take your objection.  I understand she's relied

10   on them, and we'll leave it at that.

11        Do you want to put these articles before me in some

12   fashion?  Are you going to offer them?

13        MS. BARTOSZ:  I'm going to offer them as reliance

14   materials under Rule 703, Judge.

15        THE COURT:  Well, I don't think that -- well, you

16   object?

17        MS. TRAN:  Yes, your Honor.

18        THE COURT:  Yes.  Just because she relied on them

19   doesn't get them in evidence.  So I'll sustain it.  On the

20   other hand, it might be you want to lay a foundation for

21   them as learned treatises.  Sometimes journals are that.

22        And while I've interrupted, remember with a prior

23   witness the talk about this MIT research and I said I want

24   to see that.  No one's proffered it to me.  But I haven't

25   forgotten it.

1          Go ahead, Ms. Bartosz.  The objection, however, is

2     sustained.

3               **MS. BARTOSZ:**  Thank you, Judge.

4     **Q**   Dr. Lessing, turning your attention to Exhibit GY, your

5     report.  And to page 99.

6     A   Okay.

7     **Q**   I would like to focus your attention to the top

8     paragraph of that page.

9     A   Yes.

10    **Q**   Dr. Lessing, do you address the Newton article there?

11    A   Yes, I do.

12    **Q**   How did you address the Newton article in your report?

13    A   Well, I quote from it.

14              **MS. TRAN:**  Objection.

15              **THE COURT:**  No, she may testify in accordance with

16    the report.

17              **MS. TRAN:**  Understood your Honor, but I'm just

18    unclear as to whether we're referring back to Connor or if

19    we're referring to -- this is a different portion of the

20    report than where she was testifying earlier as to the

21    summary of Connor, so I don't want it to be misleading as to

22    what it pertains to.

23              **THE COURT:**  Well, you'll have a chance to

24    cross-examine, but the quotes seem at a level of generality.

25    And so she may testify in accordance with the report.

1    However, your concern is appropriate.

2            Are we talking about Connor here or somebody else

3    when you're --

4            **MS. BARTOSZ:**  Your Honor --

5            **THE COURT:**  -- addressing facts.

6            **MS. BARTOSZ:**  -- this is a general statement.

7            **THE COURT:**  Well, no, you've making an argument.  I

8    see myself that in the text we're talking about someone

9    named Adam.  So, I can draw my own conclusion.  But

10   your point is, the point you quote is up there at the top,

11   is that right, ma'am?

12           **THE WITNESS:**  Yes.

13           **MS. BARTOSZ:**  Yes.

14           **THE COURT:**  All right.  So my question is, you took

15   that statement, and given your experience you believe that

16   to be a truthful statement --

17           **THE WITNESS:**  Yes.

18           **THE COURT:**  -- a truthful general statement about

19   children in foster care.

20           **THE WITNESS:**  Absolutely, your Honor.

21           **THE COURT:**  Go ahead, Ms. Bartosz.

22   **Q**   What reliance did you place on that statement in

23   formulating your opinions?

24   A   This statement supports my opinion that multiple moves

25   for children in, in substitute care is harmful to those

1    children.  And it also gets at the vicious cycle that we see

2    when children are moved from placement to placement in that

3    every move presents a traumatic experience and losses in

4    terms of family, in terms of community, school, friends,

5    familiar backgrounds, and that children often react to that

6    kind of trauma and loss by behaving in difficult and

7    inappropriate ways, and we know that the more difficult and

8    inappropriate the behavior becomes, the harder it is to

9    maintain a child in a placement, you know, over time.  The

10   behavior can be very overwhelming.  And so what happens when

11   child protective systems move children repeatedly is then

12   the child gets caught up in a vicious cycle where the moves

13   contribute to trauma, trauma exhibited in troubling behavior

14   and troubling behavior makes it harder and harder to find

15   and keep stable placements.  It also makes it harder to find

16   a prospective adoptive placement for children.

17   Q   Dr. Lessing, did you review Connor B's case file with

18   respect to the issue of permanency?

19   A   Yes.

20   Q   What review did you make in that regard?

21   A   Well, again, I read all of the records.  I followed his

22   movement through the system, these multiple placements and,

23   you know, also was able to see that even after being in the

24   system for five years, more than five years, he was not

25   moving toward permanency, that the goals for Connor changed

1    with some regularity, that sometimes the goal was adoption,

2    other times it would be changed back to reunification with

3    his mother.  At some point in the file it listed that, or it

4    indicated that he's expected to age out of the system at age

5    18 and so, perhaps, you know, have a guardianship situation.

6         His mother clearly is not an appropriate care giver

7    for him, and yet she still maintains parental rights more

8    than five years after he enters the system, and until

9    parental rights are terminated he isn't moving toward any

10    permanency anywhere.

11    **Q**  Dr. Lessing, you just made the statement that Connor B's

12    natural morning clearly was not able to provide a safe home.

13    A  Uh-huh.

14    **Q**  Were there facts, data in the case file that you

15    identified in reaching that conclusion?

16    A  Yes, I did.  Initially after Connor was removed from his

17    home, DCF is trying to work with his mother to make it

18    possible for Connor and his sister to return.  And they

19    indicate that Connor's mother appears to be more committed

20    to her boyfriend, who was a sex offender, than to getting

21    her children back.

22         Then it's clear that DCF isn't supervising visits,

23    and the sex offender is having access to Connor and his

24    younger sister during visits when they're, with visits with

25    their mother.  And so then DCF decides to begin supervising

1    the visits in order to protect the children from this

2    perpetrator.

3            DCF mandates that the mother receive counseling.

4    The mother was noncompliant with going to counseling on a

5    regular basis, on several episodes of that.  And then it

6    becomes clear that when she does have access to Connor her

7    behavior toward him is very upsetting.  She promises him

8    that he'll return home.  She gets pregnant and talks about

9    having him at home to take care of the new baby that's

10   coming.  At one point she shares with him that she gave away

11   or sold his Game Boy.  And at other times she is supposed to

12   care for him, to spend time with him, and she disappoints

13   him.  And the service providers, again, his, his

14   psychiatrist, his counselors, some of the licensed social

15   workers who do evaluations of Connor, are very clear in

16   stating to DCF that Connor's mother is a hindrance to him,

17   that she in essence toxic to him and that he would be unsafe

18   if he returned home to her.

19           He does eventually, DCF does eventually reunite

20   Connor with his mother, and at that point he has to be taken

21   back into foster care because she's not making sure that

22   he's getting to counseling and he fractures his collar bone

23   at some point while in her care.  And she assures DCF that

24   she'll get him medical treatment and she fails to do so.

25           She then became homeless and took her infant child

1    and moved into a hotel with, with her boyfriend, a newer

2    boyfriend, I believe, who was also physically abusing her.

3    Q    Are you familiar with any legal steps that must be taken

4    before a child is free for adoption?

5    A    Yes.  DCF has to petition the Court to terminate

6    parental rights of the biological parent of a child.

7    Q    Did you review Connor's B case file -- I'm sorry, Dr.

8    Lessing, did you make review of Connor B's case file in

9    relation to the issue of termination of presential rights?

10    A    Yes, I did.

11    Q    What did you determine from the entries in the case

12    file?

13    A    In my review of the case file there's no indication that

14    DCF petitioned the Court to terminate the parental rights of

15    Connor's mother, or that it planned to do so.  And this is

16    the case again more than five years after he came into

17    placement.  You hear, in the case records you read that his

18    service providers, including his psychiatrist, state that

19    they believe he's adoptable when he's young and that he

20    deserves the chance to have a family of his own, and that if

21    the mother is not going to be a suitable care taker for

22    Connor then DCF should move quickly.  But there's no

23    evidence to indicate that they've moved for terminating her

24    parental rights which would be the first step in freeing him

25    up to be adopted.

```
 1          It also leaves him in this position where he
 2   doesn't know what's going to happen to him.  He doesn't know
 3   if he can be adopted.  He doesn't know if he's going home.
 4   He has all of this uncertainty, which, which has got be very
 5   troubling.
 6   Q   Did you review Connor B's case file from the perspective
 7   of well-being as you defined that term earlier?
 8   A   Yes, I have.
 9   Q   And can you describe what you reviewed in that regard?
10   A   Well, again, it goes without saying, but I will say that
11   placing Connor in a foster home with a child who was at high
12   risk to sexually abuse him harmed his well-being.  The
13   multiple placements he experienced and particularly so many
14   placements in so short a time harmed his well-being.  And
15   when we talk about well-being, we mean safety, stability,
16   not overwhelming stress, and meeting basic physical needs as
17   well as emotional and psychological needs.
18          Beyond that, Connor having been sexually abused ed
19   while in foster care and having been moved around so many
20   times, he was clearly traumatized as one would expect and he
21   didn't get services for his traumatic experiences,
22   counseling, mental health services, for at least two
23   and-a-half years into his being in DCF custody.  He did get
24   some mental health services, but given the fact that he was
25   moved so many times none of those could be delivered with
```

1    any consistency.  And also when there was any degree of

2    consistency it wasn't focused towards helping to relieve his

3    trauma and his losses.  It was -- it sounded more general

4    than that.  In a few places in the case record there's an

5    indication from DCF and others that he had not received

6    trauma oriented therapy, at least within the first two

7    and-a-half years in which he was involved with DCF.  And

8    that's of concern in terms of his well-being because we know

9    again that trauma creates problematic behaviors and the

10   damage that it does is more severe if the proper services

11   aren't provided immediately after the trauma is discovered.

12   And that didn't happen for him.

13   Q    Dr. Lessing, can you direct your attention once again to

14   Exhibit 1, and more specifically to the page DCFPOL 7/08

15   119.

16   A    Okay.

17   Q    Just to make sure we're on the same place, on the bottom

18   center of that page there's the number 248a?

19   A    Uh-huh.

20   Q    Are we at the same page?

21   A    Appendix A?

22   Q    Yes.

23   A    Yes.

24   Q    Did you make reference to this portion of the DCF policy

25   manual in reviewing Connor's case file?

1    A    Yes.

2    Q    How did you apply this policy to the facts you found in

3    the case file?

4    A    In a number of ways.  One, number 7, safety protection

5    of child from sexual abuse.  These are outcomes that service

6    plans are supposed to reflect at DCF.  It says:  Assure the

7    child's continued safety and well-being by providing

8    protection from the alleged perpetrator and/or eliminating

9    the sexually abusive behavior.

10           Number 9, participate in safety planning to protect

11   child and self from domestic violence, eliminate abusive

12   behavior toward non-offending partner and the child.

13           Number 10 particularly goes to well-being.  Assist

14   child in overcoming the effects of past sexual, physical,

15   and emotional abuse and/or neglect, e.g., assist child in

16   dealing with post traumatic stress or changing problematic

17   behaviors which are the result of past inflicted harm.

18   Q    Did your review of the case file indicate to you whether

19   or not these outcome categories were adequately addressed by

20   DCF?

21   A    DCF again put Connor in a situation where he was at risk

22   for being sexually abused and was.  Once they became aware

23   of that they did remove him from that situation.  They put

24   him in a situation with another adolescent boy who may or

25   may not have been at risk for harming Connor but from

1   Connor's perspective he was obviously very frightened.

2           And then assist child in overcoming the effects of

3   past sexual, physical and emotional abuse and neglect.  DCF

4   did not follow through on getting those services to Connor

5   in a timely manner.

6   **Q**   Earlier in your testimony about the Connor B case file,

7   I think you indicated that TC, the teen in the L home, TC

8   was present as a foster youth in custody?

9   A   Yes.  Uh-huh.

10  **Q**   Are the policies that you referred to thus far today

11  applicable to TC?

12  A   They would be because he would be --

13          **MS. TRAN:**  Objection.

14  A   -- a DCF foster child.

15          **THE COURT:**  Grounds?

16          **MS. TRAN:**  She hasn't reviewed the case file of TC

17  whether or not, in her report as to whether or not the

18  policies are accurately followed or not with respect to TC,

19  nor could she.

20          **THE COURT:**  Well, she's -- again, I don't need, I

21  don't know if we need expert testimony on this.  TC's

22  mentioned in this case file.  So the natural inference is

23  since -- no, there's something to -- TC is not a foster

24  child.  TC is a child in a foster home as I've understood

25  it.

1              Is that mistaken?

2         **THE WITNESS:**  He's in the home as a foster child.

3    DCF placed him there.

4         **THE COURT:**  Okay.  So TC is in the home as a foster

5    child?

6         **THE WITNESS:**  Yes.

7         **THE COURT:**  And so naturally you've drawn the

8    conclusion that these policies to which reference has been

9    made during your testimony are being followed or required to

10   be followed with respect to TC.

11        **THE WITNESS:**  Uh-huh.  Yes.

12        **THE COURT:**  Well, at least to that extent, that's a

13   natural inference, I'm going to allow that.

14        **MS. TRAN:**  To that extent I agree.  But my concern

15   is that she was about to testify as to the ways in which

16   they were --

17        **THE COURT:**  But she didn't.  So, I'll leave it at

18   that, and of course I'll entertain your objection if a

19   question raises one.

20             Go ahead.

21        **MS. BARTOSZ:**  Thank you, Judge.  The plaintiffs,

22   we're going to leave it at that as well.

23        **THE COURT:**  All right.

24   **Q**   Did the information in the Connor B case file indicate

25   what, if any, action was taken by the Commonwealth of

1    Massachusetts in relation to TC after the sexual assault of

2    Connor B became known.

3    A    DCF conducted an investigation of the foster home.  They

4    removed moved TC.  It was learned in the investigation that

5    TC had been responsible for cooking most of the daily meals

6    and cutting wood for the stove that heated the family's

7    home.  And that Connor and is the other foster child were

8    responsible for things like bringing in the wood and so

9    forth.  And so, DCF rescinded the license of the foster home

10   in which Connor was originally placed in which TC had

11   resided for a fairly long time and removed TC from this

12   foster home and he according to the case files was

13   eventually prosecuted for having raped Connor.

14   Q    Dr. Lessing, I would like to turn to the named plaintiff

15   Adam at this time.

16          Did you make a review of Adam's case file?

17   A    Yes, I did.

18   Q    And that is Adam S?

19   A    Yes.

20   Q    Did you make that review on the issue of safety?

21   A    Yes, I did.

22   Q    Can you describe that review for the Court, please?

23   A    Well, my initial concern about safety for Adam is Adam

24   was adopted by his former foster parents.  I'll call them

25   the M's.  The M's had been DCF foster parents for many

years.  They had fostered at least 60 children.  Most of

them were young children below school age.  And they were

foster care givers to Adam and two other children from the

DCF system and were permitted to adopt the three children

Adam, a younger sister and an older sister.  But they also

continued on as foster parents and took care of other

children along with their three adoptive children, Adam and

his two sisters.

DCF had received some complaints of abuse or

neglect occurring in Adam's adoptive home and screened those

out.  And then in 2003 I believe, Adam had disclosed to

someone at his school that he and his two adoptive sisters

and the preschooler who was a foster child in that home,

were being forced to get on all fours and be paddled with an

object by their parents when they misbehaved in some way.

Adam also reported to the school that the baby, the

14 month old foster child in that home, sometimes had her

nose held so that the foster mother could force food into

her mouth and throat when she was refusing to eat.

DCF investigated and in its investigation they

interviewed the children along and verified from the three

adoptive children that they were placed on all fours and

being hit with an object, and also more than one of the

children reported that the baby's nose was held and food

forced into her.

1            The foster parents denied this, denied using

2     objects, denied having the children get on all fours, denied

3     harming the baby.  The DCF investigator talked to other DCF

4     staff who had noted that they found the foster parents to be

5     at times overly controlling and punitive.  There was an

6     episode where the worker was bringing one of the adoptive

7     daughters back and she had forgotten her shoes.  And the

8     adoption worker had, the DCF worker had noted that the

9     father's anger was far out of control, or far out of the

10    bounds that one would expect toward a child for having

11    misplaced her shoes.

12           The investigator indicates in his report that

13    clearly he believes the children and he believes that in

14    holding the baby's nose that the parents want to have

15    control over things, that it's again beyond the norm, but

16    does not open the case on the family.  And so the decision

17    is reviewed and the family's case is not opened in terms of

18    being a protective case.  However, the investigator does

19    request that DCF do a review of the home as a licensed

20    foster home.  And eventually that is done and the baby and

21    the preschooler are removed, the two foster children are

22    removed.  But in doing that, DCF then lost its access to the

23    family.  Because they weren't open as a protective case and

24    they weren't open as a foster home.  And it was in this

25    period that the children, the severe abuse of these children

1    finally came to light.

2    Q    And when you say these children, are you referring to a

3    particular group of the children in that home?

4    A    These would be the three remaining children, the

5    children that this family had adopted through DCF, Adam, I

6    believe was ten at the time, his younger sister was six, and

7    his older sister was about 14.

8         And what had happened was the six year old had

9    taken a beating that was so severe by her mother that her

10   body from, from below her buttocks up until her hips were

11   covered with one, one large bruise according to the case

12   record.  And her older sister took a photograph of her

13   sister's abused body to make sure that DCF would believe the

14   children this time when they, when they made their report.

15        And this was reported at school and DCF came in and

16   investigated and this time found that what the children had

17   been subjected to in that home, their adoptive home, was

18   tantamount to torture.

19   Q    Was there indication in the file as to whether or not a

20   51A was eventually filed and acted upon?

21   A    Yes.

22   Q    What did you find in that regard?

23   A    Well, again, this is one of the children, I think it was

24   the oldest girl, reporting at school about what had happened

25   to her sister and the fact that she had and her brother were

1    also being hit at home.  And when DCF saw the battered body

2    of the six-year-old they screened it in and opened a case on

3    the family and removed the children.

4    Q    You testified removed the children, including Adam S?

5    A    Yes, removed Adam and his two sisters, removed all of

6    the children that this family had adopted.

7    Q    You earlier made reference to DCF policies or standards

8    with respect to safety in talking about the Connor B file

9    and the L home.  Did you review those policies with respect

10   to the Adam S file?

11   A    Yes.

12   Q    Did you make findings as to whether or not DCF conformed

13   to those filings in the instance of Adam S?

14   A    Yes.

15   Q    What is your finding.

16   A    DCF did not protect Adam and his sisters and the foster

17   children that were being abused in that home.  There were

18   indications that there were problems in the reports that the

19   children had made at school, but also in the investigation,

20   clearly the investigator believed the children.  But for

21   whatever reason it was decided not to, not to open a case on

22   this family where they could have been monitored, where the

23   family could have been monitored and the children could have

24   been protected.

25           My understanding of DCF's mandate in responding to

1    complaints of abuse and neglect is to protect children from

2    being abused, it's not waiting until they are severely

3    abused in order to act on their behalf.

4    Q    In making review of Connor's file, or, I'm sorry, Adam S

5    's file, did you come across the name Lake Grove?

6    A    Yes.

7    Q    What is or was Lake Grove?

8    A    Lake Grove was a residential facility in western

9    Massachusetts that was established to care for children who

10    had mental health issues.  And Adam was admitted to that

11    facility and according to the record was admitted to a unit

12    in that facility that was designed to care for boys that had

13    been sexually abused and/or were at risk for sexually

14    abusing other children, even though Adam according to the

15    case record had no history, no known history of having been

16    sexually abused or being at risk for abusing other children.

17    Q    Did you determine whether or not Adam S was in DCF

18    foster care custody at the time he was placed at Lake Grove.

19    A    If you'll jut give me a second to refresh my memory.

20         Adam was placed in foster homes and psychiatric

21    hospitals after he was removed from his home.  First he was

22    hospitalized at Providence Hospital, which is an acute

23    psychiatric facility.  He spent one and-a-half months there.

24    Then he was discharged to a therapeutic foster home where he

25    remained for two months.  The foster parents were unable to

1    managed Adam's behavior, so he was admitted to another

2    psychiatric hospital, the Brient Center, for a four month

3    stay.

4         He is then transferred to McAuley Nazareth

5    residential treatment center.  This would have been his

6    fifth placement in eight months since he entered foster

7    care.  He stayed at McAuley Nazareth for three years and

8    during that time he was admitted to three acute care

9    hospitals for psychiatric treatment.  Then he left McAuley

10   Nazareth, was admitted to Pembroke Hospital for a 30 day

11   stay, and then he was placed at Lake Grove on the unit for

12   boys with risk for sexual abuse.

13        **THE COURT:**  Now, help me out with this.  I'm very

14   much aware that as the judicial officer here I'm not

15   entitled to use my personal experience at all.  But I'll

16   make a statement in the interest of transparency.

17        Over a quarter century ago for eight years I was a

18   Justice of the Superior Court and sat on criminal child

19   abuse cases, among others, and I learned at that time, or at

20   least it was the received wisdom among my colleagues and I,

21   that one of the terrible, this informed us with respect to

22   sentencing, because one of the terrible consequences of

23   sexual abuse of a child is that the child itself, himself,

24   herself, is going to have, is going to be damaged, have a

25   harder time forming appropriate relationships as an adult.

1    And we used to say glibly that it was crime a that carried

2    on from generation --

3              **THE WITNESS:**  Yes.

4         **THE COURT:**  -- to generation, by which I mean it's

5    more likely that the victim tragically.  Become a

6    perpetrator than the population as a whole.

7              **THE WITNESS:**  Yes.

8         **THE COURT:**  Well, I guess I'll ask you.  You agree

9    with that?

10             **THE WITNESS:**  Yes.  Yes, your Honor.

11        **THE COURT:**  And that's why, if it is problematic,

12   assuming I haven't got the evidence yet, but assuming your

13   review of the records, those things actually happened, Adam

14   had a very tough go of it, but he hasn't been sexually

15   abused.

16             **THE WITNESS:**  That's correct.

17        **THE COURT:**  So that sort of child, a child in those

18   terrible circumstances, one imagines is going to be injured

19   in very real ways because he's going to mistrust adults,

20   he's going to fear them in ways that a child from a loving

21   home would not, and things like that, but he's less

22   likely -- well, how does he relate to the general population

23   for acting out inappropriately by way of sexual abuse?

24        **THE WITNESS:**  One wouldn't expect that he would act

25   out in that way.  I mean, there's no reason to believe that

1    he would be at risk for sexually abusing anyone or having

2    inappropriate sexual contact at any higher level of risk

3    than the general population of children.

4            THE COURT:  So, cutting to the chase here on these

5    questions, putting Adam in a facility that cares for victims

6    who have been sexually abused is in your view problematic

7    because he is more likely to experience sexual abuse in such

8    a setting.

9            THE WITNESS:  Yes, your Honor.

10           THE COURT:  I mean, that's where you're going with

11   this?

12           THE WITNESS:  Yes.  It isn't a facility dedicated

13   to working with sexually abused children, but it had a unit

14   specifically for sexually abused children.

15           THE COURT:  And you said he was put in that unit.

16           THE WITNESS:  He was initially put on that unit,

17   yes.

18           THE COURT:  All right.

19   Q    Dr. Lessing, what did your review of Adam S's file

20   indicate in terms of events that transpired during Adam's

21   placement at Lake Grove?

22   A    Adam had, had gone to the nurse at Lake Grove

23   complaining of pain in his shoulder and collar area.  The

24   nurse put ice on it, gave him medication and told him to

25   rest it.  He went back to the nurse a few more times over a

```
1    seven day period.  Finally, the nurse called, the nurse from

2    Lake Grove called the doctor's office and asked if Connor

3    could be prescribed some medication over the phone.  And the

4    doctor insisted upon seeing Connor.

5    Q    You're saying Connor.  Do you mean Adam?

6    A    I'm sorry.

7    Q    That's okay.

8    A    Adam.  And it was determined that Adam had sustained a

9    broken collar bone.  The investigation of this incident in

10   terms of how Adam had broken his collar bone at Lake Grove

11   turned out to reveal that there were some off-hour staff

12   evening/nighttime residential workers at, at Lake Grove and

13   they were conducting what I'd call, for lack of a better

14   term, a fight club, that essentially these adult counselors

15   encouraged this group of buys to fight one another and

16   essentially demonstrate their power over one another.  And

17   so these fights were orchestrated by the staff at Lake

18   Grove, and Connor was in a fight with a boy who obviously

19   was stronger and broke his collar bone in the course of

20   that.  He was told by the staff person at Lake Grove to not,

21   not share how it happened and that he would be okay.  And

22   so, it was revealed that this was going to at Lake Grove and

23   then DCF investigated, which is how all of this came to

24   light.

25              It turns out that Connor's -- Adam's story was
```

1  corroborated by some of the other youths that were in that

2  facility on that unit, that it was a regular thing, and then

3  after Adam had left that facility, Lake Grove, he disclosed

4  to his foster parents that he had also been sexually abused,

5  he had been raped by a larger, stronger child at Lake Grove

6  as well.

7  **Q**   Did the file of Adam S indicate whether DCF looked into

8  that recollection or that information that was shared by

9  Adam S?

10  A    There's, there's some information in DCF's investigation

11  of the Lake Grove facility that at least one of the other

12  boys had indicated that there was sex going on, his term,

13  sex or sexual activity going on between the boys at Lake

14  Grove.  But when, when DCF got the disclosure from Adam

15  months after he had been out of Lake Grove, the DCF worker

16  made the determination that he really couldn't determine if

17  what had happened or whether Adam was making it up.  And he

18  recommended that the foster parents get him checked

19  medically and to make sure that he didn't carry any sexually

20  transmitted diseases from that event and that they might

21  want to get him, they recommended that they get him some

22  counseling or assessment for that.

23  **Q**   Did your review of Adam S's file indicate whether or not

24  DCF took action in relation to Lake Grove after the fight

25  club as you've termed it came to light?  Or the fight

1    situation came to light?

2    A    I know there was an investigation.  It appeared in the

3    record that DCF believed Adam's account of what happened

4    there in terms of the fight club.  And again, there were

5    other youth who corroborated that.  But I didn't find

6    information in Adam's case records in terms of what, what

7    happened to Lake Grove essentially after these episodes had

8    come to light.

9    Q    In testifying with respect to Connor B's case file, in

10   your review on that file you pointed us earlier to a policy

11   about monthly visitation?

12   A    Yes.

13   Q    Does that policy apply whether a child's in a foster

14   home or a STARR placement or a residential placement like

15   Lake Grove?

16   A    Yes.  It my understanding that it does.

17   Q    Dr. Lessing, did you make a review of Adam S's files in

18   terms of the issue of placements?

19   A    Yes, I did.

20   Q    Can you describe what you determined?

21   A    Adam underwent an excessive number of placements between

22   April of 2004 and March of 2001.  Eight years in DCF care,

23   he experienced 22 placements, including nine long

24   hospitalizations.  Those 22 placements don't include the

25   five short term hospitalizations that he experienced when he

1    was either in residential, like at McAuley Nazareth or when

2    he was in a foster home.  And that, you know, as the record,

3    as his own record stated at the Center Point facility in

4    2009 nine, Adam's had no stable environment in his life.

5    Many of the adults who were entrusted to care for him abused

6    him as well.  He has little ability to trust or feel safe.

7         So, again, I think you see the vicious cycle where

8    the child is abused in foster care, moved multiple times,

9    experiencing trauma both from the abuse and the multiple

10   moves, and his behavior becomes increasingly difficult to

11   manage which again threatens the stability of any placement

12   he's put in and certainly threatens his ability to achieve

13   any kind of permanency to have a family of his own that is

14   equipped to deal with, you know, the behaviors and so forth

15   of what has become a very troubled child.

16        **THE COURT:**  All right, it's one o'clock.  We'll

17   stop taking testimony at this time.  Let me speak with the

18   clerk a minute.

19        (Whereupon the Court and the Clerk conferred.)

20        **THE COURT:**  Now, at the -- you may step down.

21        **THE WITNESS:**  Thank you.

22        (Whereupon the witness stepped down.)

23        **THE COURT:**  At the end of the sixth day of trial,

24   the plaintiff has used up three days, three hours and five

25   minutes; the defense has used up two days and 25 minutes.

1          The Court has reviewed one additional deposition.

2     It is the deposition of Raymond V. Burke taken January 19th,

3     2012.

4          We'll recess until 9:00 a.m. tomorrow morning.

5     We'll recess.

6          **THE CLERK:**  All rise.

7          (Adjournment.)

8

9               **C E R T I F I C A T E**

10

11

12          I, Donald E. Womack, Official Court Reporter for

13     the United States District Court for the District of

14     Massachusetts, do hereby certify that the foregoing pages

15     are a true and accurate transcription of my shorthand notes

16     taken in the aforementioned matter to the best of my skill

17     and ability.

18

19

20

21

22          /S/ DONALD E. WOMACK 5-7-2013
          _____
23               DONALD E. WOMACK
               Official Court Reporter
                 P.O. Box 51062
24          Boston, Massachusetts 02205-1062
               womack@megatran.com

25