```
1                  UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MASSACHUSETTS
2
                                        Civil Action
3                                       No. 10-30073-WGY

4    * * * * * * * * * * * * * * * * * * * * * *
                                               *
5    CONNOR B., by his next friend, ROCHELLE   *
     VIGURS, et al., individually and on behalf *
6    of all others similarly situated,         *
                                               *
7            Plaintiffs,                        *
                                               *  BENCH TRIAL
8    v.                                         *  (Volume 9)
                                               *
9    DEVAL L. PATRICK, in his official capacity *
     as Governor of the Commonwealth           *
10   of Massachusetts, et al.,                  *
                                               *
11           Defendants.                        *
                                               *
12   * * * * * * * * * * * * * * * * * * * * * *

13           BEFORE:  The Honorable William G. Young,
                              District Judge
14   APPEARANCES:

15           NUTTER, McCLENNEN & FISH, LLP (By Daniel J.
        Gleason, Esq. and Jonathan D. Persky, Esq.), World
16      Trade Center West, 155 Seaport Boulevard, Boston,
        Massachusetts 02210-2699
17           - and -
             CHILDREN'S RIGHTS (By Sara M. Bartosz,
18      Esq., Laurence D. Borten, Esq., Sarah Russo, Esq.
        Rachel Brodin, Nili, Esq. and Jessica E. Polansky,
19      Esq.), 330 Seventh Avenue, Fourth Floor, New York,
        New York 10001, on behalf of the Plaintiffs
20
             OFFICE OF THE MASSACHUSETTS ATTORNEY
21      GENERAL (By Liza Tran, Jason B. Barshak and
        Jeffrey T. Collins, Assistant Attorneys General),
22      One Ashburton Place, Boston, Massachusetts 02108,
        on behalf of the Defendants
23
                                        1 Courthouse Way
24                                      Boston, Massachusetts

25                                      February 7, 2013
```

# I N D E X

**WITNESS:**              **DIRECT**   **CROSS**      **REDIRECT**     **RECROSS**

CHRISTOPHER BELLONCI, Recalled

   By Ms. Bartosz    5

   By Mr. Collins              10

ARBURTA E. JONES, Recalled

   By Ms. Bartosz    11

   By Mr. Collins              50


                                                          **FOR**     **IN**

**EXHIBITS:**                                 **I.D.**    **EVID.**


    1087 2010 Jensen Table  . . . . . . . . . . .9

    1088 Child Maltreatment 2010 Report . . . . .75

1        **THE CLERK:**  All rise.  The United States District

2   Court is now in session, you may be seated.

3        **THE COURT:**  Good morning, counsel.  Where are we

4   here?

5       **MS. BARTOSZ:**  Your Honor, plaintiffs at this point,

6   and we discussed this with defense counsel, would like to

7   call a witness out of order previously to clean up a matter.

8        **THE COURT:**  That's perfectly fine.  The fact that

9   we didn't have a witness is what threw me.

10       Before -- you may do that, but since we've

11  interrupted, let me say that I have reviewed the record of

12  Raymond W. Pillidge taken Wednesday, March 7th, 2012.  And

13  to ask, no one need respond now, but going through one of

14  these depositions there's a reference to a Rosie D

15  litigation.  I'd like some identifier as to what that is,

16  what docket number, what court, so I can take a look at

17  that.

18       **MS. BARTOSZ:**  Your Honor, plaintiffs would be

19  pleased to provide that.  It was a suit tried before Judge

20  Ponsor in Springfield.

21       **THE COURT:**  Fine.  All right, the witness may be

22  called.

23       **MR. COLLINS:**  Your Honor, if I could, I think it

24  may require a proffer for this witness.  This is Dr.

25  Bellonci being called back to the stand to correct, at least

1    from the defendants' position, an error in the record.  And

2    before we start to go down a road of what I think might be

3    inappropriate testimony, I think a proffer might be more

4    appropriate here so that your Honor can --

5              **THE COURT:**  Why -- well, I am a little surprised

6    that we're now recalling a witness.  But if -- you

7    characterize it as a correction.  I would certainly allow

8    any witness to correct testimony.

9              Without calling it a proffer, what's happening

10   here?

11             **MS. BARTOSZ:**  Your Honor, there's an exhibit

12   admitted, Exhibit 1062, which was in testimony tied to one

13   date and on cross tied to potentially, well, to another

14   later date, and we want to clean up the date of origination

15   of that exhibit.  And defense counsel following Dr.

16   Bellonci's testimony brought this matter to the attention of

17   plaintiffs' counsel, we pursued the question, followed up

18   with defense counsel, and are simply here today prepared to

19   clean up that matter in the record.

20             **THE COURT:**  Why, why shouldn't I allow that?

21             **MR. COLLINS:**  I'm not saying you should, your

22   Honor.  I just --

23             **THE COURT:**  You wanted to hear that.

24             **MR. COLLINS:**  Yes.  And there's a line of

25   questioning that I think, you know, if we're going to start

1    talking about documents that are not in evidence, I have

2    concern about that, you being the fact finder.

3                **THE COURT:**  I didn't hear her say that.  We'll face

4    it --

5                **MR. COLLINS:**  Okay.

6                **THE COURT:**  -- if it comes up.

7                The witness may be recalled.

8                **MS. BARTOSZ:**  Dr. Bellonci.

9                **THE COURT:**  So if you'll remind him.

10                **THE CLERK:**  I would like to remind you that you are

11    still under oath.

12                **THE WITNESS:**  Yes.

13                    CHRISTOPHER BELLONCI, Recalled

14                        **DIRECT EXAMINATION**

15    BY  **MS. BARTOSZ**

16    **Q**    Can you restate your name for the record, please?

17    **A**    Christopher Bellonci.

18    **Q**    Dr. Bellonci, do you recall the testimony you've given

19    in this proceeding previously?

20    **A**    I do.

21    **Q**    And in the course of that testimony, Dr. Bellonci, do

22    you recall offering testimony in relation to what you've

23    described as the Jensen table?

24    **A**    Yes.

25    **Q**    Dr. Bellonci, I would focus your attention on

| | |
|---|---|
| 1 | Exhibit 1062.  Do you recall Exhibit 1062 being the Jensen |
| 2 | table that you discussed in your direct examination in this |
| 3 | case? |
| 4 | A   Yes. |
| 5 | Q   Do you recall having the Jensen table brought to your |
| 6 | attention by Mr. Collins on cross-examination? |
| 7 | A   Yes. |
| 8 | Q   And at that time do you recall testifying that the |
| 9 | Jensen table to your knowledge was an updated version of an |
| 10 | original 1999 table? |
| 11 | A   Yes. |
| 12 | Q   And you indicated that in your cross-examination |
| 13 | testimony that to your understanding Dr. Jensen, or |
| 14 | Mr. Peter Jensen had updated the table later on and it was |
| 15 | your belief that you were relying on the updated table in |
| 16 | your testimony? |
| 17 | **MR. COLLINS:**  Objection. |
| 18 | **THE COURT:**  Yes.  You're leading the witness. |
| 19 | **MS. BARTOSZ:**  I'm sorry. |
| 20 | **THE COURT:**  Why don't you -- well, you're leading. |
| 21 | Sustained. |
| 22 | **MS. BARTOSZ:**  I'll withdraw it. |
| 23 | Q   Subsequent to your testimony, did you further look at |
| 24 | the issue of the Jensen table? |
| 25 | A   I did. |

1    **Q**    What did you determine?

2    A    I determined that I had misspoke and that the table that

3    I included in my report was indeed from 1999 and that the

4    2010 table is not the same as the table that was included in

5    my report.

6    **Q**    Did you locate a copy of the 2010 table?

7    A    Yes.

8    **Q**    I would like to direct your attention to Exhibit RZ.

9         **MR. COLLINS:**  Objection, your Honor.

10         **THE COURT:**  I'll hear you.  So now they want to put

11    in the more recent table.

12         **MR. COLLINS:**  That's correct, your Honor.  And this

13    is not something that, aside from being presented with this,

14    I believe yesterday morning, that we've ever seen, but more

15    importantly, this is not something that was contained in Dr.

16    Bellonci's report and it's not something that Dr. Bellonci

17    relied upon when writing his report and when testifying

18    about the report.  So I think this whole line of questioning

19    is --

20         **THE COURT:**  Well, I'll tell you how I propose to

21    proceed.  Not hearing any objection to its authenticity, I

22    propose to receive the document in evidence and let him step

23    down.

24         Satisfied with that?  Now, I have the dates, I have

25    updated data which may be relevant.

1              **MR. COLLINS:**  No, your Honor, I don't --

2              **THE COURT:**  What's the matter with that?

3              **MR. COLLINS:**  Because this is not a -- but for Dr.

4    Bellonci's misstatement on cross-examination, this document

5    never sees the light of day in this court.  So, you know,

6    this is not something he relied upon.  This is not something

7    that we had at the time of the deposition.

8              **THE COURT:**  I hear you.  I don't think it's

9    disputed.  But the Court has a genuine interest in having

10   the best available data before it.  If this data's

11   authentic, and it is, and of course this is 2010 data, it's

12   much more recent, I think those objections go to the weight.

13   But I don't propose to hold him here.  I think everything

14   else Mr. Collins says is correct.  I would like this in the

15   record.  Anyone can argue from it.  But I don't -- because

16   I've been so strict on holding everyone to their report.

17             So, you're okay with that?

18             **MS. BARTOSZ:**  Yes, Judge.

19             **THE COURT:**  Yes.  Well, that's how we're going to

20   do it.

21             **MR. COLLINS:**  Your Honor, if I could.  If I could.

22             **THE COURT:**  Yes.

23             **MR. COLLINS:**  I haven't had a chance to review this

24   document.  If this document were produced --

25             **THE COURT:**  You can, you can move to strike it, on

1    a proper foundation.

2             MR. COLLINS:  If this document were produced, I

3    would have had a chance to talk about this with Dr. Bellonci

4    at his deposition, to cross-examine him during --

5             THE COURT:  You may recall him if you want him

6    back.  This is going to take a while, and we're not to your

7    case.  I simply am not -- I'm not likely, and this case,

8    this exhibit is an example, to say on some, which I consider

9    a technical matter, not to receive probative evidence.  My

10   duty as fact finder requires me to cast the net broadly and

11   learn all I can about relevant matters.

12            Overruled.  The document's going to be admitted in

13   evidence 1087.

14            (Exhibit marked in evidence.)

15            THE COURT:  And with that he may step down, unless

16   there's --

17            MR. COLLINS:  I have two questions, your Honor.

18            THE COURT:  Fine.  You may step down.  Oh, you do

19   have some questions now that he's back here.

20            MR. COLLINS:  For the witness, yes.

21            THE COURT:  That's fine.

22            MR. COLLINS:  At least at this point.  And we

23   may --

24            THE COURT:  That's fine.  And that doesn't mean you

25   can't recall him if you have some other problems.  But we're

```
 1   not asking the same questions twice.  But you understand
 2   that.
 3             All right, Mr. Collins, go ahead.
 4        MR. COLLINS:  I do, your Honor.
 5                   CROSS-EXAMINATION
 6   BY  MR. COLLINS
 7   Q   Dr. Bellonci, good morning.
 8   A   Good morning.
 9   Q   I just want to be clear, this is not, this document that
10   was just admitted into evidence as Exhibit 1087, you didn't
11   rely on this in your report?
12   A   No.
13   Q   In fact -- and it was not produced at the time of your
14   report?
15   A   No.
16        MR. COLLINS:  That's all I have, your Honor.
17        THE COURT:  Fine.  Nothing further for,
18   Ms. Bartosz.
19        MS. BARTOSZ:  Nothing further, your Honor.
20        THE COURT:  You may step down.
21        (Whereupon the witness stepped down.)
22        THE COURT:  And now are we going to recall --
23        MS. BARTOSZ:  Your Honor, the plaintiffs will
24   recall Ms. Jones.
25        THE COURT:  She may be recalled.
```

1          **THE CLERK:**  Ms. Jones, I would like to remind you

2     that you are still under oath.

3          **THE WITNESS:**  Yes.

4          **THE CLERK:**  Please be seated.

5              ARBURTA E. JONES, Recalled

6          **DIRECT EXAMINATION** (Cont'd)

7     **BY MS. BARTOSZ**

8     **Q**   Good morning, Ms. Jones.  Welcome back.

9     A   Good morning.  Thank you.

10    **Q**   Ms. Jones, when we ended testimony yesterday you had

11    just identified four hinge pins.  Do you recall that

12    testimony?

13    A   Yes, I do.

14    **Q**   I would like to pick up today with the first hinge pin

15    you identified which I think you called visitation.

16    A   Yes.

17    **Q**   Why did you place focus on visitation in your review of

18    DCF in this case?

19    A   Visitation to children who are in foster care is one of

20    the ways, the primary ways in which the state can assure the

21    safety of children who are in care.  By visiting children in

22    their foster home, the worker has the opportunity to assess

23    the relationship between the child and foster parent, to get

24    a sense of what else might be going on in the home, as well

25    as to begin to really focus on the case plan, make sure the

1    case plan is directed and the child is moving quickly toward

2    the permanency.

3         We find that the longer children are in care the

4    more likely they are to be subjected to abuse or neglect.

5    So getting them moved through the system as quickly as

6    possible is important.

7    **Q**    Ms. Jones, I would like to direct your attention to

8    Exhibit 153.  Can you identify Exhibit 153?

9    A    Yes.  This is an Administration of Children and Families

10   program instruction to child welfare agencies regarding case

11   worker visits.

12   **Q**    First of all, can you identify for the Court what the

13   Administration for Children and Families is?

14   A    Yes.  That is the federal agency that oversees child

15   welfare practice for the nation.

16   **Q**    Did you rely upon Exhibit 153 in making your findings in

17   this matter?

18   A    Yes, I did.

19   **Q**    Can you please testify as to the reliance you placed on

20   this exhibit?

21   A    Yes.  This, this particular program instruction really

22   underscores the correlation between visitation and positive

23   outcomes for children.  Specifically it indicates there's a

24   strong correlation between frequent case worker visits with

25   children and positive outcomes including permanency and

1    other indicators of child well-being.

2    Q    Ms. Jones, I'd ask that you now direct your attention to

3    Exhibit 827.  Ms. Jones, can you identify Exhibit 827,

4    please?

5    A    Yes.  This is the Massachusetts Department of Children

6    and Families Integrated Practice Model.  In reviewing this

7    particular document, I learned that not only does the

8    Administration of Children and Families understand the

9    importance of child visitation, that the Department of

10   Children and Families also recognizes this as an important

11   factor in case management and in fact includes that in their

12   child, in their integrated case practice model.

13   Specifically, the second paragraph here indicates that

14   social workers would meet with children and families to

15   monitor the children's safety and well-being, and then goes

16   further.

17   Q    Did you place reliance on this document in any other

18   way?

19   A    This, this document also underscores the relationship

20   between their integrated case practice model and the

21   national child and family service review.  And there are two

22   components that they discuss on the second page of this

23   document regarding social worker visits to highlight the

24   need to address safety needs, including monthly face-to-face

25   contacts with children in foster care and to promote

1    communication between the children and the social worker.

2    **Q**    In reviewing the visitation hinge pin, Ms. Jones, did

3    you seek to identify applicable policies or regulations in

4    the Commonwealth of Massachusetts?

5    A    Yes, I did.

6    **Q**    Did you identify applicable policies and regulation?

7    A    Yes, absolutely.

8    **Q**    Ms. Jones, you have Exhibit 1?

9    A    Yes.

10    **Q**    Thank you.

11          Please turn to Exhibit 1 to DCFPOL and it's

12    page 140.  Can you identify what's shown on page 140?

13    A    Yes.  This is the agency policy regarding worker-client

14    contact and child family visitation with children in

15    placement.

16    **Q**    Did you place reliance on this policy in formulating

17    your opinions?

18    A    Yes.  This policy --

19    **Q**    How so, Ms. Jones?

20    A    This policy specifically states that the scheduled

21    contact should include at least monthly visits by a child

22    with a child and the social worker in the children's

23    placement and with a resource parent.

24    **Q**    Ms. Jones, I would ask you to direct your attention now

25    to Exhibit 678.  Can you identify Exhibit 678, Ms. Jones?

1    A    Yes.  This is another program instruction from the

2    Administration of Children and Families regarding monthly

3    case worker visits.

4    Q    Did you place reliance on this document in forming your

5    opinions in this case?

6    A    Yes.  This, this document really sets the standard that

7    the federal government is looking at now as well as

8    prospectively for monthly visitation with children.

9    Specifically, for the present time, visitation, the standard

10   is for 90 percent of the children in foster care to be

11   visited on a monthly basis.  That standard will be elevated

12   to 95 percent in federal fiscal year 2015.  Additionally,

13   each visit with foster children, at least 50 percent of

14   those visits are expected to take place in the child's place

15   of residence.  And additionally, this document indicates

16   that as, as these standards, if these standards are not met

17   that there would be sanctions to the state in terms of

18   federal financial participation.

19   Q    Ms. Jones, are you familiar with an organization named

20   the Council on Accreditation?

21   A    Yes.

22   Q    Did you review any publications by the Council on

23   Accreditation in your work in this case?

24   A    Yes, I did.

25   Q    I'm going to ask you to focus your attention on Exhibit

1    QH.  Can you identify Exhibit QH, Ms. Jones?

2    A    Yes.  This is from the Council on Accreditation and it's

3    referencing, it's introducing their fundamental practice

4    standards, and it indicates that these are some of the

5    critical areas that states would be expected to implement

6    immediately.

7    Q    Please hold onto that exhibit and I would ask you to

8    additionally now direct your attention to Exhibit QJ.

9            Can you identify Exhibit QJ?

10   A    Yes.  Exhibit QJ builds on the prior exhibit and this

11   exhibit lays out the indicators for public agencies, foster

12   care services specifically, and begins to categorize the

13   standards according to essential life safety, health and

14   welfare, and client rights considerations.

15   Q    Where do you see that in this document?

16   A    On the next to the last page is where it's done most

17   succinctly, the chart throughout the document specifies each

18   area, but then succinctly on the next to the last page.

19   Q    Ms. Jones, please direct your attention now to Exhibit

20   QN.  Can you identify Exhibit QN for the Court, Ms. Jones?

21   A    Yes.  This exhibit provides the definition around foster

22   care services.  Specifically how I used this with regard to

23   my review on visitation is on page 2 of the document and

24   page, in fact, page 24 the full thing, but on page 2 here,

25   indicator 12.01 where it indicates that the family foster

1    care worker meet separately with the child and the parents

2    at least once a month to assess safety and well-being, to

3    monitor service delivery, and to support the achievement of

4    permanency and other service plan goals.

5            And in addition, I would like to add as well that

6    this has been identified by COA as an essential life and

7    safety factor.

8            **THE COURT:**  Identified by who?

9            **THE WITNESS:**  By COA, the Council on Accreditation.

10           **THE COURT:**  COA.

11           **THE WITNESS:**  COA.  Yes.

12   **Q**   And what is the significance of that?

13   A   Well, I think it's significant that a recognized

14   accrediting agency, recognized for their work in child

15   welfare, has identified visitation as essential to assuring

16   the life and safety of children who are in foster care.  It

17   underscores the need to assure that those visits are in fact

18   taking place on a monthly basis.

19   **Q**   In conducting your review of DCF on the visitation hinge

20   pin, did you look at DCF performance?

21   A   Yes, I did.

22   **Q**   And did you form a finding as to whether DCF is

23   conforming with the standards you've identified here in

24   terms of visitation?

25   A   I found that DCF is not meeting the standard of 90

1    percent.  Generally, their practice is hovering around the

2    mid 80 percent range.  There are some, some of the regional,

3    regional offices are much lower than the 85 percent, some go

4    as high as perhaps 90 percent from time to time.  But

5    generally, the practice is around 85 percent.

6    **Q**   Ms. Jones, I'm going to ask you to focus your attention

7    now on Exhibit 182.  Can you identify Exhibit 1182?

8          **THE COURT:**  Let me back up to see if I understand

9    your testimony.

10         You say from your review that DCF's attainment of

11    monthly visitation practices runs about 85 percent.  Is

12    that --

13          **THE WITNESS:**  Yes.

14          **THE COURT:**  Is that right?  I heard that right?

15          **THE WITNESS:**  You did.

16          **THE COURT:**  And the standard that you think is

17    professionally acceptable is?

18          **THE WITNESS:**  Is 90 percent established by the

19    federal government at this point.

20          **THE COURT:**  Thank you.

21    **Q**   Ms. Jones, did you review Exhibit 182 in formulating

22    your opinions?

23    A   Yes.

24    **Q**   And did you rely upon this exhibit in making your

25    finding?

1    A    Yes, I did, absolutely.

2    **Q**    Can you relate to the Court the reliance you placed on

3    this exhibit?

4    A    Yes.  This -- first, I'd like to identify it.  This is a

5    departmental, Department of Children and Families internal

6    data.  And at the bottom you'll find the core practice

7    functions.  And I find that significant first of all that

8    visitation by their own categorization has been labeled a

9    core practice function, which is consistent with Child

10   Welfare League of America, as well as COA standards.  So

11   there is agreement between the departmental agency and these

12   other entities.

13           So, the indicator that I was focused on in this

14   report are children visited in placement which, your Honor,

15   is the third category down in that core practice functions.

16           **THE COURT:**  So their internal document, at least as

17   of this date, claims 90 percent success rate?

18           **THE WITNESS:**  Well, what that indicates there is,

19   that first line, is that their target.

20           **THE COURT:**  Oh, I see.

21           **THE WITNESS:**  Their target --

22           **THE COURT:**  It does say target.

23           **THE WITNESS:**  Their target is 90 percent.  As of

24   March 2011, which is, this report was for March 2011, their

25   performance statewide as of that time was about 84 percent.

1    83.9 percent.

2             **THE COURT:**  Now I'm understanding this.  Yes.

3             **THE WITNESS:**  Okay.

4             **THE COURT:**  Thank you.

5             **THE WITNESS:**  And so then as you look across you'll

6    see each regional, each region's performance, which also is

7    hovering in that, in that 80 percent range.  But as you look

8    all the way to the far end of this report you'll see that

9    the range across area offices, that practice at the local

10   level is as low as 70 percent in some places but as high as,

11   almost 93 percent in others.

12   **Q**   Was this data significant to you?

13   A   Yes, it was significant to me.  It's significant first

14   of all in terms of the variance across local offices as

15   children in one area of the state have the, should have the

16   same access or consideration to their safety as children in

17   another part.  It indicates that somewhere in the state

18   someone knows how to get this done and to get it done

19   consistently.  And so, we should be looking at how we can

20   replicate good practice so that that, that 92.8 percent

21   could be a statewide performance rather than something

22   that's more isolated.

23   **Q**   Ms. Jones, please focus at this time on Exhibit 676.

24   Can you identify Exhibit 676?

25   A   Yes.  This is a series of e-mails.  The specific one

1    that I relied upon is at the bottom here, e-mail from Olga

2    Roche or, Roche, I'm not sure how to pronounce her name, to

3    the director of areas.

4    **Q**   And just so we're clear it's the e-mail sent Friday,

5    February 11, 2011, at 1:46 p.m.  Do we have the right one?

6    A    Yes.

7    **Q**   Go ahead.  What significance did you place on this

8    e-mail?

9    A    The significant thing about this e-mail is that first of

10   all it predates the report that we just reviewed.  But

11   Deputy Commissioner Roche is indicating that she has noticed

12   that family visits have been inconsistent and that children

13   may not have been seep for several months at a time.  She

14   indicates that seeing children, assessing their safety and

15   well-being is a basic responsibility and is therefore

16   requesting that they underscore the importance of this with

17   staff and that children be seen minimally once a month.

18   **Q**   I would like to show you Exhibit 368.  Ms. Jones, can

19   you identify Exhibit 368 for the Court.

20   A    Yes.  This is an e-mail from an area director Raymond

21   Pillidge to his area office managers.  In this particular

22   e-mail Mr. Pillidge is directing, is expressing his concern

23   about this issue as well.  He's indicating here that

24   supervisory units in his region are as low, the range is

25   from as low 37 percent visitation to as high as 97 percent.

1    He's identifying that the standard for visits is 90 percent.

2    They have a range there between 85 to 90, he's saying as an

3    acceptable range.  Yet he lowers the bar to 70 percent when

4    he indicates where he wants to begin to intervene directly

5    with his staff and to seek corrective action.

6    Q    Did you place reliance on Exhibit 368 in forming your

7    opinions?

8    A    Yes.  Yes, I did.  Again, the lowering of the bar,

9    particularly for this, if, if only in this particular region

10   of the state the lowering of the bar would be of a concern

11   and it's, it's an example of management's view of this, of

12   this particular area.

13   Q    In addition to the standards and the records that you've

14   testified to this morning, Ms. Jones, did you review the

15   deposition testimony of DCF officials in your review of this

16   matter.

17   A    Yes, I did.

18   Q    Did you review that testimony on the hinge pin for

19   visitation?

20   A    Yes, I did.

21   Q    Can you relate to the Court deposition testimony that

22   you relied upon in forming your opinions?

23   A    The deposition testimony indicated that, began to try to

24   explain reasons why the visitation might not be where it

25   should be and offered that, two particular explanations.

1    One would be a staffing issue and the other explanation was

2    relative to documentation not being entered in a timely

3    manner.

4    **Q**    What do you mean by staffing issue?  What was the

5    testimony with respect to that?

6         **MR. COLLINS:**  Objection, your Honor; move to

7    strike.

8         **THE COURT:**  What was -- grounds?

9         **MR. COLLINS:**  The deposition testimony's already in

10   evidence.  I mean, this witness can't sit there and testify

11   as to what someone else testified to.

12        **THE COURT:**  That's so.  And so, I guess I, if I

13   would -- if you've got the characterization right, I'll

14   sustain that and we'll let Ms. Bartosz ask another question.

15        Sustained.

16   **Q**   Ms. Jones --

17        **THE COURT:**  I do have the testimony deposition

18   testimony, and I'm doing my very best with it and it is of

19   record.  We've talked that all through, once I have made

20   clear what I have reviewed and is not the record.

21        Go ahead.

22        **MS. BARTOSZ:**  Thank you, Judge.

23   **Q**   Ms. Jones, you identified the issue of documentation a

24   moment ago that you identified that in the deposition

25   testimony.  Did you place reliance on that in formulating

1    your opinions here?

2            MR. COLLINS:  Objection.

3            THE COURT:  Grounds?

4            MR. COLLINS:  First, it's leading.

5            THE COURT:  No, she may have that.

6            MR. COLLINS:  And secondly --

7            THE COURT:  Overruled on that ground.  What else?

8            MR. COLLINS:  We're asking the same question,

9    trying to elicit the same testimony in the deposition.

10            THE COURT:  Well, we don't know.  This says that

11   she placed on reliance on it, and we'll see how that factors

12   into her opinion.  That I'm going to allow.  Overruled.

13            Did you place reliance on the deposition testimony?

14            THE WITNESS:  Yes, I did.  Yes, I did.  As related

15   to documentation and the slow, perhaps slow entry of

16   documentation into the Family Net system, I find that's an

17   inadequate explanation for the visitation rates that are

18   being reported in the data report.

19   Q    Why do you make that finding?

20   A    I make that finding because the policy of the agency

21   allows social workers 30 days in which to input their

22   information into the system and then the report is run 60

23   days after the fact.  So that provides ample time for the

24   entry of information and for that to be captured in the

25   data.

1  **Q**   Ms. Jones, can you focus your attention again on

2  Exhibit 1.  And can you please turn to page DCFPOL 142.

3  A   I have it.

4  **Q**   Can you identify this policy for the Court?

5  A   Yes.  This is the DCF policy regarding documentation.

6  **Q**   And what, if any, reliance did you place on this policy

7  in forming your opinions?

8  A   Specifically, around the procedures for documentation as

9  it relates to frequency.  And here in this policy it

10  indicates that the contact with family and collateral should

11  be documented as soon as possible into the Family Net system

12  within one month following the contact, and that even if

13  there's been no contact that a worker should indicate that

14  and the reason why and indicate that on a monthly basis as

15  well.

16  **Q**   Ms. Jones, do you have an opinion as to whether or not

17  inadequate visitation practice raises a risk of harm for

18  children in foster care custody?

19  A   It absolutely raises a risk of harm for children in

20  foster care.  As I indicated when we began this discussion,

21  visitation to the foster home is how a worker can really

22  assess the relationship between the foster child and the

23  foster parent and get a handle on how, the level, the level

24  of comfortability that a child can have in the home.  There

25  are nuances to that relationship that cannot be picked up at

1    a visit in the, a ride in the car or a visit in the office.

2    Also, the worker gets to see if there are additional

3    individuals in the home or just red flags, new red flags

4    that might be emerging.

5            One of the challenges to being a case worker is

6    when you have children in foster care is to not presume that

7    they're safe and we can fall into that saying, well, this

8    child is in foster care, I know they're safe so I can focus

9    on other kids who might be in their own homes.  The

10   presumption of safety is a big mistake for children who are

11   in foster care.

12   Q   Ms. Jones, you identified the second hinge pin which I

13   think you referred to as licensing.  I would like to focus

14   on that second hinge pin now, all right?

15   A   All right.

16   Q   Why did you place focus on licensing in your review of

17   DCF.

18   A   Licensing is, I'm going to call it the bedrock really of

19   the agency's capacity to assure that out of home placements

20   are safe for kids.  Prior to a child even being placed there

21   as the, the assessment of the potential care givers is

22   taking place, the evaluation of the physical plant is

23   involved, and ongoing reassessments and renewals, all of

24   this is important as to, the nature of family life is

25   dynamic, so that we're constantly looking at the home, the

1    care giver and everything that's associated with that

2    placement.

3    **Q**    Ms. Jones, please focus your attention on Exhibit 114.

4    Ms. Jones, can you identify Exhibit 114 for the Court?

5    A    Yes.  This comes from Child Welfare League of America's

6    standards.

7    **Q**    Did you include citation to Exhibit 1114 in your expert

8    report?

9    A    Yes, I did.

10   **Q**    And why did you make that citation?

11   A    I cited to this specifically as it indicates that

12   licensing, and this is on the second page, the very last

13   sentence, that licensing is the basic protection provided by

14   a state or province with the well-being of its children.

15   It's an exercise of the police power of the agency relative

16   to its providers.

17   **Q**    Ms. Jones, I would like to return your attention to

18   Exhibit QJ.  I think you have that.

19          Did you review Exhibit QJ in reviewing the

20   licensing hinge pin?

21   A    Yes.  As it relates to licensing, again, licensing is

22   part of the essential life and safety standards on this

23   document and it would be 6, in the 6.0, I believe.

24   **Q**    Ms. Jones, I would ask you to focus on Exhibit QL.  Will

25   you kindly identify Exhibit QL?

1    A    Yes.   This is the companion to the previous document as

2    it relates to licensing and under the foster care services.

3    On page, the second page of this document, 6.01 indicates

4    that all foster homes are licensed, approved or certified

5    according to state or local regulation.   And this is an

6    indication that this is an expectation again of one of those

7    things that should be implemented immediately by COA.

8    Q    Beyond the COA documents you've just identified,

9    Ms. Jones, in your review of the licensing hinge pin, did

10   you seek out applicable regulations or policies in the

11   Commonwealth of Massachusetts?

12   A    Yes.

13   Q    Ms. Jones, I'm providing you with Exhibit 69.

14   Ms. Jones, I'd ask that you turn to 110 CMR 7.113 in

15   Exhibit 69.

16   A    I have it.

17   Q    Did you review 110 CMR 7.113 in forming your opinions in

18   this case?

19   A    Yes.   Yes, I did.

20   Q    Ms. Jones, what is the licensing structure in the

21   Commonwealth of Massachusetts in relation to foster homes?

22   A    When, when someone applies to be a foster parent the

23   initial home study is to be conducted within 30 days.   After

24   a license is issued the home goes on a two year cycle for

25   renewal and reassessment.   So that first year after the

1    initial license is granted there's a reassessment of the

2    home.  The year following that there would be a renewal and

3    so forth.  Homes are licensed for two years at a time.

4          In addition, these regulations provide for the

5    licensing of kin homes which is a different sort of

6    arrangement in that children can be placed in a kin home

7    prior to the license being issued, and in those instances

8    the initial home study must be conducted within 40 days of

9    the child's initial placement in a home.

10         **THE COURT:**  A what kind of home?

11         **THE WITNESS:**  A kinship home.

12         **THE COURT:**  A kin home.

13         **THE WITNESS:**  Kin.  Yes.  Yes.

14   **Q**   Ms. Jones, redirecting your attention to Exhibit 69,

15   could you turn to 110 CMR 7.108.

16   A    Yes.

17   **Q**   Did you make review of this regulation in forming your

18   opinions?

19   A    Yes.  And this is the regulation that's specific to the

20   kin home as I just discussed.  This, this further talks

21   about, you know, the background checks and so forth as well.

22   **Q**   At this time, Ms. Jones, can you redirect your attention

23   to Exhibit 1 and please turn to page DCFPOL 180.

24         Let me know when you have it, Ms. Jones.

25   A    Uh-huh.  Yes.  Yes, I have it.

1    **Q**    Did you make review of this policy in forming your

2    opinions on the licensing hinge pin?

3    A    Yes, I did.  This is the policy that talks about the

4    licensing study and how the department will, it actually

5    implements the regulations that we just referenced.

6    **Q**    In the course of your review, did you identify DCF

7    records addressing performance on the licensing hinge pin?

8    A    Yes.  I reviewed internal documents.  The quarterly

9    foster care report captures that data.

10    **Q**    Ms. Jones, I'm now going to provide you with

11    Exhibit 956.  Please identify Exhibit 956.

12    A    This is the quarterly foster care report fiscal year

13    2012.  This packet includes the first three quarters.  So

14    Quarter 1, Quarter 2, and Quarter 3.

15            For the, for the purposes of my review, I focused

16    primarily on the bottom row of data, the yellow row, safety.

17    And in the safety domain includes completion of ten studies

18    within 40 working days as well as timely reassessment and

19    license renewals.

20    **Q**    What did you determine in placing focus on that safety,

21    or those safety domain elements?

22    A    I, I really focused and made a comparison between

23    performance in Quarter 1 and performance in Quarter 3.  In

24    Quarter 1, as it relates to timely annual reassessments and

25    license renewals, the state on a statewide basis performance

1    was at approximately 84 percent in the first quarter and by

2    the third quarter there had been a marked decrease in

3    performance to 76 percent on a statewide basis.

4         THE COURT:  I'm not following this.  You have to

5    look at more than one page --

6         THE WITNESS:  Yes.  Let me --

7         THE COURT:  -- to come to that conclusion.

8         THE WITNESS:  I'll give you mine.

9         THE COURT:  Oh, I see how you're doing it.

10        THE WITNESS:  All right, why don't you take mine,

11   like that, and I'll --

12        THE COURT:  All right.

13        THE WITNESS:  So the bottom, the one on the very

14   bottom, your Honor, are the first quarter.

15        THE COURT:  Thank you.

16        THE WITNESS:  And then second quarter, third

17   quarter is on the top.  And so if you look in the safety

18   domain you'll see, which is the, as I said, it's the yellow

19   one, the variance in performance, how it dropped from the

20   first quarter to the third quarter, as it relates to timely

21   annual reassessment and licensing renewal.

22             You also see there on a --

23        THE COURT:  Well, let's just see if I'm reading it

24   right.

25        THE WITNESS:  Okay.

1          THE COURT:  So the first quarter it's 83.9, almost

2    84.

3          THE WITNESS:  Right.

4          THE COURT:  Second quarter, it's 84.3.  But third

5    quarter, it's down to 76.3.

6          THE WITNESS:  Yes.

7          THE COURT:  Thank you.

8          THE WITNESS:  Yes.  And following that same sort of

9    method, as you look across the regions you can see the

10   variability.  Each column there represents a different

11   region.  And you can see the variability of practice across

12   regions on that indicator with a low of 58 percent for one

13   region there and a high of 90 percent.

14         THE COURT:  Now, just to understand this, what does

15   the data in the little gray boxes within each yellow box

16   signify?

17         THE WITNESS:  That, that is variance.  I have

18   this -- give me a minute.  For the, for the fiscal year to

19   date, and it shows that, the variance over the course of the

20   fiscal year.

21         THE COURT:  Thank you.

22         THE WITNESS:  Okay.  So then moving on to the other

23   indicator in this box, the completion of restricted kinship

24   homes, again, there's some variance there and again hovering

25   around that, that 85 percent mark statewide.  But again, a

1    low, it looks like of 66 percent in the first quarter and a

2    low regional of 74 percent in the third quarter.  So, this

3    is just to note the variances between the two.

4         **THE COURT:**  Unlike the visitation, though, where

5    you had these federal standard of 90 percent, is there some

6    standard against which you think I ought judge the, this

7    metric?

8         **THE WITNESS:**  Yes, your Honor.  I think that

9    licensing renewals, the standard for that should be

10   consistent with the standard for visitation of children in

11   their homes.

12        **THE COURT:**  Well, I mean no disrespect, that's your

13   view and --

14        **THE WITNESS:**  Right.

15        **THE COURT:**  -- we'll accept that as evidence in

16   this case.  But the 90 percent to which, to which reference

17   was earlier made on visitation is backed up by what you

18   characterize as a federal requirement --

19        **THE WITNESS:**  Right.

20        **THE COURT:**  -- and also other professional data.

21        **THE WITNESS:**  Right.

22        **THE COURT:**  Here, what backs up your view?

23        **THE WITNESS:**  There is no federal standard to

24   support what I'm saying.

25        **THE COURT:**  Right.  But that is your professional

1    judgment?

2              **THE WITNESS:**  But that is my professional judgment.

3              **THE COURT:**  All right.

4    **Q**   On what do you base that professional judgment,

5    Ms. Jones?

6    **A**   I base that professional judgment as I was saying on the

7    fact that this is a critical aspect of assuring the safety

8    of the placement system for children.  As, as the dynamics

9    in a foster home can change from day to day and the only,

10   the only way that we have to know what is going on in a

11   foster home is to go out there and see it; otherwise, we're

12   just simply relying on self-reporting by the foster parent.

13   So when someone new moves into the home, if the foster

14   parent doesn't let us know, then this is the only way that

15   we know that these people are there.  This is the only way

16   that we know if there are problems developing with the

17   physical plant of the foster home.  This is the way that we

18   know that the foster parent may need some additional

19   supports in order to care for the particular child that's in

20   the home.  And can, and can respond to red flags as they are

21   elevated.

22   **Q**   Have you formed an opinion, Ms. Jones, as to whether or

23   not DCF is moving the standard of care on the licensing

24   hinge pin?

25   **A**   No, they are not meeting the standard of care by their

1    own documents, their own policy.  These, these reassessments

2    should be done on an annual basis and their data reflects

3    that that they are not doing so approximately 15 percent of,

4    for 15 percent of the homes.  Or I should say approximately

5    15 percent of the time, not necessarily 15 percent of the

6    homes.

7    **Q**    Did you look at the licensing hinge pin beyond the issue

8    of reassessments, renewals and 40 day home studies?

9    A    I guess I'm not clear as to the question.

10   **Q**    I'm sorry, let me rephrase my question.

11          In addition to the regulations that you've

12   identified, did you look to regulations with respect to

13   background checks?

14   A    Yes.  The background check is also a critical area and

15   aspect of the licensing process.  It --

16   **Q**    What is a background check, Ms. Jones?

17   A    The background, the background check is a twofold or two

18   pronged process.  One is fingerprinting and the other is a

19   checking of the state central registry for abuse or neglect.

20   Perpetrators of abuse and neglect.  In order to move this

21   licensing process in a timely manner, it's critical that

22   this unit, this CORI background check unit within the

23   department also be functioning at capacity and with

24   efficiency.  And I found that this unit consistently ran a

25   backlog of cases and did not have adequate capacity to meet

1    the volume of fingerprint requests that were being made.

2    Q    Ms. Jones, could you direct your attention back to

3    Exhibit 69.  Please turn to 110 CMR 18.082A.

4    A    I'm sorry, one more time.

5    Q    110 CMR 18.08, section 2.

6    A    Yes.

7    Q    Do you have that?

8    A    Yes, I have that.

9    Q    Did you make review of this regulation in your review of

10   the licensing hinge pin?

11   A    Yes, I did.  And here this regulation for the CORI, it's

12   CORI investigations, and it requires that whenever the

13   department is, it requires the department to conduct a CORI

14   investigation during the initial screening for household

15   members 14 years and older, that this would be done during

16   the initial home study as well as during the annual

17   reassessment, and that the department should conduct the

18   CORI investigations, that the unit, the CORI investigations

19   unit should conduct this investigation for the department in

20   accordance with policies and procedures established by the

21   department.

22   Q    In your review are you able to identify DCF records

23   addressing performance in the CORI background check area?

24   A    Yes.  Specifically there were a series of e-mails from

25   director Ken Sportman who is the director of the CORI BRC

1    unit and expressing grave concerns about the status of the

2    unit and its ability to complete its work.

3    **Q**   Ms. Jones, I'm going to provide you with Exhibit 282.

4         Did you review Exhibit 282 in your work on this

5    case.

6    A   Yes.  This specific e-mail is from Director Sportman to

7    his supervisor, Beryl Domingo, and in this e-mail -- it's

8    dated November 18th, 2010.  It's a response to the recent

9    layoffs that had taken place and his concern about how his

10   unit would be able to continue to conduct their work in

11   light of the lesser staff.

12        He indicates that a backlog of two to three weeks

13   or worse would be standard and that this was a condition,

14   this was the condition of the unit back in the late 1990's

15   when they had a similar situation.

16   **Q**   Please focus your attention now on Exhibit 270.

17   Ms. Jones, what is Exhibit 270?

18   A   This is an e-mail chain again between Mr. Sportman and

19   Ms. Domingo.  This particular e-mail that I'm referencing,

20   February 2nd, 2011, this is when the change took place, in

21   the middle of the page Mr. Sportman indicates that these

22   blanking things never stop and that they were going to have

23   a backlog well over 300 requests.  He was hoping that he

24   would be able to catch up that particular day, but

25   apparently not.

1    **Q**   Ms. Jones, please focus now on Exhibit 275.  Can you

2    identify this exhibit for the record, please?

3    A   Yes.  This is, this exhibit is again an e-mail between

4    Mr. Sportman and Ms. Domingo dated July 18th, 2010, which is

5    five months after the previous one where he was so

6    concerned.  And here he's identifying that there are 426

7    requests in the backlog for the unit on that particular day.

8    And of note, that 170 of that 426 are for contracted and

9    adoptive resource provided request.

10   **Q**   Ms. Jones, have you formed an opinion with respect to

11   DCF's performance in the BRC CORI check aspects of

12   licensure.

13   A   Yes.  The unit is, is inadequately staffed in order to

14   really meet the capacity of the workload that this unit has

15   had to bear for the department in order to support the

16   department in fulfilling its role particularly as it relates

17   to licensing.

18   **Q**   Have you formed an opinion, Ms. Jones, with respect to

19   whether or not DCF's practice on the licensing hinge pin

20   exposes children to a risk of harm?

21   A   Children are clearly exposed to a risk of harm when they

22   are in homes that, that have not, that have not undergone

23   the type of strict scrutiny that is involved in the

24   licensing, reassessment or renewal.  This, this risk of harm

25   is elevated for children who are in kin homes when that

1    initial assessment is prolonged beyond the 40 days because

2    the child is in the home and the background study has not

3    been completed at that point.

4    Q    I'd like to turn to the third hinge pin you identified

5    and I think you called it investigations or timely

6    investigations.

7              Do you recall that?

8    A    Yes.

9    Q    Why did you place focus on investigations in your review

10   of DCF?

11   A    As children are in foster care, the child has been

12   removed from their own home, generally speaking, some

13   children are in foster care for other reasons, but generally

14   speaking, children are in foster care, then removed from

15   their homes because of an incident of abuse or neglect in

16   their family of origin.  So now that the child is in foster

17   care, when there's an allegation of abuse or neglect, we

18   have to take that allegation even that much more seriously

19   because of the trauma, the potential trauma that this child

20   has been exposed to.  The responsibility of the state then

21   to get in to do a thorough and complete investigation in a

22   timely manner is imperative.

23   Q    Where within DCF is the function for investigating

24   allegation of abuse or neglect occurring in foster care

25   placements?

1    A    That responsibility lies with the special investigation

2    unit under the direction of director Schofield.

3    Q    Did you identify a time frame within which the special

4    investigations unit, or SIU, is supposed to make

5    investigations into allegations of abuse or neglect in

6    foster care?

7    A    Their investigations are to be completed within 15 days.

8    Q    During the course of your review, Ms. Jones, did you

9    seek to determine whether or not that 15 day time frame was

10   being met?

11   A    Yes, I did.  And based on deposition testimony by

12   Director Schofield, the majority of their investigations are

13   not completed on time within the 15 days.  He indicated that

14   it's over 50 percent of their investigations are beyond the

15   15 day for completion.

16   Q    Did you -- were you able to identify reasons for that

17   performance?

18   A    Again, it was a staffing issue, inadequate staff, as

19   well as some structural issues with the unit as far as being

20   centrally located and distance to travel to get to

21   investigations.

22   Q    Please explain that, why is the centralized location an

23   issue in terms of timeliness?

24   A    With, with the massiveness of the Commonwealth of

25   Massachusetts, you have to factor in travel time to get to

1    the point of the investigation.  In addition to that, the

2    complexity of these investigations far exceeds what would be

3    expected in a local office investigation of a child in their

4    own home.  When you're dealing with particularly an

5    allegation that's with a congruent care facility, there may

6    be multiple perpetrators, multiple child victims, the need

7    to interview multiple staff, and if you have to go back and

8    forth to this facility on more than one occasion in order to

9    complete the investigation time is, time is passing, time is

10   passing.  And it's very difficult.

11   Q   Were you able to determine in your review of the records

12   whether staffing levels within SIU had been constant or

13   changing?

14   A   Director Schofield indicated that --

15              **MR. COLLINS:**  Objection.

16              **THE COURT:**  Well, you got this from his deposition?

17              **THE WITNESS:**  Yes.

18              **THE COURT:**  Well, the deposition is in evidence.

19              **MS. BARTOSZ:**  Thank you, your Honor.

20   Q   Ms. Jones, have you formed an opinion as to whether or

21   not DCF is meeting its 15 day regulatory time frame for

22   making SIU investigates?

23   A   Yes, I have determined that the investigations are not

24   being completed in a timely manner.

25   Q   Have you formed an opinion as to whether or not that

1    exposes children to a risk of harm?

2    A    Yes, children, children are at a risk of harm.  As, as

3    the investigation results are delayed, decisions about where

4    children ought to be are hanging in the balance.  And so,

5    if, if a child could potentially remain in a home or in a

6    situation that's unsafe and be subject to additional harm

7    because the investigation is not completed, or conversely, a

8    child may be moved without, without cause because the

9    investigation is incomplete and as a precautionary measure a

10   child may be moved that didn't need to be moved, and so

11   that's a different type of harm, but it's harm nonetheless.

12            **THE COURT:**  Let me state that another way and with

13   some characterization.

14            In essence the only type of harm is you don't have

15   enough staff, you can't thoroughly investigate things, but

16   you've got an allegation.  So the safest thing, whether it's

17   true or not, is to move the kid out of that environment.

18   That carries with it the trauma of the move.

19            Is that what you're saying?

20            **THE WITNESS:**  Yes.  Yes, that's what I'm saying.

21            **THE COURT:**  All right.

22            **THE WITNESS:**  And sometimes, your Honor, that, that

23   trauma is compounded if that was perhaps a preadoptive

24   placement where the child had already created a bond, maybe

25   you're moving this child from that home and now you find

1    that, let's say the allegation is unsubstantiated, going to

2    bring the child back, of course, but that, that moving back

3    and forth, that's traumatizing.

4    **Q**    Ms. Jones, I direct your attention at this time to

5    Exhibit 471.  Would you identify Exhibit 471?

6    A    Yes.  This is a chart relating to the absence of

7    maltreatment in foster care which is a domain on the federal

8    child and family services review, and this chart was taken

9    from the Children's Bureau of child maltreatment report for

10   2010.  This is a report that the Children's Bureau issues

11   and --

12   **Q**    Did you review Exhibit 471 in formulating your opinions

13   in this case?

14   A    Yes, I did.

15   **Q**    Can you describe for the Court the reliance you placed

16   on this particular exhibit?

17   A    In this exhibit, as I said, it's a measure of the

18   federal absence of maltreatment in care.  And the standard

19   for that is .32.  But as you, as you look across this, this

20   chart you see that the state of Massachusetts is there in

21   2010, I'm trying to find the line, their performance was

22   99.2, which says that they, rather than meeting the federal

23   standard of .32 for absence in care, their, their, they were

24   at .8 eight, which is about two times what the federal

25   government would expect.

1        **THE COURT:**  And just New York, in a quick read,

2     seems to be the lowest here with Rhode Island.  Everybody

3     else is at 99 point something or other, and a few small

4     states are at a hundred percent.  One infers that they have

5     not too many children.

6        Am I reading it correctly?

7        **THE WITNESS:**  Yes, sir, you are reading it

8     correctly.

9        **THE COURT:**  But the HHS or whoever put this out,

10     the Children's Bureau, they set the standard at 99.68, and

11     at least from, in the column 2010 to the present

12     Massachusetts falls below that standard.

13        **THE WITNESS:**  Yes.  Massachusetts generally is in

14     the low tier ranking within the lowest ten states on this

15     indicator.

16        **THE COURT:**  Right.  Thank you.

17  **Q**    Does this document on the bottom, Ms. Jones, identify

18     the percentage of reporting states that met the standard?

19        **THE COURT:**  Well, it does.  I can read it.

20        **MS. BARTOSZ:**  Thank you.  Withdrawn.

21  **Q**    Ms. Jones, I would like to turn to the fourth hinge pin

22     that you identified at the beginning of your testimony, and

23     I think you referred to it as accountability.

24  A     Yes.

25  **Q**    I'd like to provide you two exhibits at this time,

1    Exhibit 200 and Exhibit 352.

2            Did you review Exhibits 200 and Exhibit 352 in

3    forming your opinions in this case?

4    A    Yes.

5    Q    First, can you identify --

6            **MR. COLLINS:**  I have one of them, not the other.

7            **MS. BARTOSZ:**  Oh, I'm sorry.

8            **THE COURT:**  Which one do you have?

9            **MR. COLLINS:**  200.  Thanks.

10   Q    Can you identify these exhibits?

11   A    Yes.  These are internal documents from the department's

12   continuous quality improvement office for their child and

13   family for them to track their performance on child and

14   family service review measures.

15   Q    Did you place reliance on Exhibits 200 and 352 in

16   forming your opinions in this case?

17   A    Yes.

18   Q    Can you describe how so?

19   A    I, I was taken by the difference in how the data is

20   presented in the two documents.  And so I did a comparison

21   between the two documents.  The document with the arrows is

22   a former machination and then it developed into the one with

23   the letter grades.

24            So, when I looked at safety outcome 1, at the top,

25   and the absence of maltreatment in foster care, which was,

1    which is, as I indicated, the federal indicator that I was

2    concerned with during a safety review, I wanted to

3    understand how the Department of Children and Families view

4    their own performance in relation to this matter.

5    **Q**    So, let's start with Exhibit 200, the earlier of the two

6    exhibits here.  How does this performance scorecard work in

7    terms of assessing performance on absence of maltreatment in

8    foster care?

9    A    Okay.  Well, first, the federal standard is rightly

10   identified as 99.7 percent or higher.  However, I was taken

11   by the department translating the federal standard into what

12   they've what they've identified as an optimal performance

13   level.  It's simply the level that's expected by the federal

14   government that every state would be trying to meet.  And

15   then the state's performance on that indicator was

16   99.1 percent during this recording period.

17          **THE COURT:**  Let me interrupt, simply to indicate

18   I'm slow.

19          **THE WITNESS:**  Right.

20          **THE COURT:**  I'm looking at Exhibit 200, but I don't

21   know what line you're looking at.

22          **MS. BARTOSZ:**  May I approach, your Honor?

23          **THE COURT:**  There.  Thank you.  Okay.

24          **MS. BARTOSZ:**  Continue, Ms. Jones.

25   A    So, the, the state's performance during this recording

1    period was 99.1 percent, and the downward arrow indicates

2    according to their code that action is warranted.  And

3    you'll see, your Honor, at the very top there a series of

4    arrows going in different places around the place.

5              THE COURT:  I do, I do see it.

6              THE WITNESS:  And that's how you would read that,

7    that part of the report.  So yes, so action was warranted

8    because they were at 99.1.  And I thought that that was an

9    appropriate way to record that performance.

10   Q    Let's turn to Exhibit 352.  What did you review of that

11   exhibit to indicate?

12   A    This, this exhibit, as you can see the, the performance

13   indicators have not changed.  The federal indicators is the

14   same, the statewide actual performance is the same.  Yet

15   what was previously indicated with a downward arrow

16   indicating that action was warranted now is reflected as an

17   A plus in performance.

18   Q    What do you mean that the performance, the actual

19   performance was the same?  What are your complaints -- what

20   columns are you comparing between Exhibit 200 and

21   Exhibit 352.

22   A    I'm comparing on Exhibit 200 the column that states, and

23   it says 99.1 percent, and then on Exhibit 352, the statewide

24   actual remains 99.1 percent.

25   Q    Thank you.

1          And proceed.  What significance did you find in

2    your review of these two exhibits?

3    A   Well, I found that, you know, a downward arrow

4    indicating action is warranted has now been translated to an

5    A plus.  And in common grading systems, an A plus when it's

6    given indicates an achievement of excellence.  And so, that

7    would be counterintuitive to action being warranted when

8    one reads the report.

9    Q   Returning to --

10         **MS. BARTOSZ:**  I'm sorry your Honor, one moment.

11   Q   Return to Exhibit 471 for a moment.

12         **THE WITNESS:**  Yes.

13   Q   Where would the score of 99.1 place the state of

14   Massachusetts or any other in the chart here in Exhibit 471?

15   A   If you are, if you look at 2010, 99.1 places the state

16   clearly in the bottom as one of the bottom performers.

17   Q   Ms. Jones, have you formed an opinion with respect to

18   the performance scorecard here, the accountability system

19   set up by DCF's CQI unit?

20   A   Yes, I find that this sort of internal document, it

21   fosters a sense of complacency and lulls, could potentially

22   lull the agency to a place being, being comfortable with

23   substandard performance.

24         If you have an A plus then as I said that, that

25   translates to excellence in the mind of people based on how

1   they're accustomed to seeing scores.  So, it would not

2   indicate to me that I needed to do anything yet, my

3   performance is at the lowest rung in the nation.  And so, it

4   gives a false sense of excellence.

5   **Q**   Have you formed an opinion as to whether this approach

6   to quality assurance or continuous quality improvement, CQI,

7   meets standards of care in the administration of a child

8   welfare agencies?

9   A   I would say that this sort of internal, this sort of an

10  internal assessment is not, is not going to move this agency

11  forward to, to creating situations that are safe for

12  children and families.  If, if the absence of maltreatment

13  in foster care as I said is at the lowest rung in the nation

14  and we're accepting this as A plus performance, then there's

15  no need to do anything further to improve our performance

16  and therefore children who are at risk today will be at risk

17  tomorrow based on this sort of an internal quality

18  assessment.

19  **Q**   Thank you, Ms. Jones.

20         **MS. BARTOSZ:**  Your Honor, that completes plaintiffs

21  direct questioning.

22         **THE COURT:**  Mr. Collins.

23         **MR. COLLINS:**  Your Honor, if it's all right with

24  you, I would like to do some moving.

25         **THE COURT:**  Oh, absolutely.

```
 1              MR. COLLINS:  Okay.

 2              THE COURT:  Just as a general matter, that's why we

 3     have that small podium.  You don't have to use it, but I'm

 4     an old state court judge and I thought that by being

 5     admitted to the bar that gave you access to this area.  You

 6     can move around.  And I've always operated that way.  And if

 7     you transgress I'll bring it to your attention.

 8              MR. COLLINS:  Very well, your Honor.

 9              THE COURT:  Go ahead, go ahead and move around.

10              MR. COLLINS:  So, I'm going to try to do this where

11     I can near my documents but also be able to see Ms. Jones.

12              THE COURT:  I understand.  And we take a moment,

13     because I want all counsel to feel that way.  Everyone's

14     acting seemly here.  But move to the document presenter, you

15     can come in close, you can move around the bar enclosure.

16              MR. COLLINS:  Thank you, your Honor.

17                          CROSS-EXAMINATION

18     BY  MR. COLLINS

19     Q    Good morning, Ms. Jones.

20     A    Good morning.

21     Q    My name is Jeffrey Collins.  I'm an Assistant Attorney

22     General.  I have some questions for you.

23              You and have I never spoken before, correct?

24     A    That's correct.

25     Q    You are currently in school, correct?
```

1    A    Yes.

2    Q    And you're at the New Brunswick Theological Seminary.

3    Yes?

4    A    Yes.

5    Q    You're in the process of getting your master's in

6    devinity.

7    A    Yes.

8    Q    And you've been doing that, and by that I mean pursuing

9    your master's in devinity since 2011.  Yes?

10   A    No, actually I think I started in, I think 2010 is when

11   I started.  Yes.

12   Q    Thank you.

13        Since 2011 you've worked for an organization of 28

14   reformed churches.  Yes?

15   A    Yes.

16   Q    Called the New Brunswick Classis organization?

17   A    Yes.

18   Q    And you testified on your direct examination about your

19   experiences as a front line social worker and a front line

20   supervisor in New Jersey.  Yes?

21   A    Yes.

22   Q    You haven't been a front line social worker for 15

23   years, correct?

24   A    That's correct.

25   Q    In fact, you haven't held any position in child welfare

1    since 2009?

2    A    That's correct.

3    Q    And none of your experiences have involved child welfare

4    outside of New Jersey, correct?

5    A    That's correct.

6    Q    You have no experience at all in Massachusetts, correct?

7    A    That's correct.

8    Q    No clinical experience and no managerial experience in

9    Massachusetts.

10   A    That's correct.

11   Q    You've never reviewed a complete DCF case file, correct?

12   A    That's correct.

13   Q    And you didn't review any complete case files in

14   rendering your opinions both on paper and here today in

15   court?

16   A    That is correct.

17   Q    You performed what you call a management review of the

18   Massachusetts Department of Children and Families.  Yes?

19   A    Yes.

20   Q    You didn't interview any managers at DCF, did you?

21   A    No, I did not.

22   Q    And you never sought to interview any managers at DCF,

23   did you?

24   A    No, I did not.

25   Q    In fact, you didn't speak to anyone, managers or

1   otherwise, at DCF, right?

2   A   That's correct.

3   Q   And you never sought to speak to anyone at DCF, correct?

4   A   That is correct.

5   Q   You didn't interview or speak with anyone at the

6   Massachusetts Executive Office of Health and Human Services

7   either, correct?

8   A   That is correct.

9   Q   And didn't attempt to either?

10  A   That's correct.

11  Q   And you didn't speak to anyone in the governor's office

12  in Massachusetts, correct?

13  A   That's correct.

14  Q   And you didn't attempt to speak to anyone there either?

15  A   Right.

16  Q   What you did do was review a whole host of documents.

17  Yes?

18  A   Yes.

19  Q   These were documents that were provided to you by

20  plaintiffs' counsel.

21  A   Yes.

22  Q   You'd agree with me that your assessment of DCF

23  management and its performance would have been more reliable

24  if you had done some interviews.  Yes?

25  A   No, I would not agree to that.  No.

1    Q    Well, you testified that you were familiar with the,

2    what's known as the CFSR process.  Yes?

3    A    Yes.

4    Q    At the federal level?

5    A    Uh-huh.

6    Q    The Administration for Children and Families

7    specifically says that a document review only of an agency

8    is inadequate; isn't that right?

9    A    Yes, they do say that.

10   Q    I would like to show you now what's been marked in this

11   case as Exhibit 108.

12           **MR. COLLINS:**  May I approach, your Honor?

13           **THE COURT:**  Of course.

14   Q    Have you seen this document before?

15   A    No, I can't say that I have.

16   Q    Would you turn to page 4027, in the upper right hand

17   corner.

18   A    Okay.

19   Q    And I'm over in the far right column, the second bullet

20   point down where it says:  We learned.

21   A    Uh-huh.

22   Q    We learned that we cannot make accurate decisions in a

23   results-focused review by only reviewing documentation in

24   records.

25           Do you see that there?

1    A    Yes.

2    Q    I'm going down a little bit further, a sentence or two.

3    Do you see where it says, it begins, In a smaller subsample

4    of the larger sample.  Do you see that?

5    A    No, I can't say that I do.

6              MR. COLLINS:  May I approach, your Honor?

7              THE COURT:  Yes.  The third sentence.

8              THE WITNESS:  Oh.  Okay.

9              THE COURT:  Right there.

10             THE WITNESS:  I had gone too far down.

11             THE COURT:  Fourth sentence.

12             THE WITNESS:  Got it.  Thank you.

13   Q    It says:  In a smaller subsample of the larger sample,

14   we interviewed the relevant parties and focused less on

15   record documentation and more on what was actually occurring

16   in each case.  Inevitably, the review team found that the

17   small sample and the strategy of in-depth analysis through

18   interviews was a more reliable source of information on

19   outcomes and conformity with applicable requirements.  The

20   information obtained solely from the case records was often

21   incomplete, not current, and left information gaps.

22   Basically, we learned that we cannot apply traditional

23   check-list type reviews of documentation to determine the

24   quality of decision making and service deliveries.

25             Did I read that right?

1    A    You did read that right.

2    Q    You disagree with that statement?

3    A    I don't disagree with that statement as it relates to

4    what this particular thing is talking about.  They are

5    talking about case record reviews and trying to make

6    assessments about case practice without having spoken to

7    people more specifically to fill in those types of gaps.

8    They're not referencing a review of the system from a

9    management perspective, which is what I did.

10    Q    So you draw a distinction between the two?

11    A    Absolutely.

12    Q    Now, you testified earlier that you were paid by

13    Children's Rights in this case $26,000 up front.

14    A    Yes.

15    Q    Correct?

16    A    Yes.

17    Q    And you've received that fee already?

18    A    Yes, I have.  Uh-huh.

19    Q    And beyond that the fee arrangement was that you would

20    bill $250 per hour for work, correct?

21    A    Yes.

22    Q    How much have you billed to date at that $250 per hour?

23    A    Well, I haven't -- I can't tell you how many hours that

24    I've billed.  I've received an additional payment of about

25    $34,000.

1    Q    And that payment obviously continues to run with your

2    testimony here in court.

3    A    Yes.

4    Q    You'd agree with me that child welfare work is at once

5    very complex and extremely difficult.  Yes?

6    A    Yes.

7    Q    Family dynamics are ever shifting.  Yes?

8    A    Yes.

9    Q    Fair to say that most kids, most children have been

10   subjected, and when I talk about children I'm talking about

11   children in DCF care --

12   A    Uh-huh.

13   Q    -- most children have been subjected to maltreatment in

14   their families of origin before they ever get to DCF.  You

15   would agree with that, yes?

16   A    Yes, pretty much.

17   Q    And you'd also agree that even a well managed child

18   welfare system cannot attain infallibility.  You agree with

19   that?

20   A    I do agree with that.

21   Q    It's unfortunate, certainly very unfortunate, but

22   children can and still will be harmed?

23   A    Yes.

24   Q    No system is perfect, correct?

25   A    That's correct.

1    Q    Now, Massachusetts is a system of approximately 7,300

2    children in care?

3    A    Okay.

4    Q    Do you know that?

5    A    Yes.

6    Q    You know that from a review of the DCF documents?

7    A    Yes.

8    Q    I believe your testimony was that you reviewed about a

9    thousand or thousands of pages.

10   A    Thousands.  Yes.

11   Q    Thousands.

12         You're aware then that that number, the number of

13   overall children in care has gone down over the last several

14   years in Massachusetts.  Yes?

15   A    I can't say that, but I will accept your representation

16   of that.

17   Q    Well, showing you, Ms. Jones -- if I may approach --

18   what's been admitted in evidence in this case as Exhibit

19   No. 87, and I'll direct you to a particular page.

20         Well, let me ask this.  In the thousands of

21   documents that you reviewed, did you review this document

22   which is entitled Fiscal Year 2012 Caseload Report?

23   A    No, I did not.

24   Q    Would you turn to, at the bottom right hand corner,

25   after the first one, two, three, four introductory type

1    pages, there's a 1 at the bottom.

2    A    Yes.  I have it.

3    **Q**    And do you see at the top there's a graph?

4    A    Yes.

5    **Q**    Which shows, I'm looking at the gray -- actually, do you

6    have a color copy or --

7    A    It's color.

8    **Q**    It is color.  Okay.

9        Do you see the blue line on top and the gray line

10   on the bottom?

11   A    Green.  Yes.  Got it.

12   **Q**    Green.  Okay.  Mine's highlighted so it's changed

13   colors.  So green?

14   A    Yes.  Blue and green.

15   **Q**    So you see from July to June children in out of home

16   placement has gone down from 7,500 to, at least at the time

17   of June, to about 7,300.  Yes?

18   A    Yes, I see that.

19   **Q**    And you don't have any reason to believe that that's an

20   inaccurate number, do you?

21   A    No, not at all.

22   **Q**    You testified earlier about certain standards against

23   which you measured DCF's performance.

24   A    Yes.

25        **THE COURT:**  If you're going to move to that, one

1    suggests we might take the morning recess.

2              **MR. COLLINS:**  Certainly, your Honor.

3              **THE COURT:**  As it doesn't sound like you're

4    finishing up.  I don't mean to crowd you.

5              We'll recess for one-half hour.  We'll recess.

6              **THE CLERK:**  All rise.

7              (Recess.)

8              **THE CLERK:**  All rise.  The United States District

9    Court is back in session, you may be seated.

10             **THE COURT:**  Mr. Collins, go right ahead.

11             **MR. COLLINS:**  Thank you, your Honor.

12                        **CROSS-EXAMINATION**

13   BY MR. COLLINS

14   **Q**   Ms. Jones, we left off beginning a discussion about the

15   standards that you applied in reaching your opinions about

16   DCF's performance.

17   A   Yes.

18   **Q**   And there's three sets of standards that you applied,

19   correct?

20   A   Yes.

21   **Q**   The CWLA, Child Welfare League of America standards, the

22   Council on Accreditation, or C O A, COA, standards, and the

23   federal government's Children's Bureau ACF CFSR standards.

24   Correct?

25   A   Yes.

1    **Q**   And your testimony earlier, actually yesterday, was that

2    these standards are a baseline, your words, a baseline that

3    we are all looking to for practice.  Yes?

4    A   All of the standards aren't a baseline.  The federal

5    standards and COA, Child Welfare League of America are best

6    practices so that, you know, a slightly different type of a

7    standard.

8    **Q**   I want to make sure I understand you.  So, you're making

9    a distinction between the CFSR standards over here in one

10   category and the CWLA and the COA standards together over

11   here in another category.  Do I have that right?

12   A   No.

13   **Q**   Okay.

14   A   I'm saying that CWLA standards are best practices.  COA

15   then seeks to have an implementation of CWLA standards in a

16   way that, that states would be able to actually begin to

17   implement the CWLA standards as they are approaching best

18   practices.  So, COA and the federal government standards are

19   more of what I would consider baseline and trying to reach

20   towards CWLA best standards, best practice standards.

21   **Q**   All right.  Well, let's break the three down.  I just

22   want to talk to you a little bit about all three.

23         Starting with the CWLA, those are what's known as,

24   they're called CWLA standards of excellence.  Yes?

25   A   Yes.

1    Q    And do you have in front of you Exhibit 114 that you

2    were looking at on direct examination with counsel.

3    A    Yes.  Got it.

4    Q    And it says here that the Child Welfare League, I'm

5    looking just at the very first paragraph there, Child

6    Welfare League of America standards of excellence are

7    designed to be used as ideals or goals for practice in the

8    field of child welfare services.  Correct.

9    A    Yes.

10   Q    You agree with that statement?

11   A    I do.  Uh-huh.

12   Q    And there's another sentence after that, They are

13   intended to encourage.  Do you see that there?

14   A    Yes.

15   Q    And I'm going on to the next sentence.  CWLA standards

16   carry no implication of control or regulation.  Do you agree

17   with that?

18   A    Yes.

19   Q    And then on to the next paragraph:  The standards

20   present practices considered to be most desirable in

21   providing the child welfare services the community offers

22   through its various agencies regardless of offices or

23   setting.

24         Do you agree with that, too?

25   A    Yes.

1    **Q**    There's no federal law or regulation, there's no

2    Massachusetts state law or regulation that requires the

3    Department of Children and Families to meet these CWLA

4    standards, correct?

5    A    That's correct.

6    **Q**    And you would agree with me that children are not

7    necessarily harmed if a state does not meet these standards

8    of excellence.  Yes?

9    A    Not necessarily.

10   **Q**    I want to move on now to the Council on Accreditation

11   standards.  And I want to show you what we have marked which

12   is actually an exhibit that we received from plaintiffs'

13   counsel a day or two ago.  We've marked it as SA for

14   identification, which I believe is the next in line.

15          **MR. COLLINS:**  May I approach, your Honor?

16          **THE COURT:**  You may.

17   **Q**    I'm handing you what's been marked as Exhibit SA.  Have

18   you seen this before?

19   A    I have seen it.  I can't say that I'm intimately

20   familiar with it.

21   **Q**    Okay.  And I know it's, the print is rather small, but

22   I'm looking at the first paragraph -- well, first of all,

23   this is the Council on Accreditation and it's a section on

24   accreditation guidelines.  Yes?

25   A    Yes.

1    Q    And I'm looking at the first paragraph here.  It says a

2    standard is a practice goal for a field or industry that is

3    widely recognized or employed as a model of excellence.

4    Yes?

5    A    That says it.  You read it properly.

6    Q    That same language that's used for the CWLA standards,

7    right?  These standards of excellence?

8    A    Yes.

9    Q    And it says a standard is not a regulation.  Yes?

10   A    That's correct.

11   Q    That's referring to the COA standards.  Yes?

12   A    Yes.

13   Q    Much like the document we looked at earlier where the

14   CWLA also said that these standards are not regulations.

15   Yes?

16   A    That's correct.

17   Q    While a regulation is generally set as a minimum

18   requirement for a field a standard represents a higher level

19   of practice.  Do you see that there?

20   A    I do see that there.

21   Q    I want to move on now to the third standard.

22   A    Might, might I add something?

23   Q    You've answered my question, thank you.

24   A    All right.

25   Q    I want to now on now to the third standard against which

1    you measured DCF's management performance in this case,

2    those are the CFSR standards, okay?

3    A    Yes.    Uh-huh.

4    Q    You'd agree with me that the CFSR standards are

5    considered benchmarks.    Yes?

6    A    Benchmarks.

7    Q    There are seven outcomes against which states are

8    measured.    Yes?

9    A    Yes.

10   Q    There are seven systemic factors.    Yes?

11   A    Yes.

12   Q    And there are a total of 45 items that are reviewed --

13   yes --

14   A    Yes.

15   Q    -- by the CFRS, in the review process?

16   A    Yes.

17   Q    You'd agree with me that these CFSR standards are also

18   aspirational.    Yes?

19   A    No, I would not agree to that.    I believe that the

20   federal government has the expectation that states will come

21   to meet those standards.

22   Q    Ms. Jones, I'm showing you now what's been marked as

23   Trial Exhibit No. 110 which is in evidence in this case.

24   And I'd ask you to look at the second paragraph from the

25   bottom -- well, let me back up.

1                Have you seen this document before in your review

2      of the thousands of pages that you looked at?

3      A    Perhaps.  I can't say that I recognize it immediately.

4      Q    Okay.  Do you know what this document is?

5      A    It seems to be the summary of your family and service

6      review, child and family service review.

7      Q    You don't remember looking at this in preparing your

8      report?

9      A    No, I can't say that I did, no.

10     Q    Okay.  I'm looking at the second paragraph from the

11     bottom.  It starts with the Administration for Children and

12     Families, ACF.  Do you see that there?

13     A    I do.

14     Q    I just ask you to read along with me silently while I

15     read it out loud.  The Administration for Children and

16     Families has set very high standards of performances for

17     CFSR review.  The standards are based on the belief that

18     because child welfare agencies work with our country's most

19     vulnerable children and families, only the highest standards

20     of performance should be acceptable.  The focus of the CFR

21     process is on a continuous quality improvement.  Thus, the

22     standards are set high to ensure ongoing attention to the

23     goal of achieving positive outcomes for children and

24     families with regard to safety, permanency and well-being.

25                Did I read that right?

1    A    Yes.

2    Q    And then you see the next sentence in the next

3    paragraph.  It says:  It should be noted, however, that

4    states are not required to achieve these standards through

5    their PIP.

6              Did I read that right?

7    A    You did.

8    Q    You know that no state, any of the 50 states, Puerto

9    Rico or the District of Columbia, 52 jurisdictions that

10   undergo this CFSR review, you know that none of them have

11   passed the CFSR at the initial stage, correct?

12             **MS. BARTOSZ:**  Objection; foundation.

13             **THE COURT:**  No, it's cross-examination.  We'll see

14   if she knows that.  The fact he says it doesn't make it

15   evidence.

16             Did you know that?  Do you know it?

17             **THE WITNESS:**  No, actually I didn't know that.

18             **THE COURT:**  All right.

19   Q    You didn't know that?

20             **THE COURT:**  It doesn't amount to anything.  We'll

21   see if we get some evidence of it.

22   Q    And did you know that there was a CFSR review in 2001?

23   A    Yes.

24   Q    Did you know that there was a CFSR review -- of all

25   states?

1   A    Yes.

2   Q    In 2001.  And that there was another one in 2007.

3   A    Yes.  I'm aware of that.

4   Q    But you don't know the outcomes?

5              THE COURT:  Excuse me.  The acronyms --

6              MR. COLLINS:  Yes.

7              THE COURT:  I get lost in the acronyms.  Because

8   COA is not a governmental agency, though it may set

9   standards or desiderata.  But I take it that CFSR is one of

10  the agencies within the Department of Health and Human

11  Services.  Is that right?

12             THE WITNESS:  The child and family services review,

13  that's the CFSR, are reviews that are conducted by the

14  federal government of child welfare agencies.

15             THE COURT:  And more precisely by the Children's

16  Bureau.

17             THE WITNESS:  By the Children's Bureau.

18             THE COURT:  Thank you.

19             THE WITNESS:  Yes.  Yes.

20             THE COURT:  Thank you.  I just -- it may be helpful

21  to separate out the governmental agencies, state and

22  federal, from what professionals in the field say about

23  standards.  But we'll see.

24             Excuse me, Mr. Collins.

25             MR. COLLINS:  Not at all, your Honor.  Thank you.

1        **THE COURT:**  I'm trying to stay oriented.

2   **Q**   So, CFSR stands for Child and Family Services Review.

3   Yes?

4   **A**   Yes.

5   **Q**   And those reviews, two of which have taken place in time

6   in memoriam, one in 2001, one in 2007.  Yes?

7   **A**   Yes.

8   **Q**   And in 2001 and 2007, each state and Puerto Rico and

9   District of Columbia, underwent this child and family

10  services review.  Yes?

11  **A**   Yes.

12  **Q**   And in particular within the children's -- so, we have

13  Health and Human Services, the U.S. Department of Health and

14  Human Services up here.  Yes?

15  **A**   Yes.

16  **Q**   Below that we have -- that's sort of the umbrella

17  agency.  Within that we have the Children's Bureau.  Yes?

18  **A**   Yes.

19  **Q**   And then within that we have ACF, or the Administration

20  for Children and Families.  Yes?

21  **A**   Yes.

22  **Q**   And it's ACF that conducts these CFSRs.  Yes?

23  **A**   Yes.

24        **THE COURT:**  And the acronym ACF stands for?

25        **THE WITNESS:**  Administration of Children and

1    Families.

2         **THE COURT:**  Thank you.

3    **Q**   I want to talk to you now, Ms. Jones, about the concept

4    of maltreatment in care which is something that you

5    testified about earlier today.  Okay?

6         And I want to talk about the rates you testified on

7    direct about the certain rates of maltreatment in care or

8    the absence of maltreatment in care based on a chart that

9    you were shown from the federal government in a child

10   maltreatment publication.

11        Do you remember that?

12   A   Yes.

13   **Q**   Ing and I want to just establish some context here.

14   You're aware that the rate of child maltreatment in the

15   general population, and when I say general population, I

16   mean kids not in foster care, the rate of child maltreatment

17   in general population is almost two times greater than in

18   foster care.

19        Are you aware of that?

20   A   Yes, I'm aware of that.

21   **Q**   And correct me if I'm wrong, but I believe your

22   testimony was based on the numbers that you saw you in that

23   table by the federal government in the child maltreatment

24   publication, the testimony was that Massachusetts' rate for

25   maltreatment in care puts children in DCF care at an

1    unreasonable risk of harm.

2             Do I have that right?

3    A    Yes.

4    Q    And I believe you said, characterized that and said that

5    Massachusetts is among the worst of the states.  Yes?

6    A    Absolutely.

7    Q    As we saw in that document, it lists -- and actually do

8    you have that document with you up there?  Child

9    maltreatment table from 2010?

10   A    I found it.

11   Q    Do you have that there, Ms. Jones?

12   A    Yes.

13   Q    This document obviously lists the percentage, it's

14   called the Absence of Maltreatment in Foster Care from 2006

15   to 2010.  Yes?

16   A    Yes.

17   Q    So it's listing the percentage of children in each state

18   that are free from maltreatment in care.  Yes?

19   A    That's right.

20   Q    And these states are as we saw and as you know compared

21   against what's called the national standard, and here it's

22   99.68.  Yes?

23   A    Yes.

24   Q    And you're aware that the national standard is set at

25   what's known as the 75th percentile?

1    A    Yes.

2    Q    Do you know that?

3    A    Yes.

4    Q    That means that 75 percent of the data set falls below

5    and 25 percent of the data exceeds that standard.  Yes?

6    A    Yes.

7    Q    As we saw in the child and family services document that

8    I showed you, Exhibit No. 110, we know that the federal

9    government, ACF, sets these standards very high.  Yes?

10   A    Yes.

11   Q    You'd agree with me that there are a number of factors

12   or reasons that cause a state's maltreatment in care numbers

13   to fluctuate.  Yes?

14   A    Yes, I suppose there are a number of factors that could

15   play into that.

16   Q    And I want to go through some of those with you now.

17          Ms. Jones, are you familiar with, or have you, have

18   you looked at, at any time, a document that's known, a

19   document entitled Child Welfare Outcomes 2007 to 2010.  I'm

20   handing you it now.  It's Exhibit No. 1086.  Just let me

21   know if you have ever seen that document or looked at it or

22   reviewed it?

23          THE COURT:  Well, I'm, as I said, eager to having a

24   full record.  But while this one seems thicker, Mr. Collins,

25   I already have 1086.

1          **MR. COLLINS:**  Okay.

2          **THE COURT:**  And your manner of passing them up on

3     both sides is helpful, but this one I have before me.  So --

4          **MR. COLLINS:**  Okay, your Honor, certainly.

5          **THE COURT:**  And I want to continue to encourage,

6     encourage you to do it the way you're doing it so I can see

7     documents as you use them in your interrogation.  But this

8     one I have.

9          **MR. COLLINS:**  With apologies to the conservation

10    league.

11    Q    Have you seen this document?

12    A    No.

13    Q    Never?

14    A    No.

15    Q    Never looked at it.  Didn't look at it in drafting your

16    report?

17    A    No.

18    Q    Nonetheless, would you turn to the executive summary

19    right now, which is page i.  It's the first -- fourth page

20    in?

21    A    Got it.

22    Q    Would you look at footnote 4.

23    A    Yes.  Got it.

24    Q    It says:  For purposes of this report, a victim of child

25    maltreatment is defined as a child for whom an incident of

1    abuse and neglect has been substantiated or indicated by an

2    investigation or assessment.

3           The federal government defines victim of

4    maltreatment in this way.  Yes?

5    A    Yes.

6    Q    You'd agree with me that states vary widely in their

7    definitions of child maltreatment.  Yes?

8    A    Yes.

9    Q    And while most states recognize four major types of

10   maltreatment, neglect, physical abuse, sexual abuse, and

11   emotional abuse, most, but not all, states recognize those

12   as the four major types.  Would you agree with that?

13   A    I agree with that.

14   Q    And I'm going to hand you now a more complete copy of

15   what was handed to you earlier, the Child Maltreatment 2010

16   Report.

17          **MR. COLLINS:**  And this right now is listed as PQ.

18   But if there's no objection, I think, counsel, we can move

19   this into evidence.

20          **MS. BARTOSZ:**  No objection.

21          **THE COURT:**  PQ is admitted in evidence, Exhibit --

22          **THE CLERK:**  1888.

23          **THE COURT:**  Thank you.  Exhibit 1088.

24          (Exhibit marked in evidence.)

25   Q    I'm handing you now, Ms. Jones, what's been admitted

1   into evidence as Exhibit 1088 and ask you if you've seen

2   that document before.

3   A   Yes.  Yes, I have.

4   Q   In fact, you relied on this document in your report.

5   Yes?

6   A   Yes.

7         **THE COURT:**  And does the page or pages that we have

8   previously marked in evidence, are they found in this?

9         **THE WITNESS:**  Yes.

10         **THE COURT:**  -- full report?

11         **MR. COLLINS:**  Page 57, your Honor.

12         **THE COURT:**  Thank you.

13   Q   Would you turn to again the summary section at the

14   beginning and in Roman numerals ix.

15         Do you have that page?

16   A   One moment.  Okay.  I have it.

17   Q   And do you see at the bottom, we've been talking about

18   the major types of maltreatment, and do you see at the

19   bottom there where it says:  As in prior years the greatest

20   percentage of children suffered from neglect.

21         Do you see that there.

22   A   Yes.

23   Q   Where it says what were the most common types of

24   maltreatment?

25   A   Yes.

1    **Q**    And then it has a breakdown for us here, more than

2    75 percent, 78.5 suffered from neglect, more than 15

3    percent, et cetera, et cetera.

4         Do you see that there?

5    A    Yes.

6         **THE COURT:**  Give me some sense, because we've used

7    this word but I'm not conversant with precisely what it

8    means.  My instinct is that to neglect a child means to

9    neglect the basic needs of a child, given some allowance for

10   age.  For instance, a younger -- well, at any age, a child

11   has got to have adequate and nourishing food, adequate and

12   protective clothing as against the elements.

13        **THE WITNESS:**  Right.

14        **THE COURT:**  You neglect a child if you neglect,

15   especially with young children, but going on, the

16   necessities of personal hygiene.

17        **THE WITNESS:**  Yes.

18        **THE COURT:**  Medical care, taking the kid for the

19   recommended shots, and if the child is ill and a reasonable

20   parent or care giver would seek a doctor --

21        **THE WITNESS:**  Yes.

22        **THE COURT:**  -- or medical care.  As apart from

23   affirmative physical abuse and sexual abuse.  That's my

24   image of what it means to neglect a child.

25        Are there other things?  And I suppose when I'm

1     saying health care, if the child is acting out in wholly

2     inappropriate ways or displays -- there are times when a

3     reasonable care giver and parent should seek out mental

4     health treatment.

5            **THE WITNESS:**  Right.

6          **THE COURT:**  So to fail to do that when the symptoms

7     are obvious would, one could imagine, be neglect.

8            Have I got the idea of what it is to neglect a

9     child in your care?

10          **THE WITNESS:**  Yes.  I think in addition to the

11    things that you've mentioned there would also be lack of

12    supervision, particularly for young children.  Well, even

13    for teen-agers, you know.  If you have teenager do you just

14    let them run the street and not providing any structure for

15    the life of that teen, or you're leaving a small child home

16    unattended, that would be neglect also.  Neglect of an

17    infant might be allowing that child to just lie in the crib

18    and fail to change diapers and propping the bottle

19    consistently instead of nurturing.

20           So, I think neglect really speaks a lot to a

21    parent's fulfilling the needs of their child that's within

22    their capacity to do so.  So, that neglect, if someone

23    doesn't have, poverty should not be identified as neglect.

24    So if I fail to feed my child and provide nourishment

25    because I don't have the capacity to do so, that's not

1    neglect, I'm just poor.  And so someone needs to step in and

2    help me, but I'm not being neglectful.

3            THE COURT:  All right.  These things are

4    necessarily a spectrum because at some stage of neglect the

5    state, which has a duty secondary to the parent or guardian,

6    but a duty to carry for all its citizens, you leave a kid in

7    a hot car with the windows up, we hear these horrific --

8            THE WITNESS:  Yes.

9            THE COURT:  -- examples, you know, a passing police

10   officer, we expect that official of the state to do

11   something.

12           THE WITNESS:  Yes, absolutely.

13           THE COURT:  But, you know, if it's foolish to leave

14   a child of tender years at home because you're going out

15   with your girlfriend or boyfriend to the movies, and the

16   state doesn't really know about it, that may be very

17   foolish, but unless something happens, I don't get the sense

18   we're separating the child from its natural parent even

19   though there may be a pattern of that.

20           Am I wrong?

21           THE WITNESS:  Well, often when young children in

22   that example are left home unsupervised neighbors will call.

23   Children in those kinds of circumstances often wind up going

24   outside to play, you know, and they're observed by

25   neighbors.

1          THE COURT:  And it says something about you're

2     sense of community that a little kid who appears to have no

3     parental care at all, people get concerns.

4          THE WITNESS:  Yes.

5          THE COURT:  I see.

6          THE WITNESS:  Yes.

7          THE COURT:  I see.  Go ahead, Mr. Collins, and

8     forgive the interruption.

9          MR. COLLINS:  Thank you, your Honor.

10    Q    You'd agree with me that along this line of what

11    constitutes neglect or what constitutes abuse or to use the

12    more general term what constitutes child maltreatment, you'd

13    agree with me that states with broader definitions of what

14    constitutes child maltreatment have higher victim rates than

15    states with a more narrow definition.  Yes?

16         MS. BARTOSZ:  Objection; foundation.

17         THE COURT:  Well, I believe in general

18    cross-examination.  So, I'll assume a good faith basis for

19    that and one would imagine that -- I assume a good faith

20    basis.  Overruled.  He may ask it.

21         If you broaden the definition of what constitutes

22    maltreatment, irrespective of state, the broader the

23    definition the harder it is to meet the state by state

24    standards because states are different.  Isn't that right?

25         THE WITNESS:  Well, I would say that the broader

1    the definition of maltreatment you are broadening the

2    different types of things that would be screened in for

3    investigation, but that does not necessarily translate to a

4    higher rate of substantiation of those allegations just

5    because they've been called in.

6         THE COURT:  Let me say that back to you.  It has

7    nothing to do with the rate of substantiation.

8         THE WITNESS:  Right.

9         THE COURT:  But if, if a state has a broad

10   definition of maltreatment that's going to affect how that

11   state deploys its resources because a child, the rate of

12   reporting, that says nothing about the rate of reporting,

13   but once reported the state is expected one imagines to

14   deploy its resources to investigate.

15        THE WITNESS:  Absolutely.

16        THE COURT:  And the broader the definition of

17   maltreatment, I would infer the more likely it is that you

18   will have a greater percentage of children within the state

19   who are defined as maltreated.  Doesn't that follow?

20        THE WITNESS:  I guess it could follow.

21        THE COURT:  But you seem to hesitate.  It just

22   seems that that's logical.

23        THE WITNESS:  I think a child is not considered

24   maltreated until the back end of the investigation, we have

25   a finding.  And so, because a call has come in and there's

1    an allegation of maltreatment, maltreatment hasn't occurred

2    until it's been substantiated.  So that's why I'm kind of

3    not quite following you.

4          THE COURT:  Well, I certainly defer to your

5    experience.  But just as a -- I see it more as a

6    proposition, a logical proposition.  If state A defines five

7    types of maltreatment and state B includes those and defines

8    another five --

9          THE WITNESS:  Right.

10         THE COURT:  -- which state A doesn't have, you're

11   going to have, allowing for population changes --

12         THE WITNESS:  Uh-huh.

13         THE COURT:  -- taking that variable out, you're

14   going to have more kids maltreated in state B than you are

15   in state A.

16         THE WITNESS:  Again, I understand what you're

17   saying from a logic point of view.  You're going to have

18   more, you have a broader spectrum of things that could be

19   called in and allegations that could be made and in certain

20   categories.  But you don't have maltreatment in those

21   categories until they're investigated and you come to a

22   finding.

23         THE COURT:  And I accept that.

24         THE WITNESS:  Yes.  So you --

25         THE COURT:  So you're going to have more

1    findings --

2              **THE WITNESS:**  You have --

3              **THE COURT:**  -- canceling out for population in

4    state B than you do in state A.

5              **THE WITNESS:**  I guess that's right.  Yes.

6              **THE COURT:**  I think so.  And if that's your point

7    you can move on.

8              **MR. COLLINS:**  Thank you, your Honor.

9    **Q**   Well, I don't want to belabor the point, but I want to

10   look beyond just the definition of maltreatment and talk to

11   you a little bit about the specific definition, definitions

12   about abuse and neglect.

13             And you would agree with me that states as they do

14   vary widely with respect to the definition of maltreatment,

15   each state varies, there's variance between each state's

16   definition of what constitutes abuse and neglect.  Correct?

17   A   Yes.  Yes, each state does have the latitude to define

18   it.

19   **Q**   And you'd agree with me that on that spectrum

20   Massachusetts' definition is broader?

21             **MS. BARTOSZ:**  Your Honor, can I object on a lack of

22   foundation.

23             **THE COURT:**  Well, no, I'm going to let him test it

24   and follow it up.  Will you agree -- except I don't

25   understand that question.  Broader than what, Mr. Collins?

1              **MR. COLLINS:**  Than most states.

2              **THE COURT:**  Than most states.

3              **THE WITNESS:**  I couldn't say because I don't know

4      the definition of abuse or neglect for every state.  So I

5      really couldn't respond to that.

6      Q   So, when you went want about opining and relying on the

7      federal government's numbers to say that Massachusetts was

8      one of the worst, you didn't take it upon yourself to do

9      this sort of research and determine whether these sort of

10     things about the spectrum and where they fall and whether a

11     state has a broad or a narrow definition, you didn't do any

12     of that?

13     A   No, I did not do that.  I rested my use of the data on

14     the analysis that had already been done by the federal

15     government.

16     Q   And in terms of analysis done by the federal government,

17     would you take a look again at Exhibit 1086, the child

18     welfare outcomes document, and look at chapter II, page 6.

19     And it's Roman numeral II, page 6.

20              Are you there?

21     A   Just a moment.

22     Q   Sure.

23     A   Okay, I'm there.

24     Q   And if you look at footnote 29, it says:  In

25     Pennsylvania, for instance, the state does not consider an

1    allegation of neglect to be maltreatment unless it's

2    determined to be severe neglect.

3            Did I read that right?

4    A   Yes.

5    Q   So, obviously Pennsylvania is under a much narrower end

6    of the spectrum, correct?  You'd agree with that?

7    A   I'd say that they have a narrow, a more narrow

8    definition to neglect than I would have thought, but I can't

9    say much so.

10   Q   And consequently, if we look at page 57 of Exhibit 1088.

11   A   Now, which one is that?

12   Q   That is the child maltreatment --

13   A   Okay.

14   Q   -- report.

15   A   Okay.

16   Q   And if we look at Pennsylvania's, Pennsylvania's number

17   for 2010, we see that there they're at 99.8, almost 99.9

18   percent.  Right?

19   A   Yes.

20   Q   Massachusetts -- did you look at the definition of

21   neglect, abuse and neglect in Massachusetts?

22   A   Yes, I did.

23   Q   To prepare your report?

24   A   Yes.

25   Q   So you know that Massachusetts includes emotional

1    neglect in its definition.  Yes?

2    A    Yes.

3    **Q**    Not all states do that, do they?

4    A    No, they don't.

5    **Q**    In your review, in preparing your report, did you learn

6    that Massachusetts also has a very long and inclusive list

7    of mandated reporters?

8    A    Yes.

9    **Q**    Not all states do, do they?

10   A    That's correct.

11   **Q**    And in doing your, your review of the thousands of pages

12   of documents, did you get a sense at all from the review in

13   particular of DCF's documents that DCF, to use parlance, is

14   considered to be a when in doubt file a report state?

15   A    I'm, I'm not certain of what you're saying here, but

16   I'll say this.  Based on my understanding of the Director

17   Schofield's deposition, he indicated that when making a

18   decision about what to screen in and/or screen out that

19   there were two prongs that he considered for screening out

20   an allegation for an investigation by the SIU.  One was was

21   the victim, in fact, a child under 18 years old; and the

22   other was was this a situation of serious abuse or neglect,

23   which suggests to me that irrespective of how broadly things

24   may be your reporters, your mandated reporters are

25   encouraged to call things in.  There's a certain level of

1    sifting and screening that takes place to determine what

2    will in fact be accepted in for investigation.

3    **Q**   And that's not inappropriate, is it?  I mean, that's

4    what we would expect a special investigations unit to do?

5    A   Well, as you say there's, there's variance even in that

6    among states.  And so, some states have their institutional

7    abuse unit investigate all allegations of abuse or neglect

8    that are made for children that are in out of home

9    placements, whereas Massachusetts only screens in serious

10   matters.

11   **Q**   And your basis for that statement is the deposition

12   testimony of Mr. Schofield?

13   A   And he, himself, identifies himself as the person who

14   ultimately has to approve that decision to screen something

15   out, that rests with him.

16   **Q**   My question was, your basis for your statement is solely

17   Mr. Schofield's deposition testimony?

18   A   His testimony, absolutely.  Yes.

19   **Q**   You didn't talk to anyone else at DCF?

20   A   No, I did not.

21   **Q**   You didn't talk to Mr. Schofield either?

22   A   I'm basing it on his testimony.

23   **Q**   You'd agree with me that a state's time frame for

24   completing investigations will have an effect on a state's

25   maltreatment in care numbers.  Yes?

1    A    Yes, it could.

2    Q    In other words, the tighter the time frame it's more

3    likely the higher number of reports are being substantiated.

4    That's a fair statement, right?

5    A    Actually, no, that's not a fair statement.

6    Q    The idea of being that the more time you get to

7    investigate, the more comfortable you can be with dispensing

8    of the allegations.  Yes?

9    A    I would think that irrespective of how much time you

10   have to conduct the investigation that you're going to do an

11   investigation that's thorough and complete and that, and

12   that you'll be comfortable with whatever finding that you

13   arrive at.

14        THE COURT:  I guess I'm not, I'm not following

15   where you're going with these questions.  Intuitively, I

16   would think that the shorter the time you have to

17   investigate the more problematic it is that the outcome of

18   the investigation is accurate.  All my training leads me to

19   that conclusion.  But you can -- just understand that's my

20   reaction.  So --

21        MR. COLLINS:  Sure.

22        THE COURT:  -- the more time an investigator is

23   given, the more accurate the results, one would think.  I

24   think.

25   Q    Well, my question is -- I mean, these are human beings

1    conducting these investigations.  So, is it not, I believe

2    you said that you spent some time in the SRU unit --

3    A    Yes.

4    Q    -- in New Jersey?

5    A    Yes.

6    Q    This being human beings conducting investigations, it's

7    human nature that the shorter the time frame you had --

8    sorry, the longer the time frame you have to investigate the

9    more comfortable you're going to feel as a human being

10   dispensing of a matter that's as serious as abuse and

11   neglect, as opposed to having less time to make that very,

12   very important decision.  Yes?

13   A    Again, I think that given time you certainly can, you

14   can gather more information and should be able to, as you

15   say, dispense with an investigation and be, and be more

16   certain that you've arrived at the correct finding.

17   Q    That's right.

18   A    And I think that's why in Massachusetts you find that

19   your SIU investigations are routinely delayed because they

20   don't have the time within 15 days to gather the information

21   that they're comfortable reaching an investigative finding,

22   and so as, again, as Director Schofield has testified, more

23   than 50 percent of them are delayed beyond the 15 days.

24   Q    We'll get to the time in its investigations in a minute.

25   My question is more narrow than that, and I think you've

1    answered it, and basically I want to make sure I understood

2    your answer.

3              Essentially, tell me if I'm wrong, more time equals

4    more certainty?

5    A    Yes.  Yes.

6    Q    And Massachusetts has a 15 day time frame.  Yes?

7    A    Yes.

8    Q    Most states have 30 to 60 days, correct?

9    A    Yes.

10             **MS. BARTOSZ:**  Objection.

11   Q    I'm asking --

12             **THE COURT:**  Noted, but he may examine and her

13   answer may stand.

14   Q    Would you agree with me that state's laws that impose

15   penalties on mandated reporters for not reporting will also

16   likely drive up a state's numbers for maltreatment in care?

17   A    I think that, I would agree that that would drive up the

18   number of calls that come into for screening.

19   Q    And did you look at the Massachusetts law with respect

20   to penalties for mandated reporters not doing what they're

21   supposed to do?

22   A    No.  I'm aware that there are penalties, but I did not

23   examine the law.

24   Q    And you're aware that those penalties include not only a

25   fine of up to $5,000 but also the possibility of

1    imprisonment for not more than two and-a-half years.  Yes?

2    A    I've been so advised.

3    Q    You weren't aware of that --

4    A    No.

5    Q    -- until now?

6    A    No.  Again, I knew that there were penalties, but I had

7    not examined the law to ascertain what those penalties would

8    be.

9    Q    Not all states have penalties that severe, do they?

10   A    No, they don't.

11   Q    These issues that we've been talking about, the broader

12   definitions of maltreatment in care, broader definitions of

13   abuse and neglect, over inclusive or erring on the side of

14   safety in terms of filing reports, things like that, you'd

15   agree with me that these all will drive up the numbers for a

16   state like Massachusetts, the maltreatment in care numbers.

17   Yes?

18   A    I agree that it would drive up the number of referrals.

19   Q    And we see this when we look at the federal data in

20   what's known as Massachusetts victim per one thousand rate.

21   Yes?  Did you look at that, those figures at all?

22   A    I did not.

23   Q    The victim per one thousand rates?

24   A    No, I did not look at that.

25   Q    Would you turn to page 36 of the Child Maltreatment 2010

```
 1    Report.  Just let me know when you've arrived.

 2    A    Okay, I've got quite a few things up here.

 3    Q    Sure?

 4    A    Give me a minute.

 5              THE COURT:  Well, you've lost me.  Page 36 of what?

 6              MR. COLLINS:  The Child Maltreatment 2010 Report,

 7    Exhibit 1088.

 8              THE COURT:  Well, my page 36 --

 9              MR. COLLINS:  I believe you have the CWL, your

10    Honor.

11              THE COURT:  Oh, the -- I'm -- you're absolutely

12    right.  Thank you.  I have a lot of things up here, too.

13              MR. COLLINS:  And I have Jeremy, so.

14    Q    Are you on page 36, Ms. Jones?

15    A    Yes.

16    Q    Did you look at this when you --

17    A    Yes.

18    Q    -- made your report?

19    A    Yes, now that you've --

20    Q    You did.

21    A    Yes.

22    Q    Okay.  And so you know what this is, yes, this is a

23    breakdown of the child victim rates --

24    A    Yes.

25    Q    -- for 2010 across the states.  Yes?
```

1    A    Yes.

2    Q    And we see here in the -- excuse me one second -- in the

3    third column, the third breakdown column of the left hand

4    column, duplicate victims column.

5    A    Uh-huh.

6    Q    And then you see rate.  Massachusetts is at

7    18.6 percent.  Yes?

8    A    Yes, I see that.

9    Q    That's for 2010.  That's the --

10        THE COURT:  What's the difference, if you know,

11   between a duplicate and a unique victim?

12        MR. COLLINS:  Ah -- oh, I'm sorry.

13        THE WITNESS:  I didn't know whether he was asking

14   me or you.

15        THE COURT:  No, everyone should understand that

16   while I have enormous respect for the attorneys, you're the

17   one source of testimony here.

18        THE WITNESS:  Okay.

19        THE COURT:  I, I have a professional skepticism,

20   with no disrespect, from what attorneys say.  You're the

21   witness.

22        MR. COLLINS:  I won't try it again, your Honor.

23        THE COURT:  No, sometimes I invite it.  But I'm

24   still skeptical, respectfully.

25        THE WITNESS:  Yes.

1          THE COURT:  Go ahead.

2          THE WITNESS:  So as I understand it, your Honor, a

3    duplicate victim is a victim that's been involved in more

4    than one report.

5          THE COURT:  Go ahead, Mr. Collins.

6          MR. COLLINS:  Sure.

7    Q    And if we look over to the unique victims column we see

8    17.0.  Yes?

9    A    Yes.

10   Q    And I don't know if you did the math before, or if you

11   can do it quickly now, but that's fourth highest among all

12   the states here, if you do a quick scan.

13   A    I'll take your word for that, fourth highest.

14   Q    Did you consider that in your report when opining that

15   children were at unreasonable risk of harm for maltreatment

16   in Massachusetts?

17   A    No, I did not factor this particular information in.

18   Q    In fact, these factors that we've been talking about,

19   the definitions of abuse and neglect, maltreatment, the

20   number of mandated reporters, the child victim per one

21   thousand rate, you didn't adjust for any of these factors

22   when you made your opinion that Massachusetts is among the

23   worst of all states for maltreatment in care, did you?

24   A    I did not make that adjustment, nor did the federal

25   government make that adjustment when they issued the report,

1    or the table that we referenced earlier.  It's a strict

2    ranking based on performance on that particular indicator

3    without deference to these other matters that you're

4    raising.

5    Q    Safe to say that you took the child maltreatment, the

6    federal governments' numbers at face value.  Yes?

7    A    Yes, I did.

8    Q    Another factor that can have an effect on a state's

9    numbers in terms of maltreatment in care is the level of

10   evidence that is required to substantiate an allegation of

11   abuse or neglect.  Yes?

12   A    Yes.

13   Q    Put another way, different states have different

14   thresholds for substantiating abuse and neglect?

15   A    Yes.

16   Q    And these different thresholds are borne out in statutes

17   and policies among the states.  Yes?

18   A    Yes.

19   Q    Do you know how many different standards exist,

20   standards, how many standards, the different levels of

21   evidence require to substantiate, how many different levels

22   exist among the states?

23   A    I'm aware of three.

24   Q    Which three are you aware of.

25   A    Preponderance of the evidence, reasonable cause to

1    believe.  What is the third one.  The third one escapes me

2    right now.

3    Q   It starts, and you correct me if I'm wrong or if your

4    understanding is different, it starts --

5    A   Clear and convincing.

6    Q   At the lowest -- let's start at the highest level of

7    evidence required to substantiate.  That's clear and

8    convincing/beyond a reasonable doubt.  Yes?

9    A   Yes.

10   Q   And then moving down from there in terms of lowering the

11   threshold, we have credible, preponderance, probable cause,

12   and then reasonable.  Yes?

13   A   Yes.  Okay.  Sounds good.

14   Q   And reasonable is the lowest level, the lowest

15   threshold.

16   A   Yes.

17           **THE COURT:**  Let me interrupt.

18   Q   Do you know what the standard --

19           **THE COURT:**  Where are these various definitions

20   found?

21           **THE WITNESS:**  They're found in the policies and the

22   statutes, regulations for different states.

23           **THE COURT:**  Of the several states.

24           **THE WITNESS:**  Of the several states.  So as a state

25   defines they have their definitions of abuse and neglect,

1    and then they have the level of evidence that's required in

2    order to reach a finding of abuse and neglect.

3              THE COURT:  And do you know how Massachusetts

4    defines it?

5              THE WITNESS:  Massachusetts defines it as

6    reasonable.

7              THE COURT:  Thank you.

8              THE WITNESS:  Which is, which is the lowest of the

9    standards.

10   Q   And we see that in the child maltreatment 2010 report on

11   page 179.  Yes?

12   A   I'm with you now.

13   Q   I'm sorry?

14   A   I'm on 179 now.  Is there something that you wanted me

15   to see there?

16   Q   I'm directing your attention to 179.  I'll ask a

17   question.

18   A   Okay.

19   Q   You'll see the third bolded heading, it says level of

20   evidence -- well, first of all, we're on the page for

21   Massachusetts.  Yes?

22   A   Yes.

23   Q   It says third level of -- level of evidence required,

24   reasonable.  Yes?

25   A   Yes.  Yes.

1   Q    And the child maltreatment document has a page for each

2   state.  Yes?

3   A    Yes.

4   Q    And if we look through this document, we'll see that

5   each state's level of evidence required is listed here.

6   Yes?

7   A    Yes.

8   Q    In fact, if we look to the opposite page there's

9   Maryland and their level of evidence is preponderance, et

10   cetera.  Yes?

11   A    Yes.

12   Q    The state that you worked in, New Jersey, its level of

13   evidence is preponderance.  Yes?

14   A    Yes.

15   Q    88 percent, 46 of the 52 jurisdictions, have a high

16   threshold than Massachusetts; isn't that right?

17   A    That's correct.

18   Q    There are now only six states that have the lowest

19   reasonable standard of threshold for level of evidence

20   required.  Yes?

21   A    Yes.

22   Q    Hawaii, Louisiana, Oregon, Utah, and Vermont.  Yes?

23   A    Yes.

24   Q    Of the six states that I just mentioned -- strike that.

25            All of the states for 2010 that met or exceeded the

1    national standard in 2010, how many had a low threshold of

2    reasonable?

3    A    I couldn't say that as I sit here.  I didn't examine all

4    of the other states.  I examined Massachusetts.

5    Q    So, in preparing your report and in preparing your

6    testimony here today you didn't do that analysis?

7    A    Of all of the states?  No.  I can say that, you know --

8    Q    Thank you, Ms. Jones.

9    A    Okay.

10   Q    Would you turn to -- well, would you turn to page 57 of

11   the child maltreatment 2010 document.

12   A    I have it.

13   Q    Are you there.

14   A    Yes.

15   Q    Okay.  Now, we've just agreed that there are six states

16   with a reasonable standard.  Yes?

17   A    Yes.

18   Q    And we agreed on which six states those were.  Yes?

19   A    Yes.  Uh-huh.

20   Q    Let's start with Hawaii.  For 2010, they were at

21   97.6 percent.  Yes?

22   A    I'm sorry.  Page 57, and you're at Hawaii?

23   Q    I'm sorry.  My bad.  99.26.

24   A    Okay.  Yes.

25   Q    All right.

1    A    Yes.

2    Q    Did I get that -- yes.  99.26.  Obviously that's below

3    the national standard.  Yes?

4    A    Yes, I see that.

5    Q    And then if we move down to Louisiana, 99.52.  They

6    don't meet the standard, right?

7    A    That's correct.

8    Q    Oregon doesn't report their data, correct?

9    A    It's missing.  Yes.

10   Q    And then we move down to Utah.  99.45, they don't meet

11   the standard, right?

12   A    That's correct.

13   Q    And finally we're with Vermont, 99.94.  They meet the

14   standard, correct?

15   A    Correct.

16   Q    So out of the six there's one state, correct?

17   A    I see that.

18   Q    That state is Vermont.

19   A    Uh-huh.  Yes.

20   Q    And the same is true for 2009, only one state, Vermont,

21   of the six meets the national standard.  Yes?

22   A    I didn't look at each, but I'm sure you have, so.

23   Q    Okay.  No state has fewer children over all than

24   Vermont, correct?

25          **MS. BARTOSZ:**  Objection; foundation.

1    **THE COURT:**  Well, we've got the populations here,

2    if we go to another chart.  So, overruled.

3    **Q**    So, if we can go to page 41 of the report.

4    **A**    And that would be correct, and looking at the child

5    population that Vermont does have the fewest children.

6    **Q**    126 275.  Yes?

7    A    Yes.

8    **Q**    By contrast Massachusetts' population is 1.433 million.

9    Yes?

10    A    Yes.

11    **Q**    Ms. Jones, you'd agree with me all of these reasons that

12    we've been discussing, level of evidence, definitions of

13    maltreatment, all the variances, all of which you did not do

14    an analysis on, you'd agree with me that this is why it

15    makes no sense to draw comparisons between the states.  Yes?

16    A    No, I don't agree that it makes no sense to draw

17    comparison.  I think that, although each state has its own

18    levels of evidence, their own definitions and so forth, each

19    state is still being held accountable to reach for the same

20    standard.  And so, you're being measured to determine where

21    you are in terms of reaching that standard.

22    **Q**    That wasn't my question.  My question was --

23    A    That's how I understood it.

24    **Q**    Okay.  Well, let me, let me see if I can rephrase it.

25    I wasn't asking whether it made sense for a state,

1    an individual state to reach to try to attain the national

2    standard.  My question was these reasons, these variances,

3    they're all reasons or factors as to why it doesn't tell you

4    anything when you compare states against each other and draw

5    conclusions like Massachusetts is the fourth worst or

6    Massachusetts is the eighth worst.  That's misleading.

7    A    Well, I think --

8              MS. BARTOSZ:  Objection; argumentative.

9              THE COURT:  No, he's asking a question.  She may

10   respond.  Overruled.

11   A    I don't think that it's misleading.  I could certainly

12   agree with you to say that it's not necessarily comparing

13   apples to apples else and oranges to oranges.  But I would

14   say that we are still comparing fruit to fruit.

15   Q    It's more akin to comparing apples and alligators, isn't

16   it?

17   A    No, I disagree.

18   Q    Isn't it true that experts in the child welfare field

19   advise against comparing states' performance based on CFSR

20   data?

21   A    There are, there are some who have that opinion, yes.

22   Q    You're not one of them?

23   A    Clearly.

24   Q    Isn't it true that the Administration for Children and

25   Families itself advises against drawing conclusions about

1    states performance based on CFSR data comparisons?

2    A   I don't know that.  I haven't seen that.

3    Q   I want to draw your attention now to the two CFS score

4    cards.  CFSR score cards.  DCF CFSR score cards.

5            Do you know what I'm talking about?

6    A   Yes.

7    Q   Okay.  Give me just a minute, my documents are starting

8    to --

9    A   Are we finished with these things for now?

10   Q   For now, yes.

11   A   Okay.

12           **MR. COLLINS:**  If you'll just give me a moment, your

13   Honor.  We may have -- I just want to manage copies --

14           **THE COURT:**  I understand.

15           **MR. COLLINS:**  -- what's been used already.  I don't

16   want to duplicate.

17   Q   So you have already Exhibit 352 --

18   A   Yes.

19   Q   -- with you.

20           Okay.  Do you have that there?

21   A   Yes.

22   Q   All right.  And I want to show you what's been marked in

23   this case as Exhibit 74.  And we'll be looking at these two

24   side by side.

25   A   Okay.

1    Q    You are familiar with these two exhibits, yes?

2    A    Yes.

3    Q    352 and 74.

4         And you testified about the two different styles of

5    CFSR score card.

6    A    Yes --

7    Q    -- from DCF.  Yes?

8    A    Yes.

9    Q    The one with the arrows and the one with the letter

10   grades.  Yes?  Do you remember that testimony?

11   A    Yes.

12   Q    And at some point, as you know, DCF changed its

13   methodology for its CFSR score card.  Yes?  They want from

14   arrows to letter grades.

15   A    Yes.

16   Q    And your testimony -- I don't recall the exact word, so

17   let me go to your report actually because I want to be clear

18   on how you've characterized the change.

19        Do you have your report in front of you?

20   A    I don't.

21   Q    You do not.

22        **MR. COLLINS:**  I believe your Honor has a copy --

23        **THE COURT:**  I do.

24        **MR. COLLINS:**  -- already.

25        **THE WITNESS:**  Thank you.

1   **Q**   Would you turn to page 16, please.

2          **THE COURT:**  Sixteen?

3          **MR. COLLINS:**  Yes, your Honor.

4   **Q**   Are you there, Ms. Jones?

5   A    Yes.

6   **Q**   Okay.  I'm looking at the second full paragraph down and

7   up from the bottom.

8   A    Uh-huh.

9   **Q**   It starts with the word Nevertheless?

10  A    Yes.

11  **Q**   And you're talking here about how in late 2011, DCF

12  management you say continued to paper over serious safety

13  problems borne out by its own maltreatment care data going

14  so far as to change its internal performance rating system

15  so that the same unacceptable rate of maltreatment foster

16  care that DCF had once given its lowest rating of action

17  warranted is now giving its highest rating an A plus.  This

18  represents an astounding abrogation of the responsibility to

19  exercise due diligence in assuring child safety and a

20  willful failure to meet standards of care.

21          Did I read that right?

22  A    You did.

23  **Q**   If you look at Exhibit 352, and in particular on direct

24  examination you were looking at the safety outcome box at

25  the top.  Yes?

1    A    Yes.

2    Q    And the 99.7 number advice, the statewide actual of 99.1

3    one.  Yes?

4    A    Yes.

5    Q    Do you know what that A plus represents on this score

6    card, what DCF is intending to capture here?

7    A    It's their rating of their performance.  I'm not sure

8    that I understand your question beyond that.

9    Q    I'm just asking you what your understanding is of

10   this -- you've opined that a switch here is astounding to

11   you.  And I'm wondering, I'm trying to get an understanding

12   of what your understanding of what this A plus represents

13   and what DCF is trying to convey here.  And maybe you know,

14   maybe you don't.

15   A    It appears to me that they're trying to convey that

16   they're doing a very good job on this particular measure.

17   Q    If you look at the header above the A plus it says

18   percentage of OPL achieved.  Correct?

19   A    Yes.

20   Q    And if you look in the very small print at the bottom

21   where the asterisk is, it says OPL stands for optimum,

22   optimal performance level.  Yes?

23   A    Yes.

24   Q    This report is saying here that the agency receives an A

25   plus based on the percentage of the optimal performance

1    level achieved.  Right?

2    A    That's correct.

3    Q    That's what this represents, the A plus, correct?

4    A    That's -- yes.

5    Q    It's not a pass/fail measured against the 99.7 standard,

6    correct.

7            **THE COURT:**  I never thought a grade system was a

8    pass/fail.  But if you, in you understand the question you

9    can answer it.

10   A    As I understand this, the A plus as you said is against

11   the, Massachusetts has taken the federal standard and

12   translated it into an optimal performance level and that

13   they are giving themselves an A plus for having made that,

14   that they are reaching this percentage of that performance

15   level.

16   Q    Well, that's what the national standard is, it's an

17   optimal performance legal, right?  I mean, we saw earlier

18   that these are very high standards.  Yes?

19   A    They're high standards.

20   Q    And so what DCF is grading itself on then is the

21   percentage of the optimal level achieved.  Right?

22   A    That's how this document reads, yes.

23   Q    And so if you look at the small print beneath the A plus

24   in the absence of maltreatment in foster care column, DCF

25   has calculated that it has achieved the optimal performance

1    level 99.4 percent of the time.  Yes?

2    A    I see that.

3    Q    And as we all know, as we all know from school, when you

4    score a 99.4 percent that's an A plus, right?

5    A    Actually that would be an A from school, not an A plus.

6    You're not beyond a hundred percent.  A hundred percent or

7    better is A plus.

8    Q    You don't know why DCF changed its score card to this

9    measure of optimal performance level vice the arrow method

10   that it was using earlier, do you?

11   A    As I understood it, based on my read of, I believe it's

12   Mr. Ferreira, who's the director of this operation, it was

13   to provide staff with a clearer way to understand the data.

14   Q    And aside from reviewing Mr. Ferreira's deposition

15   transcript, you didn't speak to or inquire of anyone at DCF

16   as to why they made this change to their score card, did

17   you?

18   A    No.

19   Q    You agree with me that DCF management does not view this

20   A plus as an indicator that their work is done in that area,

21   correct?

22   A    I really can't speak to what DCF management overall

23   thinks about this indicator.

24   Q    Ms. Jones, do you recall being deposed in this case?

25   A    Yes.

1    **Q**   And that was a deposition that was taken back in

2    November of 2012.  Yes?

3    A   Yes.

4    **Q**   I'm going to hand you a copy of your deposition

5    transcript.

6    A   Okay.

7    **Q**   And I'm going to ask you to turn to page 145, if you

8    would.  Are you there?

9    A   Yes.  I'm sorry, yes, I'm there.

10   **Q**   I want you to -- page 145, just read along with me

11   silently while I read this.  And I'm on line eight.

12         Question:  Well, without going to a specific data,

13   are you of the opinion that DCF is viewing the A plus area

14   as something where they have to make no further efforts to

15   improve their data?

16         Objection.

17         Answer:  I know that they've not said that, I know

18   that they've not said that at the management level.  In

19   depositions actually they were still saying that they felt

20   like there were still things that needed to be done there.

21         Did I read that right?

22   A   Yes, you did, and I recall now.

23   **Q**   Thank you, Ms. Jones.

24         The child maltreatment data for 2011 was just

25   recently released.  Did you know that?

1    A    Yes, I knew that.

2    Q    And Massachusetts' number for the absence of

3    maltreatment in care for 2011 is now 99.3.  Yes?

4    A    I haven't reviewed the data.  I knew that it was

5    released, but I've not viewed the new report.

6    Q    Well, you reviewed DCF's management reports.  Yes?  In

7    preparation --

8    A    Pardon me?

9    Q    -- for your testimony and for your report.

10   A    I'm sorry, say again?

11   Q    You reviewed DCF, a variety of DCF management reports in

12   preparation for your testimony.  Yes?

13   A    Yes.

14   Q    And obviously some of those reports include the CFSR

15   score card.  Yes?

16   A    Yes.

17   Q    Thank you.

18         The CFSR score card for, I believe it's -- it says

19   at the top there October 1, 2010 to September 30, 2011.

20   A    Yes.

21   Q    Yes?

22   A    Yes.

23   Q    And if you look over in the column at the top for

24   absence of maltreatment in care you see 99.3.  Yes?

25   A    Yes.

1    Q    You reviewed that document?

2    A    I can't say for a fact that I saw this particular one.

3    This may have come out after I issued my report.

4         **THE COURT:**  Why, I mean -- and I'll ask you this

5    Mr. Collins, and it's not disputed.  The document we marked

6    as Exhibit 352 appears to be Massachusetts, at least what I

7    recall, was Massachusetts fiscal year.  The document we've

8    marked 74B appears to be on what is the federal fiscal year.

9    Why?  Is that to bring it in line more with the data as

10   reported by the several states?

11        **MR. COLLINS:**  DCF is continually generating reports

12   and updating the reports based on data.  And, you know,

13   this, this particular report covers a 12 month period, CFRS

14   score card for a 12 month period.  So, it's always at

15   the point of the update of the data, it's just kicking back

16   the full year.

17        **THE COURT:**  I see.  So in a month's time

18   conceivably we would have another such report for the 12

19   months ending December 31, 2012.

20        **MR. COLLINS:**  That's correct.

21        **THE COURT:**  Thank you.

22   Q    It's your opinion, Ms. Jones, that between .3 and

23   .4 percentage points below an admittedly very high standard

24   means that DCF is putting kids at risk of harm?

25   A    When you have --

1    **Q**    Is that your opinion?

2    A    I think that children are at risk of harm, yes.

3    **Q**    I want to be sure that you're answering the question.

4    Between .3 and .4 percent off of a very high standard that

5    the federal government has admittedly said is a very high

6    standard, it's your opinion that children are being put at

7    risk of harm.

8    A    Yes.

9    **Q**    Is 100 percent the only acceptable standard for you?

10   A    100 percent is the standard that we should all be

11   expecting to reach, striving to reach, yes.

12   **Q**    Is it your testimony that DCF is essentially not doing

13   anything about this number, this 99.3 or 99.2 number?

14   They're not making any efforts to improve?

15   A    No, I don't believe that I said that.  No.

16   **Q**    You know from your review of the documents that DCF is

17   in the midst of transforming the way it delivers services to

18   children and families.  Yes?

19   A    If you're referring to the integrated case practice

20   model?

21   **Q**    That's exactly what I'm referring to, yes.

22   A    Yes, I'm aware of that.

23   **Q**    What we call the ICPM.

24   A    Yes.

25   **Q**    Integrated Casework Practice Model.

1              This is, fair to characterize this as a new

2      strength based approach to working with families.  Yes?

3      A    Yes.

4      Q    And here in Massachusetts with respect to its

5      implementation, in your review of the documents you learned

6      that Massachusetts is more towards the earlier side of the

7      implementation than the latter phases.  Yes?

8      A    Yes.

9      Q    And you'd agree with me that the entire first phase of

10     the ICPM is focused on child maltreatment.  Yes?

11     A    Yes.

12     Q    Things like safety mapping and differential response and

13     short term stabilization, all those components of the ICPM.

14     Yes?

15     A    Yes.

16     Q    Now, you're also aware of an initiative that is under

17     way with DCF called Kinship First.  Yes?

18     A    Yes.

19     Q    In fact, in your words, this is a fabulous initiative.

20     Yes?

21     A    Yes.

22     Q    What is your understanding of the Kinship First

23     initiative?

24     A    That when children are removed from their, from their

25     family of origin, for whatever the reason, that the first

1    option for placement would be to place them with a family

2    member or a kin.

3    **Q**    With kin?

4    A    With kin.

5    **Q**    And this initiative, too, addresses the issue of

6    maltreatment in care.  Yes?

7    A    For me that's not a yes or no answer.

8    **Q**    Well, let me ask you this.  Children placed with kin,

9    historically safer placements, therefore, maltreatment

10    incidents go down.  You would agree with that?

11        **MS. BARTOSZ:**  Objection; foundation.

12        **THE COURT:**  No, overruled.

13    A    I, I think that as I looked at former data from

14    Massachusetts --

15    **Q**    Well, let me just ask, do you agree with that statement

16    or not?

17    A    Well, no, if it's a yes or no, no, I don't agree with

18    that statement.

19    **Q**    You don't agree with that?

20    A    No, I don't.

21    **Q**    In terms of DCF's efforts to address this issue of

22    maltreatment in care, you know, obviously, that DCF has an

23    SIU unit, special investigations unit.  Yes?

24    A    Yes.

25    **Q**    And that unit investigates reports of child maltreatment

1    in care.  Yes?

2    A    Yes.

3    Q    You're aware that the SIU also works with the district

4    attorneys' offices and the licensing authorities to

5    coordinate investigations.  Yes?

6    A    Yes.

7    Q    And you're aware of a DCF requirement to file what's

8    known as critical incident reports within the, with the

9    central, DCF central office.  Yes?

10    A    Yes.?

11    Q    Did you look at this process, the critical incident

12    review process, in preparing for your report to understand

13    what that was?

14    A    I believe I have an understanding of it, yes.

15    Q    And how does that work at DCF?

16    A    That as critical incidents are referred in to the

17    critical incident review team, that this team meets on a

18    regular basis to review those situations and to, to respond

19    if they deem appropriate.

20    Q    And you're referring to what's known as the CIRC, or the

21    Critical Incident Review Committee.  Yes?

22    A    Yes.  Yes.

23    Q    Do you know how often they meet?

24    A    If memory serves me, it's every other week, I believe.

25    Twice a month.

1    Q    And you are familiar with the concept of a corrective

2    action plan.  Yes?

3    A    Yes.

4    Q    Do you know how many corrective action plans the

5    Critical Incident Review Committee implemented based on its

6    reviews?

7    A    No, I don't.

8    Q    In the last year let's say?

9    A    No, I don't.

10    Q    You didn't look at this?

11    A    No.

12    Q    Are you aware from your review of the documents that DCF

13    is reworking its use of restraints and/or seclusions for

14    children placed in facilities.  Yes?

15    A    Yes.

16    Q    And, in fact, DCF has what is known as the 2010 charter

17    on restraint reduction which is signed by member agencies of

18    what's known as the Massachusetts Interagency Restraint and

19    Seclusion Initiative.  Did you know that?

20    A    I did not review that.  I'm not aware of that.

21    Q    Did you look at at all the 2010 charter on restraint

22    reduction?

23    A    No, I did not.

24    Q    Did you just simply not receive a copy of it from

25    plaintiffs' counsel or did you --

1    A    No, I did not receive that document.

2    Q    You would agree with me, though, that efforts to improve

3    restraint and seclusion use will lead to a decrease in

4    maltreatment in care.  Yes?

5    A    I can see that it would lead to a decrease perhaps in

6    critical incidents; perhaps also to maltreatment as well.

7    Q    Do you know what MAPP training is?

8    A    Is that the foster parent training?  The MAPP training?

9    Q    Massachusetts Approach to Partnerships in Parenting?

10   Yes?

11   A    Yes.

12   Q    Are you aware that it was revised recently to address

13   issues that have an impact on child safety while in foster

14   care?

15   A    No, I was not aware of that.

16   Q    You didn't review any documents concerning that either?

17   A    No.

18   Q    Were you aware that DCF was recently awarded a federally

19   funded grant to address trauma informed and trauma-focused

20   practice with kids in foster care.

21       **MS. BARTOSZ:**  Your Honor, objection to the question

22   without a date.  There's a Court order with an August 15th

23   cutoff on --

24       **THE COURT:**  I think that's fair.  He'll rephrase

25   it.

1   Q   Are you aware that the DCF was awarded a federally

2   funded grant in 2011 to address trauma informed and trauma

3   focused practice with kids in foster care?

4   A   No, I did not receive information regarding that.

5   Q   Were you aware that DCF has been developing what's known

6   as the Massachusetts Child Trauma Project?

7   A   No, I'm not aware of that.

8   Q   Addressing this issue of child trauma will also have an

9   impact on or, will also help to address this issue of

10  maltreatment in care.  Yes?

11  A   It should have residual impact, yes.

12  Q   I want to return, but just briefly, to the child

13  maltreatment 2010 document and return your attention to page

14  57.

15  A   I'm with you.

16  Q   And I want to look at Massachusetts again, this time

17  starting with 2008.

18          You see the Massachusetts numbers for 2008, 98.93?

19  A   Yes.

20  Q   In 2009, 99.16.  Do you see that?

21  A   Yes.

22  Q   2010, 99.22.  Yes?

23  A   Yes.

24  Q   And then what we just saw recently for 2011,

25  Massachusetts, 99.3.  Yes?

1    A   Yes.

2    Q   Massachusetts performance is steadily increasing, isn't

3    it?

4    A   Yes.

5    Q   When a state does not reach the national standard in

6    CFSR like the 99.68 standard for maltreatment in care, the

7    state does what's called a program improvement plan.  Yes?

8    A   Yes.

9    Q   You're familiar with that term?

10    A   Yes.

11    Q   And the Children's Bureau that administers the CFSR has

12    called the PIP, planning and Implementation Process, the

13    most important component of the CFSR.  Yes?

14    A   Yes.

15    Q   It's intended, the PIP, Planning and Implementation

16    Process is intended to be an extension of the collaborative

17    planning process that states use to develop what's known as

18    the five year child and family services plan.  Yes?

19    A   Yes.

20    Q   And that five year child and family services plan that

21    states do is a strategic plan that sets for the state's

22    vision and goals to strengthen its child welfare system.

23    Yes?

24    A   Yes.

25    Q   That's filed with the feds, right?

1    A    That's right.

2    Q    In fact, in order to receive federal funding the state

3    must submit the CFSR.   Yes?

4    A    Yes.

5    Q    Did you read -- well, let me back up.

6         Massachusetts produced or entered into a program

7    improvement plan following the 2007 CFSR.   Yes?

8    A    I imagine you did, yes.

9    Q    You're not aware of that?

10   A    Again, as you said, it's required if you haven't met the

11   standards.

12   Q    I'm asking you if you're aware that following the 2007

13   CFSR Massachusetts did a PIP, a program improvement plan?

14   A    I said yes.

15   Q    Did you read the Massachusetts program improvement plan

16   as part of your review for your report or for your testimony

17   here?

18   A    No, I did not.

19   Q    You did, however, review -- let me back up.

20        After a state engages in this program improvement

21   plan with the feds the state is then required to follow up

22   with the feds with quarterly reports to report on their

23   performance.   Yes?

24   A    Yes.

25   Q    And let me actually back up another step, if I could.

```
1              Program improvement plan, that is a collaborative

2      process between the federal government and the state

3      government where the two are coming together working

4      together to develop feels to help the state achieve

5      substantial conformity in areas where a state did not meet

6      the CFS standards.  Yes?

7              MS. BARTOSZ:  Your Honor, I object to the form of

8      the question.  This is outside the scope of direct.

9              THE COURT:  Well, I'm not troubled by that.  But I

10     don't, didn't understand the question, Mr. Collins.  So if

11     you would indulge me with trying it again.

12             MR. COLLINS:  Certainly, your Honor.

13     Q    Let me do it this way.  Can you explain to the Court to

14     the best of your understanding what a PIP is?  What that

15     process is?

16     A    Yes.  The officials from the state would meet with

17     representatives from the federal government to review areas,

18     the overall child and family services review performance at

19     the end, as the, as the feds are exiting.  It's almost in

20     response to an exit interview.  And in this process they

21     look at the various indicators where the benchmarks haven't

22     been met and begin to articulate a plan for how the state

23     would respond to improved performance, and it comes with an

24     agreement about what those steps and measures would be.

25             THE COURT:  Mr. Collins, I get the sense you're not
```

```
 1    going to be done in the next five minutes.

 2              MR. COLLINS:  That is correct, your Honor.

 3              THE COURT:  All right.  Well, then we'll have the

 4    witness step down because I have a couple of things to

 5    discuss with you, and thank you.

 6              MR. COLLINS:  Certainly, your Honor.

 7              (Whereupon the witness stepped down.)

 8              THE COURT:  Now, the next time we're guaranteed,

 9    God willing, to meet on this case is Thursday, the 28th of

10    February and Friday, the 1st of March.

11              Is there a chance the plaintiffs will conclude the

12    presentation of their evidence in those two days?  We've now

13    taken a measure of each other, we see how this is going.

14              MS. BARTOSZ:  Your Honor, I expect the plaintiffs'

15    case would take two, perhaps into a third day.

16              THE COURT:  But it's in that, it's in that range.

17              MS. BARTOSZ:  I believe within three days' range,

18    Judge.

19              THE COURT:  All right.

20              MS. BARTOSZ:  And if I err by one, but in that

21    range, I'm thinking three.

22              THE COURT:  I appreciate it.

23              Now, I've got this strange pro se case to start

24    next week, and I'm trying to be fair on this, fair to

25    everyone.  I had thought surely I'd get it done by
```

1    Wednesday.  In fact, I was so sanguine I was going to

2    impanel two cases on Monday.

3              Looking over the filings, I'm not at all sure of

4    that.  But if I can give you any notice that we could meet

5    Friday, the 18th, I'm very eager to do that.  Because then

6    we would --

7              (Whereupon the Court and the Clerk conferred.)

8        **THE COURT:**  The 15th.  I'm sorry, the 18th is the

9    following Monday.  But that's a little unfair, and I know

10   it.  So let me just appeal to you, or ask you.  If I could

11   give you notice by Tuesday or Wednesday, can you line up an

12   evidentiary presentation by Friday?

13       **MS. BARTOSZ:**  Yes, Judge, we could.

14       **THE COURT:**  All right.  And I propose to hold the

15   state to that.

16       **MS. TRAN:**  That's fine, your Honor.

17       **THE COURT:**  Thank you.  I'm extraordinarily

18   appreciative.  So, we'll see.

19             Total elapsed time at the end of nine days of trial

20   stands, plaintiff, four days, two hours, 45 minutes,

21   defense, three days, two hours, 45 minutes.

22             I do want you to come back at two o'clock for a

23   brief, a brief conference.

24             We'll recess until that time.

25       **THE CLERK:**  All rise.

1          (Adjournment.)

2

3

4              **C E R T I F I C A T E**

5

6

7          I, Donald E. Womack, Official Court Reporter for

8     the United States District Court for the District of

9     Massachusetts, do hereby certify that the foregoing pages

10    are a true and accurate transcription of my shorthand notes

11    taken in the aforementioned matter to the best of my skill

12    and ability.

13

14

15

16

17          /S/ DONALD E. WOMACK 5-7-2013
           _____
18              DONALD E. WOMACK
               Official Court Reporter
19                P.O. Box 51062
           Boston, Massachusetts 02205-1062
20              womack@megatran.com

21

22

23

24

25