```
 1              UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MASSACHUSETTS
 2
                                   Civil Action
 3                                 No. 10-30073-WGY

 4   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
                                                      *
 5   CONNOR B., by his next friend, ROCHELLE          *
     VIGURS, et al., individually and on behalf       *
 6   of all others similarly situated,                *
                                                      *
 7           Plaintiffs,                              *
                                                      *  BENCH TRIAL
 8   v.                                               *  (Volume 10)
                                                      *
 9   DEVAL L. PATRICK, in his official capacity       *
     as Governor of the Commonwealth                  *
10   of Massachusetts, et al.,                        *
                                                      *
11           Defendants.                              *
                                                      *
12   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

13           BEFORE:  The Honorable William G. Young,
                              District Judge
14   APPEARANCES:

15           NUTTER, McCLENNEN & FISH, LLP (By Daniel J.
        Gleason, Esq. and Jonathan D. Persky, Esq.), World
16      Trade Center West, 155 Seaport Boulevard, Boston,
        Massachusetts 02210-2699
17              - and -
        CHILDREN'S RIGHTS (By Sara M. Bartosz,
18      Esq., Laurence D. Borten, Esq., Sarah Russo, Esq.
        Rachel Brodin, Nili, Esq. and Jessica E. Polansky,
19      Esq.), 330 Seventh Avenue, Fourth Floor, New York,
        New York 10001, on behalf of the Plaintiffs
20
             OFFICE OF THE MASSACHUSETTS ATTORNEY
21      GENERAL (By Liza Tran, Jason B. Barshak and
        Jeffrey T. Collins, Assistant Attorneys General),
22      One Ashburton Place, Boston, Massachusetts 02108,
        on behalf of the Defendants
23
                                   1 Courthouse Way
24                                 Boston, Massachusetts

25                                 February 15, 2013
```

1                         **I N D E X**

2

3   **WITNESS:**            **DIRECT   CROSS    REDIRECT   RECROSS**

4   ARBURTA E. JONES, Resumed

5       By Mr. Collins          3                    75

6       By Ms. Bartosz   72              65

7   GAIL GARINGER

8       By Mr. Gleason   85

9
                                           **FOR      IN**
10     **EXHIBITS:**                       **I.D.    EVID.**

11

12      1089 Northeastern Study . . . . . . . . . 122

13      1090 Tufts Study  . . . . . . . . . . . 122

14

15

16

17

18

19

20

21

22

23

24

25

1          **THE CLERK:**  All rise.  The United States District

2     Court is now in session, you may be seated.

3          **THE COURT:**  Good morning, counsel, and thank you

4     for resuming today.  I do appreciate it.

5          Before we remind the witness, let me simply for the

6     record say that I have reviewed the deposition of Jan, or

7     Jan Nissenbaum taken Friday, May 18th, 2012.

8          And now if you would remind the witness.

9          **THE CLERK:**  I would like to remind you that you are

10    still under oath.

11         **THE WITNESS:**  Yes, ma'am.

12         **THE COURT:**  And you may continue, Mr. Collins.

13         **MR. COLLINS:**  Thank you, your Honor.

14             ARBURTA E. JONES, Resumed

15         **CROSS-EXAMINATION** (Cont'd)

16    **BY MR. COLLINS**

17    **Q**   Good morning, Ms. Jones.

18    A   Good morning.

19    **Q**   When we left off last time we were talking about the

20    child and family services review process.

21    A   Yes.

22    **Q**   Do you remember that?

23    A   Yes.

24    **Q**   When the federal government does a review of a state in

25    its child and family services review process it conducts

1    what it calls stakeholder interviews.  Yes?

2    A    Yes.

3    **Q**    And to your knowledge, what does the government consider

4    a stakeholder in that situation?

5    A    Families, other service providers.  I guess pretty much

6    that's it.

7    **Q**    You understand that the stakeholder interviews is a

8    mandatory part of the process for the government.  Yes?

9    A    Yes.

10   **Q**    And, in fact, under their instructions you mentioned

11   families -- and, I'm sorry, what else did you say?

12   Providers?

13   A    Yes, other providers.

14   **Q**    Okay.  In fact, in addition to families and providers

15   being interviewed, the federal government as part of those

16   stakeholder interviews also must interview the state child

17   welfare director; isn't that right?

18   A    I wasn't aware of that but --

19   **Q**    You didn't know that?

20   A    Not, not -- I wouldn't consider the state child welfare

21   director a stakeholder.  I know that that party would be

22   interviewed, but I would not have put him in that particular

23   category.

24   **Q**    So, to your knowledge as you sit here today you don't

25   know if there's any instruction or guidance from the federal

1    government that says these are the stakeholders that must be

2    interviewed and the state child welfare director is one of

3    them?

4    A    Right, I didn't -- I was not aware of that.

5    Q    Were you aware that who also must be interviewed as a

6    stakeholder are the state child welfare program specialists?

7    A    Yes.  Yes.

8    Q    Foster and adoptive parents?

9    A    Yes, they would be stakeholders absolutely.

10   Q    Juvenile court judge?

11   A    Makes sense.

12   Q    Case workers.

13   A    Again, I wouldn't have considered them a stakeholder.  I

14   would have considered them the ones who are providing the

15   service.  But I understand that this full array of people

16   would in fact be part of the interview process for the

17   family and child service review.

18   Q    That the federal government does when it does a review

19   of the state.

20   A    Yes.

21   Q    You conducted no stakeholder interviews, correct?

22   A    That's right.  I was conducting a completely different

23   sort of review than a child and family services review.

24   Q    I want to talk to you a little bit now about what's

25   known as the program improvement plan.  And you'll probably

1    remember that the last time that we spoke, I had asked you

2    what your understanding of what a program improvement plan

3    was, correct?

4    A    Yes.

5    Q    Okay.  And I just want to be clear, after a CFSR is

6    completed by the federal government, if a state has not met

7    all of the benchmarks the state must enter a program

8    improvement plan.  Yes?

9    A    Yes.

10   Q    And the program improvement plan is a process by which

11   the state officials and the federal official will get

12   together and work together.  Yes?

13   A    Yes.

14   Q    And they work together to craft a plan which is known as

15   the program improvement plan.  Yes?

16   A    Yes.

17   Q    And that is a plan to address the areas where the

18   benchmarks that have been set by the federal government in

19   the review process have not been met.  Yes?

20   A    Yes.

21   Q    And as part of that process of developing the plan what

22   the federal government and the states officials do is they

23   negotiate goals, new benchmarks, correct?

24   A    Yes.

25   Q    In each of the areas where the federal benchmark was not

1    met.  Yes?

2    A    My understanding.

3    Q    And the state officials and the federal government, they

4    come to an agreement on these new goals.  Yes?

5    A    Yes.

6    Q    And ultimately they come up with an overall plan to

7    address all of these areas as they were that need

8    addressing, and that is the two year PIP plan, program

9    improvement plan.  Yes?

10   A    Yes.

11   Q    A state doesn't get a final program improvement plan

12   unless the feds approve it.  Yes?

13   A    That's right.

14   Q    And part of this program improvement plan requirement

15   for the states is for the state to follow up with the

16   federal government with quarterly reports.  Yes?

17   A    Yes, that's the process.

18   Q    And that is -- those are reports that go to the federal

19   government where the state is reporting what they're doing

20   and how they're doing on their program improvement plan.

21   Yes?

22   A    Yes.

23   Q    This is so the federal government can monitor the state

24   and their progress.  Yes?

25   A    Yes.

1    Q    And Massachusetts did this, entered into one of these

2    program improvement plans, negotiated a program improvement

3    plan, got an approved program improvement plan following the

4    2007 CFSR.  Yes?

5    A    Yes.

6    Q    And that two year plan as you know from a review of the

7    documents in this case started in October of 2009.  Yes?

8    A    Yes.

9    Q    And it concluded in September of 2011.  Yes?

10   A    Okay.  Yes.

11   Q    I want to know if you know.

12   A    Yes, I'm aware of that.

13   Q    Okay.  But you don't reference the Massachusetts program

14   improvement plan in your report, do you?

15   A    No, I do not.

16   Q    And you did not talk about the Massachusetts program

17   improvement plan at all in your direct testimony, did you?

18   A    No, I was focused in my report on the system as -- I

19   took a snapshot of the system at a moment in time.  So I

20   wasn't --

21   Q    I understand.

22   A    -- looking for where it was going.  I was focusing on

23   where the system was presently operating at the time of my

24   review.

25   Q    So, I want to -- as you said, you took a snapshot in

1    time of the system?

2    A   Right.

3    Q   And that snapshot was before any of the progress that

4    was made by the Commonwealth of Massachusetts throughout the

5    course of its two year program improvement plan?

6          **MS. BARTOSZ:**  Objection; foundation.

7          **THE COURT:**  No, I want to see how she answers that

8    question.  I understand it.

9    A   My snapshot was based on data that was collected up

10   through August of 2011.  That's the information that I was

11   looking at.

12   Q   August of two thousand --

13         **THE COURT:**  Well --

14   A   Rather 2012.  I misspoke.

15         **THE COURT:**  Okay.

16   A   2012.

17         **THE COURT:**  So you know that the state had, after

18   this review in 2007, the state was given the PIP that the

19   federal government approved.

20         **THE WITNESS:**  Yes, they would work on a PIP.

21         **THE COURT:**  I need to take the testimony from you.

22   He's leading you to there, but this is what I'm hearing.

23         Okay.  So they get a PIP, and it's two years.  So

24   that goes up to when?  Two thousand and --

25         **THE WITNESS:**  '09.

1              THE COURT:  '09.

2              THE WITNESS:  Right.

3              THE COURT:  And then what happened, did they get

4       another one?

5              THE WITNESS:  It's my understanding that after the

6       federal government exits there's time that's put in to the

7       creating a PIP.  I'm not certain exactly what their dates

8       were for their PIP when it began and when it ended.

9              THE COURT:  When was the last time the federal

10      government did one of these reviews?

11             THE WITNESS:  2007 would have been the last round

12      of reviews.

13             THE COURT:  Even though the PIP is supposedly only

14      good for two years, the way in reality that it has worked,

15      that's the last time the feds actually came out to

16      physically do the review?

17             THE WITNESS:  Yes.

18             THE COURT:  And your snapshot is data and you've

19      said up through August of 2012.

20             THE WITNESS:  Yes.

21             THE COURT:  Thank you.  Go ahead, Mr. Collins.

22      Q   I'm confused so I'm going to go back.

23             I believe I asked you, Ms. Jones, about the time

24      frame of Massachusetts program improvement plan, and I asked

25      you whether it was your understanding that that two year

1    program improvement plan started in October of 2009, and you

2    said yes.

3    A    Again, I'm not -- perhaps I misspoke.  I'm not certain

4    what the dates are on your PIP.

5    Q    Do you have a copy of your report up there with you?

6    Exhibit GV?

7    A    I don't know.  I'll see.  There's a stack here.  No.

8    Uh-huh.

9         THE COURT:  Here's a copy.  Well, you have one.

10         MS. BARTOSZ:  I have an additional copy.  May I,

11    Judge?

12         MR. COLLINS:  Yes, certainly.

13         MS. BARTOSZ:  Here, Ms. Jones.

14    Q    Okay.  You have that, Ms. Jones?

15    A    Yes.

16    Q    Okay.  Would you turn to, it's a page that is not

17    numbered, and my copy has double sided, I don't know if

18    yours does.  No.

19    A    No.

20    Q    Okay.  So, one, two, three, four pages from the back

21    where you list your materials.

22         MR. COLLINS:  May I approach, your Honor?

23         THE COURT:  You may.

24    Q    See if I can assist you, if you will.

25    A    What page?

1    **Q**    Let's see.  Yes.  You have.  So I'm looking here.

2    A    All right.

3    **Q**    I'll point out to counsel as well.

4         (Whereupon counsel conferred.)

5    **Q**    Do you see the one, two, three, fourth block down,

6    Ms. Jones?

7    A    I do.  Yes.

8    **Q**    Let me back up.

9         What we're looking at here are, is a list of all of

10   the materials that you reviewed, appendix C to your report

11   is a list of all the materials that you reviewed in

12   preparing your report.  Yes?

13   A    Yes.

14   **Q**    And you relied upon?

15   A    Yes.

16   **Q**    And if we go to that block there on the fourth page from

17   the back.

18   A    I see it.

19   **Q**    It says there, has materials listed Massachusetts, DCF

20   program improvement plan quarterly reports, quarter 1

21   through quarter 7.  Do you see that there?

22   A    I do.

23   **Q**    October 2009 through June 2011.

24   A    I see that.

25   **Q**    Okay.  So, we can agree that the program improvement

1    plan began in October of 2009.  Yes?

2    A    Yes.

3    **Q**    And I notice here that you have only quarters 1 through

4    7.  Is there a reason why you do not have listed here the

5    quarter 8 PIP quarterly report?

6    A    Simply that I didn't receive it.

7    **Q**    You didn't get it from plaintiffs' counsel?

8    A    Right.

9    **Q**    But you do understand that there would be a quarter 8

10   report.  Yes?

11   A    I imagine there would be, yes.

12   **Q**    Because that would round out the final quarter through

13   September of 2011.  Yes?

14   A    It certainly would.

15   **Q**    Which would be the end of the PIP plan for

16   Massachusetts.  Yes?

17   A    Yes.

18   **Q**    Okay.  So, if your snapshot in time was August of 2012,

19   all of these materials, these PIP quarterly reports that you

20   reviewed would have been included in that snapshot of time,

21   that window.  Yes?

22   A    Yes.

23   **Q**    But you don't mention them in your report?

24   A    Again, I was looking at the performance.  Not

25   necessarily what the state indicated it was going to do or

1    what it was planning to do, rather what the performance of

2    the state actually was.

3    **Q**    Well, you reviewed PIP quarterly reports, right?

4    A    I reviewed them.

5    **Q**    Those aren't just what the state is going to do, those

6    are reports from the state on what has actually been done

7    and performance benchmarks that have been achieved.  Yes?

8    A    Yes.  Yes.

9    **Q**    You don't mention them in your report and you didn't

10   mention them in your testimony, right?

11   A    That's correct.

12   **Q**    And when you testified here and when you drafted your

13   report you focus on the issue of maltreatment in care in

14   Massachusetts.  Yes?

15   A    Yes.

16   **Q**    But there's no mention of Massachusetts' PIP performance

17   on that issue in your report or in your testimony?

18   A    That's correct.

19            **MR. COLLINS:**  May I approach, your Honor?

20            **THE COURT:**  You may.

21   **Q**    Ms. Jones, I'm handing you now what has been marked as

22   Trial Exhibit 357 in this case and ask if you would take a

23   look at that.  And once you have, can you identify what this

24   document is?

25   A    It is the children and families PIP for the first

1    quarter of federal fiscal year 2009.

2    **Q**    This is Massachusetts -- I'm sorry, I didn't hear.  This

3    is Massachusetts first quarter quarterly report from the,

4    from their PIP?

5    A    Yes.

6    **Q**    This, this is the quarterly report that gets sent to the

7    federal government?

8    A    Yes.

9    **Q**    Were you aware in reviewing this document as you did

10    before drafting your report, before testifying here today,

11    that the federal government and Massachusetts set a PIP

12    goal, a new benchmark, if you will, for maltreatment in care

13    as part of this plan?

14    A    I don't recall.

15    **Q**    Would you turn to, I'll have to use the Bates label

16    number -- the Bates label number is the one that says DCF.

17    Okay.  DCF63281.  Would you turn to that page.

18            Let me know when you've arrived.

19    A    I have it.  I'm sorry, yes, I have it.

20    **Q**    Do you see -- all right.  So what we're looking at here

21    is what's listed as national standards measurement plan and

22    quarterly status report, right?  And it lists safety outcome

23    1 and safety outcome 2.  Do you see that?

24    A    Yes.

25            **THE COURT:**  What page, I'm sorry?

1          **MR. COLLINS:**  It's, your Honor, Bates label number,

2   because the document doesn't have a page number, DCF63281.

3          **THE COURT:**  281.  Thank you.

4          **MR. COLLINS:**  Yes.

5          **THE WITNESS:**  It's this.

6          **THE COURT:**  Thank you.

7   **Q**   And so this is, you'd agree with me that this is the --

8   well, strike that.

9          Do you see under safety outcome 1, absence of

10  maltreatment in care?

11  A   Yes, I see it.

12  **Q**   And if you look one, two, three, four blocks down, do

13  you see where it says in the left hand column negotiated

14  improvement goal?

15  A   Yes.

16  **Q**   If you look to the right hand column we see 98.8.  Yes?

17  A   Yes.

18  **Q**   That is the negotiated improvement goal negotiated by

19  and between the federal government and the state.  Yes?

20  A   Yes.

21         **MS. BARTOSZ:**  Just for clarify of the record, are

22  you looking at block four or five in the negotiated, Mr.

23  Collins?

24         **MR. COLLINS:**  Negotiated.

25         **MS. BARTOSZ:**  That's 97.2.

1          (Whereupon counsel conferred.)

2          **MS. BARTOSZ:**  Thank you.  I'm sorry.

3          **MR. COLLINS:**  Certainly.

4    **Q**   Okay.  So you see negotiated improvement goal 98.8.  And

5    then if we look at the gray block all the way to the bottom

6    where it says status, do you see that there?

7    A   Yes.

8    **Q**   And in the right hand column it says 98.93 FY08A

9    improvement goal achieved.  Do you see that there?

10   A   I see that.

11   **Q**   What that means is that the negotiated improvement goal

12   was achieved by Massachusetts and exceeded at 98.93 in FY08.

13   Yes?

14   A   That's what that says.

15   **Q**   That was before this report even came out, correct?

16   A   That's correct.

17   **Q**   Now, you didn't look at this or you simply decided not

18   to include it in your report?

19   A   I did look at this.  And in my opinion, in order for the

20   state to sustain this level of practice, the four hinge pins

21   that I identified in my report needed to be in place.  So

22   although this progress had been attained, I was looking at

23   what is necessary for the system to be strong and to remain

24   strong so that this level of performance and ultimately that

25   you could achieve the full standard.

1    Q    And of course we know from our earlier discussion that

2    Massachusetts improvement in that area has consistently gone

3    up?  Yes?  Since that time, since FY08?

4    A    That I can't say as I sit here.  I don't have a recall

5    of numbers in my mind.

6    Q    Do you recall --

7    A    So whether or not there's been fluctuation or whatever,

8    I can't say.

9    Q    Do you recall us going through the child maltreatment

10   reports of 2009, 2010 and 2011?

11   A    Yes, I do now.  Yes, I do.

12   Q    And do you recall that data going up each year.

13   A    I do now, yes.

14   Q    And actually the most recent data in 2011 has

15   Massachusetts at 99.3.  Yes?

16   A    Okay.

17   Q    Is that a yes?

18   A    Yes.  Yes.

19   Q    I want to move now to what you, I believe have called

20   the first hinge pin which is case worker visitation.  Okay?

21   A    Okay.

22   Q    Not only does the administration for children and

23   families understand the importance of child visitation, the

24   Department of Children and Families also recognizes

25   visitation as an important factor in case management and in

1    fact includes that in their integrated case practice model.

2    DCF recognizes the importance of this visitation and is

3    doing something about it with the ICPN.

4            That was your testimony, right?  On direct

5    examination?

6    A    Yes.

7    Q    And with respect to DCF performance in this area, when

8    you testified about its performance as reflected in the MOST

9    report, you said that visitation by DCF's own

10   characterization has been labeled a core practice function.

11   Yes?

12   A    Yes.

13   Q    Which is consistent with CWLA as well as COA standards.

14   Yes?

15   A    Yes.

16   Q    That was your testimony?

17   A    Uh-huh.

18   Q    So you agree with me that DCF recognizes the importance

19   of child visitation.  Yes?

20   A    That you recognize the importance, yes.

21   Q    And your testimony with respect to this issue was that

22   in opining on this you were concerned only with in-home

23   visitation.  Yes?  Case worker in home visitation with a

24   child.  That was your testimony?

25   A    No, I don't believe my testimony was that I was only

1    concerned with in home visitation.  I think that visitation

2    is important with children regardless of where it takes.

3    However, I was underscoring the importance of in home visits

4    for the safety of a child.

5    Q    That's the focus that you took in your report?

6    A    Right.

7    Q    In home visits?

8    A    Again, underscoring that as being ultimately important,

9    yes.

10   Q    That's the area that you focused on in your report, in

11   home visits, and that was your testimony here in court

12   surrounding the DCF's performance, the numbers around in

13   home visits?

14   A    Yes.

15   Q    In fact, your testimony was that visitation to the

16   foster home is how a worker can really assess the

17   relationship between the foster child and the foster parent

18   and get a handle on how the level, the level of

19   comfortability that a child can have in the home.  There are

20   nuances to that relationship that cannot be picked up at a

21   visit in the, a ride in the car or a visit in the office.

22         Yes?

23   A    Yes.

24   Q    Also the worker gets to see if there are additional

25   individuals in the home or just red flags, new red flags

1    that might be emerging.  That was your testimony?

2    A    Sounds right.

3    **Q**    And in looking at how DCF has fared in its performance

4    with respect to this issue of in home visits, you looked at

5    the March 2011 MOST report.  Yes?

6    A    Yes.

7    **Q**    The monthly operational statistics report of the

8    Department of Children and Families?

9    A    Yes.

10   **Q**    Do you have up there with you Exhibit No. 182 which you

11   would have used on your direct examination.

12           **MR. COLLINS:**  And if I may approach, your Honor?

13   A    Yes it's right here.

14   **Q**    Okay.  I just want to make sure we have the same

15   document.  Okay.

16   A    Yes.

17           **THE COURT:**  The number again?

18           **MR. COLLINS:**  182.

19           **THE COURT:**  Thank you.  If you have another copy it

20   would be helpful.

21           **MR. COLLINS:**  I do, your Honor.  I do, your Honor.

22           **THE COURT:**  Thank you.

23   **Q**    Ms. Jones, were you aware that this is not DCF's final

24   monthly report for March of 2011?

25   A    That it wasn't the final one for that month?

1    **Q**    Yes.

2    A    No, I was not aware of that.

3    **Q**    You didn't know that this was a draft, an incomplete

4    draft when you looked at it?

5    A    It's not marked as such, so, no, I did not know that.

6    **Q**    I'm showing you what's been marked as Exhibit 67A in

7    this case.  I ask you to take a look at that.

8         Do you have these two documents 182 and 67A side by

9    side --

10    A    Yes.

11    **Q**    -- Ms. Jones?

12    A    Yes.

13         **MS. BARTOSZ:**  Objection as to 67A for lack of

14    foundation and --

15         **THE COURT:**  I thought if it had a number it was in

16    evidence.  Is that not so?

17         (Whereupon counsel conferred.)

18         **MS. BARTOSZ:**  My confusion, Judge, is I was given

19    Exhibit 67 which is February 2011 report and then 67A is

20    marked as March 2011.  So, I'm just confused here as to the

21    documents.

22         (Whereupon counsel further conferred.)

23         **THE COURT:**  Just so we're clear, pursuant to the

24    pretrial orders, and because I'm trying to be careful about

25    what is in the record, those things which are, which have

```
1    been given numbers I take it are admitted; those things

2    which have letters, for example, GV, are for identification

3    but are not in the record.

4           Go ahead, Mr. Collins.

5           MS. BARTOSZ:  Thank you.  Judge, it's been

6    clarified.  I've been given the appropriate exhibit now.

7           (Whereupon counsel further conferred.)

8    Q    So, Ms. Jones, if you -- do you have 182 and 67A side by

9    side?

10   A    Yes.

11   Q    Okay.  If you look at 182 in the bottom right hand

12   corner you see that it says 5-20-11.

13   A    Yes.

14   Q    All right.  And if you look at 67A, do you see it says

15   5-20-2011?

16   A    No, I'm sorry, say again.  I'm sorry, I misspoke.

17   Q    I'm sorry.  Exhibit 182.

18   A    182.  Uh-huh.

19   Q    The bottom right hand corner.

20           MR. COLLINS:  May I approach, your Honor?

21           THE COURT:  You may.

22   A    Mine says 5-20-2011.

23   Q    5-5.

24   A    Oh.  Okay.  I'm cross-eyed.  Thank you.  Thank you.

25   Q    So let's make sure we're on the same page.
```

1    A    Yes.

2    Q    182, in the bottom right hand corner the date is

3    5-5-2011.  Do you see that?

4    A    Yes, I do.  Yes.

5    Q    67A, the date at the bottom right hand corner says

6    5-20-11.  Yes?

7    A    Yes.

8    Q    Fifteen days later.

9            And when in your report and in your testimony you

10   relied on Exhibit 182 and in particular the third box down

11   in the core practice functions area where it says children

12   visited in placement.  Yes?

13   A    Yes.

14   Q    And you looked at and relied upon the 83.9 percent

15   number?

16   A    Yes.

17   Q    Of children in placement that are visited?

18   A    Yes.

19   Q    If you look at Exhibit -- first of all, have you seen

20   Exhibit 67A before today?

21   A    No.

22   Q    Not at all?

23   A    No.

24   Q    And if you look down in the same box, core practice

25   function children visited in placement, you see the number

1  87.4 percent?

2  A   Yes, I do.

3  Q   Were you aware of that calculation of those numbers 15

4  days after the report that you looked at?

5  A   I would have no way to be ware since I hadn't seen this

6  report prior to today.

7  Q   So in the thousands of pages of documents your testimony

8  is that this report wasn't in there?

9  A   That's my testimony.

10 Q   In assessing DCF's performance on case worker visits you

11 looked at the March 2011 MOST report.  Yes?

12 A   Yes.

13 Q   March of 2011 was your in time.  Yes?

14 A   Yes.

15 Q   Did you look at any data subsequent to that within your,

16 your, I believe you called it your snapshot in time up until

17 August of 2012?

18 A   That was the most recent data that was provided to me.

19 Q   That was provided to you.

20         MR. COLLINS:  One second, your Honor.

21         (Pause in proceedings.)

22         MR. COLLINS:  My apologies.

23 Q   Showing you now what's been marked as Exhibit 67B,

24 Ms. Jones.  I know that you've testified that you were not

25 given any data at least with respect to this MOST report

1    subsequent to March 2011, but I'm going to ask you anyway

2    because I know you said you looked at thousands of pages of

3    documents.  If you would just take a look at that and tell

4    me if you've seen that document?

5    A    No.  No, I have not.

6    Q    Well, in any event, you see in the column children in

7    placement visited that you had looked at previously on the

8    March 2011 report?

9    A    Yes.

10   Q    On the left hand side?

11   A    Yes.

12   Q    This shows that placed children visited was in August of

13   2012 report, 87.9 percent.  Yes?

14   A    That's what it says.

15   Q    On that report, on the MOST report, Ms. Jones, it talks

16   about placed children visited.  Yes?

17   A    Yes.

18   Q    This is wider and broader than visits in home.  Yes?

19   A    Yes.

20   Q    It's all placed children visited.

21   A    Right.

22   Q    Visited anywhere?

23   A    Right.

24   Q    And you know from your direct testimony that the federal

25   government, ACF, Administration of Children and Families,

1    they issued a program instruction concerning visitation.

2    Yes?

3    A    Yes.

4    Q    And you should have that instruction up there on your

5    table --

6    A    Uh-huh.

7    Q    -- as Exhibit 678.  Do you have that there?

8    A    Yes, I have it.

9    Q    You'd agree with me that this is a program instruction

10   that is issued by ACF strictly with respect to federal

11   funding.  Yes?  They're instructing the states on what it is

12   that they need to do to continue to receive federal funding?

13   A    Yes.

14   Q    This is not the federal government saying based on any

15   research we've done or anything that we conclude that kids

16   are harmed unless you visit a child X amount of times.  You

17   agree with that, right?

18   A    Well, this particular program instruction is related to

19   federal funding.

20   Q    Yes.

21   A    The other program instruction that I referenced in my

22   report specifically correlates visitation to child safety.

23   Q    Well --

24   A    Child well-being.

25   Q    It correlates visitation to better outcomes.  Isn't that

1    what the instruction says?

2    A    Right.  Right.

3    Q    It doesn't say anything about visitation and harm?

4    A    Well, better outcomes.

5    Q    Better outcomes.

6    A    And being free from harm would certainly be a better

7    outcome.

8    Q    That's your opinion?

9    A    Well, I would hope that that's all of our opinions, that

10    absence of maltreatment would be a better outcome for

11    children.

12    Q    I'm not talking about absence of maltreatment.  I'm

13    asking you about this program instruction.

14    A    Right, this specific --

15    Q    And what the federal government --

16    A    -- one relates to the money.

17    Q    Let me finish the question.

18         What the federal government has done here in this

19    program instruction is tell the states what they need to do

20    in order to receive federal funding.  Yes?

21    A    Yes, this one does that, absolutely.

22    Q    Yes.  And they're not saying, they're not characterizing

23    the requirement for visitation for federal funding as if you

24    don't do this then kids will be harmed.  They're not saying

25    that?

1    A    No, this does not say that.

2    Q    Neither does the other program instruction say anything

3    about harm?

4    A    Again, a better -- when you talk about outcomes for

5    children, outcomes relate to harm or the absence thereof.

6    There are all sorts of outcomes for children that we want to

7    see.

8    Q    Correct.

9    A    And one of the outcomes that we would like to see for

10   children is that they're not harmed.

11   Q    And that is your opinion, that is not what is being put

12   forth in the previous program instruction when they talk

13   about visitation and better outcomes.  They don't say

14   anything about harm?

15   A    They don't, they don't unpack what better outcomes

16   means.  They don't define better outcome.  So, those of us

17   who are in the field understand that there are a series of

18   things that are included in better outcomes, one of which

19   would be that they're free from harm.

20   Q    Certainly.

21        Going back now to Exhibit 678, this program

22   instruction was issued in January of 2012, just last year.

23   Right?

24   A    Yes.

25   Q    And of course this is after March 2011, the MOST report

1    that you looked at.  Yes?

2    A   Yes.

3    Q   And if you turn to the second page on this, under the

4    heading the new monthly case worker visitation requirements,

5    do you see that there?

6    A   Yes.

7    Q   And in the first bullet it says the total number of

8    visits made by case workers on a monthly basis to children's

9    foster children in a fiscal year must not be less than

10   90 percent of the total number of such visits that would

11   occur if each child were visited once every month.

12           Did I read that right?

13   A   Yes, you did.

14   Q   This 90 percent is talking about children in foster care

15   regardless of the location of the visit.  Yes?

16   A   That's right.

17   Q   If we look down two bullet points, we see where it says

18   for FY2012 and each FY thereafter, at least 50 percent of

19   the total number of monthly visits made by case workers to

20   children in foster care during the fiscal year must occur in

21   the child's residence.

22           Did I read that right?

23   A   Yes.

24   Q   That's talking about in home visits.  Yes?

25   A   Yes.

1    **Q**   Fifty percent?

2    A   Yes.  At least 50 percent.

3    **Q**   Do you know what DCF's performance was for fiscal year

4    2012 with respect to in home visits for children?

5    A   No, I didn't have that data.

6    **Q**   That data wasn't given to you?

7    A   As I said, I did not have that data.

8    **Q**   I'm handing you now what has been marked for

9    identification as Exhibit SC, Sierra Charlie.

10           I ask you to take a look at that document and tell

11   me if you've seen it before?

12           **MS. BARTOSZ:**  Your Honor, plaintiffs object to this

13   exhibit.  It was not produced during the course of discovery

14   and it does not appear on the trial exhibit list of

15   defendants to our knowledge.

16           **THE COURT:**  Let me speak with the clerk a minute.

17           (Whereupon the Court and the Clerk conferred.)

18           **THE COURT:**  What do you say to that, Mr. Collins?

19           **MR. COLLINS:**  What I say is that, first of all, it

20   was produced about two weeks ago.  So, plaintiffs' counsel

21   have this document.  Number one.  Number two, this is a DCF

22   management report.  There's an agreement between the parties

23   that, with respect to the loose exchange of management

24   reports in this case, we had an agreement early on where we

25   said that it would be difficult for each of us to identify

1    specifically all of the vast number of management reports.

2    So, we agreed to have what I would call a loose exchange of

3    management reports in this case.

4          THE COURT:  Let me see if I understand and

5    attempt --

6          MR. COLLINS:  There's more, your Honor.

7          THE COURT:  Well, I don't mean to cut you off.

8    We'll hear you.

9          MR. COLLINS:  Sure.

10          THE COURT:  In an attempt to manage the discovery

11    in this case, Judge Ponsor, and I'm implementing his order,

12    he said there was a discovery cut off as of a specific date.

13          MR. COLLINS:  Yes.

14          THE COURT:  So this is a document that precedes

15    that date?

16          MR. COLLINS:  No.

17          THE COURT:  It looks like it follows it.

18          MR. COLLINS:  No, your Honor, it's FY 2012.  So, if

19    you look at it.  So, FY2012 --

20          THE COURT:  What's the scope of his order?  I

21    thought it was --

22          MR. COLLINS:  The scope of his order --

23          THE COURT:  -- cut off.

24          MR. COLLINS:  -- the scope of his order is August

25    of 2012.  FY2012 of course ends in June of 2012.

```
1              MS. BARTOSZ:  Your Honor, this document carries a
2    date of September 25, 2012.
3              THE COURT:  No, I know it does.  I'm simply trying
4    to understand -- I thought his order contemplated that this
5    case would be decided upon data, the cutoff at that date,
6    just to manage it.
7              MR. COLLINS:  That's correct.
8              THE COURT:  All right.  Now, you have a -- put
9    aside this supposed side agreement.  That's the Court order.
10   But here's a document dated September 25th.  Isn't it too
11   new?
12             MR. COLLINS:  No, your Honor.
13             THE COURT:  Why isn't it?
14             MR. COLLINS:  Let me explain why.
15             As, as counsel well knows, what we're talking about
16   here for a cut off date is data.  We're talking about data.
17   This is FY2012.  Counsel well knows we --
18             THE COURT:  Let me say it back to you, because I've
19   got to understand it.
20             You're saying that the order contemplates that the
21   data would run up to August 2012.
22             MR. COLLINS:  That is correct, your Honor.
23             THE COURT:  This is a report generated after
24   that --
25             MR. COLLINS:  That's correct.
```

1          **THE COURT:**  -- date but it reflects data within the

2     discovery period.  I have no, I have no reason to doubt

3     that.  So now --

4          **MR. COLLINS:**  Yes.

5          **THE COURT:**  -- you didn't turn it over to them

6     until about two weeks ago, but you say that's okay because

7     we had this loose turnover, this is a terribly complex case.

8          **MR. COLLINS:**  Yes.

9          **THE COURT:**  Have I got it?

10          **MR. COLLINS:**  Yes, you do, your Honor, but I want

11     to add a couple of points because they're very important.

12          **THE COURT:**  Briefly.

13          **MR. COLLINS:**  We have been producing -- the reason

14     I say counsel well knows is because we've been producing

15     reports that cover data prior to August 2012 up until last

16     month.  And they know this.  We had this agreement where we

17     were producing reports.  Because, you know, when a report,

18     when data's gathered it takes months obviously to get to

19     the --

20          **THE COURT:**  I have some familiarity with it.

21          **MR. COLLINS:**  Okay.  And so, as counsel knows,

22     we've been producing reports up through June, I think, I

23     mean, I'm sorry, January twenty --

24          **THE COURT:**  All right.

25          **MR. COLLINS:**  January 18th.

1          THE COURT:  Let me hear Ms. Bartosz.  So why

2     shouldn't I -- for one thing, she hasn't seen this.

3          MS. BARTOSZ:  That's correct, Judge.

4          THE COURT:  So, we've got an authenticity problem.

5          MS. BARTOSZ:  Judge?

6          THE COURT:  But why shouldn't I let him examine her

7     about it.  And we'll, we'll see if ever they want to get

8     this data in evidence, they're going to have to authenticate

9     it.

10         MS. BARTOSZ:  This document in this form is the

11    only time plaintiffs, and that's as of about two weeks ago,

12    maybe a little less than that when this was delivered to us,

13    this is the first time we've seen any, quote, unquote,

14    management report in this form.  We've not seen any periodic

15    management report like this beforehand.  Data with respect

16    to visitation was appearing in the form of a MOST report as

17    the Court has seen, and this exhibit therefore we don't know

18    how it was prepared.

19         THE COURT:  But you see that goes to its

20    admissibility.  I'm not admitting it.  She's never seen it.

21    But my ruling is going to be that he may examine her

22    concerning it, but of course it's her testimony that counts

23    here.  If the defense wants to get it in evidence they're

24    going to have to authenticate it and we'll find out when

25    they started producing it in this form and the like and

1    maybe there's some order that I will need to enter.  But he

2    can use it to examine her.

3              All right.  Go ahead, Mr. Collins.

4              **MR. COLLINS:**  And, your Honor, if I could because,

5    you know, in the event that we have this issue arise again,

6    I just want to point out that Exhibit 1084 in this case that

7    was, that was used with Ms. Glucksman Hyne, CRI's policy

8    analyst, they produced data for us on February 4th.

9              **THE COURT:**  With all --

10             **MR. COLLINS:**  So the summary exhibit was done --

11             **THE COURT:**  With all respect, Mr. Collins, I've

12   made my argument -- I've made my ruling.  And this sauce for

13   the goose, sauce for the gander.  I go document by document.

14   So now that's how you can use this document, and let's see

15   what we can derive from it.

16             **MR. COLLINS:**  Thank you, your Honor.

17   Q   Ms. Jones, first of all, have you seen this document

18   before?

19   A   No, I have not.

20   Q   Okay.  You have, though, in this case reviewed many DCF

21   management reports.  Yes?  Is that fair to say?

22   A   That's fair to say, yes.

23   Q   And within the structure of management reports, fair to

24   say that you've also reviewed DCF case worker visits

25   reports?  It may not be in this fashion it, but you've

1    reviewed other case worker visit reports.  Yes?

2    A    Others, yes.  Uh-huh.

3    Q    Monthly home visit reports, does that ring a bell?

4    A    Yes.

5    Q    Child visitation reports, does that ring a bell?

6    A    Rings a bell.

7    Q    And the exhibit that you have before you -- let me just

8    back up.

9          Again, before we got into this colloquy on this

10   exhibit, we were talking about the federal government's

11   program instruction which talked about 50 percent of child

12   in home visits should occur.  Yes?

13   A    Yes.

14   Q    And the federal government says that those should occur

15   in home at a 50 percent rate.  Yes?

16   A    Yes.  That's the floor, 50 percent.

17   Q    Would you look at column B of this exhibit.

18   A    Yes.

19   Q    And you see there, it says percentage of placed children

20   who have visited in their placement.  Do you see that there?

21   A    Yes, I do.

22   Q    Target, 50 percent.  Do you see that there?

23   A    Yes.

24   Q    That's the 50 percent we're talking about in the program

25   instruction.  Yes?

1    A    Yes.

2    Q    And if you look at the bottom, state totals, you see

3    78.87 percent.  Do you see that there?

4    A    Yes, I do.

5    Q    DCF is well exceeding the federal guideline for in home

6    visits.  Yes?

7              MS. BARTOSZ:  Objection; foundation.

8              THE COURT:  Well, that's well taken.  How can she

9    say?  She's never seen this document.  So, if you're asking

10   generally, given the documents which she had reviewed --

11   I'll put it this way.  Massachusetts is well exceeding the

12   50 percent floor set by the federal government based on the

13   documents you've reviewed.  Are they?

14             THE WITNESS:  The documents that I reviewed prior

15   to this --

16             THE COURT:  Well, forget that.

17             THE WITNESS:  Right.  I, I can't say that it was

18   more than 50 percent or not.  I wasn't --

19             THE COURT:  Based upon what you reviewed.

20             THE WITNESS:  Based upon what I reviewed.

21             THE COURT:  And this document suggests it was, but

22   you've never seen this before?

23             THE WITNESS:  That's correct, your Honor.

24             THE COURT:  All right.  I follow that.

25   Q    You can't say one way or the other based on the

1   documents you looked at?

2   A    I don't recall that being tallied in that particular way

3   on the documents that I previously reviewed.

4   Q    Your opinion with respect to case worker visitations in

5   the home did not account for family resource worker visits

6   to the home, fair to say?

7   A    That's correct.

8   Q    Family resource workers for DCF have an obligation to

9   ensure the safety of children in the homes that they visit,

10  it's their job, right?

11  A    I don't know if that's their job or not.  I don't

12  know -- I would not have said that, no.

13  Q    You --

14  A    My understanding of a family resource worker is that

15  their primary focus was to be a support to the resource

16  parent themselves.  They're responsible for the home and

17  they are the worker for the resource parent.  Their focus is

18  not necessarily the individual children who are placed in

19  the home.  That's my understanding of their role.

20  Q    What is your basis for that?

21  A    Again, that's just my understanding of their role,

22  that --

23  Q    Based on, based on what?

24  A    -- that the case worker's responsibility is for the

25  individual children and the resource family worker does the

1    home studies, reassessments, and is a support person for the

2    resource family.  For the resource family.

3    **Q**   What is your basis for saying that the family resource

4    worker's responsibility is not to ensure the safety of the

5    child in the home.

6    A   No, I'm not, I'm not saying that it is not.  I'm saying

7    that that would not be their primary or their focus.

8    **Q**   My question wasn't whether or not it was their primary

9    or their focus.  My question was simply you'd agree with me

10   that family resource workers have as an obligation of theirs

11   to ensure the safety of the children in the home.

12   A   As an obligation, I can't say that.  That's not my

13   understanding of their role.  I think anyone who works for

14   the agency overall has that obligation.  So if that's the

15   context in which you mean it that as an employee of the

16   Department of Children and Families going in the home that

17   that would be their obligation, I certainly could agree to

18   that.

19   **Q**   I'm simply asking you what your understanding is of a

20   Massachusetts family resource worker's obligations are.  And

21   my question is whether you, whether you know or not, whether

22   you understand or not that among the responsibilities and

23   duties that a family resource worker has, one of them is to

24   ensure the safety of the children in the homes that they are

25   required to visit?

```
 1                MS. BARTOSZ:  Your Honor, objection; argumentative,

 2      this question.

 3                THE COURT:  No, I think not.  Overruled.

 4      A    Along --

 5                THE COURT:  Do you understand his question?

 6                THE WITNESS:  I do understand his question.  And I

 7      thought that I had responded, but I would say among other

 8      things, yes.

 9                MR. COLLINS:  Okay.

10                THE COURT:  Just so I'm sure I'm following.  So --

11      actually I'm not surprised at your answer, because I would

12      think that's, that's obvious.  That type of worker visiting

13      the home, one of their duties is, as best they can from that

14      visit, is to assure the safety of the child in that

15      placement.  Isn't that right?

16                THE WITNESS:  Well, as I said, among other things.

17      I was not initially understanding that to be what his

18      question was.  But among their duties, yes, I would.

19                THE COURT:  But that's certainly one of them.

20                THE WITNESS:  Yes.  As I said, I would hope so.  I

21      would hope that they're focusing on that, among other

22      things.

23                THE COURT:  But based upon the documents that

24      you've seen you understand, and I need to know, that that's

25      what they're charged with doing, among other things.
```

1          THE WITNESS:  Yes.  Yes.

2          THE COURT:  Go ahead, Mr. Collins.

3          MR. COLLINS:  Thank you, your Honor.

4    Q    Family resource workers visit the children in their

5    homes monthly.  Yes?

6          MS. BARTOSZ:  Objection; foundation.

7          THE COURT:  Well, I recognize that, but I think

8    this is an appropriate cross-examination.  I understand her

9    answers to be based upon the data she has reviewed that's

10   her conclusion and he may ask the question in that form.

11   And you understand, that's the way I'm getting it, that's

12   what he's asking you.  So he'll say they do this, don't

13   they?  And you can answer, based, if you can, because you're

14   the witness, it's based upon the data that you've reviewed,

15   that you find credible, if you can give me an answer.  I'm

16   interested in the answer.

17         THE WITNESS:  Okay.

18         THE COURT:  So why don't you, since I've talked too

19   much, typically, ask the question again, Mr. Collins.

20         MR. COLLINS:  Your Honor, I could preface each

21   question with --

22         THE COURT:  You don't have to.

23         MR. COLLINS:  -- based, based on the date.

24         THE COURT:  That's why I talked.  Ask her the

25   question.

1              **MR. COLLINS:**  Okay.

2    **Q**   It's your understanding that family resource workers for

3    the Massachusetts Department of Children and Families visit

4    children in their foster homes on a bimonthly basis?

5    A   That is not my understanding, no.

6    **Q**   Your understanding is otherwise from --

7    A   I had, I had no data to suggest that there is a

8    requirement for family resource workers to visit children in

9    foster homes.

10   **Q**   And I just -- I want to be clear.  Is your answer that

11   you don't know or you've reviewed documentation that

12   suggests otherwise?

13   A   No, I haven't reviewed anything that suggests otherwise.

14   I just don't know.  I didn't review anything to suggest what

15   you're saying either.

16   **Q**   You don't know.

17   A   Based on what I've seen, I don't know.

18   **Q**   Based on what you've seen, do you know whether DCF, for

19   lack of a better term, staggers the monthly visit by the

20   social worker with the bimonthly visit by the family

21   resource worker such that every another month they're

22   getting a visit.

23   A   No, I have no understanding of that based on what I've

24   seen.

25              **THE COURT:**  Well, let me just get some basics here.

1    I seem to be losing it.

2         Who is it that visits, as you understand the

3    organization, who is it what visits the child monthly?

4         THE WITNESS:  As I understood, based on review of

5    the policy for the agency --

6         THE COURT:  Right.

7         THE WITNESS:  -- it's the case worker for the child

8    who's responsible to visit the child on a monthly basis.

9         THE COURT:  Okay.  Who else visits the foster home

10   or the child on any periodic basis as you understand it.

11        THE WITNESS:  As I understand it, the family

12   resource worker would visit the home.  I was not aware of

13   any schedule by which they were to do so other than I know

14   that they're responsible to do the annual reassessment of

15   the foster home for licensing purposes.  I would imagine

16   that they would visit at other times as well, but I didn't

17   have any policy to suggest when that would be.

18        THE COURT:  Let me say it back to you to see if

19   I've got it.

20        The case worker visits the child at least monthly,

21   in the foster home, family resource worker, there's no set

22   periodic basis, so far as you can see, but since they have

23   to do an annual review, you assume it's at least yearly and

24   you assume somewhat more often, visits the home.

25        Have I got it correctly?

1          **THE WITNESS:**  Yes.

2          **THE COURT:**  Thank you.

3    **Q**   Ms. Jones, again you reviewed the case worker visit

4    reports in this case.  Yes?

5    A   Yes.

6    **Q**   And you know that the family resource worker visits as

7    they occur, however they occur, as you understand them,

8    those do not appear in DCF case worker visit reports.  Yes?

9    A   Yes.

10   **Q**   Just reflects the social worker visits.  Yes?

11   A   Yes.

12   **Q**   You'd agree with me that these family resource worker

13   visits, whenever they do happen, could and do pick up

14   potential, quote, unquote, red flags in the home.  Yes?

15         **MS. BARTOSZ:**  Objection; foundation.

16         **THE COURT:**  Overruled.  Id she agrees from the

17   documents, she may tell us; if she doesn't know, she may

18   tell us that.

19   A   Could you restate the question, please?

20   **Q**   Sure.

21         You'd agree with me that these family resource

22   worker visits can and do pick up what you've referred to as

23   red flags in the home?

24   A   I would agree that they can, yes.

25   **Q**   And that they do?

1    A    Well, I can't testify that they do, because I didn't see

2    any documentation about that.  But based on my experience, I

3    believe that they can.

4    Q    And based on your experience, can you say that they do?

5    A    There are times when they do, yes.

6    Q    For example, the red flag of new individuals in the

7    home, they could pick up on that.  Yes.

8    A    Yes.

9    Q    Would you agree with me that a child not seen -- I'm

10    going back now, I'm switching gears back now to, let's say a

11    social worker visit to the home.

12    A    Okay.

13    Q    Would you agree with me that a child not seen doesn't

14    always mean not visited.  And do you know what I mean by

15    that?

16    A    No, I can't say that I do.

17    Q    Okay.  In other words, a social worker could have gone

18    out to the home and for any number of reasons the child is

19    not there.  Yes?  That happens?

20    A    That happens, yes.

21    Q    And you'd agree with me that to the extent that the

22    social worker gets out there and does the visit, gets in the

23    home, even though they haven't seen the child because the

24    child is off somewhere, that constitutes what we could call

25    a safety check?

1    A    I don't, I don't know.  I really think in that instance

2    it would really depend on what happens while the case worker

3    is there.  So, I really couldn't -- I can't say that, one

4    way or the other.

5    Q    Well, in your experience certainly you could say that a

6    social worker going out to a home, and even though not

7    seeing the child, there's certainly value in that in the

8    social worker visiting with the home, talking with the

9    individuals in the home and monitoring and assessing what's

10   happening in the home.  Yes?

11   A    Yes, there is value in that.

12   Q    Again, that's a way to monitor red flags in the home?

13   A    Yes.

14   Q    And these types of home visits where the social worker

15   goes out, visits the home, visits the adults in the home or

16   the parents, or whoever it might be, these don't show up on

17   the DCF case worker child visit reports either, do they?

18   A    Not to my knowledge, no, they do not.

19   Q    This is why it's important to look behind the numbers,

20   wouldn't you agree, on a piece of paper, in a report, to see

21   these types of things that don't appear?

22             MS. BARTOSZ:  Objection; form, argumentative.

23             THE COURT:  No, no.  He may probe her own view.

24   Isn't that true?

25   A    I think that ideally that there are some things that you

1    can learn about a process if that's what you're asking

2    about, a process, by talking to people, yes.

3    Q    Because these things are happening, but they're not

4    necessarily apparent from a piece of paper.  Yes?

5    A    That's true.  Yes.

6    Q    And you'd agree with me that social worker visits occur

7    but are not always documented, in this case, Massachusetts

8    Family Net or the social worker filed.  You'd agree with

9    that.  Yes?

10   A    Yes, I agree with that.

11   Q    And you know this from your experience, your child

12   welfare experience as a social worker in New Jersey, visits

13   don't always get documented?

14   A    That's true.

15   Q    I want to turn now, Ms. Jones, to the second, what

16   you've called hinge pin, if I could, and it's the area of

17   licensing and licensing renewal and home reassessments.

18   A    Okay.

19   Q    Home assessments, of course, are one way to know when

20   new individuals are residing in the home or coming into the

21   home.  Yes?

22   A    Yes.

23   Q    Foster parents have a contractual obligation with the

24   Department of Children and Families.  Yes?

25   A    Yes.

1    Q   And under that contractual obligation they are, foster

2    parents are required to report new individuals in the home.

3    Yes?

4    A   I didn't review the contract, but generally speaking,

5    yes.

6    Q   And other ways, aside from home assessments, to know

7    whether new individuals reside in the home, obviously, as

8    we've been talking, are social worker monthly visits.  Yes?

9    A   Yes.

10   Q   Family resource worker visits.  Yes?

11   A   Yes.

12   Q   And with respect to IFC homes, intensive foster care

13   homes, you know that those are done through contracted

14   providers here in Massachusetts, right?

15   A   Yes.

16   Q   And these intensive foster care homes also have

17   contracts with the Department of Children and Families.

18   Yes?

19   A   Yes.

20   Q   And those contracts require visiting the home weekly as

21   well.  Did you know that?

22   A   Again, didn't see any contracts.

23   Q   Let's set aside the contracts for a minute and just ask

24   if you were aware that these visits are occurring by the

25   providers visiting the children weakly in the home?

1    A    I was not aware that there's a weekly requirement, no, I

2    was not aware of that.

3    Q    Were you aware that there was some other requirement?

4    A    I made the assumption, frankly, that there would be a

5    requirement for at least monthly contact with the foster

6    home.

7    Q    Did you, did you learn that in your review of the

8    documents in this case?

9    A    Pardon me?

10   Q    Did you learn that from your review -- I'm just, I'm

11   wondering what your basis is for that.  Did you learn that

12   from your review of the documents in this case?

13   A    No, I didn't learn that from my review of the documents.

14   Again, that's just something that, it's an assumption that I

15   would make based on my experience in the field that there

16   would be a minimum requirement that the contract provider

17   would get out there at least once a month to check on the

18   home.

19   Q    Thank you.

20        And so you'd agree with me that these are all

21   mechanisms, social worker visit, family resource worker

22   visits, contractor provider visits, foster parents

23   contractual obligation to report, is all ways to keep track

24   of individuals in the home.  Yes?

25   A    Yes.

1    Q    Now, you have opined about DCF's performance on annual

2    reassessments and licensing and licensing renewals.  Yes?

3    A    Yes.

4    Q    You were critical of DCF's performance in those areas.

5    Yes?

6    A    Yes.

7    Q    And you assessed DCF's performance in these areas by

8    looking at data from fiscal year 2012.  Yes?  In particular,

9    the first and third quarters' performance of the DCF

10   quarterly report.

11   A    Yes.

12   Q    Is that right?

13   A    Yes.

14   Q    And in looking at the first quarter you learned that DCF

15   completes its annual assessments 84 percent of the time.

16   Yes?

17   A    Yes.  Could we possibly pull those documents out so that

18   I could have them.

19   Q    Certainly.  Do you still have those?

20   A    I think but just give me a moment to see if I can find

21   them in this stack here.

22   Q    Yes.  Let me see if I can get them for you.

23              It is Exhibit 956.

24   A    Yes.  I've found it.

25   Q    Do you have that there?

1    A    Yes.

2    Q    Okay.

3    A    Okay, thank you.

4    Q    Okay.  And there are three quarters stapled together

5    here.  So, if we go back a number of pages you'll find

6    quarter 1.

7    A    Yes, I have it.

8    Q    And you can count from the back.

9    A    Yes.

10    Q    Do you have it?

11    A    Yes, I have it.

12    Q    Okay.  And so we're looking at the bottom block there.

13    And so when I mention the 84 percent, 83.9 percent.  Yes?

14    A    Yes.

15    Q    And then if we flip forward to quarter 3, actually the

16    very first page, you see there 76.3.  Yes?

17    A    Yes.

18    Q    And we have in the gray box 81.5 percent completion year

19    to date.  Yes?

20    A    Yes.

21    Q    And those are the numbers that you relied upon.  Yes?

22    A    Yes.

23    Q    Did you look at quarters 2 and 4?

24    A    I looked at quarter 2 which I had.  I did not have

25    quarter 4.  These were the reports that I had.

1    **Q**    Okay.  And if we look at quarter 2, which you don't

2    mention in your report, is 84.3.  Yes?

3    A    Yes.

4    **Q**    So, I'm sorry, you did not review quarter 4; is that

5    correct?

6    A    Right, quarter 4 had not been issued yet.

7    **Q**    At the time of your report?

8    A    At the time of my report, correct.

9    **Q**    Have you seen it since?

10    A    No.  No.

11    **Q**    Going off the year to date figure from quarter 3 which

12    we have at 81.5 percent completion.  Yes?

13    A    Yes.

14    **Q**    It's your opinion that that level of completion puts

15    children in an unreasonable risk of harm.  Is that right?

16    A    Yes, I find that to be inadequate.

17    **Q**    So, in your opinion, is only 100 percent the acceptable

18    number?

19    A    I would think that minimally 90 percent, perhaps even

20    95 percent, would be a much more acceptable place to find

21    the agency.

22    **Q**    And, of course, there's no established standard like

23    case worker visitations --

24    A    Right.

25    **Q**    -- from the federal government with respect to a 90 or

1    95 percent standard, correct?

2    A    That's correct.

3    **Q**    That's your subjective opinion?

4    A    That's correct.

5    **Q**    Would you look at -- I'm on Exhibit 956.

6    A    Okay.

7    **Q**    The very front page.  In your testimony you referenced

8    what you call the variance among the different regions.

9    Yes?

10   A    Yes.

11   **Q**    And you cited the numbers at the bottom of the row going

12   from left, the bottom row, the boxes going from left to

13   right.  Yes?

14   A    Yes.

15   **Q**    And you concluded by looking at the number in the far

16   right, the 58.3, and you expressed some concern about a 58.3

17   number.  Yes?

18   A    Yes.

19   **Q**    And we see from this document that 58.3 is the report

20   from what's listed here as the seventh region.  Do you see

21   that there?

22   A    Yes, I do.

23   **Q**    Do you know what the seventh region is?

24   A    No, I don't.

25   **Q**    Did you seek to find out what the seventh region was

1    when you made your determination that the 58.3 number was

2    unacceptable?

3    A    No.

4    Q    I want to move now to the subject of restricted home

5    studies, the 40 working day requirement for kin homes

6    restricted homes, okay?

7    A    Yes.

8    Q    And again, you were critical of DCF's performance in

9    this area as well.  Yes?

10   A    Yes.

11   Q    And again your basis for this is on data from two

12   quarters' performance.  Yes?

13   A    Well, all three quarters I looked at.  I only referenced

14   two in my report, but I looked at the entire package of

15   information here.

16   Q    So you looked at all three but you only mention two in

17   your report.

18   A    Right.

19   Q    Do I have that right?

20   A    As points of comparison.

21   Q    And in your report you say that statewide performance on

22   this measure has hovered around 86 percent.  Yes?

23   A    Right.

24   Q    And again you've drawn the conclusion, or it's your

25   opinion that 86 percent places kids, children at an

1    unreasonable risk of harm.  Yes?

2    A   Yes.

3    **Q**   And so, on this measure is a hundred percent or

4    95 percent the only acceptable standard for you?

5    A   In this, in this measure, I would like to see something

6    a whole lot closer to a hundred percent, yes.  And the

7    reason for that is because the child is already in the home.

8    So any indicators, any red flags that might be present that

9    are being missed, there is a child, it's not a potential

10   harm at that point.  It's much more serious matter when a

11   child is already in the home.

12   **Q**   And again there is no established standard by the

13   federal government or CWLA or anyone with respect to the --

14   A   That's --

15   **Q**   -- home visit assessment?

16   A   That's correct.

17   **Q**   Again, that close to a hundred percent, if I have your

18   testimony right, that you would like to see, that's your

19   subjective opinion?

20   A   It's my opinion based on 30 years of child welfare

21   experience.

22   **Q**   You also testified about the, the background checks,

23   CORI checks unit within the department.  Yes?

24   A   Yes.

25   **Q**   And your testimony was that the unit did not have

1    adequate capacity to meet its workload.  Yes?

2    A    Yes.

3    **Q**    You know that this unit processes anywhere from 500 to

4    900 requests a day.  Yes?

5    A    Yes.

6    **Q**    And that the volume, the daily volume of requests

7    fluctuates depending on the number of requests that day.

8    Yes?

9    A    Yes.

10   **Q**    Some days the volume is high, some days the volume is

11   low.  Yes?

12   A    Yes.

13   **Q**    And in your testimony and in your report you cited

14   backlogs that you were concerned about.  Yes?

15   A    Yes.

16   **Q**    And in particular you cited backlogs on three specific

17   dates -- yes -- that you gleaned from some DCF personnel

18   e-mails?

19   A    Yes.

20   **Q**    And the first one was November 18 of 2010.  Yes?

21   A    Yes, I guess that's the date.

22   **Q**    And the other was February 2nd of 2011?

23   A    Could you direct me to where I discuss that in any

24   report because you're asking me to remember specific dates,

25   and I can't do that.

1    Q    Certainly.  If you --

2    A    Okay, I believe I've found it.

3    Q    Page 28.

4    A    Yes, I've found the section.  Yes.

5    Q    Okay.  And you see sort of towards the middle paragraph

6    at the top, it says in a previous e-mail dated November 24,

7    2010.  Do you see that there?

8    A    Yes.

9    Q    Okay.  The next paragraph you see on February 2nd, 2011,

10   do you see that there?

11   A    Yes.

12   Q    And then the next sentence, on July 18, 2011, do you see

13   that there?

14   A    Yes.

15   Q    So you're citing backlogs from very specific dates from

16   late 2010 to July of 2011.  Yes?

17   A    Yes.

18   Q    And the last date that you looked at with respect to the

19   background check CORI unit was July 18th, 2011.  Yes?

20   A    Yes.

21   Q    You make no reference to their workload or their

22   staffing beyond that date?

23   A    No, I don't reference that in the report.  No, I do not.

24   Q    So, you don't know whether that unit was fully staffed

25   at the start of FY2013, let's say July of 2012?

1    A    July -- no, I don't know.

2    Q    You don't know?

3    A    No, I don't.  Uh-uh.

4    Q    And you didn't seek to find out that information before

5    writing your report, did you?

6    A    Well, as I was reading Director Sportman's testimony

7    from his deposition, that's what I was basing my opinion on

8    relative to the present staffing and what the concerns would

9    have been at that point.

10   Q    My question was whether you sought, before putting pen

11   to paper, an issue in your final report whether you sought

12   to learn of what the staffing levels were in this unit in

13   July of 2012?

14   A    No.

15   Q    You still don't know to this day, do you?

16   A    No, I don't know to this day.

17   Q    And you didn't know when you wrote your report whether

18   there were any backlogs around the time of July of 2012, do

19   you?

20   A    No, I do not.

21   Q    I want to move on to the next hinge pin where you talked

22   about investigations in the SIU unit.

23   A    Okay.

24   Q    And your testimony was that the SIU unit is or was, I'm

25   not sure, understaffed.  Yes?

1    A    Yes.

2    **Q**    At the time that you looked at it.  Yes?

3    A    Yes.

4    **Q**    And that investigations were untimely?

5    A    Yes.

6    **Q**    Is that your testimony?

7    A    That is my testimony.

8    **Q**    But you didn't know at the time that you drafted your

9    report how many workers the SIU, by how many workers the SIU

10   was understaffed, did you?

11   A    No, I did not.

12   **Q**    Most states have a 30 to 60 day investigation report

13   deadline.  Yes?

14   A    Many do.  I don't know if I could say most, but many do.

15   **Q**    And when we talk about an untimely investigation, we're

16   talking about an investigation that is completed after the

17   15 day deadline; is that right?  The Massachusetts 15 day

18   deadline.  We're talking about an untimely investigation in

19   Massachusetts, DCF, the one that you opined about.  We're

20   talking about one that's completed after the 15 day

21   deadline?

22   A    Yes, it goes beyond 15 days, yes.

23   **Q**    All right.  Now, would you agree with me that the

24   definition of the word completed is critical here?  What we

25   mean by the word completed, when we talk about a completed

1    investigation within the time frame.

2    A    Yes.

3    Q    Completed could mean that the actual paperwork has yet

4    to be edited and signed off on.  Yes?  That could be what is

5    meant by completed.

6    A    Could be.

7    Q    And any delay beyond 15 days could mean that it's simply

8    something that hasn't been signed off on or been approved,

9    quote, unquote, the books.  Yes?

10   A    Well, it's not quite that simple.  What's involved in

11   that final sign-off by whatever that final authority is is

12   an acceptance of the investigation through its entirety, and

13   so when that final person is reading through that

14   investigation, if there have been things that were missed,

15   et cetera, along the way, those may be things that are very

16   critical things.  And so it's not as simple as just saying

17   well, you know, it's all done.  But we don't know if it's

18   really all done until that person has the opportunity to

19   read and approve the investigation.

20   Q    It doesn't necessarily mean that the actual

21   investigatory work, the work of the investigators going out

22   and interviewing, it doesn't mean that the actual

23   investigatory work hasn't been completed.  Correct?

24   Necessarily.

25   A    It doesn't mean that it hasn't, but likewise it doesn't

1    mean that it has either.

2    Q    In fact, in the documentation that you've reviewed, that

3    isn't the case at all.  In other words, DCF and their

4    investigators are actually getting out in a timely manner

5    and doing the actual investigatory work.  That's not what's

6    being delayed, correct?

7    A    The initial contact with the child and getting out to

8    see the children, no, that does not, that is not what's

9    being delayed.

10   Q    The investigators are out investigating the cases right

11   away in a timely fashion?

12   A    Yes.

13   Q    And if there's a perpetrator involved in the situation

14   the perpetrator's being removed in a timely fashion, there's

15   no delay there.

16   A    I can't say that.  I don't know that.

17   Q    You don't know that?

18   A    There were no data points relative to that.  This was

19   not a qualitative analysis, and that sort of information is

20   a quality review of an investigation, that you'd have to

21   read investigations and so forth to get to that, unless the

22   state itself was tracking those data points.

23   Q    And you didn't do that?

24   A    No, I was not asked to do a qualitative review.

25   Q    You were simply asked to look at the numbers and report

1    based on that?

2    A    I was basing -- I was doing a process review, not a

3    qualitative.

4    Q    So, is it fair to say that you couldn't glean from your

5    process review whether DCF was getting out right away and

6    making sure that the child under all circumstances was out

7    of harm's way?

8    A    That's correct.

9    Q    You don't know?

10    A    That's correct.

11    Q    You do know, though, with respect to these

12    investigations that the SIU unit does, there are other state

13    agencies involved when these types of reports come in.  Yes?

14    A    Yes.

15    Q    Department of Mental Health.  Yes?

16    A    Yes.

17    Q    The Department of Public Health?

18    A    Depending on the nature of the allegations, yes.

19    Q    The Department of Youth Services?

20    A    Yes.

21    Q    And the district attorney's office all respond where

22    appropriate.

23    A    Yes.

24    Q    And they collaborate and they coordinate their

25    investigations.  Yes?

1    A    Where appropriate.

2    **Q**    All to ensure that the children are safe?

3    A    Yes.

4    **Q**    You were critical, too, of the geographic location of

5    the SIU.  Yes?

6    A    Yes.

7    **Q**    And your testimony was that the centralized location of

8    the SIU in Boston makes response impractical given the

9    expanse of the Commonwealth.

10            Do I have that right?

11   A    Yes.  For the, for the SIU investigator him or herself

12   to go out.  Yes.

13   **Q**    Were you aware that SIU staff are actually all over the

14   state?  Did you know that from your review?

15   A    No, I was not aware of that from my review.

16   **Q**    There's a central office in Boston certainly, but

17   investigators are scattered throughout the state.  Did you

18   know that?

19   A    No, I didn't know that.

20   **Q**    That these staff, they're physically located in the

21   field.  Didn't know that?

22   A    No, my understanding was that the SIU was centrally

23   located and that when there was a need to respond to an

24   emergency that a worker from one of the area offices would

25   respond, not the SIU investigator, him or herself.  That was

1    my understanding of the system.

2    Q    And that that worker that is sitting in an area office

3    out in the field is an SIU investigator.  Yes?

4    A    That was not my understanding.

5    Q    You would agree with me that Scott Schofield, the SIU

6    director, is not in indifferent to the well-being of

7    children in DCF care.  Yes?

8    A    I would agree with that, yes.

9            MR. COLLINS:  Your Honor, short of renewing the

10    Commonwealth's Daubert motion on Ms. Jones, I have no more

11    questions at this time.

12            THE COURT:  Thank you.  Well, I'll allow you to

13    renew it, but it's denied.

14            Any redirect.

15            MS. BARTOSZ:  Yes, your Honor.

16            THE COURT:  Briefly.  Go ahead.

17                    REDIRECT EXAMINATION

18    BY MS. BARTOSZ

19    Q    Ms. Jones, Mr. Collins talked to you about DCF's

20    performance on the measure absence of maltreatment in foster

21    care as reflected in CFSR data.

22            Do you recall that?

23    A    Yes.

24    Q    And as reflected in the CFSR measure scorecard utilized

25    by DCF.  Do you recall that?

1    A    Yes.

2    Q    I would like to focus your attention on Exhibit 964.

3    This particular exhibit, Ms. Jones, shows statewide

4    performance on absence of maltreatment in foster care as of

5    September 30, 2011?

6    A    Yes.

7    Q    And what does it show with respect to statewide

8    performance versus the federal standard?

9    A    The statewide actual performance is below the federal

10   standard.  The federal standard being 99.7 or higher, and

11   the statewide actual at 99.3.

12   Q    Mr. Collins took you through 2011 to that performance

13   level 99.3.  Do you recall that?

14   A    Yes.

15   Q    Ms. Jones, I'm going to show you Exhibit 964 running

16   through the period June 30, 2012, and Exhibit 964, report

17   running through September 30, 2012.

18           Ms. Jones, these are similarly DCF CFSR measure of

19   performance scorecards?

20   A    Yes.

21   Q    What does Exhibit 964 through the period June 30, 2012

22   show for statewide actual performance on absence of

23   maltreatment in foster care?

24   A    The actual performance has declined to 99.2 percent.

25   Q    What does Exhibit 964 through September 30, 2012 show in

1    relation to absence of maltreatment in foster care?

2    A    This report shows further decline to 99.1 percent.

3    Q    So, on the last two reporting periods we have here

4    documented there was back-to-back declines in performance

5    from 99.3 back down to 99.1.  Yes?

6    A    Yes.

7    Q    You didn't see these reports with Mr. Collins, did you?

8    A    No, I did not.

9    Q    Mr. Collins spoke to you, Ms. Jones, about licensing,

10   the licensing hinge pin.  Do you recall that?

11   A    Yes.

12   Q    And he asked you about visitation as a way to monitor

13   for red flags in foster homes.  Do you recall that?

14   A    Yes.

15   Q    Is case worker visitation, Ms. Jones, a substitute for

16   the licensing function?

17   A    No, it is not.

18   Q    Why do you say that?

19   A    The social worker for the child, when that social worker

20   visits the home, the social worker's focus is on the child,

21   moving their case plan forward, addressing the needs of the

22   child in the home.  When the resource worker visits the

23   home, for a licensing purpose, their focus is very

24   different.  It's not about an individual child and the

25   individual child's needs being met, rather, their focus is

1    on the overall safety of the home, monitoring who's in the

2    home, the quality or the safety of the facility at

3    that point, and renewing background checks, medicals and so

4    forth, so that we can have a better sense of who's actually

5    in the home and what threats there may be to the children

6    because of their presence.

7    **Q**    In your opinion, Ms. Jones, is visitation on one hand

8    and licensing on another substitutes for one another, or are

9    they both part of the safety hinge pins you've talked about?

10   A    They are both part.  They are not substitutes one for

11   the other.  They actually dovetail off of each other and

12   would serve to strengthen each other and the safety of the

13   children in the system.

14   **Q**    Ms. Jones, Mr. Collins had you look at Exhibit 357 which

15   was the DCF PIP quarterly report for quarter 1, October

16   through December 2009.

17   A    Yes.

18   **Q**    Can I return your attention to page DCF63281.

19   A    Okay.

20   **Q**    Do you have that, Ms. Jones?

21   A    Yes.

22   **Q**    And I would like to refocus your attention on the second

23   block on this page, absence of maltreatment of children in

24   foster care.

25   A    Yes.  I see it.

1        **MR. COLLINS:**  I'm sorry, counsel, which page are

2    you saying here?

3        **MS. BARTOSZ:**  DCF63281.  It was the page that you

4    identified earlier, Mr. Collins.

5        **MR. COLLINS:**  Can I just -- can we compare notes

6    for a second because I have a different --

7        (Whereupon counsel conferred.)

8    **Q**   The national standard as shown here in that block in the

9    first row, 99.68, do you see that?

10   **A**   Yes.

11   **Q**   The negotiated improvement goal that DCF agreed to was

12   98.8.

13   **A**   Yes.

14   **Q**   And that goal is significantly below the national

15   standard?

16   **A**   Yes, it is.

17   **Q**   Would you please return to your attention to child

18   maltreatment 2010.  And that's Exhibit --

19   **A**   On page 57.

20       **THE COURT:**  1088, is that the one.

21       **MS. BARTOSZ:**  Yes, Judge.

22   **Q**   And please turn, Ms. Jones, to table on --

23   **A**   Page 57.

24   **Q**   -- on page 57, thank you.

25       **MS. BARTOSZ:**  And, your Honor, we're looking at

1  table 3.20, absence of maltreatment in foster care.

2          **THE COURT:**  I have it.

3  **Q**   Ms. Jones, the improvement goal of 98.8 in the PIP

4  document would place Massachusetts in the bottom five, six

5  states in 20010; is that correct?

6  A   Yes.

7  **Q**   Ms. Jones, could you turn to table 2.1 in this document,

8  child maltreatment 2010.  And that's on page 11.

9          Do you see that table screened in and screened out

10  referrals 2010?

11  A   Yes.

12  **Q**   If you look in the column for screened in referrals that

13  refers to intakes of alleged abuse or neglect to a child

14  that were opened for an investigation after screening?

15  A   Yes.

16          **MR. COLLINS:**  Objection.

17          **THE COURT:**  Well, you're leading the witness, but

18  I'll let that stand.  Don't lead the witness.

19  **Q**   Does this table 2.1 show the national average for

20  screened in referrals among the 45 reporting states?  I

21  would focus your attention on the percent column of screened

22  in referrals?

23  A   Oh, okay.  Yes.  Yes, I see.

24  **Q**   What does the document show?

25  A   It shows -- are you asking me for the Massachusetts

1    number?

2              THE COURT:  No, she's asking for the national?

3    A    For the national number.  The national number is

4    60.7 percent.

5              THE COURT:  And so that I'm reading this correct,

6    Massachusetts referred 55.3 percent.

7              THE WITNESS:  I need to get back up to

8    Massachusetts.  Yes.

9              THE COURT:  Thank you.

10             THE WITNESS:  Yes.

11             THE COURT:  I know you're in the middle of

12   something, but I need to take the morning recess now, and I

13   have another hearing that's all ready to go.  So we'll

14   resume at that time.

15             MS. BARTOSZ:  Thank you, Judge.

16             THE COURT:  Counsel, you can leave all your things

17   in place, but I'll need counsel table for the attorneys in

18   this other hearing.

19             THE WITNESS:  Do I need to --

20             THE COURT:  You can leave everything, while I'm

21   going to put a witness there, he's not going to be

22   interested in those documents.

23             THE WITNESS:  All right.

24             THE COURT:  You may step down.

25             THE WITNESS:  All right, thank you.

1          (Recess.)

2          **THE CLERK:**  All rise.  The United States District

3    Court is back in session, you may be seated.

4          **THE COURT:**  Go ahead, Ms. Barotsz.

5          **MS. BARTOSZ:**  Thank you, Judge.

6               **DIRECT EXAMINATION** (Cont'd)

7    BY  MS. BARTOSZ

8    Q    Welcome back, Ms. Jones.

9    A    Thank you.

10   Q    Ms. Jones, you'll recall that during cross-examination

11   Mrs. Collins spoke to you about six states within the United

12   States who apply a reasonable standard in investigating

13   allegations of abuse or neglect?

14   A    Yes.

15   Q    Could you please return your children to Child

16   Maltreatment 2010 and to table 3-20.

17         **THE COURT:**  On page?

18         **MS. BARTOSZ:**  Page 57, your Honor.

19         **THE COURT:**  Thank you.

20   A    I have it.

21   Q    And I would like to focus your attention actually on the

22   last column on this table, the 2010 set of performance

23   figures.  Do you see that?

24   A    Yes.

25   Q    And to remind you, Mr. Collins had identified with you

1    the following six states as applying that reasonable

2    standard:  Hawaii, Louisiana, Utah, Vermont, Massachusetts,

3    and Oregon, and finally, Oregon hadn't reported data at

4    least as to this table 3-20.  Correct?

5    A    Yes.

6    Q    Among those six states in 2010, where does Massachusetts

7    performance fall?

8    A    It appears that Massachusetts was in one of, it appears

9    as one of the lower performers.

10   Q    In fact, the lowest at noon 99.22.  Yes?

11   A    Yes.

12   Q    And next up Hawaii at 99.26?

13   A    Yes.

14   Q    And you'll see that up to Vermont which met the federal

15   standard of 99.94.  Yes?

16   A    Yes.

17   Q    Now, Ms. Jones, Mr. Collins talked to you about

18   visitation and documentation of visits in a case file.

19          Do you recall that?

20   A    Yes.

21   Q    In forming your opinions in this case, did you consider

22   the issue of documentation in a child's case file?

23   A    Yes, I did.  And while I, I recognize that there are

24   visits that likely take place that are not documented, the

25   lack of documentation in and of itself creates a situation

1    for risk to group.  When a worker is out of the office for

2    any number of reasons, as I indicated in my report, could be

3    anything from they're out sick for one day or an extended

4    leave, death in the family, out on another emergency on

5    their caseload, there could be any number of reasons that

6    that worker is not present in the office, and that

7    information not being in the record leaves a gap of

8    information that could be useful in making an appropriate

9    decision for a child.  So, the supervisor cannot remember

10   everything based on their conferences with a worker.  So,

11   it's really critical that that information is documented in

12   a timely manner to support appropriate decision making for

13   children, whether it's, relative to their safety, whether

14   it's the removal from the home or a decision to allow them

15   to remain.

16   **Q**   Does documentation relate to providing adequate safety

17   for a child in a foster care system?

18   A   Yes.  Again, documentation is the way that we support

19   our decisions around safety for children.  So, lack of

20   documentation, errors in documentation that become more and

21   more likely, the longer there's a delay in documentation,

22   the more likely it is that critical pieces of information to

23   be lost, nuances of information could be lost that would be

24   meaningful to make decisions around a child's safety and

25   care.

1          MS. BARTOSZ:  Your Honor, that completes

2    plaintiffs' redirect.

3          THE COURT:  Anything further for this witness?

4          MR. COLLINS:  Just a couple of questions, your

5    Honor.

6          THE COURT:  Go ahead.

7                    RECROSS-EXAMINATION

8    BY MR. COLLINS

9    Q    Ms. Jones, you were shown Exhibit 964.

10   A    Yes.

11   Q    Just a moment ago.

12         And you were shown actually two exhibits that I

13   have are listed as 964.  Do you have those two?

14   A    Yes, I have them.

15   Q    Okay.  All right.  So --

16         MR. COLLINS:  Well, may I approach, your Honor?

17         THE COURT:  Yes.

18   Q    I just want to make sure that I understand that, we've

19   labeled a number of scorecards No. 964, I just want to make

20   sure that we're looking at the same two.  9-30-12.  No.

21         So, do you have the 9-30-2012 one?  Yes.  There it

22   is.  Okay.  And do you have the 6-30-2012?

23   A    Yes.

24   Q    Okay.  So you were just shown these two exhibits, and

25   you were looking with counsel at the number with respect to

1     the absence of maltreatment in foster care, and we see that

2     those two numbers, respectively, 6-30-2012, 9-30-2012, 99.2

3     and 99.1.  Yes?

4     A    Yes.

5     Q    It's not unusual for those numbers to fluctuate quarter

6     to quarter, is it?

7     A    No, it's not unusual to see fluctuation.

8     Q    In fact, the next quarter we see may be 99.5, right?

9               MS. BARTOSZ:  Objection.

10              THE COURT:  Well, that is speculative.  Sustained.

11              MR. COLLINS:  Your Honor, you know, I think the

12    timing is appropriate for this now with respect to Exhibit

13    964.

14              We've had this discussion about a cutoff date.  And

15    I want to point out that the plaintiffs have introduced, and

16    this isn't the first one, we can create a list for you, a

17    document that is now covering the period ending 9-30-2012.

18    This is beyond the cutoff date that plaintiffs have offered.

19    We don't necessarily have an objection to this, your Honor.

20    But I want to make sure that when we're going back and forth

21    with information that the defendants will not be

22    precluded --

23              THE COURT:  I don't give advisory opinions.  Go on.

24    Your point is noted, but I don't give advisory opinions.

25              Anything else for this witness?

1          MR. COLLINS:  That's all I have, your Honor, thank

2     you.

3          THE COURT:  Nothing else, Ms. Bartosz?

4          MS. BARTOSZ:  Nothing else, your Honor.

5          THE COURT:  You may step down, thank you.

6          (Whereupon the witness stepped down.)

7          THE COURT:  Call your next witness.

8          MR. GLEASON:  Gail Garinger.

9          MR. KLIBANER:  Your Honor, my name is Alex

10    Klibaner.  I have put in a notice of appearance on behalf of

11    Judge Garinger and filed a motion to quash the subpoena and

12    I would like an opportunity to be heard.

13         THE COURT:  I thought that was going to be worked

14    out, but it seems like it has not.

15         MR. KLIBANER:  I would like to work that out on the

16    record.

17         MR. GLEASON:  I thought it had been worked out,

18    your Honor.

19         THE COURT:  Well, if it's been worked out why don't

20    you tell me it's been worked out.

21         MR. KLIBANER:  And then I also want to give an

22    opportunity for the, for the defendants' counsel to --

23         MR. COLLINS:  Your Honor --

24         MR. KLIBANER:  -- to take their own positon on it.

25         THE COURT:  Well, either it's been worked out or

1    not.

2         MR. COLLINS:  It has not been worked out.

3         THE COURT:  Well, if it's not been worked out why

4    don't I -- do we have to do this witness now?  Why don't we

5    put her off to some other day, you people work it out or

6    not, and I'll hear it during an afternoon.

7         MR. COLLINS:  That is, that is the defendants

8    suggestion, your Honor.

9         THE COURT:  Yes.  Have you got other evidence.

10        MR. GLEASON:  No, this was the last witness for

11   today.

12        THE COURT:  Well, then let's, let's take the time

13   to work it out.

14        All right.  So it's not -- tell me what has in your

15   mind been worked out.

16        MR. KLIBANER:  All right.

17        THE COURT:  Now, Judge Garinger --

18        MR. KLIBANER:  Garinger.

19        THE COURT:  She's been deposed in this case.

20        MR. KLIBANER:  She has not been.

21        THE COURT:  She has not been deposed.

22        MR. KLIBANER:  She has no discovery.

23        THE COURT:  She's been mentioned.

24        MR. KLIBANER:  I'm not sure how she's been

25   mentioned.

1          THE COURT:  Oh, I'm satisfied she's been mentioned.

2          MR. KLIBANER:  Okay.

3          THE COURT:  The name is not unfamiliar to me and

4   I've been reading, I've been reading deposition transcripts.

5   So I have some idea who she is.

6          And you are who, sir?

7          MR. KLIBANER:  I'm Alex Klibaner.  I'm an

8   Standpoint Attorney General from a different bureau of the

9   AG's office.

10          THE COURT:  I understand.

11          MR. KLIBANER:  From the public protection and

12   advocacy bureau.

13          THE COURT:  You're welcome and I understand how

14   ethically they're working it out.

15          And your position is.

16          MR. KLIBANER:  So we had filed a motion to quash --

17          THE COURT:  I've read it.

18          MR. KLIBANER:  -- when we did not know that areas

19   of inquiry that plaintiffs intended to --

20          THE COURT:  But now that the plaintiffs are --

21          MR. BORTEN:  They told me what their areas of

22   inquiry are.

23          THE COURT:  And you're okay with that?

24          MR. BORTEN:  Well, I would like to tell you what my

25   understanding is of what would be --

```
1              THE COURT:  I'll hear you.

2              MR. KLIBANER:  -- amenable to Judge Garinger.

3              THE COURT:  I'll hear you.

4              MR. BORTEN:  Okay.  That the motion to quash would

5     be denied without prejudice and not on the merits and the

6     Court would order Judge Garinger to testify on three areas,

7     three limited areas of inquiry, which are A, the Office of

8     Child Advocate's formation and responsibilities, B, the

9     comprehensive plan that is called for in the statute,

10    Chapter 18C, and C, the Office of Child Advocate's review of

11    the Rogers process for authorizing antipsychotic

12    medications.  Then furthermore, two things, I would be

13    permitted to sit at counsel's table and object to two areas.

14    One would be that there would be no questions eliciting

15    opinion or expert testimony, because she's not been

16    designated as an expert, and number two, that I retain the

17    right to renew the motion and object to any inquiry about

18    any particular information that came to the Office of the

19    Child Advocate.

20             THE COURT:  And you agree to these limitations, Mr.

21    Gleason?

22             MR. GLEASON:  Well, I agree.  I mean, I don't know,

23    there may be a squiggly line on expert testimony.

24             THE COURT:  I understand.  But you agree to --

25             MR. GLEASON:  The concepts are fine.
```

```
 1           THE COURT:  -- the formulation.

 2           MR. GLEASON:  The concepts are fine.

 3           THE COURT:  And of course as a member of the bar

 4    you may sit at counsel table wherever you can find a place.

 5           MR. KLIBANER:  Thank you, your Honor.

 6           THE COURT:  So --

 7           MR. KLIBANER:  Defendants counsel has a different

 8    position.  But that's, that's a suggestion as it relates to

 9    the motion to quash.

10           THE COURT:  With all, with all respect, right, why

11    don't you let me preside.

12           MR. KLIBANER:  Of course.

13           THE COURT:  They have a different position, but if

14    that's counsel's position, I don't think you have any

15    standing to take a different position.

16           MR. COLLINS:  Well, respectfully, your Honor, we

17    disagree.

18           THE COURT:  All right, I'll hear you.

19           MR. COLLINS:  On behalf of our clients in this

20    case, who are the Governor, the Department of EHS, Executive

21    Office of Health and Human Services, and Department of

22    Children and Families, if you look at the statute, and it's

23    Chapter 18C, Section 12, and in particular C, it talks about

24    the judge advocate, I'm sorry, the child advocate being

25    protected from disclosing information, documents or records
```

1    subject to subpoena.  These, of course, of course, if you

2    look at her annual report, or the office's annual report

3    these are records of our clients.  We're talking about DCF

4    records.  We're talking about EOHHS agency's records.  This

5    is going to have a major impact we think going forward

6    perhaps on the disclosure of this type of information.  This

7    is, this is exactly why section 12 was created, the

8    confidentiality of this information.

9         **THE COURT:**  Here's how we're going to do it.

10   You'll certainly welcome your colleague, though you're from

11   different portions of the Attorney General's office, to

12   counsel table.  She may take the stand, be sworn.  I'm going

13   to go on a question-by-question basis.  And the objection,

14   the institutional, or the statutory objection just raised by

15   you, Mr. Collins, in essence I'm going to take that under

16   advisement.  I may strike this whole thing for appropriate

17   reasons.  But as case management, we're going to welcome her

18   to the stand and we're going to go forward.

19        All right, she may come forward.

20        **MR. COLLINS:**  Your Honor, if I might, would you, I

21   mean, this motion obviously has been filed by a different

22   department of the office.  With your Honor taking that

23   information under advisement, if you require us to file an

24   additional motion it will be the same arguments.

25        **THE COURT:**  No.

1          **MR. COLLINS:**  Of course that's something your Honor

2     will consider despite this agreement.  I just want to make

3     the motion hasn't been withdrawn despite the agreement.

4          **THE COURT:**  No, your concern over procedure is an

5     appropriate one.  The motion has not been withdrawn.

6          **MR. COLLINS:**  Okay.

7          **THE COURT:**  I'm going to accept what evidence I can

8     get as a matter of case administration.  That said, you are

9     articulating, meaning no disrespect to your colleague, but

10    you are articulating some broader policy concerns.

11         **MR. COLLINS:**  That's correct.

12         **THE COURT:**  Those, you don't have to file more

13    papers.

14         **MR. COLLINS:**  Okay.

15         **THE COURT:**  But if when this interrogation is over

16    you think that that injures, does violence to the statutory

17    scheme going forward, you can further brief it and some

18    afternoon we'll talk about it.

19         She may some forward to be sworn.

20         **MR. COLLINS:**  Your Honor, I'm sorry, there's just

21    one further point.  You know, I'm not sure who's in the

22    gallery here and I'm not sure --

23         **THE COURT:**  I'm not troubled by it.  She may come

24    forward.  This is a court -- I'm not closing the court

25    session based upon your argument.  I'm saying I may strike

1    it.

2            **MR. COLLINS:**  Thank you, your Honor.

3            **THE WITNESS:**  Good afternoon.

4            **THE CLERK:**  Would you please remain standing and

5    raise your right hand.

6            Do you solemnly swear the testimony you are about

7    to make in the matter now pending before this Court will be

8    the truth, the whole truth, and nothing but the truth, so

9    help you God?

10            **THE WITNESS:**  I do.

11            **THE CLERK:**  You can be seated.

12                            GAIL GARINGER

13        **THE COURT:**  Now, they've got these agreements or

14    not agreements, but let me start by asking you a couple of

15    questions here.

16            Would you state your full name, ma'am?

17            **THE WITNESS:**  My name is Gail Garinger, G A R I N G

18    E R, your Honor.

19            **THE COURT:**  And, Ms. Garinger, you are the -- what

20    is your office within the Commonwealth of Massachusetts.

21            **THE WITNESS:**  I currently serve as Child Advocate

22    for the Commonwealth, within the Office of the Child

23    Advocate.

24            **THE COURT:**  I guess it's just personal curiosity,

25    you were in fact a judicial officer?

1          THE WITNESS:  Yes, your Honor.  I was a juvenile

2    court judge for 13 years, leaving the bench to take this

3    position.

4          THE COURT:  Here in Massachusetts?

5          THE WITNESS:  Yes.

6          THE COURT:  I apologize that we haven't met.

7          THE WITNESS:  I'm honored to meet you.

8          THE COURT:  Well, the honor is mine.  That's not to

9    say anything about credibility.  But here's a, here's a

10   state judicial colleague on the bench.  All right.

11                     **DIRECT EXAMINATION**

12   BY MR. GLEASON

13   Q    As a housekeeping matter, there's water up there if you

14   need it, Judge.  The cup is clean on your left there.

15   A    Thank you.

16   Q    And would you prefer Judge Garinger or Ms. Garinger or

17   do you care?

18   A    Whatever's more comfortable for you.  I'm called

19   everything these days.

20          MR. KLIBANER:  Your Honor, if I may interrupt, part

21   of the understanding we had is that there would be an

22   explicit order from the bench.

23          THE COURT:  There is.  If it wasn't explicit

24   enough, Mr. Collins, I hesitate to say is obstreperous, but

25   he certainly objected to what I was doing.  I'm doing it.

1          **MR. KLIBANER:**  I appreciate that.  Thank you.

2          **THE COURT:**  So, that's an order.  In other words,

3     within the parameters that you agreed to subject to your

4     individual objections and over the objection of Mr. Collins,

5     she is ordered to testify on those issues.

6          Go ahead.

7          **THE WITNESS:**  Your Honor, could I possibly just

8     move these papers?

9          **THE COURT:**  You could.  Someone will come and take

10    them away.

11         **THE WITNESS:**  Thank you.

12         **THE COURT:**  Go ahead, Mr. Gleason.

13    **Q**   And as you know my name is Dan Gleason and I represent

14    the plaintiffs.

15         When did you become, when did you become the

16    Child's Advocate -- when did you come into the Child

17    Advocate's position?

18    A    I assumed my responsibilities on April 28th of 2008.

19    **Q**   And I would like go to back over your legal experience

20    and credentials briefly, starting with your law school.

21    Where and when did you graduate from law school?

22    A    I graduated Harvard Law School in 1972.

23    **Q**   And after that, what did you do next?

24    A    My first really full-time job was as an attorney at

25    Children's Hospital in Boston.

1    **Q**    Were you general counsel there?

2    A    I became general counsel over the course of my tenure at

3    Children's, yes.

4    **Q**    All right.  And you were there approximately four years.

5    A    All together, I was at children's from 2003 through

6    2009.

7    **Q**    And what position did you take after that.

8    A    After that I went into private practice with a number

9    of, two firms here in Boston, consecutively, and then

10   engaged in private practice on my own.

11   **Q**    And how long were you in that, in practice?

12   A    I was in private practice starting in 2009, and I

13   remained in private practice, although I did take some time

14   off to have three children in 2000.

15   **Q**    And from private practice where did you go next?

16   A    Private practice, I actually went from there to the

17   juvenile court bench.

18   **Q**    Okay.  And you served as first justice of that bench

19   eventually?

20   A    Eventually.  I started as an associate justice in

21   Norfolk.

22   **Q**    Was that in Middlesex?

23   A    I was one year in Norfolk County and then was

24   reappointed to Middlesex County.

25   **Q**    And so the span of years that you were a justice, a

1    judge at the, first justice or judge at the Middlesex County

2    bench was what?

3    A    Middlesex County, I served from 1996 through 2008.

4    **Q**    And then the year before that was Norfolk?

5    A    Was in Norfolk County the year prior.

6    **Q**    All right.  Now, in your, in the course of your career

7    before being appointed child advocate have you had other

8    occasions, either before that or outside of the Child's

9    Advocate position, to deal with legal matters concerning

10   children?

11   A    Yes.  My first position at Children's Hospital that

12   started in 1973, I actually was on a federal grant to come

13   in as the attorney for an interdisciplinary child abuse and

14   neglect team at Children's Hospital.

15   **Q**    And you are the first Child Advocate that's been

16   appointed --

17   A    That's correct.

18   **Q**    -- in the state?

19            And could you tell us how that office came to be

20   created?

21   A    The office was created by an executive order of Governor

22   Patrick in December of 2007.  I believe it was December 20th

23   of 2007.

24   **Q**    Let me show you what is Exhibit 821 in this case.

25   Executive Order 494.  Are you familiar with it?

1          **MR. COLLINS:**  Counsel, copy?

2   **Q**   Are you familiar with that order?

3   A   I am, yes.

4   **Q**   And do you see the whereas clauses in the first three

5   paragraphs?

6   A   Yes, sir.

7   **Q**   And looking them over, you don't need to read them, but

8   looking them over to yourself, do you agree with the

9   principles that are espoused there?

10  A   I do.

11  **Q**   And in furtherance of those principles was that one of

12  the reasons why you accepted the Child's Advocate position

13  when offered?

14  A   It was.

15  **Q**   I'm now going to show you Exhibit 500 in this case.  For

16  the record, a March 28th, 2007 report entitled, quote, First

17  to do no harm, close quote?

18  A   I believe, counsel, it's actually First Due No Harm.

19  **Q**   First Do No Harm.  I'm sorry.  Dyslexic.

20          Is that a document you're familiar with?

21  A   Yes, I'm very familiar with it.

22  **Q**   And are you familiar with the recommendations that were

23  made in that document concerning the Child's Advocate

24  position?

25  A   I am familiar with having read them quite some time ago.

1    I've not read them recently.

2    Q    Well, we need not get into great detail, but on page 5,

3    I'm looking at paragraph 4, beginning in an attempt to

4    permanently direct a spotlight on this disturbing human

5    condition.

6          Do you see that?

7    A    Yes.

8    Q    And that's the position that you assumed, the one

9    described there?

10   A    I can't agree with that actually.

11   Q    Okay.  Is this, is this, conceptually, is this the

12   position that led to the Child's Advocate appointment?  Or

13   do you know?

14   A    I think you'd have to ask Governor Patrick that.

15   Q    Was the appointment -- what date were you appointed, or

16   what month were you appointed as the Child Advocate, first

17   appointed?

18   A    An announcement came out about my appointment at the end

19   of March.  I actually assumed my responsibilities April 28th

20   of 2008.

21   Q    Okay.  And at that time legislation, the legislation

22   that was created had not yet been passed; is that right?

23   A    I took the position, correct, under the executive order.

24   Q    Okay.  And you are now working under the statute 18C

25   that was passed later that year?

1    A    The office was codified in the statute, right, in July

2    of 2008.

3    Q    Okay.  Now, you are familiar with the statute and in

4    specifics the section 11 portion of the statute concerning a

5    comprehensive plan?

6    A    Yes.

7    Q    And before we get into that, can I ask you whether you

8    understand that the office is charged with these items:

9    Critical incident review, annual reporting, five year

10   comprehensive plan, and advisory board role?

11   A    That, and many responsibilities, yes.

12   Q    Many others, yes.

13        So, I'm going to show you now exhibit marked 238.

14   Have I got the right number?  238.  Which I represent is

15   section 11 from the -- I'm sorry, 337.  I apologize.  238 is

16   the exhibit in the deposition.  337.  Which I represent to

17   be section 11 from the comprehensive plan entitled

18   comprehensive plan for response to child abuse and neglect,

19   advice of experts, contents.

20        Are you familiar with that?

21   A    Yes.

22   Q    Does the statute treat this as a mandate?

23   A    I believe the statute treats it as one of the

24   responsibilities of the Office of the Child Advocate.

25   Q    And is this an area of the responsibilities that you've

1    been assigned, that you have focused on throughout the time

2    period of being the Child Advocate?

3    A    Could you repeat the question?

4    Q    Is this area of your responsibility, this comprehensive

5    plan, something that you've been focused on throughout the

6    time that you've been Child Advocate?

7    A    I would say it's something we certainly have been aware

8    of and certainly something that I have attempted to work on

9    throughout my tenure as Child Advocate.

10   Q    Do you have a staff?

11   A    I have a staff of now three other full-time employees,

12   previously two and-a-half.  We only recently in, I believe

13   July of last year went to three full-time employees.

14   Q    And that staff --

15   A    In addition to myself.

16   Q    And just briefly, what is the, what are the credentials

17   and responsibilities of the staff that you supervise?

18   A    The staff of, additional staff of three consists of a

19   deputy director, Elizabeth Armstrong, who has a law degree,

20   practicing attorney, as well as a nursing degree.  I have a

21   clinical specialist who has a master's in social work with

22   much experience in child welfare.  And I have a program

23   assistant with a master's degree in early education.

24   Q    Okay.  And how long have those three people been working

25   with you?

1    A    I believe attorney Armstrong, the deputy director,

2    started in September of 2008, and the prior clinical

3    specialist -- I don't know the exact dates, counsel, in

4    fact.

5    Q    I mean, have they been approximately co-extensive with

6    the time that you've been in the office or some of them

7    newer than that?

8    A    Some are newer than that.

9    Q    Okay.  And the most recent hire is who?

10   A    The most recent hire is the clinical specialist, we had

11   a prior clinical specialist who was half time.

12   Q    How is this office being funded?

13   A    We have a very modest appropriate appropriation.

14   Originally it was $300,000 and because of 9C cuts starting

15   in September of 2008, we were reduced to somewhat less than

16   $244,000.  Fiscal year 13, appropriation is $300,000.

17          **THE COURT:**  What is a 9C cut?

18          **THE WITNESS:**  Those are the budget cuts that were

19   imposed by the state, and our office did have a cut as a

20   result of that.  They were across-the-board cuts.

21   Q    So, do I understand from that that the 244,000 roughly

22   that you mentioned, the number that you were working with

23   when, when the cuts, when the cuts were implemented, did

24   that same number apply to the 2009, '10 and '11 years?

25   A    It did.

1    Q    And that was changed this year?

2    A    The fiscal year 13 appropriation is $300,000.

3    Q    So, I apologize, in 2012 it's 244 and then it goes --

4    A    Correct.

5    Q    -- for fiscal year '13 it goes to 300.

6          Okay.  Now, are those costs sufficient to cover the

7    work that you've been doing?

8          **MR. COLLINS:**  Objection.

9          **MR. GLEASON:**  I'll withdraw it.  I'll rephrase it.

10         **THE COURT:**  Withdrawn.

11   Q    Have you received any supplemental funds from any

12   source?

13   A    Many of our human resource functions are taken care of

14   by the governor's office and that in a sense supplements our

15   ability to perform our responsibilities.  We also did

16   receive a very modest grant from the SJC court improvement

17   program for a particular project with which the office was

18   engaged.

19   Q    And to what, to what part of the budget are salaries

20   devoted?  What part of the budget is consumed by salaries?

21   A    The total amount.  With budget and fringes, with

22   salaries and fringes.

23   Q    Do you have office supplies and other things that get

24   covered by the governor's office.  Is that what happens?

25   A    There's a supply cabinet, we hoard -- we, we reach to

1   whenever we can four our office supplies.

2           **THE COURT:**  I'm okay with the word hoard.

3           **THE WITNESS:**  That was a mistake.  I didn't mean

4   that.

5   **Q**   There's a, there's a statement in --

6           **THE COURT:**  I credit it.  Go ahead.

7   **Q**   There's a statement attributed to you about the budget

8   which is, as follows, see if you recognize it:  OCA has a

9   large mandate and a small budget.

10          Would that be fair?

11          **MR. COLLINS:**  Objection, your Honor.

12          **THE COURT:**  Grounds?

13          **MR. COLLINS:**  Leading.

14          **THE COURT:**  Well, he's referring apparently to

15  something in a public record.  I'll allow it.

16  A   Is there some specific document you're referring to,

17  counsel?

18  **Q**   Yes.  This is Exhibit SE for identification.  I'll refer

19  you to page 2 under budget.

20  A   This is minutes from the advisory board meeting of

21  October 1st, 2009.  And I can't recall whether I stated it

22  exactly that way, but some reference was made to our large

23  mandate and our limited resources.

24  **Q**   And that's, that's so today as it was then, is it not?

25  A   The budget situation is the same as it was then for my

1    office, yes.

2    **Q**    Now, referring to the comprehensive plan, 337.  Could

3    I point you to some of these sections that are contained

4    Section 11, the subsections, and ask about those

5    specifically.  I'm sorry, I have a marked copy of this, but

6    I'm looking for the one that's marked.

7            All right.  If you could look at D8 in Section 11.

8    Social worker caseloads and learning.  And teaming, sorry.

9            Have you been focusing at all in your capacity on

10   this element of the comprehensive plan?  The effects of

11   teaming on caseloads and, or caseloads on teaming and so

12   forth that's covered in this?

13           **MR. COLLINS:**  Objection, your Honor.  I'm going to

14   object to -- I'm just going to renew the grounds, we're

15   getting into the deliberative process.  This is exactly the

16   type of information that is protected under the statute.

17   I'm just renewing the objection.

18           **THE COURT:**  Noted but overruled.  There's no

19   general deliberative process privilege in the Commonwealth,

20   is there?  There May be in the statute, that I've reserved,

21   but there's no general process.

22           **MR. COLLINS:**  Not that I'm aware of, your Honor, at

23   the moment.

24           **THE COURT:**  At the moment.

25           **MR. COLLINS:**  At the moment.

1    Q    Has been an area that the office as done any work in?

2    A    Yes, we have done some work in this area.

3    Q    Okay.  And can you describe what you've done in general

4    terms?

5    A    In general terms, we have had our clinical specialists

6    both of our clinical specialists -- I take that back.  We

7    had a prior clinical specialist do some work researching

8    caseloads, informing us and educating us about the concept

9    of teaming.  We have looked at ratios within the state.

10   We've looked at other publications that talk to the best

11   practices with regard to ratios.  And we have looked at, had

12   some work looking at various levels of social workers and

13   the responsibilities that they might be able to undertake.

14   Q    Okay.  Is that an ongoing investigation of this topic?

15   Is that ongoing at this point?

16   A    We have not done any work in the most recent eight

17   months or so with that, since our prior clinical specialist

18   left.

19   Q    Left the advocate's office?

20   A    Yes.

21   Q    Yes.

22   A    She was half time.

23   Q    Okay.  And the next one I would like to direct you to is

24   D11.

25            THE COURT:  Excuse me.  So when you lost her that

1    sort of research stopped given the amount of things you're

2    supposed to be doing.

3            THE WITNESS:  Correct, your Honor.  That was just

4    one thing that, we had to reassess our priorities and that

5    was one that for the time we put aside.

6            THE COURT:  Thank you.

7    Q    Could you look at (d)(11).  Social worker

8    qualifications, including the infrastructure needed to

9    support a more qualified work force and so forth.

10           Has work been done in that area by the advocate's

11   office?

12   A    Yes, it has; it is work we've been engaged in.

13   Q    Okay.  So, could you describe what work's been done?

14   A    Again, as you see, counsel, there are a number of

15   different aspects to this provision.  With respect to the

16   Child Welfare Institute, our prior clinical specialist had a

17   strong link about the Child Welfare Institute, and that part

18   of the work again ceased when she left.

19           THE COURT:  This is the same half time employee?

20   A    Yes.  Independent of her work, I had made some inquiry

21   of the various schools of social work regarding their

22   curricula regarding where we might be able to add additional

23   training, particular kinds of training to social work

24   education.  Specifically, our office has been very involved

25   with trying to add better curricula around trauma informed

1    care to social workers' curriculum.

2    **Q**   Is that a summary of what you've done in this category

3    11?

4    A    Well, with respect to the more qualified work force, or

5    I shouldn't say more qualified, the qualified work force, I

6    think the qualified work force issue across DCF and all the

7    state agencies is something that my office has been

8    attempting to work on and address.  Again, our office feels

9    very strongly that trauma informed care needs to be

10    introduced at every level of education and training for

11    agencies and personnel dealing with children.

12    **Q**   So that's one of the recommendations that the

13    comprehensive plan intends to, will cover?

14    A    Counsel?

15         **MR. COLLINS:**  Objection.

16         **THE COURT:**  Grounds?

17         **MR. COLLINS:**  We're getting into particular

18    information that's -- I mean, this is in violation of the

19    agreement, your Honor.  We're getting into particular

20    information as to --

21         **THE COURT:**  Overruled.  She may answer.

22    A    I certainly can't imagine trauma informed care not being

23    part of any recommendation we made without a comprehensive

24    plan.

25    **Q**   And could you look at (d)(14), continuous quality

1    improvement and quality service review.

2    A    I'm sorry, 14, counsel?

3    Q    I'm sorry.  Yes, 14 reads critics of the -- critiques of

4    the department including, and then itemizes little i and

5    little double i.  The little i unit is the one I'm talking

6    about here.

7    A    Yes, my office -- is.

8    Q    Has that been an area you've been looking into?

9    A    Yes, definitely.

10   Q    All right.  And what have you done in that area?

11   A    You want the long answer or the short answer, counsel?

12   This is a -- quality improvement, you know, it's, continuous

13   quality improvement is something that affects all of our

14   work.

15   Q    This is --

16   A    I think we're, all of us, continuing, trying to improve

17   the quality of the services we deliver, whether it be the

18   OCA or the DYS or it could be whatever.  The department I

19   understand refers here to the Department of Children and

20   Families --

21   Q    Right.

22   A    -- in this provision.  So if you can rephrase, could you

23   ask your specific question again.

24   Q    Well, I understand that this is, this is something that

25   you're at all times doing something or trying to do

1    something about?  I mean, this is an important priority for

2    you?

3                MR. COLLINS:  Objection.

4                THE COURT:  Grounds?

5                MR. COLLINS:  Leading.

6                THE COURT:  Overruled.

7    A    I believe one of the core missions of the Office of the

8    Child Advocate is to try to engage in improving the quality

9    of services provided to children and families.  To that

10   extent, I don't know what has come into evidence at all, but

11   we receive critical incident reports, we receive supported

12   51B's, 51A's of institutional out of home alleged abuse and

13   neglect that have been supported.  We meet regularly.  My

14   staff meets weekly to go over these reports and to see what

15   we can learn from them and make recommendations for changes

16   we feel that's appropriate.

17   Q    Okay.  And is that covered in the dissemination part of

18   this paragraph?  Does your answer cover what, if anything,

19   you've done with the dissemination of findings?

20   A    We schedule meetings with the appropriate persons within

21   DCF and within the government to, to inform them or make

22   recommendations for improving services.

23   Q    Paragraph 15, CORI reviews and background checks.  Has

24   any work been done in that area?

25   A    There's been some work in that area.

1   **Q**   Is it ongoing?

2   A   Again, I would say that this is, this is not a high

3   priority with the office right now.

4   **Q**   Okay.

5   A   Although we are concerned about CORI checks and have

6   been involved in that at various points when issues have

7   arisen.

8   **Q**   Sixteen, permanency planning.

9   A   Permanency planning is actually something we're quite

10  actively involved with right now.  We have a volunteer

11  fellow with our office who has been devoting herself to the

12  issue of permanency planning and transition planning.

13  **Q**   This is an unpaid fellow?

14  A   Correct.

15  **Q**   All right.  How long has she been with you?

16  A   She's been working with us since, for probably about

17  eight months now.

18  **Q**   No. 17, frequency of transitions.  Examining the

19  frequency of transitions in the treatment plans and living

20  placements of foster children.  Has anything been done in

21  that area?

22  A   Certainly in the course of our work this is an issue

23  that we've been, we've had on an ongoing, on an ongoing

24  basis.

25  **Q**   Is it a high priority?

1    A    I wouldn't -- it's hard to answer the question.  The way

2    it's phrased in this legislation is not how I would phrase

3    it.  The issue with permanency planning for children is a

4    very high priority for our office.

5    Q    Okay.  Number 19, the adoption process.  What, if

6    anything, have you been doing in that area?  Or have you

7    done in that area?

8    A    This, too, is something we've been looking at on an

9    ongoing basis.  And I would view, I would say that this is

10   something that as recently as last month we were examining

11   with others as to how we might think about improving the

12   adoption process.  Not just in Massachusetts but throughout

13   New England.

14   Q    Have any regulations been drafted or proposals been made

15   or determinations been made as to a process?

16   A    Counsel, I think it's --

17             **MR. COLLINS:**  Objection, your Honor.

18             **THE COURT:**  Grounds?

19             **MR. COLLINS:**  We're outside of the scope of the

20   agreement here.

21             **THE COURT:**  Overruled.  You may answer.

22             **THE WITNESS:**  Your Honor, this is difficult because

23   I don't know how much you know about our office.

24             **THE COURT:**  I don't know, I don't know very much at

25   all, and I'm very curious and I intend to review these

1    documents that are in evidence, and I've got some questions

2    of my own.

3         So, let me respond to your comment.  Tell me what

4    you think I ought to know about your office.

5         **THE WITNESS:**  Oh.  Oh.  I think what's important to

6    know about our office is that it's an office that's very

7    small, which on the one hand is difficult, but on the other

8    means that on a daily basis, on an hourly basis we are

9    sharing information with one another, we are communicating

10   what we've learned from the various meetings we attend.

11   We're on a myriad of committees.  We're gathering

12   information.  We're synthesizing information.  We're

13   receiving information via our help line calls, or contacts.

14   We are reviewing critical incident reports.  We are

15   reviewing 51B's of supported abuse in out of home settings.

16   We are discussing those at our weekly meetings.  We have

17   daily and informal meetings, but we have a weekly staff

18   meeting.  We take very seriously and we review reports among

19   ourselves.

20        Our specific information informs our

21   recommendations for policy.  Our policy work informs the

22   information we're able to give callers who might call in on

23   our help line.  So it's an office that's attempting to

24   respond to specific concerns.  But generally we are trying

25   to learn as much as we can to communicate that information

1      to people in a way that we think might lead to policy

2      changes to changes in regulations or changes in statutes.

3              THE COURT:  Now, I know you have a very real

4      familiarity with the job that I'm required to do here.  And

5      having that in mind, put aside the due process floor the way

6      my colleague, Judge Ponsor, and I have adopted it for this

7      case, put that aside, that legal frame work.  What in your

8      judgment can be done to improve the quality of child care in

9      Massachusetts?

10             MR. COLLINS:  I'm going to object, your Honor.

11             THE COURT:  I thought you might.  And I wonder, and

12     this may be the subject of briefing, if this were the

13     attorney-client privilege, which is certainly the oldest and

14     among the most honored privileges, at least under the laws

15     of the Commonwealth of Massachusetts an objection would

16     allow me to draw a negative inference.

17             Your objection is overruled subject to briefing.

18     I'm interested in the answer.  You tell me.

19             THE WITNESS:  Your Honor, the child

20     welfare/juvenile justice system is so complex.  If I were to

21     attempt to answer that question for you, we would be here

22     for hours.  I truly mean that.

23             THE COURT:  Yes.  But I guess, I guess what I'm

24     grappling with -- and that's certainly a responsive answer.

25     And in any public administrative policy issue, which is not

1    the function of this Court, this Court, I mean, one answer

2    would be you could throw money at an issue.  If you made

3    that the chief policy goal and had unlimited quantities of

4    money various things could be accomplished.  But given your

5    background and your current responsibility, and the real

6    world, what would be the major priority for improvement?

7            THE WITNESS:  Putting more money up front.

8            THE COURT:  What do you mean by up front?

9            THE WITNESS:  In child abuse and neglect

10    prevention, in early education, in early assessment.  In

11    other words, I think the resources that are put up front

12    avoid more costly --

13            THE COURT:  Well, wholly apart from what we're

14    talking about here, and this is in no sense a partisan

15    comment, but the President is articulating, given his

16    priority, the great value of preschool education.  And you

17    started out with child abuse, but then you did go to early

18    education.  Didn't I hear you say that?

19            THE WITNESS:  I said that, but I also said early

20    assessment, early identification and assessment, and that

21    means young children, as young as, it means --

22            THE COURT:  As young as you can --

23            THE WITNESS:  We would start preconception, your

24    Honor, and we would have wanted pregnancies with parents who

25    were able and got the supports they needed to care for those

1    children.  We would then have maternal screening so that we

2    didn't send children home with mothers who were severely

3    depressed without the supports they needed to care for those

4    children.  And then I would continue through the continuum,

5    your Honor.

6              THE COURT:  Keep going.

7              THE WITNESS:  You're serious?

8              THE COURT:  I am serious.

9              THE WITNESS:  I think that we as a society need to

10   put our money where our mouth is in terms of children.  And

11   we need to start early, we need to never give up on our

12   children.  We should to whatever we can to fund as I said

13   education around planned pregnancies, education around

14   maternal screening, home visiting, so that we were able to

15   really work with particularly vulnerable mothers or children

16   in the home.  We would fund universal pre-K early education

17   for children.  We would have trained staff who would be able

18   to identify children who were at particular risk, particular

19   vulnerable, and we would invest resources to address those

20   to concerns with the child and the parents early on.

21             We would be, at the next stage I think that we

22   would be having staff at all levels dealing with children to

23   be trauma informed, to be sensitive to the fact that if we

24   can identify again children whose parents were particularly

25   vulnerable we would avoid more harm of abuse and neglect.

1          THE COURT:  I don't mean to interrupt you.

2          THE WITNESS:  That's all right.

3          THE COURT:  But in your testimony at you've gone

4     along you've stressed the need for the governmental staff,

5     the case workers to be trauma informed.  And I'm thinking

6     that what you mean by that is to be able to detect the

7     symptoms of child abuse.  Is that what you mean?

8          THE WITNESS:  It's beyond that.  I mean, trauma

9     can -- many of us may have experienced trauma who weren't,

10    you know, abused or neglected.

11         THE COURT:  Physically abused.

12         THE WITNESS:  It could be exposure to domestic

13    violence.  It could be witnessing that as a young child.

14    Witnessing crime in the community.  It isn't limited to

15    people in the home who see something.  I mean, we have a lot

16    of very vulnerable, at risk children in Massachusetts

17    because they live in communities of poverty where they've

18    witnessed violence.  These are children who are more

19    susceptible to running to problems as they, you know, come

20    up, as they age in life and get involved with various

21    systems.

22         THE COURT:  How do you train people to be aware of

23    that?

24         THE WITNESS:  I think that -- how do you train

25    people?

1          THE COURT:  Well, isn't that what you're talking

2     about?  You said staff at all levels dealing with children

3     ought be trauma informed.

4          THE WITNESS:  Correct.

5          THE COURT:  And I've picked up on that and I

6     wonder --

7          THE WITNESS:  There are --

8          THE COURT:  -- what does it mean and you've told

9     me.  Now how, how are they to be trauma informed?

10          THE WITNESS:  There are various curriculas that

11     have been developed that work with persons in different

12     positions, whether it be a school teacher, a social worker,

13     a police officer, to, to help train them how to identify

14     what situations present that might suggest a child is

15     particularly vulnerable.

16          THE COURT:  Now back to my more general question.

17     You were going on and it's very helpful.

18          So what else should we be doing?

19          THE WITNESS:  We should have schools -- you want

20     the whole system or you're looking at --

21          THE COURT:  I'm interested in your answer, and I'm

22     not trying to cabin it in.  You go ahead.

23          THE WITNESS:  I mean, all of this requires more

24     money.  So we start with that, reallocation of money.

25     Correct?  So we're talking about teachers really have the

1    educational background and training.  They're being asked to

2    do not just, you know, academic subjects, they're being

3    asked to fulfill a lot of responsibilities.  They should be,

4    I use this term trauma informed, they need to be able to

5    again look for signs that children are having behavioral

6    health issues, having situations that warrant intervening at

7    an early age in that child and family's life.

8          We should be doing whatever we can to offer

9    supports in home in my view to families, to kin, to give

10   them what they need to avoid as much as we can the risk of

11   abuse or neglect.

12         We should be providing in home supports.  It's much

13   cheaper to do that in the long run.

14         **THE COURT:**  As opposed to foster care.

15         **THE WITNESS:**  As opposed to removing children.

16         **THE COURT:**  Removing.  Yes.

17         **THE WITNESS:**  And obviously if the state chooses to

18   intervene in any way, we should be doing what we can to,

19   with the resources we have to improve the situation for kids

20   and families.

21         **THE COURT:**  Now, my question was well meant, even

22   outside the legal framework, and we're going to let Mr.

23   Gleason and Mr. Collins, if he has questions, ask you the

24   questions.  But if other things occur to you, you may

25   interject them, that we should be doing.

1          Go ahead, Mr. Gleason.

2   **Q**   In the area of foster children and psychotropic drugs

3   there's been issues raised in this litigation.  Can you tell

4   us, along the lines of what you've been speaking to the

5   Court about, how you believe the psychotropic drug issue

6   that affects foster children should be addressed?

7          **MR. KLIBANER:**  Objection.

8          **MR. COLLINS:**  Objection, your Honor.

9          **THE COURT:**  Now, this, I mean, I may have invited

10  this, but this seems to go beyond the agreement here.

11         **MR. GLEASON:**  Well, I can go through it because

12  she's been involved in this, your Honor.  I can ask her what

13  that involvement has been.  That's, that's --

14         **THE COURT:**  Well, now, now we've got her counsel

15  objecting.  And so, I've been operating in a manner that is

16  comfortable for me seeking to get information, but without

17  doing violence, at least in the eyes of her counsel, to your

18  agreement.  It's not that I reject Mr. Collins' view, but I

19  have in my own mind a mechanism for getting that more fully

20  briefed and considering it.  So I wanted to use the time

21  this morning.  But where her counsel objects, I'm going to

22  sustain it.  You try to stay within the agreement.

23         **MR. GLEASON:**  Fair enough.

24  **Q**   Let me return to the comprehensive plan which is part of

25  the statute that we've been talking about.

1    A    Yes.

2    Q    Now, that originally according to the statute, there was

3    a deadline for producing that plan; is that not correct?

4    A    It was in the original statute, yes.

5    Q    Was that -- I think it's -- I'll get the exact date

6    here.  April, is it, 2010?  June 2010?  Was that the

7    deadline you were originally working with?

8    A    The statute provided for June 30th of 2010.

9    Q    Now, that comprehensive plan has not yet come to

10   fruition, has it?  Am I correct?

11   A    As a comprehensive plan, no.

12   Q    Okay.  And from your annual reports, I believe you have

13   stated in the earlier ones that you expected and gave

14   various times when you expected it could be done by, and as

15   of the 2012 report I don't see it mentioned there.  Is the

16   comprehensive plan still on your agenda?

17   A    I'm aware of the responsibility of the office to

18   generate a comprehensive plan.  Given the other core

19   responsibilities of the office and given the limited

20   resources we have, I have not been able to produce that

21   plan.

22   Q    And does your answer suggest that in some areas you've

23   been able to come up with what would be in a comprehensive

24   plan but you simply haven't gotten to the whole, the whole

25   piece?

1     **MR. COLLINS:**  Objection, your Honor.

2     **THE COURT:**  Well, I don't understand that question.

3 **Q**  The comprehensive plan covers some 24 items, does it

4 not?

5 A  It does.

6     **MR. COLLINS:**  Objection, your Honor.

7 A  With subparts.

8 **Q**  In legislative terms.  Yes.  Okay.

9     **MR. COLLINS:**  Objection, your Honor.

10     **THE COURT:**  Well, the documents speak for

11 themselves, and the documents are in evidence before me.

12 **Q**  Are there any of the --

13     **THE COURT:**  Now you can, now you can put a

14 question.

15 **Q**  Are there any of the items listed by legislation as

16 components of the comprehensive plan developed in your mind

17 to the point where they could be published as a subpart of

18 the confidential plan, for example?  I'm sorry,

19 comprehensive plan.

20     I mean, my question is are we at the stage where

21 any portion of the comprehensive plan has reached the area,

22 level where you believe it can be published?

23 A  I don't believe that at this point in time given the

24 wording of the legislation, what we've been asked to do,

25 that I can respond, that I could publish something that

1    would totally satisfy the requirement in the legislation.

2    Q    The various components?

3    A    This is a moving system.  That's part of the problem.

4    Any report that we do, or any report that we have drafted,

5    the system is changing.  And if we focus on one part, try to

6    integrate it with another and find that we need to go back

7    to the first part to rewrite.

8         So, no, I guess the bottom line would be -- I would

9    have to go through each of the 24 points to see if I think I

10   had anything yet that I would put out there.  I'm happy to

11   do that if you would like me to do that.

12   Q    Well, I suggested a few of them to you.  As to any of

13   those, and I can go back over them if you want, is there

14   anything publishable at this point?  Item 8?

15   A    Well, we put out, we put out in our annual reports and

16   on our website some responses to some of these areas that

17   are included in the comprehensive plan.

18   Q    In short, I think I'm hearing you to say that you don't

19   think there will ever be a comprehensive plan, at least as

20   envisioned by the legislation?

21        MR. COLLINS:  Objection, your Honor.

22        THE COURT:  No, overruled.

23   A    I remain optimistic that at some point in time there may

24   be a comprehensive plan that addresses all of these

25   elements.  I remain optimistic.

1    Q    And it would take more money, I take it, than your

2    office is in control of to come up with that plan in the

3    foreseeable future?

4              MR. KLIBANER:  Objection.

5              MR. COLLINS:  Objection.

6              THE COURT:  Well, that's her counsel objecting.

7    Sustained.

8    Q    Do you anticipate --

9              THE COURT:  Although, although I will tell you,

10   counsel, that's the conclusion I'm drawing.  But that's

11   neither here nor there.

12             Go ahead, Mr. Gleason.

13             And that's based upon the testimony she's been

14   allowed to give.

15   Q    Let me turn to the issue of psychotropic drugs in the

16   context of DCF charges, children in DCF's custody.

17             Are you familiar with the Rogers Working Group?

18   A    Yes.

19   Q    And you had a role in -- did you have a role in forming

20   that group.

21   A    Yes.

22   Q    And describe for us what your role was and what that

23   group was created for, for what purpose?

24   A    Massachusetts is one of only two states that involves

25   the courts in the authorization of psychotropic medications

1    for children.  In Massachusetts we have something called the

2    Rogers Process that has been in existence for close to 25

3    years that requires court authorization for antipsychotic

4    medication for children in the custody of the Commonwealth,

5    in the custody of DCF.

6         The working group was formed to take a look at that

7    process and to see if we felt that it was serving its

8    purpose and to, to decide whether we felt that we would

9    recommend changing that process in some way.

10   Q   All right.  And what did the group consist of, either

11   conceptually or by name, if you can help us, in terms of the

12   talent that was brought to bear in that group.

13   A   The group consisted of representatives from DCF, from

14   the Office of the Child Advocate, from the research

15   community involved with this issue, Tufts researchers.  It

16   involved representative from CPCS.  Someone from the

17   juvenile court came later on.  DMH.

18        I'm thinking, counsel.  We had a nurse who had been

19   involved with the Children's Hospital unit dealing with

20   psychotropic medications.  And I think, I believe that's it.

21   Q   And what was your role with the group?

22   A   I was the convenor of the group.

23   Q   Okay.  And how did the group go about examining the

24   process you've described?

25   A   We actually were fortunate enough to have a group of

1    Northeastern law students make themselves available.  We

2    thought it would be useful to conduct research among people

3    who were involved with the Rogers Process to collect

4    information about the legislative regulatory background for

5    Rogers and to formulate a report based on those activities.

6    **Q**   And did you get such a report?

7    A    We did.

8    **Q**   Did it reach conclusions or make recommendations?

9    A    The report is posted on our website.  It's available for

10   people to read, so it's public information.  I believe it's

11   fair to say that among -- there are over a hundred

12   interviews conducted with people around the Commonwealth and

13   there was not a consensus as to what should be done with the

14   Rogers Process.  We thought it was a lot of useful

15   information.  We being the Office of the Child Advocate,

16   with the support of the Rogers group, felt that it would be

17   useful to take that a step further.  So we were able to

18   obtain a limited amount of court improvement program money

19   to have the Tufts researchers try to refine this information

20   or further analyze this information to continue our

21   discussion about the efficacy of the Rogers process.

22            **THE COURT:**  This is going to reveal my own

23   ignorance.  I guess I'm not clear, and maybe you could give

24   me just sort of some general concerns here.

25            I'm not clear what's wrong with the Rogers process.

1    In any process it can be too slow, it can be too expensive,

2    it can be redundant.  It can, it's conceivable things could

3    operate under the radar without the proper people doing the

4    proper things.  People could do things simply by rote and

5    check boxes.  I don't infer any of those things.  But as it

6    has been described to me in this litigation, it seemed to me

7    like it was a pretty good process, because of the powerful

8    nature have of these drugs, the involvement of various

9    actors.  I guess my untutored reaction was that that served

10   the public good.

11           Now, that's an unfocused comment.  But just try to

12   help me out with the major concerns of the Rogers process

13   review.  If I'm making sense even.

14           **THE WITNESS:**  Well, your Honor, I served as a

15   juvenile court judge for 13 years and was involved with the

16   Rogers process as it involved children.  And as a judge I

17   was probably most uncomfortable making, authorizing

18   medications for children because of the inadequacy of the

19   training I felt I had received as a judge and because of the

20   variable quality of the guardians ad litem who were

21   investigating and making recommendations to the Court.

22           Also, I felt that children, that antipsychotics was

23   certainly an appropriate focus when antipsychotics first

24   started getting used, but that we needed to be looking more

25   broadly at the issue of medications for children of which

1    antipsychotics were a small piece.  And in my experience as

2    a judge, I felt that the process was cumbersome.  I felt

3    that it was cumbersome in the sense that it often -- strike

4    often.  I'm sorry.  It sometimes led to delays in treatment

5    of children with appropriate medications, or it led perhaps

6    to physicians changing their opinion about what would be the

7    best medications to avoid the Rogers process, or it led to a

8    focus on a narrow class of medications as opposed to looking

9    at the full picture of what medications the child was

10   receiving in the context of a comprehensive behavioral

11   health treatment plan.

12           So, it felt at times like we have this very, sort

13   of on paper great process for looking at a particular class

14   of medications for kids, but we were missing the child, we

15   were missing the behavior, we were missing, and it just felt

16   like that had been adopted from adult, an adult incompetent

17   patient and had been transferred to children in state

18   custody by DCF regulation, and that it was time to take a

19   look at it given that there's been a proliferation of

20   psychotropic medication usage, and this only dealt with the

21   antipsychotics.

22           **THE COURT:**  Thank you.  Go ahead, Mr. Gleason.

23   **Q**   You mentioned the Northeastern study which we have here

24   as Exhibit IK.  And did you mention the Tufts study to me?

25   I think you did.

1    A    Yes.

2    **Q**    Let me show you that as well.

3         And if I understand it these are both studies that

4    your group initiated and were performed by academic,

5    academic students at these universities and professors.  Is

6    that what happened?

7    A    The Northeastern study was part of this, conducted as

8    part of the legal skills in social context curriculum in

9    Northeastern law schools.  So, yes, this was done by

10   Northeastern under, in conjunction with our office and was

11   consistent with, as far as I know, with the way their, you

12   know, program works for doing research and writing reports.

13              **MR. GLEASON:**  Okay.  So I would offer the

14   Northeastern study IK as the next exhibit.  What's the

15   number?

16              **THE COURT:**  Any objection?

17              **MR. GLEASON:**  Next exhibit number.

18              **MR. COLLINS:**  I'm sorry, which, which one are we

19   talking about?

20              **THE COURT:**  IK --

21              **MR. GLEASON:**  IK.

22              **THE COURT:**  -- is being offered, and if received it

23   would be Exhibit --

24              **MR. COLLINS:**  Your Honor, I would like to --

25              **THE COURT:**  -- 1089.

1          MR. COLLINS:  I would like to have an opportunity

2     to look at this before making a decision as to whether we

3     agree that it comes into evidence.  So, yes, there's an

4     objection and we would like to leave it as Exhibit IK.

5          THE COURT:  Well, it's premarked.

6          MR. COLLINS:  It's premarked with letters.

7          THE COURT:  Yes, it is.  Premarked with letters.

8          MR. COLLINS:  For identification.

9          THE COURT:  Yes, for identification.

10         MR. COLLINS:  Your Honor --

11         THE COURT:  I'm going to admit it subject to your

12    moving to strike it once you've looked it over.  It seems to

13    me it comes in as a government report but --

14         MR. COLLINS:  From Northeastern?

15         THE COURT:  I know it's from Northeastern.  But

16    we're in the federal courts.  Look at 803(8)(c), I think it

17    is, and the, the gloss that's given under that rule.  Look

18    at Beach Aircraft v. Rainey.

19         MR. COLLINS:  Certainly, your Honor.  And I will

20    object to the record as well that there's totem pole hearsay

21    I'm sure within this document.  Out of the 250,000 plus

22    pages that are in evidence in this case, I just have not had

23    a chance to review this one.

24         THE COURT:  Right.

25         MR. COLLINS:  Thank you.

1            THE COURT:  Nor have I reviewed them all myself

2    yet.

3            It's admitted, Exhibit 1089 in evidence.

4            (Exhibit marked in evidence.)

5    Q   And exhibit for identification CG is the Tufts study; is

6    that right?  Tufts report.

7    A   Yes.

8            MR. GLEASON:  I would offers that as the next

9    exhibit.

10           THE COURT:  Same objection?

11           MR. COLLINS:  Same objection, your Honor.

12           THE COURT:  Overruled.  1090 in evidence.

13           (Exhibit marked in evidence.)

14   Q   Now, did the Rogers group that you worked with also

15   discuss the GAO report of December 2011.

16           I'll show you the report?

17   A   No, I mean, I know you're with --

18   Q   It's Exhibit 16.

19   A   The question again, counsel, I'm sorry.

20   Q   Do you recall this report I've shown you, Exhibit 16?

21   A   Yes.

22   Q   And did recommendations from this report appear in one

23   of your annual reports?  I'm sorry.  Did recommendations

24   from your study appear in your annual report of 2012?

25   A   Yes.

1    Q    Do you have a copy of that?  I can give you a copy and

2    just cite to where these recommendations appear in

3    Exhibit 691.

4          MR. COLLINS:  I'm sorry, what document?  I've lost

5    track.

6          (Whereupon counsel conferred.)

7    Q    Page 13.

8    A    Your question, counsel?

9    Q    Were these recommendation that the Rogers group made,

10   the ones at the bottom the recommendations were that the

11   Child Advocate made in connection with the Rogers report,

12   the Rogers process?

13   A    These were recommendations I made.

14   Q    Okay.  Were they made through the Rogers report process

15   or made on your own?  The Rogers group, did they consider

16   these and endorse them or were they just your own?

17   A    They were my recommendations.

18   Q    Okay.  And so you're recommending that judges no longer

19   be required to authorized the administration of

20   antipsychotic medications for children in state custody?

21   A    That was correct, as part of the recommendation package,

22   yes.

23   Q    And that there be a tiered system of oversight as the

24   second bullet indicates?

25   A    Yes.

1    **Q**    By a team with expertise in child and adolescent

2    behavioral health to be established.  And that the data

3    analysis, the third bullet, on a continuous quality

4    improvement model should be used to monitor behavioral

5    health treatment and outcomes for children in state custody;

6    is that correct?

7    A    Correct.

8    **Q**    And do you know the status of those recommendations at

9    this point in terms of whether they're being acted upon in

10    any way or worked on?

11    A    Yes, I do.  The Commissioner of DCF and I co-chair a

12    group that is attempting to flesh out more detailed aspects

13    of these recommendations.

14    **Q**    And this is a group of professionals or people from

15    within DCF only, or what are you talking about in terms of

16    the next steps to be taken with respect to these

17    recommendations?

18    A    As a result of the federal government -- let me strike

19    that.

20            Since these recommendations were made, the

21    Commissioner and I have convened a group comprised of

22    persons from the Office of the Child Advocate, from DCF,

23    from DMH, from EOHHS, from Medicaid, to, as they say,

24    attempt to push forward, in line with these recommendations,

25    of improving, what I would characterize as improving our

1    system in Massachusetts.

2    **Q**    Through, through regulatory requirements, internal best

3    practices?  What's the mechanism for improving those --

4    A    We're considering all options as to whether this should

5    be done through policy, through regulation, or some other,

6    through statute.

7    **Q**    And the group you've just described, how long have they

8    been in existence consulting on this project?

9    A    This group first started meeting, it's kind of shifted a

10   little bit, but we starred meeting in, most of us, in

11   February of '12.

12   **Q**    February of '12.

13   A    February of 2012.  I made my recommendations to the

14   Secretary in January of '12.

15   **Q**    All right.  So, it's been roughly a year?

16   A    Yes.

17   **Q**    Okay.  And --

18              **THE COURT:**  Are you about done with this witness.

19              **MR. GLEASON:**  I'm close, yes.

20   **Q**    And has there been any consensus formed yet, or is it

21   still in the discussion phase?

22   A    I believe we're making good progress, counsel.

23   **Q**    Do you anticipate issuing something at some point that

24   would be best practices or requirements in this area?

25   A    I think we're, I think we're taking good steps toward

1    coming up with something that will better serve the children

2    in custody in the Commonwealth.

3    **Q**    And just one last area.  Have you been keeping the

4    governor apprised of the question about the requirement of

5    coming up with a comprehensive plan and your concerns about

6    doing so?

7                   **MR. KLIBANER:**  Objection.

8                   **THE COURT:**  Sustained.  You think that's outside

9    the agreement?

10                   **MR. KLIBANER:**  I believe so, because this is about

11    communications with the governor and that was not part of

12    the agreement.

13                   **MR. GLEASON:**  She's reporting --

14                   **THE COURT:**  I'm going to infer that she has.  But

15    sustained.

16                   **MR. GLEASON:**  All right.  No further questions,

17    your Honor.

18                   **THE COURT:**  All right.  Now, not just in light of

19    the hour, but you're in a difficult position, Mr. Collins,

20    because you've got your general objection.  So we're going

21    to let her step down.  We're not going to reconvene until

22    the 28th anyway.  The way we're going to proceed with her

23    is, if you, if you want to call her, you can call her as

24    part of your case when we get there, if we have to, if you

25    want to recall her.  And by that time one imagines I will

```
 1      have ruled on, if you want to press this, what I've called

 2      statutory or institutional objection, then fine, I will have

 3      ruled on it.  And if I overrule you, you may recall her.

 4              She may step down.

 5          MR. COLLINS:  I'm sorry, your Honor, a point of

 6      clarification.

 7              THE COURT:  Yes.

 8          MR. COLLINS:  Are you saying I don't have the

 9      opportunity to cross-examine the witness?

10              THE COURT:  Oh, I'm not at all.

11          MR. COLLINS:  Okay.

12              THE COURT:  Of course if you cross-examine her

13      perhaps you've waived your objection, haven't you?  Because

14      either your in the awkward -- I'm trying to spare you this

15      awkward position.  Either you are going to seek to impugn

16      the Child Advocate of the Commonwealth of Massachusetts and

17      say that those things that she has testified to ought not be

18      believed -- I rather think that that's unlikely -- or you're

19      going to try, as you have with other witnesses, to introduce

20      things that put in context some of the things she has said

21      in a manner that you think benefits the defense.  It would

22      be improvident of me to force you to do the first, but I

23      don't think that's your plan, and if you try to do the

24      second, you are offending against the very institutional

25      objection you have made.  So, you either are going to waive
```

1    that objection and I'll get her full testimony, or you're

2    going to press the objection and we'll see how I come out.

3    I'm just giving you time to do it.

4             All right, you may step town.

5             THE WITNESS:  Thank you, your Honor.

6             (Whereupon the witness stepped down.)

7             THE COURT:  Now, I have reviewed the deposition of

8    Marilyn Chase taken Monday, May 21st, 2012.

9             I've reviewed the deposition of Olga I. Roche taken

10   May 23rd, 2012.

11            I have reviewed the deposition of, it's actually a

12   30(b)(6) deposition of Mary Gambon, taken Thursday,

13   January 5th, 2012.

14            The total elapsed time at now the end of ten days

15   of testimony is plaintiffs have used up five, days, one

16   hour, 15 minutes; the defense has used up four days, two

17   hour, 15 minutes.

18            We'll resume at 9:00 a.m. on the 28th of February

19   and go for two more days, at which time, though I'm not

20   ordering it, I really do expect the plaintiffs to be ready

21   to rest.

22            All right.  We'll recess until that time.  Thank

23   you for coming in today.

24            We'll recess.

25            THE CLERK:  All rise.

1        (Adjournment.)

2

3

4                **C E R T I F I C A T E**

5

6

7        I, Donald E. Womack, Official Court Reporter for

8    the United States District Court for the District of

9    Massachusetts, do hereby certify that the foregoing pages

10   are a true and accurate transcription of my shorthand notes

11   taken in the aforementioned matter to the best of my skill

12   and ability.

13

14

15

16

17        /S/ DONALD E. WOMACK 5-7-2013
         _____
18              DONALD E. WOMACK
              Official Court Reporter
19               P.O. Box 51062
          Boston, Massachusetts 02205-1062
20             womack@megatran.com

21

22

23

24

25