```
1                  UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS
2
                                       Civil Action
3                                      No. 10-30073-WGY

4    * * * * * * * * * * * * * * * * * * * * *
                                             *
5    CONNOR B., by his next friend, ROCHELLE *
     VIGURS, et al., individually and on behalf *
6    of all others similarly situated,        *
                                             *
7            Plaintiffs,                      *
                                             *
                                             *  BENCH TRIAL
8    v.                                       *  (Volume 11)
                                             *
9    DEVAL L. PATRICK, in his official capacity *
     as Governor of the Commonwealth          *
10   of Massachusetts, et al.,                *
                                             *
11           Defendants.                      *
                                             *
12   * * * * * * * * * * * * * * * * * * * * *

13           BEFORE:  The Honorable William G. Young,
                            District Judge
14   APPEARANCES:

15           NUTTER, McCLENNEN & FISH, LLP (By Daniel J.
         Gleason, Esq. and Jonathan D. Persky, Esq.), World
16       Trade Center West, 155 Seaport Boulevard, Boston,
         Massachusetts 02210-2699
17               - and -
             CHILDREN'S RIGHTS (By Sara M. Bartosz,
18       Esq., Laurence D. Borten, Esq., Sarah Russo, Esq.
         Rachel Brodin, Nili, Esq. and Jessica E. Polansky,
19       Esq.), 330 Seventh Avenue, Fourth Floor, New York,
         New York 10001, on behalf of the Plaintiffs
20
             OFFICE OF THE MASSACHUSETTS ATTORNEY
21       GENERAL (By Liza Tran, Jason B. Barshak and
         Jeffrey T. Collins, Assistant Attorneys General),
22       One Ashburton Place, Boston, Massachusetts 02108,
         on behalf of the Defendants
23
                                     1 Courthouse Way
24                                   Boston, Massachusetts

25                                   February 28, 2013
```

1                        **I N D E X**

2

3    **WITNESS:**              **DIRECT   CROSS    REDIRECT   RECROSS**

4    CATHY CRABTREE

5      By Ms. Bartosz    7

6                                              **FOR      IN**

7      **EXHIBITS:**                           **I.D.    EVID.**

8

9        1091 NCSL Pamphlet  . . . . . . . . . . .60

10       1092 NCRCOI Document  . . . . . . . . . .92

11       1093 Child Welfare Workforce Survey . . . . 102

12       1094 NRC Hunter College Document  . . . . . 103

13       1095 NCSL Document  . . . . . . . . . . . 119

14

15

16

17

18

19

20

21

22

23

24

25

1          THE CLERK:  All rise.  The United States District

2     Court is now in session, you may be seated.

3          THE COURT:  Good morning, counsel.

4          MS. BARTOSZ:  Good morning, your Honor.

5          THE COURT:  And you may proceed.

6          MS. BARTOSZ:  Thank you, Judge.  Before we call our

7     witness for the day, Judge, can I address a couple of

8     housekeeping matters?

9          THE COURT:  Briefly.

10          MS. BARTOSZ:  Yes.  Judge, first of all, plaintiffs

11     have proffered to the Court an additional seven depositions

12     that have been designated and I think we've got them all

13     right here on the table.

14          THE COURT:  That's in addition to what the clerk

15     brought in this morning?

16          THE CLERK:  No, I brought them out back to you.

17          MS. BARTOSZ:  Same set.

18          THE COURT:  Okay.  I already have them.

19          MS. BARTOSZ:  Thank you, Judge.

20          THE COURT:  Which does not mean that I have

21     reviewed them.  I mean, as is obvious, I'm putting it on the

22     record when I've reviewed them.  So I'm behind.  That's not

23     said in any sense critically, but I have a fair amount of

24     work to do and I'm doing it as best I can.

25          MS. BARTOSZ:  Thank you, your Honor.  I just wanted

1    to let you know where we were at there, and I think that

2    leaves two other transcripts that we'll be giving to the

3    Court perhaps even by week's end or into early next week.

4    But we're about finished between counsel working this out at

5    least proffering --

6              **THE COURT:**  Fine.

7              **MS. BARTOSZ:**  -- the designations to the Court.

8              One other matter I just wanted to quickly raise is

9    there were a number of contested exhibits on plaintiffs'

10   trial exhibit list to go through still, and I'm trying to

11   work with defense counsel on a process to bring those to the

12   Court for ruling where it will be necessary.  We're trying

13   to wean those down to a number where it's most efficient and

14   see if we can't come to agreement on perhaps some of these

15   records.  But I just wanted to address with the Court.  My

16   sense has been 9:00 to 1:00 is really live witness testimony

17   and we ought to --

18             **THE COURT:**  That's exactly how I want to handle it

19   and that is the time that counts against the parties, not

20   against them, that's the time they have.

21             Here's how we ought to do that.  I'm hopeful you'll

22   be able to rest by tomorrow.  I don't require it, but I'm

23   hopeful.  And before we stop tomorrow I will say, well, how

24   much more and what is it.  Is it anecdotal, is it an

25   essential element.  And you'll tell me.  Or maybe you'll

1    rest.  Then our deal was that because I'm now going to go

2    off and try some jury cases that I would not press the

3    defendants for a motion, though I anticipate they'll make a

4    motion, at least in whole or in part.  That all was working

5    out logically in my mind because I just acknowledged, and I

6    acknowledge again, I have a great deal of careful reading to

7    do and I'm trying to do it carefully.

8           Eventually the defendants will make their motion,

9    in writing.  You get the usual time to respond but you know

10   it's coming.  And I've said what I've said.  Somewhere along

11   there, and I appreciate your cooperating in the processes of

12   litigation, you work out what's the contested exhibit list.

13   Get me those exhibits with as brief but cogent objections,

14   and I don't want you felling trees, to each exhibit.  Maybe

15   I will be able to rule as I have on the depositions.  You've

16   done it just right.  In fact, I mean, most of the foundation

17   objections I have overruled in the sense they're not crossed

18   out, but a few hearsay I've crossed out.  But you've done

19   what I've asked.  Do the same thing on exhibits.  I'll rule.

20   To the extent I need oral argument, we'll just do it in the

21   afternoon and bang our way through those exhibits and then

22   the record will be clear.

23           All right, I think --

24           **MS. BARTOSZ:**  Thank you, Judge.

25           **THE COURT:**  And then we'll get to the arguments on

1    the motion, that will be resolved, and we'll see where we

2    are, and if we're going to reconvene we'll schedule that.

3    So that's how I see the thing working.

4        MS. BARTOSZ:  Thank you, Judge.  And for purposes

5    of plaintiffs saying the words we rest, I just wanted to

6    address this, because with contested exhibits or perhaps

7    depositions still coming in there's some little window there

8    of trying to see if there's some piece of evidence we may

9    want to think about.  And so, we could be in a position to

10   rest in terms of further live witnesses but subject to some

11   rulings that were made.

12       THE COURT:  I'm perfectly, I'm perfectly accepting

13   of that.

14       MS. BARTOSZ:  Okay.

15       THE COURT:  That's how we've, for efficiency sake,

16   justice first, but efficiency is part of the justice, you

17   have submitted significant evidence by way of these

18   depositions.  So, of course.  And also by way of exhibit,

19   and you may wish to rely upon it in argument.  So, no one's

20   going to be sandbagged here.

21       All right, ready to proceed?

22       MS. BARTOSZ:  I am, Judge, thank you.

23       THE COURT:  Please.

24       MS. BARTOSZ:  Your Honor, plaintiffs call Cathy

25   Crabtree.

1          **THE COURT:**  She may be called.

2          **THE CLERK:**  Can you please remain standing and

3    raise your right hand.

4          Do you solemnly swear the testimony you are about

5    to make in the matter now pending before this Court will be

6    the truth, the whole truth, and nothing but the truth, so

7    help you God?

8          **THE WITNESS:**  I do.

9          **THE CLERK:**  You can be seated.

10                    CATHY CRABTREE

11              **DIRECT EXAMINATION**

12   BY MS. BARTOSZ

13   **Q**   Good morning, Ms. Crabtree.  Could you state your full

14   name for the record, please?

15   A    Cathy Crabtree.

16          **MS. BARTOSZ:**  Before we proceed, your Honor, I will

17   proffer to the Court Ms. Crabtree's report which is marked

18   as Exhibit JB.  I hope I said it right.  JB, as in boy.

19   **Q**   Ms. Crabtree, where are you currently employed?

20   A    I'm employed by Auburn University at Montgomery,

21   Montgomery, Alabama, the Center for Government and Public

22   Affairs.

23   **Q**   Do you reside in Montgomery, Alabama?

24   A    Actually outside of Montgomery in Wetumpka, Alabama.

25   **Q**   Are you employed within a particular unit or office of

1    Auburn University?

2    A    The Division of Outreach, and the Division of Outreach

3    has several centers that do public work.   Mine is the Center

4    for Government and Public Affairs.

5    Q    Could you describe in general terms what your duties and

6    responsibilities are in your current position with Auburn

7    University?

8    A    I'm a senior project lead for the center.   And that in

9    very simple form means that I'm doing consulting work for

10    public agencies and nonprofits around the state of Alabama,

11    and that includes organizational reform, performance

12    management.   I'm outbased three days a week as an employee

13    at the senate pro tem of our legislature to institute a

14    streamlining government initiative that he has.

15    Q    Generally, can you describe what your role is in the

16    streamlining government project with the Alabama

17    legislature?

18    A    Streamlining government is an effort by the legislature

19    to find cost efficiencies and work efficiencies across

20    various state agencies.

21    Q    To whom do you report on the project?

22    A    Senator Marsh.

23    Q    And Senator Marsh is the president pro tem?

24    A    Yes.

25    Q    For how long have you been employed in the Center for

1    Government and Public Affairs?

2    A    A total of two and-a-half years.

3    Q    What other types of public agencies have you consulted

4    with during this two and-a-half years?

5    A    The Alabama Medicaid Agency, the Department of Youth

6    Services, the Alabama Department of Mental Health, the

7    Alabama Department of Public Health, the Alabama Department

8    of Human Resources.  I'm trying to remember, there are so

9    many.  Several nonprofits.  Child, the Alabama Child Abuse

10   and Neglect Prevention Agency.  Those are a few.

11   Q    Thank you.

12        I would like to walk the Court, hopefully fairly

13   efficiently, through your background, Ms. Crabtree.

14        Could we start with your education.  And can you

15   describe your education, beginning with your undergraduate

16   level work?

17   A    Undergraduate was in education.  I have a BS in

18   education, specifically in social sciences and secondary

19   education.

20   Q    From what school did you attain that degree?

21   A    University of Tennessee, Knoxville.

22   Q    Did you pursue any master's level work?

23   A    Yes.  I have a master's in educational psychology from

24   the University of Tennessee, and part of that educational

25   psychology degree was developmental psychology.

1  **Q**   When did you attain your master's?

2  A   1982.

3  **Q**   Can you describe for the Court your first employment

4  following attainment of your undergraduate degree from the

5  University of Tennessee?

6  A   My first job was as a case manager in the field working

7  with children and families in a program called Youth

8  Opportunities Unlimited which helped young people,

9  adolescents, to enter the workforce as part of their

10  involvement with the juvenile court.

11  **Q**   Generally, what was the nature of your work there?

12  A   In?

13  **Q**   In that position.

14  A   Oh, in that position?  I traveled a 15 county area

15  working with children to connect them with employers and

16  work with their families on evaluating their situation so

17  they didn't end up returning to the juvenile court.

18  **Q**   For how long did you work there?

19  A   Oh, approximately -- that was really a long time ago.

20  Probably almost two years, I think.

21  **Q**   Do you recall what your next employment was?

22  A   Well, I worked for Cherokee Mental Health Center -- now

23  it's called Cherokee Systems, I think.  It's a different

24  name.  -- as a community liaison.  Very similar to the first

25  job in that we worked with the field as case managers with

1    families and children, did home visits, worked with the

2    schools, children who had problems in school and had had

3    some involvement with the juvenile courts.

4    **Q**    Did you personally carry a caseload in that position?

5    A    Yes, I did.

6    **Q**    And your clients were?

7    A    Children and families.

8    **Q**    For how long did you work at Cherokee?

9    A    I want to say 1979 to 1982 or '3.

10   **Q**    And what did you do next in terms of your employment

11   progression?

12   A    After I finished my master's, I was licensed as a

13   psychological examiner and did psychological testing in a

14   private practice, as well as for a school system, did

15   psychological testing in schools, and then moved from there

16   to a private psychiatric hospital where I worked doing

17   assessments with, adults assessments, abuse disorders.

18   **Q**    Can you describe what it means to be licensed as a

19   psychological examiner, what's involved in that?

20   A    A psychological examiner, in Tennessee at that time, is

21   licensed to do testing and counseling with families and

22   children, which is what I did.  And the testing that's done

23   can be school testing, MMPI profiles, the Rorschach Inkblot,

24   personality profiles and tests.  Those are some examples.

25   **Q**    Thank you.

1              There came a time when you worked as Director of

2    Mental Health Programs for Peninsula Lighthouse?

3    A    Yes.

4    Q    What was your position there and generally what were

5    your duties and responsibilities?

6    A    Peninsula Lighthouse is an outpatient center that treats

7    mental illness and alcohol assessments/abuse problems for

8    adults, and I worked with the adult population, helped to

9    set up their mental health program there.

10   Q    And what was your next employment?

11   A    The Director of Children's Services for the East

12   Tennessee Community Health Agency.  That has been renamed

13   since.  And was Director of Children's Services for them.

14   We did assessments and worked with the child welfare system

15   over a 15 county area again, to do the preliminary work for

16   children to either help divert them from foster care or to

17   work with them and the family if they came into care.

18   Q    You say you worked with the public child welfare agency.

19   What agency was that?

20   A    At the time it was, it was called DHS, Department of

21   Human Services.

22   Q    In the state of Tennessee?

23   A    Yes.

24   Q    How many employees were under your management there?

25   A    I would need to look at the actual numbers to be

1    perfectly accurate.  Probably about 35 to 40.  I'm guessing.

2         THE COURT:  Well, when you use the word guess it's

3    a red flag in court because I'm not permitted to guess.  I

4    have to make findings based on a preponderance of the

5    evidence.  And it isn't semantic.  So if your best

6    estimate is around --

7         THE WITNESS:  May I?

8         THE COURT:  You can.

9         THE WITNESS:  Thank you, your Honor.

10         THE COURT:  I'm not trying to put words in your

11    mouth.

12         THE WITNESS:  Right.

13         THE COURT:  But if you're qualifying -- and that's

14    in your testimony.  If your best estimate or your best

15    memory is something, you're permitted to testify to that and

16    I take that into account in how much weight I'm going to

17    give it.  But if you say you're guessing, I can guess about

18    anything, and it doesn't count for me and I can't let it

19    count for a witness.

20         THE WITNESS:  Okay.  I can estimate.

21         THE COURT:  All right.

22         THE WITNESS:  I can estimate that it was

23    approximately 35 to 40.

24    Q    Thank you.

25         Following your tenure as Director of Children's

1    Services at the East Tennessee Community Health Agency,

2    where was your next employment?

3    A    I was Assistant Commissioner for the Department of

4    Children's Services in Nashville.

5    Q    And was that -- is that Department of Children's

6    Services that you just referred to the statewide child

7    welfare agency in Tennessee?

8    A    It is now.

9    Q    What was it then?

10   A    We created the Department of Children's Services in

11   Tennessee.  It did not exist, and part of, part of my job

12   hiring in was to help create that department.

13   Q    For how long were you Assistant Commissioner for Program

14   Operations?

15   A    From 1995 through, total years, through 2002, 2003.

16   Q    Can you describe for the Court generally what your

17   duties and responsibilities were in that position?

18   A    I was responsible for program operations for the

19   department, for managing foster care, all the child welfare

20   services, adoption, licensing.  We also had juvenile justice

21   programs as part of the department.  The investigations for

22   child protective services.  And we had a front end program

23   to help children avoid custody who had truancy or status

24   offenses, and was responsible for that.

25   Q    Did you have any involvement in budgeting?

1    A   Yes, budgeting, policy and procedure development,

2    ensuring that the department was in line with federal

3    regulations, filing the reports that are necessary for

4    regulations.

5    Q   Approximately how large an organization was the

6    Department of Children Services during your tenure as

7    Assistant Commissioner for Program Operations?

8    A   We had approximately, estimated, your Honor, estimated,

9    close to, at that time, close to 10,000 children in care and

10   approximately 3,500, 4,000 employees.

11   Q   Did there come a time where you accepted a different

12   position within the Tennessee child welfare agency?

13   A   Yes.  I actually was hired away for a six month period

14   to work on a special project for Science Applications

15   International Corporation in Oak Ridge, Tennessee, to look

16   at development of a child perpetrator tracking system, and

17   then returned back to the department as associate, assistant

18   commissioner, excuse me, as compliance commissioner after a

19   lawsuit settlement for child welfare.

20   Q   What was your day-to-day responsibility or set of duties

21   and responsibilities as Assistant Commissioner for

22   Compliance?

23   A   My, my job was to ensure that the plan that we had in

24   place related to the settlement of the lawsuit was

25   implemented by the various functional areas of the

1    department that have pieces of that responsibility.  For

2    example, the training division, the foster care division,

3    child protective services, all had pieces of that settlement

4    that had to be implemented.  We approved contracts out of my

5    office.  We did diversity study approval and arranged all of

6    the meetings that took place between the plaintiffs and the

7    defendant to go over progress in the settlement.

8    Q    When you use the term settlement, are you referring to a

9    private arrangement or was this a court enforceable order?

10   A    It was a court enforceable order.

11   Q    As a result of a lawsuit in which the Tennessee child

12   welfare agency was the defendant?

13   A    Yes.

14   Q    Was that a Children's Rights lawsuit?

15   A    Yes, it was.

16   Q    Brought on behalf of a class, brought on behalf of a

17   class of children?

18   A    Yes, it was.

19   Q    For how long did you work as Assistant Commissioner for

20   Compliance?

21   A    I would estimate a year and-a-half.

22   Q    And what did you do next, professionally?

23   A    I had, I had an opportunity to do private consulting.  I

24   had had that opportunity before but really liked my work at

25   the Department of Children's Services and wasn't really

1    ready to leave.  But the opportunity was very good.  I had

2    always wanted to do that, and so left to do some private

3    consulting work on my own.

4    Q    And what was the nature of that private consulting work?

5    A    I did some work for private providers out of state to

6    really investigate opportunities for them in the area of

7    expanding their business into other, other states that were

8    nearby.

9    Q    And you next then joined Auburn University at the Center

10   for Government and Public Affairs?

11   A    Yes.

12   Q    And you've had two employment tenures there?

13   A    Yes, I have.

14   Q    What happened in between those two tenures?

15   A    The Commissioner at the Department of Mental Health had

16   an associate commissioner that retired and asked if I would

17   be willing to take that on until he retired for about a two

18   year period.  And so I left to do that.  He's a good friend

19   and the work was challenging, it was with children with

20   developmental disabilities, and so I was there for two

21   and-a-half years and then returned back to Auburn to the

22   same position.

23   Q    What was your position with the Alabama Department of

24   Mental Health?

25   A    Associate commissioner.

1    **Q**    To whom did you directly report?

2    A    The commissioner.

3    **Q**    What generally were your day-to-day responsibilities as

4    assistant commissioner?

5    A    I was associate commissioner and I --

6    **Q**    I'm sorry, associate commissioner.

7    A    And I ran the Division of Developmental Disabilities.

8    And at the time we were moving people from institutions to

9    the community and were able to close the last facility in,

10    we were the first state in the South to close all of our

11    institutions for those with developmental disabilities.  All

12    of those folks are now in the community and arranged

13    community services for them.  We did budgeting, protocols,

14    and planning, running of the last institution, took about a

15    year of that time period.

16    **Q**    Was the child welfare agency in Tennessee that you were

17    employed at a designated Title IV-E agency --

18    A    Yes, it was.

19    **Q**    -- for the state?

20    A    Yes, it was.

21    **Q**    And will you share your understanding of what that means

22    to be the designated Title IV-E agency?

23    A    The federal government requires child welfare states to

24    have a designated agency that receives funding for children

25    going into foster care to receive Title IV-E funding.  And

1    in Tennessee that was the Department of Children Services,

2    in Alabama the Department of Human Resources.

3    **Q**    And what is the agency in Massachusetts that has been

4    designated as the IV-E agency?

5    A    The Department of Children and Families.

6    **Q**    Is that the agency that you focused on in this suit?

7    A    Yes, it is.

8    **Q**    During your tenure with Tennessee's child welfare

9    agency, did you have interaction with the federal government

10   and the laws and regulations that applied to a designated

11   IV-E agency?

12   A    Interaction in the sense that we were required to report

13   according to federal regulations, not direct day-to-day

14   interaction.

15   **Q**    Did you become familiar at that time with a process

16   known as a child and family services review?

17   A    Yes, I did.

18   **Q**    And in general can you generally describe what your

19   understanding of that process was or how it operated during

20   your time at the agency in Tennessee?

21   A    The child and family services review actually had its

22   beginnings back in the '90's, and it was a way for the

23   federal government to essentially get, see what they were

24   getting, what they were paying for from the states around

25   the country in terms of performance.  And standards were

1    established, an organization was put together around, coming

2    out to each state, the federal folks would send out a group

3    of people to do what was called the child and family

4    services review of that state.  Each state provided their

5    own needs assessment to the federal government to give them

6    sort of a status where things stood as a preliminary to the

7    actual review that took place.

8          During that time period, I was actually not part of

9    that review at the, at the state office.  I had

10    responsibility for a section of the state, but the actual

11    review itself was handled by the state office.

12    Q    Are you generally familiar, Ms. Crabtree, with the

13    performance outcome measures used by the federal government

14    in the child and family services review process?

15    A    Yes.

16    Q    Prior to your work in this case, Connor B v. Governor

17    Patrick, have you had engagement as an expert with the

18    Children's Rights organization?

19    A    Yes, I have.

20    Q    Can you describe those prior engagements for the Court?

21    A    I did a case record review for Children's Rights in the

22    state of Georgia.  I did a management review in the state of

23    Mississippi, and a management review in the state of

24    Michigan.

25    Q    Did you prepare reports in each one of those

1    engagements?

2    A    Yes, I did.

3    **Q**    Did you provide any testimony as part of, any one or

4    more of those engagements?

5    A    Deposition testimony.

6    **Q**    Did you provide trial testimony in any of those matters?

7    A    No.

8    **Q**    Have you been retained as an expert in any other

9    litigation?

10   A    Yes, I have.

11   **Q**    Can you describe those retentions?

12   A    I was retained by a gentleman in Alberta, Canada, to do

13   a review of their child welfare system, and retained by a

14   law firm in Montana to do a case record review of an

15   individual child welfare case.

16   **Q**    Generally what was involved in the work you performed up

17   in Canada?

18   A    It was similar to the other management reviews that I've

19   done in that we looked at the structure of the organization

20   and how that harmed or didn't harm children coming into

21   care.  It's a little different than in the United States in

22   terms of how they are organized and how their system works.

23   Their core system is quite different.

24   **Q**    Did you submit a report in that matter?

25   A    Yes, I did.

1    **Q**    Did that matter lead to your testifying?

2    A    No.

3    **Q**    Did you provide testimony in the Montana engagement?

4    A    Deposition testimony.

5    **Q**    Any court testimony?

6    A    No.

7    **Q**    Ms. Crabtree, can you describe associations or

8    affiliations you've had with professional organizations

9    during your career in the child welfare field?

10   A    Professional organizations.  I belong -- current?  I'm

11   sorry, excuse me, current or --

12   **Q**    Currently.

13   A    Currently.

14   **Q**    Or if you remember some -- over the last, let's say over

15   the last decade.

16   A    The National Association of State Directors for

17   Disability Services.  I belong to the American Public Human

18   Services Association.  I don't think that's on my current --

19   the Child Death Review Team in Alabama.  I was appointed by

20   the governor to serve on that team.

21          **MR. COLLINS:**  Objection, your Honor; move to

22   strike.  None of these relate back to matters in the report.

23          **MS. BARTOSZ:**  It's all in the curriculum vitae

24   attached as an exhibit to the report, your Honor.

25          **THE COURT:**  If it's set forth there, she's just

1    recounting it.  Overruled.

2          **MR. COLLINS:**  Your Honor, I don't know if you want

3    to hear argument on what's actually in the report but --

4          **THE COURT:**  Well, you differ with that?  You don't

5    think that's in the CV attached?

6          **MR. COLLINS:**  Unless I'm missing something, your

7    Honor, I see professional activities, a professional

8    activities section that lists current.  And I believe the

9    witness just said it's not in my CV.  I mean, that was her

10   testimony.

11         **THE COURT:**  I think that's right.

12         **MS. BARTOSZ:**  On page 6 of the CV there's the,

13   there is reference to the Alabama State Child Death Review

14   Team which Ms. Crabtree just referred to.

15         **THE COURT:**  That may stand.  Go ahead.

16         **MS. BARTOSZ:**  Thank you.

17   **Q**   Can you describe, please, Ms. Crabtree, briefly what was

18   involved in your work with the Alabama State Child Death

19   Review Team?

20         **THE COURT:**  Well, that's not in the report, is it?

21         **MR. COLLINS:**  No, your Honor.  It's simply a

22   list --

23         **THE COURT:**  No, I was asking Ms. Bartosz.

24         **MR. COLLINS:**  I'm sorry.

25         **THE COURT:**  But I don't think it is.  So we're not

1    going there, in light of his objection.

2            **MS. BARTOSZ:**  Thank you, your Honor.

3    **Q**   When were you first contacted with respect to this

4    lawsuit in the Connor B lawsuit?

5    A   Last spring.

6    **Q**   Who contacted you?

7    A   You did.

8    **Q**   And do you recall that conversation and what opportunity

9    was discussed?

10   A   Yes.

11   **Q**   Can you relay that for the Court?

12   A   The question you had was whether I might be interested

13   in doing a management review related to a case here in

14   Massachusetts.

15   **Q**   But ultimately did you agree to that engagement?

16   A   Yes.

17   **Q**   What review, if any, did you undertake before agreeing

18   to that engagement?

19   A   Well, I did what I always do.  I read over the complaint

20   and arranged to call you back to talk about that.

21   **Q**   When you say complaint you're referring to the complaint

22   filed in the federal court here in Massachusetts?

23   A   Yes.

24   **Q**   Why did you review that document?

25   A   I always review the complaint to see what the background

1    is around the issue with child welfare.  It may or may not

2    be appropriate for me to take on something that I don't know

3    anything about.

4    Q    When you agreed to perform expert work in this lawsuit

5    did you come to an agreement in terms of compensation?

6    A    Yes, I did.

7    Q    Can you describe that agreement for the Court?

8    A    The project fee was set at $18,000 to produce the

9    report, and then the hourly rate was set at 150 an hour for

10   any work after that.

11   Q    In conducting your expert work in this case did you

12   apply a methodology?

13   A    Yes.

14   Q    Can you describe for the Court the methodology that you

15   utilized in forming your opinions here?

16   A    I used the basic federal regs, federal and state

17   regulations that are in place that guide the work of child

18   welfare agencies, and any national standards that were

19   available, as well as documentation and information from the

20   department itself around policies, procedures.  There are a

21   multitude of, what's the right word, conveyances of

22   information that were available in terms of how the

23   Massachusetts department operates.

24   Q    When you say --

25   A    Including deposition testimony and internal

1    communications and policy statements, all of those.  And

2    outside resources that are recognized for their work in

3    child welfare research.

4    Q    Generally, what use did you make of the federal laws,

5    professional organizational standards and state policies

6    that you just referred to?

7    A    I looked to make sure that what Massachusetts was

8    actually doing day to day with children was in line with

9    what the federal regulations and state regulations say that

10   they're supposed to be doing.

11   Q    Were facts and information made available to you for

12   purposes of applying those standards to performance in the

13   Commonwealth of Massachusetts?

14   A    Yes.

15   Q    Can you generally describe the data information that was

16   supplied to you?

17   A    I had deposition testimony.  I had reports that are

18   generated from the department.  The departmental policies,

19   plans that the department has developed in the past.

20   Q    Did you receive performance data?

21   A    Yes, I did.

22   Q    Generally, can you describe the categories of

23   performance data that you were able to review?

24   A    I received and reviewed their own performance data that

25   they generate out of their reporting system, as well as the

1    child family services review federal reporting data, their

2    state assessment that they do prior to those reviews and

3    final reports that are submitted from the federal level back

4    to the state.

5    **Q**    Can you please turn to page 11 of your report,

6    Ms. Crabtree, Exhibit JB.

7            Do you see that it's the page with the heading B,

8    Methodology?

9    A    Yes.

10   **Q**    Would you look at the second paragraph of your report

11   beneath the heading, there's a list of five data categories?

12   A    Yes.

13   **Q**    Are these the categories of data that you reviewed in

14   forming opinions here?

15   A    Yes.

16   **Q**    And can you turn to page 12.  Do you see there a list of

17   four categories of laws or standards?

18   A    Yes.

19   **Q**    Are these the materials that you referred to in

20   identifying the standard of care, the standard of care in

21   your work here?

22   A    Yes, I did.

23   **Q**    For the record, can you identify what standards you

24   looked at as shown here in the report?

25   A    On page 12?

1   **Q**    Yes, ma'am.

2   **A**    Federal law related to Title IV-E, which is the funding

3   source for child welfare agencies, the state laws including

4   their DEEC, which is the licensing agency for child placing

5   agencies in Massachusetts.   The standards of the child

6   Welfare League of America, called CWLA.   And the Council on

7   Accreditation which is another national standard and

8   recognized agency called the CLA, and the general accepted

9   practice from the field and from my own experience.

10  **Q**    Thank you.

11         Could you turn now to Appendix B of your report.

12  Do you have that before you now, Ms. Crabtree?

13  **A**    I do.

14  **Q**    Can you identify Exhibit B, or appendix B?

15  **A**    This is a list of depositions that I was provided, well,

16  first pages of depositions, and other documents that were

17  provided for review for this report.   You can see it's quite

18  extensive and --

19  **Q**    Did you read the depositions listed on the first page of

20  appendix B?

21  **A**    I, I did read the depositions.   The, the paper provided

22  to me by the Department of Children and Families was

23  massive, and I read for things that were pertinent to a

24  management review when I was looking through the depositions

25  in reading.

1    Q    You indicated that you read depositions supplied to you.

2    Did you conduct one-on-one interviews with any DCF

3    representatives?

4    A    No, I did not.

5    Q    Did you conduct any interviews of other child welfare

6    stakeholders within the Commonwealth of Massachusetts?

7    A    No, I did not.

8    Q    Did you seek out any information or data from Children's

9    Rights during your work that was not supplied to you?

10   A    Other than reading the complaint the -- no.  Everything

11   else was supplied.

12   Q    Now, in making your review of DCF, did you place focus

13   on certain structural elements of that organization?

14   A    Yes.

15   Q    Can you describe what you focused on?

16   A    Whenever I look at the management of an organization of

17   child welfare, and it applies across really other government

18   structures as well, the way I look at that is as four

19   critical building blocks that have to be in place for an

20   effective child welfare agency to function.

21         The first of those is that you really have to have

22   enough people to actually get the work done and they have to

23   be trained in the skills that are required for whatever the

24   particular job is that they're going to be doing.

25         The second critical building block for an agency is

1    to have the right mix of services and placements.

2    Especially that's important with children who are being

3    removed and traumatized by the move from their natural home,

4    to meet their needs and to stabilize the situation for the

5    child.

6          The third element is that an agency just simply

7    must have a quality assurance system in order to know how

8    the state themselves, how are we doing at what we are

9    required to do by law, and where do we need to improve.  So

10   there's a quality assurance cycle that has to take place

11   within the agency, top to bottom, so that people know where

12   they need to make adjustments in the work that they're doing

13   to improve or to take corrective action if that's needed to

14   get back on the right path to taking care of children and

15   families.

16         The last building block would have to do with

17   leadership and accountability.  If there's not the proper

18   stable leadership in place for an agency you have what I

19   call shotgun approaches to trying to get anything done.

20   Plans are put together but not implemented.  Plans are laid

21   on top of plans.  Work is layered so that someone's required

22   to continue doing the same work, but something's put on top

23   of that adding to their workload, and leadership is

24   responsible for ensuring that people have enough time to get

25   the work done and the resources and tools to do that and to,

1    and to take on the ultimate responsibility for making sure

2    that children and families are safe.

3            May I add?

4    Q    Yes, please.

5    A    And it's not just good enough to have those four

6    building blocks.  It's important that they all be in place

7    and that they all be working in concert.  If even one of

8    those is out of sync, it's going to affect the entire

9    organization somewhere.  And by affecting the entire

10   organization you're affecting the life of a child somewhere.

11   Q    I would like to focus now on the first building block

12   you identified.  I think you called it people or workforce?

13   A    Yes.

14   Q    In assessing the building block one, did you focus on

15   particular structural elements within DCF?

16   A    Yes.

17   Q    Could you describe the elements that you placed focus

18   on?

19   A    As I mentioned before, the first building block, really

20   the two, the two elements that are important, there are

21   caseloads and training.

22   Q    Let's focus on caseloads for a time, okay?

23            When you use the term caseload what are you

24   intending to convey?

25   A    Caseload is the actual number of children that an

1    individual worker may be responsible for at any one time.

2    Q    Why are caseloads significant in managing a child

3    welfare agency?

4    A    Well, we all have 40 hours in a week and caseworkers to

5    their credit many times end up having to go out at night to

6    take care of children who are in harm's way, and the number

7    of children that they're responsible for directly impacts

8    their ability to get their work done day to day.

9         There's a component of caseload, this is just

10   numbers of caseworkers.  It's workload.  What is, what is

11   the job.  How many tasks are they required to do.  Workload

12   is a part of a person's caseload.  In other words, the

13   workload is how much time does it take to travel to a

14   family's home.  If siblings are in different locations, I'm

15   a caseworker and I have two places to travel to instead of

16   just one, plus the parents' home, there are doctor

17   appointments that have to be made, there are permanency

18   requirements that have to be put together with the Court.

19   There are data entry requirements for the department in

20   order for them to capture needed information for federal

21   regulation.

22        So, there are a multitude of tasks related to the

23   actual caseload of one child, and you multiply that across

24   many children, then you have a tremendous amount of

25   responsibility that a social worker is carrying.  It

1    sometimes sounds like a simple job.  It's quite complex.

2    Q    In assessing caseloads within DCF, Ms. Crabtree, did you

3    review professional standards?

4    A    Yes, I did.

5    Q    Can you identify what standards' organizations you

6    focused upon?

7    A    I looked at the Child Welfare League, Child Welfare

8    League of America standards for caseloads and workload, and

9    the Council on Accreditation standards.

10   Q    What is the Child Welfare League of America to your

11   understanding?

12   A    I'm sorry, I couldn't hear.

13   Q    What is the Child Welfare League of America to your

14   understanding?

15   A    The Child Welfare League of America is a public and

16   nonprofit agency that represents the child welfare functions

17   of this country and also in Canada, there's a branch there.

18   Massachusetts is a member of the Child Welfare League of

19   America.  They establish standards for services.  They have

20   a long, many decades history of research in best practices

21   in child welfare.

22   Q    Briefly, what is the Council on Accreditation?

23   A    Council on Accreditation is, COA is an accrediting

24   organization that also has a long history of research in to

25   best practice and best management of child welfare

1    organizations.  They have quite a reversed process that

2    states have to go through or providers have to go through to

3    become accredited to meet their standards.

4    **Q**    In your experience, Ms. Crabtree, do child welfare

5    agencies, public agencies, rely on or focus on CWLA and COA

6    standards?

7    A    Yes, they do.

8    **Q**    Did you do so during your tenure within the Tennessee

9    child welfare agency?

10   A    Yes.

11   **Q**    Ms. Crabtree, I now ask that you direct your attention

12   to an exhibit, for the record, it is Exhibit QS.

13            Can you identify Exhibit QS?

14   A    This is the CWLA staffing section from their best

15   practices in foster care services, and on the second page

16   you'll see that this section talks about workload.

17   **Q**    Are you referring to the heading 3.2 Workloads?

18   A    Yes.

19   **Q**    Did you place reliance on this exhibit in forming your

20   opinions here?

21   A    Yes.

22   **Q**    Can you describe how so?

23   A    Yes.  When we're looking at workload in child welfare,

24   we're trying to determine the functions and how to organize

25   inside an agency and how many staff are available to do the

1    work.  That can vary from state to state, from agency to

2    agency.  The workload has to take into account some of the

3    things you see on 3.2 that I just mentioned earlier around

4    travel, visitation and a setting of services and court time.

5    The only way to determine what workload is is through a

6    careful time study of how much time it takes to do all of

7    those various activities depending on how your department's

8    organized.

9    Q   Ms. Crabtree, I'm now going to focus your attention on

10   Exhibit RH.  Can you identify Exhibit RH, please, Ms.

11   Crabtree?

12   A   This is Council on Accreditation foster care services

13   information about average number of cases and caseload again

14   is addressed on the second page under PA-FC 19.06 where it

15   talks about what is a manageable workload and indicates that

16   workers simply have to have enough time to meet their

17   practice requirements based on how their state is organized,

18   or how their agency is organized.  It also has to take into

19   account the qualification levels of the workers and their

20   competency areas, if you look at the bottom of the page.

21         May I add to that?

22   Q   Yes, please.

23   A   The other thing that's important from the COA standpoint

24   in the information that is in this section is that the

25   workload shouldn't impede the ability to get the children

1    what they need when they need it.  Just as I'm a parent, I

2    need to be able to have the time to get my child to the

3    doctor when the child needs to go to the doctor, that's an

4    example.

5    **Q**    Now, beyond the provisions or standards you just

6    identified, Ms. Crabtree, does CWLA and COA have standards

7    that focus on caseloads?

8    A    Yes, they do.

9    **Q**    And did you review those standards in your work here?

10   A    I did.

11   **Q**    Let me show you Exhibit QU.  Please identify Exhibit QU?

12   A    QU is the CWLA standards of excellence in foster care

13   services again.  This section, the second page, 3.48 talks

14   about caseload size for individual workers.

15   **Q**    And is there a particular individual workload function

16   that is addressed by 3.48?

17   A    Foster care social work.

18   **Q**    How did you, if you did, rely on this standard in

19   forming your opinions here?

20   A    The rationale for having this here, yes, they require a

21   workload study to be done in order to determine what

22   caseload size should be.  Absent a workload study research

23   that CWLA has done indicates that a size of 12 to 15

24   children is about the maximum that most caseworkers can

25   handle and still meet the requirements of their jobs.

1    **Q**    Focusing on the foster care worker addressed in the

2    standard 3.48, what is the child client base for a foster

3    care worker?

4    A    Could you repeat --

5    **Q**    In other words, are these children in home with their

6    families?  Are they in out-of-care placements?

7    A    I understand.

8    **Q**    What children are served by the foster care workers as

9    they're described here in 3.48?

10    A    These are, these are foster children who have been

11    removed from homes is the reference here.

12    **Q**    I would like to return your attention to Exhibit RH, the

13    COA standard.  And again focusing on the second page in

14    provision PA-FC 19.06.

15        Does COA there recommend any caseload ratio?

16    A    Yes, in the absence of workload, a workload study, they

17    recommend a caseload not to exceed 18 children.  And it goes

18    on to say eight children who have special therapeutic needs.

19        **THE COURT:**  Not to exceed 18?

20        **THE WITNESS:**  That's right, your Honor.

21    **Q**    And both this COA standard you just looked at, PA-FC

22    19.06, and the CWLA standard measure caseload ratio by

23    children?

24    A    By children.  Individual children.

25    **Q**    Did you also review CWLA and COA standards relating to

1    family preservation work?

2    A    Yes, I did.

3    **Q**    Let me now show you Exhibit QT.  Can you identify

4    Exhibit QT, Ms. Crabtree?

5    A    This is the CWLA standards for abused or neglected

6    children and their families, and at the bottom begins with a

7    section on staffing workload and caseload standards.

8    **Q**    And if you turn to the second page of this exhibit, at

9    the bottom.  Do you see a bullet point beginning with the

10   language ongoing services to families?

11   A    Yes.

12   **Q**    To what does that bullet point refer?

13   A    Ongoing families refers to caseworkers who carry what's

14   known as a mixed caseload where you may have ongoing work

15   with an intact family and that's been opened for services

16   and assessment and the children are there with their

17   parents, they're not in a separate location.

18   **Q**    I got confused for a moment.  During your answer you

19   indicated that these children are in home with their parents

20   and you used the term mixed caseload.  Is this provision

21   addressing a mixed caseload or a single form of caseload?

22   A    This is, I'm sorry, this is addressing ongoing work.

23   **Q**    Okay.

24   A    With the family in the home.

25   **Q**    And for clarity, can you address what client population

1    is served by the ongoing caseworker as that term would be

2    used here in the CWLA standard?

3    A    This, this ratio is 1 to 17 for ongoing work with

4    families.

5    Q    And this kind of caseload is measured here by families?

6    A    By family, right.

7    Q    Please now direct your attention to Exhibit RG.  Can you

8    identify Exhibit RG, please, Ms. Crabtree?

9    A    Family Preservation and Stabilization Services section

10   from Council on Accreditation.

11   Q    Did you place reliance on this exhibit in forming your

12   opinions?

13   A    Yes.

14   Q    And let me direct your attention to the second page of

15   this exhibit, and the particular standard PA-FPS 11.07.

16   A    Yes.

17   Q    Did you rely on that provision?

18   A    Yes, at the bottom of the page you'll notice that it

19   recommends, COA recommends no more than 18 families in

20   family preservation programs where you're working with the

21   family intact.

22   Q    And, again, this is measured by families?

23   A    By family.

24   Q    Ms. Crabtree, why are the foster care caseload ratios

25   that have been promulgated by COA and CWLA measured by child

1    units and the family preservation caseload ratios measured

2    by family units?

3    A    Foster care --

4         **MR. COLLINS:**  Objection, your Honor.  This is not

5    in the report.  The why is not in the report.

6         **MS. BARTOSZ:**  I'll move on, your Honor.

7         **THE COURT:**  Thank you.

8    Q    How does -- let me back up.

9         Does DCF in allocating its work assign work to

10   foster care workers as that term is used in the CWLA

11   caseload standard?

12   A    Not in the way it's described in the CWLA standard.

13   Q    Does DCF allocate in-home or family preservation work in

14   the way that is used in the CWLA or COA standard?

15        **MR. COLLINS:**  Objection; leading.

16        **THE COURT:**  Yes, sustained, on that ground.

17   Q    How does DCF allocate its foster care and in-home

18   services work to its caseworker staff?

19   A    They don't allocate it in the way that it's described in

20   the Council on Accreditation as strictly a family

21   preservation intact family.

22   Q    What kind of caseloads does DCF use?

23   A    They use what are known as mixed caseloads where an

24   ongoing worker may have a mix of families with children

25   living in their home in an intact situation and they have

1    some cases on their caseload that are foster care cases

2    where the children have been removed from their homes and

3    may be in multiple locations.

4    **Q**    In performing your work here, did you identify COA or

5    CWLA standards or for that matter any other standard that

6    recommends a caseload ratio where casework is assigned on a

7    mixed caseload basis as DCF does?

8    A    No, I did not.

9    **Q**    If you use mixed caseloads how do you determine what the

10   appropriate caseload ratio should be based on the standards

11   that you've identified so far today?

12   A    There's no reason that you can't have mixed caseloads.

13   But if, if you have an organization where you choose to have

14   a caseworker carry children who are at home with their

15   parents as well as children who are being removed and are in

16   foster care in different locations, you simply have to have

17   a workload study to determine what the right number of

18   caseworkers is that you need in order to get the job done

19   effectively and keep children safe and ultimately hopefully

20   reunify those children or get them to adoption.  Without the

21   workload study there's no way to know if you have enough

22   people to get the work done.

23   **Q**    In performing your work did you determine whether or not

24   DCF has established caseload ratios?

25   A    They have, they have a ratio.

1    Q    Ms. Crabtree, I'll now provide you Exhibit 21.  Have you

2    seen this document before?

3    A    Yes.

4    Q    Can you identify it, please?

5    A    This is the collective bargaining agreement between DCF

6    and their union from 2009.

7    Q    Can you please turn to page 121 of this exhibit, the

8    page that is captioned Supplemental Agreement Q.

9         Do you have that, Ms. Crabtree?

10   A    I do.

11   Q    Did you review this part of Exhibit 21 in forming your

12   opinions?

13   A    Yes, I did.

14   Q    What information did you glean from this part of the

15   document in forming your opinions?

16   A    Two things.  One, that they were setting the caseloads

17   standard for their workers at 18 to 1 and that, 18 to 1

18   families, and that they recognized that this is not an

19   optimal workload and caseload for them to use.

20   Q    How do you know that?

21   A    In the first paragraph you'll see --

22   Q    Can you point that out, please.

23   A    Excuse me?

24   Q    Can you point that out, please.

25            THE COURT:  I find it.  It's the last sentence of

1    the first paragraph.

2              **THE WITNESS:**  Yes, sir.

3              **MS. BARTOSZ:**  Thank you, Judge.

4    Q   And you've indicated, Ms. Crabtree, that the 18 cases

5    ratio is measured by families?

6    A   Yes.

7    Q   Is that the unit that the caseload is measured by

8    whether the child on the caseload is in-home with an intact

9    family or in an out-of-home foster care placement?

10             **MR. COLLINS:**  Objection.

11             **THE COURT:**  Grounds?

12             **MR. COLLINS:**  Leading.

13             **THE COURT:**  Yes, sustained.

14   Q   Does the unit of measure families change depending upon

15   where the child is living?

16   A   No, it takes, whether the child is in the intact home

17   with the parents or has been removed from foster care, it's

18   still 18 to 1.

19   Q   In performing your review of DCF were you able to

20   determine how long that 18 to 1 ratio was established?

21   A   I seem to recall that it's been several decades.  I

22   would estimate several decades.

23   Q   I'll now show you Exhibit 642.  Ms. Crabtree, can you

24   identify Exhibit 642?

25   A   Yes, this is a presentation put together by the

1    department recognizing the need for reducing ongoing

2    caseloads.

3    Q   Did you review this document and place reliance on it --

4    A   Yes, I did.

5    Q   -- in forming your opinions?

6        Please turn to page 7.  Did you glean any

7    information and data here with respect to how the 18 to 1

8    ratio is established?

9    A   I'm sorry, I couldn't hear you.

10   Q   I'm sorry.

11       Did you glean any information on this page 7

12   regarding when the 18 to 1 ratio used by DCF for ongoing

13   workers was established?

14   A   Yes, they point, they point out in their presentation

15   that the 18 to 1 was established 25 to 30 years ago and say

16   it's rapidly becoming obsolete.  And this was done in, this

17   presentation was done in May of 2010.

18       And there's also a recognition in the first

19   bullet point on the same page that the ratio is probably not

20   reflective of increased workload on the caseworkers as far

21   as --

22           THE COURT:  Excuse me, now you've gotten away from

23   me, I'm sorry.  Can you tell me what page you're on?

24           THE WITNESS:  Page 7.

25           THE COURT:  Page 7.  Thank you.  Right.  All right.

1    A    Okay.

2    Q    Ms. Crabtree, you were referring to the first

3    bullet point.  Can you address that?

4    A    The first bullet point indicates that DCF recognizes

5    that their current 18 to 1 ratio does not meet the changes

6    in workload, regulations that have changed over the last 25

7    to 30 years in, changes in policy and practice, and the

8    second bullet points out that it's an obsolete number to

9    use.

10   Q    In performing your assessment of DCF's caseloads, did

11   you determine whether DCF has conducted a workload study as

12   that term is used in the CWLA and COA standards?

13   A    I could locate a workload study in the materials that I

14   have.

15   Q    Did you review any deposition testimony that addressed

16   that point?

17   A    Yes, I did.

18   Q    Can you describe what you found there?

19   A    The deposition testimony that I was able to locate

20   indicated that they have in the past recognized that there

21   is a need for workload and have sent for sample workload

22   studies from a couple of other states that they've received.

23   They have not done anything with those workload studies to

24   my knowledge and had not done one themselves.

25   Q    In performing your analysis of DCF's 18 to 1 ratio, did

1    you look to see whether the case practice model used by the

2    agency changed from when the ratio was established 30 years

3    ago up until the present?

4    A    The ratio has not changed.   The change that occurred

5    with the practice model proposed by the department is that

6    they have now layered in on top of that an assessment, a new

7    assessment responsibility for those same workers.   So, they

8    increased the workload without reducing the ratios of

9    families that they're responsible for.

10   **Q**    Are you familiar with the term integrated case practice

11   model?

12   A    Yes.

13   **Q**    And what do you understand that to be?

14   A    The integrated case practice model is a new approach

15   that the department is taking to do their social work with

16   families and children.

17   **Q**    Did you in reviewing DCF's caseload standards look to

18   see if the agency conducted a workload study as part of the

19   development and implementation of the integrated case

20   practice model?

21   A    Yes.   They, they have not done a workload study at all.

22   **Q**    Did you determine whether or not the integrated case

23   practice model changed the array of duties and

24   responsibilities that an ongoing caseworker would have?

25   A    Yes --

1          **MR. COLLINS:**  Objection.

2     A    -- I did.

3          **MR. COLLINS:**  Leading.

4          **THE COURT:**  Well, I'll let that stand.  Go ahead.

5     Q    What did you determine?

6     A    They have additional responsibilities to the families

7     that they're serving.

8     Q    In what way?

9     A    They layered in on top of that new duties for the

10    caseworkers related to assessment.

11    Q    And what do you understand an assessment to be?

12    A    In the Massachusetts case, in this agency, an assessment

13    is a way to determine if the child and family -- I'm trying

14    to figure out an easy way to explain this.  As I mentioned

15    the work's kind of complex sometimes.

16         But as I understand it, the assessment helps to

17    differentiate children who need to be worked with in an

18    intact family situation versus children who are part of, I

19    think it's called a differential response in here and they

20    are moved into a different function in the department.

21    Q    Ms. Crabtree, focusing on DCF's caseload, did you seek

22    to determine whether DCF tracks the caseloads carried by its

23    staff?

24    A    Yes.

25    Q    And what did you find?

1    A    They, again, they track by families and not by

2    individual children.

3    Q    And is that significant to you in forming your opinions?

4    A    Yes.  It skews the information that's available so that

5    you, so that you have a distorted picture of what an actual

6    caseload is.

7    Q    What do you mean by that, a distorted picture?

8    A    If you're counting families you may have an intact

9    family with all the children living in the home and you

10   count 18 families and that's my caseload.  That is rare that

11   you would have all 18 families intact with the children

12   living in the home.  Instead, you're likely to have 15

13   families with two children all living in the same home,

14   which would really give you 30 children to be keeping up

15   with, but you could also have three more families and still

16   be at the 1 to 18 ratio but those three families all have

17   five children and they're all placed out of home.  You've

18   now added 15 children to the original 18.  So, to make that

19   simpler there's no way really to know because they don't

20   count children, they only count families.

21   Q    I'm going to now show you Exhibit 966.  Ms. Crabtree,

22   can you identify Exhibit 966?

23   A    This is a report that DCF produces.  It's called the

24   Monthly Caseload/Weighted Caseload Report.

25   Q    Did you review Monthly Caseload/Weighted Caseload

1    Reports in forming your opinion?

2    A   Yes.

3    **Q**   Did you rely upon these reports in forming your opinion?

4    A   It's very difficult to rely on this report because as I

5    mentioned before it's counting families.  So, for example,

6    if you are looking at the very bottom of the first page and

7    you scroll all the way across the bottom to the far right

8    lower corner you'll see that their weighted caseload ratio

9    16.07, if you're counting families that looks like a really

10   good number, but they've missed an entire group of children

11   who may be placed in foster care that have not been counted.

12       **THE COURT:**  You've lost me there.  Because I

13   thought the gravamen of your testimony was that the national

14   standards with which you're familiar and which you consulted

15   uniformly count children.  Have I got that right?

16       **THE WITNESS:**  That's right, your Honor.

17       **THE COURT:**  Massachusetts has chosen to count

18   families.

19       **THE WITNESS:**  That's right.

20       **THE COURT:**  And so now we're looking at a

21   Massachusetts report and down at the bottom there there's

22   the 16.07 weighted caseload.

23       **THE WITNESS:**  That's right.

24       **THE COURT:**  And you said that looks good.  But

25   your point is, if I'm following it, is you can't tell

1    whether that's good or not because that's counting families.

2              THE WITNESS:  I think what I meant to say was that

3    the 16.07 in counting by child would look --

4              THE COURT:  Would look good.

5              THE WITNESS:  -- would look good.

6              THE COURT:  But we know this doesn't count by

7    child.

8              THE WITNESS:  Right.  And so this report is not

9    very useful is what I'm saying.

10             THE COURT:  Not very useful if you accept the

11   premise that the appropriate standard for counting is

12   children.

13             THE WITNESS:  Is children, that's right.  That's

14   right.

15             THE COURT:  Okay.

16             THE WITNESS:  Does that help, sir?

17             THE COURT:  It helps me.

18             THE WITNESS:  Okay.  Thank you.

19   Q   Ms. Crabtree, for clarity, the appropriate standard for

20   counting caseloads being children, is that directed at a

21   certain kind of function under the CWLA and COA standards?

22   A   Foster care.

23   Q   Can you further advise the Court with respect to the

24   difference between family preservation work and the caseload

25   established there and the professional standards versus

1    foster care work?

2    A    Absolutely.  The family preservation work, the

3    determinations are made that children are safe enough to

4    remain in the family and don't need to be removed into

5    foster care and traumatized in that way.  So the family

6    preservation work has the caseworker with the family and

7    their children in one home.

8         **THE COURT:**  And again --

9    A    In one place.

10        **THE COURT:**  -- logically, it makes sense to count

11   by family for family preservation --

12        **THE WITNESS:**  That's right.

13        **THE COURT:**  -- work because there's the whole

14   interaction of that family unit that the caseworker is

15   trying to preserve.

16        **THE WITNESS:**  Absolutely.  That's exactly right.

17        **THE COURT:**  Once the determination has been made

18   that the interest of the child is to place the child in

19   foster care you say that the usual professional caseload

20   count is by child because they might go to different homes

21   and for a lot of different reasons.

22        **THE WITNESS:**  That's right.  That's right.

23        **THE COURT:**  Thank you.

24   Q    Ms. Crabtree, can I return your focus now to Exhibit 966

25   and the first page of the exhibit.

1    A    Okay.

2    Q    You've made reference with the Court to the statewide

3    total ratio of 16.07 shown in the bottom right hand corner

4    of this report.  Yes?

5    A    Yes.

6    Q    That 16.07 ratio as this report presents data, does that

7    ratio address only one kind of worker or multiple kinds of

8    workers?

9    A    It -- can you repeat that?

10   Q    Sure.

11            THE COURT:  What does this calculation address?

12   What types of workers, if you know?

13            THE WITNESS:  Oh, it appears to account for all

14   kinds of workers.

15            THE COURT:  Family preservation plus tracking kids

16   in foster homes?

17            THE WITNESS:  And adoption, it has adoption on

18   here, and investigations and, you know, they give different

19   categories if you look across the top, your Honor, it shows

20   those areas.

21            THE COURT:  Thank you.

22   Q    You're looking at that colored column up at the top of

23   the document, the Area Office row?

24   A    Yes.  Yes.

25   Q    Or I should say row.  Thank you.

1              Could you please turn to the third page of

2     Exhibit 966.  Do you have that, Ms. Crabtree?

3     A    I do.

4     Q    What is shown here?

5     A    This is a social worker workload, what is called a

6     workload report that the department produces.

7     Q    Did you rely upon the data in this kind of social worker

8     workload report in forming your opinions?

9     A    Yes.

10    Q    And what do you understand this workload report to

11    convey?

12    A    It describes the number of workers that have workloads

13    greater than their set 1 to 18 ratio.  And this is dated,

14    the latest date, July 31st, 2012.

15    Q    Looking at the top row there's three columns set up, 22

16    for two months, 22 in current month, 20 in current month.

17              Do you see that?

18    A    That's right.

19    Q    How do you read those rows and columns?

20    A    Their ratio is 1 to 18 families.  What this indicates is

21    number of workers who have more than 20, if you look at the

22    right, far right hand column, more than 20 families in a

23    month, then the next column is more than 22 families in a

24    month, and the next is, in that current month, and the first

25    column says 22 for more than two months they have carried

1   more than 18.  At the bottom you can see the total,

2   statewide totals.  A hundred and one case workers are

3   carrying more than 20 cases.  This is, the next column over,

4   the 21 is encompassing that 101, it's not cumulative.  And

5   the 10 carry more than 18 families for more than two months

6   is also encompassed in the 101.  So that's not cumulative at

7   the bottom, it's 101 total.

8        I couldn't find an explanation for why they start

9   at 20 rather than using 19 and 20.  It's greater than 20.

10  So, actually it's at 21.  I don't know why they don't show

11  the 19 and 20 over workload.  So, there's no explanation for

12  that.  And again, these are, these are families, these are

13  not children.

14  **Q**   Thank you.

15       I would like to turn your attention now to

16  Exhibit 642.  It's the May 2010 proposal to reducing ongoing

17  caseloads.

18       And can you turn to page 8 of this document.  Do

19  you have that, Ms. Crabtree?

20  A   I do.

21       **MR. COLLINS:**  Do you have a copy of that?

22       **MS. BARTOSZ:**  642.

23       **MR. COLLINS:**  Oh, you've got that.

24       **MS. BARTOSZ:**  Okay.  Page 8, Mr. Collins.

25       **MR. COLLINS:**  Thank you.

1    **Q**    Ms. Crabtree, did you rely upon this portion of

2    Exhibit 642 in forming your opinions?

3    A    Yes.

4    **Q**    How so?

5    A    It's an indication from the presentation from May 2010,

6    which is almost three years ago now, that there's an

7    urgency, you see in the title "Why We Must Act Now" to

8    reduce caseloads.

9          It indicates, if you look at the second bullet, it

10   indicates that they have determined that they're not in line

11   with national standards and they're looking at trying to

12   address issues related to this particular lawsuit that's

13   taking place and comment that they need to be getting

14   themselves in line to assist their caseworkers with

15   manageable workloads.

16         I guess the bottom line there is the very first

17   bullet, and in my mind the most important, which is that

18   carrying that heavy workload and not having enough people do

19   the work causes the agency to have an inability to keep

20   children safe.

21   **Q**    Can you turn your attention now to page 6 of this same

22   exhibit.

23         Did you rely on any of the information on this page

24   in forming your opinions?

25   A    Yes, I did.

1    **Q**    Can you describe how so?

2    A    It describes as a, as a part of their trying to

3    negotiate with their union and the issues around this

4    lawsuit the things that are critically important in

5    stabilizing life for children and families who get caught up

6    in the child welfare system.  Things like safety,

7    visitation, the placement stability.  And by placement

8    stability we mean children having a hopefully first

9    placement/best placement opportunity so they're not moving

10    around from place to place further traumatizing them.

11    Quickly reunifying families, but reunifying them safely so

12    that we aren't jumping the gun trying to meet a deadline and

13    put children back, only to have to remove them again.

14         And coordinating services for those children, and

15    also helping to institute educational stability.  That is

16    one of the contributing factors to children who age out,

17    that if they've had to move around from place to place in

18    foster care they age out of the system at a disadvantage on

19    an educational side because of constantly having to catch up

20    in class and learn new educational school systems and move

21    from one teacher to another, it's not familiar.  It's

22    especially hard on the children.

23    **Q**    Do caseload sizes relate to the various child outcomes

24    or case management areas that you've just described?

25    A    Yes, a reasonable caseload allows a caseworker to do a

1    great job at making sure that children are taken care of and

2    that families are reunified if at all possible.  Those are

3    the two primary focuses of the worker, the social worker in

4    child welfare.

5    **Q**   Ms. Crabtree, have you formed an opinion as to whether

6    or not DCF's 18 to 1 ratio for ongoing workers departs from

7    accepted professional judgment?

8    A   Yes.  It does.

9         **THE COURT:**  I just want to be clear as to our

10   terminology.  When you're given the phrase ongoing worker,

11   what do you think that refers to?

12        **THE WITNESS:**  The ongoing workers are carrying a

13   mixed caseload of foster care in in-home families.

14   **Q**   Now, in reviewing the DCF caseloads, Ms. Crabtree, did

15   you place any focus on visitation practice within the

16   agency?

17   A   Yes, I did.

18   **Q**   And why did you do that?

19   A   The ability of caseworkers to visit with the children

20   and the families is recognized as the, I'll call it the

21   linchpin of success in determining reunification of families

22   and is critical to putting the family back together.  The

23   caseworker becomes the constant in that family's life in the

24   sense that a child who's removed from home, for example, is

25   going to a place to live with a stranger in many cases that

1    they've never met before.  And that's a very traumatic and

2    scary thing for a young child.  Parents are frightened that

3    they're never going to get to see their child again.  So the

4    caseworker visits reinforce the work that's being done

5    inside the family to pull the family back together.  It

6    allows the caseworker to gauge the ongoing safety of a

7    situation with a child in a foster home or other setting, as

8    well as the progress that's being made by the parents.  So

9    it's critical, visitation is critical to making the child

10   welfare system work.

11   **Q**   Ms. Crabtree, I'm now going to provide you with Exhibit

12   JM.  Is this an exhibit that you relied upon in forming your

13   opinions here?

14   A   Yes, it did.

15   **Q**   And can you identify --

16          **MR. COLLINS:**  Objection, your Honor.

17          **THE COURT:**  Grounds?

18          **MR. COLLINS:**  This is a National Conference of

19   State Legislatures.  I mean, the witness can identify this

20   as something that she's relied upon, but I believe the

21   rule's clear that she can't then go and testify to hearsay

22   contained within the document.

23          **THE COURT:**  Well, I didn't have a question that I

24   thought was eliciting hearsay.  So she's identified it and

25   she's relied upon it.  And if it calls for her to explicate

1    it then I'll entertain your objection.

2            Go ahead, Ms. Bartosz.

3    **Q**   Ms. Crabtree, are you familiar with the National

4    Conference of State Legislatures?

5    A    Yes, I am.

6    **Q**   What is that?

7    A    The National Conference of State Legislatures is an

8    organization of legislators from around the country that has

9    an extensive policy and research arm for government

10   functions in various states and on various state policy

11   issues.  They have a particularly robust ability to engage

12   in child welfare services.

13           **MR. COLLINS:**  Objection, your Honor.  I move to

14   strike.  None of this is in the report.

15           **THE COURT:**  Well, I'll stop it.  Where they have a

16   particularly robust is stricken.  But it is what it is.

17   **Q**   Ms. Crabtree, is the National Conference of State

18   Legislatures considered to be an authoritative and credible

19   source of information within the child welfare field?

20           **MR. COLLINS:**  Objection, your Honor; not in the

21   report.

22           **MS. BARTOSZ:**  Your Honor, I'm trying to lay a

23   foundation under the learned treatise exception.

24           **THE COURT:**  Yes, I'm going to allow that.  And so

25   you may answer.  Overruled.

1    A    Okay, thank you.

2              Yes.  In recognizing innovations in state policy

3    and best practices.

4              **MS. BARTOSZ:**  Your Honor, plaintiffs would offer

5    Exhibit JM into evidence.

6              **THE COURT:**  As a learned treatise?

7              **MS. BARTOSZ:**  Yes.

8              **THE COURT:**  Any objection?

9              **MR. COLLINS:**  Yes, your Honor.

10             **THE COURT:**  Grounds?

11             **MR. COLLINS:**  I don't see how this pamphlet from

12   the National Conference of State Legislatures is considered

13   a learned treatise.  So, yes, we object.

14             **THE COURT:**  No, overruled.  I'm going to accept it

15   under that exception.  Your argument, Mr. Collins, seems to

16   go to its weight, not to its admissibility.  I will accept

17   JM in evidence.  It will be Exhibit 1091.

18             (Exhibit marked in evidence.)

19   **Q**   What reliance did you place on Exhibit 1091 in forming

20   your opinions here?

21             **THE COURT:**  Well, I've got a problem in that he

22   started his objections -- well, he's made a variety.  But he

23   says it's not in the report.

24             **MS. BARTOSZ:**  It is in the report, your Honor.  I

25   can designate the page.

1          **THE COURT:**  Oh, all right.  All right.

2          **MS. BARTOSZ:**  It's on page 38.

3          **THE COURT:**  All right.  She may testify consistent

4    with what's in the report on page 38.  And so you can answer

5    the question.

6    A    Okay.

7    Q    Ms. Crabtree --

8    A    Would you repeat the question?

9    Q    Yes, sure.

10         Can you turn to your report again and to page 38.

11         **MR. COLLINS:**  Your Honor, I'm going to object.  You

12   know, I think it's one thing to refer to the report to

13   refresh recollection, but there hasn't even been a question

14   yet for this witness, and we're already referring to her

15   report.  The reports are not in evidence in this case.

16         **THE COURT:**  No, overruled.  I'm the one who's

17   caused this.  You're concerned that she be confined to the

18   report.  She may refer -- and I've instructed her to confine

19   herself to the report.  Surely you may refer to it.

20         Put your question, Ms. Barotsz.

21         **MS. BARTOSZ:**  Thank you.

22   Q    Do you have page 38 of your report before you,

23   Ms. Crabtree?

24   A    Yes.

25   Q    With that as a guide, can you explain to the Court what

1    reliance you placed on Exhibit 1091 in forming your opinions

2    here?

3    A    Yes.  If you, if you look at the report, I have included

4    at the bottom of the page indented under C where it

5    describes caseworker visits and quoted from the state policy

6    document from Council of State Legislatures around why

7    caseworker visits are important.  And I think I, in fact, I

8    mentioned that earlier that they allow the caseworker to

9    build that constant relationship with the family that

10   cements the relationship that's necessary to put the family

11   back together, if possible.

12   Q    Ms. Crabtree, beyond this Exhibit 1091, did you rely

13   upon standards promulgated by professional organizations in

14   reviewing caseworker child visitation --

15   A    Yes, I did.

16   Q    -- in DCF?

17   A    Yes, I did.

18   Q    What standards did you look at?

19   A    There are federal requirements for visitation.  There

20   are also Massachusetts requirements for visitation and

21   departmental policy.  And the Child Welfare League and

22   Council on Accreditation also have standards for visitation.

23   Q    Let me work from the back forward there and I'll now

24   provide you with Exhibit QN.

25            Can you identify Exhibit QN, please, Ms. Crabtree?

1    A    QN is Council on Accreditation that addresses visitation

2    of children.

3    Q    Are there particular provisions within Exhibit QN which

4    you placed reliance on?

5    A    On page, on the second page, PA-FC 12.01 and PA-FC

6    12.02.

7    Q    Can you describe what significance these standards had

8    to you in forming your opinions?

9    A    The recommendations from COA are that workers and

10   children and parents meet at least once a month other than

11   therapeutic, children who are in therapeutic needs, and the

12   recommendation is for a minimum of twice a month.

13   Q    Ms. Crabtree, I will now present you with Exhibit QV.

14        Can you identify this exhibit, please?

15   A    This is Child Welfare League of America's visitation

16   standards.

17   Q    And focusing your attention on the second page and to

18   the provision 2.55.  Do you see that?

19   A    Yes.

20   Q    Did you rely upon this provision in forming your

21   opinions?

22   A    Yes, I did.

23   Q    How so?

24   A    It recommends that social workers visit with their

25   children face to face at least monthly; if more is required

1    that should also be done.  And the section goes on to lay

2    out some information about meeting with children under

3    various circumstances, informing the child visit, making

4    sure that appointments are kept, there are various pieces

5    that go along with that visitation.

6    **Q**   Ms. Crabtree, you made reference to federal law.  I

7    would like to now provide you with Exhibit SH.

8            Will you please identify this exhibit for the

9    Court?

10           **MR. COLLINS:**  Your Honor, objection at this point.

11   We're getting into cumulative evidence.  There was a witness

12   on prior to Ms. Crabtree, Ms. Jones, who testified at length

13   about child caseworker visitation.

14           **THE COURT:**  I don't know that this is about

15   caseworker visitation.  I immediately perked up at this.  I

16   thought this was going to be about the alleged statutory

17   violation in this case, but maybe Ms. Bartosz can help us.

18           **MS. BARTOSZ:**  Your Honor, this --

19           **THE COURT:**  I'm not terribly troubled if it's -- it

20   doesn't seem to be cumulative yet.

21           **MS. BARTOSZ:**  And we are proffering this exhibit at

22   this time, your Honor, with respect to the visitation issue.

23           **THE COURT:**  Fine.

24   **Q**   Ms. Crabtree, can you identify Exhibit SH?

25   **A**   This is the federal code that includes section around

1    required visitation of children.

2    **Q**    And turning your attention to the second page of this

3    exhibit and provision (f)(1)(A).  Did you place reliance on

4    this provision in forming your opinions?

5    A    Yes.

6    **Q**    How so?

7    A    The federal code --

8         **MR. COLLINS:**  Objection.  Objection, your Honor.

9    This is exactly what we got into with Ms. Jones, the 90

10   day --

11        **THE COURT:**  I don't think it's, I don't think it's

12   cumulative.  It's as simple as that.  I don't think it's

13   cumulative.  This is another witness.  Maybe with Ms. Jones

14   there were credibility issues.  There will be a point where

15   it becomes cumulative, but so far we're in the now eleventh

16   day of trial of which you've taken a fair amount of time.

17   They seem to be trying this rather tight, and I appreciate

18   that.  She may testify.

19   **Q**    I'll repeat my question, Ms. Crabtree.

20        Can you describe --

21        **THE COURT:**  Wait a minute.  Having, having

22   interrupted, though, now looking at the clock.  Do you want

23   to take a recess or are you about done?

24        **MS. BARTOSZ:**  We can take a recess, Judge.

25        **THE COURT:**  We'll take a recess.

1        MS. BARTOSZ:  Thank you.

2        THE COURT:  All right.

3        THE WITNESS:  Thank you.

4        THE COURT:  We'll take the morning recess for

5    one-half hour.  We'll recess.

6        THE CLERK:  All rise.

7        (Recess.)

8        THE CLERK:  All rise.  The United States District

9    Court is back in session, you may be seated.

10        THE COURT:  Proceed.

11        MS. BARTOSZ:  Thank you, your Honor.

12                DIRECT EXAMINATION (Cont'd)

13  BY  MS. BARTOSZ

14  Q   Ms. Crabtree, when we took the break we were focused on

15  Exhibit SH.  Do you still have that there handy?

16  A   Yes, I do.

17  Q   Okay.  Redirecting your attention to the second page of

18  this exhibit and to the provision (f)(1)(A).  Did you place

19  reliance on this portion of this federal statute in forming

20  your opinions here?

21  A   Yes, I did.

22  Q   Can you describe what reliance you placed on this?

23  A   This describes, the federal statute, the visits that are

24  required to be made by caseworkers on a monthly basis to

25  children in foster care.  Excuse me.

1    Q    Did you rely on this provision in any other way?

2    A    I didn't hear you.

3    Q    I'm sorry, I'll speak up louder.

4         Did you rely on any other portions of this

5    provision?

6    A    Yes.  Of this particular section (f)(1)(A)?

7    Q    Yes.

8    A    Yes, it describes that the visitation should happen

9    during the fiscal year not less than 90 percent, that goes

10   up in two years in 2015 to 95 percent, and the visits are to

11   be made monthly.

12   Q    You earlier testified, Ms. Crabtree, that you also

13   looked at DCF policy with respect to caseworker child

14   visits.

15   A    Yes.

16   Q    I'm providing you with Exhibit 1.  And can you turn to

17   page 140 of this exhibit.  That would be DCFPOL, P O L, page

18   140.

19        Do you have that page, Ms. Crabtree?

20   A    I do.

21   Q    And did you rely upon this section of the DCF policy

22   manual in forming your opinions regarding caseworker-child

23   visitation?

24   A    I did.

25   Q    How so?

1    A    If you look halfway down the page at, where it says

2    Procedures/Social Worker-Client Contact, item number 2 and 3

3    describe monthly visitation contact as required by policy.

4    And if it's less than that it should be approved by the

5    supervisor and documented.

6    Q    Can you look at one heading up also, the heading Policy

7    Social Worker-Client Contact, in the second paragraph there.

8         Did you review that policy provision in forming

9    your opinions?

10   A    No. 1 Social Worker Contact?

11   Q    The heading above that.

12   A    Oh, the heading.  I'm sorry.

13   Q    Second paragraph.

14   A    Yes.

15   Q    Did you rely upon that provision in forming your

16   opinions?

17   A    Yes.  Paragraph 2 refers to the schedule of contacts

18   should include at least monthly contacts by the social

19   worker with children, the placement resource and the

20   parents.

21   Q    Ms. Crabtree, I'm now going to show you Exhibit 677.

22   Can you identify this document?

23   A    This is what's called a practice point from the

24   integrated case practice model, the Department of Children

25   and Families here in Massachusetts.

1    Q    Did you review this document in forming your opinions?

2    A    Yes.

3    Q    Directing your attention toward the bottom of page 1 and

4    into the top of page 2, did you review that information?

5    A    Yes.

6    Q    What reliance, if any, did you place on this

7    information?

8    A    It reiterates from the federal level that visitation is

9    one of the most important pieces of child welfare work in

10    promoting positive outcomes for children and families.

11    Q    Did you place any reliance on provisions 1 and 2 on the

12    second page at the top?

13    A    Yes.

14    Q    How so?

15    A    That the visits incorporated by the caseworker, the

16    rationale for the face-to-face contact is to help reinforce

17    that the children are safe and address any needs that the

18    social worker may find, and also reiterates the

19    communication aspect of the caseworker and the children and

20    the families.

21    Q    Now, Ms. Crabtree, in reviewing caseworker-child

22    visitation within DCF were you able to identify performance

23    data addressing that issue?

24    A    DCF performance data?

25    Q    Yes.

1    A    Yes.

2    Q    I'll now present you with Exhibit MZ.

3         What is Exhibit MZ?

4    A    MZ is a home visit report that the department produced

5    and this run date is June of 2012.

6    Q    And you reviewed this report in forming your opinions?

7    A    Yes.

8    Q    Can you describe for the Court what data you found to be

9    significant in this exhibit and how you read it?

10   A    It describes the number of adults and children not seen

11   for two and three months, in other words, 60 and 90 day

12   periods of time.  And if you look at the very bottom, grand

13   total across the state, in the last two columns you can see

14   that there were children that were not seen for two months,

15   more than 1,400 children were not seen for two months by

16   anyone.  I'm sorry, by the caseworker.  And in the last

17   column children, there were children that weren't seen for

18   90 days, three months, 500 children.  So you have

19   approximately, I estimate about, I don't have my calculator

20   in front of me here, close to 1,900 children that hadn't

21   been seen for 60 to 90 days.

22   Q    Ms. Crabtree, with this data in mind -- well, let me

23   back up a second.

24        Let me now focus your attention on Exhibit 954.

25   Can you identify Exhibit 954?

1    A    Yes, I can.

2    Q    And what is that?

3    A    This is one of the department's monthly operations

4    statistical reports, also called the MOSt report.

5    Q    What do you understand the MOSt report to be?

6    A    The MOSt report takes the areas of safety, permanency

7    well-being and core practice functions at the child welfare

8    agency and establishes the measures that are looked at as

9    far as standards and targets that are set.  This MOSt, this

10   particular MOSt report then lays out the statewide targets,

11   whether it's met or not, and then lays that out also by

12   region.  At the far right side of the report, the report

13   gives you a range across all of those areas.

14   Q    Focusing your attention on the core practice area for

15   visiting children in placement.  Do you see that?

16   A    Yes.

17   Q    Did you review that data in forming your opinions here?

18   A    Yes.

19   Q    How so?

20   A    If you, if you look at the section called core practice

21   functions in the left hand column, and about, one, two,

22   three, it's about the third, it is the third line down it

23   says placed children visited, you'll see that the target is

24   the 90 percent, also the federal requirement is 90 percent,

25   then you can look in your next column --

1              THE COURT:  I'm sorry, I've lost you.  Third line

2     down.

3              THE WITNESS:  Yes, your Honor.

4              THE COURT:  Under performance.

5              THE WITNESS:  Under core practice functions.

6              THE COURT:  I'm sorry.

7              THE WITNESS:  Measures.

8              THE COURT:  Placed children.

9              THE WITNESS:  Visited.

10             THE COURT:  I'm with you.

11             THE WITNESS:  There you are.

12             THE COURT:  Thank you.

13             THE WITNESS:  Okay.  And so if you look to the

14    right of that, the federal target is 90 percent.  And if you

15    go on across that line you can see the next column is the

16    state percent of visitation.  This is from May of 2012.  And

17    if you go on across and look at the area percents.  At the

18    very end of that line is the range visitation, 75.6 to 94.9.

19    Q    Did you place focus on --

20             THE COURT:  Just so I'm --

21             MS. BARTOSZ:  I'm sorry, Judge.

22             THE COURT:  Excuse me.  I didn't mean to talk over

23    you.  You know, the accurate thing is I meant to talk over

24    you, but I need to, and I apologize.

25             The range -- so what I get in these intermediate

1    columns are the averages for the region, at least that's how

2    you read it?

3                THE WITNESS:  That's correct.

4                THE COURT:  And in this last column to the right I

5    get the range from which I can derive that at least within

6    one of these regions the visitation rate for certain people

7    was as low as 75.6 but in another spot in the state it was

8    as high as 94.9.

9                THE WITNESS:  That's right, your Honor.

10               THE COURT:  Right.

11               THE WITNESS:  That's right.

12   Q    That range, does that speak to the range in area office

13   performance among the various regions?

14   A    That's a range across the state.

15   Q    Given the data you reviewed and the -- well, let me back

16   up a second.

17               Did you look at one or more than one home visit

18   reports in the form shown in Exhibit MZ?

19   A    There were multiple, excuse me, there were multiple home

20   visits reports.

21   Q    Did you --

22   A    I believe this is the latest one that I received.

23   Q    Exhibit MZ?

24   A    In June of 2012.

25   Q    And did you have more than one MOSt report to review?

1    A    Yes.

2    Q    Based on your review of the home visit reports and the

3    MOSt reports in relation to visitation, did you form an

4    opinion, Ms. Crabtree, as to whether or not DCF

5    caseworker-child visitation practice meets the applicable

6    standard of professional judgment?

7    A    No, it doesn't.  May I add --

8    Q    Please.

9    A    -- to that?

10   Q    Please.

11   A    The, the information on the report, of course, and the

12   target is set at 90 percent.  But I think it's important

13   to point out that while there may be a place in the state

14   that did hit 94 percent, the difference is not just a

15   number.  The difference is that translates into children.

16   So those are actual children that haven't been seen.  So,

17   anything less than the 90 percent, for example, is a certain

18   number of children who haven't had a connection with their

19   caseworker, haven't laid eyes on them or had that constant

20   person that's in their life for as much as three months.

21   And for young children especially, developmentally, as I

22   know from my children, it's a long time, three months is a

23   long time not to see somebody that tells you that they're

24   going to be seeing you regularly.

25   Q    Ms. Crabtree, did you place focus on the issue of

1    sibling visitation?

2    A   Yes.

3    Q   And what does that term refer to in the child welfare

4    field?

5    A   When children are moved from home into foster care at

6    times they may be separated and the, the fear that is

7    instilled in those children when they're separated from

8    their siblings, from their parents is one thing, and then

9    from their siblings, compounds the trauma for them again.

10   So it becomes extremely important for visitations to happen

11   between brothers and sisters, siblings, so that they can

12   maintain the emotional ties that they have and it's a

13   security for them while they're out of placement and away

14   from their parents.

15   Q   In placing focus on sibling visitation, did you seek to

16   identify laws, regulations or other standards that establish

17   a standard of professional judgment?

18   A   Yes.

19   Q   What did you look at?

20   A   The federal and national standards.

21   Q   Ms. Crabtree, I'll now provide you with a copy of

22   Exhibit SL.  Can you identify what Exhibit SL is?

23   A   Yes.  It's the federal code related to state plans for

24   foster care and adoption.

25   Q   Can you please turn to page 9 of this exhibit.

1              Directing your attention to subparagraph (31),

2    halfway down that page.

3    A    Yes.

4    Q    Did you consider this provision in addressing the issue

5    of sibling visitation?

6    A    Yes, I did.

7    Q    And can you describe how so?

8    A    The, the state -- I'm sorry, the federal code requires

9    that all reasonable efforts have to be made to place

10   siblings together that are removed from their homes.  And

11   the only exception would be if there's a safety reason for

12   not putting those children together.

13             In the case that the children must be separated for

14   some reason, the federal code goes on to require that

15   frequent visitation happen between the siblings unless, of

16   course, there's a safety reason.

17   Q    I'll now show you Exhibit 180, Ms. Crabtree.  Can you

18   identify Exhibit 180, please?

19   A    This is Massachusetts law related to sibling visitation.

20   Q    Did you rely on this exhibit in seeking to identify the

21   applicable standard of professional judgment?

22   A    Yes, I did.

23   Q    How so?

24   A    It states in the Massachusetts law that -- let me find

25   my notation on here that, under (b), which is about halfway

1    down the page --

2         **THE COURT:**  I see it.

3    A    -- it, it states that children in foster care have to

4    have access to visitation with their siblings and their

5    parents and extended family members while they're in care.

6    **Q**    Were you able to identify any standards from child

7    welfare professional organizations that speak to sibling

8    visitation?

9    A    Yes, I did.

10   **Q**    What organizations' standards did you look to?

11   A    The CWLA standards and the Council on Accreditation.

12   **Q**    I'll now show you Exhibit RR.  Ms. Crabtree, can you

13   identify Exhibit RR?

14   A    Yes.  This is related to visitation in foster care to

15   help develop and maintain connections with the family.

16   **Q**    Directing your attention to the second page of this

17   exhibit, provision PA-FC 7.01.  Do you see that?

18   A    Yes.

19   **Q**    Is this a provision that you considered in forming your

20   opinions?

21   A    Yes.

22   **Q**    What consideration did you give to this provision?

23   A    It supports the importance of regular visits and ongoing

24   contact between the child, the parent, and the siblings.

25   And if you look at the section underneath, or in the

1    interpretation, that contact, it's just not physical contact

2    but it includes things like phone calls and letters and

3    shared activities through, they might go together out to the

4    park to play, things like that.

5    Q    I'll additionally provide you with Exhibit QY.  What is

6    Exhibit QY, Ms. Crabtree?

7    A    These are foster family centers of excellence from Child

8    Welfare League of America.

9    Q    And focusing your attention on provision 2.30.  Did you

10   place reliance on that provision?

11   A    Yes.

12   Q    How so, Ms. Crabtree?

13   A    Section 2.3 talks about the best practice of having

14   foster family for a sibling group and having them together

15   and why it's important in the sense of lessening trauma.  It

16   keeps the stress level down for the parents who are still

17   being worked with at home hopefully for reunification

18   purposes, and facilitates the ability to communicate back

19   and forth with the entire family with the caseworker.

20   Q    Now, having identified these standards, did you in

21   performing your work here look for data from DCF management

22   reports that addresses sibling visitation?

23   A    Yes, I did.

24   Q    Were you able to identify any such data?

25   A    They don't track sibling visitation.

1    **Q**    By they you're referring to DCF?

2    A    Excuse me?

3    **Q**    By they you're referring to DCF?

4    A    Yes, DCF does not track sibling visitation.

5    **Q**    How did you determine that?

6    A    The lack of tracking sibling visitation was an area

7    needing improvement in their child and family services

8    review by the federal Administration for Children and

9    Families.

10    **Q**    Did you review any deposition testimony of DCF officials

11    that addressed tracking of sibling visitation?

12    A    Yes.

13    **Q**    What did those officials indicate in that regard?

14    A    The indication from the department officials was that

15    they had intended to build that into their information

16    technology system as a tracking mechanism to use for sibling

17    visitation.  However, they have not done that to my

18    knowledge to this date and in fact prioritized something

19    else in their information technology development ahead of

20    that, so it's still not there.

21    **Q**    You just made reference to the second round CFSR.  I'm

22    going to show you, Ms. Crabtree, Exhibit 33.

23        Can you identify Exhibit 33, please?

24    A    This is DCF's program improvement plan to address areas

25    needing improvement found by the federal CFSR review.

1    Q    Can you please turn to page 7 of the exhibit.  Do you

2    have the table there on Exhibit 7?

3    A    Yes, I do.

4    Q    What does this table address?

5    A    These are the identified items that were found to be

6    areas that needed improvement inside the department.  I'm

7    sorry, inside the agency.

8    Q    And directing your attention to item 13, did you

9    consider that entry in this chart in forming your opinions?

10   A    Yes, I did.

11   Q    What does that entry indicate?

12   A    It indicates that an area needing improvement that was

13   found was visiting with parents and siblings in foster care.

14   Q    Please direct your attention now to Exhibit 1066.  Can

15   you identify Exhibit 1066, Ms. Crabtree?

16   A    Yes.  1066 is a table that shows visits between children

17   and families between 2009 and 2011.  Visits from the -- can

18   I go ahead?

19   Q    Sure.

20   A    This is from the CRC study that was done as part of this

21   lawsuit.

22   Q    Did you give consideration to table 16 in assessing

23   sibling visitation practice within DCF?

24   A    Yes, I did.

25   Q    What information did you glean from this exhibit?

1   A   You can see from this exhibit that of the records that

2   were reviewed by CRC that in the first column under percents

3   you can see that in the records that they reviewed that

4   percent of visit with family and kin, that ten percent of

5   those, 10.8 percent, there were, there were no recorded

6   visits.

7   Q   Did you -- I'm sorry to interrupt, but we're addressing

8   sibling visits.  Could you look down to the bottom right.

9   A   I'm sorry.

10  Q   The bottom row, please.

11  A   The bottom.

12  Q   Thank you.

13  A   49.3 percent of the records showed no sibling visits.

14  Q   Based on this data and the testimony from the state

15  officials that you've referred to, have you formed an

16  opinion with respect to whether or not DCF is managing

17  sibling visitation in conformance with accepted professional

18  judgment?

19  A   Yes.

20  Q   What is your opinion?

21  A   They're, they're not.

22  Q   Did you place additional focus or focus also on

23  visitation on the area of parent-child visits?

24  A   Yes.

25  Q   I would like to redirect your attention at this time,

1    Ms. Crabtree, to Exhibit RR which you should already have.

2        Let me know if you need help locating that.

3        **THE COURT:**  She has it.

4        **MS. BARTOSZ:**  Oh, great.

5    **Q**   Can you identify again Exhibit RR?

6    **A**   The Council on Accreditation Foster Care Services around

7    visitation and the importance of that.

8    **Q**   Does this particular standard focus, or place focus on

9    parent-child visitation?

10   **A**   Yes, it does.

11   **Q**   How does it do so?

12   **A**   It again states the importance of visits between the

13   children and their parents to help stabilize and maintain

14   those relationships and emotional ties.

15   **Q**   Did you place reliance on that standard in forming your

16   opinions?

17   **A**   Yes.

18   **Q**   I'm going to also show you Exhibit QZ.  Can you identify

19   this exhibit, please?

20   **A**   Yes.  This is CWLA, Child Welfare League of America,

21   standards for visitation with parents and describes the

22   positive aspects and experiences that hopefully happen when

23   children and parents visit regularly while they have to be

24   separated.

25   **Q**   Which provision here are you referring to?

1    A    2.42.

2    Q    Did you place reliance on this standard in formulating

3    your opinion?

4    A    Yes.

5    Q    Please return your attention to Exhibit 1, the policy

6    manual.  If you could again turn to page DCFPOL 140.

7         In forming your opinions, Ms. Crabtree, were you

8    able to identify DCF policy that addresses the issue of

9    parent-child visitation?

10   A    Yes.

11   Q    Focusing your attention on this page 140 and the number

12   paragraph 2, did you place reliance on that particular

13   provision?

14   A    Are you referring to the Policy/Social Worker-Client

15   Contact at the top of the page, the bold?

16   Q    I'm looking -- well, go ahead, just --

17   A    Okay.

18   Q    Let me ask a general question.

19        Did you rely on this policy in forming your

20   opinions, and how so?

21   A    Yes.  Yes.  The policy states that it is the

22   responsibility of the social worker to arrange and document

23   in the service plan for the family the schedule of their

24   contacts, client contacts with children and family on a

25   visitation schedule for all their children.  And if you go

1    down further, the second paragraph under that says that they

2    should be monthly visits with the children and with the

3    parents and the placement resources.  If you go further

4    down, the opportunity for contact between the child and the

5    parents should occur as frequently as once a week, or once

6    every other week.

7    **Q**   Now, having identified these standards, did you review

8    performance data or attempt to review performance data to

9    determine whether or not DCF is meeting caseworker or

10   parent-child visitation requirements?

11   A   The department doesn't track caseworker-parent

12   visitation.

13           **THE COURT:**  As far as you know they don't track it

14   at all?

15           **THE WITNESS:**  That's right, your Honor.

16   **Q**   Please now focus your attention to Exhibit 58.  Can you

17   identify Exhibit 58.

18   A   This is the final report on the child and family

19   services review from 2008.

20   **Q**   Did you consider this report in forming your opinions in

21   relation to parent-child visitation?

22   A   Yes, I did.

23   **Q**   Please turn to pages 39 and 40 of this exhibit.  Do you

24   see item 13 there?

25   A   Yes.

1    Q    Visiting with parents and siblings in foster care?

2    A    Yes.

3    Q    And there's two entries where you can check.  One says

4    strength, one says ANI.  Do you see that?

5    A    Yes, I do.

6    Q    And what does ANI designate?

7    A    Area needing improvement.

8    Q    Turning back for a moment to Exhibit 33, page 7.  Item

9    13 was listed on the chart here as an area needing

10   improvement?

11   A    That's correct.

12   Q    That ties to this entry in this final report?

13   A    Yes.  Same thing.

14   Q    Please turn to page 40 -- I'm sorry, please turn to

15   page 40 of Exhibit 58.

16           Did you consider the data in the charts here in

17   forming your opinion?

18   A    Yes, I did.

19   Q    How so?

20   A    If you look at the information at the bottom of the page

21   it gives you a chart of visitation frequency for children in

22   foster care for this particular review and breaks those

23   findings out for that period weekly, or at least twice a

24   month, at least once a month, et cetera.

25           And then to the right it shows you visits with

1    another visit, excuse me, visits with the father and then

2    siblings and foster care visits.

3              **THE COURT:**  What page are you on?

4              **THE WITNESS:**  Page 40, your Honor.

5              **THE COURT:**  Thank you.  The very next page.

6              **THE WITNESS:**  At the bottom.

7              **THE COURT:**  I see it.

8    **Q**   What was found in terms of visitation with fathers and

9    specifically what was found in terms of the rate of no

10   visits occurring during the period under review?

11   A    If you look at the column titled Fathers, where the

12   column is, where the column indicates there were no visits

13   during the period under review, you can see that that number

14   was 40 percent where the children had no visits with their

15   father.

16   **Q**   39 percent.

17   A    I'm sorry, 39 percent.

18   **Q**   Thank you.

19              And with what frequency in this review was it

20   determined that visits with mothers occurred, not at all or

21   less frequently than once a month?

22   A    If you look under the column labeled Mothers that's a

23   number of, if you add the less than once a month or no visit

24   at all it's 34 percent.

25              **THE COURT:**  Let me just check myself that I'm

1  following.

2          You've testified that Massachusetts does not have a

3  system for tracking caseworker visitation with parents.

4          **THE WITNESS:**  That's right.

5          **THE COURT:**  But here in this final report what's

6  being reported is some data that points out the frequency of

7  visits by the children in foster care with either their

8  mother or father.

9          **THE WITNESS:**  That's right.

10         **THE COURT:**  All right.

11         **MS. BARTOSZ:**  May I --

12         **THE COURT:**  And their sibling in the last column.

13         **THE WITNESS:**  That's right.  This particular

14  information, your Honor, is not taken from any sort of DCF

15  system that's in place.  This is from the federal child

16  family services review where they send people out and pull

17  the actual case records and look at the information from the

18  actual documented paper in the record.

19         **MR. COLLINS:**  Objection, your Honor.

20         **THE COURT:**  And the this is Exhibit 58 here.

21         **MR. COLLINS:**  Move to strike; it's not in the

22  report.

23         **THE COURT:**  No, I'm going to let it stand in the

24  exercise of discretion.  It's a reasonable inference from

25  the document before me in any event.

1    **Q**    And, Ms. Crabtree, I would like to redirect your

2    attention now to Exhibit 1066.  Again for clarity of the

3    record, what is Exhibit 1066?

4    A    This is information from the CRC case record review on

5    visitation.

6    **Q**    Did you rely on this table 16 in your assessment of

7    parent-child visitation?

8    A    Yes.

9    **Q**    How so?

10    A    If you look at the middle column that indicates that in

11    13.4 percent of the cases under the column labeled None

12    Recorded, that's the percent of child-parent visits that

13    they were, that were not indicated in the records that were

14    reviewed.

15    **Q**    What do you understand the next two entries in that row

16    to convey?

17    A    Are you referring to 0.1 to 24.9?

18    **Q**    Yes, and to 25 to 49.9.

19    A    Those are the number, or the percents of visits that

20    didn't occur that percent of the time in the record review.

21    So, for example, you could add those up across to get the

22    full total.

23    **Q**    Did you rely upon those entries in forming your opinion?

24    A    Yes.

25    **Q**    Ms. Crabtree, have you formed an opinion with respect to

1    whether or not DCF conforms with accepted professional

2    judgment in its parent-child visitation directives?

3    A    Yes, I have.

4    **Q**    What --

5    A    They do not.

6    **Q**    I'd like to turn now, Ms. Crabtree, to the second part

7    of building block one that you identified.  I think you

8    referred to it as training.

9    A    Training, yes.

10   **Q**    Did you place focus on training in your review here?

11   A    I did.

12   **Q**    And addressing that issue, did you identify standards

13   that apply?

14   A    Yes, I did.

15   **Q**    Let me show you Exhibit RC.  What is Exhibit RC?

16   A    Child Welfare League of America's information about

17   Management and Governance of Child Welfare Organizations.

18   **Q**    Does the standard speak to the issue of training?

19   A    Yes, it does.

20   **Q**    And did you rely on it in forming your opinions here?

21   A    I did.

22   **Q**    Can you describe for us the reliance you placed on this

23   exhibit?

24   A    The Child Welfare League states that an organization

25   should have a training plan, a staff-wide development

1    training plan that encompasses competency based performance

2    of its employees and staff members that are going to be

3    working with children and families, but also people in

4    administrative functions as well, supervisory and up.  The

5    training plan is not just for new employees, but they

6    recommend that it also include in-service and ongoing

7    training.

8    Q    Ms. Crabtree, I'm now going to show you Exhibit RX.  Can

9    you please identify this exhibit for the Court?

10   A    This, this is the Council on Accreditation Training and

11   Supervision sections.

12   Q    Turning your attention to the second page here to the

13   standards PA-TS 1.10, 1.02 and 1.03.  Did you give

14   consideration to these provisions --

15   A    Yes, I did.

16   Q    -- in addressing training?

17   A    Excuse me.  Yes, I did.

18   Q    What consideration did you give to these provisions?

19   A    This information on training and supervision echoes the

20   Child Welfare League information around the importance of

21   having a trained workforce so that people have the skills

22   and the competencies available to do the jobs.

23        Also, it's important to note that they recommend

24   that it be reviewed annually and updated and revised

25   according to any kind of changes that may occur with

1    regulations, policies, procedures, or new best practices.

2    **Q**    Ms. Crabtree, I now would like you to focus your

3    attention on Exhibit IX.  First of all, can you identify

4    Exhibit IX?

5    A    This is from the National Resource Center for

6    Organizational Improvement, and it's in regard to building

7    effective training systems for child welfare agencies.

8    **Q**    What is the National Child Resource Center for

9    Organizational Improvement?

10   A    This, this particular national resource center deals

11   with organizations and management of child welfare systems

12   across the country.  The national resource center as a

13   whole, there are several different types, are all supported

14   through the federal Department of Health and Human Services

15   and Administration of Children and Families.  This

16   particular resource center is located in Maine at the

17   University of Maine.  Southern Maine, I'm sorry.

18   **Q**    Are the National Welfare Child Resource Centers

19   considered to be credible and authoritative sources in the

20   field of child welfare?

21   A    Yes, they are.  They provide technical assistance to the

22   states to help improve their systems.

23        **MS. BARTOSZ:**  Your Honor, plaintiffs would move

24   Exhibit IX into evidence as a learned treatise.

25        **THE COURT:**  Any objection?

1          **MR. COLLINS:**  No objection, your Honor.

2          **THE COURT:**  It may be received.  It will be, excuse

3     me, it will be Exhibit 1092 in evidence.

4          (Exhibit marked in evidence.)

5          **MS. BARTOSZ:**  One moment, I'm sorry, your Honor.

6  **Q**   Let me ask you, as I look here, Ms. Crabtree, did you

7     rely on this exhibit in forming your opinions?

8  A   Yes, I did.

9  **Q**   And how so?

10 A   If you -- can I refer you to a page?

11 **Q**   Absolutely, that would be helpful.

12 A   If you look on page 4 of the document.

13 **Q**   Thank you.

14 A   You'll see that it references, the federal government

15    requires states to provide each year in their state plan for

16    Title IV-E and IV-B funding, which is how they fund their

17    child welfare system, that's how children are paid for in

18    care, part of that plan has to include a training plan that

19    lays out the courses and staff development plan for

20    caseworkers and include components around worker

21    recruitment, retention, and ongoing training.

22 **Q**   Can you please keep this exhibit handy but turn back to

23    your report for a moment, Exhibit JB.  I ask you to turn to

24    page 35.

25          Do you see the series of bullet points on this

1    page?

2    A    Yes, I do.

3    Q    Did you derive that set of bullet points from Exhibit

4    IX, or Exhibit 1092?

5    A    Yes, I did.

6    Q    Can you describe for the Court what information you're

7    conveying here with respect to training in a child welfare

8    system.

9    A    Well, the, the National Resource Center document

10   compilation of information about training development

11   systems includes all of these bullet points that are

12   important in putting together a training system for child

13   welfare, including new hire curriculum, supervisory

14   training, on-the-job training, evaluation, which is, some

15   states use a competency exam, informal and formal ongoing

16   in-service, and a feedback loop on the quality of the

17   training, usually done through surveys of employees who had

18   gone through training to see how they received it.  And also

19   reviewing and updating and keeping that training current

20   based on changes that happen within best practice and

21   regulation policy.

22   Q    Did you make a review of DCF's in-service training

23   program?

24   A    Yes, I did.

25   Q    And were you able to locate documents from DCF business

1    records that addressed that issue?

2    A   Yes.

3    Q   I'd like to first show you Exhibit 56.  Can you identify

4    Exhibit 56, please?

5    A   This is the final assessment from back in 2001 of the

6    first round of the child and family services reviews that

7    were done.

8    Q   If you could please turn to page 40 of this exhibit, and

9    item 33.

10           Did you review and rely on this portion of

11   Exhibit 56 in forming your opinions?

12   A   Yes, I did.

13   Q   What information did you glean here?

14   A   This indicates that there was an area needing

15   improvement in their original child family services review.

16   Q   And is there a specific part of training that was

17   designated as an area needing improvement, in item 33?

18   A   Yes.  Let me find it.

19   Q   Is it shown in item 33?

20   A   That's what I'm looking at.

21   Q   Let me reframe my question.  I'm trying to clarify for

22   the record whether item 33 addresses pre-service training,

23   in-service training, or some other type of training.

24   A   Can you let me --

25   Q   Sure.

1    A    -- look through it.

2         Actually if you look at page 41.

3    Q    Yes.

4    A    At the bottom.  It gives the rationale for why it was an

5    area needing improvement.

6    Q    What information did you glean there?

7    A    That ongoing training was needed to help the workers and

8    supervisors better carry out their duties.  And it

9    identified training needs, including engaging families in

10   case planning, better assessments, addressing mental health

11   and substance abuse issues.  There are a lot of what I would

12   call in-service, ongoing type training elements that are

13   included there.

14   Q    Have you --

15   A    And may I finish?

16   Q    Oh, please.  I'm sorry.

17   A    And also in that particular area is identified that the

18   increasing workload pressures were making it more and more

19   difficult for workers and supervisors to get to any kind of

20   ongoing in-service training that would be offered to them.

21   Q    In reviewing the DCF training curriculum, were you able

22   to determine whether in-service training is mandatory or

23   not?

24   A    In-service training is not mandatory, it's voluntary at

25   DCF.

1    Q    You just looked at documentation with respect to the

2    first round of CFSR.  Let me now show you documentation that

3    relates to the second round, specifically Exhibit 373.

4              Can you identify Exhibit 373, please?

5    A    This is the DCF Performance Improvement Plan, the

6    seventh quarter, quarterly report that's required to be

7    submitted to the federal government.

8    Q    Did you review this document in relation to the training

9    issue?

10   A    Yes, I did.

11   Q    And please turn your attention to pages 16 and 17 of the

12   document.  Do the items 2G and 2G.2 address the issue of

13   training?

14   A    Yes.

15   Q    What information did you glean from those provisions in

16   terms of DCF's training program?

17   A    When the Program Improvement Plan was originally

18   submitted ongoing training was viewed as an area needing

19   improvement.  So in the Program Improvement Plan it

20   submitted to the feds the inclusion of mandatory training

21   was there in the Program Improvement Plan.

22   Q    Did DCF indeed implement mandatory in-service training?

23   A    No, they didn't.  If you, if you, if you notice they've

24   renegotiated that out of the plan based on the fact that it

25   required negotiating that with the union to make it

1   mandatory.  So it was removed.  And so it still remains

2   voluntary.

3   **Q**   Okay.  Was there some other form of training substituted

4   for mandatory caseworker in-service training?

5   A   No.

6   **Q**   Were you able to review -- in assessing training were

7   you able to review any statements made by Commissioner

8   Angelo McClain regarding that matter?

9   A   Yes.

10  **Q**   I'm going to show you Exhibit 387.  Can you identify

11  Exhibit 387?

12  A   Yes, I can.  This is a letter in response to a request

13  from the legislature in Massachusetts question about why any

14  training in DCF was considered voluntary rather than

15  mandatory.

16  **Q**   Where in particular in Exhibit 387 is that addressed?

17  A   Excuse me?

18  **Q**   Where in particular within Exhibit 387 is the voluntary

19  training addressed?

20  A   On the first page on No. 1 is the question from the

21  legislature:  Why is any DCF training voluntary?

22          And after each question is Commissioner's McClain's

23  response to the legislature.

24  **Q**   What did you glean from the Commissioner's response?

25  A   The Commissioner in my finding was not answering the

1    question completely.  Instead, the Commissioner referenced

2    that they strongly encouraged staff to attend ongoing

3    in-service training, that they allow caseworkers and

4    employees to attend conferences, and that any requirement

5    for mandatory training would have to be negotiated through

6    the union.

7              The idea that a conference -- excuse me.

8         **THE COURT:**  Wait a minute.  In all candor, I don't

9    know what to make of that answer.  I have the document and

10   the document, which is executed by the commissioner -- am I

11   correct?  Yes. -- says what it says, and it's in evidence.

12             Now, I don't see how her reflection on -- she

13   thinks he's being evasive seems to trench a little bit on my

14   function.  And you can argue that.  But I don't think that's

15   the place of witnesses to argue that.  I mean no disrespect.

16   She asked the question.  But as I was listening to your

17   answer, this is a little different than your professional

18   judgment that various records evidence a failure of

19   compliances with professional standards.  That's something

20   else.  But when you start saying, well, he's being evasive

21   here, we'll leave that to me.

22             Go ahead, Ms. Barotsz.

23        **MS. BARTOSZ:**  Thank you, your Honor.

24   **Q**   Ms. Crabtree, in assessing DCF's in-service training did

25   you place any focus on the hiring practices of the agency?

1    A    Yes, I did.

2    Q    Can you describe what focus you gave to that issue?

3    A    In relation to training?

4    Q    Yes.

5    A    The structure of the department is such that as there

6    are openings in other areas, functional areas such as

7    adoption or child protective services, resource management,

8    that the more experienced workers from the ongoing casework

9    staff, the caseworkers who carry both family preservation

10   and foster care cases, promote into, or transfer into those

11   positions leaving the new workers to come into the ongoing

12   caseload mixed caseloads function.

13   Q    Why is that significant to you in relation to training?

14   A    Well, the significance of that is that they're brand-new

15   employees picking up some of the most complex work in the

16   department.  And we already know that the caseloads are

17   very, very high.  And the institutional knowledge that would

18   be there, if there were experienced workers left in that

19   pool to help teach and pass on their knowledge and skills to

20   new employees coming into those roles would be significant.

21   But that doesn't happen.  And that's based on information

22   from their self-reported depositions.

23   Q    Ms. Crabtree, I'm now going to show you Exhibit DD.  Can

24   you identify Exhibit DD, please?

25   A    This is a child welfare workforce survey from the

1    American Public Human Services Association from 2004 on

2    state agency workforce across the country.

3    Q   What is the American Public Human Services Association?

4    A   It's an organization that promotes the public human

5    service policies that increase the health and well-being of

6    children and families.

7    Q   Are publications from the American Public Human Services

8    Association considered credible and authoritative amongst

9    child welfare administrators?

10   A   Yes, they are.

11            MR. COLLINS:  Objection, your Honor.

12            THE COURT:  Grounds?

13            MR. COLLINS:  Again, we're getting into a document

14   that this witness relied on.  Again, I think it's

15   appropriate for her to identify but --

16            THE COURT:  Well, the line I'm following is if any

17   of these things themselves have evidentiary materials, I'll

18   let her lay a foundation for its admission.  That's

19   consistent with my expression at the beginning of the trial

20   that I was going to cast the evidentiary net broadly.

21   However, she's not going to testify to anything that's not

22   in the report.  And this sounds like laying a foundation.

23   So, overruled.

24            MS. BARTOSZ:  Your Honor --

25   Q   Well, are publications -- can I read -- was the question

1   answered?  I don't recall.  I can reask it.

2       THE COURT:  Well, what's this American Public Human

3   Services Association?

4       THE WITNESS:  It's a human services organization

5   that promotes improvements in the health and safety and

6   well-being of children and families through research and

7   dissemination of information to the state.

8       THE COURT:  Now, it's clear from your report you

9   relied on this, correct?

10      THE WITNESS:  Yes.

11      THE COURT:  But who -- forget litigation.  Who's

12  the normal audience for these type of things?

13      THE WITNESS:  Public child welfare agencies,

14  private provider organizations, private individuals.  I'm a

15  member as a private individual.

16      THE COURT:  And in your work other than consulting

17  with respect to litigation, I mean, you've had various and

18  presently have various government consulting and you've been

19  an employee of government agencies, do you rely on it?

20      THE WITNESS:  Yes, I do.

21      THE COURT:  Do you have a view whether people so

22  situated rely on this?

23      THE WITNESS:  Yes, I do.

24      THE COURT:  Yes, it may be admitted.  It will be

25  Exhibit 1093 in evidence, DD for identification.

1                  (Exhibit marked in evidence.)

2    **Q**    Ms. Crabtree, will you turn to page 21 of Exhibit 1093.

3              Do you see the table 6 on that page?

4    A    I do.

5    **Q**    Did you give consideration to this table in forming your

6    opinions?

7    A    Yes, I did.

8    **Q**    Can you describe for the Court the information that you

9    gleaned from this table?

10    A    This is a, this is a table that shows some information

11    that was collected from the states on types of training and

12    the number of hours that were mandatory in the states for

13    in-service training.  The years is what I relied on it for.

14    And if you look at across the page, at the top it gives the

15    number of states that responded and then a breakout of

16    different child welfare functions.  Under foster care and

17    adoption workers, we follow that column down to the average

18    number of hours of mandatory in-service training each year,

19    this shows 30 as the mandatory average number of hours

20    required.

21    **Q**    Does table 6 also address the average number of hours of

22    mandatory in-service training for in-home workers?

23    A    In-home protective service workers?

24    **Q**    Yes.

25    A    Twenty-nine.

1    Q   Ms. Crabtree, have you formed an opinion as to whether

2    or not DCF's in-service training program meets standards of

3    professional judgment?

4    A   Yes, and it does not.

5    Q   I'd like to turn back for a moment to the issue of

6    sibling placements and visitation.  I show you Exhibit IY.

7             What is Exhibit IY, Ms. Crabtree?

8    A   This is from another of the national resource centers.

9    This one is the Family, Permanency and Family Connections

10   Resource Center at Hunter College.

11   Q   Is the National Resource Center at Hunter College like

12   the one you earlier referred to at the University of Maine,

13   is it considered an authoritative and credible source in the

14   child welfare field?

15   A   Yes, it is.

16            **MS. BARTOSZ:**  Your Honor, plaintiffs would move

17   Exhibit IY into evidence as a learned treatise.

18            **THE COURT:**  Any objection?

19            **MR. COLLINS:**  No objection to its admittance.

20            **THE COURT:**  IY is admitted Exhibit 1094 in

21   evidence.

22            (Exhibit marked in evidence.)

23   Q   Turning to the second page of that exhibit and the top

24   paragraph.  Did you place focus on that paragraph in your

25   report in this case?

1    A    Yes, I did.

2    Q    For the record, can you indicate what reliance you

3    placed on this exhibit with respect to the issue of sibling

4    visitation?

5    A    It's a paragraph that describes the relationship of

6    siblings and emotional bonds that are nurtured and the

7    importance of placing siblings together for a sense of

8    safety and stability.

9    Q    Ms. Crabtree, I would now like to turn to building block

10   number two that you earlier identified.  I think you

11   described it as the placement and services array.

12           Do I have that right?

13   A    That's right.

14   Q    I would like to begin discussion on building block two

15   by placing focus on the placement array, okay?

16   A    Okay.

17   Q    When you use the term placement array, what do you mean?

18   A    When I use placement, placement array, what I'm

19   referring to is the number of placements available for

20   children who have to be removed from home, the type of those

21   placements, the location, the racial-ethnic diversity of the

22   placements, and the availability of sibling, of families who

23   take sibling groups together, as well as other kinds of

24   categories of children, I guess you'd say, for example,

25   teenagers.

1    **Q**    What significance does a placement array play in

2    operating a child welfare system?

3    A    The significance of having the right mix of placements

4    available for children is that when you have to remove a

5    child from home you want to right off the bat try to get the

6    child to the right place at the right time and not have to

7    move the child from one location to another further

8    traumatizing the child after being removed from home.

9            The placement isn't just about a place for the

10   child to live, it's also about the right kind of foster

11   parents available to work with the right kind of children.

12   **Q**    Are there standards that you've identified in performing

13   your review here that address the issue of recruitment and

14   retention of a placement array?

15   A    Yes.

16   **Q**    Ms. Crabtree, I would now like to provide you Exhibit

17   SG.  Can you identify Exhibit SG, please?

18   A    Yes.  This is the federal code that relates to state

19   plans for child welfare services.

20   **Q**    And turning to the second page of this exhibit, Ms.

21   Crabtree, and in particular attention please focus on item 7

22   about a third of the way down.

23   A    Yes.

24   **Q**    Do you see that?

25   A    Yes.

1    **Q**    Did you rely on that statutory language in reviewing

2    DCF's placement array?

3    A    Yes, I did.

4    **Q**    And what did you glean from this statutory language?

5    A    The federal government requires that states provide

6    diligent recruitment efforts to recruit potential foster and

7    adoptive families that are reflective of the state's ethnic

8    and racial diversity of the children when they need foster

9    and adoptive homes.

10    **Q**    I'd like to now show you Exhibit SS.  Can you identify

11    Exhibit SS, Ms. Crabtree?

12    A    This is also a code of regulations.

13    **Q**    Focusing your attention on page 6 and specifically

14    subparagraph 7(iv) on that page.  Do you see that?

15    A    Yes.

16    **Q**    Did you place reliance, or did you consider, I should

17    say, this regulatory provision in forming your opinions?

18    A    Yes, in order to be in what's called substantial

19    conformity with federal code you have to administer, as I

20    mentioned before, and it states here, diligent recruitment

21    efforts for children who have to be placed out of home.

22    **Q**    Are there standards from professional organizations that

23    address recruitment of foster parents?

24    A    Yes, there are.

25    **Q**    Please direct your attention now to Exhibit RJ.  Can you

1    identify Exhibit RJ, Ms. Crabtree?

2    A    Council on Accreditation Foster Care Services, the

3    recruitment and retention of foster families.

4    Q    And directing your attention to the second page and

5    provision PA-FC 16.02.  Did you consider that --

6    A    Yes, I did.

7    Q    -- COA standard?

8    A    Yes.

9    Q    What consideration did you give to this standard in

10   forming your opinions here?

11   A    The child welfare agency according to the national

12   standards for COA needs a plan to implement and to evaluate

13   constantly the mix of homes that are available for

14   placements for children and should include a regular

15   assessment of the types of those homes.

16   Q    Did you additionally look at CWLA standards on this

17   issue?

18   A    I did.

19   Q    Please take a look now at Exhibit QX.  What is Exhibit

20   QX?

21   A    QX is from CWLA and talks about retention as well as

22   recruitment of foster placements for children.

23   Q    Did you place reliance on provision 3.64 in forming your

24   opinions here?

25   A    Yes, I did.

1    **Q**    Can you please indicate what reliance you placed on that

2    provision?

3    A    It describes a recruitment plan for foster placements

4    needs to include a thorough assessment -- I typically refer

5    to it as a needs assessment -- for the client population

6    that you're trying to serve, what mix of children, the

7    number of available social workers that you have, the

8    distance the caseworkers may have to travel between

9    placements.  You aren't just taking into effect, or taking

10   into account the actual child population, but you're also

11   taking into account the caseworker population and have to

12   include that as part of assessing your ability to provide

13   all of those placements for children, looking at turnover

14   rates of caseworkers and their caseloads and constantly

15   evaluating do I have enough homes and do I have enough

16   workers and is the workload reasonable to get the children

17   taken care of.

18   **Q**    I'm going to show you another CWLA document, Exhibit QW.

19   Can you identify Exhibit QW, please?

20   A    Yes.  This is CWLA information on the relationship

21   between a recruitment plan and retaining those placement

22   resources that are recruited.

23   **Q**    And you made reference to this standard in your report?

24   A    Yes, I did.

25   **Q**    Why did you do so?

1    A    It reinforces the information that I've mentioned about

2    the importance of not just recruiting a bunch of homes.

3    That's not, that's not what a child welfare effective agency

4    does.  If your recruitment plan is solid then you also have

5    to have a way to retain the people that you do have that are

6    good foster placements for your children, and that requires

7    a constant reassessing of multiple pieces of information

8    that come into play.  Do you need more homes in Boston than

9    you need in Springfield.  Do you need more teen homes in

10   Springfield than you need in Worcester.  It's a, it's a

11   variety of pieces of information that have to be put

12   together into a matrix that recruits and then retains and

13   then cycles back and is constantly reassessed to make sure

14   that you're not falling behind and that puts you in a

15   situation of children going into emergency placement

16   situations which is bad for children obviously.

17   Q    Now, having identified these standards, did you review

18   DCF performance in relation to recruitment of the placement

19   array?

20   A    Yes.

21   Q    As part of that review did you look at the capacity of

22   the system in terms of recruitment?  Human resources

23   capacity, I should say.

24   A    I'm sorry, in terms of?

25   Q    The capacity in terms of human resources.

1    A    Oh.  I see.  I did not perform a needs assessment for

2    the state of Massachusetts.  I did look at their internal

3    information in relation to how they talk about recruiting

4    and the foster homes that they have --

5    Q    Is there --

6    A    -- available and their, their acknowledged need.

7    Q    Is the recruitment function within DCF situated

8    somewhere in the central office?  Partly anyway.

9    A    The foster care recruitment function at DCF belongs

10   essentially to one person in the state office.

11   Q    Did you review the testimony of Mary Gambon in this

12   case?

13   A    Yes, I did.

14   Q    And did you review that testimony with respect to the

15   issue of recruitment of foster parents and adoptive parents?

16   A    Yes.

17   Q    What did you glean from that testimony?

18            MR. COLLINS:  Objection, your Honor.

19            THE COURT:  Well, I'm not clear.  What's, what's

20   the objection?

21            MR. COLLINS:  The deposition testimony is in

22   evidence.

23            THE COURT:  That's true.  And so, I guess I'll

24   sustain that.  She can ask another question and we'll see

25   where this is going.

1  **Q**   Did you glean information from Ms. Gambon's testimony

2  that you utilized in assessing DCF's practice in terms of

3  recruitment of foster care placements?

4  A   Yes, I did.

5  **Q**   What testimony from Ms. Gambon did you rely upon in that

6  regard?

7            **MR. COLLINS:**  Objection.

8            **THE COURT:**  Well, the testimony is in evidence.  An

9  opinion witness who's reviewed that evidence is allowed to

10 express the opinion.  So let's ask this question.

11           Based upon your review of her testimony, since

12 that's, Ms. Bartosz wants you to focus on this witness, what

13 effect did that have on forming your opinion in this case,

14 any of your opinions in this case?

15           **THE WITNESS:**  It had a great deal of effect.

16           **THE COURT:**  And?  What is it?

17           **THE WITNESS:**  And that effect was that --

18           **MR. COLLINS:**  I'm sorry, your Honor, I can't hear

19 the witness.

20           **THE COURT:**  She started to say that effect is.  I

21 said:  What is it?  What effect?

22           **MR. COLLINS:**  Thank you.

23           **THE COURT:**  Now she's going to tell us.

24           **THE WITNESS:**  It had a great deal of effect.  The

25 information that was available to me through that testimony

1    indicated that there's one person in the state office

2    responsible for recruitment for the entire state of

3    Massachusetts.  That in itself would tell me that that may

4    be an impossible task for one person to take on recruitment

5    for several thousand children as well as the other

6    information available which indicated that she had

7    originally had a staff up to six people to assist her who

8    were full-time recruiters and those positions had been

9    eliminated.

10   Q    Were you able to determine from Ms. Gambon's testimony

11   whether DCF conducts needs assessments as you earlier

12   referred to them?

13   A    They don't do what is called a needs assessment, no.

14   Q    Were you able to determine how DCF sets targets of any,

15   for purposes of conducting recruitment of foster homes?

16   A    The only information that was available was that a

17   directive had been sent to the regions to send in regular, a

18   regularly scheduled recruitment report and the report was to

19   indicate what they needed in the way of placements.  That

20   wasn't done and the information from the department was that

21   they hadn't followed up on that and it was overdue and they

22   didn't intend to ask for it.

23   Q    In your review of DCF's recruitment --

24           **THE COURT:**  Give me that answer again.  I'm lost

25   between the pronouns.  The information you got there is that

1     the information was coming from somewhere.  Where?

2          **THE WITNESS:**  The, the central office sent a

3     directive to the regions to provide regular recruitment

4     report that was due at a certain point in time.  And the

5     reports were not received by the department by their

6     admission and they didn't request the report and they didn't

7     intend to request the reports.

8          **THE COURT:**  Thank you.

9     **Q**   In your review of DCF's recruitment activities were you

10    able to determine whether the agency sets any form of

11    recruitment goal?

12    A   They set a generic number of 1,000 homes.

13    **Q**   What do you mean by generic?

14    A   The 1,000 homes was a number.  It was not connected to

15    any kind of racial or ethnic diversity or geographic

16    distribution or siblings or young versus teens.  There was

17    no information.  It was just a number of a thousand generic

18    homes.

19    **Q**   Did you make a finding with respect to the adequacy of

20    using a generic 1,000 home target?

21    A   There's no way to know if that's useful or not since

22    there's no needs assessment that accurately indicates what

23    the state actually needs in the way of placements.

24    **Q**   As we talk about the placement array within DCF, I would

25    like to place focus now on this aspect of that array.  Are

1    you familiar with the term hot line home?

2    A    Yes, I am.

3    **Q**    And to your understanding what does that refer to within

4    DCF?

5    A    Hotline homes are used as temporary emergency homes for

6    children where a foster parent or foster parents may agree

7    to take a child on a temporary basis, usually for no more

8    than one night, and then the child must move again.

9    **Q**    In conducting your review at DCF's replacement array did

10   you place focus on hotline homes?

11   A    Yes.

12   **Q**    I would like to show you now Exhibit 342.  Can you

13   identify Exhibit 342, please?

14   A    This is an e-mail from the Commissioner to his senior

15   staff in regard to hotline homes in which he points out that

16   a young three-year-old child is having to be moved from a

17   hotline home, also he refers to as night-to-night homes, and

18   that he realizes that that's not good for children and

19   thinks that they should be able to do better.

20         He also states that he's preaching to the choir

21   which essentially indicates that he thinks they agree with

22   him.

23         **MR. COLLINS:**  Objection.

24         **THE COURT:**  Yes, I'm going to treat that as a

25   motion to strike and strike it out --

1          **MR. COLLINS:**  Yes.  Sorry.

2          **THE COURT:**  -- as a matter of discretion.  I can

3    read.  She's simply reiterating for me what the document

4    says.  Now, on this tabular, there's many tabular exhibits

5    here, and I've needed assistance in figuring out what the

6    tables mean.  But these are just natural inferences.  I

7    don't need specialized testimony.  I mean no disrespect.  I

8    understand what preaching to the choir means.

9          Go ahead, Ms. Bartosz.

10          **MS. BARTOSZ:**  Thank you, your Honor.

11   **Q**   Were you able to determine in reviewing the issue of

12   hotline homes whether action was taken by DCF to address the

13   concerns raised by the Commissioner following the

14   transmission of this e-mail?

15   A    No action was taken.  Excuse me, may I clarify that?

16   **Q**    Sure.

17   A    As far as I know to this point no action was taken to

18   resolve the problem of the night-to-night hotline homes

19   where children would move frequently.

20   **Q**    How did you determine that?

21   A    There was further information from the department.

22   **Q**    Did some of that information include testimony from

23   Commissioner McClain?

24   A    Yes, it did.

25          **MR. COLLINS:**  Objection, your Honor; leading.

1    Q   Did you review testimony from any state official --

2         **THE COURT:**  Wait a minute.

3         **MS. BARTOSZ:**  I'm sorry, Judge.

4         **THE COURT:**  Wait a minute.  His objection is on a

5    narrow ground, it's leading.  I have a more fundamental

6    problem.  It's one thing to call an experienced and skilled

7    witness and make reference to standards, and I've cast the

8    net broadly, and then to receive her opinion relative to

9    compliance with those standards.

10        Now, the gravamen here is she says that nothing was

11   done.  And I think we ought to leave it at that.  I don't

12   know that she's, I mean is especially qualified to go into

13   the assessment of the prosecution here or -- I'm not clear

14   what you're asking.  Nothing was done.  There's no evidence

15   that anything was done.  If they, if they -- that's it.

16   Nothing was done.  I made a note.

17        **MS. BARTOSZ:**  Thank you, Judge.

18        **THE COURT:**  Now, if on cross-examination that's not

19   so, if something was done, then you'll get a chance to go

20   back over it with her.

21        **MS. BARTOSZ:**  Thank you, your Honor.

22   Q   Ms. Crabtree, in assessing DCF's placement array, did

23   you place focus on whether children are placed in their

24   communities when removed into foster care?

25   A   Yes.

1    **THE COURT:**  And that simply means geographically

2    close to their home from which they were removed?

3    **THE WITNESS:**  Of course.

4    **Q**   I'm going to show you Exhibit 944, Ms. Crabtree.  Can

5    you identify Exhibit 944?

6    **A**   This is a breakout where children are located or not

7    located in the various areas of the state.

8    **Q**   Was this information provided to you as you formed your

9    opinions in this case?

10   **A**   Yes.

11   **Q**   Did you consider the data here in formulating your

12   opinions?

13   **A**   Yes.

14   **Q**   Would you please turn to the last page of Exhibit 944.

15   And I would like to focus your attention on the final

16   columns of information for the period 3-31-2012.

17   Do you see that?

18   **A**   Yes.

19   **Q**   And there are four columns on the top in that period

20   starting from number of children placed in area of origin

21   through number of children placed?

22   **A**   Yes.

23   **Q**   Did you rely upon this information in forming your

24   opinions here?

25   **A**   Yes.

1    **Q**    What reliance did you place on this information?

2    A    If you look at the number of children that are placed

3    out of region and out of area and then look at the total

4    number of children placed and do the math there, then you

5    can see that, you can see that, I think the number is closer

6    to three percent of children are placed elsewhere than their

7    area of natural family.

8    **Q**    And was that significant to you in forming your

9    opinions?

10    A    Yes.

11    **Q**    Why was that so?

12    A    That's very high in my opinion and indicates that

13    available resources for those children, that's a lot of

14    children, it's not just a percent, that those children are

15    not close to family, they tend to change schools most

16    likely.  They may have new medical care physicians that

17    they've got to become familiar with.  Caseworkers may have

18    to travel long distances to visit the children.  And it's

19    much more difficult to renew when the child's far away from

20    his parents.

21    **Q**    Ms. Crabtree, I would now like to show you Exhibit IV.

22    Can you identify Exhibit IV, please?

23    A    This is from National Conference of State Legislatures

24    and it's concerning finding permanent homes for children.

25    **Q**    Let me ask you again, is the National Conference of

1    State Legislatures considered to be a credible and

2    authoritative source in the field of child welfare?

3    A   Yes, it is.

4            **MS. BARTOSZ:**  Your Honor, plaintiffs would move

5    into evidence Exhibit IV as a learned treatise.

6            **MR. COLLINS:**  Objection; same grounds as earlier,

7    your Honor.

8            **THE COURT:**  Noted, but overruled.  And the IV is

9    admitted in evidence.  And it will be Exhibit 1095 in

10   evidence.

11           (Exhibit marked in evidence.)

12   **Q**   Ms. Crabtree, focusing your attention on the first two

13   full paragraphs on page 1 of this exhibit.  Can you indicate

14   to the Court what reliance you placed on Exhibit 1095 in

15   forming your opinions?

16   A   The first paragraph reinforces the child welfare focus

17   of the permanent home for a child as the, the key element of

18   the safety for children, they have to be associated with the

19   state child welfare system.

20   **Q**   Looking at that second paragraph did you rely on that in

21   relation to the issue of the geographic spread of foster

22   care placements and where children are placed?

23   A   Yes.

24   **Q**   How so?

25   A   The importance of a stable, nurturing home that benefits

1    that children in terms of furthering their education and

2    their health, having available a network of friends and

3    familiar communities that they live in and activities that

4    they're part of helps them to grow up to be productive

5    members of society as opposed to children who move from

6    place to place and many times far away from home with

7    strangers and in situations that can be pretty frightening

8    for a child.

9    Q    Based upon the information that you gleaned from

10   Exhibit 944, have you formed an opinion with respect to

11   whether the DCF placement array meets standards of

12   professional judgment in terms of the geographic

13   availability of homes for children?

14   A    It does not.

15        **MS. BARTOSZ:**  Your Honor, I note it's 12:59.  I'm

16   about to turn to a new topic.

17        **THE COURT:**  Then it's a good time to stop.

18        You may step down, ma'am.

19        **THE WITNESS:**  Thank you.

20        (Whereupon the witness stepped down.)

21        **THE COURT:**  Let me ask you this question.  This

22   isn't your last witness, I take it?

23        **MS. BARTOSZ:**  Judge, it is our, Ms. Crabtree will

24   be our last witness or second to last witness.

25        **THE COURT:**  All right.  Well, let me anticipate

1    then.  I'm going to short you an hour tomorrow.  We'll take

2    a shorter recess, only 15 minutes.  That will make up some

3    of the time.  But I'm going to short you an hour.  Now --

4    because I am holding a motion session out at Boston

5    University tomorrow afternoon and we have to leave.

6         But, mechanically here, what's going to happen is,

7    I then have three jury trials.  None of them are going to

8    settle.  Two of them are pro se.  They won't settle.  The

9    other one, which is a two week trial, conceivably could

10   settle, but they've shown no evidence.

11        That's March right there.  Now, it will be helpful,

12   just as a matter of case management, if I have a record

13   against which the defense can move.

14        Let me suggest that, that one way to do this -- the

15   defense naturally has a chance to cross-examine this

16   witness, because in a jury waived case, to the extent she's

17   found not persuasive, it doesn't count in the calculus of

18   whether we should go further.  And you're going to get that

19   right.  And really the whole day's been used up with her

20   direct examination.  I don't criticize that at all.

21        But a way to do this would be to forgo

22   cross-examination, for now, let them put on their last

23   witness tomorrow, and recognizing, since the word rest has

24   some give there, because we have to work out exhibits, then

25   you could start, and there's going to be a month while I'm

1    doing other work anyway, you could start in.

2          To make that a carrot, let me suggest the following

3    since the manner and order of examination is for me.  If you

4    go for that, so they can wind up tomorrow, I will allow you

5    to recall the witness and -- well, I'm not really giving you

6    anything.  It's an adverse witness.  You can cross-examine

7    the witness, and I give you general cross-examination

8    anyway.  So, it wouldn't change.  If it's in your case

9    you're going to get wide open cross-examination of these

10   last two witnesses anyway.

11         I'm not requiring anything.  Just think about it.

12   I have to stop at 12:00 tomorrow.  Talk among yourselves.

13   But in essence, pursuant to the explanation, or the way I

14   was going to manage this case going in, there's a month

15   while I'm trying jury cases.  I might call you back, but I

16   consider it highly unlikely, other than for afternoon

17   arguments.

18         I'm going to recess now.  But you can talk it over

19   and we have the day tomorrow.

20         MR. COLLINS:  Your Honor, may I just ask one

21   question?

22         THE COURT:  Of course.

23         MR. COLLINS:  I don't have a problem with what you

24   propose.  My concern is this word rest.  We've heard from

25   plaintiffs that they intend to try to get admitted a number

1    of uncontested exhibits.

2              My concern is this, is the filing of the DV motion.

3    Until, unless and until all of that evidence is in we can't

4    file our DV motion.  We could go the month of March

5    without --

6              **THE COURT:**  No one's going to be -- I don't think

7    anyone's going to be sandbagged.  And I try to be practical,

8    even though it's the month of March.  I told you at the

9    beginning I would give you whatever time you wanted --

10             **MR. COLLINS:**  Sure.

11             **THE COURT:**  -- to prepare this voluminous evidence.

12    I expect the memoranda that are filed to be helpful to the

13    Court in focusing me, though I'm going to grind ahead and

14    carefully review deposition exhibits.  But I've got a stack

15    of exhibits referred to here behind the bench that's almost

16    as high as where I sit.  Half as high as where I sit.  Now,

17    in all candor some of them I've looked at in more detail

18    than others.  And unless they're referred to as a glowing

19    radioactive thing in a deposition, it's not likely I'm going

20    to go back and review them on my own.

21             Depositions carefully, yes, but not necessarily

22    exhibits.  The adversary process is going to work.  You're

23    going to do that for me.  And so are the plaintiffs with

24    equal skill.  And then we'll see where we are.  So, I'm not

25    pressing you.

1              The shorter answer is this.  If I need you back

2     here, no one's saying you have to file your motion, but

3     you've got to start putting on an affirmative case.  I'm

4     going to work you to work through all these days that we've

5     agreed that the parties might put on evidence.  That's all.

6              MR. COLLINS:  Understood, your Honor.

7              THE COURT:  So you work it out.

8              MR. COLLINS:  That helps.

9              THE COURT:  I'll give you the -- I need your motion

10    to be a good one, if you will, and I need their response to

11    be equally focused and good.  But if you take longer time --

12             MR. COLLINS:  Okay.

13             THE COURT:  -- and I'm ready, you're going to have

14    to spend the time in court presenting an affirmative case.

15             MR. COLLINS:  All right.

16             THE COURT:  All right.  The total elapsed time now

17    at the end of eleven days of trial is plaintiff, six days,

18    one hour, 15 minutes, defense, four days, two hours, 15

19    minutes.

20             We'll recess until 9:00 a.m. tomorrow morning.

21    We'll recess.

22             THE CLERK:  All rise.

23             (Adjournment.)

24

25

**C E R T I F I C A T E**

I, Donald E. Womack, Official Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.


/S/ DONALD E. WOMACK 5-7-2013
_____
DONALD E. WOMACK
Official Court Reporter
P.O. Box 51062
Boston, Massachusetts 02205-1062
womack@megatran.com