```
 1              UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MASSACHUSETTS
 2
                                     Civil Action
 3                                   No. 10-30073-WGY

 4   * * * * * * * * * * * * * * * * * * * * *
                                             *
 5   CONNOR B., by his next friend, ROCHELLE  *
     VIGURS, et al., individually and on behalf *
 6   of all others similarly situated,        *
                                             *
 7           Plaintiffs,                      *
                                             *  BENCH TRIAL
 8   v.                                       *  (Volume 12)
                                             *
 9   DEVAL L. PATRICK, in his official capacity *
     as Governor of the Commonwealth          *
10   of Massachusetts, et al.,                *
                                             *
11           Defendants.                      *
                                             *
12   * * * * * * * * * * * * * * * * * * * * *

13           BEFORE:  The Honorable William G. Young,
                            District Judge
14   APPEARANCES:

15           NUTTER, McCLENNEN & FISH, LLP (By Daniel J.
        Gleason, Esq. and Jonathan D. Persky, Esq.), World
16      Trade Center West, 155 Seaport Boulevard, Boston,
        Massachusetts 02210-2699
17           - and -
             CHILDREN'S RIGHTS (By Sara M. Bartosz,
18      Esq., Laurence D. Borten, Esq., Sarah Russo, Esq.
        Rachel Brodin, Nili, Esq. and Jessica E. Polansky,
19      Esq.), 330 Seventh Avenue, Fourth Floor, New York,
        New York 10001, on behalf of the Plaintiffs
20
             OFFICE OF THE MASSACHUSETTS ATTORNEY
21      GENERAL (By Liza Tran, Jason B. Barshak and
        Jeffrey T. Collins, Assistant Attorneys General),
22      One Ashburton Place, Boston, Massachusetts 02108,
        on behalf of the Defendants
23
                                     1 Courthouse Way
24                                   Boston, Massachusetts

25                                   March 1, 2013
```

<u>**I N D E X**</u>

**WITNESS:**              **DIRECT**   **CROSS**    **REDIRECT**   **RECROSS**

CATHY CRABTREE, Resumed

   By Ms. Bartosz    4

                                           **FOR**      **IN**
   **EXHIBITS:**                          **I.D.**   **EVID.**


     1096 NCSL Education Document   . . . . . . . .12

1          **THE CLERK:**  All rise.  The United States District

2     Court is now in session, you may be seated.

3          **THE COURT:**  Good morning.  And if you would remind

4     the witness.

5          **THE CLERK:**  I would like to remind you that you are

6     still under oath.

7          **THE WITNESS:**  Yes.

8          **THE COURT:**  There's one thing I should say, and it

9     just picks up on our discussion yesterday.  I got talking

10    off the top of my head and I said to the defense I'm not

11    really giving you anything if you forgo cross-examination.

12    It occurs to me that if you want, sort of as a sweetener, we

13    could require the witnesses, these two witnesses to come

14    back for cross-examination before we have oral argument on

15    the motion, that would take a day, and certainly if you want

16    to start your case by recalling those witnesses you have

17    that right, and then we would do the argument.  I'm just

18    trying to use, primarily, or primarily to be fair and just,

19    and secondarily, to use my time efficiently.

20          Very well.  Ms. Bartosz.

21          **MS. BARTOSZ:**  Yes.  And, your Honor, just to

22    apprise the Court, plaintiffs intend on completing their

23    direct examination of Ms. Crabtree and in terms of live

24    witnesses resting their case at this point.

25          **THE COURT:**  Thank you.  Thank you.

| | |
|---|---|
| 1 | CATHY CRABTREE, Resumed |
| 2 | **DIRECT EXAMINATION** (Cont'd) |
| 3 | **BY MS. BARTOSZ** |
| 4 | **Q**   Good morning, Ms. Crabtree. |
| 5 | A   Good morning. |
| 6 | **Q**   When we left off yesterday we were focused on building |
| 7 | block two that you had identified with respect to placement |
| 8 | array. |
| 9 | Do you recall that? |
| 10 | A   Yes. |
| 11 | **Q**   I would like to focus again on building block two with |
| 12 | you, all right? |
| 13 | In assessing building block two, Ms. Crabtree, did |
| 14 | you place focus on the DCF supply of foster homes capable of |
| 15 | serving adolescents or teens in foster care? |
| 16 | A   Yes, I did. |
| 17 | **Q**   Would you please turn to Exhibit 33.  I think it's right |
| 18 | on top, Ms. Crabtree. |
| 19 | A   Oh, I'm sorry, I was looking at exhibit number, the |
| 20 | wrong exhibit. |
| 21 | **Q**   Do you have that? |
| 22 | A   I do. |
| 23 | **Q**   And could you turn to page 46, please. |
| 24 | As you've already indicated yesterday in your |
| 25 | testimony, you said that Exhibit 3 is the Program |

1    Improvement Plan that DCF entered into following its second

2    round CFSR?

3            **THE COURT:**  It's 33, isn't it?

4            **MS. BARTOSZ:**  Thirty-three, that's right, Judge.

5    **Q**    Yes?

6    A    Yes.

7    **Q**    Did you give consideration to items 3B and 3B.1 on

8    page 46 of Exhibit 33 in forming your opinions?

9    A    Yes, I did.

10   **Q**    And what consideration did you give to those provisions?

11   A    In the Program Improvement Plan the department stated

12   that one of the action, or two of the action steps that they

13   intended to take were to develop strategies to recruit more

14   foster homes for teenagers and to implement those strategies

15   by way of an analysis of placement stability.

16   **Q**    And did you in conducting your review seek to determine

17   whether these action steps were pursued?

18   A    Yes.

19   **Q**    Ms. Crabtree, can you return your attention now to

20   Exhibit 373.  And as you have already indicated, this is one

21   of the PIP quarterly reports submitted by DCF during the

22   second round PIP?

23   A    Yes.

24   **Q**    Could you turn to page 20.  I'm sorry, to pages 52 and

25   53.  And do you see that here on page 52 and to 53 that

1    action step 3B is addressed?

2    A    Yes, I do.

3    Q    Did you give consideration to this portion of

4    Exhibit 373 in forming your opinions?

5    A    Yes, I did.

6    Q    What information did you glean from this document that

7    you relied upon in forming your opinions?

8    A    The document, the quarter 7 quarterly report, Program

9    Improvement Plan, indicates that they are asking to change

10   the strategy for recruitment of homes.

11   Q    And was that strategy changed?

12   A    Yes, it was deleted.

13   Q    What was deleted?

14   A    Improving placement stability during the first three

15   months by increasing the focus on teenage recruitment of

16   homes.

17   Q    In your review of DCF's placement array following the

18   deletion of the adolescent home action step, were you able

19   to identify any targeted efforts by DCF to focus on

20   recruitment of adolescent homes?

21   A    No, I was not.

22        THE COURT:  Well, let me see if I understand the

23   bottom line of your testimony.

24        From these, review of these documents they say

25   they're going to change their strategy, but the way you view

```
 1    these documents, what happens is they simply delete this
 2    action step and so far as you can see take no targeted, make
 3    no targeted effort to increase the supply of foster homes
 4    that can handle teenage children?
 5             THE WITNESS:  That's correct.  That's correct.
 6    Q    Ms. Crabtree, did you --
 7             THE WITNESS:  Excuse me, may I clarify though?
 8         MS. BARTOSZ:  Please.
 9         THE COURT:  You may, always.  If you've misstated
10    or I have misunderstood, and that's true, if you've made a
11    mistake on anything, you can always go back and correct it.
12             THE WITNESS:  Okay, thank you, your Honor.
13             It was -- to elaborate just a little bit on that.
14    It was not simply to delete the focus on recruitment of
15    teenage homes, which they had expressed a need for, they
16    shifted the focus placement to kinship care, in other words,
17    relative placements.
18             MS. BARTOSZ:  Thank you.
19         THE COURT:  And again, so I'm following, and we all
20    live in limited resources, so your refinement on what I've
21    earlier understood is it's not that they just cut out
22    positions, if you will, what they did was change their focus
23    to improve kinship care?
24             THE WITNESS:  That's correct.
25    Q    And do you have an opinion with respect to that shift in
```

1    focus to kinship care and away from the action step calling

2    for recruitment of adolescent homes?

3    A   The original statement I think I made around the need to

4    do a thorough needs assessment about what you actually need

5    in the way of placements would still stand as to how they

6    should approach knowing what they need and in what

7    quantities and where.  So that really doesn't make a

8    difference.  There's certainly -- it's always commendable to

9    make an effort to seek kin first.  There are many, many

10   children who are not in that position of having a relative

11   available.

12   Q   In reviewing the DCF placement array, did you place any

13   focus on the supply of homes capable of accepting sibling

14   groups?

15   A   Yes.

16   Q   Would you once again look at Exhibit 33, and

17   specifically page 19.

18           Do you see the heading Placement with Siblings?

19   A   Yes.

20   Q   Did you rely upon this portion of Exhibit 33 in forming

21   your opinions?

22   A   Yes, I did.

23   Q   How so?

24   A   This, this section of the Program Improvement Plan

25   recognizes that the department places importance on, they

1    understood the importance of placing siblings together and

2    they've done some analysis around home removals and

3    separation of siblings, and they expressed that they don't

4    really have a strategy in place for tracking whether

5    siblings are placed together or not.

6    **Q**    In your review of the DCF placement array were you able

7    to identify targeted strategies within DCF to recruit homes

8    capable of serving sibling groups?

9    A    No, there weren't.

10   **Q**    You've served as an administrator of a child welfare

11   agency.  Are there foreseeable consequences, Ms. Crabtree,

12   when an agency does not have an adequate supply of foster

13   homes, assuming that to be the case?

14            **MR. COLLINS:**  Objection.

15            **THE COURT:**  Grounds?

16            **MR. COLLINS:**  Leading.

17            **THE COURT:**  Well, it is leading but --

18            **MS. BARTOSZ:**  I'll -- I'm sorry.

19            **THE COURT:**  Go ahead.

20            **MS. BARTOSZ:**  I'm happy to restate it.

21            **THE COURT:**  Leading.  Sustained.

22   **Q**    What are the consequences, to your understanding, to a

23   foster care system should it have an inadequate supply of

24   foster homes?

25            **MR. COLLINS:**  Objection, your Honor.

1          **THE COURT:**  Grounds?

2          **MR. COLLINS:**  This is not in the report.

3          **THE COURT:**  Where is it?

4          **MS. BARTOSZ:**  Your Honor, I'll -- it's in the

5    report.  I'll reframe the question to make that more clear.

6          **THE COURT:**  Fine.

7    **Q**    Ms. Crabtree, in assessing the placement array within

8    DCF, did you consider the issue of placement stability?

9    A    Yes, I did.

10   **Q**    And what do you understand that term to mean, placement

11   stability?

12   A    Placement stability indicates that for a child that must

13   go through the trauma of being removed from home that the

14   outside-the-home placement of the child should be stable as

15   possible, just what it says, and that the child should be in

16   familiar surroundings, as close to their natural home as

17   possible and with as few unnecessary moves as can possibly

18   be managed.

19   **Q**    Ms. Crabtree, at this time I am going to focus your

20   attention on Exhibit 54.  Can you identify Exhibit 54, Ms.

21   Crabtree?

22   A    Yes.  This is a report from National Research Center

23   Child Welfare Data and Technology done by Dr. Penny Maza.

24   It concerns placement stability in Massachusetts.

25   **Q**    Did you review this document in formulating your

1    opinions?

2    A    Yes.

3    Q    Would you please turn to page 3 of this document.  Did

4    you rely upon the information provided on page 3 in forming

5    your opinions?

6    A    Yes.

7    Q    Would you describe to the Court what consideration you

8    gave to this information?

9    A    The document as a whole talks about placement moves.

10    And if you look at the CFR measures that are listed on page

11    3, at the last bullet it indicates that Massachusetts ranks

12    43rd out of the 51 states on placement stability for

13    children.

14    Q    Did you give consideration in formulating your opinions,

15    Ms. Crabtree, to the issue of placement stability in

16    relation to education?

17    A    Yes, I did.

18    Q    I'm going to present you with Exhibit IZ.  What is

19    Exhibit IZ, Ms. Crabtree?

20    A    I'm sorry, I didn't hear you.

21    Q    Can you identify Exhibit IZ, please, for the Court?

22    A    IZ is a document from the National Conference of State

23    Legislatures on educating children in foster care.

24    Q    Is this a document that you reviewed in forming your

25    opinions?

```
1    A    Yes.

2    Q    And we've addressed before, but I'll ask you again, is

3    the National Conference of State Legislatures considered to

4    be an authoritative and credible source in the field of

5    child welfare?

6    A    Yes, it is.

7              MS. BARTOSZ:  Your Honor, plaintiffs offer Exhibit

8    IZ into evidence as a learned treatise.

9              THE COURT:  Do you object?

10              MR. COLLINS:  Yes, your Honor.  Object on the

11    grounds that this does not meet the criteria under the

12    Federal Rules of Evidence.

13              THE COURT:  Noted, but overruled.  IZ is admitted

14    Exhibit 1096 in evidence.

15              (Exhibit marked in evidence.)

16    Q    Ms. Crabtree, could you please turn to page 3, or, I'm

17    sorry, the second page of this exhibit.

18              Do you see the four bullet points there?

19    A    Yes.

20    Q    Did you rely upon those in forming your opinions?

21    A    Yes, I did.

22    Q    How so?

23    A    These bullet points summarize the high points in the,

24    I'm sorry, in the treatise that talks about the factors that

25    cause negative impacts on youth and their educational
```

1    progress, including frequent placement changes where they

2    have to also change schools, where they're trying to track

3    children's educational records and sometimes those records

4    don't make it to that school; the inability or

5    ineffectiveness of education in child welfare and other

6    service providers for children to coordinate the activities

7    around the child while they're in school, especially special

8    needs children; the lack of what some states have in place

9    an educational advocate or education specialist that can

10   focus on the children in particular regions that are inside

11   the child welfare system.

12   **Q**   Ms. Crabtree, could you quickly turn to page 4.  And do

13   you see the heading Educational Stability?

14   **A**   Yes.

15   **Q**   That first sentence there, did you make reference to

16   that in your report?

17   **A**   Yes.

18   **Q**   And for the record, can you read that sentence, please?

19   **A**   One significant barrier to the educational success of

20   children and youth in foster care is the placement and

21   instability resulting from school mobility.

22   **Q**   In considering the education issue, Ms. Crabtree, did

23   you identify policies or standards addressing that matter?

24   **A**   Yes, I did.

25   **Q**   At this time, Ms. Crabtree, I would like to show you

1    Exhibit SO.  Can you identify Exhibit SO, please?

2    A    This is federal law regarding federal payments for

3    foster care adoption.

4    Q    Could you please turn to page 3 of this document.  And

5    do you see provision G at the top of the page?

6    A    Yes.

7    Q    Sub (i), and downward.

8          Did you rely on these statutory provisions in

9    formulating your opinions?

10    A    Yes.

11    Q    How so?

12    A    The federal law states that there must be a plan for

13    ensuring educational stability of a child while they're in

14    foster care.

15          May I go on?

16    Q    Yes, you may.

17    A    It's also important that, the federal law states, that

18    there are assurances made that the child is placed as close

19    as possible in proximity to the school that they are

20    currently enrolled in at the time they're removed to foster

21    care.

22    Q    In conducting your review did you seek out information

23    in DCF records regarding educational stability?

24    A    Yes.

25    Q    I'm now showing you Exhibit 636.  Can you identify

1    Exhibit 636?

2    A    This was a presentation, a readiness cabinet

3    presentation for DCF children attending underperforming

4    schools, from 2010-2011.

5    Q    Did you review this document in forming your opinions?

6    A    Yes.

7    Q    Let me specifically address or focus your attention now

8    on page 16 of this document.  Do you have that?

9    A    Yes, I do.

10   Q    Did you factor the information on page 16 in formulating

11   your opinions?

12   A    Yes, I did.

13   Q    How so, ma'am?

14   A    This gives an overview of the impact, the results that

15   can occur, the particular page on behavior, when students

16   are moved frequently when they're in foster care placements.

17            THE COURT:  I note that this page in the copy

18   delivered to the Court has a handwritten --

19            MS. BARTOSZ:  Your Honor?

20            THE COURT:  -- glossary here.

21            MS. BARTOSZ:  I think I gave you my lawyer's notes.

22   I'll trade with a clean exhibit, your Honor, and I

23   apologize.

24            THE COURT:  No apology is necessary.  But thank

25   you.  Right.

1  Q    I'm sorry, Ms. Crabtree, what reliance did you place on

2  the information that you've gleaned on page 16?

3  A    This indicates results that can happen in the behavioral

4  area with students who are moved frequently while they're in

5  foster care.

6  Q    And what were you able to determine from the information

7  here?

8  A    That children who are frequently moved in foster care

9  from this information are more likely to be truant, they're

10 more likely to be runaways.  There are risks that they be

11 suspended from school for behavioral episodes.  And the

12 information on the page actually gives you the information

13 related to students with three or more moves, with no moves,

14 and compares, this is the Springfield public school system,

15 as I understand it, from the information I looked at, and

16 the UPS is the underperforming school and non-UPS indicates

17 non-underperforming schools.

18 Q    Based on your review of this information what finding or

19 conclusion did you reach regarding the impact, if any, of

20 placement moves on education, at least of the kids in this

21 cohort?

22 A    That the more often that children move here the more

23 difficult it becomes for them to attain educational

24 progress, if you will.

25 Q    Would you turn to page 17 of this Exhibit 636.

1    A    Perhaps I should have said on the previous page it

2    really is, what I glean from that was more related to

3    behavior, the next page is more focused on academics.

4    Q    Did you review this next page in forming your opinions?

5    A    Yes.

6    Q    What consideration did you give to this information in

7    forming your opinions?

8    A    That the children with, with many placement moves, three

9    or more, to be precise, are more likely to have trouble

10    achieving an honor roll status in school and they're also

11    more likely to be failing.

12    Q    Ms. Crabtree, based upon the standards you've identified

13    and the facts and data that you've identified now in

14    relation to the DCF placement array, have you formed an

15    opinion as to whether or not DCF meets the accepted standard

16    of professional judgment in its recruitment and retention of

17    a foster care placement array?

18    A    No, they don't.

19    Q    Ms. Crabtree, one last item in relation to the placement

20    array.  Did you give consideration to per diems in forming

21    your opinions?

22    A    Per diems meaning the payments that are made to foster

23    parents?

24    Q    Yes.

25    A    Yes.

1    Q    And why did you look at that issue?

2    A    It's related to the placement array in the sense that it

3    is connected to the recruitment of foster parents as well as

4    the retention of foster parents.

5    Q    Would you please return your attention to Exhibit SL.

6    And would you once again identify Exhibit SL?

7    A    SL is the United States Code related to the state plan

8    for foster care and adoption assistance.

9    Q    Do you see on page 1 of this exhibit paragraph A(1)?

10   A    Yes.

11   Q    Did you consider this portion of the statutory language

12   in addressing the foster care maintenance payment issue?

13   A    Yes, I did.

14   Q    And what did you glean there?

15   A    The federal government requires that foster care

16   maintenance payments be made to foster parents in accordance

17   with particular sections of the title, and also adoption

18   assistance.

19   Q    Can you further focus your attention now on page 3 of

20   this document and subparagraph (11).

21   A    Yes.

22   Q    And did you consider this provision in forming your

23   opinions?

24   A    Yes.

25   Q    How did you factor this provision into your findings?

1    A    The federal government requires that periodic review be

2    made of those foster care maintenance payments and adjusted

3    for their continuing appropriateness based on the level of

4    the cost of children --

5                THE COURT:  Which page are you on, and forgive me.

6                THE WITNESS:  Page 3, your Honor, at the top.

7                THE COURT:  Thank you.

8                THE WITNESS:  Eleven.

9                THE COURT:  I interrupted your answer.  Go ahead.

10               THE WITNESS:  I was through.

11               THE COURT:  All right.

12   Q    Did you in reviewing DCF seek to determine whether the

13   state has conducted periodic reviews of its foster care

14   maintenance payment rates as called for in the statute?

15   A    I could not find periodic reviews.

16   Q    What did you find?

17   A    I found that the, within the last three years the rate

18   had not been adjusted for quite some time.  The department

19   made an effort to try to adjust the rates.  I wouldn't say

20   that they did a thorough review.  I couldn't find evidence

21   that they had reviewed across foster parents placement array

22   what was actually needed as part of a needs assessment.

23   They made an effort to try to raise the per diems.  I think

24   they had some difficulty doing that budgetarily from what I

25   reviewed, and implemented a system called recompense where

1    they tried to go back and pay parents a one time catch-up, I

2    guess is the best way to put that, ability to make up for

3    not having raised per diems in quite some time.

4    **Q**    Did you formulate a finding --

5              **THE COURT:**  I just didn't get the end of your

6    review.  Did they get that through?  Did they make such a

7    recompense payment?

8              **THE WITNESS:**  They made a recompense payment, yes,

9    they did.  The recompense payment was not permanent.  It was

10   intended to be a makeup.

11             **THE COURT:**  As you said, a catch-up.

12             **THE WITNESS:**  A catch-up.

13             **THE COURT:**  So it was a one time lump sum.

14             **THE WITNESS:**  Yes.  The difficulty with the

15   recompense payment was that those children may or may not

16   have been still in the home of the foster parents.  So they

17   were getting a payment for perhaps children who were or were

18   not there any longer.

19   **Q**    Did you give consideration to these recompense payments

20   in relation to the issue of retention?

21   A    Yes.  The recompense payments, while they were a

22   laudable attempt to try to help the foster parents, were,

23   were not something that was intended to be ongoing and

24   continuing based on a review of what the necessary cost of

25   raising those children in the state of Massachusetts would

1    be.  It was intended to be temporary.

2    **Q**   Ms. Crabtree, in your review of the foster care

3    maintenance payment issue, were you able to identify any

4    state law or regulation in Massachusetts requiring periodic

5    adjustment of rates?

6    **A**   Other than, other than the federal law, I think that

7    they reiterate in Massachusetts law, but I am not certain.

8    **Q**   I show you Exhibit 11.  Can you identify Exhibit 11,

9    please?

10   **A**   This is a letter from the Department of Children and

11   Families from the Commissioner to the Budget Director for

12   Finance, for Finance in Massachusetts.

13   **Q**   Did you review this document in forming your opinions in

14   this case?

15   **A**   Yes.

16   **Q**   Would you please turn to page 2 of this exhibit, in the

17   second bullet point.  Do you see the second sentence there?

18   **A**   Yes, I do.

19   **Q**   Starting with section 83.  Did you review that language

20   in forming your opinions?

21   **A**   Yes.

22   **Q**   What does this language provide to your understanding?

23   **A**   It indicates the variance between the departmental

24   foster care payments and the actually USDA rate that is used

25   to provide those payments in those states for foster care

1   maintenance.

2   **Q**    Please focus for a moment --

3           **THE COURT:**  I don't -- I hear you and I read this,

4   but in all candor, I don't understand it.

5           This is a, as I read this, this is a letter

6   addressed to the Budget Director in the Executive Office of

7   Administrative, Administration and Finance by the

8   Commissioner, and over here on this bullet point DCF wants

9   11.9 million to get the rates up to the USDA rate.  Is that

10  right?

11          **THE WITNESS:**  That's right.  That's right, your

12  Honor.

13          **THE COURT:**  And USDA stands for what here?

14          **THE WITNESS:**  U.S. Department of Agriculture.

15          **THE COURT:**  Well, that's what I thought it meant.

16          **THE WITNESS:**  That's, that's where the foster care

17  maintenance rates are set for the US government.

18          **THE COURT:**  Oh.  I had not known that.

19          **THE WITNESS:**  They use that based on the cost of

20  living, cost of raising a child.  And I'm not, I'm not

21  familiar with the history of where that came from, but the

22  USDA rate is used as a --

23          **THE COURT:**  I just didn't know the federal

24  government was organized like that.  Thank you.

25  A    And may I continue?

1    Q    Yes, please.

2    A    That's exactly right.  What they're indicating in their

3    letter to their budget office is that in order to get to

4    that rate they would need $11.9 for their families.

5    Q    And you determined that in calendar 2011 that per diem

6    rates were in fact raised by DCF?

7              MR. COLLINS:  Objection.

8              MS. BARTOSZ:  I'm sorry.

9              THE COURT:  Sustained.  It is leading.

10   Q    Did you determine that per diem rates changed in 2011?

11   A    They were, they were changed by the commissioner, not by

12   a legislative act as far as I know.

13             THE COURT:  But what were they changed to?  To meet

14   the USDA rate?

15             THE WITNESS:  Yes.  But, they did bring the rates

16   up, but because it was not legislatively part of the code

17   with a new commissioner that, that could change.

18             THE COURT:  But at present --

19             THE WITNESS:  At present.

20             THE COURT:  -- at present it meets the USDA rate.

21             THE WITNESS:  Right now.  As far as I know.

22             THE COURT:  But as near as you can determine that's

23   done by executive action within DCF?

24             THE WITNESS:  Yes, it is.

25   Q    That series of events that you've just identified, did

1    you make a finding based on those events as to whether or

2    not DCF is making adequate periodic reviews of its foster

3    care rates in terms of the retention issue?

4    A    There's no indication that they intended to continue

5    doing periodic reviews of the rates, and in my opinion it

6    still remains a risk because it's not codified.

7    Q    Ms. Crabtree, I would like to turn to a new topic and

8    it's part of building block two.  You described that as

9    involving the placement array and the services array.  And I

10   would like to now shift to services, okay?

11           In reviewing DCF's services array, did you place

12   any focus on the issue, any focus on the issue of health

13   care services?

14   A    Yes, I did.

15   Q    Did you consider any laws, regulations or policies on

16   that issue?

17   A    Yes.

18   Q    I would like to now show you Exhibit SJ.  Can you

19   identify Exhibit SJ, please?

20   A    Yes.  This is the federal law related to state plans for

21   medical care for children.

22   Q    Did you review and place reliance on this document?

23   A    Yes, I did.

24   Q    Would you please turn your attention to page 3 of the

25   document, 3 of 54, and specifically the subparagraph (10) on

1    that page.

2    A    Yes.

3    Q    Do you have that?

4    A    Yes, I do.

5    Q    Did you give consideration to this provision?

6    A    Yes, I did.

7    Q    And how so, ma'am?

8    A    This indicates that for the care, for the care and

9    provision of services to children in foster care who are,

10   who fall under the title of this chapter that medical care

11   must be provided to them.

12            THE COURT:  I didn't hear the last part of your --

13            THE WITNESS:  Medical care must be provided.

14   Q    I'm going to also proffer to you now Exhibit SK.  Please

15   identify Exhibit SK, Ms. Crabtree?

16   A    SK relates to the federal government's requirement for

17   state plans.

18   Q    Can you please turn to the second page of this exhibit.

19   And I'm going to direct your attention to the subparagraph

20   (3) near the bottom of the page.

21   A    I'm there.

22   Q    Yes.  Did you consider this provision in forming your

23   opinions?

24   A    Yes.

25   Q    Would you describe what reliance you placed on this

1    provision?

2    A    The state, the state has to certify in its foster care

3    and adoption program that they're able and willing to

4    provide medical assistance to children in foster care.

5    Q    In addition to these provisions of federal law, did you

6    give consideration to Massachusetts law on the issue of

7    health care?

8    A    Yes, I did.

9    Q    I'm now going to show you Exhibit SF.  Can you identify

10   Exhibit SF, please?

11   A    This is Massachusetts law relating to the requirement

12   that children entering the foster care system are required

13   to be screened and evaluated under what's known as EPSDT,

14   that's Early Screening Periodic Diagnostic and Testing.  And

15   that's under the federal Social Security Act.

16          May I go on?

17   Q    Yes, please.

18   A    It also indicates that those children who are medically

19   needed cannot be placed in a foster home without their

20   health care needs being met.

21   Q    Could you return your attention now, Ms. Crabtree, to

22   Exhibit 1.  And again this is the DCF Practice Policy and

23   Procedures Manual.

24   A    I'm there.

25   Q    Yes.  Did you review this document in relation to the

1    health care issue?

2    A    Yes, I did.

3    Q    I'll direct your attention to page DCFPOL 283.  Do you

4    have that page, Ms. Crabtree?

5    A    I do.

6            THE COURT:  Say again the page, forgive me.

7            MS. BARTOSZ:  I'm sorry, Judge, it's DCFPOL and the

8    page number 283.

9            THE COURT:  Thank you.

10   Q    Focusing your attention on Roman numeral I on that page.

11   Did you give consideration to this policy in forming your

12   opinions?

13   A    Yes.

14   Q    And how so?

15   A    It refers to medical screens that are required for

16   children.  May I back up --

17   Q    Yes.

18   A    -- on that same page?

19   Q    Sure.

20   A    The middle of the page, it refers to the departmental

21   policy that medical screenings are required within seven

22   calendar days after a child enters DCF care, and that a

23   comprehensive medical exam's required within 30 days after

24   the child enters DCF care.  Excuse me.

25   Q    Thank you.

1    A    Medical screening is Roman numeral I, it gives more

2    information about that.

3    Q    And turn to page 284, the next page, do you see Roman

4    numeral comprehensive medical examinations?

5    A    Yes.

6    Q    Did you give consideration to that policy provision in

7    forming your opinions?

8    A    Yes, I did.

9    Q    How so?

10    A    That gives more comprehensive information about the 30

11    day medical exam.

12    Q    In addition to looking at law and policy, did you review

13    the standards of any professional organizations on the issue

14    of health care?

15    A    Yes, I did.

16    Q    I'm now going to show you Exhibit RT.  Please identify

17    Exhibit RT, Ms. Crabtree?

18    A    This is the National Council on Accreditation.  And on

19    the second page it describes the importance of initial

20    health screening under PA-FC 2.04.

21    Q    I'm also going to show you Exhibit RA.  Can you identify

22    Exhibit RA, please?

23    A    These are Child Welfare League of America standards for

24    medical, psychological, developmental, educational

25    assessments on 2.63.  It describes that within 30 days of

1    placement the initial assessments, including medical, should

2    be carried out for the child.

3    **Q**    Ms. Crabtree, you've identified laws and professional

4    standards here on the issue of health care.  Did you review

5    DCF documents and data to determine whether the department

6    is meeting these standards?

7    A    I did.

8    **Q**    Can you return your attention to Exhibit 954.  Here's an

9    extra copy.

10   A    Okay.  I'm sure it's here somewhere.

11   **Q**    Can you identify again Exhibit 954?

12   A    This is a sample of DCF's Monthly Operations Statistical

13   Report, the MOSt report, from May of 2012.

14   **Q**    Did you make review of these MOSt reports in relation to

15   the issue of health care?

16   A    Yes, I did.

17   **Q**    Can you describe to the Court the review you made and

18   what information you were able to glean from the MOSt

19   report?

20   A    As a part of the MOSt report they look at, if you look

21   at the left, far left column, they look at safety,

22   permanency, well-being, community care and core practice.

23   In the row labeled well-being you can see that they have

24   measures for meeting the initial 7 day medical appointment,

25   as well as the measure for meeting the 30 day medical

1    appointment.  Their target set by DCF is at 50 percent

2    indicating that they would like to target meeting those

3    requirements at a 50 percent level for children.

4    Q    And were you able to determine performance levels in

5    that document?

6    A    Yes.  If you, if you follow the columns across you can

7    see in the statewide column, which is next to those

8    50 percent target dates, that they meet the 7 day

9    requirement statewide only 26.4 percent of the time and they

10   meet the 30 day comprehensive medical exam for their

11   children only 15.2 percent of the time.

12   Q    Let me now show you Exhibit 594.

13   A    May I add to that before you go on?

14   Q    Yes, please.

15   A    If you go to the far end of the column where it

16   indicates the range across the state, you'll see that both

17   the 7 day and the 30 day medical appointments for children

18   range from an actual point range of zero percent, meaning no

19   children met that, up to 80 and 55.6 percent.

20   Q    Why do you now place focus on that regional variance?

21   A    Excuse me?

22   Q    Why did you now place extra focus on that regional

23   variance or call that out?

24       **MR. COLLINS:**  Objection, your Honor.  This section

25   is not in the report.

```
 1              THE COURT:  What do you say?  Why did you --

 2              MS. BARTOSZ:  I'll withdraw the question.

 3              THE COURT:  Withdrawn.

 4              MR. COLLINS:  I'm talking about --

 5              THE COURT:  No, no, it's withdrawn.  She withdrew

 6     it.

 7     Q    Ms. Crabtree, can you now place focus on Exhibit 594.

 8     A    Yes.

 9     Q    Did you review this document in forming your opinions?

10     A    Yes.  This is historical, historical document actually

11     from 2003 looking at calendar year 2001 which discusses the

12     concern that the department has around being able to meet

13     these 7 and 30 day requirements for medical examinations of

14     children coming into care.

15     Q    And focusing your attention on the third page of this

16     document there's a paragraph with the heading Results?

17     A    Yes.

18     Q    Did you review that portion of this document in forming

19     your opinions?

20     A    Yes, I did.

21     Q    Did you glean any information there that you relied

22     upon?

23     A    I did.  The, the important information to me from this

24     paragraph of results indicated that as far back as 2003 they

25     recognized that they were not meeting the 7 and 30 day
```

1    medical exam requirements.  If you look at the third

2    sentence in the paragraph under results it gives you

3    information that 4,000 children, who had at least one,

4    what's called HRE, that's an entry into care, only

5    10.5 percent of those children got in to see a doctor within

6    seven days of coming into care and only 25 percent got in to

7    see the doctor for comprehensive exam within 30 days.

8         If you look at the bottom of the page, the data

9    across six of the DCF regions, it shows you 7 day and 30 day

10   visits for children with one, one, first entry into care,

11   and shows that that ranged from 8.1 percent in the central

12   region and right below --

13        **MR. COLLINS:**  Objection; move to strike.  It's not

14   in the report.

15        **THE COURT:**  The ranges are not in the report?

16        **MR. COLLINS:**  Correct.

17        **THE COURT:**  Yes.  It's stricken.  We'll stop it

18   there.

19   **Q**   Thank you, Ms. Crabtree.  I will now show you

20   Exhibit 596.

21        Can you identify Exhibit 596 for the Court, Ms.

22   Crabtree?

23   **A**   Yes.  This is a medical visit survey that was done by

24   DCF in 2006.  The previous document was from 2003 moving

25   forward into 2006.  They recognized in the DCF agency that

1    they continued to have a problem with 7 and 30 day medical

2    exam for children and surveyed their department staff around

3    their understanding of that as policy and law.

4    Q   And what reliance did you place on the information you

5    gleaned from Exhibit 596?

6    A   The information actually in the survey ranges from staff

7    who have absolutely no knowledge whatsoever that this policy

8    exists to people who actually do understand the policy.  So,

9    there's a range from no understanding to understanding.  The

10   department's intent according to the information I had was

11   to use the survey planning, but nothing was done with the

12   survey improvement itself.

13          MR. COLLINS:  Objection, your Honor.  This is not

14   in the report; move to strike.

15          THE COURT:  That nothing was done with is not in

16   there?

17          MR. COLLINS:  Yes.

18          MS. BARTOSZ:  There's follow-up on what this report

19   is in Ms. Crabtree's report.

20          THE COURT:  Where is it?

21          MS. BARTOSZ:  Page 84 and 85.

22          THE COURT:  Eighty-four.  Let me see.

23          MS. BARTOSZ:  Beginning of the last paragraph of

24   page --

25          THE COURT:  I'm reading.  Yes.  No, overruled.  She

1    may so testify.

2    **Q**    Were you able to determine -- did you look to see if

3    there was adequate follow-up to the information gleaned in

4    the 2006 survey?

5    A    There was no follow-up from 2006.

6            **MR. COLLINS:**  Objection, your Honor.

7            **THE COURT:**  But that's the gravamen of the report;

8    that may stand.

9    **Q**    Ms. Crabtree, based upon the documents and data you've

10    now identified and the standards you've identified, have you

11    formed an opinion as to whether or not DCF is meeting

12    accepted professional judgment in the provision of initial

13    screenings and medical assessments?

14    A    They're not.

15    **Q**    Are you familiar with the term medical passport?

16    A    Yes, I am.

17    **Q**    What do you understand that to be?

18    A    The medical passport is a record of the child's medical

19    care when you're in foster care and the medical passport is

20    required to travel with the child wherever the child is

21    located while they're in foster care.

22    **Q**    In conducting your review of DCF, did you determine

23    whether or not the Commonwealth of Massachusetts makes

24    provision for medical passports?

25    A    Yes.

1    Q    I would like to return your attention to Exhibit 1, the

2    policy manual.  Could you turn to page DCFPOL 155.

3         Do you have that, Ms. Crabtree?

4    A    Yes.

5    Q    Appendix A, Guidelines for Medical Passport Review?

6    A    Yes.

7    Q    Did you review this portion of the policy manual in

8    considering the issue of medical passports?

9    A    Yes, I did.

10   Q    What information did you glean here that you relied

11   upon?

12   A    These guidelines describe what has to be reflected in

13   the medical passport itself and the requirement that a

14   counter form be completed when a child visits a dentist or a

15   doctor.  Those also have to be brought to their foster care

16   review meetings that are held as a along-the-way check on

17   how a child's doing in foster care.

18   Q    Ms. Crabtree, I now ask that you return your attention

19   to Exhibit 69.  Here, I'll open up a copy here, and

20   specifically provision 110 CMR 7.124.

21   A    Thank you.

22   Q    Do you see that, Ms. Crabtree?

23   A    I do.

24   Q    Did you review this regulation --

25   A    Yes.

1    **Q**    -- in formulating your opinions?

2    A    This is Massachusetts law around the medical passport

3    requirement.

4    **Q**    What consideration did you give to this provision in

5    forming your opinions?

6    A    It reinforces that the record has to contain the

7    medical, dental health, mental health information about the

8    child.

9    **Q**    Having identified these policy and regulatory

10    provisions, did you look to see whether DCF is complying

11    with them?

12    A    Yes, I did.  May I expand on it just a little bit on

13    Massachusetts policy?

14    **Q**    Yes, please.

15    A    It also requires that the, it reaffirms that the

16    passport travels with the child and that if the child moves

17    to a substitute home or returns home that the passport

18    remains with the child.

19    **Q**    Thank you.

20          In assessing the issue of medical passports were

21    you able to identify regular management reports used by DCF

22    that focus on conformance with medical passport policy and

23    regulation?

24    A    I could not find that they track the use of the medical

25    passport.

1    **Q**   Is that issue addressed in the MOSt report?

2          **MR. COLLINS:**  Objection, your Honor; leading.

3          **THE COURT:**  On what documents did you rely to draw

4    that conclusion?

5          **THE WITNESS:**  I'm not sure I understand the

6    question.  Can you repeat the question?

7          **MS. BARTOSZ:**  I'll withdraw the question.

8          **THE COURT:**  How do you know that?

9    **Q**   How do you know that?

10   A   How do I know that?

11   **Q**   Yes.

12   A   From, from departmental lack of information.

13   **Q**   I'm going to show you Exhibit 919.  Can you identify

14   Exhibit 919?

15   A   Yes.  This is an example of an ad hoc report that's done

16   for foster care review.  It's not a standard departmental

17   report document that's done.  It's ad hoc for foster care

18   review purposes.

19   **Q**   Did you review this document in assessing the medical

20   passport issue?

21   A   Yes, I did.

22   **Q**   And did you rely upon the information gleaned from this

23   document?

24   A   Yes.

25   **Q**   Can you please describe how you read this document and

1    what reliance you placed on it?

2    A    This is a document from 2007, an extract that was run to

3    determine passports, whether they were in the record or not

4    in the record and when they were in the record if they were

5    complete or not in the child's health care record.

6    Q    What information were you able to glean in that respect?

7    A    If you look at the summary page, first page, you can see

8    that in this particular extract for foster care review that

9    close to 60 percent of the children either did not have a

10   passport in their current record or they had a record but it

11   was not complete or up-to-date.

12       THE COURT:    And what does it mean when a child's

13   not in placement?

14       THE WITNESS:    Those are children, we talked about

15   the children who were in family preservation who are in

16   intact homes.

17       THE COURT:    I see.  So they're included in the

18   grand total, but because they're still with the family home

19   they're not within this medical passport system.

20       THE WITNESS:    That's right, your Honor.

21       THE COURT:    So your 60 percent is the total of the

22   ones in the system.

23       THE WITNESS:    Children who are removed from home in

24   care.

25       THE COURT:    Right.  Thank you.

1    **Q**    Ms. Crabtree, based upon your review of the provisions

2    of policy and regulation you've now identified and the

3    information you were able to glean from DCF business

4    records, have you formed an opinion as to whether or not DCF

5    is conforming with its medical passport policy?

6    **A**    They are not.

7    **Q**    And why do you, or how is it that you can come to that

8    finding?

9    **A**    The information that was available indicated that their

10    records do not include medical passports, or if they do

11    include the passport they're not up-to-date.   The

12    information from their MOSt report are missing the 7 and 30

13    day screening and setting only a 50 percent level of target

14    for trying to get those children to doctors when they need

15    to go, and the information that, it's a requirement that

16    under federal law those children get the medical services

17    that they need.

18    **Q**    I would like to turn to another issue now.   In reviewing

19    building blocks one and two on the placement and services

20    array, did you give consideration to the issue of

21    permanency?

22    **A**    Yes, I did.

23    **Q**    How did you focus on that?   What focus did you place on

24    that issue?

25    **A**    I looked at two areas.   I looked at adoption for

children who for a variety of reasons may not ever be able

to return to their natural parents, and I looked at reentry

into care for children who had initially been reunited with

their home and had to be removed again.

**Q**    In reviewing the permanency issue did you first identify

standards?

A    Yes, I did.

**Q**    I'll now show you Exhibit 854.  Can you identify

Exhibit 854, Ms. Crabtree?

A    This is Massachusetts law that relates to casework

practice, management of casework practice in Massachusetts.

**Q**    And could you turn to the second page of this document

and direct your attention to provision 3.

        Did you consider this provision in formulating your

opinions?

A    Yes, I did.

**Q**    Can you describe for the Court what consideration you

gave to this provision?

A    It records the responsibility of social work staff to

move children toward permanency plans as quickly as

possible.

**Q**    In addition to Massachusetts regulation, did you look to

any standards from professional organizations on the

permanency issue?

A    Yes.

1    Q    I show you Exhibit RL.  Can you identify Exhibit RL,

2    please?

3    A    This is the Council on Accreditation child and youth

4    permanency section related to permanency planning of

5    families.  And there are two sections, PA-FC 4.01 and PA-FC

6    4.02.

7    Q    Can you describe for the Court how you considered these

8    provisions in formulating your opinions?

9    A    Council on Accreditation recommends that within 30 days

10   of removal that a permanency plan be in place for the child

11   and the family in order to quickly move children toward

12   permanency.

13          The other information that's available is that many

14   times we don't know immediately if the family's going to

15   stabilize or not, and so what's called concurrent planning

16   is recommended to take place where you build a permanency

17   plan for the child that's based on perhaps the child can be

18   reunified with the parents, perhaps not.  So, you would want

19   to have two tracks working together to address various

20   circumstances of the family they face.

21   Q    Ms. Crabtree, I would like to also now refocus your

22   attention to Exhibit SO.  Do you have a copy of that

23   document?

24   A    Somewhere.

25   Q    Here, I'll just -- you can use mine, Ms. Crabtree.

1    A    I'm sorry.

2    Q    That's okay.  There's a lot of documents up here now.

3         Can you identify Exhibit SO once again?

4    A    This is the U.S. Code around foster care payments and

5    adoption payments.

6    Q    And focusing your attention to the second page of this

7    document and provision, E, did you consider that in

8    formulating your opinions?

9    A    Yes.

10   Q    How so?

11   A    It gives information about the move to adoption when

12   it's clear that reunification with the parents is not

13   possible and states that the minimum requirement in the

14   federal law, that specific recruitment efforts have to be

15   made by the state to find adoptive homes for those children.

16   Q    Finally, Ms. Crabtree --

17   A    Excuse me, can I add to that?

18   Q    Please.

19   A    The other thing that the requirement states is that

20   those steps have to be outlined in the actual permanency

21   plan itself.

22   Q    Thank you.

23        If you'll return your attention once against to

24   Exhibit 1, the policy manual.  Do you have that, Ms.

25   Crabtree?

1    A    I do.

2    Q    Okay.  Did you give consideration to DCF permanency

3    policy in formulating your opinions?

4    A    Yes.

5        **MS. BARTOSZ:**  I'm sorry, your Honor, I'm trying to

6    locate the page.  I'm sorry, your Honor, we'll come back to

7    this.

8    Q    Ms. Crabtree, having identified the standards that we've

9    addressed thus far here, did you look at DCF performance in

10    the area of adoption to see if the organization is meeting

11    the standards?

12    A    Yes.

13    Q    And have you formed an opinion with respect to adoption

14    practice within DCF?

15    A    Yes.

16    Q    What is that opinion?

17    A    They are not.

18    Q    How did you assess, what steps did you take to assess

19    the adoption practice within DCF?

20    A    I looked at their internal information about the

21    methodology they use to move children from foster care to

22    adoption workers.  That was one piece of information that

23    helped do that.

24    Q    Would you return your attention to Exhibit 954, the MOSt

25    report.

1                Here you go, Ms. Crabtree.

2    A    I've got it.

3    Q    You've got it.

4                Did you consider Exhibit 954 in your review of

5    adoption practice?

6    A    Yes.

7    Q    Can you describe to the Court what consideration you

8    gave to Exhibit 954?

9    A    Yes.  Again, on the MOSt report from 2012, in the area

10   that's labeled permanency, about halfway down under the

11   measures you see adoption worker assignment.  DCF's policy

12   is to, once a child is indicated to be moving to adoptive

13   placement with a family permanently, they set a five day

14   target for moving the case from the foster care worker to an

15   adoption worker.  And you can see that they have the target

16   date listed there under adoption worker assignment.

17               If you move over to the statewide and then the

18   regional listing of how long it takes for a foster care

19   worker to hand a case to the adoption worker you can see

20   that 15 days is the statewide average.  And the range at the

21   far end of the row is zero to forty, I'm sorry, zero to 814

22   days.

23   Q    And I think you said 15 days.  Did you mean to say 26?

24   A    I meant to say 26.  It's one row up.  I looked at the

25   next row down.

1    **Q**    Thank you.

2         Beyond looking at the time frame for assigning an

3    adoption worker, did you take any other steps to assess the

4    adoption practice within DCF?

5    A    Beyond the length of time it takes to take a case file

6    and hand it to an adoption worker, I looked at the ability

7    of those children to actually move into permanent homes and

8    out of continuing to be in foster care while they're waiting

9    to be adopted.

10    **Q**    Did you consider what occurs once the child is assigned

11    to adoption worker, the adoption worker, the adoption

12    worker's caseload?

13    A    The adoption worker's caseloads, if in fact they are

14    able to receive a case within the five day time frame that

15    they have set to hand the case off then I would ask do they

16    have a reasonable workload so that they could make an effort

17    to actually get the adoption work, which is very complex

18    work, done, and was able to identify that their caseloads in

19    adoption are somewhere around 1 to 20.

20    **Q**    How did you do that?

21    A    Looked at their departmental information that was

22    available to me.  The national standard for adoption workers

23    is 1 to 12 simply because that work does require a lot of

24    working with attorneys on legal preparation of the adoption

25    documents and clearing potential adoptive parents'

1    backgrounds.  It requires making children known for adoption

2    through, in Massachusetts it's called a MARE system, which

3    is an online, it's publicizing of this child is available

4    for adoption if a parent should be interested.

5              THE COURT:  Where does that national standard to

6    which you just made reference come from?

7              THE WITNESS:  The national 1 to 12 standard comes

8    from Child Welfare League of America.

9    Q   Ms. Crabtree, could you return to your report for a

10   second, to page 72.  I direct your attention to the first

11   full paragraph, or the paragraph beginning with the word

12   "Second" on page 72.

13   A   Yes.

14   Q   Did you make reference there to the standard set by CWLA

15   in terms of adoption caseloads?

16   A   I did.

17   Q   And what is that standard?

18             MR. COLLINS:  Objection, your Honor; leading.

19             THE COURT:  Not -- what is that standard isn't

20   leading.  Overruled.

21             MR. COLLINS:  It was the question before that.

22             THE COURT:  Well, I'll let that stand.

23   Q   What is that standard?

24   A   The standard is 1 to 12.

25             MS. BARTOSZ:  Your Honor, I'll provide the witness

1    now and the Court and counsel an additional document, ST.

2    **Q**   Ms. Crabtree, is Exhibit ST the CWLA standard to which

3    you referred?

4    A   Yes, it is.

5    **Q**   You earlier, Ms. Crabtree, identified and testified with

6    respect to the collective bargaining agreement in place

7    between DCF and its caseworker staff a Supplemental Letter

8    Q.

9          Do you recall that?

10   A   Yes.

11   **Q**   Does that Supplemental Letter Q establish an adoption

12   caseload?

13   A   It does not.

14   **Q**   Did you find in your review of DCF business records any

15   regular report that tracks adoption caseloads by caseworker?

16          **MR. COLLINS:**  Objection, your Honor.

17          **THE COURT:**  Well, is it on the grounds of leading?

18          **MR. COLLINS:**  Yes.

19          **THE COURT:**  It is leading.

20   **Q**   Does DCF track adoption caseloads?

21          **THE COURT:**  What did you find in the records about

22   that?

23          **THE WITNESS:**  They did not track adoption

24   caseloads.

25          **THE COURT:**  At least you couldn't find any.

1          **THE WITNESS:**  I couldn't find any.

2          **THE COURT:**  Right.

3     **Q**    Did you give consideration to DCF's permanency planning

4     policy in addressing the adoption issue?

5     **A**    I did.  That was the third point of looking at adoptions

6     is that if the caseworkers met the five day handoff to an

7     adoption worker, and did they have the resources available

8     to actually get that job done in a timely fashion, and if

9     they did do they have a solid permanency planning process so

10    that, as is required by law, they have the steps in the

11    permanency plan of moving the child through the adoption

12    process.

13    **Q**    What did you determine with respect to DCF's permanency

14    planning policy?

15    **A**    They have a, they have a permanency planning policy that

16    is somewhere around 25 to 30 years old according to the

17    department.  They have a draft updated policy, but it's

18    still in draft form and has been for approximately 13 years.

19    So, there are two, essentially two types of permanency

20    planning policies that the state has as a part of DCF's

21    work.

22    **Q**    What significance, if any, did you place on that in

23    forming your opinions?

24    **A**    If I'm relying on the permanency planning policy from 25

25    to 30 years ago, I'm looking at a policy that has certainly

1    not been updated over time to reflect differences in new

2    regulations and requirements and laws and policies and

3    practices.  If I'm relying on a draft policy then

4    technically I am not really accountable since that's not

5    the, quote, real policy that's in place and finalized.  As

6    an adoption worker, I would find that very confusing.

7            THE COURT:  What about the age of these policies,

8    does that trouble you in any way?

9            THE WITNESS:  It troubles me greatly.

10           THE COURT:  And why?

11           THE WITNESS:  In the last 25 to 30 years the

12   federal laws have changed significantly around adoption and

13   safe families and measures, performance measures and

14   benchmarks and time frames for completion of work with

15   adoption in foster care.  If I'm relying on that as my

16   permanency planning instrument, I'm not taking into account

17   the changes that have been made over the years.

18           MR. COLLINS:  Your Honor, I move to strike.  I

19   don't know what the --

20           THE COURT:  It's not in the report?

21           MR. COLLINS:  It's not in the report.

22           THE COURT:  It's not, but I'm going to let it

23   stand, for this reason.  That's a natural inference for

24   policies that, that hold that the regulatory system, and

25   indeed what we're able to do in adoption would change,

1    that's an inference I would draw.

2         But let me ask you this.  You can answer this one

3    yes or no.  Have you compared the provisions of either the

4    30-year-old policy or the 13-year-old draft policy with the

5    regulatory provisions that exist today?

6         **THE WITNESS:**  I can't answer it yes or no.  I can

7    answer it somewhat.

8         **THE COURT:**  I'll accept the answer somewhat.

9         **THE WITNESS:**  Okay.

10        **THE COURT:**  Okay.  And if we go any further, Ms.

11   Barotsz will take you there.

12        Have you compared it, the same question, have you

13   compared either of these policies with the standards of care

14   for this service?  I said regulatory framework in my first

15   question.  And your answer, yes, no, or somewhat?

16        **THE WITNESS:**  I would say somewhat.

17        **THE COURT:**  Thank you.

18        Ms. Bartosz.

19   **BY  MS. BARTOSZ**

20   **Q**   Ms. Crabtree, did you further review the testimony of

21   DCF officials in connection with adoption practice?

22   A   Yes.

23   **Q**   And did you rely upon any of that testimony in forming

24   your opinion with respect to adoption practice?

25   A   Yes.

1   Q    Can you describe the information that you relied on and

2   why you placed reliance on it?

3   A    Yes.  The information I have from the departmental

4   officials indicated that the concern about the number of

5   adoptions and the timeliness of those adoptions was related

6   to the fact that they had lost focus on the need to get

7   those children adopted timely.

8   Q    Based on the policies and the data and information that

9   you've identified, have you formed an opinion with respect

10  to adoption practice within DCF?

11  A    Yes.

12  Q    What is that opinion?

13  A    That there are many children who are available for

14  adoption and due to departmental inefficiency and focus on

15  that function of child welfare that those children are stuck

16  in care and not moving quickly to a permanent family, a

17  permanent home to stabilize their life.

18  Q    Have you formed an opinion as to whether that practice

19  conforms with accepted standards of professional judgment?

20  A    Yes.  It does not.

21  Q    Are you familiar with the permanency goal for

22  reunification?

23  A    Yes.

24  Q    And what is that permanency goal?

25  A    Reunification is when all of the groundwork has been

1    completed for a child, in a family for a child who has been

2    removed from home and the family is able to be reunified and

3    go on with their lives.

4    Q    Have you given consideration to the issue of

5    reunification in any way in assessing DCF?

6    A    Yes.

7    Q    What focus did you place on reunification?

8    A    I looked at the information available around the

9    stabilization of the family once the child had returned

10   home, and that is also known, when children come back into

11   care that's known as reentry into care, I looked at that

12   aspect.

13   Q    Can you clarify further what is meant by the term

14   reentry?  How does that happen in the foster care system?

15        **THE COURT:**  I didn't hear, what is meant by the

16   term?

17        **MS. BARTOSZ:**  Reentry.

18        **THE COURT:**  Oh, reentry.

19   Q    How does that happen in the foster care system?

20   A    Reentry happens when a family is, a child is removed

21   from a family into foster care, then the child is returned

22   home and another event happens that requires the removal

23   again of the child from the home.

24   Q    Thank you.

25        Now, in conducting a review of reunification did

1    you look at standards?

2    A    Yes.

3    Q    I would like to show you Exhibit RL.  I think it's up

4    with you.  Let me help you locate that in the pile again.

5         Here we go, Ms. Crabtree.

6    A    Thank you.

7    Q    Can you indicate to the Court what reliance you placed

8    on Exhibit RL in addressing the reunification issue?

9    A    This is the Council on Accreditation stabilization,

10   child and youth permanency stabilization information.  It

11   addresses time frames for permanency and the ability of

12   children to remain stable based on service provision in the

13   home through the caseworker process.

14   Q    Can you also focus once again on Exhibit 854.

15        **MS. BARTOSZ:**  Excuse me, your Honor, we're not

16   finding a copy here.

17        **THE COURT:**  The specific document again?

18        **MS. BARTOSZ:**  It's Exhibit 854.

19        **THE COURT:**  Here it is.

20        **THE WITNESS:**  Thank you, sir.

21        **MS. BARTOSZ:**  Thank you, your Honor.

22        **MR. COLLINS:**  I'm sorry, counsel what is the

23   document?  I couldn't find it, too.

24        (Whereupon counsel conferred.)

25        **MR. COLLINS:**  Okay, thank you.

1    **Q**    Ms. Crabtree, can you once again identify that document?

2    A    The Massachusetts code that relates to case management.

3    **Q**    And focusing your attention to 5.05, subparagraph (3),

4    did you consider that provision in addressing reunification?

5    A    I couldn't hear you, I'm sorry.

6    **Q**    Focusing your attention on 102 CMR 5.05, subparagraph

7    (3).

8    A    Yes.

9    **Q**    Did you give consideration to that provision?

10   A    Yes.

11   **Q**    Can you describe to the Court what reliance, if any, you

12   placed on that provision in addressing reunification

13   practice in DCF?

14   A    The listing under needs, responsibilities of the social

15   work staff, really lays out the way that caseworkers go

16   about putting the services together to reunify a family.

17            May I continue?

18   **Q**    Yes, please.

19   A    That includes including the child and the family

20   communication process, providing the services that are

21   needed for the home, making sure that visits are conducted

22   between the children and the family, and of the ongoing

23   planning that may be necessary while the children are making

24   trial, what are known as trial visits into the home.

25   **Q**    Thank you.

1          And you've just made reference to the provision

2    calling for engagement with the parents?

3    A    Yes.

4    Q    Let me show you Exhibit 1066.  Can you identify 1066

5    again, Ms. Crabtree?

6    A    1066 were tables that are from the CRC record review

7    that I used.

8    Q    And this particular excerpt from Exhibit 1066 is table

9    28C?

10            THE COURT:  Well, have I seen this particular table

11   before?

12            MS. BARTOSZ:  Yes, Judge, this is part of the --

13            THE COURT:  All right, fine.

14            MS. BARTOSZ:  -- set of tables admitted.

15            THE COURT:  Fine.  So, the document control is

16   fine.  Why are we going over something I've already seen?

17            MS. BARTOSZ:  I was simply going to ask this expert

18   to indicate what reliance she placed on information on this

19   table.

20            THE COURT:  You may have that one question.

21   Q    Ms. Crabtree, did you place reliance on information

22   contained within Exhibit, or on table 28C in addressing

23   reunification?

24   A    The table describes the goal of reunification of the

25   family and indicates the percent that was found in the

1    record review, the actual planned visits that occurred, as

2    well as whether parents' signatures, which are required,

3    were on the permanency plan itself.

4    **Q**   Why did you look for information regarding parental

5    signature?

6    A   It indicates the parental involvement in the case

7    planning process and in the reunification itself.

8    **Q**   And why did you look for data with respect to planned

9    visits with parents?

10   A   Because that's what we're discussing, the visitation

11   process is one of the key components to the successful

12   reunification of families.

13   **Q**   Were you able to locate any information indicating that

14   DCF tracks parental signature?

15   A   No.

16   **Q**   I would like to return your attention now to the MOSt

17   report, Exhibit 954.  Focusing your attention to the core

18   practice elements towards the lower third of that document.

19           **THE COURT:**  Could I have back the one I gave you

20   since that's the one --

21           **THE WITNESS:**  Yes.  This is 854.

22           **THE COURT:**  Yes, 854, that's what I want.  Thank

23   you.

24           **MS. BARTOSZ:**  Your Honor, do you have a 954 handy?

25           **THE COURT:**  Not handy.

1          **MS. BARTOSZ:**  Here you go.

2     **Q**   Do you see the entry in the core practice area called

3     engaging families?

4     A    Yes.

5     **Q**   Did you review that in addressing the reunification

6     issue?

7     A    Yes.

8     **Q**   Why did you do so?

9     A    Engaging families is the process of the caseworker

10    developing a communication relation and a relationship with

11    that family as they work toward bringing the children and

12    the family back together and making them whole again.

13    **Q**   What information did you glean from the MOSt report that

14    you relied upon, if you did so, in forming your opinions?

15    A    If you look at that column, the measure of 62 percent is

16    the target.  And you can look straight across the page from

17    the report and see that they are, all areas, other than

18    western, where they're not meeting that goal.  And the range

19    is from 46 --

20          **MR. COLLINS:**  Objection, your Honor; move to

21    strike.  There's nothing in the report about the range.

22          **THE COURT:**  We'll stop it as to the range.  But her

23    answer stands.

24          Go ahead, Ms. Bartosz.

25    **Q**   Ms. Crabtree, I would now like to also show you Exhibit

1    MZ.  We've previously looked at this, but I have an extra

2    copy here so we don't have to dig through the stack.

3           Is that the home visit report you previously

4    identified?

5    A   Yes.

6    Q   Did you look at this document in addressing the issue of

7    parental engagement?

8    A   Yes.

9    Q   And what information did you glean in doing that?

10   A   This provides information about the, if you look at the

11   third column of percent of adults seen for the month, it

12   tells you how many of those parents have been seen by the

13   caseworker during that month.  Then the next two columns

14   indicate two months and three months out, in other words, 60

15   and 90 days have gone by without the parents having contact

16   with the key person to assist them in reunifying their

17   family.

18          If you look at the very bottom you can see the

19   grand total that translates into close to 10,000 parents not

20   being seen, 5870 and 4380, for between 60 and 90 days.

21   Q   Is that information significant to you in forming your

22   opinion?

23   A   That's very significant.

24   Q   Why?

25   A   In that it delays any reunification that could be

1  happening.  It indicates that those parents are still in

2  their home and don't have --

3          MR. COLLINS:  Objection; move to strike.  None of

4  this is in the report.

5          THE COURT:  Well, we'll stop it at the point where

6  she says that indicates.

7          Go ahead, Ms. Bartosz.

8          MS. BARTOSZ:  Thank you, your Honor.

9          Just one moment, your Honor.

10         Your Honor, I'm referring to page 76 of

11 Ms. Crabtree's report and there is an entry there with

12 respect to this issue.  It's the last sentence.

13         THE COURT:  I see it.  She may testify consistent

14 with what's there.

15         MR. COLLINS:  I'm sorry, where's the reference?

16 Q   Ms. Crabtree, let's return to your report and page 76.

17         MS. BARTOSZ:  And, counsel, I'm referring to the

18 last sentence of the top paragraph that's carried over from

19 the prior page.

20         THE COURT:  She may so testify.

21 Q   Ms. Crabtree, what was your opinion there?

22         MR. COLLINS:  Your Honor, can I be heard?

23         THE COURT:  You may be.

24         MR. COLLINS:  We're talking about the last sentence

25 in the top paragraph that's immediately following findings

1    from CRC.  We're not referencing findings from CRC.  If you

2    look at the two sentences above --

3              **THE COURT:**  This is, this is her opinion.

4              **MR. COLLINS:**  I understand.

5              **THE COURT:**  That's her basis.  She may so testify.

6    **Q**    What finding did you make there, Ms. Crabtree?

7    A    Yes, that indicates to me that without that kind of

8    regular contact on an ongoing basis that caseworkers don't

9    have the ability that's, or hands-on time with the parents

10   that's needed to help them stabilize their family situation.

11   **Q**    Ms. Crabtree, in reviewing the permanency practice

12   within DCF, did you consider performance data in relation to

13   adoption and reentry?

14   A    Yes.

15   **Q**    Let me show you Exhibit, or Trial Exhibit 468.  Can you

16   identify Exhibit 468?

17   A    This is the Child and Family Services review data

18   profile from 2011.

19   **Q**    Did you review this data profile in forming your

20   opinions?

21   A    Yes.

22   **Q**    Is this the only data profile you reviewed or were there

23   others?

24   A    No, there are other data profiles.  This is a sample.

25   **Q**    Could you please turn to page DCF005504991.  And if it's

1    helpful, it's the page on permanency composite number 1.

2    A    Yes.

3    Q    Did you review this data in formulating your opinions?

4    A    I did.

5    Q    And let me focus your attention on the component B,

6    measure C1-4.  Do you see that?

7    A    Yes.

8    Q    What does that --

9            **THE COURT:**  May I have the page number again, I'm

10   sorry.

11           **MS. BARTOSZ:**  Yes, your Honor, it's unfortunately

12   just a Bates stamp.

13           **THE COURT:**  Well, that's all right.

14           **MS. BARTOSZ:**  DCF005504991.

15           **THE COURT:**  Thank you.

16   Q    Ms. Crabtree, what does measure C1-4 address?

17   A    C1-4 addresses reentries into foster care from children

18   who come into care, reentries within, less than 12 months.

19   Q    And you see there at the end of the entry here in C1-4

20   it says lower scores preferable?

21   A    Yes.

22   Q    Did you look at this data and rely upon it in forming

23   your opinions?

24   A    Yes.

25   Q    And what, well, what findings did you make?

1    A    If you, if you look at the national median, which is

2    15 percent, and look at the 25th percent, which is 9.9, you

3    can see, if you look across the, to the end of the row at

4    the, at the 12 month period, DCF was at 15.9.  The two

5    thousand -- that was in 2011.  Backing it up it went from

6    16.2, 15.3, 15.9.  Those are children who have gone home to

7    be reunified with their parents only to be re-traumatized by

8    removal within the first 12 months that they've gone home.

9    Q    Can you turn to the next page, permanency composite 2.

10           Do you see that?

11   A    Yes.

12   Q    What practice does this permanency composite address?

13   A    Timeliness of adoption.

14   Q    Did you review this performance data --

15   A    Yes.

16   Q    -- in assessing DCF?

17           Can you describe for the Court what reliance you

18   placed on this information?

19   A    If you look at the national ranking of state composite

20   scores across the top you can see that in 2009 they were at

21   the, they were 30 out of 47 states and 31 out of 47 states,

22   in 2011, 33 out of 47 states that were reviewed.

23   Q    Ms. Crabtree, refocusing for a moment on the prior page

24   of this exhibit, measure C-1, or C dash, or C1-4, I'm sorry.

25           Based on that information and the other policies

1    and data you've described here today with respect to

2    reunification, have you formed an opinion as to whether or

3    not DCF is meeting accepted standards of professional

4    judgment in its reunification practice?

5    A    They are not.

6        **MS. BARTOSZ:**  Your Honor, I don't know if now's a

7    good time for a short morning break.

8        **THE COURT:**  We're going to take a short morning

9    break, and if it is we'll take it.  And you think it is?

10       **MS. BARTOSZ:**  I was going to change topics and try

11   to get these documents back over the mountain so we can move

12   a little more smoothly.

13       **THE COURT:**  That will be fine.  We'll take a 15

14   minute recess at this time.  We'll recess.

15       **THE CLERK:**  All right.

16       (Recess.)

17       **THE CLERK:**  All rise.  The United States District

18   Court is back in session, you may be seated.

19       **THE COURT:**  Go ahead, Ms. Barotsz.

20       **MS. BARTOSZ:**  Thank you, your Honor.

21               **DIRECT EXAMINATION** (Cont'd)

22   BY  MS. BARTOSZ

23   **Q**   Ms. Crabtree, I would like to turn to the third building

24   block you identified, and I think you referred to that as

25   internal and external accountability.

1    A    Yes.  Or quality assurance.

2    Q    Okay.  In assessing accountability, and you've now

3    identified quality assurance, did you look at any other

4    function as well within DCF?

5    A    I looked at contract monitoring which I consider part of

6    the accountability within the department, how well we are

7    doing the job that we're doing.

8    Q    In discussing building block three, let's start with

9    contract monitoring, all right?

10    A    Okay.

11    Q    Can you generally describe first of all what you mean

12    when you refer to contract monitoring?

13    A    Contract monitoring in child welfare refers to the

14    ability of the child welfare, the state agency to, if they

15    use private providers to provide services, placements for

16    children, monitoring to ensure that services are happening

17    the way that they are supposed to for those children.

18    Q    And does DCF use private providers in delivering

19    placements or services to children?

20    A    Yes, they do.

21    Q    In reviewing the issue of contract monitoring, did you

22    seek to identify the laws, regulations or professional

23    standards that speak to that issue?

24    A    I did.

25    Q    I show you Exhibit SI.  Can you identify Exhibit SI, Ms.

1    Crabtree?

2    A    Yes.  This is the federal code requirement for

3    monitoring and reporting program performance.

4    Q    And focusing your attention on the first page of this

5    document in the top paragraph (a), did you give

6    consideration to that provision?

7    A    Yes, I did.

8    Q    And what reliance did you place on that provision?

9    A    That the state agency's responsible for managing and

10   monitoring programs.  There is no regulation that states

11   that, states that a child welfare agency must use private

12   providers, but if they do they have to remain the

13   responsible child welfare agency for the state and

14   monitoring if they have what are called sub-recipients or

15   sub-rewards to private providers.

16   Q    Ms. Crabtree, I'll now direct your attention to

17   Exhibit 217.  Please identify Exhibit 217?

18   A    This is from the U.S. Department of Health and Human

19   Services, Office of the Inspector General.  It's a report on

20   sub-grantee or provider monitoring in the state foster care

21   programs.

22   Q    Did you rely on this document in formulating your

23   opinion?

24   A    Yes.

25   Q    And did you make reference to it in your report?

1    A    Yes.

2    Q    Please focus your attention on pages 7 and 8 of this

3    document.  Starting at the bottom paragraph of page 7, our

4    criteria.

5    A    Yes.

6    Q    Did you rely or refer to this provision in your report?

7    A    I did.

8    Q    Can you describe for the Court what reliance you placed

9    on this particular portion of Exhibit 217?

10   A    It, it reports the requirement of states to have at

11   least two things in place when they do contract monitoring.

12   One has to be a fiscal monitoring mechanism, the other a

13   program monitoring mechanism.

14   Q    What is a program monitoring mechanism as opposed to a

15   fiscal mechanism?

16   A    Fiscal refers to the actual monetary contract that a

17   state may have with a private provider agency, and a program

18   monitoring mechanism monitors the actual service, delivery

19   of, the implementation, availability of those to the

20   children as required.

21   Q    Ms. Crabtree, please now focus on Exhibit 835.  Can you

22   identify Exhibit 835, please?

23   A    Yes.  This is a paper that was done that relates to

24   quality of contract for child welfare services in December

25   of 2008, Department of Health and Human Services.

1    **Q**    Did you refer to this document in your report?

2    A    Yes.

3    **Q**    Let me direct your attention to pages 11 and 12 of this

4    exhibit.

5              **THE COURT:**  Say again the page numbers.

6              **MS. BARTOSZ:**  Pages 11 and 12 of Exhibit 835, your

7    Honor.

8              **THE COURT:**  Thank you.

9    **Q**    Are these the portions of Exhibit 835 to which you

10   referred in your report?

11   A    Yes.

12   **Q**    Can you describe for the Court why you refer to these,

13   what reliance you placed on these passages?

14   A    It gives you the primary areas of monitoring that are

15   required in child welfare programs.  The middle of the page

16   under letter A where it says focus of monitoring you see

17   four bullet points that lay out both the fiscal and the

18   program monitoring requirements.

19   **Q**    Turning to page 12, item 4, performance monitoring.

20   What does that refer to?

21   A    Performance monitoring is the monitoring of the

22   accomplishment of the agency moving toward goals that the

23   agency has set; in other words, a prior agency sets

24   performance goals related to the children in its care, and

25   performance monitoring is a way of measuring that.

1    Q    Measuring that as to private providers?

2    A    As to, as to whatever target that's been set for the

3    children in their care.

4    Q    Did you additionally look at any standards from

5    professional organizations that relate to contract

6    monitoring?

7    A    Yes.

8    Q    Let me direct your attention to Exhibit RW.  Can you

9    identify Exhibit RW, please, Ms. Crabtree.

10   A    Council on Accreditation quality monitoring provider

11   services, and the second page it gives some information in

12   PA-RPM 10.1, 10.02, 10.03 and 10.04, about how to, how to go

13   about ensuring that you're getting quality purchased

14   services from private providers.

15   Q    Focusing your attention on provision PA-RPM 10.03, did

16   you give consideration to that portion of this standard in

17   formulating your opinions?

18   A    Yes.

19   Q    What significance did you place on this, if any?

20   A    Particularly in the criteria for evaluating the

21   provider's performance, which is item b, and reaching

22   communication and data that may be available to support

23   progress toward performance targets that may be set for

24   private providers.

25   Q    Ms. Crabtree, I now would like to redirect your

1    attention to Exhibit 69.  And could you please turn to 110

2    CMR 1.02, or 120.  7.120.

3            Do you have that, setup of residential community

4    care?

5    A   Yes.  This is the Massachusetts code and the section on

6    community care.

7    Q   Turning to the next page, provision 6.  Did you give

8    that provision consideration in formulating your opinions?

9    A   Yes.

10   Q   Can you describe what significance you gave to this

11   provision?

12   A   That, that section requires that the department conduct

13   periodic reviews of its community providers that are under

14   contract to the department.

15           May I add?

16   Q   Yes, please.

17   A   It also requires a site visit and written report

18   communicated back to the provider concerning their

19   evaluation.

20   Q   Now, beyond the regulations and standards you've

21   identified, did you look at DCF business records in

22   formulating your opinion regarding contract monitoring?

23   A   Yes.

24   Q   At this time will you focus your attention on

25   Exhibit 502.  Ms. Crabtree, can you identify Exhibit 502?

1    A    This is a historical document from 2004 around the

2    system of care that the department had in place, and this is

3    information from interviews that they did with providers.

4    Q    Did you review this document --

5    A    Yes.

6    Q    -- in your work here?

7    A    Yes.

8    Q    Let me direct your attention to page 7 of this exhibit.

9    And do you see the heading on that page, accountability?

10   A    Yes.

11   Q    And then the first paragraph under that, did you give

12   reference or make reference to this portion of Exhibit 502

13   in your report?

14   A    Yes.

15   Q    Can you describe for the Court why you made reference to

16   this, what significance you placed on this provision or

17   passage?

18   A    It's the department's feedback that the accountability

19   system that they have in place in 2004 is more reactive than

20   proactive in terms of monitoring their providers in the

21   community.  And the, I think the other important piece of

22   information from that particular paragraph is that the

23   internal DCF staff was strongly advocating for a more

24   robust, and I think they even used the word robust system to

25   increase the quality of the care that the children were

1    receiving with the community providers.

2    Q    Looking on, did this also address any feedback from the

3    private provider community itself?

4    A    Yes.  If you look at the end of that paragraph it says

5    members of the private community said the same.  So there's

6    agreement across the board that the contract monitoring

7    within the state needed to be regularly strengthened.

8    Q    Ms. Crabtree, I'm now going to show you Exhibit 40.  Can

9    you identify Exhibit 40, Ms. Crabtree?

10    A    This is an addendum that was added to what are called

11    provider lead agencies that have contracts in place to be

12    the funnel point for children out to provider agencies, and

13    they are the lead agency and have a contract for that

14    function.  This is an addendum to that from FY12-13.

15    Q    Did you review this document in addressing contract

16    monitoring within DCF?

17    A    Yes.

18    Q    Could you please turn to page of this document with a

19    Bates stamp designation DCF007263607.

20           Do you have that page?  And there's two bold

21    sections up on top, B, performance, outcomes and reports, C,

22    management of area lead agency performance?

23    A    Yes.

24    Q    Okay.  Did you refer to those portions of this contract

25    addendum in your expert report?

1   A   Yes.

2   Q   Can you describe for the Court what reliance or

3   significance you placed on these provisions?

4   A   As part of this addendum, the department is to develop

5   some performance outcome objectives for those lead agencies

6   that are contract monitoring, in the contract monitoring

7   process.   They're supposed to function on certain areas of

8   safety, permanency and well-being.   If you look down at

9   number C, it also says that the department is, DCF is

10  supposed to do a comprehensive annual review of those lead

11  agencies' performance, and there's a governance committee

12  that does a written report and provides that feedback.

13        The things that are measured are listed in item 2A

14  through E, and are generally things that you would find in a

15  good contract monitoring system.

16  Q   Ms. Crabtree, at this time I would like you to return

17  your attention to Exhibit 387.   Please keep Exhibit 40 handy

18  there.

19        We've looked at this before, but can you identify

20  again Exhibit 387?

21  A   This is Commissioner McClain's response to a legislative

22  inquiry.

23  Q   In reviewing contract monitoring, did you place reliance

24  on this exhibit?

25  A   Yes.

1    Q    Please turn to the page of this exhibit with the Bates

2    stamp, Bates stamp designation DCF 000543377.  And do you

3    see the bold item 13 in the question?

4    A    Yes, I do.

5    Q    Do you refer to this particular question and response by

6    the commissioner in your report?

7    A    Yes.

8    Q    Why did you make that reference?

9    A    The commissioner acknowledged to a question about ways

10   to improve the supervision of the private contract agencies,

11   that, that he agreed that the level of monitoring and

12   quality assurance for them was not at a level that one would

13   expect for a state agency with a purchase of service budget

14   in excess of $350 million.

15          He also indicated further in that comment that he

16   thought that resources were needed for the development of

17   that.

18          **MR. COLLINS:**  Objection, your Honor.

19          **THE COURT:**  Well, the document speaks for itself.

20   The document's in evidence.

21   Q    In your review of this letter and the testimony and

22   other documentation provided to you in formulating your

23   opinion, your findings here, Ms. Crabtree, did you determine

24   whether or not DCF met the obligations set forth in

25   Exhibit 40, the contract addendum under item E, performance

1    outcome reports and, and C, management of area lead agency

2    performance?

3    A    Yes.

4    Q    What did you find?

5    A    They don't.  Do not.

6    Q    Please now focus your attention on Exhibit 218.  Can you

7    identify this exhibit, Ms. Crabtree?

8    A    Yes, I can.

9    Q    And what is it?

10   A    It's a monitoring document from the federal Office of

11   Inspector General, Department of Health and Human Services,

12   of state foster care systems.

13   Q    What is the Office of Inspector General?

14   A    The Office of Inspector General conducts reviews of

15   state expenditures related to particular programs, in this

16   case, it's health and human services.

17   Q    Can you turn to page 7 of this Exhibit 218.  Do you have

18   that?

19   A    I do.

20   Q    Looking at the last paragraph on that page, I would like

21   to focus your attention on the two sentences beginning with

22   In State D.  Do you see that?

23   A    I do.

24   Q    Do you understand state D to be Massachusetts?

25   A    State D is Massachusetts.

1    Q   Did you refer to this provision --

2           THE COURT:  May I have the page number again, and I

3    apologize.

4           MS. BARTOSZ:  Judge, it's page 7.

5           THE COURT:  Thank you.

6           MS. BARTOSZ:  And the final paragraph.

7    Q   Did you refer to this passage regarding state D in your

8    report?

9    A   I did.

10   Q   Can you describe for the Court why you placed reliance

11   on this passage?

12   A   The Office of Inspector General reported that in state D

13   that only one licensing visit occurs every year and that no

14   programs received site visits.  The OGI goes on to explain

15   that they rely heavily on a network of state and local

16   oversight to provide --

17          MR. COLLINS:  Objection, your Honor.

18   A   -- any kind of referrals that come up for problems that

19   occur.

20          THE COURT:  Well, the document speaks for itself,

21   and with no disrespect, I can read.

22   Q   Ms. Crabtree, did you rely upon this document in forming

23   your opinions?

24   A   I did.

25   Q   Ms. Crabtree, I'm going to return your attention at this

1    time to Exhibit 33.  This again is the second round PIP.

2    Did you refer to this document in formulating your opinions

3    regarding contract monitoring?

4    A    I did.

5    Q    Please turn to page 12 of Exhibit 33.  Do you have that

6    page?

7    A    I have it.

8    Q    And do you see there the heading G, performance,

9    management and accountability system?

10    A    I do.

11    Q    Did you make reference to this portion of the PIP in

12    your report?

13    A    Yes.

14    Q    Can you please describe for the Court why you made

15    reference to this passage in assessing contract monitoring?

16    A    Particularly in regard to the second bullet point where

17    it refers to the DCF as having a performance accountability

18    system under construction that they used under development

19    for their area offices.

20    Q    In your review of the records and data provided to you,

21    were you able to identify whether DCF now uses performance

22    scorecards in relation to its private provider community?

23            **MR. COLLINS:**  Objection.

24            **THE COURT:**  Would you ask the question again,

25    forgive me.

1          **MS. BARTOSZ:**  Yes.

2    **Q**    In your review of DCF documents and information, did you

3    determine whether this set of PIP provisions were actually

4    implemented?

5          **MR. COLLINS:**  Objection.

6          **THE COURT:**  She may have that in that form.

7    A    I can answer?

8          **THE COURT:**  You may answer, yes.

9    A    Okay.  Yes, the answer is yes, I looked at that and no,

10   they do not.

11   **Q**    In your review of DCF's contract monitoring did you come

12   across the name Joy Cochran?

13   A    I did.

14   **Q**    Did you review her testimony?

15   A    I did.

16   **Q**    Did you place reliance on portions of that testimony in

17   formulating your opinions?

18   A    Yes, I did.

19   **Q**    Can you please describe for the Court the reliance you

20   placed on Ms. Cochran's testimony?

21   A    Ms. Cochran is the DCF official who is in charge of the

22   intensive foster care branch of child welfare for the

23   department, and as such she was able to convey information

24   about the inability of the staff to meet the requirement of

25   contract monitoring at the level that is needed.

1    **Q**    Did Ms. Cochran testify with respect to whether her

2    unit's able to conduct site visits, desk audits, those sort

3    of contract monitoring activities?

4         **MR. COLLINS:**  Objection.

5    **Q**    What did Ms. Cochran testify to with respect to contract

6    monitoring activities?

7         **THE COURT:**  Withdrawn.

8    A    She testified that she was down to one person who had

9    that responsibility that worked for her who had the

10   responsibility for 26, 26 agencies around the state and

11   2,100 children.

12   **Q**    Did you place significance on that testimony?

13   A    Yes.

14   **Q**    How so?

15   A    To, to expect one person to be able to conduct site

16   visits and do the required necessary performance monitoring,

17   written evaluations, feedback and communication for 26

18   agencies located in various parts of the state is a workload

19   issue for the department and is in my opinion not going to

20   be able to allow them to do that effectively.

21   **Q**    In assessing DCF contract monitoring did you encounter

22   the name Fran Carbone?

23   A    I did.

24   **Q**    Did you review her testimony?

25   A    Yes.

1    Q    Did you place reliance on that testimony in forming your

2    opinions?

3    A    Yes.

4    Q    Please describe for the Court the reliance that you

5    placed on Ms. Carbone's testimony?

6    A    Ms. Carbone was the official in the DCF agency that has

7    responsibility for congregate care placement of children,

8    congregate care meaning group home type settings for

9    children, and originally had a staff of several people, I

10    estimate five to six people, if I'm remembering correctly,

11    who were able to work with her around the monitoring

12    congregate care placements.  There were originally developed

13    a system of monitors around the state, resource monitors,

14    that were supposed to take on that responsibility.  Those

15    positions were --

16    Q    Are you referring to the regional resource centers?

17    A    Yes, the regional resource centers.  And those were done

18    away with, and the people that were located in the, as a

19    field responsibility, so that that function went away from

20    the state office in terms of their responsibility to cover

21    that.

22                THE COURT:  Wait a minute, you've lost me.

23                You thought it significant that she said that they

24    originally, or during the course of her employment had

25    regional offices, and then what?

```
 1          THE WITNESS:  They had regional, they had people

 2   assigned out of the state office with regional resource

 3   responsibilities for monitoring.  Those went away and left

 4   her, they were --

 5          THE COURT:  That's where I lost you.  The people

 6   went away because by attrition or budget cuts or something,

 7   or the duty went away?

 8          THE WITNESS:  A little of both I think is the best

 9   way to put that.  The responsibility was sent to the field

10   for people who already worked in the field to pick up extra

11   responsibility.

12          THE COURT:  Right.  That's a way to do it.  So, so,

13   that -- I understand that testimony.

14          THE WITNESS:  Okay.  Okay.

15          THE COURT:  And what else?  And the people who were

16   assigned from the central office to perform that function

17   either were lost due to attrition or reassigned.  Is that

18   right?

19          THE WITNESS:  Right.  Right.  So that left

20   Ms. Carbone, not Carbone -- yes, Carbone.

21          THE COURT:  Yes.

22          THE WITNESS:  We're talking about congregate care.

23   Q    Did Ms. Carbone, when contract monitoring staff from her

24   office were moved to the regional office as you just

25   described to the Court, did Ms. Carbone retain direct
```

1    reporting authority over them?

2    A    No, she did not.

3    Q    Did you find that significant?

4    A    Yes.  The responsibility still lies with Ms. Carbone at

5    the state office, but she has no direct reports and no

6    connection to those people in the field to do that, or who

7    absorbed that responsibility.

8         **THE COURT:**  And who is the witness who said she had

9    to review alone 26 different agencies?

10        **THE WITNESS:**  That, that is intensive foster care.

11   That was Joy Cochran.

12        **THE COURT:**  Thank you.

13        **THE WITNESS:**  And she has one person that does that

14   for her.

15   Q    And just to clarify for the Court, you've spoken about

16   staff that Ms. Carbone had for congregate care monitoring

17   that moved to the regional offices, and you referred to a

18   different entity or regional resource center.

19        Can you describe what the regional resource center

20   is?

21   A    The regional resource centers were originally intended

22   to be the planned monitoring function of the provider

23   system, and due to reorganization within the department that

24   responsibility, that function went, I guess went away is the

25   best way to put it.  It was eliminated.  And so it's not

1    that piece in place any longer.

2    **Q**    Based on your review of the standards that you've

3    identified, as well as the documents and information you've

4    identified, have you formed an opinion as to whether or not

5    DCF's contract monitoring function departs from accepted

6    standards of professional judgment?

7    A    It departs from accepted standards.

8    **Q**    Ms. Crabtree, I'm now going to show you Exhibit 406.

9    Can you identify Exhibit 406?

10   A    Yes.  This is an e-mail from the Commissioner of DCF

11   related to his getting concerns from the provider agencies

12   around the level of difficulty of children having referred

13   to them for service in placement.

14   **Q**    Did you give consideration to Exhibit 406 in looking at

15   the contract monitoring function?

16   A    Yes.

17   **Q**    Why did you do so?

18   A    This, this letter asks for information to address the

19   problem.  The commissioner is asking that the departmental

20   officials participate in discussion in planning to alleviate

21   the problem.

22   **Q**    Please now direct your attention to Exhibit 38.  Can you

23   identify this exhibit, please?

24   A    The same report on intensive foster care placement

25   stability, intensive foster care meaning the private

1    provider side of the work that DCF does.

2    **Q**    Looking back to Exhibit 406, the last document we

3    referred to, that addresses intensive foster care?

4    A    Yes.

5    **Q**    Did you --

6    A    Well, the commissioner also mentions congregate care in

7    the e-mail.

8    **Q**    Thank you.

9         Did you give consideration to Exhibit 38 in forming

10   your opinions?

11   A    Yes.

12   **Q**    Please turn to page 3 of this document that has the

13   Bates stamp designation DCF000547371.

14        Do you have that page?

15   A    I do.

16   **Q**    And focusing upon the heading toward the bottom of this

17   page, Lateral Moves, did you make reference to this portion

18   of Exhibit 38 in your report?

19   A    Yes, I did.

20   **Q**    Did you relay upon this data in forming your opinions?

21   A    Yes.

22   **Q**    Can you please describe for the Court how so?

23   A    The information on lateral moves is where the department

24   describes what I mentioned earlier around children doing

25   what Massachusetts refers to as churning in care; in other

1    words, they move from place to place to place rather than

2    moving into permanent foster homes where they stay until

3    they're either reunified or adopted.

4    **Q**    In conducting your review of DCF contract monitoring,

5    did you seek to determine whether any action was taken to

6    address the lateral moves described here in Exhibit 38?

7    A    Yes.

8    **Q**    Let's return to the testimony of Ms. Cochran.  Did you

9    look at that?

10   A    Yes.

11   **Q**    What did you determine?

12   A    Ms. Cochran expressed concern about the moves and the

13   so-called churning in placement and requested that the

14   providers track for a six week period of time the moves of

15   children in intensive foster care.  And so the providers did

16   that and sent that information in.  And to my knowledge

17   nothing was done with that information.

18   **Q**    Where did you glean that knowledge?

19   A    From the department's information they provided.

20   **Q**    Did you review testimony from Ms. Cochran in that

21   regard?

22   A    Yes.

23   **Q**    Did she describe any follow-up after that information

24   was collected for six weeks?

25   A    She said there wasn't a follow-up.

1    **Q**    In your review of DCF contract monitoring and specific

2    focus on this lateral movement issue, did you find any

3    additional DCF follow-up on the issue after Mr. Ferreira's

4    report was issued?

5            **MR. COLLINS:**  Objection.

6            **THE COURT:**  No, she may have the question.  Did you

7    find any follow-up?

8    A    No, I did not.

9    **Q**    Ms. Crabtree, I would like to turn to the second prong

10    of building block three, accountability, that you

11    identified, quality assurance.

12            Can you first describe what you refer to when you

13    use the term quality assurance in the child welfare context?

14    A    Quality assurance in child welfare is the agency's

15    method of taking a look at themselves internally and across

16    the board if they're using private providers to make a

17    determination of do we have a plan that assures that we can

18    implement laws and regulations and best practice, is the

19    plan logical, is the plan being carried out timely, do we

20    have targets that we're setting and goals that we're trying

21    to meet, and if not, do we have a mechanism, a feedback

22    mechanism top to bottom within the agency so that we can

23    make adjustments as we go and improve the areas that need

24    improvement.

25    **Q**    In reviewing quality assurance within DCF you identified

1    applicable standards?

2    A   Yes.

3    **Q**   I would like to now show you Exhibit SP.  Can you

4    identify Exhibit SP, please?

5    A   Yes.  This is the federal law regarding comprehensive

6    child and family service plan requirements.

7    **Q**   Did you place reliance on this document --

8    A   Yes.

9    **Q**   -- in conducting your work?

10        Could you please turn to page 8 of this document,

11   more specifically to provision U on that page.  Did you make

12   reference to provision U in your report?

13   A   Yes.

14   **Q**   What reliance did you place on this provision in

15   formulating your opinions?

16   A   The federal law requires that states, state plan include

17   a description of what their quality assurance system is

18   that's regularly updated and that it's used to assess and

19   identify problems and correct those.

20   **Q**   I would like to now direct your attention again to

21   Exhibit SS.  Here's a copy.

22        Can you identify Exhibit SS?

23   A   Yes.  SS is the federal law also around determining

24   whether the state meets substantial, title IV-E conformity.

25   **Q**   And I would like to focus your attention on page 4 of

1    the exhibit.  Paragraph 3.  Did you refer to that provision

2    in formulating your opinions?

3    A   Yes.

4    Q   Why did you place reliance on that provision, if you

5    did?

6    A   In order to receive funding for the foster children they

7    have to meet federal requirements around IV-E.  The DCF

8    agency is the designated IV-E agency for the state for child

9    welfare.  They have to be able to do the pieces laid out in

10   (3), quality assurance system, and then it goes little i

11   through little v, Roman numerals, that specify what that has

12   to include.

13   Q   Beyond the federal provisions that you've just

14   identified, did you look at standards from professional

15   organizations in reviewing quality assurance within DCF?

16   A   Yes.

17   Q   And I'll show you Exhibit RV.  Please identify Exhibit

18   RV?

19   A   RV is the quality and performance section of the Council

20   on Accreditation standards.

21   Q   Did you place focus on the second page of this exhibit

22   and the provision PA-PQI 2.02?

23   A   Yes.

24   Q   Did you refer to this provision in your report?

25   A   I did.

1   Q   Did you rely on this provision in forming your opinions?

2   A   Yes.

3   Q   Can you describe what reliance you gave to this

4   provision?

5   A   This, this helps to lay out the framework for a quality

6   assurance planning system, including the need for identified

7   time frames and addressing any barriers and what are needed

8   supports or implementation of an appropriate quality

9   assurance plan for the department, the agency.

10   Q   I'm going to focus your attention to Exhibit RD.  Please

11   identify Exhibit RD, Ms. Crabtree.

12   A   RD is the Child Welfare League governance and

13   organizational standards for child welfare.

14   Q   Turning to page 2 of this exhibit there's a provision

15   2.77.

16   A   Yes.

17   Q   Did you make reference to this provision in your report?

18   A   Yes, I did.

19   Q   Did you rely upon that in forming your opinions?

20   A   I did.

21   Q   Can you describe the reliance you placed on this

22   provision?

23   A   Aside from the fact that it reinforces that a quality

24   assurance improvement system is necessary, particularly on

25   bullet three, review systems for monitoring the progress of

1    children and their families.  But the whole point of a

2    quality assurance system that's functional is that it tells

3    you that the children that the state has given over to the

4    care of private provider agencies have to keep those

5    children safe and see to their well-being.  Just because a

6    private provider is providing a placement and services for

7    children doesn't take away the obligation that the state is

8    the responsible party to see that those children are safe

9    and taken care of.

10   **Q**   Ms. Crabtree, I now would like to redirect your

11   attention to Exhibit 33, the PIP.  And will you please turn

12   your attention to page 11 of this document.

13          Do you have that, Ms. Crabtree?

14   A   Almost.  Okay.

15   **Q**   Do you see a bold heading B, Strengthen CQI Structures

16   and Processes?

17   A   Yes.

18   **Q**   Did you refer to this provision B in the report?

19   A   I did.

20   **Q**   Can you describe what reliance you placed on this

21   provision in forming your opinions?

22   A    In this program improvement plan from 2009, the

23   Department of Children and Families sketched out how they

24   were going to strengthen their quality assurance system and

25   gives specifics in items 1, 2 and 3 about what they plan to

1    do as part of improving quality assurance.

2    **Q**    I'm now going to show you Exhibit 44.  Can you identify

3    Exhibit 44, Ms. Crabtree?

4    A    This is a guidance manual that was produced by a

5    departmental official named Jan Nissenbaum, I think is how

6    you pronounce her name, and it lays out a quality

7    improvement program for the department.

8    **Q**    Did you place reliance on this document in forming your

9    opinions?

10   A    I did.

11   **Q**    Ms. Crabtree, in reviewing DCF documentation as well as

12   the testimony of DCF officials, were you able to determine

13   whether the CQI structures described in Exhibit 33, the PIP,

14   or in the guidance manual, Exhibit 44, had actually been

15   implemented within DCF?

16   A    It has not.

17   **Q**    Have you formed an opinion, Ms. Crabtree, as to whether

18   or not the DCF quality assurance function conforms with

19   accepted practices of professional judgment?

20   A    It does not.

21         **THE COURT:**  Wait a minute.  I lost this here.  And

22   maybe I didn't understand the question.

23         You were asked if you were familiar with this

24   guidance manual.  You testified you were.  You were asked

25   whether the recommendations there have been implemented.

1    You testified so far as you could tell from the documents

2    they had not.  Then you were asked whether something

3    complies with professional standards.

4              What did you think you were being asked?

5              **THE WITNESS:**  If their quality assurance system as

6    it currently exists complies with federal standards.

7              **THE COURT:**  Thank you.

8              **THE WITNESS:**  With accepted standards.

9              **THE COURT:**  Right.

10   **Q**   In your review of the DCF quality assurance function

11   were you able to identify what staff is assigned to that

12   function in the central office?

13   A    The, the difficulty in identifying the staff was

14   compounded for me in this report, this review, that there

15   were, there was an original plan for a quality assurance

16   team.  That team didn't come to fruition.  The person who

17   provided this quality assurance guidance manual had

18   responsibility for putting that plan together but that was

19   never implemented.  The person who produced the, the data

20   report, Mr. Ferreiro, Ferreira.

21   **Q**   Ferreira?

22   A    Ferreiro.  Ferreira.  Had that responsibility for a

23   period of time, but then also had other central office or

24   state office duties that he was responsible for and that was

25   a side piece added onto his function and then taken away.

1   So, as of this date it's not clear to me that there is a

2   single individual who has responsibility for quality

3   assurance in the department.

4   Q   Ms. Crabtree, you identified as a final building block

5   leadership.  Based upon the findings and opinions you've

6   shared as to building blocks one, two and three, have you

7   formed an opinion with respect to leadership within DCF on

8   the various issues you've addressed?

9   A   Yes, I have.

10  Q   And what's that opinion?

11  A   The Department of Children and Families has several

12  areas of difficulty across all of those building blocks that

13  we've discussed earlier that get in the way of building and

14  maintaining an effective child welfare agency that keeps

15  children safe from harm, that provides permanency for them,

16  that sees that they get the services that they need.  The

17  state, DCF is the designated state child welfare agency so

18  they are acting as, they're acting in the stead of the

19  parent and have the same responsibility that we have as

20  parents for seeing that the children in their care are taken

21  care of.  From the, obviously from the caseload information

22  we know that there are not enough caseworkers in place to do

23  the job.  Leadership has to make that case for funding for

24  those positions.  The department finds itself in a situation

25  where it's unable to comply with some of the federal

1     regulations in regard to meeting certain standards that are

2     expected in the state, and understaffing is a huge part of

3     that.  And so, without the leadership at the top and the

4     management positions they simply can't resolve the problems

5     down the line in the direct care of the children.

6               The staffing cuts have severely impacted their

7     ability to get managers in place, to get teams in place to

8     get the actual work done.

9               **THE COURT:**  That's about it, isn't it?

10              **MS. BARTOSZ:**  That is, Judge.

11              **THE COURT:**  All right.  Here's the order of the

12    Court.  The Court's going to adjourn sine die, which in my

13    mind means that -- you may step down, thank you.

14              (Whereupon the witness stepped down.)

15              **THE COURT:**  I take it from what the plaintiffs have

16    said that subject to my careful review of the depositions

17    which have been proffered and my ruling on the objections

18    made by the defense, and subject to the submission of

19    additional exhibits either by agreement or after a court

20    hearing, plaintiffs rest.

21              **MS. BARTOSZ:**  That's true, your Honor.

22              **THE COURT:**  Very well.

23              **MS. BARTOSZ:**  Plaintiffs do rest based upon those

24    conditions.  And I additionally, Judge, do have a couple of

25    other evidentiary matters to address relating to exhibits

1    that this witness identified.

2         **THE COURT:**  Address them with the defense first and

3    if they're disputed we can sort them through at another

4    time.

5         **MR. COLLINS:**  Your Honor, I would like a point of

6    clarification on that order that you just made.

7         **THE COURT:**  Well, I'm not done with it.

8         **MR. COLLINS:**  Okay.

9         **THE COURT:**  Now, I'm not setting another time for

10   us to meet.  I expect the following to happen.  If all

11   document issues can be resolved without dispute the

12   documents will be submitted to me and they'll be part of the

13   record.  If there are document disputes, Ms. Gaudet will be

14   notified and I will schedule, I will review the matter, I

15   mean, you don't have to, you may, but I'm not requiring you

16   to brief it, but at least submit the documents with a brief

17   notation of the issue.  If I need a hearing, I'll schedule

18   one.

19        I expect, because the defense has indicated they

20   want to, they will file a motion for -- it isn't a directed

21   verdict because it's jury waived and I can never get my mind

22   around what it is.  But it's like a directed verdict.  A

23   motion for, that on this record the defendant is entitled to

24   judgment.  I'm not requiring, I'm not setting a date for the

25   filing of that motion.  When that motion is filed, the

1    defense will have the normal time, 14 days, because they

2    know it's coming to respond to it.  That motion I will set

3    an oral hearing on, and given the complexity of the matter,

4    I'll give you each a half an hour to argue because it's the

5    same thing as final argument, at least on the first phase.

6            All of that's in your hands.  The next thing that

7    will happen from the Court is I will try those three cases

8    that I have, that are March cases that I think are within

9    the scope of our agreement.  At the end of those three

10   cases, whenever they end, which I think will take us to

11   April, I will schedule another hearing, and if I have not

12   acted upon your motion, or if the motion has not yet been

13   filed, the defense may recall this witness and have full

14   cross-examination of this witness.  And I think it makes

15   sense to start there, even though you may wish to put on an

16   affirmative case.  And you may do that before filing your

17   motion.

18           Now, does that answer your question?

19           **MR. COLLINS:**  That answers my question, your Honor.

20           **THE COURT:**  Fine.

21           **MR. COLLINS:**  But I have one other question.

22           **THE COURT:**  Go ahead.

23           **MR. COLLINS:**  The defendants would like to move for

24   a 30 page limit to the directed verdict motion.

25           **THE COURT:**  Denied.

1          **MR. COLLINS:**  So we're, so we're at 20 just so I'm

2    clear.

3          **THE COURT:**  We're at 20.  Remember Voltaire's

4    admonition.  It is a very wise one.

5          We'll recess.

6          **MS. BARTOSZ:**  Thank you, your Honor.

7          **THE CLERK:**  All rise.

8          (Adjournment.)

9

10                    **C E R T I F I C A T E**

11

12

13          I, Donald E. Womack, Official Court Reporter for

14    the United States District Court for the District of

15    Massachusetts, do hereby certify that the foregoing pages

16    are a true and accurate transcription of my shorthand notes

17    taken in the aforementioned matter to the best of my skill

18    and ability.

19

20

21

22          /S/ DONALD E. WOMACK 5-7-2013
              _____
23                 DONALD E. WOMACK
                 Official Court Reporter
24                  P.O. Box 51062
             Boston, Massachusetts 02205-1062
25                womack@megatran.com