## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CONNOR B., by his next friend, ROCHELLE VIGURS, et al., individually and on behalf of all others similarly situated,<br><br>　　　　　Plaintiffs,<br>v.<br><br>DEVAL L. PATRICK, in his official capacity as Governor of the Commonwealth of Massachusetts, et al.,<br><br>　　　　　Defendants. | C.A. No. 1:10-cv-30073 (WGY) |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE RECORD

The principal question in this case is whether the structural failings of the Massachusetts child welfare system as administered by the Department of Children and Families ("DCF"), and attendant and long-standing poor outcomes for children that render DCF one of the most harmful foster care systems in the nation, deprive children of their substantive due process right to be reasonably protected from harm while in the state's legal custody. Plaintiffs have provided evidence that DCF lacks key structures or "building blocks" that are critical to the provision of care consistent with recognized professional standards. The deficient structures include an inadequate workforce, an insufficient placement array, and a lack of accountability systems for DCF's field offices and private contractors. Plaintiffs have provided evidence that these structural deficiencies are well-known to Defendants and compromise children's basic safety: DCF's safety net lacks the "hinge pins" required to reasonably protect children from harm, including consistent licensure and oversight of foster placements, consistent visitation with children, and timely investigations of reported maltreatment by foster caretakers, resulting in one

1

of the highest rates of abuse and neglect of children in foster placements in the nation. DCF's structural failings result in other poor outcomes for children in its care, who are harmed by excessive placement moves, protracted stays in foster care without a permanent family, and inadequate medical and mental health care. Defendants claim that the Constitution does not recognize any duty on their part to protect children from these harms; but the law of the case and weight of authority hold otherwise.

## ARGUMENT

### I.    THE EVIDENCE SUPPORTS PLAINTIFFS' SUBSTANTIVE DUE PROCESS CLAIM

When children enter state foster care custody, a special relationship is created which gives rise to substantive due process rights under the Constitution, including the right "to be reasonably free from harm." *Connor B. v. Patrick*, 771 F. Supp. 2d 142, 162 (D. Mass. 2011).[1]

---

[1] Defendants would cabin the scope of Plaintiffs' asserted rights by mischaracterizing them as demands for the specific "entitlements" in Plaintiffs' demand for relief. (Mem. of Law in Supp. of Defs.' Mot. for J. on the R., Dkt. No. 317 ("Defs.' Br.") at 6 & n.9, citing Compl. ¶ 303.) But it is the law of the case that at least some of the harms claimed fall within the scope of constitutional protection. The Court has already found that "*Youngberg*'s guarantee of reasonable care and safety clearly contemplates" the rights enumerated in Compl. ¶ 303(a)-(d), including "protection from unnecessary harm," *Connor B*., 771 F. Supp. 2d at 161, and "the right to services necessary to prevent foster children from deteriorating or being harmed physically, psychologically, or otherwise while in government custody, including but not limited to the right to safe and secure foster care placements, appropriate monitoring and supervision, appropriate planning and services directed toward ensuring that the child can leave foster care and grow up in a permanent family, and adequate medical, dental, psychiatric, psychological, and educational services" (Compl. ¶ 303(a), (c)). The Court further ruled that it is "easily conceivable" that *Youngberg*'s guarantee of reasonable care and safety contemplates the protections sought in ¶ 303(e)-(g). *Connor B*., 771 F. Supp. 2d at 161.

This ruling is consistent with the weight of authority concerning children in state custody. *See Yvonne L. v. N.M. Dep't of Human Servs.*, 959 F.2d 883, 893 (10th Cir. 1992) ("right to be reasonably safe from harm"); *K.H. v. Morgan*, 914 F.2d 846, 851 (7th Cir. 1990) (state constitutionally required "to take steps to prevent the child from deteriorating physically or psychologically"); *Marisol A. v. Giuliani*, 929 F. Supp. 662, 675 (S.D.N.Y. 1996) ("right to be free from unreasonable and unnecessary intrusions into their emotional well-being"), *aff'd*, 126 F.3d 372 (2d Cir. 1997); *LaShawn A. v. Dixon*, 762 F. Supp. 959, 993 (D.D.C. 1991) *aff'd and remanded sub nom. LaShawn A. v. Kelly*, 990 F.2d 1319 (D.C. Cir. 1993) (rights "extend[] to safety from psychological and emotional harm").

Specific harms that have been recognized include: (1) inappropriate and unstable placements, *LaShawn A.*, 762 F. Supp. at 996; *Kenny A. v. Perdue*, No. 1:02-cv-1686-MHS, 2004 WL 5503780, at *4 (N.D. Ga. Dec. 13, 2004); (2) unnecessarily long stays in foster care, *E.C. v. Sherman*, No. 05-0726-CV-W-SOW, 2006 WL 6358376, at *37 (W.D. Mo. Aug. 4, 2006); *Marisol A*., 929 F. Supp. at 676; (3) inadequate essential services and case planning, *Norfleet v. Ark. Dep't of Human Servs.*, 989 F.2d 289, 293 (8th Cir. 1993); *LaShawn*, 762 F. Supp. at 996; *Kenny A*., 2004 WL 5503780, at *4; *Charlie H. v. Whitman*, 83 F. Supp. 2d 476, 507 (D.N.J. 2000); (4) failure to maintain family connections, *Marisol A*., 929 F. Supp. at 676-77.

In addition, to prevail on a substantive due process claim, "Plaintiffs must show that Defendants' conduct represented a substantial departure from accepted professional judgment, which deprived them of conditions of reasonable care and safety, *and* that such conduct shocks the conscience." *Id*. at 163. Whether or not Defendants' conduct shocks the conscience is context-dependent: "[A] substantial departure from accepted professional judgment may shock the conscience under some circumstances but not others." *Id*. Accordingly, children in foster care are "'entitled to more considerate treatment and conditions' than criminals." *Yvonne L.*, 959 F.2d at 894 (quoting *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982)). It is law of the case that harm caused by "placing [children] in foster homes that presented known risks of harm, failing to monitor these improper placements, shuttling [children] among foster families without any hope of finding a permanent home, preventing visitation with parents and siblings, and failing to provide . . . essential treatment" can shock the conscience.[2] *Connor B.*, 771 F. Supp. 2d at 163. Certainly, a long-standing failure to exercise professional judgment and remedy systemic failures by the very agency charged with protecting children, in the full knowledge that these failures can and have caused damaging harm, should shock the conscience. *See Alsina-Ortiz v. Laboy*, 400 F.3d 77, 82 (1st Cir. 2005) (discussing liability for a constitutional violation where an official "ignores or turns away from what is otherwise apparent").[3]

---

[2] Defendants, relying on *D.L. v. District of Columbia*, Nos. 11-7153, 12-7042, 2013 WL 1489471 (D.C. Cir. Apr. 12, 2013), attempt in a footnote to re-litigate, for a third time, the certification of the Plaintiff class. *See* Dkt. Nos. 49, 79. The argument is irrelevant at this juncture, as it is the law of the case that "the fact that the harms alleged by named Plaintiffs may differ in some respects from those suffered by unnamed Plaintiffs does not undermine typicality." *Connor B. v. Patrick*, 272 F.R.D. 288, 296 (D. Mass. 2011). Furthermore, the characteristics of the plaintiff class, the specific violations alleged, and the legal standards at issue in *D.L.* were dissimilar to those alleged here and therefore have no bearing on this Court's assessment of Defendants' conduct.

[3] Defendants rely on damages cases to argue that liability hinges on whether their conduct is "brutal and offensive" and "more egregious and more extreme" than violations of state law. (Defs.' Br. at 3-4, citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833 (1998) and *J.R. v. Gloria*, 593 F.3d 73 (1st Cir. 2010).) But the Court has already recognized that a damages case "involves different considerations." *Connor B.*, 771 F. Supp. 2d at 160, 162 n.5. Courts have applied a lesser standard in cases seeking injunctive relief where the chilling effect on public service caused by exposure to money damages is absent. *See LaShawn*, 762 F. Supp. at 996 n.29 ("This is not a case . . . in which the plaintiff seeks money damages. In such cases, a deliberate indifference standard may be warranted due to the

## A.  DCF's Departures From Professional Judgment Cause Harm and Risk of Harm

Plaintiffs have provided evidence that they are subject to harms at rates far exceeding national norms, such that Massachusetts is (and has been for many years) among the poorest-performing states on many of the child welfare indicators and outcomes in the areas of safety, well-being and permanency measured by the U.S. Administration for Children and Families ("ACF").  Plaintiffs' Proposed Findings of Fact, attached hereto as Ex. A, ¶¶ 192-194, 692-701, 729-736, 834, 912-913, 1086-1089, 1235(a)-(g).[4]  Thus, DCF performance is not only "not perfect" (Defs.' Br. at 1), but far behind that of its peers.  These harms arise from DCF case practice and management practices that fall significantly short of recognized professional standards relating to the recruitment, retention, licensing, and oversight of foster placements; workforce capacity; and the establishment of internal and external accountability systems.  Those standards are reflected in DCF's own policies; state and federal law; standards published by the Child Welfare League of America ("CWLA") and the Council on Accreditation ("COA"); performance indicators, outcomes, and systemic factors developed by HHS; academic publications; and the professional experience of child welfare experts.[5]  Plaintiffs' expert Dr. Lenette Azzi-Lessing articulated how DCF's failure to meet case practice standards places

---

chilling effect that an unfavorable judgment may have on municipal policymakers."); *see also K.H.*, 914 F.2d at 854 (acknowledging "broader liability in an injunctive suit").  Plaintiffs here do not seek to penalize officials, but only to prevent ongoing harm to children.

[4] All further paragraph number references are to Plaintiffs' Proposed Findings of Fact.

[5] "[T]hese standards form a reliable basis for evaluating the performance of a state's child welfare system" and "will assist the Court in determining whether State Defendants have violated plaintiffs' rights."  *Kenny A.*, 2004 WL 5503780, at *13.  Defendants suggest that none of these permit assessment of agency performance under the constitutional standard.  (Defs.' Br. at 4 & n.6.)  However, that would "effectively destroy plaintiffs' substantive due process rights and permit State Defendants to operate [a] child welfare system in complete disregard of any professional standards, no matter how well accepted, so long as no uniform set of national standards had been formally adopted."  *Kenny A.*, 2004 WL 5503780, at *13. Defendants rely on *Braam v. Wash.*, 150 Wash.2d 689, 708 (2003) to argue that the Court should disregard COA and CWLA standards and in fact argue that there should be no standards at all to judge how a state treats the children in its custody.  (Defs.' Br. at 4-5.)  But federal courts have recognized the value of these standards, together with agency policy and state and federal law, in deciding whether a state agency violated children's rights. *Kenny A.*, 2004 WL 5503780, at *13; *Doe v. Johnson*, 52 F.3d 1448, 1462 (7th Cir. 1995).  Defendants' reference to *J.R.*, 593 F.3d at 80, in this context is misplaced as *J.R.*'s comments on professional standards are related to the standard applicable in a damages case.  *See* n.3 *supra*.

Plaintiffs at risk of harm, and detailed the nature of that harm.  Plaintiffs' experts Cathy Crabtree and Arburta Jones identified the missing management practices and structures—"building blocks" and "hinge pins"—that must be in place for DCF to meet professional standards.[6]

   *Basic Safety.*  Children who spend significant time in DCF custody are victims of maltreatment at the hands of foster caretakers at shockingly high rates:  18% of children in care two years or more have experienced substantiated abuse or neglect.  ¶ 136.  Using the federal measure of maltreatment in care, fully 0.9% of the 16,000 children passing through DCF custody each year are victims,[7] nearly three times the national standard of 0.32% (met by 24 states in 2011).  ¶ 129.  This amounts to 90 additional victims (0.58% x 16,000) each year.  All children are at risk of being one of these victims.  In 2011 (when the rate was only 0.7%) Massachusetts was the 7th most dangerous jurisdiction to be in foster care, and Massachusetts has been among the least safe jurisdictions since at least 2004.[8]  ¶¶ 122-130, 126, 137-153.  The record here includes egregious examples of maltreatment in individual cases.  ¶¶ 165-174, 1752-1779.

   *Appropriate, Stable Placements.*  DCF frequently places children in inappropriate

---

[6] Contrary to Defendants' sweeping assertion (Defs.' Br. at 4 n.5), Ms. Crabtree did not merely "recite[] the requisite legal terms of art" but rather supported each opinion with statutes, regulations or policies, professional literature, and DCF management reports and other documents.  *See, e.g.*, Trial Tr., Feb. 28, 2013, 104:14-120:14 & Trial Tr., Mar. 1, 2013, 4:6-17:18 (analyzing deficiencies in placement array using over ten exhibits, and concluding DCF fails to meet professional standards regarding recruitment and retention foster homes).

[7] That this is less than the rate of maltreatment in the general population (Defs.' Br. at 7-8) is irrelevant:  "The fact that a state's foster care system, no matter how deficient, arguably represents an improvement on the abused child's prior living conditions does not diminish th[e] entitlement [to safety]."  *Connor B.*, 771 F. Supp. 2d at 160 (citing *K.H.*, 914 F.2d at 849).

[8] Defendants argue that such comparisons are unfair because Massachusetts applies a lower evidentiary standard for supporting reports of abuse and neglect.  (Defs.' Br. at 7.)  Commissioner McClain acknowledged that the federal standard is "realistic and attainable."  ¶ 146.  In any event, the Court should not presume that differing evidentiary standards affect these rates.  As Chief Justice Burger said of "standard-of-proof catchwords":

   [T]he ultimate truth as to how the standards of proof affect decisionmaking may well be
   unknowable, given that factfinding is a process shared by countless thousands of individuals
   throughout the country.  We probably can assume no more than that the difference between a
   preponderance of the evidence and proof beyond a reasonable doubt probably is better understood
   than either of them in relation to the intermediate standard of clear and convincing evidence.

*Addington v. Texas*, 441 U.S. 418, 424-25 (1979). Defendants must provide evidence of a meaningful correlation between differing standards and the actual rate of maltreatment in care to overcome Plaintiffs' evidence of how dangerous DCF foster care is.

placements that cannot meet their needs, or that are outright dangerous, in violation of its policies and state and federal regulations. ¶¶ 327-555, 702-705. These poor matches further result in placement disruptions, causing children to be unnecessarily moved from one placement to another. ¶¶ 528-534. DCF shuttles children among placements (and consequently among schools, ¶¶ 757-761, and service providers, including therapists, ¶ 724) at a rate that has consistently placed Massachusetts among the ten worst jurisdictions for placement stability since at least 1998.[9] ¶¶ 729-736, 773-780. Multiple moves traumatize children, cause behavioral problems, and thereby stymie efforts to provide further stable placements and permanency, ¶¶ 706-727, 762-771, resulting in a vicious cycle of ever-increasing instability. ¶ 709.

DCF's poor placement practice stems from an inadequate array of foster placements that compels DCF to house children wherever there is an available bed. ¶¶ 576-625. That shortage is, in turn, the result of an under-resourced recruitment program for foster homes, ¶¶ 626-642, and inadequate oversight of IFC providers' recruitment and placement practices, ¶¶ 684-689, 802-807, 1743, 1751.[10]

*Permanency: Safe Reunification and Adoption.* Defendants subject Plaintiff Children to added risk of harm by returning them home without adequately ensuring they will be safe. Since at least 2004, DCF has performed poorly relative to other states on the rate at which children re-enter foster care after being returned home and experiencing further maltreatment; recent

---

[9] Defendants' argument that some moves "may be beneficial and/or warranted" (Defs.' Br. at 8) has no traction absent a reason why foster children in Massachusetts would require more such "beneficial" moves than children elsewhere. Massachusetts's poor standing can only be explained by additional, unnecessary moves, and is evidenced by, *inter alia*, a high rate of "lateral" moves among placements of the same type. ¶¶ 748-756. Defendants' argument is also at odds with admissions by DCF officials that placement instability is a systemic problem requiring urgent attention. ¶¶ 737-740. Commissioner McClain testified without qualification that "the fewer moves, the better" for foster children. ¶ 737. Defendants' reliance on *Eric L. v. Bird*, 848 F. Supp. 303, 307 (D.N.H. 1994) is misplaced (Defs.' Br. at 8), as the Court has already noted it was not following that court's reasoning regarding placement instability. *Connor B.*, 771 F. Supp. 2d at 161 (noting tension between *Eric L.* and *Youngberg*, *Marisol*); *see also* n.1 *supra*.

[10] DCF also fails to provide needed information and supports to foster parents to stabilize placements. ¶¶ 816-822.

performance has deteriorated further.  ¶¶ 832-852.  For children who cannot be reunified, DCF is slow to identify adoptive families and finalize adoptions in accordance with professional standards,[11] ¶¶ 895-903, 910-965, resulting in emotional and psychological damage from growing up without a family, ¶¶ 904-907, and protracted exposure to other dangers of foster care, including maltreatment and placement instability, ¶¶ 122-155, and the risk of aging out of care, ¶¶ 1076-1107.  DCF's poor performance on permanency measures is due to the high workload of social work staff and related structural problems, ¶¶ 853-894, 966-973, 992-1070, 1502-1514, 1518-1530, and years of delay in implementation of an updated Permanency Planning policy designed to improve and accelerate the permanency process, ¶¶ 974-992, 1531-1535.

     *Family Connections*.  Various provisions of state and federal law and DCF policy provide for siblings to be placed together, regular sibling visits, and parental visits, subject to the child's best interests.  ¶¶ 327-329, 1866-1875.  Failure to maintain family connections through placement and visitation is emotionally damaging to children and compromises the likelihood of successful reunification or other forms of permanency.  ¶¶ 330-335, 1876-1888.  DCF does not track aggregate performance on these outcomes, ¶¶ 348-354, 1906-1911, 1919-1920; and Plaintiffs' review of case files found that DCF often fails to place foster children with siblings when it is in their best interest, ¶¶ 336-337, systematically denies children meaningful visitation with siblings when not placed together, ¶¶ 1890-1891, and provides inadequate visitation between children and their parents, ¶ 1900.[12]  Defendants have long been aware of DCF's poor

---

[11] Plaintiffs do not claim that they are entitled to be "releas[ed] . . . from custody the moment it is no longer necessary." (Defs.' Br. at 6 n.10, citing *Marisol*, 929 F. Supp. at 675-76.)  Rather, they seek protection from the harms of protracted stays in foster care.  *See Marisol*, 929 F. Supp. at 676 and *supra* n.1 for cases recognizing this protection.

[12] Defendants' contention that the data from CRC provides "no insight into the variety of reasons . . . why a visit may not have been documented or provided" even if deemed in a child's best interest (Defs.' Br. at 12) is a red herring.  While there may be individual cases in which a visit would not be appropriate, this cannot explain the fact

performance in these areas, ¶¶ 344-347, 1902-1927, which is due to the inadequate array of placements that can accept sibling groups, ¶¶ 588-593, and limited workforce capacity to arrange for and accomplish visits, ¶¶ 1502-1514, 1518-1530.

_Service Planning and Services._  DCF fails to engage in adequate service planning (_see_ Part III.B _infra_), and fails to provide and adequately oversee the provision of essential services for children's well-being, including medical screenings and passports, ¶¶ 1175-1209, 1239-1272, and for children at risk of "aging out" of foster care without a family, independent living services, ¶¶ 1108-1139.

_Psychotropic Medications_.  Almost 40% of children in DCF care are prescribed psychotropic medications.  ¶ 1327; _see also_ ¶¶ 1324-1325.  DCF lacks the oversight and monitoring structures needed to ensure that these medications are administered safely, failing to adhere to professional standards regarding giving informed consent and documenting children's medical histories and medications.  ¶¶ 1273-1309, 1370-1452.  Defendants fault Plaintiffs' expert Dr. Bellonci for failing to identify children in DCF custody harmed by inappropriate administration of medication (Defs.' Br. at 9), but it is Defendants' own inability to monitor medications that places children at risk.  ¶¶ 1429-30.

**B.  DCF's Failures to Meet Professional Standards Shock the Conscience**

DCF lacks critical structures it admittedly needs to provide adequate care to children: workforce capacity, a sufficient placement array, and internal and external accountability mechanisms.  The Massachusetts Legislature underscored these failings when it mandated that the Office of the Child Advocate ("OCA") prepare a comprehensive five-year plan by June 2010

---

that more than 50% of children are not receiving any sibling visitation and more than 60% are not receiving monthly visits with parents.  ¶¶ 1890, 1900.  Nor would this justify DCF's failure to document a visit.  Further, because DCF does not track family visitation, DCF cannot take action to remedy any systemic deficiencies that are preventing such visits.  As Commissioner McClain testified, "you can only manage what you can measure."  ¶ 1604.

to address 24 areas of concern, including social worker caseloads and qualifications, placement

stability, adoption timeliness, background checks for foster parents, psychotropic medication

oversight, and DCF's Continuous Quality Improvement ("CQI") mechanisms. *See* ¶¶ 1835-

1839. DCF's 2009 Program Improvement Plan ("PIP") similarly promised to address training,

the placement array, and accountability. ¶¶ 621, 1611. However, the OCA was never provided

the resources to prepare its comprehensive plan, ¶¶ 1835-1852, and DCF re-negotiated key goals

out of its PIP prior to completion, ¶¶ 621-622, 791-797, 1588.

Defendants tout recent DCF initiatives and its 2012-2015 Strategic Plan, which target

some of these problems. These may be well-meaning, but, like similar plans from the past, may

or may not be implemented. They will also have limited impact so long as DCF lacks the

building blocks of an effective child welfare agency.

      1. *DCF Lacks the "Hinge Pins" and "Building Blocks" Required to Ensure*
         *Minimally Adequate Care*

<u>*Safety Net "Hinge Pins"*</u>. DCF case practice does not meet professional standards critical

to maintaining the safety of children in foster placements. ¶¶ 175-182, 237-243, 295-297, 464-

467. DCF does not meet its own licensing regulations for departmental foster homes: Large

numbers of kinship homes are not timely licensed and annual re-assessment or re-licensure of

unrestricted homes is frequently delayed. ¶¶ 244-249, 266-269, 473-479. Investigations of

maltreatment in foster care are not timely completed. ¶¶ 298-306. Monthly caseworker visits to

children, critical to permanency planning and well-being as well as safety, are frequently missed.

¶¶ 190-208, *see also* ¶¶ 209-236. DCF's failure to repair these holes in its safety net, coupled

with its statistical rationalizations for a poor safety record, ¶¶ 156-164, shocks the conscience.

DCF has also failed, after years of discussions through the *Rogers* Working Group and

other initiatives, to implement oversight and informed consent mechanisms needed to ensure

children are not harmed by the overuse or misuse of psychotropic medications.  ¶¶ 1350-1362, 1370-1452.[13]

        *Workforce*.  DCF admits that lower caseloads would address many of the harms at issue here.  ¶¶ 1520-1529.  Yet it has not acted to build its workforce capacity.  ¶¶ 1551-1563. Professional standards require that DCF conduct a time study to determine the appropriate caseload limit for its social workers in light of DCF's particular structure, policies, and practices. ¶¶ 1456-1461, 1554-1559.  Instead, DCF continues to use an 18 families-per-worker caseload standard from the 1980s that exceeds established standards and fails to take account of the heavier demands that foster care cases, and cases with multiple siblings, place on its ongoing and adoption workers relative to family support cases.  ¶¶ 1462-1482, 1493-1501.  DCF does not even meet its own caseload standard:  Thousands of children are served by overburdened social workers whose caseloads exceed 18 families.[14]  ¶¶ 1485-1491, 1502-1506.

        DCF also fails to meet professional standards requiring its workforce to receive ongoing training.  ¶¶ 1564-1570.  It neither requires in-service training, ¶¶ 1576-1582, nor tracks any optional training workers have completed, ¶¶ 1591-1593.  Caseloads and training were among the subjects to be addressed by the never-completed OCA Comprehensive Plan, ¶¶ 1560, 1594, and mandatory in-service training was initially included in, but later written out of, the 2009 PIP, ¶ 1588.  The importance of mandatory in-service training was highlighted in planning meetings for the 2009 Strategic Plan, but the final plan did not include it.  ¶ 1587.

---

[13] Plaintiffs note that Jan Nisenbaum's May 14 trial testimony concerning implementation in July 2012, just before the fact-cutoff in this case, of a monitoring plan was unsupported by documentary evidence (Trial Tr., May 14, 2013, at 113:22-121:23), appeared to be inconsistent with testimony on the same topic by Gail Garinger, *see* ¶ 1362, and has not been subject to cross-examination.  As of May 2012, Defendants had been working on such plans for years without concrete progress.  ¶¶ 1350-1364.  In any event, reliance by Defendants on Ms. Nisenbaum's testimony would at best amount to an ineffective assertion of mootness by "voluntary cessation."  *See* p. 13 & n.19 *infra.*

[14] DCF has in recent years succeeded in reducing the *average* caseload of workers to somewhat under 16 families (Defs.' Br. at 10), but wide variations persist both seasonally and geographically, with many individual workers carrying over 20, and even over 22, families.  ¶¶ 1487-1489, 1515-1517.

*Placement Array*.  DCF's inadequate recruitment and retention of foster homes, ¶¶ 563-575, 680-691, has prevented the development of a placement array that can meet the needs of foster children.  DCF has not made foster parent recruitment a priority, reducing its central office recruitment staff from six to two, failing to obtain and update regional recruitment plans, failing to conduct a needs assessment as required by state law, failing to analyze its placement needs for categories like sibling groups, infants, and adolescents, and failing to conduct a geographical analysis of foster home needs.  ¶¶ 626-679.  The analysis of placement stability required for the OCA Comprehensive Plan never took place, ¶¶ 621-622, and key goals included in the 2009 PIP for improving recruitment and placement stability were eliminated, ¶¶ 621-622, 791-801.

*Accountability*.  Professional standards require that a child welfare agency have robust systems of accountability, both internally for its own operations and externally for providers of services and placements.  ¶¶ 1596-1604, 1664-1668.  DCF lacks an adequate internal CQI system, something both the 2009 PIP and the 2009 Strategic Plan promised to remedy.  ¶¶ 1609, 1611.  But DCF did not follow through on these plans, and its CQI staffing remains skeletal.  ¶¶ 1648-1656.  In addition, rather than effectively using available data to drive improvement, DCF has at times manipulated it to whitewash poor performance:  DCF's "CFSR scorecard" ostensibly compares DCF to its peers, but misleadingly relies on "national medians" dating from 2004, and gives DCF high grades—even an A+ in the case of maltreatment in care—in areas where it is near the bottom nationally.  ¶¶ 39-41, 732-733, 836-837, 1089, 1622-1647.  DCF's reporting to its umbrella agency, EOHHS, is similarly flawed.  ¶¶ 1805-1814.

DCF's private providers have physical custody of nearly 40% of children in placement, ¶ 1669, yet DCF lacks sufficient oversight mechanisms to ensure they comply with applicable policies and law and achieve good outcomes for children.  DCF has long acknowledged the need

to engage in proactive oversight through performance measures and provider "scorecards," comprehensive program reviews, and performance-based contracting. ¶¶ 1672-1676. Despite commitments dating back to 2005 (including in the 2009 PIP), ¶¶ 1684-1688, DCF has failed to implement these measures, ¶¶ 1707-1751, and has in fact reduced its private provider oversight capacity, ¶¶ 1692-1706. The risks of harm to children posed by this inadequate oversight structure are evident in DCF's anemic response to concerns about placement instability, ¶¶ 749-754, 805-807, 1751, and abuse and neglect of foster children in the care of IFC providers.[15]

   2.  *DCF's recent initiatives are insufficient*

Defendants have introduced evidence of DCF "initiatives" that, they believe, will "strengthen" DCF practice. (Defs.' Br. at 5-6 n.8.) These initiatives are limited in scope[16] and/or appear to place additional demands on DCF's deficient infrastructure.[17] While actual DCF performance in a few areas has shown some improvement recently, performance in other areas, such as re-entry and time to adoption, has declined. ¶¶ 832-842, 910-919. Clearly, DCF's well-meaning efforts are constrained by the continuing lack of attention to needed structures:

---

[15] The death of baby L.M. in a Mentor IFC home in January 2012, which revealed the provider's failure to provide training to its $100/day foster homes on safe sleeping practices, ¶¶ 594, 1758-1760, illustrates the dangers of inadequate DCF oversight. L.M.'s death came on the heels of several other disturbing incidents of maltreatment in Mentor homes, including child-on-child sex abuse, a near-drowning, and an incident in which a 2-year-old and a 4-year-old were found wandering, unsupervised, on a busy street. ¶¶ 1754-1756. Indeed, Mentor had 16 supported incidents of maltreatment in its homes during the twelve-month period ending March 31, 2012. ¶ 1753. DCF did not impose a compliance plan until four months after L.M.'s death, and monitoring of the plan now in place falls on the limited staff of two people responsible for monitoring the entirety of DCF's statewide, 2100-bed, IFC network. ¶¶ 1700-1701, 1758, 1770. Within ten weeks of the compliance plan, four more reports of maltreatment were substantiated in Mentor homes. ¶ 1777. Baby L.M.'s death echoed the death of another foster child, Dontel Jeffers, in a Mentor foster home in 2004. After L.M.'s death, DCF identified "several programmatic issues that reflect slippage from the agency oversight[s] that were put in place after the death of Dontel Jeffers." ¶¶ 1763-1769.

[16] **ICPM**, as implemented to date, addresses primarily "front-end" screening, assessment, and investigation of reports of maltreatment, and not case practice for children already in DCF custody. ¶ 2053. **Kinship First** addresses placement stability for children entering care who have available kin resources, but not for children already in care or the significant plurality without available kin. ¶¶ 796-800. **Caring Together/Joint Procurement** addresses oversight of congregate care providers, but not of other providers. ¶ 2050.

[17] The **trauma initiative** includes funding for needed training, but no mechanism for mandating it or resources for continuing it beyond the term of the five-year grant. ¶ 2052. **ICPM**, and its later modification to include Short-Term Stabilization units, has placed additional burdens on ongoing workers. ¶¶ 1748, 2054. The **Kinship First** initiative increases the volume of foster home approval and licensing tasks relative to placing children in already-licensed unrestricted foster homes. ¶¶ 480-497.

workforce, placement array, and accountability.[18]

Defendants' invocation of these recent initiatives and the 2012-2015 Strategic Plan appears to rely on a "voluntary cessation" theory of mootness. However, "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine [its] legality." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000) (internal quotation marks omitted); *see also Adams v. Bowater, Inc.*, 313 F.3d 611, 615 (1st Cir. 2002) ("[W]here a defendant is unwilling to give any assurance that the conduct will not be repeated, a natural suspicion is provoked that recurrence may well be a realistic possibility.").[19] The re-appearance in DCF's initiatives and current strategic plan of the very same goals found in earlier initiatives and plans weakens any "assurances" they supply. *Compare* ¶ 420 *with* ¶¶ 410-419; *compare* ¶ 1188 *with* ¶¶ 1210-1238; *compare* ¶¶ 2047-2049 *with* ¶¶ 1677-1678, 1684-1688. In addition, initiatives and plans not implemented as of August, 15, 2012, including Caring Together, Intake Homes, and any plans for psychotropic medication oversight, are also subject to the agreed-upon fact cutoff for liability imposed by Court order. ¶¶ 414-420, 1359-1361, 2046-2050. *See* Electronic Order, May 17, 2012.

---

[18] DCF's limited resources are not a defense. "[I]t is obvious that vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them." *Watson v. City of Memphis, Tenn.*, 373 U.S. 526, 537 (1963). Federal courts have rejected budgetary arguments in civil rights actions involving state institutions. *See Welsch v. Likins*, 550 F.2d 1122, 1132 (8th Cir. 1977); *Inmates of Boys' Training Sch. v. Southworth*, 76 F.R.D. 115, 118-19 (D.R.I. 1977); *Mills v. Bd. of Educ. of D.C.*, 348 F. Supp. 866, 876 (D.D.C. 1972). Of particular note, in a challenge to a foster care agency's practice of placing children in night to night emergency beds, one court concluded that "the availability of resources is not part of the constitutionally acceptable decision-making process." *Doe v. N.Y.C. Dep't of Soc. Servs.*, 670 F. Supp. 1145, 1184 (S.D.N.Y. 1987). Moreover, Defendants' utilization of existing resources is questionable, sometimes placing children in more expensive IFC homes because of a shortage of departmental foster homes. ¶¶ 510-516.

[19] Two conditions must be satisfied to escape liability on the basis of the voluntary cessation of challenged practices: "(1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Cnty. of L.A. v. Davis*, 440 U.S. 625, 631 (1979) (citations and internal quotation marks omitted); *accord Free v. Landrieu*, 666 F.2d 698, 704 (1st Cir. 1981). This applies equally to public officials: "'The tendency to trust public officials is not complete . . . nor is it invoked automatically . . . . Experience has proved that if public officials can be trusted more readily than private defendants, they cannot be trusted with the power to moot judicial proceedings simply by professing that they have mended their ways.'" *Kiedos v. Apfel*, 45 F. Supp. 2d 80, 88 (D. Mass. 1999) (alteration in original) (citation omitted).

## II.    PLAINTIFFS' FAMILY ASSOCIATION CLAIM IS SUPPORTED

This Court has held that the right to familial integrity under the First, Ninth, and Fourteenth Amendments encompasses the right of foster children to maintain "meaningful contact with parents [and] siblings." *Connor B.*, 771 F. Supp. 2d at 164.[20]  As noted *supra*, pp. 7-8, children in DCF custody are often deprived of that meaningful contact.[21]

Defendants erroneously contend that Plaintiffs' Family Association claim fails because Defendants did not take action that was directly aimed at Plaintiffs' familial relationships "with knowledge that the conduct will adversely affect those relationships."  (Defs.' Br. at 10.) Defendants import this requirement from a Tenth Circuit damages case where the challenged action had the *incidental* consequence of interfering with a family relationship.  *See Griffin v. Strong*, 983 F.2d 1544, 1546, 1548 (10th Cir. 1993) (citing *Trujillo v. Bd. of Cnty. Comm'rs of Cnty. of Santa Fe*, 768 F.2d 1186 (10th Cir. 1985)).  The First Circuit has rejected such incidental consequence claims and distinguished Tenth Circuit decisions on that very ground. *See Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 563 (1st Cir. 1988) (distinguishing *Trujillo*).  Here, since *direct* action and inaction by DCF interferes with familial relationships, *Griffin* is inapplicable,[22] as is *D.G. v. Yarbrough*, No. 08-CV-074-GKF-FHM, 2011 WL 6009628, at *16-17 (N.D. Okla. Dec. 1, 2011), a district court case that relied exclusively on

---

[20] This holding is in accord with the weight of authority.  *See Kenny A. v. Perdue*, 218 F.R.D. 277, 296-97 (N.D. Ga. 2003); *Brian A. v. Sundquist*, 149 F. Supp. 2d 941, 956 (M.D. Tenn. 2000); *Eric L.*, 848 F. Supp. at 307; *Aristotle P. v. Johnson*, 721 F. Supp. 1002, 1005-07 (N.D. Ill. 1989).  Further, this Court has rejected the finding in *Charlie H.*, 83 F. Supp. 2d at 513-14, that the right to familial integrity is implicated only "when the state denies children *any* contact with family members."  *Connor B.*, 771 F. Supp. at 164 ("The narrow articulation set forth in *Charlie H.* and its sister cases would appear to preclude, for example, a claim by a plaintiff who has been allowed to visit one of his ten siblings once every five years.  This standard is far too stringent.").  The same reasoning applies to *Baby Neal v. Casey*, 821 F. Supp. 320, 336-37 (E.D. Pa. 1993).

[21] Plaintiffs do not assert that their associational rights are violated when DCF does not provide visits or placement with siblings after a determination by DCF or the Juvenile Court that visitation or placement is not in the child's best interests.  Therefore, Defendants' arguments about "the impact of Juvenile Court oversight on visitation with biological family members," (Defs.' Br. at 12), are irrelevant.

[22] *Griffin* is also distinguishable because it was an action for damages under Section 1983, and the culpability standard is higher in damages cases.  *See supra* n.3.

*Griffin.*[23]  In any event, Defendants' awareness of the problem and failure to take remedial

actions satisfies any requirement of knowing deprivation.  ¶¶ 344-354, 1902-1927.

### III.    PLAINTIFFS' AACWA CLAIMS ARE SUPPORTED

#### A.  Voluntary Cessation of a Longstanding Practice of Paying Inadequate Foster Care Maintenance Payments Does Not Defeat Plaintiffs' Claim.

Under the Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 670 *et seq.*

("AACWA"), states that accept federal funds for their foster care systems must make foster care

maintenance ("FCM") payments to foster parents that cover the cost of identified categories of

expenses, and must periodically review FCM payments to "assure their continuing

appropriateness."  42 U.S.C. §§ 675(4)(A), 671(a)(1), (a)(11).  Contrary to Defendants' assertion

that they need only achieve "substantial conformity" (Defs.' Br. at 19-20), courts generally apply

a full compliance standard in private rights of action under federal statutes.  *See Health Care for*

*All, Inc. v. Romney*, No. Civ.A. 00-10833RWZ, 2005 WL 1660677, at *7-8 (D. Mass. July 14,

2005) (finding the "lower standard of substantial compliance, as opposed to full or perfect

compliance" inapplicable in private actions since federal funding not at stake); *Withrow v.*

*Concannon*, 942 F.2d 1385, 1387-88 (9th Cir. 1991) (error to apply substantial compliance).[24]

Defendants have a longstanding practice of failing to fully *or* substantially comply with

AACWA's requirements.  From 2004 to March 2012, DCF's rates were frozen at 2004 levels,

sinking to 17% to 24% below United States Department of Agriculture ("USDA") guidelines due

---

[23] *D.G.* is also against the weight of authority, *see supra* n.20, and erroneously required that each plaintiff suffer actual harm.  The gravamen of Plaintiffs' claim is that Defendants' patterns and practices expose all children in custody to a risk that they will be separated from siblings, even if they are currently in the same placement. Moreover, this Court can fashion relief tailored to the particular harm shown without a risk of unduly benefitting any individual children.  Also, unlike DCF, the agency in *D.G.* tracked family visitation.  *D.G.*, 2011 WL 6009628, at *16 (records from 2008 to 2010 reflected percentage of visits completed).

[24] Although *California Alliance of Child and Family Services v. Allenby* (Defs.' Br. at 5 n.7, 19, 20 n.29) allowed for less than strict compliance with AACWA, the court stated that as a general rule, "a state that accepts federal funds with conditions attached must strictly comply," and ruled that payments of approximately 80% of the required amount failed to even substantially comply with the statute.  589 F.3d 1017, 1022-23 (9th Cir. 2009).

to inflation, and foster parents went unreimbursed for excess costs. ¶¶ 2017-2022. Defendants

assert that they have met USDA estimates "at least as of March of 2012." (Defs.' Br. at 19.)

However, this "fix" for state FY 2013 does not defeat Plaintiffs' AACWA claim: Rates were

raised only to the 2010 USDA level, and Defendants have neither committed to adjusting the rate

to each year's current USDA level nor suggested they have a process in place (or even an intent)

to periodically review rates to assure their continuing appropriateness. ¶¶ 2026-2030. Rather,

Commissioner McClain testified that the 2012 increase occurred because the "stars aligned and

we . . . got $12 million in the budget last year," and that funding for the additional $2 million

needed to maintain the USDA 2010 rates for the upcoming year was uncertain. ¶¶ 2023-2025.

Defendants' claim that an isolated increase – five months before the fact cut-off in this case –

moots eight years of underpayments is unsupportable. *See* p. 13 & n.19 *supra*.

### B. DCF Fails to Comply With AACWA's Case Plan Requirement

Under AACWA, DCF must develop case plans for children in its care that contain, *inter*

*alia*, a plan for assuring that services are provided to the child and his or her parents, a

description of independent living services provided to children sixteen and over, a child-specific

recruitment plan for children whose permanency plan is adoption or placement in another

permanent home, and a plan for ensuring educational stability while in foster care. 42 U.S.C.

§ 671(a)(16) (2012); 42 U.S.C. § 675(1) (2011). Defendants do not fully or substantially comply

with these requirements. The evidence shows that DCF fails to provide children with case plans

having all required elements, and in some cases, any case plan at all. ¶¶ 2032-2045.

### IV. PLAINTIFFS' PROCEDURAL DUE PROCESS CLAIMS ARE SUPPORTED

Plaintiffs have introduced evidence showing that (1) DCF deprives Plaintiffs of state-law

property interests, and (2) the procedural safeguards attending these deprivations are

constitutionally insufficient. *González-Fuentes v. Molina*, 607 F.3d 864, 886 (1st Cir. 2010)

(citing *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)).

### A.  Plaintiffs Have Shown Deprivations of Protected Property Interests

Defendants' assertion that Plaintiffs have not identified constitutionally protected property interests ignores the law of this case that Plaintiffs possess "legitimate claims of entitlement" to regular visitation with siblings, medical passports, diligent searches for kin caretakers and medical screenings in accordance with Early Periodic Screening, Diagnosis, and Treatment standards.  *Connor B.*, 771 F. Supp. 2d at 165-67.[25]  Ample evidence at trial demonstrated DCF's pattern and practice of depriving Plaintiffs of these entitlements:  DCF fails to assure consistent sibling visitation, ¶¶ 1867-1870, 1890-1899, 1903-1918; searches for kin, ¶¶ 1928-1930, 1934-1956; and provision of medical passports and timely initial medical screenings, ¶¶ 1143-1145, 1155; *see generally* ¶¶ 1175-1238.

Defendants incorrectly argue that Plaintiffs must prove that an "actual deprivation" has occurred to every class member.  (Defs.' Br. at  14.)  But in *L.H. v. Schwarzenegger*, 519 F. Supp. 2d 1072, 1086 (E.D. Cal. 2007), plaintiffs prevailed based on proof that the flawed procedural scheme, including the absence of prompt hearings, would effect a due process violation whenever applied.  The *L.H.* class, as here, included children already subjected to the deprivation as well as children *at risk* of such deprivation in the future.  *See id.* at 1074.[26]

---

[25] Defendants seek safe harbor in agency policies intended to implement these entitlements.  (Defs.' Br. at 15-16).  But no such safe harbor is available given DCF's pattern and practice of failing to comply with those very policies and regulations.  For example, notwithstanding efforts made in the context of the Kinship First initiative, DCF continues to deprive many children of the right to a timely diligent search for kin.  ¶¶ 1936-1940.

[26] *D.G. v. Yarbrough* is materially distinguishable.  In *D.G.*, plaintiffs did not adduce facts establishing either a pattern and practice of deprivations or defects in Oklahoma's procedural safeguards.  The court found that deprivations had only been shown with respect to "specific children," and that the plaintiffs "do not claim, nor do they provide evidence, that all members have been denied an appropriate level of process."  2011 WL 6009628, at *18.  Here, Plaintiffs have proffered substantial evidence of defects in the Commonwealth's scheme of procedural safeguards, such that Plaintiffs are all exposed to due process violations.

### B.  Defendants Fail to Provide Notice or an Opportunity to be Heard

#### 1.  Pre-deprivation notice is required

State regulations mandate 14-day advance notice "if the Department intends to deny, reduce, or terminate services."[27]  ¶ 1978.  DCF does not provide this notice when services are disrupted.  ¶¶ 1983-1989.  Citing cases including *Parratt v. Taylor*, 451 U.S. 527 (1981) and *Hudson v. Palmer*, 468 U.S. 517 (1984), Defendants argue they need not provide pre-deprivation notice because the deprivations are "random and attributable to events outside of DCF's control." (Defs.' Br. at 15.)  However, courts must "scrutinize carefully the assertion by state officials that their conduct is 'random and unauthorized' within the meaning of *Parratt* and *Hudson,* where such a conclusion limits the procedural due process inquiry under § 1983 to the question of the adequacy of state postdeprivation remedies." *Lowe v. Scott*, 959 F.2d 323, 341 (1st Cir. 1992) (citing *Zinermon v. Burch*, 494 U.S. 113, 136-39 (1990)).

Pre-deprivation notice is particularly appropriate where a deprivation is one "the state could be expected to anticipate" due to its longstanding and ongoing nature.  *Wayfield v. Town of Tisbury*, 925 F. Supp. 880, 887 (D. Mass. 1996) (applying *Lowe*).[28]  Further, conduct cannot be said to be "unauthorized" when the state has "delegated . . . broad authority to 'effect the very deprivation complained of.'"[29]  *Id.* (citation omitted).  Pre-deprivation process is also required

---

[27] Each of the above entitlements constitutes a "service" under DCF regulations.  ¶¶ 1979-1982.

[28] Defendants' attempt to depict the deprivations at issue as isolated events does not pass muster.  (Defs.' Br. at 14-15.)  For example, to describe a circumstance in which nearly half of children in the entry cohort did not timely receive a medical passport as "isolated error" is simply wrong, and ignores the real risk of harm created by failing to maintain and provide to foster caretakers and practitioners accurate and complete medical information.  (*Id.*)

[29] This assertion further ignores the Supreme Court's analysis of *Parratt*, addressing a similar argument:

> This argument misses *Parratt*'s point.  In *Parratt*, the Court emphasized that it was dealing with "a tortious loss of . . . property as a result of a random and unauthorized act by a state employee . . . not a result of some established state procedure."  Here, in contrast, it is the state system itself that destroys a complainant's property interest, by operation of law, whenever the Commission fails to convene a timely conference—whether the Commission's action is taken through negligence, maliciousness, or otherwise.

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 435-36 (1982) (alteration in original) (citation omitted) (quoting

where irreparable harm might result. *See Goldberg v. Kelly*, 397 U.S. 254, 261 (1970). Those very circumstances exist here, where the entitlements are prophylactic measures designed to protect children from recognized forms of harm. ¶¶ 1165-1174, 1876-1888, 1957-1974. For example, medical needs and emergencies often arise unexpectedly such that the absence of a medical passport or timely health screenings may cause irreparable harm. ¶¶ 1165-1174.

2. *Defendants fail to provide any meaningful post-deprivation process*

Even were DCF providing the required pre-deprivation notice, no process of any "probable value" exists to assure children a meaningful opportunity to be heard. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).[30] The Fair Hearing process is intended to provide children a means to challenge the termination, reduction or suspension of a service, but DCF lacks the capacity to conduct them in a timely manner sufficient to safeguard Plaintiffs' rights. ¶¶ 1990-2004. DCF regulations require that fair hearings be scheduled within 90 days from receipt of a request, ¶ 1993, but this rarely occurs due to a backlog that accumulated years ago without abatement, and requests for a hearing routinely sit idle for six months or longer. ¶¶ 1995-2004.[31]

Given this inadequacy, Defendants point to alternative administrative or judicial hearings, all of which presuppose notice has been provided. First, Defendants suggest the 72-hour hearing provides "a meaningful opportunity . . . to be heard on sibling visitation." (Defs.' Br. at 17.) However, Plaintiffs' entitlement to sibling visits and medical passports and screenings is ongoing

_____

*Parratt v. Taylor*, 451 U.S. 527, 541 (1981)); *see also Zinermon*, 494 U.S. at 136-39 (1990) (finding *Parratt* inapplicable when deprivation was foreseeable).

[30] *See also Raper v. Lucey*, 488 F.2d 748, 753 (1st Cir. 1973) ("It is elementary that due process . . . requires the opportunity to be heard 'at a meaningful time and in a meaningful manner.'") (quoting *Goldberg*, 397 U.S. at 267). The means of redress offered by Defendants do not provide such an opportunity.

[31] Defendants point to the tripartite balancing test of *Mathews*, and suggest that Plaintiffs "have not provided evidence to negate the Government's strong interest in allocating its resources in the manner currently provided." (Defs.' Br. at 15 n.25.) Plaintiffs have not, however, suggested that DCF erect costly new procedural mechanisms, but rather that they appropriately fund the procedural architecture already mandated by state law, including the provision of notice. In any event, Courts have held that "a showing of a likelihood of irreparable harm resulting from the lack of a pre-deprivation hearing is a private interest which countervails *any* public interest in streamlined administration." *Kahn v. United States*, 753 F.2d 1208, 1219 (3d Cir. 1985).

in nature, such that deprivations occur after the 72-hour hearing. And though the 72-hour hearing may address the search for kin, oftentimes a search only commences, if at all, afterward. ¶¶ 1936-1940. As to medical passports and screenings, the hearing typically occurs before the child's service plan has been prepared. ¶¶ 1148, 2014. In any event, the hearing is focused on the circumstances of the child's home removal, not service planning. ¶ 2013.

Defendants next focus on permanency hearings. (Defs.' Br. at 17.) Since these occur only annually, a child may wait months to be heard, during which time the irreparable harm discussed above is compounded. ¶ 2012. As the name suggests, these are intended to address the child's permanency plan, which does not include the entitlements at issue here. ¶ 2013. Defendants' focus on the court's authority to "make any appropriate order" (Defs.' Br. at 17) is misdirected, as the issue is not the scope of the Juvenile Court's power, but the absence of timely notice and the irreparable harm that may occur before a permanency hearing occurs.[32] Foster Care Reviews (*id*. at 18) are similarly insufficient in that they occur only once every 6 months. ¶ 2005. In any event, DCF fails to consistently or timely conduct these reviews. ¶¶ 2007-2011.

Finally, "abuse of discretion" motions and grievance processes are also ineffective safeguards. (Defs.' Br. at 17-18.) Their meaningfulness is entirely dependent on timely notice, and the grievance process is not available for complaints that can be the subject of a Fair Hearing, cutting off this remedy for deprivations of the entitlements claimed here. ¶ 1994.

## CONCLUSION

For the reasons stated above, Defendants' motion should be DENIED.

---

[32] The sufficiency of appeals from orders of the Juvenile Court made at either the 72-hour or annual permanency hearing to address violations of Plaintiffs' procedural due process rights suffers from the same defects.

DATED: May 16, 2013                    Respectfully submitted:

                                       By:  */s/ Laurence D. Borten*
                                             Marcia Robinson Lowry, *admitted pro hac vice*
                                             Sara Michelle Bartosz, *admitted pro hac vice*
                                             Laurence D. Borten, *admitted pro hac vice*
                                             Jessica Polansky, *admitted pro hac vice*
                                             Rachel Brodin Nili (BBO# 666227)
                                             Elizabeth Pitman Gretter, *admitted pro hac vice*
                                             Sarah T. Russo, *admitted pro hac vice*
                                             CHILDREN'S RIGHTS
                                             330 Seventh Avenue, Fourth Floor
                                             New York, New York 10001
                                             Phone: (212) 683-2210
                                             Facsimile: (212) 683-4015
                                             *mlowry@childrensrights.org*
                                             *sbartosz@childrensrights.org*
                                             *lborten@childrensrights.org*
                                             *jpolansky@childrensrights.org*
                                             *rnili@childrensrights.org*
                                             *egretter@childrensrights.org*
                                             *srusso@childrensrights.org*

                                       By:  Daniel J. Gleason (BBO# 194900)
                                             Mary K. Ryan (BBO# 435860)
                                             Jonathan D. Persky (BBO# 666651)
                                             Emily J. Grannon (BBO #682267)
                                             NUTTER MCCLENNEN & FISH, LLP
                                             Seaport West
                                             155 Seaport Boulevard
                                             Boston, MA 02210-2604
                                             Phone: (617) 439-2000
                                             Facsimile: (617) 310-9000
                                             *dgleason@nutter.com*
                                             *mryan@nutter.com*
                                             *jpersky@nutter.com*
                                             *egrannon@nutter.com*

## CERTIFICATE OF SERVICE

I hereby certify that, on May 16, 2013, this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Laurence D. Borten
Laurence D. Borten