# EXHIBIT A

## <u>UNITED STATES DISTRICT COURT</u>
## <u>DISTRICT OF MASSACHUSETTS</u>

CONNOR B., by his next friend, ROCHELLE
VIGURS, et al., individually and on behalf of all
others similarly situated,

                Plaintiffs,

v.

DEVAL L. PATRICK, in his official capacity as
Governor of the Commonwealth of Massachusetts,
et al.,

                Defendants.

C.A. No. 1:10-cv-30073 (WGY)

## <u>PLAINTIFFS' PROPOSED FINDINGS OF FACT</u>

# TABLE OF CONTENTS

I.  Background ........................................................................................................ 1

   A.  Mission, Structure, and Management of DCF ................................................ 1

      1.  Mission ................................................................................................ 1

      2.  Governor, Executive Office of Health and Human Services, and the
          Commissioner ...................................................................................... 1

      3.  DCF Central Management and Field Structure .................................... 2

      4.  Entry into DCF Foster Care ................................................................ 2

      5.  Title IV-E Funding and the Child and Family Services Review ........... 3

      6.  Data and Record Keeping ................................................................... 5

      7.  Regular Management Reports ............................................................. 6

   B.  Child Welfare Standards: Child Welfare League of America and Council on
      Accreditation .............................................................................................. 7

   C.  Plaintiffs' Experts ...................................................................................... 10

      1.  Case Record Review ........................................................................ 10

      2.  Named Plaintiff File Reviews ............................................................ 14

      3.  Psychotropic Medication Review ...................................................... 16

      4.  Management Reviews ....................................................................... 18

II.  Maltreatment in Care ...................................................................................... 21

   A.  Measurement and Standards ...................................................................... 21

   B.  DCF Performance ...................................................................................... 23

      1.  Rate of Maltreatment ....................................................................... 23

      2.  Comparison with Federal Standards ................................................. 30

      3.  Named Plaintiffs and Individual Children ......................................... 33

   C.  Systemic Departures From Professional Judgment in Key DCF Practice Areas and
      Structures which Impact the Safety of Children in Foster Care ................... 35

      1.  Visitation ......................................................................................... 35

2.     Foster Home Licensing and Assessments................................................. 48

3.     Special Investigations Unit ("SIU")...................................................... 62

III.   Inappropriate Placements................................................................................ 68

A.     Placements in Which Children Are Separated from Their Siblings ......................... 68

    1.     Professional Standards .......................................................................... 68

    2.     Failure to Place Children With Siblings Can Cause Them Harm....................... 68

    3.     DCF Fails to Consistently Place Siblings Together............................................. 70

    4.     Chronic Failures To Ensure that Siblings are Placed Together and to Prioritize Sibling Placement ................................................................... 71

B.     Placements Far from Children's Families and Home Communities ......................... 73

    1.     Professional Standards .......................................................................... 73

    2.     Placements Far from Their Families and Home Communities Can Cause Children Harm ........................................................................................ 73

    3.     DCF Places Children Far from Their Home Communities ................................. 74

    4.     DCF Has Historically Failed to Maintain Children in Their Home Communities 75

C.     Inappropriate Use of Night to Night Placements and Hotline Homes....................... 77

    1.     Short-term Placements Necessitate Additional Moves for Children, Causing them Harm ............................................................................................. 77

    2.     DCF Places Children in Night-to-Night Placements and Hotline Homes ............ 78

    3.     DCF Has Long Utilized Hotline Homes and Night-to-Night Placements Despite Acknowledging that they are Not Good For Children, and Has Failed to Take Action to Create a New Emergency Placement System ....................................... 81

D.     Inappropriate Use of Short-term Stabilization Assessment and Rapid Reintegration Placements ........................................................................................... 85

    1.     Professional Standards .......................................................................... 85

    2.     The Use of STARR Placements Necessitates Additional Moves for Children .... 86

    3.     DCF Places Children In STARR Emergency Placements Inappropriately .......... 86

4.      DCF Has Failed to Address its Use of STARR Placements for Non-Therapeutic
        Reasons .................................................................................................................. 88

E.      Unapproved Kinship Placements ......................................................................... 89

    1.  Professional Standards ......................................................................................... 89

    2.  Placement in Unapproved Kinship Homes Causes Harm and the Risk of Harm . 90

    3.  DCF Places Children in Kinship Foster Homes That Do Not Meet Its Policies
        Regarding Licensing and Approval ...................................................................... 90

    4.  DCF's Chronic Failure to Ensure the Safety of Kinship Homes before Placing
        Children in the Home ........................................................................................... 92

F.      Inappropriate Placement in Intensive Foster Care ............................................... 94

    1.  Professional Standards ......................................................................................... 94

    2.  DCF Inappropriately Utilizes Intensive Foster Care for Children Who Need a
        Different Level of Care ......................................................................................... 94

    3.  DCF Has Failed to Take Action to Ensure that Children Are Placed in IFC Only
        When It Would Best Meet Their Needs ................................................................ 97

G.      Failure to Match Children To Placements that Meet Their Needs ........................... 98

    1.  Failure to Match Children to a Placement that Meets their Needs Can Lead to the
        Placement Disrupting, Subsequent Placement Moves, and Harm ......................... 99

    2.  DCF Places Children in Foster Homes and Institutions That Do Not Meet Their
        Needs ................................................................................................................... 100

    3.  DCF Has Historically Failed to Ensure Appropriate Matching .......................... 101

H.      DCF's Inappropriate Placement of Children Results from an Inadequate Placement
        Array of Departmental and Intensive Foster Care Homes ........................................ 103

    1.  Recruitment of DCF Family Foster Homes ....................................................... 103

    2.  IFC Placement Array ......................................................................................... 124

IV.  Placement and Educational Stability ......................................................................... 126

A.      Standards ............................................................................................................. 126

    1.  Placement Stability ............................................................................................ 126

iii

2.  Educational Stability ................................................................. 128

B.  Placement and Educational Instability Cause Harm and Risk of Harm to Children 129

1.  Emotional trauma and attachment issues ................................... 129

2.  Disruption of Education and Services ........................................ 131

3.  Effect on permanency ............................................................... 134

C.  DCF Fails to Meet Standards for Placement Stability .................... 134

1.  Excessive Placement Moves ...................................................... 134

2.  Lateral Moves ............................................................................ 139

3.  Educational Stability ................................................................. 141

4.  Named Plaintiffs and Individual Children ................................. 142

D.  Chronic Failures and DCF Inaction .............................................. 143

1.  Consistently Poor Performance Since 1997 .............................. 144

2.  DCF Inaction after the 2007 CFSR ........................................... 146

3.  The PIP Process ......................................................................... 147

4.  DCF Failure to Monitor and Analyze Placement Moves ........... 149

5.  DCF Failure to Monitor or Address Educational Stability ........ 151

E.  Systemic Departures From Professional Judgment ....................... 152

V.  Permanency ......................................................................................... 153

A.  Unsafe Reunification & Reentry ................................................... 154

1.  Professional Standards .............................................................. 154

2.  DCF Performance ...................................................................... 156

3.  Chronic Failures, DCF Inaction and Systemic Departures from Professional
    Judgment ................................................................................... 158

B.  Adoption ....................................................................................... 169

1.  Professional Standards .............................................................. 169

2.  Delays in Adoption and Languishing in Foster Care Without a Permanent Family
    Cause Harm and the Risk of Harm to Children .......................... 172

3. DCF Performance ................................................................................ 173

4. Chronic Failures, DCF Inaction and Systemic Departures from Professional Judgment ................................................................................ 179

C. Aging Out ..................................................................................................... 202

1. Professional Standards ......................................................................... 202

2. Aging Out of Foster Care Without a Permanent Family Causes Harm and Risk of Harm to Children ......................................................... 203

3. DCF Performance ................................................................................ 205

VI. Services ................................................................................................................ 218

A. Medical ......................................................................................................... 218

1. Professional Standards ......................................................................... 218

2. Failure to Provide Appropriate Medical Care Causes Harm and Risk of Harm to Children ......................................................................... 223

3. DCF Performance ................................................................................ 225

4. History of DCF Inaction and Chronic Failure .................................... 231

5. Systemic Departures From Professional Judgment ............................ 241

B. Psychotropic Medications ............................................................................ 247

1. Professional Standards ......................................................................... 247

2. The Misuse of Psychotropic Medications Can Cause Harm and Risk of Harm to Children ......................................................................... 253

3. DCF Performance ................................................................................ 255

4. Historic Use of Psychotropic Medications and Defendants' Failures to Address ................................................................................ 259

5. Systemic Deficiencies in Informed Consent, Clinical Oversight, and Monitoring ................................................................................ 263

VII. Workforce: Caseloads and Training ................................................................... 275

A. Caseloads ...................................................................................................... 275

1.      DCF Social Work Functions.................................................................. 275

2.      Professional Caseload and Workload Standards.................................... 276

3.      DCF Social Worker Caseloads .............................................................. 279

4.      Excessive Caseloads Cause Harm and Risk of Harm to Children..................... 288

5.      Field Restructuring and other Administrative Staff............................. 291

6.      Defendants' Inaction ............................................................................. 294

B.      Qualifications and Training ............................................................................. 296

1.      Professional Standards .......................................................................... 296

2.      DCF Social Workers and Supervisors Receive Insufficient Training ............... 297

3.      Defendants' Inaction and Departures From Professional Judgment................... 299

VIII.   Inadequate Internal and External Accountability ............................................. 301

A.      Continuous Quality Improvement.................................................................. 301

1.      Professional Standards .......................................................................... 302

2.      DCF's Failure to Implement Adequate CQI Structures..................... 304

B.      Contract Monitoring....................................................................................... 320

1.      Professional Standards .......................................................................... 320

2.      DCF Places Many Children in Privately Provided Placements........................ 321

3.      DCF Has Failed to Build Sufficient Contract Oversight Capacity ................ 322

4.      Lead Agency Oversight ......................................................................... 332

5.      Congregate Care Oversight................................................................... 333

6.      Intensive Foster Care Oversight............................................................ 336

C.      DEEC Licensing and Oversight.................................................................... 347

D.      EOHHS Oversight ......................................................................................... 351

E.      Management Performance Reviews .............................................................. 353

F.      Office of the Child Advocate Oversight and 5-year Plan ........................ 355

1.      Comprehensive plan............................................................................... 357

2.      Critical Incidents.................................................................................... 361

    3.     Psychotropic Medications .................................................................. 362

IX.   Family Association ....................................................................................... 363

   A.   Professional Standards ......................................................................... 363

   B.   Depriving Children of Their Family Connections Causes Harm and Risk of Harm 364

   C.   DCF Fails to Consistently Place Siblings Together or to Provide Regular Sibling Visitation ............................................................................................... 366

      1.     Named Plaintiffs and Individual Children ........................................ 367

   D.   DCF Fails to Consistently Provide Regular Child-Parent Visitation ....................... 368

   E.   DCF's Historic Failures to Ensure That Family Relationships Are Maintained ...... 369

X.    Procedural Due Process ............................................................................ 372

   A.   State-Law Entitlement ......................................................................... 372

      1.     Kin Placement ................................................................................. 373

      2.     Medical Passports ........................................................................... 373

      3.     EPSDT Screenings ........................................................................... 373

      4.     Sibling Visits .................................................................................. 373

   B.   Denials of entitlements: ....................................................................... 373

      1.     Kin Placement ................................................................................. 374

      2.     Medical Passports ........................................................................... 380

      3.     EPSDT Screenings ........................................................................... 380

      4.     Sibling Visits .................................................................................. 380

   C.   Inadequate Notice and Process ........................................................... 380

      1.     Pre-deprivation Notice and Process ................................................. 380

      2.     Fair Hearings ................................................................................... 381

      3.     Foster care reviews ......................................................................... 385

      4.     Juvenile Court ................................................................................. 386

XI.   Statutory Claims ....................................................................................... 387

   A.   Foster Care Maintenance Rates ........................................................... 387

      1.     March 2012 Rate Increase ................................................................ 389

B.      Service Planning ................................................................................ 390

XII.   DCF Initiatives.................................................................................... 393

A.      Caring Together ................................................................................. 393

B.      Massachusetts Child Trauma Project.................................................. 394

C.      Integrated Case Practice Model ........................................................ 394

D.      Kinship First and Fatherhood Initiative .............................................. 395

## I.    Background

### A.    Mission, Structure, and Management of DCF

#### 1.    Mission

1. The Department of Children and Families ("DCF") is charged with strengthening families and protecting children from abuse and neglect.  DCF is statutorily required to provide and administer a comprehensive child welfare program which includes casework and counseling, protective services for children, adoption services, foster family care for children and specialized foster family care for children with special needs, comprehensive youth development services, and access to and coordination of medical, dental, and mental health services for children in foster care.  Mass. Gen. Laws ch. 18B, § 2.  DCF is also charged with formulating the policies, procedures, and rules necessary for the implementation of programs for children and families; administering the services, funds, and personnel necessary for these programs; establishing and enforcing high standards of service while striving to elevate such standards; collaborating with other departments and private agencies to assure efficient and high-quality social and educational services; and recruiting and retaining foster care and pre-adoption parents sufficient for the needs of children serviced by the department.  *Id.* § 3.

2. The basic obligation of DCF to a child in foster care, regardless of a child's permanency goal, is "to meet all their needs and from the sense of child well-being that they're, you know, that they're safe, that they're prospering, that their medical needs are met, their basic needs are met, educational needs are met, and that their emotional and social needs are met." (Trial Tr. May 7, 2013 (McClain), at 15:1-10).

#### 2.    Governor, Executive Office of Health and Human Services, and the Commissioner

3. The Executive Office of Health and Human Services ("EOHHS"), created under Mass. Gen. Laws ch. 6A, § 2 and Mass. Gen. Laws ch. 6A, § 16, is vested with the duty to administer the Commonwealth's human services programs, including the child welfare operations of DCF. The current Secretary of EOHHS, John Polanowicz, was appointed by the Governor pursuant to Mass. Gen. Laws ch. 6A, § 3.

4. DCF's Commissioner holds the highest position of authority within DCF and is appointed by the secretary of health and human services with the approval of the governor; the commissioner serves at the pleasure of the secretary.  Mass. Gen. Laws ch. 18B, § 6.  Until recently, Angelo McClain was Commissioner of DCF. (Trial Tr., April 30, 2013 (McClain), at 5:4-9). Olga Roche, Deputy Commissioner for Field Operations, and Jan Nisenbaum, Deputy Commissioner for Clinical and Program Services, reported directly to Commissioner McClain.  (Trial Exhibit 1109, DCF Organizational Chart, Oct. 2011).

5. Secretary Polanowicz has ultimate authority over the DCF budget that is submitted to the Administration and Finance Office and has the discretion to increase or decrease the budget. (Deposition of Marilyn Chase, EOHHS Assistant Secretary for the Office of Children, Youth, and Families, May 21, 2012, at 93:12-94:2).  Assistant Secretary Marilyn Chase

1

further acknowledged that budgets are a statement of priorities, and thus it is Secretary Polanowicz who has the authority each year to set the budgetary priorities for DCF.  (*Id.* at 94:3-11).

### 3.    DCF Central Management and Field Structure

6.  DCF's central office is located in Boston and provides support to DCF field offices.  DCF currently has four regional offices and 29 area offices across the Commonwealth.  (Rule 30(b)(6) Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, re: Staffing, Caseloads, Training, Jan. 20, 2012, at 17:4-18:15; Trial Exhibit 361, Update on DCF Reorganization, Sept. 17, 2010).

7.  In 2010, DCF developed an Updated Field Management Structure in response to budget constraints. The primary features of the revised structure were: (1) the combination of regional offices to reduce the number of DCF regions from six to four; (2) maintenance of the existing 29 Area Offices, but a reduction in the administrative structure for these offices to 15 area management teams, including a "Director of Areas," (each management team was assigned two area offices; the Pittsfield Office retained its dedicated management structure); and (3) the creation of an Area Clinical Manager ("ACM") position to provide daily clinical oversight. (Rule 30(b)(6) Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, re: Staffing, Caseloads, Training, Jan. 20, 2012, at 16:17-18:15; Trial Exhibit 361, Update on DCF Reorganization, Sept. 17, 2010, at DCF005080109-18; *see also* Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 146:15-23).

8.  As a result of these cuts to DCF's administrative budget in fiscal year 2011, Commissioner McClain testified that the reorganization of DCF's area offices and regions was basically "asking the area directors and their business managers not to manage one office but to manage two offices."  (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 146:15-23).

9.  The Deputy Commissioner for Field Operations, Olga Roche, oversees the four regional directors for the Western Region (Paul Fitzsimmons), Northern Region (Raymond Pillidge), Southern Region (Terrence Flynn), and Boston Region (Valerie Lovelace-Graham).  (Trial Exhibit 185, Department of Children and Families Organizational Charts, Jan. 2011, at DCF001272560).  Each regional director supervises eight or nine area offices (except for the Boston regional director who supervises four area offices).  (*Id.* at DCF001272566).  The area offices are managed by 15 Area Office Directors.  Within each area office, supervisors oversee groups of social workers. (*See, e.g.*, Trial Exhibit 259, Organizational Chart of Pioneer Valley Areas, Springfield Area; Trial Exhibit 261, Organizational Chart of DCF Western Regional Office).

### 4.    Entry into DCF Foster Care

10. Reports of suspected abuse or neglect, referred to as "51A Reports," are made to DCF pursuant to Mass. Gen. Laws ch. 119, § 51A (2012), which defines the responsibilities of mandated reporters, and states that any person may file a report if they have reasonable cause to believe that a child is suffering or has died as a result of abuse or neglect.

11. Upon receipt of a 51A Report, DCF policy dictates that the report either be screened out with no additional follow up or screened in for investigation or assessment response. (Trial Exhibit 1, DSS Casework Process, Apr. 4, 2008, DCF Case Practice Policy & Procedures Manual, at DCF POL (7/08) 17; Trial Exhibit 1127, Strengthening the Safety Net: DCF's Strategic Plan for Action, April, 2009, at DCF7605092).

12. Once a 51A Report has been screened in for investigation, state law requires that an investigation be conducted into the suspected child abuse or neglect, and that a written determination (referred to as a "51B Report") be made relative to the safety of and risk posed to the child, and whether the suspected child abuse or neglect is substantiated. This investigation must be completed within 24 hours in the case of emergency removal of the child, or within 15 days in non-emergency cases. Mass. Gen. Laws ch. 119, § 51B (2013).

13. If a 51A report is substantiated, DCF may seek custody of the child by initiating a Care and Protection ("C & P") petition in the Juvenile Court. Mass. Gen. Laws ch. 119, § 51B(c) (2013)

14. DCF may seek emergency custody through an *ex parte* proceeding. This is followed by a 72-hour hearing to determine the temporary custody of the child in question pending trial of the C & P. Mass. Gen. Laws ch. 119, §§ 24-26 (2013).

15. Upon a finding that a child has been subjected to abuse or neglect by his/her parent(s) or guardian(s), the Juvenile Court may commit the child to the custody of DCF. Mass. Gen. Laws ch. 119, §§ 26, 29C.

### 5.    Title IV-E Funding and the Child and Family Services Review

16. Pursuant to Title IV-E of the Social Security Act, the Children's Bureau under the Administration of Children and Families (ACF), a division of Health and Human Services, provides federal assistance to states providing foster care services to children in need of protective services. 42 U.S.C. §§ 671-675.

17. To qualify for Title IV-E funds, states must operate their foster care systems in conformance with certain federal requirements, including monthly visits to children in foster care, setting licensing and approval standards for child care institutions and foster family homes, developing case plans and permanency goals and regularly reviewing their implementation, and providing foster care maintenance payments that cover the cost of (and the cost of providing) "food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, reasonable travel to the child's home for visitation, and reasonable travel for the child to remain in the school in which the child is enrolled at the time of placement." 42 U.S.C. §§ 671, 675(4)(a). (*See infra* § XI).

18. As a condition to receipt of federal Title IV-E funds, each state agency must participate in the Child and Family Services Review ("CFSR") process. (Trial Exhibit 808, U.S. Department of Health and Human Services Administration of Children and Families, Children's Bureau, Child and Family Services Reviews Fact Sheet).

19. By Final Rule dated January 25, 2000 (and made effective as of March 25, 2000), the United States Department of Health & Human Services ("HHS") created the federal Child and Family Services Review ("CFSR") process. The CFSR is a tool by which HHS monitors the performance of state child welfare agencies for conformity to federal law, regulation, and policy. In the Final Rule, HHS established seven outcome measures that are applied to grade a state agency's performance in assuring the safety (2 outcomes), permanency (2 outcomes), and well-being (3 outcomes) of all children served. (Trial Exhibit 469, 45 C.F.R. §§ 1355, 1356, 1357, Final Rule, Jan. 25, 2000, at 4023).

20. HHS has conducted two "rounds" of CFSRs: The first round was completed in 2004, and the second in 2008. (Trial Exhibit 808, U.S. Department of Health and Human Services Administration of Children and Families, Children's Bureau, Child and Family Services Reviews Fact Sheet; Trial Exhibit 58, Massachusetts Child and Family Services Review Final Report, Feb. 21, 2008).

21. In the second-round CFSR, HHS evaluated states using, among other things, seven "outcome measures"—two in the area of safety, two in the area of permanency, and three in the area of well-being. In addition, HHS established six "statewide data indicators" used to evaluate states in the areas of Safety (2 measures) and Permanency (4 measures). For each data indicator, it set as a "national standard" the 75th percentile of all states' performance for federal fiscal year 2004. (Trial Exhibit 58, Massachusetts Child and Family Services Review Final Report, Feb. 21, 2008).

22. At the conclusion of a CFSR review, each state that does not meet the requirements of the CFSR must submit, and have approved by ACF, a "Program Improvement Plan" ("PIP") setting forth performance improvement targets to be met within the next two years on all outcomes determined not to be in substantial conformity with federal review standards. (Trial Exhibit 808, U.S. Department of Health and Human Services Administration of Children and Families, Children's Bureau, Child and Family Services Reviews Fact Sheet).

23. Each state that does not meet the requirements of the CFSR must submit PIP quarterly reports reflecting its progress on action steps and benchmarks identified in the PIP. These reports usually include: (1) a description of progress made during the reporting period and (2) data about measurable factors and their relationship to the established benchmarks and timeframes. (*See* Trial Exhibit 587, DCF PIP Quarterly Report, Quarter One, Oct. – Dec. 2009; Trial Exhibit 588, DCF PIP Quarterly Report, Quarter Two, Jan. – Mar. 2010; Trial Exhibit 589, DCF PIP Quarterly Report, Quarter Three, Apr. – June 2010; Trial Exhibit 590, DCF PIP Quarterly Report, Quarter Four, July – Sept. 2010; Trial Exhibit 591, DCF PIP Quarterly Report, Quarter Five, Oct. – Dec. 2010; Trial Exhibit 592, DCF PIP Quarterly Report, Quarter Six, Jan. – Mar. 2011; Trial Exhibit 760, DCF PIP Final Report Oct. 2009 – Sept. 2011, Quarter Eight Report, July – Sept. 2011).

24. If the Children's Bureau Regional Office, which monitors each state's progress in completing provisions of the PIP, determines that the state failed to submit status reports, or that the state is not making satisfactory progress toward completing the action steps or achieving the goals in a timely manner, it may subject the state to financial penalties. (Trial Exhibit 808, U.S.

Department of Health and Human Services Administration of Children and Families, Children's Bureau, Child and Family Services Reviews Fact Sheet).

25. On July 20, 2009, DCF submitted the "Massachusetts Child and Family Services Review Program Improvement Plan" to address the areas that ACF found to be needing improvement during the second-round CFSR completed in 2008. The lead contact within DCF for the PIP was Jan Nisenbaum, DCF's Deputy Commissioner for Clinical Practice and Program Operations, with support from DCF staff Liz Skinner-Reilly and Data Manager Ros Walter. An updated PIP was submitted on October 5, 2009, and approved by ACF. (Trial Exhibit 33, Massachusetts Child and Family Services Review Program Improvement Plan, Oct. 5, 2009).

26. Commissioner McClain approved the final PIP that was executed between DCF and the federal government. (Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: Program Improvement Plan, Apr. 4, 2012, at 31:18-21).

27. Commissioner McClain acknowledged that he receives and makes use of the Massachusetts Child and Family Services Review State Data Profiles in managing the Department of Children and Families, for purposes of "analytical drill-down." (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 111:19-112:20; *see also* Trial Exhibit 960, Massachusetts Child and Family Services Review Data Profile, July 30, 2008; Trial Exhibit 960, Massachusetts Child and Family Services Review Data Profile, June 2, 2009; Trial Exhibit 960, Massachusetts Child and Family Services Review Data Profile, June 14, 2011).

## 6.    Data and Record Keeping

28. DCF maintains an electronic information system called FamilyNet which is to be used to collect and manage information necessary to facilitate the delivery of child welfare support services. (Deposition of Rosalind Walter, DCF Director of Data Management, Jan. 4, 2012, at 5:10-11).

29. In addition, DCF maintains paper files, known as "green binders" that contain records for each case. (Rule 30(b)(6) Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, re: Placement, Sept. 20, 2011, at 103:9-104:11).

30. Professional social work standards require that certain actions taken by social workers in providing care to children be timely recorded in the child's case file. (Trial Tr., Jan. 31, 2013 (Freitag), at 53:25-55:14; Trial Tr., Feb. 4, 2013 (Johnson), at 30:14-23). Failure to record events such as case worker visits in the file prevents managers from accurately identifying problematic areas of practice and makes it difficult to ensure the continuity of services when there are transitions of cases from one worker to another. (Trial Tr., Jan. 31, 2013 (Freitag), at 55:15-56:20, 61:22-62:16; *see also* Trial Exhibit 1065, Table C12, Appendix C, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; Trial Tr., Jan. 30, 2013 (Freitag), at 121:2-19).

31. Dr. Lenette Azzi-Lessing testified that records,

> [P]articularly in child welfare should be a very strong representation of what has and hasn't happened in that case, especially from a safety standpoint, that if a worker is not available and something happens in a case or something needs to happen in a case, or the worker is sick or leaves, somebody else has to be able to pick up that case and understand very clearly what did and didn't happen in that case. . . .

(Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 87:5-18).  As such, the record is "very significant." (*Id.*).

32. Commissioner McClain acknowledged that in building appropriate caseloads, an important consideration is to assure that there is enough time for the caseworkers not only to conduct activities such as service planning, meeting with children and parents, and going to court, but also the caseload must permit caseworkers to timely record activities into dictation.  He agreed that this is a key piece of "managing with data."  (Trial Tr. May 6, 2013 (McClain), at 60:14-25).

### 7.    Regular Management Reports

33. Since 2008, DCF has published a monthly management report called the Monthly Operations Statistical Report ("MOSt Report").  Within the MOSt Report, DCF publishes aggregate data in relation to defined safety, permanency, and well-being outcomes developed by DCF.  With respect to each outcome measure, DCF has also developed a performance target.  The performance of each region and area office is reported separately.  (Deposition of Ruben Ferreira, DCF Assistant Commissioner for Continuous Quality Improvement, Feb. 2, 2012, at 55:11-56:5, 63:9-64:20; Trial Exhibit 954, All Monthly Operations Statistical Reports, to the extent they were created by the Department of Children and Families, reflecting performance from Jan. 1, 2008 through Aug. 15, 2012).

34. Former Commissioner McClain testified that in selecting the measures on the MOSt Report, DCF wanted reflect "the five main goals in the agency" – safety, permanency, well-being, community connected care and effective leadership.  "We were trying to keep it to what's the 30 or so things that are the most critical."  (Trial Tr. May 6, 2013 (McClain), at 105:25-107:2).

35. According to Mr. Ferreira, DCF developed the MOSt report in order to "summarize a number of indicators that were thought to be key indicators."  (Rule 30(b)(6) Deposition of Ruben Ferreira, DCF Assistant Commissioner for Continuous Quality Improvement, re: Data Collection and Retention, Aug. 23, 2011, at 96:11-23). The MOSt Report is distributed to managers in the field offices. (*Id.*).

36. Commissioner McClain testified that he approved the performance targets set in the MOSt Report.  (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 235:9-236:1). However, Commissioner McClain testified that the targets in the MOSt Report were not intended to reflect minimally acceptable performance, but rather a benchmark which may be adjusted over time.  (Trial Tr. May 6, 2013 (McClain), at 104:12-105:19).

37. According to Mr. Ferreira, when DCF set targets for the MOSt report, the intent was that the first set of targets would be interim targets and that they would be elevated as performance progressed.  (Rule 30(b)(6) Deposition of Ruben Ferreira, DCF Assistant Commissioner for Continuous Quality Improvement, re: Data Collection and Retention, Aug. 23, 2011, at 116:13-118:2).

38. There is generally at least a 60-day time lag between the end of a reporting month and the publication of a MOSt report for that month.  (Deposition of Ruben Ferreira, DCF Assistant Commissioner for Continuous Quality Improvement, Feb. 2, 2012, at 61:15-20).

39. DCF publishes a quarterly Continuous Quality Improvement ("CQI") management report, commonly known as the "CFSR Scorecard," which reflects agency performance in relation to certain federal data indicators and composites (*see infra* § VII.A.2.a (¶¶ 1622-47)).  Results are broken down by region and by area office.  The CFSR Scorecard is distributed to managers in field offices. (*See, e.g.*, Trial Exhibit 964, CFSR Measures – 12 Month Period Ending: 09/30/2012).

40. Ruben Ferreira, DCF Assistant Commissioner for Continuous Quality Improvement, testified that the "CFSR Measures - Targeted CQI" page of the CFSR scorecard is intended to allow regional directors and directors of areas to quickly identify practice areas where they need to target their efforts.  (Deposition of Ruben Ferreira, DCF Assistant Commissioner for Continuous Quality Improvement, Feb. 2, 2012, at 158:8-16; Trial Exhibit 964, CFSR Measures - 12 Month Period: 4/01/2010 to 3/31/2011, p. 8).

41. Commissioner McClain testified that the intended audience for the CFSR Scorecard is the DCF management team, and secondarily, supervisory and caseworker staff.  (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 59:2-12).

42. Commissioner McClain testified that he had identified DCF's four priority areas by reviewing data, in particular from the CFSR Scorecard, the MOSt Report, the EHS Results Dashboard report, the "quarterly department report," and others.  (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 40:1-15).

43. DCF uses CFSR standards established by the Department of Health and Human Services as targets.  (Rule 30(b)(6) Deposition of Ruben Ferreira, DCF Assistant Commissioner for Continuous Quality Improvement, re: Data Collection and Retention, Aug. 23, 2011, at 100:6-23; Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 40:16-41:10).

### B. Child Welfare Standards: Child Welfare League of America and Council on Accreditation

44. The Child Welfare League of America ("CWLA") is a public nonprofit agency that has a long history of research in best practices in child welfare and establishes standards related to child welfare services.  Massachusetts is a member of the CWLA.  The Council on Accreditation ("COA") is an accrediting organization that also has a long history of research into best practices and management of child welfare organizations.  States must go through a

rigorous process to become accredited. (Trial Tr., Feb. 28, 2013 (Crabtree), at 33:13-34:3). Plaintiffs' expert Cathy Crabtree testified that in her experience, child welfare agencies rely on CWLA and COA standards, and that she did so during her tenure with the Tennessee child welfare agency. (Trial Tr., Feb. 28, 2013 (Crabtree), at 34:4-10).

45. Richard Klarberg, President and CEO of the Council on Accreditation ("COA"), testified that the five individuals in COA's standards department do not determine what the standards are; rather, the standards are determined by "independent panels of experts drawn from the social services field." (Rule 30(b)(6) Deposition of Richard Klarberg, COA President and CEO, and Karen Callender, COA Director of Accreditation, Aug. 9, 2012, at 37:13-20). Experts who are knowledgeable in a particular area create the framework for the standards and the essential aspects of the standards. (*Id.* at 37:21-38:2). COA then takes that information and, "in effect, transposes it into a format that is consistent with" COA's standards. (*Id.* at 38:3-5). The process is the same for each of the 45 different services that COA accredits. (*Id.* at 38:6-7).

46. The experts who serve on COA's independent panels are determined through a process by which COA identifies a group of individuals who either agree to serve on the panel or who provide a recommendation as to those individuals who would better be able to serve on the panel. (*Id.* at 38:8-15). The panels are typically made up of practitioners in that field and academics in that field. (*Id.* at 38:16-19). COA's goal is to "identify and hav[e] participating those persons who have the most knowledge about what is most appropriate for the given subject area." (*Id.* at 38:20-39:1). COA draws upon people "from wherever they may be, who have that type of expertise." (*Id.* at 39:1-3).

47. COA's expert panels, based on their collective expertise, reach a consensus about what the standard should be, and the consensus is reflected in the standard. (*Id.* at 40:5-20). There is a subsequent draft and review process during which the same panel reviews the standard as drafted by COA. (*Id.* at 40:21-41:9). COA also always solicits feedback from individuals who were not part of the panel. (*Id.* at 41:10-12). Once standards that are in draft form have been reviewed by COA's standards panel, they are disseminated broadly to the field (whatever field is relevant to the standard) and to others who have been identified as having expertise in the area, including persons who are not currently affiliated with a service-providing organization, and COA solicits input and comment from a "significantly large population." (*Id.* at 41:13-19, 46:14-22). COA collects this feedback and compiles a report that reflects the number and nature of comments received. (*Id.* at 47:17-23). Depending on the number and nature of the comments -- and depending on whether the comments are substantive -- COA may distribute that report to the experts who serve on the standards panel. (*Id.* at 47:23-48:11). If the feedback "provides insights that were not previously contemplated into a standard, it will be incorporated into the standard and then disseminated to the standards panelists for their review"; "possibly, if it is a significant enhancement, potential enhancement, it will be disseminated broadly to the field again." (*Id.* at 46:23-47:15).

48. In addition to the panelists, a "very exhaustive literature search is involved so that [COA not only has] the value and the benefit of the experience of the panelists and their own perception, but [COA also has] the opportunity to understand the point of view of both

practitioners and academicians who do not serve on the panel and who may not elect, for whatever reason, to respond to the draft standards." (*Id.* at 41:20-42:4). COA staff, who conduct the literature review, have access to position papers, reports and articles from throughout North America. (*Id.* at 42:5-18). The literature search is typically part of the discussion process as to how the panel is evaluating its determinations as to what would be appropriate for a specific standard. (*Id.* at 42:19-24).

49. Once a draft standard has been sent out to the field and the responses received do not cause COA to believe that the basic elements of the standard are incorrect – and once there are no further comments or concerns that are raised regarding the appropriateness of the standard – then the standard is ready to be sent out. (*Id.* at 48:13-49:1, 49:18-50:3). However, COA standards are not "chiseled in stone" – they are a "living document" and at any time that COA receives comments from the field saying that what is included in a standard is inappropriate or unrealistic, COA takes that into consideration and can provide that to the standards panel and amend the standard. (*Id.* at 49:2-17). Comments may be received not only from COA providers but from any provider of that type of service, public or private. (*Id.* at 50:4-8).

50. COA reviews its published standards on an ad hoc basis based on the "activity that we perceive to be happening in a given area of the human services field." (*Id.* at 50:13-51:10).

51. Karen Callender, Director of the Accreditation Program at COA, testified that in a large foster care services provider organization with multiple offices, each individual office must comply with COA standards in order to be accredited. (*Id.* at 91:10-15). An exceptional performance at one office could not make up for a substandard performance at another office. (*Id.* at 91:16-19).

52. Ms. Callender testified that COA has dealt with budget cuts and budget issues with state systems and private organizations "for many, many years now, and that is not a justification to not show implementation to the standards." (*Id.* at 104:16-22).

53. Ms. Callender testified that when COA hears from the field that it needs to review standards, COA convenes a task force to discuss the standards; sometimes the feedback is valuable and it supports the literature and sometimes COA cannot update the standard because it is not supported throughout the country and the literature just does not support it. (*Id.* at 115:17-116:7).

54. Linda Spears, Vice President of Policy and Public Affairs at the Child Welfare League of America ("CLWA"), testified that within CWLA's Standards of Excellence there is a hierarchy of standards and guidelines to public agencies that begin with licensure, which CWLA views as "the floor below which no organization should be operating a child welfare service. (Rule 30(b)(6) Deposition of Linda Spears, CWLA Vice President of Policy and Public Affairs, Aug. 14, 2012, at 59:20-60:3). Ms. Spears testified that these standards are in state regulations in most states. (*Id.* at 60:3-4). The next level of standard is the Council on Accreditation standards or JCAHO standards, which CWLA cites as "standards that provide one of the roadmaps or vehicles by which people can measure and assess their process." (*Id.* at 60:5-9).

55. Ms. Spears testified that CWLA cites its overall standards as "goal standards in that we believe that agencies should aspire to meet all of the requirements that are in the standards." (*Id.* at 60:12-15).

56. In developing its standards, CWLA uses a process of reviewing the literature and convening a group of individuals around the country to assist. (*Id.* at 77:6-14). In determining the best ways to meet the needs of children and families, CWLA uses a development process that brings representative people from constituencies within the field to work with CWLA on development of standards. (*Id.* at 95:4-16). The individuals who CWLA picks to assist in preparing the standards are experts with knowledge about the delivery of services, understanding what best practices are and what real-world challenges are in delivery of best practices. (*Id.* at 77:15-19). CWLA brings researchers to the table to help inform them about what the knowledge base is saying about practice, and it brings collateral organizations and disciplines to the table, including people who work outside of direct child welfare but may have other expertise, such as from the judicial perspective, from law enforcement, from medicine, from psychology, and from other fields, to inform the process. (*Id.* at 77:20-78:3). A short set of standards generally takes approximately 18 months to develop and a long set takes approximately two years. (*Id.* at 77:6-11).

57. CWLA's program staff on an ongoing basis attempts to stay on top of the literature and the emerging practices as well as who is doing what around the country. (*Id.* at 78:4-10). CWLA does formal structure literature reviews, and if it finds something interesting that it is not aware of then it reaches out to talk to the people involved. (*Id.* at 78:11-14). However, usually CWLA is already aware of the practices and of what people are doing that is good work. (*Id.* at 78:14-17). CWLA brings these people "to the table" and has discussions with them, engaging them "in some way, shape or form." (*Id.* at 78:18-20). Some of these people work with CWLA to provide input about what a standard should look like in a given area, while others may review and offer literature or research that supports that work. (*Id.* at 78:20-24).

58. CWLA's process for developing its standards involves research and use of agency practice, knowledge, and wisdom, but it is not an empirical survey of the states or public or private agencies. (*Id.* at 95:4-22).

59. Commissioner McClain testified that, in developing some of the programs and processes he has tried to implement within DCF during his tenure, he looked to professional guidelines and standards published by professional organizations including the Council on Accreditation and the Child Welfare League of America, of which DCF is a member. (Trial Tr. May 2, 2013 (McClain), at 78:22-79:12).

    **C.**    **Plaintiffs' Experts**

        **1.**    **Case Record Review**

60. Plaintiffs retained the Children's Research Center ("CRC"), a division of the National Council on Crime and Delinquency ("NCCD"), to perform a reading of case files to determine the extent to which DCF met standards of case practice for children in foster care

during the period under review.  (Trial Tr., Jan. 30, 2013 (Freitag), at 4:8-16, 20:5-21:2; Trial Tr., Jan. 31, 2013 (Johnson), at 77:9-22).

61. NCCD is a 100-year-old nonprofit organization with approximately 100 employees whose mission is "helping to develop just and equitable social service systems . . . primarily in the areas of criminal justice, juvenile justice, and child protection."  CRC is a division of NCCD that focuses on the child protection area.  (Trial Tr., Jan. 30, 2013 (Freitag), at 6:20-7:6, 8:15-18).  CRC's primary emphasis is helping governmental agencies to develop systems that enable the best decisions to be made for families and to "make the best use of resources to achieve the best outcomes."  (*Id.* at 8:24-9:6; *see also id.* at 9:7-10:4).

62. CRC's case record review was managed by Dr. Raelene Freitag.  (Trial Tr., Jan. 30, 2013 (Freitag), at 30:7-15).  Dr. Freitag has been the director of CRC for six years.  (*Id.* at 4:8-21).  Dr. Freitag joined CRC in 1997, serving as a senior research associate, senior researcher, and associate director prior to becoming director.  (*Id.* at 4:22-13, 15:24-17:13).  She has worked with fifteen different U.S. jurisdictions, including DCF, as well as jurisdictions in Canada, Australia, and Taiwan, primarily relating to CRC's "Structured Decision Making" and "Safe Measures" tools.  (*Id.* at 9:7-11:14, 13:25-15:23, 17:14-18:22).  She has undertaken a number of case record reviews in connection with these engagements.  (*Id.* at 22:7-24).

63. Dr. Freitag has an MSW and a PhD in Urban Studies with a specialization in social service delivery systems.  (Trial Tr., Jan. 30, 2013 (Freitag), at 5:18-24, 7:23-8:14).  She had fourteen years of social work experience prior to joining CRC, including over one-and-a-half years as a social worker and supervisor for a state child protection agency.  (*Id.* at 5:6-17, 5:25-6:19, 7:8-22).

64. NCCD has a research division that supports its work, including the work of CRC.  (Trial Tr., Jan. 30, 2013 (Freitag), at 13:2-16).

65. Dr. Kristen Johnson, a senior researcher in NCCD's research division, assisted Dr. Freitag in the case record review.  (Trial Tr., Jan. 30, 2013 (Freitag), at 22:25-23:6; Trial Tr., Jan. 31, 2013 (Johnson), at 67:22-68:3).

66. Dr. Johnson has been a researcher at NCCD for seventeen years, first as a research associate for three years, then as a senior research associate for five years, and for the last nine years as a senior researcher.  (Trial Tr., Jan. 31, 2013 (Johnson), at 68:4-22).  She received a bachelor's degree in sociology, with a focus on analysis and research, in 1991; a master's degree in policy analysis in 1996; and a Ph.D. in human development and family studies, with a minor in prevention science, in 2010.  (*Id.* at 68:23-70:7).  She has taken approximately eight courses in statistics, as well as courses in quantitative and qualitative research methods relevant to the type of case record review performed for this litigation.  (*Id.* at 70:8-72:8).  She has also taken a number of courses relating to child welfare systems and family welfare systems.  (*Id.* at 73:9-16).  Her work at NCCD has included workload studies, risk assessment studies, and evaluation studies in both child welfare and juvenile justice contexts in approximately twenty U.S. jurisdictions and five jurisdictions in Canada and Australia.  (*Id.* at 73:17-76:14, 77:5-8).  She also performed the sampling for an earlier litigation-related case record review relating to the Michigan child welfare system, in which

11

CRC was jointly engaged by plaintiffs and defendants. (*Id.* at 76:15-77:4; Trial Tr., Jan. 30, 2013 (Freitag), at 19:22-24).

67. The case record review consisted of an examination by experienced social workers of a representative sample of case files to answer "a specific set of questions" about DCF's actions or other events in those cases, and aggregating and analyzing the answers to those questions to determine the proportion of cases in which those events took place. (*Id.* at 24:2-6, 26:18-27:4). The six Named Plaintiff children were not among files sampled for the case record review. (*Id.* at 28:8-10).

68. The information CRC sought to find in children's case files was of the sort that, in CRC's opinion, was "so important that we would expect to see [it] documented." (*Id.* at 62:5-17).

69. CRC had undertaken similar studies in two other child welfare class-action lawsuits, one as an expert engaged by plaintiffs and another as an expert agreed upon jointly by plaintiffs and defendants. (*Id.* at 21:14-22:6).

70. Dr. Johnson was primarily responsible for designing the sampling process, the survey questions, and the data collection protocols for the case record review; for training the case readers and case read coordinators; and for performing all data analysis after the case reading was completed. (Trial Tr., Jan. 31, 2013 (Johnson), at 78:1-15, 84:12-85:2, 88:3-89:16).

71. CRC consulted with Dr. Erik Nordheim, a Professor of Statistics at the University of Wisconsin in Madison, Wisconsin, concerning the size of the samples to be selected from each cohort for the case record review and the procedure for making a random selection of cases from each cohort. (Trial Tr., Jan. 30, 2013 (Freitag), at 31:14-32:10; Trial Tr., Jan. 31, 2013 (Johnson), at 78:22-79:8; Trial Tr., Feb. 4, 2013 (Nordheim), at 35:15-36:24). Dr. Nordheim is an applied statistician who has worked with scientists in a wide range of disciplines, including the social sciences. (*Id.* at 33:16-35:14).

72. CRC studied two separate cohorts of children. The first cohort, the "entry cohort," consisted of children who entered foster care during the twelve-month window from July 1, 2009 to June 30, 2010. The entry cohort was designed to permit CRC to examine recent DCF practice with respect to children entering foster care. Since none of these children could have, at any time during the thirty-month review period, been in care for more than thirty months, CRC studied a second cohort, the "two-year cohort," consisting of children who had already been in foster care for two years or more on July 1, 2009, to study the recent case practice of DCF for children who have spent a longer time in foster care. (Trial Tr., Jan. 30, 2013 (Freitag), at 25:3-23; Trial Tr., Jan. 31, 2013 (Johnson), at 79:19-22).

73. Within each cohort, CRC chose a random sample of "cases," where each "case" consisted of a family with a child or children in DCF custody. CRC then randomly chose, for each family with more than one child in care, a single child for inclusion in the case record read. This sampling plan was chosen because children within a family will have been removed from the home on account of the same parental issues, and having more than one child from the same family in the sample would result in an over-representation of children with that family's

particular issues and outcomes. (*Id.* at 79:19-81:18; *see also* Trial Tr., Feb. 4, 2013 (Nordheim), at 36:25-37:7, 54:13-55:1).

74. CRC randomly chose a sample size of 242 cases from each cohort in order to assure that CRC "could be 95 percent confident that the findings for the sample would be generalizable to the population within plus or minus six percent." (Trial Tr., Jan. 31, 2013 (Johnson), at 82:2-83:18; *see also* Trial Tr., Feb. 4, 2013 (Nordheim), at 37:24-38:25, 39:15-40:5, 48:4-15, 57:17-58:8). Where a particular data element was inapplicable to a portion of the 242 files in a cohort (such as sibling placement together for children who have no siblings in foster care), generalization from the smaller number ("N") of available files would result in a larger uncertainty. For example, if data was available for sixty files (approximately one-quarter of 242), the uncertainty when generalizing to the entire cohort would be doubled from plus or minus 6% to plus or minus 12%. For N between sixty and 242, the uncertainty would be between 6% and 12%. (*Id.* at 43:5-19).

75. CRC drew the sample proportionally from the DCF administrative regions in existence as of July 1, 2009, according to the number of families served in each region, in order to avoid any "regional bias." (Trial Tr., Jan. 31, 2013 (Johnson), at 83:19-84:11; *see also id.* at 124:13-126:11; Trial Tr., Feb. 4, 2013 (Nordheim), at 39:15-41:1, 41:11-13, 41:23-43:4, 43:20-44:23; Trial Exhibit 1072, Appendices A-D to Report of Erik V. Nordheim, Aug. 22, 2012).

76. The questions to which CRC sought answers from each child's case file were contained in a case reading instrument that was completed electronically by the case readers. (Trial Exhibit 1067, Appendix A to Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; Trial Tr., Jan. 30, 2013 (Freitag), at 28:23-29:16; Trial Tr., Jan. 31, 2013 (Johnson), at 84:12-85:2; *see also id.* at 86:4-7). The questions were based on CRC's review of DCF policies and regulations to determine "what standards DCF was holding itself to," and a review of the issues raised by Plaintiffs in the Complaint. (*Id.* at 86:8-18).

77. CRC generally reviewed the selected children's files for case practice during the thirty-month period from July 1, 2009 through December 31, 2012 so as to examine recent social work practice within DCF. (Trial Tr., Jan. 30, 2013 (Freitag), at 25:3-13, 31:2-13, 37:15-23). CRC was provided with portions of the electronic record and the complete paper file for each child sampled. (Trial Tr., Jan. 31, 2013 (Johnson), at 95:17-96:15).

78. CRC hired fourteen retired child welfare professionals to read the sample files, including several who had retired from DCF. The fourteen readers had a combined experience of approximately 400 years in public child welfare practice. (Trial Tr., Jan. 30, 2013 (Freitag), at 33:5-17, 34:18-36:8; 37:7-14). They were trained extensively on-site and were provided with written training materials. (Trial Tr., Jan. 31, 2013 (Johnson), at 91:5-94:22; Trial Exhibit 1068, Appendix B to Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; *see also* Trial Tr., Jan. 31, 2013 (Johnson), at 89:22-90:18). Either the case read coordinator or one of two case reading supervisors were on site at all times during the case reading. (*Id.* at 96:16-97:6).

79. Dr. Johnson, with the assistance of two NCCD analysts, performed the data analysis that formed the basis for CRC's conclusions, as reflected in Trial Exhibits 1065, 1066, 1070, and 1071. (Trial Tr., Jan. 30, 2013 (Freitag), at 38:19-22; Trial Tr., Jan. 31, 2013 (Johnson), at 97:7-22). Trial Exhibit 1066 consists of tabulations, for each question on the case record review instrument, of the number and percentage of case files for which each available response was recorded. (Trial Tr., Jan. 30, 2013 (Freitag), at 38:25-39:9, 44:22-24). Trial Exhibits 1065, 1070, and 1071 consist of additional analyses CRC performed that provide additional explanation or further sorting of the raw data contained in Exhibit 1066. (*Id.* at 39:10-40:8, 75:25-76:1; Trial Tr., Jan. 31, 2013 (Johnson), at 110:22-113:17).

80. In order to determine the inter-rater reliability of the data elements collected in the case record review, CRC randomly chose two to three cases each week for rereading by a different case reader. A total of fifty-five of the 484 sampled files were reread in this way. The reliability was considered adequate for a particular data element when the two readers agreed on the result 75% of the time or more. Trial Exhibit 1069 displays all data elements, among approximately 266 collected, for which the percent agreement was 80% *or less*; any data element not on this list had a percent agreement of over 80%. (Trial Tr., Jan. 31, 2013 (Johnson), at 89:17-91:4, 98:19-100:19, 101:11-12, 103:2-8, 103:16-22, 104:4-12, 104:21-107:4; Trial Exhibit 1069, Table 3 to Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC) and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowsky, Oct. 19, 2012, Nov. 19, 2012).

## 2.    Named Plaintiff File Reviews

81. Dr. Lenette Azzi-Lessing, a tenured professor of social work at Wheelock College, reviewed all of the DCF case records of the five Named Plaintiffs, dating from when the child's family first became involved with DCF to early 2012, amounting to twenty-two bankers boxes of unbound documents. (Trial Tr., Jan. 25, 2013 (Azzi-Lessing), at 103:3-18; Trial Tr., Feb. 4, 2013 (Azzi-Lessing), at 76:5-7, 76:11-13, 79:3-10). In reviewing the Named Plaintiffs' files, she sought "to formulate opinions regarding the case work services that were provided to the five named plaintiffs . . . and the impact of the case work upon these five children." (Trial Tr., Feb. 4, 2013 (Azzi-Lessing), at 78:18-21).

82. Dr. Azzi-Lessing assessed DCF's casework practice in each case using "the framework that is found in federal child welfare policy and also within DCF's own policy manuals which is evaluating the work that took place in terms of its focus on . . . [and] effectiveness on providing children with safety, permanency and well-being." (Trial Tr., Feb. 4, 2013 (Azzi-Lessing), at 71:10-14; *see also id.* at 79:21-23). Dr. Azzi-Lessing testified that her review was "informed by standards that I'm familiar with as established by the Child Welfare League, by the Council on Accreditation for Services for Children and [T]heir Families." (*Id.* at 73:14-21). She also relied on her "understanding and familiarity with the literature both in books and peer review journals on appropriate practices in compiled welfare," her "own direct work experience both as a practitioner and as an agency administrator," her "teaching in the area of child welfare practice," and "DCF's own standards and the Massachusetts regulation." (*Id.* at 73:14-74:2).

83. Dr. Azzi-Lessing testified that the situations that the five Named Plaintiffs whose files she read were in and the problems that they were encountering when they came into foster care "are fairly typical of situations that bring children into state child welfare agencies." (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 86:14-21).

84. Dr. Azzi-Lessing testified that she identified standards of care within Massachusetts in the form of "DCF policy and procedures manuals and . . . Massachusetts regulations," which reflect "basic minimum standards of accepted practice found in federal policy as well as in the literature." (Trial Tr., Feb. 4, 2013 (Azzi-Lessing), at 74:3-11).

85. In addition to assessing DCF's casework practice in each case, as Dr. Azzi-Lessing read through the case records of the five Named Plaintiffs, she "determined that there were some common themes across these cases that would in my opinion raise red flags to an administrator in a child welfare system in terms of DCF's policy, DCF's practices." (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 62:19-63:6). Dr. Azzi-Lessing testified that "given what I read in these records and the fact that different parts of the DCF system are touching these children, I did see red flags as I call them in terms of problems that appear to be in the system." (*Id.* at 94:14-95:5). She further testified that the practices in the cases that she reviewed "go beyond the competence of just the worker who might have had that case, or the fact that there are foster homes that are so unsafe, that are licensed but they're so unsafe, or residential programs, that does alert me that, that it appears that there are some significant problems within the system." (*Id.* at 97:5-17).

86. Dr. Azzi-Lessing has previously conducted similar case reads. (Trial Tr., Feb. 4, 2013 (Azzi-Lessing), at 77:14-78:14). She holds a master's degree in social work and a Ph.D. in human development and family studies. (Trial Tr., Jan. 25, 2013 (Azzi-Lessing), at 103:21-104:20). She has over thirty years of social work and child welfare experience, including founding and serving as executive director of the Rhode Island Center for Children at Risk, "a private nonprofit organization with the mission of providing more comprehensive, appropriate services to families with very young children who were already beginning to struggle," and serving for thirteen years as executive director of Children's Friend, a licensed child-placing agency with approximately 26 to 28 staff members that offered a variety of programs, including an adoption program, "a small network of foster homes," a home-based program for young children, a program "working with substance abuse affected families" in the social services system, and outpatient mental health services. (*Id.* at 127:20-128:8, 133:20-135:17, 136:15-17; *see generally id.* at 104:5-142:9). Dr. Azzi-Lessing's experience includes ample work with respect to mental health service needs of adults and children, including children in foster care – both in providing direct service and in overseeing mental health service provision. (*See, e.g., id.* at 106:5-107:12, 115:5-10, 115:22-116:19, 120:15-23, 121:6-122:19, 135:15-17, 139:9-25). Dr. Azzi-Lessing also has an extensive background in teaching in the areas of social work and child welfare. (*Id.* at 129:15-18; Trial Tr., Feb. 4, 2013 (Azzi-Lessing), at 64:10-67:4). Dr. Azzi-Lessing has long been involved with the Council on Accreditation, the Child Welfare League of America, and the National Resource Center on In-Home Services and is familiar with their standards for child welfare work. (Trial Tr., Jan. 25, 2013 (Azzi-Lessing), at 140:12-141:8, 144:10-146:3; Trial Tr., Feb. 4, 2013 (Azzi-Lessing), at 61:16-63:8). She has published articles in peer-reviewed journals in

the field of social work and child welfare.  (Trial Tr., Feb. 4, 2013 (Azzi-Lessing), at 63:9-64:9).

87. Based on her review of the five Named Plaintiff files, Dr. Azzi-Lessing concluded that DCF's "consistent . . . failure to adhere to [state and federal] laws and the standards of adequate practice have repeatedly harmed Connor, Adam, Camila, Andre and Seth in innumerable ways."  (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 80:2-16).  Dr. Azzi-Lessing further found that DCF's "substandard practices . . . also caused harm to some of the siblings of the named plaintiffs, as well as to other children in state custody who are placed in the same dangerous and/or harmful settings before, during and after these five named plaintiffs."  (*Id.* at 80:16-20).  Furthermore, Dr. Azzi-Lessing found that "DCF has denied and continues to deny the five named plaintiff children the safety, well-being and permanency to which all children in state custody are entitled."  (*Id.* at 80:20-23).

### 3.    Psychotropic Medication Review

88. Plaintiffs retained Dr. Christopher Bellonci to determine the extent to which Massachusetts is meeting the standard of care with regard to providing informed consent, clinical oversight, and monitoring of psychotropic medications for children in foster care.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 36:2-37:10, 77:14-78:8).  To conduct his analysis, Dr. Bellonci reviewed the DCF case files of three Named Plaintiffs and assessed DCF's practices against a minimal standard of care.  (*Id.* at 43:11-12, 77:18-21).  Dr. Bellonci's assessment is based on his twenty years of experience working with the foster care population; his knowledge of other states' oversight and monitoring and consent processes; the literature; the AACAP Position Statement on Oversight of Psychotropic Medication Use for Children in State Custody: A Best Principles Guideline; guidance from the federal government; and Foster Children: HHS Guidance Could Help States Improve Oversight of Psychotropic Prescriptions ("the GAO report").  (*Id.* at 43:12-17, 44:1-10, 77:14-78:13).

89. Dr. Bellonci reviewed three named plaintiffs' files in order to evaluate whether DCF had adequate information about the following areas: why the children were being administered psychotropic medications; whether the medications were indicated; and to ensure that the children were protected from harm.  (Trial Tr., Jan. 24, 2013 (Bellonci), 118:5-8, 119:2-6).  Dr. Bellonci assessed whether DCF had sufficient information to provide adequate informed consent, adequate clinical oversight, and adequate monitoring in these cases.  (*Id.* at 116:21-117:2).

90. Dr. Bellonci is a board-certified psychiatrist, certified in both adult psychiatry and child and adolescent psychiatry, and has been a practicing child and adolescent psychiatrist for twenty years.  (Trial Tr., Jan. 22, 2013 (Bellonci), at 119:24-120:15).  Dr. Bellonci currently serves as an attending psychiatrist at Tufts University Medical Center and is an assistant professor at the Tufts University Medical School.  (*Id.* at 111:24-112:3).  Dr. Bellonci has a clinical practice at Tufts and "participate[s] in research largely in the domain of foster care."  (*Id.* at 112:4-11).

91. Dr. Bellonci has also worked for approximately eighteen years at Walker, a multi-service agency for children where he is currently a senior psychiatric consultant.  (Trial Tr., Jan. 22,

16

2013 (Bellonci), at 112:11-20, 113:6-8; *see also id.* at 123:1-12). Walker serves children ages five to thirteen who often have already received outpatient treatment and have already been hospitalized. (Trial Tr., Jan. 24, 2013 (Bellonci), at 66:8-14). Dr. Bellonci helped to design and launch Walker's residential treatment unit. (Trial Tr., Jan. 22, 2013 (Bellonci), at 122:15-25).

92. Dr. Bellonci has been providing clinical care to children who are involved with DCF since at least 1993. (Trial Tr., Jan. 22, 2013 (Bellonci), at 116:11-118:11). Dr. Bellonci has worked with hundreds of children in DCF foster care. (*Id.* at 124:14-20). In the majority of instances, those children were already being prescribed psychotropic medications, often multiple medications. (*Id.* at 126:10-14).

93. Dr. Bellonci has served on the advisory board, committees, and task forces of multiple professional organizations dealing with the mental health treatment of children in foster care. (Trial Tr., Jan. 22, 2013 (Bellonci), at 139:21-140:9, 143:3-8, 143:20-144:10). Dr. Bellonci served on the Mental Health Advisory Board of the Child Welfare League of America for thirteen years and as part of that work, has "presented on the issue of psychotropic medications for children in the child welfare system." (*Id.* at 139:21-140:9). Dr. Bellonci has also been actively involved in developing guidelines for the treatment of children in foster care with "mental and behavioral health needs." (*Id.* at 142:5-23).

94. Dr. Bellonci has served as a consultant for various state child welfare agencies on the issue of psychotropic medications for children in foster care, including those in Tennessee, Florida, Ohio, and a county in North Carolina. (Trial Tr., Jan. 22, 2013 (Bellonci), at 149:15-150:19; Trial Tr., Jan. 24, 2013 (Bellonci), at 23:10-24:14). As part of that work, he has developed policies and guidelines about the oversight and monitoring of psychotropic medications for children in foster care, including policies around informed consent. Many of those policies and guidelines were ultimately implemented. (Trial Tr., Jan. 22, 2013 (Bellonci), at 151:3-151:20, 152:11-152:22, 153:12-14; *see also* Trial Tr., Jan. 24, 2013 (Bellonci), at 3:21-4:8).

95. Dr. Bellonci is currently serving as a clinical consultant to the Psychotropic Medication Quality Improvement Collaborative, which was convened by the Center for Healthcare Strategies and through which he is working with six states around their oversight of psychotropic medications for children in foster care: Rhode Island, New York, New Jersey, Vermont, Illinois, and Oregon. (Trial Tr., Jan. 24, 2013 (Bellonci), at 24:23-25:13, 25:17-27:17).

96. Dr. Bellonci testified before Congress in 2008 about the high rate of use of psychotropic medication for children in foster care and the need for oversight and has presented at national conferences about this issue. (Trial Tr., Jan. 22, 2013 (Bellonci), at 146:11-13, 147:12-18; Trial Tr., Jan. 24, 2013 (Bellonci), at 27:9-28:18).

97. Dr. Bellonci coauthored the Multi-State Study on Psychotropic Medication Oversight in Foster Care, issued by the Tufts Clinical and Translational Science Institute, which surveyed state practices regarding consent, monitoring, and oversight of psychotropic medications for children in foster care. (Trial Tr., Jan. 24, 2013 (Bellonci), at 30:8-31:11; Trial Exhibit 1063,

Laurel K. Leslie et al., "Multi-State Study on Psychotropic Medication Oversight in Foster Care," 4 Tufts Clinical and Translational Science Institute (Sept. 2010)).

98. The Administration for Children and Families has cited to two publications that Dr. Bellonci co-authored as useful for child welfare agencies seeking to improve their monitoring and oversight practices of psychotropic medications for children in foster care. (Trial Exhibit 825, ACF Children's Bureau, Information Memorandum, Log No: ACYF-CB-IM-12-03, Apr. 11, 2012, p. 12).

99. Dr. Bellonci served on the Rogers Working Group, which was convened by the Child Advocate of Massachusetts to evaluate Massachusetts's process for providing informed consent and oversight for antipsychotic medications for children in DCF foster care. (Trial Tr., Jan. 24, 2013 (Bellonci), at 31:12-17, 33:10-33:25).

### 4. Management Reviews

#### a) *Catherine Crabtree*

100. Ms. Crabtree has more than thirty years of experience in the child welfare field, and has held positions ranging from direct work with children and families as a case manager to several senior management positions. (*See* Trial Tr., Feb. 28, 2013 (Crabtree), at 9:14-18:16).

101. She holds a B.S. in education and an M.S. in educational psychology, both from the University of Tennessee. (*Id.* at 9:14-25). Upon attaining her undergraduate degree, Ms. Crabtree spent approximately two years as a case manager in a program called Youth Opportunities Unlimited. There, she worked directly with children who had been involved with the juvenile court to help them enter the workforce. Ms. Crabtree traveled a fifteen-county area connecting children with employers and working with their families to evaluate their situation. (*Id.* at 10:3-10:20). Ms. Crabtree performed similar functions in her next position, as a community liaison for the Cherokee Mental Health Center, where she worked directly with the families and children on her caseload, conducted home visits, and worked with schools. (*Id.* at 10:21-11:9).

102. She served as director of mental health programs for Peninsula Lighthouse, an outpatient center that treats mental illness and alcohol abuse problems for adults. (*Id.* at 12:1-10). Following that position, Ms. Crabtree was director of children's services for the East Tennessee Community Health Agency, which worked with the public child welfare agency in Tennessee—then called the Department of Human Services. The East Tennessee Community Health Agency covered a fifteen-county area and primarily focused on preliminary stages of a child's involvement with the system, either helping to divert children from foster care or working with a child and family when the child came into care. Ms. Crabtree estimates that she managed approximately thirty-five to forty employees in this position. (*Id.* at 12:11-13:24).

103. Ms. Crabtree was also an assistant commissioner for the Department of Children's Services in Tennessee from 1995 to 2003. Initially, she was responsible for program operations, which involved managing all child welfare services including foster care,

adoption, licensing, juvenile justice programs, investigations for child protective services, and front-end programs aimed at helping children avoid custody. Ms. Crabtree's responsibilities also extended to budgeting, policy and procedure development, and compliance with federal regulations. At that time, the Department served approximately 10,000 children in care and employed a staff of approximately 3500 to 4000 people. (*Id.* at 13:25-15:10). Ms. Crabtree subsequently served as assistant commissioner for compliance for approximately one and a half years. In that position, Ms. Crabtree was responsible for ensuring the department's implementation of a plan that was in place due to the court-enforceable order that resulted from a class action lawsuit brought on behalf of a class of children. (*Id.* at 15:12-16:21).

104.    Following her employment with the Department of Children's Services in Tennessee, Ms. Crabtree performed consulting work for private providers outside the state and then joined the Center for Government and Public Affairs at Auburn University. (*Id.* at 16:22-17:11). Ms. Crabtree then spent two and a half years as associate commissioner at the Alabama Department of Mental Health, where she ran the Division of Developmental Disabilities. She then returned to Auburn University. (*Id.* at 17:10-18:16).

105.    Ms. Crabtree has spent the last two and a half years as a senior project lead for the Center for Government and Public Affairs at Auburn University, where she engages in consulting work for public agencies and nonprofits around the state on such topics as organizational reform and performance management. She has consulted with several public agencies including the Alabama Medicaid Agency, the Department of Youth Services, the Alabama Department of Mental Health, the Alabama Department of Public Health, the Alabama Department of Human Resources, and the Alabama Child Abuse and Neglect Prevention Agency. Ms. Crabtree also spends three days a week as an employee of the president pro tempore for the Alabama Senate, Senator Marsh, where she is involved in implementing the legislature's government-streamlining initiative—an effort "to find cost efficiencies and work efficiencies across various state agencies." (*Id.* at 7:19-9:10).

106.    Ms. Crabtree has also served as a member of professional organizations including the National Association of State Directors for Disability Services and the Alabama State Child Death Review Team—a governor-appointed position. (*Id.* at 22:7-20).

107.    Ms. Crabtree's professional experience has allowed her to gain familiarity with the federal laws and regulations that apply to a designated IV-E agency, as well as the Child and Family Services Review process and the performance outcome measures used by the federal government as part of that process. (*Id.* at 18:16-20:15).

108.    Ms. Crabtree was retained in the *Connor B.* lawsuit to conduct a management review related to DCF. (*Id.* at 24:3-16). She reviewed a number of sources to determine whether DCF's performance was in line with standards in the field. Sources related to DCF performance included deposition testimony, internal DCF communications and DCF policies, DCF-generated data reports, and the federal Child and Family Services Review reporting data. In identifying the standard of care, she also relied on federal and state laws and regulations and national standards promulgated by the Child Welfare League of America and

the Council on Accreditation, as well as the generally accepted practice in the field and her own experience. (*Id.* at 25:11-28:25).

109. Ms. Crabtree testified that there are "four critical building blocks" that must be in place in a child welfare agency. First, the agency must have enough people to do the work, and those people must have the necessary skills and training. Second, the agency must have "the right mix of services and placements," particularly for those children removed from their family home. Third, the agency must have a quality assurance and contract monitoring system that allows it to identify areas where improvements or corrective actions are necessary. Finally, the agency must have "stable leadership in place." All four building blocks must be in place and "working in concert." (Rough Trial Tr., Feb. 28, 2013 (Crabtree), at 29:12-31:10).

110. Ms. Crabtree ultimately found that DCF has "several areas of difficulty across all of those blocks," and that those difficulties "get in the way of building and maintaining an effective child welfare agency that keeps children safe from harm, that provides permanency for them, [and] that sees that they get the services they need." (Trial Tr., Mar. 1, 2013 (Crabtree), at 92:4-93:8).

b)    *Arburta Jones*

111. Plaintiffs' expert, Arburta Jones, conducted a review of "DCF's practice as it relates to children who are in out of home care . . . and the extent to which that out of home care is safe." (Trial Tr., Feb. 6, 2013 (Jones), at 138:25-139:4).

112. Ms. Jones holds a master's degree in public administration and an undergraduate degree in social work. (*Id.* at 114:16-20). She has nearly thirty years of social work and child welfare experience. (*See id.* at 115:2-135:1). During that time, Ms. Jones served as a frontline caseworker with a caseload including children in foster care and was responsible for visiting children on a monthly basis, conducting investigations into allegations of child abuse and neglect, and assuring the safety of children in foster homes. (*Id.* at 117:10-118:10, 118:13-119:19). Ms. Jones also served for ten years as frontline supervisor within New Jersey's Division of Youth and Family Services ("DYFS"), with responsibility for up to nine social workers with caseloads including children in foster care. Her supervisory responsibilities included oversight of workers' visitation of children in foster care, documentation of visits, and investigations of allegations of abuse or neglect. (*Id.* at 120:23-124:19).

113. Ms. Jones has held a variety of management positions within New Jersey's child welfare system directly related to the safety of children in foster care. In her first position with the central office of DYFS, Ms. Jones was responsible for implementation of the federal Comprehensive Child Abuse Prevention and Treatment Act for the state of New Jersey and established that state's system for child fatality and near-fatality review. (Trial Tr., Feb. 6, 2013 (Jones), at 125:15-126:5). After serving as the deputy chief of staff of the New Jersey Department of Human Services, which houses DYFS, Ms. Jones took the position of assistant commissioner of program integrity and accountability. In that role, Ms. Jones oversaw all licensing for the department, including the licensing of foster homes; the office of auditing, which conducted "360" reviews of contracted agencies; and the program

compliance and public safety unit, which handled all fingerprinting operations for the department, investigations and assessments of child fatalities and near-fatalities, and critical incident monitoring. (*Id.* at 127:12-131:11). Ms. Jones next served as the chief of staff to New Jersey's Office of the Child Advocate. (*Id.* at 131:15-132:15). Returning to the Department of Human Services, Ms. Jones served as the director of central operations, a position that required oversight of the state central registry, child abuse hotline, and the state's institutional abuse investigations unit. (*Id.* at 133:4-14).

114.    As part of her assessment, Ms. Jones reviewed depositions of DCF staff and executives, internal DCF data, management reports and communications, information from the Massachusetts Office of the Child Advocate, Massachusetts and federal laws and regulations, the DCF case practice policies and procedures manual, and relevant child welfare standards. (Trial Tr., Feb. 6, 2013 (Jones), at 135:24-136:11, 136:25-137:11). Ms. Jones also reviewed publications by child welfare professional organizations include the Child Welfare League of America, Council on Accreditation, and National Association of Social Workers. Ms. Jones reviewed these publications because she testified that the standards set by these organizations are "important to lay a foundation . . . for what's expected nationally." (*Id.* at 137:12-19). Ms. Jones described these standards as "the base line" for child welfare practice. (*Id.* at 137:19-25). Ms. Jones gained familiarity with these regulations, as well as the CWLA and COA standards during her work at DYFS. (*Id.* at 141:2-10).

115.    Ms. Jones focused her review on particular areas of DCF practice, which she referred to as the "hinge pins that are critical to having a strong foundation for a child welfare system and a strong safety net for children." These areas are: visitation with children, licensing, investigations, and internal and external systems of accountability. (*Id.* at 141:11-142:1). These four areas are also identified by CWLA, COA, and the federal government as critical areas for child welfare agencies to place focus. (*Id.* at 142:2-10). Ms. Jones conducted her review by assessing the relevant state and federal regulations, as well as the applicable standards from organizations such as CWLA and COA, and then examining "the extent to which the practice was . . . meeting the standard." (*Id.* at 138:11-24).

## II.    Maltreatment in Care

### A.    Measurement and Standards

116.    Among the seven outcomes that constitute the federal CFSR process, the United States Department of Health and Human Services ("HHS") explicitly prioritized safety, formulating a principal safety outcome that tests whether "[c]hildren are, first and foremost, protected from abuse and neglect." 45 C.F.R. §1355.34(b)(1)(i)(A) (2012). Additionally, Dr. Freitag testified that maltreatment of children in foster care is "one of the most fundamental issues in foster care" because it can "set the child on a very, very adverse trajectory." (Trial Tr., Jan. 30, 2013 (Freitag), at 109:18-19, 110:5-17). Finally, former Commissioner McClain admitted that protecting children is one of DCF's primary responsibilities. (Trial Tr. May 3, 2013 (McClain), at 31:23-32:2).

117.    HHS additionally established six statewide data indicators that are applied to assess whether a state agency substantially conforms to national standards set in relation to the

safety and permanency outcomes.  In relation to the principal safety outcome testing whether "[c]hildren are, first and foremost, protected from abuse and neglect," HHS established a statewide data indicator for "[m]altreatment of children in foster care" that measures "[o]f all children in foster care in the State during the period under review, what percentage was the subject of substantiated or indicated maltreatment by a foster parent or facility staff?"  65 Fed. Reg. 4020-01, 4024 (Jan. 25, 2000).

118.    In assessing substantial conformity, HHS determined that "[t]he national standard for each statewide data indicator . . . will be based on the 75th percentile of all States' performance for that data indicator, as reported in AFCARS and NCANDS."  In setting the CFSR national standard at the 75th percentile of all states' performance for each data indicator, HHS stated: "We considered using the 90th percentile and the median to establish the national standard and rejected both because these standards, respectively, were deemed either too high or too low."  65 Fed. Reg. 4020-01, 4024 (Jan. 25, 2000).  HHS has further stated that, "[b]y setting the standard at the 75th percentile (as adjusted for sampling error and for normality of distribution), we believe that the goals represented by the standards are realistic and attainable and that, by establishing standards, ACF is promulgating the expectation that States make concerted efforts to achieve these goals."  (Trial Exhibit 47, U.S. Department of Health and Human Services, Administration for Children & Families, Corrected Federal Register Announcement, p. 6).   The federal government has the expectation that states will meet the standards set out in the CFSR.  (Trial Tr., Feb. 7, 2013 (Jones), at 65:17-21).

119.    Commissioner McClain acknowledged that at the time the federal government set the standards for the measure "Absence of Maltreatment Occurrence," by definition at least 25% of states had met or exceeded the standard.  (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 52:10-23).

120.    DCF applies the same definition of "abuse" to all allegations of maltreatment, whether the incident occurred in a parental home or a foster care placement setting.  Massachusetts regulation defines abuse to mean:

> [T]he non-accidental commission of any act by a caretaker upon a child under age 18 which causes, or creates a substantial risk of physical or emotional injury, or constitutes a sexual offense under the laws of the Commonwealth or any sexual contact between a caretaker and a child under the care of that individual.  *Abuse* is not dependent upon location (*i.e.*, abuse can occur while the child is in an out-of-home or in-home setting.)

(Trial Exhibit 69, 110 Mass. Code Regs. 2.00 (2013) (emphasis in original)).

121.    DCF applies the same definition of "neglect" to all allegations of maltreatment, whether the incident occurred in a parental home or a foster care placement setting.  Massachusetts regulation defines neglect to mean the:

> [F]ailure *by a caretaker*, either deliberately or through negligence
> or inability, to take those actions necessary to provide a child with
> minimally adequate food, clothing, shelter, medical care,
> supervision, emotional stability and growth, or other essential care;
> provided, however, that such inability is not due solely to
> inadequate economic resources or solely to the existence of a
> handicapping condition.  This definition is *not* dependent upon
> location (*i.e.*, neglect can occur while the child is in an out-of-
> home or in-home setting.)

(Trial Exhibit 69, 110 Mass. Code Regs. 2.00 (emphasis in original)).

## B.     DCF Performance

### 1.     Rate of Maltreatment

122.     HHS annually publishes a data report titled "Child Maltreatment."  This publication,
among other things, provides state-by-state data with respect to the annual rate of
substantiated maltreatment in foster care in the given federal fiscal year.  Massachusetts has
consistently reported an annual rate of substantiated maltreatment in foster care that falls
within the bottom quartile of performance among all states.  (*See* Trial Exhibit 1161, U.S.
Department of Health & Human Services, Administration for Children and Families,
Children's Bureau, Child Maltreatment 2011, p. 55; Trial Exhibit 1088, U.S. Department of
Health & Human Services Administration for Children and Families, Children's Bureau,
Child Maltreatment 2010, p. 57; Contested Exhibit PN, U.S. Department of Health & Human
Services, Administration for Children and Families, Children's Bureau, Child Maltreatment
2007, p. 54; *see also, e.g.*, Trial Exhibit 960, Massachusetts Child and Family Services Data
Profile, Feb. 24, 2012, at DCF011066193).

123.     In the HHS Child Maltreatment 2010 data, Massachusetts ranked 8th worst out of 47
reporting jurisdictions with respect to the annual rate of substantiated maltreatment in foster
care, reporting a rate of 0.78% which failed to conform to the CFSR national standard of
0.32%.  Twenty-two states (46.8% of reporting jurisdictions) met the CFSR national standard
in 2010.  (Trial Exhibit 1088, U.S. Department of Health & Human Services, Administration
for Children and Families, Children's Bureau, Child Maltreatment 2010, p. 57).

124.     This percentage represents a total number of 116 child victims of substantiated
institutional abuse or neglect occurring in DCF foster care settings in federal fiscal year
2010.  (Trial Exhibit 452, Defendants' Responses and Objections to Plaintiffs' 2nd Set of
Interrogatories, Apr. 24, 2011, p. 3).  This means that, on average, in federal fiscal year 2010,
DCF substantiated an incident of institutional abuse or neglect to a child in foster care once
every third day.

125.     Of the 116 child victims of substantiated institutional maltreatment in foster care in
federal fiscal year 2010, 39 (33.6%) were in an unrestricted DCF foster home at the time of
the incident, 24 (20.6%) were in a kinship or child specific DCF foster home, 20 (17.2%)
were in an IFC foster home, and 32 (27.5%) were in a congregate placement setting).  (*Id.*).

126.    In the HHS Child Maltreatment 2011 Report, Massachusetts ranked 7th worst out of 49 reporting jurisdictions with respect to the annual rate of substantiated maltreatment in foster care, reporting a rate of .70% which failed to conform to the CFSR national standard of .32%.  Twenty-four states (49% of reporting jurisdictions) met the CFSR national standard in federal fiscal year 2011.  (Trial Exhibit 1161, U.S. Department of Health & Human Services, Administration for Children and Families, Children's Bureau, Child Maltreatment 2011, p. 55; *see also* Trial Exhibit 960, Massachusetts Child and Family Services Data Profile, Feb. 24, 2012, at DCF011066193 (reflecting performance of 99.29)).  Even this improved rate of maltreatment at 99.3% places children at risk of harm.  (Trial Tr., Feb. 7, 2013 (Jones), at 110:22-111:8).

127.    For fiscal year 2011 in Massachusetts, each .1% improvement in performance on the federal measure of maltreatment in foster care would have represented 14 children (.1% of 14030). (Trial Exhibit 452, Defendants' Responses and Objections to Plaintiffs' Second Set of Interrogatories, Apr. 24, 2012, p. 2).  Had Massachusetts met the federal standard in 2011, 56 children (or more than one child per week) would have been spared abuse or neglect.

128.    Of the 99 child victims of substantiated institutional maltreatment in foster care in federal fiscal year 2011, 14 (14.4%) were in an unrestricted DCF foster home at the time of the incident, 19 (19.2%) were in a kinship or child specific DCF foster home, 30 (30.3%) were in an IFC foster home, and 33 (33.3%) were in a congregate placement setting.  (Trial Exhibit 452, Defendants' Responses and Objections to Plaintiffs' Second Set of Interrogatories, Apr. 24, 2012, pp. 2-3).

129.    DCF performance in this area has steadily declined since 2011.  DCF's internal data reports a decline back to 99.2% as of June 30, 2012, then most recently 99.1% (or a rate of maltreatment in foster care of .9%) as of September 30, 2012.  (Trial Exhibit 964, CFSR Measures – 12 Month Period Ending 06/30/2012, p. 1; Trial Exhibit 964, CFSR Measures – 12 Month Period Ending 09/30/2012, p. 1).  This represents a return to the level of maltreatment in foster care reported in 2009, when Massachusetts ranked 4th worst out of 47 reporting jurisdictions. (Trial Exhibit 1088, U.S. Department of Health & Human Services, Administration for Children and Families, Children's Bureau, Child Maltreatment 2010, p. 57). Former Commissioner McClain agreed that assuming 15 fewer victims of abuse or neglect in foster care in a given annual reporting period is required to move the rate of maltreatment in foster care in Massachusetts by a tenth of a point, to move a rate of 99.1 to 99.6, it would take 75 fewer substantiated reports of maltreatment in care.  (Trial Tr. May 3, 2013 (McClain), at 89:1-90:17).

130.    Commissioner McClain admitted that DCF's absence of maltreatment in foster care rate for the period from April 1, 2010 to March 3, 2011 was 99.1%, which was .58% below the national standard.  (Trial Tr. May 3, 2013 (McClain), at 91:17-92:6).  Commissioner McClain admitted that for the 12 month period ending September 30, 2012, DCF's absence of maltreatment in foster care score was still 99.1 even though the number of children flowing through the system had been dropping.  (Trial Tr. May 3, 2013 (McClain), at 99:3-21; Trial Exhibit 964-I, CFSR Measures – 12 Month period Ending 09/30/2012, p. 1).

131.    DCF periodically runs a data report known as "Maltreatment in Placement" or "Outcome 2.1 Report." This report provides the count of children with a supported allegation of abuse or neglect by a foster parent or residential facility staff member in a designated reporting period, along with information regarding the maltreatment type, the perpetrator, and the placement location. (*see* Trial Exhibits 948-953, 1102, Maltreatment in Placement Reports (also called "OCM Foster Care Maltreatment reports")). For example, the Outcome 2.1 Report for the 12-month period ending September 30, 2012 listed 140 child victims of institutional abuse or neglect in the reporting period. (Trial Exhibit 1102, Maltreatment in Placement Report for the year ending 9/30/12).

132.    The Children's Research Center found in conducting its review of DCF case records that twenty-four (9.9%) children in the entry cohort were alleged victims of abuse or neglect, either in a foster home or institutional setting during the period under review. Five of the reports were screened out, and nineteen were investigated, resulting in substantiated incidents for four (1.7%) of these children. (Trial Exhibit 1066, Table 18, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; *see also* Trial Tr., Jan. 30, 2013 (Freitag), at 109:6-113:25). This data was based on a sample size of 242 children for whom this measure was applicable, and the inter-rater reliability for this measure exceeded 80%. (Trial Exhibit 1066, Table 45, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; Trial Exhibit 1069, Table 3 to Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC) and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowsky, Oct. 19, 2012, Nov. 19, 2012; *see also supra* ¶ 80).

133.    The Children's Research Center found in conducting its review of DCF case records that an additional twenty (8.3%) children in the entry cohort were alleged victims of abuse or neglect perpetrated by someone in the parental home (for example, an incident of abuse/neglect occurred while the child was home on a trial basis). Six of the reports were screened out, and fourteen were investigated, resulting in substantiated incidents for eight (3.3%) of these children. (Trial Exhibit 1066, Table 18, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012). This data was based on a sample size of 242 children for whom this measure was applicable, and the inter-rater reliability for this measure exceeded 80%. (*Id.*; Trial Exhibit 1069, Table 3 to Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC) and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowsky, Oct. 19, 2012, Nov. 19, 2012; *see also supra* ¶ 80).

134.    The Children's Research Center found in conducting its review of DCF case records that forty (16.5%) children in the two-year cohort were alleged victims of abuse or neglect, either in a foster home or institutional setting during the period under review. Fifteen of the reports were screened out, and twenty-five were investigated, resulting in substantiated incidents for seven (2.9%) of these children. (Trial Exhibit 1066, Table 45, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; *see also* Trial Tr.,

Jan. 30, 2013 (Freitag), at 114:1-14).  This data was based on a sample size of 242 children for whom this measure was applicable, and the inter-rater reliability for this measure exceeded 80%.  (Trial Exhibit 1066, Table 45, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; Trial Exhibit 1069, Table 3 to Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC) and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowsky, Oct. 19, 2012, Nov. 19, 2012; *see also supra* ¶ 80).

135.    The Children's Research Center found in conducting its review of DCF case records that an additional sixteen (6.6%) children in the two-year cohort were alleged victims of abuse or neglect perpetrated by someone in the parental home (for example, an incident of abuse/neglect occurred while the child was home on a trial basis). Three of the reports were screened out, and thirteen were investigated, resulting in substantiated incidents for three (1.2%) of these children.  (Trial Exhibit 1066, Table 45, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012).  This data was based on a sample size of 242 children for whom this measure was applicable, and the inter-rater reliability for this measure exceeded 80%.  (*Id.*; Trial Exhibit 1069, Table 3 to Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC) and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowsky, Oct. 19, 2012, Nov. 19, 2012; *see also supra* ¶ 80).

136.    The Children's Research Center found in conducting its review of DCF case records that of 240 children in the two-year cohort, forty-three (17.9%) children experienced a substantiated incident of maltreatment in a placement setting prior to July 2009.  Of those forty-three children, twenty-seven had one previous substantiated incident, nine children had two previous substantiated incidents, and four children had three previous substantiated incidents.  Three more children had more than 3 substantiated incidents of maltreatment in a placement setting prior to July 2009.  (Trial Exhibit 1065, Table C59, Appendix C, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; *see also* Trial Tr., Jan. 30, 2013 (Freitag), at 119:9-121:1).  This data was based on a sample size of 240 children for whom this measure was applicable, and the inter-rater reliability for this measure exceeded 80%.  (Trial Exhibit 1065, Table C59, Appendix C, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; Trial Exhibit 1069, Table 3 to Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC) and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowsky, Oct. 19, 2012, Nov. 19, 2012; *see also supra* ¶ 80).

137.    For purposes of the First Round of CFSRs beginning in 2001, HHS determined that a 0.57% rate of substantiated maltreatment to children in foster care by a foster parent or facility staff perpetrator constituted the 75th percentile of all states' performance on this statewide data indicator.  This was adopted by HHS as the national standard.  (*See* Trial Exhibit 488, U.S. Dept. of Health and Human Services, Administration for Children and

Families, Background Paper: Child and Family Services Reviews National Standards, July 27, 2012, p. 3; *see also* Trial Exhibit 489, U.S. Dept. of Health and Human Services, Administration for Children & Families, Child and Family Services Reviews Schedule, 2001-2004, July 27, 2012 (establishing First Round CFSR schedule beginning in 2001)).

138.    In the First Round CFSR conducted in Massachusetts in 2001, DCF reported a rate of maltreatment to children in foster care of 0.94%, thereby failing to conform to the national standard of 0.57%. (Trial Exhibit 55, Massachusetts Child and Family Services Review Statewide Assessment, July 23-27, 2001, at CSF-000000425; Trial Exhibit 56, Massachusetts Child and Family Services Review Final Assessment, July 2001, at CSF-00000317-19).

139.    In 2004, DCF conducted a case record review focusing on the case files of 136 children who had been victims of substantiated maltreatment in state foster care. DCF concluded that "[n]early 40% of all maltreatment in foster care occurred in homes that are broadly defined as 'kinship homes' (Kinship foster homes 15% and Child Specific foster homes 24%)." (Trial Exhibit 446, CQI Child Maltreatment in Care Records Review, Sept. 22, 2004, at DCF003525836).  In a separate report, DCF further concluded that "60% of the child maltreatment in care occurred in DCF Unrestricted (35%) and Contracted (25%) Foster Homes."  (Trial Exhibit 447, CQI Child Maltreatment in Care Case Reviews, at DCF00355846).

140.    DCF prepared a "Maltreatment in Placement" data study in 2004 that indicated rates of substantiated maltreatment to children in DCF foster care custody of 1.15% in 1999, 1.22% in 2000, 1.39% in 2001, 1.46% in 2002, and 1.48% in 2003. (Trial Exhibit 498, Maltreatment in Placement, at DCF003622586).

141.    In the HHS Child Maltreatment 2006 data, Massachusetts ranked 4th worst out of 46 reporting jurisdictions with respect to the annual rate of substantiated maltreatment in foster care, reporting a rate of 0.95% which failed to conform to the CFSR national standard of 0.32%.  Nineteen states (41.3% of reporting jurisdictions) met the CFSR national standard in 2006.  (Trial Exhibit 1088, U.S. Department of Health and Human Services, Administration for Children and Families, Children's Bureau, Child Maltreatment 2010, p. 57).

142.    In the HHS Child Maltreatment 2007 data, Massachusetts ranked 7th worst out of 46 reporting jurisdictions with respect to the annual rate of substantiated maltreatment in foster care, reporting a rate of 0.86% which failed to conform to the CFSR national standard of 0.32%.  Twenty states (43.5% of reporting jurisdictions) met the CFSR national standard in 2007.  (Trial Exhibit 1088, U.S. Department of Health and Human Services, Administration for Children and Families, Children's Bureau, Child Maltreatment 2010, p. 57; *see also* Trial Exhibit 411, U.S. Department of Health and Human Services, Administration for Children and Families, Children's Bureau, Child Welfare Outcomes, Massachusetts Context and Outcomes Data for 2007-2010, p. 4).  Prior to HHS's public release of this data, DCF Commissioner Angelo McClain observed, "As per usual, Massachusetts does not look good in most of the measures in this report. We are listed with the highest rate of child maltreatment in the country. The numbers accurately reflect our NCANDS data, it's a matter of putting the data in the report into a positive light . . . ." (Trial Exhibit 332, Meeting

Invitation from Angelo McClain re: Today's Task list: Maltreatment Data Follow Up: Judge Garinger & Marilyn; develop press message, Mar. 30, 2009, at DCF005964865).

143.    For purposes of the Second Round of CFSRs conducted beginning in 2007, HHS determined that a 0.32% rate of substantiated maltreatment to children in foster care by a foster parent or facility staff perpetrator constituted the 75th percentile of all states' performance on this statewide data indicator.  This was adopted by HHS as the new national standard.  The downward adjustment to the national standard for maltreatment in foster care reflected improved performance across the states following the First Round of CFSRs.  (*See* Trial Exhibit 492, U.S. Dept. of Health and Human Services, Administration for Children and Families, Table A: Data Indicators for the Child and Family Services Review, July 27, 2012, p. 1; s*ee also* Trial Exhibit 493, U.S. Dept. of Health and Human Services, Administration for Children and Families, Child and Family Services Review Onsite Review Schedule Round 2, July 27, 2012 (establishing Second Round CFSR schedule beginning in 2007)).

144.    In the Second Round CFSR conducted in Massachusetts in 2007, DCF reported a rate of maltreatment to children in foster care of 1.28%, thereby failing to conform to the national standard of 0.32%. Massachusetts's performance actually declined from the First Round to the Second Round CFSR, and the Final Report noted that Massachusetts "continue[d] to experience challenges." (Trial Exhibit 57, Massachusetts Child and Family Services Review Statewide Assessment, May 2007, at CSF-000000697; Trial Exhibit 58, Massachusetts Child and Family Services Review, Final Report, Feb. 21, 2008, at CSF-000000751).

145.    As HHS prepared its methodology for the Second Round of CFSRs, certain states requested that HHS no longer use national standards for assessing the statewide data indicators, preferring that states be judged instead on the basis of individual continuous improvement. HHS declined this request stating: "By setting the standard at the 75th percentile . . . we believe that the goals represented by the standards are realistic and attainable and that, by establishing standards, ACF is promulgating the expectation that States make concerted efforts to achieve these goals." (Trial Exhibit 47, U.S. Dept. of Health and Human Services, Administration for Children and Families, Corrected Federal Register Announcement, p. 6).

146.    Commissioner McClain testified that he has always communicated to his staff that the national standards set forth in the CFSR are "realistic, they are attainable."  (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 91:15-92:8; *see* Trial Exhibit 352, CFSR Measures - 12 Month Period: 07/01/2010 to 6/30/2011).

147.    Because DCF's performance failed to meet federal requirements in the Second Round CFSR, it was required to submit for HHS approval, and then to implement, a Program Improvement Plan ("PIP") establishing performance improvement targets to be met on all non-conforming outcomes.  (*See* Trial Exhibit 33, Massachusetts Child and Family Services Review Program Improvement Plan, Oct. 5, 2009).  45 C.F.R. § 1355.35(a)(1) (2000).

148.    In relation to "Safety Outcome 1: Absence of Maltreatment of Children in Foster Care," DCF initially agreed to a negotiated improvement goal of 99.03% (conversely, 0.97% of

children experience a substantiated incident of maltreatment in care), compared to its Second Round CFSR score of 98.72% (conversely, 1.28%). (Trial Exhibit 33, Massachusetts Child and Family Services Review Program Improvement Plan, Oct. 5, 2009, p. 54 (Safety Outcome 1: Absence of Maltreatment of Children in Foster Care)).

149.    DCF subsequently reduced this negotiated improvement goal to 98.8% (conversely 1.2%). (Trial Exhibit 587, DCF PIP Quarterly Report, 1st Quarter, Oct. through Dec. 2009, at DCF000063281). A reported maltreatment rate of 1.2% would have ranked among the bottom three reporting states in Child Maltreatment 2010. (*See* Trial Exhibit 1088, U.S. Department of Health & Human Services, Administration for Children and Families, Children's Bureau, Child Maltreatment 2010, p. 57).

150.    Despite achieving the latter negotiated improvement goal in the period between its Second Round CFSR audit and approval of its PIP by HHS in October 2009, DCF still ranked among the bottom four state performers in fiscal year 2008 in relation to the rate of maltreatment in foster care, and among the bottom seven state performers in fiscal year 2009. (Trial Exhibit 1088, U.S. Department of Health & Human Services, Administration for Children and Families, Children's Bureau, Child Maltreatment 2010, p. 57).

151.    In the HHS Child Maltreatment 2008 data, Massachusetts ranked 4th worst out of 48 reporting jurisdictions with respect to the annual rate of substantiated maltreatment in foster care, reporting a rate of 1.07% which failed to conform to the CFSR national standard of 0.32%. Twenty-three states (47.9% of reporting jurisdictions) met the CFSR national standard in 2008. (Trial Exhibit 1088, U.S. Department of Health & Human Services, Administration for Children and Families, Children's Bureau, Child Maltreatment 2010, p. 57; *see also* Trial Exhibit 411, U.S. Department of Health and Human Services, Administration for Children and Families, Children's Bureau, Child Welfare Outcomes, Massachusetts Context and Outcomes Data for 2007-2010, p. 4).

152.    In the HHS Child Maltreatment 2009 data, Massachusetts ranked 7th worst out of 49 reporting jurisdictions with respect to the annual rate of substantiated maltreatment in foster care, reporting a rate of 0.84% which failed to conform to the CFSR national standard of 0.32%. Twenty-three states (46.9% of reporting jurisdictions) met the CFSR national standard in 2009. (Trial Exhibit 1088, U.S. Department of Health & Human Services, Administration for Children and Families, Children's Bureau, Child Maltreatment 2010, p. 57; *see also* Trial Exhibit 411, Massachusetts Outcomes Data, at Outcome 2.1 Maltreatment in Foster Care).

153.    At the time of publication of the HHS Child Maltreatment 2009, DCF Commissioner Angelo McClain observed to CQI Director Ruben Ferreira, "I noticed that 46-49% of states met the national standard in 2009; which puts a 'hole' in part of our talking points regarding the national standards." Knowing that nearly half the states had achieved the 0.32% national standard for maltreatment in foster care, DCF still chose to characterize the national standard as an "optimal performance level set by ACF" in subsequent CQI management reports. (Trial Exhibit 313, Email from Angelo McClain to Ruben Ferreira re: Child Maltreatment 2009, Dec. 17, 2010, at DCF005288697; Trial Exhibit 964, CFSR Measures – 12-Month Period: 04/01/2010-03/31/2011). Commissioner McClain testified that this email was his way of

saying, "Hey, look, guys, if 49 of the folks can meet the standard, we need to be pushing toward meeting the standard."  (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 97:22-99:12).  Commissioner McClain acknowledged that prior to writing this, "there was some discussion that for many of the standards or for some of the standards, no state met the standard."  (*Id.* at 97:22-98:10).  However, he explained, the fact that many states were meeting the standard "puts a hole in [that] thought."  (*Id.* at 98:11-15).

154.    Notwithstanding the fact that DCF continued to perform among the bottom quartile of states in terms of the reported incidence of substantiated maltreatment of children in foster care, the agency prepared a fiscal year 2010 through fiscal year 2014 Child and Family Services Plan for submission to HHS that made no reference to, much less placed strategic focus on, the agency's need to improve performance on this specific safety outcome, focusing instead on the "repeat maltreatment" measure.  (See Trial Exhibit 94, Child and Family Services Plan, FY2010-FY2014, at DCF007054449-50).

155.    Despite this level of performance, dating back to the 2001 CFSR, Mary Gambon, DCF's Assistant Commissioner for Adoption, Foster Care and Adolescent Services testified that she was unable to recall any meeting within DCF in the two prior years during which a strategy for reducing the incidence of maltreatment in care was discussed.  (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 60:9-15).  Similarly, Deputy Commissioner Jan Nisenbaum testified that she was unaware of any initiatives being taken by DCF to reduce the incidence of maltreatment of foster children while in DCF care.  (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 129:2-130:8). Deputy Commissioner Olga Roche testified with respect to maltreatment in foster care, "we're satisfied that it's not an area of concern to us," and that "it has not reached an area we can say we have a significant problem here and we need to do something." (Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 130:13-132:8).  Ms. Roche testified that she did not recall improving safety to have been raised as focal point at any DCF meeting over the prior two years. (*Id.* at 130:6-12). At the regional level, Paul Fitzsimons, DCF's Regional Director for the Western Region, testified that no specific plans came to mind with regard to reducing the rate at which children in DCF's custody are maltreated while in foster care. (Deposition of Paul Fitzsimons, DCF's Regional Director for the Western Region, Mar. 5, 2012, at 186:9-13).

## 2.    Comparison with Federal Standards

156.    During the cross examination of Ms. Jones, Defendants suggested that DCF's rate of substantiated maltreatment in foster care cannot be compared to other states for numerous reasons.  First, because DCF policy requires abuse and neglect investigations to be completed within 15 days (increased from 10 days in 2010), whereas numerous other states allow four weeks or more to complete such investigations, DCF contends that its rate of substantiated maltreatment in foster care tends to include more substantiated incidents in the annual numerator for this measure simply because DCF is required by policy to close more investigations within the last month or two of the annual reporting period. (Trial Tr. Feb. 7, 2013 (Jones), at 86:23-87:5; Trial Exhibit 57, Massachusetts Child and Family Services Review Statewide Assessment, May 2007, at CSF-000000634). Even deducting from the

numerator of DCF's formula for the rate of maltreatment in foster care *all* child victims whose investigations were completed *within the final month* of the federal fiscal year (September), Massachusetts would still rank 4th worst out of 48 reporting jurisdictions in 2008 (with a rate of 98.99%), 7th worst out of 49 reporting jurisdictions in 2009 (with a rate of 99.23%), and 9th worst out of 47 reporting jurisdictions in 2010 (with a rate of 99.31%). Even deducting from the numerator of DCF's formula *all* child victims whose investigations were completed *within the final two months* of the federal fiscal year (August and September), Massachusetts would still rank 4th worst out of 48 reporting jurisdictions in 2008 (with a rate of 99.08%), 7th worst out of 49 reporting jurisdictions in 2009 (with a rate of 99.26%), and 10th worst out of 47 reporting jurisdictions in 2010 (with a rate of 99.41%). (Trial Exhibit 1088, U.S. Department of Health & Human Services, Administration for Children and Families, Children's Bureau, Child Maltreatment 2010, p. 57; Trial Exhibit 452, Defendants' Responses and Objections to Plaintiffs' Second Set of Interrogatories, Apr. 24, 2011, p. 2). In any event, SIU investigations are routinely completed outside the fifteen-day timeframe. (*See infra* ¶¶ 298-315).

157.    Although each state has its own level of evidence for substantiating allegations of maltreatment, every state is still accountable for meeting the same federal safety standards. (Trial Tr., Feb. 7, 2013 (Jones), at 100:11-21).

158.    DCF has further suggested that its rate of substantiated maltreatment in foster care cannot be compared to other states because of the lower level of evidence Massachusetts requires for substantiating allegations of abuse or neglect (Massachusetts applies a "reasonable" standard). (Trial Tr. Feb. 7, 2013 (Jones), at 94:8-100:10; Trial Exhibit 1161, U.S. Department of Health & Human Services, Administration for Children and Families, Children's Bureau, Child Maltreatment 2011, p. 169; Trial Exhibit 1088, U.S. Department of Health & Human Services, Administration for Children and Families, Children's Bureau, Child Maltreatment 2010, p. 179).

159.    Based on data available in Child Maltreatment, among the five reporting states applying a "reasonable cause" standard of proof to allegations of child abuse or neglect (Hawaii, Louisiana, Massachusetts, Utah, and Vermont), Massachusetts ranked second worst in its rate of substantiated maltreatment in foster care in 2009 and the single worst in 2008. (Trial Exhibit 1088, U.S. Department of Health & Human Services, Administration for Children and Families, Children's Bureau, Child Maltreatment 2010, pp. 57, 163, 173, 179, 209, 221, 223 (Oregon also applies a reasonableness standard but does not report data on this measure.); Massachusetts ranked worst among those states in 2010, and second to last in 2011. (Trial Tr. Feb. 15, 2013 (Jones), at 72:10-73:16; Trial Exhibit 1161, U.S. Department of Health & Human Services, Administration for Children and Families, Children's Bureau, Child Maltreatment 2011, pp. 55, 151, 162, 169, 208, 223, 225).

160.    DCF publishes a Quarterly Report setting forth demographic, child maltreatment, placement, and permanency data as well as other statistical information regarding its child welfare programs. Included within the Quarterly Report's child maltreatment data section are statistics regarding the screening, investigation, and substantiation by DCF of allegations of child abuse and neglect. This statistical information regularly shows a marked difference in the substantiation rate for allegations of abuse and neglect relating to children in foster

care—represented in the "Special Investigations" row—and children victimized by their parents in the community. During fiscal years 2011 and 2012, the substantiation rate in relation to allegations of institutional maltreatment has consistently hovered around 20%, falling as low as 14% in the first quarter of fiscal year 2011. (Trial Exhibit 955, Department of Children and Families Quarterly Reports: Fiscal Year 2011 1st Quarter – Fiscal Year 2012 3rd Quarter, at Table 4: Child Abuse/Neglect Responses by DCF Region). Defendants' Responses and Objections to Plaintiffs' Second Set of Interrogatories report even lower numbers, indicating a substantiation rate of around 12% for reports of institutional abuse during fiscal years 2009 through 2011. (Trial Exhibit 452, Defendants' Responses and Objections to Plaintiffs' Second Set of Interrogatories, Apr. 24, 2012, pp. 3-4). By contrast, the substantiation rate in relation to allegations of abuse and neglect occurring in the community, as reflected in the Quarterly Report, has consistently exceeded 60%. (Trial Exhibit 955, Department of Children and Families Quarterly Reports: Fiscal Year 2011 1st Quarter – Fiscal Year 2012 3rd Quarter, p. 10, Table 4).

161. When asked to explain the lower rate of substantiations in the SIU, as opposed to the area office investigative units, Mr. Scholefield explained that for some investigations, in addition to the ability to decide whether or not to support the allegation, the SIU is able to "take some remedial actions which result in an unsupport." (Rule 30(b)(6) Deposition of Scott Scholefield, DCF Director of Case and Special Investigations, re: Abuse or Neglect in Foster Care, Nov. 16, 2011, at 177:16-178:6).

162. DCF officials are aware that the substantiation rate in the SIU for institutional abuse is much lower than the substantiation rate for the allegations of abuse or neglect occurring in the community. (*See* Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 73:3-75:16; Rule 30(b)(6) Deposition of Scott Scholefield, DCF Director of Case and Special Investigations, re: Abuse or Neglect in Foster Care, Nov. 16, 2011, at 175:10-177:10; *see also* Trial Exhibit 956, Department of Children and Families Quarterly Report: Fiscal Year 2011 1st Quarter, July 2011, p. 10, Table 4). Commissioner McClain testified that he had never undertaken an assessment of why the substantiation rate for the SIU was so much lower than the area office investigative units and had never asked one of his staff to undertake that assessment. (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 74:18-75:16, 77:6-11). He did not know whether Mr. Scholefield or Ms. Nisenbaum had ever conducted such analysis. (*Id.* at 77:6-16).

163. Defendants further suggested during the testimony of Ms. Jones that stricter mandated reporter laws could lead to a higher rate of maltreatment in foster care. (Trial Tr. Feb. 7, 2013 (Jones), at 89:14-16). The federal Child Maltreatment reports provide information on the number of referrals (defined as allegations of abuse or neglect) received by a particular state's child welfare system during the reported year, including institutional abuse. In both 2010 and 2011, Massachusetts ranked in the bottom half of all reporting jurisdictions. In 2010 Massachusetts had a referral rate of 50.3, with 21 states receiving fewer referrals, and 23 states receiving more referrals during the year. (Trial Exhibit 1088, U.S. Department of Health & Human Services, Administration for Children and Families, Children's Bureau, Child Maltreatment 2010, pp. viii, 11). In 2011, Massachusetts fell lower in the group of reporting jurisdictions with a referral rate of 52.2; 19 states received fewer referrals and 24 states received more referrals during the year. (Trial Exhibit 1161, U.S. Department of

Health & Human Services, Administration for Children and Families, Children's Bureau, Child Maltreatment 2011, p. 11).

164.    In addition to tracking the total number of referrals received, the Child Maltreatment reports also indicate the percentage of referrals that are screened in or out. In both 2010 and 2011, Massachusetts's screen-in rate was below the national average. In 2010, Massachusetts screened in 55.3% of referrals received, below the national average of 60.7%. (Trial Exhibit 1088, U.S. Department of Health & Human Services, Administration for Children and Families, Children's Bureau, Child Maltreatment 2010, pp. viii, 11). Similarly in 2011, Massachusetts screened in 51.6% of referrals received, below the national average of 60.8%. (Trial Exhibit 1161, U.S. Department of Health & Human Services, Administration for Children and Families, Children's Bureau, Child Maltreatment 2011, p. 11).

### 3.    Named Plaintiffs and Individual Children

165.    Dr. Azzi-Lessing testified that safety, as it's used in the context of federal policy, means "keeping children physically safe as well as emotionally protected." (Trial Tr., Feb. 4, 2013 (Azzi-Lessing), at 71:18-72:4). Dr. Azzi-Lessing additionally testified that:

> It means when a child is removed from the home that is based largely if not entirely on the child's safety in that home or lack thereof and that it be done in a way that the child experiences greater safety once removed from the home than less in the home.

(*Id.*). She further testified that safety "also means protection from not only physical abuse of any sort but also protection from emotional abuse, from trauma, from anything that would negatively impact a child's well-being, mental health as well as physical health." (*Id.* at 72:1-4).

166.    Dr. Azzi-Lessing testified that a common theme she found in the named plaintiff case records she reviewed was that DCF placed children in foster homes or group settings that were "inappropriate, dangerous and/or unable to meet the children's needs, and … that DCF's failure to consistently monitor its foster homes and group care settings often results in children being physically and emotionally harmed." (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 63:23-64:4).

167.    DCF failed to provide Named Plaintiff Connor with safety by placing him in a foster home with a 17-year old boy at risk for sexually abusing younger children, who ultimately raped Connor multiple times. (Trial Tr., Feb. 4, 2013 (Azzi-Lessing), at 80:12-14, 83:16-85:10; Trial Exhibit 1181, DCF Case File: Connor B., at DCF000005409, DCF010192054-55, DCF000004874, DCF000004503-04, DCF000004897-912, DCF003636493-94, DCF010196565, DCF003639264, DCF003639267, DCF010196558-61, DCF003639467; Contested Exhibit NX, DCF Case File: Connor B., at DCF000004885-88, DCF000004914, DCF000004896-931).

33

168.    DCF failed to protect Named Plaintiff Adam and his sisters and the foster children who lived in his adoptive home from being abused.  (Trial Tr., Feb. 4, 2013 (Azzi-Lessing), at 120:7-24, 115:12-120:3; 119:4-18; 117:1-2; Trial Exhibit 1182, DCF Case File: Adam S., at DCF000001160, DCF000000360, DCF003634948, DCF000001150-54, DCF003634873-77, DCF003634879, DCF003634871, DCF010214544, DCF000001619, DCF003635078-79, DCF000001182, DCF000001185, DCF000001167-68, DCF000001170-1, DCF000001173-77, DCF003634906, DCF010182847, DCF010182853, DCF010182857, DCF003634888; Contested Exhibit NV, DCF Case File: Adam S., at DCF003634858).  In addition, while at a residential treatment facility Adam sustained a broken collar bone in a fight that was orchestrated by facility staff, and the facility failed to provide Adam with timely medical treatment.  (Trial Tr., Feb. 4, 2013 (Azzi-Lessing), at 125:8-21; Trial Exhibit 1182, DCF Case File: Adam S., at DCF000000627, DCF000001575, DCF010182916; Contested Exhibit NV, DCF Case File: Adam S., at DCF010214619-20; *see also* Trial Exhibit 1083, Child Abuse/Neglect Investigation – Initial Assessment, at DCF003639434-35, DCF003639437, DCF003639439-40, DCF003639442, DCF003639444-45).  After Adam left the residential treatment facility, he disclosed that he had also been raped by a larger, stronger child at Lake Grove.  (Trial Tr., Feb. 4, 2013 (Azzi-Lessing), 125:25-126:6). The DCF investigator stated that he could not determine whether the rape had occurred, and recommended that Adam's foster parents "get him checked medically . . .  to make sure he didn't carry any sexually-transmitted diseases . . . ."  (*Id.* at 126:7-22; Trial Exhibit 1182, DCF Case File: Adam S., at DCF000001500-02, DCF000001518, DCF000001522, DCF000001525-26, DCF010184521-22; *see also id.* at, DCF003634656, DCF010182917).

169.    After removing Andre and his sister from their home due to neglect when Andre was about three and a half and his sister was about two and a half,  DCF failed to provide safety to Andre and his sister; evidence indicated that both children suffered sexual abuse, including forced sexual contact between them, while in their cousin's foster home.  (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 28:3-9, 35:15-19, 36:1-19, 38:14-39:9, 52:6-22; Trial Exhibit 1183, DCF Case File: Andre S., at DCF000001966, DCF010188049-50, DCF010188051, DCF010188056-57, DCF010188059, DCF010188055, DCF010186075; *see also* Trial Exhibit 1074, Child Abuse/Neglect Non-Emergency Investigation, at DCF010188185).

170.    Ms. James testified that she was placed in foster homes where she was pressured to forget her biological family.  (Trial Tr., Jan. 22, 2013 (James), at 39:17-41:21).  This caused severe stress for Ms. James because she still had a relationship with her biological mother.  (*Id.*).  Ms. James testified that the foster family "would make fun of my family, they would make fun of even the car [her mother] drove, they would just talk very badly about them and tell me constantly that they didn't care about me."  (*Id.* at 39:19-22).  The foster family was also not "very supportive of [Lauren's] grieving" when her biological mother committed suicide.  (*Id.* at 39:22-24, 41:18-21).  Further, while she was distressed about her mother's suicide, Ms. James testified that the foster family told Ms. James that her father "killed himself because he didn't want you."  (*Id.* at 43:18-44:14).

171.    Ms. James testified that DCF "has not truly helped to, to fix, to help mend" aspects of the cycle of abuse she inherited from her mother. (*Id.* at 86:12-19).

172.    Ms. James testified that she was not provided with adequate clothing during several of her placements. (*Id.* at 53:15-19; *see also id.* at 40:17-19).

173.    Ms. James testified that she was not given adequate or consistent food in several foster homes. (*Id.* at 35:15-19, 36:16-37:15, 52:24-53:10, 69:15-70:2). For example, in one foster home, Ms. James did not eat every day – indeed, the last weekend she was there she only had one meal. She was not given open access to food and as a result, she lost over twenty-five pounds in nine weeks while she was placed in this foster home. (*Id.* at 35:15-18, 36:16-37:15). In another home, only "school breakfast and school lunch were the meals that [she] could rely on. There wasn't necessarily consistent meal time." (*Id.* at 52:24-53:10). Another time, a foster care provider took her to a restaurant but only "ordered food for herself and ate it in front of [Ms. James]." (*Id.* at 69:15-70:2).

174.    In addition to the harms experienced by Ms. James and the named plaintiffs, one intensive foster care provider, Mass Mentor, had 16 substantiated incidents of abuse and neglect occurring to children in its homes over a one-year period. This series of incidents culminated in the death of a child in a Mass Mentor foster home in January 2012. (*See infra* ¶¶ 1752-79).

     **C.    Systemic Departures From Professional Judgment in Key DCF Practice Areas and Structures which Impact the Safety of Children in Foster Care**

          **1.    Visitation**

               a)    *Professional Standards*

175.    Federal law requires that caseworkers visit children in foster care on a monthly basis. 42 U.S.C. § 624(f)(1)(A). (Trial Tr., Feb. 28, 2013 (Crabtree), at 64:24-67:11). For federal fiscal years 2012 through 2014, each state must take steps to ensure that the "total number of visits made by caseworkers on a monthly basis to children in foster care under the responsibility of the State during a fiscal year is not less than 90 percent." 42 U.S.C. § 624 (f)(1)(A). (*See also* Trial Tr., Feb. 28, 2013 (Crabtree), at 64:24-67:11). By fiscal yeasr 2015, the total number of visits by caseworkers on a monthly basis must not be less than 95 percent. (Trial Exhibit 678, Administration on Children, Youth and Families Program Instruction, Jan. 6, 2012, Log. No. ACYF-CB-PI-12-01, p.2). Failure to meet this requirement will result in financial penalties. (*Id.*).

176.    The federal government has recognized the importance of regular caseworker visitation. The Children's Bureau of the U.S. Department of Health and Human Services, which administers the Child and Family Service Reviews ("CFSR"), "believes that one of the most important ways to promote positive outcomes for children and their families is to ensure the quality and frequency of Social Worker visits with the children and families in the agency's care." (Trial Exhibit 677, Integrated Casework Practice Model Practice Points: Social Workers visits with Children and Families, Dec. 2009, at DCF001953308; *see also* Trial Tr., Feb. 28, 2013 (Crabtree), at 68:21-69:20). "Findings from the federal CFSRs have shown an association between a positive rating on Social Worker visits and positive ratings on other areas under review," and have shown that "when state child welfare agencies do well on the

35

Social Worker visits, they are better positioned to assess children's risk of harm and need for alternative permanency options, to identify and provide needed services, and to engage children and parents in planning for their future." (Trial Exhibit 677, Integrated Casework Practice Model Practice Points: Social Workers visits with Children and Families, Dec. 2009, at DCF001953308).

177.    The first round federal CFSRs, conducted between 2001 and 2004, showed statistically significant associations between CFSR Item 19 (caseworker visits with children) and a number of other indicators, including risk of harm to children, protection of children from abuse and neglect, timely permanency goals, timely reunification, child's visits with parents and siblings, relative placements, and meeting educational and physical health needs. (Trial Exhibit 671, Findings From the Initial Child and Family Service Review, 2001-2004, at 39-40).

178.    Moreover, the Child and Family Services Improvement Act of 2006 (P.L. 109-288) amended Title IV-B of the Social Security Act to support at least monthly caseworker visits with children in foster care because regular caseworker visits were found to be associated with positive outcomes for children in foster care during the first round of the Child and Family Services Reviews. (Trial Exhibit 153, Administration on Children, Youth and Families Program Instruction, May 30, 2007, Log. No. ACYF-CB-PI-07-08, at 1 (citing P.L. 109-288); Trial Tr., Feb. 7, 2013 (Jones), at 12:7-13:1). These "outcomes" include the goal that children would be free from harm in foster care. (Trial Tr., Feb. 15, 2013 (Jones), at 29:11-19).

179.    The Council on Accreditation standards provide that "[t]he family foster care worker meets separately with the child and the parents at least once a month to: (a) assess safety and well-being; (b) monitor service delivery; and (c) support the achievement of permanency and other service plan goals." (Contested Exhibit QN, Council on Accreditation Eighth Edition Foster Care Services Standards, 2008, § 12.01; *see also* Trial Tr., Feb. 28, 2013 (Crabtree), at 62:23-63:12; Trial Tr., Feb. 7, 2013 (Jones), at 15:19-17:18).

180.    The Child Welfare League of America standards provide that:

> The social worker is a vital constant in the life of a child in foster care, representing stability, dependability, and trust. It is the social worker's responsibility to ensure the child's continuing safety and to ensure that developmental needs are being met in the family foster home and that the child is maintaining optimal connections with his or her parents. The family foster care social worker should visit the child at least monthly. Visits should be more frequent if required by the needs of the child or requested by the foster parents. Meetings may be less frequent (but never less than once every two months) in accord with the strengths of the foster parents and the progress of the child.

(Contested Exhibit QV, Child Welfare League of America Standards of Excellence for Family Foster Care Services, 1995, § 2.55; *see also* Trial Tr., Feb. 28, 2013 (Crabtree), at 63:13-64:5).

181.    Since at least 1986, DCF policy has required a minimum of monthly visitation with all children, except in exceptional circumstances.  (Trial Exhibit 1, Ongoing Casework and Documentation Policy, DSS Policy No. 86-011, DCF Case Practice Policy & Procedures Manual, rev. Feb. 10, 1998, at DCF POL (7/08) 139-40; Trial Exhibit 94, Child and Family Services Plan, FY 2010 – FY 2014, at DCF007054507; Trial Tr., Feb. 7, 2013 (Jones), at 14:2-23).  DCF policy further requires social workers to arrange and enter into the family's service plan a schedule of social worker-client contacts in accordance with the child's needs and permanency plan.  (Trial Exhibit 1, Ongoing Casework and Documentation Policy, DSS Policy No. 86-011, DCF Case Practice Policy & Procedures Manual, rev. Feb. 10, 1998, at DCF POL (7/08) 140).  In many cases, the actual schedule of contacts may be more frequent than once per month.  For example, the social worker and supervisor should consider more frequent contacts if the child has recently been placed or if the child has recently moved to a new placement.  (*Id.* at DCF POL (7/08) 139-140).

182.    DCF recognizes that "regular worker visits are . . . one of the foundations of good casework practice."  (Trial Exhibit 374, Annual Progress and Services Report, Federal FY 2012, June 30, 2011, at DCF007413766).  DCF officials agree that monthly visitation is essential to ensuring the safety of children in DCF care and is a fundamental part of their job.  (Deposition of Ruben Ferreira, DCF Assistant Commissioner for Continuous Quality Improvement, Feb. 2, 2012, at 121:8-21, 246:14-22, 247:2-5; Deposition of Raymond Pillidge, DCF Regional Director for the Northern Region, Mar. 7, 2012, at 130:11-22).

183.    Commissioner McClain admitted that an element of safety in foster care is having a workforce that is able to do timely and sustained timely visitation of children in foster care, and that visitation is known to be an important contributor to safety because that is where the foster worker can see a child, the provider and conditions in the home. (Trial Tr. May 3, 2013 (McClain), at 107:10-20). He testified that research shows that there is a correlation between frequency of visits and good outcomes. (*Id.* at 107:20-21; *see also* Trial Exhibit 94, Child and Family Services Plan, FY 2010-FY 2014, at DCF007054507).

184.    In a February 2011 email chain, Ms. Roche emphasized that "[s]eeing children, and assessing their safety and well-being, is one of our basic responsibilities, if not the most important one.  It is imperative that we adhere to our policies regarding visits to families/children."  (Trial Exhibit 676, Email from Olga Roche and Virginia Peel re: Visits to children - need for improvement, Feb. 13, 2011, at DCF005882924).  She added that children must be seen by the social worker at least once a month, and that the social worker must document interactions with the child and the conditions of the child's care.  (*Id.*).

185.    DCF has long acknowledged the relationship between frequent, high quality social worker visits with children and positive outcomes for children and their families.  DCF's own policy recognizes that, during the time that a child is in placement, client contacts with the social worker are vital to the process of identifying and implementing a permanent plan for the child.  (Trial Exhibit 1, Ongoing Casework and Documentation Policy, DSS Policy

37

No. 86-011, DCF Case Practice Policy & Procedures Manual, rev. Feb. 10, 1998, at DCF POL (7/08) 139-40; *see also* Trial Tr., Feb. 28, 2013 (Crabtree), at 67:12-68:20).

186.    DCF practice guidance indicates that quality visits should include such key elements as offering meaningful consultation and providing time to meet alone with children so that children have "the opportunity to privately share their experiences and concerns and to ensure that domestic violence or other issues that might not be disclosed when other family members are present are identified and addressed, as needed." (Trial Exhibit 677, Integrated Casework Practice Model Practice Points: Social Workers visits with Children and Families, Dec. 2009, at DCF001953309; *see also* Trial Exhibit 785, Instructions: Monthly Foster Care Contact Record). This practice guidance further provides that regular visits allow social workers to monitor the child's safety and well-being, to assess ongoing service needs and ensure those services are being provided, and to assess permanency options for the child. (*Id.* at DCF001953308; *see also* Trial Exhibit 608, FY2010 - 2011 Results Plan Presentation for EOHHS DRAFT, Aug. 31, 2009, p. 12).

187.    The Child and Family Services Plan for fiscal years 2010 through 2014 states that "regular visits from social workers significantly improve positive safety and permanency outcomes for children and families." (Trial Exhibit 94, Child and Family Services Plan, FY 2010-FY 2014, at DCF007054449; *see also* Trial Exhibit 33, Massachusetts Child and Family Services Review Program Improvement Plan, Oct. 5, 2009, p. 20).

188.    The National Conference of State Legislatures has stated that:

> [c]aseworker visits provide an opportunity for child welfare staff to spend time with families and to observe them in their homes and in other settings. During these visits, caseworkers build relationships with families that enable them to help the families more effectively respond to crises, opportunities, and child and family needs. Caseworker visits also enable child welfare agencies to set boundaries; they are a statement that child safety is the priority and that caseworkers will monitor each child's circumstances and hold adults accountable for their well-being. Effective caseworker visits provide a community framework for children—that of protection and support—when families are struggling to care for them.

(Trial Exhibit 1091, National Conference of State Legislatures, Child Welfare Caseworker Visits with Children and Parents, Innovations in State Policy 1 (2006), at 1; *see also* Trial Tr., Feb. 28, 2013 (Crabtree), at 61:22-62:11).

189.    Plaintiffs' Expert Arburta Jones identified visitation as one of the four "hinge pins" critical to a strong safety net for children in foster care. (Trial Tr., Feb. 6, 2013 (Jones), at 141:11-142:1). Visits to children in foster care are "one of the . . . primary ways in which the state can assure the safety of children who are in care." (Trial Tr., Feb. 7, 2013 (Jones), at 11:17-21).

b)    *DCF Performance and Inaction*

190.    Plaintiffs' Expert Cathy Crabtree testified that DCF caseworker-child visitation practice does not meet the applicable standard of professional judgment, including the standard set by the federal government. (Trial Tr., Feb. 28, 2013 (Crabtree), at 57:14-74:24).

191.    Plaintiffs' Expert Arburta Jones testified that DCF caseworker-child visitation practice, a "hinge pin" critical to a strong safety net for children in foster care, does not meet federal standards and there is wide variance in performance across area offices. (Trial Tr., Feb. 7, 2013 (Jones), at 11:14-26:11).

192.    Federal data reveals that during each federal fiscal year from 2007 to 2010, less than half of children received all monthly visits required during the year, with the percentage ranging from 39% in federal fiscal year 2007 to 47% in federal fiscal year 2010. (Trial Exhibit 411, Excerpt from Massachusetts Context and Outcomes Data 2007-2010, at 1; *see also* Trial Exhibit 1086, Child Welfare Outcomes 2007-2010, Massachusetts Context and Outcomes Data, p. 167). This performance fell far short of the federal government's 90% benchmark for this measure. (Trial Exhibit 153, Administration on Children, Youth and Families Program Instruction, May 30, 2007, Log. No. ACYF-CB-PI-07-08, at 3).

193.    In federal fiscal year 2009 and federal fiscal year 2010, Massachusetts ranked in the bottom 25th percentile on the monthly caseworker visitation measure among reporting jurisdictions. (Trial Exhibit 1086, Children's Bureau, Child Welfare Outcomes, 2007-2010, pp. 19, 167). In federal fiscal year 2010, Massachusetts ranked 43rd out of 51 jurisdictions reporting on this measure with 47% of children receiving monthly visits. (Contested Exhibit SB, Summaries of state-by-state performance data and rankings from Child Welfare Outcomes 2007-2010, p. 1). In fiscal year 2011, Massachusetts remained ranked 43rd out of the 51 jurisdictions reporting on this measure. (Trial Exhibit 1085, Summaries of state-by-state performance data and rankings from Child Welfare Outcomes 2008 – 2011, p. 1).

194.    Federal data also measures the percentage of monthly visits that occur in the home of the child. In federal fiscal year 2011, Massachusetts ranked 41st among 51 reporting jurisdictions on this measure. (*Id*. at 2).

195.    CRC's case record review indicated that of the 199 children in the Entry Cohort who spent at least 31 days in care, there was no contact recorded between the case worker and the child for 16.1% of children and no contact with the care provider for more than half (52.3%) of children during the first 30 days of placement. (Trial Exhibit 1066, Table 12, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; Trial Tr., Jan. 30, 2013 (Freitag), at 84:20-85:10; 85:16-22; 86:3-87:5). The inter-rater reliability for this measure exceeded 80%. (*See supra* ¶ 80; Trial Exhibit 1069, Table 3 to Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC) and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowsky, Oct. 19, 2012, Nov. 19, 2012; Trial Tr., Jan. 30, 2013 (Freitag), at 84:20-85:10; 85:16-22; 86:3-87:5).

196.    CRC's case record review indicated that of the 227 children in the Entry Cohort who were in care for at least 31 days, or were in care for less than 31 days but met the required standard, 3.5% were contacted monthly in any location less than 25% of the time.  Fifteen children, or 6.6.%, were contacted monthly 25% to 49% of the time; 27.8% of the children were contacted monthly 50% to 74.9% of the time; 33.5% of the children were contacted monthly 75% to 99.9% of the time; and 28.6% of children received all required monthly contacts.  (Trial Exhibit 1066, Table 13a, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; Trial Tr., Jan. 30, 2013 (Freitag), at 70:20-72:19; 77:3-79:15; 82:8-83:7).  Of the 200 children in placement for a full calendar month, or who were in care for a partial month but had worker contact during that partial month, workers made all required contacts in the placement home for only 25% of the children. (*Id.*). The inter-rater reliability for this measure exceeded 80%.  (*see supra* ¶ 80; Trial Exhibit 1069, Table 3, Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC) and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowsky, Oct. 19, 2012, Nov. 19, 2012; Trial Tr., Jan. 30, 2013 (Freitag), at 84:20-85:22; 86:3-87:5).

197.    CRC's case record review indicated that, of the 242 children in the two-year cohort, 240 were in custody for one month or more during the observation period, or were in custody for less than one month but met the required standard.  On average, contact standards were met 71.2% of this time.  DCF workers made face-to-face contact in the placement home an average of 49.7% of months children were in custody over the observation period.  (Trial Exhibit 1066, Table 41, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; Trial Tr., Jan. 30, 2013 (Freitag), at 83:8-24).  The inter-rater reliability for this measure exceeded 80%.  (*see supra* ¶80; Trial Exhibit 1069, Table 3 to Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC) and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowsky, Oct. 19, 2012, Nov. 19, 2012).

198.    CRC's case record review revealed no reason provided for the lack of contact between worker and child for a given month 38% of the time for the entry cohort and 42.6% of the time for the two-year cohort.  (Trial Exhibit 1065, Table C53, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012).  The inter-rater reliability for this measure exceeded 80%.  (*see supra* ¶ 80; Trial Exhibit 1069, Table 3 to Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC) and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowsky, Oct. 19, 2012, Nov. 19, 2012).

199.    DCF publishes a monthly management report called the Home Visit Report, which tracks the frequency of caseworker visits with adults and children. The report also provides the number of children who have not been seen for either two or three consecutive months. The Home Visit Report consistently indicates that thousands of children have not been visited by a caseworker in the previous two months, and that hundreds have not been seen for three months. For example, in August 2012, the most recent month for which this report was

produced to Plaintiffs, 1416 children had not been seen for two months and 521 children had not been seen for three months. (Trial Exhibit 82, State Home Visit Report, Aug. 2012, Oct. 12, 2012, p. 1). Similarly, in May 2012, 1352 children had not been seen for two months and 493 children had not been seen for three months. (Trial Exhibit 82, State Home Visit Report, May 2012, July 13, 2012, p. 1). In March 2012, 1392 children had not been seen for two months, and 575 children had not been seen for three months. (Trial Exhibit 82, State Home Visit Report, Mar. 2012, May 11, 2012, p.1). One year earlier, in March 2011, 1,304 children had not been seen for two months, and 517 had not been seen for three months. (Trial Exhibit 82, State Home Visit Report, Mar. 2011, May 13, 2011). In the two years before that, these monthly reports consistently indicated that thousands of children were not visited by their caseworker for two or three consecutive months. (*See* Trial Exhibit 82, State Home Visit Reports, June 2008 – Feb. 2011).

200.    DCF consistently fails to meet its own performance targets regarding caseworker visitation. The outcome measure titled "Placed Children Visited" (formerly called "Children Visited in Placement") measures the percent of all consumer children in open cases during the reporting month who had a face-to-face social worker visit. (*See, e.g.*, Trial Exhibit 954, Monthly Operations Statistical Report, May 2012, p. 1; Trial Exhibit 954, Monthly Operations Statistical Report, Dec. 2011, p. 1). The state's current target for this measure is 90%. (Trial Exhibit 954, Monthly Operations Statistical Report, May 2012, p. 1). During the month of August 2012, the MOSt Report indicates that 87% of monthly visits took place. (Trial Exhibit 954, Monthly Operations Statistical Report, Dec. 2011, p. 1). DCF's performance regularly fails to meet the 90% target, varying between 85.3% and 87.9% over the period from March 2011 to August 2012. (Trial Exhibit 954, Monthly Operations Statistical Reports, Mar. 2011 – Aug. 2012).

201.    DCF's data on caseworker visitation also demonstrates inconsistent performance among area offices and regions throughout the state. In August 2012, the most recent month for which a MOSt Report was produced to Plaintiffs, the percent of "Placed Children Visited" ranged from 78.4% to 95.3% across DCF's 29 area offices. (Trial Exhibit 954, Monthly Operations Statistical Report, Aug. 2012, p. 1). Between March 2011 and May 2012, the range always spanned at least 13 percentage points, and has often spanned 20 points or more. (Trial Exhibit 954, Monthly Operations Statistical Report, Mar. 2011 – May 2012, p. 1). DCF has reported similarly uneven performance since December 2008, when this measure was first reported. (Trial Exhibit 954, Monthly Operations Statistical Reports, Dec. 2008 – Mar. 2011).

202.    According to the results of a 2009 Statewide Foster Parent Survey produced by the Massachusetts Society for the Prevention of Cruelty to Children (MSPCC), 31% of survey respondents indicated that social worker visits with children were more infrequent than the monthly basis required by DCF policy. (Contested Exhibit DJ, Massachusetts Society for the Prevention of Cruelty to Children, Statewide Foster Parent Survey, Feb. 2005, p. 22; *see also* Contested Exhibit DK, Massachusetts Foster Parent Survey, p. 31). Furthermore, 33% of foster parent respondents indicated that the social worker spent time alone with their foster children only some of the time, and 27% indicated that the social worker never spends time alone with their foster child. (Contested Exhibit DJ, Massachusetts Society for the Prevention

of Cruelty to Children, Statewide Foster Parent Survey, Feb. 2005, p. 23; *see also* Contested Exhibit DK, Massachusetts Foster Parent Survey, p. 32).

c) *Named Plaintiffs and Individual Children*

203.    Dr. Azzi-Lessing testified that, in reviewing the named plaintiff files, she found that visitation did not occur as frequently as it should have or as frequently as DCF policies and procedures dictate, which "contributed to the lack of safety of these children in these foster homes and residential programs." (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 65:19-66:5).

204.    Dr. Azzi-Lessing testified that the purpose of caseworker visits to children in foster care is to "ensure the child's safety and well-being" and "identify if there are problems in a facility or in a home[.]" (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 65:25-66:2). There were "a number of situations" that she identified in the named plaintiff case records that indicated that "many of these children" were not provided with consistent visits. (*Id.* at 66:2-5). Dr. Azzi-Lessing testified that these situations are "of concern" because the children were experiencing multiple placements and were sometimes in dangerous situations, and were "not getting the frequent visits that they are entitled to essentially." (*Id.* at 67:13-18).

205.    For two months when Connor was in the foster home where he was sexually abused, he was not visited by his DCF worker. (Trial Tr., Feb. 4, 2013 (Azzi-Lessing), at 100:15-102:10; Trial Exhibit 1181, DCF Case File: Connor B., at DCF010192055-56). When Connor was in a group home, there were two approximately four-month periods when his worker did not visit him and only saw him during supervised visits with his family. (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 66:6-9; Trial Exhibit 1181, DCF Case File: Connor B., at DCF010192113-40, DCF010192259-62; *see also id.* at DCF010196927-28).

206.    Andre and his sister were visited only once in the first three months that they were in their cousin's home. (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 43:8-44:7; Trial Exhibit 1183, DCF Case File, Andre S., at DCF010188041-44). There was a two-and-a-half-month period when Andre and his sister were not visited when they were visiting with a preadoptive family, and an approximately three-month period when they were not visited when they were in the Wanda L foster home, "a home that was noted to be inappropriate for them." (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 66:10-20; Trial Exhibit 1183, DCF Case File, Andre S., at DCF010188036-37). During the first five months that Andre was at St. Ann's, he saw his DCF worker only three times, one of which was a supervised visit with his sister. (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 66:21-23; Trial Exhibit 1183, DCF Case File, Andre S., at DCF010188050-56).

207.    Since Camila's reentry into DCF custody in June 2008, there has been a four month period, at least a three month period, and at least a six month period from 2008 to 2010 where the record indicates that Camila did not receive any visits in her placement from her case worker and only saw her case worker during office or school visits, when the worker was supervising family visits, when the worker was transporting her, or during case conferences. (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 67:4-10; Trial Exhibit 1184, DCF Case File: Camila R., at DCF010199822-972). This was at a time when Camila was

42

"experiencing numerous foster placements, moving from placement to placement."  (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), 67:10-12).

208.    DCF's ongoing casework and documentation policy, which requires at least monthly visits by a social worker to children in care, was violated with respect to Connor, Andre, and Camila.  (Trial Exhibit 1, Ongoing Casework and Documentation Policy, DSS Policy No. 86-011, DCF Case Practice Policy and Procedures Manual, rev. Feb. 10, 1998, at DCF POL (7/08) 139-140).

d)    *DCF Awareness of Poor Performance*

209.    Inadequate visitation practice to children in foster care exposes children to a risk of harm.  (Trial Tr., Feb. 7, 2013 (Jones), at 25:16-26:11).

210.    DCF's Central Office officials do not view DCF's current visitation performance as adequate.  (Deposition of Ruben Ferreira, Assistant Commissioner for Continuous Quality Improvement, Feb. 2, 2012, at 121:8-21).  Likewise, DCF's Regional Directors agree that visitation performance is substandard.  (Deposition of Terrence Flynn, Regional Director for the Southern Region, Jan. 26, 2012, at 64:16-21; Deposition of Raymond Pillidge, DCF Regional Director for the Northern Region, Mar. 7, 2012, at 48:12-49:23, 143:3-144:13; *see also* Trial Exhibit 368, Email from Raymond Pillidge to Laurie McNeil, John Doyle, Corinne Contarino, et al. re: Home Visits and Kinship Care, Apr. 6, 2011).

211.    In a 2011 email, DCF Deputy Commissioner of Field Operations Olga Roche acknowledged that "[i]n reviewing recent cases, I have noticed that family/child visits have been inconsistent and children may not have been seen for several months at a time."  (Trial Exhibit 676, Email exchange among Olga Roche, Virginia Peel, Angelo McClain, et al. re: Visits to children - need for improvement, Feb. 13, 2011, at DCF005882924).  Data on caseworker visits was also provided in an April 19, 2011 Director of Areas Meeting Agenda. Visitation statistics for January 2011 were broken down by area office, and demonstrated that many children in each office had not been seen for as long as two or three months.  Of these, the most glaring example was the Lowell Area Office, in which 276 children were not seen for two months, and 156 children were not seen for three months.  (Trial Exhibit 367, Director of Areas Meeting Agenda and Accompanying Materials, Apr. 19, 2011, at DCF003265091; Deposition of Raymond Pillidge, DCF Regional Director for the Northern Region, Mar. 7, 2012, at 136:5-20).  Visitation statistics also demonstrated the inconsistent performance throughout the state.  For example, performance in January 2011 ranged from 62.1% in Lowell to 92.2% in Malden.  (Trial Exhibit 367, Director of Areas Meeting Agenda and Accompanying Materials, Apr. 19, 2011, at DCF003265090-91).  The data demonstrates further variation at the supervisor level.  For example, while the overall percentage of children seen in the Cape Ann Area Office was 71.8% in January 2011, the percentage of children seen by individual supervisory units ranged from 54% to 86.2%.  (*Id.* at DCF003265090).

212.    In a January 2011 email chain, DCF Director of the Data Management/Quality Assurance Unit Rosalind Walter circulated data showing that during federal fiscal year 2010, 46.6% of children were visited each and every full month of placement.  (Trial Exhibit 679, Email

43

exchange among Ruben Ferreira, Rosalind Walter, Brian Cummings, et al. re: Federal visitation data, Jan. 21, 2011, at DCF005137217). "The good news," she stated, was that "we're getting better; the bad news, not very fast . . . ." (*Id.*). Ms. Walter went on to note that "as the % of children visited each and every full month of placement has (slowly) increased, the % who were visited at their placement has declined . . . Our rate of improvement has also steadily declined." (*Id.*). In February of that year, Ms. Walter emailed a draft of the Quarter 5 PIP Report to a number of DCF officials and pointed out the "comparatively poor performance in regard to caseworker/child visits (Item 19)." (Trial Exhibit 680, Email from Jan Nisenbaum to Angelo McClain, Patricia Mackin, Olga Roche, et al. re: PIP Quarterly Report Qtr 5 Oct Dec 2010 Draft 1 w data updates.doc, Feb. 22, 2011). She stated that "[w]e continue to do very poorly overall on caseworker visits to children in placement -- the range of performance for Oct10 was 70.6% for Cambridge to 31.4% for Cape Cod. The state average was 47% . . . ." (*Id.*). The same day, DCF Deputy Commissioner for Clinical Practice and Program Operations Jan Nisenbaum forwarded the email to DCF Commissioner Angelo McClain, among others, and drew attention to Ms. Walter's comment on the caseworker/child visits. Ms. Nisenbaum wrote that "[w]e need to think about some strategies that we can convey to Children's Bureau [sic] to show that we're addressing this particular issue." (*Id.*).

213.    In April 2011, Regional Director Raymond Pillidge acknowledged the Northern Region's "very uneven performance" on monthly home visits to children. (Trial Exhibit 368, Email from Raymond Pillidge to Laurie McNeil, John Doyle, and Corinne Contarino, et al. re: Home Visits and Kinship Care, Apr. 6, 2011). More specifically, he noted that according to a recent Home Visit Report, "[s]upervisory units still range considerably on this outcome from 37% to 97%" and that "'[c]hildren not seen for three months or more' ranges from zero to 37 per unit." (*Id.*).

214.    Olga Roche, Deputy Commissioner for Field Operations,  testified that she has discussions with regional directors about any area offices that are "out of the . . . range," since low visitation "runs the risk of some kids falling through the cracks." (Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 138:7-139:16).

215.    Ms. Roche further testified that she finds performance relating to visitation to be unacceptable if the proportion of required visits that are completed falls below 85 percent, and views the regional directors as responsible for investigating the reasons for falling short and "deal[ing] with the problem." (Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 143:19-146:22; *see also id.* at 200:13-201:4). Despite this, Ms. Roche did not recall any action taken in late 2011, at the time the MOSt report indicated that the Western Region's visitation rate was under 85%. (*Id.* at 157:19-22). She also could not explain the variation in performance within the Western region with respect to visitation, where one area office completed 89% of required visits and another only 75%. (*Id.* at 200:5-12, 201:5-9).

216.    Assistant Commissioner Ruben Ferreira testified that he is not aware of specific action steps DCF has implemented to address the issue of children not being visited for multiple

consecutive months.  (Deposition of Ruben Ferreira, DCF Assistant Commissioner for Continuous Quality Improvement, Feb. 2, 2012, at 245:12-16).

217.    When reviewing home visit reports, Area Directors focus their attention on children who have not been visited in care by their caseworker for three months rather than two. (Deposition of Raymond Burke, DCF Director of Areas for Pioneer Valley, Jan. 19, 2012, at 269:9-270:9).

218.    DCF Director of Areas Joseph Collins, testified that he does not focus on or push to improve the "children visited in placement" rate in Greenfield and Holyoke, although the year-to-date averages are 45.1% and 54.1 % respectively, compared to DCF's 90% target rate.  (Deposition of Joseph Collins, DCF Director of Areas for Franklin and Hampshire, Jan. 25, 2012, at 169:8-9, 172:4-16).

219.    In addition, an August 2011 Review of the Lowell Office revealed that social workers in the reviewed cases lacked a "sense of purpose" in their visits with the children.  "Workers did not appear to have a relationship with the children or parents.  There was no sense of working together with the family toward a well defined goal."  (Trial Exhibit 1005, Document re: Central Office review of Lowell area offices, at DCF011131312).

220.    Visits and other contacts among case participants are to be recorded by DCF social workers in "dictation" in FamilyNet, a window that permits social workers to enter the names of the persons involved in the visit or contact, the type of visit, the reason a visit failed to take place, the purpose of the visit, and a narrative description of the visit or contact. (Deposition of Rosalind Walter, DCF Director of Data Management, Jan. 4, 2012, at 43:14-45:23).  DCF's Home Visit Report uses the data recorded in dictation to determine the completion of visits between social workers and children, and between social workers and parents.  Social worker visits with parents must be in the home, but visits with children are included no matter what the location.  (*Id.* at 45:24-46:21; Rule 30(b)(6) Deposition of Ruben Ferreira, DCF Assistant Commissioner for Continuous Quality Improvement, re: Data Collection and Retention, Aug. 23, 2011, at 123:7-124:6).  The dictation is the only source of information on visitation that is available to DCF management, and is used to determine the "Engaging Children" and "Children Visited in Placement" data included in DCF's MOSt reports.  (Deposition of Rosalind Walter, DCF Director of Data Management, Jan. 4, 2012, at 46:22-47:6, 160:11-161:4; *see also, e.g.*, Trial Exhibit 954, Monthly Operations Statistical Report, Mar. 2011, p. 12).

221.    Further, Deputy Commissioner of Field Operations, Olga Roche, testified that, in connection with a PIP performance measure regarding the integrity of FamilyNet data, she recalled one discussion concerning the fact that workers were recording contacts with children that took place in court or otherwise outside of the home as "home visits," even though reporting on home visits is supposed to only capture visits made in the child's home. (Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 214:2-216:13).

222.    FamilyNet has the capacity to provide workers with prompts or "ticklers" to perform tasks that are due, but no prompt or "tickler" has been implemented with respect to monthly

caseworker-child. (Deposition of Rosalind Walter, DCF Director of Data Management, Jan. 4, 2012, at 81:12-83:1).

223.    In the June 30, 2010 Annual Progress and Services Report, DCF asserted that "[i]t remains unclear whether our current performance is attributable to a lack of actual visits, data definition/entry issues, or some combination of both. This is compounded by the lack of an institutionalized quality assurance process that could potentially identify systemic and practice issues." (Trial Exhibit 575, Department of Children and Families, Annual Progress and Services Report, June 30, 2010, at DCF007412364; *see also* Rule 30(b)(6) Deposition of Ruben Ferreira, DCF Assistant Commissioner for Continuous Quality Improvement, re: Data Collection and Retention, Aug. 23, 2011, at 163:4-164:1, 172:15-24; Rule 30(b)(6) Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, re: Visitation and Permanency Planning, Sept. 28, 2011, at 164:20-165:10). Further, "[d]ue to budget reductions and a resulting reduction in quality assurance staffing, the Department has not had the staff to conduct in-depth case record reviews to determine how significantly data entry of home visits is impacting the Department's performance." (Trial Exhibit 374, Department of Children and Families, Annual Progress and Services Report, Federal FY2012, June 30, 2011, at DCF007413766); *see also* Rule 30(b)(6) Deposition of Ruben Ferreira, DCF Assistant Commissioner for Continuous Quality Improvement, re: Data Collection and Retention, Aug. 23, 2011, at 158:22-159:24, 169:10-22; Trial Exhibit 153, Administration on Children, Youth and Families Program Instruction, May 30, 2007, Log No. ACYF-CB-PI-07-08).

224.    DCF policy allows social workers 30 days to input information regarding visits into the FamilyNet system, and reports are then run 60 days in arrears, allowing ample time for data to be captured. (Trial Tr., Feb. 7, 2013 (Jones), at 24:19-25; *see also* Trial Exhibit 1, Ongoing Casework and Documentation Policy, DSS Policy No. 86-011, DCF Case Practice Policy & Procedures Manual, rev. Feb. 10, 1998, at DCF POL (7/08) 142).

225.    Plaintiffs' Expert Arburta Jones testified that slow documentation of visits into the FamilyNet system is not an adequate explanation for the visitation rates that are being reported. (Trial Tr., Feb. 7, 2013 (Jones), at 22:13-24:18). The lack of documentation poses risks to children when information key to appropriate decision making for the child is not available to workers and supervisors. (Trial Tr., Feb. 15, 2013 (Jones), at 73:21-74:25).

226.    In addition, when data is entered beyond 30 days of an actual event, there is a decreased likelihood that it will get entered in a reliable fashion. (Rule 30(b)(6) Deposition of Ruben Ferreira, DCF Assistant Commissioner for Continuous Quality Improvement, re: Data Collection and Retention, Aug. 23, 2011, at 165:9-23). For the cases where a child visit is not documented in FamilyNet or documented beyond the 30 day requirement, the "qualitative information for the period of time that it was measured may have been lost" or not "ideally captured." (Rule 30(b)(6) Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, re: Visitation and Permanency Planning, Sept. 28, 2011, at 162:11-24). Untimely documentation of child visits also presents a barrier to improving the rate at which children are visited in placement. (*Id.* at 152:20-153:15).

227.    According to DCF's 2012-2015 Strategic Plan, "[a]dditional effort is needed to further strengthen the availability of reports that provide 'real time' information to local managers to support their efficient and effective monitoring of Area Office operations including . . . home visits."  (Trial Exhibit 7, 2012-2015 DCF Strategic Plan, Aug. 2012, at CSF-000006352).

228.    Similarly, DCF indicated in its 2009 Strategic Plan for Action that "regular visits from social workers significantly improve positive safety and permanency outcomes for children and families." (Trial Exhibit 1127, Strengthening the Safety Net: DCF's Strategic Plan for Action, April 2009, at DCF7605093). The Plan identified a need to "incorporate guidance on practice expectations relative to social worker visits, including timeliness of visits and expectations regarding areas of attention and focus during visits" into the DCF Policy Manual.  (*Id.* at DCF7605094).

229.    In the October 5, 2009 Massachusetts Child and Family Services Review Program Improvement Plan ("PIP"), DCF identified priority activities to "affirm the importance of [social worker visits] as a core function of the agency."  (Trial Exhibit 33, Massachusetts Child and Family Services Review Program Improvement Plan, Oct. 5, 2009, at 20).  One identified priority was that the "DCF Practice Manual and departmental policies will incorporate enhanced guidance on practice expectations relative to social worker visits, including timeliness of visits and expectations regarding areas of attention and focus during visits." (*Id.*).  However, DCF has yet to adapt the policies that speak to specific expectations for what happens during home visits. (Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: Program Improvement Plan, Apr. 4, 2012, at 106:1-108:23; Trial Exhibit 33, DCF Massachusetts Child and Family Services Review, Program Improvement Plan, Oct. 5, 2009, at 20; *see also* Rule 30(b)(6) Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, re: Visitation and Permanency Planning, Sept. 28, 2011, at 139:4-140:1).  There is a tip sheet on engaging families during home visits, but it is unclear whether that tip sheet is a part of the practice manual.  (Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: Program Improvement Plan, Apr. 4, 2012, 2012, at 107:18-20, 108:15-23).

230.    Deputy Commissioner for Field Operations Olga Roche further testified that she does not review the Home Visit Report on a monthly basis, and was not sure if it included children in foster care or only children who have not been removed from their homes.  (Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 197:8-200:4).

231.    Moreover, regularly produced DCF management reports do not monitor qualitative aspects of worker-child visits. (*See* Trial Exhibit 954, Monthly Operations Statistical Reports, 2008- Aug. 2012; Trial Exhibit 82, State Home Visit Reports, June 2008 – Aug. 15 2012; and Trial Exhibit 220, Report Schedule).  For example, DCF does not track in the aggregate whether the worker communicated with the child in private.  (Deposition of Rosalind Walter, DCF Director of Data Management, Jan. 4, 2012, at 50:8-51:9, 89:10-91:1).  Rather, DCF relies on the supervisor-social worker relationship to ensure that qualitative elements of worker-child visits transpire.  (Rule 30(b)(6) Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, re: Visitation and Permanency Planning, Sept. 28, 2011, at

139:4-19; Deposition of Raymond Pillidge, DCF Regional Director for the Northern Region, Mar. 7, 2012, at139:17-140:11).

232.    Regularly produced DCF management reports also do not monitor visitation of intensive family foster homes by the social workers employed by private child placing agencies. (*See, e.g.*, Trial Exhibit 954, Monthly Operations Statistical Reports, June 2008 – Aug. 2012; Trial Exhibit 82, State Home Visit Reports, June 2008 – Aug. 15, 2012; Trial Exhibit 220, Report Schedule; Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr.13, 2012, at 122:6-123:18).

233.    Ruben Ferreira, DCF's Assistant Commissioner for Continuous Quality Improvement, testified that DCF's revised system for capturing visitation data is focused on visits conducted between DCF employed caseworkers and children, and that he does not know whether FamilyNet captures private caseworker visitation data.  (Rule 30(b)(6) Deposition of Ruben Ferreira, DCF's Assistant Commissioner for Continuous Quality Improvement, re: Data Collection and Retention, Aug. 23, 2011, at 66:12-67:6).

234.    Similarly, a DCF official indicated that he was not sure whether DCF issues a report on visitations with foster parents by family resources workers. (Deposition of Raymond Pillidge, DCF Regional Director for the Northern Region, Mar. 7, 2012, at 153:4-9).

235.    High caseloads impact social workers' ability to complete their work in a timely matter, including child visits.  (Trial Exhibit 1159, Monthly Caseworker Visit Data, at DCF011203530; Rule 30(b)(6) Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, re: Visitation and Permanency Planning, Sept. 28, 2011, at 149:11-22).

236.    A DCF official stated that DCF has set the "minimal expectations" for required social worker visits, such as a social worker visiting parents a minimum of once a month, the foster parent a minimum of once a month, and the child in placement a minimum of once per month, (Rule 30(b)(6) Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, re: Visitation and Permanency Planning, Sept. 28, 2011, at 80:8-24), and that the 90% target is viewed as aggressive. (Deposition of Joseph Collins, DCF Director of Areas for Franklin and Hampshire, Jan. 25, 2012, at 167:20-24).  Indeed, One DCF official indicated that he would not intervene with staff or seek corrective action until a unit's performance on home visits fell below 70%. (Trial Exhibit 368, Email from Raymond Pillidge to Laurie McNeil, John Doyle, and Corinne Contarino, et al. re: Home Visits and Kinship Care, Apr. 6, 2011; Trial Tr., Feb. 7, 2013 (Jones), at 21:18-22:12).Deputy Commissioner for Field Operations Olga Roche testified that DCF does not "encourage" interns to do home visits in the place of the assigned social worker, but could not say it has not happened.  Such a visit would be recorded in FamilyNet by the assigned social worker and would be indistinguishable in the Home Visit Report from a social worker visit.  The dictation would be expected to reflect that an intern undertook the visit.  (Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 207:21-210:15).

### 2.    Foster Home Licensing and Assessments

a)    *Professional Standards regarding licensing*

237.    The Council on Accreditation has established a number of "Fundamental Practice Standards" which it defines as "fundamental to quality practice" and which organizations are expected to "implement . . . immediately."  (Contested Exhibit QH, Council on Accreditation, What Are the Fundamental Practice Standards).  There are three types of Fundamental Practice Standards: "Essential Life and Safety Standards," "Health and Welfare Standards," and "Clients Rights Standards."  (*Id.*).  Included within the Essential Life and Safety Standards is the directive that "all foster homes are licensed, approved, or certified according to state or local regulation."  (Trial Exhibit 1077, Council on Accreditation, Foster Care Services § 6.01; Contested Exhibit QJ, Council on Accreditation, Service Narrative: Public Agency Foster Care Services (PA-FC), pp. 7-8; *see also* Trial Tr., Feb. 7, 2013 (Jones), at 27:17-28:7).

238.    In the preface to its published standards, the Child Welfare League of America provides that:

> Through the licensing of child-placing agencies, residential group care facilities, foster family homes, and child day care facilities, states exercise their police power to protect children from risks against which they would have little or no capacity for self-care and protection. . . .  Licensing requirements provide basic protections by the state for the well-being of children and their families.

(Trial Exhibit 114, Child Welfare League of America Recommended Caseload/Workload Standards, Nov. 2008, p. 3; *see also* Trial Tr., Feb. 7, 2013 (Jones), at 27:3-16).

239.    Plaintiffs' expert Arburta Jones identified licensing as one of the four "hinge pins" critical to a strong safety net for children in foster care, and testified that licensing is "the bedrock . . . of the agency's capacity to assure that out of home placements are safe for kids." (Trial Tr., Feb. 6, 2013 (Jones), at 141:11-142:1; Trial Tr., Feb. 7, 2013 (Jones), at 26:12-27:2).  Ms. Jones explained that "the dynamics in a foster home can change from day to day and the only . . . way that we have to know what is going on in a foster home is to go out there and see it," adding that licensing allows the agency to "respond to red flags as they are elevated."  (Trial Tr., Feb. 7, 2013 (Jones), at 34:8-21).

240.    Similarly, Commissioner McClain admitted that structures to be looked at in terms of protecting children in foster care include certain key safety net elements, such as licensing, which ensures that the providers with whom DCF children are placed are competent, safe, and able to provide adequate care in protection of children in their homes.  (Trial Tr. May 3, 2013 (McClain), at 106:20-107:6).  He further acknowledged that licensing is a fundamental piece of the safety net and is a requirement of state and federal law.  (*Id.* at 107:7-9). Specifically, former Commissioner McClain acknowledged that there are legal mandates regarding licensing timeframes, and that this is a fundamental practice area. (Trial Tr. May 6, 2013 (McClain), at 64:12-65:1).

b)    *Licensing of DCF Foster Homes*

241.    Massachusetts regulations require the Department to "annually reassess foster/pre-adoptive parents and foster/pre-adoptive homes whether unrestricted, kinship or other child-specific . . . . Every two years a license renewal will be conducted in place of the annual reassessment." (Trial Exhibit 69, 110 Mass. Code Regs. 7.113 (2013); *see also* Trial Tr., Feb. 7, 2013 (Jones), at 28:8-29:3).

242.    DCF Family Resource policy similarly requires that "[e]ach foster/pre-adoptive family is reassessed annually. The reassessment completed every second year is called the 'License Renewal Study,' is conducted by the assigned Family Resource Worker (FRW), and includes additional steps required for renewal of the license." (Trial Exhibit 1, Family Resource Policy, Policy No. 2006-01, Feb. 6, 2006, DCF Case Practice Policy & Procedures Manual, at DCF POL (7/08) 180; *see also* Trial Tr., Feb. 7, 2013 (Jones), at 27:22-30:5).

243.    Massachusetts regulation states that while the duration of a foster/pre-adoptive license shall be two years, "[i]n any case in which the Department is delayed in completing its re-assessment . . . the foster/pre-adoptive license shall continue in effect until such time as the Department completes its re-assessment process . . . ." (Trial Exhibit 69, 110 Mass. Code. Regs. 7.107(8) (2013)).

244.    DCF maintains a regular, periodic management report known as the Quarterly Foster Care Report that provides, among other data elements, aggregate data with respect to compliance by DCF with foster home licensing requirements.  Quarterly Foster Care Reports for fiscal year 2012 indicated that between 76.3% and 84.3% of annual license renewals or reassessments due on DCF foster homes statewide in each of the four quarters were timely completed.  (Trial Exhibit 956, Foster Care Quarterly Reports, Fiscal Year 2012, 1st Quarter through 4th Quarter, p. 1; *see also* Trial Exhibit 146, all DCF Unapproved Homes with Overdue Annual Events reports).

245.    Performance on this measure has hovered in this range for a number of years.  The Quarterly Foster Care Report for the fourth quarter of fiscal year 2011 indicated that only 74.0% of annual license renewals or reassessments due on DCF foster homes in fiscal year 2011 had been timely completed.  (Trial Exhibit 956, Foster Care Quarterly Report for Fiscal Year 2011, 4th Quarter, p. 1).  Similarly, only 86.3% of annual license renewals or reassessments due on DCF foster homes in fiscal year 2010 were timely completed. (Trial Exhibit 956, Foster Care Quarterly Report for Fiscal Year 2010, 4th Quarter, p. 1).

246.    The performance levels reflected in the DCF Quarterly Foster Care Report demonstrate that DCF is failing to meet standards of care with respect to licensing of DCF foster homes. (Trial Tr., Feb. 7, 2013 (Jones), at 36:22-37:2; *see generally id.* at 26:12-39:3).

247.    Poor performance in this area historically is reflected in other DCF management reports. Overdue Reassessments and Departmental Foster Care Compliance Reports for April and March 2009 showed statewide totals of 406 and 602, respectively, in relation to past-due foster home reassessments.  (Trial Exhibit 278, Departmental Foster Care Compliance Report, Apr. 2, 2009, p. 1).  In an August 3, 2010 email responding to a report listing homes with overdue annual events, Terry Flynn wrote that "[t]here appear to be a number of homes with overdue annual [background record] checks."  (Trial Exhibit 692, Email exchange

between William Brown, Corinna Chan, and Grace Scantlebury re: Active STARS Family Resources, Aug. 4, 2010).

248.    Mary Gambon acknowledged in an email sent at the end of fiscal year 2010 that "[i]n reviewing compliance issues in preparation for both the audit and licensing, timely completion of annual events is an outstanding issue for some offices."  (Trial Exhibit 1008, Email exchange between Anastasia King and Laurie Sullivan re: Overdue Annual Reassessments and License Renewal Events for Foster/Pre-Adoptive Homes, June 13, 2011, at DCF011250373).

249.    DCF data, submitted to Commissioner McClain by Mary Gambon on June 11, 2010, indicated that 983 Departmental foster homes were overdue for a licensing reassessment, representing 27% of all Departmental foster homes. (Trial Exhibit 425, Email and attachment from Mary Gambon to Angelo McClain, June 11, 2010, at DCF004976829; *See also*, Trial Tr. May 3, 2013 (McClain), at 62:7-17). Commissioner McClain acknowledged that percentage of homes that had overdue reassessments was unacceptable and potentially unsafe.  (*Id.* at 62:18-63:10).

250.    Children are exposed to a risk of harm when they are in homes that have not had timely regular licensing reassessment or renewal.  (Trial Tr., Feb. 7, 2013 (Jones), at 38:18-39:3).

251.    DCF central office and regional management acknowledges that timely licensing and reassessment of foster homes is important for children's safety.  Paul Fitzsimons, DCF's Regional Director for the Western Region, indicated that licensing unapproved homes within the prescribed time frame is important for children's safety, which is DCF's first responsibility to the children in its custody.  (Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, Mar. 5, 2012, at 113:7-18).  Ms. Gambon further testified that the steps DCF can take to assure the safety of children in family foster homes include conducting background record and criminal record checks for adults and children over 14 years old who live in the home or are frequent visitors to the home, and reassessing and relicensing the home.  (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 58:5-59:8; *see also id.* at 211:19-212:17; Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, Mar. 5, 2012, at 113:7-114:4; Deposition of Raymond Pillidge, DCF Regional Director for the Northern Region, Mar. 7, 2012, at 145:9-13, 151:16-152:19).

252.    Despite this awareness, Ms. Gambon could not identify any specific barriers to timely completion of annual assessments and was unaware of any specific action steps that were being taken to improve performance in this area other than providing management reports listing overdue assessments and continuing discussions with regional directors.  (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 143:13-144:10.)  Ms. Roche testified that DCF has no target for the number of foster homes with overdue annual reassessments.  (Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 166:18-167:5).

253.    Ms. Roche did not view overdue annual reassessments as a safety issue, even though the reassessments involve updated medical exams for foster caretakers, updated criminal records

checks, and fingerprinting for any new members of the household so that a national criminal records check can be performed.  (Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 166:18-169:8, 169:16-23.)

254.    DCF regional management has failed to take necessary steps to track and improve performance with this measure.  Paul Fitzsimons, DCF's Regional Director for the Western Region, indicated that his region set a goal of ensuring that 98 percent of licensing studies on unapproved homes were completed within prescribed timeframes, but that he did not know how the region was performing relative to that objective, because he had not analyzed his region's performance over the past year. (Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, Mar. 5, 2012, at 111:12-112:22).  The Quarterly Foster Care Report for the third quarter of fiscal year 2011 indicated that 71.3 percent of licensing studies on unapproved homes had been completed within the prescribed time frame in the Western Region, fiscal year to date.  (*Id.* at 114:5-115:21; Trial Exhibit 956, Quarterly Foster Care Report: Fiscal Year 2011, 3rd Quarter, p. 1).

255.    Mr. Fitzsimons stated that there was no specific action plan in force in the Western Region to improve timely completion of reassessments.  (Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, Mar. 5, 2012, 118:20-122:6; Trial Exhibit 956, Quarterly Foster Care Report: Fiscal Year 2011, 3rd Quarter, p. 1).  The Robert Van Wart Area Office in the Western Region had the highest number of overdue annual assessments and license renewals in the state.  (Trial Exhibit 357, Email from Judith Macmunn to Douglas Foresta and Dawn Sweetman re: Overdue Annual Re-Assessments and License Renewals, July 11, 2011, and attached Overdue Annual Events, pp. 4-5).

256.    Mr. Fitzsimons further indicated that he does not regularly review any report containing information that reflects overdue annual assessments and license renewals. (Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, Mar. 5, 2012, at 219:17-20).

257.    Plaintiffs' expert Arburta Jones testified that the minimal standard for timely licensing renewals against which states should be measured is a 90% performance level.  (Trial Tr., Feb. 7, 2013 (Jones), at 33:4-11).  DCF has not established a statewide goal for this measure.  (*See, e.g.,* Trial Exhibit 956, Foster Care Quarterly Report, Fiscal Year 2012, 4th Quarter)

c)    *Licensing of Kin and Child Specific Foster Homes*

258.    DCF fails to timely conduct the required 40-day home studies for kinship foster homes, placing children in those homes at risk of harm.  Plaintiffs incorporate herein *infra* § III.E.

d)    *Licensing of Child Placing Agencies and Intensive Foster Care Homes*

259.    Massachusetts regulation provides that a regular license for a child placing agency "shall remain in effect for two years from the date of issuance."  The license "shall remain in effect beyond its term until a license renewal study is completed" and a determination is made, if the licensee has filed timely request for renewal.  (Trial Exhibit 428, 102 Mass. Code Regs. 5.03(4) (2012)).

260.    DCF does not maintain aggregate data reflecting the frequency with which DCF refers children for foster care placement with a private agency whose license is in effect beyond its term, as provided for in Title 102, sections 3.03(2) and 5.03(4) of the Code of Massachusetts Regulations. (Trial Exhibit 452, Defendants' Responses and Objections to Plaintiffs' Second Set of Interrogatories, Apr. 24, 2012, p. 10; *see* 102 Mass. Code Regs. 3.03(2) (2013); Trial Exhibit 428, 102 Mass. Code Regs. 5.03(4) (2012)).

261.    DCF data, submitted to Commissioner McClain by Mary Gambon on June 11, 2010, indicated that IFC agencies under contract with DCF collectively had 1161 foster homes with overdue licensing reassessments, representing 56% of all approved IFC homes. (Trial Exhibit 425, Email and attachment from Mary Gambon to Angelo McClain, June 11, 2010, at DCF004976829; *see also*, Trial Tr. May 3, 2013 (McClain), at 62:7-17). Commissioner McClain acknowledged that percentage of homes that had overdue reassessments was unacceptable and potentially unsafe.  (*Id.* at 62:18-63:10). Joy Cochran testified that this was "a concern."  (Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 90:16-21).  She acknowledged that a child in DCF foster care custody may be placed in an IFC foster family home whose annual assessment is untimely, and that there are children in such homes.  (*Id.* at 84:11-16).

262.    Barriers to improving the timeliness of annual reassessment and biennial relicensing of intensive foster homes include inexperience of private providers with using "i-FamilyNet," DCF's web-based electronic data system, difficulties with the simultaneous requirements of DEEC and DCF reassessment and relicensing, and difficulties interfacing with DCF when considering and obtaining waivers.  (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 210:4-211:18).

263.    In a July 26, 2011 email, Joy Cochran notified Paul Fitzsimons and Raymond Burke that a child had been placed with an unlicensed IFC applicant for a period of four months, describing the situation as a "significant issue."  (Trial Exhibit 1009, Email exchange between Joy Cochran, Paul Fitzsimons, and Raymond Burke re: assistance, July 26, 2011, at DCF010990242).  Mary Gambon received notification of the same incident.  (Trial Exhibit 1010, Email exchange between Mary Gambon and Catherine Slater, Joy Cochran, Mary Blake, et al. re: assistance, July 26, 2011, at DCF011156698-99).

264.    DCF developed a "Regulatory Compliance Plan," dated May 29, 2012, which addresses ten identified issues related to the practices of Mass Mentor, one of DCF's largest intensive foster care providers. The plan identifies the corrective measure that must be taken regarding each issue, and either a 0-1 month, 0-3 month or 0-6 month time frame fame for completing each measure. (Trial Exhibit 1162, Email from Mary Gambon to Olga Roche, Joy Cochran, Mary Blake re: Mentor Follow Up, June 1, 2012, and attached DCF Compliance Plan, DCF011326192-93; Trial Tr. May 6, 2013 (McClain), at 44:18-46:16; Trial Tr., May 3, 2013 (McClain), at 41:14-17).

265.    One measure required that all active IFC foster homes have complete License Studies and Annual Re-assessment/License Renewals. (Trial Exhibit 1162, Email from Mary Gambon to Olga Roche, Joy Cochran, Mary Blake re: Mentor Follow Up, June 1, 2012, and attached

DCF Compliance Plan at p. 3, Item 7). Former Commissioner McClain acknowledged that there are legal mandates regarding licensing timeframes, and that this is a fundamental practice area. (Trial Tr. May 6, 2013 (McClain), at 64:12-65:1). While he did not know how often DCF's own family resource workers conduct timely licensing, he agreed that 82 or 83 percent compliance "would be and is unacceptable." (Id. at 66:2-67:3).

> e) *DCF has long been aware of deficiencies in its licensing practice and the associated risk of harm to children*

266.    In a fiscal year 2004 audit report dated April 14, 2005, the Massachusetts State Auditor concluded that the DCF "Process for Home Licensing Needs Improvement." (Contested Exhibit DT, Independent State Auditor's Report on Certain Activities of the Department of Social Services: July 1, 2003 to June 30, 2004, Apr. 14, 2005, at DCF000764522). Observing that "[t]he lack of proper licensing could result in children being placed in an unsafe environment, noncompliance with [DCF] policy, and ineligible claims for federal reimbursement," the State Auditor recommended that "[t]he [DCF] should identify foster homes that require immediate licensing approvals and develop a process to ensure the homes identified as unlicensed obtain a timely review. Additionally, a process for central monitoring and oversight should be implemented to address deficiencies that are not being identified at the regional offices. As part of the CQI process, [DCF] should review procedures and recognize the safety hazards that exist by placing children in unlicensed homes. Lastly, [DCF] should maximize federally reimbursable expenditures by ensuring the timely performance of licensing reviews that would have been otherwise non-reimbursable." (*Id.* at DCF000764534).

267.    In the fiscal year 2005 Statewide Single Audit, the auditor stated that follow-up review of the licensing issues raised in the fiscal year 2004 audit report "disclosed that late home licensing and annual reassessments continue to occur, although the number has been significantly reduced." (Contested Exhibit DW, Independent State Auditor's Report on Certain Activities of the Department of Social Services: July 1, 2004 to June 30, 2005, Mar. 30, 2006, at DCF004350679). The auditor recommended that "[t]he Central Office monitoring and oversight process should continue to review for and address deficiencies that are not being identified at the Regional or Area Offices, and continue to emphasize to personnel the importance of timely licensing. (*Id.* at DCF004350682; *see also* Contested Exhibit DV, Reports on Compliance and Internal Controls in Accordance with Government Auditing Standards and the Requirements of OMB Circular A-133 and the Schedule of Expenditures of Federal Awards For the Fiscal Year Ended June 30, 2005, at DCF010173439).

268.    In a fiscal year 2007 audit report dated April 8, 2008, the Massachusetts State Auditor noted improvement and concluded that "[DCF] implemented a process whereby compliance reports are distributed on a monthly basis to Regional and Area Office staff. Additionally, the Central Office Foster Care Support staff continued ongoing monitoring of the status of the homes that exceed the 40 days allowed by regulation, ensuring due diligence." (Contested Exhibit DX, Independent State Auditor's Report on Certain Activities of the Department of Social Services: July 1, 2006 to June 30, 2007, Apr. 8, 2008, at DCF006428502).

269.    However, in its Report of Findings from a Title IV-E Foster Care Eligibility Review in Massachusetts for the period October 1, 2008 through March 31, 2009, HHS determined that DCF failed to substantially comply with federal requirements during the period under review and was therefore required to submit a Program Improvement Plan.  (Trial Exhibit 326, Letter from Joseph J. Bock to Angelo McClain re: Review of Title IV-E Foster Care Program, Apr. 9, 2010 and attached State of Massachusetts Primary Review Title IV-E Foster Care Eligibility Report of Findings for October 1, 2008 through March 31, 2009, Feb. 8, 2012, at DCF001192717-18, DCF001192721-22).  The Report of Findings identified "Licensing Requirements for Children Placed in Foster Family Homes" and "Safety Requirements for Children Placed in Foster Care" among the "Areas in Need of Improvement."  (*Id.* at DCF001192724-25).  HHS found that "[i]n several of the error cases, the child had been living in the foster care setting for extended periods either prior to full licensure of the placement or prior to the safety requirements being met for the child's placement. These situations raise serious concerns about the administrative oversight provided for the safety of children placed in these settings."  (*Id.* at DCF001192725).

f)    *Criminal Offender Record Information*

270.    Under Massachusetts regulations and policy, Criminal Offender Record Information (CORI) and Departmental Background Records Checks (BRC) must be completed on household members age 14 years or older during the initial homestudy and during the annual renewal/reassessment of the foster home. (Trial Exhibit 1, Background Records Check Policy, DSS Policy No. 86-014, Dec. 1, 2008, DCF Case Practice Policy & Procedures Manual, at DCF POL (7/08) 245; Trial Exhibit 69, 110 Mass. Code Regs. 18.08(2)(b) (2013); see also Trial Tr., Feb. 7, 2013 (Jones), at 36:2-21).

271.    A 2005 State Auditors Report outlined DCF's mandate with respect to background checks.  DCF is:

> [R]equired to perform criminal background checks on all new hires and an annual re-evaluation of individuals and families seeking or providing services as foster family resources. Federal regulation, 45 CFR 1356.30(a) and (b), requires that the foster family home provider must have satisfactorily met a criminal records check with respect to prospective foster and adoptive parents. Under Massachusetts regulation, CMR 110-7.113, [DCF] is required to "reevaluate foster parents and foster homes annually and request criminal record and Central Registry (an in-house database that tracks child abuse and neglect cases) checks for adult household members.

(Contested Exhibit DT, Independent State Auditor's Report on Certain Activities of the Department of Social Services: July 1, 2003 to June 30, 2004, Apr. 14, 2005, at DCF000764530).

272.    Plaintiffs' expert Arburta Jones testified that background checks are a "critical . . . aspect of the licensing process."  (Rough Trial Tr., Feb. 7, 2013 (Jones), at 35:11-15).

273.    DCF's performance in the completion of background checks as part of the licensing process fails to meet standards of care.  (Trial Tr., Feb. 7, 2013 (Jones), at 38:10-17; *see generally id.* at 35:11-38:17).

274.    The 2005 State Auditors Report concluded that:

> [DCF] did not perform timely re-evaluations of CORI checks for persons providing foster care services under the Title IV-E Foster Care Program . . .  Untimely re-evaluations could result in children being placed in an unsafe environment, noncompliance with [DCF] policy, and potential ineligible claims for federal reimbursement. In addition, the placement of children in homes with foster parents who have sealed CORI records or microfiche records not received could place children at risk.

(Contested Exhibit DT, Independent State Auditor's Report on Certain Activities of the Department of Social Services: July 1, 2003 to June 30, 2004, Apr. 14, 2005, at DCF000764521-22).

275.    In the fiscal year 2005 Statewide Single Audit, the auditor stated "[t]he fiscal year 2004 single audit report disclosed that [DCF] was not performing CORI checks within the required annual timeframes. Our follow-up disclosed that although there was a significant improvement in the timeliness of provider CORI checks, the CORI checks continue to be performed late."  (Contested Exhibit DW, Independent State Auditor's Report on Certain Activities of the Department of Social Services: July 1, 2004 to June 30, 2005, Mar. 30, 2006, at DCF004350674).  The auditor recommended that:

> The Department should ensure timely completion of the annual CORI re-evaluations by Department personnel and contract care providers. Department management should reemphasize to personnel and contract care providers the importance of competing timely criminal background checks on foster care provider homes and continue to take steps to monitor and improve CORI compliance.

(*Id.* at DCF004350678).

276.    The BRC/CORI Unit assigned to processing background checks has consistently reported backlogs from the late 1990s up through the present. (*See, e.g.*, Trial Exhibit 282, Email exchange between Kim Sportman and Beryl Domingo re: Reassignments, Nov. 18, 2010; Trial Exhibit 523, Email exchange between Kimberly Norato and Kim Sportman re: BRC Unit Backlog, Mar. 24, 2008; Trial Exhibit 524, Email from Beryl Domingo to Kim Sportman re: CORI unit update, May 14, 2009; Trial Exhibit 525, Email exchange between Kim Sportman, Terry Flynn, Paul Fitzsimons, et al. re: BRC Coverage Northern Region, Merrimack Valley, Metro North and North Shore Areas, Nov. 24, 2010; Trial Exhibit 526, Email from Kim Sportman to DSS-DL – APMs, DSS-DL - Director of Areas, DSS-DL –

Family Resource Sups, et al. re: BRC Coverage Northern Region, Merrimack Valley, Metro North and North Shore Areas, Dec. 1, 2010, and attached BRC CORI Unit Assignments Resulting from Field Office Restructuring, Dec. 6, 2010; Trial Exhibit 697, Email from Marianne Smith to Luz Mendez and Sean Carleton re: M.L., Jan. 5, 2011, at DCF005418127; Trial Exhibit 270, Email exchange between Beryl Domingo and Kim Sportman re: BRC/CORI Unit Today Wednesday, February 2, 2011, Feb. 2, 2011; Trial Exhibit 273, Email exchange between Kim Sportman and Patricia Mackin re: BRC Unit As of Friday, July 1, 2011, June 29, 2011; Trial Exhibit 271, Email from Kim Sportman to Beryl Domingo re: Justification Statement in Support of BRC/CORI Unit Paid Student Internship Fy-2012, Apr. 6, 2011, and attached Memorandum from Kim Sportman to Anne Kelly re: Request for Contracted BRC/CORI Unit Paid Student Intern, Apr. 5, 2011; Trial Exhibit 275, Email from Kim Sportman to Patricia Mackin re: BRC Unit Backlog Monday, 7/18/2011 AM, July 18, 2011; Trial Exhibit 276, Email exchange between Beryl Domingo and Kim Sportman re: BRC Unit  Backlog Monday, 7/18/2011 AM, July 18, 2011).

277.    Beryl Domingo, DCF's Director of Field Support Programs and supervisor of the Director of the BRC/CORI Unit, does not receive any DCF management reports setting forth past-due background checks.  (Deposition of Beryl Domingo, DCF Director of Field Support Programs, Jan. 25, 2012, at 95:16-97:22).

278.    In August 2009, Mary Gambon advised Deputy Commissioner Olga Roche regarding the significant backlog of CORI waiver requests submitted by IFC providers to DCF for approval.  Ms. Gambon reported that "[t]here are 314 waivers that we consider in the 'overdue' status (over 8 weeks). Of that 314, there are 61 that are in the applicant status. All 314 need updated CORIs."  (Trial Exhibit 510, Email from Mary Gambon to Olga Roche re: IFC Info, Aug. 10, 2009).

> (1)    *Despite an awareness of the safety concerns posed by delayed background checks, DCF management has failed to maintain an adequate and stable work force tasked with assuring timely processing of CORI checks.*

279.    DCF management is aware that the shortage of staffing in the BRC/CORI unit raises safety concerns.  In an October 20, 2011 email responding to notification of staffing shortages in the BRC/CORI unit, Area Clinical Manager Pamela Gray informed Kim Sportman, Director of the BRC/CORI unit, that "[o]n several occasions, in Intake, particularly, we have received results that indicated there was no CORI.  Upon our suggestion that we believed there was more to the history, we found very serious charges on someone's record."  Mr. Sportman forwarded these concerns to Beryl Domingo, DCF's Director of Field Support Programs, explaining, "[u]nfortunately, I suspect that the concern raised by Pamela Gray will be an increasing issue given staffing and volume difficulties. BRC Unit staff are rushing to process requests and it only takes one minor search entry transposition or error to result in missing a record."  Ms. Domingo responded that she would "continue to update Olga regarding the stress and pressure on your staff."  (Trial Exhibit 1011, Email exchange between Beryl Domingo and Kim Sportman re: BRC Unit Thursday, 10/20/2011, Oct. 20, 2011).

280.  Staffing shortages in the BRC/CORI unit can also lead to unnecessary placement moves for children.  In a January 25, 2012 email from a caseworker to Kim Sportman, the worker expressed that she was "worried that we cannot keep children with families due to [CORI] issues."  Mr. Sportman responded that "unfortunately, there are instances where that happens."  (Contested Exhibit OO, Email exchange between Kim Sportman and Luz Mendez, Jan. 25, 2012).

281.  Beryl Domingo, DCF's Director of Field Support Programs, testified that to her knowledge, no workload analysis had been done on Kim Sportman's BRC/CORI Unit to determine how many full-time staff members the unit needs to fulfill its function consistent with DCF policy.  (Deposition of Beryl Domingo, DCF Director of Field Support Programs, Jan. 25, 2012, at 151:7-12).  However, Ms. Domingo assumed that seven staff could perform the required duties without a major backlog "most of the time."  (*Id.* at 151:16-22).  When asked why Mr. Sportman's unit has not been staffed up to this level, Ms. Domingo said that no reason had specifically been given to her other than a budget shortage.  (*Id.* at 152:6-13).

282.  In a November 17, 2010 email from Kim Sportman to Beryl Domingo, Mr. Sportman proposed the reassignment of areas and regions as a result of the loss of a BRC/CORI Unit staff member.  He wrote that with the changes he suggests, "DCF staff individuals . . . will be assigned to cover between 600-800+ direct service staff, which I can state without hesitation, cannot be done in any manner close to timely."  (Trial Exhibit 282, Email exchange between Kim Sportman and Beryl Domingo re: Reassignments, Nov.18, 2010, at DCF005671244-45; *see also* Trial Exhibit 526, Email exchange among Kim Sportman, DSS-DL – APMs, and DSS-DL - Director of Areas, et al. re: BRC Coverage Northern Region, Merrimack Valley, Metro North and North Shore Areas, Dec. 1, 2010).  Ms. Domingo responded that she approved of the reassignment.  Ms. Domingo also informed Mr. Sportman that his request for an additional intern had been denied.  (Trial Exhibit 282, Email exchange between Kim Sportman and Beryl Domingo re: Reassignments, Nov. 18, 2010, DCF005671244).  Ms. Domingo testified that Deputy Commissioner Roche informed her that this request for an intern was denied because interns were not permitted to be brought on to replace laid-off staff.  (Deposition of Beryl Domingo, DCF Director of Field Support Programs, Jan. 25, 2012, at 187:12-188:9).  Mr. Sportman responded the next day, informing Ms. Domingo that under the new reassignments, "[a] backlog of two to three weeks (or worse) will be standard."  (Trial Exhibit 282, Email exchange between Kim Sportman and Beryl Domingo re: Reassignments, Nov. 18, 2010, at DCF005671242).  Ms. Domingo accepted these estimates as accurate, but did not recall whether she passed this information up the chain of command.  (Deposition of Beryl Domingo, DCF Director of Field Support Programs, Jan. 25, 2012, at 188:19-191:12).

283.  In December 2010, due to chronic staff shortages, the BRC/CORI Unit prepared and distributed a "BRC/CORI Unit Work Processing Priority Protocol" setting forth a ranking of BRC requests in terms of priorities in the event of a backlog.  (Trial Exhibit 281, Email exchange between Elizabeth D'Sarno, Gloria Kelliher, Miriam Porter, et al. re: BRC Unit As of Friday, July 1, 2011, June 28, 2011, with attached BRC / CORI Unit Work Processing Priority Protocol).  Thus, rather than engage sufficient staff to handle work flow, the department prepared a triage plan for addressing BRC/CORI requests when backlog conditions arise.

284.    In a February 2, 2011 email to Beryl Domingo, Director Sportman advised that there was a backlog of over 300 requests, and writes, "these ---n things never stop." (Trial Exhibit 270, Email exchange between Beryl Domingo and Kim Sportman re: BRC/CORI Unit Today Wednesday February 2, 2011, Feb. 2, 2011). Upon viewing this email in her deposition, Ms. Domingo acknowledged that in early 2011, Mr. Sportman's Unit was "not able to keep up with their workload." (Deposition of Beryl Domingo, DCF Director of Field Support Programs, Jan. 25, 2012, at 118:24-122:8). Ms. Domingo acknowledged that a backlog of 300 requests created a safety risk for children being served by DCF. (*Id.* at 123:24-124:5). In the same email chain, Mr. Sportman wrote that "[b]urn out, personal and within the unit is fast approaching," and that there is "NEVER any letup in volume and the apparent duplication of requests is non-ending." (Trial Exhibit 270, Email exchange between Beryl Domingo and Kim Sportman re: BRC/CORI Unit Today Wednesday February 2, 2011, Feb. 2, 2011). Although she described a backlog of 300 requests as "[e]xtraordinary," Ms. Domingo testified that she did not recall whether she did anything in regard to this particular email to address the backlog in Mr. Sportman's unit. (Deposition of Beryl Domingo, DCF Director of Field Support Programs, Jan. 25, 2012, at 122:17-123:23). Ms. Domingo responded to Mr. Sportman that she would pass the email along to Olga Roche, and testified that she had an understanding that Ms. Roche would take it up with the appropriate leadership. (Trial Exhibit 270, Email exchange between Beryl Domingo and Kim Sportman re: BRC/CORI Unit Today Wednesday February 2, 2011, Feb. 2, 2011). Ms. Domingo did not relay to Ms. Roche her opinion that the backlog posed a risk of harm to children being served by DCF. However, she said there is "always an assumption that the CORI unit is not to conduct complete CORI's that there is a safety risk." (Deposition of Beryl Domingo, DCF Director of Field Support Programs, Jan. 25, 2012, at 129:16-131:2).

285.    In a June 28, 2011 email from Kim Sportman, manager of the BRC/CORI Unit, he wrote that as of July 1, 2011, the unit would be losing its three student interns. (Deposition of Beryl Domingo, DCF Director of Field Support Programs, Jan. 25, 2012, at 144:24-146:1; Trial Exhibit 281, Email exchange between Elizabeth D'Sarno, Gloria Kelliher, Miriam Porter, et al. re: BRC Unit As of Friday, July 1, 2011, June 28, 2011, with attached BRC / CORI Unit Work Processing Priority Protocol, at DCF005465917). Mr. Sportman writes that the loss of these interns will lead to "a sizable backlog of requests, which will likely be the situation going forward absent a reduction in the numbers of requests being submitted or additional staff being added to the Unit." (Trial Exhibit 281, Email exchange among Elizabeth D'Sarno, Gloria Kelliher, Miriam Porter, et al. re: BRC Unit As of Friday, July 1, 2011, June 28, 2011, with attached BRC / CORI Unit Work Processing Priority Protocol, at DCF005465917). The Priority Protocol that had originally been created to triage a large amount of backlogs in December 2010 was re-circulated. (*Id.* at DCF005465918-19).

286.    In addition to Beryl Domingo, DCF's Director of Field Support Programs, and Olga Roche, DCF's Deputy Commissioner for Field Operations, DCF's Chief of Staff Patricia Mackin has also been made aware of the backlog within the BRC/CORI Unit. (Deposition of Patricia Mackin, DCF Chief of Staff, Mar. 1, 2012, at 32:20-33:18). Kim Sportman forwarded his June 28, 2011 email regarding an anticipated backlog in the CORI/BRC Unit to Ms. Mackin. Mr. Sportman wrote that "things are going to go downhill real quick." (Trial Exhibit 273, Email exchange between Kim Sportman and Patricia Mackin re: BRC Unit As of Friday, July 1, 2011, June 29, 2011). Discussing what action was taken in June and July

2011 to address the concerns raised by Mr. Sportman, Ms. Domingo admitted that "[n]o urgent action was taken." (Deposition of Beryl Domingo, DCF Director of Field Support Programs, Jan. 25, 2012, at 155:16-23).  A few weeks later, on July 18, 2011, Mr. Sportman informed Ms. Domingo, Ms. Roche, and others of a backlog in his unit of 426 requests. (Trial Exhibit 275, Email exchange between Kim Sportman and Patricia Mackin re: BRC Unit Backlog Monday, 7/18/2011 AM, July 18, 2011).  Ms. Domingo admitted that things had, in fact, gone "downhill real quick."  (Deposition of Beryl Domingo, DCF Director of Field Support Programs, Jan. 25, 2012, at 159:6-160:9).  Although she agreed that a backlog of this volume required "urgent attention," Ms. Domingo did not recall taking any action to address this backlog other than to "check in with Kim."  (*Id.* at 160:10-23).  Later that night, Ms. Domingo responded to Mr. Sportman to instruct him not to copy Deputy Commissioner Roche on his email updates regarding backlogs in the CORI/BRC Unit, but rather to only send the updates to her.  (*Id.* at 162:11-23; Trial Exhibit 276, Email exchange between Beryl Domingo and Kim Sportman re: BRC Unit  Backlog Monday, 7/18/2011 AM, July 18, 2011).  Ms. Domingo could not recall why she would have given this instruction to Mr. Sportman, but suggested Ms. Mackin may have advised her to do so.  (Deposition of Beryl Domingo, DCF Director of Field Support Programs, Jan. 25, 2012, at 162:24-164:2).  Ms. Domingo did not hear from Ms. Mackin or DCF Commissioner Angelo McClain following Ms. Mackin's receipt of this email, and testified that she did not hear from Ms. Mackin or Commissioner McClain at all during the next couple of weeks with respect to the backlog issue.  (*Id.* at 161:4-20).

287.    Months later on October 20, 2011, Kim Sportman forwarded another email to DCF Chief of Staff Patricia Mackin informing her of staffing issues within the BRC impacting the level of available support of the DCF offices and units.  He added that "[t]he battle *never* ends." (Trial Exhibit 1013, Email exchange between Kim Sportman and Patricia Mackin re: BRC Unit Thursday, 10/20/2011, Oct. 20, 2011).

288.    In late January 2012, Director of Data Management Rosalind Walter commented to Ruben Ferreira, Assistant Commissioner for Continuous Quality Improvement, that "[t]he CORI unit is always overwhelmed!"  (Trial Exhibit 1015, Email exchange between Ros Walter and Ruben Ferreira re: Assistance BRC, Jan. 30, 2012).  As recently as May 2012, Kim Sportman informed a private adoption provider seeking information about registry check forms that had been submitted for a pre-adoptive home that "with the volume of requests and staffing issues we cannot log these requests in or out."  (Contested Exhibit ON, Email exchange between Kim Sportman and Veronica Listerud re: Central Child Abuse Registry, May 21, 2012).

289.    DCF is increasing its efforts to locate and place children with kin for foster care purposes. Beryl Domingo, DCF's Director of Field Support Programs, acknowledged that increased utilization of kin for foster care purposes would increase the volume of work for Kim Sportman's unit, because any potential kin placement would require a CORI and central registry check, while a licensed foster home would already have gone through that process as part of being licensed.  (Deposition of Beryl Domingo, DCF Director of Field Support Programs, Jan. 25, 2012, at 194:20-196:4).  However, no analysis has been conducted to measure the amount of additional work required of Mr. Sportman's unit as a result of DCF's increased focus on kin placements, and Ms. Domingo had not asked that such an analysis be

conducted.  (*Id.* at 196:15-24).  Although Ms. Domingo testified that her current job responsibilities include oversight of the field operations budget, she did not know whether any work had been done in relation to additional staff to be allocated to Mr. Sportman's unit in the next budget cycle for DCF, in order to support DCF's increased focus on kin placements.   (*Id.* at 197:12-17; 199:16-200:5).

290.    DCF also fails to maintain sufficient staff to handle background checks for IFC foster homes.  Joy Cochran, DCF's Director of Foster Care Support Services, testified that the Foster Care Background Check Coordinator position – a position intended to work specifically with IFC agencies to review prospective foster homes, criminal histories, and BRC CORI waiver requests – has been vacant since October 2008 due to a hiring freeze. Ms. Cochran also testified that she sought to have the freeze on this position lifted during the last two budget cycles, but she does not know if the position will be unfrozen. (Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 26:23-29:6). In addition, Ms. Cochran testified that in the absence of a BRC coordinator, the responsibilities are triaged among a number of individuals. Ms. Cochran is responsible for managing this process, and currently devotes "at least several hours" per week to the background check/waiver function. (*Id.* at 33:18-34:13; *see also* Trial Exhibit 1014, Email from Joy Cochran to Leo Farley re: IFCs in 2007, Apr. 23, 2012).

291.    As a result, DCF has reported substantial backlogs of requests for IFC foster homes. (Trial Exhibit 510, Email from Mary Gambon to Olga Roche re: IFC info., Aug. 10, 2009). In a July 2011 email, Director Sportman advised that all "[c]ontracted adoption and foster care requests" (which would include IFC homes), were to be placed on hold unless there is an "EMERGENCY need."  (Trial Exhibit 274, Email exchange between Kim Sportman, Joy Cochran, Mary Blake, et al. re: BRC Unit As of Friday, July 1, 2011, July 1, 2011).

292.    The Office of the Governor has not required submission of the Comprehensive Plan set forth in Massachusetts General Laws chapter 18C, providing in part for a review of the CORI process, including "areas for improved efficiency and equality," by June 30, 2010 and annually thereafter.  (Trial Exhibit 337, Mass. Gen. Laws ch. 18C, § 11(d)(15) (2012); *see infra* § VIII.F.1).

293.    Beryl Domingo, DCF's Director of Field Support Programs, testified that she did not know whether there was a written policy requiring BRC/CORI analysts to complete any mandatory CORI service training.  Ms. Domingo testified that she had not instructed Kim Sportman that his staff must complete CORI training, and did not know whether any of Mr. Sportman's current staff had completed the training. (Deposition of Beryl Domingo, DCF Director of Field Support Programs, Jan. 25, 2012, at 111:21-112:14).

294.    The DCF Central Registry contained in FamilyNet does not include information regarding families or individuals who have been subject to the initial assessment process. (Deposition of Beryl Domingo, DCF Director of Field Support Programs, Jan. 25, 2012, at 78:15-19).  The DCF Central Registry is a database maintained by DCF "pursuant to MGL c. 119, § 51 F, containing identifying information on those children reported to the Department pursuant to MGL c. 119, § 51 A. The registry also includes identifying information regarding the reported children's parents and other family members and the outcome of any

investigation which resulted from such a report, including the name of any individual(s) identified as responsible for the child abuse or neglect or any individual listed on the Registry of Alleged Perpetrators." (Trial Exhibit 1, Background Records Check Policy, DCF Case Practice Policy & Procedures Manual, Dec. 1, 2008, at DCF POL 07/08 241).

### 3.    Special Investigations Unit ("SIU")

#### a)    *Regulations and Professional Standards*

295.    Massachusetts regulations require investigations of screened in non-emergency reports of abuse or neglect (generally reports of abuse or neglect received by DCF are known as 51As) to be completed within fifteen days from the date the report is received. (Trial Exhibit 69, 110 Mass. Code Regs. 4.31(2) (2013); *see also* Trial Tr., Feb. 7, 2013 (Jones), at 40:3-7). Although DCF policy still contains an earlier requirement that investigations be completed within ten days, Director of the Special Investigations Unit, Scott Scholefield, testified that DCF policy is consistent with regulations in requiring investigations to be completed within fifteen days. (Rule 30(b)(6) Deposition of Scott Scholefield, DCF Director of Case and Special Investigations, re: Abuse or Neglect in Foster Care, Nov. 16, 2011, at 99:6-100:24; Trial Exhibit 1, Protective Intake Policy, DSS Policy No. 86-015, Feb. 10, 1998, DCF Case Practice Policy & Procedures Manual, at DCF POL (7/08) 34).

296.    The potential trauma experienced by children who are abused or neglected in foster care makes it "imperative" that investigations into such allegations are conducted in a thorough and timely manner. (Trial Tr., Feb. 7, 2013 (Jones), at 39:9-22).

297.    Plaintiffs' expert Arburta Jones identified timely investigations of abuse or neglect in foster care as one of the four "hinge pins" critical to a strong safety net for children in foster care, and testified that "[t]he responsibility of the state then to get in to do a thorough and complete investigation in a timely manner is imperative." (Trial Tr., Feb. 7, 2013 (Jones), at 39:4-22).

#### b)    *DCF Fails to Conduct Timely SIU Investigations*

298.    DCF is failing to meet standards of care with respect to the timeliness of SIU investigations, a failure which exposes children to a risk of harm, particularly when a child is remaining in a home that is potentially unsafe. (Trial Tr., Feb. 7, 2013 (Jones), at 41:20-42:11; *see generally id.* at 39:4-43:3).

299.    Deputy Commissioner Jan Nisenbaum testified that it "is absolutely important that [SIU investigations] are completed on a timely basis." (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 42:13-43:5). Mr. Scholefield agreed that investigation timeliness is important for safety. (Rule 30(b)(6) Deposition of Scott Scholefield, DCF Director of Case and Special Investigations,  re: Abuse or Neglect in Foster Care, Nov. 16, 2011, at 109:22-110:7).

300.    Despite this awareness and even with the timeframe extended from 10 days to 15 under current DCF policy, only 27 of the 136 (19.8%) SIU investigations resulting in a substantiated report of maltreatment in foster care reported in the DCF Outcome 2.1 Report

for the annual reporting period ending on March 31, 2012 were completed within a 15 day period. (Trial Exhibit 953, Maltreatment in Placement year ending 3-31-12). In fact, over 30% of these investigations took more than 30 days, double the lengthened time period. (*Id.*).

301.    Plaintiffs' expert Arburta Jones testified that "final sign-off" on SIU investigations, at which point the investigation is considered complete for purposes of the Maltreatment in Placement report, is the way to catch "critical things" that may have been missed in the investigation. (Trial Tr., Feb. 15, 2013 (Jones), at 60:23-61:19). She stated that "we don't know if it's really all done until that person has the opportunity to read and approve the investigation." (*Id.* at 61:17-19).

302.    Mr. Scholefield requests an ad hoc report to track the timeliness of SIU investigations "every couple months." (Rule 30(b)(6) Deposition of Scott Scholefield, DCF Director of Case and Special Investigations, re: Abuse or Neglect in Foster Care, Nov. 16, 2011, at 103:10-21). As of the date of his deposition, Mr. Scholefield said that the last time he saw this report, it reflected "that the majority [of investigations] are not completed on time." (*Id.* at 104:23-105:20). He agreed that the investigations were "late very frequently." (*Id.*).

303.    Commissioner McClain admitted that the SIU was "not addressing things as quickly as we wanted." (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 148:2-7). However, he testified that following the cuts to DCF's administrative budget in fiscal year 2011, he opted not to provide additional resources to the SIU. (*Id.* at 146:15-148:7).

304.    SIU investigators are supposed to meet the child who is the subject of the investigation within three days. Mr. Scholefield thought that performance on this requirement was "very good," but could only say that he believed it to be achieved more than 50% of the time. Mr. Scholefield does not track compliance with this requirement and has never requested an ad hoc report capturing this data. (Rule 30(b)(6) Deposition of Scott Scholefield, DCF Director of Case and Special Investigations, re: Abuse or Neglect in Foster Care, Nov. 16, 2011, at 117:21-119:10).

305.    Despite the fact that SIU investigators are often unable to meet the 15-day investigative timeframe, after-hours Emergency Response Workers are charged with conducting an investigation of abuse or neglect within less than 24 hours. (Trial Exhibit 811, Department of Children and Families After-Hours Emergency Response System Guidelines, at DCF0056885566, 573). Although they have the option of consulting with an SIU worker during the following business day, this is discouraged by published guidelines. (*Id.* at DCF0056885573).

306.    According to Mr. Scholefield, when an area office receives a report of abuse or neglect, they have 24 hours to screen that report in or out, at which point it is passed on to the SIU with a recommendation. In some circumstances, extended screening allows 72 hours for the screening decision to be made. (Rule 30(b)(6) Deposition of Scott Scholefield, DCF Director of Case and Special Investigations, re: Abuse or Neglect in Foster Care, Nov. 16, 2011, at 101:18-102:21). Although he does not track compliance with these requirements, Mr. Scholefield said he "frequently" saw screening decisions coming from the area offices

beyond the 24-hour timeframe.  (*Id.* at 123:12-24).   Mr. Scholefield has raised this issue to his supervisor Jan Nisenbaum in the context of discussions about caseload and workload.  However, he was not aware of any action taken by DCF to address the issue of late screenings.  (*Id.* at 124:13-125:10).  Mr. Scholefield has also spoken to some area office managers about the issue of late screenings.  He reported that some area managers told him that "things are very busy," and that they were "trying to get to it."  (*Id.* at 125:4-126:24).

c)    *DCF fails to maintain sufficient staff in the SIU.*

307.    Barriers preventing timely completion of SIU investigations include staffing and workload.  (Rule 30(b)(6) Deposition of Scott Scholefield, DCF Director of Case and Special Investigations, re: Abuse or Neglect in Foster Care, Nov. 16, 2011, at 112:1-11).  Mr. Scholefield said that the delay was in spite of SIU investigators often working 10-hour workdays and weekends.  (*Id.* at 129:21-130:1).  The staff in the SIU work beyond normal business hours "the majority of the time."  (*Id.* at 128:17-129:2).  The typical workday is over ten hours per day, and SIU workers "very frequently" work on the weekends to catch up.  (*Id.* at 128:17-129:12).

308.    Mr. Scholefield has asked for additional staff in the SIU based on the workload of his investigators.  (Rule 30(b)(6) Deposition of Scott Scholefield, DCF Director of Case and Special Investigations, re: Abuse or Neglect in Foster Care, Nov. 16, 2011, at 121:12-122:4).  Mr. Scholefield described the workload of a Special Investigations Unit investigator as "tremendous" and a job that "required a lot of their time."  (*Id.* at 23:23-24:10). It was his belief that upper management within DCF was aware of the extra hours put in by SIU investigators and the delays in completed investigations.  Mr. Scholefield said that despite this awareness within upper management, he did not know if help was on the way.  (*Id.* at 129:21-19).

309.    Indeed, Deputy Commissioner Jan Nisenbaum has at times been aware of the need for additional staff in the SIU due to the number of staff out on medical leave.  (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 14:18-15:5).  Ms. Nisenbaum is aware that there are times when SIU investigations do not get completed on time, in part due to staffing issues, even when the unit is fully staffed.  (*Id.* at 18:5-16).  Similarly, DCF Chief of Staff Patricia Mackin has also been made aware, within the last 12 months, of the inadequacy of staffing within the SIU.  (Deposition of Patricia Mackin, DCF Chief of Staff, Mar. 1, 2012, at 198:18-199:6).

310.    Despite this awareness, no assessment has been done, or requested, to determine how many SIU staff would be needed in order for the unit to meet the demands placed on it within the time period set forth in DCF policy.  (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 43:16-44:1; Rule 30(b)(6) Deposition of Scott Scholefield, DCF Director of Case and Special Investigations, re: Abuse or Neglect in Foster Care, Nov. 16, 2011, at 122:9-123:11).

311.    In addition to the inadequate staffing of SIU investigators, as of November 16, 2011, the position of Assistant Director of Case/Special Investigations, which served a supervisory role to SIU investigators, had been vacant for approximately a year.  The position was vacated as

a result of layoffs.  Mr. Scholefield testified that he had sought authority from Deputy Commissioner Nisenbaum to fill the position, but at the time, he did not have the authority to do so.  (Rule 30(b)(6) Deposition of Scott Scholefield, DCF Director of Case and Special Investigations, re: Abuse or Neglect in Foster Care, Nov. 16, 2011, at 13:17-16:11).

312.    Also due to lack of staff in the SIU, Mr. Scholefield has discontinued CQI practices within the SIU, previously conducted by his staff.  When asked whether there was any sort of corrective action feedback loop in place to allow him to provide information up to management or down to area offices when his investigative files revealed a poor match between a child and his placement, Mr. Scholefield testified, "[n]ot as it was before, no." (Rule 30(b)(6) Deposition of Scott Scholefield, DCF Director of Case and Special Investigations, re: Abuse or Neglect in Foster Care, Nov. 16, 2011, at 146:6-17).  He explained that his Case Investigations Unit ("CIU") used to produce a "quality assurance memo" highlighting concerns, making recommendations, and then requiring a response within 30 days as to the remedial action taken.  Mr. Scholefield was instructed by Deputy Commissioner Jan Nisenbuam to stop this process over a year ago, due to workload issues at the SIU level.  (*Id.* at 146:18-149:21).  Mr. Scholefield said he has done his best to reimplement "a piece of it," by directing his supervisors to send an email with the outcome of investigations and recommendations, "if they do exist."  (*Id.* at 149:22-150:17).  Mr. Scholefield has regularly asked his staff to aggregate these emails to identify common problems, but due to staffing concerns, they have not been able to do it.  (*Id.* at 152:16-154:1).

313.    Commissioner McClain directed that the Special Investigations Unit also discontinue including practice recommendations in its institutional abuse investigation reports.  Instead, practice issues are examined only in annual "critical incident trend reports" prepared by Ms. Nisenbaum and the Special Investigations Unit and reviewed by the Critical Incident Review Committee.  (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 182:24-187:10; Trial Exhibit 442, Email exchange between Patricia Mackin and Jan Nisenbaum re: Institutional Abuse Cases, Apr. 13, 2011).  There is no review mechanism for substantiated institutional abuse incidents that are not reported to the Critical Incident Review Committee, that is, those incidents in which no serious injury occurred.  (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012 at 187:23-188:17).

314.    The Office of the Child Advocate has expressed frustration over the late completion and submission of child fatality reports by the SIU.  (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 18:17-20:9).  In addition, according to Mr. Scholefield, not all critical incident reports are sent to the Office of the Child Advocate.  Mr. Scholefield said there are criteria that determine which reports are sent to the OCA, but that DCF had "not been very good at sending up the serious bodily injury."  (Rule 30(b)(6) Deposition of Scott Scholefield, DCF Director of Case and Special Investigations, re: Abuse or Neglect in Foster Care, Nov. 16, 2011, at 222:3-222:13).  However, the shortage of SIU staff has not been discussed in connection with the backlog in fatality reports.  (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 20:10-14).

315.    Also due to "workload issues," the SIU has transferred investigative responsibility for allegations of maltreatment occurring in unlicensed foster care placements, such as kin who have not yet been licensed, to the area offices.  (Rule 30(b)(6) Deposition of Scott Scholefield, DCF's Director of Case and Special Investigations, re: Abuse or Neglect in Foster Care, Nov. 16, 2011, at 88:5-90:22).  Mr. Scholefield explained his position that these investigations should be under the purview of SIU because, as he stated, "foster care is foster care."  (*Id.*).

> d)    *DCF fails to provide SIU screeners and investigators with consistent policy or training.*

316.    DCF policy in relation to "51A Investigations in Certain Institutional Settings" is set forth in Policy 85-005 of the DCF Case Practice Policy and Procedures Manual. (Trial Exhibit 1, 51A Investigations in Certain Institutional Settings, DSS Policy No. 85-005, Dec. 23, 2002, DCF Case Practice Policy & Procedures Manual, at DCF POL (7/08) 43-49).  That policy directs that investigations of maltreatment in care should be handled in accordance with DCF's Protective Intake Policy.  (*Id.* at DCF POL (7/08) 45; Trial Exhibit 1, Protective Intake Policy, DSS Policy No. 86-015, Feb. 10, 1998, DCF Case Practice Policy and Procedures Manual, at DCF POL (7/08) 27-41).  These policy statements are unclear and, in certain respects, internally conflicting.  On one page, the 51A Investigations in Certain Institutional Settings policy directs that when the Department screens in a 51A alleging maltreatment by a DCF foster or pre-adoptive parent, that report should be immediately referred to "another [DCF] Area Office for investigation."  (Trial Exhibit 1, 51A Investigations in Certain Institutional Settings, DSS Policy No. 85-005, Dec. 23, 2002, DCF Case Practice Policy & Procedures Manual, at DCF POL (7/08) 44).  However, the Addendum to the same policy indicates that these 51As are subject to investigation by the SIU.  (*Id.* at DCF POL (7/08) 48).  Director of Case and Special Investigations, Scott Scholefield, testified that this language creates confusion, and that he has requested it be changed.  (Rule 30(b)(6) Deposition of Scott Scholefield, DCF Director of Case and Special Investigations, re: Abuse or Neglect in Foster Care, Nov. 16, 2011, at 266:10-267:5).  To date, the conflicting nature of the policy has not been remedied.

317.    Although the DCF institutional abuse policy says that "[s]creened-in 51A reports shall be investigated by another [DCF] Area Office," these investigations in practice go to SIU.  (Trial Exhibit 1, 51A Investigations in Certain Institutional Settings, DSS Policy No. 85-005, Dec. 23, 2002, DCF Case Practice Policy & Procedures Manual, at DCF POL (7/08) 48; Rule 30(b)(6) Deposition of Scott Scholefield, DCF Director of Case and Special Investigations, re: Abuse or Neglect in Foster Care, Nov. 16, 2011, at 262:5-267:5).  Mr. Scholefield first said that this was not in fact DCF policy, but then said that he believed it was correct because it is "everyone's interpretation" that SIU is "theoretically . . . another area office."  (Rule 30(b)(6) Deposition of Scott Scholefield, DCF Director of Case and Special Investigations, re: Abuse or Neglect in Foster Care, Nov. 16, 2011, at 262:5-264:18).  Mr. Scholefield said he had tried to have this language changed a number of times, and admitted that this was in order to "remove any possibility of confusion as to who has what responsibility." (*Id.* at 265:14-267:5).

318.    There is "no standardized training" for screeners at the area office level. Their training is "pretty much left up to the area offices." (*Id.* at 50:23-51:16).

319.    Regarding collateral contacts made by area office screeners for purposes of making a recommendation to the SIU to screen a report of institutional abuse in or out, Mr. Scholefield said that "it varies within area offices. Some area offices are better at making those contacts than others." (*Id.* at 50:23-51:16).

320.    There is no written policy that establishes required steps the SIU screener must take in determining whether or not to screen in an allegation of institutional abuse. Rather, Mr. Scholefield testified, the staff in the SIU "knows what I want." (Rule 30(b)(6) Deposition of Scott Scholefield, DCF Director of Case and Special Investigations, re: Abuse or Neglect in Foster Care, Nov. 16, 2011, at 52:5-14; 261:7-12).

321.    SIU screeners do not use a structured decision-making tool to determine whether information alleged in an institutional 51A rises to the level of "serious abuse or neglect" as defined by DCF policy. (Rule 30(b)(6) Deposition of Scott Scholefield, DCF Director of Case and Special Investigations, re: Abuse or Neglect in Foster Care, Nov. 16, 2011, at 58:23-21).

322.    As part of the processing of screening in or out allegations of institutional abuse or neglect, the SIU screener is not required to meet with the child or speak with the foster parent or caretaker. (Rule 30(b)(6) Deposition of Scott Scholefield, DCF Director of Case and Special Investigations, re: Abuse or Neglect in Foster Care, Nov. 16, 2011, at 113:24-114:12). Mr. Scholefield testified that SIU investigators are not required during the course of an SIU investigation to ask DEEC for a history of licensing infractions with respect to the placement being investigated, although he said he was "sure they do." (*Id.* at 192:10-16). SIU investigators are also not required by policy to reach out to Joy Cochran and her IFC staff in conducting investigations. (*Id.* at 198:12-199:6).

323.    Although not in written DCF policy, it is DCF practice that an allegation of institutional abuse or neglect may not go down the initial assessment track, but rather, must go down the investigation track. Asked how DCF ensures that all staff members know of and comply with this practice, Mr. Scholefield further explained that the FamilyNet system is set up so that once a worker clicks the box for institutional abuse, the initial assessment fields are not available to them. (Rule 30(b)(6) Deposition of Scott Scholefield, DCF Director of Case and Special Investigations, re: Abuse or Neglect in Foster Care, Nov. 16, 2011, at 242:21-244:1). However, Mr. Scholefield later testified that there have been instances where a worker checks the wrong box, allowing an institutional abuse or neglect allegation to proceed down the initial assessment track, without SIU being aware of it. (*Id.* at 248:2-22). When it is caught, Mr. Scholefield testified, this sort of error is only caught ad hoc when an investigator contacts the family and realizes it is a provider. (*Id.*).

324.    There are differences between the policy SIU investigators use in practice and the policy currently in effect. (Rule 30(b)(6) Deposition of Scott Scholefield, DCF Director of Case and Special Investigations, re: Abuse or Neglect in Foster Care, Nov. 16, 2011, at 70:22-71:4).

325.    All SIU investigative staff and hotline workers belong to the SIU 509. (Rule 30(b)(6) Deposition of Scott Scholefield, DCF Director of Case and Special Investigations, re: Abuse or Neglect in Foster Care, Nov. 16, 2011, at 249:23-250:1). Under the current collective bargaining agreement with the SIU 509, disciplinary action for a worker failing to comply with policy could include anything up to termination. However, Mr. Scholefield was unaware of disciplinary actions available for a worker who fails to comply with practice. (*Id.* at 249:21-251:12).

326.    Although he assumed that it was the same iteration as his own, Mr. Scholefield admitted that he does not know what hard copy manual his SIU investigators work from in the course of performing their functions. (Rule 30(b)(6) Deposition of Scott Scholefield, DCF Director of Case and Special Investigations, re: Abuse or Neglect in Foster Care, Nov. 16, 2011, at 298:14-300:8). Mr. Scholefield does not provide new SIU investigators with a hard copy policy manual because he said, "they should have been provided a copy of the policy when they were hired." (*Id.* at 284:23-285:17).

## III.    Inappropriate Placements

### A.    Placements in Which Children Are Separated from Their Siblings

#### 1.    Professional Standards

327.    Federal law, Massachusetts statute and regulation, and DCF policy require that DCF place children with their siblings unless such placement would be contrary to the safety or well-being of the child or sibling(s). 42 U.S.C. § 671(a)(31)(A). (Trial Exhibit 164, Mass. Gen. Laws ch. 119, § 23(c) (2009); Trial Exhibit 69, 110 Mass. Code Regs. 7.101(1)(e), 7.101(4)(2013); Trial Exhibit 1, Placement Prevention and Placement Policy, DSS Policy No. 90-004(R), Feb. 10, 1998, DCF Case Practice Policy and Procedures Manual, at DCF POL (7/08) 170; *see also* Trial Tr., Feb. 28, 2013 (Crabtree), at 75:15-76:16). DCF's Sibling Bill of Rights states that every foster child shall be placed with siblings or shall be in close proximity to their siblings if placement in the same setting is not possible. (Trial Exhibit 731, Department of Children and Families Sibling Bill of Rights, May 24, 2012, p. 1).

328.    Professional standards provide that "[t]he family foster care agency should recognize the right of siblings to be placed together while in family foster care. . . . Siblings should be placed separately only if placement together would be contrary to the developmental, treatment, and safety needs of a given child." (Contested Exhibit QY, Child Welfare League of America, Standards of Excellence for Family Foster Care Services, 1995, § 2.30).

329.    According to the Council on Accreditation, a priority for selecting a placement for a child in foster care is placement with siblings. (Contested Exhibit RQ, Council on Accreditation, Foster Care Services Standards, 2008, § 6.03).

#### 2.    Failure to Place Children With Siblings Can Cause Them Harm

330.    DCF recognizes that home removal can be one of the most traumatic events a child experiences, and placement with siblings can significantly mitigate this trauma. (Trial Exhibit 550, Documents re: Placement Stability, at DCF008913870; Trial Exhibit 33,

Massachusetts Child and Family Services Review Program Improvement Plan, Oct. 5, 2009, p. 19; Trial Exhibit 94, Child and Family Services Plan, FY 2010-FY 2014, at DCF007054452; Trial Exhibit 552, DCF Integrated Casework Practice Model: Practice Point No. 1, Trauma Informed Casework Practices, at DCF000245355; Trial Exhibit 1127, Strengthening the Safety Net: DCF's Strategic Plan for Action, April 2009, at DCF7605096).

331.    DCF's Sibling Bill of Rights further recognizes that "sibling relationships provide needed continuity and stability" for children in foster care and that sibling separation is "a significant and distinct loss that must be repaired by frequent and regular contact." (Trial Exhibit 731, Department of Children and Families Sibling Bill of Rights, May 24, 2012, p. 1).

According to DCF:

> Children experience separation from their siblings as a traumatic loss. This heightens the emotion of grief and abandonment that they are already feeling, which interferes with their healthy development.
>
> When we split siblings up from their brothers and sisters, we are taking away the only connection they have left to the people they love. This pain severely hurts children.
>
> This sense of loss continues into adulthood . . . .

(Trial Exhibit 1039, WAO – Siblings in Placement, at DCF011069835).

332.    Siblings who have been maltreated and removed from home often cope by forming healthy and meaningful relationships with each other, the disruption of which may cause even more severe trauma than the stress of separation from their parents. The emotional stability of lasting sibling relationships can even serve to minimize some of the long term psychological damage caused by dysfunctional or disrupted parent/child attachments. (Trial Exhibit 1073, Sharon Connor, National Resource Center for Family-Centered Practice and Permanency Planning, Information Packet: Siblings in Out-of-Home Care, Dec. 2005, p. 3; *see also* Trial Exhibit 1094, Michelle Cohn, Sibling Placement: The Importance of the Sibling Relationship for Children in Foster Care (2012), p. 2; Trial Exhibit 857, Child Welfare Information Gateway, Sibling Issues in Foster Care and Adoption (2006), p. 3).

333.    According to a document prepared by AdoptUsKids: "Being with siblings in placement helps to mitigate the impact of separation and loss and offers continuity, support and a sense of safety and security." (Trial Exhibit 729, Sibling Group Considerations at Every Step for the Recruitment and Retention of Kinship, Foster and Adoptive Families, at DCF009019218).

334.    DCF officials acknowledge that DCF tries to keep siblings together in foster care because of the importance of preserving and honoring the relationship between siblings, (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18,

2011, at 191:23-192:12), and that DCF's "first priority" is to place siblings together. (Rule 30(b)(6) Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, re: Staffing, Caseloads, and Training, Jan. 20, 2012, at 78:24-79:17).

335.    A DCF director of areas stated that "[i]t's a matter of comfort for the siblings to be [placed] together when they've been through the trauma of coming into care."  (Deposition of Joseph Collins, DCF Director of Areas for Franklin and Hampshire, Jan. 25, 2012, at 223:6-224:20).

### 3.    DCF Fails to Consistently Place Siblings Together

336.    Plaintiff's expert, the Children's Research Center ("CRC"), found that, excluding children with a documented reason not to be placed with siblings, 35.1% of children in the entry cohort with siblings were not placed with any of their siblings for some portion of the period under review.  (Trial Exhibit 1070, Table 1, Memorandum from Kristen Johnson to Larry Borten, Sara Bartosz, Children's Rights re: Additional Analyses of Sample Child Placement and Contact With Siblings, Oct. 18, 2012; *see also* Trial Tr., Jan. 31, 2013 (Johnson), at 110:22-112:3).  This data was based on a sample size of 97 children for whom this measure was applicable, and the inter-rater reliability for this measure exceeded 80%. (*Id.*; *see supra* ¶ 80; Trial Exhibit 1069, Table 3, Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC) and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowsky, October 19, 2012, Nov. 19, 2012).

337.    Of the 107 children in the two-year cohort with siblings and with no documented reason not to be placed with their siblings, 26.2% were never placed with any siblings during the entire period under review.  (Trial Exhibit 1070, Table 1, Memorandum from Kristen Johnson to Larry Borten, Sara Bartosz, and Children's Rights, re: Additional Analyses of Sample Child Placement and Contact with Siblings, Oct. 18, 2012; *see also* Trial Tr., Jan. 31, 2013 (Johnson), at 110:22-112:3).  The inter-rater reliability for this measure exceeded 80%. (*See supra* ¶ 80; Trial Exhibit 1069, Table 3, Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC) and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowsky, October 19, 2012, Nov. 19, 2012).

338.    DCF case files often fail to document why sibling groups were not placed together.  Out of the 182 placements where children in the entry cohort were not placed with all of their siblings, there was clear documentation in the file as to why the siblings were not placed together in only 98 cases (53.8%).  (Trial Exhibit 1065, Tables C26, C28, Appendix C, Children's Research Center, Compliance with Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; *see also* Trial Tr., Jan. 30, 2013 (Freitag), at 64:5-6, 63:3-10, 66:23-70:19).  The inter-rater reliability for this measure exceeded 80%.  (*See supra* ¶ 80; Trial Exhibit 1069, Table 3, Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC) and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowsky, October 19, 2012, Nov. 19, 2012).

339.    According to a DCF document from October 2011, siblings are "almost always separated" when placed in regular unrestricted or specialized foster homes.  Further, adolescents are almost always separated from younger siblings.  (Trial Exhibit 1039, Document re: WAO – "Siblings in Placement," at DCF011069834).

340.    A DCF Director of Areas noted that siblings in the Springfield and Holyoke offices are not placed together as often as he would like.  (Deposition of Joseph Collins, DCF Director of Areas for Franklin and Hampshire, Jan. 25, 2012, at 223:6-224:20).

341.    Dr. Lenette Azzi-Lessing testified that a common theme that she found in her review of the Named Plaintiffs' files was "DCF's failure to support and maintain the important sibling relations, relationships between children in custody and their siblings."  (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 71:17-19).

342.    Denise Sullivan testified that none of her clients who have siblings in foster care are placed with those siblings.  (Trial Tr., Feb. 6, 2013 (Sullivan), at 103:19-23).

343.    Lauren James was only placed with one sibling for less than two weeks in all her time in DCF care.  (Trial Tr., Jan. 22, 2013 (James), at 58:16-59:1).  DCF officials told Ms. James that "there was never any way that a foster family would take all five of us [Ms. James and her four brothers]."  (*Id.* at 59:2-6).

### 4.    Chronic Failures To Ensure that Siblings are Placed Together and to Prioritize Sibling Placement

344.    DCF has historically failed to ensure that siblings are placed together in foster care.  According to a DCF study, from April through June 2008, DCF placed just 43% of siblings together.  Of the 361 cases in which DCF removed children from their homes and placed them into foster care, DCF separated siblings in 205 cases.  (Trial Exhibit 550, Documents re: Placement Stability, at DCF008913870-71; *see also* Trial Exhibit 33, Massachusetts Child and Family Services Review Program Improvement Plan, Oct. 5, 2009, p. 19).

345.    The 2008 Child and Family Services Review ("CFSR") Final Assessment found that Placement with Siblings was an area needing improvement.  DCF's performance had declined from the 2001 CFSR, in which this item was a strength in 20 of 21 cases.  (*Compare* Trial Exhibit 58, Massachusetts Child and Family Services Review Final Assessment, Feb. 21, 2008, at CSF-000000783*, with* Trial Exhibit 56, Massachusetts Child and Family Services Review Final Assessment, July 2001, at CSF-000000331-32).

346.    According to the 2008 CFSR, stakeholders indicated that siblings were not always placed together when placement in foster care together was possible and appropriate.  (Trial Exhibit 58, Massachusetts Child and Family Services Review Final Report, Feb. 21, 2008, at CSF-000000784).  Similar concerns had been raised in the 2001 CFSR.  (Trial Exhibit 56, Massachusetts Child and Family Services Review Final Assessment, July 2001, at CSF-000000332).

347.    Placement with siblings was identified as an issue for development in DCF's Program Improvement Plan ("PIP"), but the PIP did not include a requirement or action plan for

increasing the percentage of children placed with siblings. (Trial Exhibit 33, Massachusetts Child and Family Services Review Program Improvement Plan, Oct. 5, 2009, pp. 7, 57-61; Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: Program Improvement Plan, Apr. 4, 2012, at 115:1-116:5).

348.    In its 2009 Program Improvement Plan, DCF acknowledged that "[c]urrently the Department does not have an easy method for tracking when siblings are placed together. (Trial Exhibit 33, Massachusetts Child and Family Services Review Program Improvement Plan, Oct. 5, 2009, p. 19; *see also* Trial Tr., Mar. 1, 2013 (Crabtree), at 8:12-9:5).

349.    DCF does not regularly track the rate at which it keeps sibling groups together in foster care. (Trial Exhibit 57, Massachusetts Child and Family Services Review Statewide Assessment, May 2007, at CSF-000000662; Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, re: Implementation of Provisions of the Fostering Connections Act, Apr. 24, 2012, at 518:16-519:6. DCF's regularly produced management reports do not include data about sibling placement. (Trial Tr., May 6, 2013 (McClain), at 107:3-6; *see also* Trial Exhibit 954, Monthly Operations Statistical Report, May 2012; Trial Exhibit 220, Report Schedule).

350.    Former Commissioner McClain testified that DCF did not consider including a measure for sibling placement on DCF's regular management reports because it was not one of the "most critical" performance measures. (Trial Tr., May 6, 2013 (McClain), at 106:12-107: 2).

351.    DCF officials do not receive data regarding and are not aware of the frequency with which siblings in DCF foster care are placed together. (Deposition of Terrence Flynn, Regional Director for the Southern Region, Jan. 26, 2012, at 131:12-132:5; Deposition of Raymond Burke, DCF Director of Areas for Pioneer Valley, Jan. 19, 2012, at 236:13-17, 237:9-22, 247:11-22; Deposition of Joseph Collins, DCF Director of Areas for Franklin and Hampshire, Jan. 25, 2012, at 222:20-223:5). DCF's Director of Areas for the Pioneer Valley has not established a performance target for the rate at which sibling groups should be placed together. (Deposition of Raymond Burke, DCF Director of Areas for the Pioneer Valley, Jan. 19, 2012, at 247:23-248:15).

352.    DCF's PIP identified DCF's failure to track the frequency with which sibling groups are placed together as a concern. (Trial Exhibit 33, Massachusetts Child and Family Services Review Program Improvement Plan, Oct. 5, 2009, p. 19; Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: Staffing, Caseloads, and Training, and the Program Improvement Plan, Apr. 4, 2012, at 111:17-112:6). However, the PIP Quarterly Reports, which reflect DCF's progress on action steps and benchmarks identified in the PIP, do not report on DCF's performance with regard to sibling placement. (*See, e.g.*, Trial Exhibit 760, DCF PIP Final Report, Oct. 2009 through Sept. 2011, Quarter Eight Report, July through Sept. 2011). DCF's PIP contained no enforceable requirement to obtain data regarding the frequency of sibling placements. (Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: Program Improvement Plan, Apr. 4, 2012, at 115:1-12, 115:19-116:1).

353.   Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, and Rule 30(b)(6) designee with regard to the PIP, testified that DCF does not currently have the capacity to efficiently track the placement of siblings together.  (*Id.* at 112:7-113:16; *see also* Trial Exhibit 33, Massachusetts Child and Family Services Review Program Improvement Plan, Oct. 5, 2009, p. 19).  Ms. Nisenbaum testified that a case read would be necessary in order to capture aggregate data regarding the placement of siblings together.  (Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: Program Improvement Plan, Apr. 4, 2012, at 114:6-12).

354.   DCF chose not to collect data on sibling placement as part of its upgraded i-FamilyNet 2.0 computer system, and does not anticipate that its computer system will be able to track whether siblings are placed together until further upgrades of the computer system.  (*Id.* at 112:7-113:16).

### B.     Placements Far from Children's Families and Home Communities

### 1.     Professional Standards

355.   According to DCF policy and Massachusetts regulation, the placement should be in the closest proximity to the child's family, to promote the opportunity for visits between the child and family. (Trial Exhibit 1, Placement Prevention and Placement Policy, DSS Policy No. 90-004(R), Feb. 10, 1998, DCF Case Practice Policy and Procedures Manual, at DCF POL (7/08) 170; Trial Exhibit 69, 110 Mass. Code Regs. 7.101(1)(b)-(c) (2013)).

### 2.     Placements Far from Their Families and Home Communities Can Cause Children Harm

356.   Children benefit from remaining in their home communities.  "This network of support can help a child perform well academically, have positive health and mental health outcomes and make it more likely that they will develop good relationship and social skills that can enable them to become successful adults."  (Trial Exhibit 1095, Nina Williams-Mbengue, Moving Children Out of Foster Care: The Legislative Role in Finding Permanent Homes for Children, National Conference of State Legislatures, Oct. 2008; *see also* Trial Tr., Feb. 28, 2013 (Crabtree), at 118:21-120:8).

357.   Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, testified that out-of-area placements are more likely to cause educational disruptions, cut children off from their friends, and make family visits more time-consuming for workers. (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 159:18-161:2).

358.   Joy Cochran, DCF Director of Foster Care Services, testified that "connections for kids are essential. If you can keep a kid in their same school with their same friends, their same . . . church, their relationships, that is less distressing to them when they have to come into care."  (Deposition of Joy Cochran, DCF Director of Foster Care Services, Apr. 13, 2012, at 107:12-17).

359.    Ms. Gambon testified that, unless it is necessary to protect the child's safety, she is concerned whenever a child is placed outside of their home area, and that "it's never a good thing to make too many changes for a child."  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, 104:13-105:8).

360.    DCF does not want to place any children outside of their home area.  (*Id.* at 105:9-14; Trial Exhibit 735, Email from Judith Rocha to John Raposa, re: Minutes from today's meeting and important info I am adding my own notes too, July 14, 2011, at DCF004842191).

361.    DCF has acknowledged the need to "[p]lace more children within their school district." (Trial Exhibit 736, Legislative Foster Care Caucus Meeting, Mar. 2011, at DEF000238130).

362.    DCF has stated: "We must keep children as close to their home and community as possible while meeting their needs."  DCF noted that regular attendance at school is a "vital" part of a child's participation in a community.  (Trial Exhibit 57, Massachusetts Child and Family Services Review Statewide Assessment, May 2007, at CSF-000000664).

363.    Olga Roche, DCF Deputy Commissioner for Field Operations, testified that when children are placed in a different town, they often spend their days in the lobby of the DCF office because they cannot be transported to their original school and have not yet been enrolled in a school in the town of their foster home.  (Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 227:5-230:10).

### 3.    DCF Places Children Far from Their Home Communities

364.    As of March 31, 2012, more than half of all children in DCF foster care statewide— 50.5%—were placed outside of their home area. This figure ranged from 25.6% to 87.0% based on placement type, with children in residential programs, independent living group homes, and departmental pre-adoptive homes experiencing the highest out-of-area placements.  (Trial Exhibit 418, Exhibit B to Defendants' Responses and Objections to Plaintiffs' Second Set of Interrogatories, Apr. 24, 2012, p. 12; Trial Exhibit 944, Defendants' Responses and Objections to Plaintiffs' Second Set of Interrogatories, Apr. 24, 2012, and all supporting exhibits and underlying documentation, p. 48).  This means that children may be far from their families, may need to change schools and physicians, and their caseworkers may need to travel long distances to visit them.  (Trial Tr., Feb. 28, 2013 (Crabtree), at 117:4-120:20).

365.    As of March 31, 2012, more than one quarter of children in unrestricted DCF foster homes were placed outside of their home area.  (*Id.* at 7; s*ee also* Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 161:12-163:6; Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 169:24-172:1).

366.    Ms. Roche testified that she was unaware that fewer than half of the children coming into DCF unrestricted foster care from Boston are placed in foster homes in Boston, compared to approximately 75% for the rest of the state, and she could not explain the reason for this

disparity. (Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 175:13-176:2; *see also* Trial Exhibit 944, Defendants' Responses and Objections to Plaintiffs' Second Set of Interrogatories, and all supporting exhibits and underlying documentation, Apr. 24, 2012, p. 8).

367.    In addition, just 35.2% of children in Intensive Foster Care ("IFC") placements statewide were placed in their home area. (Trial Exhibit 418, Exhibit B to Defendants' Responses and Objections to Plaintiffs' Second Set of Interrogatories, Apr. 24, 2012, p. 9).

368.    Some children are even placed outside of their entire DCF region. As of March 31, 2012, more than 1,500 children, 18.6% of all children in DCF custody, were placed outside of their home region. (*Id.* at 12).

369.    These numbers have shown no improvement since December 31, 2010, when DCF reported that 50.3% of children were placed out of their home area. (*Compare id.* at 12, *with* Trial Exhibit 944, Defendants' Responses and Objections to Plaintiffs' Second Set of Interrogatories, and all supporting exhibits and underlying documentation, Apr. 24, 2012, p. 54). This ranged from 24.7% to 88.3% based on placement type, with children in residential programs, behavioral treatment residences, and departmental pre-adoptive homes experiencing the highest out of area or region placements. (Trial Exhibit 944, Defendants' Responses and Objections to Plaintiffs' Second Set of Interrogatories, and all supporting exhibits and underlying documentation, Apr. 24, 2012, pp. 49-54). 18.2% of children were placed out of their home region. (*Id*. at 54).

370.    Cathy Crabtree testified that the number of children DCF places far from their home communities in Massachusetts is high. (Trial Tr., Feb. 28, 2013 (Crabtree), at 117:4-118:20; *see generally id*. at 116:22-120:14).

### 4.    DCF Has Historically Failed to Maintain Children in Their Home Communities

371.    DCF has long been aware of the high rates of children placed out of their home areas and regions and the wide disparities in performance across the Commonwealth in this measure. According to fiscal year 2007 placement data from certain area offices, significant numbers of children in DCF foster care were placed outside of their home areas. (Trial Exhibit 341, Area Office Profile).

372.    The percentage of children placed in Intensive Foster Care settings outside their home region ranged from 0.5% in the Cape Cod Area Office to 89.8% in the Coastal Area Office. (*Id.*). The percentage of children placed in group homes outside their home region ranged from 5.2% in the Springfield area office to 66.2% in the Coastal Area Office. (*Id.*). The percentage of children placed in residential treatment settings outside their home region ranged from 40% in the Cape Cod Area Office to 100% in the Springfield area office. (*Id.*). The percentage of children placed in Short Term Stabilization and Rapid Reentry ("STARR") facilities outside their home region ranged from 0% in the Greenfield area office to 56.5% in the Worcester East Area Office. (*Id.*).

373.    In 2009, 62% of children in Intensive Foster Care with private provider Wayside Youth & Family Support Network had been placed out of their home region, mostly due to a lack of available homes within the region.  (Contested Exhibit EG, Email from Bonny Saulnier to Lian.Hogan@state.ma.us and Joyce.Nardine@state.ma.us re: IFC Data, Apr. 17, 2009, and attached Wayside Youth & Family Support Network and Department of Social Services/Metro Region Intensive Foster Care Comparison, at DCF005031899).

374.    According to the 2008 CFSR Final Report, stakeholders reported "region-specific challenges" in placing children close to their families, with stakeholders from certain regions reporting that a "lack of foster homes, particularly for adolescents, often forces children to be placed outside their communities."  Stakeholders in the South Central Area Office reported that placement is "more dependent on where available foster homes are located than parent's proximity."  (Trial Exhibit 58, Massachusetts Child and Family Services Review Final Report, Feb. 21, 2008, at CSF-000000783).

375.    A review of cases in the Greenfield Area Office found that only eight of 66 children (12%) in Intensive Foster Care were placed in a foster home within their area of origin. (Trial Exhibit 57, Massachusetts Child and Family Services Review Statewide Assessment, May 2007, at CSF-000000662).  On average, these children were placed over 35 miles from their home community.  (*Id.*).  The Greenfield Area Office conducted a continuous quality improvement ("CQI") initiative that reportedly increased the number of children placed in area by 50%.  (*Id.*).  However, as of December 31, 2010, over 71% of children placed in Intensive Foster Care in that month were placed outside of the Greenfield Area.  (Trial Exhibit 944, Defendants' Response and Objections to Plaintiffs' Second Set of Interrogatories, and all supporting exhibits and underlying documentation, Apr. 24, 2012, p. 51).

376.    Ms. Gambon was not surprised at data from 2007 showing that only approximately one-fifth of children in Intensive Foster Care from certain area offices were placed in their home area, and agreed that generally, far fewer than half of all children in IFC were placed within their area.  (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 156:20-159:17; *see also* Trial Exhibit 341, Area Office Profile).

377.    DCF reported in its 2007 Statewide Assessment that it did not maintain a database that reflected the distance that children's foster care placements were from their birth parents or home communities.  (Trial Exhibit 57, Massachusetts Child and Family Services Review Statewide Assessment, May 2007, at CSF-000000661).

378.    Ms. Gambon does not regularly review data regarding children placed outside of their home area.  (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 165:15-23).  Ms. Gambon testified that when she has looked at data regarding the number of children placed outside of their home area, the data she has looked at was contained in ad hoc reports and was not aggregated at the state level.  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 99:11-104:8).

379.    Ms. Roche testified that she does not receive any management reports reflecting the number of children who are placed within the area or region they are from.  (Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 170:17-20). She further testified that she was not aware that approximately one quarter of children in DCF departmental unrestricted foster homes are placed outside their area of origin, but was not surprised.  (*Id.* at 169:24-172:1; *see also* Trial Exhibit 944, Defendants' Response and Objections to Plaintiffs' Second Set of Interrogatories, and all supporting exhibits and underlying documentation, Apr. 24, 2012, p. 49).

380.    DCF's placement array does not meet the standards of professional judgment with regard to the geographic availability of homes for children.  (Trial Tr., Feb. 28, 2013 (Crabtree), at 120:9-14; *see generally id.* at 118:21-120:14).

## C.    Inappropriate Use of Night to Night Placements and Hotline Homes

### 1.    Short-term Placements Necessitate Additional Moves for Children, Causing them Harm

381.    DCF uses a form of foster home called a "hotline home," which is a short-term placement that is intended to be used only as an emergency placement for children entering foster care after regular business hours.  (Deposition of Raymond Pillidge, DCF Regional Director for the Northern Region, Mar. 7, 2012, at 184:22-185:1).

382.    DCF has a practice in which it places children overnight and moves them the next day and the next.  DCF refers to this as "night-to-night" placements.  (Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 159:22-160:6; Deposition of Raymond Pillidge, DCF Regional Director for the Northern Region, Mar. 7, 2012, at 185:18-186:6).  Dr. Azzi-Lessing testified that night-to-night placements are placements that are only used for a single night or two, that are not intended to provide ongoing stable care for children, and that are typically used when a state agency has no other placement to put a child.  (Trial Tr., Feb. 4, 2013 (Azzi-Lessing), at 90:18-22).

383.    DCF has long acknowledged that the use of night-to-night placements is harmful to children.  As early as 2005, DCF acknowledged that the use of night-to-night placements was "not acceptable practice." (Trial Exhibit 161, Letter from Susan Orr to Lewis Spence and attached Massachusetts AFCARS Assessment Review Report, Sept. 2005, pp. *ii*, 3).

384.    DCF officials and staff acknowledge that short-term placements contribute to children being moved too frequently while in DCF custody. (Trial Exhibit 293, Email from Francis Galligan to Terry Flynn, June 27, 2011; *see also* Trial Exhibit 463, Email and attachment from Terry Flynn to Jan Nisenbaum, July 6, 2011, at DCF005627618; Trial Exhibit 558, Meeting notes from DCF Senior Staff meeting, Feb. 13, 2008, at DCF003144976; Trial Exhibit 557, Celebrating Effective and Enduring Partnerships, Aug. 20, 2007, at DCF004976608).

385.    Raymond Pillidge, DCF Regional Director for the Northern Region, testified that DCF is "quite concerned" about how emergency placements contribute to placement instability.

(Deposition of Raymond Pillidge, DCF Regional Director for the Northern Region, Mar. 7, 2012, at 186:23-187:10).  Terrence Flynn, DCF Regional Director for the Southern Region, testified that the use of hotline homes does not support placement stability.  (Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, Jan. 26, 2012, at 123:5-19).

386.    DCF's Commissioner, Angelo McClain, acknowledged in January 2010 that DCF's "hotline home/night-to-night system" is "not good for kids." (Trial Exhibit 342, Email from Angelo McClain to Olga Roche, Jan Nisenbaum, and Mary Gambon, et al., Jan. 29, 2010).

387.    A DCF official stated that she was aware that Commissioner McClain does not support hotline placements "as it oftentimes perpetuates frequent night-to-night movement of children from one family to another." (Trial Exhibit 393, Email from Debora Sullivan to Mary Gambon, July 13, 2009, at DCF006232998; *see also* Trial Exhibit 420, Email from Mary Gambon to Deborah Sullivan, July 14, 2009, p. 2).

388.    According to a May 2011 Springfield Family Resource CQI Self-Assessment, night-to-night placements "often do not work" for children.  (Trial Exhibit 32, Email from Raymond Burke to DSS-DL – Springfield Users re: Springfield Family Resource CQI Self Assessment –FY11-12 ---5-27-11, May 27, 2011, and attached Family Resource CQI/Self Assessment FY 11-12, at DCF001946169).

389.    According to a memorandum authored by Angelo McClain dated October 5, 2011, the high rate of placement instability that children experience in their first three months in DCF custody is due primarily to "overreliance" on hotline homes. (Trial Exhibit 415, Angelo McClain Agenda Document, Oct. 5, 2011, at EOHHS000179750).

390.    Ms. Gambon testified that night-to-night placements cause the same harms as placement instability generally.  (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 167:18-168:3).

## 2.    DCF Places Children in Night-to-Night Placements and Hotline Homes

391.    Despite its acknowledgement that short-term placements are not good for children, DCF continues to place children in short-term, night-to-night placements and hotline homes. (Trial Exhibit 34, MA CFSR 2007: Summary of Key Issues for PIP Development, at DCF008117146; Trial Exhibit 292, Email and attachments from Janis Lynch to Staverne Miller et al., May 13, 2010; Trial Exhibit 562, Email from Ellen Finnegan to Angelo McClain, Patricia Mackin, and David O'Callaghan, Mar. 9, 2011; Trial Exhibit 563, Email from Jean Boutin to undisclosed recipients, Mar. 7, 2011; Trial Exhibit 161, Letter from Susan Orr to Lewis Spence and attached Massachusetts AFCARS Assessment Review Report, Sept. 2005, pp. *ii*, 3; Trial Exhibit 560, Email from Ros Walter to Daniel Arnold, May 24, 2011, at DCF006032840; Trial Exhibit 356, Email from Olga Roche to Angelo McClain, Mar. 14, 2011, at DCF004932917; Trial Exhibit 559, Email and attachments from Jan Nisenbaum to Liz Skinner-Reilly and Ros Walter, Nov. 30, 2007, at DCF007248282).

392.    DCF uses a quarterly report titled the "Foster Care Night to Night Placement Study" to track the number of children experiencing "night to night placements."  The report reflects

the number of children in each region during the quarter who experienced a placement lasting less than eight days.  (Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 159:22-161:11, 168:3-173:10; Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 177:12-20; *see, e.g.*, Trial Exhibit 962, Foster Care Night to Night Placement Study, Fiscal Year 2013 1st Quarter).

393.    According to the Foster Care Night to Night Placement Study Report for the fourth quarter of state fiscal year 2011, 341 children experienced two or more foster care placements within eight days in the three-month period from April through June 2011.  (Trial Exhibit 962, Foster Care Night to Night Placement Study, Fiscal Year 2011 4th Quarter, pp. 1, 3, 5, 7 at measure "Clients w FC Plcmt < 8 Days").

394.    Similarly, during the third quarter of state fiscal year 2011, 302 children experienced such placements, (Trial Exhibit 962, Foster Care Night to Night Placement Study, Fiscal Year 2011 3rd Quarter, pp. 1, 3, 5, 7 at measure "Clients w FC Plcmt < 8 Days"); during the second quarter, 358 experienced such placements, (Trial Exhibit 962, Foster Care Night to Night Placement Study, Fiscal Year 2011 2nd Quarter, pp. 1, 3, 5, 7 at measure "Clients w FC Plcmt < 8 Days"); and during the first quarter, 379 experienced such placements.  (Trial Exhibit 962, Foster Care Night to Night Placement Study, Fiscal Year 2011 1st Quarter, pp. 1, 3, 5, 7, 9 at measure "Clients w FC Plcmt < 8 Days").

395.    DCF continued to place hundreds of children in night to night placements during each quarter of state fiscal year 2012.  That year, there were 1,177 instances in which children experienced two or more foster care placements in less than eight days.  (Trial Exhibit 962, Foster Care Night to Night Placement Study, Fiscal Year 2012 1st Quarter – Fiscal Year 2012 4th Quarter, pp. 1, 3, 5, 7, 9 at measure "Clients w FC Plcmt < 8 Days").

396.    Most recently, during the first quarter of state fiscal year 2013 (July through September 2012), 22 children in the Boston region, 41 children in the Northern region, 101 children in the Southern Region, and 170 children in the Western region, or a total of 334 children, experienced a foster care placement that lasted less than 8 days. (Trial Exhibit 962, Foster Care Night to Night Placement Study, Fiscal Year 2013 1st Quarter, pp. 1, 3, 5, 7, 9 at measure "Clients w FC Plcmt < 8 Days").

397.    Although the purpose of the hotline home system is ostensibly for emergency after-hours placement, DCF sometimes utilizes these homes for other purposes, such as when it cannot find a placement during normal business hours.  DCF often uses night-to-night placements or hotline homes for adolescents for whom DCF has not identified an appropriate placement. (*See, e.g.*, Trial Exhibit 569, New Bedford Adolescent Placements, at DCF001982357; Trial Exhibit 356, Email from Olga Roche to Angelo McClain, Mar. 14, 2011, at DCF4932917; Trial Exhibit 557, Celebrating Effective and Enduring Partnerships, Aug. 20, 2007, at DCF004976608).

398.    Ms. Gambon testified that part of the explanation for placement instability among older foster children lies in DCF's use of night to night placements. (Deposition of Mary Gambon,

DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 40:17-43:6).

399.    A September 2011 email requested a placement for a 5-year-old child who had already been placed in 26 placements and was currently in a night-to-night placement.  The email stated that the child "need[ed] a stable home."  (Contested Exhibit OQ, Email from Dawn Wareham to Suzanne Cole, Kathryn Musiak, Donna Jerszyk-Holliz, et al., Sept. 21, 2011).

400.    DCF uses hotline homes and night-to-night placements for "lobby kids" – children whom DCF has not placed at the end of the day. (Trial Exhibit 570, Southeast Regional Office Hotline Meeting Notes, Oct. 2, 2008; Trial Exhibit 567, Email to Mary Gambon; *see also* Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 297:15-298:5, 301:1-10; Trial Exhibit 206, The Adoption and Foster Care Recruitment Unit: Adoption, Foster Care and Adolescent Services Division, at DCF000658336).

401.    DCF uses these short-term placements on an ad hoc basis and practice varies among area offices.  For example, 22 of the 656 children in the Boston Region experienced at least one placement that was less than eight days during the three-month period from July through September 2012, compared to 170 of the 2,454 children in the Western Region.  If DCF in the Western Region utilized night to night placements at the same rate as in the Boston Region, fewer than half that number of children in the Western Region would have experienced night to night placements during this time period. (Trial Exhibit 962, Foster Care Night to Night Placement Study, Fiscal Year 2013 1st Quarter, pp. 1, 7).  This disparity has persisted since at least 2009.  (*Compare id., with* Trial Exhibit 962, Foster Care Night to Night Placement Study, Fiscal Year 2009 4th Quarter, pp. 1, 11).

402.    Ms. Nisenbaum testified that each area office utilizes hotline homes differently and defines what constitutes a hotline home differently.  (Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: the Program Improvement Plan, Apr. 4, 2012, at 189:7-190:4).

403.    Rosalind Walter testified that some regions use departmental homes as hotline homes and others use IFC homes.  It is not possible to identify through FamilyNet which homes are hotline homes.  (Deposition of Rosalind Walter, DCF Director of Data Management, Jan. 4, 2012, at 59:8-60:14).

404.    Each Region has a different set of rules regarding referrals and payments to after-hours placements.  (See Trial Exhibit 566, Email from Timothy Haley to Ellen Finnegan, Mar. 7, 2011).

3.      **DCF Has Long Utilized Hotline Homes and Night-to-Night
        Placements Despite Acknowledging that they are Not Good For
        Children, and Has Failed to Take Action to Create a New Emergency
        Placement System**

405.    DCF's use of such short-term placements has persisted for many years.  Both the
        September 2005 Massachusetts Adoption and Foster Care Analysis and Reporting System
        ("AFCARS") Assessment Review Report and the 2008 Massachusetts Child and Family
        Services Review Final Report ("2008 CFSR") stated that DCF indicated that there are times
        when children who enter foster care may be placed in a series of night to night foster homes
        for one night at a time because DCF is unable to find an appropriate foster home or facility
        for the child.  (Trial Exhibit 161, Letter from Susan Orr to Lewis Spence and attached
        Massachusetts AFCARS Assessment Review Report, Sept. 2005, pp. *ii*, 3; Trial Exhibit 58,
        Massachusetts Child and Family Services Review Final Report, Feb. 21, 2008, at CSF-
        000000768-69, CSF-000000837, CSF-000000849).

406.    Stakeholders indicated that many children were subjected to a pattern of "night to night"
        placement, and were forced to spend time at DCF offices awaiting confirmation of their next
        placement.  (Trial Exhibit 58, Massachusetts Child and Family Services Review Final
        Report, Feb. 21, 2008, at CSF-000000768-69; Trial Exhibit 34, MA CFSR 2007: Summary
        of Key Issues for PIP Development, at DCF008117146).  Stakeholders also reported that at
        times, DCF utilizes these temporary placements when children first enter care.  (Trial Exhibit
        34, MA CFSR 2007: Summary of Key Issues for PIP Development, at DCF008117146).

407.    A 2008 email to Ms. Gambon reported that hotline homes have been "misused" for
        purposes other than when "children [are] removed from home in emergency situations."
        (Trial Exhibit 567, Email to Mary Gambon re: "Hotline" Home Recruitment).  Although
        hotline homes are intended to be used only for emergency after-hours placements or on
        weekends or holidays, DCF had not implemented any process or "gatekeeper" to prevent
        their use for other purposes. (*See* Trial Exhibit 570, Southeast Regional Office Hotline
        Meeting Notes, Oct. 2, 2008; *see also* Trial Exhibit 354, Email from Salvatore Scibelli to
        Ellen Finnegan, Mar. 8, 2011, at DCF001038001).

408.    Patricia Mackin, DCF Chief of Staff, testified that since she joined DCF in 2007, she has
        heard from experts and from Commissioner McClain that hotline or night to night homes are
        not good for kids.  (Deposition of Patricia Mackin, DCF Chief of Staff, Mar. 1, 2012, at
        206:20-207:4).

409.    Ms. Gambon testified that Commissioner McClain made known his belief that night to
        night placements were bad for kids, and should be replaced with a different emergency
        placement system, in 2009 or 2010.  (Deposition of Mary Gambon, DCF Assistant
        Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 165:24-
        166:19).  She agreed with Commissioner McClain's assessment.  (*Id*. at 167:4-17).

410.    Former Commissioner McClain testified that DCF first became aware of the fact that it
        needed to come up with an alternative to hotline homes in September of 2008.  (Trial Tr.,
        May 3, 2013 (McClain), at 19:3-15).  Commissioner McClain testified that he had first raised

the issue of the hotline home system to his staff in September 2008, and suggested at that time that DCF needed to "figure out a better way to deal with it." (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 182:7-183:17).

411.    Almost four years later at the time of his deposition, Commissioner McClain testified that a plan to address the issue of hotline homes was still in the early planning stages, at "less than 20 percent." (*Id.* at 180:12-182:6). Commissioner McClain testified that he knew in 2008 that "we weren't going to get to it for a couple years." (*Id.* at 183:18-184:6). Commissioner McClain testified that he was waiting for a time when DCF "actually could tackle the foster care piece in a really comprehensive way and come up with a systemic response," and said DCF had to "get it done in the next 15 to 18 months." (*Id.* at 186:8-18).

412.    As of late May 2012, former Commissioner McClain admitted that the planning process for some new form of hotline home or emergency placement system was in the early stages and DCF had not come up with a solid systemic solution for this problem. (Trial Tr., May 3, 2013 (McClain), at 27:21-28:14). He further testified that he "would have anticipated that we would have gotten to that earlier." (*Id.* at 29:15-30:8).

413.    Mr. Pillidge testified that there have been "conversations at the regional director level" about how emergency placements contribute to placement instability but was unaware of "whether there have been conversations at a higher level." (Deposition of Raymond Pillidge, DCF Regional Director for the Northern Region, Mar. 7, 2012, at 186:23-187:10).

414.    Documents from 2011 note DCF plans to redesign hotline homes and create a new emergency placement system, called "intake homes." These documents describe multiple models, in which children might be placed in a home for 45, 60, or 90 days. (Trial Exhibit 355, Email from Paul Fitzsimons to Hogan re Oversight of Old Central Region, Mar. 23, 2011; *see also* Trial Exhibit 733, Summary of Staff Feedback from Worcester West Staff Meeting Presentation on Kinship First, June 29, 2011, at DCF007180978; Trial Exhibit 738, Email from Karin Bettencourt to John Renzi, June 6, 2011, at DCF002827774;Trial Exhibit 392, Intake Foster Homes, at DCF000765471; Trial Exhibit 408, Email and attachment from Mary Gambon to Jan Nisenbaum, Feb. 14, 2011).

415.    Ms. Cochran testified that she has mixed feelings about the intake foster home model, and is "concerned about setting up intrinsically a placement that is planned to result in a second placement." (Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 190:13-191:6).

416.    DCF stated that it conducted an assessment of its "emergency placement" system and use of "hotline" homes in Quarter 6 of its PIP and that it was identifying how other states handle emergency placements in Quarter 7. (Trial Exhibit 373, DCF PIP Quarterly Report, Quarter Seven, Apr. through June 2011, pp. 52-53). Ms. Nisenbaum testified that this "assessment" of the emergency placement system was "a series of conversations with staff," and that DCF did not create a final report following its assessment. (Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: Program Improvement Plan, Apr. 4, 2012, at 189:7-190:21; *see also* Trial Exhibit 373, DCF PIP Quarterly Report, Quarter Seven, Apr. through June 2011, p. 53). "Final strategies will

be incorporated into report on Kinship First and Placement Stability which will be completed [by] the end of May [2011]."  (Trial Exhibit 373, DCF PIP Quarterly Report, Quarter Seven, Apr. through June 2011, p. 53).

417.    The final PIP report did not report any further action by DCF, and the sole recommendation about emergency placements in the Placement Stability Report was that DCF explore the reason for rapid moves within a short period from removal and "[d]esign and implement a state-wide initiative to address this issue."  (Trial Exhibit 54, Placement Stability in Massachusetts, Penelope (Penny) L. Maza, Ph.D., Consultant, National Resource Center for Child Welfare Data and Technology, Jan. 20, 2011, p. 52; Trial Exhibit 760, DCF PIP Final Report, Oct. 2009 through Sept. 2011, Quarter Eight Report, July through Sept. 2011, at CSF-000005416-17).

418.    Ms. Mackin testified that, as of March 1, 2012, there were no initiatives or strategies in place to address the issue of hotline homes within DCF.  She agreed that this issue was "still in the talking phase."  (Deposition of Patricia Mackin, DCF Chief of Staff, Mar. 1, 2012, at 207:14-21).  Ms. Mackin testified that, to her knowledge, DCF does still use hotline homes.  (*Id.* at 208:13-15).

419.    As of April 2012, DCF has not established a timetable for the procurement of a new emergency placement system.  (Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: Program Improvement Plan, Apr. 4, 2012, at 195:5-9; *see also* Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, Mar. 5, 2012, at 207:14-210:23).

420.    DCF's 2012-2015 Strategic Plan, issued in August 2012, includes an initiative to "Strengthen Emergency Placement Alternatives."  (Trial Exhibit 7, Department of Children and Families 2012-2015 Strategic Plan: Preserving, Strengthening, and Expanding the DCF Safety Net, Aug. 2012, at CSF-000006346).  The Strategic Plan states that as part of this initiative, DCF "will conduct a review of our current practices related to emergency placements, explore models used in other states, and design a system for emergency placements that results in improved stability for children."  (*Id.*).

421.    In Ms. Crabtree's opinion, DCF has not taken action to resolve the issue of night to night placements and hotline homes.  (Trial Tr., Feb. 28, 2013 (Crabtree), at 113:24-115:19).

422.    DCF's failure to take action about these short-term placements is compounded by its failure to track its use of these placements.  DCF does not have the capability to provide aggregate reporting regarding its placement of children in hotline homes.  DCF is unable to report the number of children in its custody who were placed in a hotline home, the number of nights they spent in hotline homes, or the number of children who experienced three or more placements in hotline homes.  (Trial Exhibit 452, Defendants' Responses and Objections to Plaintiffs' Second Set of Interrogatories, Apr. 24, 2012, pp. 5-6).  FamilyNet does not permit specific identification of respite homes or hotline homes, and a proxy must be used.  (Deposition of Rosalind Walter, DCF Director of Data Management, Jan. 4, 2012, at 57:7-58:21).

423.    DCF does not maintain data concerning the number of times DCF uses a hotline home because no regular unrestricted bed is available.  (Rule 30(b)(6) Deposition of Terrence Flynn, Regional Director for the Southern Region, re: Placement Array, Assignment of Placements, and Placement Moves, Sept. 20, 2011, at 147:16-19).

424.    Paul Fitzsimons, DCF Regional Director for the Western Region, testified in March of 2012 that he could not think of any reports he had seen which track the usage of hotline homes.  (Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, Mar. 5, 2012, at 204:21-24).

425.    Similarly, DCF does not have the capability to track its placement of children in night to night placements.  DCF is unable to report the number of children in its custody who were placed in a night to night placement, the number of nights they spent in night to night placements, or the number of children who experienced three or more night to night placements.  (Trial Exhibit 452, Defendants' Responses and Objections to Plaintiffs' Second Set of Interrogatories, Apr. 24, 2012, pp. 7-8; Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, Mar. 5, 2012, at 171:23-172:1).

426.    Instead, DCF tracks the number of children who experience at least two placements in less than eight days. (Trial Exhibit 561, Email from Debora J. Sullivan to DSS-DL - RegDirs, DSS-DL - AreaDirs, and DSS-DL - Regional Clinical Directors re: Placement Stability/Placement DATA, Sept. 17, 2008, with attached Foster Care Night to Night Placement Study, Jan. through June 2008; Trial Exhibit 419, Email from Kim Occhiuti to Joy Cochran, Debora Sullivan, and Mary Gambon re: Night to Night, Sept. 17, 2008 and attached Foster Care Night to Night Placement Study, Jan. through June 2008; Trial Exhibit 962, all Foster Care Night to Night Placement Study Reports (*e.g.*, Trial Exhibit 962, Foster Care Night to Night Placement Study, FY11 Q4)).

427.    The Foster Care Night to Night Placement Study was developed in the second half of 2008 because of concerns about placement stability.  The goal of utilizing this report was to reduce night to night placements.  (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 169:9-171:9).

428.    Ms. Cochran testified that the Foster Care Night to Night Placement Study, which measures any placement that lasts for eight days or less, is intended to be "informational." No required action steps are triggered as a result of any concerning information demonstrated in the report.  (Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 164:1-165:17).  Further, she is not aware of any efforts to evaluate trends in short-term placements using this report.  (*Id.*)

429.    Ms. Roche testified that she does not use the Foster Care Night to Night Placement Study as a management tool to evaluate each area office's use of night to night placements and identify offices that need to reduce their reliance on them.  (Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 225:4-8).

430.    Mr. Fitzsimons testified that he did not have a mechanism by which to track the number of children spending the day in a DCF area office lobby on a day-to-day basis and that he was not aware of any efforts to reduce the number of children spending the day in these lobbies.  (Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, Mar. 5, 2012, at 214:5-12).

431.    DCF's Rule 30(b)(6) designee on placements was not aware of any DCF policies regarding the maximum amount of time that a child may spend in a DCF office before being placed, and was not aware of any record DCF keeps of how long each child is in the office before being taken to a placement.  (Rule 30(b)(6) Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, re: Placement Array, Assignment of Placements, and Placement Moves, Sept. 20, 2011, at 81:3-10).

432.    An email from March 2011 noted that an ongoing caseworker or supervisor would almost never know where a child was placed by an emergency response worker ("ERW") after-hours unless the ERW specifically notified them.  (Trial Exhibit 739, Email from Jennifer Greene to David Rondeau and David VanKennen, Mar. 16, 2011, at DCF002565845).

### D.    Inappropriate Use of Short-term Stabilization Assessment and Rapid Reintegration Placements

#### 1.    Professional Standards

433.    DCF policy and regulations require that all of-out-home placement decisions be made in the best interests of the child, based upon the safety, well-being and permanency of the child and the child's individual needs.  (Trial Exhibit 69, 110 Mass. Code Regs. 7.101(1) (2013); Trial Exhibit 1, Placement Prevention and Placement Policy, DSS Policy No. 90-004(R), Feb. 10, 1998, DCF Case Practice Policy and Procedures Manual, at DCF POL (7/08) 170).

434.    According to DCF policy, factors to consider in determining the placement for a child include, but are not limited to, "the individual child's needs, the nature and length of the placement, and the placement resources available."  (*Id.* at DCF POL (7/08) 170).

435.    Federal law requires that DCF place a child in foster care in the most family-like setting possible that can meet the child's individual needs.  (Trial Exhibit 476, 42 U.S.C. § 675(5)(A) (2011).

436.    According to policy and regulation, a child should always be placed in the least restrictive setting possible.  (Trial Exhibit 69, 110 Mass. Code Regs. 7.101(1)(a) (2013); Trial Exhibit 1, Placement Prevention and Placement Policy, DSS Policy No. 90-004(R), Feb. 10, 1998, DCF Case Practice Policy and Procedures Manual, at DCF POL (7/08) 170). DCF officials testified that the first choice of placement for any child is in a family foster home, and that, when possible, DCF should put children in family foster homes rather than in residential or group care.  (Deposition of Virginia Peel, DCF General Counsel, Feb. 8, 2012, at 77:15-22; Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 241:18-243:18).

437. If a child needs to be placed in an institutional setting, the child should remain there for only as long as their needs require.  (Contested Exhibit UL, Council on Accreditation, Residential Treatment Services, § 1).

## 2.    The Use of STARR Placements Necessitates Additional Moves for Children

438.    DCF maintains a type of congregate care known as Stabilization, Assessment and Rapid Reintegration facilities ("STARRs"), which are:

> [I]ntended as an up-to-45-day placement for children or youth who may be coming into the department's care or custody and [DCF knows] little about them, who may be disrupting from other services, and [the child needs] a period of more intensive assessment and stabilization before determining the next appropriate level of care.

(Rule 30(b)(6) Deposition of Robert Wentworth, DCF Assistant Commissioner for Planning and Program Development, re: Purchased Services Licensing, Delivery, and Oversight,  Dec. 29, 2011, at 12:10-13:8).

439.    Robert Wentworth, DCF Assistant Commissioner for Planning and Program Development, and Rule 30(b)(6) designee with regard to purchased services licensing, delivery, and oversight, testified with respect to STARRs that DCF did not "want to see children remaining in short-term placement facilit[ies] where a move was by design necessary, to stay there any longer than they needed to before going to a more permanent setting." (Rule 30(b)(6) Deposition of Robert Wentworth, DCF Assistant Commissioner for Planning and Program Development, re: Purchased Services Licensing, Delivery, and Oversight, Dec. 29, 2011, at 148:1-22).

440.    Short-term placements create additional moves for children, causing them harm. Plaintiffs incorporate herein § III.C.1.

## 3.    DCF Places Children In STARR Emergency Placements Inappropriately

441.    DCF places large numbers of children in short-term Stabilization and Rapid Reintegration placements.  There were 324 children in DCF custody in STARR facilities on December 31, 2010. (Trial Exhibit 955, Department of Children and Families Quarterly Report: Fiscal Year 2011 2nd Quarter, pp. 41, 44).  One year later, as of December 31, 2011, there were 325 children in STARRs.  (Trial Exhibit 955, Department of Children and Families Quarterly Report: Fiscal Year 2012 2nd Quarter, pp. 43, 46).

442.    As of March 31, 2012, 339 children in DCF custody were placed in STARR facilities. This comprised over 19% of all children in congregate care facilities.  (Trial Exhibit 955,

Department of Children and Families Quarterly Report: Fiscal Year 2012, 3rd Quarter, pp. 43, 46).

443.    Of the 166 children who entered DCF foster care in the Boston Region between September 1, 2010 and January 31, 2011, DCF placed 22 children in STARR facilities. (Trial Exhibit 672, Initial Placement into Care between 9/1/10 – 1/31/11).

444.    DCF keeps children in STARR placements beyond their 45-day limit.  According to an Area Systems report, as of April 2011, 21 children in the Northern Region were in STARR placements and had been there for more than 45 days. (Trial Exhibit 673, Northern Regional Office Area Systems Report, Apr. 2011, p. 1).

445.    Two hundred sixty eight STARR placements of the 766 that ended during the three-month period from July 1, 2010 through September 30, 2010 – or 35% – lasted for more than 45 days, and over 100 of these STARR placements lasted for 75 days or longer.  (Trial Exhibit 548, Email from Kim Occhiuti to Ruben Ferreira, re: LOS for New Model, and attached LOS Analysis for New Model).

446.    According to an email from a private provider to Ms. Cochran, some children are "stuck in a starr [sic] bed." (Trial Exhibit 424, Email from Joy Cochran to Mary Gambon re: Follow-up request for data mentioned during the IFC Executive Directors' meeting, June 8, 2010, at DCF005166156).

447.    Children experience multiple, and sometimes consecutive, STARR placements. For example, 134 children of 766 children who experienced STARR placements that ended during the three-month period from July 1 through September 30, 2010 came to that STARR placement directly from another STARR placement.  In addition, 84 children moved from the STARR placement that ended between July 1 and September 30, 2010 directly to another STARR.  (Trial Exhibit 548, Email from Kim Occhiuti to Ruben Ferreira, re: LOS for New Model, and attached LOS Analysis for New Model).

448.    DCF places children in STARR placements for non-therapeutic reasons. (*See, e.g.*, Trial Exhibit 407, Memorandum from Michelle Mason to Terry Flynn re: Plymouth Office Staff Meeting Feedback Re: Joint Procurement, Jan. 18, 2011, and Email from Frances Carbone to Perry Trilling and Amy Kershaw re: STARR Design, July 19, 2010 at DCF003355182).

449.    Former Commissioner McClain testified that "some people think of [STARR facilities] as a shelter program.  (Trial Tr., April 30, 2013 (McClain), at 46:18-47:4; *see also* Trial Tr., May 3, 2013 (McClain), at 23:6-20).  Former Commissioner McClain testified that generally it would not be good clinical practice for a child to move from one STARR to another.  (Trial Tr., May 3, 2013 (McClain), at 26:24-27:20).

450.    Mr. Wentworth testified that it would be "entirely consistent with what we intended by this program" to place a child in a STARR facility strictly for shelter purposes. (Rule 30(b)(6) Deposition of Robert Wentworth, DCF Assistant Commissioner for Planning and Program Development, re: Purchased Services Licensing, Delivery, and Oversight,  Dec. 29, 2011, at 151:6-17).

451.   DCF uses STARR facilities for night-to-night placements when DCF cannot locate an appropriate placement for the child; according to a DCF Regional Planner, this is one of the two purposes for which STARR placements should be used.  (Trial Exhibit 1032, Email from Christie Sawyer to Gretchen Carleton re: FW: STARR bed Question, Aug. 16, 2011, at DCF011115928).

452.   Ms. Nisenbaum testified that STARR placements are used for "short-term" placements, and are sometimes used as an emergency placement when there is no other available placement for a child coming into care. (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 246:18-247:21).

453.   Mr. Flynn testified that, in the Southern Region, DCF utilizes STARRs for adolescents who should be placed in foster family homes.  (Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, Jan. 26, 2012, at 130:4-16).

### 4.   DCF Has Failed to Address its Use of STARR Placements for Non-Therapeutic Reasons

454.   Ms. Nisenbaum testified that DCF has no written policy or guidelines addressing the placement of children who have been sexually abused in STARR facilities with other children.  (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 250:11-252:10).

455.   Mr. Wentworth testified that it was "not a good situation" to have mixed populations of lower and higher need children in a shelter program together.  (Rule 30(b)(6) Deposition of Robert Wentworth, DCF Assistant Commissioner for Planning and Program Development, re: Purchased Services Licensing, Delivery, and Oversight, Dec. 29, 2011, at 133:8-134:7).

456.   However, DCF does not track the frequency with which it utilizes STARR facilities for emergency shelter purposes, as opposed to stabilization and rapid reintegration purposes.  (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 247:22-248:3; Rule 30(b)(6) Deposition of Robert Wentworth, DCF Assistant Commissioner for Planning and Program Development, re: Purchased Services Licensing, Delivery, and Oversight, Dec. 29, 2011, at 155:19-156:8).

457.   Frances Carbone, DCF Director of Program Operations, testified that, to her knowledge, DCF does not track in the aggregate whether children are placed in STARR facilities for shelter versus stabilization rapid reintegration purposes.  (Deposition of Frances Carbone, DCF Director of Program Operations, Apr. 19, 2012, at 206:20-207:2).

458.   Ms. Carbone testified that she could not think of any studies DCF had conducted to collect and assess data regarding whether or not children placed in a STARR facility benefited from such a placement.  (Deposition of Frances Carbone, DCF Director of Program Operations, Apr. 19, 2012, at 115:22-116:4).  Ms. Carbone further testified that rather than conducting a comprehensive, evidence-based report analyzing the STARR model, DCF has instead performed a series of ad hoc looks at return home rates, recidivism rates, and other factors.  (*Id*. at 116:5-17).

459.    Ms. Roche testified that DCF is trying to eliminate the use of night to night placements by using STARR facilities.  (Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 223:11-225:3).

### E.    Unapproved Kinship Placements

#### 1.    Professional Standards

460.    The Council on Accreditation defines Formal Kinship Care Services as "plac[ing] children in state custody with kinship families, ensur[ing] their safety, and promot[ing] permanency and well-being."  Kinship caregivers can be "relatives or other adults who have a relationship with the child."  (Contested Exhibit RU, Council on Accreditation Eighth Edition Kinship Care Services Standards, 2008, § PA-KC Definition).

461.    The Council on Accreditation standards provide that one of the priorities for selecting a placement for a child in foster care is placement with kin.  (Contested Exhibit RQ, Council on Accreditation Eighth Edition Foster Care Services Standards, 2008, § 6.03).

462.    By Massachusetts statute and regulation, whenever a child is taken into foster care, DCF is required to immediately commence a search for a relative or other adult with a significant role in the child's life to serve as a foster parent for the child.  (Trial Exhibit 164, Mass. Gen. Laws Ann. ch. 119, § 23(c) (2009); Trial Exhibit 69, 110 Mass. Code Regs. 7.101(3) (2013); *see also infra*, § X.A.1).

463.    According to policy and regulation, DCF is to prioritize placement with kin if consistent with the child's best interests.  (Trial Exhibit 69, 110 Mass. Code Regs. 7.101(2) (2013)).

464.    Massachusetts regulation and DCF policy require that DCF screen and approve all kinship and child-specific placements.  DCF is required to conduct an initial eligibility screening before placing a child in an emergency kinship or child-specific placement.  (Trial Exhibit 69, 110 Mass. Code Regs. 7.108 (2013); Trial Exhibit 1, Family Resource Policy, DSS Policy No. 2006-01, DCF Case Practice Policy & Procedures Manual, Feb. 6, 2006, at DCF POL (7/08) 184-89).

465.    Massachusetts regulations require that when "an emergency kinship or child-specific placement is made . . . [t]he Department shall complete a comprehensive assessment of the foster/pre-adoptive application within 40 working days after placement."  (Trial Exhibit 69, 110 Mass. Code Regs. 7.108(1)(f) (2013); Trial Tr., Feb. 7, 2013 (Jones), at 29:4-21).  DCF policy similarly requires that a full license study be completed and approved or denied within 40 working days after the placement of a child in a kinship or child-specific foster or pre-adoptive home.  (Trial Exhibit 1, Family Resource Policy, DSS Policy No. 2006-01, DCF Case Practice Policy & Procedures Manual, Feb. 6, 2006, at DCF POL (7/08) 190).

466.    Massachusetts regulation requires that DCF annually reassess foster and pre-adoptive parents and foster and pre-adoptive homes, and that DCF conduct a license renewal every two years in place of the annual reassessment.  (Trial Exhibit 69, 110 Mass. Code Regs. 7.113(1) (2013); *see also* Trial Exhibit 1, Family Resource Policy, DSS Policy No. 2006-01, DCF Case Practice Policy & Procedures Manual, Feb. 6, 2006, at DCF POL (7/08) 198-205).

467.    DCF is required to conduct a Criminal Offender Record Information (CORI) investigation on any individual applying to become a foster or pre-adoptive parent and on any household member age 14 or older, both as part of the initial screening process and as part of any annual reassessment of the foster or pre-adoptive home. (Trial Exhibit 69, 110 Mass. Code Regs. 18.00-18.16 (2013); *see also* Trial Exhibit 1, Background Records Check Policy, DCF Policy No. 86-014, DCF Case Practice Policy & Procedures Manual, Dec. 1, 2008, at DCF POL (7/08) 241-82).

468.    Dr. Azzi-Lessing testified that when children are placed with relatives, "it's the obligation of the child welfare agency that places those children to move quickly on licensing those relatives to be foster parents, but also equally important, of monitoring that placement." (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 32:7-11).  DCF must ensure that the home is "safe enough," the care giver has "decent parenting skills," and that they can keep the child safe. (*Id.* at 32:17-20).

469.    Dr. Azzi-Lessing testified that it is important for DCF to provide support and frequent visitation to kinship placements.  (*Id.* at 33:14-23, 35:2-8).

### 2.    Placement in Unapproved Kinship Homes Causes Harm and the Risk of Harm

470.    The risk of harm a child is exposed to when the home they are placed in is not subjected to timely licensing processes is heightened for children in a kinship home when the initial assessment is delayed beyond forty days, because during that time the child has been residing in a home where no background home study has been conducted.  (Trial Tr., Feb. 7, 2013 (Jones), at 38:18-39:3).

471.    Twenty-four children were the victims of substantiated maltreatment in kinship or child-specific foster homes in federal fiscal year 2010.  This was 20.7% of all substantiated institutional maltreatment for that year.  Of the 99 child victims of substantiated institutional maltreatment in foster care in federal fiscal year 2011, 19 (19.2%) were in a kinship or child specific DCF foster home.  (Trial Exhibit 452, Defendants' Responses and Objections to Plaintiffs' Second Set of Interrogatories, Apr. 24, 2012, p. 3).

472.    A 2004 review of maltreatment in care noted that nearly 40% of all maltreatment in foster care occurred in restricted foster homes.  15% of maltreatment occurred to children in kinship foster homes and 24% in child-specific foster homes.  (Trial Exhibit 14, CQI Child Maltreatment in Care Records Review, Sept. 22, 2004, at DCF003525836).

### 3.    DCF Places Children in Kinship Foster Homes That Do Not Meet Its Policies Regarding Licensing and Approval

473.    DCF maintains children in kinship or child-specific placements without timely conducting a full approval process to ensure that these placements are safe for children.  (*See, e.g.*, Trial Exhibit 512, Email from Joy Cochran to Susan Diamantopoulos, DSS-DL - Regional Clinical Directors, and Stephanie Frankel, et al. re: DSSRP 171, Unapproved Homes with Active Placements, Apr. 22, 2011, with attached Boston Region Unapproved Homes with Active Placements, Apr. 20, 2011, Northern Region Unapproved Homes with

Active Placements, Apr. 20, 2011, Southern Region Unapproved Homes with Active Placements, Apr. 20, 2011, Western Region Unapproved Homes with Active Placements, Apr. 20, 2011, at DCF000465827). As of June 20, 2011, 399 children in DCF custody were in kinship or child-specific foster homes that were not approved foster homes. (Trial Exhibit 149, DCF Unapproved Homes with Active Placements, June 20, 2011). Of these, 232 children were in kinship or child-specific foster homes still within the probationary period, 114 children were in homes where approval was up to 49 days overdue, and 53 children were in homes where approval was at least 50 days overdue. (*Id.*).

474.    More than one year later, as of August 20, 2012, 421 children were in unapproved kinship or child-specific foster homes. (Trial Exhibit 149, DCF Unapproved Homes with Active Placements, Aug. 20, 2012). Of these, 267 children were in kinship or child-specific foster homes still within the probationary period, 107 children were in homes where approval was up to 49 days overdue, and 47 children were in homes where approval was at least 50 days overdue. (*Id.*)

475.    During fiscal year 2012, only 85.2% of restricted (kinship or child-specific) foster home studies that came due were completed within the forty days required by policy and regulation. (Trial Exhibit 956, Foster Care Quarterly Report for Fiscal Year 2012, Quarter 4, at 1).

476.    Most recently, during the first quarter of fiscal year 2013, DCF completed 83.0% of restricted home studies within the required 40-day timeframe. (Trial Exhibit 956, Foster Care Quarterly Report, Fiscal Year 2013, Quarter 1). Performance varied in this measure across DCF regions and areas, ranging as low as 69.7% for the Boston Region and just 35.7% in the Hyde Park Area office. (*Id.* p. 5).

477.    Olga Roche, DCF Deputy Commissioner for Field Operations, is aware that the failure to timely complete home studies within the required 40 days of a child's placement is a "safety issue" because, even with kin, "anything can happen," and DCF must ensure the safety of the placement. Ms. Roche testified that although DCF does not have a formal target for the number of home studies that are past due, she believed there should not be more than five homes with overdue home studies in any region at any time. (Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 160:13-161:17, 164:17-166:4). However, Ms. Roche testified that the Western and Northeastern regions sometimes have more than five kin homes with overdue home studies on any given day, because those regions are "still overwhelmed with placement[s]." (*Id.* at 166:5-17).

478.    Further, despite acknowledging the potential safety issues in kinship foster homes, DCF does not have a process to ensure that the initial eligibility screening required by Massachusetts regulation before a child is placed in an emergency kinship or child-specific placement happens. Terrence Flynn, DCF Regional Director for the Southern Region and Rule 30(b)(6) designee with respect to Placement Array, Assignment of Placements, and Placement Moves, is not aware of any report that tracks the completion of initial eligibility screening for restricted foster homes. (Rule 30(b)(6) Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, re: Placement Array, Assignment of Placements, and Placement Moves, Sept. 20, 2011, at 110:12-24).

479. In addition, DCF places significant numbers of children in kinship and child-specific foster homes where the annual reassessment or license renewal is overdue. (*See, e.g.*, Trial Exhibit 278, Departmental Foster Care Compliance Report, Apr. 2, 2009; Trial Exhibit 146, All Unapproved Homes with Overdue Annual Events Reports (e.g., Trial Exhibit 357, Email from Judith Macmunn to Douglas Foresta and Dawn Sweetman re: Overdue Annual Re-Assessments and License Renewals, July 11, 2011, and attached Overdue Annual Events); *see also* Trial Exhibit 735, Email from Judith Rocha to John Raposa, July 14, 2011, at DCF004842193).

### 4. DCF's Chronic Failure to Ensure the Safety of Kinship Homes before Placing Children in the Home

480. Timely completion of restricted home studies has historically been a problem for DCF – 73.7% were timely completed in fiscal year 2011, and 71.9% in fiscal year 2010. (Trial Exhibit 956, Foster Care Quarterly Report for Fiscal Year 2011, Quarter 4, at 1; Trial Exhibit 956, Foster Care Quarterly Report for Fiscal Year 2010, Quarter 4, at 1).

481. DCF has not established a metric to determine the acceptable number of home studies that are past due beyond 40 days or 90 days each month. (Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 220:24-221:3).

482. Raymond Pillidge, DCF Regional Director for the Northern Region, testified that he has not sought to identify barriers to the completion of timely kinship home studies despite the fact that more than one-quarter of the population in his region is without timely kinship home studies. (Deposition of Raymond Pillidge, DCF Regional Director for the Northern Region, Mar. 7, 2012, at 148:15-150:13).

483. Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, was unaware of any disciplinary action that has been taken against DCF staff relating to the failure to timely complete home studies. (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 140:17-21).

484. DCF does not have sufficient resources to timely conduct background record and Criminal Offender Record Information (CORI) checks, both for initial approval and for reassessments and relicensing. Plaintiffs incorporate herein *supra* § II.C.2.f.

485. There are problems obtaining CORI information after-hours, including receiving inaccurate information. (Trial Exhibit 463, Email and attachment from Terry Flynn to Jan Nisenbaum, July 6, 2011, at DCF005627620-21; *see also* Trial Exhibit 732, Hotline Forum 4/14/2011 Workgroup Feedback, at DCF005494023).

486. It can take considerable time to obtain information for CORI waivers. (Trial Exhibit 733, Summary of Staff Feedback from Worcester West Staff Meeting Presentation on Kinship First, June 29, 2011, at DCF007180978).

487. A memorandum on Placement Stability in the Southern Region noted CORI waivers are the biggest barrier to placing children in kinship homes. The memorandum stated: "Until we

find a way to overcome this issue, we will continue to struggle with Kin/child specific placements." (Trial Exhibit 805, Draft Document re: Southern Region Placement Stability, at DCF004843379).

488. DCF Area offices have identified the CORI/BRC process and the homestudy process as barriers to kinship placements. (Trial Exhibit 988, Email exchange among Jan Nisenbaum, Paul Fitzsimons, and Olga Roche re: Kinship and Placement Stability PP - Staff Presentation, Aug. 2, 2011, at DCF010990674-75).

489. DCF has failed to clarify its policies and procedures regarding foster home standards for kinship and child-specific foster parents. There is confusion among DCF caseworkers regarding physical space requirements and possible exemptions for kinship and child-specific foster parents, and there is no formal mechanism for granting such exemptions. (*See, e.g.*, Trial Exhibit 462, Email from Raymond Pillidge to Olga Roche, Apr. 26, 2011, at DCF004917653; Trial Exhibit 293, Email from Francis Galligan to Terry Flynn, June 27, 2011; *see also* Trial Exhibit 463, Email and attachment from Terry Flynn to Jan Nisenbaum, July 6, 2011, at DCF005627618; Trial Exhibit 669, Documents re: Kinship Plans at DCF008434733; Trial Exhibit 734, FY 11-12 Family Resource CQI/Self-Assessment at DCF000085869).

490. Terrence Flynn, DCF Regional Director for the Southern Region, testified that while "discussions" have taken place regarding flexibility of physical standards in kinship home placements, he was not aware of any training originating from the central office dedicated to the issue, and that no written clarification had yet been issued. (Deposition of Terrence Flynn, DCFs Regional Director for the Southern Region, Jan. 26, 2012, at 175:21-176:13, 179:11-180:14).

491. Terrence Flynn testified that at times, staff interpret the policy governing space and physical standards in potential kinship home placements "too narrowly." (*Id.* at 175:21-178:24).

492. There is confusion and inconsistent practice among DCF workers regarding CORI waivers for kinship and child-specific foster parents. (*See, e.g.*, Trial Exhibit 462, Email from Raymond Pillidge to Olga Roche, Apr. 26, 2011, at DCF004917653; Trial Exhibit 293, Email from Francis Galligan to Terry Flynn, June 27, 2011; Trial Exhibit 463, Email and attachment from Terry Flynn to Jan Nisenbaum, July 6, 2011, at DCF005627618; Trial Exhibit 58, Final Report, Massachusetts Child and Family Services Review, Feb. 21, 2008, at CSF-000000789; Trial Exhibit 669, Documents re: Kinship Plans at DCF008434733; Trial Exhibit 34, MA CFSR 2007: Summary of Key Issues for PIP Development, at DCF008117148; Trial Exhibit 547, Placement Stability PDSA at DCF007161712, DCF007161715; Trial Exhibit 734, FY 11-12 Family Resource CQI/Self-Assessment at DCF000085875; Trial Exhibit 732, Hotline Forum 4/14/2011 Workgroup Feedback at DCF005494022, DCF005494026).

493. DCF staff have recommended creating a policy statement to clarify information about CORI waivers for kinship placements and simplifying the waiver process. (Trial Exhibit 1034, Placement Stability Area Feedback, at DCF010997635, DCF010997638).

494.     Terrence Flynn testified that "[s]taff don't always" have a good understanding of how to read and interpret CORI records, and proper understanding of the CORI and waiver process is important to understanding whether proper decisions are being made regarding kin placement.  (Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, Jan. 26, 2012, at 165:9-167:18).

495.     Terrence Flynn testified that with regards to the home study for a prospective kin placement, there is no uniform allocation of work between the ongoing worker and the family resource staff across offices, particularly in emergency situations, but is instead specific to the area or regional office.  (*Id.* at 161:3-163:6).

496.     A DCF PowerPoint noted a specific concern about timely reviewing and securing CORI waivers when appropriate.  (Trial Exhibit 1041, Document re: Adoption Reviews, at DCF011385933).

497.     A barrier to initial placement of a child in kin or child-specific home is that there are sometimes issues with background record checks and criminal background checks.  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 78:7-19).

### F.     Inappropriate Placement in Intensive Foster Care

#### 1.     Professional Standards

498.     DCF policy and regulations require that all of-out-home placement decisions be made in the best interests of the child, based upon the safety, well-being and permanency of the child and the child's individual needs.  (Trial Exhibit 69, 110 Mass. Code Regs. 7.101(1) (2013); Trial Exhibit 1, Placement Prevention and Placement Policy, DSS Policy No. 90-004(R), Feb. 10, 1998, DCF Case Practice Policy and Procedures Manual, at DCF POL (7/08) 170).

499.     According to DCF policy, factors to consider in determining the placement for a child include, but are not limited to, "the individual child's needs, the nature and length of the placement, and the placement resources available."  (Trial Exhibit 1, Placement Prevention and Placement Policy, DSS Policy No. 90-004(R), Feb. 10, 1998, DCF Case Practice Policy and Procedures Manual, at DCF POL (7/08) 170).

#### 2.     DCF Inappropriately Utilizes Intensive Foster Care for Children Who Need a Different Level of Care

500.     DCF utilizes a form of foster care called "Intensive Foster Care" (IFC).  IFC placements provide therapeutic services and supports in a family home to children for whom a traditional foster care environment will not be sufficiently supportive, children transitioning from a residential or group home level of care, and children discharging from a hospital setting.  (Trial Exhibit 385, Letter to Angelo McClain re: Intensive Foster Care Scope of Services, Dep. Ex. 288, at DCF000465967).

501.    Private providers have received referrals to their programs that are not appropriate matches for IFC.  There is tremendous variability in the type of referrals between area offices without appropriately assessing whether an IFC placement would be appropriate for the child.  (Trial Exhibit 424, Email from Joy Cochran to Mary Gambon re: Follow-up request for data mentioned during the IFC Executive Directors' meeting, June 8, 2010, at DCF005166156).  Further, there is no standardized means of making an IFC referral. (*Id.*; *see also* Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 203:23-204:7).

502.    In April 2010, Commissioner McClain reported concerns regarding referrals to Intensive Foster Care statewide, including that the acuity of children in IFC had increased and that children who would be more appropriately placed in residential care were being placed in IFC.  Reports from providers concluded: "Kids are being harmed by the current system." (Trial Exhibit 406, Email from Angelo McClain to DSS-DL – Statewide Managers Meeting Participants, Apr. 24, 2010;  *see also* Trial Exhibit 422, Email from Mary Gambon to Olga Roche, Apr. 27, 2010; Trial Exhibit 425, Email from Mary Gambon to Angelo McClain re: Report on IFC, June 11, 2010, and attached Letter to Angelo McClain re: Info on IFC, June 2010, at DCF004976830; Contested Exhibit CP, The Children's League of Massachusetts, Public Secrets: Silent Suffering, The State of Our Most Vulnerable Children, 2009, at DCF000545364; Rule 30(b)(6) Deposition of Barbara Talkov, Children's League Executive Director, Aug. 3, 2012, at 145:7-9, 145:21-146:14).

503.    DCF has referred children with significant needs who were "too difficult" for IFC to IFC providers, and the providers were unable to maintain placement stability.  (Trial Exhibit 425, Email from Mary Gambon to Angelo McClain re: Report on IFC, June 11, 2010, and attached Letter to Angelo McClain re: Info on IFC, June 2010, at DCF004976830; *see also* Trial Exhibit 423, Email Exchange between Olga Roche and Mary Gambon re: Points for RD Discussion, Apr. 30, 2010).  Providers report that some children "do not match" the IFC foster families.  (Trial Exhibit 425, Email from Mary Gambon to Angelo McClain re: Report on IFC, June 11, 2010, and attached Letter to Angelo McClain re: Info on IFC, June 2010, at DCF004976830).

504.    Barbara Talkov, the Executive Director of the Children's League, testified that the "acuity of kids" referenced in an email from Angelo McClain referred to the level of behavioral and emotional needs of the children, including "more disturbed, more volatile," and more "self-destructive."  (Rule 30(b)(6) Deposition of Barbara Talkov, Children's League Executive Director, Aug. 3, 2012, at 147:4-149:11; Trial Exhibit 406, Email from Angelo McClain to DSS-DL – Statewide Managers Meeting Participants, Apr. 24, 2010).

505.    Commissioner McClain testified that "generically they all [IFC providers] were to a greater or lesser extent saying they were experiencing" referrals of children with higher needs.  (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 214:24-215:18; *see also* Trial Exhibit 406, Email from Angelo McClain to DSS-DL – Statewide Managers meeting Participants re: HEADS UP – CONCERNS REGARDING IFC RECENT REFERAL PATTERNS, Apr. 24, 2010).

506.    Ms. Roche testified that IFC providers have sometimes told DCF that children being referred to IFC are too complex or needy for that level of care, and that IFC providers do not have appropriate foster homes for those children. (Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 23:11-24:15). Ms. Gambon testified that three of the largest IFC providers in Massachusetts raised the issue of the increased "acuity" of children referred by DCF to IFC. (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 184:3-185:4, 189:15-191:5; Trial Exhibit 421, Email exchange between Angelo McClain and Mary Gambon re: Heads Up-Concerns Regarding ICF Recent Referral Patterns, Apr. 26, 2012).

507.    Ms. Cochran testified that one IFC agency has pointed to the increased acuity of the children since 2006 as the cause of placement instability. (Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 99:18-103:7).

508.    Ms. Gambon acknowledged that DCF has deliberately reduced its use of congregate care, and that a possible result of this is that children referred to Intensive Foster Care will have more severe emotional problems. (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 198:12-199:10).

509.    DCF continues to place children with significant emotional and behavioral issues in foster homes instead of residential programs. (Rule 30(b)(6) Deposition of Barbara Talkov, Children's League Executive Director, Aug. 3, 2012, at 145:11-146:22).

510.    DCF also places children who do not need Intensive Foster Care in IFC because of a lack of regular DCF foster homes. (*See, e.g.*, Trial Exhibit 295, Email exchange between Dennis Gauthier and Terry Flynn re: IFC, Jan. 13, 2011, and attached letter from Dennis Gauthier to Terry Flynn re: Analysis of IFC Usage in the New Bedford Office, Jan. 10, 2011, at DCF004997971).

511.    Ms. Gambon testified that DCF often uses intensive foster care for "hoteling," or placement of children in IFC simply because DCF does not have an available departmental foster home that meets the child's needs, rather than because the child meets the "threshold" for intensive foster care. (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 213:3-214:6).

512.    A document from Ms. Gambon to Commissioner McClain noted the "history of IFC being used for 'hoteling.'" Trial Exhibit 425, Email from Mary Gambon to Angelo McClain re: Report on IFC, June 11, 2010, and attached Letter to Angelo McClain re: Info on IFC, June 2010, at DCF004976830).

513.    For example, the Lynn area office placed 19 infants in IFC in 2008, and approximately one-third of the IFC placements used by one DCF region were for non-therapeutic reasons. (*Id*.).

514.    Ms. Gambon testified that when infants or toddlers are placed in IFC due to the lack of an unrestricted home, they would receive that placement even though they are not in need of an

intensive level of foster care support.  (Rule 30(b)(6) Deposition of Mary Gambon re. Recruiting and Retention of Foster Homes, Oct. 18, 2011, 127:19-128:6).

515.    DCF has utilized IFC to place sibling groups because it does not have other foster homes available to accommodate them. (Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, Mar. 5, 2012, at 200:9-201:24; Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 213:3-214:6).

516.    Terrence Flynn, DCF's Regional Director for the Southern Region and Rule 30(b)(6) designee with respect to placement array, assignment of placements, and placement moves, testified that there are times when children remain in intensive foster care ("IFC") home when they no longer require that level of care because DCF does not have regular foster homes available.  (Rule 30(b)(6) Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, re: Placement Array, Assignment of Placements, and Placement Moves, Sept. 20, 2011, at 72:1-3, 73:1-11).

517.    Ms. Roche testified that some children leaving mental health facilities to be placed in IFC must wait for a placement or are not placed in IFC at all due to a lack of families that would be an appropriate match for the child.  (Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 15:18-18-1).  As a result, DCF sometimes makes the "second best decision" and places the child in a different level of care than that which was clinically recommended, or there is a delay of weeks or months before an appropriate IFC home is found.  (*Id.* at 18:2-10:1).

518.    Mr. Flynn testified that he is aware of children who have been identified for placement in an IFC home but have not yet been placed in such a home for a variety of reasons.  (Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, Jan. 26, 2012, at 194:7-19, 196:21-24).

### 3.    DCF Has Failed to Take Action to Ensure that Children Are Placed in IFC Only When It Would Best Meet Their Needs

519.    In response to an email noting IFC provider concerns that they could not meet the needs of children being referred, Ms. Nisenbaum responded that it may be helpful to do some case record reviews of children in IFC, to which Commissioner McClain responded, "[t]hat's a good idea for collecting qualitative information."  (Trial Exhibit 473, Email exchange between Angelo McClain and Jan Nisenbaum re: Concerns Regarding IFC Recent Referral Patterns, Apr. 24, 2010).  Commissioner McClain did not know at the time of his deposition one year later whether any such reviews had ever occurred.  (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 221:1-16).

520.    Ms. Nisenbaum testified that the review of IFC case files she proposed to undertake to investigate the concerns raised in the email about IFC referrals (Trial Exhibit 473, Email exchange between Angelo McClain and Jan Nisenbaum re: Concerns Regarding IFC Recent Referral Patterns, Apr. 24, 2010) did not take place because staff was unavailable to do such a review.  (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice

and Program Operations, May 18, 2012, at 235:13-237:4). Instead, Ruben Ferreira was charged with performing a quantitative analysis of placement stability in Intensive Foster Care, leading to the IFC report of March 2011. (*Id*. at 236:23-239:4; *see also* Trial Exhibit 38, Intensive Foster Care Placement Stability, Prior and Next Placement: Calendar Years 2007-2010, Mar. 2011).

521.    Commissioner McClain testified that the Intensive Foster Care Placement Stability report, prepared by Ruben Ferreira eleven months after these concerns were initially raised in these emails, was a "timely" response. (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 222:18-223:13).

522.    Mr. Flynn testified that he was troubled upon learning that intensive foster care providers are closing because they "cannot handle acuity and needs of the kids," but stated that he "do[es]n't track IFC agencies and which ones are open and which ones are closed." (Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, Jan. 26, 2012, at 207:16-208:6; Trial Exhibit 296, Email exchange between Terry Flynn and John Renzi re: HEADS UP - CONCERNS REGARDING RECENT REFERAL PATTERNS, Apr. 26, 2010, at DCF004918842).

523.    As of August 2012, the Executive Director of the Children's League was unaware of any efforts DCF had undertaken with IFC providers specifically to better match children to IFC placements. (Rule 30(b)(6) Deposition of Barbara Talkov, Children's League Executive Director, Aug. 3, 2012, at 158:5-20).

524.    Mr. Flynn testified that he does not maintain a list of children who have been identified for but not placed in intensive foster care homes, does not know the number of children who are in such a situation at any given time, and does not have any sense of how long children typically wait to be placed in an intensive foster care home. (Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, Jan. 26, 2012, at 194:7-197:7).

525.    The DCF Central Office does not have a management report that identifies who the children are that are waiting for intensive foster care. (Rule 30(b)(6) Deposition of Robert Wentworth, DCF Assistant Commissioner for Planning and Program Development, re: Purchased Services Licensing, Delivery, and Oversight, Dec. 29, 2011, at 83:3-16).

526.    DCF does not track the length of time it takes to place a child in intensive foster care following the decision that a child needs that level of care. (Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, Mar. 5, 2012, at 260:3-8).

527.    DCF does not track the number of children statewide or at a regional level who are placed in IFC homes because there is not a regular foster home available. (Rule 30(b)(6) Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, re: Placement Array, Assignment of Placements, and Placement Moves, Sept. 20, 2011, at 73:12-24).

       **G.**      **Failure to Match Children To Placements that Meet Their Needs**

       1.     **Failure to Match Children to a Placement that Meets their Needs Can Lead to the Placement Disrupting, Subsequent Placement Moves, and Harm**

528.    DCF has long acknowledged that a good match between the child and foster parents impacts placement stability. (*See, e.g.*, Trial Exhibit 57, Massachusetts Child and Family Services Review Statewide Assessment, May 2007, at CSF-000000647). "Mismatching placements to children's needs" can lead to placement instability. (Trial Exhibit 671, U.S. Department of Health and Human Services, Administration for Children and Families, Findings From the Initial Child and Family Service Reviews, 2001–2004, p. 22).

529.    Ms. Gambon testified that even if DCF has a number of "very good homes . . . with a lot of good attributes . . . they may not be the appropriate home at that particular time for [a particular] child." (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 259:6-24).

530.    The 2008 CFSR noted that ineffective matches between children and resource homes were one of the key factors influencing placement instability in Massachusetts. (Trial Exhibit 58, Massachusetts Child and Family Services Review Final Report, Feb. 21, 2008, at CSF-000000769).

531.    According to a DCF Request for Response ("RFR") for Intensive Foster Care ("IFC") placements, placements should be made after carefully considering a child's needs and preferences as well as the willingness of the foster family to meet the child's needs. A good fit is "crucial" to ensure that the placement remains stable and leads towards permanency. (Trial Exhibit 425, Email from Mary Gambon to Angelo McClain re: Report on IFC, June 11, 2010, and attached Letter to Angelo McClain re: Info on IFC, June 2010, at DCF004976827).

532.    Ms. Cochran and Ms. Gambon testified that "planful placement" and appropriate matching are factors that lead to placement stability. (Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 177:9-178:5; Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 34:19-37:12; *see also id.* at 31:5-32:3; Trial Exhibit 408, Email from Mary Gambon to Jan Nisenbaum re: Info for Steering Committee, Feb. 14, 2011, and attached Draft Intake Foster Homes Rationale, p. 2).

533.    Good matches keep sibling groups together; keep children close to family and community whenever possible and appropriate; and rely on the foster parents' skills and abilities to meet the child's needs. (Trial Exhibit 425, Email from Mary Gambon to Angelo McClain re: Report on IFC, June 11, 2010, and attached Letter to Angelo McClain re: Info on IFC, June 2010, at DCF004976827).

534.    Notes from meetings in DCF area offices in 2011 state that DCF's goal is the "true matching" of children's needs with foster families, and note that it is essential to

communicate with foster parents about a child's unique behaviors. (Trial Exhibit 734, FY 11-12 Family Resource CQI/Self-Assessment at, DCF000085871, DCF000085874).

### 2.    DCF Places Children in Foster Homes and Institutions That Do Not Meet Their Needs

535.    DCF placed Named Plaintiff Adam in inappropriate placements, including a unit of a residential facility that was designed to care for boys who had been sexually abused and/or were at risk for sexually abusing other children, even though Adam had no known history of having been sexually abused or being at risk for abusing other children. (Trial Tr., Feb. 4, 2013 (Azzi-Lessing), at 121:8-16; Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 12:3-21; Trial Exhibit 1182, DCF Case File: Adam S., at DCF000001501-02). Adam was raped while living in this facility. (Trial Tr., Feb. 4, 2013 (Azzi-Lessing), 125:25-126:22; Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 14:8-17).

536.    DCF also placed Named Plaintiff Andre in inappropriate placements, including a foster home that already had seven children with no waiver for additional children as well as a residential treatment facility where he remained for almost five years. (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 28:14-21, 45:14-20; 46:9-12; Trial Exhibit 1183, DCF Case File: Andre S., at DCF000003556, DCF010188415).

537.    DCF violated its own placement prevention and placement policy by removing Named Plaintiff Connor "from his biological home where there was a threat of harm and plac[ing] him in a situation where the threat of harm was even greater by placing him in this foster home with a . . . much older boy, that DCF knew was at risk for abusing other children." (Trial Tr., Feb. 4, 2013 (Azzi-Lessing), at 87:18-23; 88:2-3; Trial Exhibit 1, Placement Prevention and Placement Policy, DSS Policy No. 90-004(R), Feb. 10, 1998, DCF Case Practice Policy and Procedures Manual, at DCF POL (7/08) 167). In addition, by placing Connor in a home where it was evident that he would be in physical and emotional danger, DCF violated 110 Mass. Code Regs. 7.101(1), which requires that all out-of-home placement decisions be made in the best interest of the child, based upon safety and the child's individual needs. (Trial Tr., Feb. 4, 2013 (Azzi-Lessing), at 88:8-11, 88:15-20, 89:3-8; Trial Exhibit 69, 110 Mass. Code Regs. 7.101(1)(2013)).

538.    DCF subsequently placed Connor in other inappropriate placements, including a night to night placement, a home with a teenage boy, a locked hospital ward, and two short-term assessment programs. (Trial Tr., Feb. 4, 2013 (Azzi-Lessing), at 90:8-22, 91:3-7, 95:12-23, 96:8-97:10, 98:15-22, 99:14-19, 99:20-100:14; Trial Exhibit 1181, DCF Case File: Connor B., at DCF000005409, DCF010190973, DCF010191148, DCF000004836, DCF003639400-01, DCF010192056, DCF010192244, DCF010194938-39).

539.    DCF also placed Named Plaintiff Camila in inappropriate placements, including night to night placements; she also "spent a lot of time in DCF offices after she was suspended from school or during the summer when DCF was unable to locate a summer camp for her and her sister." (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 68:18-24; Trial Exhibit 1184, DCF Case File: Camila R., at DCF010200570-73, DCF010199896-97, DCF010197016; *see, e.g.*, *id.* at DCF003636929).

540.    Ms. James testified that she lived with her grandmother in an adult residential home when she was fourteen for the last few weeks of school.  (Trial Tr., Jan. 22, 2013 (James), at 46:5-47:17).  If her grandmother had not taken her in, Ms. James would have had to stay at a home where she felt unsafe because "DCF didn't have anywhere to put me."  (*Id.* at 46:16-22).  Ms. James commuted over an hour in order to get to school each day. (*Id.* at 47:14-17).

541.    Ms. James testified that in several of her foster care placements, the family she was living with spoke a different language and knew limited or no English.  (*Id.* at 33:13-34:9, 51:16-25; 52:19-23).  As a result, it was difficult for Ms. James to communicate with her foster parents and express her needs or to feel welcome in the home.  (*Id.* at 51:16-25, 52:19-23).

### 3.    DCF Has Historically Failed to Ensure Appropriate Matching

542.    The 2008 CFSR noted that ineffective matches between children and resource homes were one of the key factors influencing placement stability.  (Trial Exhibit 58, Massachusetts Child and Family Services Review Final Report, Feb. 21, 2008, at CSF-000000768).

543.    Stakeholders reported that children were sometimes placed wherever there was a bed, often resulting in poor matches.  (*Id.* at CSF-000000767-68; s*ee also* Trial Exhibit 34, MA CFSR 2007: Summary of Key Issues for PIP Development, at DCF008117146).

544.    According to a 2009 survey of DCF foster parents, approximately 51% of foster parents had initiated the process to terminate a child's placement in their home.  Of those foster parents who had terminated a child's placement, almost 71% reported that they terminated the placement due to the child's behavior, and almost 32% reported that they terminated a placement due to the child's mental health needs.  (Contested Exhibit DK, Massachusetts Foster Parent Survey, p. 16; Contested Exhibit GP, Massachusetts Foster Parent Survey, at DCF003811185; *see also* Rule 30(b)(6) Deposition of Marylou Sudders, Massachusetts Society for the Prevention of Cruelty to Children President/CEO, Aug. 14, 2012, at 110:9-113:9 (establishing that Contested Exhibit DK is business record of MSPCC); Trial Exhibit 192, Stepping Stones to Permanence: Foster Families in Massachusetts, at DCF000985278).

545.    Notes from a DCF Family Resource and Adoption Coalition meeting on February 16, 2011, state that foster placements are not always appropriately matched, and some children are instead placed "out of need for a bed."  (Trial Exhibit 553, Document re: Family Resource and Adoption Coalition a.k.a. Permanency Workgroup, Feb. 16, 2011, at DCF008167895).  DCF's Placement Stability Sub-Committee meeting notes from September 14, 2011, note that barriers to making the "best matches" include "[w]hen we place a child in 'the only opening.'"  (Trial Exhibit 1020, Permanency Work Group, Placement Stability Sub-Committee Meeting, Sept. 14, 2011, at DCF011119039).

546.    Notes from a foster parent focus group from April 30, 2011, state that youth have voiced concern that there is a lack of matching.  (Trial Exhibit 730, Email from Marsha Donovan to Gina Emanuel, John Renzi, Karin Bettencourt, et al. re: Foster parent focus group at Harbor, May 2, 2011, at DCF003093639).

547.    Ms. Gambon agreed with the conclusion of the IFC placement stability report that "upfront efforts to better match the unique needs of children with the specific qualities of IFC

homes may reduce lateral movements." (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 225:19-226:10; Trial Exhibit 38, Intensive Foster Care Placement Stability, Prior and Next Placement: Calendar Years 2007-2010, Mar. 2011, at DCF000547371). Ms. Cochran testified that "[b]etter matching would probably lead to less lateral moves." (Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 60:15-61:3).

548.    DCF does not have a "live" system to track available placements for children. (Rule 30(b)(6) Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, re: Placement Array, Assignment of Placements, and Placement Moves, Sept. 20, 2011, at 118:4-125:11).

549.    In order to keep track of available placements, DCF supervisors and workers need to "keep an eye on where the openings are moment to moment" and "rely on their own monitoring and management of what is available." (Rule 30(b)(6) Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, re: Placement Array, Assignment of Placements, and Placement Moves, Sept. 20, 2011, at 122:3-20, 125:1-8). Therefore, matching a child with a placement is generally based on the general familiarity of the family resource workers in a given office with the foster homes that are available. (*Id.* at 129:12-130:8).

550.    Commissioner McClain described a bed tracking system developed during his time with the New Jersey child welfare system that allowed the agency to see how many beds that might fit a child's needs were open by contract, and then match that child based on approximately 188 characteristics. (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 191:12-192:16). Massachusetts does not have that type of system, but rather, has a system where "you don't know if the bed capacity that's shown is actually real," and the matching is done using a "watered-down sort of piece." (*Id.* at 192:17-193:24).

551.    Commissioner McClain testified that DCF's matching system is "more geared towards a provider when they're looking for referrals to be able to find referrals, whereas the [tracking system developed in New Jersey] is more centered around the kid's needs." (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 192:17-193:24).

552.    With respect to matching a child to a home that is going to meet their needs, Commissioner McClain testified that "we need to have a robust, systemic sort of response to that, and we don't have that sort of robust, systemic response to that. We understand that we need that." (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 195:2-21).

553.    Ms. Nisenbaum testified that a data tool developed in 2006 that permitted regular tracking of all placement moves by region and area, and which was designed to capture emerging patterns of failed placement, particularly failing up in placement, was discontinued in early 2007. Subsequently, this was done only through ad hoc reporting approximately two times per year. (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 145:17-150:1).

554.    Ms. Nisenbaum testified that IFC providers choose the particular home that a child will be placed in.  (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 159:11-16).  Ms. Nisenbaum was not aware of any additional studies DCF has undertaken to determine how well IFC providers are matching children to individual homes since the 2011 IFC placement stability report.  (*Id.* at 159:17-24).

555.    Mr. Flynn testified that placement of children in placements that do not meet their needs leads to "frequent fliers in psychiatric units" and that children "may have longer lengths of stay there than [DCF] could care for."  (Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, Jan. 26, 2012, at 210:15-22).

**H.    DCF's Inappropriate Placement of Children Results from an Inadequate Placement Array of Departmental and Intensive Foster Care Homes**

**1.    Recruitment of DCF Family Foster Homes**

a)    *Professional Standards*

556.    Federal law requires that each state receiving federal funding for its child welfare system shall establish a plan for child welfare services that "provide[s] for the diligent recruitment of potential foster and adoptive families that reflect the ethnic and racial diversity of children in the State for whom foster and adoptive homes are needed."  42 U.S.C. § 622(b)(7) (2011).  (*See also* Trial Tr., Feb. 28, 2013 (Crabtree), at 105:16-106:9).

557.    Federal regulations provide that for purposes of determining a state's conformity to federal law, there must be an assurance that "[t]he title IV-E agency has in place an identifiable process for assuring the diligent recruitment of potential foster and adoptive families that reflect the ethnic and racial diversity of children in the State or Tribe for whom foster and adoptive homes are needed."  (Trial Exhibit 1178, 45 C.F.R. § 1355.34(c)(7)(iv) (2012); *see also* Trial Tr., Feb. 28, 2013 (Crabtree), at 106:10-24).

558.    The Council on Accreditation standards provide that "[p]lanning should include a regular assessment of the types of homes needed, recruitment resources available, and recruitment goals.  Evaluation of recruitment efforts should include the cost-effectiveness of activities and the utilization of new foster families."  (Contested Exhibit RJ, Council on Accreditation, Foster Care Services § PA-FC 16.02; *see also* Trial Tr., Feb. 28, 2013 (Crabtree), at 106:25-107:18).

559.    The Child Welfare League of America standards emphasize the relationship between recruitment and retention of foster parents and provide in part that "[t]he family foster care agency should establish an annual plan for the ongoing recruitment and retention of social workers and foster parents, recognizing that recruitment efforts can be successful only if a strong retention program is in place."  (Contested Exhibit QW, Child Welfare League of America, Standards of Excellence for Family Foster Care Services § 3.62; *see also* Trial Tr., Feb. 28, 2013 (Crabtree), at 107:19-108:17).  Furthermore, these standards recognize that:

> The agency should recognize that recruitment and retention are interrelated and that efforts to recruit qualified social workers, other staff members, and foster parents can be only as successful as the agency's ability to retain them. Both recruitment and retention are enhanced by an agency's clear communication of duties, challenges, and opportunities associated with agency positions; knowledge, skills, and qualities associated with success in these positions; and agency support for social workers' and foster parents' efforts to be successful. In addition, the agency should recognize the impact of community attitudes on recruitment and retention and should intentionally build community recognition of, and support for, its staff members and foster parents.

(Contested Exhibit QW, Child Welfare League of America Standards of Excellence for Family Foster Care Services, 1995, § 3.62; *see also* Trial Tr., Feb. 28, 2013 (Crabtree), at 108:18-109:16).

560.    The Child Welfare League of America standards provide that a family foster care agency's recruitment plan should be guided by an assessment of recruitment and retention needs. The agency should analyze "its current and projected client population and the current and projected number of social workers and foster parents available to meet the needs." (Trial Exhibit 1100, Child Welfare League of America, Standards of Excellence for Family Foster Care Services § 3.64; *see also* Trial Tr., Feb. 28, 2013 (Crabtree), at 107:19-108:17). Furthermore:

> The recruitment plan should be guided by an assessment of current and projected client populations, the number of social workers and foster parents currently available, current and projected social worker and foster parent vacancies based on analysis of turnover rates, projected budget constraints or opportunities, and projected new plans for the agency.

(Trial Exhibit 1100, Child Welfare League of America Standards of Excellence for Family Foster Care Services, 1995, § 3.64; *see also* Trial Tr., Feb. 28, 2013 (Crabtree), at 107:19-108:17).

561.    DCF's Family Resource Policy provides that in order to assure the quality of its foster/pre-adoptive family resources, DCF must use "wide-ranging, family-centered and community-focused approaches for identifying families willing to participate in training and assessment in preparation for licensing as placements for children in the Department's care or custody" and that approaches include "(1) efforts to identify prospective kinship and child-specific families from the children's own kinship, social and community networks; and (2) programs to recruit unrestricted families that involve statewide, regional and local multi-media advertising, toll-free telephone access, person-to-person contacts, recognition events, child-specific recruitment events, etc." (Trial Exhibit 1, Family Resource Policy, Policy No. 2006-01, Feb. 6, 2006, DCF Case Practice Policy & Procedures Manual, at DCF POL (7/08) 180; *see also id.* at DCF POL (7/08) 182-83).

562.    The National Conference of State Legislatures recognizes the importance of stable nurturing homes for children in foster care:

> Children benefit from stable, nurturing family lives, positive school environments and networks of caring friends, relatives and neighbors. This network of support can help a child perform well academically, have positive health and mental health outcomes and make it more likely that they will develop good relationship and social skills that can enable them to become successful adults.

(Trial Exhibit 1095, Nina Williams-Mbengue, Moving Children Out of Foster Care: The Legislative Role in Finding Permanent Homes for Children, National Conference of State Legislatures, Oct. 2008, p. 1).

> b)    *DCF Fails to Recruit an Adequate Number of Unrestricted Departmental Foster Homes and Fails to Meet Agency Recruiting Targets*

563.    DCF does not meet the accepted standard of professional judgment in its recruitment and retention of a foster care placement array. (Trial Tr., Mar. 1, 2013 (Crabtree), at 17:12-18; *see generally* Trial Tr., Feb. 28, 2013 (Crabtree), at 104:9-124:23; Trial Tr., Mar. 1, 2013 (Crabtree), at 3:1-17:18).

564.    Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services and Rule 30(b)(6) designee in the area of recruiting and retention of foster homes, testified that one of the goals of DCF's recruitment unit is "to have more than enough foster families for children needing temporary care so that a child's individual needs can be met by selecting from a large enough pool the most skilled family available to meet a child's needs." (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 302:15-303:3; *see also* Trial Exhibit 206, The Adoption & Foster Care Recruitment Unit: Adoption, Foster Care and Adolescent Services Division, at DCF000658341; Rule 30(b)(6) Deposition of Robert Wentworth, DCF Assistant Commissioner for Planning and Program Development, re: Purchased Services Licensing, Delivery, and Oversight, Dec. 29, 2011, at 78:24-79:13).

565.    According to Ms. Gambon, at any point in time, approximately 1000 to 1500 homes are without placements because "it's all about matching the right home" and "it's beyond just the quantity measure" because DCF needs to look for, for example, homes that can take sibling groups, homes that can work more closely with families, and homes that can commit to a family over time. (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 96:20-97:14).

566.    Ms. Gambon testified that it is important to have families available to take children, and that "you always need more available homes than kids you have coming into placement." (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and

Adolescent Services, May 14, 2012, at 53:14-54:24; *see also* Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 97:10-14).

567.    Ms. Gambon testified that the baseline number of family foster care homes (including departmental and intensive foster care) that DCF wants to maintain, at a minimum, is 6000, including around 4000 unrestricted homes. (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 93:23-96:19). She further testified that although it "would be delightful to have more" than 6000 homes, 6000 is a number that DCF has been able to "work with in the last couple of years." (*Id.* at 96:16-19).

568.    DCF has consistently failed to recruit and retain 4000 unrestricted homes during the past decade; DCF has not reported having over 4000 unrestricted homes since 1998. (Trial Exhibit 955, Department of Children and Families Quarterly Report: Fiscal Year 2012 3rd Quarter, p. 62).

569.    The number of unrestricted homes that DCF has recruited has declined in recent months from 2308 at the end of the first quarter of fiscal year 2011 to 2245 at the end of fiscal year 2011 to 2202 as of the end of fiscal year 2012. (Trial Exhibit 955, Department of Children and Families Quarterly Report: Fiscal Year 2011 1st Quarter, p. 59; Trial Exhibit 955, Department of Children and Families Quarterly Report: Fiscal Year 2011, 4th Quarter, p. 61;Trial Exhibit 955, DCF Quarterly Report for Fiscal Year 2012 4th Quarter, pp. 62-63).

570.    Ms. Gambon also testified that DCF has a target of increasing the number of unrestricted homes by 1000 newly recruited families a year.[1] (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 91:17-93:22). DCF has failed to meet this goal in recent years, recruiting only 508 new unrestricted homes in fiscal year 2012 and 593 new unrestricted homes in fiscal year 2011. (Trial Exhibit 956, Foster Care Quarterly Report: Fiscal Year 2012, 4th Quarter, p. 1; Trial Exhibit 956, Foster Care Quarterly Report: Fiscal Year 2011, 4th Quarter, p. 3).

571.    Ms. Gambon testified that the goal of recruiting a thousand new homes a year was based on an analysis that DCF performed "a number of years back," based on the number of homes that were leaving the system annually and a goal of increasing the number of available homes over time. (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, May 14, 2012, at 9:24-12:18). Ms. Gambon could not remember when further analyses of the number of homes leaving the system were performed or the results of those analyses. (*Id.* at 17:15-19:6).

---

[1] At her individual deposition, Ms. Gambon stated that DCF's goal to recruit 1000 total homes a year included both restricted and unrestricted placements. (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, May 14, 2012, at 19:2-6, 126:6-11). However, more than 1000 restricted homes alone close each year, and therefore reaching this goal would not result in a net gain in homes. (*See, e.g.*, Trial Exhibit 198, DCF Foster Care Quarterly Report for Fourth Quarter FY 2011, p. 3 (reflecting loss of 1337 restricted homes)).

572.    DCF fails to recruit enough foster homes to make up for homes that are closed each year. According to the fiscal year 2012 Fourth Quarter DCF Foster Care Quarterly Report, 707 unrestricted foster homes closed during fiscal year 2012 and only 508 new unrestricted homes opened during the fiscal year.  (Trial Exhibit 956, Foster Care Quarterly Report: Fiscal Year 2012, 4th Quarter, p. 1).  In fiscal year 2011, 897 unrestricted foster homes closed and only 593 new unrestricted homes opened.  (Trial Exhibit 956, DCF Foster Care Quarterly Report: Fiscal Year 2011, 4th Quarter, p. 3).

573.    DCF has acknowledged that there is a lack of foster family resources resulting in a "critical need for recruitment."  (Trial Exhibit 32, Fiscal Year 11-12 Family Resource CQI/Self-Assessment, at DCF001946167).

574.    Terrence Flynn, DCF Regional Director for the Southern Region and Rule 30(b)(6) designee with respect to placement array, assignment of placements, and placement moves, testified that one of the barriers to placement stability for children in DCF's custody is that "not every office has sufficient unrestricted homes to help make that initial decision as informed as we would like."  (Rule 30(b)(6) Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, re: Placement Array, Assignment of Placements, and Placement Moves, Sept. 20, 2011, at 275:11-22).  Mr. Flynn testified that recruitment efforts for regular foster homes is an area of improvement for DCF because if DCF has a "broad enough array of regular foster homes," then it is better able to match children "in a planful way."  (*Id.* at 258:22-259:3).

575.    Mary Lou Sudders, the Executive Director of the Massachusetts Society for the Prevention of Cruelty to Children, a DCF contractor, testified that DCF has a "systemic issue around recruiting the number of [foster] homes as needed," and that DCF should sponsor "a more positive public awareness campaign . . . a much more active public education awareness campaign."  She testified that she had discussed this with Commissioner McClain, and believed that, notwithstanding budget constraints, that DCF "could make [recruitment] a priority."  (Rule 30(b)(6) Deposition of Marylou Sudders, Executive Director of the Massachusetts Society for the Prevention of Cruelty to Children, Aug. 14, 2012, at 71:17-72:1, 73:5-76:10).

>   c)     *As a Result of its Failure to Recruit a Sufficient Number of Placements, DCF Does Not Have a Placement Array Sufficient to Meet the Needs of Children in its Custody.*

576.    DCF's foster home recruitment plan acknowledges that sufficient family resources are needed in order to decrease the average number of placement changes for children in foster care.  (Trial Exhibit 203, Draft Recruitment Plan FY' 2012, p. 1).

577.    Ms. Crabtree testified that it is necessary to have the right mix of placements available for children in foster care in order to avoid unnecessary placement moves.  (Trial Tr., Feb. 28, 2013 (Crabtree), at 105:1-11).

578.    Commissioner McClain acknowledged that an important element that must be in place for proper matching of children to placements is "a sufficient pool of foster family homes

available." (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 191:12-19).

579. However, Commissioner McClain testified that in addressing the issue of placement stability identified by Penny Maza's report regarding placement stability in Massachusetts, he did not undertake any analysis of the adequacy of the placement array to meet the needs of children and whether it was sufficient to allow appropriate matching between child and foster care placement. (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 188:24-189:12; *see also* Trial Exhibit 54, Placement Stability in Massachusetts, Penelope (Penny) L. Maza, Ph.D., Consultant, National Resource Center for Child Welfare Data and Technology, Jan. 20, 2011).

580. Ms. Gambon testified that even if DCF has a number of good homes with a lot of "good attributes . . . , they may not be the appropriate home at that particular time for the child," and the question is whether there is an appropriate array "available at that moment in time." (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 259:6-24).

581. According to Ms. Gambon, DCF should have "a large array of families with a large array of talents that can take the different types of children" that DCF has and the families should include families willing to make a long-term commitment to children. (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 260:1-19).

582. Ms. Gambon testified that "in assessing the adequacy of a foster care placement array to meet the needs of the foster care population, you have to look beyond simply the number of homes that are under licensure." (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 260:20-261:1).

583. Ms. Gambon testified that instability in children's placements within the first three months of care "raises a number of concerns," including the concern that the foster care placement array is likely short of the number of homes required to make good matches. (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 262:21-263:11).

584. Commissioner McClain testified that DCF would like to have more foster family homes for adolescents. (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 197:15-17). However, he testified that DCF does not track the number of available homes that will accept teens at a "systemic every day how many openings are there" level, but in a "general sense." (*Id.* at 194:1-8).

585. Ms. Gambon testified that placement of adolescents is "always a challenge" and that the majority of children in placement are over the age of twelve. (Rule 30(b)(6) Deposition of

Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 97:17-98:7).  She testified that there is an initiative in place to address this problem and "a large media campaign [beginning in May 2012] . . . to recruit for older youth and for large sibling groups."  (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, May 14, 2012, at 43:14-19; *see also* Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, Jan. 26, 2012, at 130:4-131:4; Rule 30(b)(6) Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, re: Placement Array, Assignment of Placements, and Placement Moves, Sept. 20, 2011, at 135:21-136:6).

586.    Terrence Flynn, DCF's Regional Director for the Southern Region, testified that the lack of sufficient family foster homes for adolescents in the southern region contributes to placement instability for adolescents.  (Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, Jan. 26, 2012, at 130:4-131:4).

587.    In an email dated May 13, 2010, Janis Lynch, a hotline coordinator, stated that her staff was "in a panic that we will not have enough placements for teens" and requested information about "any homes that would take teens for the long weekend" or "any homes that would take teens forever and a day." (Trial Exhibit 292, Email and attachments from Janis Lynch to Staverne Miller, et al., May 13, 2010, at DCF004913933).

588.    According to Ms. Gambon, in addition to DCF's shortage of foster homes for teens and adolescents, DCF also needs to develop homes for large sibling groups.  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 218:18-219:15; *see also id.* at 191:23-193:1).

589.    Commissioner McClain testified that DCF would like to have more foster family homes for sibling groups. (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 197:20-21).

590.    Other DCF officials have also acknowledged that DCF lacks sufficient placements for sibling groups.  (Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 228:6-14, 229:4-5; *see also* Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, Mar. 5, 2012, at 200:9-24).

591.    Stakeholders have also reported a shortage of placement resources for sibling groups. (Trial Exhibit 58, Massachusetts Child and Family Services Review Final Report, Feb. 21, 2008, at CSF-000000784; *see also* Trial Exhibit 34, MA CFSR 2007: Summary of Key Issues for PIP Development, at DCF008117148).

592.    A DCF document discussing siblings in placement for children in the Worcester area office noted that the solution to the lack of placement resources capable of accommodating large siblings groups was for the office to concentrate on recruiting foster homes especially for large sibling groups. (Trial Exhibit 1039, Document re: WAO Siblings in Placements, at DCF011069835).

593.    DCF's 2009 Strategic Plan for Action identified a need to "establish practice expectations for identification of placement alternatives where siblings may be placed together." (Trial Exhibit 1127, Strengthening the Safety Net: DCF's Strategic Plan for Action, April 2009, at DCF7605096).

594.    Former Commissioner McClain testified that DCF maintains a practice, known as "hoteling," of placing children who do not need an intensive level of care in Intensive Foster Care ("IFC") homes when the departmental placement array is insufficient to provide a match for a child.  (Trial Tr., May 3, 2013 (McClain), at 64:19-65:12; *see also* Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, May 14, 2012, at 213:3-214:6; *see also* Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, Mar. 5, 2012, at 200:11-201:24).  He testified that the rate that DCF pays for an IFC placement is approximately $100 per day compared to a rate of approximately $20 to $25 per day for a regular foster home. (Trial Tr., May 3, 2013 (McClain), at 53:4-10).  He acknowledged that DCF has overpaid for a number of kids in IFC "because they really did not need that level of care."  (*Id.* at 56:17-19).

595.    Former Commissioner McClain was informed in June 2010 that the Northeast region estimated that one third of their IFC placements fell below the IFC definition.  (*Id.* at 66:20-67:8; Trial Exhibit 425 at DCF004976830).

596.    Former Commissioner McClain acknowledged that as of August 15, 2012, DCF was not tracking the referrals that did not meet IFC thresholds and instead he thought DCF was "relying more on anecdotal reporting in that instance."  (Trial Tr., May 3, 2013 (McClain), at 72:8-11).

597.    On January 21, 2012, a two-month-old girl with the initials L.M. died in a Mentor foster home. The child had been placed in the home on January 13, 2012, and it was reported that "a Mentor home was used because placement was needed within days of the case being transferred to the Lynn office, and Lynn did not have any other available resources." (Trial Exhibit 1170, DCF Child Fatality Report, at DCF011184865). Upon reviewing the Child Fatality Report, Former Commissioner McClain testified that "[t]his is an instance where from reading this she could have gone to a departmental foster home that wasn't available, so she went to an IFC home." (Trial Tr. May 6, 2013 (McClain), at 72:1-2).  He acknowledged that in such a circumstance, the state and the taxpayer pay extra money for a degree of services or a level of services that are not clinically found to be necessary. (*Id.* at 72:5-11). (*See also infra* ¶¶ 1758-65).

598.    Ms. Gambon testified that DCF relies on its IFC providers to help "around issues of adolescents and large sibling groups."  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 97:17-98:7).

599.    Ms. Gambon stated that one reason it is easier to place adolescents and large sibling groups in IFC homes than in DCF homes is that the reimbursement rate is higher, and that even though she knows that this practice is costly for DCF, she is unaware of whether DCF has ever analyzed the cost of IFC in this manner.  (Deposition of Mary Gambon, DCF

Assistant Commissioner for Adoption, Foster Care and Adolescent Services, May 14, 2012, at 154:19-156:19, 214:7-18).

600.    Mr. Flynn testified that placement of children in intensive foster care due to lack of available DCF foster homes in the area caused additional budget spending, and that he did not know whether all of the solutions proposed to remedy the problem, such as an increase in the number of DCF foster homes available, were implemented.  (Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, Jan. 26, 2012, at 200:8-202:23).

601.    A January 10, 2011 memo from a director of areas to a regional director stated that reviews of 119 children in intensive foster care concluded that there were 47 or 39% who at the time of placement were appropriate for departmental foster care but were placed in IFC due to lack of available DCF foster homes in the area and region or kinship homes and that 27 of these children belonged to sibling groups. (Trial Exhibit 295, Memorandum from Dennis Gauthier to Terrence Flynn, Jan. 10, 2011, at DCF004997971).  DCF officials have acknowledged that a solution to this problem would be to recruit more departmental foster homes. (*Id.* at DCF004997972).

602.    Ms. Gambon testified that over a period of time she noticed that "a number of young children were being placed in IFC homes" and that "[i]t became clear that . . . the area office had not been recruiting for baby homes" and they were using IFC because they did not have the home capacity.  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 125:18-126:12).  Ms. Gambon testified that recruiters spent time with that office but that she was not aware of any formal plan or writing setting forth strategies that would be taken to address this gap in the placement array.  (*Id.* at 126:13-127:18).

603.    DCF has acknowledged that "there has been a history of IFC being used for 'hoteling' (no available Dept home at the time)" and that an example was "Lynn placing 19 infants in IFC in 2008." (Trial Exhibit 425, Letter to Angelo McClain, at DCF004976830).

604.    Paul Fitzsimons, DCF Regional Director for the Western Region, indicated that the Western Region utilizes intensive foster care homes as placement settings for children with special medical needs, and that "[s]ome" of the intensive foster care homes in the Western Region are equipped to meet those medical needs. (Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, Mar. 5, 2012, at 202:21-203:3).

605.    Children are sometimes placed in Short Term Stabilization and Rapid Reentry (STARR) facilities when there are no family homes available.  (Deposition of Frances Carbone, DCF Director of Program Operations, Apr. 19, 2012, at 208:12-209:7).  Ms. Carbone further stated that DCF has not conducted an assessment of STARR placement utilization to determine whether or not additional foster families need to be recruited for any category of children. (*Id.* at 209:8-13).

606.    DCF also lacks sufficient foster homes for infants. As reflected in an internal DCF email, pre-adoptive Adolescent Development Licensing Unit ("ADLU") homes are used

inappropriately "due to a lack of infant foster homes." (Contested Exhibit FA, Email from Martin Kenney to Arlene Smith, June 3, 2011, at DCF005735312-13). As DCF officials acknowledged, the lack of placement resources was evidenced by "Lynn placing 19 infants in IFC in 2008." (Trial Exhibit 425, Letter to Angelo McClain, at DCF004976830).

607.    DCF officials have also testified that there are times when DCF needs more homes for babies.  (Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 228:6-17; Rule 30(b)(6) Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, re: Placement Array, Assignment of Placements, and Placement Moves, Sept. 20, 2011, at 135:21-136:7).

608.    Mr. Fitzsimons indicated that the Western Region "always would like more" placements for preschool children, as it is a "difficult population" for which to locate appropriate placement settings because it requires the foster parent to be home all day, and that he does not know whether DCF has ever considered paying a different rate for placements for preschool children wherein the foster parent must be home all day.  (Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, Mar. 5, 2012, at 202:1-20).

609.    Commissioner McClain testified that DCF would like to have more foster family homes within school districts so children could be kept within their own school districts upon placement.  (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 197:13-15).

610.    Ms. Gambon testified that in understanding why, as of March 31, 2012, only 74% of children in regular DCF foster homes are placed within their area, "the first question would be is there availability within their area or their region for the placement of the particular child and their needs."  (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, May 14, 2012, at 161:12-163:6).

611.    A large number of DCF's foster homes are "clustered around the area offices" and in order to keep children closer to home, particularly in rural settings, there are areas that DCF needs "to do development in."  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 225:17-227:14).

612.    Olga Roche, DCF Deputy Commissioner for Field Operations, testified that DCF places a large proportion of children out-of-area and that DCF frequently does not have homes available within each area office's "catchment area."  (Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 171:22-172:7).

613.    Dr. Lenette Azzi-Lessing testified that if DCF had more quality homes available, it would be better able to place children in homes that meet their needs.  (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 110:17-21).  She further testified that when an agency has "an adequate supply of appropriate, well-supported, well-trained foster homes you are far more likely to find a setting in terms of meeting the key needs, the critical needs that a given child would bring into foster care."  (*Id.* at 110:25-111:18).

614.    Dr. Azzi-Lessing testified that, in the case of Named Plaintiff Connor, it is hard for her "to believe that a worker with the knowledge of the supervisor would put a six year old child" in a home with "a 17 year old known to be at risk for sexually abusing other boys . . . in a separate sleeping area from the foster parents . . . if he or she had alternatives and good alternatives."  (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 109:22-110:21).

615.    Lauren James testified that despite the fact that she discussed with DCF her negative feelings about the placements she was put in, DCF officials told her that they were unable to get her into another home "because they always said there's not enough foster homes." (Trial Tr., Jan. 22, 2013 (James), at 57:4-58:4). Ms. James repeatedly told DCF officials that she wanted a permanent place to live. (*Id.*).

        d)    *Chronic Failures, DCF Inaction and Systemic Departures from Professional Judgment*

616.    DCF and state officials have long been aware of their failure to recruit an adequate number and array of foster homes. Since 1998, the number of available unrestricted homes decreased from more than 4000 to less than 2200 as of the third quarter of state fiscal year 2012.  (Trial Exhibit 955, Department of Children and Families Quarterly Report: Fiscal Year 2012, 3rd Quarter, p. 61).  Since 2004, the number of available restricted foster homes decreased from approximately 2500 to less than 1800 as of the third quarter of state fiscal year 2012.  (*Id.*).

617.    According to the First Round CFSR in 2001, stakeholders "expressed the opinion that a scarcity of foster families, particularly in some regions, ha[d] resulted in children being placed outside of their communities or regions."  (Trial Exhibit 56, Child and Family Services Review, Final Assessment, Massachusetts, July 2001, at CSF-000000331). Furthermore, stakeholders expressed "concerns about a lack of focus and continuity in recruitment efforts caused by shifts in responsibilities between central and regional/area offices."  (*Id.* at CSF-000000369).  Specific barriers to recruitment and retention of foster, kinship, and adoptive homes were said to include "the need for increased day care availability for two-parent working foster families, the current income requirements for potential families . . . and limited availability of support services outside of normal working hours."  (*Id.*).  DCF also acknowledged that there was a great need for foster care and adoptive families for children in DCF care or custody.  (Trial Exhibit 55, Massachusetts Child and Family Services Review Statewide Assessment, July 2001, at CSF-000000417). DCF also acknowledged the need to analyze why foster parents were leaving the system.  (*Id.* at CSF-000000422).  DCF also recognized the need for continuous recruitment aimed at increasing the number and diversity of foster and adoptive parents and for ongoing support for those families, which is "crucial to retention" of the placement resources.  (*Id.* at CSF-000000454-55).  Furthermore, DCF acknowledged in the First Round Statewide Assessment that it could improve placement stability in adolescents by, among other things, identifying additional foster homes capable of addressing the "unique needs of adolescents."  (*Id.* at CSF-000000445).

618.    In the years between the First Round and the Second Round CFSR, DCF failed to effectively address its failure to recruit and retain an adequate number of foster homes.

According to the Second Round CFSR, stakeholders consistently reported challenges associated with placement stability for adolescents in Massachusetts, specifically expressing concern over the lack of resource homes for adolescents in the State. (Trial Exhibit 58, Massachusetts Child and Family Services Review Final Report, Feb. 21, 2008, at CSF-000000768). Stakeholders also noted that "[i]n some areas of the State there are not enough resource homes or more intensive placement resources located in children's home communities" and that there was a shortage of placement resources for sibling groups. (*Id.* at CSF-000000781, CSF-000000784). The Second Round CFSR found that within Systemic Factor VII, Foster and Adoptive Parent Licensing, Recruitment, and Retention, Item 44 ("The State has in place a process for ensuring the diligent recruitment of potential foster and adoptive families that reflect the ethnic and racial diversity of children in the State for whom foster and adoptive homes are needed") was an area needing improvement. (*Id.* at CSF-000000847). Furthermore, stakeholders indicated that there were not enough foster homes that reflect the racial and ethnic diversity of children of color in the Boston area. (*Id.* at CSF-000000849). In addition, stakeholders reported an ongoing shortage of foster homes to meet the needs of a diverse group of adolescents. (*Id.*). Lawrence stakeholders reported that "many adolescents [were] in congregate care because there [were] not enough intensive foster homes," while Boston Region stakeholders indicated that the shortage of foster parents to care for adolescents led to "inappropriate placement matches for these youth." (*Id.*). The Statewide Assessment identified two factors impacting DCF's performance on proximity of foster care placement (Item 11): the recruitment of a sufficient number of foster care providers to meet the needs of children in every area and the number of children requiring specialized treatment programs. (Trial Exhibit 57, Massachusetts Child and Family Services Review Statewide Assessment May 2007, at CSF-000000661).

619.    In a memo dated October 7, 2008, an area director reported to her regional director that the "lack of placement resources is a huge challenge." (Trial Exhibit 663, Memorandum from Christina Joyce to Randy Whittle, Oct. 7, 2008, at DCF001091901). The lack of placement resources and resulting use of night to night placements was raised as a priority issue. (*Id.*).

620.    Terrence Flynn, DCF's Regional Director for the Southern Region and Rule 30(b)(6) designee with respect to placement array, assignment of placements, and placement moves, testified that, as reflected in the DCF Quarterly Report for the first quarter of fiscal year 2011, the number of restricted foster homes dropped around the fourth quarter of fiscal year 2009. (Rule 30(b)(6) Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, re: Placement Array, Assignment of Placements, and Placement Moves, Sept. 20, 2011, at 270:10-12; *see also* Trial Exhibit 955, Department of Children and Families Quarterly Report: Fiscal Year 2011 1st Quarter, p. 60). Mr. Flynn attributed this drop to "fairly significant budgetary cuts" that brought about "a significant number of personnel reductions" and a "significant amount of reorganization of the agency itself." (Rule 30(b)(6) Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, re: Placement Array, Assignment of Placements, and Placement Moves, Sept. 20, 2011, at 270:13-271:15).

621.    In its October 5, 2009 Massachusetts Child and Family Services Review Program Improvement Plan ("PIP"), DCF recognized its need for additional adolescent foster homes. (Trial Exhibit 33, DCF Massachusetts Child and Family Services Review, Program

Improvement Plan, Oct. 5, 2009, p. 46). DCF set as action steps to "[d]evelop strategies for recruitment and retention of adolescent foster homes" and to "[i]mplement strategies for recruitment and retention of adolescent foster homes in areas identified by analysis of placement stability." (*Id.*). DCF subsequently failed to implement – and instead renegotiated and eliminated – both of these two action steps, the only two action steps in its PIP related to recruitment and retention of foster homes. (Trial Exhibit 760, DCF PIP Quarterly Report, Quarter Eight, July-Sept. 2011, at CSF-000005416-18).

622.    Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operation, testified that DCF changed its PIP action step 3B from "develop strategies for recruitment and retention of adolescent foster homes" to focusing on improving placement stability for children during their first three months in placement, because placement stability is an area where DCF needs to improve significantly. (Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operation, re: Program Improvement Plan, Apr. 4, 2012, at 185:8-186:6). Ms. Nisenbaum testified that the original action step was in place because DCF understood that it needed a greater supply of adolescent foster homes, and that she is not aware whether there were efforts targeted at specifically recruiting or retaining adolescent foster homes. (*Id.* at 187:3-16, 187:22-188:6). Ms. Nisenbaum testified that she is not aware whether there is currently a need for more adolescent foster homes. (*Id.* at 188:10-14). Ms. Nisenbaum testified that there will likely always be a need to recruit and retain adolescent foster homes because it is generally more challenging to place adolescents. (*Id.* at 197:7-16).

623.    Ms. Gambon testified that, in response to the fact that more homes closed during state fiscal year 2011 than were recruited, she asked DCF's Director of Recruitment, Deborah. Sullivan to "develop a recruitment strategy, which she did do relative to a media buy." (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, May 14, 2012, at 126:12-129:6). She did not think that there was consideration given to increasing the recruitment target above 1000. (*Id.* at 129:16-23). Ms. Gambon testified that DCF did not undertake any specific initiative to improve retention of family foster homes at this point, but stated that there is ongoing attention paid "to the work that we're supposed to be doing with families, visiting them, supporting them. (*Id.* at 129:24-130:19).

624.    Raymond Burke, DCF Area Director for Pioneer Valley, testified that he "[couldn't] think of a concerted particular effort" to recruit unrestricted foster homes for teens in DCF custody. (Deposition of Raymond Burke, DCF Director of Areas for Pioneer Valley, Jan. 19, 2012, at 241:8-22).

625.    Mr. Fitzsimons indicated that the "[l]ack of family foster resources result[ing] in a critical need for recruitment in FY-12" was a concern identified in the Springfield family resource CQI self-assessment, but that he did not know what steps had been taken since May 2011 to recruit additional foster family resources in Springfield, and he could not recall any specific recruitment efforts arising as a result of this action plan. (Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, Mar. 5, 2012, at 163:20-164:15, 166:13-167:14; *see also* Trial Exhibit 32, Email from Raymond Burke to DSS-DL – Springfield Users re: Springfield Family Resource CQI Self Assessment –FY11-12 ---5-27-11, May 27,

2011, and attached DCF Springfield Family Resource CQI/Self Assessment FY 11-12, at DCF001946167).

626.    Ms. Gambon testified that at regional forums held by DCF in 2008, there was feedback that there needed to be more funds, and that as of 2011, feedback from the field is that there was still a need for more funding for recruitment and retention.  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 234:5-236:2; *see also* Trial Exhibit 205, Documents re: Summary of Recruitment Efforts, Fiscal Years 2004-2010, at DCF000666606).

627.    DCF has failed to delegate sufficient staffing to recruitment.  DCF's recruitment unit in the Central Office consists solely of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Support; a director of recruitment; and two statewide recruiters.  (Trial Exhibit 206, The Adoption & Foster Care Recruitment Unit: Adoption, Foster Care and Adolescent Services Division, at DCF000658337; *see also* Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 17:14-18).

628.    Ms. Gambon testified that recruitment is one of many responsibilities that she has.  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 17:19-21).  According to Ms. Gambon, she spends approximately 25% of her time on adoption responsibilities, 25% of her time on adolescent support services, 30% of her time on foster care support, and 20% of her time on recruitment.  (*Id.* at 191:10-22).

629.    Previously, there were six full-time adoption and foster care recruitment supervisors who were assigned to all of the Area Offices and Regional Offices and who "worked with Area Office Family Resource Units to build effective and enduring Recruitment and Retention Teams."  (Trial Exhibit 575, Annual Progress and Services Report, June 30, 2010, at DCF007412340; *see also* Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 37:8-41:14; Trial Exhibit 579, Recruitment Overview, 2005-2011, at DCF000658115; Trial Exhibit 665, Recruitment Overview, 2005-2010, at DCF000661849).  "This design allowed for continuous shared learning that permeated the state with information about the recruitment and retention efforts that are most successful and effective across the state."  (Trial Exhibit 575, Annual Progress and Services Report for Federal FY 2012, June 30, 2010, at DCF007412340).  It also relieved family resource staff from targeted and focused recruitment research and activities.  (Trial Exhibit 579, Recruitment Overview, 2005-2011, at DCF000658115; Trial Exhibit 665, Recruitment Overview, 2005-2010, at DCF000661849).

630.    As a result of budget cuts the number of statewide recruiters was cut down to two.  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18,

2011, at 37:8-41:14; *see also* Trial Exhibit 575, Annual Progress and Services Report, June 30, 2010, at DCF007412340).

631.    Because of workload, DCF's two statewide recruiters perform "similar but not the same" functions as the six statewide recruiters that DCF previously employed and they spend less time with each area office.  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 41:15-42:17).  Because of the reduction of recruitment staff, DCF is not able to do as much work locally and that most of their work is around "planning and not reacting."  (*Id.* at 43:7-44:16, 51:24-52:18).

632.    The role of area office recruiter in all 29 area offices was lost due to budget cuts. (Trial Exhibit 575, Annual Progress and Services Report, June 30, 2010, at DCF007412339; *see also* Trial Exhibit 94, Child and Family Services Plan FY2010-FY2014, at DCF007054481-82).

633.    New positions have not been created in the area offices to augment their recruitment staff.  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 44:12-16).

634.    The recruitment unit has been operating at 40% capacity. (Trial Exhibit 579, Recruitment Overview, 2005-2011, at DCF000658115). Many of the family resource activities provided for by DCF policy are assigned to area office recruiters or central office recruitment staff. (Trial Exhibit 1, Family Resource Policy, Policy No. 2006-01, Feb. 6, 2006, DCF Case Practice Policy & Procedures Manual, at DCF POL (7/08) 234-248; *see also* Trial Exhibit 776, Untitled and undated proposal, at DCF002804949).

635.    Ms. Gambon testified that in the fiscal year 2012 budget cycle, she asked for additional staff, one of which would have been recruitment, as a replacement for any of the statewide recruiter positions that had previously been reassigned.  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 49:4-50:8). She testified that, as of May 14, 2012, no new recruitment personnel had been employed in DCF's central office. (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, May 14, 2012, at 8:12-16).  Ms. Gambon testified that, minimally, DCF would need four additional statewide recruiters in order to fulfill the mission and the function of the recruitment unit, and that she has made that known to her direct supervisor, Olga Roche, Deputy Commissioner for Field Operations.  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 50:9-51:13).

636.    Ms. Gambon testified that given the nine rounds of budget cuts that DCF has gone through, the decision that DCF has made to put the emphasis on protecting the field personnel and trying to reduce either the regional or central office is "painful" but one that

she "understand[s]."  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 51:8-23).

637.   The net loss of foster homes during fiscal year 2011 was impacted by the layoffs of recruitment staff, and as of May 2012, those positions had not been refilled.  (Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 160:13-163:13).

638.   The Recruitment Tracking position has been vacant for at least two years, there is a hiring freeze on this position, and the person in this position would be responsible for receiving inquiries from prospective foster or adoptive parents; this function is currently fulfilled by a regional recruiter.  (Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 41:17-43:22).

639.   Mr. Flynn testified that at least one office was encountering challenges in initially finding restricted homes due to management issues such as management understaffing.  (Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, Jan. 26, 2012, at 138:22-140:14).

640.   During regional forums held by DCF in 2008 to discuss issues relating to recruiting and retention, attendees reported that DCF resource workers had weighted workloads that did not allow them time needed for planning and implementing recruitment and retention events.  (Trial Exhibit 205, Documents re: Summary of Recruitment Efforts, Fiscal Years 2004-2010, at DCF000666607). Attendees also reported that funding was a challenge for recruitment and retention. (*Id.* at DCF000666606). Attendees recommended that DCF "engage Area Leads and Regional Resource Centers in an active campaign to improve the image of foster parenting." (*Id.* at DCF000666607). Since this time, the regional resource centers have been disbanded. (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 249:21-251:17).

641.   In an April 2010 email to Patricia Mackin, chief of staff for DCF, Deborah Terzian stated that weighted caseloads for foster resource staff are "concerning" and asked, "How are we supposed to recruit more homes?" (Trial Exhibit 777, Email from Deborah Terzian to Patricia Mackin, Apr. 16, 2010, at DCF010276973). Six months later, Ms. Terzian resent the email to Ms. Mackin with the message, "I sent this to you back in April….STILL NO CHANGE."  (Trial Exhibit 778, Email from Deborah Terzian to Patricia Mackin, Oct. 13, 2010, at DCF010276977-79).

642.   Family Resource workers in the area offices are responsible for local foster parent recruiting efforts, and this activity is reflected in their workloads by crediting workers with 0.2 "cases" for each inquiry received from potential foster parent applicants.  (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, May 14, 2012, at 131:16-138:17).

643.    DCF has failed to implement the action steps in its recruitment plans and to effectively recruit and timely approve new homes.  In its Strategic Recruitment Plan fiscal year 2011-2012, DCF set as a goal to ensure that adequate quality resources are available for foster care and adoption.  (Trial Exhibit 202, Strategic Recruitment Plan FY 2011-2012, at DCF000666736).  DCF set as an objective that "[r]ecruitment and retention efforts result in adequate numbers, locations, capacity, and ethnic and racial diversity of placement resources." (*Id.*).  DCF set strategies for accomplishing this objective, including increasing the capacity for foster parent recruitment and retention, increasing training for foster parents and relative caregivers, ensuring implementation of an annual survey of foster parents and relative caregivers, and increasing the percentage of foster care licensing renewals.  (*Id.*).

644.    In its Draft Recruitment Plan for fiscal year 2012, DCF set a number of action steps, including the designation of staff to conduct recruitment activities, the development of a regional recruitment plan by each region to be given to the Central Office Recruitment Unit by August 31 of each year, the development of performance measures with regional recruitment staff to ensure progress in recruitment and retention efforts, and the evaluation and establishment of data on the need for foster and adoptive parents in certain zip codes and enhancement of recruitment efforts to meet those needs. (Trial Exhibit 203, Draft Recruitment Plan FY' 2012, pp. 1-2). DCF also set recruitment strategies including to develop and implement specialized recruitment projects to find families who will foster and adopt children with disabilities, minority children, children with developmental delays, sibling groups, older children and children who are in institutions and would benefit from a family setting; to use current demographic information on children and families to establish recruitment targets and track progress; to concentrate recruitment activities in identified communities to facilitate placement with licensed families; to assure consistent and accurate information and services are provided to the public regarding foster care and adoption; and to establish statewide standards regarding the coordination of efforts with and between recruitment staff. (*Id.* at 2-4, 6).

645.    According to Ms. Gambon, as of her deposition on October 18, 2011, not every region had provided the DCF Central Office with a recruitment plan for fiscal year 2012, which, as provided above, was due by August 31, 2011. (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 214:1-10).

646.    Ms. Gambon testified that she did not ask for a report as to the status of the recruitment plans due on August 31 because of both her workload and her staff's workload and that she would need more staff in order to comply with this action step.  (Rule 30(b)(6) Deposition of Mary Gambon DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 214:11-215:8).

647.    Ms. Gambon testified that, as of May 14, 2012, no regional recruitment plans had been developed in accordance with Strategy 1, Action Step b of the fiscal year 2012 DCF Recruitment Plan.  (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, May 14, 2012, at 144:18-145:15; Trial Exhibit 203, Draft Recruitment Plan FY' 2012, p. 1)

648.    Ms. Gambon testified that, as of May 14, 2012, she was unaware of any effort to begin work on Strategy 2b, Action Step b in DCF's fiscal year 2012 Draft Recruitment Plan, which stated that "DCF will evaluate and establish data on need for foster and adoptive parents in disproportional[it]y zip codes and enhance recruitment efforts to meet those needs." (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, May 14, 2012, at 145:16-146:9; Trial Exhibit 203, Draft Recruitment Plan FY' 2012, p. 2).

649.    Ms. Gambon testified that she did not know whether Strategy 1, Action Step c in DCF's Statewide Recruitment Plan – to develop performance measures with regional recruitment staff to ensure progress in recruitment and retention efforts – had been completed.  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 215:12-216:17; Trial Exhibit 203, Draft Recruitment Plan FY' 2012, p. 1).

650.    Ms. Gambon testified that she was not aware of what DCF's recruitment targets are in relation to licensed foster homes, as required by DCF's Statewide Recruitment Plan.  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 229:4-20; Trial Exhibit 203, Draft Recruitment Plan FY' 2012, p. 3).

651.    In its fiscal year 2012 Statewide Recruitment Plan, DCF emphasized the importance of maintaining a pool of foster and adoptive families who are capable of promoting each child's development and permanent needs, and set as an action step the development of a comprehensive recruitment plan that includes, *inter alia*, a description of the characteristics of waiting children and specific strategies to reach all parts of the community through both targeted, child-specific and general recruitment campaigns. (Trial Exhibit 204, Department of Children and Families (DCF) FY' 2012 Statewide Recruitment Plan, pp. 1-3; Trial Exhibit 374, Annual Progress and Services Report for Federal Fiscal Year 2012, June 30, 2011, at DCF007413708-10).  According to Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services and rule 30(b)(6) designee with respect to recruitment and retention of foster homes, DCF's fiscal year 2012 Statewide Recruitment Plan is not distributed to area or regional offices and there is no strategy plan or recruitment plan that is disseminated to regional and area offices.  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 199:10-202:11).

652.    Ms. Gambon testified that when DCF had six statewide recruiters, most of the area offices had a recruitment plan; however, since the number of statewide recruiters has been reduced, she does not believe that separate regional or area office level recruitment plans have been generated annually.  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 113:8-114:15).

653.    During the last three years, there has not been a directive from DCF requiring area offices or regional offices to develop and submit written recruitment plans.  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 117:24-119:21).

654.    Ms. Gambon stated that during the last three years, the only written recruitment plan within DCF that she was aware of was a statewide strategic recruitment plan.  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 119:22-120:1).

655.    The statewide recruitment plan included two components: a "recruitment week" publicized through public service announcements at five Jordan's Furniture locations in June 2012, targeted at recruiting adoptive parents, and a "media blitz" to take place in May and June 2012. (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, May 14, 2012, at 146:10-147:13).

656.    Ms. Gambon testified that she did not know whether area recruitment plans exist that, area by area, address and identify actual and potential barriers to successful recruitment efforts.  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 289:23-290:14; Trial Exhibit 206, Adoption, Foster Care and Adolescent Services Division, at DCF000658335).

657.    According to Ms. Gambon, because of the budget, DCF has not conducted a three-year media campaign to the level referenced in its recruitment plan.  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 304:17-305:21; Trial Exhibit 206, Adoption, Foster Care and Adolescent Services Division, at DCF000658341).

658.    Ms. Gambon testified that she is unaware of any study by DCF that analyzed the number of vacant foster homes needed in order for appropriate matching of children to homes to occur.  (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, May 14, 2012, at 55:1-57:7).

659.    Ms. Gambon testified that in setting a strategic recruitment plan, it is important to know the rate at which area offices are placing children outside of the area because of the unavailability of a licensed home.  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 107:4-10).  She testified that when a child is placed outside of his or her home area for lack of an available home in the child's home area, there would be a notation in the child's dictation but she does not request an aggregation of those notations to determine how often children are placed outside of their home area because of the unavailability of a foster home in the area.  (*Id.* at 111:17-112:23).

660.    DCF's goal of 1,000 newly recruited homes a year is not broken down into specific
targets (*i.e.*, for infants or adolescents).  (Rule 30(b)(6) Deposition of Mary Gambon, DCF
Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment
and Retention of Foster Homes, Oct. 18, 2011, at 161:1-162:1).

661.    Former Commissioner McClain testified that doing generic recruitment does not
necessarily lead to the development of a placement array that facilitates matching between
children and homes that are well-suited to meet their needs and that DCF needs to have a
multi-pronged approach that includes generic recruitment and also specific recruitment.
(Trial Tr., May 3, 2013 (McClain), at 68:16-69:5).

662.    Ms. Gambon testified that she had not looked at any numerical targets set in relation to
the recruitment and development of foster homes for children who are hard of hearing or
blind.  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for
Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster
Homes, Oct. 18, 2011, at 217:23-218:4).

663.    Ms. Gambon testified that she does not receive documentation in the Central Office that
reflects how each area is targeting its recruitment efforts.  (Rule 30(b)(6) Deposition of Mary
Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services,
re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 162:2-13).

664.    There were not targeted strategies within DCF to recruit homes capable of serving sibling
groups. (Trial Tr., Mar. 1, 2013 (Crabtree), at 9:6-9).

665.    Ms. Gambon testified that she does not think that area offices within DCF conduct needs
assessments in relation to placement resources.  (Rule 30(b)(6) Deposition of Mary Gambon,
DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re:
Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 164:20-165:8).

666.    According to Ms. Gambon, neither she nor Deborah Sullivan, DCF Director of
Recruitment and Support Services, has directed that needs assessments be conducted by area
offices to determine the placement needs in each area office.  (Rule 30(b)(6) Deposition of
Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent
Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 169:4-17).

667.    Patricia Mackin, DCF Chief of Staff, stated that she was familiar with Chapter 18B,
Section 7(d) of the Massachusetts General Laws, which directs the Commissioner of DCF to
conduct an annual needs assessment for all services under the control of the department.
(Deposition of Patricia Mackin, DCF Chief of Staff, Mar. 1, 2012, at 172:15-173:4; Trial
Exhibit 318, Mass. Gen. Laws ch. 18B, § 7(d) (2008)).  Ms. Mackin testified that she did not
know whether the Commissioner conducted such a needs assessment in the previous year.
Since she joined DCF in 2007, Ms. Mackin has not been aware of the Commissioner
directing such a needs assessment to be conducted.   (Deposition of Patricia Mackin, DCF
Chief of Staff, Mar. 1, 2012, at 173:4-14).  Ms. Mackin testified that the Commissioner has

122

the responsibility to make sure that the power and duties outlined in Chapter 18B, Section 7(d) are fulfilled. (*Id.* at 173:15-20). Specifically with regard to the needs assessment outlined in Section 7(d), Ms. Mackin testified that the DCF had not done such a formal needs assessment since she joined DCF. (*Id.* at 173:9-14, 173:21-174:12).

668.    In response to Plaintiffs' request for production of "All documents concerning the annual needs assessments required by M.G.L. ch 18B § 7(d)," Defendants failed to produce documents reflecting that the needs assessments required by this statute had ever occurred and admitted that the only documents potentially responsive to this request would relate to the budget process or the federal government's audit process. (Contested Exhibit PA, Email from Robert Higgins to Rachel Nili re: Missing documents, Jan. 14, 2013).

669.    Mr. Burke testified that since October 2010, the Springfield office has not conducted an assessment to determine whether there are an adequate number of foster care placements capable of caring for medically fragile children. (Deposition of Raymond Burke, DCF Area Director for the Pioneer Valley, Jan. 19, 2012, at 240:20-241:3).

670.    Ms. Gambon testified that she did not think that there was a document that DCF had developed within the past 36 months that establishes the number of foster homes needed across categories of children such as teens, babies, special needs, so on, but that there had been discussions of the number of children that come into care by age, race, ethnicity, and sex, and what DCF's needs are for those children. (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 172:6-24).

671.    Without a needs assessment, there is no way to assess the state's generic 1,000 home annual recruitment goal. (Trial Tr., Feb. 28, 2013 (Crabtree), at 113:19-23).

672.    Ms. Gambon testified that the recruitment performance targets that DCF sets are not all contained in one document and that she did not remember DCF's recruiting target for homes for teens or for babies and toddlers. (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 174:18-176:19, 183:9-184:13).

673.    Ms. Gambon testified that it was her expectation that DCF's performance targets for recruiting would be reflected in a report or set of documents but she was unable to reference any specific reports or documentation of such targets. (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 174:18-177:6, 182:22-183:8).

674.    Joy Cochran, DCF Director of Foster Care Support Services, testified that she has not been tasked with conducting a formal assessment regarding the demands within the DCF system for adolescent, infant, or sibling group homes. Rather, she secures knowledge about those placement needs through case-by-case anecdotal feedback. (Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 229:13-230:4).

675.  Mr. Flynn, DCF Regional Director for the Southern Region, testified that he has not seen a regular or official needs assessment regarding foster care beds in several years. (Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, Jan. 26, 2012, at 133:4-24).

676.  Former Commissioner McClain acknowledged that in June 2010 his staff recommended to him that DCF track placement refusals but that as of August 15, 2011 DCF was not routinely tracking placement refusals.  (Trial Tr., May 3, 2013 (McClain), at 70:15-71:22).

677.  DCF uses the Quarterly Foster Care Report as a tool for assessing DCF's recruitment and retention of foster homes. DCF has stated that, in order to implement its "Priority Action Plan[s]" for recruiting new unrestricted families and identifying kinship and child-specific families, employees should utilize the quarterly foster care report.  (Trial Exhibit 667, Recruitment and Quality Assurance, FY 2011-2012).  Ms. Gambon testified that she tracks whether DCF has met its recruitment goal by reviewing Quarterly Foster Care reports. (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, May 14, 2012, at 124:21-126:5; *see also* Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 58:11-59:7, 63:10-65:22, 79:14-22, 124:3-23).  Portions of the data contained in DCF's Quarterly Foster Care Reports are inaccurate and inconsistent. Specifically, the values in the statewide column for Restricted Foster Homes at End of Report Quarter and Unrestricted Foster Homes at End of Report Quarter are inconsistent throughout different pages of the report. For example, on the DCF Foster Care Quarterly Report for the Second Quarter of fiscal year 2011, the statewide number of restricted foster homes at the end of the report quarter is reported as 1343 on the first page of the report (with a net loss of 69 homes in the fiscal year to date) and 1569 on the sixth page of the report (with a net gain of 157 homes in the fiscal year to date). (*See, e.g.*, Trial Exhibit 956, DCF Foster Care Quarterly Report for Second Quarter Fiscal Year 2011, p. 1, 6).

678.  DCF's recruitment efforts are impeded by its backlogs in conducting background checks. Plaintiffs incorporate herein *infra* ¶¶ 270-94.

679.  DCF has long been aware of the deficiencies in its recruitment process, including its tracking of important events and deadlines.  (Trial Exhibit 779, Family Resource Policy Questions as of 6/19/2007).

## 2.    IFC Placement Array

680.  Joy Cochran, DCF Director of Foster Care Support Services, testified that it is important to have more available Intensive Foster Care ("IFC") homes than the number of kids coming into placement "in order to do a match."  (Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 97:10-14, 97:24-98:2).  She testified that "in order to do a correct match for a child," you cannot just look at whether a home has an opening; rather, the home "has to match with this kid's emotional needs, physical needs, community needs . . . age and gender, behavior, all of those factors."  (*Id.* at 97:16-22).

681.   There is not an overall number of available IFC homes that DCF targets. (Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 98:12-16). Ms. Cochran testified that DCF has roughly 700 approved IFC homes statewide with no current placement on a monthly basis. (*Id.* at 98:2-5). Out of the 700 homes, there are always a certain number that are not taking placements "for whatever reason." (*Id.* at 99:24-100:2). She stated that it is important to look at why DCF has homes with no placement "and yet have kids that are moving," what DCF is "doing in terms of the match," and "[w]hat are the abilities and the matching with those homes." (*Id.* at 100:8-13).

682.   Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, testified that children in IFC are placed out of their area much more frequently than children in DCF foster homes because the private agencies that recruit and manage IFC homes cover much wider geographic areas than one area office, and have fewer homes. (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, May 14, 2012, at 164:10-165:23).

683.   Stakeholders in certain regions have noted that there is a lack of intensive foster home placements for adolescents. (Trial Exhibit 58, Massachusetts Child and Family Services Review Final Report, Feb. 21, 2008, at CSF-000000837).

684.   DCF recognizes that the private providers that it has contracted with are providing generalized recruitment for IFC homes, not special needs or targeted recruitment. (Trial Exhibit 385, Letter to Angelo McClain, at DCF000465973).

685.   Former Commissioner McClain testified that DCF planned to have two levels of intensive foster homes but that IFC Level 2 did not come to scale. (Trial Tr. May 3, 2013 (McClain), at 52:16-54:17). He admitted that he was advised in June 2010 that the performance of the IFC providers was not at a level where implementation of Skill Level 2 could be addressed. (*Id.* at 60:14-17).

686.   Ms. Carbone testified that although DCF had planned on implementing two levels of intensive foster care services, known as skill level 1 and skill level 2, skill level 2 has not yet been implemented in the field. (Deposition of Frances Carbone, DCF Director of Program Operations, Apr. 19, 2012, at 53:24-54:9, 57:8-16). Ms. Carbone further stated that while the operations team has had implementing skill level 2 on the agenda for "a while," it is not currently on the agenda. (*Id.* at 57:17-58:3).

687.   According to Ms. Gambon, IFC Skill Level 1 has been implemented by DCF but Skill Level 2 has never been implemented. (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, re: the Process by which DCF Monitors Compliance with and Enforces Contracts with Private Providers for the Provision of Foster Care Placement, April 24, 2012, 472:12-20). Ms. Gambon testified that DCF decided to stay implementation of IFC Skill Level 2 first and foremost because the staff that was most familiar with the IFC agencies felt that none of them had hit the threshold for Skill Level 1. (*Id.* at 476:17-478:3). Ms. Gambon testified that, at the time of her deposition, she generally did not believe that the IFC agencies were positioned to implement IFC Skill Level 2. (*Id.* at 479:19-480:4).

688.   Ms. Cochran testified that IFC Skill Level 2 was not implemented for a number of reasons, including that "in terms of consistency and compliance, the IFC agencies hadn't totally met skill level 1 requirements." (Deposition of Joy Cochran, DCF's Director of Foster Care Services, Apr. 13, 2012, 82:19-83:4).

689.   DCF does not monitor the recruitment efforts of the private agencies that provide IFC foster homes. (Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 20:23-23:10). Furthermore, DCF's monthly report reflecting family resources does not include IFC homes. (Rule 30(b)(6) Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, re: Placement Array, Assignment of Placements, and Placement Moves, Sept. 20, 2011, at 182:10-183:4).

690.   IFC providers report that they lose IFC homes due to delays in DCF providing CORI waivers during the relicensing process. (Rule 30(b)(6) Deposition of Barbara Talkov, Executive Director of the Children's League of Massachusetts, Aug. 3, 2012, at 150:6-151:8).

691.   Children in IFC homes experience a high rate of lateral moves, indicating a shortage of IFC homes. Plaintiffs incorporate herein *infra* ¶¶ 749-54.

## IV.    Placement and Educational Stability

### A.    Standards

#### 1.    Placement Stability

692.   The Administration for Children and Families ("ACF") Children's Bureau measures states' performance with respect to placement stability by analyzing the proportion of children in foster care who have experienced two or fewer placement settings during their foster care episodes. Specifically, the Children's Bureau uses the Adoption and Foster Care Analysis and Reporting System ("AFCARS") data to determine the percentage of children, under 18 years of age on the first day of the fiscal year, with two or fewer placement settings. The Children's Bureau further distinguishes among children who have been in foster care for (a) eight days to 12 months (Measure C4.1); (b) 12 months to 24 months (Measure C4.2); and (c) more than 24 months (Measure C4.3). From the proportions of children in these groups with two or fewer placement settings, the Children's Bureau additionally computes a composite score, "Permanency Composite 4." (Trial Exhibit 1086, U.S. Department of Health and Human Services, Administration for Children and Families, Children's Bureau, Child Welfare Outcomes 2007-2010: Report to Congress, p. B-5).

693.   Jan Nisenbaum, DCF's Deputy Commissioner for Clinical Practice and Program Operations, testified that the CFSR measure adopted by the Administration for Children and Families for placement stability is the "key indicator" that should be used to assess whether placement moves are only taking place when appropriate. (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 167:8-24). Ms. Nisenbaum described the indicator as a "really, really important measure for us to look at systemically." (*Id.* at 167:10-22). Mary Gambon, DCF's Assistant

Commissioner for Adoption, Foster Care and Adolescent Services, testified that it is appropriate to compare DCF's federal performance data regarding placement stability with data from other states. (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, May 14, 2012, at 40:7-16).

694.    The 2004 national median was 83.3% for Measure C4.1, 59.9% for Measure C4.2, and 33.9% for Measure C4.3. (Trial Exhibit 960, Massachusetts Child and Family Services Review Data Profile, Feb. 24, 2012, at DCF011066204).

695.    By 2010, the national medians for Measures C4.1 through 4.3 had improved. The median for Measure C4.1 was 85.4% (represented by Pennsylvania and New Jersey, which were tied for 26th of 52 jurisdictions). (Trial Exhibit 1084, Summaries of state-by-state performance data and rankings from Child Welfare Outcomes 2007-2010, Prepared by Elissa Glucksman, p. 18). The median for Measure C4.2 was 62.1% (represented by California and Kentucky) and for Measure C4.3 was 34.1% (represented by the average of Idaho and Oregon, 26th and 27th of 52 jurisdictions, respectively).[2] (*Id*. at 19-20).

696.    In 2011, the national median for Measure C4.1 was 83.65% (represented by Minnesota and South Dakota), for Measure C4.2 was 63.5% (California and Kansas), and for Measure C4.3 was 34.15% (Wyoming and Tennessee). (Trial Exhibit 1085, Summaries of state-by-state performance data and rankings from Child Welfare Outcomes 2008-2011, Prepared by Elissa Glucksman, pp. 19-21).

697.    The Children's Bureau set a "national standard" for Permanency Composite 4 of 101.5. (Trial Exhibit 960, Massachusetts Child and Family Services Review Data Profile, Feb. 24, 2012, at DCF011066204).

698.    The Children's Bureau additionally reports state performance on three measures of placement stability that are slightly different from Composites 4.1 through 4.3. These are referred to as "Outcome Measures" 6.1a, 6.1b, and 6.1c. The three Outcome 6.1 Measures include children who were ages eighteen or older on the first day of the fiscal year and, in contrast to Composite Measure C4.1, children who were in care less than eight days. Outcome Measure 6.1a measures the percentage of children with two or fewer placement settings among children who have been in foster care for less than twelve months. Measure 6.1b does the same for children in care between twelve and twenty-four months, and 6.1c for children in care at least twenty-four months. (Trial Exhibit 1086, U.S. Department of Health and Human Services, Administration on Children and Families, Children's Bureau, Child Welfare Outcomes 2007-2010: Report to Congress, p. 27).

---

[2] According to the earlier-published Child Welfare Outcomes 2007-2010: Report to Congress, the medians for the first two measures were slightly different: the median for Measure C4.1 was 85.25% (based on Minnesota and Pennsylvania) and for Measure C4.2 was 62.35% (based on Kentucky and California). (Contested Exhibit SB, Summaries of state-by-state performance data and rankings from Child Welfare Outcomes 2007-2010, Prepared by Elissa Glucksman, pp. 18-19).

699.   The national median for Outcome Measure 6.1a in 2010 was 86.25% (based on Pennsylvania and Wyoming).  The national median for Outcome Measure 6.1b in 2010 was 61.95% (based on California and Kentucky) and for Outcome Measure 6.1c was 32.9% (based on Colorado and Oregon).  (Trial Exhibit 1084, Summaries of state-by-state performance data and rankings from Child Welfare Outcomes 2007-2010, Prepared by Elissa Glucksman, p. 5).[3]

700.   The national median for Outcome Measure 6.1a in 2011 was 85.95% (based on Maryland and Florida).  The national median for Outcome Measure 6.1b in 2010 was 63.4% (based on California, Kansas, and New Hampshire's tie for 25th out of 52 jurisdictions) and for Outcome Measure 6.1c was 33.05% (based on Tennessee and Kentucky).  (Trial Exhibit 1085, Summaries of state-by-state performance data and rankings from Child Welfare Outcomes 2008-2011, Prepared by Elissa Glucksman, pp. 5-6).

701.   The 25th percentile on Outcome Measures 6.1a through 6.1c in 2010, representing the bottom quartile of state performance on placement stability, was 82.5% for Outcome Measure 6.1a, 56.6% on Outcome Measure 6.1b, and 25.7% on Outcome Measure 6.1c. (Trial Exhibit 1086, U.S. Department of Health and Human Services, Administration on Children, Youth and Families, Children's Bureau, Child Welfare Outcomes 2007-2010: Report to Congress, p. 27).

### 2.      Educational Stability

702.   Under federal law, as amended by the Fostering Connections to Success and Increasing Adoptions Act of 2008 (the "Fostering Connections Act"), DCF is required to include the following in a child's case plan:

> A plan for ensuring the educational stability of the child while in foster care, including—
> (i) assurances that each placement of the child in foster care takes into account the appropriateness of the current educational setting and the proximity to the school in which the child is enrolled at the time of placement; and
> (ii) (I) an assurance that the State agency has coordinated with appropriate local educational agencies . . . to ensure that the child remains in the school in which the child is enrolled at the time of placement; or (II) if remaining in such school is not in the best interests of the child, assurances by the State agency and the local educational agencies to provide immediate and appropriate enrollment in a new school, with all of the educational records of the child provided to the school.

---

[3] According to the earlier-published Child Welfare Outcomes 2007-2010: Report to Congress, the medians were 85.1%, 62.2%, and 33.0%, respectively.  (Trial Exhibit 1086, U.S. Department of Health and Human Services, Administration on Children and Families, Children's Bureau, Child Welfare Outcomes 2007-2010: Report to Congress, p. 27).

42 U.S.C. § 675(1)(G)(ii) (2011. (*See also* Trial Tr., Mar. 1, 2013 (Crabtree), at 13:25-14:21). In addition, states must include in foster care maintenance payments to foster parents the cost of "reasonable travel for the child to remain in the school in which the child is enrolled at the time of placement." 42 U.S.C. § 675(4)(A) (2011).

703.    DCF acknowledges that it is responsible for assuring "that all of our children and youth have the opportunity to be successful: to be ready for school, to be engaged in school and to graduate with a life plan." (Trial Exhibit 981, MA Department of Children and Families, Supporting Educational Stability and Success, Apr. 24, 2012, at DCF011020191). A DCF "Reminder Tip Sheet" regarding "Education Data and FamilyNet" states that DCF is "responsible, like parents, for assuring that our children go to school, make continuous academic progress, stay in school and graduate high school" and recognizes that the Fostering Connections Act "prioritizes the need for us to assure school stability and continuity." (Trial Exhibit 792, Documents re: Education Data, Placement Stability, Education Continuity and Outcomes, Mar. 23, 2011, at DCF002729722).

704.    The Council on Accreditation standards reflect the importance of educational stability for youth in foster care, stating that "[t]he child receives support to achieve his/her full educational potential through . . . efforts to keep the child enrolled in a familiar school or, if change is unavoidable, to enroll the child in the best educational setting available." (Contested Exhibit RS, Council on Accreditation, Foster Care Services Standards, § FC 9.04).

705.    The Child Welfare League of America standards provide that "[w]hen placed in family foster care, school-age children should be allowed to continue their education in their own schools and neighborhoods whenever in the child's best interests and feasible." These standards further provide that "[w]henever transition to a new school is necessary, the move should include activities and services to prepare the child for what may be a major life disruption." (Contested Exhibit RB, Child Welfare League of America, Standards of Excellence for Family Foster Care Services, § 2.72).

### B.    Placement and Educational Instability Cause Harm and Risk of Harm to Children

#### 1.    Emotional trauma and attachment issues

706.    DCF has acknowledged that "Placement stability . . . is . . . a key factor in promoting and maintaining a child's well-being" and that, since "[t]he initial removal of a child from their parents is one of the most traumatic events a child can experience, . . . subsequent moves to different placement settings add additional trauma and further stressors that impede a child's positive growth and development." (Trial Exhibit 550, Documents re: Placement Stability, at DCF0089138863). DCF's practice guidance to social workers states that "every move may be experienced by the child as another traumatic event." (Trial Exhibit 552, DCF Integrated Casework Practice Model: Practice Point No. 1, Trauma-Informed Casework Practices at DCF000245355).

707.    DCF officials understand and acknowledge the harmful impact of placement stability on
children.  Then Commissioner McClain acknowledged that placement moves are traumatic
and harmful, stating, "the fewer moves a child has the better" and "we wanted to have as few
moves as possible for children's health and well-being." (Trial Tr. May 2, 2013 (McClain), at
34:18-35:5; Trial Tr. May 3, 2013 (McClain), at 9:17-10:2).  Jan Nisenbaum, DCF's Deputy
Commissioner for Clinical Practice and Program Operations, testified that placement
instability creates trauma for children.  (Deposition of Jan Nisenbaum, DCF Deputy
Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 81:12-82:8).
Olga Roche, DCF's Deputy Commissioner for Field Operations, testified that when children
experience multiple placements, they get "more disturbed" and need "higher levels of
placement," i.e., congregate care.  (Deposition of Olga Roche, DCF Deputy Commissioner
for Field Operations, May 23, 2012, 82:12-83:13).  Mary Gambon, DCF Assistant
Commissioner for Adoption, Foster Care and Adolescent Services, testified that "some
placement moves traumatize children" due to the "separation and loss" involved, and that
reducing placement moves would "decrease[] attachment/emotional/behavioral issues." She
acknowledged that placement moves can have lasting effects.  (Deposition of Mary Gambon,
DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14,
2012, 28:1-29:20; Trial Exhibit 408, Email from Mary Gambon to Jan Nisenbaum re: Info
for Steering Committee, Feb. 14, 2011, and attached Draft Intake Foster Homes Rationale, p.
2).

708.    DCF has repeatedly acknowledged that multiple placement moves disrupt children's
ability to maintain family and community connections and creates behavioral issues.  (Trial
Exhibit 33, Massachusetts Child and Family Services Review Program Improvement Plan,
Oct. 5, 2009, p. 20; Trial Exhibit 25, DCF Kinship First Placement Stability presentation,
June 2011, at DCF003245931; Trial Tr. May 3, 2013 (McClain), at 8:3-10:25; Trial Exhibit
408, Email from Mary Gambon to Jan Nisenbaum re: Info for Steering Committee, Feb. 14,
2011, and attached Draft Intake Foster Homes Rationale, at DCF005079400; Trial Exhibit
94, Child and Family Services Plan, at DCF007054453; Trial Exhibit 1127, Strengthening
the Safety Net: DCF's Strategic Plan for Action, April 2009, at DCF7605097).

709.    Dr. Azzi-Lessing testified that multiple moves for children in foster care are harmful to
those children.  (Trial Tr., Feb. 4, 2013 (Azzi-Lessing), at 106:24-107:1).  Specifically, she
testified that there is a:

> [V]icious cycle that we see when children are moved from
> placement to placement in that every move presents a traumatic
> experience and losses in terms of family, in terms of community,
> school, friends, familiar backgrounds, and that children often react
> to that kind of trauma and loss by behaving in difficult and
> inappropriate ways, and we know that the more difficult and
> inappropriate the behavior becomes, the harder it is to maintain a
> child in placement . . . over time.

(*Id.* at 107:1-9).  She further testified that "what happens when child protective systems move
children repeatedly is then the child gets caught up in a vicious cycle where the moves
contribute to trauma, trauma exhibited in troubling behavior and troubling behavior makes it

130

harder and harder to find and keep stable placements" or "find a prospective adoptive placement for children." (*Id.* at 107:10-16).

710.    As recognized by the National Conference of State Legislatures, "[f]requent moves may result in children losing contact with siblings, other family members, friends and adults in their community who may have been involved in their lives, such as neighbors, coaches, religious leaders and others. This further places the children at risk of emotional and behavioral problems and other negative outcomes." (Trial Exhibit 1095, Nina Williams-Mbengue, Moving Children Out of Foster Care: The Legislative Role in Finding Permanent Homes for Children, National Conference of State Legislatures, Oct. 2008, p. 1).

711.    With regard to children who have had many placement moves, Denise Sullivan, a special education advocate who has been appointed as a special educational advocate for hundreds of DCF foster children over the last thirteen years, has observed that among children in care for two or more years, there is an increase in negative behaviors—"behaviors that were not there in the beginning"—as "each move happens." (Trial Tr., Feb. 6, 2013 (Sullivan), at 80:6-11; 87:9-12; 101:6-102:4). For example, Ms. Sullivan testified to observing during a classroom observation that one of her students, in anger, "was tipping over desks" and "throwing books, he threw a chair across the room," when two years prior to that the student "was able to sit at his desk and do his work." (*Id.* at 101:25-102:4).

712.    Lauren James testified that DCF never gave her much time to prepare for a move to a new foster home. "Sometimes [she] only had an hour to pack all of [her] belongings, and if [she] didn't have luggage they went in plastic bags." (Trial Tr., Jan. 22, 2013 (James), at 54:21-55:7).

## 2.    Disruption of Education and Services

713.    Placement moves often result in a change in school placement, which disrupts the child's education. (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 86:11-88:10; Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, May 14, 2012, at 160:9-15).

714.    Massachusetts State Senator Sal DiDomenico wrote to Commissioner McClain and the Commissioner of the Massachusetts Department of Elementary and Secondary Education, Mitchell Chester, that "[f]ar too many youth are being 'bounced' between multiple schools during the academic year, often leading to further administrative, academic and social-emotional challenges." (Contested Exhibit OC, Letter from Sal DiDomenico to Mitchell Chester and Angelo McClain, Jan. 23, 2012).

715.    DCF has repeatedly acknowledged that placement instability significantly impacts a child's educational achievement. (Trial Exhibit 33, Massachusetts Child and Family Services Review Program Improvement Plan, Oct. 5, 2009, p. 20; Trial Exhibit 94, Child and Family Services Plan FY2010-FY2014, at DCF007054453; Trial Exhibit 408, Email from Mary Gambon to Jan Nisenbaum re: Info for Steering Committee, Feb. 14, 2011, and attached Draft Intake Foster Homes Rationale, at DCF005079400; Trial Exhibit 25, DCF Kinship First Placement Stability presentation, June 2011, at DCF003245931; Trial Tr. May 3, 2013

(McClain), at 8:3-10:25; Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, May 14, 2012, at 23:10-24:2; Trial Exhibit 1127, Strengthening the Safety Net: DCF's Strategic Plan for Action, April 2009, at DCF7605097).

716.    The National Conference of State Legislatures recognized that placement changes, "which frequently result in school changes and delays in school enrollment," are among the factors that "have been found to contribute to . . . negative educational experiences" among children and youth in foster care. (Trial Exhibit 1096, Sara Munson & Madelyn Freundlich, Educating Children in Foster Care: State Legislation 2004 – 2007, Mar. 2008, p. 2; *see also* Trial Tr., Mar. 1, 2013 (Crabtree), at 11:18-13:11).

> Children and youth in foster care face significant barriers to positive educational experiences and academic achievement. . . . One significant barrier to the educational success of children and youth in foster care is placement instability and the resulting school mobility.  Children and youth in foster care frequently experience both planned and unplanned school changes, often when they first enter the foster care system (and cannot be placed in a foster home within their original school district), and again throughout their time in foster care if they move from one foster home to another.

(Trial Exhibit 1096, Sara Munson & Madelyn Freundlich, Educating Children in Foster Care: State Legislation 2004 – 2007, Mar. 2008, pp. 1, 4; *see also* Trial Tr., Mar. 1, 2013 (Crabtree), at 13:12-21).

717.    DCF acknowledges that maintaining school continuity would require consideration of the "proximity of placement to [the] current school." (Trial Exhibit 981, "MA Department of Children and Families: Supporting Educational Stability and Success," Apr. 24, 2012, at DCF011020192).

718.    In the 2007 Second Round Child and Family Services Review, stakeholders reported that children were not consistently attending school when they were in night to night or transitional placements. (Trial Exhibit 58, Massachusetts Child and Family Services Review Final Report, Feb. 21, 2008, at CSF-000000804).

719.    Ms. Sullivan testified:

> As I'm the person who is also going to review the report cards and their progress within their IEPs, what I see, as students are moving, I see grades slipping.  I see children who have the cognitive ability to do well, but as each placement happens grades slip, curriculum is not the same across the state.  In Massachusetts there is curriculum that must be addressed each year, but at no specific time within that school year.  So, a child may be coming into a

> school that they're doing something that he has never seen before
> and is really struggling and getting angry because of it. I will see
> students who have already done the same curriculum and they will
> disengage, they will shut down, they will not want to do anything
> of what the whole class is doing because they've already, they feel
> they've already done this, they shouldn't have to do it again.

(Trial Tr., Feb. 6, 2013 (Sullivan), at 98:13-99:6).

720.  Children with multiple placement moves "score lower on standardized tests than children
      in stable housing." Reducing the number of placements a youth experiences by one per year
      "doubles the likelihood that youth will graduate from high school before leaving [state] care.
      (Trial Exhibit 983, Essex County Community Foundation, 2012 Youth at Risk Conference,
      Education Stability & Transition Services for DCF Youth, at DCF011396221).

721.  "It takes children 4 to 6 months to recover academically from a school move." (Trial
      Exhibit 983, Essex County Community Foundation, 2012 Youth at Risk Conference,
      Education Stability & Transition Services for DCF Youth, at DCF011396221).

722.  The negative educational impact of placement instability is evidenced by the higher rates
      of truancy, missed school days, out-of-school suspensions, and poor academic performance
      experienced by children in DCF custody with three or more placement moves. In October
      2011, DCF prepared a presentation to be given to EOHHS examining outcomes and rates of
      performance for children in DCF custody attending the Springfield, Holyoke, and Worcester
      school systems. According to this presentation, DCF youth in the Springfield Public School
      system with three or more placement moves were three times more likely to be on-the-run,
      2.5 times more likely to be hospitalized, more likely to be truant, and 1.4 times more likely
      to be suspended than DCF students generally. (Trial Exhibit 636, DCF Children Attending
      Underperforming Schools, Springfield, Holyoke, Worcester, School Year: 2010-2011 -
      Readiness Cabinet Presentation, Oct. 27, 2011, at EOHHS000076323). Students with three
      or moves were also one-third less likely to be on the A-B honor roll and one-third more
      likely to be failing than other DCF children in Springfield Public Schools. (*Id.* at
      EOHHS000076324). By comparison, DCF youth in the Springfield Public School system
      with no placement moves were four times less likely to be on-the-run, 6.5 times less likely to
      be hospitalized, less likely to be truant, and less likely to be suspended than other DCF
      students. (*Id.* at EOHHS000076323). These children were also 20% more likely to be honor
      students. (*Id.* at EOHHS000076324).

723.  School disruptions cause further emotional harm to children. Ms. Nisenbaum testified
      that, particularly for older children, educational disruption is harmful not only because it
      affects their educational achievement, but also because it is socially and emotionally
      "disruptive," since "school provides an ever increasing . . . source of support for children" as
      they get older. She testified that educational stability is also a key element of preparing
      children for independent living. (Deposition of Jan Nisenbaum, DCF Deputy Commissioner
      for Clinical Practice and Program Operations, May 18, 2012, at 88:11-89:21). Ms. Sullivan
      testified that children she advocates for often discuss how they are afraid to make

connections with other children at school because they may be moved again and lose those connections.  (Trial Tr., Feb. 6, 2013 (Sullivan), at 99:7-24).

724.    Placement moves disrupt the continuity of other needed services provided to children in DCF care.  (Trial Exhibit 25, DCF Kinship First Placement Stability presentation, June 2011, at DCF003245931; Trial Tr. May 3, 2013 (McClain), at 8:3-10:25; Trial Exhibit 408, Email from Mary Gambon to Jan Nisenbaum re: Info for Steering Committee, Feb. 14, 2011, and attached Draft Intake Foster Homes Rationale, at DCF005079400).  For example, when a child changes placements while on a waiting list for mental health services, he or she is often added to a new wait list because "usually a new service provider has to be instituted."  (Trial Tr., Feb. 6, 2013 (Sullivan), at 103:2-6, 103:10-13).  For the same reason, when a child who is already receiving mental health treatment changes placements, the services are often terminated and the child needs to go on another wait list and wait for services again.  (*Id.* at 103:14-18).

### 3.    Effect on permanency

725.    DCF has acknowledged that "Research has shown that the more frequently a child moves subsequent to a home removal, the longer it is before they are able to return home."  (Trial Exhibit 33, Massachusetts Child and Family Services Review Program Improvement Plan, Oct. 5, 2009, p. 20; *see also* Trial Exhibit 25, DCF Kinship First Placement Stability presentation, June 2011, at DCF003245931; Trial Tr. May 3, 2013 (McClain), at 8:3-10:35; Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, May 14, 2012, at 30:16-31:4; Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, Mar. 5, 2012, at 193:11-194:1).

726.    Dr. Azzi-Lessing testified that "[p]ermanency also means minimizing the number of times that a child is moved from foster placement or group or residential placement" and that "[i]t means using placements very strategically and carefully so that there aren't multiple moves because we know that multiple moves and transitions disrupt children's ability to obtain permanency."  (Trial Tr., Feb. 4, 2013 (Azzi-Lessing), at 72:17-25).

727.    There is a statistically significant association between placement stability and timely reunification, guardianship, and permanent relative placement.  (Trial Exhibit 671, Findings From the Initial Child and Family Services Review, p. 18).  Ms. Gambon testified that "fewer placements leads to better outcomes for children," and specifically, that multiple placements often lead to "reduce[d] opportunities [for] reunification sooner."  (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, May 14, 2012, at 23:10-24:2).  Accordingly, placement stability "is an integral factor in permanency planning."  (Trial Exhibit 547, Placement Stability PDSA, at DCF007161712).

### C.    DCF Fails to Meet Standards for Placement Stability

### 1.    Excessive Placement Moves

728.    DCF records children's placements, including start and end dates, in FamilyNet in a window for referrals (for paid placements like foster homes), and in a window for "non-

referral locations" (for unpaid locations such as hospitals, detention, or runaway status). (Deposition of Rosalind Walter, DCF Director of Data Management, Jan. 4, 2012, at 53:10-57:6, 60:19-62:8, 67:9-18, 68:5-19). DCF relies on entries made by Lead Agencies to record changes in a child's placement from one intensive foster home to another within the same provider. (*Id.* at 66:4-67:8).

729. In recent years, DCF's performance on CFSR measures of placement stability has been among the worst in the nation. In federal fiscal year 2010, Massachusetts performance on the CFSR Composite Measure 4.1 reflected that 74.0% of children in care between eight days and twelve months experienced two or fewer placements. Only three states performed worse than Massachusetts. (Trial Exhibit 1084, Summaries of state-by-state performance data and rankings from Child Welfare Outcomes 2007-2010, Prepared by Elissa Glucksman, p. 18). Its performance on Composite Measure 4.2 reflected that 48.9% of children in care between twelve and twenty-four months experienced two or fewer placements. Only six states performed worse than Massachusetts. (*Id.* at 19). Its performance on Composite Measure 4.3 reflected that 23.4%[4] of children in care 24 months or more experienced two or fewer placements; only seven states performed worse. (*Id.* at 20).

730. In federal fiscal year 2011, Massachusetts's performance on Composite Measure 4.1 reflected that 77.5% of children in care between eight days and twelve months experienced two or fewer placements. Only four states performed worse than Massachusetts. (Trial Exhibit 1085, Summaries of state-by-state performance data and rankings from Child Welfare Outcomes 2008-2011, Prepared by Elissa Glucksman, p. 19). Its performance on Composite Measure 4.2 reflected that 49.2% of children in care between 12 and 24 months experienced two or fewer placements; only five states performed worse. (*Id.* at 20). Its performance on Composite Measure 4.3 reflected that 24.2% of children in care twenty-four months or more experienced two or fewer placements; only seven states performed worse. (*Id.* at 21).

731. The alternative CFSR measures for placement stability, Outcomes 6.1a through 6.1c, similarly reflect poor performance relative to other states on placement stability. For federal fiscal year 2011, DCF performance was 78.5% (ranking 46th), 49.2% (ranking 47th), and 24.3% (ranking 44th), respectively, on these three measures. (Trial Exhibit 1085, Summaries of state-by-state performance data and rankings from Child Welfare Outcomes 2008-2011, Prepared by Elissa Glucksman, p. 5). In 2010, DCF performance was 75.4% (ranking 48th), 48.9% (ranking 46th), and 23.4% (ranking 43rd), respectively. (Trial Exhibit 1084, Summaries of state-by-state performance data and rankings from Child Welfare Outcomes 2007-2010, Prepared by Elissa Glucksman, p. 5).[5]

---

[4] According to the earlier-published Child Welfare Outcomes 2007-2010: Report to Congress, Massachusetts's performance was 74.1%, 48.8%, and 23.5%, respectively, on these three measures. This does not affect the ranking for the first two, but moves Massachusetts up by one on the third. (Contested Exhibit SB, Summaries of state-by-state performance data and rankings from Child Welfare Outcomes 2007-2010, Prepared by Elissa Glucksman, p. 20).

[5] According to the earlier-published Child Welfare Outcomes 2007-2010: Report to Congress, Massachusetts's performance was 75.5% (ranking 48th), 48.8% (ranking 45th), and 23.4%

732.   DCF's only internal management report that tracks placement stability is the CFSR Scorecard, which reports, for each quarter, DCF's performance on Measures C4.1 through C4.3 during the preceding twelve-month period.  The most recent CFSR Scorecard, for the twelve-month period ending September 30, 2012, reported performance of 80.2% on Measure C4.1, 53.3% on Measure C4.2, and 25.1% on Measure C4.3.  (Trial Exhibit 964, CFSR Measures – 12 Month Period Ending: 09/30/2012, p. 1).  The immediately preceding CFSR Scorecard reported performance of 80.0%, 52.5%, and 25.0% on Measures C4.1, C4.2, and C4.3, respectively.  (Trial Exhibit 964, CFSR Measures – 12 Month Period Ending: 06/30/2012, at DCF011421629).  Although this performance was well below the 2004 national medians appearing on the Scorecard (and even further below the 2010 and 2011 medians noted *supra* ¶¶ 695-96), DCF gave itself an "A" for its performance on Measure C4.1 and a "B-" to a "B+" for its performance on C4.2.  (*Id*.).

733.   Using the fixed baseline of 2004 national data, the CFSR Scorecard has consistently reflected DCF performance on Measures C4.1 and C4.2 as well below the national median, and often in the bottom quartile.  Measure C4.1 performance has ranged between 72.5% and 80.2% since 2008, compared to the 2004 national median of 83.3% and the 2004 national 25th percentile of 78.8%.  Measure C4.2 performance has ranged between 47.8% and 53.3% since 2008, compared to the 2004 national median of 59.9% and the national 25th percentile of 52.1%.  Performance on Measure C4.3 is consistently in the 2004 bottom quartile.  Measure C4.3 performance has ranged between 22.8% and 25.1% since 2008, compared to the national 25th percentile of 26.6%.  (Trial Exhibit 964, All CFSR Measures Reports for the 12-month periods ending between 12/31/2008 and 9/30/2012).

734.   The Administration for Children and Families ("ACF") computes a "Permanency Composite" from Measures C4.1 through C4.3 for the purpose of providing an overall score on placement stability.  For Federal Fiscal Year 2011, DCF's Composite Score was 80.9, compared to the National Standard of 101.5, placing Massachusetts 41st out of 51 jurisdictions based on 2004 national data.  (Trial Exhibit 960, Massachusetts Child and Family Services Review Data Profile, Feb. 24, 2012, at DCF011066204).  Based on both 2011 and 2010 national data, Massachusetts placed 47th out of 52 jurisdictions.  (Trial Exhibit 1085, Summaries of state-by-state performance data and rankings from Child Welfare Outcomes 2008-2011, Prepared by Elissa Glucksman, p. 18; Trial Exhibit 1084, Summaries of state-by-state performance data and rankings from Child Welfare Outcomes 2007-2010, Prepared by Elissa Glucksman, p. 17; *see also* Contested Exhibit SB, Summaries of state-by-state performance data and rankings from Child Welfare Outcomes 2007-2010, Prepared by Elissa Glucksman, p. 17).

735.   A June 2011 DCF presentation to staff highlighted that 74.1% of children in DCF custody for less than twelve months experienced two or fewer placement, as compared to the "National Standard" of 86%.  (Trial Exhibit 25, Kinship First: Placement Stability, June 2011, at DCF003245932).

---

(ranking 43rd).  (Contested Exhibit SB, Summaries of state-by-state performance data and rankings from Child Welfare Outcomes 2007-2010, Prepared by Elissa Glucksman, p. 5).

736.   Among children in DCF custody during federal fiscal year 2011, 1700 children, or
19.7%, had experienced six or more placements during their current foster care episode.
(Trial Exhibit 960, Massachusetts Child and Family Services Review Data Profile, Feb. 24,
2012, at DCF011066200).

737.   Former Commissioner McClain, Mary Gambon, DCF Assistant Commissioner for
Adoption, Foster Care and Adolescent Services and Rule 30(b)(6) designee regarding
Recruiting and Retention of Foster Homes, and Terrence Flynn, DCF Regional Director for
the Southern Region and Rule 30(b)(6) designee with respect to Placement Array,
Assignment of Placements, and Placement Moves, testified that DCF's performance on
placement stability needs improvement.  (Trial Tr. May 3, 2013 (McClain), at 5:21-6:2; Rule
30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster
Care and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18,
2011, at 145:22-147:8, 263:20-264:2, 283:6-13; Rule 30(b)(6) Deposition of Terrence Flynn,
DCF Regional Director for the Southern Region, re: Placement Array, Assignment of
Placements, and Placement Moves, Sept. 20, 2011, at 254:19-256:16).

738.   Commissioner McClain testified that he had directed Deputy Commissioner Olga Roche
to focus on improving DCF's performance with respect to placement and educational
stability.   (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 38:21-
39:18).

739.   Other DCF officials also recognized concerns about DCF's performance in the area of
placement stability. (Deposition of Raymond Pillidge, DCF Regional Director for the
Northern Region, Mar. 7, 2012, at 70:3-19, 186:23-187:10; Deposition of Joseph Collins,
DCF Director of Areas for Franklin and Hampshire, Jan. 25, 2012, at 226:22-227:1, 227:15-
19; Deposition of Beryl Domingo, DCF Director of Field Support Programs, Jan. 25, 2012, at
191:19-192:9; Rule 30(b)(6) Deposition of Scott Scholefield, DCF Director of Case and
Special Investigations, re: Abuse or Neglect in Foster Care, Nov. 16, 2011, at 154:14-155:4).

740.   As a result of concerns about placement stability raised in the 2007 CFSR and DCF's
2009 Program Improvement Plan, DCF contracted in January 2010 with the National
Resource Center on Child Welfare Data and Technology ("NRC-CWDT") to perform an
analysis of placement stability data.  Penny Mazza of NRC-CWDT issued a report presenting
the conclusions of the resulting study on January 20, 2011, entitled "Placement Stability in
Massachusetts."  (Trial Exhibit 54, Placement Stability in Massachusetts, Penelope (Penny)
L. Maza, Ph.D., Consultant, National Resource Center for Child Welfare Data and
Technology, Jan. 20, 2011; Deposition of Angelo McClain, DCF Commissioner, May 25,
2012, at 169:15-171:15; Deposition of Jan Nisenbaum, DCF Deputy Commissioner for
Clinical Practice and Program Operations, May 18, 2012, at 67:2-68:18).

741.   The NRC-CWDT report stated that 16,000 children placed in out-of-home care by DCF
in federal fiscal year 2009 had experienced a total of 95,000 different placement settings.
(Trial Exhibit 54, Placement Stability in Massachusetts, Penelope (Penny) L. Maza, Ph.D.,
Consultant, National Resource Center for Child Welfare Data and Technology, Jan. 20, 2011,
p. 4).  It found that within the first year of placement, 63% of children in DCF custody
experienced at least one placement move, 41% moved twice, and 27% moved three times.

Within the first three months of placement, 52% had experienced at least one placement move, 26% moved twice, and 13% moved three times. 79% of those children who had a placement move had a move within the first three months in care, 55% had two moves within the first three months in care, and 36% had three moves within the first three months in care. (*Id*. at 46-47; *see also* Trial Exhibit 25, Kinship First, Placement Stability, June 2011, at DCF003245933).

742.    The NRC-CWDT report found that adolescents in particular experience a large number of placement moves.  DCF performance on Measure C4.1 during federal fiscal year 2009 for thirteen- to seventeen-year olds ranged from 70% (for fourteen-year-olds) to 73% (for seventeen-year-olds).  These percentages were lower than for any other age group.  (Trial Exhibit 54, Placement Stability in Massachusetts, Penelope (Penny) L. Maza, Ph.D., Consultant, National Resource Center for Child Welfare Data and Technology, Jan. 20, 2011, pp. 4, 14).  Similarly, performance on Measure C4.2 was significantly worse, between 33% and 40%, for thirteen- to sixteen-year-olds than for all other age groups. (*Id*.).  Children thirteen to sixteen years old were far more likely to experience two moves within a three-month period than any other age group except infants under 1.  (*Id*. at 48).

743.    CRC's case record review indicated that during the thirty-month observation period, 21.1% of the children in the entry cohort experienced four or more placements.  Of the eighty children who were in custody more than twelve months but less than twenty-four months, fully 40% experienced four or more placements; and of the forty children in custody twenty-four months or more, 35% experienced four or more placements.  (Trial Exhibit 1066, Table 7, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; *see also* Trial Tr., Jan. 30, 2013 (Freitag), at 52:17-53:7, 54:3-55:1).

744.    CRC's case record review indicated that 31.1% of the children in the two-year cohort had experienced four or more placements during the review's thirty-month observation period. (Trial Exhibit 1066, Table 36, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; *see also* Trial Tr., Jan. 30, 2013 (Freitag), at 55:2-22).

745.    In the Boston Region, between September 1, 2010 and January 31, 2011, there were 166 children with new placements.  Of those children, 35 experienced three or more placements during the five-month period, and 18 experienced four or more placements.  Since 44% of the 166 children had their first placement during the last two months of the period, the actual number ultimately experiencing multiple placements within five months was understated.  (Trial Exhibit 547, Placement Stability PDSA, at DCF007161712).

746.    Almost 5000 children who entered DCF foster care between January 2, 2007 and August 13, 2010 were moved from their first foster care placement in less than four days.  (Contested Exhibit ED, Spreadsheet re: First placement less than 4 days).

747.    In some area offices in the Western Region, children who had been placed in congregate care experienced an average of 10 to 13 placements prior to the congregate care placement.

(Trial Exhibit 426, Memorandum from Lian Hogan to Elorie Stevens and Jennifer Coupe, Jan. 7, 2011).

## 2.    Lateral Moves

748.    Numerous placement moves experienced by children in DCF custody are moves between placements of the same type ("lateral" moves), rather than "positive" moves, such as placement in a more family-like setting, returning home, or placement with kin.  According to the NRC-CWDT report, during federal fiscal year 2009, 44% of first moves were lateral, 29% of second moves were lateral, 20% of third moves were lateral, 15% of fourth moves were lateral, and 11% of fifth moves were lateral.  The only type of move that was more common than a lateral move was discharge from care.  (Trial Exhibit 54, Placement Stability in Massachusetts, Penelope (Penny) L. Maza, Ph.D., Consultant, National Resource Center for Child Welfare Data and Technology, Jan. 20, 2011, pp. 4, 35).

749.    In 2011, Ruben Ferreira and Kim Occhiuti prepared a report concerning placement stability within DCF's IFC homes.  (Trial Exhibit 38, Department of Children and Families, Intensive Foster Care Placement Stability, Prior and Next Placement, Calendar Years 2007-2010, Mar. 2011; *see also* Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 46:3-48:19).  Mr. Ferreira testified that this study arose from a concern expressed by IFC providers that DCF was placing children with higher intensity needs in IFC placements.  (Deposition of Ruben Ferreira, DCF Assistant Commissioner for Continuous Quality Improvement, Feb. 2, 2012, at 251:12-18).

750.    According to the IFC Placement Stability report, the percentage of moves into an Intensive Foster Care ("IFC") placement that were lateral moves from another IFC placement, rather than from a lower or higher level of care, increased from 40% to 52.7% between 2007 and 2010.  Similarly, the percentage of moves out of one IFC placement that were into another IFC placement, rather than into a different level of care, within 45 days of the first placement, increased from 47.9% to 59.7%.  The percentage of such exits within 46 to 90 days of the first placement increased from 41.3% to 50.2%.  (Trial Exhibit 38, Department of Children and Families, Intensive Foster Care Placement Stability, Prior and Next Placement, Calendar Years 2007-2010, Mar. 2011, at DCF000547371).

751.    Of the 11,227 placements into IFC homes in 2007-2010, a total of 2,086 consisted of lateral moves from another IFC home within 45 days of the earlier placement, and another 624 were lateral moves within 46 to 90 days of the earlier placement.  (Trial Exhibit 38, Department of Children and Families, Intensive Foster Care Placement Stability, Prior and Next Placement, Calendar Years 2007-2010, Mar. 2011, at DCF000547406, "Entry Acuity Status Counts," Column "Grand Total").

752.    The IFC Placement Stability report concluded that "[t]hese lateral moves represent significant churning within the IFC system" and that "[u]pfront efforts to better match the unique needs of children with the specific qualities of IFC homes may reduce lateral movement within IFC."  (Trial Exhibit 38, Department of Children and Families, Intensive Foster Care Placement Stability, Prior and Next Placement, Calendar Years 2007-2010, Mar. 2011, at DCF000547371).  Commissioner McClain testified that he would have "probably

drawn the same conclusion" and that this meant that children were moving from one IFC home to another too many times.   (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 201:10-202:6; Trial Tr. May 3, 2013 (McClain), at 34:25-35:4, 37:24-38:7). Jan Nisenbaum testified that no one took exception to the findings in the report.  (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 156:24-157:20).

753.     According to the IFC Placement Stability report, the five IFC providers with the highest percentage of lateral moves during the period from January 1, 2007, to November 9, 2010 were (1) Berkshire Children & Families, Inc. (53.0% of moves lateral); (2) Northeast Center for Youth & Families (50.0% of moves lateral); (3) Dare Family Services, Inc. (44.7% of moves lateral); (4) Mass Mentor, Inc. (42.7% of moves lateral) and (5) Devereux Foundation (42.4% of moves lateral).  (Trial Exhibit 427, Email from Ruben Ferreira to Robert Wentworth, Feb. 3, 2011, p. 1).  These five providers, as of June 2, 2010, managed 1,267, or 60.8%, of the 2,083 Intensive Foster Care homes serving DCF.  (Trial Exhibit 425, Email from Mary Gambon to Angelo McClain, June 11, 2010, and attached Letter to Angelo McClain, June 2010, at DCF004976825-26).

754.     During the period from January 1, 2010 to November 4, 2010, 189 children in Intensive Foster Care had four or more IFC placements, and twenty-three of those children had eight or more placements.  According to Ros Walter, DCF's Director of Data Management and Quality Assurance, two IFC providers, Dare and Mentor, were "the big winners in the multiple placement arena."  (Trial Exhibit 549, Email exchange between Ros Walter, Joy Cochran, and Ruben Ferreira re: IFC situation that needs to be looked at, Nov. 9, 2010).  Dare Family Services and MassMentor are DCF's two largest providers of IFC homes. (Trial Exhibit 425, Email from Mary Gambon to Angelo McClain re: Report on IFC, June 11, 2010, and attached Letter to Angelo McClain re: Info on IFC, June 2010, at DCF004976825-26).

755.     DCF maintains a type of congregate care known as Stabilization, Assessment and Rapid Reintegration facilities ("STARRs"), which are "intended as an up-to-45-day placement for children or youth who may be coming into the department's care or custody and we know little about them, who may be disrupting from other services, and we need a period of more intensive assessment and stabilization before determining the next appropriate level of care." (Rule 30(b)(6) Deposition of Robert Wentworth, DCF Assistant Commissioner for Planning and Program Development, re: Purchased Services Licensing, Delivery, and Oversight, Dec. 29, 2011, at 12:10-13:8).

756.     Mr. Wentworth testified that in certain circumstances STARR facilities are assigned on back-to-back bases for children in care, and that there is "nothing that specifies in the contract [with the provider] that a child cannot leave and reenter a STARR program."  (Rule 30(b)(6) Deposition of Robert Wentworth, DCF Assistant Commissioner for Planning and Program Development, re: Purchased Services Licensing, Delivery, and Oversight, Dec. 29, 2011, at 144:8-18, 150:2-17).  There is no regular management report that reflects when a child experiences multiple STARR placements within a certain period of time.  (*Id*. at 148:23-149:5).  Ms. Carbone testified that DCF does not have any limitations on how many different STARR placements a child might experience within a twelve-month period.

(Deposition of Frances Carbone, DCF Director of Program Operations, Apr. 19, 2012, at 135:20-136:3).

### 3.    Educational Stability

757.    The review of case files conducted by Plaintiffs' expert CRC revealed that of the 387 placement moves experienced by children over the age of five in the entry cohort, at least 101 (or 26%) resulted in a change in schools.  For the two-year cohort, of the 779 placement moves experienced by children over five, at least 239 (or 31%) resulted in a change in schools.  (Trial Exhibit 1065, Table C34, Appendix C, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; *see also* Trial Tr., Jan. 30, 2013 (Freitag), at 63:7-22).  The inter-rater reliability for these measures exceeded 80%.  (*See supra* ¶ 80; Trial Exhibit 1069, Table 3, Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC) and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowsky, Oct. 19, 2012, Nov. 19, 2012).

758.    Ms. Sullivan testified that among the forty DCF foster children whom she currently serves, "there isn't a child that I can think of that has not had a school move."  (Trial Tr., Feb. 6, 2013 (Sullivan), at 81:24-84:6, 89:1-3, 94:1-5).  Ms. Sullivan estimated that most of these children have each had five to seven placement moves.  (*Id*. at 99:25-100:7).  DCF workers have explained to Ms. Sullivan that these school moves take place most often due to a placement change, which results in a change in school because "the foster home that the child was in is in a certain school district . . . , and as each child moves into a different school district it's a new placement for school."  (*Id*. at 94:25-96:11).  Children are moved to a placement in a different school district because there are no foster homes available in the same school district.  (*Id*. at 96:5-22).

759.    Although a child is supposed to start school within three school days after a school change, Ms. Sullivan testified that "it doesn't happen that way."  She has been an advocate for children who have been out of school for thirty or more days because of the delay in accomplishing a transfer of school records.  (Trial Tr., Feb. 6, 2013 (Sullivan), at 97:21-98:12).

760.    A foster parent focus group in the Harbor Area Office reflected that "[s]chool stability is a huge issue."  (Trial Exhibit 730, Email from Marsha Donovan to Gina Emanuel et al., May 2, 2011, at DCF003093639).

761.    DCF recognizes the need to increase the educational stability of children in its care.  (*See* Trial Exhibit 7, Executive Office of Health and Human Services, 2012-2015 Strategic Plan, Aug. 2012, at CSF-000006351; Trial Exhibit 799, Strengthening the Safety Net: DCF Strategic Priorities CY 2011 and FY 2012, at DCF010275207-08; Trial Exhibit 800, Document re: Possible DCF Priorities, at DCF010275210).

### 4.     Named Plaintiffs and Individual Children

762.     Dr. Azzi-Lessing testified that a common theme found in her review of the named plaintiff files was multiple placements. (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 67:19-21). She further testified that "DCF subjects the children it removes from their biological families to an excessive number of placements, and we know that these placements cause additional losses and trauma to the children which are known to contribute to behavior problems, attachment disorders, and other mental health problems." (*Id.* at 67:22-68:2). Dr. Azzi-Lessing testified that multiple placements impede children's access to "appropriate and consistent therapy and educational services and it hampers their prospects for permanency." (*Id.* at 68:3-6).

763.     Dr. Azzi-Lessing testified that given the multiple placements of the named plaintiffs whose files she reviewed, "their educational experiences have been horrific." (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 77:16-78:4). She testified that these children have been "[i]n and out of various schools, . . . not getting an individual education plan developed and . . . consistently followed" and that at least one "has dropped out of school as soon as he could." (*Id.* at 78:4-7).

764.     Named Plaintiff Connor experienced twelve placements between his entry into care in February 2007 and April 5, 2012. (Trial Exhibit 1077, Connor B. Placement Settings, Run date April 5, 2012). Connor's placement moves caused him trauma. (Trial Tr., Feb. 4, 2013 (Azzi-Lessing), at 93:12-21; Trial Exhibit 1181, DCF Case File: Connor B., at DCF010191150). Specifically, Dr. Lessing testified that after Connor was removed from the home in which he was raped, the mental health professionals who then evaluated him stated that he was "in a very fragile state after having been raped in the foster home, that what he needed was stability, that his mental health at that point was unstable," and that "moving from one foster home to another to another in just a matter of days had to be traumatic to him." (Trial Tr., Feb. 4, 2013 (Azzi-Lessing), at 93:12-19; Trial Exhibit 1181, DCF Case File: Connor B., at DCF010705462, DCF003639401, DCF010191150). Dr. Lessing further testified that moving Connor "from one foster home to another to another in just a matter of days had to be traumatic to him." (Trial Tr., Feb. 4, 2013 (Azzi-Lessing), at 93:19-21).

765.     By subjecting Connor to multiple placement moves, DCF violated 110 Mass. Code Regs. 1.02, which provides that, in delivering services to children and families, DCF shall ensure the safety of children and reflect the understanding that every child needs stability and permanency. (Trial Tr., Feb. 4, 2013 (Azzi-Lessing), at 92:9-93:8; Trial Exhibit 69, 110 Mass. Code Regs. 1.02 (2013)).

766.     DCF also failed to provide stability for Named Plaintiff Adam as required by 110 Mass. Code Regs. 1.02. During eight years in DCF care, Adam experienced 22 placements, including nine long-term hospitalizations. (Trial Tr., Feb. 4, 2013 (Azzi-Lessing), at 127:22-24; *see also* Trial Exhibit 1078, Adam S. Placement Settings). As a result of his excessive placement moves, Adam had no stable environment in his life, has little ability to trust or feel safe, and has been unable to get high quality, consistent therapeutic services; specifically "there's no way that consistent mental health services can be delivered when a child is being moved from facility to facility.". (Trial Tr., Feb. 4, 2013 (Azzi-Lessing), at 128:4-6; Trial

Tr., Feb. 5, 2013 (Azzi-Lessing), at 11:16-12:2, 20:20-22; Trial Exhibit 1182, DCF Case File: Adam S., at DCF010184640-41, DCF010805859; *see also*, Trial Exhibit 1080, Andre S. Placement Settings). These moves were extremely harmful to Adam. (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 14:5-12:17, 19:7-25).

767. Dr. Azzi-Lessing testified that, with respect to Named Plaintiff Adam:

> [Y]ou see the vicious cycle where the child is abused in foster care, moved multiple times, experiencing trauma both from the abuse and the multiple moves, and his behavior becomes increasingly difficult to manage which again threatens the stability of any placement he's put in and certainly threatens his ability to achieve any kind of permanency to have a family of his own that is equipped to deal with, you know, the behaviors and so forth of what has become a very troubled child.

(Trial Tr., Feb. 4, 2013 (Azzi-Lessing), at 128:7-15).

768. DCF also failed to provide stability for Named Plaintiff Andre, as required by 110 Mass. Code Regs. 1.02. As of April 5, 2012, Andre had experienced eight placements, including one hospitalization. (Trial Exhibit 1080, Andre S. Placement Settings, Trial Exhibit 1183, DCF Case File: Andre S., at DCF000001966). The placement moves that Andre experienced were excessive and harmed his chances for permanency. (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 45:7-13, 49:17-25).

769. DCF also failed to provide stability for Named Plaintiff Camila as required by 110 Mass. Code Regs. 1.02. Camila experienced 31 placements in approximately four years. (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 68:10; *see also* Trial Exhibit 1079, Camila R. Placement Settings).

770. DCF also failed to provide stability for Named Plaintiff Seth as required by 110 Mass. Code Regs. 1.02. Seth was subjected to five placements during his first 16 months in DCF custody. (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 68:13-14). By April 5, 2012, Seth had experienced nine placement settings. (Trial Exhibit 1081, Seth T. Placement Settings).

771. Lauren James, a former foster youth in DCF custody, testified that she was placed in at least fourteen different DCF foster care placements throughout her childhood. She was transferred to several different schools as a result of her placement changes, "[o]ver five, over seven, perhaps," and in one case she was transferred in the middle of or toward the end of the school year. (Trial Tr., Jan. 22, 2013 (James), at 31:5-38:14, 46:5-47:17, 55:13-17). Some of Ms. James' high school credits were not counted because of her multiple school placement moves. As a result she was a year behind in school and turned eighteen in her junior year. (*Id*. at 70:4-16). Ms. James testified that it was difficult to maintain connections with her friends because she was moved around so much. (*Id*. at 55:8-12).

### D. Chronic Failures and DCF Inaction

### 1.    Consistently Poor Performance Since 1997

772.    DCF has acknowledged that "when children are moved a substantial number of times before a permanent home is identified . . . a further examination of our effectiveness in meeting the needs of those children should be conducted."  (Trial Exhibit 550, Documents re: Placement Stability, at DCF0089138863).

773.    Since at least 1997, DCF has been aware of its poor performance, compared to other jurisdictions, on federal placement stability standards.  DCF's 2001 Statewide Assessment indicated that in both 1997 and 1999, Massachusetts failed to meet the national standard for Point-in-Time Data Element XI (percentage of children in care for less than 12 months with two or less placements). (Trial Exhibit 55, Massachusetts Child and Family Services Review Statewide Assessment, July 2001, at CSF-000000444).  The percentage of children in care for less than 12 months with two or less placements was 77% in 1999 and 81% in 1997, well below the national standard at that time of 89%.  (*Id.*).

774.    The percentage of children in DCF custody during federal fiscal year 1997 with one placement setting during their current episode was 35.0%, with two placement settings was 22.1%, with three placement settings was 13.1%, with four placement settings was 7.9%, with five placement settings was 5.8%, and with six or more placement settings was 14.7%. Two years later, placement stability had deteriorated, with a smaller percentage of children having a single placement (30.4%) and a larger percentage having six or more placements (17.6%).  (Trial Exhibit 55, Massachusetts Child and Family Services Review Statewide Assessment, July 2001, at CSF-000000428-29).

775.    The 2001 CFSR Final Assessment found that Massachusetts did not meet the national standard for "[s]tability of foster care placements."  (Trial Exhibit 56, Child and Family Services Review, Final Assessment, July 2001, at CSF-000000322).  76.95% of the children who had been in care for less than 12 months had no more than two placements, compared to a national standard of 86.7%.  (*Id.* at CSF-000000322-24).

776.    Accordingly, in its 2001 Statewide Assessment, DCF identified stability of foster care placements as an important priority. (Trial Exhibit 55, Massachusetts Child and Family Services Review Statewide Assessment, July 2001, at CSF-000000444).

777.    From 2000 to 2005, there was some improvement in DCF's performance on the percent of children in placement less than 12 months who had two or fewer moves, but by 2008 performance had fallen back to 2000 levels—only 74% experienced two or fewer moves. (Trial Exhibit 33, Massachusetts Child and Family Services Review Program Improvement Plan, Oct. 5, 2009, p. 20).

778.    From federal fiscal years 2004 through 2010, DCF's performance on placement stability was consistently worse than in 1999.  (*see supra* ¶ 774).  During that period, the proportion of children in DCF custody with one placement setting during their current foster care episode ranged between 23.6% and 27.5%, and the proportion with six or more settings ranged between 20.8% and 25.9%.  (Trial Exhibit 57, Massachusetts Child and Family

Services Review Statewide Assessment, May 2007, at CSF-000000704; Trial Exhibit 465, Massachusetts Child and Family Services Review Data Profile, Mar. 19, 2007, at DCF000066350; Trial Exhibit 960, Massachusetts Child and Family Services Review Data Profile, July 30, 2008, at DCF005555602; Trial Exhibit 960, Massachusetts Child and Family Services Review Data Profile, June 2, 2009, at DCF004931079; Trial Exhibit 960, Massachusetts Child and Family Services Review Data Profile, June 14, 2011, at DCF005504990).

779.    Massachusetts Child and Family Services Review Data Profiles reflect that for all Federal Fiscal Years back at least to 2007, Massachusetts has performed among the eleven worst jurisdictions, using 2004 national data, among fifty-one states and the District of Columbia on Permanency Composite 4, Placement Stability.  (Trial Exhibit 960, Massachusetts Child and Family Services Review Data Profile, July 30, 2008, at DCF005555606; Trial Exhibit 960, Massachusetts Child and Family Services Review Data Profile, June 2, 2009, at DCF004931083; Trial Exhibit 960, Massachusetts Child and Family Services Review Data Profile, June 14, 2011, DCF005504994).

780.    The 2008 CFSR Final Assessment found, again, that Massachusetts was not in substantial conformity with Permanency Outcome 1: Children have permanency and stability in their living situations, and in particular, that Massachusetts failed to meet the national standard on Composite 4 (Placement stability).  (Trial Exhibit 58, Massachusetts Child and Family Services Review Final Report, Feb. 21, 2008, at CSF-000000762).  Case reviewers determined that children experienced placement stability, or that placement changes were in the best interests of the child, in only 65% of applicable cases, well below the 90% or higher required for a rating of Strength.  (*Id*. at CSF-000000768).

781.    Placement stability has been particularly troublesome for adolescents in DCF care.  According to the 2001 Statewide Assessment, DCF acknowledged the need to improve placement stability in adolescents.  The report set forth different strategies DCF identified to remedy this issue including improvement of initial placement decision making process, identifying additional foster homes capable of addressing the "unique needs" of adolescents and providing support services.  (Trial Exhibit 55, Massachusetts Child and Family Services Review Statewide Assessment, July 2001, at CSF-000000444-45).  Additionally, the report stated that exploring more kinship resources as placement options would be a more appropriate and stable placement option for many children in non-kinship care.  (*Id.*).

782.    Six years later, AFCARS data used in the 2007 CFSR reflected that "adolescents aged 12-17 experience the most moves."  (Trial Exhibit 34, MA CFSR 2007: Summary of Key Issues for PIP Development, at DCF008117146, Item 6)  According to the 2008 CFSR Final Assessment, stakeholders consistently reported challenges associated with placement stability for adolescents in Massachusetts, expressing concern over the lack of resource homes for adolescents in the State.  (Trial Exhibit 58, Massachusetts Child and Family Services Review Final Report, Feb. 21, 2008, at CSF-000000768).

## 2. DCF Inaction after the 2007 CFSR

783.    For three years after the second-round CFSR report was issued in 2008, DCF took no concerted action to improve its performance on placement stability.  Commissioner McClain testified that he had been aware since 2007 that Massachusetts ranked in the bottom ten state performers in terms of placement stability based on the CFSR and had identified placement stability as a performance area within DCF that requires improvement.  He admitted, however, that from 2007 to 2011, DCF "really didn't have a solid initiative in place" to address the issue.  (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 170:5-172:4).  Although he said that efforts are being made to improve, DCF "need[s] to step up our response."  He described the progress as "slow; it's like watching a car rust.  We haven't had a breakthrough in improvement."  (*Id.* at 170:22-171:13).

784.    Jan Nisenbaum, DCF's Deputy Commissioner of Clinical Practice and Program Operations, stated in September 2008 with respect to an analysis that had been performed of placement instability among children in DCF custody during the second half of 2007, that "I'd . . . like to suggest that at some point we spend a little time in a [Senior] Staff meeting taking a closer look at this data. . . We might want to use some of that to target priority areas for our strategic plan."  (Trial Exhibit 725, Email from Jan Nisenbaum to DSS - DL - Senior Staff re: Placement Stability, Sept. 18, 2008, with attached Placement Stability, at DCF004935979).

785.    At a 2009 conference sponsored by the Casey Foundation, the convening team assigned to review Massachusetts DCF identified "[a]rea reviews of any child who experiences three placements" as a suggested task.  This suggestion was "still in discussion" a year later.  (Trial Exhibit 350, Email from Mary Gambon to Olga Roche, Leo Farley, and Maureen Messeder, et al. re: Permanency Convening Follow Up, Mar. 23, 2011; Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, Mar. 5, 2012, at 136:19-138:10, 140:1-20).  DCF never subsequently implemented this plan.  (*Id.* at 140:21-141:3).  Commissioner McClain had been aware that placement stability was an issue since 2010.  (Trial Tr. May 2, 2013 (McClain), at 35:6-15).

786.    Placement stability was the subject of discussion at a March 11, 2010 meeting of the DCF Statewide Advisory Council, attended by Commissioner McClain, DCF Chief of Staff Patti Mackin, Deputy Commissioner Jan Nisenbaum, and Bob Wentworth.  DCF acknowledged that "Placement stability is an area which DCF is not doing well," citing CFSR measures.  Council members observed that "There needs to be more conscious decisions made and acknowledgements that kids are looking for longer term placement."  An example was presented of two children who had 4 and 5 placements within a six-week period, respectively.  (Trial Exhibit 551, Department of Children and Families Statewide Advisory Council, Mar. 11, 2010, at DCF00786589-90).

787.    After the NRC-CWDT issued its report in January 2011, DCF engaged Casey Family Programs to undertake a two-day "peer-to-peer session" in June 2011 with other states that had "put in place some good practices related to placement stability," namely New Jersey and Florida.  (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 67:8-68:21, 74:9-76:23).  Ms. Nisenbaum

testified that she didn't know of any "specific actions that came solely out of" the peer-to-peer session.  (*Id.* at 76:24-78:22).

788.    Commissioner McClain testified that he had not "'Directed' with a capital D" anyone to prepare a strategy to address the IFC placement instability found in the IFC Placement Stability report (Trial Exhibit 38).  When asked why he had not done so, Commissioner McClain said that to come up with a "robust system in response" it would require "a concerted effort by the entire senior management team to really get our arms around something, to really get down to the root cause and to really come up with a good analysis . . . . how many things can we move at once?"  (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 204:21-205:22; *see also* Trial Tr. May 3, 2013 (McClain), at 46:2-11; Department of Children and Families, Intensive Foster Care Placement Stability, Prior and Next Placement, Calendar Years 2007-2010, Mar. 2011).  Other DCF officials were unaware of any strategies being developed or implemented to address placement instability in IFC.  (Deposition of Ruben Ferreira, DCF Assistant Commissioner for Continuous Quality Improvement, Feb. 2, 2012, at 253:24-254:8; Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: Program Improvement Plan, Apr. 4, 2012, 2012, at 205:4-8).

789.    Ms. Nisenbaum testified she was unaware of any concrete steps by DCF to promote placement stability of children in unrestricted (non-kin) foster homes, other than "general conversations" in senior staff meetings.  (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 72:3-23).

790.    Ms. Nisenbaum testified that DCF is hoping to address placement stability in congregate care by educating providers about the impact of placement moves on children in connection with the "joint procurement" initiative with DMH.  (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 80:24-83:7; *see also id.* at 35:21-36:23).  To date, DCF had not sought from congregate care providers any input as to strategies that might promote placement stability or barriers they perceive to improving placement stability.  (*Id.* at 83:8-84:7).

### 3.    The PIP Process

791.    In its 2009 Program Improvement Plan, DCF identified placement stability as an "Area Identified as Needing Improvement" and included it among its "priority strategies."  (Trial Exhibit 33, Massachusetts Child and Family Services Review Program Improvement Plan, Oct. 5, 2009, pp. 20, 30).

792.    In its 2009 Program Improvement Plan, DCF negotiated an "Improvement Goal" for Permanency Composite 4 (erroneously referred to as "Permanency Outcome 1") of 81.1, representing a 3% increase over the baseline performance level of 78.7 set in federal fiscal year 2008.  The "national standard" is 101.5.  (Trial Exhibit 33, Massachusetts Child and Family Services Review Program Improvement Plan, Oct. 5, 2009, p. 56).

793.    By January 31, 2010, however, DCF had renegotiated the "Improvement Goal" down to 78.8, just a tenth of a point greater than its 2008 performance of 78.7. This lowered

"Improvement Goal" was computed by applying the 3% increase to a different baseline period, namely, the first two quarters of federal fiscal year 2007, when DCF's performance level was 76.5. (Trial Exhibit 587, PIP Quarterly Report, Quarter 1, at DCF000063283; Trial Exhibit 33, Massachusetts Child and Family Services Review Program Improvement Plan, Oct. 5, 2009, p. 56). A meeting summary reflects that this baseline was the "[l]owest potential baseline" for computing a 3% PIP improvement goal. (Trial Exhibit 372, PIP Measurement Advisory Committee Meeting Summary, Dec. 8, 2010, at DCF008719951). This goal change was responsible for DCF's success in meeting its PIP goal on Permanency Outcome 1: Placement Stability—albeit only after the two-year PIP period had expired. DCF's final PIP report, for the eighth quarter, reflects "Q9" performance of 80.9—above the renegotiated Improvement Goal but still not meeting the original goal of 81.1. (Trial Exhibit 760, DCF PIP Final Report Oct. 2009 - Sept. 2011, Quarter Eight Report, July - Sept. 2011, at CSF-000005472; Trial Exhibit 33, Massachusetts Child and Family Services Review Program Improvement Plan, Oct. 5, 2009, p. 56).

794.    Ms. Nisenbaum testified that she was not aware why the negotiated improvement goal for Placement Stability was reduced from 81.1 to 78.8. (Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: Program Improvement Plan, Apr. 4, 2012, at 150:21-151:14). She acknowledged that DCF's eighth quarter performance of 79.8, which met the negotiated improvement goal, would not have met the original goal. (*Id.* at 153:9-16).

795.    In the 2009 Program Improvement Plan, DCF committed to several actions steps aimed at "[i]mprov[ing] stability of children and families," including "[d]evelop[ing] strategies for recruitment and retention of adolescent foster homes" and "[i]mplement[ing] strategies for recruitment and retention of adolescent foster homes in areas identified by analysis of placement stability." (Trial Exhibit 33, Massachusetts Child and Family Services Review Program Improvement Plan, Oct. 5, 2009, pp. 46-47).

796.    However, by February 2011, DCF abandoned its intent to address placement stability for adolescents, based on the premise that "NRC-CWDT noted in their report that addressing placement stability of younger children (rather than adolescents) was needed." (Trial Exhibit 591, DCF PIP Quarterly Report, Quarter 5, at DCF000548326; Trial Exhibit 373, DCF PIP Quarterly Report, Quarter Seven, Apr.-June 2011, at PIP-000000082, Trial Exhibit 592, DCF PIP Quarterly Report, Quarter 6, at DCF000548393; Trial Exhibit 376, PIP Change Notice Reporting Form, at DCF003596430). DCF instead "focused [its] efforts in terms of placement stability around increasing the number of kinship placements." (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 67:8-69:6). In fact, the NRC-CWDT report found that compared to other age groups, placement instability was greatest for adolescents. (*See supra* ¶ 742).

797.    The PIP also committed to: "Establish performance expectations for congregate care providers to promote stability; Monitor through quarterly report." (Trial Exhibit 33, Massachusetts Child and Family Services Review Program Improvement Plan, Oct. 5, 2009, p. 47). However the latter benchmark, "Monitor through quarterly report," was subsequently eliminated. (Trial Exhibit 760, DCF PIP Final Report Oct. 2009 - Sept. 2011, Quarter Eight

Report, July - Sept. 2011, at CSF-000005455; *see also* Trial Tr. May 6, 2013 (McClain), at 102:5-103:25).

798.    DCF's current strategy for "improving placement stability during first three months of placement," is primarily to place a larger proportion of children with kin at the time they enter foster care.  (Trial Exhibit 760, DCF PIP Final Report Oct. 2009 - Sept. 2011, Quarter Eight Report, July - Sept. 2011, at CSF-000005394, CSF-000005416, CSF-000005451-53). DCF staff have expressed concern that this strategy "will not impact the children already in care," who are—because "[f]ewer kids are coming into care"—the ones "with more intense needs."  (Trial Exhibit 727, PIP Measurement Advisory Committee, Meeting Summary, Dec. 8, 2010, at DCF00057776).

799.    Commissioner McClain acknowledged that given the fact that a large number of children cannot be placed with kin, strategies in addition to increasing placements with kin are needed if placement stability is to be brought in line with the national standard.  (Trial Tr. May 3, 2013 (McClain), at 17:1-7).

800.    While it is always commendable to make an effort to identify kin placements first, many children may not have the option of being placed with a relative.  (Trial Tr., Mar. 1, 2013 (Crabtree), at 7:25-8:11).

801.    DCF's 2012-2015 Strategic Plan addresses placement stability only through strategies aimed at reducing placement moves during the first three months in placement.  (Trial Exhibit 7, 2012-2015 DCF Strategic Plan, Aug. 2012, at CSF-000006346, CSF-000006351).

### 4.    DCF Failure to Monitor and Analyze Placement Moves

802.    In a February 7, 2006 letter, then-DCF Commissioner Harry Spence explicitly cautioned about the potential for children to experience placement instability when emphasizing community placement over institutional care: "The primary assurance of the quality and stability of community placements is the professional capacity of Departmental and provider staff.  But in a system that is in the process of developing its capacity to define and create successful community placements, it is important to monitor the system for any emerging patterns of failed placements, particularly for patterns of children 'failing up' in placement." (Trial Exhibit 441, Letter from Lewis H. Spence to Colleagues in the System of Care re: Family Networks, Feb. 7, 2006, and attached Guidance Principles for Family Centered Practice, Working Paper – Draft No. 4, Jan. 27, 2005, at DCF008009949).  Commissioner Spence continued:

> The Department has developed a data tool that tracks all movements in placement by children in care.  Aggregate movements can be analyzed at the Departmental, Regional and Area level, by Departmental and Area Lead staff.  If failed placements increase in number, it will show up as increasing churning in placement.  This CQI analysis at the clinical, managerial and systemic level will allow for prompt intervention if problems in placement emerge.

(*Id.* at DCF008009949-50).

803.  Today, however, the tracking envisioned by former Commissioner Spence does not take place.  Ms. Walter testified that DCF maintains a "flow data" data set that contains data on child placements since approximately 2000, which is updated weekly.  A small number of DCF developers are able to produce reports from the data set.  Ms. Walter knew of only one regular report that is generated, by a developer in the Western region—a weekly report indicating the proportion of initial placements made during the prior week that were with kinship homes.  (Deposition of Rosalind Walter, DCF Director of Data Management, Jan. 4, 2012, at 109:4-111:21).  Regular reporting from the "flow data" data set that had tracked placement moves has been discontinued.  (Deposition of Frances Carbone, DCF Director of Program Operations, Apr. 19, 2012, at 211:18-214:1; Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 145:17-150:1).

804.  DCF's 2009 Strategic Plan stated DCF's intention to "further support stability as a priority area of focus," by including the measure in provider profile scorecards for congregate care and IFC providers, planned to be implemented in 2009.  (Trial Exhibit 1127, Strengthening the Safety Net: DCF's Strategic Plan for Action, Apr. 2009, at DCF7605097).  As discussed below, (*see infra* ¶ 1686, 1707-08) these private provider scorecards have never been implemented.

805.  After the completion of the Intensive Foster Care Placement Stability report, (*see supra* ¶¶ 749-54) DCF's only effort to continue monitoring lateral moves was to request its IFC providers, for a period of four to six weeks in May to June of 2011, to submit a "Critical Incident Report" each time a child moved from one IFC home to another.  Those critical incident reports are no longer required.  No further use has been made of those that were submitted, and there was no formal assessment or report regarding the information generated.  Joy Cochran, DCF's Director of Foster Care Support Services, was not aware of any plan to conduct a formal assessment in the future.  (Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 53:3-57:12, 61:5-20).  Rather, "[t]he hope was that the agencies would self-monitor."  (*Id.* at 56:18-57:3).

806.  Former Commissioner McClain testified that he was not aware of any systemic effort to collect data from IFC providers in calendar year 2011 after the publication of the March 2011 placement stability report and that DCF's tracking of placement stability overall did not focus simply on children in IFC placements.  (Trial Tr. May 3, 2013 (McClain), at 48:24-49:18)

807.  Ms. Nisenbaum testified that no analysis has been done to determine whether the recent improvement in placement stability reflected in the CFSR measures is occurring within kinship placements, within IFC placements, or within any other category of placement.  (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 160:16-161:6).

808.    Terrence Flynn, DCF's Regional Director for the Southern Region, testified that he did not have any understanding as to why two area offices, Cape Cod and Arlington, had such a wide range of performance as to placement stability.  (Deposition of Terrence Flynn, Regional Director for the Southern Region, Jan. 26, 2012, at 122:12-17).  He was not aware of any particular study that had been performed to determine the reasons for the disparity in performance among offices relating to placement stability.  (*Id*. at 141:11-142:7).

809.    DCF has not analyzed whether the STARR program has fulfilled its purpose of permitting children to be assessed, stabilized, and then successfully and stably placed in a family foster home.  Ms. Carbone testified that prior to developing the new STARR model, DCF had assessed the rate of disruption experienced by children who were returned from STARR programs to family-based placements, and concluded that "we wanted to impact that number and decrease it dramatically."  (Deposition of Frances Carbone, DCF Director of Program Operations, Apr. 19, 2012, 120:23-121:19).  Ms. Carbone further testified that DCF does not produce a report setting forth the disruption rate, and has not established any performance targets or baseline disruption rates to determine how well the new STARR model reduces the rate of disruption.  (*Id.*).

### 5.    DCF Failure to Monitor or Address Educational Stability

810.    DCF has no means of aggregating or tracking data on the number of schools children in its custody have attended during a particular school year or over the duration of their time in care.  In Defendants' Responses to Plaintiffs' Second Set of Interrogatories, dated April 24, 2012, Defendants admitted that due to the limitations of the current SACWIS system, DCF is not able to aggregate or track data on the number of children enrolled in two or more different schools since being removed into DCF foster care custody.  This information is only available by a manual review of each child's case file.  (Trial Exhibit 452, Defendants' Responses and Objections to Plaintiffs' 2nd Set of Interrogatories, Apr. 24, 2012, pp. 8-9; *see also* Trial Exhibit 637, Email from Ros Walter to Ruben Ferreira, Jan Nisenbaum, and Liz Skinner-Reilly, Jan. 15, 2010, at DCF005019092).

811.    DCF officials were unaware of any data tracking how often placement changes result in a change in schools, or how often children in DCF care change schools.  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Implementation of Provisions of the Fostering Connections Act, Apr. 24, 2012, at 513:11-21; Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, May 14, 2012, at 30:4-15; Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, Mar. 5, 2012, at 65:15-66:14.

812.    Ms. Gambon testified that she was unaware of whether DCF developed a baseline for the outcome of educational stability that would enable it to determine whether educational stability has improved.  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Implementation of Provisions of the Fostering Connections Act, Apr. 24, 2012, at 521:18-522:4).

151

813.    A DCF document outlining DCF's planned implementation of the Fostering Connections to Success and Increasing Adoptions Act of 2008 highlights the requirements relating to educational stability, but fails to identify any strategy for implementation of this provision—other than analyzing the budget impact of paying foster parents for the cost of transporting children to their home school.  (Trial Exhibit 196, Implementation Plan for the Fostering Connections to Success and Increasing Adoptions Act, Aug. 8, 2011, pp. 5-6).  DCF does not provide transportation back and forth to a child's original school when the child is moved, for example, from Leominster to Worcester.  (Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 227:21-228:18).

### E.    Systemic Departures From Professional Judgment

814.    DCF has not taken action to address the inadequacy of its array of family foster care placements, which is an important factor in its performance on placement stability.  Plaintiffs incorporate herein *supra* ¶¶ 617-679.

815.    DCF has not taken action to address its reliance on emergency short-term placements, such as night to night homes, hotline homes, and STARR emergency placements, which is an important factor in it performance on placement stability.  Plaintiffs incorporate herein *supra* ¶¶ 405-32, 454-59.

816.    DCF has provided insufficient training to foster parents and DCF staff concerning the harms suffered by children who experience multiple placement moves.  Notes from a "Permanency Workgroup" meeting on February 16, 2011 reflect that both foster parents and DCF staff need education regarding the "[t]rauma children experience thru multiple moves." (Trial Exhibit 553, Document re: Family Resource and Adoption Coalition a.k.a. Permanency Workgroup, Feb. 16, 2011 at DCF008167894-95).

817.    DCF does not provide adequate information to foster parents about children it is considering placing in their homes, so that foster parents can make informed judgments about the appropriateness of the placement and be prepared to meet children's needs.  DCF acknowledges that one factor impacting performance on placement stability is the preparation provided to foster parents, including the provision of background information about the child, prior to placement.  (Trial Exhibit 57, Massachusetts Child and Family Services Review Statewide Assessment, May 2007, at CSF-000000646-48).  The agreement signed by foster parents and DCF concerning the placement of foster children includes a "Foster Parent Bill of Rights" which includes:

> [t]he right to information concerning behavior, medical health history, educational status, cultural and family background, as well as other issues relative to the child, which are known to the department at the time the child is placed in foster care prior to the child's placement in the foster home. When the department knows such information after placement, the department shall make that information available to the foster parent as soon as practicable.

(Trial Exhibit 724, Massachusetts Foster Parent Bill of Rights, Feb. 2006, at DCF004706182).  It additionally includes the right to review, prior to placement, "a written summary of information concerning the child, including, but not limited to, assessments, evaluations, and case plans which allows the foster parent to determine if the child would be a proper placement for their home." (Trial Exhibit 724, Massachusetts Foster Parent Bill of Rights, Feb. 2006, at DCF004706182).

818.    Barbara Joan Talkov, The Children's League's 30(b)(6) designee and Executive Director of the Children's League, testified that foster parents need "a good sense of who the kid is coming into foster care" and to know the needs of the child.  (Rule 30(b)(6) Deposition of Barbara Talkov, Children's League Executive Director, Aug 3. 2012, 165:3-166:8).

819.    An April 2004 survey of foster parents indicated that only 52% of foster parents surveyed said "they regularly receive adequate information about their foster children" and that foster parents noted that "background information is an important factor in their ability to fully participate in the planning and delivery of services aimed at meeting their foster child's needs."  Only 24% of foster parents indicated they always receive adequate background information, and 17% indicated they receive it "rarely or never."  (Contested Exhibit DJ, Statewide Foster Parent Survey, Feb. 2005, pp. 1, 20; *see also* Rule 30(b)(6) Deposition of Marylou Sudders, President & CEO of MSPCC, Aug. 14, 2012, at 107:17-110:8 (testifying that survey was conducted by MSPCC for DCF at DCF's request, pursuant to a contract with DCF, and establishing Ex. DJ as business record of MSPCC)).

820.    A 2009 survey of foster parents developed jointly by the Massachusetts Society for the Prevention of Cruelty to Children and DCF indicated that 11.1% of foster parents surveyed stated that they "always" receive "adequate background information about children placed in [their homes]," 19.9% received it "most of the time," 37.7% received it "sometimes," and 22.5% received it "rarely or never."  (Contested Exhibit DK, Massachusetts Foster Parent Survey, p. 17; Contested Exhibit GP, Massachusetts Foster Parent Survey, at DCF003811185; *see also* Rule 30(b)(6) Deposition of Marylou Sudders, President & CEO of MSPCC, Aug. 14, 2012, at 110:9-113:9 (establishing Contested Exhibit DK as business record of MSPCC)).

821.    DCF acknowledges that one factor impacting performance on placement stability is the ongoing support provided to the foster parents and the child after placement. (Trial Exhibit 57, Massachusetts Child and Family Services Review Statewide Assessment, May 2007, at CSF-000000646-48).  The DCF Foster Parent Bill of Rights states that foster parents have the right "to training, consultation and assistance in evaluating, identifying and accessing services to meet their needs related to their role as foster care providers."  (Trial Exhibit 724, Massachusetts Foster Parent Bill of Rights, Feb. 2006, at DCF004706182).

822.    Ms. Roche testified that DCF has not undertaken any analysis of whether it needs more staffing to be able to provide the additional supports to homes so that placements at risk of disrupting can be stabilized.  (Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 222:20-223:10).

## V.     Permanency

### A.     Unsafe Reunification & Reentry

#### 1.     Professional Standards

823.     Under federal law, a state receiving federal funds to operate its child welfare system must operate a service program designed to help children to return to families from which they have been removed "where safe and appropriate."  42 U.S.C. 622(b)(8)(A)(iii)(I).

824.     DCF policy provides that when a child's "assessed problems or needs have not been alleviated and have resulted in continued or increased risk of abuse and/or neglect to the child(ren) in the family," a permanency plan other than reunification or stabilization of the family must be established.  (Trial Exhibit 1, Revised Permanency Plan Goals for Children and Youth, DCF Case Practice Policy & Procedures Manual, Jan. 2, 2008, DCF POL (7/08) 130).

825.     The Council on Accreditation standards require that:

> The case record documents opportunities provided to parents in support of reunification, including:
> a. involvement in service planning and access to needed services;
> b. constructive visitation and ongoing contact with the child;
> c. reduction of barriers to contact, visitation, and involvement in the child's care; and
> d. use of resources to prepare the family for reunification."

(Contested Exhibit RL, Council on Accreditation Eighth Edition Foster Care Services Standards, 2008 § 4.05; *see also* Trial Tr., Mar. 1, 2013 (Crabtree), at 53:3-13).

826.     Council on Accreditation standards provide that within 30 days of placement, a service plan should be developed, "which specifies: a. the permanency goal(s); b. a timeframe for achieving permanency; and c. activities that support permanency."  (Contested Exhibit RL, Council On Accreditation Eighth Edition Foster Care Services Standards, 2008, § 4.01).

827.     Massachusetts regulations require DCF to provide each child in its care with a service plan, which is defined as:

> a written document which describes in detail the behavioral changes needed, the tasks to be undertaken and the services to be provided to either . . . (b) reunify a family unit for a child who has been removed from his or her home; or (c) provide an alternative permanent home for a child who has been removed from his or her home.

(Trial Exhibit 69, 110 Mass. Code Regs. 6.01(1) (2013)).  The service plan "shall provide a basis for assessing the progress of family members in meeting the goal of the service plan. (*Id.* at 6.01(2) (2013)).

828.    Massachusetts regulations require that a service plan be completed "(a) for all cases within ten working days after a comprehensive assessment is completed, but in no event later than 55 working days after the opening of the case" or "(b) for a placement made on an emergency basis to ensure the immediate safety of a child, where there is no service plan, a service plan shall be completed within 30 working days after the placement."  (Trial Exhibit 69, 110 Mass. Code Regs. 6.05(1) (2013); *see also* Trial Exhibit 1, Service Planning and Referral Policy, DSS Policy No. 97-003, Sept. 6, 2000, DCF Case Practice Policy & Procedures Manual, at DCF POL (7/08) 109).

829.    Massachusetts regulations require the participation of parents in service planning by requiring that social workers shall maintain contact with the child and his or her birth family for the purposes of, *inter alia*:

> (e) reinforcing the birth parent(s)' strengths and resources to help them participate in service planning for their child;
> (f) helping parents obtain services needed to make it possible for the child and family to be reunited, when called for by the service plan; and
> (g) ensuring continuity of planning for the child and family.

(Trial Exhibit 854, 102 Mass. Code Regs. 5.05(3) (2011)).

830.    DCF policy requires the service plan to establish a goal for the family and to specify what must be accomplished in order to achieve that goal and/or close the case.  (Trial Exhibit 1, Service Planning and Referral Policy, DSS Policy No. 97-003, Sept. 6, 2000, DCF Case Practice Policy & Procedures Manual, at DCF POL (7/08) 109).  To the greatest extent possible, the service plan will be developed jointly with the family.  (*Id.* at DCF POL (7/08) 109; Trial Exhibit 69, 110 Mass. Code Regs. 6.06 (2013)).  Specific services to be provided may also be stated in the service plan.  For example, family support services may be approved for families when, in the judgment of the Department, they will strengthen the family unit and thereby eliminate the need for placement of children into substitute care. (Trial Exhibit 69, 110 Mass. Code Regs. 7.031 (2013)).

831.    Massachusetts regulations provide that social workers shall maintain contact with the child and his or her birth family for the purposes of, *inter alia*:

> (a) assisting the child and his/her birth family to adjust to placement and separation;
> (b) developing a visiting plan and encouraging the family's continued interaction with the child, when called for by the service plan;
> (c) informing the birth family of the child's progress, as appropriate;

(d) helping the child to cope with problems experienced in the
family foster home or residential program;
(e) reinforcing the birth parent(s)' strengths and resources to help
them participate in service planning for their child;
(f) helping parents obtain services needed to make it possible for
the child and family to be reunited, when called for by the service
plan; and
(g) ensuring continuity of planning for the child and family.

(Trial Exhibit 831, 102 Mass. Code Regs. 5.05(3); *see also* Trial Tr., Mar. 1, 2013 (Crabtree),
at 53:14, 54:1-24).

## 2.    DCF Performance

832.    DCF is not meeting accepted standards of professional judgment in its reunification
practice. (Trial Tr., Mar. 1, 2013 (Crabtree), at 62:23-63:5; *see generally id.* at 51:21-63:5).

833.    Former DCF Commissioner Angelo McClain testified that one of DCF's three basic
objectives is to safely reunify families, "but only to the degree that we feel like that's going
to be a safe situation." (Trial Tr., May 7, 2013 (McClain), at 16:11-17:1). One way that
safety is examined is through the rate of reentry measure. (*Id.*). He acknowledged that re-
entry into foster care is harmful to a child. (Trial Tr., May 2, 2013 (McClain), at 26:17-18).

834.    Plaintiff children reenter DCF custody at high rates. The Children's Bureau of the U.S.
Department of Health and Human Services' Administration for Children and Families
measures states' performance with respect to children who are reunified and subsequently
reenter foster care through Measure C1.4: Of all children discharged from foster care to
reunification in the 12-month period prior to the year shown, what percentage reentered care
in less than 12 months from the date of discharge. (Trial Exhibit 171, Massachusetts Child
and Family Services Review Data Profile, Dec. 6, 2010, at DCF003187388). Massachusetts
ranked in the bottom quarter of the nation on Measure C1.4 for federal fiscal years 2010 and
2011. In federal fiscal year 2010, Massachusetts's performance on Measure C1.4 was
15.3%, ranking it as 41st out of 52 jurisdictions. (Trial Exhibit 1086, Children's Bureau,
Child Welfare Outcomes 2007-2010, p. 172; Trial Exhibit 1084, Summaries of state-by-state
performance data and rankings from Child Welfare Outcomes 2007-2010, Prepared by Elissa
Glucksman, p. 6; *see also* Contested Exhibit SB, Summaries of state-by-state performance
data and rankings from Child Welfare Outcomes 2007-2010: Report to Congress, Prepared
by Elissa Glucksman, p. 6). In federal FY 2011, the percentage of children in Massachusetts
who reentered care in less than 12 months from the date of discharge rose to 15.6%, ranking
Massachusetts as 43rd out of 52 jurisdictions. (Trial Exhibit 1085, Summaries of state-by-
state performance data and rankings from Child Welfare Outcomes 2008-2011, Prepared by
Elissa Glucksman p. 7).

835.    Former Commissioner McClain acknowledged that he was aware that in 2011
Massachusetts was 43rd worst among 52 reporting jurisdictions in the federal measure of rate
of re-entry into foster care. He further acknowledged that Massachusetts' position has

remained roughly the same over a number of years, and that he recognized that this was an issue.  (Trial Tr., May 2, 2013 (McClain), at 24:12-25:15).

836.    According to DCF's own management reports, its performance has dropped even further in federal FY 2012.  On DCF's Child and Family Services Review (CFSR) Scorecard Report for the twelve-month period ending September 30, 2012, DCF reported that 16.9% of children discharged from foster care to reunification in the period covered by the report reentered care in less than twelve months from the date of discharge (Measure C1.4).  (Trial Exhibit 964, CFSR Measures – 12 Month Period Ending: 09/30/2012, p. 1). DCF gave itself a grade of "F" for this performance.  (*Id.*; *see also* Trial Exhibit 964, CFSR Measures – 12 Month Period Ending: 06/30/2012, p. 1).

837.    DCF's current performance of 16.9% substantially deviates from the 2010 national median of 12.4% for Measure C1.4, reported in Child Welfare Outcomes 2007-2010, as well as the 2004 national median of 15.0% that DCF compares its performance to on its CFSR Scorecard.  (Trial Exhibit 1086, Children's Bureau, Child Welfare Outcomes 2007-2010, p. vii; Trial Exhibit 964, CFSR Measures – 12 Month Period Ending: 09/30/2012, p. 1).

838.    The Children's Research Center found in conducting its review of DCF case records that 18.4% of children in the entry cohort had reentered foster care.  (Trial Exhibit 1066, Table 22, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; *see also* Trial Tr., Jan. 30, 2013 (Freitag), at 91:10-14, 92:25-94:4).  This data was based on a sample size of 125 children for whom this measure was applicable, and the inter-rater reliability for this measure exceeded 80%.  (Trial Exhibit 1066, Table 22, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; *see also supra* ¶ 80; Trial Exhibit 1069, Table 3 to Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC) and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowsky, Oct. 19, 2012, Nov. 19, 2012).

839.    Reentry rates can also be measured in terms of the percentage of children entering care in a given year who had previously been in foster care.  Massachusetts ranked in the bottom eight jurisdictions in the country in federal fiscal years 2010 and 2011 on the Children's Bureau's Outcome 4.2, the percentage of children reentering care within 12 months of a prior episode.  (Trial Exhibit 1086, Children's Bureau, Child Welfare Outcomes 2007-2010, p. 171; Trial Exhibit 1084, Summaries of state-by-state performance data and rankings from Child Welfare Outcomes 2007-2010, Prepared by Elissa Glucksman, p. 3; Trial Exhibit 1085, Summaries of state-by-state performance data and rankings from Child Welfare Outcomes 2008-2011, Prepared by Elissa Glucksman, p. 3; *see also* Contested Exhibit SB, Summaries of state-by-state performance data and rankings from Child Welfare Outcomes 2007-2010: Report to Congress, Prepared by Elissa Glucksman, p. 3).

840.    The Massachusetts Executive Office of Health and Human Services (EOHHS) tracks DCF's performance on reentry through its Dashboard Detail Report, which measures the percentage of children who entered care during the reporting period who were not discharged

from care during the prior twelve months. (Trial Exhibit 963, Dashboard Detail Report, July 20, 2012, p. 11). The EOHHS Dashboard Detail Report for July 20, 2012 reflects that DCF has consistently failed to meet the federal standard of 90.1% on this indicator and that DCF's performance in the most recent quarter – the third quarter of FY 2012 – was the lowest that it has been since before the fourth quarter of FY 2009. (*Id.*).

841.    The data that DCF reports in its quarterly reports also reflects the high rate of reentry. In the DCF Quarterly Report for the fourth quarter of fiscal year 2012, DCF reported that 38% were re-entrants. (Trial Exhibit 955, Department of Children and Families Quarterly Report: Fiscal Year 2012, 4th Quarter, pp. 59-60, Table 20). In the DCF Quarterly Report for the third quarter of fiscal year 2012, DCF reported that 39% of children entering a placement setting during the third quarter of fiscal year 2012 were reentrants. (Trial Exhibit 955, Department of Children and Families Quarterly Report: Fiscal Year 2012, 3rd Quarter, pp. 58-59, Table 20). DCF reported that 38% of children entering a placement setting during the second quarter of fiscal year 2012 and 40% of children entering a placement setting during the first quarter were reentrants. (Trial Exhibit 955, Department of Children and Families Quarterly Report: Fiscal Year 2012, 2nd Quarter, pp. 58-59, Table 20; Trial Exhibit 955, Department of Children and Families Quarterly Report: Fiscal Year 2012, 1st Quarter, pp. 58-59, Table 20). In the DCF Quarterly Reports for Quarters 1-4 of fiscal year 2011, DCF reported that 37-38% of children who entered DCF placement were reentrants. (Trial Exhibit 955, Department of Children and Families Quarterly Report: Fiscal Year 2011, 1st Quarter, pp. 56-57, Table 20; Trial Exhibit 956, Department of Children and Families Quarterly Report: Fiscal Year 2011, 2nd Quarter, pp. 56-57, Table 20; Trial Exhibit 956, Department of Children and Families Quarterly Report: Fiscal Year 2011, 3rd Quarter, pp. 56-57, Table 20; Trial Exhibit 956, Department of Children and Families Quarterly Report: Fiscal Year 2011, 4th Quarter, pp. 58-59, Table 20).

842.    DCF Commissioner Angelo McClain has admitted that there has been a significant increase in reentry from 2006 to 2012. (Trial Exhibit 1036, Email exchange between Shaheer Mustafa, Francis Galligan, and Roberta Barrasso re: CFSR Scorecard for 12-Month period ending Dec. 2011, Apr. 27, 2012, at DCF011320538).

### 3.    Chronic Failures, DCF Inaction and Systemic Departures from Professional Judgment

843.    DCF and state officials have long been aware of the high rate of reentry and the resultant harm to children. From federal fiscal year 2004 to 2010, as the national median on Measure C1.4 improved from 15.0% to 12.4%, Massachusetts performance stagnated, fluctuating between 15.1% (in 2006) and 17.1% (in 2008) and ultimately returning to almost 17% in 2012. (Contested Exhibit PS, Children's Bureau, Child Welfare Outcomes, 2004-2007, pp. vii, 177; Trial Exhibit 1086, Children's Bureau, Child Welfare Outcomes 2007-2010, p. vii, 172; Trial Exhibit 964, CFSR Measures - 12 Month Period Ending: 09/30/2012, p. 1).

844.    According to the First Round Child & Family Services Review (CFSR) in 2001, Massachusetts did not meet the national standard for Permanency Outcome 1, Item 5 (foster care reentries) (of all children who entered care during the year, what percentage reentered foster care within 12 months of a prior foster care episode): the rate of foster care reentries

was 22.33% in 1999, more than double the national standard of 8.6%. (Trial Exhibit 56, Massachusetts Child and Family Services Review Final Assessment, July 2001, CSF-000000323-24). DCF acknowledged in the First Round Statewide Assessment that foster care reentry was an area of "great concern." (Trial Exhibit 55, Massachusetts Child and Family Services Review Statewide Assessment, at CSF-000000445). DCF also acknowledged that that a key element in addressing the problem of high reentry rates is focusing on family-based and other community services supporting reunification and that specialized services need to be developed to address the unique needs of adolescents and their families because adolescents are more likely to reenter care than younger children. (*Id.*).

845. In the years between the First Round and the Second Round CFSR, DCF failed to effectively address the high rate of foster care reentry. The Second Round CFSR found that Massachusetts did not meet the national standard for Permanency Outcome 1, Item 5 (foster care reentries), with 15.7% of children reentering foster care within 12 months, which fell below the national median of 15.0% (since the First Round, this measure had been revised to, "of children discharged from foster care to reunification in the 12 month period prior to the year shown, what percentage reentered foster care in less than 12 months from the discharge date"). (Trial Exhibit 58, Massachusetts Child and Family Services Review Final Report, Feb. 21, 2008, at CSF-000000765; Trial Exhibit 57, Massachusetts Child and Family Services Review Statewide Assessment, May 2007, at CSF-000000705). In addition, the Second Round CFSR found that Massachusetts was not in substantial conformity with this permanency outcome: it was substantially achieved in 80% of applicable cases reviewed, below the 90% or higher required for a rating of Strength. (Trial Exhibit 58, Massachusetts Child and Family Services Review Final Report, Feb. 21, 2008, at CSF-000000766). According to the Second Round CFSR, stakeholders expressed concern that expedited legal timeframes under the Adoptions & Safe Families Act (ASFA) potentially resulted in children reunifying too quickly with parents who had histories of substance abuse, and that those children were accordingly placed at risk of reentering foster care following a parental relapse. (*Id.*). The Second Round CFSR also reported that some stakeholders indicated that there are disruptions in adoptions and guardianships, which they attributed to premature case closures and the need for more post-permanency services in the State. (*Id.*). In the Second Round Statewide Assessment, DCF acknowledged that increased availability of adequate services to support the child and family during the child's transition home are critical to assuring that the child does not return to out-of-home care and that engagement of families in service planning is a factor impacting performance in preventing multiple entries into foster care. (Trial Exhibit 57, Massachusetts Child and Family Services Review Statewide Assessment, May 2007, at CSF-000000644).

846. According to DCF's Child Welfare Act Report for fiscal year 2009, 16% of children who returned home after leaving placement between April 1, 2007 and March 31, 2008 reentered out-of-home care within 12 months after their reunification. (Trial Exhibit 234, DCF Child Welfare Act Reports, Fiscal Year 2011, Sept. 2009, p. 23, Table 11A). According to DCF's Child Welfare Act Report for fiscal year 2010, 15% of children who returned home after leaving placement between July 1, 2008 and June 30, 2009 reentered out-of-home care within 12 months of their reunification. (Trial Exhibit 740, DCF Child Welfare Act Reports, Fiscal Year 2010, Mar. 2011, at DCF00741663, Table 10A).

847.     DCF recognized in its October 5, 2009 Massachusetts Child and Family Services Review Program Improvement Plan that foster care reentry was an area identified by the CFSR as needing improvement and that performance on Safety Outcome 2: Item No. 3 ("services to protect children and prevent removal or reentry into foster care") was measured as only 80%. (Trial Exhibit 33, Massachusetts Child and Family Services Review Program Improvement Plan, Oct. 5, 2009, pp. 6-7, 57).  However, DCF's October 5, 2009 Massachusetts Child and Family Services Review Program Improvement Plan does not contain any action steps that directly related to DCF's performance on foster care reentry. (*Id.* at pp. 7, 46-47).

848.     According to DCF's Child Welfare Act Report for fiscal year 2009, DCF set a target that 89.6% of children returning home would remain there safely for at least 12 months. (Trial Exhibit, 234, Department of Children and Families Child Welfare Act Reports, Fiscal Year 2009, Sept. 2009, p. iii). DCF failed to meet that target in either fiscal year 2009 or fiscal year 2010. (*Id.*; Trial Exhibit 740, Department of Children and Families, Child Welfare Act Reports, Fiscal Year 2010, Mar. 2010, at DCF007413663).

849.     In internal strategic planning documents as well as testimony to the legislature, DCF has characterized reentry as an area where significant progress had been made.  A February 23, 2011 document entitled, "Department of Children & Families Budget Testimony to Joint Committee on Ways & Means" stated that DCF had "achieved some important permanency outcomes" including "[s]afely [r]eunifying [f]amilies" with a 96.2% absence of reentry rate after six months.  Trial Exhibit 743, Department of Children & Families Budget Testimony to Joint Committee on Ways & Means, Feb. 23, 2011, DEF000196932-33.  DCF's August 2012 2012-2015 Strategic Plan stated that "[r]educed [r]e-entry into [c]are" was a "major accomplishment[] in helping to achieve positive outcomes for children and families, based on a reduction in the number of children who return to care within six months of their discharge. (*See* Trial Exhibit 7, Department of Children and Families 2012-2015 Strategic Plan: Preserving, Strengthening, and Expanding the DCF Safety Net, Aug. 2012, p. 6). In fact, DCF's performance on children reentering care in less than 12 months from the date of discharge has steadily worsened since federal fiscal year 2010 and Commissioner McClain admitted in April 2012 that there had been a significant increase in reentry from 2006 to 2012.  (*see infra* ¶¶ 834-37).

850.     Commissioner McClain testified that he had directed Deputy Commissioner Olga Roche to focus on improving DCF's performance with respect to reentry into foster care. (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 38:21-39:18).  However, Commissioner McClain testified that DCF had not "come up with a solid plan on how we're going to impact that measure."  (*Id.* at 39:19-24).

851.     As of April 20, 2012, Ms. Roche stated that despite the continued focus on reentries, "we need to still accomplish significant improvement" in that area, and that DCF's performance was at 16.2%, as compared to its target of 9.9%.  (Trial Exhibit 1037, Email from Barbara Curley to Valerie Lovelace-Graham re: EHSResults - Quarterly Dashboard Detail Report - DCF, Apr. 25, 2012, at DCF011124719).

852.    Former Commissioner McClain testified that one of the functions of DCF's reunification permanency planning is to safeguard the child from the risk of harm during the time that the child is separated from his or her family.  (Trial Tr., May 7, 2013 (McClain), at 15:1-5).

a)    *Failure to Provide Timely Assessments*

853.    DCF fails to provide timely assessments to children in care.  Massachusetts regulations require that "[a]n assessment of a family's or individual's needs for services must be completed for each new case."  (Trial Exhibit 69, 110 Mass. Code Regs. 5.02 (2013)).  DCF policy and regulations further require prompt assignment of all cases opened for assessment and completion of the assessment within 45 working days of assignment.  (Trial Exhibit 1, Assessment Policy, DSS Policy No. 85-011, Sept. 6, 2000, DCF Case Practice Policy & Procedures Manual, at DCF POL (7/08) 77; *see also* Trial Exhibit 69, 110 Mass. Code Regs. 5.02 (2013)).  The assessment is a family-focused, participatory process of

> [G]athering and evaluating information and formulating conclusions regarding a family's functioning, strengths and needs relative to the presenting/identified problem(s) . . . . For families who are identified as needing services, the assessment also serves as the basis for determining the goal of the Service Plan and the outcomes, behavioral change indicators, tasks and services which will be identified in the Plan.

(Trial Exhibit 1, Assessment Policy, DSS Policy No. 85-011, Sept. 6, 2000, DCF Case Practice Policy & Procedures Manual, at DCF POL (7/08) 77).

854.    However, DCF consistently fails to complete assessments in this time frame, with 73.1% of assessments completed in a timely manner during state fiscal year 2013, as of August 2012.  (Trial Exhibit 954, Monthly Operations Statistical Report, Aug. 2012, p. 1).  For state fiscal year 2012, the average performance on this measure was 67.7%, with a range in June 2012 in performance from 48.9% to 100%.  (Trial Exhibit 954, Monthly Operations Statistical Report, June 2012, p. 1).  These percentages translate into hundreds of children and families who do not receive a timely assessment upon entering foster care as required under DCF policy.  For example, in August 2012, DCF had 313 overdue assessments.  (Trial Exhibit 958, Statewide Statistics for Casework Report, Aug. 2012, p. 1).  DCF's performance on timeliness of assessments has been chronically low.  In state fiscal year 2011, DCF's average for timeliness of assessments was 58.8%.  (Trial Exhibit 954, Monthly Operations Statistical Report, June 2011, p. 1).  In state fiscal year 2010, DCF's average for timeliness of assessments was 55.9%.  (Trial Exhibit 954, Monthly Operations Statistical Report, June 2010, p. 1).

855.    At the time that the Child and Family Services Plan Fiscal Year 2010 – Fiscal Year 2014 was published, the Plan indicated that the State "should aspire to a target rate of 80%" for timely comprehensive assessments.  (Trial Exhibit 94, Child and Family Services Plan FY2010-FY2014, at DCF007054497).  However, as of August 2012, DCF had only set a

target of 70.7% for timeliness of assessments.  (Trial Exhibit 954, Monthly Operations Statistical Report, Aug. 2012, at p.1).

856.    In a March 7, 2011 email, Western Regional Director Paul Fitzsimons stated that basic completions of assessments in a timely way were not good and "continue to go in the wrong direction" although intakes were not overly high during the relevant time period. (Trial Exhibit 346, Email from Paul Fitzsimons to Raymond Burke, Joseph Collins, and Donna Jerszyk-Hollis, et al. re: February Statistics for Casework, Mar. 7, 2011, and attached Statistics for Casework, Feb. 2011, at DCF005265191).

857.    In addition, according to a November 8, 2010 email from Chief of Staff Patricia Mackin to Deputy Commissioner for Clinical Practice and Program Operations Jan Nisenbaum, "timeliness/compliance with timeframes" for both assessments and service plans were identified by Commissioner McClain as areas in which case practice could be strengthened. (Trial Exhibit 685, Email from Patricia Mackin to Jan Nisenbaum, Nov. 8, 2010).

b)    *Failure to Provide Timely and Adequate Service Planning*

858.    DCF fails to provide timely and complete service plans to children in its care.  Plaintiffs incorporate herein ¶¶ 2032-44.

859.    DCF fails to adequately involve parents in service planning. The Children's Research Center found in conducting its review of DCF case records that 41.4% of the service plans reviewed for children in the entry cohort in care for at least 30 days with the goal of reunification or stabilization did not have a parent signature.  (Trial Exhibit 1066, Table 28c, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; *see also* Trial Tr., Jan. 30, 2013 (Freitag), at 101:13-24, 102:12-18).  This data was based on 444 service plans, and the inter-rater reliability for this measure exceeded 80%. (Trial Exhibit 1066, Table 28c, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; Trial Exhibit 1069, Table 3, Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC) and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowski, October 19, 2012, Nov. 19, 2012; *see also supra* ¶ 80).  For the two-year cohort, CRC found that 29.4% of service plans for children with a goal of reunification or stabilization did not have a parent signature.  (Trial Exhibit 1066, Table 55c, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; *see also* Trial Tr., Jan. 30, 2013 (Freitag), at 102:19-24).  This data was based on seventeen service plans, and the inter-rater reliability for this measure exceeded 80%.  (Trial Exhibit 1066, Table 55c, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; Trial Exhibit 1069, Table 3, Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC) and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowski, October 19, 2012, Nov. 19, 2012; *see also supra* ¶ 80).

860.    DCF fails to adequately involve children age fourteen and above in service planning. The Children's Research Center found that 53.4% of service plans for children in the entry cohort in care for at least thirty days where the child was age fourteen or above did not have a child signature.  (Trial Exhibit 1066, Table 28d, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; *see also* Trial Tr., Jan. 30, 2013 (Freitag), at 102:12-18).  This data was based on eighty-eight service plans, and the inter-rater reliability for this measure exceeded 80%.  (Trial Exhibit 1066, Table 28d, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; Trial Exhibit 1069, Table 3, Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC) and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowsky, October 19, 2012, Nov. 19, 2012; *see also supra* ¶ 80).  For the two-year cohort, CRC found that 51.4% of service plans for children age fourteen or above did not have a child signature.  (Trial Exhibit 1066, Table 55d, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; *see also* Trial Tr., Jan. 30, 2013 (Freitag), at 102:19-103:7). This data was based on 214 service plans, and the inter-rater reliability for this measure exceeded 80%.  (Trial Exhibit 1066, Table 55d, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; Trial Exhibit 1069, Table 3, Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC) and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowsky, October 19, 2012, Nov. 19, 2012; *see also supra* ¶ 80).

861.    DCF is aware of its poor performance in the area of service planning. In the first round of the Massachusetts Child and Family Services Review, the federal government identified key concerns related to Child and Family Well-Being Outcome 1 (families have enhanced capacity to provide for their children's needs) including inadequate consideration of the needs and services of children and parents and a lack of consistent family involvement in case planning.  (Trial Exhibit 56, Massachusetts Child and Family Services Review, Final Assessment, July 2001, at CSF-000000309-10).  With regard to Item 17 (needs and services of child, parents, foster parents), the federal government determined that in 68% of cases reviewed, "case plan activities and services were in place and working well"; "providers and [DCF] workers were actively involved in assessing and addressing families' needs and there was a good match between needs and services"; and "workers made diligent efforts to get services to families in a timely manner."  (*Id.* at CSF-000000335-36).  With regard to Item 18 (child and family involvement in case planning), workers engaged families in case planning in only 66% of cases reviewed.  (*Id.* at CSF-000000336-37).

862.    DCF's performance on Well-Being Outcome 1 dropped in the years between the first- and second-round CFSR.  In the second round of the CFSR, Well-Being Outcome 1 Items 17 (needs and services of child, parents, foster parents) and 18 (child and family involvement in case planning) were both identified as areas needing improvement.  (Trial Exhibit 58, Massachusetts Child and Family Services Review Final Report, Feb. 21, 2008, at CSF-000000793-98).  Reviewers determined that the state had adequately assessed and addressed

the service needs of children and parents in only 49% of applicable cases – far below the 90% or higher required for a rating of strength. *(Id.* at CSF-000000794). Similarly, reviewers found that the state made diligent efforts to involve parents and/or children in the case-planning process in only 49% of applicable cases – also far below the 90% threshold. *(Id.* at CSF-000000797). Moreover, stakeholders reported that though there had been increased emphasis on family engagement and strength-based case planning with families, the degree to which those approaches were actually utilized in practice varied not only across the State but even among staff within their own local offices. *(Id.* at CSF-000000793). Stakeholders also expressed concern that DCF did not make consistent, concerted efforts to work with parents who were difficult to locate or who were uncooperative, and identified insufficient services for fathers. *(Id.* at CSF-000000795, CSF-000000797).

863.    In the October 5, 2009 Massachusetts Child and Family Services Review Program Improvement Plan, DCF acknowledged that Items 17 and 18 were areas needing improvement. (Trial Exhibit 33, DCF Massachusetts Child and Family Services Review, Program Improvement Plan, Oct. 5, 2009, p. 7; *see also* Trial Exhibit 34, MA CFSR 2007: Summary of Key Issues for PIP Development, at DCF008117149).

864.    However, DCF negotiated improvement goals of 46.6% for Item 17 and 49.1% for Item 18, both significantly lower than DCF's actual performance had been in the first round CFSR. (Trial Exhibit 760, DCF PIP Quarterly Report, Quarter Eight, July – September 2011, at CSF-000005475-76).

865.    In its PIP, DCF identified several action steps designed to improve its performance including: "Provide training on new assessment and service plan," "Implement revised assessment and service plan," "Monitor completion of assessment and service plans through monthly reporting," and "Develop practice expectations for family progress reviews," and "Implement family progress reviews." (Trial Exhibit 33, Massachusetts Child and Family Services Review, Program Improvement Plan, Oct. 5, 2009, pp. 43-44). However, two of these action steps were eliminated, and two have been weakened: "Provide training on new assessment and service plan" was changed to "Develop training plan for implementation of comprehensive assessment and service plan," and "Implement revised assessment and service plan," was changed to "Develop implementation plan for revised assessment and service plan." (Trial Exhibit 376, PIP Change Notice Reporting Form (Federal Form Term: PIP Matrix Narrative Reporting Form), at DCF003596423-24; *see also* Trial Exhibit 37, PIP Summary - Prep for PIP Annual Evaluation Meeting - 11/22/10; Trial Exhibit 760, PIP Quarterly Report, Quarter Eight, July – September 2011, at CSF-000005439).

c)    *Failure to Provide Parent-Child Visitation*

866.    DCF fails to provide children with quality and sufficient parent-child visitation. Plaintiffs incorporate herein ¶¶ 1900-1927.

d)    *Failure to Provide Caseworker-Parent Visitation*

867.    Caseworkers must have regular, ongoing contact or "hands-on time" with a child's parents in order to help stabilize the family.  (Trial Tr., Mar. 1, 2013 (Crabtree), at 57:25-60:10).

868.    DCF fails to ensure quality and sufficient worker-parent visitation. DCF caseworkers do not visit the parents of children with a goal of reunification with sufficient frequency to promote successful and safe reunifications. DCF policy requires that the social worker:

> arrange[] and document[] in the family's Service Plan a schedule of Social Worker-client contacts and a child-family visitation schedule for all cases with children in placement, in accordance with the child(ren)'s needs and permanency plan.  The schedule of contacts should include at least monthly visits by a Social Worker with the child(ren), the child(ren)'s placement resource and the child(ren)'s parents.

(Trial Exhibit 1, Ongoing Casework Policy, Procedures and Documentation, DSS Policy No. 86-011, Feb. 10, 1998, at DCF POL (7/08) 140).  The ongoing worker is required to "maintain regular contact with the family and with collaterals, as indicated in the family's Service Plan."  (*Id.* at DCF POL (7/08) 139).

869.    As DCF has acknowledged, social worker visits with families have been shown to have a direct correlation with positive outcomes for children and families.  (Trial Exhibit 155, DCF Monthly Operations Statistical Report: Trends Fiscal Year 2009 through 2010, p. 6; *see also* Trial Exhibit 33, Massachusetts Child and Family Services Review, Program Improvement Plan, Oct. 5, 2009, p. 20 ("Research has clearly demonstrated that regular visits from social workers significantly improve positive outcomes, including permanency, for children and families.")).

870.    Ruben Ferreira, Assistant Commissioner for Continuous Quality Improvement, testified that DCF management believes that each parent should be visited monthly.  (Deposition of Ruben Ferreira, Assistant Commissioner for Continuous Quality Improvement, Feb. 2, 2012, at 121:12-17).

871.    However, DCF data indicates that caseworkers often fail to visit parents on a monthly basis.  The outcome measure titled "Engaging Families" on DCF's Monthly Operations Statistical (MOSt) report measures the percent of adult consumers in open cases during the reporting month who had an in-home Social Worker visit.  (*See, e.g.*, Trial Exhibit 954, Monthly Operations Statistical Report, Aug. 2012, p. 12).  DCF's target for this measure is only 62.0%.  (*Id.* p. 1).  In August 2012, only 59.4% of adult consumers in open cases had an in-home visit with a social worker, and DCF's year to date average for this measure was 59.5%.  (*Id.*).  DCF's performance across areas for August 2012 was 44.7% to 70.3%.  (*Id.*).  DCF's average performance for state fiscal year 2012 was 59.6%.  (Trial Exhibit 954, Monthly Operations Statistical Report, June 2012, p. 1).

872.    A caseworker's failure to visit a child's parents for 60 or 90 days at a time can delay a potential reunification.  (Trial Tr., Mar. 1, 2013 (Crabtree), at 57:25-60:10).

873.    DCF's monthly Home Visit Report indicates that thousands of adults are not visited for two or three months at a time.  (*See* Trial Exhibit 82, All State Home Visit Reports, June 2008-Aug. 2012).  For example, in August 2012, 5825 adults had not been seen for two months and 4352 adults had not been seen for three months.  (Trial Exhibit 82, State Home Visit Report, Aug. 2012).  In March 2012, 5756 adults had not been seen for two months and 4289 adults had not been seen for three months.  (Trial Exhibit 82, State Home Visit Report, Mar. 2012).  One year earlier, in March 2011, 5862 adults had not been seen for two months and 4453 adults had not been seen for three months.  (Trial Exhibit 82, State Home Visit Report, Mar. 2011).

874.    The Children's Research Center found in conducting its review of DCF case records that, for the entry cohort, contacts between the caseworker and parent were made in all of the months required in only 37.6% of cases, and the monthly contact guideline was met at least half of the time for 82.3% of cases.  (Trial Exhibit 1066, Table 13b, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; *see also* Trial Tr., Jan. 30, 2013 (Freitag), at 83:25-84:19).  This data was based on a sample size of 226 children for whom this measure was applicable, and the inter-rater reliability for this measure exceeded 80%.  (Trial Exhibit 1066, Table 13b, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; *see also supra* ¶ 80; Trial Exhibit 1069, Table 3 to Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC) and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowsky, Oct. 19, 2012, Nov. 19, 2012).

875.    CRC also found that of children in the entry cohort who spent at least 31 days in care, there was no contact recorded between the worker and the parent during the first 30 days for more than one fifth of children.  (Trial Exhibit 1066, Table 12, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; *see also* Trial Tr., Jan. 30, 2013 (Freitag), at 84:20-85:10, 85:16-22, 86:13-87:5).  This data was based on a sample size of 199 children for whom this measure was applicable, and the inter-rater reliability for this measure exceeded 80%.  (Trial Exhibit 1066, Table 12, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; *see also supra* ¶ 80; Trial Exhibit 1069, Table 3 to Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC) and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowsky, Oct. 19, 2012, Nov. 19, 2012).

876.    DCF has long been aware of its poor performance on worker visits with parents.  DCF's average performance was 57.8% for state fiscal year 2011, 56.4% for state fiscal year 2010, 56.0% for state fiscal year 2009, and 54.3% for state fiscal year 2008.  (Trial Exhibit 954, Monthly Operations Statistical Reports for June 2008, June 2009, June 2010, and June 2011,

p. 1). Monthly Home Visit Reports from September 2008 to February 2011 indicate that more than 5,000 adults had not been seen for the previous two months, and that more than 4,000 had not been seen for the last three months. (Trial Exhibit 82, State Home Visit Reports, Sept. 2008 – Feb. 2011).

877.    In the second round of the Massachusetts Child and Family Services Review, Child and Family Well-Being Outcome 1, Item 20 (worker visits with parents) was identified as an area needing improvement. (Trial Exhibit 58, Massachusetts Child and Family Services Review Final Report, Feb. 21, 2008, at CSF-000000800). Reviewers determined that the frequency and/or quality of caseworker visits with parents were sufficient to monitor the safety and well-being of the child or promote attainment of case goals in only 50% of cases, far below the 90% or higher required for a rating of Strength. (*Id.* at CSF-000000801). While the CFSR found that there were insufficient caseworker visits and challenges associated with the quality of visits with both parents, these findings were more pronounced for fathers, as evidenced by inconsistent, concerted efforts to visit or engage fathers in either case planning or services. (*Id.* at CSF-000000800-01; Trial Exhibit 34, MA CFSR 2007: Summary of Key Issues for PIP Development, at DCF008117149).

878.    In the October 5, 2009 Massachusetts Child and Family Services Review Program Improvement Plan (PIP), DCF acknowledged the need to improve both the quality and quantity of worker visits with parents. (Trial Exhibit 33, Massachusetts Child and Family Services Review, Program Improvement Plan, Oct. 5, 2009, p. 7). According to the PIP, only approximately 60% of families are seen on at least a monthly basis. (*Id.* at 20).

879.    In the October 5, 2009 PIP, the Department identified priority activities to "affirm the importance of [social worker visits] as a core function of the agency." (Trial Exhibit 33, Massachusetts Child and Family Services Review Program Improvement Plan, Oct. 5, 2009, p. 20). One identified priority was that the "DCF Practice Manual and departmental policies will incorporate enhanced guidance on practice expectations relative to social worker visits, including timeliness of visits and expectations regarding areas of attention and focus during visits." (*Id.*). However, DCF has yet to adapt the policies that speak to specific practice expectations regarding home visits. (Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: the Program Improvement Plan, Apr. 4, 2012, at 106:1-108:23). Moreover, DCF's negotiated improvement goal on this item (54.4%) is still far below the 90% or higher required for a rating of Strength in the CFSR. (Trial Exhibit 760, DCF PIP Final Report, Quarter Eight Report, July-Sept. 2011, at CSF-000005477). While DCF met this goal in Quarter 7 (April through June 2011) of the PIP Quarterly Review process, its performance remained low at 56.5%. (*Id.*).

e)    *Failure to Provide Sufficient Family Group Conferences*

880.    DCF has also failed to provide sufficient family group conferences to families. Mr. Fitzsimons testified that in the "last round of budget cuts," DCF had to consolidate the position of family group conferencer from one per Area Office to a per-region position supporting multiple offices. (Rule 30(b)(6) Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, re: Visitation and Permanency Planning, Sept. 28, 2011, at

116:15-120:2).  Mr. Fitzsimons further stated that the position of family group counselor was "frankly on the block because we had to make so many social work cuts."  (*Id.* at 119:15-16).

881.     Mr. Fitzsimons testified, "I don't know that I could give you a number" of how many family group conferences occur each year in the Western Region.  (Rule 30(b)(6) Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, re: Visitation and Permanency Planning, Sept. 28, 2011, at 121:17-122:14).

882.     Raymond Burke, DCF Director of Areas for Pioneer Valley, testified that although there are DCF reports that track the number of family group conferences conducted by area offices during a reporting period, he has not seen one "in a long time."  (Deposition of Raymond Burke, DCF Director of Areas for Pioneer Valley, Jan. 19, 2012, at 83:4-15).

883.     Mr. Burke testified that he has not undertaken any formal analysis in Van Wart or Springfield regarding how well each office is utilizing family group conferencing.  (Deposition of Raymond Burke, DCF Director of Areas for Pioneer Valley, Jan. 19, 2012, at 84:3-12).  Rather, Mr. Burke stated that his knowledge of this topic is "[m]ostly just word of mouth."  (*Id.*).

884.     Mr. Burke testified that he has not established a performance metric regarding whether the family group conferencing mechanism is being adequately utilized in the Springfield or Van Wart area offices.  (Deposition of Raymond Burke, DCF Director of Areas for Pioneer Valley, Jan. 19, 2012, at 83:16-23).

885.     Mr. Fitzsimons testified that he did not know how many cases each family group conference coordinator was working on, though he stated he "probably should be able to, but I can't."  (Rule 30(b)(6) Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, re: Visitation and Permanency Planning, Sept. 28, 2011, at 122:19-22).

886.     DCF does not have a policy regarding when family team meetings should be held.  (Rule 30(b)(6) Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, re: Visitation and Permanency Planning, Sept. 28, 2011, at 125:17-20; Deposition of Raymond Burke, DCF Director of Areas for Pioneer Valley, Jan. 19, 2012, at 81:23-82:8).

887.     Mr. Fitzsimons testified that DCF does not have a policy regarding when family team meetings should be held with the Lead Agencies providing services. (Rule 30(b)(6) Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, re: Visitation and Permanency Planning, Sept. 28, 2011, at 125:21-23).

f)     *Failure to Provide Adequate Supports and Other Failures*

888.     According to a DCF document entitled "MA CFSR 2007: Summary of Key Issues for PIP Development," with respect to Item 5 (Foster Care Reentry) on the CFSR, stakeholders were concerned that "expedited reunifications under the Adoption & Safe Families Act (ASFA) to parents with substance abuse histories may lead to reentries."  (Trial Exhibit 34, MA CFSR 2007: Summary of Key Issues for PIP Development, at DCF008117146).

889.    Other than oversight and meeting the family, DCF does not provide any specific policies addressing the activities that should take place to insure child safety when a child is returned home after being in care.  (Rule 30(b)(6) Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, re: Visitation and Permanency Planning, Sept. 28, 2011, at 130:14-131:5).

890.    Massachusetts Child Advocate Gail Garinger testified to the importance of providing supports in homes to avoid the risk of abuse or neglect.  (Trial Tr., Feb. 15, 2013 (Garinger), at 110:8-13).

891.    Mr. Fitzsimons testified that an area that required priority attention in the Western Region was reducing the percentage of children reentering foster care, as reentry into care indicates that a plan – whether it be reunification, adoption, or guardianship – did not work for a particular child, accordingly raising concerns about the decision-making behind the implementation of that plan.  (Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, Mar. 5, 2012, at 192:1-3, 193:2-194:11).

892.    Mr. Fitzsimons testified that he had not analyzed the reasons behind the 15% of children in 2010 who reentered care after reunification, and he did not know if DCF had done a formal analysis on the issue of reentry.  (Rule 30(b)(6) Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, re: Visitation and Permanency Planning, Sept. 28, 2011, at 135:11-13, 137:15-19).

893.    Mr. Fitzsimons testified that he has not assessed the sufficiency of post-permanency services in Massachusetts.  (Rule 30(b)(6) Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, re: Visitation and Permanency Planning, Sept. 28, 2011, 226:4-8).  Mr. Fitzsimons further stated that he is not aware of any discussion or initiatives within DCF to deal with the issue of sufficiency of post-permanency services.  (*Id.* at 226:4-12).

894.    Terrence Flynn, DCF Regional Director for the Southern Region, testified that DCF needs to focus more on the back door and how "kids [are] doing within the system and exiting the system," because "we don't really do well when it comes to kids exiting our system," "so we need to have more conversations about goals we pick and why we pick them and to assure that the service plans that are developed for that individual child in reference to that goal has very specific tasks that will assist us in achieving that."
(Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, Jan. 26, 2012, at 78:16-80:1).

### B.    Adoption

#### 1.    Professional Standards

895.    Massachusetts regulations provide that in delivering services to children and families, DCF shall "reflect the understanding that every child needs stability and permanency" and "recognize that substitute care is a temporary solution . . . .  As soon as it is determined that reunification is not feasible, the Department shall take swift action to implement another

permanent plan, such as adoption or guardianship." (Trial Exhibit 69, 110 Mass. Code Regs. 1.02(3)-(4) (2013); *see also* Trial Exhibit 854, 102 Mass. Code Regs. 5.05(3) (2011) ("The social worker shall work toward implementing a permanent plan for the child as quickly as possible"); Trial Tr., Mar. 1, 2013 (Crabtree), at 40:8-25).

896.   Massachusetts regulations provide that DCF will "promote early permanency decisions and outcomes for children in substitute care" and "will seek to have no more than 1/3 of all children (under the age of 18) who have been in foster care for over 24 months that remain in foster care at any given time during the fiscal year." (Trial Exhibit 69, 110 Mass. Code Regs. 7.101(9) (2013)).

897.   DCF policy provides that DCF is "committed to the swift implementation of permanent plans for all children in the care and custody of the Commonwealth." (Trial Exhibit 2, Interim Policy and Procedures for Permanency Planning, Jan. 31, 1996, Case Practice Policy and Procedures Manual, at DCF POL 739).

898.   DCF policy provides that all placements be made in accordance with permanency planning objectives, and "[f]rom the time a child is placed, a plan shall be developed for returning the child home, or, if that is not possible, for identifying an alternative permanent home." (Trial Exhibit 1, Placement Prevention and Placement Policy, DSS Polic No. 90-004(R), Feb. 10, 1998, DCF Case Practice Policy & Procedures Manual, at DCF POL (7/08) 169).

899.   The Council on Accreditation standards provide that "[t]he agency participates in or facilitates a permanency planning process with families to promote stability and permanency." (Contested Exhibit RL, Council on Accreditation, Foster Care Services Standards, § 4). Within thirty days of placement, a permanency plan should be developed which specifies: a. the permanency goal(s); b. a timeframe for achieving permanency; and c. activities that support permanency." (*Id.* § 4.01; *see also* Trial Tr., Mar. 1, 2013 (Crabtree), at 41:1-20).

900.   In addition, the Council on Accreditation standards provide that:

> The child, parents, foster parents, and relevant professionals participate in a court or administrative case review at least every six months to assess:
> a. the safety and appropriateness of continued placement;
> b. parent, child, and sibling visitation;
> c. efforts to reunify the family and progress toward permanency;
> d. possible placement resources and best options; and
> e. appropriateness of services.

(Contested Exhibit RL, Council on Accreditation, Foster Care Services Standards, § 4.03).

901.   Federal law requires that:

> In the case of a child with respect to whom the permanency plan is adoption or placement in another permanent home, documentation of the steps the agency is taking to find an adoptive family or other permanent living arrangement for the child, to place the child with an adoptive family, a fit and willing relative, a legal guardian, or in another planned permanent living arrangement, and to finalize the adoption or legal guardianship. At a minimum, such documentation shall include child specific recruitment efforts such as the use of State, regional, and national adoption exchanges including electronic exchange systems to facilitate orderly and timely in-State and interstate placements.

(Trial Exhibit 476, 42 U.S.C.A. § 675(1)(E) (2011); *see also* Trial Tr., Mar. 1, 2013 (Crabtree), at 42:2-42:21).

902.    Dr. Azzi-Lessing testified that permanency, "stated simply, [means] to have a family of one's own that is expected to be permanent" and that "it is the ultimate goal for any children who are removed from their homes in a child welfare setting." (Trial Tr., Feb. 4, 2013 (Azzi-Lessing), at 72:6-10). She further stated:

> [T]hat means that a plan is made as rapidly as possible to make the home that the child was removed from sufficiently safe so that the child could be returned there or that the child moves towards or the state moves towards terminating parental rights and finding an adoptive home for that child. But it's also about finding a permanent family for a child instead of letting that child be in limbo and their fate uncertain.

(*Id.* at 72:10-16).

903.    Dr. Azzi-Lessing testified that permanency planning is "the critical work that anyone involved in child welfare practice engages in as soon as a child is removed from his or her biological home" in order to ensure that:

> [T]he child doesn't remain in substitute care a day longer than is absolutely necessary, and that a permanent setting, preferably always a permanent family setting, is identified for that child, whether it is reunification with biological family members, whether it's a kinship placement with relatives, or whether it's an adoption placement, long term guardianship placement, but that permanency planning is about being proactive and ensuring that once children come into care that they leave temporary care as soon as possible for a permanent setting.

(*Id.* at 142:9-18).

## 2.    Delays in Adoption and Languishing in Foster Care Without a Permanent Family Cause Harm and the Risk of Harm to Children

904.    Children who languish in foster care for long periods of time without getting adopted or achieving other permanency suffer harm or are at risk for suffering harm. Massachusetts's Child Advocate, former Juvenile Court Judge Gail Garinger, has stated that "[c]hildren need permanent homes where they can be safe, stable, and nurtured as they grow.  The connection of a permanent home and a caring adult supports healthy growth and development as youth transition into adulthood."  (Trial Exhibit 339, Office of the Child Advocate Annual Report, Fiscal Year 2011, p. 10).  "When children and youth wait in foster or congregate care for years without a permanent home, the child welfare system has failed to provide permanency."  (*Id.*).

905.    The American Academy of Pediatrics recognizes the risk that children who have experienced abuse or neglect are faced with if they do not obtain a permanent placement.  As they note,  "[c]hildren who have experienced abuse or neglect have a heightened need for permanency, security, and emotional constancy and are, therefore, at great risk because of the inconsistencies in their lives and the foster care system. Every effort should be made to rapidly establish a permanent placement for the child."  (Trial Exhibit 1076, Committee on Early Childhood, Adoption and Dependent Care, American Academy of Pediatrics, Developmental Issues for Young Children in Foster Care, 106 Pediatrics 1145 (2000), p. 1148).

906.    The National Conference of State Legislatures also recognizes the importance of a permanent home and family for a child's health and development and further states that:

> [c]hild development experts know that in order for a child to grow up as a healthy, functioning and productive member of society, a sense of a permanent home and family is key.  Children thrive in an environment that includes an adult who is committed to their long-term well-being: someone whom they can depend on to take them to school, monitor their grades, attend PTA meetings and sporting events and ask about their friends.

(Trial Exhibit 1095, Nina Williams-Mbengue, Moving Children Out of Foster Care: The Legislative Role in Finding Permanent Homes for Children, National Conference of State Legislatures, Oct. 2008, p. 1).

907.    DCF recognizes that every child is entitled to a "safe, secure, appropriate, and permanent home."  (Trial Exhibit 33, Massachusetts Child and Family Services Review Program Improvement Plan, Oct. 5, 2009, p. 17; *see also* Trial Exhibit 691, Office of the Child Advocate Annual Report Fiscal Year 2012, p. 15).  DCF further recognizes that "[a]ny change in a child's family is disruptive of established relationships and the comforts, familiar rhythms, and normal routines of life," and that "[c]ontinuity in caring relationships and consistency of settings and routines are essential for a child's sense of identity, security,

attachment, trust, and optimal social development." (Trial Exhibit 33, Massachusetts Child and Family Services Review Program Review Plan, Oct. 5, 2009, p. 17; *see also* Trial Exhibit 94, Child and Family Services Plan FY2010-FY2014, at DCF007054450-51). DCF understands the importance of identifying and finalizing adoption or guardianship for children in as timely a manner as possible. (Trial Exhibit 94, Child and Family Services Plan FY2010-FY2014, at DCF007054452).

908. Children spending years in foster care are placed at continuing risk of experiencing abuse or neglect by foster caretakers. (*See, e.g., supra* ¶ 136).

909. Children spending years in foster care are also placed at continuing risk of experiencing multiple placement moves.

### 3. DCF Performance

910. DCF performance in the area of adoption does not meet the standard of care. (Trial Tr., Mar. 1, 2013 (Crabtree), at 43:8-17).

911. Former Commissioner McClain testified that examining timeliness of adoptions is one way of assessing the performance of a child welfare agency's adoption practice. (Trial Tr. May 7, 2013 (McClain), at 18:2-22). Those measures are promulgated by the federal government, reflected in the CFSR scorecard, and reflected in the scorecard developed by the EOHHS. (*Id.*). EOHHS has a performance improvement report, EHS Results!, which reflects DCF's results on "critical measures so that at a secretariat level we can look to see how we're progressing or not progressing with meeting the secretary's major objectives." (*Id.*).

912. DCF's performance on timeliness of adoption has placed it in the bottom five jurisdictions in the country in recent years. ACF measures states' performance on timely adoptions from foster care through five measures, C2.1 through C2.5. From these five measures, ACF computes "Permanency Composite 2." (Trial Exhibit 1086, U.S. Department of Health and Human Services, Administration for Children and Families, Children's Bureau, Child Welfare Outcomes 2007-2010: Report to Congress, pp. B4-B5, 167-172). During federal fiscal year 2010, Massachusetts had a composite score of 83.9 on Composite 2, its worst performance in the four year period from 2007-2010. (*Id.* at 172). This score placed Massachusetts as 48th out of 52 jurisdictions on Permanency Composite 2. (Contested Exhibit SB, Summaries of state-by-state performance data and rankings from Child Welfare Outcomes 2007-2010: Report to Congress, Prepared by Elissa Glucksman, p. 7; *see also* Trial Exhibit 1084, Summaries of state-by-state performance data and rankings from Child Welfare Outcomes 2007-2010, Prepared by Elissa Glucksman, p. 7 (ranking 47th with a score of 83.7). During federal fiscal year 2011, Massachusetts' composite score fell to 76.2, placing it as 49th out of 52 jurisdictions. (Trial Exhibit 1085, Summaries of state-by-state performance data and rankings from Child Welfare Outcomes 2008-2011, Prepared by Elissa Glucksman, p. 8).

913. DCF's recent performance on the five measures comprising the composite score for Permanency Composite 2: Timeliness of Adoptions substantially deviates from the 2010 national median for these measures reported in Child Welfare Outcomes 2007-2010. (Trial

Exhibit 964, CFSR Measures: 12-Month Period Ending: 09/30/2012, p. 1; Trial Exhibit 964, CFSR Measures: 12-Month Period Ending: 6/30/2012, p. 1; Trial Exhibit 1086, U.S. Department of Health and Human Services, Administration for Children and Families, Children's Bureau, Child Welfare Outcomes 2007-2010, p. vii).

914.    Former Commissioner McClain acknowledged that in 2011 Massachusetts ranked 43rd lowest among 52 jurisdictions on federal measure C2.1 (of children discharged from foster care to a finalized adoption, what percentage were discharged in 24 months), and said that the agency still needed to make improvement on that outcome. (Trial Tr. May 2, 2013 (McClain), at 30:1-14, 31:24).  Former Commissioner McClain testified that the correction of a reporting error could potentially improve DCF's performance on this measure, but acknowledged that it would only bring DCF's ranking up to 41st out of 52 jurisdictions.  (*Id.* at 30:1-31:24).

915.    Former Commissioner McClain acknowledged that in 2011 Massachusetts ranked 44th worst out of 52 jurisdictions in the federal measure for federal measure C2.2 (median time to adoption), and said that he understood that this was an area in which DCF needed to make significant improvement. (Trial Tr. May 2, 2013 (McClain), at 32:10-33:2).

916.    DCF states that it "works to make sure that all children who are unable to return home (and for whom adoption is the most appropriate permanency plan) are adopted within 24 months of their entry into foster care." (Trial Exhibit 740, Department of Children and Families, Child Welfare Act Reports, Chapter 176 of the Acts of 2008, Fiscal Year 2010, at DCF007413666).  However, DCF's performance on achieving adoptions for children in its care within 24 months has steadily deteriorated since the second quarter of state fiscal year 2009.  The proportion of children with a goal of adoption who were adopted within 24 months has declined from 33% in quarter two of state fiscal year 2009 to 21% in quarter three of state fiscal year 2012.  (Trial Exhibit 963, Dashboard Detail Report, July 20, 2012, at DCF011098032).

917.    DCF's management reports reflect that children with a goal of adoption languish in care for too long.  As of the fourth quarter of fiscal year 2012, 51 percent of consumers in placement with a goal of adoption had been in continuous placement for more than two years.  (Trial Exhibit 955, Department of Children and Families Quarterly Report: Fiscal Year 2012 4th Quarter, p. 36).  As of the third quarter of fiscal year 2012, 50 percent of consumers in placement with a goal of adoption had been in continuous placement for more than two years. (Trial Exhibit 955, Department of Children and Families Quarterly Report: Fiscal Year 2012 3rd Quarter, pp. 36-37).  51 percent of consumers in placement with a goal of adoption during the second quarter of state fiscal year 2012 and 53 percent of consumers in placement with a goal of adoption during the first quarter of state fiscal year 2012 had been in continuous placement for more than two years. (Trial Exhibit 955, Department of Children and Families Quarterly Report: Fiscal Year 2012 2nd Quarter, pp. 36-37; Trial Exhibit 955, Department of Children and Families Quarterly Report, Fiscal Year 2012 1st Quarter, pp. 36-37).  For each quarter of state fiscal year 2011, at least 53 percent of consumers in placement with a goal of adoption had been in continuous placement for more than two years.  (Trial Exhibit 955, Department of Children and Families Quarterly Report: Fiscal Year 2011 1st Quarter, pp. 34-35; Trial Exhibit 955, Department of Children and

Families Quarterly Report: Fiscal Year 2011 2nd Quarter, pp. 34-35; Trial Exhibit 955, Department of Children and Families Quarterly Report: Fiscal Year 2011 3rd Quarter, pp. 34-35; Trial Exhibit 955, Department of Children and Families Quarterly Report: Fiscal Year 2011 4th Quarter, pp. 36-37).

918.     DCF has consistently failed to meet its own targets for numbers of adoptions per year.  In its Child and Family Services Plan for fiscal years 2010-2014, DCF stated that its goal for fiscal year 2009 was to "complete adoptions for more than 800 children."  (Trial Exhibit 94, Child and Family Services Plan FY2010-FY2014, at DCF007054431).  However, DCF failed to meet this goal in fiscal year 2009, fiscal year 2010, or fiscal year 2011; in fiscal year 2011 only 678 children were adopted.  (*See* Trial Exhibit 411, U.S. Department of Health and Human Services, Administration for Children and Families, Children's Bureau, Child Welfare Outcomes, Massachusetts Context and Outcomes Data for 2007-2010, p. 1; Department of Children and Families Quarterly Report: Fiscal Year 2011 1st Quarter, p. 58, Table 21; Trial Exhibit 955, Department of Children and Families Quarterly Report: Fiscal Year 2011 2nd Quarter, p. 58, Table 21; Trial Exhibit 955, Department of Children and Families Quarterly Report: Fiscal Year 2011 3rd Quarter, p. 58, Table 21; Trial Exhibit 955, Department of Children and Families Quarterly Report: Fiscal Year 2011 4th Quarter, p. 60, Table 21).  For fiscal year 2012, DCF set a goal of only 767 adoptions, with a goal of 800 in fiscal year 2013.  (Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 49:11-50:4).  For FY 2012, DCF's quarterly reports reflect that approximately 850 children were adopted during the fiscal year.  (Department of Children and Families Quarterly Report: Fiscal Year 2012 1st Quarter, p. 60, Table 21; Trial Exhibit 955, Department of Children and Families Quarterly Report: Fiscal Year 2012 2nd Quarter, p. 60, Table 21; Trial Exhibit 955, Department of Children and Families Quarterly Report: Fiscal Year 2012 3rd Quarter, p. 60, Table 21; Trial Exhibit 955, Department of Children and Families Quarterly Report: Fiscal Year 2012 4th Quarter, p. 61, Table 21).

919.     Ms. Roche testified that during approximately the last thirty months, DCF has been "going down in the timeliness to adoption," and that this is related to DCF's consistent failure to reach the target of 800 adoptions per year.  She stated that with respect to timeliness of adoptions "[DCF] dropped that focus" that had been present in the prior administration, when there was a "clear" focus on permanency.  The new administration "came in, and it was not a priority, and we sort of didn't pick it up again." (Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 43:18-46:7).  Ms. Roche testified that DCF is not currently performing according to the federal standards in timeliness of adoption.  (Rule 30(b)(6) Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, re: Staffing, Caseloads, and Training, Jan. 20, 2012, at 89:19-24).

920.     DCF has admitted that it needs to improve timeliness to adoption.  In an email dated November 15, 2011, DCF Commissioner Angelo McClain stated that one of the agenda items for his upcoming meeting with EOHHS Secretary Bigby was the "Need to Improve Timeliness to Adoption," as reflected on the EHS Dashboard Detail Report.  (Trial Exhibit 577, Email from Angelo McClain to Mary Skahen re: Meeting with Secretary Bigby - Agenda, Nov. 15, 2011, at EOHHS000008117).

921.    In a January 11, 2012 email to Ruben Ferreira, Ros Walter stated that "[w]e are doing so badly on the time to adoption that I'm meeting with Mary and Ajay on Friday to figure out a way to use the legalization date on the AFCARS Foster Care file."  (Trial Exhibit 1042, Email from Ros Walter to Ruben Ferreira re: Updating DataMart, Jan. 12, 2012).

922.    DCF has admitted in its Strategic Recruitment Plan for fiscal years 2011-2012 that it needs to increase timely permanent placements for children in out-of-home care.  (Trial Exhibit 202, Strategic Recruitment Plan FY 2011 – 2012, at DCF00066733).

923.    DCF is aware that its performance on timeliness of adoptions has fallen over the past three years.  Former Commissioner McClain testified that DCF's timeliness of adoption has been reported as an area in need of improvement for ten consecutive quarters starting in the second quarter of 2010 through the third quarter of 2012 as reflected in the EHS Results Dashboard Detail Report. (Trial Tr. May 7, 2013 (McClain), at 21:25-24:6). This was a drop in performance from the previous quarters at the end of 2009 and beginning of 2010. (*Id.*). McClain testified that DCF "really didn't notice the decline until about the first quarter of 2011" and realized that improvements needed to be put in place. (*Id.*).

924.    Commissioner McClain testified that DCF's declining performance on the federal composite for timeliness of adoptions from 87.9 in federal fiscal year 2007 to 80.3 in the twelve-month period ending March 31, 2011 has "concerned" him.  (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 116:24-117:5; *see* Trial Exhibit 960, Massachusetts Child and Family Services Review Data Profile, July 30, 2008, at DCF005555604; Trial Exhibit 960, Massachusetts Child and Family Services Review Data Profile, June 2, 2009, at DCF004931081; Trial Exhibit 960, Massachusetts Child and Family Services Review Data Profile, June 14, 2011, at DCF005504992).  Commissioner McClain testified that "part of the reason" for the drop in performance "is in '09, we implemented our integrated case practice model, and so folks were a little distracted getting that up in place, but that's no excuse for that happening."  (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 117:6-9).  He acknowledged that "[o]ur timeliness to adoption, our performance there, has slipped.  We have to improve it."  (*Id.* at 118:15-17).

925.    Other DCF officials have also acknowledged DCF's deteriorating performance on timeliness of adoptions.  Ms. Nisenbaum testified that DCF's performance on the timeliness of adoptions had worsened over the ten quarters preceding her May 2012 deposition.  (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 111:13-112:2, 113:14-24).  Mr. Ferreira testified that DCF's timeliness to adoption performance has significantly decreased over the last fourteen months, and is currently eight or nine percent below the federal target.  (Deposition of Ruben Ferreira, DCF Assistant Commissioner for Continuous Quality Improvement, Feb. 2, 2012, at 47:8-14).  Mr. Ferreira testified that DCF management is concerned about this decline.  (*Id.* at 47:15-16).

926.    DCF acknowledges that it fails to achieve timely adoptions for adolescents.  DCF has reported that the adolescent age group had the highest proportion of children who were legally free for adoption and that the "larger proportions of older children legally free is a reflection of the difficulty in achieving adoptions for older children."  (Trial Exhibit 955,

Department of Children and Families Quarterly Report: Fiscal Year 2012 3rd Quarter, p. 39). DCF further reported that the "younger children who are legally free are being adopted while adolescents who are legally free are 'stuck' in placement." (*Id.*). DCF also reported that a separate analysis of children adopted in fiscal year 2011 showed that "the proportion of older children (12 to 17 years old) who were adopted accounted for only 7% of all adoptions," and "[t]he amount of time from being legally freed to adoption is much longer for these older children." (*Id.*).

927.    Ms. Gambon testified that the performance trend in terms of older children waiting for adoption is "[n]eeding improvement." (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner, for Adoption, Foster Care, and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 159:16-160:24).

928.    Mr. Pillidge testified that timeliness to adoption is an area requiring improvement in the Northern Region. (Deposition of Raymond Pillidge, DCF Regional Director for the Northern Region, Mar. 7, 2012, at 164:13-165:8). He testified that "[t]he big priority, the sort of metric that we've been struggling to improve is length of time to adoption." (*Id.* at 53:19-56:14; *see also id.* at 58:7-18). He further testified that untimely adoption is an "area where my region is not doing very well and overall the state, as a state we're not doing very well." (*Id.* at 53:19-56:14). In addition, Mr. Pillidge testified that the area offices in the Northern Region are "actually [going] backwards on timeliness to adoption." (*Id.* at 168:15-169:4).

929.    Terrence Flynn, DCF's Regional Director for the Southern Region, testified that due to "issues related to performance," a "significant number of kids that could be adopted and should have been adopted" in the Southern Region have not been adopted in a timely manner. (Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, Jan. 26, 2012, at 216:8-12).

930.    As a result of delays in adoption, many children languish in foster care for long periods of time and ultimately age out of care without a permanent family. Plaintiffs incorporate herein *infra* ¶¶ 1083-1089, 1107.

931.    Dr. Azzi-Lessing testified that one of the red flags that she identified in reviewing the named plaintiff files was that:

> DCF often fails to work actively to achieve permanency for the children in its care and by doing so, by failing in this regard, DCF forces these children to languish, often for years, without . . . safe and permanent families and leaves them to ultimately have to age out of foster care.

(Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 73:5-10).

932.    As of April 2012, Named Plaintiff Connor had been in foster care for more than five years and still lacked a permanent family. (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 76:7-10; Trial Exhibit 1181, DCF Case File: Connor B., at DCF010194943, DCF010194917; *see*

*also* Trial Exhibit 1077, Connor B. Placement Settings).  His goals changed "with some regularity" and at some point his file indicates that he is expected to age out of the system at age 18.  (Trial Tr., Feb. 4, 2013 (Azzi-Lessing), at 107:21-108:5; Trial Exhibit 1181, DCF Case File: Connor B., at DCF010705765-6, DCF010189450, DCF010192492, DCF010194943-45). For the period covered by Trial Exhibit 1181, there was no indication of Connor's parental rights being terminated.

933.    Named Plaintiff Adam was removed from his home in 2004 and continued to lack a permanent family as of April 2012.  (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 75:14-15; Trial Exhibit 1182, DCF Case File: Adam S., at DCF010184725, DCF010183206; *see also* Trial Exhibit 1078, Adam S. Placement Settings).  Adam is now 18 years old and has spent the past ten years in DCF custody with no prospects for a family to care for him on a permanent basis or the apparent capacity to care for himself. (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 76:3-6; Trial Exhibit 1182, DCF Case File: Adam S., at DCF010178482, DCF010184725, DCF010184907-09; *see also* Trial Exhibit 1078, Adam S. Placement Settings).

934.    DCF's permanency planning for Named Plaintiff Andre did not, at times, conform with standards of care or DCF policy.  (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 51:14-18). Specifically, his progress towards achieving permanency was "stymied by DCF placing him in a residential care at the age of seven and allowing him to languish there for nearly five years."  (*Id.* at 77:4-7; Trial Exhibit 1183, DCF Case File: Andre S., at DCF010188415). During the time Andre was in residential care at St. Ann's, "DCF made few efforts to move Andre toward having a permanent family as evidenced by a string of service plans that were obviously cut and pasted from previous plans, and the failure of Andre's DCF worker to attend an number of case conferences at St. Ann's."  (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 77:7-12; *see also id.* at 47:5-9, 48:1-49:12, 51:19-52:5; Trial Exhibit 1183, DCF Case File: Andre S., at DCF010187828-29, DCF010187662, DCF010187880; *see, e.g., id.* at DCF010185068, DCF010185053, DCF010185039, DCF010185032, DCF010188103; *see also* Trial Exhibit 1080, Andre S. Placement Settings, at DCF010188415).  In addition, subjecting Andre to numerous placements at the onset of DCF custody as well as failing to provide him with needed mental health services harmed his chances at permanency.  (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 49:17-51:13).

935.    In the four years since Named Plaintiff Camila was removed from her home, there has been no consistent plan to provide her with permanency.  (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 73:17-21; Trial Exhibit 1184, DCF Case File: Camila R., at DCF000006343, DCF000006347, DCF010197116, DCF000006351, DCF010197029, DCF010197116-17, DCF010199671-74).  Camila's January 2012 foster care review report stated that her plan was permanency through care with kin with a projected date of May 2014, the month Camila will turn 18 years old.  (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 74:2-8; Trial Exhibit 1184, DCF Case File: Camila R., at DCF010196932).

936.    Seven years after Named Plaintiff Seth's home removal, he remains without a permanent family of his own.  (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 75:11-13; Trial Exhibit 1185, DCF Case File: Seth T., at DCF010209458; *see also* Trial Exhibit 1081, Seth T. Placement Settings).  When Seth was nine years old, DCF inappropriately assigned him the goal of

long-term substitute care, a goal no longer permitted by federal law or DCF policy. (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 74:9-14; Trial Exhibit 1185, DCF Case File: Seth T., at DCF003639871; Trial Exhibit 1, Addendum: Revised Permanency Plan Goals for Children and Youth, Jan. 2, 2008, DCF Case Practice Policy and Procedures Manual, at DCF POL (7/08) 130; *see also* Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 74:20-75:4). Ultimately, DCF placed Seth with a pre-adoptive family that "appeared to be ill prepared to care for any adolescent, a healthy, typical adolescent, let alone one like Seth who had experienced so many traumas and losses." (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 75:5-9; Trial Exhibit 1185, DCF Case File: Seth T., at DCF010213762, DCF010213765, DCF010210394-95; *see also* Trial Exhibit 1081, Seth T. Placement Settings).

937.    Ms. James testified that DCF did not make an effort to find a permanent home for her. No one at DCF spoke with her about the ways in which they were attempting to find a permanent home. Nor did they ever bring Ms. James to meet with potential adoptive parents. (Trial Tr., Jan. 22, 2013 (James), at 47:18-23).

### 4.    Chronic Failures, DCF Inaction and Systemic Departures from Professional Judgment

938.    DCF and state officials have long been aware of DCF's poor performance on timeliness of adoption and the resultant harm to children. Since 2007, Massachusetts has consistently been in the bottom half of the nation on the federal composite measuring timeliness of adoptions. (Trial Exhibit 960, Massachusetts Child and Family Services Review Data Profile, July 30, 2008, at DCF005555604; Trial Exhibit 960, Massachusetts Child and Family Services Review Data Profile, June 14, 2011, at DCF005504992).

939.    The number of adoptions of children in DCF custody has decreased over the past decade and a half. (*See* Trial Exhibit 573, U.S. Department of Health and Human Services, Administration for Children and Families, Adoptions of Children with Public Child Welfare Agency Involvement by State, FY 1995 – FY 2006, rev. Mar. 2008, at P_022263 (reflecting a decrease in the number of adoptions of children with public child welfare agency involvement in Massachusetts from 1,073 in fiscal year 1995 to 874 in fiscal year 2006); Trial Exhibit 574, U.S. Department of Health and Human Services, Administration for Children and Families, Adoptions of Children with Public Child Welfare Agency Involvement by State, FY 2002 – FY 2010, p. 2 (reflecting a decrease in the number of adoptions of children with public child welfare agency involvement in Massachusetts from 808 in fiscal year 2002 to 726 in fiscal year 2010)).

940.    According to the First Round CFSR in 2001, Massachusetts was not in substantial conformity with Permanency Outcome 1: Children have permanency and stability in their living situations. (Trial Exhibit 56, Massachusetts Child and Family Services Review Final Assessment, July 2001, at CSF-000000322). Reviewers identified Permanency Outcome 1, Item 9 (Adoption) as an area needing improvement. (*Id.* at CSF-000000328). Stakeholders noted "delays in pursuing TPR because some personnel in [DCF] and the Courts [were questioning] the efficacy of adoption for older youth and for some special needs children, especially those needing residential treatment for periods of time." (*Id.* at CSF-000000329).

According to the 2001 CFSR, "[t]his perspective may impede the achievement of permanency for these youth." (*Id.*).

941.    The First Round CFSR also found that Permanency Outcome 1, Item 7 (permanency goal for child) was an area needing improvement. (*Id.* at CSF-000000325). According to the First Round CFSR Final Assessment:

> In the 15 cases in which this area was rated as needing improvement, the following delays were found: (1) a lack of clarity regarding the goal and/or a lengthy period before the goal was changed, (2) inappropriate services to reach permanency, (3) incomplete paperwork, (4) voluntary placement cases kept open for no apparent reason, (5) changes in judges or attorneys, and (6) lengthy periods of time required for obtaining the necessary paperwork/home studies through the ICPC. Stakeholders noted that there were Departmental delays in carrying out various activities that promote permanency for children including delays in obtaining children's birth certificates; . . . submitting reports to the Court; and initiating efforts to finalize the new plan.

(*Id.* at CSF-000000326).

942.    The First Round CFSR also found that Massachusetts' case review system was "Not In Substantial Conformity." (*Id.* at CSF-000000312). "[S]ome stakeholders voiced concern that [Termination of Parental Rights] and permanency for some older youth and youth in residential treatment programs was not always vigorously pursued." (*Id.* at CSF-000000350).

943.    According to the First Round Statewide Assessment, during federal fiscal year 1999, 52.6% of children were in care for 17 of the most recent 22 months, the median length of stay in foster care was 18.50 months, and the median length of time to achieve the goal of adoption was 49.28 months. (Trial Exhibit 55, Massachusetts Child and Family Services Review Statewide Assessment, July 2001, at CSF-000000428-30). The length of time to accomplish the permanency goal of adoption increased from 44 months in 1997 to 49 months in 1999. (*Id.*). The report indicated that, of the children adopted in fiscal year 2001, only 23% spent 24 months or less in care. (*Id.* at CSF-000000441). DCF acknowledged the need to address the issues/barriers to moving children through the foster care system and reaching permanency sooner. (*Id.* at CSF-000000442).

944.    In the years between the First Round and the Second Round CFSR, DCF failed to effectively address its poor performance on timeliness of adoptions. The Second Round CFSR found that Massachusetts was not in substantial conformity with Permanency Outcome 1: Children have permanency and stability in their living situations. (Trial Exhibit 58, Massachusetts Child and Family Services Review Final Report, Feb. 21, 2008, at CSF-000000762). This outcome was substantially achieved in only 47.5% of applicable cases reviewed, far below the 95% or higher required for an overall rating of substantial conformity. (*Id.*). Massachusetts failed to meet the national standard on all four composite

measures factoring into Permanency Outcome 1: timeliness and permanency of reunification, timeliness of adoptions, permanency for children in foster care for extended periods of time, and placement stability.  (*Id.*).  In addition, according to the Massachusetts Child and Family Services Review Data Profile for March 19, 2007, DCF performed below the national median on all five measures that make up Permanency Composite 2: Timeliness of Adoptions. (Trial Exhibit 57, Massachusetts Child and Family Services Review Statewide Assessment, May 2007, at CSF-000000706).

945.    The Second Round CFSR identified Permanency Outcome 1, Item 9 (adoption) as an area needing improvement and found that Massachusetts did not meet the national standard for Composite 2: timeliness of adoptions.  (Trial Exhibit 58, Massachusetts Child and Family Services Review Final Report, Feb. 21, 2008, at CSF-000000775-76).  Case reviewers determined that DCF made diligent efforts to achieve adoptions in a timely manner in only 64% of applicable cases, well below the 90% or higher required for a rating of Strength.  (*Id.*).  According to the Second Round Statewide Assessment, although DCF met its First Round PIP goal for adoptions occurring in less than 24 months, its performance on this measure was still below the national median.  (Trial Exhibit 57, Massachusetts Child and Family Services Review Statewide Assessment, May 2007, at CSF-000000656, CSF-000000706).  Furthermore, some area offices had performance as low as 9.1% on this measure.  (*Id.* at CSF-000000656).

946.    The Second Round CFSR also found that DCF often fails to establish appropriate and timely permanency goals.  (*See* Trial Exhibit 34, MA CFSR 2007: Summary of Key Issues for PIP Development, at DCF008117146).  Specifically, the Second Round CFSR found that Permanency Outcome 1, Item 7 (permanency goal for child) was an area needing improvement.  Case reviewers found that the agency established an appropriate permanency goal for the child in a timely manner in only 67% of applicable cases, failing to meet the 90% or higher required for a rating of Strength.  (Trial Exhibit 58, Child and Family Services Review Final Report, Feb. 21, 2008, at CSF-000000770-71).

947.    The Second Round CFSR also found that Massachusetts was not in substantial conformity with respect to its case review system, finding that case plans were not routinely developed jointly with parents and youth, and that there were ongoing concerns about deficiencies in the permanency hearings process, specifically pertaining to the inadequacy of notification to foster caretakers about reviews and hearings. (*Id.* at CSF-000000815).  Stakeholders expressed concerns over the continued existence of barriers that undermined the quality of permanency hearings.  (*Id.* at CSF-000000816).  The Second Round CFSR also found that the Massachusetts process for terminating children's parental rights needed improvement because of delays in TPR filings and hearings due to the Department's inconsistent approach to parent and child evaluations.  (*Id.* at CSF-000000820).  The Second Round Statewide Assessment reported that the Massachusetts Court Improvement reassessment, conducted in 2005, found that, overall, only 70% of permanency hearings reviewed for eight counties occurred in a timely manner.  (Trial Exhibit 57, Massachusetts Child and Family Services Review Statewide Assessment, May 2007, at CSF-000000583-84).  The Second Round Statewide Assessment also reported that adequate support staff is required to ensure that the permanency hearing reports are obtained and filed timely so that the hearings can occur on time.  The Assessment also reported that without adequate

managers and support staff, there was a rise in the number of overdue hearings as well as hearings that were continued and not rescheduled. (*Id.* at CSF-000000583).

948.    DCF recognized in its October 5, 2009 Massachusetts Child and Family Services Review Program Improvement Plan ("PIP") that adoption was an area identified by the CFSR as needing improvement, specifically with regards to the timeliness of identification of a resource, TPR filing, and finalization. (Trial Exhibit 33, Massachusetts Child and Family Services Review Program Improvement Plan, Oct. 5, 2009, pp. 6-7). In its PIP, DCF stated that it was seeking to improve permanency for children and families and, specifically, to improve timeliness to adoption or guardianship. (*Id.* at 17-21, 31, 40, 43-45, 48-52). DCF recognized in its PIP that its performance on Permanency Outcome 1: Timeliness of Adoptions (corresponding to Permanency Composite 2: Timeliness of Adoptions) as measured in the final report was 78.3 and its performance as measured in the baseline/source data period was 84.0, both far below the national standard of 106.4. (*Id.* at 55).

949.    As part of its 2009 PIP, DCF and ACF set a goal of improving its Composite 2: Timeliness of Adoptions score from 84.0 to 87.4, a goal still far below the national standard. (Trial Exhibit 33, Massachusetts Child and Family Services Review Program Improvement Plan, Oct. 5, 2009, p. 55).

950.    By January 2010, DCF had renegotiated its improvement goal for Permanency Outcome 1: Timeliness of Adoptions down to 81.5. (Trial Exhibit 587, DCF PIP Quarterly Report: Quarter One, Oct. – Dec. 2009, at DCF000063282). DCF renegotiated its PIP goal by selecting as the baseline the first half of federal fiscal year 2006, when its performance was 78.3. (Trial Exhibit 33, Massachusetts Child and Family Services Review Program Improvement Plan, Oct. 5, 2009, p. 55; Trial Exhibit 587, DCF PIP Quarterly Report, Quarter One, Oct. – Dec. 2009, at DCF000063282). In doing so, DCF chose the lowest possible baseline available to it, rather than the earlier-selected baseline of fiscal year 2008, when its performance was 84.0. (Trial Exhibit 33, Massachusetts Child and Family Services Review Program Improvement Plan, Oct. 5, 2009, p. 55).

951.    However, because DCF's performance had already increased to 87.9 for the first PIP quarterly reporting period, DCF was considered to have already achieved its improvement goal, which, under ACF's procedures, meant that this outcome measure would not be examined further during the two-year PIP process. (Trial Exhibit 587, DCF PIP Quarterly Report, Quarter One, Oct. – Dec. 2009, at DCF000063282; *see* Trial Exhibit 760, DCF PIP Final Report, Oct. 2009-Sept. 2011, Quarter Eight Report, July-Sept. 2011, at CSF-000005471-77). At a PIP Measurement Advisory Committee meeting on December 8, 2010, attendees concluded that the timeliness of adoptions goal was "met in 2007" and that the state would "achieve minimal improvement in fiscal year 2007 using 2005B06A baseline." (Trial Exhibit 372, PIP Measurement Advisory Committee Meeting Summary, Dec. 8, 2010, at DCF008719951).

952.    In fact, DCF's performance after 2009 has steadily dropped; the most recent measure of DCF's performance on this composite was 76.2, below both the original and the renegotiated PIP targets. (Trial Exhibit 1085, Summaries of state-by-state performance data and rankings from Child Welfare Outcomes 2008 – 2011, p. 8). Because DCF had attained its PIP target

for at least one quarter, ACF in 2012 nevertheless deemed DCF to have "successfully completed" its PIP in this area.  (Trial Exhibit 758, Letter from Joseph J. Bock to Angelo McClain re: conclusion of CFSR PIP program, July 12, 2012, at DCF-000000001-PIP).

953.    DCF also failed to effect meaningful improvement in other permanency-related items in its PIP.  DCF negotiated an improvement goal of only 76.9% on Permanency Outcome 1: Item No. 7 (Timeliness and Appropriateness of Permanency Goals), which it measured through case reviews, rather than through foster care reviews as provided for in the PIP. (Trial Exhibit 760, DCF PIP Final Report, Oct. 2009-Sept. 2011, Quarter Eight Report, July-Sept. 2011, at CSF-000005474; Trial Exhibit 33, Massachusetts Child and Family Services Review Program Improvement Plan, Oct. 5, 2009, p. 58).  In addition, during the implementation process for the PIP, DCF also eliminated a benchmark related to the monitoring of the "completion of assessment and service plans through monthly reporting" and determined that there was "no need" for an action step related to the timeliness of TPR. (*See* Trial Exhibit 760, DCF PIP Final Report, Oct. 2009-Sept. 2011, Quarter Eight Report, July-Sept. 2011, at CSF-000005407, CSF-000005411, CSF-000005440).

954.    DCF's 2009 Strategic Plan for Action identified a need for increased efforts to improve permanency, including "enhance[d] casework practice to focus on concurrent planning to achieve timely permanency," and "early and ongoing efforts to identify guardianship and adoption resources known to the family."  (Trial Exhibit 1127, Strengthening the Safety Net: DCF's Strategic Plan for Action, April 2009, at DCF7605096).

955.    DCF has misstated its performance with respect to timeliness of adoption.  In an April 16, 2010 email to Therese Murray, President of the Massachusetts Senate, DCF Commissioner Angelo McClain stated that DCF had "achieved many historically significant outcomes over the past several years," including that it "exceeded the national standard for . . . timeliness to adoption (the national standard is 36% vs. DCF 36.6%)."  (Trial Exhibit 747, Emails among Angelo McClain, Therese Murray, David Murphy et al. re: Children's Rights, Inc. Class Action Lawsuit, Apr. 16, 2010, at DEF000250104; *see also* Trial Exhibit 745, Improving the Lives of Children and Families, Mar. 31, 2010, p. 11 (stating that the number of children free for adoption who are adopted within 24 months had increased from 249 (24.7%) in March 2007 to 272 (36.6%) in March 2009 and that it exceeded the national standard of 36%)).  In testimony to the Massachusetts Joint Committee on Ways and Means on February 23, 2011, Commissioner McClain again stated that DCF had met the national standard for timeliness to adoption in 24 month with a FY 2009 performance of 36.6%.  (Trial Exhibit 773, Budget Testimony to Joint Committee on Ways & Means, Feb. 23, 2011, at DEF000250560). However, DCF's CFSR Scorecards reflected that DCF's performance had not reached the national standard during either state or federal fiscal year 2009.  (Trial Exhibit 964, CFSR Measures: 12-Month Period: 07/01/2008 to 06/30/2009, p. 1; Trial Exhibit 964, CFSR Measures: 12-Month Period: 10/01/2008 to 9/30/2009, p. 1).  In fact, Commissioner McClain had been informed three months earlier, in an email from Ruben Ferreira dated January 6, 2010, that the 36.6% figure reported by DCF for this measure was in fact inaccurate, and that in initially reporting the 36.6% figure he had not (but "perhaps should have") used a data report that reflected the CFSR Round Two methodology, which would have been "about 4% points below the old measure."  (Trial Exhibit 748, Email from Ruben Ferreira to Angelo

McClain, re: Children Exiting to Adoption:  Percent Who Exit in Less than 24 Months (36.6%), Jan. 6, 2010).

956.    Furthermore, according to CFSR scorecards released by DCF in subsequent years, DCF's performance on percentage of children adopted within twenty-four months dropped precipitously subsequent to the time period addressed in Commissioner McClain's email. For the twelve-month period ending June 30, 2009, 30.6% of children exited to adoption in less than twenty-four months; for the twelve-month period ending June 30, 2010, 27.1% of children exited to adoption in less than twenty-four months; and for the twelve-month period ending June 30, 2011, 24.7% of children exited to adoption in less than twenty-four months. (Trial Exhibit 964, CFSR Measures: 12-Month Period: 07/01/2008 to 06/30/2009, p. 1; Trial Exhibit 964, CFSR Measures: 12-Month Period: 07/01/2009 to 06/30/2010, p. 1; Trial Exhibit 964, CFSR Measures: 12-Month Period: 07/01/2010 to 06/30/2011, p. 1).

957.    In the CFSP, DCF also reported that it had improved its performance on timeliness to adoption within 24 months from 26% to 34%.  (Trial Exhibit 94, Child and Family Services Plan FY2010-FY2014, at DCF7054431).  However, DCF's performance subsequently declined on this measure, with federal data reflecting performance at 29.8% in federal fiscal year 2009 and 26.9% in federal fiscal year 2010.  (Trial Exhibit 411, U.S. Department of Health and Human Services, Administration for Children and Families, Children's Bureau, Child Welfare Outcomes, Massachusetts Context and Outcomes Data for 2007-2010, p. 6).

958.    As of May 2011, DCF recognized that timeliness to adoption still needed to be a "priority area of focus."  (Trial Exhibit 746, Quality Improvement Teams: Focusing on FY'2012 Priorities, May 2011, at DEF000230398-99).

959.    Ms. Nisenbaum testified that in the summer of 2011, Commissioner McClain asked that timeliness of adoptions become "a priority area of focus."  (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 111:13-112:2; *see also id.* at 113:14-24).

960.    Ms. Gambon testified that Commissioner McClain became concerned about the timeliness of adoption when he saw the July 2011 EHS Reports.  (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 91:17-92:5; *see also* Trial Exhibit 963, Dashboard Detail Report, July 20, 2011).

961.    DCF acknowledges that managers lack depth of knowledge "regarding adoption PIP / Federal timeframes" and that there has been a "[l]ack of focus by management team on timeliness to adoption," both of which have contributed to delays in timeliness to adoption. (Trial Exhibit 1043, Timeliness to Adoption, Notes from Exercise on Jan. 27, 2012).

962.    In a February 2, 2012 email, DCF's Director of Adoption Support Leo Farley stated, "Time to adoption is suddenly a BIG issue."  (Trial Exhibit 1044, Email from Leo Farley to Steven Maloof re: work loads, Feb. 2, 2012).

963.    Commissioner McClain testified that he had directed Deputy Commissioner Olga Roche to focus on improving DCF's performance with respect to timeliness to adoption.

(Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 38:21-39:18). Commissioner McClain acknowledged at the time of his deposition that two DCF regions "aren't doing so well" in the area of timeliness to adoption. (*Id.* at 43:12-18).

964.    As recently as August 2012, DCF acknowledged the deficiencies in its adoption processes. In an August 2012 strategic plan, DCF set an objective to "Strengthen Adoption Processes & Practices" and noted "multiple opportunities for improvement," including "current practices related to matching children to adoptive parents, recruitment of adoptive families, and workflow processes related to termination of parental rights and . . . assignment of an adoption worker." (Trial Exhibit 7, Department of Children and Families 2012-2015 Strategic Plan: Preserving, Strengthening, and Expanding the DCF Safety Net, Aug. 2012, at CSF-000006351). In the plan, DCF set a target of finalizing 800 adoptions or more per year. (*Id.* at CSF-000006359).

965.    The Office of the Governor has not required submission of the Comprehensive Plan set forth in Massachusetts General Laws chapter 18C, providing in part for a review of "the process of adopting children in foster care" and recommendations for "streamlined procedures to reduce the time required to complete the adoption process," by June 30, 2010 and annually thereafter. (Trial Exhibit 337, Mass. Gen. Laws ch. 18C, § 11(d)(19) (2012); *see infra* § VIII.F.1).

a)    <em>Failure to Timely and Appropriately Assign Permanency Goals</em>

966.    DCF fails to timely and appropriately assign and change children's permanency goals. An April 2012 Foster Care Review/Quality Assurance meeting revealed that "[s]taff seem unclear about how to correctly use particular goals in their service planning" and that some staff use the goal of "Permanent Care with Kin . . . as a substitute for the former Long-Term Substitute Care goal." (Trial Exhibit 1040, Email from Renee Zalesky to Paul Fitzsimons, Lian Hogan, and Jaime Caron re: Foster Care Review & QA meeting follow-up, Apr. 6, 2012). In addition, "[s]ome staff/offices are not using the goal of Permanency through Adoption in cases where the child's goal should be adoption because the child is 'not yet ready for adoption'/in a residential placement and to use this goal would negatively affect the Timeliness to Adoption measure." (*Id.*).

967.    DCF is aware of concerns about children with a service plan goal of Permanency with Kin or Another Permanent Planned Living Arrangement ("APPLA"), and specifically, that there "has been use of 'Permanency with Kin' when 'Kin' is the current foster parent . . . [or] Permanency with Kin under the age of 16 to lead to APPLA when the child turns age 16," and that "connections/permanency may not be addressed." (Trial Exhibit 1041, Document re: Adoption Reviews, at DCF011385933). DCF's adoption reviews also raised concerns about DCF's over-utilization of "permanency with kin" and "APPLA" goals. (Contested Exhibit GC, Southeastern Regional Adoption Reviews, Mar. 2011, at DEF000218013; Trial Exhibit 750, Overview, Regional Adoption Reviews, Spring 2011, at DCF007318925).

968.    DCF recognized in its Annual Progress and Services Report for fiscal year 2011 that it needed to improve on the appropriateness of permanency goals assigned to children in its care and set a benchmark to increase the percentage of families with appropriate permanency

goals as determined by foster care reviews. (Trial Exhibit 374, Annual Progress and Services Report, FY2012, June 30, 2011, at DCF007413700).

969.     Mr. Fitzsimons testified that he is aware of cases where permanency planning conferences have deferred a decision on the child's permanency goal.  (Rule 30(b)(6) Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, re: Visitation and Permanency Planning, Sept. 28, 2011, at 184:7-14).  Mr. Fitzsimons further stated that DCF does not provide any report that would track how often that happens.  (*Id.* at 184:15-17).

970.     In its spring 2011 adoption reviews, DCF admitted that there is "a general lack of understanding regarding the impact that the timing of individual casework practice has on the CFSR measures," and that "[i]ncreased training and support is needed."  (Trial Exhibit 358, Department of Children and Families, The Spring 2011 Adoption Reviews, at DCF005474777).  DCF also admitted that it needs to improve on completing child assessments for "children whose goal is changed to adoption, regardless of age or length of time in the foster or pre-adoptive placement." (*Id.*).

971.     DCF acknowledges that it needs to improve its permanency work with families. (Trial Exhibit 350, Email from Mary Gambon to Leo Farley, and Maureen Messeder, et al. re: Permanency Convening Follow Up, Mar. 23, 2011; *see also* Trial Exhibit 751, Western Regional Adoption Reviews).

972.     DCF acknowledges that "[t]ime to goal change" and "[l]ack of monitoring of established/adjusted goals for adoption per region/area office" has caused delays in timeliness to adoption.  (Trial Exhibit 1043, Timeliness to Adoption, Notes from Exercise on Jan. 27, 2012).

973.     Paul Fitzsimons, DCF's Regional Director for the Western Region, testified that concurrent planning positions DCF to meet permanency goals for children more efficiently than exclusively pursuing one permanency plan, but indicated that DCF has no way to track the degree to which concurrent planning is occurring. (Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, Mar. 5, 2012, at 240:9-241:2).

> b)     *Failure to Implement Permanency Policy and to Conduct Timely Permanency Planning Conferences, Six-Week Review and Foster Care Reviews*

974.     DCF identified the need for a permanency planning policy in the spring of 1999.  (Trial Exhibit 343, Policy Status Overview, July 24, 2009, at DCF000211557; *see also* Trial Exhibit 755, Summary of Changes to the Draft Permanency Planning Policy, Nov. 10, 2005-Feb. 1, 2010; Trial Exhibit 1108, DCF Policies under Development or Revision as of 7/2/09, at DCF007310251).

975.     DCF's interim permanency policy was last revised in 1996.  (Trial Exhibit 2, Interim Policy and Procedures for Permanency Planning, Jan. 31, 1996, Case Practice Policy and Procedures Manual, at DCF POL 739-753).

976.    McClain testified that he is "painfully aware" of the fact that DCF has been operating with an interim permanency policy for the better part of a decade. (Trial Tr. May 7, 2013 (McClain), at 25:8-28:20). As of August 15, 2012, that interim policy was still the policy in effect within DCF. (*Id.*).

977.    Although finalizing the permanency policy was set as a priority in November 2010, to be accomplished by September 2011, negotiations with the union regarding ICPM preempted discussions regarding the permanency planning policy.  (Trial Tr. May 7, 2013 (McClain), at 25:8-28:20; *see also* Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 123:19-124:9 (testifying that as of May 2012, DCF was still in negotiations with the union over a new permanency policy that would address barriers to achieving permanency for youth in DCF foster care for long periods of time and that these negotiations have been going on for more than four years)).

978.    DCF's draft permanency policy is not currently binding on DCF employees.  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, re: DCF Programs for Implementing Any and All Provisions of the Fostering Connections to Success and Increasing Adoptions Act, Apr. 24, 2012, at 506:18-20).

979.    Ms. Gambon testified that DCF's failure to implement the new permanency planning policy that has been in draft form for many years has been an obstacle to improving the timeliness of adoptions; among other things, the draft policy accelerates the time frame for a permanency planning conference from eighteen months to nine months and requires a six-week placement review.  (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 82:9-20, 83:8-17, 99:3-100:1, 108:13-24, 109:19-110:11).

980.    According to Ms. Gambon, the permanency policy has been in negotiations for "a very long period of time" and it is her "hope that it will be done in my lifetime." (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 238:18-239:9).

981.    Ms. Gambon testified that as of May 2012, DCF and the union had not reached an agreement on workload standards in relation to the Draft Permanency Policy, preventing its implementation.  (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 99:17-101:23).

982.    According to Ms. Gambon, other than the draft permanency policy (which is not binding on DCF workers) and foster care reviews, she does not know of any regulation or other manner in which DCF ensures that the federal requirements mandated by the Fostering Connections Act are met.  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, re: DCF Programs for Implementing Any and All Provisions of the Fostering Connections to Success and Increasing Adoptions Act, Apr. 24, 2012, at 505:1-507:2).

983.   According to Ms. Roche, DCF began developing an updated permanency planning policy in approximately 1997.  (Rule 30(b)(6) Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, re: Staffing, Caseloads, and Training, Jan. 20, 2012, at 60:19-24).  Ms. Roche testified that DCF has "been in negotiations for a permanency planning policy for a long, long time, and part of the negotiations of the permanency planning policy program was the workload of adoption workers, family resource adoption workers specifically."  (Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 204:13-205:18).

984.   Patricia Scibak, DCF's Regional Counsel for the Western Region and Rule 30(b)(6) designee with respect to permanency planning, testified that because DCF's permanency policy is under negotiation and has not been released, training has not been conducted on the policy as a whole.  (Rule 30(b)(6) Deposition of Patricia Scibak, DCF Regional Counsel for the Western Region, re: Permanency Planning, Aug. 24, 2011, at 11:23-12:16).

985.   As of October 2010, due to "recent budget problems . . . there [was] no one [at DCF] to work on policy-writing except incidental to other over-riding obligations." (Trial Exhibit 576, Email from Leslie Akula to Kim Stevens re: permanency policy, Oct. 19, 2010).

986.   The delay in finalizing the permanency policy has led to delays in permanency planning training.  (Trial Exhibit 358, The Spring 2011 Adoption Reviews, at DCF005474775).

987.   DCF identified implementation of the updated Permanency Planning Policy as a benchmark for one of DCF'S "strategic priorities" for calendar years 2011 and 2012 in a November 18, 2010 PowerPoint presentation, noting that this would "[p]rovide clear guidance to staff" and so "[r]educe barriers."  (Trial Exhibit 1103, Strengthening the Safety Net: DCF's Proactive Agenda, DCF Strategic Priorities, Calendar Years 2011 and 2012, Nov. 18, 2010, at DEF000224510).

988.   In its spring 2011 adoption reviews, DCF admitted that it needed to implement the draft permanency policy and train staff on that policy in order to "improve current case practice and timeliness."  (Trial Exhibit 358, The Spring 2011 Adoption Reviews, at DCF005474777).

989.   According to a permanency workgroup convened by DCF, the Department fails to allocate adequate resources or provide necessary training to its staff to support necessary permanency efforts.  (Trial Exhibit 756, Family Resource and Adoption Coalition a.k.a. Permanency Workgroup, Feb. 16, 2011, at DCF007416932).

990.   Mr. Pillidge testified that policy and practice are inconsistent in some areas, including DCF's permanency policies.  (Deposition of Raymond Pillidge, DCF Regional Director for the Northern Region, Mar. 7, 2012, at 81:13- 83:10).

991.   Mr. Burke testified that DCF's "old" permanency policy does not establish a time frame within which an ADLU worker must be assigned to a particular adoption case file. (Deposition of Raymond Burke, DCF Director of Areas for the Pioneer Valley, Jan. 19, 2012, at 89:19-90:3).

992.     DCF's draft permanency policy provides that permanency planning conferences ("PPCs") are the "[p]rimary vehicle for reviewing clinical and legal issues related to permanency decision-making."  (Trial Exhibit 174, Permanency Planning Policy Draft, Nov. 10, 2005, at  FOIA 00845; *see also id.* at FOIA 00853, FOIA 00870-73; Trial Exhibit 752, Permanency Planning Policy – Section II Draft, Feb. 1, 2010, at DEF000280464-467). According to the draft permanency policy, PPCs must be convened in the following circumstances: as soon as it is determined that the prognosis for reunification is poor; within the first nine months following the date of placement; if the nine-month PPC outcome was not to initiate TPR and the child remained in placement fifteen out of the previous twenty-two months; to change the child's permanency plan; within twenty working days after a foster care review determination that includes a recommendation that the child's permanency plan be changed; or immediately after the court determines that reasonable efforts are not required.  (Trial Exhibit 174, Permanency Planning Policy Draft, DSS Policy No. XXXX-XX, Nov. 10, 2005, at FOIA 00845). According to DCF's interim permanency planning policy, a PPC must only be held "when the Area Office clinical team recommends that a child's plan be changed from return home, or when the clinical team recommends that a child's previously identified permanent plan be changed to return home or to another alternative permanent plan."  (Trial Exhibit 2, Interim Policy and Procedures for Permanency Planning, Jan. 31, 1996, Case Practice Policy and Procedures Manual, at DCF POL 739).  "A Permanency Planning Conference must also be held within twenty working days of a Foster Care Review Unit determination that an alternative permanent plan for the child is required." (*Id.*).

993.     DCF fails to ensure that children have timely permanency planning conferences. DCF fails to aggregate or track on an aggregate level the timeliness of these events and has not set targets in its MOSt reports for improving timeliness of these events.  (*See, e.g.,* Trial Exhibit 954, Monthly Operations Statistical Report, Aug. 2012; *see also* Trial Exhibit 220, Report Schedule).  The data that DCF maintains in its Adoption and Safe Families ("ASFA") Report and its Children in Placement Report is by individual child only and is not aggregated or tracked on an aggregate level. (Trial Exhibit 224, ASFA List, June 1, 2011; Trial Exhibit 222, Children in Placement Report, July 1, 2011).

994.     The Children's Research Center found in its case record review that, of children in the entry cohort who had been in care for at least twelve months, a permanency planning conference had been held for only 62.5%.  (Trial Exhibit 1066, Table 20a, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012). This data was based on a sample size of 120 children for whom this measure was applicable, and the inter-rater reliability for this measure exceeded 80%.  (*Id.*; Trial Exhibit 1069, Table 3, Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC) and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowsky, Oct. 19, 2012, Nov. 19, 2012; *see also supra* ¶ 80).

995.     Ms. Roche testified that the need for permanency planning conferences to take place earlier is a barrier to timely adoption.  (Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 46:8-49:10).

996.    DCF acknowledges that lack of timeliness of PPCs and the lack of planned PPCs has caused delays in timeliness to adoption.  (Trial Exhibit 1043, Timeliness to Adoption, Notes from Exercise on Jan. 27, 2012).

997.    Ms. Gambon testified that one barrier to more timely adoptions is the use of DCF ASFA reports to determine when the goal of adoption should be considered for a child because the child has spent fifteen of the previous twenty-two months in foster care.  (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 80:15-84:22).

998.    In its spring 2011 adoption reviews, DCF acknowledged that it needs to provide more opportunities for interaction between caseworkers and legal staff to exchange information about upcoming court dates and the clinical status of cases, and that it needs to develop strategies for addressing delays in the adoption process due to variations in court practices.  (Trial Exhibit 358, The Spring 2011 Adoption Reviews, at DCF005474777).

999.    DCF has acknowledged deficiencies in its data concerning tracking of children with a goal of adoption.  (Trial Exhibit 753, Email from Debora Sullivan to Paul Fitzsimons, Terry Flynn, Valerie Lovelace-Graham, et al., May 12, 2011, and attached Document re: Adoption and Area Office Adoption User Guide, at DCF009253751).

1000.    DCF policy requires a six-week placement review to be "conducted within 30 working days after all placements."  (Trial Exhibit 2, Service Planning and Referral at a Glance, DSS Policy No. 97-003, June 19, 1997, Case Practice Policy and Procedures Manual, at DCF POL 259).  DCF's draft permanency policy provides that at six-week placement reviews, a child-specific team "reviews information about the child," "gathers needed documents," and discusses the child's needs, "in particular her/his need for safety, well-being, permanence, and continuity of significant relationships."  (Trial Exhibit 174, Permanency Planning Policy Draft, DSS Policy No. XXXX-XX, Nov. 10, 2005, at FOIA-00852).

1001.    According to Ms. Gambon, although six-week reviews are required by both DCF's draft permanency policy and the existing policy, those reviews do not take place in all DCF offices, and she did not remember which offices were doing it or not.  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, re: DCF's Programs for Implementing Any and All Provisions of the Fostering Connections to Success and Increasing Adoptions Act, Apr. 24, 2012, at 497:24-498:13).

1002.    In its spring 2011 adoption reviews, DCF acknowledged that six-week placement reviews were not being held in all offices and needed to be reestablished.  (Trial Exhibit 358, The Spring 2011 Adoption Reviews, at DCF005474778).

1003.    DCF also fails to ensure that foster children have timely foster care reviews.  Massachusetts regulations require DCF to "conduct a FCR within six months after a child is placed out of the home and every six months thereafter for a child who remains out of the home" and to include consideration in the FCR of the following issues:

(a) the necessity and appropriateness of the services to the family; and

(b) a review of the purpose of the service plan; and

(c) a review of the past six months' activities . . . ;

. . . .

(d) a review of the safety of the child and the necessity and appropriateness of the child's continued placement; and

(e) a review of the extent of progress made toward alleviating or mitigating the causes necessitating the child's placement; and

(f) a review of the goal and the projected date by which the child will achieve permanency either through

1. stabilization with his or her parents or guardian;

2. reunification and safely maintaining with his or her parents or guardian;

3. adoption;

4. guardianship by a person other than the Department or its agent;

5. permanently living with Kin; or

6. another permanent planned living arrangement; and

(g) a review of the proposed direction of service planning for the next six months, including:

1. the steps necessary to achieve permanency for the child; and

2. the visitation schedule for the parents and the means by which the schedule will be implemented; and

(h) a review of the child's medical and dental checkups, consistent with the well-child schedule.

(Trial Exhibit 69, 110 Mass. Code Regs. 6.10(1)-(2) (2013)).

1004.   The Children's Research Center found in its case record review that DCF files contained the expected number of foster care reviews in only 58.3% of cases for children in the entry cohort and 70.7% of cases for children in the two-year cohort. (Trial Exhibit 1066, Tables 20b & 47b, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; *see also* Trial Tr., Jan. 30, 2013 (Freitag), at 121:21-122:16). The data for each cohort was based on a sample size of 242 children for whom this measure was applicable, and the inter-rater reliability for this measure exceeded 80%. (Trial Exhibit 1066, Table 47b, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; Trial Exhibit 1069, Table 3, Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC) and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowsky, Oct. 19, 2012, Nov. 19, 2012; *see also supra* ¶ 80). CRC also found that only 11.6% of children in the entry cohort had foster care reviews within the first six months of custody. (Trial Exhibit 1066, Table 20a, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012). This data was based on a sample size of 242 children for whom this measure was applicable, and the inter-rater reliability for this measure exceeded

80%. (*Id.*; Trial Exhibit 1069, Table 3, Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC) and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowsky, Oct. 19, 2012, Nov. 19, 2012; *see also supra* ¶ 80).

1005.   Massachusetts law requires the submission of an annual report on the foster care review system:

> The director of the unit shall submit an annual report to the governor, the child advocate and the joint committee on children, families and persons with disabilities on the performance of the unit. The report shall contain: an analysis and evaluation of the foster care review system and recommendations, if any, for its improvement; the total number of children in the care of the department or its agents during the previous fiscal year; the number of children who were in its care for more than 6 months; the number of reviews conducted; the number of children returned to their parents or guardian; the number of children for whom guardians, other than the department or its agent, were appointed; the number of children released for adoption; and the number of children adopted.

(Trial Exhibit 319, Mass. Gen. Laws ch. 18B, § 6A (2008)).
DCF has failed to submit this report during the past five years. (Contested Exhibit PA, Email from Robert Higgins to Rachel Brodin Nili et al., Jan. 14, 2013, p. 2; *see also* Deposition of Virginia Peel, DCF General Counsel, Feb. 8, 2012, at 62:2-19).

### c)    *Assignment of Adoption Workers*

1006.   DCF fails to timely assign children to an adoption worker and implement adoption plans. DCF's draft permanency policy sets a timeframe of five days for the adoption social worker to assume responsibility for the child's case. (Trial Exhibit 174, Permanency Planning Policy Draft, DSS Policy No. XXXX-XX, Nov. 10, 2005, at FOIA-00846, FOIA-879-88). The adoption worker assigned is responsible for the subsequent case management responsibility for the child, including conducting "a thorough assessment of the child's current and projected needs" and "identifying the prospective adoptive family resource which best meets the child's . . . needs." (Trial Exhibit 2, Interim Policy and Procedures for Permanency Planning, Case Practice Policy and Procedures Manual, Jan. 31, 1996, at DCF POL 748-49).

1007.   In its Monthly Operations Statistical Report, DCF reports on the average time to adoption worker assignment, for which it has set a target of 5.0 days. (*See, e.g.*, Trial Exhibit 954, Monthly Operations Statistical Report, Aug. 2012, p. 1 at Measure: Adoption Worker Assignment). DCF consistently fails to assign adoption workers to children within five days after a child's goal has changed and nearly always takes substantially longer than that. According to the August 2012 MOSt Report, the statewide average for assignment of adoption workers was 19.7 days for the state fiscal year to date. (*Id.*). The range across area

offices for adoption worker assignment was 1 to 97.0 days.  (*Id.*).  The average time to adoption worker assignment for state fiscal year 2011 was 52.5 days.  (Trial Exhibit 954, Monthly Operations Statistics Report, June 2011, p. 1 at Measure: Adoption Worker Assignment).  Based on the most recent two years of MOSt reports produced by Defendants to date, DCF's statewide average has not reached the target of five days and has ranged as high as 75.7 days (as reported in the February 2011 MOSt Report).  (Trial Exhibit 954, All Monthly Operations Statistical Reports, June 2010 to May 2012).

1008.  Timely assignment of cases to an adoption worker after the goal has been changed to adoption at a permanency planning conference is a barrier to more timely adoptions.  (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 67:3-68:15, 80:15-81:7, 84:17-22).

1009.  Ms. Roche testified that, in one region, the adoption worker is assigned at the permanency planning conference by ensuring that a manager is at the conference with a computer having access to FamilyNet, enabling an immediate decision on, and assignment of, the adoption worker.  There is "[n]o obstacle whatsoever" to implementing this practice across all DCF offices, but it was not required immediately because "the offices were allowed to develop their own practices."  Ms. Roche was "wait[ing] to hear" if other offices decided to implement this practice and did not "specifically" require it to be implemented; the only deadline provided to offices is one for "improving" on the time to adoption worker assignment.  (Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 148:15-151:13).

1010.  DCF acknowledged in its spring 2011 adoption reviews that it fails to timely assign children to adoption workers.  (Trial Exhibit 358, The Spring 2011 Adoption Reviews, at DCF005474781-815; *see also* Trial Exhibit 751, Western Regional Adoption Reviews, at DCF007319316).

1011.  Ms. Gambon testified that she has not yet received a report with the results of the focus on assignment of children to adoption workers during DCF's 2011 adoption review process.  (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 67:3-68:15, 80:15-81:7, 84:17-22).

1012.  Paul Fitzsimons, DCF's Regional Director for the Western Region, testified that it is important that DCF performs administrative tasks such as the assignment of an adoption worker or assignment of a social worker in a given phase of a case on a timely basis.  (Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, Mar. 5, 2012, at 142:11-17).

1013.  DCF acknowledges that delays in case assignment to adoption workers have caused delays in timeliness to adoption.  (Trial Exhibit 1043, Timeliness to Adoption, Notes from Exercise on Jan. 27, 2012).

1014.  Ms. Roche testified that making sure an adoption caseworker is assigned within five days of a child's goal changing to adoption is a barrier to timely adoption.  (Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 46:8-47:7).

1015.  Ms. Mackin testified that she had been present in February 2012 for a discussion within DCF management regarding the length of time taken to assign an adoption worker after the child's goal has been changed to adoption, and specifically why DCF was not meeting the target of five days set in the MOSt Report.  The discussion included Commissioner McClain, Deputy Commissioners Jan Nisenbaum and Olga Roche, Assistant Commissioner Mary Gambon, and others.  (Deposition of Patricia Mackin, DCF Chief of Staff, Mar. 1, 2012, at 64:22-67:2).  Reasons for DCF's failure to meet the target included availability within worker caseloads and supervisor delays in assigning.  Ms. Mackin testified that strategies had not yet been developed for addressing these issues.  (*Id.* at 67:3-20).  Speaking for herself, Ms. Mackin testified that DCF must do better on this measure and agreed that tardiness in assigning an adoption worker leads to less timely finalized adoptions.  (*Id.* at 68:23-69:6).

1016.  Mr. Fitzsimons testified that DCF's success is "mixed" regarding DCF's requirement and policy that an adoption worker must be assigned to a child within five days of a permanency planning conference where the goal is changed to adoption.  (Rule 30(b)(6) Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, re: Visitation and Permanency Planning, Sept. 28, 2011, at 195:22-196:5).  Mr. Fitzsimons further testified that "[i]n some place[s] it's very good and in other places it's not as good."  (*Id.* at 196:5-6).

1017.  Paul Fitzsimons, DCF's Regional Director for the Western Region, testified that the Western Region has a target of 5.0 days for adoption worker assignment, and acknowledged that, as captured by the MOSt report, the average time for adoption worker assignment in the Western Region is 42.4 days.  (Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, Mar. 5, 2012, at 141:13-143:20).  He further testified that factors contributing to the delays in assignment include DCF's failure to timely complete and follow up on the assignment process.  (*Id.* at 144:1-144:8).

1018.  Mr. Fitzsimons testified that DCF is not doing anything specific to improve performance on the timing of adoption worker assignment other than "the reminder that it is something that should be a goal for each office to address."  (Rule 30(b)(6) Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, re: Visitation and Permanency Planning, Sept. 28, 2011, at 199:8-13).

1019.  Mr. Fitzsimons testified that he is not aware of any analysis within DCF as to why performance on the median time for an adoption to be completed has deteriorated in Massachusetts since 2008.  (Rule 30(b)(6) Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, re: Visitation and Permanency Planning, Sept. 28, 2011, at 219:9-17, 220:1-4).

1020.  Mr. Fitzsimons testified that he was not aware of any report capturing the amount of time it takes DCF to complete child assessments when a child's goal is changed to adoption. (Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, Mar. 5, 2012, at 226:2-5, 224:24-225:11).

1021.  According to Ms. Gambon, the biggest barrier to timeliness of adoption for DCF is referral to an adoption worker.  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant

Commissioner for Adoption, Foster Care, and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 268:9-269:12).

1022.  Ms. Gambon testified that for fiscal year 2011, the average amount of time to assign an adoption worker was 52.5 days, which was more than ten times the target established by the state.  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 271:7-24; *see also* Trial Exhibit 197, Excerpt of Monthly Operations Statistical Report, June 2011, p. 1).

1023.  Ms. Gambon testified that barriers to getting an adoption or child case file to an adoption worker include additional information needing to be provided prior to the assignment at the time of the permanency planning conference and people wanting to have a "child adoption assessment completed prior to the assignment."  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 272:1-19).

1024.  Terrence Flynn, DCF's Regional Director for the Southern Region, testified that failure to comply with the five-day requirement for assigning an adoption worker (including one case of 993 days for assignment of an adoption worker) stemmed from staff not "following what they've been directed to do" and that managers have "lacked sufficient focus" in assuring timely assignment.  (Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, Jan. 26, 2012, at 220:3-221:10).

1025.  Terrence Flynn, DCF's Regional Director for the Southern Region, testified that the barriers to timely assignment of adoption workers are "all within our control" and that "we need to make sure this happens."  (Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, Jan. 26, 2012, at 223:18-225:8).

1026.  Mr. Collins testified that the rates of timely adoption worker assignment in both Greenfield and Holyoke were unacceptable.  (Deposition of Joseph Collins, DCF Director of Areas for Franklin and Hampshire, Jan. 25, 2012, at 185:18-186:1).

1027.  Even though the year to date averages of the Greenfield and Holyoke offices for this indicator were 64.2 and 38.3 days, respectively, Mr. Collins testified that he found DCF's target of five days between a permanency goal change and the assignment of an adoption worker to be realistic.  (Deposition of Joseph Collins, DCF Area Director for Franklin and Hampshire, Jan. 25, 2012, at 188:2-11).  Mr. Collins further stated that in many offices adoption worker assignment occurs in less than five days, so "why can't it be that way in Greenfield and Holyoke?"  (*Id.* at 188:4-8).

d)    *Recruitment and Approval of Adoptive Parents*

1028.  DCF fails to effectively recruit and timely approve adoptive parents.  DCF admitted in its Strategic Recruitment Plan for fiscal year 2011-2012 that it needs to improve child-specific adoption recruitment for older children, sibling groups, and children with special needs.  (Trial Exhibit 202, Strategic Recruitment Plan FY 2011-2012, at DCF000666733).  DCF set

a goal of ensuring that adequate quality resources are available for foster care and adoption. (*Id.* at DCF000666736).

1029.   DCF acknowledged in its Draft Recruitment Plan for fiscal year 2012 a need to increase the staff that it has statewide to carry out recruitment and retention efforts. (Trial Exhibit 203, Draft Recruitment Plan FY' 2012, p. 1). In its recruitment plan, DCF set a number of action steps, including: the designation of staff to conduct recruitment activities; the development of a regional recruitment plan by each region to be given to the Central Office Recruitment Unit by August 31 of each year; the development of "performance measures with regional recruitment staff to ensure progress in recruitment and retention efforts"; and the evaluation and establishment of data on the need for foster and adoptive parents in certain zip codes and an enhancement of "recruitment efforts to meet those needs." (*Id.* at 1-2). DCF also set recruitment strategies including to "[d]evelop and implement specialized recruitment projects to find families who will foster and adopt children with disabilities, minority children, children with developmental delays, sibling groups, older children and children who are in institutions and would benefit from a family setting"; to "[u]se current demographic information on children and families to establish recruitment targets and track progress"; to "[a]ssure children are matched with appropriate waiting adoptive families across the state"; to "[c]oncentrate recruitment activities in identified communities to facilitate placement with licensed families"; to "[a]ssure consistent and accurate information and services are provided to the public regarding foster care and adoption"; and to "[e]stablish statewide standards regarding the coordination [of] efforts with and between recruitment staff." (*Id.* at 2-4, 6).

1030.   In its fiscal year 2012 Statewide Recruitment Plan, DCF set strategies and action steps, including maintaining a "pool of foster and adoptive families who are capable of promoting each child's development and permanent needs" and developing a comprehensive recruitment plan that includes, *inter alia*, a "description of the characteristics of waiting children" and "[s]pecific strategies to reach all parts of the community" through both targeted, child-specific, and general recruitment campaigns. (Trial Exhibit 204, Department of Children and Families (DCF) FY' 2012 Statewide Recruitment Plan, pp. 1-3; Trial Exhibit 374, Annual Progress and Services Report, FY2012, June 30, 2011, at DCF007413708-10).

1031.   DCF has failed to implement the action steps in its recruitment plans and to effectively recruit and timely approve new homes. The Department has also failed to delegate sufficient staffing to recruitment efforts. Plaintiffs incorporate herein *supra* ¶¶ 626-42.

1032.   DCF acknowledges that it needs to improve its recruitment and retention of adoptive families, that it should provide "training to residential program providers on permanency and the adoption process so that staff can work with children" to find potential adoptive homes, and that it should improve its development of "targeted and smaller adoption parties" for certain populations of children. (Trial Exhibit 750, Overview: Regional Adoption Reviews, Spring, 2011, at DCF007318924).

1033.   DCF acknowledges that "resource issues" have led to delays in timeliness to adoption and that, with respect to recruitment efforts, "supply does not meet demand" and that DCF

"need[s] child specific recruitment efforts." (Trial Exhibit 1043, Timeliness to Adoption, Notes from Exercise on Jan. 27, 2012).

1034.   Massachusetts law and regulations require child-placing agencies such as DCF to register any child whose goal is adoption with the Massachusetts Adoption Resource Exchange ("MARE") within sixty days. Mass. Gen. Laws ch. 15D, § 14 (2008). (Trial Exhibit 847, 102 Mass. Code Regs. 5.08(8)).

1035.   DCF's spring 2011 adoption reviews found that only 48% of the 431 children in DCF custody in need of an adoptive match had been referred to MARE for listing. (Trial Exhibit 358, The Spring 2011 Adoption Reviews, at DCF005474776).

1036.   According to Ms. Gambon, the statewide practice in terms of timely listing children on MARE is "less then optimal" and that the standard of listing children who have a goal of adoption and have not been matched in thirty or sixty days is not met. (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 279:22-280:5).

1037.   Ms. Gambon testified that part of the challenge in meeting the timetable for listing a child on MARE could be the length of time it is taking on average to get an adoption worker assigned to a child. (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 281:5-19).

1038.   Mr. Burke testified that he does not know whether or not the Van Wart and Springfield offices fully utilize MARE services for children with the goal of adoption, other than asking supervisor Jamie Caron, "How are things going when your staff comes out?" (Deposition of Raymond Burke, DCF Area Director for the Pioneer Valley, Jan. 19, 2012, at 254:21-255:7).

1039.   Adoption focus groups conducted by MARE in 2010 reflected that DCF's recruitment of adoptive families suffers from several deficiencies, including poor communication, limited training opportunities, and a lack of information to adoptive parents about a child's needs and history. (Contested Exhibit GD, Adoption Focus Groups: Reports and Recommendations, June 25, 2010; Contested Exhibit GE, Adoption Focus Groups: Reports and Recommendations, June 30, 2010).

1040.   Mr. Pillidge testified that system-related barriers to improved performance in terms of timely adoptions include "uneven understanding of the processes that are required to move a child through the adoption part of the system related in part to all the management changes we're had over the last few years" and failure to routinely refer "a child to the recruitment unit or to the Massachusetts Adoption Resource Exchange." (Deposition of Raymond Pillidge, DCF Regional Director for the Northern Region, Mar. 7, 2012, at 165:9-167:17).

1041.   Policy recommendations have been made to DCF by stakeholders surveyed, including adoptive parents, social workers, and advocates, in order to strengthen its efforts to "recruit and support adoptive families for older children and youth." (Trial Exhibit 484,

Memorandum from Emily Blair to Marylou Sudders and Nancy Scannell re: Summary of Survey Data/Policy Paper update, Aug. 22, 2008, pp. 1, 6).

1042.    DCF has acknowledged that it has historically "had difficulty creating a sense of shared responsibility for recruitment between Area Offices and recruitment units" and that its "[r]eferrals of children without an identified placement to recruitment units and MARE" has remained low.  (Trial Exhibit 757, Documents re: Adoption Development Unit, at DCF008905075).

1043.    DCF fails to provide each child with a child-specific recruitment plan that documents the steps DCF is taking to find an adoptive family.  (*See* Trial Exhibit 174, Permanency Planning Policy Draft, DSS Policy No. XXXX-XX, Nov. 10, 2005, at FOIA-00882; Rule 30(b)(6) Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, re: Visitation and Permanency Planning, Sept. 28, 2011, at 251:23-253:14).

1044.    DCF acknowledges that "[l]ack of timely matching" has caused delays in timeliness to adoption.  (Trial Exhibit 1043, Timeliness to Adoption, Notes from Exercise on Jan. 27, 2012).

1045.    In an email from Raymond Pillidge to Olga Roche dated September 10, 2009, Mr. Pillidge admitted that there was "much room for improvement" in referral rates to the Adoption Development and Licensing Unit ("ADLU") and that there were "big gaps in policy adherence around timeframes." (Trial Exhibit 754, Email from Raymond Pillidge to Olga Roche, Sept. 10, 2009, at DCF008905047).  He further stated that DCF had "a whole population of children and youth that are at risk in our system of falling through the cracks and not achieving permanency or lifelong connections" and that in focusing on issues of immediate danger, "focus is taken off the more insidious long term risk to these youth." (*Id.* at DCF008905047-49).

1046.    In its spring 2011 adoption reviews, DCF admitted that it needs to improve on "[p]roviding training to residential program providers on permanency and the adoption process so that staff can work with the children and youth it serves to identify relatives, kin and significant adults in their lives." (Trial Exhibit 358, The Spring 2011 Adoption Reviews, at DCF005474777).  DCF also admitted that it needs to increase "targeted and smaller adoption parties aimed at multiple medical issues/medically complex children and youth; siblings; and children and youth in group/residential care." (*Id.*).  Reviewers also listed as opportunities for improvement: "[t]argeted recruitment for children requiring specialized adoptive parents," "expanding searches through AdoptUSKids," and increasing referrals to the Adolescent Development Licensing Unit ("ADLU") and MARE. (*Id.* at DCF005474784, DCF005474798-99).

1047.    December 2011 adoption reviews revealed that DCF needs to improve "[t]raining to residential program providers on permanency and the adoption process so that staff can support the work." (Trial Exhibit 1041, Document re: Adoption Reviews, at DCF011385931).  The December 2011 adoption reviews also revealed that DCF needs to improve its recruitment of adoptive families.  (*Id.* at DCF011385932).

1048.  DCF acknowledged that, as of spring of 2011, there were 2405 children with a goal of adoption in DCF custody and 36% of those children still needed to be matched with adoptive families.  (Trial Exhibit 358, The Spring 2011 Adoption Reviews, at DCF005474775-76). The largest group of waiting children were placed in intensive foster care (44%).  (*Id.* at DCF005474776).

1049.  Through state fiscal years 2011 and 2012, approximately one fifth of children in DCF custody who were legally freed for adoption had not been matched with a permanent family. (Trial Exhibit 955, DCF Quarterly Report: Fiscal Year 2012 4th Quarter, p. 40; Trial Exhibit 955, DCF Quarterly Report: Fiscal Year 2012 3rd Quarter, p. 40; Trial Exhibit 955, DCF Quarterly Report: Fiscal Year 2012 2nd Quarter, p. 40; Trial Exhibit 955, DCF Quarterly Report: Fiscal Year 2012 1st Quarter, p. 40; Trial Exhibit 414, Figure 18: Consumers in Placement With a Goal of Adoption Figures: Legal Status and Match Status, Fiscal Year 2011 1st through 4th Quarters).

1050.  The field in FamilyNet indicating that a child has been matched with an adoptive family is checked when the child's social worker believes that such a family has been identified, and the finalization of that adoption is therefore still uncertain.  (Deposition of Rosalind Walter, DCF Director of Data Management, Jan. 4, 2012, at 126:23-127:23, 138:19-139:14).

1051.  Ms. Gambon testified that workers indicate that a child is "matched" for adoption in FamilyNet when a family "has indicated an interest and willingness to adopt" the child, whether in writing or orally.  (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 87:4-88:12).  DCF does not have any aggregate data indicating with what frequency children marked "matched" in FamilyNet are actually adopted by the family they have been matched with.  (*Id.* at 89:16-90:7).

1052.  According to DCF's Implementation Plan for the Fostering Connections to Success and Increasing Adoptions Act dated August 2011, as of that month DCF had not implemented the adoption incentives program section (section 401) of the Fostering Connections to Success and Increasing Adoptions Act, which "[e]nhances incentives to promote the adoption of children from foster care," or the section that promotes adoption of children with special needs (section 402).  (Trial Exhibit 196, Implementation Plan for the Fostering Connections to Success and Increasing Adoptions Act, pp. 8-9).

1053.  Mr. Fitzsimons testified that "it's always a challenge recruiting appropriate and willing folks" to become adoptive parents.  (Rule 30(b)(6) Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, re: Visitation and Permanency Planning, Sept. 28, 2011, at 220:5-13).  Mr. Fitzsimons further stated that he expected staff to discuss adoption with existing foster parents, but he was "more concerned about the process that says are we adequately having the conversation and assessing them, and sometimes they are and sometimes they are not."  (*Id.* at 220:20-221:12).

1054.  Paul Fitzsimons, DCF's Regional Director for the Western Region, indicated that areas within the Western Region that are large in geographic scope and have an accordingly large volume of children in their purview may have "less success" locating adoptive resources.

(Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, Mar. 5, 2012, at 236:5-17).

1055.  Terrence Flynn, DCF's Regional Director for the Southern Region, testified that, due to the differences between foster care and adoption, it is a "necessity" to complete a child adoption assessment and adoption home study, and that failure to do so "probably happens more than I'm comfortable with" even though "once is too much."  (Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, Jan. 26, 2012, at 241:13-243:14, 245:19-246:10).

1056.  A DCF document discussing siblings in placement noted that even though "the State's regulations required the placement of all siblings in one adoptive resource, the reality is that very few adoptive resources are available to take in a large sibling group."  (Trial Exhibit 1039, Document re: WAO Siblings in Placements, at DCF011069834).

e)  *Finalization of Adoptions*

1057.  DCF fails to timely finalize adoptions. Federal data reflects that after children are legally free for adoption, they wait too long before they are discharged to finalized adoptions. Of all children who became legally free for adoption in the twelve-month period prior to federal fiscal year 2010, only 45.6 percent were discharged from foster care to a finalized adoption in less than twelve months from the date of becoming legally free, ranking Massachusetts as 40th in the country on this measure. (Trial Exhibit 171, Massachusetts Child and Family Services Review Data Profile, Dec. 6, 2010, at DCF003187389 (Measure C2.5); Contested Exhibit SB, Summaries of state-by-state performance data and rankings from Child Welfare Outcomes 2007-2010: Report to Congress, Prepared by Elissa Glucksman, p. 12). In federal fiscal year 2011, DCF's ranking fell to 49th, with a score of 38.7%.  (Trial Exhibit 1085, Summaries of state-by-state performance data and rankings from Child Welfare Outcomes 2008-2011, Prepared by Elissa Glucksman, p. 13).

1058.  According to data released by the United States Department of Health and Human Services Administration for Children and Families, for federal fiscal year 2010, the mean number of months from termination of parental rights to adoption finalization in Massachusetts was 15.9 and the median was 11.3. (Trial Exhibit 580, Time between Termination of Parental Rights (TPR) and Adoption Finalization: Oct. 1, 2009 to Sept. 30, 2010 (FY 2010), p. 2; *see also* Trial Exhibit 581, Time Between TPR and Finalization Oct. 1, 2005 to Sept. 30, 2006, at P_022282).

1059.  The percentage of children in DCF custody who are ultimately adopted out of the number of children whose parental rights have been terminated has consistently been low.  In federal fiscal year 2007, 794 children were adopted out of 2867 total waiting children (1536 of whom had parental rights terminated); in federal fiscal year 2008, 712 children were adopted out of 2840 total waiting children (1,606 of whom had parental rights terminated); in federal fiscal year 2009, 790 children were adopted out of 2834 total waiting children (1503 of whom had parental rights terminated); and in federal fiscal year 2010, 721 children were adopted out of 2744 total waiting children (1479 of whom had parental rights terminated). (Trial Exhibit 411, U.S. Department of Health and Human Services, Administration for

Children and Families, Children's Bureau, Excerpt from Massachusetts Context and Outcomes Data, 2007-2010, p. 3; *see also* Trial Exhibit 171, Massachusetts Child and Family Services Review Data Profile: Dec. 6, 2010, at DCF003187387).

1060.  Ms. Gambon testified that a barrier to more timely adoptions is the amount of urgency accorded legalization of an adoption once a child is matched to an adoptive family. (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 80:15-81:7, 85:4-19).

1061.  In its spring 2011 adoption reviews, DCF admitted that it needs to "[a]ggressively manag[e] the process from PPC to transfer to Subsidy" and that the "milestones of assignments and closures would benefit from further focus." (Trial Exhibit 358, The Spring 2011 Adoption Reviews, at DCF005474777).  Reviewers also recommended that DCF "[t]ighten timeframes so finalizations happen sooner." (*Id.* at DCF005474781).

1062.  Mr. Pillidge testified that "in some of [his] sites there's a very long time from home removal episode to finalizing adoption." (Deposition of Raymond Pillidge, DCF Regional Director for the Northern Region, Mar. 7, 2012, at 47:19-48:11).

1063.  Ms. Gambon testified that she did not know why, when the number of children freed for adoption increased from 2007 to 2010, the number of children actually adopted declined. (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 74:6-77:12).

1064.  Ms. Gambon testified that DCF has never analyzed the rate at which children adopted from DCF care have returned to DCF care through a longitudinal analysis of a cohort. (*Id.* at 251:12-252:21).

        f)    *Other Barriers to Adoption*

1065.  DCF acknowledges a lack of urgency in DCF adoption casework that has, in at least one case, resulted in children in foster care losing opportunities to be adopted. (Contested Exhibit OY, Email from Kelly Prendergast to Marilyn Crowley, Deborah Deso-Davenport, and Donna Jerszyk-Hollis re: follow up to your phone call re: MA adoption process, Nov. 17, 2011).

1066.  At an April 2012 Foster Care Review/Quality Assurance meeting, DCF's Director of Adoption Support Leo Farley stated that ADLU workers were "not consistently being assigned as secondary workers to children for whom recruitment is needed." (Trial Exhibit 1040, Email from Renee Zalesky to Paul Fitzsimons, Lian Hogan, Jamie Drain, et al. re: Foster Care Review & QA meeting follow-up, Apr. 6, 2012).

1067.  Terrence Flynn, DCF's Regional Director for the Southern Region, testified that "no clear practice guidelines" exist regarding whether the ADLU worker or the adoption worker should perform the home study on a pre-adoptive home, even though it would "[a]bsolutely" be beneficial to have clear practice guidelines on that issue. (Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, Jan. 26, 2012, at 240:15-241:12).

1068.  Many children who are available for adoption are stuck in care, and are not moving quickly to a permanent family, due to departmental inefficiency and loss of focus.  (Trial Tr., Mar. 1, 2013 (Crabtree), at 50:19-51:19; *see generally id.* at 39:18-51:19).

1069.  The Massachusetts Office of the Child Advocate has reported that callers on its helpline have "expressed concerns about delays or failures in achieving permanency for children and youth in Massachusetts."  (Trial Exhibit 339, Office of the Child Advocate Annual Report, Fiscal Year 2011, p. 10).

1070.  DCF routinely requires its adoption caseworkers to handle excessive caseloads.  (*See supra* ¶¶ 1509-14).

### C.    Aging Out

#### 1.    Professional Standards

1071.  Under the federal Fostering Connections to Success and Increasing Adoptions Act of 2008:

> [D]uring the 90-day period immediately prior to the date on which the child will attain 18 years of age . . . a caseworker on the staff of the State agency, and, as appropriate, other representatives of the child provide the child with assistance and support in developing a transition plan that is personalized at the direction of the child, includes specific options on housing, health insurance, education, local opportunities for mentors and continuing support services, and work force supports and employment services . . . .

(Trial Exhibit 476, 42 U.S.C.A. § 675(5)(H) (2011)).

1072.  DCF policy provides that "[i]t is critical that youth served by [DCF] be systematically and comprehensively prepared for independent living to enable them to function as productive members of society."  (Trial Exhibit 2, Assessment Policy Appendix B: Standards for Independent Living Services, DSS Policy No. 85-011, Feb. 13, 1995, Case Practice Policy and Procedures Manual, at DCF POL 201).  DCF policy further provides that "[s]ervices that relate to the provision of a program of life skills training and other activities to develop independent living skills for adolescents shall be based on a consistent and coordinated approach among [DCF] staff, foster parents, and provider program personnel toward the development of independent living skill areas."  (*Id.*).

1073.  DCF policy requires that all youth age fourteen and older served by DCF, "with the exception of youth who are severely developmentally delayed with a discharge objective of return to parent/relative or discharge to adult custodial care," receive the following independent living services: the Preparing Adolescents for Young Adulthood curriculum, an independent living skills initial assessment within 20 working days of placement, independent living skills reassessment, 90 day notice and independent living discharge/case

closing plan, and appropriate and stable housing. (*Id.* at DCF POL 201-202). Specifically, DCF policy provides that:

> It is the responsibility of the Department, with assistance from the substitute care providers, to ensure that all youth discharged from substitute care shall have an appropriate and stable . . . living arrangement available to them upon discharge. IN NO CASE MAY YOUTH BE PLACED IN INAPPROPRIATE HOUSING. If appropriate housing cannot be found, the youth should not be discharged.

(*Id.* at DCF POL 202).

1074.  The Council on Accreditation standards provide, with regard to "Youth Independent Living Services," that the youth and worker develop a service plan that contains "clearly stated preliminary goals and services that will advance him or her toward opportunities and self-sufficiency." This plan is to be based on a "systemic assessment" of several factors including "the number and kind of family connections, and relationships with other responsible adults; life skills; educational status . . . ; housing; physical health and medical health care needs; and emotional and social development." (Contested Exhibit RY, Council on Accreditation, Youth and Independent Living Services, 2008, §§ PA-YIL 5-5.01).

1075.  The Child Welfare League of America standards provide that "[t]he agency should conduct a case review to develop the final plans for the youth transitioning out of the system six months before discharge of the youth. The case review session should be used to determine if the young person is properly prepared for living on his or her own." These standards further provide that the transition plan should address the youth's housing, educational, employment, financial, and health needs and identify adults who can provide a "support network." (Contested Exhibit RE, Child Welfare League of America Standards of Excellence for Transition, Independent Living, and Self-Sufficiency Services, 2005, § 4.66).

## 2.  Aging Out of Foster Care Without a Permanent Family Causes Harm and Risk of Harm to Children

1076.  DCF acknowledges the importance of "identifying, establishing, and sustaining lifelong familial commitments and connections for [young adults in its custody] that are expected to be a source of enduring support." (Trial Exhibit 33, Massachusetts Child and Family Services Review Program Improvement Plan, Oct. 5, 2009, p. 19; Trial Exhibit 94, Child and Family Services Plan FY2010-FY2014, at DCF007054452).

1077.  DCF recognizes that "[e]ducational achievement and life skill mastery without permanent connections to family and/or other caring enduring relationships with adults is not sufficient to sustain youth well into adulthood." (Trial Exhibit 94, Child and Family Services Plan FY2010-FY2014, at DCF007054605).

1078.  As recognized by the Massachusetts Office of the Child Advocate, "[c]hildren need permanent homes where they can be safe, stable, and nurtured as they grow," and the "connection of a permanent home and a caring adult supports healthy growth and development as youth transition into adulthood."  (Trial Exhibit 339, Office of the Child Advocate, Annual Report for Fiscal Year 2011, p. 10).

1079.  A December 2010 draft of EOHHS initiatives for the 2012 fiscal year reads:

> [Youth] transitioning into adulthood need nurturing relationships, a stable place to live and encouragement to continue their education or develop skills to become contributing members of the community.  Many of these youth are completing their high school education at the time they turn 18, and will need to leave their foster home or placement at a critical time in their life.  There are long term ramifications to these individuals when there is no one there to support them at this difficult time in any young adult's life.  This also goes against the intent of the 2008 Act to Protect Children in the Care of the Commonwealth, the Federal Fostering Connections Act, and language in the fiscal year 2011 supplemental budget regarding aging out youth. . . . We cannot abandon these young adults at such a crucial stage in their lives.

(Trial Exhibit 583, Draft EOHHS FY12 "Major" Initiative Templates with Additional Implementation Detail, Dec. 2010, EOHHS000073106).

1080.  In 2007, a study was published by the Boston University School of Social Work in response to a Request for Proposals issued by the Massachusetts Task Force on Youth Aging out of Department of Social Services Care, of which DCF is a member.  (Contested Exhibit EN, Mary Elizabeth Collins, Cassandra Clay, and Rolanda Ward, Leaving Care in Massachusetts: Policy and Supports to Facilitate the Transition to Adulthood, Nov. 2007). The goal of the study was to produce data for use in developing strategies to assist youth aging out of foster care with success in adulthood.  (*Id.* at P_017565).  The study reported statistical data on 812 youth who turned 18 in 2005, surveys, and interviews with former foster youth and stakeholders.  (*Id.*).  The following outcomes were reported for the 812 youth surveyed: only 46% were currently employed; less than half reported excellent or good emotional health; 37% experienced perceived homelessness since age 18; 43% had been pregnant or gotten someone else pregnant; and 30% reported being threatened or injured with a weapon in the previous 12 months.  (*Id.* at P_017566-67).  Stakeholders identified problems with the system including a lack of existing opportunities for this population (especially housing) and a lack of accountability for poor outcomes for youth aging out of foster care.  (*Id.* at P_017567-68).  The study made the following conclusions: 1) Concrete assistance with employment and housing was warranted, 2) Parenting youth need more independent living housing and day care options, and 3) Youth aging out of DCF foster care are vulnerable to violence and victimization.  (*Id.* at P_017568-72).

1081.  In June 2008, the Boston Foundation published a report of the Massachusetts Task Force on Youth Aging out of DCF Care, titled "Preparing Our Kids for Education, Work and Life:

Report of the Task Force on Youth Aging Out of DSS Care." (Contested Exhibit EP, Preparing Our Kids for Education, Work and Life: A Report on the Task Force on Youth Aging out of DSS Care, June 2008). The report identified "System-Oriented Challenges" including a lack of inter-agency collaboration that allowed youth to "fall through the cracks," and a "lack of opportunities and options, especially housing." The report identified "Individual-Oriented Challenges" including a lack of "unpaid, caring adult relationships" and the lack of knowledge of basic life skills. (*Id.* at DCF001005369).

1082.  The Boston Foundation's study found that children who "age out" of foster care face heightened risks of harm; they are more likely to experience homelessness, unemployment and incarceration. (Contested Exhibit EP, Boston Foundation, Preparing Our Kids for Education, Work and Life: A Report of the Task Force on Youth Aging Out of DSS Care, June 2008, at DCF001005362).

### 3. DCF Performance

1083.  DCF fails to achieve permanency for numerous children who languish for years in foster care. According to the most recent DCF Quarterly Reports available, approximately one-quarter to one-third of children under the age of 18 have been in continuous care for more than two years. (Trial Exhibit 955, DCF Quarterly Report for First Quarter Fiscal Year 2012, p. 33, Table 13C; Trial Exhibit 955, DCF Quarterly Report for Second Quarter Fiscal Year 2012, p. 33, Table 13C; Trial Exhibit 955, DCF Quarterly Report for Third Quarter Fiscal Year 2011, p. 33, Table 13C; Trial Exhibit 955, DCF Quarterly Report for Fourth Quarter Fiscal Year 2012, p. 33, Table 13C). This number has fluctuated and has, in some years, exceeded the percentage permitted under 110 Mass. Code Regs. 7.101(9). (*See supra* ¶ 896). According to the Massachusetts Department of Children and Families Annual Profile for fiscal year 2010, 1064 children under the age of 18 (14%) were in continuous placement for more than four years, and over 2600 children (34%) were in continuous placement for more than two years. (Trial Exhibit 578, Massachusetts Department of Children and Families Annual Profile, at DCF005889693).

1084.  As of the fourth quarter of fiscal year 2012, 1409 children under the age of eighteen in DCF foster care had been in custody for two to four years, and another 987 children had been in custody for over four years, including 277 children under the age of twelve. Thus, a total of 2396 children had been in foster care two years or more. (Trial Exhibit 955, DCF Quarterly Report for 4th Quarter Fiscal Year 2012, p. 33, Table 13C).

1085.  In fiscal year 2010, 1064 children were in placement for over six years. (Trial Exhibit 983, Essex County Community Foundation, 2012 Youth at Risk Conference, Education Stability & Transition Services for DCF Youth, at DCF011396224).

1086.  The Children's Bureau measures states' performance with respect to achieving permanency for children in foster care for long periods of time through three measures: C3:1: Of all children in foster care for 24 months or longer on the first day of the year, what percentage were discharged to a permanent home prior to their 18th birthday and by the end of the year; C3:2: Of all children discharged from foster care during the year, and who were legally free for adoption at the time of discharge (i.e., there was a parental rights termination

date reported to AFCARS for both mother and father), what percentage were discharged to a permanent home prior to their 18th birthday; C3:3: Of all children who, during the year shown, either (1) were discharged from foster care prior to age 18 with a discharge reason of emancipation, or (2) reached their 18th birthday while in foster care, what percentage were in foster care for 3 years or longer. From these measures, the Children's Bureau computes "Permanency Composite 3." (Trial Exhibit 411, U.S. Department of Health and Human Services, Administration for Children and Families, Children's Bureau, Excerpt from Massachusetts Context and Outcomes Data, 2007-2010, p. 6).

1087.   Massachusetts ranked in the bottom one third to one half of jurisdictions on Permanency Composite 3 for federal fiscal years 2010 and 2011.  In federal fiscal year 2010, Massachusetts was ranked 38th out of 52 jurisdictions, and in federal fiscal year 2011, Massachusetts was ranked 34th out of 52 jurisdictions for this composite.  (Trial Exhibit 1084, Summaries of state-by-state performance data and rankings from Child Welfare Outcomes 2007-2010, Prepared by Elissa Glucksman, p. 13; Trial Exhibit 1085, Summaries of state-by-state performance data and rankings from Child Welfare Outcomes 2008-2011, Prepared by Elissa Glucksman, p. 14; *see also* Contested Exhibit SB, Summaries of state-by-state performance data and rankings from Child Welfare Outcomes 2007-2010: Report to Congress, Prepared by Elissa Glucksman, p. 13).

1088.   Massachusetts has consistently performed in the bottom quarter of the nation on Measure C3:2 (Of all children who were discharged from foster care during the year, and who were legally free for adoption (i.e., there is a parental rights termination date reported for both parents) at the time of discharge, what percent were discharged to a permanent home prior to their 18th birthday?).  In federal fiscal year 2010, Massachusetts ranked 40th on this measure, and in federal fiscal year 2011 its performance dropped to 45th with a score of 90%.  (Trial Exhibit 1086, U.S. Department of Health and Human Services, Administration of Children and Families, Children's Bureau, Child Welfare Outcomes, 2007-2010, p. 172; Trial Exhibit 1084, Summaries of state-by-state performance data and rankings from Child Welfare Outcomes 2007-2010, Prepared by Elissa Glucksman, p. 15; Trial Exhibit 1085, Summaries of state-by-state performance data and rankings from Child Welfare Outcomes 2008-2011, Prepared by Elissa Glucksman, p. 16; *see also* Contested Exhibit SB, Summaries of state-by-state performance data and rankings from Child Welfare Outcomes 2007-2010: Report to Congress, Prepared by Elissa Glucksman, p. 15).

1089.   DCF's current performance of 91.6% on Measure C3.2 remains in the bottom quarter of jurisdictions according to DCF's CFSR Scorecard Report.  (Trial Exhibit 964, CFSR Measures, 12-Month Period Ending 09/30/2012, p. 1; *see also* Trial Exhibit 964, CFSR Measures, 12-Month Period Ending: 6/30/2012, p. 1).  This performance substantially deviates from the 2010 national median of 95.5%, reported in Child Welfare Outcomes 2007-2010, as well as the 2004 national median of 96.8% to which DCF compares its performance on its CFSR Scorecard.  (Trial Exhibit 1086, U.S. Department of Health and Human Services, Administration of Children and Families, Children's Bureau, Child Welfare Outcomes 2007-2010, p. vii; Trial Exhibit 964, CFSR Measures, 12-Month Period Ending: 09/30/2012, p. 1).  DCF gave itself a grade of an "A" for this performance.  (Trial Exhibit 964, CFSR Measures, 12-Month Period Ending: 09/30/2012, p. 1).

1090.  DCF and state officials have long been aware of DCF's poor performance on children aging out of care without a permanent home.  Since 2004, Massachusetts has consistently been below the national median on the federal composite measuring permanency for children in foster care for long periods of time.  (Trial Exhibit 465, Massachusetts Child and Family Services Review Data Profile, Mar. 19, 2007, at DCF000066353; Trial Exhibit 466, Massachusetts Child and Family Services Review Data Profile, July 30, 2008, at DCF005555605; Trial Exhibit 467, Massachusetts Child and Family Services Review Data Profile, June 2, 2009, at DCF004931082; Trial Exhibit 171, Massachusetts Child and Family Review Data Profile, Dec. 6, 2010, at DCF003187390).

1091.  Commissioner McClain did not have any explanation for the downward trend in performance from federal fiscal year 2009 to the 12-month period ending March 31, 2011 on Permanency Composite 3, the measure of permanency for children in foster care for long periods of time, but said he views it as "flat over time.  It's not gotten worse or better relative – if you think of it at a statistically significant level."  (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 119:17-121:8; Trial Exhibit 468, Massachusetts Child and Family Services Review Data Profile, June 14, 2011, at DCF005504993).

1092.  From 2008 through 2010, more than 800 children a year exited DCF's custody because they were 18 or older.  (Trial Exhibit 955, DCF Quarterly Reports for Fiscal Year 2008-2010, Table 11).

1093.  According to federal data, between fiscal year 2007 and fiscal year 2010 the number of children in DCF foster care who exited custody for a reason other than adoption, guardianship or reunification fluctuated between 16.9% and 19.8%.  (Trial Exhibit 411, Excerpt from Massachusetts Context and Outcomes Data, 2007-2010, p. 4).  Exits to emancipation for children who entered custody when they were older than the age of 12 fluctuated between 73.1% in fiscal year 2007 and 75.4% in fiscal year 2010.  (*Id.*).

1094.  The First Round CFSR identified Permanency Outcome 1, Item 8 (independent living services) as an area needing improvement. (Trial Exhibit 56, Massachusetts Child and Family Services Review Final Assessment, July 2001, at CSF-000000327). In four of the nine (44%) applicable cases reviewed this area was rated as needing improvement. (*Id.*). According to the First Round CFSR, "[t]he following problems were observed in the case records: (1) delayed and weak assessments of youths' independent living skills, (2) no follow-up on identified issues, (3) needed services not provided, (4) [independent living] goals not articulated in case planning, and (5) a lack of residential/placement options in the area." (*Id.*).  Stakeholders expressed concern about youth continuing to age out of the system "with few supports and without any connections."  (*Id.* at CSF-000000307).

1095.  The First Round CFSR also found that Permanency Outcome 1, Item 10 (permanency goal of other planned permanent living arrangement) was an area needing improvement. (Trial Exhibit 56, Massachusetts Child and Family Services Review Final Assessment, July 2001, at CSF-000000330).  Between 1997 and 1999, the percentage of children with the goal of "emancipation" increased from 8% to 13%.  (*Id.*).  In addition, in the on-site review, the area of permanency goal of other planned living arrangement was rated as needing improvement in five (56%) of the nine applicable cases under review "because appropriate

services to achieve the permanency plan were not provided." (*Id.*).  In two of those five cases, more appropriate permanency goals were not thoroughly explored before planned permanent living arrangement was set as the goal. (*Id.*).

1096.    DCF failed to resolve these problems in the intervening years between the First Round and Second Round CFSR. According to the Second Round Statewide Assessment, in state fiscal year 2005, 803 foster youth and young adults ages 18-23 left the care of DCF without returning home or being adopted, and of this number 506 were 18-year-olds. (Trial Exhibit 57, Massachusetts Child and Family Services Review Statewide Assessment, May 2007, at CSF-000000659). Of the 506 eighteen year olds discharging, 350 had a service plan goal of independent living.  (*Id.*).  The Second Round Statewide Assessment further reported that youth ages 12 and older make up 59% of all youth in out-of-home care in Massachusetts. (*Id.* at CSF-000000660). DCF admitted that this percentage was higher than the national level of approximately 45%. (*Id.*). DCF acknowledged the need to address this population, referring to the "dire consequences faced by youth leaving foster care at age 18," and "the need for policies that support youth in attaining legal permanency and developing lifelong connections." (*Id.*).  Permanency Outcome 1, Item 10 (permanency goal of other planned permanent living arrangement) was again found to be needing improvement in the Second Round CFSR, with only 47% of cases reviewed rates as Strength.  (Trial Exhibit 58, Massachusetts Child and Family Services Review Final Report, Feb. 21, 2008, at CSF-000000777-78).

1097.    In its PIP, DCF set a negotiated improvement goal of 116.1 for its performance on achieving permanency for children in foster care for long periods of time – a target that was lower than its performance as measured in the source data period (116.6) and significantly lower than the national standard of 121.7. (Trial Exhibit 33, Massachusetts Child and Family Services Review, Program Improvement Plan, Oct. 5, 2009, p. 56). DCF subsequently renegotiated its improvement goal to 112.9, more than eight points below the national standard.  (Trial Exhibit 760, DCF PIP Final Report, Oct. 2009 through Sept. 2011, Quarter Eight Report, July through Sept. 2011, at CSF-000005472).

1098.    Ms. Nisenbaum testified that she could not explain the change in the negotiated improvement goal for Permanency Outcome 1: Achieving Permanency for Children in Foster Care for Long Periods of Time, from 116.1 in the PIP to 112.9 in the eighth quarter PIP quarterly report.  (Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: Program Improvement Plan, Apr. 4, 2012, at 148:9-149:3).  Ms. Nisenbaum testified that the revised goal is farther from the national standard than the original negotiated improvement goal.  (*Id.* at 149:19-150:1).

1099.    DCF concluded that the improvement goal was achieved in the first quarter of the PIP implementation period, when it hit 114.6, and subsequently discontinued monitoring of, or efforts to improve, this outcome.  (Trial Exhibit 760, DCF PIP Final Report, Oct. 2009 through Sept. 2011, Quarter Eight Report, July through Sept. 2011, at CSF-000005472; Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: Program Improvement Plan, Apr. 4, 2012, at 152:18-153:8). Ms. Nisenbaum further testified that DCF's final performance of 114.6 is worse than its performance as measured at the time of the second round CFSR review, and that she was not

able to explain DCF's decline in performance on this measure.  (Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: Program Improvement Plan, Apr. 4, 2012, at 154:16-23).

1100.   At a PIP Measurement Advisory Committee meeting on December 8, 2010, attendees concluded that the goal for achieving permanency for children in foster care for long periods of time was met in 2009 and that the state would "achieve minimal improvement in fiscal year 2009 using fiscal year 07 baseline." (Trial Exhibit 372, PIP Measurement Advisory Committee Meeting Summary, Dec. 8, 2010, at DCF008719951).

1101.   DCF recognized its poor performance on assigning the permanency goal of another planned permanent living arrangement in its PIP. (Trial Exhibit 33, Massachusetts Child and Family Services Review Program Improvement Plan, Oct. 5, 2009, p. 59). However, DCF is still not in compliance with this outcome: in its PIP Final Report, DCF reported that its "Negotiated Improvement Goal" for this item was "TBD."  (Trial Exhibit 760, DCF PIP Final Report Oct. 2009 - Sept. 2011, Quarter Eight Report, July - Sept. 2011 at CSF-000005475).  ACF has stated that this performance measure has not been achieved.  (Trial Exhibit 758, Letter from ACF to Angelo McClain, Jul. 12, 2012 at DCF-000000001-PIP).

1102.   Ms. Roche testified that an early 2011 study of children with the APPLA goal was conducted because such reviews help DCF "mak[e] every effort that every child . . . reach a permanent home."  The review revealed "high use [of APPLA] as a default goal and misuse in a number of cases where birth family is regularly involved with the youth over 16." (Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 230:11-232:6; Trial Exhibit 350, Email from Mary Gambon to Olga Roche, Leo Farley, Maureen Messeder, et al. re: Permanency Convening Follow Up, Mar. 23, 2011).  The cases in which APPLA was determined to be an inappropriate goal were shared with the applicable area offices, but Ms. Roche was not aware of the status of any follow-up.  (Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 232:19-233:1).  Nor has another such study been performed to assess whether APPLA continues to be used inappropriately.  (*Id*. at 232:7-18).

1103.   DCF has also been long aware of its failure to provide youth aging out of its custody with adequate access to services. Foster parents responding to a survey published in 2005 that was conducted by MSPCC and commissioned by DCF noted that DCF needed to provide more support for teenage foster children.  (Contested Exhibit DJ, Statewide Foster Parent Survey, Feb. 2005, pp. ii, 8, 47; *see also* Rule 30(b0(6) Deposition of Marylou Sudders, MSPCC President and Chief Executive Officer, Aug. 14, 2012, at 107:16-110:8 (testifying that survey was conducted by MSPCC for DCF at DCF's request, pursuant to a contract with DCF, and establishing that Contested Exhibit DJ is business record of MSPCC)).

1104.   A December 2006 spreadsheet titled "CQI by Topic Region" lists the following issues for transitional age youth in certain regions of the state: in the Western Region, "Adolescents with special needs aging out of foster care system; lack of agency coordination"; in the Metro Boston Region: "Lack of intra-agency coordination to ensure adequate access to services." (Trial Exhibit 582, CQI by Topic Region, Feb. 27, 2007).

1105.   The Children's Research Center found that the median number of days that children in the entry cohort whose cases had closed remained in custody was 262.00 days. (Trial Exhibit 1065, Table C6, Appendix C, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; *see also* Trial Tr., Jan. 30, 2013 (Freitag), at 103:7-104:5; 104:20-105:4; 105:15-22). This data was based on a sample size of 180 children for whom this measure was applicable, and the inter-rater reliability for this measure exceeded 80%. (Trial Exhibit 1065, Table C6, Appendix C, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; Trial Exhibit 1069, Table 3, Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC) and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowsky, October 19, 2012, Nov. 19, 2012; *see also supra* ¶ 80).

1106.   The Children's Research Center found that the median number of days that children in the two-year cohort whose cases had closed remained in custody was 1877.00 days. (Trial Exhibit 1065, Table C6, Appendix C, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; *see also* Trial Tr., Jan. 30, 2013 (Freitag), at 103:7-104:5; 104:20-105:4; 105:15-18). This data was based on a sample size of 137 children for whom this measure was applicable, and the inter-rater reliability for this measure exceeded 80%. (Trial Exhibit 1065, Table C6, Appendix C, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; Trial Exhibit 1069, Table 3, Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC) and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowsky, October 19, 2012, Nov. 19, 2012; *see also supra* ¶ 80).

1107.   Many children in DCF custody never achieve permanency and instead age out of the system without a long term, meaningful adult connection. According to DCF's own data in the DCF Quarterly Report, in state fiscal year 2012, 832 children exited because they were 18 or older. (Trial Exhibit 955, Department of Children and Families Quarterly Report: Fiscal Year 2012 1st Quarter, p. 60, Table 21; Trial Exhibit 955, Department of Children and Families Quarterly Report: Fiscal Year 2012 2nd Quarter, p. 60, Table 21; Trial Exhibit 955, Department of Children and Families Quarterly Report: Fiscal Year 2012 3rd Quarter, p. 60, Table 21; Trial Exhibit 955, Department of Children and Families Quarterly Report: Fiscal Year 2012 4th Quarter, p. 60, Table 21). In state fiscal year 2011, more children exited because they were 18 or older (712) than to adoption (678). (Trial Exhibit 955, Department of Children and Families Quarterly Report: Fiscal Year 2011 1st Quarter, p. 58, Table 21; Trial Exhibit 955, Department of Children and Families Quarterly Report: Fiscal Year 2011 2nd Quarter, p. 58, Table 21; Trial Exhibit 955, Department of Children and Families Quarterly Report: Fiscal Year 2011 3rd Quarter, p. 58, Table 21; Trial Exhibit 955, Department of Children and Families Quarterly Report: Fiscal Year 2011 4th Quarter, p. 60, Table 21).

a)     *Independent Living Services/Outcomes*

1108.   DCF acknowledges the importance of providing skills and supports required by older youth as they transition into adulthood and that the "goal of assisting older youth is to build the capacities necessary to live safely and to function successfully and interdependently following services." (Trial Exhibit 33, Massachusetts Child and Family Services Review Program Improvement Plan, Oct. 5, 2009, p. 19). DCF recognizes that these services are needed to "support the youth in mastering the skills they will need to live successfully in the community upon discharge from agency care." (Trial Exhibit 195, Chafee Foster Care Independence Program and Education and Training Voucher Program Summary 2011, p. 3).

1109.   According to federal data, approximately 1,870 youth age fourteen and older entered care during federal fiscal year 2011. (Contested Exhibit PV, U.S. Department of Health and Human Services, Administration for Children and Families, Children's Bureau, Child Welfare Outcomes 2008-2011, Massachusetts Context Data for 2011, p. 2). Yet, despite DCF policy requiring all children in DCF's custody fourteen and older to receive independent living needs assessments within 20 working days of placement, *(see supra* ¶ 1073), only 167 youth received independent living needs assessments in federal fiscal year 2011. (Trial Exhibit 968, National Youth in Transition Database, Statewide Managers Meeting, May 24, 2012, at DCF011027641). In addition, only a small number of DCF youth received each type of independent living service in federal fiscal year 2011: 248 received career preparation, 112 received employment programs or vocational training, 230 received budget and financial management, 261 received housing education and home management training, 215 received health education and risk prevention, 199 received family support and healthy marriage education, 396 received mentoring, and 255 received supervised independent living. (Trial Exhibit 968, National Youth in Transition Database, Statewide Managers Meeting, May 24, 2012, at DCF011027641; Contested Exhibit PV, U.S. Department of Health and Human Services, Administration for Children and Families, Children's Bureau, Child Welfare Outcomes 2008-2011, Massachusetts Context Data for 2011, p. 2).

1110.   The Children's Research Center found in conducting its review of DCF case records that 37.6% of youth in the two-year cohort ages fourteen and above who did not have a disability that precluded independent living services planning did not have skills of daily living preparation included in their most recent case plan. (Trial Exhibit 1066, Table 59, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; *see also* Trial Tr., Jan. 30, 2013 (Freitag), at 105:23-109:5). This data was based on a sample size of 141 children for whom this measure was applicable, and the inter-rater reliability for this measure exceeded 80%. (Trial Exhibit 1066, Table 59, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; Trial Exhibit 1069, Table 3, Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC) and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowsky, Oct. 19, 2012, Nov. 19, 2012; *see also supra* ¶ 80).

1111.   Despite DCF policy requiring all children in DCF's custody over the age of 14 to receive instruction in the PAYA curriculum, (*see supra* ¶ 1073), the Children's Research Center found that for 84.4% of youth in the two-year cohort ages fourteen and above who did not have a disability that precluded independent living services planning there was no evidence that the child completed a PAYA workbook. (Trial Exhibit 1066, Table 59, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012). This data was based on a sample size of 141 children for whom this measure was applicable, and the inter-rater reliability for this measure exceeded 75%. (*Id.*; Trial Exhibit 1069, Table 3 to Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC) and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowsky, Oct. 19, 2012, Nov. 19, 2012; *see also supra* ¶ 80).

1112.   The number of youth and young adults who have received "intensive, individualized life skill assessment to identify their strengths, life skills training to address their needs, as well as assistance for youth in developing and strengthening life long connections" has decreased in recent years.  From June 2008 to June 1, 2009, 501 youth and young adults received such services.  (Trial Exhibit 1158, Chafee Foster Care Independence Program and Education and Training Voucher Program, at P_022840; Trial Exhibit 94, Child and Family Services Plan FY2010-FY2014, at DCF007054607). From June 2009 to June 1, 2010, 445 youth and young adults received such services.  (Trial Exhibit 575, Annual Progress and Services Report, June 30, 2010, at DCF007412433).  From July 2010 to June 2011, this number dropped to 380 youths. (Trial Exhibit 195, Chafee Foster Care Independence Program and Education and Training Voucher Program Summary 2011, p. 3; *see also* Trial Exhibit 374, Annual Progress and Services Report Federal Fiscal Year 2012, June 30, 2011, at DCF007413773-801).

1113.   This volume of services is inadequate to meet the needs of youth.  The number of youth who exited DCF care because they were 18 or older in fiscal year 2011 (712) was almost double the number of youth receiving these services during the same period (380).  (Trial Exhibit 195, Chafee Foster Care Independence Program and Education and Training Voucher Program Summary 2011, p. 3; Trial Exhibit 955, Department of Children and Families Quarterly Report: Fiscal Year 2011 1st Quarter, p. 58; Trial Exhibit 955, Department of Children and Families Quarterly Report: Fiscal Year 2011 2nd Quarter, p. 58; Trial Exhibit 955, Department of Children and Families Quarterly Report: Fiscal Year 2011 3rd Quarter, p. 58; Department of Children and Families Quarterly Report: Fiscal Year 2011 4th Quarter, p. 60).

1114.   DCF admits that "[a]ccess to full Outreach services may be limited by the availability of an Outreach worker in specific geographic locations."  (Trial Exhibit 195, Chafee Foster Care Independence Program and Education and Training Voucher Program Summary 2011, p. 3).

1115.   The number of youth who have received assistance with job search, education, financial aid/college applications, housing support, Mass Health applications, and/or referral/resource information is also insufficient and has decreased from 757 in the period from June 2008 to June 1, 2009 to 730 in the period from July 2010 to June 2011. (Trial Exhibit 1158, Chafee Foster Care Independence Program and Education and Training Voucher Program, at

P_022840; Trial Exhibit 195, Chafee Foster Care Independence Program and Education and Training Voucher Program Summary 2011, p. 3).

1116.   DCF fails to allocate sufficient staff to its adolescent outreach program.  For fiscal year 2011, the adolescent outreach program was staffed by only fifteen outreach workers (as compared to seventeen outreach workers in fiscal year 2009). (Trial Exhibit 195, Chafee Foster Care Independence Program and Education and Training Voucher Program Summary 2011, p. 4; Trial Exhibit 1158, Chafee Foster Care Independence Program and Education and Training Voucher Program, at P_022840).  Each of the fifteen outreach workers carries an active caseload of fifteen adolescents, (Trial Exhibit 195, Chafee Foster Care Independence Program and Education and Training Voucher Program Summary 2011, p. 4; Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, re: Staffing Caseloads and Training, and Purchased Services Licensing, Delivery, and Oversight, Jan. 5, 2012, at 369:4-8), providing capacity for only 225 youths to be served at any given time. Some area offices do not have any adolescent outreach workers assigned to them.  (Trial Exhibit 195, Chafee Foster Care Independence Program and Education and Training Voucher Program Summary 2011, p. 3).  Mary Gambon, DCF's Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, testified in her individual deposition on May 14, 2012 that she had been "approved to hire five additional adolescent outreach workers and one adolescent outreach supervisor."  (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 7:1-8:11).

1117.   A recent study found that DCF'S Adolescent Outreach Program for Youths in Intensive Foster Care did not effectively improve outcomes for youth placed in intensive foster care in key areas, including employment, economic well-being, housing, delinquency, pregnancy, and preparedness for independent living.  (Trial Exhibit 239, Multi-Site Evaluation of Foster Youth Programs, Evaluation of the Massachusetts Adolescent Outreach Program for Youths in Intensive Foster Care: Final Report, OPRE Report 2011, p. 14).

1118.   DCF does not provide youth aging out of its custody with adequate access to mental health services, housing assistance, employment opportunities and training programs, life and parenting skills classes, health education and services, assistance obtaining payments and benefits, transition or case closure plans, or lifelong supportive connections.  In February 2010, DCF retained the Bronner Group to make recommendations to improve the system of supports and resources for youth aging out of DCF foster care and to "alter policy" related to those youth, ages sixteen to twenty-four.  (Trial Exhibit 5, Solutions for Youth Aging Out of Care, Bronner Group, LLC, May 2010, at DCF003042587).  The Bronner Group's final report, published in May 2010, analyzed DCF's "past and current service offerings for this population" and presented findings in the following categories: Education, Housing, Employment, Life and Parenting Skills, Health, Civic Involvement and Leadership, Payments and Benefits, and Lifelong Supportive Connections.  (*Id.*).

      a)   Regarding access to mental, medical, and sexual health education and services for youth aging out of DCF foster care, the Bronner Group study found that "many youth leaving DCF do not receive the mental health interventions they need," because of a gap in the criteria for eligibility for services between the Adolescent

Mental Health system and the Massachusetts Department of Mental Health's Adult services; that "[y]outh feel limited by the availability of, and their willingness to access, mental and behavioral health services and substance abuse counseling;" and that "[y]outh often lack the skills and knowledge necessary to access healthcare independently." (Trial Exhibit 5, Solutions for Youth Aging Out of Care, Bronner Group, LLC, May 2010, at DCF003042623, DCF003042649).

b)  Regarding access to assistance obtaining benefits for youth aging out of DCF foster care, the Bronner Group study found that "[y]outh often feel daunted by the process of determining what benefits are available to them and how to access and maintain those benefits," and that "DCF lacks a tiered payment system that takes into account all benefits that a youth could receive. Development of such a system would ensure more equitable distribution of resources." (*Id.* at DCF003042650-51).

c)  Regarding access to and assistance obtaining housing for youth aging out of DCF foster care, the Bronner Group study found that "few functional, high-capacity program models" addressing housing needs for youth aging out of DCF foster care exist in Massachusetts and that "[q]uality, affordable/subsidized housing options for youth aging out of care are scarce in Massachusetts," and noted that "the state has too few public housing vouchers and developments open to youth aging out." (*Id.* at DCF003042605, DCF003042645).

d)  Regarding access to and support for obtaining educational opportunities for youth aging out of DCF foster care, the Bronner Group study found that "[y]outh lack the financial resources, particularly in regards to housing and transportation, to attend educational programs" and that "[y]outh lack information on how to apply for college, financial aid, and scholarships and how to find and utilize community resources." (*Id.* at DCF003042644).

e)  Regarding independent living services, including training in basic life skills such as hygiene, financial literacy, and cooking for youth aging out of DCF foster care, the Bronner Group study found that "[y]outh do not have the financial resources (furnishings, transportation, etc.) to live independently;" that "[y]outh aging out of care are often unprepared to care for themselves, including acquiring mental and behavioral health services, hygiene, presentable dress for employment, and other related issues;" that "[y]outh often cite feeling deficient in, or not knowing how to develop, financial literacy and money management skills;" and that "[y]outh lack the skills and knowledge necessary for securing stable housing, especially regarding acquiring public housing benefits or subsidies, and living independently (many youth do not know how to cook or clean, pay rent, budget money, [and] live harmoniously neighbors and landlords)." (*Id.* at DCF003042645-48).

e)  Regarding access to and support for obtaining employment opportunities for youth aging out of DCF foster care, the Bronner Group study found that "[y]outh

exiting care often lack marketable and soft skills, including interpersonal communication skills, job responsibility, resume writing, and interviewing skills" and "are not aware of the universe of employment experiences, and often cite feeling un- or under-supported in their career trajectory." (*Id.* at DCF003042647).

g) Regarding parenting skills training for youth aging out of DCF foster care, the Bronner Group study found that "[y]outh cite a shortage of quality parenting programs for pregnant and parenting youth in care." (*Id.* at DCF003042648).

h) Regarding the formation and maintenance of lifelong supportive connections for youth aging out of DCF foster care, the Bronner Group study found that "[t]he availability of mentoring programs designed specifically for youth in, and aging out of care, is limited;" that "[t]oo few youth maintain healthy connections with biological relatives and other important adults;" and that "[g]iven the often transient and unstable experience youth have while in care, trainings are needed to address the need for healthy communication strategies, to mitigate violence tendencies in relationships, foster trust, and enhance general communication skills." (*Id.* at DCF003042651, DCF003042648).

1119. Minutes of a September 28, 2011 board meeting of the Massachusetts Society for the Prevention of Cruelty to Children's Massachusetts Alliance for Families noted that, with respect to transitional youth, "services for [the] aging out population [were] still an issue." (Trial Exhibit 481, MAFF Board Meeting Minutes, Sept. 18, 2011, p. 2).

1120. In a statement adopted on March 7, 2012, the Massachusetts Alliance for Families set forth goals and objectives, including to "provide specific life skills and financial management training to foster youth, including consistent implementation of [Preparing Adolescents for Young Adulthood]." (Trial Exhibit 482, Email from Marylou Sudders to Cheryl Haddad, eleanordowd@verizon.net, and Nancy Scannel, et al. re: MAFF goals/objectives, Mar. 3, 2012, with attached Massachutts Alliance for Families 2012 Goals and Objectives, Mar. 7, 2012, p. 2).

1121. To prepare Ms. James for aging out of foster care, DCF provided her with a workbook. (Trial Tr., Jan. 22, 2013 (James), at 66:15-67:4). DCF did not attempt to teach Ms. James any basic life skills, such as cooking, shopping for food, budgeting, or driving. (*Id.*). Ms. James believes this was inadequate preparation for independent living. (*Id.*).

1122. For the two years before Ms. James aged out of foster care, she lived with an "independent living partner" under a private provider. (Trial Tr., Jan. 22, 2013 (James), at 67:1-70:2). The independent living partner also did not assist Ms. James with preparing for aging out of foster care. The independent living partner informed her that "the reason why [Ms. James] was staying in her house was so that [she] could learn that [she] could never rely on anybody but [her]self." (Trial Tr., Jan. 22, 2013 (James), at 68:14-18).

1123. Ms. James "had no idea what [she] was going to do" when she turned 18. (Trial Tr., Jan. 22, 2013 (James), at 70:17-71:12). She did not want to be homeless but the independent living partner was selling the house where Ms. James was living. (*Id.*). After deciding to

move to Maine, Ms. James went back to the house to retrieve her belongings only to find the house locked up. Ms. James "had to climb over the fence and go through the doggie door in order just to get [her] belongings." (*Id.*).

1124.  Ms. James testified that her social worker informed her that she would remain in DCF custody until she was 24 years old because of an exception for people who are in school. Based on this information, Ms. James moved to New York City and enrolled in Parsons School of Design. (Trial Tr., Jan. 22, 2013 (James), at 104:19-105:18). Two days before her 22nd birthday, however, Ms. James testified that she received a letter from DCF notifying her that she would no longer be in DCF custody. She testified that she was "surprised" and it "flustered" her plans. (Trial Tr., Jan. 22, 2013 (James), at 106:5-14).

1125.  Dr. Azzi-Lessing testified that given the multiple placements endured by the named plaintiffs whose files she reviewed, and their resulting "horrific" educational experiences, there are repercussions for their employability, which "goes to ability to live on [their] own and take care of [themselves] in terms of being able to earn any kind of living." (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 77:16-78:10). She testified that it also "goes to all of the things that families teach their children, through chores, through summer jobs, through . . . engagement with the family, learning to cook learning to do laundry, learning to balance a checkbook, learning to have a job . . . and what that entails" and "if a child has reached the age of 18 or 19 and has never been employed, even babysitting, or dog sitting or . . . something like that, they really have no skills to take care of themselves." (*Id.* at 78:10-18).

1126.  Dr. Azzi-Lessing testified that the ongoing mental health issues experienced by all five of the named plaintiffs whose files she reviewed also affect their ability to live independently. As she stated, "[d]epression, anxiety, attachment disorders . . . get at the ability to finish [their] education, get a job, have . . . healthy relationships with other people in their life." (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 79:16-19).

1127.  In March 2012, Named Plaintiff Adam turned 18 while still in DCF custody without any permanent, long-term home or family. He dropped out of school two days after his birthday and made a plan to move in with friends or go to a homeless shelter while he was awaiting placement in adult program; he was subsequently hospitalized. (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 18:1-19:1; Trial Exhibit 1182, DCF Case File: Adam S., at DCF010184725, DCF010184907).

1128.  After 14 years in DCF custody, at 18 years old, Named Plaintiff Andre "does not appear to have the skills necessary to care for himself nor does he have a permanent family that is prepared to adopt him." (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 77:12-16; Trial Exhibit 1183, DCF Case File: Andre S., at DCF010184991; *see also* Trial Exhibit 1080, Andre S. Placement Settings).

1129.  Foster parents surveyed by MSPCC in 2008 stated that more funding needs to be provided for independent living programs and that DCF needs to do more to ensure that each child has a lifelong connection or mentor who will commit to remain in the youth's life until at least age 22. (Trial Exhibit 484, Memorandum from Emily Blair to Marylou Sudders and

Nancy Scannell re: Summary of Survey Data/Policy Paper update, Aug. 22, 2008, p. 3; *see also id.* at 5).

1130.  DCF is aware that although its adolescent outreach program is "seen as positive," stakeholders have reported that "only a limited number of youth may be served."  (Trial Exhibit 34, MA CFSR 2007: Summary of Key Issues for PIP Development, at DCF008117147).  In addition, CFSR reviewers noted that in some cases reviewed adequate independent living services were not provided or the agency had not established a permanent living arrangement with the child.  (*Id.*).

1131.  A document revised three years after the passage of the Fostering Connections to Success and Increasing Adoptions Act of 2008 shows no target completion date for the development of a plan to review DCF's procedures for transition planning for youth exiting care.  It similarly has no target completion date for the development of a plan to assess staffing implications in order to implement the requirement in the Act to help youth make the transition to adulthood by ensuring that the child's caseworker helps the child develop a personal transition plan within the 90-day period before the child exits care.  (Trial Exhibit 196, Implementation Plan for the Fostering Connections to Success and Increasing Adoptions Act, Aug. 2011, p. 4).

1132.  Ms. Gambon was unaware of whether DCF has any report or tracking that would alert management to the extent to which transition planning has occurred within ninety days before a child exits foster care, and there is no document that is produced as part of the transition file.  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, re: DCF's Programs for Implementing Any and All Provisions of the Fostering Connections to Success and Increasing Adoptions Act, Apr. 24, 2012, at 507:3-19).

1133.  Ms. Gambon was also unaware of how DCF has implemented the requirement in the Foster Connections Act that a child's transition plan "must be as detailed as the child chooses" and must "include specific options on housing, health insurance." (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, re: DCF's Programs for Implementing Any and All Provisions of the Fostering Connections to Success and Increasing Adoptions Act, Apr. 24, 2012, at 507:20-508:2).

1134.  As of January 2012, DCF had not implemented a federal requirement effective October 1, 2011 that children sixteen and older in foster care receive a copy of a consumer credit report each year until they are discharged from foster care and that they receive assistance in interpreting the report and resolving any inaccuracies.  (Trial Exhibit 999, Email exchange between Liz Skinner-Reilly and Maureen Messeder re: ACYF-CB-PI-11-09 Title IV-E Plan Amendments as a Result of the Child and Family Services Improvement and Innovation Act, Jan. 24, 2012).

1135.  The Office of the Governor has not required submission of the Comprehensive Plan set forth in Massachusetts General Laws chapter 18C § 11, providing for an examination of the status of "permanency planning for those who, due to their age, are transitioning out of the

child welfare system to assist with health care, housing, higher education, long-term interpersonal connections and other needs for independent living," (Trial Exhibit 337, Mass. Gen. Laws ch. 18C, § 11(d)(16) (2012)), by June 30, 2010 and annual updates thereafter. (*See infra* § VIII.F.1).

1136.   DCF recognizes that focusing on "establishing and achieving permanency goals" will "support casework practice relative to older youth." (Trial Exhibit 94, Child and Family Services Plan FY2010-FY2014, at DCF007054452-53). Ms. Roche testified that assignment of the permanency goal of Another Planned Permanent Living Arrangement ("APPLA") "leads to children not reaching permanency, and . . . [is] unacceptable, . . . especially when [a child's] . . . birth family is involved." (Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 230:11-231:23). Ms. Roche testified that an APPLA goal does not result in children leaving foster care with any "lifelong connections." (*Id.* at 231:24-232:6). However, DCF has been inappropriately assigning children the goal of APPLA for over a decade. (*See supra* ¶¶ 967, 1095-96, 1102).

1137.   As acknowledged by EOHHS, DCF fails to prioritize support for children aging out of care because "there is a finite amount of resources and DCF needs o [sic] prioritize safety and protective services." (Contested Exhibit GF, "Highlights of Marilyn and Kathy's discussion with Gail G," at DEF000222289).

1138.   DCF has not developed and implemented adequate tracking and accountability mechanisms to ensure that youth who age out of custody receive supports and services necessary to facilitate a successful transition into independent adult life. Ms. Gambon testified that, other than surveys that have been done with youth, she was not able to answer the question of whether DCF has any way, in the aggregate, of determining whether the independent living service needs of youth in DCF custody are identified and whether those needs are met. (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, re: Staffing Caseloads and Training, and Purchased Services Licensing, Delivery, and Oversight, Jan. 5, 2012, at 430:2-431:16).

1139.   DCF has also failed to keep any data with respect to where youths go after leaving DCF. (Trial Exhibit 584, Email from Ros Walter to Joann Vautour re: DCF data, Aug. 18, 2009, at DCF005201650).

## VI.   Services

### A.   Medical

#### 1.   Professional Standards

1140.   Federal law requires that medical care and services be provided to children in foster care. 42 U.S.C. § 1396a(a)(10). (Trial Tr., Mar. 1, 2013 (Crabtree), at 24:18-25:13). Massachusetts must certify that it will operate a foster care and adoption assistance program under a state plan approved by the federal government, and that the state will take such actions as are necessary to ensure that children receiving assistance are eligible for medical

assistance under the state plan.  42 U.S.C. § 602(a)(3).  (Trial Tr., Mar. 1, 2013 (Crabtree), at 25:14-26:20).

1141.  Under federal law, DCF is required to develop, in coordination and collaboration with the state Medicaid agency and in consultation with pediatricians and other experts, a plan for the ongoing oversight and coordination of health care services for any child in foster care. The plan must include: (1) health screening and follow up screenings; (2) how needs will be identified and addressed; (3) how medical information will be updated and shared; (4) steps taken to ensure continuity of care including the possible use of medical homes for each child; (5) oversight of medication; and (6) how the state consults with medical and nonmedical professions on appropriate treatment of children. 42 U.S.C. § 622(b)(15).

1142.  Dr. Azzi-Lessing testified that the term "well-being" as used in federal policy "goes beyond just keeping . . . the child safe and finding the child a permanent family, a permanent home" and "has to do with promoting good mental health and good physical health."  (Trial Tr., Feb. 4, 2013 (Azzi-Lessing), at 73:1-6).  She further stated:

> [I]t means that the child's physical needs are attended to, that there's primary health care, that if the child has any disabilities that those disabilities are addressed appropriately, and if the child has any mental health problems that he or she receive appropriate services in a very timely manner, and that good physical and emotional health is supported throughout practice with children in child welfare settings.

(*Id.* at 73:6-13).

1143.  Upon entry into the foster care system, Massachusetts law requires that the department ensure that every foster child "shall be screened and evaluated under the early and periodic screening, diagnostic and treatment ["EPSDT"] standards established by Title XIX of the Social Security Act, unless the child has been screened and evaluated within 30 days prior to his entry into the system."  (Trial Exhibit 321, Mass. Gen. Laws ch. 119 § 32; *see also* Trial Exhibit 69, 110 Mass. Code Regs. 7.121-7.126 (2013); Trial Exhibit 619, 102 Mass. Code Regs. 3.06 (2011)).

1144.  The provisions of EPSDT require that all children receiving Medicaid receive, among other things, medical visits that occur at designated ages and intervals throughout a child's life, developmental and behavioral health screenings, and dental assessments. (Trial Exhibit 621, Early and Periodic Screening, Diagnosis, and Treatment (EPSDT) Medical Protocol and Periodicity Schedule (the Medical Schedule) and EPSDT Dental Protocol and Periodicity Schedule (the Dental Schedule), Nov. 1, 2009).

1145.  DCF policy requires that children receive comprehensive medical examinations that comply with the EPSDT Medical Protocol and Periodicity Schedule. (Trial Exhibit 1, Medical Examinations for Children Entering DCF Placement or Custody, DCF Policy No. 2010-001, Feb. 1, 2010, DCF Case Practice Policy & Procedures Manual, at DCF POL

(7/08) 284-85; Trial Exhibit 620, Highlights of Medical Examinations for Children Entering DCF Placement or Custody).

1146.   DCF policy requires the agency to provide children with a medical screening examination within seven calendar days of the child's entry into DCF custody; a comprehensive medical examination "must be completed within 30 calendar days after the child initially enters DCF out of home placement or custody."  (Trial Exhibit 1, Medical Examinations for Children Entering DCF Placement or Custody, DCF Policy No. 2010-001, Feb. 1, 2010, DCF Case Practice Policy & Procedures Manual, at DCF POL (7/08) 283-85; Trial Tr., Mar. 1, 2013 (Crabtree), at 26:21-28:11).

1147.   Further, DCF policy requires that DCF schedule "[a]ll services and treatments recommended by a medical practitioner" in the initial medical screening or 30-day comprehensive medical examination "as soon as possible."  (Trial Exhibit 1, Medical Examinations for Children Entering DCF Placement or Custody, DCF Policy No. 2010-001, Feb. 1, 2010, DCF Case Practice Policy & Procedures Manual, at DCF POL (7/08) 286).

1148.   Massachusetts regulations also require that every family receiving services from DCF has a service plan. (Trial Exhibit 69, 110 Mass. Code Regs. 6.02 (2013)). For children in substitute care, the service plan must identify the child's specific health and dental needs while in placement.  (Trial Exhibit 69, 110 Mass. Code Regs. 6.04(9) (2013)). The service plan must be completed (1) "for all cases within ten working days after a comprehensive assessment is completed, but in no event later than 55 working days after the opening of the case," and (2) "for a placement made on an emergency basis to ensure the immediate safety of the child, where there is no service plan, a service plan shall be completed within 30 working days after the placement." (Trial Exhibit 69, 110 Mass. Code Regs. 6.05(1) (2013)).

1149.   The service plan must be reviewed, at a minimum, during each case review, or every six months. (Trial Exhibit 69, 110 Mass. Code Regs. 6.07 (2013)).  A new service plan must be written when there has been a change in the goal of the plan. (Trial Exhibit 69, 110 Mass. Code Regs. 6.08 (2013); *see also* Trial Exhibit 1, Service Planning and Referral Policy, DSS Policy No. 97-003, DCF Case Practice Policy & Procedures Manual, at DCF POL (7/08) 114).

1150.   According to DCF Policy, "[i]t is the goal of the Department to ensure that comprehensive, quality health care services are provided to all children, particularly children in placement . . . Health care services include routine medical, dental and mental health services as well as emergency services."  (Trial Exhibit 1, Health Care Services to Children in Placement, DSS Policy No. 85-003, Feb. 10, 1998, DCF Case Practice Policy and Procedures Manual, at DCF POL (7/08) 289).

1151.   Child placing agencies ("CPAs") that contract with DCF are also required to ensure the availability of "a range of medical and dental services to foster children, in order to promote the children's complete physical, mental and social well-being."  (Trial Exhibit 852, 102 Mass. Code Regs. 5.11(3)).  CPAs are required to "provide or arrange for a range of psychological and psychiatric services in order that each child's and family's needs for psychological or psychiatric services will be met."  (*Id.* at 5.11(5)).

1152.   The standard of care is also informed by the Council on Accreditation standards, which provide that a child "receives an initial health screening from a qualified medical practitioner within 72 hours of entry into care to identify the need for immediate medical or mental health care, and assess for infectious and communicable diseases."  (Contested Exhibit RT, Council on Accreditation, Foster Care Services Standards, § 2.04; Trial Tr., Mar. 1, 2013 (Crabtree), at 28:16-29:2).

1153.   The Child Welfare League of America standards provide that:

> Within 30 days of placement, the family foster care agency social worker, in collaboration with the foster parents, should arrange for medical, dental, developmental, and educational assessments for each child in care.  The assessments should be made periodically thereafter to screen for and treat the child's ongoing health, mental health, dental, developmental, and educational needs.

(Contested Exhibit RA, Child Welfare League of America, Standards of Excellence for Family Foster Care Services, § 2.63).

1154.   The standard of care with regard to both clinical oversight and monitoring is also informed by Massachusetts regulations and DCF policy requiring medical passports. (Trial Tr., Jan. 24, 2013 (Bellonci), at 60:1-61:25, 67:11-12, 67:25-68:12, 69:6-14, 70:8-15).

1155.   State regulation provides:

> The Department shall implement a program of utilization of a "medical passport" for all children in substitute care. The medical passport shall record pertinent and available medical/dental/mental health and developmental data about the child. Department social workers and medical providers shall each complete relevant portions of the passport. The passport shall be held by the substitute care provider and shall remain with the child for the duration of his/her placement. If a child moves to a new substitute care placement or returns home, the medical passport moves with the child.

(Trial Exhibit 69, 110 Mass. Code Regs. 7.124(2013)).

1156.   DCF policy further requires that all children placed by DCF have a medical passport containing all pertinent and available medical, dental, mental health and developmental information prior to or at the time of placement. This passport is to be provided to each new substitute care provider at the time of placement, kept up to date by the child's caseworker and filed in the child's physical case record. (Trial Exhibit 1, Foster Care Review Policy Appendix A: Guidelines for Medical Passport Review, Sept. 6, 2000, DCF Case Practice Policy and Procedures Manual, at DCF POL (7/08) 155; Trial Exhibit 1, Placement Prevention and Placement Policy, DSS policy No. 90-004(R), Feb. 10, 1998, DCF Case

Practice Policy and Procedures Manual, at DCF POL (7/08) 172; Trial Exhibit 1, Medical Examinations for Children Entering DCF Placement or Custody, DCF Policy No. 2010-001, Feb. 1, 2010, at DCF POL (7/08) 285-86).

1157.   In the case of an emergency placement, if the medical passport cannot be completed, the social worker must provide the substitute care provider with as much of the information as possible, including the child's doctors' names and addresses, a list of medical problems, a list of medications, and the date of the next routine exam and/or follow-up appointments. (Trial Exhibit 1, Health Care Services to Children in Placement, DSS Policy No. 85-003, Feb. 10, 1998, DCF Case Practice Policy and Procedures Manual, at DCF POL (7/08) 290). The medical passport should be completed as soon as possible but no later than 30 working days after placement. (*Id.*).

1158.   DCF policy requires that a child's current medications be listed in the medical passport. (Trial Exhibit 1, Foster Care Review Policy Appendix A: Guidelines for Medical Passport Review, Sept. 6, 2000, DCF Case Practice Policy and Procedures Manual, at DCF POL (7/08) 155; Trial Exhibit 1, Medical Examinations for Children Entering DCF Placement or Custody, DCF Policy No. 2010-001, Feb. 1, 2010, at DCF POL (7/08) 285-86; Trial Tr., Jan. 24, 2013 (Bellonci), at 69:12-18).

1159.   Plaintiffs' expert Dr. Bellonci testified that the medical passport is intended as a tool to address the complex situation of children in foster care who have experienced multiple placements, multiple providers, and often multiple treatment recommendations and potentially multiple medications. (Trial Tr., Jan. 25, 2013 (Bellonci), at 49:20-50:1).

1160.   DCF policy also outlines the information caseworkers are expected to enter into the medical sections of FamilyNet, including names and dates of medical examinations, findings, prescribed medications, and behavioral health conditions. (Trial Exhibit 1, Medical Examinations for Children Entering DCF Placement or Custody, DCF Policy No. 2010-001, Feb. 1, 2010, at DCF POL (7/08) 286).

1161.   DCF is also required to ensure that medical and dental appointments are documented by use of the encounter form. Upon receipt of the second page of the encounter form from either the physician or substitute care provider, the social worker completes the form and directly enters the information into FamilyNet. The encounter form should then be placed in the special document section envelope with the copy of the passport. (Trial Exhibit 1, Health Care Services to Children in Placement, DSS Policy No. 85-003, Feb. 10, 1998, DCF Case Practice Policy and Procedures Manual, at DCF POL (7/08) 291; Trial Tr., Jan. 24, 2013 (Bellonci), at 84:14-15).

1162.   A June 2011 "Department of Children and Families Healthcare Services Plan" states that "[a] system to monitor treatment after the screening and comprehensive examinations currently exists."  The system is described as follows:

> Healthcare providers complete Encounter Forms, which are then provided to the DCF social worker.  The social worker then enters these data into the FamilyNet system.  Once entered into the

> database, a Medical Passport is printed out from FamilyNet; the [M]edical [P]assport includes new medical information with the medical history.  The Medical Passport is designed to follow children between placements and to be updated as new medical documentation is entered into FamilyNet.

(Trial Exhibit 436, Department of Children and Families Healthcare Services Plan, June 12, 2011, at DCF000967411).

1163.   The medical passport is defined as a "service[]" under 110 Mass. Code Regs. 7.124 (Trial Exhibit 69, 110 Mass. Code Regs. 7.124 (2013)) and, therefore, subject to the notice requirements of 110 Mass. Code Regs. 8.01 (*Id.*). (*See infra* §§ X.A.2, B.2, C).

1164.   DCF policy requires that a child's caseworker provide each new substitute care provider with the child's Medicaid/health insurance card at the time of placement. If the child does not have insurance at the time of placement, policy instructs the social worker to obtain Medicaid coverage for the child. (Trial Exhibit 1, Placement Prevention and Placement Policy, DSS Policy No. 90-004(R), Feb. 10, 1998, DCF Case Practice Policy & Procedures Manual, at DCF POL (7/08) 172; Trial Exhibit 1, Health Care Services to Children in Placement, DSS Policy No. 85-003, Feb. 10, 1998, DCF Case Practice Policy and Procedures Manual, at DCF POL (7/08) 290; Trial Exhibit 2, Obtaining Medicaid, DSS Polic No. 89-004, June 1, 1990, Case Practice Policy and Procedures Manual, at DCF POL 785).

### 2.    Failure to Provide Appropriate Medical Care Causes Harm and Risk of Harm to Children

1165.   The purpose of the seven and 30 day medical examinations required when a child enters foster care is to provide the department and foster care provider with up-to-date medical information regarding the child as soon as possible so that the child's well-being may be safeguarded. (Rule 30(b)(6) Deposition of Robert Wentworth, DCF Assistant Commissioner for Planning and Program Development, re: Purchased Services Licensing, Delivery, and Oversight, Dec. 29, 2011, at 249:17-251:11).

1166.   DCF is aware that failing to provide children with timely initial and comprehensive medical examinations is harmful to them. In October 2007, the first report resulting from DCF's Health and Medical Services Project was released, titled "Screening and Comprehensive Exams for Children in Out-of-Home Placement: Review of Policies and Procedures in Five States." The report was prepared by the Justice Resource Institute at Boston University School of Public Health for DCF. Regarding the importance of medical examinations occurring for children with specified timeframes upon entry into care, the report states:

> [T]he literature and experts agree that these timeframes ensure state child welfare agencies respond to the high prevalence of chronic medical and behavioral health needs among children in state custody. The screening exam identifies medical or behavioral health conditions requirement immediate attention, such as neglect

or abuse, infections disease, and acute-onset chronic illness. The comprehensive examination ensures diagnosis of medical, behavioral, developmental, and dental conditions for access to appropriate services and follow-up care.

(Trial Exhibit 600, Screening and Comprehensive Exams for Children in Out-of-Home Placement: Review of Policies and Procedures in Five States, Oct. 2007, at DCF000969616 (internal citations omitted)).

1167.  The second report published by the Justice Resource Institute noted that "the absence of these medical examinations can have a detrimental effect on the health and development of children in out of home placement." (Trial Exhibit 601, The Health and Medical Services Project Research Findings, Report No. 2, Recommendations from a Multi-Perspective Study, Jan. 2008, at DCF003177192).

1168.  DCF is also aware of the harms that can be caused to children by a failure to maintain and disseminate current medical information. According to a study conducted by the United States Government Accountability Office regarding "State Practices for Assessing Health Needs" for children in foster care, timely medical assessments when children enter foster care are important so that health needs can be identified as quickly as possible. The study explains that "[h]ealth or developmental status may be a critical factor in determining the appropriate placement and level of care for children." (Trial Exhibit 613, Foster Care: State Practices for Assessing Health Needs, Facilitating Service Delivery, and Monitoring Children's Care, U.S. Office Government Accountability Office, Feb. 2009, at DCF006424791). "Without these records, their health care may be delayed until records are available, or their care may be compromised. . . . Similarly children may miss immunizations, receive duplicate immunizations, or forego necessary medications." (*Id.* at DCF006424808). The study further found that, "[m]onitoring procedures that aggregate information across foster children can help managers ensure that health policies are consistently implemented and having the intended results." (*Id.* at DCF006424811).

1169.  Further, if a provider does not know whether a medication has already been tried, he or she may recommend a medication that has already been tried and has caused a side-effect in the child or has not been effective.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 64:11-16).

1170.  For example, in one case, a physician did not have information regarding a named plaintiff's previous use of a particular antipsychotic medication, and considered putting the child on the antipsychotic because, in his understanding, the child had never received that antipsychotic, but in fact the child had previously been on that medication.  (*Id.* at 8:13-20, 64:14-23).

1171.  An email from a Boston-based practitioner to Secretary JudyAnn Bigby described the state of initial medical screenings for foster children in Boston, citing the lack of complete medical records and the risk of harm: "[W]e have no or at best incomplete medical information about the child- it is poor care with little value for money, unlikely benefits the child or foster parent and a medical error waiting to happen."  (Trial Exhibit 458, Email

exchange between JudyAnn Bigby and Marilyn Chase re: physical system, medical information for foster children, May 2, 2008).

1172.  Mary Gambon, DCF's Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, testified that it is important for workers to have easy access to children's health and behavior information so that they can identify children's needs and make decisions that take those needs into consideration.  (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 241:6-14).

1173.  Children in foster care frequently experience multiple placement moves, which often results in the child receiving a new medical provider, which can lead to a lack of clarity about the child's medical history, treatment history, and the diagnoses.  (Deposition of Russell Livingston, DCF Medical Director for Psychiatry, Jan. 6, 2012, at 19:16-22, 29:7-10).

1174.  Jan Nisenbaum, DCF's Deputy Commissioner for Clinical Practice and Program Operations, testified that, due to this frequent movement of children from one placement to another, the maintenance of updated medical passports is very important for physicians who examine and treat children in DCF care. (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 107:22-108:19).

### 3.    DCF Performance

1175.  DCF fails to conform to its own policy pertaining to medical visits and medical passports. (Trial Tr., Mar. 1, 2013 (Crabtree), at 39:1-17; *see generally id.* at 24:11-39:17; Trial Tr., Jan. 24, 2013 (Bellonci), at 62:15-17, 85:10-20, 92:3-15).

1176.  DCF routinely fails to timely provide children entering foster care with the seven-day medical screening and thirty-day comprehensive medical examination required by its own regulations.  A DCF report aggregating the number of seven- and thirty-day medical visits completed during the target month in which they were due, and the number of these visits that were completed on time within the required seven- and thirty-day periods, reflects that during August 2012, DCF offices statewide completed only 21.9% of seven- and thirty-day visits during the target month in which they were due. Only 11.9% of these visits statewide were completed on time during the seven- and thirty-day period in which they were due. This performance ranged across area offices during the calendar year, with the Western region completing 8% of monthly visits due on time. The highest performer, the Northern region, completed only 22.1% of required monthly medical visits on time. (Trial Exhibit 148, Monthly Compliance for Medical Screenings Due, Aug. 2012). In May 2012, DCF still only completed 14.3% of seven-day medical visits and 9.3% of thirty-day medical visits due to children on time.  Statewide, in May 2012, DCF completed only 12% of all medical visits due to children in its custody in a timely manner. (Trial Exhibit 148, Monthly Compliance for Medical Screenings Due, May 2012).

1177.  Similarly, the Monthly Compliance for Medical Screenings Due in 2011 report reflects that, during calendar year 2011, DCF offices statewide completed only 18.2% of all medical

visits due.  Only 9.7% of these visits statewide were completed on time. This performance ranged across area offices during the calendar year, with the Central Office completing only 1.3% of monthly visits due on time. The highest performer, the Boston region, completed only 24.6% of required monthly medical visits on time. (Trial Exhibit 610, Monthly Compliance for Medical Screenings Due in 2011). Specifically, only 12.1% of seven-day visits and 7.1% of thirty-day visits were completed on time during the calendar year.  (*Id*.).

1178.   Since 2008, DCF has set a target for itself of 50% for both measures.  Yet, over the period March 2008 to August 2012, DCF consistently failed to meet its 50% target for seven- and thirty-day medical visits statewide, with performance ranging from 5.1% to 29.6% for seven-day visits, and from 6.1% to 20.7% for thirty-day visits. (Trial Exhibit 954, All Monthly Operations Statistical Reports, 2008-2012; Trial Exhibit 884, Medical Exam Compliance Trends, Feb. 2011 through Sept. 2011; Trial Exhibit 147, All Medical Visits Needed Reports).

1179.   Performance in the area of timely medical visits has not shown lasting improvement in calendar year 2012. According to the August 2012 MOSt Report, DCF still only completed 27.9% of seven-day medical visits and 16.2% of thirty-day visits due to children within the reporting month, still well below the target of 50%. (Trial Exhibit 954, Monthly Operations Statistical Report, Aug. 2012, at DCF_RFP_2013-000000547). These numbers do not take into account whether the visit was actually completed on time within the required seven or thirty day period.  (*Id.* at DCF_RFP_2013-000000557).

1180.   Current performance in the area of 30 day medical visits shows a decline from fiscal year 2010.  According to the document, DCF MOSt Trends Fiscal Year 2009 through 2010, in fiscal year 2010, of all children in a non-hospital placement during some part of each reporting month with a 30 Day Medical Visit due, an average of 16.3% of children attended an appointment during that month.  The report notes that there "continues to be considerable room for improvement on these indicators." (Trial Exhibit 155, Department of Children and Families Monthly Operations Statistical Report, Trends Fiscal Year 2009 through 2010, p. 5). However, according to the Monthly Compliance for Medical Screenings Due Report for May 2012, performance in this measure has fallen to 15.2%.  (Trial Exhibit 148, Monthly Compliance for Medical Screenings Due, May 2012).

1181.   "Tickler" reports showing lists of children with medical visits due show large numbers of overdue appointments.  For example, a November 30, 2010 "tickler" lists an outstanding medical visit due for a child on August 26, 2009. (Trial Exhibit 611, Assessments Due Through Nov. 30, 2010, p. 57).

1182.   A fiscal year 2011-2012 document titled "Family Resource CQI/Self Assessment" noted that "[m]edical appointments for all new children into placement need to be a priority for all staff."  (Trial Exhibit 734, Family Resource CQI/Self Assessment FY 11-12, at DCF000085870).

1183.   Former Commissioner McClain acknowledged that for several reporting periods, DCF performance on 7 and 30 day medical examinations has routinely been in the low teens or low twenties. (Trial Tr. May 6, 2013 (McClain), at 61:15-63:1).

1184.   Internally, DCF employees have acknowledged that there is improvement needed in the area of seven and 30 day medical visits. (Trial Exhibit 615, Email from Laurie Sullivan to Christine Blake, Susan Conrad, and Michelle Curletti, et al. re: Medical Visit Compliance for April, June 16, 2011; Trial Exhibit 616, Email from William Brown to Monica Fernandez-Castro, Elizabeth Mauro, Sandra Salmon, et al. re: Medical Visit Compliance in April, June 16, 2011; Trial Exhibit 617, Email from Martha Taylor to June Bennett, Peter Bolduc, Cora Brown, et al. re: Medical Visit Compliance for April, June 16, 2011). DCF officials at the regional level have incorporated the goal of improving seven and 30 day medical visit compliance into their own strategic plans, all evidencing the depth of awareness of this problem within the agency. (Trial Exhibit 348, Email from Daniel Arnold to Paul Fitzsimons re: "Road Show" Data and Reports, May 24, 2011, with attached DCF Western Region Goals and Objectives Data Plan FY 2012, at DCF005347206; Trial Exhibit 32, Email from Raymond Burke to "DSS-DL Springfield Users re: Springfield Family Resource CQI Self Assessment – FY11-12---5-27-11, May 27, 2011, with attached Springfield FY 11-12 Family Resource CQI/Self-Assessment, at DCF001946168).

1185.   DCF officials in the area offices are aware of low rates of completed medical visits in their offices. A DCF Area Director testified that rates of children attending their initial medical appointments within seven days in the Greenfield and Holyoke offices are unacceptable. (Deposition of Joseph Collins, DCF Director of Areas for Franklin and Hampshire, Jan. 25, 2012, at 191:20-192:17). Similarly, another Area Director acknowledged that the year-to-date average performance for completing 30-day medical appointments in the western region was 16.7 percent, not even half of DCF's target of 50 percent. (Deposition of Raymond Burke, DCF Director of Areas for Pioneer Valley, Jan. 19, 2012, at 152:24-153:6, 156:20-157:3).

1186.   One of DCF's deputy commissioners testified that she thought it would be acceptable if only 50% of the required 7- and 30-day initial medical screenings for children entering DCF care were completed, since that is the target set by DCF. (Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 153:13-154:6). Another Deputy Commissioner testified that ensuring that children receive required medical examinations is an area in need of improvement. (Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: Program Improvement Plan, Apr. 4, 2012, at 102:23-103:5, 103:17-22).

1187.   Former Commissioner McClain agreed that even if DCF met the 50 percent target for timely 7 and 30 day medical visits, performance would still be way too low. (Trial Tr. May 6, 2013 (McClain), at 63:2-7).

1188.   DCF's 2012-2015 Strategic Plan again includes the goals of increasing the number of youth who access routine medical and dental care and who receive seven- and thirty-day medical appointments. (Trial Exhibit 7, Department of Children and Families 2012-2015 Strategic Plan: Preserving, Strengthening, and Expanding the DCF Safety Net, Aug. 2012, at CSF-000006348).  Strategic objectives to this end include the intention to "update [DCF's] Medical Services Strategic Plan to reflect systemic changes and current priorities." DCF acknowledges in this Plan that "[e]nhancing the medical and dental health of children and families is an important component of their well-being." (*Id.* at CSF-000006349).

1189.  As recently as April 2012, Field Liaison Peter McKeon sent several DCF officials an excel spreadsheet documenting uncompleted medical visits for children in custody.  In an email response to the recent Medical Visit Compliance Report, William Brown urged, "[p]lease make this a priority." (Trial Exhibit 1029, Email exchange between Peter McKeon, William Brown, Catherine Harris, et al. re: Medical Visits Needed, Apr. 5, 2012).  In April 2012, in response to an email from Peter McKeon about medical visit compliance for February 2012, Terrence Flynn urged DCF managers to "[p]lease begin to ID strategies to address this requirement." (Trial Exhibit 1025, Email exchange between Terry Flynn and Gary Calhoun re: Medical Compliance for February 2012, Apr. 17, 2012).  Gary Calhoun, after looking at the Medical Visit report stated that "New Bedford and Fall River aren't doing well at all," to which Flynn confirmed that there was "[n]o where to go but up!" (*Id.*). Later, in June 2012, Brown admitted, "[DCF's] performance as of late has been going down. Please ensure that you highlight the importance of medical visits during your next supervisor meetings and in individual supervision with APMs."  (Trial Exhibit 1028, Email from William Brown to Robert MacDonald and Monica Fernandez-Castro re: Medical Visit Compliance for April 2012, June 19, 2012). In January 2012, Frank Galligan responded to the recent Medical Visit Compliance Report, urging that staff follow up about the issue with their supervisors and social workers because "[o]ur medical visit completion percentage has been less than stellar." Galligan also suggested that DCF create a "system" that ensures medical visits are being completed.  (Trial Exhibit 1031, Email from Francis Galligan to Roberta Barrasso, Shaheer Mustafa, Mary Ann Dellea, et al. re: Medical Visits Needed, Jan. 23, 2012, at DCF011322453; *see also* Trial Exhibit 1030, Email from Kim Keefe to Francis Galligan re: Medical Visit Compliance for August 2011, Oct. 17, 2011).

1190.  Similarly, in response to the August 2011 Medical Visit Compliance Report sent by Peter McKeon, Kim Keefe stated, "[w]e need a safety net – perhaps the gatekeeper for service referrals." (Trial Exhibit 1030, Email from Kim Keefe to Francis Galligan re: Medical Visit Compliance for August 2011, Oct. 17, 2011).  In December 2011, Mary Lutz, DCF Director of Medical Services, described the current medical exam data as "[p]retty concerning." (Trial Exhibit 1026, Email from Mary Lutz to Russell Livingston re: Reports on Medical Exams, Dec. 20, 2011).

1191.  Under DCF policy, caseworkers are supposed to enter data within 30 days of an event. (Deposition of Ruben Ferreira, DCF Assistant Commissioner for Continuous Quality Improvement, Feb. 2, 2012, at 105:10-12).

1192.  DCF officials appear to believe that "children in care have better compliance with 7 and 30 medical care [than] the Family Net data reflects." (Trial Exhibit 227, Email exchange between Mary Ellen Bennard, Tomy Abraham, and Ros Walter, et al. re: DCF kids check ups, Jan. 27, 2010, at DCF004863353; *see also* Trial Exhibit 306, Email exchange between Ruben Ferreira and Ros Walter re: clarification of criteria to use for DCF 7/30 data, Jan. 21, 2011; Trial Exhibit 626, Email from Donna Jerszyk-Hollis to Mary Lutz re: Public Review of Medical Exams for Chn Entering DCF Care/Custody Policy, July 28, 2008; Trial Exhibit 627, Email from Ruben Ferreira to Ros Walter re: 7 and 30 Day Medical Examinations, Jan. 29, 2010; Trial Exhibit 594, Children in the Care or Custody of the Department of Social Services During Calendar Year 2001: Medical Visits within Seven and Thirty Days of Placement, Nov. 2003).  DCF documents, stating that "actual performance" for initial

medical visits is "poorly documented," refer only to a 2007 Medicaid study that showed 68% of DCF youth receiving an annual physical. (Trial Exhibit 765, Strengthening the DCF Safety Net: An Update for EOHHS Leadership Team, Feb. 16, 2010, at DEF000227233; Trial Exhibit 803, DCF Improving the Lives of Children and Families: Outcomes Tell the Story, Regional Forums, Nov. 2009, at GOV000006474).

1193.   Former Commissioner McClain acknowledged that DCF workers are allotted 30 days to enter dictation. (Trial Tr. May 6, 2013 (McClain), at 61:5-12). However, McClain admitted that DCF insisted that one of its private providers to enter data within one week as part of a corrective action plan. (*Id.*).

1194.   Even when reports about initial and 30-day medical visits are run so as to allow for data entry beyond the 30-day data-entry period, data shows that initial and 30-day medical visits are occurring less than 50% of the time. (Deposition of Ruben Ferreira, DCF Assistant Commissioner for Continuous Quality Improvement, Feb. 2, 2012, at 105:14-24).

1195.   DCF Commissioner Angelo McClain testified to his belief that DCF is actually exceeding the 50% performance target set in the MOSt Report for initial and 30-day medical appointments for children in DCF custody, and that it is really a "compliance issue" of getting workers to fill out the proper fields in FamilyNet. (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 236:2-237:9; Trial Tr. May 6, 2013 (McClain), at 61:15-63:1). When asked for the basis of this opinion, Commissioner McClain cited a 2008 or 2009 report run by MassHealth that looked at the number of children receiving their annual physical. (*Id.* at 237:10-238:2). However, Commissioner McClain testified that he had seen no similar data reflecting higher levels of performance for initial and 30-day medical appointments, rather that he was using the MassHealth report "as a proxy" for those measures. (*Id.* at 238:3-239).

1196.   DCF routinely fails to keep accurate and up-to-date records of children's medical visits, medical conditions and diagnoses, prescribed medications, and needed follow-up. An audit of DCF records found that over 38% of the records reviewed had no health/behavioral information. (Trial Exhibit 431, Email exchange between Ros Walter and Ruben Ferreira re: DHHS Notice – AFCARS Data, July 8, 2010).

1197.   A DCF official testified that the system is "data-hungry" and that "there's a lot of fields that routinely don't get filled out by social workers," including behavioral characteristics, educational characteristics, race and ethnicity characteristics, and screens about health. (Deposition of Raymond Pillidge, DCF Regional Director for the Northern Region, Mar. 7, 2012, at 107:15-108:2, 112:10-113:8).

1198.   DCF also fails to ensure that children receive timely service plans, which are required by Massachusetts regulations to include a description of the child's health and dental needs. MOSt Reports provide monthly data on the percentage of children in a given month with a timely service plan completed, which must include an assessment of the child's health and dental needs. Since 2008, DCF has set a target for itself of 87.6% in this measure. Over the period January 2008 – August 2012, DCF consistently failed to reach the 87.6% target for the timely completion of service plans, with performance ranging from 76.8% to 86.6%. (Trial

Exhibit 954, all Monthly Operations Statistical Reports for 2008-2012). Ruben Ferreira, DCF's Assistant Commissioner for Continuous Quality Improvement and Rule 30(b)(6) designee with respect to data collection and retention, has admitted that the targets in the MOSt Report are interim improvement benchmarks based on actual agency performance. (Rule 30(b)(6) Deposition of Ruben Ferreira, DCF Assistant Commissioner for Continuous Quality Improvement, re: Data Collection and Retention, Aug. 23, 2011, at 115:22-118:2; *see supra* §§ V.A.3.b, XI.B).

1199.    The review of case files conducted by the Children's Research Center indicated that for 44.3% of foster care placements experienced by children in the entry cohort, case readers did not locate a medical passport in the case file and further found no indication that a medical passport had been provided to the new foster care placement. For the two-year cohort, medical passports were not in the file materials in 19.1% of cases. The inter-rater reliability for this measure exceeded 80%. (*see supra* ¶ 80; Trial Exhibit 1065, Table C37, Appendix C, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; Trial Tr., Jan. 30, 2013 (Freitag), at 45:2-21, 48:7-17, 52:2-16; Trial Tr., Jan. 31, 2013 (Johnson), at 117:4-6, 117:15-25).

1200.    Dr. Bellonci has only seen three or four medical passports during his 20 years of working with hundreds of children in DCF custody.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 62:5-10; Trial Tr., Jan. 22, 2013 (Bellonci), at 124:18-20).  This is not unusual; it is fairly universally recognized that medical passports are not utilized in practice as required.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 62:10-17).

1201.    DCF officials concede that DCF does not utilize medical passports as required. (Deposition of Russell Livingston, DCF Medical Director for Psychiatry, Jan. 6, 2012, at 105:1-23; *see also* Trial Tr., Jan. 24, 2013 (Bellonci), at 62:15-17, 85:10-20).  Similarly, DCF officials acknowledge that Encounter forms are not being utilized as required.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 85:6-18).

1202.    Dr. Bellonci has never been provided with a child's medical passport that was current, and did not see any current medical passports in the Named Plaintiffs' files.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 70:22-71:3).

1203.    Dr. Bellonci has been asked to complete approximately two Encounter forms over the course of his 20 years treating children in DCF care.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 84:14-17).

1204.    There were instances in the Named Plaintiffs' DCF files in which there were no medical passports at all in the file.  At other times, there were medical passports in the file but they were blank, or they did not include known allergies or current psychotropic medications that the child was taking.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 62:7-13).

1205.    The Named Plaintiffs' medical and treatment histories were not available to Dr. Bellonci, and such histories are rarely available when he works with children in DCF foster care. (Trial Tr., Jan. 24, 2013 (Bellonci), at 63:17-19).

1206.   In the case of Adam S., there was a medical passport in his file from November 4, 2004 which was blank and did not list any psychotropic medications that he was taking. (*Id.* at 82:20-83:1; Trial Exhibit 1182, DCF Case File: Adam S., at DCF010177690, DCF010177730).  His medical passport was not updated until four years later, in April 2008, and the second page of the passport was missing from the DCF case file. (Trial Tr., Jan. 24, 2013 (Bellonci), at 83:1-3; Trial Exhibit 1182, DCF Case File: Adam S., at DCF010177690, DCF010177730). There were only two additional medical passports in his file, from 2011 and 2012. (Trial Tr., Jan. 24, 2013 (Bellonci), at 83:3-4; Trial Exhibit 1182, DCF Case File: Adam S., at DCF010179868, DCF010184787, DCF010179881).  His medical passports did not note that Adam had an acute allergy to bee stings and should be carrying an EpiPen, which was something that Adam's caretakers should know. (Trial Tr., Jan. 24, 2013 (Bellonci), at 83:4-5, 83:13-17; Trial Exhibit 1182, DCF Case File: Adam S., at DCF010178693).

1207.   There was no medical passport in Connor B.'s DCF case file until April 4, 2012. (Trial Tr., Jan. 24, 2013 (Bellonci), at 83:18-19; Trial Exhibit 1181, DCF Case File: Connor B., at DCF010196694). Connor had been in DCF custody since February 2007. (*Id.* at DCF010196927-28).

1208.   Andre S. had a medical passport in his file from September 2001. (Trial Tr., Jan. 24, 2013 (Bellonci), at 83:19-20; Trial Exhibit 1183, DCF Case File: Andre S., at DCF010187456). At that time, Andre was being treated for Post-Traumatic Stress Disorder and Attention Deficit Hyperactivity Disorder, and in fact had been psychiatrically hospitalized for those conditions, but "none known" was listed under medical and behavioral conditions in his medical passport. (Trial Tr., Jan. 24, 2013 (Bellonci), at 83:21-84:2; Trial Exhibit 1183, DCF Case File: Andre S., at DCF010187456, DCF000002423, DCF000002425). At that time, Andre was taking four psychotropic medications, but none were listed in his medical passport. (Trial Tr., Jan. 24, 2013 (Bellonci), at at 83:25-84:2; Trial Exhibit 1183, DCF Case File: Andre S., at DCF000002425, DCF000002426).

1209.   There were no Encounter forms in any of the Named Plaintiffs' DCF case files, nor was there any discussion about Encounter forms reflected in the case files. (Trial Tr., Jan. 24, 2013 (Bellonci), at 84:17-18, 85:4-6).

## 4.    History of DCF Inaction and Chronic Failure

1210.   DCF has consistently failed to implement strategies to solve these problems, leading to persistently poor medical services to children. In 2003, DCF conducted a study and issued a report titled, "Children in the Care and Custody of the Department of Social Services During Calendar Year 2001: Medical Visits Within Seven and Thirty Days of Placement." The report was undertaken "in response to concerns raised by pediatricians regarding the extent to which children in [DCF] care or custody receive the required medical visits after out of home placement." (Trial Exhibit 594, Children in the Care or Custody of the Department of Social Services During Calendar Year 2001: Medical Visits Within Seven and Thirty Days of Placement, Nov. 2003, at DCF003626422). Using MassHealth paid claims, the study found that children received initial visits within seven days only 10.5% of the time, and a visit within thirty days only 25% of the time. (*Id.*). The study recommended that efforts be made

to address "the areas needing improvement" and noted that "[i]f the medical documentation in FamilyNet became consistent and reliable, future efforts to identify visit rates would require less reliance upon . . . MassHealth data." (*Id.* at DCF003626424).

1211.    In 2004, a multi-departmental Policy Development Steering Committee discussed revisions to DCF policy regarding health care services to children.  Identified issues included seven and thirty-day medical visits, well-child physical and dental visits, and MassHealth coverage. (Trial Exhibit 595, Email from Mary Lutz to Susan Getman, Apr. 6, 2004).  At that time, Mary Lutz, DCF Director of Medical Services, estimated that approximately 10% and 25%, respectively, of seven and thirty-day medical visits were performed in a timely manner. (*Id.* at DCF007086689).  Also in 2004, the Massachusetts Society for the Prevention of Cruelty to Children (MSPCC) released a study titled "Oral Health and the Commonwealth's Most Vulnerable Children: A State of Decay," described in DCF documents as highlighting "the poor oral health and lack of access to dental care faced by low-income and foster children in Massachusetts." (Trial Exhibit 42, Department of Children and Families, Medical Services Strategic Plan Draft, June 2010, at DCF000553942).

1212.    Around the same time, a 2004-2005 foster parent survey conducted by the MSPCC reported that, of foster parents surveyed, "44% had difficulty finding a dentist who accepts MassHealth." Even when foster parents find a dentist who will accept MassHealath, oftentimes they are not local – "[The network] of dental care providers needs to be expanded." (Contested Exhibit DJ, Statewide Foster Parent Survey, Feb. 2005, at DCF000066769).  Additionally, 15% of foster parents with children over age three reported that they had paid for their foster child's dental care out of pocket at least once. (*Id.* at DCF000066770).  More than 1/5 of foster parents surveyed reported that their foster children's oral health was "fair or poor." (*Id.*).  The survey went on to suggest that this figure likely underestimated the levels of poor oral health among foster children, "[g]iven that dental decay and other oral diseases can be non-symptomatic until later stages and that foster parents are not trained dental health professionals." (*Id.*).  The survey reported that, according to MassHealth data, "only about 30% of children on MassHealth receive a dental service of any kind in a given year." (*Id.*; *see also* Trial Exhibit 42, Medical Services Strategic Plan Draft, June 12, 2010, at DCF000553942 (describing "Oral Health and the Commonwealth's Most Vulnerable Children: A State of Decay," a 2004 MSPCC study highlighting "the poor oral health and lack of access to dental care faced by low-income and foster children in Massachusetts")).

1213.    In December 2006, a survey was distributed to workers asking for information about the workers' understanding of the seven and thirty-day medical visit requirements, and the barriers to success in ensuring compliance with these requirements.  A number of workers responded that they were unaware of the policy, that they believed it was the foster parents' responsibility to schedule these appointments, or that they were aware of one required visit but not the other.  (Trial Exhibit 596, Medical Visit Survey, Dec. 2006, at DCF009508673-79).  Barriers to success reported by the workers include high caseloads, placements out of area and frequent moves between night to night placements, and incomplete medical records. (*Id.* at DCF009508684-90; *see also* Trial Exhibit 597, Open-Ended Results Detail for Medical Visit Survey Question No. 7, Jan. 4, 2007).

1214.  Two months later, in a February 2007 statement following the death of a child in DCF foster care, JudyAnn Bigby, Secretary of the Executive Office of Health and Human Services, wrote of her "concern about questions related to mental health diagnoses and medication use for children." She pointed to DCF's plans to develop "longer-term, comprehensive systems for medical review and oversight."  (Trial Exhibit 598, Statement from Secretary JudyAnn Bigby on the Welfare of the Commonwealth's Children, Feb. 8, 2007).

1215.  In 2007, DCF formed the Health and Medical Services Team ("HMST") to focus on increasing access to healthcare services. The new team was anticipated to include nine new staff positions, including a Chief Medical Officer. A Request for Information was issued to healthcare organizations in May 2007. Among other things, the RFI sought information regarding how healthcare organizations could help DCF "develop a statewide systematic approach to accessing appropriate, necessary and timely healthcare services" for children in DCF care or custody and how CQI could be used to monitor performance. (Trial Exhibit 43, Request for Information, Department of Social Services Healthcare Resources Expansion, May 9, 2007, at DCF000536341, DCF000536352).  DCF never engaged a Chief Medical Officer as envisioned by the 2007 RFI. (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 217:16-219:15).

1216.  Also in 2007, DCF undertook two related projects regarding healthcare under the umbrella of "Health and Medical Services Projects": the first project related to "Healthcare Access and Facilitation" and the second to "Planning and Staff Development." (Trial Exhibit 599, Department of Social Services, Health and Medical Services Projects, Project 1: Healthcare Access and Facilitation, and Project II: Access to Healthcare Resources: Planning and Staff Development).  Goals of these projects included: assessing recommendations of the Child Welfare League of America and the American Academy of Pediatrics related to the nature and timing of medical screenings for children; gathering information from stakeholders to determine appropriate practices to "support the healthcare needs of children"; educating the medical community and DCF staff about the importance of timely medical care; and finding timely methods to assist DCF staff with obtaining medical records about children moving between placements or entering placement. (*Id.* at DCF000455234-35).

1217.  In October 2007, the first report resulting from the Health and Medical Services Projects was released, titled "Screening and Comprehensive Exams for Children in Out-of-Home Placement: A Review of Policies and Procedures in Five States."  The report was prepared for DCF by the Justice Resource Institute at Boston University School of Public Health.  In its overview of selected state practices, this report emphasized (among other things) the importance of a centralized medical record system to communicate a child's health care needs, a monitoring system to track timely visits and performance, and accurate and ongoing data entry.  (Trial Exhibit 600, Screening and Comprehensive Exams for Children in Out-of-Home Placement: A Review of Policies and Procedures in Five States, Oct. 2007, at DCF000969614-15).

1218.  The need for accurate record keeping is demonstrated by a DCF management report from May 18, 2007 which indicates that 74.09% of the 13,330 children subjected to foster care

reviews during that year had either no passport in their record and none presented at the review (47.07%) or an incomplete passport (27.02%). (Trial Exhibit 918, Document re: Determination Code).

1219.   In January 2008, the Justice Resource Institute released its second report for the Health and Medical Services Projects, summarizing both the October 2007 Review of Policies and Procedures of Five States and additionally providing "Recommendations from a Multi-Perspective Study." (Trial Exhibit 601, Health and Medical Services Project Research Findings, Report No. 2, Jan. 2008). An introduction to the report explains that, in 1998, the Commissioner of DCF issued a directive that all children in out-of-home placement receive medical screenings within seven and thirty days. A follow-up study, years later, showed that statewide only 10% of children were receiving the required seven-day examination. In an effort to improve that level of compliance, DCF commissioned this study to address challenges and recommend specific interventions that could increase the rate of timely visits. (*Id.* at DCF003177190). The main findings of that study included conclusions that the FamilyNet system was underutilized for tracking medical visits; that training structures for DCF staff and foster parents was insufficient to convey the importance of medical services; and that existing medical, dental, and mental health services were not accessed for children in a timely manner. Recommendations from the report included: ensuring "consistent documentation of medical information in FamilyNet and dissemination to health care providers" and caregivers; establishing "a system to regularly update medical information and ensure timely completion of the medical passport"; developing "an electronic medical record (EMR) system for all children in out-of-home placement;" instituting supervisory review of cases within 45 days of a child's entry into care in order to measure performance; and mandating in-service training regarding the importance of medical exams. (*Id.* at DCF003177192-94).

1220.   In April 2008, an email from Barry S. Zuckerman, M.D., Chairman of the Department of Pediatrics for the Boston Medical Center, provided notice to Secretary JudyAnn Bigby regarding the ongoing danger associated with incomplete medical records, stating, "we have no or at best incomplete medical information about the child – it is poor care with little value for money, unlikely benefits [for] the child or foster parent and a medical error waiting to happen." (Trial Exhibit 458, Email from JudyAnn Bigby to Marilyn Chase re: physical system, medical information for foster children, May 2, 2008). Dr. Zuckerman went on to state that "the process for [hiring a] medical director for [DCF] is somewhat invisible and certainly not seeming to move." (*Id.*). Upon reading this email at her deposition, Marilyn Chase, Assistant Secretary of EOHHS's Office of Children, Youth, and Families, testified that "[t]he concerns that Dr. Zuckerman raised were concerns that we were painfully aware of. . . . [T]he commissioner, the secretary and myself . . . had been very much concerned about the absence of a medical director for [DCF]." (Deposition of Marilyn Chase, Assistant Secretary of EOHHS's Office of Children, Youth, and Families, May 21, 2012, at 165:17-166:8).

1221.   After the release of the Justice Resource Institute report, a strategic plan was developed with the goal of ensuring that children receive necessary medical and dental services. The document identified two major problems: documentation and service availability. The plan noted that "[d]ocumenting visits in Family net [is] not viewed as a priority" and "[t]he

ticklers are not an effective method of notification that visits are due." (Trial Exhibit 602, Strategic Planning: Improve Medical and Dental, at DCF000540088). Regarding service delivery, the plan noted that "[m]any rural communities do not have local dental providers" and that "[p]lacement instability impedes the process of ensuring that a child visits a practitioner in a timely manner." (*Id.* at DCF000540089). The plan identified activities that would improve healthcare services, including changes to the FamilyNet system, additional training for new workers, communication with local providers, and linkage to the MassHealth data system. (*Id.* at DCF000540088-90). The plan also identified the measures of success to be used as a benchmark for improvement in these areas: increased compliance with the requirement that all children entering placement receive medical screenings within seven and thirty days as well as appropriate dental care, consistent documentation of medical information in FamilyNet and dissemination of information to caretakers and providers, a "[d]ecrease in over due [sic] medical and dental appointments on ticklers," and "[i]ncreased capacity for availability of medical and dental appointments." (*Id.* at DCF000540090; *see also* Trial Exhibit 603, Strategic Planning: Improve Medical and Dental Draft, July 22, 2008).

1222.  Also in July 2008, DCF officials circulated for review a draft policy on medical exams for children entering custody, and received comments expressing concerns about a new requirement that children who are missing for any reason be screened within seven days of their return as well as about the risk of allowing for a seven-day window for the initial screening. (Trial Exhibit 604, Email from Gert Condon to Mary Lutz, Aug. 4, 2008). Feedback was also given from a Youth Advisory Board, with the youths reporting that they had never seen the medical passport that is supposed to maintain all their health information and travel with them to new placements. (Trial Exhibit 605, Feedback from the Youth Advisory Boards on the draft Medical Examinations Policy, at DCF003185964). Feedback from regional directors and others continued into 2009. (*See* Trial Exhibit 606, Revisions to the Medical Examinations Policy Based on Recommendations from the Regional Directors and Others, Feb. 10, 2009; Trial Exhibit 607, Senior Staff Meeting Agenda, Apr. 6, 2009). This new policy would not go into effect until February 2010. (Trial Exhibit 1, Medical Examinations for Children Entering DCF Placement or Custody, DCF Policy No. 2010-001, Feb. 1, 2010, DCF Case Practice Policy & Procedures Manual, at DCF POL (7/08) 283-86).

1223.  Approximately one year later, following years of strategic planning, an August 31, 2009 draft presentation to be made to the Executive Office of Health and Human Services reported that in state fiscal year 2009, only 12.3% of children with a thirty-day medical visit due received a medical exam. Again identifying problems with data entry related to medical services, the presentation explains DCF's belief that "[i]n practice, significantly more children receive the 30 day medical visit than documented within FamilyNet." The presentation then lists "Course Corrections," including the "[n]eed for improved documentation," "[i]mproved access to medical professionals," and closer monitoring of performance. (Trial Exhibit 608, FY 2010-2011 Results Plan: Presentation for EOHHS Draft, Aug. 31, 2009, p. 21).

1224.  A 2008 DCF management report from March 2008 indicates that approximately 60% of 5201 children subjected to foster care reviews during the period under review had either no passport in the record or presented at the review (31.13%), or an out of date or incomplete

passport in the record (29.53%). (Trial Exhibit 919, FCR Determination Report, Mar. 6, 2008, at "Percentages" and "Breakdown" tabs.)

1225.    Additionally, at the conclusion of the 2008 licensing process conducted by the Department of Early Education and Care ("DEEC"), Mary Gambon, DCF's Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, wrote to DEEC Commissioner David McGrath to address DEEC's concern that placement of medical information was inconsistent.  DEEC recommended that DCF have a policy requiring consistent placement of this information.  (Trial Exhibit 430, Letter from Mary Gambon to David McGrath re: Licensing of the Department of Social Services, Apr. 23, 2008, p. 2; *see also* Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 121:16-123:6).  Ms. Gambon testified that she was unaware whether DCF has ever evaluated compliance with the policy that was implemented in response to DEEC's concerns. (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 238:14-240:9).

1226.    In 2010, revisions were proposed to DCF's existing policy regarding healthcare services to children in DCF care or custody, adding (among other changes) information clarifying the steps that should be taken when a child enters custody.  (Trial Exhibit 609, Healthcare Services to Children in DCF Care or Custody Draft, DCF Policy No. 85-003, June 21, 2010, at DCF000457529-30).  To date, no revisions of this fourteen-year-old policy have been put into effect. (*See* Trial Exhibit 1, Health Care Services to Children in Placement, DSS Policy No. 85-003, Feb. 10, 1998, DCF Case Practice Policy and Procedures Manual, at DCF POL (7/08) 289-92).

1227.    Also in 2010, noting the numerous reviews of medical services for children in Massachusetts over the previous six years, DCF began another strategic planning process designed to address problems nearly identical to those addressed in 2007 and 2008.  A draft medical services strategic plan noted that "the Department needs to ensure that children in its care or custody are receiving 7 day screening, 30 day evaluations, and annual check ups in a timely manner."  (Trial Exhibit 42, Department of Children and Families, Medical Services Strategic Plan Draft, June 12, 2010, at DCF000553947; *see also* Trial Exhibit 438, Draft Medical Services Strategic Plan, at DCF003712034). Regarding the maintenance of medical information, the plan noted that "[d]ue diligence is needed in entering the information in the child's case record" and that "[a] strengthened or improved 'Medical Passport' . . . would be beneficial . . . . Foster parents and congregate care settings need timely and up to date information on a child's healthcare status and medical conditions at the time of placement." (Trial Exhibit 42, Medical Services Strategic Plan Draft, June 12, 2010, at DCF000553947). Specifically the plan recommended that DCF "[r]e-evaluate the utility of the Medical passport and make recommendations for improvement in documenting and sharing healthcare information with substitute care providers."  (Trial Exhibit 42, Medical Services Strategic Plan Draft, June 12, 2010, at DCF000553951).  The plan also recommended strengthened Continuous Quality Improvement structures for monitoring and accountability related to health care services for children, revised training for new social workers, and practice guidance regarding oral health for children in DCF care or custody. (*Id.* at DCF000553948). The Plan had still not been finalized two years after the draft was developed.  (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice

236

and Program Operations, May 18, 2012, at 210:10-211:4).  As of the date of his deposition, Commissioner McClain did not know whether a medical services strategic plan had ever been put into final form.  (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 233:3-7).

1228.  No action has been taken concerning "Goal No. 3" in the draft Medical Services Strategic Plan, to "[r]e-evaluate the utility of the Medical passport and make recommendations for improvement in documenting and sharing healthcare information with substitute care providers," except to look at the practices of some other states.  (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 216:8-217:2; Trial Exhibit 42, Department of Children and Families, Medical Services Strategic Plan, June 2010, at DCF000553951).  DCF is aware of possible means for improvement. For example, Jan Nisenbaum testified about other states' use of web-based medical passports that foster parents can access directly and update themselves at the time they take children to medical appointments.  (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 216:8-217:2).

1229.  In 2010, DCF officials modified the Monthly Compliance Reports by including medical visits that are done late as long as they are done within the month, to improve the appearance of the compliance rate, since the version of the report that only counted reports done on time within the month resulted in such low rates of compliance. (Trial Exhibit 612, Email exchange between Mary Kennedy, Ruben Ferreira, Mary Lutz, Ros Walter, et al. re: Central Office Renamed Lutherans, Oct. 5-8, 2010).

1230.  Also in January 2010, there were discussions with MassHealth about obtaining claims data from MassHealth in order to better track whether children in DCF custody were receiving initial and 30-day medical visits.  (Deposition of Ruben Ferreira, Assistant Commissioner for Continuous Quality Improvement, Feb. 2, 2012, at 125:21-126:11; Trial Exhibit 227, Email exchange between Mary Ellen Bennard, Tomy Abraham, Ros Walter, et al. re: DCF kids check ups, Jan. 27 2010).  This project did not proceed and DCF does not currently receive data from MassHealth.  (Deposition of Ruben Ferreira, Assistant Commissioner for Continuous Quality Improvement, Feb. 2, 2012, at 126:16-21, 131:7-12).

1231.  A July 2010 internal email noted that DCF had "again" failed to meet AFCARS data standards because over 38% of records reviewed had no health/behavioral information. (Trial Exhibit 431, Email exchange between Ros Walter, Mary Gambon, Ruben Ferreira and Jan Nisenbaum, July 8, 2010, p. 1; *see also* Trial Exhibit 626, Email from Donna Jerszyk-Hollis to Mary Lutz, July 28, 2008). One of DCF's Assistant Commissioners testified that she was unaware of any actions DCF has taken to come into compliance with AFCARS data standards relating to medical information contained in electronic files.  (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 241:1-5).

1232.  A year later, in June 2011, the agency produced another Healthcare Services Plan, again suggesting: improved compliance with timely delivery of initial and comprehensive assessments, as well as with the EPSDT schedule; additional training to emphasize the importance of healthcare; changes to FamilyNet; and changes to the medical passport. The

plan also discusses training about the importance of documentation in FamilyNet. (Trial Exhibit 436, Healthcare Services Plan, June 2011, at DCF000967410-11). The 2011 Healthcare Services Plan was also never finalized or adopted by DCF. (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 211:5-23). However, similar plans appear in DCF's 2010 and 2011 Annual Progress and Services Reports, and the fiscal years 2010-2014 Child and Family Services Plan. (Trial Exhibit 374, Department of Children and Families, Annual Progress and Services Report Federal FY2012, June 30, 2011, at DCF007413716-23; Trial Exhibit 575, Department of Children and Families, Annual Progress and Services Report, June 30, 2010, at DCF007412353-59; Trial Exhibit 94, Child and Family Services Plan FY2010-FY2014, at DCF7054495-501). Finally, a July 2011 document identifying "priority areas of focus," states DCF's intention to "[i]ncorporate strategies for coordination of medical care into Medical Services Strategic Plan." (Trial Exhibit 41, Email from Jan Nisenbaum to Angelo McClain and Patricia Mackin re: Priority Practice Areas of Focus, July 22, 2011, and attached Casework Practice Topics Identified as Priority Areas of Focus, at DCF007385003; *see also* Trial Exhibit 746, Quality Improvement Teams: Focusing on FY'2012 Priorities, May 2011, at DEF000230399).

1233.   Again, in spite of the goals laid out in the previous years' strategic plans and the enactment of new policy in 2010 specific to medical visits for children entering care, DCF data for initial and comprehensive medical visits throughout 2010 and 2011 showed performance ranging from 11.6% to 29.6% for seven-day medical visits and 6.1% to 18.5% for thirty-day visits. (Trial Exhibit 954, Monthly Operations Statistical Report, Feb. 2010; Trial Exhibit 954, Monthly Operations Statistical Report, June 2010; Trial Exhibit 954, Monthly Operations Statistical Report, Sept. 2010; Trial Exhibit 954, Monthly Operations Statistical Report, Dec. 2010; Trial Exhibit 954, all Monthly Operations Statistical Reports, Jan. – Dec. 2011).

1234.   In 2012, another draft of the Healthcare Services Plan was created but never finalized. (Trial Exhibit 1021, Healthcare Services Plan, June 2012). Despite this and more revisions to the policy, DCF's current performance has continued to fall short of its targets for initial and comprehensive medical visits despite the goals laid out in the strategic plan. (*See supra* § VI.A.3; Trial Exhibit 1022, Healthcare Services to Children in DCF Care or Custody Draft, DCF Policy No. 85-003, June 7, 2012; Trial Exhibit 1023, Healthcare Services to Children in DCF Care or Custody Draft, DCF Policy No. 85-003, June 20, 2012).

1235.   In addition to DCF's internal reports, the Federal Child and Family Services Review ("CFSR") has continually identified mental, medical, and dental services as areas of concern. DCF's participation in the CFSR process has failed to result in any meaningful improvement in performance in the area of 7 and 30 day medical visits

a.   The 2001 CFSR Final Assessment found that Massachusetts was not in substantial conformity with Wellbeing Outcome 3: children receive adequate services to meet their physical and mental health needs. (Trial Exhibit 56, Child and Family Services Review Final Assessment, July 2001, at CSF-000000340). Specifically, the 2001 CFSR Final Assessment found that Well-Being Outcome 3, Item 22 (physical health

of the child) was an area needing improvement. In 14 (29%) of the 49 applicable cases reviewed, meeting children's physical health needs was rated as an area needing improvement. Key findings with respect to this area included the statement that, in some cases involving adolescents with frequent placement changes, the required initial health screenings were not received. (*Id*. at CSF-000000340-41). Indeed, in 2004, a DCF official expressed her view that the agency would most likely never be able to attain full compliance with required 7 and 30 day medical visits, noting that even if current compliance rates were doubled, performance would only be at 21% for 7 day visits and 50% for 30 day visits. (Trial Exhibit 595, Email from Mary Lutz to Susan Getman re: Health Care Services for Children in Placement, Apr. 6, 2004, at DCF007086689).  Other key findings with respect to this area included a general lack of available dental services, lack of follow-through with healthcare providers, and a failure to provide children with the required screenings.  (Trial Exhibit 56, Child and Family Services Review, Final Assessment, July 2001, at CSF-000000341).  With respect to Item 23 (Mental health of the child), DCF's performance was also rated as an area needing improvement. Stakeholders reported "significant gaps in mental health services." (*Id*. at CSF-000000342).

b. The May 2007 Massachusetts CFSR Statewide Assessment identified a number of area office initiatives and strategies being undertaken to improve performance in the area of medical care for children. Specifically, the Assessment reported that the Worcester West office had undertaken a program to ensure that children receive their required 7 and 30 day medical visits. (Trial Exhibit 57, Massachusetts Child and Family Services Review Statewide Assessment, May 2007, at CSF-000000677). Despite these efforts, DCF's recent data shows that in February 2012, only 19% of children in the Worcester West Area Office with initial medical appointments due received those appointments. Similarly, only 27.3% of children received their required 30-day medical visits in the Worcester West Area Office during the month of February 2012.  Both were still far below the target of 50%. (Trial Exhibit 954, Monthly Operations Statistical Report, Feb. 2012, at DCF010897363).

c. According to a document assessing the Second Round CFSR, titled "MA CFSR 2007: Summary of Key Issues for PIP Development," in 9 of 10 cases rated as needing improvement in Item 22, there was no record of a comprehensive assessment of the child's physical or dental health.  Stakeholders reported a lack of dental providers accepting MassHealth in some areas. Regarding mental health, stakeholders reported a lack of consistent accessibility and availability of services.  (Trial Exhibit 34, MA CFSR 2007: Summary of Key Issues for PIP Development, at DCF008117150).

d. The 2008 CFSR Final Report found that Massachusetts was again not in substantial conformity with Child and Family Well Being Outcome 3: Children receive adequate services to meet their physical and mental health needs.  This outcome was substantially achieved in 75.4% of the applicable cases reviewed, well below the 95% or higher required for a rating of substantial conformity.  (Trial Exhibit 58, Massachusetts Child and Family Services Review Final Report, Feb. 21, 2008, at CSF-000000806).  The 2008 CFSR Final Report found that Child and Family Well Being Outcome 3, Item 22, physical health of the child, was an area needing

improvement.  Reviewers determined that the agency was adequately addressing the health needs of children in foster care and in-home services cases in 79% of the applicable cases reviewed, below the 90% or higher required for a rating of Strength. (*Id*. at CSF-000000807-08).  According to the 2008 CFSR Final Report, Massachusetts was deficient in appropriately assessing and meeting the physical, mental, and dental health needs of children, and inconsistent in providing health assessments and health records. (*Id*. at CSF-000000806-11).  In particular, the 2008 CFSR Final Report indicated that in many instances, comprehensive assessments of children's physical and dental health and medical information were not completed. (*Id*. at CSF-000000807).  With respect to Item 23 (Mental health of the child), DCF's performance was again rated as an area needing improvement.  (*Id.* at CSF-000000809).

e.  In response to the 2008 CFSR, DCF's October 5, 2009 Program Improvement Plan ("PIP") identified medical care as an area in need of improvement. The PIP said that efforts made to "to increase our performance on medical/dental care will be directed to both improving the data collection to document children's medical appointments and working with our community partners to improve access to medical and dental care for children in our care or custody." (Trial Exhibit 33, Massachusetts CFSR Program Improvement Plan, Oct. 5, 2009, p. 25).  Specifically, DCF planned to monitor these measures through case reviews and to establish new practice expectations for the documentation of medical and dental visits and new pathways to access consultations with child psychiatrists. (*Id.* at 53).

f.  According to the DCF PIP Final Report, all action steps and benchmarks related to the goal of access to needed medical and mental health services have been met through measures including the finalization of DCF's new policy regarding medical visits for children in DCF custody and new monthly management reports designed to track the occurrence of 7 and 30 day medical visits. (Trial Exhibit 760, DCF PIP Final Report, Oct. 2009 – Sept. 2011, Quarter Eight Report, July – Sept. 2011, at CSF-000005468-70).  However, performance in the area of 7 and 30 day medical visits has remained below DCF's target of 50% since the implementation of the PIP. (*See* Trial Exhibit 954, all Monthly Operations Statistical Reports).

g.  In both the 2011 APSR and the fiscal years 2010-2014 Child and Family Services Plan, DCF provided health care services plans which made a number of similar recommendations including prompts in FamilyNet for medical visits, updated MOSt report targets, modified reports, access to MassHealth data, and electronic records. (Trial Exhibit 374, Annual Progress and Services Report Federal FY2012, June 30, 2011, at DCF007413715-23; Trial Exhibit 94, Child and Family Services Plan FY2010-FY2014, at DCF7054496-501).

1236.  In addition, a chart revised in August 2011, outlining DCF's planned implementation of the Fostering Connections to Success and Increasing Adoptions Act of 2008, explains that under the Act, states are required to "develop a plan for ongoing oversight and coordination of health care services for children in foster care, including mental and dental health needs." (Trial Exhibit 196, Implementation Plan for the Fostering Connections to Success and

Increasing Adoptions Act, Aug. 2011, p. 6). This chart, revised three years after the passage of Act, shows no target completion date for the development of this plan. (*Id.*).

1237.   Regional offices have identified the timely provision of medical appointments as an important goal. For example, the Western Region's goals and objectives report included an item to "[r]eview existing Area Office monitoring system for timely provision of initial and 30-day medical appointments for children" and to "[i]dentify barriers to improving timely access and appropriate documentation of services delivered."  However, Regional Director Paul Fitzsimons indicated that no such reviews had taken place and he did not know if there were plans to achieve this goal prior to the end of fiscal year 2012. (Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, Mar. 5, 2012, at 152:8-153:4; Trial Exhibit 348, Email from Daniel Arnold to Paul Fitzsimons re: "Road Show" Data and Reports, May 24, 2011, and attached DCF Western Region Goals and Objectives Data Plan FY 2012).

1238.   DCF officials testified that social workers do not consider documentation of medical visits to be one of their highest priorities. (Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, Mar. 5, 2012, at 153:21-154:11). In addition, DCF's Director of Areas for the Pioneer Valley testified that he had not undertaken a case review in the Springfield and Van Wart offices to determine the actual rate of timeliness for children's 30-day medical appointments because of "where it fits into the priorities of what we need to do for children in our custody."  (Deposition of Raymond Burke, DCF Director of Areas for the Pioneer Valley, Jan. 19, 2012, at 160:21-161:3, 166:13-167:2).

### 5.    Systemic Departures From Professional Judgment

1239.   Plaintiffs' Expert Cathy Crabtree testified that DCF fails to conform to its own policy pertaining to medical visits and medical passports. (Trial Tr., Mar. 1, 2013 (Crabtree), 39:1-17; *see generally, id.* at 24:11-39:17).

### a)    *Lack of Data and Failure to Document*

1240.   Plaintiffs' Expert Dr. Bellonci testified that DCF departs from the standard of care by failing to adequately monitor and oversee children's clinical care.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 84:3-13).

1241.   Dr. Bellonci testified that DCF fails to utilize medical passports; passports are not current and do not include information about current medications, diagnoses, and allergies; and fails to utilize the Encounter form.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 94:2-14).

1242.   DCF is "not following [its] own guidelines around monitoring and oversight."  (Trial Tr., Jan. 24, 2013 (Bellonci), at 11:13-14).

1243.   DCF officials agree that there is no adequate system in place to document that children are receiving appropriate medical and dental care. (Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: The Program Improvement Plan, Apr. 4, 2012, at 100:13-101:4; *see also* Deposition of Raymond Pillidge, DCF Regional Director for the Northern Region, Mar. 7, 2012, 108:3-7,

115:13-16). DCF officials further acknowledge that documentation of medical appointments is an area needing improvement. (Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: Program Improvement Plan, Apr. 4, 2012, at 102:23-103:5; Deposition of Raymond Burke, DCF Director of Areas for the Pioneer Valley, Jan. 19, 2012, at 153:23-154:20, 160:15-20).

1244. DCF does not have a system to track whether children are receiving required Early Periodic Screening, Diagnosis and Treatment ("EPSDT") medical screenings beyond the 7-day and 30-day screenings. (Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: Program Improvement Plan, Apr. 4, 2012, at 105:2-13; Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 215:8-216:7). FamilyNet does not permit this type of tracking. (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 215:8-216:7).

1245. Dr. Bellonci testified that DCF's data system, FamilyNet, is not searchable and so does not support the monitoring function. (Trial Tr., Jan. 24, 2013 (Bellonci), at 91:13-17).

1246. FamilyNet has the capacity to provide workers with prompts or "ticklers" to perform tasks that are due, but no prompt or "tickler" has been implemented with respect to initial 7 or 30-day medical screenings. (Deposition of Rosalind Walter, DCF Director of Data Management, Jan. 4, 2012, at 81:12-83:1). FamilyNet currently has no system of "ticklers" to prompt social workers that either the initial screenings or periodic screenings are coming due. (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 216:2-7).

1247. In multiple strategic plans and presentations between 2008 and 2011, DCF officials identified problems related to the documentation of medical services, including the failure of workers to enter data into FamilyNet, and a lack of effective reporting. For example, a strategic plan to improve healthcare services in 2008 identified the following problems: "[c]apturing medical and dental visits in the Family Net system is difficult" and "[d]ocumenting visits in Family net not viewed as a priority." (Trial Exhibit 602, Strategic Planning: Improve Medical and Dental, at DCF000540088; *see also* Trial Exhibit 803, DCF Improving the Lives of Children and Families: Outcomes Tell the Story, Regional Forums, Nov. 2009, at GOV000006474 (stating that "actual performance [for initial medical appointments] is poorly documented.")). Despite discussions within DCF about DCF's performance (failure to meet the target of 50% set by the MOSt Report) for initial medical appointments and an acknowledgement that DCF "needed to do better in reporting," DCF officials are not aware of any action steps being taken to address the level of performance being reported in the FamilyNet system for initial medical appointments. (Deposition of Patricia Mackin, DCF Chief of Staff, Mar. 1, 2012, at 70:3-71:2, 72:16-23; *see also* Deposition of Raymond Pillidge, DCF Regional Director for the Northern Region, Mar. 7, 2012, at 109:3-20).

1248. DCF also does not have any way of tracking or ensuring that children are receiving required dental visits. (Deposition of Raymond Pillidge, DCF's Regional Director for the Northern Region, Mar. 7, 2012, at 117:11-20).

1249.   "Tickler" reports show lists of children with dental visits due.  For example, a November 3, 2010 "tickler" shows a large number of children with overdue dental visits, listing one outstanding dental visit due for a child since March 5, 2009. (Trial Exhibit 611, Assessments Due Through November 30, 2010, at Dental Tab, p. 61). A 2008 strategic plan to improve healthcare services identified "a lack of protocol and accountability for missed medical and dental visits." (Trial Exhibit 602, Strategic Planning: Improve Medical and Dental, at DCF000540088).

1250.   DCF has repeatedly aspired to access MassHealth data to populate children's case records regarding medical care, and in doing so has acknowledged that their own data is inaccurate, but has yet to effectively implement this strategy. Although recent documents report that an agreement was reached that allows DCF some access to reports from MassHealth, these efforts have, as of yet, had no impact on the quantity or timeliness of medical visits reported. (Trial Exhibit 438, DCF Medical Services Strategic Plan Draft, at DCF003712037; Trial Exhibit 954, all Monthly Operations Statistical Reports Reports; *supra* § VI.A.3).  Ruben Ferreira, DCF's Assistant Commissioner for Continuous Quality Improvement, testified that conversations about data sharing between DCF and MassHealth had not "led to any data flow between MassHealth and the department" regarding medical appointment data, due to "budget issues and resource issues." (Deposition of Ruben Ferreira, DCF Assistant Commissioner for Continuous Quality Improvement, Feb. 2, 2012, at 125:13-126:21; Trial Exhibit 227, Email exchange between Mary Ellen Bennard, Tomy Abraham, Ros Walter, et al. re: DCF kids check ups, Jan. 27, 2010). When asked in 2011 whether DCF was going to pursue a strategy of using MassHealth data to determine compliance with seven- and thirty-day medical visits, Mr. Ferreira replied, "I have discussed it with the Commissioner… and he stated: 'I'll see to it!' So… …I wait and see… though I'm not holding my breath."  (Trial Exhibit 306, Email exchange between Ruben Ferreira and Ros Walter re: clarification of criteria to use for DCF 7/30 data, Jan. 21, 2011, at DCF006031637 (ellipses in original)). Mr. Ferreira testified that he is not aware of any other actions that DCF has taken in order to obtain more accurate data regarding medical appointments.  (Deposition of Ruben Ferreira, DCF Assistant Commissioner for Continuous Quality Improvement, Feb. 2, 2012, at 131:7-12).

1251.   Similarly, Commissioner McClain and Secretary Bigby had discussions about obtaining provider data from the department of medical assistance in order to better track whether children's initial and 30-day medical appointments are occurring.  (*Id.* at 97:5-16).  However, this project has not moved forward and is not likely to move forward.  (*Id.* at 98:19-99:2).

1252.   DCF also fails to keep accurate records for medical passports. DCF has consistently acknowledged its failure to effectively document and maintain medical information for children in its custody and care in both the child's medical passport and the FamilyNet system.  Jan Nisenbaum, DCF's Deputy Commissioner for Clinical Practice and Program Operations, testified that the medical information captured in the FamilyNet system, from which the statutorily-required medical passports are created, is "not a hundred percent accurate," and acknowledged that this is "an area that we need to work on and do some improvement on." (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 103:6-104:12; *see also* Deposition of

Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 152:4-153:12).

1253.  If the medical passport was included in a database that could run reports, it could support a monitoring function.  For example, DCF could run a report based on medical passports of how many children in foster care are on psychotropic medication, or how many children are prescribed three or more psychotropic medications.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 61:12-25).

1254.  Medical passports, if properly utilized, could be very useful for providers to learn the child's medical history, including diagnoses, treatment history, and adverse reactions to medications.  This would be especially useful given "the disjointed care that children in child welfare receive" due to multiple placement moves and multiple providers.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 62:18-63:17).

1255.  Information on prescriptions and the administration of medications, as well as changes in medication, is also often not entered into the medical area of FamilyNet. (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 195:8-15).  DCF does not have any other system for tracking the drugs children are taking, other than paper records available in area offices.  (*Id*. at 195:16-197:2; *see infra* VI.B.5 (¶¶ 1400-1452)).

1256.  DCF does not have a process in place to audit medical passports on any periodic basis to determine whether they are comprehensive and up to date.  (Rule 30(b)(6) Deposition of Robert Wentworth, DCF Assistant Commissioner for Planning and Program Development, re: Purchased Services Licensing, Delivery, and Oversight, Dec. 29, 2011, at 241:24-242:7).

1257.  Similarly, there is no specific audit of child case files to determine whether or not case workers are consistently maintaining up-to-date medical passports. (Rule 30(b)(6) Deposition of Robert Wentworth, DCF's Assistant Commissioner for Planning and Program Development, re: Purchased Services Licensing, Delivery, and Oversight, Dec. 29, 2011, at 242:15-243:1; *see also id.* at 241:24-242:7).

1258.  DCF officials agree that it would be "helpful" to have a means of ensuring that case workers are in fact identifying issues, such as medication, that might impact the safety and well being of the child. (*Id.* at 239:5-240:6).

1259.  There is also no management report to determine with what frequency case workers consult with parents before consenting to the administration of prescription medications. (*Id.* at 236:17-237:10).

b)     <em>Lack of Training</em>

1260.  DCF fails to provide in-service training on issues related to medical services despite recommendations to the contrary. A March 2008 PowerPoint presentation had recommended mandatory in-service training for staff regarding medical services for children in out-of-home placement.  (Trial Exhibit 763, DSS Health and Medical Services Project, Research Findings, Mar. 3, 2008, at DCF002583264).  However, DCF currently mandates no further "in-service"

training following the training required of new social workers. (Trial Exhibit 387, Letter from Angelo McClain to Hon. Kay Khan and Hon. Gale D. Candaras, Mar. 8, 2010, at DCF000543369-70).

1261. In addition, an April 2010 document included in the preparation for a July 2010 meeting explains that there is "no formal training by DCF that addresses any issues related to the identification or the role of a child's medical decision maker." (Trial Exhibit 624, DCF Workgroup Agenda, July 1, 2010, at DCF003185446).

c)    <em>Social workers' high caseloads and uncertainty about the policy</em>

1262. DCF staff at the area office level have expressed frustration with the inability to complete 7 and 30 day medical visits, citing high caseloads and confusion about policy. In December 2006, a survey was distributed to workers asking for information about the workers' understanding of the 7 and 30 day medical visit requirements, and the barriers to success in ensuring compliance with these requirements. A number of workers responded that they were unaware of the policy, that they believed it was the foster parents' responsibility to schedule these appointments, or that they were aware of one required visit but not the other. (Trial Exhibit 596, Medical Visit Survey, Dec. 2006, at DCF009508673-679). Barriers to success reported by the workers include high caseloads. (*Id.* at DCF009508684-89; *see also* Trial Exhibit 597, Open-Ended Results Detail for Medical Visit Survey Question No. 7, Jan. 4, 2007). Five years later, in 2011, DCF caseworkers still report being unable to stay on top of compliance with 7 and 30 day medical visits due to their workload. (Trial Exhibit 618, Email from Michelle Mason to Cynthia Harmon, Paula Caramello, et al. re: Medical visits due/compliance, Apr. 19, 2011).

1263. Responding to DCF's new policy, "Medical Exams for Children Entering DCF Placement or Custody," which mandates 7 and 30 day medical visits, Peter MacKinnon asked for guidance in how to "get these visits done (and save the sanity of my workers!)." (Trial Exhibit 761, Email from Peter MacKinnon to Lori Ortiz re: Medical Exams for Children Entering DCF Placement or Custody, May 20, 2011, at DCF005655986). On the same day, Mr. MacKinnon wrote to Zevorah Bagni (then president of SEIU Local 509) and Donna Morin to inquire whether the union had been involved in bargaining related to this policy. He explained to Ms. Morin that he was confused, given the fact that medical policy was also contained in the as-yet-unpromulgated Permanency Policy. He was additionally confused by policy he found "on family net," stating that under some circumstances medical visits were not required upon entry into care, in direct contradiction of the policy being enforced by managers. He said that he brought this up because the policy "[is] being enforced now in the area offices, and is causing quite a bit of panic." His questions are forwarded on to Virginia Peel and Jan Nisenbaum. (Trial Exhibit 762, Emails among Virginia Peel, Jan Nisenbaum, Peter MacKinnon, Zevorah Bagni and Donna Morin re: do you recall if we bargained this?, May 10-20, 2011).

245

d)    *Communication with Foster Parents*

1264.    Medical information DCF has regarding a child is not communicated in writing to the foster parent at the time of placement on a regular basis.  (Deposition of Joseph Collins, DCF Director of Areas for Franklin and Hampshire, Jan. 25, 2012, at 198:6-9).

1265.    Even though there are policies requiring that foster homes must be provided with a child's service plan, a child placement agreement, and a medical passport, DCF does not have any way of tracking whether these documents are in fact provided.  (Rule 30(b)(6) Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, re: Placement Array, Assignment of Placements, and Placement Moves, Sept. 20, 2011, at 239:8-20, 240:24-243:2; *see also* Deposition of Virginia Peel, DCF General Counsel, Feb. 8, 2012, at 86:9-88:3).

1266.    DCF does not produce any management report that tracks, in the aggregate, whether foster parents are timely provided with updated medical passports at the time a child is placed.  (Rule 30(b)(6) Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, re: Staffing, Caseloads, and Training, Jan. 20, 2012, at 180:6-24).  Olga Roche, DCF's Deputy Commissioner for Field Operations, was unaware of any case record review performed in 2008 or later to determine the rate at which medical passports are timely provided.  (*Id.* at 181:20-182:2).

1267.    DCF also does not have any sort of "check box" within the FamilyNet system that allows management to track whether foster parents and other caregivers are being provided with medical passports at the time a child is placed in their home. (*See* Deposition of Virginia Peel, DCF General Counsel, Feb. 8, 2012, at 86:9-88:3; Deposition of Raymond Burke, DCF Director of Areas for Pioneer Valley, Jan. 19, 2012, at 263:12-264:1; Rule 30(b)(6) Deposition of Terrence Flynn, DCF Regional Director of the Southern Region, re: Placement Array, Assignment of Placements, and Placement Moves, Sept. 20, 2011, at 160:20-161:20, 239:8-20; 242:20-243:2; Deposition of Ruben Ferreira, DCF Assistant Commissioner for Continuous Quality Improvement, Feb. 2, 2012, at 238:13-239:3; Deposition of Rosalind Walter, Jan. 4, 2012, at 181:23-182:7; Deposition of Joseph Collins, DCF Director of Areas for Franklin and Hampshire, Jan. 25, 2012, at 196:8-198:9: Rule 30(b)(6) Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, re: Staffing, Caseloads, and Training, Jan. 20, 2012, at 179:7-182:2). Nor was there any case record review performed in 2008 or later to determine the rate at which medical passports are timely provided.  (Rule 30(b)(6) Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, re: Staffing, Caseloads and Training, Jan. 20, 2012, at 181:20-182:2; *see also* Deposition of Joseph Collins, DCF's Area Director for Franklin and Hampshire, Jan. 25, 2012, at 197:2-4)

1268.    DCF also does not measure the performance of case workers in timely getting Medicaid numbers or Medicaid cards to foster parents. (Rule 30(b)(6) Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, re: Staffing, Caseloads, and Training, Jan. 20, 2012, at 177:7-178:20; Rule 30(b)(6) Deposition of Robert Wentworth, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, re: Purchased Services Licensing, Delivery, and Oversight, Dec. 29, 2011, at 280:12-281:1).

1269.   A fiscal year 2011-2012 document titled "Family Resource CQI/Self Assessment" noted that "[c]ommunication around responsibility for children's medical care needs to be addressed across all units" and that "[m]aking sure foster parents know about medical appointments in a timely fashion benefits everyone." (Trial Exhibit 734, FY 11-12 Family Resource CQI/Self Assessment, at DCF000085871, DCF000085875).

1270.   In addition, supporting foster parents who cannot take children to medical appointments has been identified as a barrier to wellbeing that needs to be addressed. (Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, Mar. 5, 2012, at 177:4-7; Trial Exhibit 32, Email from Raymond Burke to DSS-DL – Springfield Users, re: Springfield Family Resource CQI Self Assessment—FY11-12—5-27-11, May 27, 2011, with attached DCF Springfield Family Resource CQI/Self Assessment FY 11-12).

e)   *Lack of Providers*

1271.   Availability of providers is also a problem for medical services, particularly with regard to specialists who will see foster children.  The 2004-2005 Massachusetts Society for the Prevention of Cruelty to Children ("MSPCC") Foster Parent Survey, foster parents reported that "it can be difficult to find specialists for children," and expressed "concerns that doctors are not necessarily attuned to the unique needs of foster children."  (Contested Exhibit DJ, Statewide Foster Parent Survey, Feb. 2005, at DCF000066769).  The foster parents expressed the need for "a network of doctors who understand the [foster] child's misfortunes and fears."  (*Id.*) (alteration in original) (internal quotation marks omitted).

1272.   DCF is also aware of difficulties finding dentists that will accept Medicaid rates to treat children in foster care. (Rule 30(b)(6) Deposition of Robert Wentworth, DCF Assistant Commissioner for Planning and Program Development, re: Purchased Services Licensing, Delivery, and Oversight,  Dec. 29, 2011, at 294:11-18).

**B.   Psychotropic Medications**

**1.   Professional Standards**

1273.   A psychotropic or psychiatric medication is a medication being used for a "primary emotional or behavioral focus."  (Trial Tr., Jan. 22, 2013 (Bellonci), at 126:15-19).  Antipsychotic medications are a class of psychotropic medications that are approved for the treatment of psychotic conditions.  (*Id.* at 126:20-25, 127:11-20).

1274.   According to a document produced by the Massachusetts Department of Mental Health and revised in 2007: "Any pharmacotherapy should be preceded by assessment that is individualized, careful, and as comprehensive as necessary."  (Contested Exhibit ER, Massachusetts Department of Mental Health, Psychoactive Medication for Children and Adolescents: Orientation for Parents, Guardians, and Others,  at DCF000072659).

1275.   According to the American Academy of Child and Adolescent Psychiatrists ("AACAP") standards, "[y]outh in state custody should have access to effective psychosocial, psychotherapeutic, and behavioral treatments, and, when indicated, pharmacotherapy."  (Trial Exhibit 17, AACAP Position Statement on Oversight of Psychotropic Medication Use

247

for Children in State Custody: A Best Principles Guideline, p. 1; *see also* Trial Tr., Jan. 24, 2013 (Bellonci), at 41:22-24).

1276.   Non-pharmacological psychosocial interventions such as therapy should be utilized before prescribing medication to treat children's mental health issues.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 7:19-25; Deposition of Russell Livingston, DCF Medical Director for Psychiatry, Jan. 6, 2012, at 18:10-17).  Children should not be "prescribed medications in lieu of psychosocial therapies."  (Trial Tr., Jan. 24, 2013 (Bellonci), at 9:3-7, 97:12-14).

1277.   Psychosocial interventions can be "very effective" and have much more benign potential side effects than medications.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 7:19-23; *see also* Deposition of Russell Livingston, DCF Medical Director for Psychiatry, Jan. 6, 2012, at 21:5-11).

1278.   Dr. Bellonci relied on the following in identifying the standard of care with respect to a child welfare system's oversight of the administration of psychotropic medication to children in foster care: the "AACAP Position Statement on Oversight of Psychotropic Medication Use for Children in State Custody: A Best Principles Guideline" ("the AACAP standards"); guidance from the federal government, including the information memorandum regarding the "Safe, Appropriate, and Effective Use of Psychotropic Medication for Children in Foster Care" issued by the Administration for Children and Families ("ACF"), the Fostering Connections to Success and Increasing Adoptions Act of 2008, and the Child and Family Services Improvement and Innovation Act; the oversight mechanisms of other state child welfare systems; Massachusetts policies and regulations; research and literature on the safety and efficacy of psychotropic medications; research regarding oversight and monitoring of psychotropic medications; and Foster Children: HHS Guidance Could Help States Improve Oversight of Psychotropic Prescriptions ("the GAO report").  (Trial Tr., Jan. 24, 2013 (Bellonci), at 42:21-43:4, 44:16-46:10, 46:25-49:4, 75:12-76:1).  Dr. Bellonci's understanding is further informed by his twenty years of clinical experience.  (*Id*. at 46:25-47:3, 48:15-20).

1279.   Dr. Livingston testified that he considers the AACAP standards to be a valid set of professional standards regarding the oversight of the provision of psychotropic medications to children in state custody.  (Deposition of Russell Livingston, DCF Medical Director for Psychiatry, Jan. 6, 2012, at 79:8-80:9, 81:5-19).

1280.   The Administration for Children and Families has described the AACAP standards as "based on a core set of clinical practice principals specific to psychiatric and pharmacologic treatment of children in foster care."  According to ACF, the AACAP standards "may be particularly relevant to States . . . when developing the psychotropic medication oversight and monitoring component of their title IV-B plan.  (Trial Exhibit 825, ACF Children's Bureau, Information Memorandum, Log No: ACYF-CB-IM-12-03, Apr. 11, 2012, p. 13).

1281.   The AACAP standards require that state child welfare agencies "implement effective oversight procedures" for psychotropic medication including, at a minimum, "establish[ing] guidelines for the use of psychotropic medications for youth in state custody."  (Trial Exhibit 17, AACAP Position Statement on Oversight of Psychotropic Medication Use for Children in

State Custody: A Best Principles Guideline, p. 2). Dr. Livingston testified that he would characterize this requirement in the AACAP standards as "less than minimal," because it does not establish minimum guidelines. (Deposition of Russell Livingston, DCF Medical Director for Psychiatry, Jan. 6, 2012, at 82:12-84:6).

1282. According to the AACAP standards, children in foster care "often have no consistent interested party" to oversee their mental health treatment. Accordingly, the state has a duty "to provide informed consent for their treatment, to coordinate treatment planning and clinical care," and "to provide longitudinal oversight" or monitoring of children's treatment. (Trial Exhibit 17, AACAP Position Statement on Oversight of Psychotropic Medication Use for Children in State Custody: A Best Principles Guideline, p. 1; *see also* Trial Tr., Jan. 24, 2013 (Bellonci), at 39:16-40:17).

a)    *Informed Consent*

1283. A medical provider cannot prescribe a psychotropic medication to a child without the consent of the child's parent or guardian. (Trial Tr., Jan. 24, 2013 (Bellonci), at 10:1-3). It is the responsibility of the medical practitioner to provide the person who is authorized to give consent – either the parent or the state for children in foster care – the information necessary for them to make an informed choice about what treatment is in the child's best interest. (*Id*. at 9:12-10:1; 13:20-25).

1284. During the informed consent process, the provider should explain to the consenter what is not known about the use of medications in children and adolescents, including long-term side effects and safety for children and adolescents. (Trial Tr., Jan. 24, 2013 (Bellonci), at 13:20-25, 17:14-17). There should be a discussion of risks and benefits, potential side effects, the child's likely response, and an expected timeline for the child's response. (*Id*. at 20:20-25). The physician typically makes a recommendation about multiple alternative treatment options but does not order treatment, and the parent or guardian should not simply defer to the physician. (*Id*. at 7:17-19, 10:3-15, 11:15-23, 17:21-23).

1285. Ms. Roche testified that "if the child is in [DCF] custody, we become the role of parents," and therefore "[w]e also have authority within that decision-making" concerning mental health treatment provided to children. (Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 9:13-11:6).

1286. The AACAP standards require informed consent for the psychiatric treatment of children and adolescents "by a person or agency authorized . . . to act *in loco parentis*." (Trial Exhibit 17, AACAP Position Statement on Oversight of Psychotropic Medication Use for Children in State Custody: A Best Principles Guideline, p. 2; Trial Tr., Jan. 24, 2013 (Bellonci), at 37:25-38:10, 38:13-39:1, 39:11-15).

1287. Massachusetts regulation requires "prior judicial approval" before administering antipsychotic medications to children in DCF custody unless in an emergency. (Trial Exhibit 69, 110 Mass. Code Regs. 11.14 (2013); *see also* Trial Tr., Jan. 24, 2013 (Bellonci), at 55:23-57:12).

1288.   Massachusetts regulation lists eighteen antipsychotic medications and has not been updated to include second-generation antipsychotic medications.  (Trial Exhibit 69, 110 Mass. Code Regs. 11.14 (2013);Trial Tr., Jan. 24, 2013 (Bellonci), at 57:14-58:9).

1289.   Massachusetts regulation states that DCF may consent to all routine medical care for children in DCF custody, which includes psychiatric assessment, evaluation, and treatment, including psychotropic medications other than antipsychotic medications.  (Trial Exhibit 69, 110 Mass. Code Regs. 11.04 (2013);Trial Tr., Jan. 24, 2013 (Bellonci), at 58:12-59:8).

1290.   The standard of care is informed by the "Safe, Appropriate, and Effective Use of Psychotropic Medication for Children in Foster Care" Information Memorandum issued by ACF, which notes the need for "[i]nformed and shared decision-making (consent and assent) and methods for on-going communication between the prescriber, the child, his/her caregivers, other healthcare providers, the child welfare worker, and other key stakeholders."  (Trial Exhibit 825, ACF Children's Bureau, Information Memorandum, Log No: ACYF-CB-IM-12-03, Apr. 11, 2012, p. 12).

1291.   The standard of care with regard to assent is informed by the AACAP standards, which require assent from the youth for the psychiatric treatment of children and adolescents.  (Trial Exhibit 17, AACAP Position Statement on Oversight of Psychotropic Medication Use for Children in State Custody: A Best Principles Guideline, p. 2).

1292.   Dr. Livingston testified that a minimal standard for state oversight of the use of psychotropic medications would be to "[e]stablish a mechanism to obtain assent for psychotropic medication management from minors when possible."  (Deposition of Russell Livingston, DCF Medical Director for Psychiatry, Jan. 6, 2012, at 82:3-11; Trial Exhibit 17, AACAP Position Statement on Oversight of Psychotropic Medication Use for Children in State Custody: A Best Principles Guideline, p. 2).

1293.   There is no minimum age that triggers obtaining assent from a child, although the conversation varies depending on the child's age.  Dr. Bellonci obtains assent from five-year-old children.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 15:6-13).

b)   *Clinical Oversight and Documentation*

1294.   Massachusetts regulation and DCF policy require that DCF provide a medical passport for all children in placement, which includes all pertinent and available medical, dental, mental health, and developmental data about the child.  The child's caseworker is required to ensure that the passport is kept up to date.  (Trial Exhibit 69, 110 Mass. Code Regs. 7.124 (2013); Trial Exhibit 1, Foster Care Review Policy Appendix A: Guidelines for Medical Passport Review, Sept. 6, 2000, DCF Case Practice Policy and Procedures Manual, at DCF POL (7/08) 155; Trial Exhibit 1, Placement Prevention and Placement Policy, DSS policy No. 90-004(R), Feb. 10, 1998, DCF Case Practice Policy and Procedures Manual, at DCF POL (7/08) 172; Trial Exhibit 1, Medical Examinations for Children Entering DCF Placement or Custody, DCF Policy No. 2010-001, Feb. 1, 2010, at DCF POL (7/08) 285-86; *see also supra* ¶¶ 1154-1159).

1295.   According to DCF policy, caseworkers are supposed to input the medications children are
        prescribed and any medication history into FamilyNet.  (Deposition of Russell Livingston,
        DCF Medical Director for Psychiatry, Jan. 6, 2012, at 26:13-20; Trial Tr., Jan. 24, 2013
        (Bellonci), at 91:10-12).

1296.   In order for a medical provider to develop an appropriate medical opinion, the provider
        needs information about what treatment and medication has previously been tried and the
        child's response to those interventions.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 8:11-13,
        11:25-12:25).  Dr. Bellonci would expect that a reasonable parent could provide this
        information.  (*Id.* at 8:21-25).  Without information about the child's developmental history,
        past interventions that have been tried, and the child's response to those interventions, the
        provider cannot provide the consenting authority with an informed opinion about what the
        problem is and what treatment options there are.  (*Id.* at 13:4-10).

1297.   In addition, to monitor whether a medication trial is working for a child and to develop a
        medical opinion about what is in the child's best interest, the provider needs information
        about the child's response to the medication and whether the child has been exhibiting any
        side effects.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 8:1-10).

1298.   A September 2010 "Multi-State Study on Psychotropic Medication Oversight in Foster
        Care" conducted by The Tufts Clinical and Translational Science Institute (the "Tufts Multi-
        State Study"), identified as one of the components of an oversight system for psychotropic
        medication use among youth in foster care that the child welfare agency "has mechanism(s)
        to document: medication, rationale, informed consent, [and] dose. (Trial Exhibit 1063, Multi-
        State Study on Psychotropic Medication Oversight in Foster Care, Study Report, Sept. 2010,
        pp. 20, 22).

1299.   The parent or consenting authority has a continuing responsibility after the initial
        consent.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 20:5-8).  The parent or guardian needs to
        inform the provider about how the intervention is working, including the child's response to
        the medication, the side effects the child is experiencing, and their severity.  This information
        then informs the provider's treatment recommendations.  (*Id.* at 21:1-18).  Ultimately, the
        parent or guardian needs to decide whether the child's side effects are so intolerable that the
        medication should be stopped.  (*Id.* at 21:18-23).

1300.   According to a document for caregivers produced by the Massachusetts Department of
        Mental Health ("DMH"), "[f]requent movement requires that assessment and treatment
        information be efficiently transmitted from one setting to another. . . . As the child or
        adolescent recovers, the goal should be to provide continuity of treatment, including
        medication, and relationships."  (Contested Exhibit ER, Psychoactive Medication for
        Children and Adolescents: Orientation for Parents, Guardians, and Others, Massachusetts
        Department of Mental Health, revised Sept. 2007, at DCF000072668).  Similarly, the
        AACAP standards require that "[y]outh in state custody who require mental health services
        are entitled to continuity of care, effective case management, and longitudinal treatment
        planning."  (Trial Exhibit 17, AACAP Position Statement on Oversight of Psychotropic
        Medication Use for Children in State Custody: A Best Principles Guideline, p. 1; *see also*
        Trial Tr., Jan. 24, 2013 (Bellonci), at 41:22-24).

1301.   When a child is being administered a psychotropic medication, the child welfare agency has monitoring and oversight responsibilities.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 9:1-3).

1302.   If the state treats children with psychotropic medications, the state should be "engaging in a truly informed conversation about the potential risk of these medications over the long-term, and . . . have a mechanism for monitoring side-effects."  (Trial Tr., Jan. 24, 2013 (Bellonci), at 11:9-12).

1303.   In April 2012, the Administration for Children and Families ("ACF") issued a Memorandum regarding the "Safe, Appropriate, and Effective Use of Psychotropic Medication for Children in Foster Care." (Trial Exhibit 825, ACF Children's Bureau, Information Memorandum, Log No: ACYF-CB-IM-12-03, Apr. 11, 2012).  The memo urges "close supervision and monitoring . . . [and] careful management and oversight" in the use of psychotropic medications for children.  (*Id.* at p. 10; *see also* Trial Tr., Jan. 24, 2013 (Bellonci), at 45:4-46:10).

1304.   The Tufts Multi-State Study found that components of a state child welfare agency's oversight program should include that the agency has a mechanism to document the child's response and emerging side effects to any medication and that the agency "has [a] system for monitoring medication use for individual youth in foster care."  (Trial Exhibit 1063, Multi-State Study on Psychotropic Medication Oversight in Foster Care, Study Report, Sept. 2010, pp. 20, 22).

c)      *Comprehensive Oversight and Monitoring*

1305.   "Comprehensive oversight programs" can help states identify the health risks associated with psychotropic medications.  (Trial Exhibit 1033, Memorandum from Russell Livingston re: DCF Review of GAO Report "Foster Children: HHS Guidance Could Help States Improve Oversight of Psychotropic Prescriptions," Dec. 8, 2011, at DCF011038045).

1306.   Under federal law, DCF and other child welfare agencies are required to "develop . . . a plan for ongoing oversight and coordination of health care services for any child in a foster care placement," which must include "an outline of . . . the oversight of prescription medicines, including protocols for the appropriate use and monitoring of psychotropic medications." 42 U.S.C. § 622(b)(15)(A).  (*See also* Trial Exhibit 825, ACF Children's Bureau, Information Memorandum, Log No: ACYF-CB-IM-12-03, Apr. 11, 2012, p. 2; Trial Tr., Jan. 24, 2013 (Bellonci), at 45:4-46:10).

1307.   The ACF Information Memorandum notes the need for "[e]ffective medication monitoring at both the client and agency level."  (Trial Exhibit 825, ACF Children's Bureau, Information Memorandum, Log No: ACYF-CB-IM-12-03, Apr. 11, 2012, p. 12).

1308.   The Tufts Multi-State Study found that one component of an oversight system for psychotropic medication use among youth in foster care is that the "[a]gency uses oversight program to monitor population trends, including 'red flags' and 'outliers.'"  (Trial Exhibit 1063, Multi-State Study on Psychotropic Medication Oversight in Foster Care, Study Report, Sept. 2010, pp. 20, 22).

1309.   The AACAP standards also recommend that state child welfare agencies "design a
consultation program" to allow the agency staff charged with consenting to psychotropic
medications and treating physicians to consult with child and adolescent psychiatrists.  (Trial
Exhibit 17, AACAP Position Statement on Oversight of Psychotropic Medication Use for
Children in State Custody: A Best Principles Guideline, p. 3).  The ACF Information
Memorandum also notes the need for "mental health expertise and consultation regarding
both consent and monitoring issues."  (Trial Exhibit 825, ACF Children's Bureau,
Information Memorandum, Log No: ACYF-CB-IM-12-03, Apr. 11, 2012, p. 13).

## 2.    The Misuse of Psychotropic Medications Can Cause Harm and Risk of Harm to Children

1310.   There is a lack of research to support the use of psychotropic medications for children
and adolescents.  (Trial Tr., Jan. 22, 2013 (Bellonci), at 131:21-132:2, 133:13-16 (discussing
Trial Exhibit 1062, Appendix C to Christopher Bellonci, Expert Witness Report, Aug. 22.
2012, Peter Jensen Table of Scientific Knowledge v. Frequent Use); *see also* Trial Exhibit
246, Email exchange between Russell Livingston, Jan Nisenbaum, and Donna Reulbach, et
al. re: Draft of talking points, Sept. 25, 2009, at DCF005334511).  As ACF has noted,
"research on the safe and appropriate pediatric use of psychotropic medications lags behind
prescribing trends.  There is even less evidence of the effectiveness of pharmacologic
interventions for the treatment of trauma-related symptoms in children."  (Trial Exhibit 825,
ACF Children's Bureau, Information Memorandum, Log No: ACYF-CB-IM-12-03, Apr. 11,
2012, p. 7). The memo warns that in the absence of research on the safe pediatric use of
psychotropic medications, "it is not possible to know all of the short- and long-term effects,
both positive and negative, of psychotropic medications on young minds and bodies."  (*Id.* at
pp. 7-8).

1311.   Trial Exhibit 1062 is a chart that identifies the evidence supporting the use of classes of
psychotropic medications for children and adolescents.  (Trial Tr., Jan. 22, 2013 (Bellonci),
at 131:15-132:2).  Numerous classes of psychotropic medications are used in children to treat
particular mental health indications, based only on "case reports or open label trials," which
is "the lowest research standard."  (Trial Exhibit 1062, Appendix C to Christopher Bellonci,
Expert Witness Report, Aug. 22. 2012, Peter Jensen Table of Scientific Knowledge v.
Frequent Use; Trial Tr., Jan. 22, 2013 (Bellonci), at 132:3-7, 133:13-20; *see also* Trial
Exhibit 1087; Trial Tr., Feb. 7, 2013 (Bellonci), at 6:23-7:7, 9:12-13).

1312.   Psychotropic medications, and antipsychotic medications in particular, carry lifetime
risks, for example, of diabetes and heart disease.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 7:7-
16).  Side effects from psychotropic medications may include: death; tardive dyskinesia ("a
potentially irreversible movement disorder"); hyperglycemia; hyperlipidemia, which can be a
precursor to obesity and diabetes; a toxic skin condition; and arrhythmias.  (Deposition of
Russell Livingston, DCF Medical Director for Psychiatry, Jan. 6, 2012, at 12:16-13:12,
14:10-23, 17:12-18:1).

1313.   Ms. Nisenbaum testified that the members of the psychotropic medication work group are
aware that "the mental health community as a whole believes that there are some potential
risks and dangers to children" associated with the prescription of psychotropic medications.

(Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program and Operations, May 18, 2012, at 105:17-106:1). She agreed that the psychotropic medication issue should be "a priority." (*Id*. at 109:10-15).

1314. There are concerns that psychotropic medications are frequently used to suppress children's manifestations of the trauma they have experienced due to removal from home and past maltreatment, as opposed to being used to treat a mental health disorder. (Trial Tr., Jan. 24, 2013 (Bellonci), at 6:20-7:7). One of the concerns with psychotropic medications is that they may be prescribed to children as behavior management in order to make the child easier to handle. (*Id*. at 6:9-15). Mr. Wentworth testified that "whether it's medication or any other system that's in place that's coercive, that intends to subjugate kids in order to extinguish behaviors, we think that's been the wrong approach." (Rule 30(b)(6) Deposition of Robert Wentworth, DCF Assistant Commissioner for Planning and Program Development, re: Purchased Services Licensing, Delivery, and Oversight, Dec. 29, 2011, at 227:17-228:12).

1315. According to an information memorandum issued by the Administration for Children and Families ("ACF"), practices dealing with psychotropic medication that may be "of concern include instances where children are prescribed too many psychotropic medications, too much medication, or at too young an age: too many, and too much, too young." (Trial Exhibit 825, ACF Children's Bureau, Information Memorandum, Log No: ACYF-CB-IM-12-03, Apr. 11, 2012, p. 8).

1316. According to experts consulted in conjunction with the GAO report, "the use of five or more drugs at once is a high-risk practice . . . no evidence supports the use of five or more psychotropic drugs in adults or children." (Trial Exhibit 16, United States Government Accountability Office, Foster Children: HHS Guidance Could Help States Improve Oversight of Psychotropic Prescriptions, Dec. 2011, p. 14; *see also* Trial Exhibit 825, ACF Children's Bureau, Information Memorandum, Log No: ACYF-CB-IM-12-03, Apr. 11, 2012, p. 8).

1317. There is "scant evidence of the effectiveness of using multiple psychotropic medications at once." (Trial Exhibit 825, ACF Children's Bureau, Information Memorandum, Log No: ACYF-CB-IM-12-03, Apr. 11, 2012, p. 8; *see also* Trial Tr., Jan. 22, 2013 (Bellonci), at 139:11-14). Each additional medication adds a new variable about the impact of the medications working together. (Trial Tr., Jan. 22, 2013 (Bellonci), at 139:14-17). "There is even less outcome research regarding the (increasing) usage of polypharmacy in [the foster care] population." (Trial Exhibit 246, Email exchange between Russell Livingston, Jan Nisenbaum, and Donna Reulbach, et al. re: Draft of talking points, Sept. 25, 2009, at DCF005334512).

1318. "[T]aking drugs at dosages exceeding levels recommended by the FDA and medical literature increases the potential for adverse side effects. Although there may be cases in which such doses are clinically justified, in general, there is a lack of research demonstrating that high dosages are more effective." (Trial Exhibit 16, United States Government Accountability Office, Foster Children: HHS Guidance Could Help States Improve Oversight of Psychotropic Prescriptions, Dec. 2011, p. 15).

1319.  No antipsychotic medications are approved for use with children under the age of ten. (Trial Tr., Jan. 22, 2013 (Bellonci), at 127:16-128:4).

1320.  Given the dearth of research about psychotropic medications in children, there is "a great breadth of opinions" about the use of medications in child psychiatry and a wide range of prescribing practices.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 5:12-15, 10:9-15).

1321.  It is "critically important" for children in the child welfare system to understand why they are being put on medications. (Trial Tr., Jan. 24, 2013 (Bellonci), at 14:20-24).  The assent process can help inform the child "about their condition, their responsibility for helping in health promotion, and what role the medicine is meant to play in that." (*Id.* at 16:8-13).  Many youth age out of foster care at age eighteen and "immediately stop" their psychotropic medications because they do not understand why they are taking those medications.  (*Id.* at 15:1-5).

### 3.    DCF Performance

1322.  Over the last ten to fifteen years, there has been exponential growth in the utilization of psychotropic medications to treat children, especially for children in foster care.  (Trial Exhibit 825, ACF Children's Bureau, Information Memorandum, Log No: ACYF-CB-IM-12-03, Apr. 11, 2012, pp. 10-11; Trial Tr., Jan. 24, 2013 (Bellonci), at 49:21-25).  There is a "perfect storm of potential hazard" because children in foster care have been traumatized, abused, and/or neglected, so may be acting out their anger; they have access to Medicaid and ready access to psychotropic medications; there is "a dearth of practitioners trained in evidence based practices"; and there is "a dearth of evidence to support" the utilization rate of psychotropics.  (*Id*. at 50:1-16).

1323.  Children in foster care are more likely to be prescribed medication without first attempting more conservative interventions.  (Deposition of Russell Livingston, DCF Medical Director for Psychiatry, Jan. 6, 2012, at 18:18-19:13).  It is not uncommon for a child in foster care to be prescribed a psychotropic medication when "there has not been an adequate trial" of evidence-based, non-pharmacological treatment.  (*Id.* at 20:4-21).  This occurs in part because of the lack of clarity about children's medical and treatment history when they move frequently, which often results in the child continuing to manifest symptoms and continued pressure to medicate the child to mitigate those symptoms.  (*Id.* at 19:16-20:3).

1324.  The review of case files conducted by Plaintiffs' expert, the Children's Research Center ("CRC"), revealed that more than half (52.1%) of the 242 children in the two-year cohort were given psychotropic medications during the period under review.  (Trial Exhibit 1065, Table C46, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; *see also* Trial Tr., Jan. 30, 2013 (Freitag),at 49:16-25).  In addition, 16.5% of the 242 children in the entry cohort were prescribed psychotropic medications during the period under review.  (*Id.*).  The inter-rater reliability for these measures exceeded 80%.  (Trial Exhibit 1069, Table Three, Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC)

and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowsky, Oct. 19, 2012, Nov. 19, 2012; *see also supra* ¶ 80).

1325.   Seven children under the age of six in the two-year cohort out of a sample of fewer than ninety-nine children – or at least 7% – were prescribed one or more psychotropic medications during the thirty-month period from July 1, 2009 to December 31, 2012.  (Trial Tr., Jan. 30, 2013 (Freitag), at 51:11-23).  There were ninety-nine children in the two-year cohort who were under the age of six at the time they entered DCF custody; accordingly, there were fewer than ninety-nine children who were under the age of six as of July 1, 2009.  (Trial Exhibit 1066, Table 34, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012).

1326.   In December 2011, the United States Government Accountability Office published a report ("GAO Report"), which examined the rates of psychotropic medication prescription for foster and non-foster children in 2008 and state oversight of psychotropic medications for foster children in five states, including Massachusetts.  (Trial Exhibit 16, United States Government Accountability Office, Foster Children: HHS Guidance Could Help States Improve Oversight of Psychotropic Prescriptions, Dec. 2011).

1327.   According to the GAO Report, 39.1% of foster children in Massachusetts under the age of eighteen were prescribed psychotropic medications.  (Trial Exhibit 16, United States Government Accountability Office, Foster Children: HHS Guidance Could Help States Improve Oversight of Psychotropic Prescriptions, Dec. 2011, p. 102; *see also* Trial Tr., Jan. 24, 2013 (Bellonci), at 76:14-24).  This was the highest rate of any of the five states studied in the GAO Report and is high compared to other states.  (Trial Exhibit 16, United States Government Accountability Office, Foster Children: HHS Guidance Could Help States Improve Oversight of Psychotropic Prescriptions, Dec. 2011, pp. 101-05; Trial Tr., Jan. 24, 2013 (Bellonci), at 77:11-13, 87:20-25).  In addition, children in foster care in Massachusetts were prescribed psychotropic medications 3.8 times as frequently as non-foster children in Medicaid.  (Trial Exhibit 16, United States Government Accountability Office, Foster Children: HHS Guidance Could Help States Improve Oversight of Psychotropic Prescriptions, Dec. 2011, p. 102).

1328.   More than half of youth in foster care in Massachusetts ages thirteen to seventeen (53.4%) were prescribed psychotropic medications, compared to 14.7% of non-foster children in Medicaid.  (Trial Exhibit 16, United States Government Accountability Office, Foster Children: HHS Guidance Could Help States Improve Oversight of Psychotropic Prescriptions, Dec. 2011, p. 102).  Just under half (44.8%) of children ages six to twelve in foster care in Massachusetts were prescribed psychotropic medications.  (*Id*.).

1329.   Dr. Livingston testified that many psychotropic medications are prescribed to children "off label."  (Deposition of Russell Livingston, DCF Medical Director for Psychiatry, Jan. 6, 2012, at 96:20-97:1; *see also* Trial Exhibit 246, Email exchange between Russell Livingston, Jan Nisenbaum, and Donna Reulbach, et al. re: Draft of talking points, Sept. 25, 2009, at DCF005334512).  Dr. Livingston testified that these off-label uses may be for another purpose than that specified on the label or at a higher dosage range or for younger children.

(Deposition of Russell Livingston, DCF Medical Director for Psychiatry, Jan. 6, 2012, at 97:2-15).

1330.   According to the GAO Report, 2.21% of Massachusetts foster children under the age of eighteen were prescribed a medication dosage exceeding maximum guidelines established by the U.S. Food and Drug Administration, which was almost four times as frequently as non-foster children in Medicaid, 0.56% of whom were prescribed these levels of dosages.  (Trial Exhibit 16, United States Government Accountability Office, Foster Children: HHS Guidance Could Help States Improve Oversight of Psychotropic Prescriptions, Dec. 2011, p. 107).

1331.   In Dr. Livingston's experience, it is "exceedingly rare" that it would be appropriate for a child to be prescribed five or more psychotropic medications.  (Deposition of Russell Livingston, DCF Medical Director for Psychiatry, Jan. 6, 2012, at 74:21-75:21).  Dr. Livingston testified that in his work with DCF, he has never seen an instance where a child in DCF custody was appropriately prescribed five or more medications.  (*Id.* at 75:22-76:1).  Dr. Livingston testified that he has only seen one or two such instances in which a child in DCF custody was appropriately prescribed four medications.  (*Id.* at 76:2-3).

1332.   However, according to the GAO Report, 1.33% of foster children in Massachusetts were concomitantly prescribed five or more psychotropic medications, which was nineteen times the rate for non-foster children in Medicaid (0.07%) during the same period.  (Trial Exhibit 16, United States Government Accountability Office, Foster Children: HHS Guidance Could Help States Improve Oversight of Psychotropic Prescriptions, Dec. 2011, p. 107).  This was the highest percentage of any of the five states studied in the GAO report.  (Trial Exhibit 16, United States Government Accountability Office, Foster Children: HHS Guidance Could Help States Improve Oversight of Psychotropic Prescriptions, Dec. 2011, pp. 106-10).

1333.   Dr. Livingston testified that he was not surprised that foster children in Massachusetts were prescribed five or more medications concomitantly at nearly 20 times the rate of children in Massachusetts who were not in foster care, and that he has no reason to doubt the accuracy of that data.  (Deposition of Russell Livingston, DCF Medical Director for Psychiatry, Jan. 6, 2012, at 86:4-10, 86:17-22; *see also* Trial Exhibit 16, United States Government Accountability Office, Foster Children: HHS Guidance Could Help States Improve Oversight of Psychotropic Prescriptions, Dec. 2011, p. 107).

1334.   Dr. Livingston testified that there is a concerning frequency of polypharmacy for children.  (Deposition of Russell Livingston, DCF Medical Director for Psychiatry, Jan. 6, 2012, at 96:7-19; *see also* Trial Exhibit 246, Email exchange between Russell Livingston, Jan Nisenbaum, and Donna Reulbach, et al. re: Draft of talking points, Sept. 25, 2009, at DCF005334512).

1335.   In September 2009, Dr. Livingston provided a set of talking points regarding psychotropic medications for foster children to be used by Commissioner McClain.  Dr. Livingston identified the following factors that contribute to the "complex picture of risk" for a child in foster care in need of mental health services: "[p]rofound problems with access to adequate [mental health] services," "[p]rofound problems with the quality of available

services," and "[i]nadequate monitoring of quality of state-contracted services." (Trial Exhibit 246, Email from Russell Livingston to Jan Nisenbaum, Donna Roulbach, Alison Goodwin, et al. re: Draft of talking points, Sept. 25, 2009, at DCF005334511). "The net effects of trying to meet [the] complex need [of children in foster care] with inadequate services are multiple and concerning," and include, "[n]o service provided despite need" and "[e]xcessive usage of psychotropic medication where a competently applied psychotherapeutic service would serve." (*Id.*).

1336.   There were numerous instances in the Named Plaintiffs' DCF case files where concerns were evident regarding the child's medications and mental health care, yet there was not a response from DCF. (Trial Tr., Jan. 24, 2013 (Bellonci), at 92:15-19). For example, non-pharmacological psychosocial therapies were recommended but not provided. (*Id.* at 93:5-7; *see also* Trial Exhibit 1182, DCF Case File: Adam S., at DCF010179879).

1337.   Further, the children experienced side-effects from medications. (Trial Tr., Jan. 24, 2013 (Bellonci), at 93:7-10). For example, one of the Named Plaintiffs was administered medication that sedated the child and made the child fall asleep. Despite this being noted in the child's case file, DCF did not appear to take action to ensure that the child was appropriately medicated. (*Id.* at 92:6-19; Trial Exhibit 1182, DCF Case File: Adam S., at DCF000000709, DCF000001002-03; *see also* Trial Exhibit 1183, DCF Case File: Andre S., at DCF010188035).

1338.   During an occupational therapy evaluation, Named Plaintiff Adam had a slight to moderate hand tremor, which he reported was due to medication. (Trial Exhibit 1182, DCF Case File: Adam S., at DCF010181099).

1339.   As of November 2011, Named Plaintiff Adam S. was taking five psychotropic medications, some multiple times a day. (Trial Exhibit 1182, DCF Case File: Adam S., at DCF010177884).

1340.   Ms. James testified that she was constantly medicated while in DCF care. (Trial Tr., Jan. 22, 2013 (James), at 62:13-63:13). Ms. James further testified that she would be taken to hospitals where they would run "tests of medications on me to see what made my behavior better, until they realized that it was the environment causing my behavior problems." (*Id.*). Yet, at any point during her time in foster care, she was given "[l]ots of different medications, up to five, possibly more at a time." (*Id.* at 63:14-16).

1341.   Ms. James testified that the medications made her feel "[a]bsolutely dreadful," as if she had "a weight" on her, and that she could not think clearly. (Trial Tr., Jan. 22, 2013 (James), at 63:22-64:20). At times, Ms. James refused to take the medications. (*Id.*). However, Ms. James was forced to take the medications under threat that she would be taken to a mental hospital or kicked out of her foster home if she did not comply. (*Id.* at 65:7-66:4).

1342.   Ms. James testified that one medication caused her to gain forty-five pounds in three to four weeks. (Trial Tr., Jan. 22, 2013 (James), at 66:7-14). She has scars from the severe weight gain. (*Id.*).

1343.  Ms. James testified that she was prescribed multiple medications in order to counteract the side effects of other medications.  For example, medication given to treat attention deficit disorder made Ms. James unable to sleep.  She was then prescribed Trazodone to counteract her hyperactivity.  (Trial Tr., Jan. 22, 2013 (James), at 63:22-64:20).

1344.  Ms. James is no longer taking any of the medications that were prescribed to her during her time in DCF custody.  (Trial Tr., Jan. 22, 2013 (James), at 107:24-25).

### 4.    Historic Use of Psychotropic Medications and Defendants' Failures to Address

1345.  A state collaborative reported that Massachusetts' use of antipsychotic medications for children and adolescents involved with Medicaid in 2007 was higher than other states with regard to overall antipsychotic medication use, children prescribed more than two antipsychotic medications, and children receiving more than four psychotropic medications. (Trial Exhibit 18, State Collaborative "Antipsychotic Medication Use in Children": Massachusetts State Summary and Recommendations on Antipsychotic and Mental Health Drugs Utilization and Trends (2004-2007) in Medicaid Children and Foster Care, at DCF005176261).  22.25% of children in DCF foster care were prescribed antipsychotic medications, compared with a median among the 13 states surveyed of 12.32%.  (*Id*. at DCF005176268).

1346.  In addition, 23.18% of children in DCF foster care were prescribed four or more psychotropic medications, compared with a median of 19.02%.  (Trial Exhibit 18, State Collaborative "Antipsychotic Medication Use in Children": Massachusetts State Summary and Recommendations on Antipsychotic and Mental Health Drugs Utilization and Trends (2004-2007) in Medicaid Children and Foster Care, at DCF005176270).  This rate represented a 6.2% increase from 2004.  (*Id*.).

1347.  The report recommended that Massachusetts consider investigating the cause for its elevated use, regional variations, drug preferences, and prescriber types that might explain the elevated rates.  (*Id*. at DCF005176261).

1348.  In 2004, as part of a discussion of proposed revisions to health services-related policy changes, a DCF official wrote:

> I forgot to mention including a review of the psychotropic medication issue . . . [t]here's not much that we say to give guidance in regs or policy about consent to treatment and newer generation meds . . . [a]t one point a few years ago, we talked about pulling some respected medical providers together who could help guide our thinking. We also talked [about] getting information on the meds most often prescribed to children in placement, as well as the ages at which the meds are prescribed. I'm not sure whether we ever got that.

(Trial Exhibit 629, Email exchange between Dianne Curran and Mary Lutz re: Health Care Services for Children in Placement, Apr. 8, 2004, at DCF007083150).

1349.   In a September 2009 draft memorandum for Commissioner McClain, Dr. Livingston stated that "[a]ny discussion about improving on the State's [Massachusetts'] capacity to monitor the use of antipsychotic medications should be broadened to include all psychotropic usage" and then stated that DCF was in the process of considering an initiative to address this issue.  (Trial Exhibit 246, Email exchange between Russell Livingston, Jan Nisenbaum, and Donna Reulbach, et al. re: Draft of talking points, Sept. 25, 2009, at DCF005334512-13).  At that time, DCF was hosting a workgroup to help shape its approach regarding oversight of psychotropic medications.  (*Id.* at DCF005334513).

1350.   In 2009 a "*Rogers* Process Working Group" was established, in conjunction with the Office of the Child Advocate, to address concerns regarding the *Rogers* Process.  (Trial Tr., Feb. 15, 2013 (Garinger), at 115:15-116:9).  According to the minutes of the June 10, 2009 *Rogers* Process Working Group, there was a concern reflected at the meeting that "the *Rogers* process may not achieve its intended purpose of assuring appropriate use of antipsychotic medications for children in DCF custody."  (Trial Exhibit 630, *Rogers* Process Working Group Minutes, June 10, 2009, at DCF004956552).  The *Rogers* Working Group included representatives from the Office of the Child Advocate, representatives from DCF (including Russell Livingston, DCF's Medical Director for Psychiatry, and others.  (*Id.*; Trial Tr., Feb. 15, 2013 (Garinger), at 116:10-20).  Dr. Livingston testified that he and Ms. Nisenbaum are the only DCF representatives on the Working Group.  (Deposition of Russell Livingston, DCF's Medical Director for Psychiatry, Jan. 6, 2012, at 47:6-11).

1351.   Dr. Livingston testified that he spoke with Commissioner McClain at least two years before his deposition in January 2012 about the *Rogers* Working Group and the need for oversight of the use of antipsychotic medications for children in foster care, and that Commissioner McClain authorized Dr. Livingston's participation in the Working Group.  (Deposition of Russell Livingston, DCF's Medical Director for Psychiatry, Jan. 6, 2012, at 44:2-45:9).  Dr. Livingston and Commissioner McClain had only one follow up conversation about the issue of psychotropic medications in approximately July 2010.  (*Id.* at 98:2-99:16, 100:7-16).  Dr. Livingston proposed that DCF collect data regarding the *Rogers* process but Commissioner McClain did not authorize this project.  (*Id.* at 98:2-99:7).  DCF had previously hosted the *Rogers* Working Group, but following this conversation, the Child Advocate offered to host the Working Group.  (*Id.* at 98:8-99:12, 100:13-16).

1352.   Ms. Garinger testified that "it felt at times like we have this very, sort of on paper great process for looking at a particular class of medications for kids, but we were missing the child, we were missing the behavior."  (Trial Tr., Feb. 15, 2013 (Garinger), at 119:12-21).  She further testified that "it was time to take a look at it given that there's been a proliferation of psychotropic medication usage, and this only dealt with the antipsychotics."  (*Id.*).

1353.   Ms. Garinger testified to the failures of the *Rogers* process, including a narrow focus exclusively on antipsychotic medication and the inadequacy of training for judges who are making decisions about antipsychotic medication, particularly in light of the variable quality of the guardians ad litem who were making recommendations to the court.  Ms. Garinger further testified that the process is cumbersome and as a result "sometimes led to delays in treatment of children with appropriate medications, or it led perhaps to physicians changing their opinion about what would be the best medications to avoid the *Rogers* process, or it led

to a focus on a narrow class of medications as opposed to looking at the full picture of what medications the child was receiving in the context of a comprehensive behavioral health treatment plan." (Trial Tr., Feb. 15, 2013 (Garinger), at 117:25-119:21).

1354.   A March 2011 report published in collaboration with Northeastern University School of Law and the Massachusetts Office of the Child Advocate ("OCA") noted that a wide variety of stakeholders "indicated that certain critical concerns have emerged surrounding the [*Rogers*] process as it applies to children." (Trial Exhibit 1089, Court-Ordered Consent: Revisiting the *Rogers* Process for Children in State Custody, Mar. 2011, p. 118).

1355.   The *Rogers* Working Group decided it would be useful to take the Northeastern study a step further by publishing a follow up report by researchers at Tufts. (Trial Tr., Feb. 15, 2013 (Garinger), at 116:23-117:21). An August 2011 study conducted by the Tufts University Clinical and Translational Science Institute, identified the following concerns with the *Rogers* process: (1) lack of standardization, coordination and quality assurance; (2) inconsistencies in the timeliness of the approval process for a *Rogers* order; (3) lack of medical expertise in the decision-making process; and (4) an inadequate amount of ongoing oversight of antipsychotic medications given to youth in DCF custody. (Trial Exhibit 1090, Tufts Clinical and Translational Science Institute, Examination of the *Rogers* Process for Youth in the Custody of the Massachusetts Department of Children and Families, Aug. 2011, pp. 9-10).

1356.   The Office of the Child Advocate included recommendations from these studies in its Annual Report 2012. (Trial Exhibit 691, Office of the Child Advocate, Annual Report FY 2012, p. 13). These recommendations included (1) judges no longer being required to authorize the administration of antipsychotic medications for children in state custody; (2) a tiered system of oversight by a team with expertise in child and adolescent behavioral health be established; and (3) a continuous quality improvement model should be used to monitor behavioral treatment and outcomes for children in state custody. (*Id.;* Trial Tr., Feb. 15, 2013 (Garinger), at 122:22-124:7).

1357.   Although the *Rogers* Working Group has been working for two-and-one-half to three years as of January 2012, their work is not complete, and Dr. Livingston is not aware of a date by which that work will be completed. (Deposition of Russell Livingston, DCF's Medical Director for Psychiatry, Jan. 6, 2012, at 34:12-35:4). To Dr. Bellonci's knowledge, no recommendations that came out of the *Rogers* Working Group are being implemented. (Trial Tr., Jan. 24, 2013 (Bellonci), at 35:23-36:1).

1358.   DCF's 2010 Annual Progress and Services Report lists the oversight of psychotropic medications as one of the areas DCF would focus as part of its 2010-2011 Health Care Services Plan. (Trial Exhibit 575, Annual Progress and Services Report, June 30, 2010, DCF007412353-57). The Report recommended a periodic review of prescribed medications at the case level to assist in monitoring the appropriate provision of medication. (*Id.* at DCF007412357-58). DCF's 2011 Annual Progress and Services Report identified the same focus on oversight of psychotropic medications, and repeated the same recommendation of periodic case reviews for the coming fiscal year. (Trial Exhibit 374, Annual Progress and Services Report, June 30, 2011, at DCF007413721).

1359.  Although DCF's 2012-2015 Strategic Plan includes the establishment of another committee to address the issue, and according to Ms. Nisenbaum, a new work group was recently formed with representatives from DCF, EOHHS, DMH and MassHealth, she testified that as of May 2012 there was no strategic plan in place to address the issue of the administration of psychotropic medication to children in DCF foster care. (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 96:6-98:12; Trial Exhibit 7, Department of Children and Families, 2012-2015 Strategic Plan, Preserving Strengthening, and Expanding the DCF Safety Net, Aug. 2012, at CSF-000006352). Dr. Livingston testified that as of January 2012, DCF had not taken action in response to the GAO Report beyond its participation in the *Rogers* Working Group. (Deposition of Russell Livingston, DCF's Medical Director for Psychiatry, Jan. 6, 2012, at 87:16-88:6).

1360.  Ms. Nisenbaum testified that as of May 2012, DCF had not set a timeline for the development and implementation of any new policies or procedures regarding the administration of psychotropic medications to children in foster care.  (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 101:18-103:5).

1361.  Ms. Nisenbaum testified that as of May 2012, DCF was working to obtain data from MassHealth about which children in DCF foster care are prescribed psychotropic medications, and that DCF was deferring other action regarding oversight of psychotropic medications until it obtained that data. (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 101:18-102:19, 106:2-107:21).

1362.  Although the Child Advocate co-chairs a new working group with the Commissioner of DCF that is attempting to flesh out more detailed aspects of these recommendations, as of February 2013, no changes or concrete action had come as a result.  Despite the group convening for a year, no policy or regulatory changes had been made.  (Trial Tr., Feb. 15, 2013 (Garinger), at 124:8-126:2).

1363.  Ms. Chase testified that there have been "too many EHS workgroups" focused on children in DCF care receiving or taking multiple psychotropic medications.  (Deposition of Marilyn Chase, Assistant Secretary of EOHHS' Office of Children, Youth & Families, May 21, 2012, at 157:5-16).

1364.  The Office of the Governor has not required submission of the Comprehensive Plan set forth in Mass. Gen. Laws ch. 18C, § 11(d)(13), providing for an examination of the issues of behavioral and mental health services and oversight and review of the safety and effectiveness of the use of psychotropic medications by children involved with executive agencies, by June 30, 2010 and annual updates thereafter.  (*See infra* § VIII.F.1).

1365.  In addition, the federal government has recognized: "Any effort to ensure the appropriate use of psychotropic medications for these children [in foster care] must be accompanied by increased availability of evidence-based psychosocial treatments that meet the complex needs of children who have experienced maltreatment."  (Trial Exhibit 825, ACF Children's

Bureau, Information Memorandum, Log No. ACYF-CB-IM-12-03, Apr. 11, 2012, p. 16). The document continued: "Increased access to timely and effective screening, assessment, and non-pharmaceutical treatment will reduce the potential for over-reliance on psychotropic medication as a first-line treatment strategy . . . ." (*Id.*).

1366.   However, there is a "very substantial differential in access to and quality of nonpharmacologic evidence-based clinical services (Diagnostic Evaluations, Family Therapies, Individual Therapies) for children in [DCF] foster care." (Trial Exhibit 1033, Memorandum from Russell Livingston re: DCF Review of GAO Report "Foster Children: HHS Guidance Could Help States Improve Oversight of Psychotropic Prescriptions," Dec. 8, 2011, at DCF011038046). Dr. Livingston noted "the relationship between [the] inadequate provision of these services and consequent increased rates of psychotropic usage." (*Id.*). Dr. Livingston has also noted that "access issues exacerbate the risks of inappropriate prescribing, 'undermedicating', and 'overmedicating'." (Trial Exhibit 246, Email exchange between Russell Livingston, Jan Nisenbaum, and Donna Reulbach, et al. re: Draft of talking points, Sept. 25, 2009, at DCF005334512).

1367.   One of the primary causes of the inappropriate usage of psychotropic medications for foster children in DCF custody is the relative deficit in access to and quality of other mental health services. (Deposition of Russell Livingston, DCF's Medical Director for Psychiatry, Jan. 6, 2012, at 63:16-64:1).

1368.   Dr. Livingston noted that this is more of a problem for children in foster care than other children served by Medicaid, "because geographic moves interrupt continuity of treatment, because clinics see DCF-served children as more complex and are therefore more reluctant to offer services, and because foster families are not likely to advocate as vigorously for a child as the child's biologic or adoptive parent might." (Trial Exhibit 1033, Memorandum from Russell Livingston re: DCF Review of GAO Report "Foster Children: HHS Guidance Could Help States Improve Oversight of Psychotropic Prescriptions," Dec. 8, 2011, at DCF011038046).

1369.   Dr. Livingston testified that he is not aware of any specific efforts to ensure that a child maintains the same mental health provider when he moves to a different placement or to reduce the number of mental health providers serving the child. (Deposition of Russell Livingston, DCF's Medical Director for Psychiatry, Jan. 6, 2012, at 24:21-25:13).

## 5.     Systemic Deficiencies in Informed Consent, Clinical Oversight, and Monitoring

1370.   The federal government has noted that "[s]trengthened oversight of psychotropic medication use is necessary in order to responsibly and effectively attend to the clinical needs of children who have experienced maltreatment." (Trial Exhibit 825, ACF Children's Bureau, Information Memorandum, Log No. ACYF-CB-IM-12-03, Apr. 11, 2012, pp. 1, 11).

1371.   The concepts of clinical oversight and monitoring and concerns regarding the use of psychotropic medication in child welfare have existed for the last decade or 15 years. (Trial Tr., Jan. 24, 2013 (Bellonci), at 48:23-49:4). State child welfare systems in the United States

were implementing informed consent, clinical oversight, and longitudinal monitoring before Congress enacted Fostering Connections and the Child and Family Services Improvement and Innovation Act. (Trial Tr., Jan. 24, 2013 (Bellonci), at 50:25-51:10).

1372.    In a December 2011 memorandum to Commissioner McClain in response to the GAO report, Dr. Livingston proposed that DCF review the AACAP standards and the Child and Family Services Improvement and Innovation Act, assess DCF's adherence to the AACAP standards, identify promising approaches, and propose a comprehensive oversight approach consistent with AACAP standards and federal legislation. (Trial Exhibit 1033, Memorandum from Russell Livingston re: DCF Review of GAO Report "Foster Children: HHS Guidance Could Help States Improve Oversight of Psychotropic Prescriptions," Dec. 8, 2011, at DCF011038046-47).

1373.    In a February 2012 proposal to the Center for Healthcare Strategies, DCF acknowledged that it lacks a unified system for oversight of psychotropic medications for children in foster care. (Trial Exhibit 628, Proposal for Response to the Center for Healthcare Strategies, at EOHHS001158665). The proposal noted that "[o]versight includes informed consent, authorization, and monitoring" and that the system would "provide coordination between medication and other behavioral health services" for children. (*Id*.).

a)    <em>Informed Consent</em>

1374.    DCF fails to provide informed consent for psychotropic medications that are not subject to the *Rogers* process. Although DCF is required to provide consent for children in its custody to be prescribed and administered psychotropic medications that are not subject to the *Rogers* process, in practice consent is not given in any written or formal manner. (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 193:9-24). If a doctor prescribes such a medication, it is simply administered without any consent from DCF. (*Id*. at 194:1-195:7).

1375.    Children are being administered antipsychotic medications that have not been properly approved and consented. (Trial Tr., Jan. 24, 2013 (Bellonci), at 90:9-12). Dr. Livingston testified that he is aware of instances when the *Rogers* process was not followed. (Deposition of Russell Livingston, DCF's Medical Director for Psychiatry, Jan. 6, 2012, at 53:19-22, 55:4-15).

1376.    Dr. Livingston testified that he is further aware of providers deciding not to prescribe an antipsychotic medication in order to avoid the *Rogers* process, even when they deemed the antipsychotic medication to be the best treatment. (Deposition of Russell Livingston, DCF's Medical Director for Psychiatry, Jan. 6, 2012, at 55:16-20).

1377.    Some prescribers of psychotropic medications for children in DCF foster care report that they avoid "prescribing an antipsychotic despite seeing it as the treatment of choice because they see the *Rogers* process as fundamentally failed." Further, DCF staff often note that the *Rogers* process "frequently result[s] in an outcome that they do not see as optimal for the child in question." (Trial Exhibit 246, Email from Russell Livingston to Jan Nisenbaum,

Donna Roulbach, Alison Goodwin, et al. re: Draft of talking points, Sept. 25, 2009, at DCF005334512).

1378.  In addition, DCF cannot provide true informed consent because they lack knowledge about psychotropic medications.  DCF caseworkers have repeatedly reported that they have difficulty understanding psychiatrists' decision-making regarding psychotropic medications and their rationale for prescribing medications to children in foster care.  (Deposition of Russell Livingston, DCF's Medical Director for Psychiatry, Jan. 6, 2012, at 23:22-24:3).

1379.  Ms. Nisenbaum testified that DCF social workers do not have expertise concerning psychotropic medication.  (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 107:1-21).

1380.  Although DCF reported that it had partially complied with the AACAP standard that it establish training requirements and noted that general information is available to caseworkers on the use and effect of psychotropic medications (Trial Exhibit 16, U.S. Government Accountability Office, HHS Guidance Could Help States Improve Oversight of Psychotropic Prescriptions, pp. 20, 71; Trial Exhibit 1024, Massachusetts Statement of Facts, at DCF011077487), in its February 2012 proposal to the Center for Healthcare Strategies, DCF reported as a systemic challenge that it lacked an appropriate educational system about psychotropic medications, and noted that the people charged with authorizing and approving care for children need both basic knowledge about pharmacotherapy and its place in the comprehensive care for children, as well as knowledge about emerging developments.  (Trial Exhibit 628, Proposal for Response to the Center for Healthcare Strategies, at EOHHS001158665).

1381.  Further, DCF does not have the capacity to know whether the *Rogers* process is being adhered to or whether there is active authorization for antipsychotic medications that have been prescribed to children.  (Trial Tr., Jan. 24, 2013 (Bellonci), 89:17-21, 90:6:-9).

1382.  DCF should document that it is providing informed consent for the use of psychotropic medications for children in foster care.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 91:5-11).

1383.  However, the medical passport does not document consent.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 70:8-15).  DCF regulations and policy do not address the documentation of consent.  (*Id*. at 71:4-12).

1384.  Dr. Livingston testified that he is not aware whether DCF has a way to track whether the *Rogers* process was followed.  (Deposition of Russell Livingston, DCF Medical Director for Psychiatry, Jan. 6, 2012, at 56:23-57:3).

1385.  Dr. Livingston testified that he believes that some states do a substantially better job than Massachusetts in overseeing the use of psychotropic medications for children in foster care.  (Deposition of Russell Livingston, DCF Medical Director for Psychiatry, Jan. 6, 2012, at 33:12-16).

1386.  Some states have embedded an expert medical consultation into the informed consent process for the treatment of children in foster care because of the unknowns about

medications. (Trial Tr., Jan. 24, 2013 (Bellonci), at 14:1-4). For example, since 1995, all recommendations for psychotropic medications for children in foster care in the state of Illinois are sent to a team of psychiatrists and nurses who render an opinion as to whether the medication is warranted. The child welfare agency maintains the consent authority, and based on that medical consultation, the child welfare agency decides whether to consent to the medication. (*Id.* at 49:19-50:3; Deposition of Russell Livingston, DCF Medical Director for Psychiatry, Jan. 6, 2012, at 33:16-34:9).

1387.   As early as 2009, Dr. Livingston had recommended that Massachusetts utilize such expert consultation:

> [T]he individual charged with capably assessing a request for consent [to the use of psychotropic medication for children in DCF foster care] requires a much deeper knowledge and experience base than that of the parent or guardian in the general population . . . For this reason, the process of assessing a request for consent for psychotropic medications by DCF workers is best supported by access to expert consultation, a model that exists currently in a handful of states.

(Trial Exhibit 246, Email from Russell Livingston to Jan Nisenbaum, Donna Roulbach, Alison Goodwin, et al. re: Draft of talking points, Sept. 25, 2009, at DCF005334512).

1388.   Expert consultation was again recommended in a March 2011 report issued by Northeastern and the Office of the Child Advocate. The report recommended that DCF "[c]reate a medical panel composed of experts in child and adolescent psychiatry, clinical nurses, and pediatric specialists that could act as a reviewing body or provide consent." (Trial Exhibit 1089, Northeastern University School of Law Social Justice Program and The Massachusetts Office of the Child Advocate, "Court-Ordered Consent: Revisiting the *Rogers* Process for Children in State Custody," Mar. 2011, p. 10). The report also recommended that DCF "facilitate uniform training" for social workers about behavioral and clinical practices and about standard protocols and that a doctor or nurse practitioner oversee training on the *Rogers* process. (*Id.*).

1389.   Medical professionals within DCF continued to raise concerns about the oversight of psychotropic medications, including informed consent, with Commissioner McClain throughout 2010. (*See, e.g.*, Trial Exhibit 247, Email exchange between Russell Livingston, Thomas Mackie, Gordon Harper, et al. re: Medical Services Focus Group Follow Up, July 2, 2010). However, any action on these concerns was tabled due to budget restrictions. (Trial Exhibit 631, Email exchange between Jan Nisenbaum and Russell Livingston re: Medical Services Focus Group Follow-Up, July 16, 2011, at DCF006101091).

1390.   In its 2011 Annual Report, the Massachusetts Child Advocate urged DCF to consider the findings of the Northeastern Study and to "examine the efficacy of the current process for obtaining informed consent for anti-psychotic medication use for children in DCF custody." (Trial Exhibit 339, Office of the Child Advocate Annual Report, FY 2011, p. 13).

1391.   In its Annual Report for fiscal year 2012, the OCA again urged DCF "to develop a process for authorizing and overseeing psychotropic medication use for children in DCF custody." (Trial Exhibit 691, Office of the Child Advocate Annual Report FY 2012, p. 14).

1392.   DCF fails to adhere to its regulations regarding informed consent and the documentation of such consent. (Trial Tr., Jan. 24, 2013 (Bellonci), at 93:17-25).

1393.   DCF practice deviates from the standard of care with regard to informed consent. (Trial Tr., Jan. 24, 2013 (Bellonci), at 82:9-19). The absence of information regarding informed consent in DCF records exposes children to a risk of harm. (*Id.* at 91:18-93:4).

1394.   According to the GAO Report, Massachusetts has not established a mechanism "to obtain assent for psychotropic medication management from minors when possible," one of the minimal recommendations of the AACAP standards. (Trial Exhibit 16, United States Government Accountability Office, Foster Children: HHS Guidance Could Help States Improve Oversight of Psychotropic Prescriptions, Dec. 2011, p. 20).

(1)    <em>Named Plaintiffs</em>

1395.   In the case files of both of the two Named Plaintiffs who were prescribed antipsychotic medications, there were instances when the child was administered antipsychotic medication that was not authorized by a *Rogers* order or that was in excess of the approved dosage. (Trial Tr., Jan. 24, 2013 (Bellonci), at 79:3-8, 80:5-16, 89:23-90:1).

1396.   During an eleven-month period, Named Plaintiff Connor was prescribed Risperdal at three milligrams, which was in excess of the dosage approved by the court. (Trial Exhibit 1181, DCF Case File: Connor B., at DCF010190725, DCF010190752, DCF010194329; Trial Tr., Jan. 24, 2013 (Bellonci), at 80:16-23). This error was not discovered for eleven months. (Trial Exhibit 1181, DCF Case File: Connor B., at DCF010190752; Trial Tr., Jan. 24, 2013 (Bellonci), at 80:16-23; Trial Exhibit 1181, DCF Case File: Connor B., at DCF010190752).

1397.   In the case of Adam, there was a five-month period during which he was administered antipsychotic medications without a *Rogers* order. (Trial Exhibit 1182, DCF Case File: Adam S., at DCF010180035, DCF010180825; Trial Tr., Jan. 24, 2013 (Bellonci), at 80:24-81:4). A number of years later, there was another period when Adam's *Rogers* order expired, and Adam continued to be provided antipsychotic medications without a new court order. (Trial Exhibit 1182, DCF Case File: Adam S., at DCF010180062; Trial Tr., Jan. 24, 2013 (Bellonci), at 81:4-10).

1398.   With regard to other psychotropic medications that the Named Plaintiffs were prescribed, there was no indication in the Named Plaintiffs' files that informed consent was provided. Typically there was no mention in the record of side effects from medications, symptoms to look for, or how to know whether the medication was effective. (Trial Tr., Jan. 24, 2013 (Bellonci), at 81:13-21, 90:14-25).

1399.   In the case of Andre S., there was a five-year period during which there was no mention of psychotropic medications in the dictation section of Andre's DCF file, although he was

being administered psychotropic medications during that period.  (Trial Exhibit 1183, DCF Case File: Andre S., at DCF010188052-74; Trial Tr., Jan. 24, 2013 (Bellonci), at 81:21-23).  There was no mention in the dictation that DCF had consented to his medication, Wellbutrin, or that there was a discussion of what the risks and side effects of the medication might be.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 82:4-6, 82:9-11).  Further, Wellbutrin is indicated for depression, but Andre had not been diagnosed with depression.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 82:6-8, 82:11-13). At the end of the five-year period, when the medication was mentioned, it was noted that there had been a medication error and Andre had not been administered his medication for a period of time.  (Trial Exhibit 1183, DCF Case File: Andre S., at DCF010188074; Trial Tr., Jan. 24, 2013 (Bellonci), at 81:23-82:3).  This failure to provide and document informed consent was consistent with Dr. Bellonci's clinical experience.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 82:13-16).

b)    *Clinical Oversight and Tracking of Medical History and Treatment*

1400.   DCF departs from the standard of care by failing to adequately monitor and oversee children's clinical care.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 84:3-13).

1401.   Dr. Livingston testified that it is necessary for DCF to monitor that the mental health services children in DCF custody receive meet the child's needs.  (Deposition of Russell Livingston, DCF Medical Director for Psychiatry, Jan. 6, 2012, at 94:18-95:5).  However, DCF has no "systematized way" to assess whether a child is receiving mental health services that meets his needs and that are of adequate quality.  (*Id.* at 91:1-16, 92:5-12).  DCF is less likely to monitor the quality and appropriateness of the mental health services a child in custody is receiving than a parent would be.  (*Id*. at 94:10-95:5).

1402.   Mr. Wentworth testified that there is no specific policy that requires consultation between caseworker and supervisor when children are being administered more than one psychotropic medication.  (Rule 30(b)(6) Deposition of Robert Wentworth, DCF Assistant Commissioner for Planning and Program Development, re: Purchased Services Licensing, Delivery, and Oversight,  Dec. 29, 2011, at 234:6-12).

1403.   Mr. Wentworth testified that he was not aware of any specific DCF policy in place within DCF to ensure that children are being administered medications in a safe and appropriate way, other than the *Rogers* process, which is limited to antipsychotic medication.  (Rule 30(b)(6) Deposition of Robert Wentworth, DCF Assistant Commissioner for Planning and Program Development, re: Purchased Services Licensing, Delivery, and Oversight,  Dec. 29, 2011, at 234:24-235:9).

1404.   Ms. Nisenbaum testified that, other than the individual social worker, no one at DCF has responsibility for overseeing the administration of psychotropic medications to children in DCF custody.  (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program and Operations, May 18, 2012, at 197:3-17).

1405.   The March 2011 report issued by Northeastern and the Office of the Child Advocate recommended that "[a]n automatic review ought to be triggered when a child is taking multiple medications, regardless of whether the medications are classified as antipsychotic."

(Trial Exhibit 1089, Northeastern University School of Law Social Justice Program and The Massachusetts Office of the Child Advocate, "Court-Ordered Consent: Revisiting the *Rogers* Process for Children in State Custody," Mar. 2011, p. 11).

1406.   DCF recommended in its June 2011 Healthcare Services Plan that: "The review of medications prescribed at the case level would be helpful to monitor the appropriate provision of medicines." (Trial Exhibit 436, Healthcare Services Plan, June 12, 2011, at DCF000967414). The Plan was never implemented. (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 211:5-23).

1407.   DCF fails to utilize medical passports as required in order to document a child's medical and treatment history and current medications. (*See supra* ¶¶ 1199-1208; *see also* Trial Tr., Jan. 24, 2013 (Bellonci), at 62:15-17, 85:10-20.

1408.   Dr. Bellonci has never been provided with a child's medical passport that was current, and did not see any current medical passports in the Named Plaintiffs' files. (Trial Tr., Jan. 24, 2013 (Bellonci), at 70:22-71:3).

1409.   Ms. Nisenbaum testified that information on prescriptions and the administration of medications, and changes in medication is often not entered into the medical area of FamilyNet. (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program and Operations, May 18, 2012, at 195:8-15).

1410.   There are many cases in which all of the medications a child has been prescribed are not listed in FamilyNet. (Deposition of Russell Livingston, DCF Medical Director for Psychiatry, Jan. 6, 2012, at 77:22-78:2). Dr. Livingston testified that he has reviewed cases in which the child's complete medication history was not in FamilyNet. (*Id.* at 26:21-27:1).

1411.   The CRC case record review found that information concerning the dates that medications were prescribed and the dates that administration of a medication ceased was rarely available in children's case files. (Trial Tr., Jan. 30, 2013 (Freitag), at 50:1-9).

1412.   DCF acknowledged in a proposal to the Center for Healthcare Strategies that "[o]btaining accurate and up to date information about the medications [a] child is being prescribed is a challenge, as is timely data entry of relevant information." (Trial Exhibit 628, Proposal for Response to the Center for Healthcare Strategies, at EOHHS001158667).

1413.   A parent can typically provide information about a child's family history, developmental history, past interventions that have been tried, and the child's response to those interventions and any side effects. (Trial Tr., Jan. 24, 2013 (Bellonci), at 12:17-13:2). However, the DCF caseworker or person representing a child in state custody can "rarely" provide this information. (*Id.* at 13:2-4).

1414.   DCF does not always have a child's complete medical and treatment history if a caseworker fails to input information into FamilyNet or a hospital fails to provide a discharge summary. (Deposition of Russell Livingston, DCF Medical Director for Psychiatry, Jan. 6, 2012, at 32:1-13).

1415.  Due to a lack of information about the child's medical and treatment history, children in DCF custody are at a higher risk of being prescribed medications instead of receiving more conservative treatment first. (Deposition of Russell Livingston, DCF Medical Director for Psychiatry, Jan. 6, 2012, at 19:3-20:4, 28:13-29:2).

1416.  This also creates a risk that the child will receive a trial of a medication that has already proven to be "useless or . . . problematic." (Deposition of Russell Livingston, DCF Medical Director for Psychiatry, Jan. 6, 2012, at 21:12-22:15). Without knowing whether a medication has already been tried, a provider may recommend a medication that has already been tried and has caused a side-effect in the child or has not been effective. (Trial Tr., Jan. 24, 2013 (Bellonci), at 64:10-16).

1417.  There was evidence in the Named Plaintiffs' files that medical providers could not obtain information about a child's previous treatment history from DCF for months. (Trial Tr., Jan. 24, 2013 (Bellonci), at 8:13-15). For example, when Named Plaintiff Connor B. was moved to a residential program, the admitting psychiatrist wrote "I have very limited info now" and continued Connor on three psychotropic medications. (Trial Exhibit 1181, DCF Case File: Connor B., at DCF010196927, DCF010194303). Three months into Connor's stay at the facility, the psychiatrist noted, "no medication history available." (*Id*. at DCF010195918).

1418.  On another occasion, a physician did not have information regarding the fact that a Named Plaintiff had previously been prescribed a particular antipsychotic medication. The doctor considered putting the child on the antipsychotic because in his understanding the child had never received that antipsychotic. (Trial Tr., Jan. 24, 2013 (Bellonci), at 8:13-20, 64:16-23; Trial Exhibit 1181, DCF Case File: Connor B., at DCF010190475, DCF000005511).

1419.  In addition, DCF lacks the capacity to identify "red flag" or outlier practice. DCF has acknowledged that it has "no oversight program" to review "non-standard, unusual, and/or experimental psychiatric interventions" for children in state custody, as recommended by AACAP. (Trial Exhibit 1024, Massachusetts Statement of Facts, at DCF011077489).

1420.  Dr. Livingston testified that he has not been part of any conversation at DCF about developing a system to flag cases where children are prescribed more than a certain number of medications. (Deposition of Russell Livingston, DCF Medical Director for Psychiatry, Jan. 6, 2012, at 78:3-79:4).

1421.  DCF does not have the capacity to monitor whether children are receiving "outlier" treatment, because DCF cannot obtain that data from FamilyNet without a page-by-page read. (Trial Tr., Jan. 24, 2013 (Bellonci), at 101:15-21).

1422.  Some outlier practices include children on two psychotropic medications within the same class; dosages in excess of clinical or FDA guidelines; medications that are prescribed for conditions that the child has not been diagnosed with; and multiple psychotropic medications, for example three or more. (Trial Tr., Jan. 24, 2013 (Bellonci), at 97:5-12, 99:17-21). Dr. Bellonci has recommended these red flags to state foster care systems with

which he has consulted, some of which are embedded in some state regulations. (*Id.* at 99:6-24; Trial Tr., Jan. 22, 2013 (Bellonci), at 152:11-154:17).

1423.   If a "red flag" is identified about a child's medication regimen, this should trigger a conversation about whether the medication is indicated, whether there is an alternative treatment that would carry fewer side-effects, and whether the benefits outweigh the risks. (Trial Tr., Jan. 24, 2013 (Bellonci), at 100:1-10).  Without such a structure of identifying red flags, there is the risk that children are being harmed.  (*Id.* at 100:10-13).

1424.   There was no indication in the Named Plaintiffs' files that caseworkers and supervisors were discussing any red flags in the Named Plaintiffs' cases; there was no indication that concerns were raised, that there was any change in the children's treatment, that DCF requested a second opinion, or that medications were stopped as a result of DCF concerns. (Trial Tr., Jan. 25, 2013 (Bellonci), at 57:20-58:25).

1425.   DCF does not have a second-opinion capacity. (Trial Tr., Jan. 24, 2013 (Bellonci), at 96:10-18).  DCF employs one medical director for psychiatry, Dr. Russell Livingston, who works part-time for DCF twenty-four hours per week.  (Deposition of Russell Livingston, DCF Medical Director for Psychiatry, Jan. 6, 2012, at 8:17-18).  One part-time physician is unable to provide a rigorous second opinion capacity for DCF.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 96:17-97:1).

1426.   These problems are not new.  Dr. Livingston, DCF's Medical Director for Psychiatry, testified that he has never seen a child's medical passport in the course of his clinical work with children in DCF custody.  (Deposition of Russell Livingston, DCF Medical Director for Psychiatry, Jan. 6, 2012, at 105:1-8).  Dr. Livingston has never heard from other psychiatrists that they utilized a child's medical passport.  (*Id.* at 105:9-19).  He further testified that he would never rely on a child's medical passport in directly caring for a child.  (*Id.* at 105:20-23).

1427.   The March 2011 report issued by Northeastern and the Office of the Child Advocate recommended that DCF create a position, to be held by a doctor or nurse practitioner, to monitor children in state custody who are receiving psychotropic medications, and that Massachusetts improve and centralize recordkeeping for children receiving state services. (Trial Exhibit 1089, Northeastern University School of Law Social Justice Program and The Massachusetts Office of the Child Advocate, "Court-Ordered Consent: Revisiting the *Rogers* Process for Children in State Custody," Mar. 2011, pp. 10-11).

1428.   DCF fails to adhere to its regulations regarding the monitoring and oversight of psychotropic medications that children are being administered.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 93:17-25).

1429.   DCF's failure to oversee the mental health care that children receive "exposes . . . children to the risk of harm."   (Trial Tr., Jan. 24, 2013 (Bellonci), at 92:25-93:4).  DCF's lack of knowledge about whether medications carried side effects and whether benefits outweigh those side effects create harm and the risk of harm.  (*Id.* at 93:10-16).

1430.  DCF departs from the standard of care because it cannot answer the question of whether a medication is appropriately prescribed to a child in any particular case, and this creates a risk of harm to the child.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 120:4-20, 137:13-138:6).

1431.  DCF departs from the standard of care by failing to provide a second-opinion capacity to review outlier practices.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 96:10-97:21, 99:3-100:13).

1432.  The absence of system of tracking red flags exposes children to a risk of harm.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 103:21-105:1).  Without that capacity, DCF cannot know that children are safe from harm.  (*Id*. at 104:3-5).

1433.  DCF lacks the ability to monitor the medications that are administered to children in its custody.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 94:7-9).  DCF fails to utilize medical passports; passports are not current and do not include information about current medications, diagnoses, and allergies; and fails to utilize the Encounter form.  (*Id*. at 94:2-7; *see also* 62:15-17, 85:10-20).  This finding is also based on Dr. Bellonci's clinical experience, review of case files, and review of depositions of DCF officials.  (*Id*. at 94:10-14).

c)    *Monitoring*

1434.  DCF acknowledged in its proposal to the Center for Healthcare Strategies that "[the Department has]  not developed methods of monitoring medication use specific to DCF children, including those in foster care.  Nor [has it] developed quality improvement measures specific to this population."  (Trial Exhibit 628, Proposal for Response to the Center for Healthcare Strategies, at EOHHS001158669).

1435.  DCF has no way of monitoring, in the aggregate, key data points regarding the use of psychotropic medications among children in foster care, including the number of a medications children are being prescribed and the total number of children in the aggregate prescribed psychotropic medications.  (*See* Rule 30(b)(6) Deposition of Robert Wentworth, DCF Assistant Commissioner for Planning and Program Development, re: Purchased Services Licensing, Delivery, and Oversight, Dec. 29, 2011, at 229:11-230:12; Rule 30(b)(6) Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, re: Staffing, Caseloads, and Training, Jan. 20, 2012, at 185:23-187:17; Deposition of Marilyn Chase, Assistant Secretary of EOHHS's  Office of Children, Youth & Families, May 21, 2012, at 163:13-20; Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program and Operations, May 18, 2012, at 102:2-9).

1436.  There are no periodic DCF management reports generated off an electronic database to track the rate at which psychotropic medications are being administered to children in DCF foster care.  (Rule 30(b)(6) Deposition of Ruben Ferreira, DCF Assistant Commissioner for Continuous Quality Improvement, re: Data Collection and Retention, Aug. 23, 2011, at 63:9-14). There is no management report that tracks the number of children within the foster care population who at any given point in time are being administered psychotropic or antipsychotic medication. (Rule 30(b)(6) Deposition of Robert Wentworth, DCF Assistant Commissioner for Planning and Program Development, re: Purchased Services Licensing,

Delivery, and Oversight, Dec. 29, 2011, at 229:11-230:12).  This information would be "very difficult to extract" for reporting and analyses because there is no "drop-down list" for that information on FamilyNet and any information about it would be in dictations.  (*Id.*).

1437.  DCF is not currently utilizing an automated data system that would allow it to run management reports providing information about the percentage of children in DCF foster care being administered psychotropic medications, and to Mr. Wentworth's knowledge, has not had discussions about obtaining such a system over the last three years.  (Rule 30(b)(6) Deposition of Robert Wentworth, DCF Assistant Commissioner for Planning and Program Development, re: Purchased Services Licensing, Delivery, and Oversight, Dec. 29, 2011, at 230:22-231:19).  MassHealth holds that information, but it is not in a format that DCF "can extract without data agreements from other agencies." (*Id.*).

1438.  DCF does not have regular "macro-level reports" to analyze data regarding the administration of psychotropic medications to children in foster care.  (Trial Exhibit 1024, Massachusetts Statement of Facts, at DCF011077489; Trial Exhibit 16, United States Government Accountability Office, Foster Children: HHS Guidance Could Help States Improve Oversight of Psychotropic Prescriptions, Dec. 2011, pp. 76-77).

1439.  As of May 2012, DCF did not have the ability to determine the number of children who are prescribed more than two psychotropic medications at the same time. (Deposition Transcript of Marilyn Chase, Assistant Secretary of EOHHS' Office of Children, Youth & Families, May 21, 2012, at 163:7-20; *see also* Trial Tr., Jan. 24, 2013 (Bellonci), at 85:14-19, 103:4-11).

1440.  DCF currently "does not have a means of accessing information about which children are receiving multiple psychotropic meds" and does not "have good current information in our own electronic files about children or a way to aggregate the number of children, for example, under five who have been prescribed psychotropic medications."  (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program and Operations, May 18, 2012, at 101:18-103:5; *see also* Trial Tr., Jan. 24, 2013 (Bellonci), at 103:11-17).

1441.  The *Rogers* Working Group attempted to find out how many children were prescribed antipsychotic medications, but DCF was unable to report that information.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 88:20-23).

1442.  Ms. Mackin described DCF's efforts to obtain data from MassHealth about the number of children in DCF care who are prescribed psychotropic medications.  (Deposition of Patricia Mackin, DCF Chief of Staff, Mar. 1, 2012, at 189:14-190:12).  Ms. Mackin said that its "initiative" was still in "the talking stages," and "to say it's an initiative would be putting [DCF] further along than [it is]."  Ms. Mackin did not know if there was any timetable for the talking phase to be completed, but said that potential funding from the Center for Health Care Strategies would help move things along. (*Id.* at 190:13-191:3).  Massachusetts was not selected to be part of that program. (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program and Operations, May 18, 2012, at 96:19-97:4).

1443.   Ms. Roche testified that she does not recall reviewing any particular report on children in care receiving psychotropic medication or any report that tracks two or three psychotropic medications.  (Rule 30(b)(6) Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, re: Staffing, Caseloads, and Training, Jan. 20, 2012, at 185:23-186:17).

1444.   Terrence Flynn, DCF's Regional Director for the Southern Region, testified that he has had "conversations" and "engaged in a set of activities to look at" the rate at which or manner in which children are being prescribed psychotropic medications, but he did not have any understanding of the number of children in the Southern region taking psychotropic medications, despite seeing statewide numbers and other reports on the topic indicating high rates, particularly relating to children in congregate care.  (Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, Jan. 26, 2012, at 267:6-268:7).

1445.   According to the GAO Report, Massachusetts has not fully implemented any of the best principles provided by AACAP related to state oversight of psychotropic drug prescriptions for foster children.  (Trial Exhibit 16, United States Government Accountability Office, Foster Children: HHS Guidance Could Help States Improve Oversight of Psychotropic Prescriptions, Dec. 2011, p. 23).  Massachusetts has only partially implemented the minimal recommendation that states "[e]stablish guidelines for the use of psychotropic medications for children in state custody," and has not implemented the recommendation that states have an oversight program that includes an advisory committee to oversee medication monitoring.  (*Id.* at 23).

1446.   Following the publication of the GAO report, on December 8, 2011, the Child Advocate sent an email to the *Rogers* Working Group members, including Jan Nisenbaum and Dr. Livingston.  The Child Advocate noted the "considerable activity on a national level regarding psychotropic medication among children in foster care."  She continued: "These developments provide an opportunity as well as an imperative!"  (Contested Exhibit OR, Email from Gail Garinger to Gordon Harper, Russell Livingston, Nancy Baratta, et al. re: *Rogers* Working Group Meeting 12.9.11: Agenda and Documents Attached, Dec. 8, 2011, at DCF011181251).

1447.   In the fall of 2011, the *Rogers* Working Group had begun to formulate the "dimensions of a psychotropic medication oversight system."  (Contested Exhibit OR, Email from Gail Garinger to Gordon Harper, Russell Livingston, Nancy Baratta, et al. re: *Rogers* Working Group Meeting 12.9.11: Agenda and Documents Attached, Dec. 8, 2011, at DCF011181251).  Notes from an October 2011 meeting listed considerations about the scope and content of the oversight system.  Proposals included expert consultation, consent, subsequent review, and monitoring.  (*Id.* at DCF011181255).

1448.   DCF departs from the standard of care with regard to oversight and monitoring of psychotropic medications for children in the foster care system.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 85:22-86:10).  DCF is "not following [its] own guidelines around monitoring and oversight."  (*Id.* at 11:13-14).

1449.   Massachusetts departs from the standard of care because it does not have the capacity to do longitudinal oversight or monitoring.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 39:16-40:17).

1450.   DCF's data system, FamilyNet, is not searchable and so does not support the monitoring function.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 91:13-17).

1451.   DCF deviates from the standard of care by its inability to track which psychotropic medications children are prescribed.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 104:12-23).  For example, if an alert comes out about a particular medication, DCF would be unable to identify which children are taking that medication.  (*Id.* at 40:18-23, 104:5-11).  This failure further prevents DCF from providing the medical practitioner with the necessary information to provide appropriate mental health treatment.  (*Id*. at 104:23-105:1).

1452.   This opinion is based on Dr. Bellonci's twenty years working with the DCF foster care system in Massachusetts, his review of three Named Plaintiffs' case files, his "knowledge of what other states are doing," the AACAP standards, the federal government's guidance and law, research, and literature, and was confirmed by deposition testimony of DCF officials.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 86:11-87:19).

## VII.    Workforce: Caseloads and Training

### A.    Caseloads

#### 1.    DCF Social Work Functions

1453.   DCF's "ongoing" or "case management" social workers are responsible for providing front-line social work services to intact families ("family preservation" or "family support" cases), as well as to children and families where removal has occurred (i.e., foster care  or "Care and Protection" cases).  Massachusetts is "unique" in having "mixed" caseloads of intact families and families with children in placement assigned to the same workers.  (Trial Exhibit 642, Department of Children & Families, Proposal for Reducing Ongoing Caseloads, Presented May 2010, p. 9; Trial Exhibit 20, Department of Children & families: Proposal for Reducing Ongoing Workloads, Presented to SEIU 509, May 11, 2010, p. 6; Trial Exhibit 641, Department of Children and Families: Rationale for Reducing Ongoing Caseloads, May 25, 2010, at DCF010278533; Trial Tr., May 7, 2013 (McClain), at 31:22-32:2; Rule 30(b)(6) Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, re: Staffing, Caseloads and Training, Jan. 20, 2012, at 93:21-94:3).

1454.   DCF Family Resource workers are responsible for, among other things: maintaining information about the availability of DCF unrestricted foster homes, the recruitment and training of foster parents, the ongoing management of homes—including licensing, annual reassessments, and relicensing of unrestricted homes—participating in decisions of where to place children, addressing, with the child's social worker, requests to remove a child from a home, and supporting foster homes through visits.  (Trial Exhibit 1, Family Resource Policy, DSS Policy No. 2006-01, DCF Case Practice Policy & Procedures Manual, Feb. 6, 2006, at DCF POL (7/08) 234-238; Rule 30(b)(6) Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, re: Placements, Sept. 20, 2011, at 118:4-120:22; *see also generally* Trial Exhibit 1 at DCF POL (7/08) 179-239).

1455.  DCF adoption workers are responsible for providing social work services to children in foster care whose goal has been changed to adoption. Adoption workers generally take over case management functions for these children, including visitation and service planning, as well as responsibility for preparing them for adoption and overseeing the adoption process. (Rule 30(b)(6) Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, re: Permanency, Sept. 28, 2011, at 199:23-202:6; Rule 30(b)(6) Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, re: Staffing, Caseloads, and Training, Jan. 20, 2012, at 78:6-14, 80:20-81:10, 82:23-85:12; Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, re: Staffing, Caseloads, and Training, Jan. 5, 2012, at 346:9-22, 384:11-21).

## 2.    Professional Caseload and Workload Standards

1456.  Mass. Gen. Laws ch. 18B § 7 states that "The commissioner shall establish reasonable caseload rates." (Trial Exhibit 318, Mass. Gen. Laws ch. 18B § 7(a) (2009)).

1457.  Nationally-recognized standards emphasize that the staffing needs of a child welfare agency depend on a number of agency-specific factors, including the "number of services provided directly" and the "responsibilities other than direct service, such as community activities and administrative responsibilities." (Contested Exhibit QS, Child Welfare League of America, Standards for Organization & Administration for All Child Welfare Services § 3.1; Trial Tr., Feb. 28, 2013 (Crabtree), at 34:11-35:8).

1458.  Professional standards provide that child welfare agencies maintain a caseload/workload standard that is based on an agency-specific workload study.  CWLA standards state that "[t]he size of the work load that can be effectively carried by an individual worker" must "[take] into account the different responsibilities assigned to the worker in a given agency" and be "based on the time required to complete satisfactorily a specific set of tasks or units of work for which the practitioner is responsible." (Contested Exhibit QS, Child Welfare League of America, Standards for Organization & Administration for All Child Welfare Services § 3.2; Trial Tr., Feb. 28, 2013 (Crabtree), at 34:11-35:8).  Thus, "[a]ppropriate work loads can be determined only through careful time studies carried on in the individual agency." *Id.*  COA standards similarly state that a caseload weighting formula should be based on "time and case study data" and that workloads should be based upon an assessment of, among other things, "the work and time required to accomplish assigned tasks including those associated with individual caseloads and other responsibilities." (Contested Exhibit RH, Council on Accreditation, Foster Care Services, § 19.06; Contested Exhibit UO, Council on Accreditation, Kinship Care Services, § PA-KC 16.06; Trial Tr., Feb. 28, 2013 (Crabtree), at 35:9-36:4).  According to a Casey Family Programs 2009 report, "Absent a workload study, the rationale for establishing a specific caseload standard is not always clear." (Contested Exhibit EX, Caseload Standards Workload Studies: A Scan of Standards by State & Brief Review of Literature and Research, at DCF010359479).

1459.  Ms. Crabtree testified that a caseload standard is significant in managing a child welfare agency because the number of children for whom workers are responsible for "directly impacts their ability to get their work done day to day." (Trial Tr., Feb. 28, 2013 (Crabtree), at 31:14-32:8).  She described a workload as the multitude of tasks related to the actual

caseload of one child, multiplied by the number of children on a worker's caseload, and emphasized that the only way to assess a workload is by performing a careful study of the time it takes to perform activities such as travel, visitation with children and parents, data entry, and court appearances. (*Id*. at 32:2-33:1).

1460.  DCF management understands the nature and value of a workload study.  Olga Roche testified that she understood that a workload study assesses the "activities that are required" for "the basic provision of services to families and children by a worker" to determine "how many humanly possible and effectively" the worker can handle in light of the particular procedures, processes, and circumstances under which the agency operates.  (Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 205:19-206:20).  In April 2009, senior DCF officials obtained and circulated workload studies performed by New York and Washington. (Contested Exhibit SV, Email from Mary Gambon to Angelo McClain, Jan Nisenbaum, and Olga Roche re: Great to Catch Up, Apr. 15, 2009, and attached Washington State Children's Administration Workload Study Executive Summary, Nov. 2007, Apr. 15, 2009).

1461.  The Council on Accreditation defines a "manageable caseload" for foster care workers as one that "makes it possible for workers to meet practice requirements . . . does not impede the achievement of outcomes, and . . . takes into consideration the qualifications and competencies of the worker and case status and complexity."  (Contested Exhibit RH, Council on Accreditation, Foster Care Services § 19.06; Trial Tr., Feb. 28, 2013 (Crabtree), at 35:9-36:4; *see also* Contested Exhibit UO, Council on Accreditation, Kinship Care Services, § 16.06).

1462.  National standards relating to the caseloads carried by investigators and by social workers serving intact families use the family as the relevant case unit. (Contested Exhibit QT, Child Welfare League of America (CWLA) Standards of Excellence for Services for Abused or Neglected Children and Their Families, § 5.9; Trial Tr., Feb. 28, 2013 at (Crabtree), at 37:25-39:6; Trial Exhibit 15, Email from Paula Neese to christy.lawton@alaska.gov et al. re: Advocacy for Maintaining Workforce During State Budgetary Process, at DCF005958454; Contested Exhibit RG, Council On Accreditation, Family Preservation and Stabilization Services, 8th ed., 2006, § 11.07; Trial Tr., Feb. 28, 2013 (Crabtree), at 39:7-23).

1463.  However, national standards relating to the caseloads carried by social workers responsible for children in out-of-home care and children with a goal of adoption all use the individual child as the relevant case unit, rather than the family. (Trial Exhibit 1099, Child Welfare League of America Standards of Excellence for Family Foster Care Services, 1995, § 3.48; Trial Tr., Feb. 28, 2013 (Crabtree), at 36:5-37:11; Contested Exhibit ST, CWLA Standards of Excellence for Adoption Services, 2000, § 7.19; Trial Exhibit 15, email and attachment from Paula Neese to Christy Lawton, Nancy Buckner, Paul Butler, et al., Jan. 12, 2011, at DCF005958454; Contested Exhibit RH, Council On Accreditation, Foster Care Services Standards, 8th ed., 2006, § 19.06; Trial Tr., Feb. 28, 2013 (Crabtree), at 35:9-36:4; Contested Exhibit UO, Council On Accreditation, Kinship Care Services, 8th ed., 2006, § 16.06).  According to the COA, foster care agencies typically examine foster care caseloads by children, not families, since "it's easier and more useful for [a foster care agency] to see it by child."  (Rule 30(b)(6) Deposition of Richard Klarberg, Council on Accreditation

President and CEO, and Karen Callender, Council on Accreditation Director of the Accreditation Program, re: Council on Accreditation, Aug. 9, 2012, at 106:1-11).

1464.    Absent a workload study, professional standards relating to the caseloads of foster care workers indicate that the maximum reasonable caseload is between 12 and 18 children per worker.  The CWLA has established a caseload standard of 12 to 15 children per social worker for workers serving children in family foster care, "depending upon the level of service required to meet the assessed needs of each child." (Trial Exhibit 1099, Child Welfare League of America Standards of Excellence for Family Foster Care Services, 1995, § 3.48; Trial Tr., Feb. 28, 2013 (Crabtree), at 36:5-37:11; *see also* Trial Exhibit 15, Email and attachment from Paula Neese to Christy Lawton, Nancy Buckner, Paul Butler, et al., Jan. 12, 2011, at DCF005958454).  The COA interprets its requirement of a manageable caseload to generally mean that foster care caseloads not exceed 18 children, or 8 children with special therapeutic needs.  (Contested Exhibit RH, Council on Accreditation, Foster Care Services § 19.06; Trial Tr., Feb. 28, 2013 (Crabtree), at 35:9-36:4).  This COA caseload standard is a "Fundamental Practice Standard" in the area of Health and Welfare.  (Contested Exhibit QJ, Council on Accreditation Service Narrative: Public Agency Foster Care Services, pp. 7-8; *see also* Contested Exhibit QH, Council on Accreditation, What are the Fundamental Practice Standards?; *see supra* ¶ 237).

1465.    For adoption workers the CWLA has established a caseload standard, in the absence of a workload study, of 10-12 children per social worker "preparing children for adoption who are older or who have special needs." (Contested Exhibit ST, CWLA Standards of Excellence for Adoption Services, 2000, § 7.19; *see also* Trial Exhibit 15, email and attachment from Paula Neese to Christy Lawton, Nancy Buckner, Paul Butler, et al., Jan. 12, 2011, at DCF005958454).  Mary Gambon agreed that the CWLA standard for older children and special-needs adoption casework of 10 to 12 children per worker is the appropriate adoption caseload standard to apply to DCF adoption workers.  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, re: Staffing Caseloads and Training, Jan. 5, 2012, at 378:6-10, 383:7-385:2).

1466.    Where a family is receiving services and support with children remaining in the home, the CWLA has determined that "[o]ngoing services . . . should involve no more than 17 active families, assuming the rate of new families assigned is no more than one for every six open families." Trial Exhibit QT, CWLA Standards of Excellence for Services for Abused or Neglected Children and Their Families, § 5.9; Trial Tr., Feb. 28, 2013 (Crabtree), at 37:25-39:6).  The CWLA Standard for family-centered casework services is 12 families per social worker.  (Trial Exhibit 15, Email and attachment from Paula Neese to Angelo Mcclain et al., Jan 18, 2011 re. Advocacy for Maintaining Workforce During State Budgetary Process, at DCF005958454).

1467.    The CWLA development of caseload standards to be used in the absence of a workload study included examination of "existing literature on caseload and workload," gathering "input from people in the field about the key activities and demands that are on staff," and consultation with CWLA internal staff and external experts.  (Rule 30(b)(6) Deposition of Linda Spears, Child Welfare League of America Vice President of Policy and Public Affairs, re: Child Welfare League of America, Aug. 14, 2012, at 105:14-106:1, 112:5-113:21).  The

standards are "goal standards," but many states, including Maryland and Florida, "embrace them and use them," so that they are "reality." (*Id.* at 119:5-12, 127:8-19). The COA standard of 18 children is based on a review of literature, input from COA's own advisory panel, and comments from the field. (Rule 30(b)(6) Deposition of Richard Klarberg, Council on Accreditation President and CEO, and Karen Callender, Council on Accreditation Director of the Accreditation Program, re: Council on Accreditation, Aug. 9, 2012, at 100:17-101:6).

1468.   DCF is a member of the Child Welfare League of America ("CWLA"). (Trial Exhibit 15, Email and attachment from Paula Neese to Angelo Mcclain et al., Jan 18, 2011 re. Advocacy for Maintaining Workforce During State Budgetary Process, at DCF005958450; Rule 30(b)(6) Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, re: Staffing, Caseloads, and Training, Jan. 20, 2012, at 61:15-19).   DCF has relied on CWLA caseload standards in analyzing the effects of potential budget reductions on its ability to provide needed services to clients. (Trial Exhibit 653, Joint Ways and Means Fiscal Year 2011 Maintenance Submission Agency-Wide Reduction Narrative, at DCF007026344).   The Massachusetts Legislature relied on CWLA caseload standards when it authorized DCF to "establish a pilot program of family engagement in child welfare practice" in "4 to 8 area offices," and required the pilot program and a "control group" to use "social worker teams based on caseload standards recommended by the [CWLA]." (Trial Exhibit 775, 2008 Mass. Acts ch. 176 § 135(a)).

### 3.    DCF Social Worker Caseloads

a)    *DCF's current standards and weightings are obsolete*

1469.   The Collective Bargaining Agreement between Massachusetts and the union representing DCF social workers specifies that investigators and assessment workers are to be assigned no more than twelve cases per month and that ongoing workers are to be assigned no more than eighteen cases.   It does not establish a caseload standard for adoption workers.  (Trial Exhibit 21, Collective Bargaining Agreement entered Feb. 12, 2009 between the Commonwealth and the Alliance, AFSCME/SEIU, AFL-CIO, p. 121; *see also* Rule 30(b)(6) Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, re: Staffing, Caseloads and Training, Jan. 20, 2012, at 69:13-21, 70:8-14, 105:14-106:6; Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, re: Staffing, Caseloads, and Training, Jan. 5, 2012, at 340:22-342:6, 369:9-12).

1470.   A caseload standard for adoption workers will not be developed until negotiations over the Permanency Planning Policy are completed.   (Trial Exhibit 640, Email from Mary Gambon to Martin E. Kenney re: Follow up, Feb. 21, 2008, at DCF005160893; Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, re: Staffing, Caseloads, and Training, Jan. 5, 2012, at 340:22-342:6, 369:9-12; *see also* Rule 30(b)(6) Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, re: Staffing, Caseloads, and Training, Jan. 20, 2012, at 105:14-106:12). Commissioner McClain testified that he did not have any sense of what caseload limit DCF management would propose for adoption workers.  (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 134:14-135:2).  Pending the completion of union

negotiations, DCF has applied a caseload standard of 18 cases per worker for adoption workers. (Rule 30(b)(6) Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, re: Staffing, Caseloads, and Training, Jan. 20, 2012, at 104:6-106:12).

1471.  The 18:1 caseload ratio for ongoing workers and the 12:1 ratio for investigators and assessment workers was established in the 1980s. (Trial Exhibit 769, Email from Patricia Mackin to Marilyn Chase and Angelo McClain re: clothing allotment and 15 family plan, June 30, 2011, at DEF000230552; Trial Exhibit 641, Department of Children and Families: Rationale for Reducing Ongoing Caseloads, May 25, 2010, at DCF010278533; Trial Exhibit 642, Department of Children & Families, Proposal for Reducing Ongoing Caseloads, Presented May 2010, at DCF010275219; Trial Exhibit 770, Signed copy of Supplemental Agreement Q, Apr. 1986).

1472.  Massachusetts is the only state that has established caseload standards through a union bargaining agreement. (Contested Exhibit EX, Casey Family Programs, "Caseload Standards Workload Studies: A Scan of Standards by State & Brief Review of Literature and Research," 2009, at DCF010359482).

1473.  The union contract has, since at least 1986, stated that "The Department and the Union recognize, that although the provisions of this Agreement do not provide optimal workload and caseload assignment standards, that the Agreement does represent the parties' best efforts to effectively utilize currently available resources." (Trial Exhibit 21, Collective Bargaining Agreement entered Feb. 12, 2009 between the Commonwealth and the Alliance, AFSCME/SEIU, AFL-CIO, p. 121; Trial Exhibit 770, Supplemental Agreement Q Covering Bargaining Unit 8 Employees at the Department of Social Services, Apr. 1986, at DEF000187560; *see also, id.* at DEF000187563).  SEIU 509 has actively sought to reduce caseloads to below the 18:1 level.  (Trial Exhibit 20, Department of Children & Families: Proposal for Reducing Ongoing Workloads – Presented to SEIU 509, May 11, 2010, p. 4; Trial Exhibit 643, Supplemental Agreement Q Union proposal, Apr. 24, 2008, at DCF0006099556).

1474.  DCF has acknowledged that the 18:1 caseload ratio "does not appropriately reflect increases in workload requirements due to changes in statutes, regulations, industry standards, policy and practice" and "is rapidly becoming obsolete" due to the complexity of the "profile" of DCF clients. (Trial Exhibit 641, Department of Children and Families: Rationale for Reducing Ongoing Caseloads, May 25, 2010, at DCF010278533; Trial Exhibit 642, Department of Children & Families, Proposal for Reducing Ongoing Caseloads, Presented May 2010, at DCF010275219).

1475.  Former Commissioner McClain acknowledged that the current caseload standard of 18:1 was set 25 years ago and is "obsolete," since it does not appropriately reflect increases in the workload requirements that have occurred due to changes in statutes, regulation, industry standards, policy and practice.  (Trial Tr., May 2, 2013 (McClain), at 71:17-72:22, 73:18-23, 76:21-77:13).  He also acknowledged that the profile of children involved with DCF is more complex than 25 to 30 years ago, resulting in an increased expectation upon workers, making it extremely difficult for workers to complete all the required tasks associated with their 18

assigned families, and resulting in workers prioritizing the most urgent tasks as they arise and being thus unable to consistently meet all required examinations.  (*Id.* at 77:14-25).

1476.   The 18:1 caseload ratio was established "when the acuity level of the children and families was less," so that "comparison of 18:1 then and now is not a valid comparison." (Trial Exhibit 769, Email from Patricia Mackin to Marilyn Chase and Angelo McClain re: clothing allotment and 15 family plan, June 30, 2011, at DCF000230552).

1477.   Under the 18:1 caseload ratio, it is "extremely difficult for workers to complete all the required tasks associated with their 18 assigned families," which "compromises the Commonwealth's ability to ensure the safety of all the children [it is] responsible for." (Trial Exhibit 641, Department of Children and Families Rationale for Reducing Ongoing Caseloads, May 25, 2010, at DCF010278533; *see also* Trial Exhibit 642, Department of Children and Families Proposal for Reducing Ongoing Caseloads, May 2010, at DCF0102745219-20).

1478.   DCF's implementation of a new "Integrated Case Practice Model" ("ICPM") has contributed to the obsolescence of the 18:1 caseload ratio.  (Trial Exhibit 769, Email from Patricia Mackin to Marilyn Chase and Angelo McClain re: clothing allotment and 15 family plan, dated June 30, 2011, at DCF000230552).  A report based on the first eighteen months of ICPM implementation stated that "[a]t the Social Worker level [the Integrated Practice] model is, more complex to effectively manage than the previous model.  This is because adding [Initial Assessments] to case management caseloads heightens the acuity of certain demands.  This makes scheduling casemanagement [sic] activities less consistent and more unpredictable.  There are more . . . time-sensitive activities that require the Social Worker's attention."  (Trial Exhibit 771, Regional Summary of the Integrated Casework Practice Model: Northern Region, at DCF010258814).

1479.   Former Commissioner McClain testified that the ICPM's extended screen-in process and differential response implementation affects only children who are not yet in DCF custody. (Trial Tr., May 1, 2013 (McClain), at 130:7-131:9).

1480.   In December 2005, DCF and SEIU 509 agreed to apply the contractual standard of 18 cases per worker to Family Resource workers, using a new set of weightings for the functions performed by Family Resource social workers.  Under this Memorandum of Understanding ("MOU"), active foster homes in the caseload of a Family Resource worker are weighted at 0.6 points; homes undergoing the licensing process carry 0.9 points; homes licensed but in the probationary period carry 0.75 points; out-of-state homes used through the Interstate Compact on the Placement of Children ("ICPC") carry 0.4 points; and pending inquiries by potential foster homes carry 0.2 points. (Trial Exhibit 647, Memorandum of Understanding, at DCF00350781; *see also*, Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Staffing, Caseloads, and Training and Purchased Services Licensing, Delivery, and Oversight, Jan. 5, 2012, at 347:9-348:7).

1481.   When DCF's weighted caseload system for Family Resource workers was designed, it was understood that "it should be revisited at some point."  The weighted workload

computation applied to Family Resource workers does not account for certain activities, including recruitment activities, follow-up on new kinship placements, and kinship placement with overdue licensing assessments. (Trial Exhibit 640, Email exchange between Mary Gambon and Martin E. Kenney, Feb. 15-21, 2008, DCF005160893-894, at DCF005160893; Trial Exhibit 971, Email from Ros Walter to Mary Gambon and Joy Cochran re: FR weighted workload report, Jan. 19, 2012).

1482.  Based on changes in DCF practice and the population served since the 18:1 caseload standard was set by DCF in the 1980s and, the fact that DCF ongoing workers have "mixed" caseloads of intact families and families with children in foster care, as described below, Plaintiffs' expert Cathy Crabtree concluded that DCF's use of an 18-family per worker caseload ratio for ongoing workers is a departure from accepted professional judgment. (Trial Tr., Feb. 28, 2013 (Crabtree), at 57:5-13; s*ee generally id.* at 31:22-57:13).

> b)    *DCF Permits Workers to Carry Caseloads in Excess of 18:1*

1483.  Since December 2009, DCF's management has used a monthly "Caseload Weighted Caseload" report, posted on the DCF intranet, to monitor staff workloads in accordance with the contractual 18:1 "prorated weighted caseload." (Trial Exhibit 648, Email from Steven Maloof to Regional Directors, Area Directors, Olga Roche, and others re: New monthly caseload report, Dec. 29, 2009; Rule 30(b)(6) Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, re: Staffing, Caseloads and Training, Jan. 20, 2012, at 190:2-14).

1484.  The monthly Caseload Weighted Caseload report gives investigations, initial assessments, and assessments a weight of 1.5 to take into account the agreed-upon ratio of 12:1 for these functions. (*See, e.g.*, Trial Exhibit 967, Caseload Weighted Caseload Report, Aug. 2012, p. 2 at Columns O-Q). It also assigns weights to Family Resource worker functions in accordance with the MOU concerning Family Resource caseloads. (*Id.* at Column T; *see supra* ¶ 1480). Thus, all caseloads are normalized to the 18:1 ratio set forth in the collective bargaining agreement.

1485.  Notwithstanding the 18:1 ratio agreed upon with SEIU, DCF imposes no upper limit on the number of cases that can be assigned to a social worker. (Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: Staffing, Caseloads and Training, Jan. 13, 2012, at 92:11-24).

1486.  The monthly "Caseload Weighted Caseload Report" distributed to the field reports the number of workers with over 20 cases or over 22 cases, but not the number of workers with more than 18 cases. (Trial Exhibit 967, All Caseload Weighted Caseload Reports, *e.g.*, Monthly Caseload Weighted Caseload Report, Aug. 2012, pp. 3-5).

1487.  During calendar year 2011, the number of social workers with weighted caseloads of 20 or more ranged from 96 to 217, and the number of social workers with weighted caseloads of 22 or more ranged from 13 to 64. (Trial Exhibit 967, Caseload Weighted Caseload Report, Dec. 2011, pp. 4-5).

1488.   During the first eight months of calendar year 2012, the number of social workers with weighted caseloads of 20 or more on the last day of the month ranged from 101 (in July) to 209 (in May).  The twelve-month average from September 2011 to August 2012 was 143.8. (Trial Exhibit 967, Caseload Weighted Caseload Report, Aug. 2012, p. 5).

1489.   During the first eight months of calendar year 2012, the number of social workers with weighted caseloads of 22 or more on the last day of the month ranged from 21 (in July) to 63 (in May).  The twelve-month average from September 2011 to August 2012 was 33.9.  (Trial Exhibit 967, Caseload Weighted Caseload Report, Aug. 2012, p. 4).

1490.   As of August 2012, 390 social workers had weighted caseloads exceeding DCF's 18:1 standard. (Trial Exhibit 957, Number of Social Workers with Weighted Caseloads over 18, Aug. 2012, p. 11).  The total number of cases handled by these workers was 7,481.25.  (*Id.*, tab "August'12 Detail," sum of column E).  The total number of cases for all DCF workers in August 2012 was 29,016.66.  (Trial Exhibit 967, Caseload Weighted Caseload Report, Aug. 2012, p. 2).

1491.   Between September 2011 and August 2012, the number of social workers with weighted caseloads exceeding 18:1 varied between 337 (in September 2011 and July 2012) and 571 (in May 2012). (Trial Exhibit 957, Number of Social Workers with Caseloads over 18, Sept. 2011 – July 2012 (all figures found on last page of report); *see also* Trial Exhibit 773, Angelo McClain, "Budget Testimony to Joint Committee on Ways & Means," Feb. 23, 2011, at DEF000250558).

1492.   Caseload data on the Caseload-Workload report, and therefore the average caseloads computed therein, do not take into account additional work performed by "specialty" workers who are permitted to carry, and reported as carrying, reduced caseloads. (Trial Exhibit 652, Email exchange between Richard Geffin, Frances Sceppa, and Steven Maloof, Mar. 10-22, 2011).

c)    <em>Ongoing Social Worker Caseloads</em>

1493.   Plaintiffs' expert Cathy Crabtree testified that she was unaware of any COA or CWLA standard that includes a caseload ratio for social workers who carry "mixed" caseloads of family preservation and foster care cases.  (Trial Tr., Feb. 28, 2013 (Crabtree), at 40:17- 41:8).   Professional standards require that, if an organization chooses to have its caseworkers carry mixed caseloads, it conduct a workload study to "determine the right number of caseworkers that you need in order to get the job done effectively and keep children safe and ultimately hopefully reunify those children or get them to adoption.  Without the workload study there's no way to know if you have enough people to get the work done."  (*Id*. at 41:9- 22).

1494.   DCF management reporting does not distinguish ongoing cases that are family support cases from ongoing cases that are foster care cases, and does not take into account the number of children in the family.  (Trial Exhibit 644, Email from Commissioner McClain to Secretary Bigby, Apr. 29, 2010; Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: Staffing, Caseloads, and

283

Training, Jan. 13, 2012, at 43:2-18, 54:2-13; Rule 30(b)(6) Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, re: Staffing, Caseloads and Training, Jan. 20, 2012, at 191:6-19; *see also* Trial Exhibit 967, All Caseload Weighted Caseload Reports, p. 1).

1495.   The collective bargaining agreement gives the same weight to a case whether the children remain at home with their parents or have been placed in foster care, and regardless of the number of children and whether siblings are placed in the same or different placements. (Rule 30(b)(6) Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, re: Staffing, Caseloads, and Training, Jan. 20, 2012, at 96:2-97:12).

1496.   Foster care cases often require more work than cases involving intact families. Children in foster care must be visited separately from their parents, and if placed apart from siblings, separately from their siblings. The worker must also arrange and attend family visits, prepare for and attend court proceedings, and engage in permanency planning activities. (Trial Exhibit 641, Department of Children and Families: Rationale for Reducing Ongoing Caseloads, May 25, 2010, at DCF010278533; Trial Exhibit 644, Email from Angelo McClain to JudyAnn Bigby re: SEIU Local 509 Update, Apr. 29, 2010; Trial Exhibit 254, Email exchange between Raymond Pillidge and Jan Nisenbaum re: APM to Assist in Training on Initial Assessments, Dec. 4, 2009, at DCF004957356; Trial Exhibit 1101, Email exchange between John Vogel and Susan Getman, Oct. 17-20, 2009, at DCF010359473; Trial Exhibit 20, Department of Children & Families, Proposal for Reducing Ongoing Workloads - Presented to SEIU 509, May 11, 2010, p. 4; Rule 30(b)(6) Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, re: Staffing, Caseloads and Training, Jan. 20, 2012, at 96:8-97:19).

1497.   Former Commissioner McClain acknowledged that as a general rule, a case with multiple siblings who are separated in care will predictably place more time demands on the caseworker than a case where there is a family unit under one roof. (Trial Tr., May 2, 2013 (McClain), at 87:8-14).

1498.   Ms. Nisenbaum agreed that the number of children a social worker is working with should be a factor in considering equitable workload allocation. (Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: Staffing, Caseloads, and Training, Jan. 13, 2012, at 55:11-23).

1499.   DCF does not have a limit on the number of children, the number of children in out-of-home care, or the relative number of foster care and family support cases, that can be assigned to an ongoing social worker. (Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: Staffing, Caseloads, and Training, Jan. 13, 2012, at 112:19-114:3; Rule 30(b)(6) Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, re: Staffing, Caseloads and Training, Jan. 20, 2012, at 94:4-8).

1500.   Ms. Nisenbaum testified that "without drilling down and looking at the specific case records" there is "no easily identifiable aggregate way in our system of knowing" whether the allocation of cases among workers is equitable. (Rule 30(b)(6) Deposition of Jan

Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: Staffing, Caseloads & Training, Jan. 13, 2012, at 60:14-24). She further testified that no one at DCF is doing so. (*Id.* at 61:1-4). According to Ms. Gambon, only individual supervisors would be in a position to identify workers who, although within their contractual limit of 18 cases per worker, have a very high number of children on their workload. (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, re: Staffing, Caseloads, and Training and Purchased Services Licensing, Delivery, and Oversight, Jan. 5, 2012, at 398:13-399:2).

1501.    Mr. Burke testified that area offices do not have a strict allocation method when assigning cases to ensure a balance between cases that involve children in intact families versus cases that involve children in out-of-home substitute care. (Deposition of Raymond Burke, DCF Director of Areas for Pioneer Valley, Jan. 19, 2012, at 68:8-69:7). Mr. Burke further stated that he "would hope" that as cases are assigned, there is enough balance between the cases so that "a social worker can do their work and meet their responsibilities." (*Id.* at 69:2-7).

1502.    As of February 2, 2012, 23.2% of ongoing workers had over 30 children on their caseloads. (Trial Exhibit 977, Email from Ruben Ferreira to David O'Callaghan, et al. re: 15-Family Plan: Frequency Distribution of Ongoing Worker Caseload, May 1, 2012, with attached Document re: Frequency Families Children, Feb. 2012, pp. 4, fourth column, summing percentages for workers with over 31 children in third column)). The total number of children on these workers' caseloads was 12,216, out of a total of 36,253 children on all workers' caseloads. (*Id.* at 3-4 (multiplying number of workers by number of children for each row)).

1503.    A May 2010 DCF presentation concerning workloads indicated that 533 ongoing workers had more than 30 children in their caseload; these 533 workers served a total of 19,466 children—approximately half of the 38,395 children served by DCF in the ongoing caseload. (Trial Exhibit 642, Department of Children & Families, Proposal for Reducing Ongoing Caseloads, Presented May 2010, at DCF010275223; Trial Exhibit 265, Documents re: Ongoing Worker Caseloads, p. 1).

1504.    A May 2010 DCF presentation concerning workloads indicated that 64 ongoing workers had caseloads with more than 15 children *in placement*; these 64 workers served a total of 955 children—approximately one-sixth of the 6,767 children in placement served by DCF in the ongoing caseload. (Trial Exhibit 642, Department of Children & Families, Proposal for Reducing Ongoing Caseloads, Presented May 2010, at DCF010275223; Trial Exhibit 265, Documents re: Ongoing Worker Caseloads, p. 1).

1505.    As of February 2010, excluding Adoption, Family Resource, Screening, and Intake/ Investigation units, and therefore including primarily ongoing and assessment workers, 39 social workers had between 40 and 59 children on their caseloads (and therefore served *at least* 1,560 children), and 241 social workers had 30 to 39 children (and therefore served a total of *at least* 7,230 children). Five social workers had 20 to 28 children *in out-of-home placement* (and therefore served a total of at least 100 foster children) and thirty social workers had 15 to 19 children in placement (and therefore served a total of at least 450 foster

children). (Trial Exhibit 655, Email from Jan Nisenbaum to Commissioner McClain re: Revised Children on Caseloads, Apr. 29, 2010).

1506.   Workers with over 15 children in out-of-home placement also have substantial numbers of cases with children not in out-of-home placement.  For example, of the 22 workers with more than 15 children in out-of-home care in February 2010, one had 36 children, three had 11 children, one had nine children, one had eight children, two had six children, two had five children, one had four children, four had three children, two had two children, two had one child, and three had no children on their caseloads who were not in foster care. (Trial Exhibit 650, Chart re: Assessment Ongoing Only, Feb. 2010, Apr. 29, 2010, Columns AF and AG).

1507.   One ongoing worker with a "typical" caseload of 16 families, including 14 foster children in 13 separate placements, 10 children in family support cases, and 25 adults in 25 different locations, reported she would have to undertake the following during each month of 20 working days:  38 home visits per month, often spread out over a wide geographic area within the state; 4 to 5 half-day court appearances per month; a varying number of supervised parent-child visits (including picking up the children and driving them home); school meetings; medical visits; and other meetings.  The worker would likely need to have additional phone contacts with schools and doctors.  In addition, the social worker would have to draft and/or update court reports, service plans, service referrals, and assessments. (Trial Exhibit 970, Email Exchange between Frances Carbone, Perry Trilling, and Elizabeth Ford, re: unscientific survey of 1, Sept. 15-16, 2011).

1508.   The creation in early 2012 of new "Short Term Stabilization" ("STS") units in connection with the Integrated Case Practice Model further increased the caseloads and workloads of ongoing workers, because the STS workers' caseloads had to be re-assigned to ongoing workers, and also because ongoing workers kept the same number of cases while "easier" short-term cases were diverted to the new STS units.  (Trial Exhibit 972, Email from John Whalen to Andrew Cayward, Eileen Beal, Sylvia Monteiro, et al., re: Case assignments, Mar. 23, 2012; Trial Exhibit 973, Email from Marcia Roddy to Paul Fitzsimons, re: Status of STS, Apr. 19, 2012, at DCF011140063; Trial Exhibit 974, Email from Brett Antul-Cabral to Donna Morin re: STS Problems, June 20, 2012; Trial Exhibit 975, Emails among Julie Cardoz-Pietruszka, Peter MacKinnon, Donna Morin, and Terry Flynn re: "STS issues in the SE," June 25, 2012; Trial Tr., May 7, 2013 (McClain), at 33:15-34:9; 36:6-39:25).

d)    <em>Adoption Worker and ADLU Unit Caseloads</em>

1509.   A DCF adoption "case" may consist of either a child or a sibling group whose permanency goal is adoption.  When a sibling group cannot be placed in a single family home but rather is going to be placed in two separate adoptive families, there are additional time requirements imposed on a DCF adoption worker.  (Rule 30(b)(6) Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, re: Staffing, Caseloads, and Training, Jan. 20, 2012, at 76:8-14, 80:20-81:10).

1510.   DCF management reporting does not distinguish adoption cases involving one child from adoption cases involving multiple siblings, or involving cases with siblings in separate placements. (Trial Exhibit 967, All Caseload Weighted Caseload Reports, *e.g.*, Caseload

Weighted Caseload Report, Aug. 2012, p. 2; Trial Exhibit 644, Email from Commissioner McClain to Secretary Bigby, Apr. 29, 2010; Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, re: Staffing, Caseloads, and Training, Jan. 5, 2012, at 346:5-22; Rule 30(b)(6) Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, re: Staffing, Caseloads, and Training, Jan. 20, 2012, at 73:1-7; 81:11-82:19).

1511.   Ms. Gambon acknowledged that given DCF's adoption worker standard of 18 cases per worker, where each case may include multiple siblings, DCF does not meet the CWLA standard for adoption workers.  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, re: Staffing, Caseloads, and Training and Purchased Services Licensing, Delivery, and Oversight, Jan. 5, 2012, at 385:3-23).

1512.   Based on child assignments shown in DCF's monthly Goal of Adoption report, numerous DCF adoption workers carry caseloads that include well in excess of twelve children, and many even in excess of twenty children. (Trial Exhibit 81, All Children With a Goal of Adoption/Guardianship Reports, *e.g.*, Trial Exhibit 225, Children With a Goal of Adoption/Guardianship, May 28, 2011, pp. 1-39).

1513.   Ms. Gambon testified that she would not be surprised to see that there were more than 30 children assigned to an adoption worker, and it did not surprise her that an adoption worker with a weighted workload of 17 had 35 children assigned to her.  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, re: Staffing, Caseloads, and Training and Purchased Services Licensing, Delivery, and Oversight, Jan. 5, 2012, at 396:16-17; 397:2-398:12.

1514.   Mr. Burke testified that he has not tracked the number of children, as opposed to families, on an adoption worker's caseload in the Springfield office.  (Deposition of Raymond Burke, DCF Director of Areas for Pioneer Valley, Jan. 19, 2012, at 257:18-258:8).  Mr. Burke further stated that this task is the responsibility of the adoption supervisor and the program manager.  (*Id*. at 257:17-258:18).

e)   *Imbalances*

1515.   Social workers performing "Case Management" functions consistently carry heavier weighted caseloads across all area offices, compared to Family Resource workers and Investigators. (Trial Exhibit 961, All Caseload Function Comparison Reports, *e.g.*, Caseload Function Comparison Report, Aug. 2012; Trial Exhibit 19, Considerations for Equalizing Workload: Ongoing Social Workers and Investigators, Apr. 2011 Draft, p. 1; *see also*, Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: Staffing, Caseloads, and Training, Jan. 13, 2012, at 98:3-10; Trial Exhibit 1101, Email exchange between Susan Getman, John M. Vogel, and Raelene Freitag, et al. re: LEC survey draft, Oct. 20, 2009, at DCF010359473).

1516.   There is often large variation in average caseloads between the area offices and among regions.  For example, the range of average caseloads among area offices in August 2012

varied between 10.85 (in Lawrence) and 18.84 (in South Central). (Trial Exhibit 967, Caseload Weighted Caseload Report, Aug. 2012, p. 2 at Column W). The disparity between Laurence and South Central has persisted at since December 2011. (Trial Exhibit 967, Caseload Weighted Caseload Reports, Dec. 2011 – Aug. 2012, p. 2 at Column W). The four DCF regions also had significant variation in August 2012, from 13.74 (Northern) to 16.13 (Boston). (Trial Exhibit 967, Caseload Weighted Caseload Report, Aug. 2012, p. 2 at Column W). Ms. Nisenbaum agreed that there is often variation in the average caseload among area offices. (Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: Staffing, Caseloads, and Training, Jan. 13, 2012, at 88:8-14). Family resource workers in the Western region tend to be higher than in Boston, for example. (Rule 30(b)(6) Deposition of Mary Gambon, DCF's Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, re: Staffing, Caseloads, and Training and Purchased Services Licensing, Delivery, and Oversight Jan. 5, 2012, at 391:11-20).

1517.   Notes from the DCF 2008 Strategic Planning process indicate that "Allocation of staffing resources must be fine tuned and area staffing needs reviewed more frequently," and that "[t]he current method for allocating staff" is "inconsistent." (Trial Exhibit 1111, Email exchange between Liz Skinner-Reilly and Michelle Regnier re: FW: Strategic Planning - Final Draft Grids, Aug. 22, 2008, with attached Strategic Planning Final Draft Grids, at DCF006016014).

### 4.   Excessive Caseloads Cause Harm and Risk of Harm to Children

a)   *Caseworkers cannot perform casework in conformance with professional standards*

1518.   The Child Welfare League of America has stated that:

> Manageable caseloads and workloads can make a real difference in a worker's ability to spend adequate time with children and families, improve staff retention, and ultimately have a positive impact on outcomes for children and families. The General Accounting Office and Children's Bureau have linked workloads and caseloads to performance on federal CFSRs and achievement of safety and permanency outcomes. . . . States with higher case ratios are less likely to achieve improved outcomes for the children and families served.

(Trial Exhibit 15, Email from Paula Neese re: Advocacy for Maintaining Workforce During State Budgetary Process, Jan. 18, 2011, and attached Child Welfare League of America, Maintaining Workable Caseloads/Workloads Within Child Welfare, at DCF005958453).

1519.   CWLA has found, in its evaluations or assessments of child welfare systems, that caseloads are a factor that contributes to harm to children and/or poor functioning in a system. (Rule 30(b)(6) Deposition of Linda Spears, re: Child Welfare League of America, Aug. 14, 2012, at 123:10-23).

1520.  DCF has acknowledged that a potential consequence of failing to reduce current caseloads would be to "jeopardize our ability to keep children safer." (Trial Exhibit 642, Department of Children and Families Proposal for Reducing Ongoing Caseloads, May 2010, at DCF010275228).

1521.  Former Commissioner McClain acknowledged that caseworkers cannot complete the tasks required to protect children and strengthen families if they do not have the time to perform in accordance with law and policy.  (Trial Tr., May 2, 2013 (McClain), at 56:13-17).

1522.  DCF has acknowledged that reducing caseloads would address safety, visitation, case and service planning, placement stability, quality assurance, training, reunification, adoption timeliness, educational stability, service coordination, and timeliness of investigations, assessments, and service plans. (Trial Exhibit 660, DCF FY12 Funding Needs/Issues, at EOHHS001911918-919; Trial Exhibit 642, Department of Children and Families Proposal for Reducing Ongoing Caseloads, May 2010, at DCF010275218; Trial Exhibit 661, Massachusetts Department of Children and Families Progress Report, Feb. 2010, at DCF000549748).

1523.  DCF has acknowledged that there is a link among excessive caseloads, the ability of workers to meet DCF policies concerning visitation, and the risk of harm to children. (Trial Exhibit 657, DSS Senate Ways & Means Budget: Background & Talking Points on the Administrative and Social Worker Accounts, May 20, 2008, at DCF000401019; Trial Exhibit 658, Letter from Angelo McClain to Hon. Gale D. Candaras, June 12, 2009, DCF000792595-96; Trial Exhibit 659, Department of Children and Families FY2010 Budget Testimony, Joint Committee on Ways and Means, Mar. 11, 2009, at DCF000412328; Trial Exhibit 1159, Monthly Caseworker Visit Data, at DCF011203530).

1524.  DCF has acknowledged that "manageable caseload levels are a critical variable in assuring worker availability to see families at a frequency and intensity that promotes addressing the goals of safety, permanency and well-being," and that "increasing social worker caseloads continue [sic] to be the number one barrier identified" to improved performance on visitation. (Trial Exhibit 94, Child and Family Services Plan FY2010-FY2014, at DCF007054507-08).

1525.  DCF officials have acknowledged that the caseload a worker is carrying could impact many parts of what the worker does, including whether they are able to complete all the home visits they need to do.  (Rule 30(b)(6) Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, re: Visitation and Permanency Planning, Sept. 28, 2011, at 167:1-168:1; *see also* Deposition of Joseph Collins, DCF Director of Areas for Franklin and Hampshire, Jan. 25, 2012, at 127:12-128:2).

1526.  Former Commissioner McClain acknowledged that in building appropriate caseloads, an important consideration is to assure that there is enough time for the caseworkers not only to conduct activities such as service planning, meeting with children and parents, and going to court, but also the caseload must permit caseworkers to timely record activities into dictation. He agreed that this is a key piece of "managing with data."  (Trial Tr., May 6, 2013 (McClain), at 60:14-25).

1527.  DCF social workers have difficulty ensuring that children entering foster care receive the required 7- and 30-day medical screenings because of their heavy workloads.  (Trial Exhibit 761, Email from Peter MacKinnon to Lori Ortiz re: Medical Exams for Children Entering DCF Placement or Custody, May 20, 2011, DCF005655986; *see also* Trial Exhibit 618, Email from Michelle Mason to Cynthia Harmon, Paula Caramello, and Michaelle Dimanche-Silva, et al., re: Medical visits due/compliance, Apr. 19, 2011, at DCF005470568).

1528.  One reason there are delays in assigning an adoption worker to children whose goal has been changed to adoption is the unavailability "within a worker caseload for another case to be assigned." (Deposition of Patricia Mackin, DCF Chief of Staff, Mar. 1, 2012, at 66:5-67:9).

1529.  Commissioner McClain has stated that "the solution to improving child welfare systems is about lower caseloads, effective quality improvement processes, and raising foster care rates."  (Contested Exhibit FT, Email exchange between Angelo McClain and Julie Caliwan re: Heard About Children's Rights, May 11, 2010, at DEF000226568).

1530.  Ms. Sullivan testified that DCF social workers have expressed to her that they have "too many cases on [their] caseload" and they lack time to complete all their responsibilities. (Trial Tr., Feb. 6, 2013 (Sullivan), at 110:4-13).

> b)  *DCF is unable to make essential policy changes*

1531.  Any change in DCF policy affecting workload must be negotiated with the union. (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 101:13-103:21).

1532.  The current set of DCF policies relating to permanency planning consist of an "interim" set of policies most recently revised in January 1996.  (Trial Exhibit 2, Interim Policy and Procedures for Permanency Planning, DSS Case Practice Policy and Procedures Manual, Jan. 31, 1996, DCF POL 739-754).   The need for an updated permanency planning policy was identified in the spring of 1999, and a first draft was developed by 2000.  A draft was approved in the summer of 2005 and has been in revision since that time.  Due to the anticipated impact on workload, the draft Permanency Planning Policy became the subject of union negotiations in March 2006. (Trial Exhibit 662, Policy Status Overview, Mar. 24, 2009, at DCF000402764; Trial Exhibit 1108, DCF Policies under Development or Revision as of 7/2/09, at DCF007310251-52; Trial Exhibit 174, Draft Permanency Planning Policy, Nov. 10, 2005; *see also*, Trial Exhibit 752, Permanency Planning Policy – Section II: Draft, Feb. 1, 2010).

1533.  To date, DCF and the union have not reached an agreement on workload standards in relation to the Draft Permanency Policy, preventing its implementation. (Rule 30(b)(6) Deposition of Mary Gambon, Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011,at 237:24-239:9; Deposition of Mary Gambon, Assistant Commissioner for Adoption, Foster Care and Adolescent Services, May 14, 2012, at 99:17-101:12; Trial Exhibit 1108, DCF Policies under Development or Revision as of 7/2/09, at DCF007310251-52).

1534.  DCF identified implementation of the updated Permanency Planning Policy as a "strategic priority" for calendar years 2011 and 2012 in a November 18, 2010 PowerPoint presentation, noting that this would "[p]rovide clear guidance to staff" and so "reduce barriers." (Trial Exhibit 1103, Strengthening the Safety Net: DCF Strategic Priorities, Calendar Years 2011 and 2012, Nov. 18, 2010, at DEF000224510).

1535.  Failure to implement the draft Permanency Planning Policy has impacted DCF's ability to timely accomplish adoptions for children with that goal.  Plaintiffs incorporate herein *supra* ¶¶ 978-92.

### 5.    Field Restructuring and other Administrative Staff

1536.  In 2010, DCF developed an Updated Field Management Structure in response to budget constraints. The primary features of the revised structure were: (1) the combination of regional offices to reduce the number of DCF regions from six to four; (2) the maintenance of the existing 29 Area Offices, but reducing the administrative structure for these offices to 15 area management teams (each management team was assigned two area offices; the Pittsfield Office retained its dedicated management structure) and (3) the creation of an Area Clinical manager position to provide daily clinical oversight. (Trial Exhibit 545, Memorandum from Angelo McClain to Friends and Colleagues of the Department of Children and Families re: DCF Budget and Field Management Structure, Aug. 12, 2010; Trial Exhibit 546, Sept. 29, 2010 Field Management Structure and Manager Assignments; Trial Exhibit 361, Update on DCF Reorganization, Sept. 17, 2010; Trial Exhibit 374, Annual Progress and Services Report, June 30, 2011, at DCF007413693). The restructuring included an increase in the ratio of area program managers to supervisors from 4:1 to 5:1.  (Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, Mar. 5, 2012, at 35:20-36:7; Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, Jan. 26, 2012 at 60:16-61:12).

1537.  In an October 5, 2011 Statement of "New" and "Key" DCF Initiatives, Commissioner McClain observed in relation to the field management restructuring that "based on our 100, 200 & 300-day reviews and other feedback it is clear that the administrative support within the Area Offices has been **"stretched" way too thin;** in order to keep up with . . . the volume staff are routinely working 70+ hours on a weekly basis." (Trial Exhibit 415, Angelo McClain Agenda Document, Oct. 5, 2011, at EOHHS000179751; *see also* Trial Exhibit 31, June 1, 2011 Email from Olga Roche to Paul Fitzsimons et al. re: Field Restructure 200 Day Assessment with attachment; Trial Exhibit 46, Email from Olga Roche to Kimberly Norato et al. re: Field Restructuring 100 Day Assessment with attachment, Mar. 3, 2011).

1538.  As one example of being "stretched way too thin," a Plymouth Area Program Manager wrote to Regional Director Terry Flynn in October 2010: "I have been managing at a frenzied pace since August; I have expressed to Michelle that although I have been able to do this volume of work for 'short-term', it is concerning for me and my staff who service clients directly to have me continue to manage 'long-term' with this volume." (Trial Exhibit 287, Email from Paula Caramello to Terry Flynn and Michelle Mason re: Management Staffing for Plymouth, Oct. 5, 2010).

1539.   A DCF internal memorandum, "Field Restructuring 100 Day Assessment," describes serious workload concerns flowing from and following the field reorganization. Among these concerns: "Review the AAM's workload and ability to meet the demands of two Area Offices," "In some offices, understaffing (e.g., AAAM/PC Coach) has seriously hampered efforts to meet the daily demands of staff on administrative tasks," "Review the assignment of 5 units per APM. The workload and number of staff in that many units may prove to be untenable for one manager" and "Better alignment of staff functions with area workload. Priorities. Investigators and Family Resource Workers." (Trial Exhibit 46, Email and attachment from Olga Roche to Angelo McClain, Mar. 3, 2011, at DCF004931675).

1540.   A DCF internal memorandum, "Field Restructuring - 200 Day Assessment," lists the following concerns under the heading, "WORKING DIFFERENTLY" – "Working many more uncompensated hours," "Delegating more, but not confident meeting same high standard as prior to reorganization," "Not able to perform AAM job responsibilities at same high level as before reorg," "No time for supervision (either of direct reports or received from D of A)," "Feel disconnected from staff in both offices," "Feel loss of control," "No connection to other AAMs statewide. Too busy to share best practice," and "Travel very difficult. Decrease in productivity." (Trial Exhibit 461, Field Restructuring – 200 Day Assessment).

1541.   Following the field management reorganization, DCF submitted a "PIP Change Notice Reporting Form" to the Department of Health and Human Services ("HHS") requesting that a number of Program Improvement Plan action steps be eliminated or revised because the reorganization prevented or delayed their completion. Included among these action steps were "Provide training on new assessment and service plan," "Implement revised assessment and service plan," "Monitor completion of assessment and service plans through monthly reporting," "Develop practice expectations for family progress reviews and Implement family progress reviews," and "Implement review of cases with 3 or more 51As in 12 months." (Trial Exhibit 376, PIP Change Notice Reporting Form, at DCF003596423, DCF003596424, DCF003596425, DCF003596428, and DCF003596438).

1542.   In response to an October 8, 2010 email from Olga Roche inquiring, "Please send me an email, by October 14, indicating the contributing factors for the low numbers of adoptions in your region," Mary Gambon wrote, "Honestly at this point it is the reorg . . . We are keeping a look at this weekly and pushing at the worker level.  We will see some increase but it's important to manage expectations." (Trial Exhibit 412, Email from Mary Gambon to Olga Roche re: NAD, Oct. 8, 2010).

1543.   An October 15, 2010 internal DCF email exchange between Ellen Finnegan and Timothy Haley included the following in relation to the reorganization:  Finnegan wrote, "This is really all kind-of funny because I thought the western region got kind of screwed in the final analysis . . . but that is for another day – maybe 100 days from now."  Haley wrote back, "Sadly, I think the displeasure and upheaval of the re-org will manifest itself in many areas over the coming weeks and months. All of us are trying to not get drawn into conflict and debate as resources are allocated. After clearly being the largest Region for 20 years with 6 offices, can't help but feel that square miles have now become the only measure of workload, incontinence, and resource allocation. Other than Boston, ALL regions feel unmanageable."

(Trial Exhibit 344, Email exchange between Timothy Haley and Ellen Finnegan re: For Your eyes Only, Oct. 15, 2010).

1544.   Olga Roche testified that the restructuring hit the Area Administrative Managers ("AAMs") the hardest, since they had no subordinates to whom to delegate their increased workloads, including reviewing non-performing contracts, oversight of day care slots, coordination of area boards, and expenditures for children. (Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 89:18-91:22). DCF spent "some very good chunk of time" in 2012 "trying to bring support to that level of the restructuring of the area administrative manager." (*Id*. at 91:9-12). On any given day "you have a parade of social workers . . . sitting outside of your office . . . because they need day care" for families with open DCF cases and for children in kinship foster homes. (*Id*. at 92:4-7). AAMs struggled with their day-care-related responsibilities; the problem has been fixed "slowly" through the hiring of service coordinators in five area offices. (*Id*. at 93:9-94:13). Ms. Roche was "optimistic that by the end of the fiscal year, that that's not an issue," although there will still be "other issues that they have at the table." (*Id*. at 94:10-13).

1545.   Ms. Roche testified that when Area Directors were assigned to two offices in the restructuring, the position of Area Clinical Manager was created because the new Directors of Areas would not be available daily in each area office to be a clinical manager. (*Id*. at 80:2-81:20). This led to "conflicts about duplicity, lack of authority, empowering people, what you're going to do, what you're not going to do, what you need to pull back, what you need to delegate." (*Id*. at 81:13-16).

1546.   Paul Fitzsimons, DCF's Regional Director for the Western Region, indicated that DCF's October 2010 reorganization, which consolidated the previously separate Central and Western Regions into the new Western Region, increased the size of his region in terms of both geography and personnel, creating challenges in terms of implementing consistent practices and policies across all offices within the region. (Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, Mar. 5, 2012, at 38:17-42:20).

1547.   Ms. Cochran testified that DEEC had inquired about the impact of the reduction from six to four regions, and from 29 to 15 area directors, and that she responded that she "obviously had been some impact on field staff" due to those changes. (Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 153:18-154:20).

1548.   Commissioner McClain testified that there are many areas where DCF does not have adequate staffing, and that "you can take any of our units and make a pretty easy argument that they need more additional staffing." (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 146:7-10, 156:3-5).

1549.   Ms. Nisenbaum testified that "[i]t's hard to imagine that there isn't a unit within the Department of Children and Families that wouldn't benefit from some additional resources," but stated that there has been no formal request for the additional staffing. (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 43:11-15).

1550. As a result of staffing reductions that took place in 2008 and 2009, DCF eliminated a number of positions or reduced a number of positions at the regional level. (Rule 30(b)(6) Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, re: Staffing, Caseloads, and Training, Jan. 20, 2012, at 129:4-130:2).

### 6.    Defendants' Inaction

1551. Ms. Nisenbaum testified that a top priority for the department since 2007 has been reducing caseloads for social workers because there were a significant number of workers who had caseloads over 18 when the Commissioner took office. (Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: Staffing, Caseloads, and Training, Jan. 13, 2012, at 95:13-96:2, 110:1-11).

1552. Former Commissioner McClain testified that DCF "needed to lower the caseloads." (Trial Tr., May 2, 2013 (McClain), at 71:17-72:22; *see also id.* 90:6-7, 97:15-17).

1553. Ms. Roche testified that DCF had not, within the three preceding years, considered reducing the caseloads of adoption workers as a strategy for improving DCF's performance, relative to federal standards, on the timeliness of adoptions. (Rule 30(b)(6) Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, re: Staffing, Caseloads, and Training, at 91:19-92:3).

### a)    *Workload Study*

1554. DCF has not, at least since 2007, conducted, or engaged a consultant to conduct, a workload analysis in establishing appropriate caseloads. (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 139:16-22; Trial Tr., May 2, 2013 (McClain), at 92:11-15; Deposition of Olga Roche, DCF Deputy Commissioner of Field Operations, May 23, 2012, at 204:2-207:9; Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 199:1-201:8; Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Sevices, re: Staffing, Caseloads, and Training, Jan. 5, 2012, at 347:9-350:21, 353:6-14).

1555. Former Commissioner McClain testified that he reviewed workload studies from Washington and New York to "benefit from these two studies and other information I could gather," despite acknowledging that Massachusetts is "unique" in having mixed caseloads. (Trial Tr., May 2, 2013 (McClain), at 89:23-91:13). Commissioner McClain described the efforts DCF has made to analyze caseloads and workloads as trying to see "what we can take from the work of Children's Rights, Inc. in other states and not necessarily have to produce our own study." (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 140:4-7).

1556. Ms. Roche testified that she was not familiar with any studies conducted by DCF, either through its own staff or through a consultant, to determine how many hours are required of a social worker to perform casework functions (1) on a care and protection matter; (2) in relation to adoption workers; (3) in relation to investigators; (4) in relation to DCF supervisors; or (5) in relation to the work of caseworkers employed by private child-placing

agencies.  (Rule 30(b)(6) Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, re: Staffing, Caseloads, and Training, Jan. 20, 2012, at 58:13-59:9).

1557.  DCF's weightings for Family Resource workers were based not on a workload study, but on "conversations that workers, their union, and then management had at the time that it was being negotiated."  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, re: Staffing, Caseloads, and Training and Purchased Services Licensing, Delivery, and Oversight, Jan. 5, 2012, at 349:2-350:21).

1558.  DCF has not conducted a workload study of the time commitments that would be placed on ongoing caseworkers with the implementation of the integrated case practice model, which resulted in a reduction in the workload of investigators and an increase in the workload of ongoing social workers.  (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 201:9-204:1; *see also* Rule 30(b)(6) Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, re: Staffing, Caseloads, and Training, Jan. 20, 2012, at 60:6-12 (unaware of any workload study)).  Nor was any such study conducted in order to implement the new draft permanency planning policy.  (*Id*. 60:13-18).

1559.  Ms. Nisenbaum testified that, although she has had general conversations about ways to reduce caseloads, there have not been any specific conversations about the way children in out-of-home care should be counted as compared to children still in the home. (Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: Staffing, Caseloads, and Training, Jan. 13, 2012, at 96:3-15).

1560.  The Office of the Governor has not required submission of the Comprehensive Plan set forth in Mass. Gen. Laws ch. 18C, §§ 11(a), 11(d)(8), and 11(d)(11) (Trial Exhibit 337), providing for an examination of the issues of social worker caseloads by June 30, 2010, and annual updates thereafter.  Plaintiffs incorporate herein *infra* ¶¶ 1835-52.

  b)  *15-Families Initiative*

1561.  Commissioner McClain described the "15 Families Initiative" as DCF management's "proposal to address caseload/workload issues." (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 132:1-5).  The proposal contemplates renegotiating the current caseload limit with the union to a maximum of 15 families, as opposed to the current limit of 18.  (*Id*. at 132:6-23).  The proposal would also limit the number of investigations that a DCF investigator may handle on a monthly basis to "something less than twelve," and limit the caseload for initial assessments to be conducted by workers to twelve families per worker.  (*Id*. at 135:13-136:19).  The proposal also contemplates a cap on the number of children who can be represented by the assignment of 15 families, an aspect of the initiative which Commissioner McClain testified was informed by previous Children's Rights settlements.  (*Id*. at 137:1-20).  The caps currently proposed by DCF management are in the range of 25 to 30 children in a caseload, where 8 to 10 or 12 children are in placement. (*Id*. at 137:21-138:9).  This proposal was all but totally abandoned because it would "require a substantial influx of resources." (Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy

Commissioner for Clinical Practice and Program Operations, re: Staffing, Caseloads, and Training, Jan. 13, 2012, at 120:3-121:12; *see also* Deposition of Patricia Mackin, DCF Chief of Staff, Mar. 1, 2012, at 81:24-84:1).

1562.  In the fiscal year 2013 budget, the Governor has not sought funding for any additional full-time-equivalent caseworkers to be assigned to the DCF area offices. (Deposition of Patricia Mackin, DCF Chief of Staff, Mar. 1, 2012, at 204:6-10).

1563.  Former Commissioner McClain testified that he was "shooting for" a caseload standard of 15 families per worker with a 30-child cap.  However, as of August 15, 2012, the 18:1 ratio contained in Supplemental Q had not been modified in any way. (Trial Tr., May 2, 2013 (McClain), at 102:5-19).

### B.    Qualifications and Training

### 1.    Professional Standards

1564.  The Child Welfare League of America standards provide that a child welfare agency:

> [S]hould create a staff development and training plan . . . based upon an assessment of the competency needs of all of the organization's staff members and volunteers, on the identification by management of those needs not known by staff members, and on consultation with experts who can identify trends in the field not known to the organization.

(Contested Exhibit RC, Child Welfare League of America, Standards of Excellence for the Management and Governance of Child Welfare Organizations § 3.18; Trial Tr., Feb. 28, 2013 (Crabtree), 89:15-90:7).  CWLA further states that the staff development and training plan should encompass in-service training. (Contested Exhibit RC, Child Welfare League of America, Standards of Excellence for the Management and Governance of Child Welfare Organizations § 3.18).

1565.  The Council on Accreditation standards provide that child welfare agencies should implement a training and development program that enhances the knowledge, skills, and abilities of personnel and prepares personnel to assume their responsibilities.  Among other things, the training and development program should "outline[] specific expectations regarding training required of personnel in different positions and categories" and be "reviewed annually and revised in accord with an assessment of the agency's training needs." (Contested Exhibit RX, Council on Accreditation Standards for Personnel Development and Training, §§ 1.01, 1.03; Trial Tr., Feb. 28, 2013 (Crabtree), at 90:8-91:1).

1566.  DCF social workers must exercise professional judgment that is a product of training and experience, and cannot be entirely codified in written policies and procedures. (Deposition of Virginia Peel, DCF General Counsel, Feb. 8, 2012, at 43:7-44:20).

1567.   Terrence Flynn, DCF's Regional Director for the Southern Region, testified that "[t]he biggest challenge [in developing a training program] is the enormity of the knowledge base," including an understanding of child welfare, child abuse, child neglect, domestic violence, substance abuse, mental health issues, and special education. (Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, Jan. 26, 2012, at 259:8-20).

1568.   A child welfare training system should include a training curriculum for new hires, an on-the-job training period, ongoing informal and formal in-service training, a performance feedback process to measure the quality of the training, and a method for reviewing and updating training to reflect changes within best practices, regulation, and policy. (Trial Tr., Feb. 28, 2013 (Crabtree), at 92:22-93:21; *see also* Trial Exhibit 1092; Susan Kanak et al., National Child Welfare Resource Center for Organizational Improvement, Building Effective Training Systems for Child Welfare Agencies (2008)).

1569.   A 2004 child welfare workforce study conducted by the American Public Human Services Association ("APHSA"), found that among more than 20 states participating in the survey, the average annual mandatory in-service training hours for foster care staff is 30 hours. (Trial Exhibit 1093, Report from the 2004 Child Welfare Workforce Survey: State Agency Findings, Feb. 2005, p. 21; Trial Tr., Feb. 28, 2013 (Crabtree), at 99:23-102:25). The same survey found that the average number of mandatory in-service training hours for in-home workers is 29. (Trial Exhibit 1093, Report from the 2004 Child Welfare Workforce Survey: State Agency Findings, Feb. 2005, p. 21).

1570.   The Massachusetts Legislature has expressed concern at the failure of DCF to require in-service training of all social workers, asking the Commissioner to explain after a 2009 oversight hearing, "[w]hy is any DCF training voluntary?" (Trial Exhibit 387, Letter from Angelo McClain to Hon. Kay Khan and Hon. Gale D. Candaras, Mar. 8, 2010, at DCF000543369-70).

## 2.    DCF Social Workers and Supervisors Receive Insufficient Training

1571.   No prior work experience is required for new DCF social worker hires. (Rule 30(b)(6) Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, re: Staffing, Caseloads, and Training, Jan. 20, 2012, at 146:1-147:1, 151:12-152:4). The educational requirement for DCF social workers is a bachelor's degree and "relevant education" in psychology, social work, sociology, counseling, or another social-services related field. (*Id*. at 143:12-21).

1572.   DCF Social Workers are not required to have a social work license at the time of hire. (Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: Staffing, Caseloads, and Training, Jan. 13, 2012, at 144:11-14; Rule 30(b)(6) Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, re: Staffing, Caseloads, and Training, Jan. 20, 2012, at 154:6-10). DCF does not maintain data concerning the number or percentage of its social workers that are licensed; this information can only be compiled through a manual examination of individual social worker names in the State's Division of Licensure records—a "huge undertaking." (Trial

Exhibit 1104, Email exchange between Ruben Ferreira, Susan Spurlock, and David O'Callaghan re: Feb. 15 Report Due to Legislature, Feb. 14, 2011).

1573.    The social work license that DCF requires social workers and supervisors to obtain is of a type that does not require any annual training to retain.  (Rule 30(b)(6) Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, re: Staffing, Caseloads, and Training, Jan. 20, 2012, at 152:17-154:5).

1574.    Ongoing workers are generally the least experienced among DCF's social workers because the vast majority of newly-hired DCF social workers are assigned to the ongoing social work function.  Adoption, family resource, or investigation positions are generally filled by ongoing workers with three to five years experience. (Rule 30(b)(6) Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, re: Staffing, Caseloads, and Training, Jan. 20, 2012, at 145:8-24, 147:22-151:5; Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, Jan. 26, 2012, at 256:4-16; Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 198:9-199:23).

1575.    New social workers hired by DCF receive twelve days of mandatory classroom training and eight days of on-the-job training before taking on a caseload as full-time social workers.  An additional day of "Trauma Training" is also required of new workers. (Trial Exhibit 374, Annual Progress and Services Report, June 30, 2011, at DCF007413805-10).  DCF social workers are not evaluated or tested regarding the material presented.  (Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: Staffing, Caseloads, and Training, Jan. 13, 2012, at 141:24-142:6, 143:23-144:6; Deposition of Joseph Collins, DCF Director of Areas for Franklin and Hampshire, Jan. 25, 2012, at 248:13-249:19).

1576.    DCF mandates no further "in-service" training following the training required of new social workers because the union contract between DCF and SEIU 509, which represents DCF social workers, does not allow for mandatory in-service training. (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 54:22-55:15; Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: Staffing, Caseloads, and Training, Jan. 13, 2012, at 148:20-24; Deposition of Patricia Mackin, DCF Chief of Staff, Mar. 1, 2012, at 93:15-19; Deposition of Joseph Collins, DCF Director of Areas for Franklin and Hampshire, Jan. 25, 2012, at 251:10-17; Trial Exhibit 387, Letter from Angelo McClain to Hon. Kay Khan and Hon. Gale D. Candaras, Mar. 8, 2010, at DCF000543369-70).

1577.    Ms. Nisenbaum testified that it "would be desirable" for DCF to institute mandatory in-service training for its social worker staff. (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 54:13-55:2; *see also* Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: Staffing, Caseloads, and Training, Jan. 13, 2012, at 148:3-14).

1578.    No additional or specialized formal training is required for ongoing workers who become adoption workers or family resource workers.  (Rule 30(b)(6) Deposition of Olga Roche,

DCF Deputy Commissioner for Field Operations, re: Staffing, Caseloads, and Training, Jan. 20, 2012, at 154:23-156:13, 159:4-11, 161:15-20). However, family resource workers who have not been certified to provide the required "MAPP" training to prospective foster parents may not perform the specific task of providing that training. (*Id*. at 159:4-11).

1579.   New supervisors are offered a five-day training which is available once per year. (Trial Exhibit 374, Annual Progress and Services Report, June 30, 2011, at DCF007413810; Trial Exhibit 94, Child and Family Services Plan FY 2010 - FY 2014, at DCF007054646). However, this training is not mandatory. (Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: Staffing, Caseloads, and Training, Jan. 13, 2012, at 153:17-154:22).

1580.   During the third quarter of state fiscal year 2007, only 16% of area office staff participated in any professional development opportunity offered by DCF's Child Welfare Institute. (Trial Exhibit 233, Massachusetts Department of Social Services, CQI Data Book, Statewide/Quarter 3, FY '07, p. 32). Subsequently, DCF discontinued publication of this or any other aggregate report concerning participation in in-service training. (*See infra* ¶¶ 1591-93, 1605, 1614).

1581.   Participation in the "mandatory" 3-month follow-up training sessions for new caseworkers was only 70% in fiscal year 2006. (Trial Exhibit 57, Massachusetts Child and Family Services Review Statewide Assessment, May 2007, at CSF-000000598).

1582.   A number of supervisors did not attend Supervisory Training to Enhance Permanency Solutions (STEPS), a training series designed to help social workers facilitate the transition of youth in care to adulthood. In the Metro region, participation was so low the series was cancelled after one module. (Trial Exhibit 57, Massachusetts Child and Family Services Review Statewide Assessment, May 2007, at CSF-000000605-06).

1583.   DCF has not trained its workforce regarding the requirements of the federal Fostering Connections Act. (Deposition of Olga Roche, Deputy Commissioner for Field Operations, May 23, 2012, at 178:8-180:11; *see also* Trial Exhibit 462, Email from Raymond Pillidge to Olga Roche re: Kinship and Kinship First, Apr. 26, 2011, at DCF004917653).

1584.   DCF permits interns to perform some ongoing social worker functions. (Trial Exhibit 445, Email exchange between Susan Spurlock, Donna Reulbach, and Steven Maloof re: Case Carrying Interns, Dec. 15, 2009; Trial Exhibit 444, Draft "Guidance for Supporting Student Interns at DCF," July 22, 2009, at DCF001839564, DCF001839568-69; Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 207:10-210:21; Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 221:11-224:6).

### 3.    Defendants' Inaction and Departures From Professional Judgment

1585.   As early as 2001, DCF workers felt unable to avail themselves of needed in-service training opportunities on account of their heavy workloads. (Trial Exhibit 56, Massachusetts Child and Family Services Review Final Assessment, July 2001, at CSF-000000356).

1586.   DCF has long known that its failure to require in-service training is an obstacle to improving case practice.  Notes from a February 9, 2004 DCF Child Welfare Institute Planning Meeting reflect that among "Start Up Issues" discussed for the Child Welfare Institute was inclusion of "10 days of mandatory training annually for workers and sup[ervisor]s."  (Trial Exhibit 1112, Child Welfare Institution Planning Meeting, Feb. 9, 2004, at DCF006949348).

1587.   Meeting notes from a strategic planning session on July 10, 2008 reflect that the "[a]bsence of professional development required of staff of all levels" was viewed as a "[p]roblem area . . . that hinder[s] the Department" in fostering a "culture of learning."  (Trial Exhibit 1110, Email from Richard H. Ho to Liz Skinner-Reilly, et al., re: Liz Skinner-Reilly, July 11, 2008, with attached Discussion Points on Culture of Learning, July 7, 2008, at DCF005544660).  The notes also indicated that "[i]nstead of striving for excellence, our system tends to maintain mediocrity," that it is difficult for social workers "to balance between workload and the need for learning to achieve best practice."  (*Id.*).  The participants, including Elizabeth Skinner-Reilly, Raymond Pillidge, Valerie Lovelace-Graham, and Susan Spurlock, the current director of the Child Welfare Institute ("CWI"), found that solutions to these problems included recognizing professional development as "a core function" to be "institutionalized within the Department."  (*Id.*; *see also* Trial Exhibit 1113, Email from Michelle Regnier to Richard H. Ho, et al., re: Professional Development, July 14, 2008, with attached Professional Development Outline Draft, at DCF005544551-54).  These observations and recommendations were incorporated into a final "grid" provided to DCF management for inclusion in DCF's 2009 Strategic Plan.  (Trial Exhibit 1111, Email exchange and attachment between Liz Skinner-Riley and Michelle Regnier re: Strategic Planning – Final draft Grids, Aug. 22, 2008, at DCF006015981, DCF006016000-04; Trial Exhibit 1113, Email from Michelle Regnier to Richard H. Ho, et al., re: Professional Development, July 14, 2008, with attached Professional Development Outline Draft, at DCF005544551-52).  However, the final 2009 Strategic Plan itself only identified a need for "[t]raining that is targeted across the agency for social workers, supervisors and management to support a commonly held framework of best case practice."  (Trial Exhibit 1127, Strengthening the Safety Net: DCF's Strategic Plan for Action, April 2009, at DCF7605094)

1588.   DCF's 2009 PIP included an action step to design a mandatory annual in-service training for caseworkers; during the PIP process, DCF renegotiated this action step to instead require only a supervisor training.  (Trial Exhibit 760, DCF PIP Quarterly Report, Quarter Eight, July through Sept. 2011, at CSF-000005413, 48; *see also* Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: the Program Improvement Plan, Apr. 4, 2012, at 179:12-180:4, 181:1-6).  This supervisor training was not mandatory.  (*Id.* at 180:19-24).  Only 58% of DCF supervisors participated in the training, and as of April 2012, there had not been another training for the remaining 42% of supervisors.  (Trial Exhibit 760, DCF PIP Quarterly Report, Quarter Eight, July through Sept. 2011, at CSF-000005449; Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: Staffing, Caseloads, and Training and the Program Improvement Plan, Apr. 4, 2012, at 183:24-185:3).

1589.   DCF's Annual Progress and Services Report for Federal FY2012 reported that "[t]he Child Welfare Training Institute was funded at $1.9 million.  This is a reduction of $200,000

(9.7%) over FY 2011. The cumulative cuts to the training budget exceed $1M and represents a 33% [cut] in available funding." (Trial Exhibit 374, Annual Progress and Services Report Federal FY2012, June 30, 2011, at DCF007413695).

1590. DCF has reduced the number of in-service training opportunities available to social workers due to the assignment of Child Welfare Institute staff to coaching responsibilities in connection with the new Integrated Case Practice Model. (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 31:12-32:22).

1591. DCF does not track participation by staff in in-service training opportunities. The electronic training registration system used by DCF, "PACE," does not currently provide information about the total number of social workers who have participated in in-service training. In addition, DCF does not consistently maintain attendance sheets for in-service trainings it provides. (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 55:16-58:15; Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: Staffing, Caseloads, and Training, Jan. 13, 2012, at 149:3-12; *see also* Deposition of Raymond Burke, DCF Director of Areas for Pioneer Valley, Jan. 19, 2012, at 260:15-23).

1592. Former Commissioner McClain testified that DCF has not introduced a periodic, aggregate management report documenting either the percentage of DCF's own caseworkers that complete in-service trainings, or the hours completed. (Trial Tr., May 6, 2013 (McClain), at 54:9-23). Ms. Nisenbaum testified that she cannot recall any report showing the percentage of supervisors that have indeed completed the supervisor training. (Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: Staffing, Caseloads, and Training, Jan. 13, 2012, at 155:2-5).

1593. Notes from the 2008 Strategic Planning process reflect a recommendation that PACES [sic] be "[r]efine[d]" so that it is "able to produce reports for management." (Trial Exhibit 1111, Email exchange and attachment between Liz Skinner-Riley and Michelle Regnier re: Strategic Planning – Final draft Grids, Aug. 22, 2008, at DCF006016016).

1594. The Office of the Governor has not required submission of the Comprehensive Plan set forth in Mass. Gen. Laws ch. 18C, §§ 11(a), 11(d)(8), and 11(d)(11) (Trial Exhibit 337), providing for an examination of the issues of social worker qualifications, by June 30, 2010 and annual updates thereafter. (*See infra* § VIII.F.1). Ms. Nisenbaum testified that she could not recall if she and Susan Spurlock prepared a written submission to the OCA concerning the topic "Social Work Qualifications," required to be included in the OCA's Comprehensive Plan under Mass Gen. Laws ch. 18C § 11. (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 52:20-54:12).

1595. DCF's in-service training program does not meet the standards of professional judgment. (Trial Tr., Feb. 28, 2013 (Crabtree), at 103:1-4; *see generally id.* at 89:6-103:4).

## VIII. Inadequate Internal and External Accountability

### A. Continuous Quality Improvement

### 1.    Professional Standards

1596.  Federal law requires that the state agency receiving Title IV-E funds to operate a foster care system develop and maintain an internal quality assurance mechanism with adequate capacity to drive sound case practice and appropriate child outcomes. Specifically, it provides, in relation to the requirements for a state's comprehensive Child and Family Services Plan ("CFSP"):

> Quality assurance. The State must include in the CFSP a description of the quality assurance system it will use to regularly assess the quality of services under the CFSP and assure that there will be measures to address identified problems.

45 C.F.R. § 1357.15(u) (2013); *see also* Trial Tr., Mar. 1, 2013 (Crabtree), at 86:3-19).

1597.  Likewise, in relation to the criteria to be applied by HHS in determining conformity with federal requirements:

> *Quality assurance system*: The State has developed and implemented standards to ensure that children in foster care placements are provided quality services that protect the safety and health of the children (section 471(a)(22)) and is operating an identifiable quality assurance system (45 CFR 1357.15(u)) as described in the CFSP that:
>
> (i) Is in place in the jurisdictions within the State where services included in the CFSP are provided;
> (ii) Is able to evaluate the adequacy and quality of services provided under the CFSP;
> (iii) Is able to identify the strengths and needs of the service delivery system it evaluates;
> (iv) Provides reports to agency administrators on the quality of services evaluated and needs for improvement; and
> (v) Evaluates measures implemented to address identified problems.

45 C.F.R. § 1355.34(c)(3).  (Trial Tr., Mar. 1, 2013 (Crabtree), at 86:20-87:12).

1598.  The Child Welfare League of America standards provide that "[t]he organization should implement and incorporate throughout itself a process for monitoring the quality of its performance that is outcome based and centered on the child's well-being and stability; the physical, emotional, and developmental status of the child; and the achievement of permanence for the child."  These standards further provide that "[i]ncorporating a quality improvement process throughout the organization helps create a culture of continual improvement in the quality of the organization's services."  (Contested Exhibit RD, Child

Welfare League of America, Standards of Excellence for the Management and Governance of Child Welfare Organizations § 2.77).

1599.  The Child Welfare League of America standards provide that an organization's quality improvement process should include:

> [P]redefined standards or benchmarks for measuring the quality of services; data collection instruments that capture demographic and service utilization information, and that permit tracking and monitoring of the children, the services provided and their appropriateness, the length of time the children have been in care, and postplacement services; review systems for monitoring the progress of children and their families; and a management information system with reporting capabilities and a process to periodically review data in such a way as to enhance the organization's policy and practice.

(Contested Exhibit RD, Child Welfare League of America, Standards of Excellence for the Management and Governance of Child Welfare Organizations § 2.77; *see also* Trial Tr., Mar. 1, 2013 (Crabtree), at 88:10-89:9).

1600.  The Council on Accreditation standards provide, with regard to "Performance and Quality Improvement" ("PQI"), that the agency's PQI plan:

> (a) assigns responsibility for implementation and coordination of PQI activities and technical assistance in using the PQI process;
> (b) sets forth the purpose and scope of PQI activities;
> (c) establishes how the agency periodically reviews essential management and service delivery processes consistent in light of quality priorities;
> (d) defines stakeholders and how stakeholders will participate in the PQI process;
> (e) outlines methods and timeframes for monitoring and reporting activities; and
> (f) includes provision for an assessment of the utility of the PQI program, including any barriers and supports for implementation.

(Contested Exhibit RV, Council on Accreditation, Performance and Quality Improvement § 2.02; *see also* Trial Tr., Mar. 1, 2013 (Crabtree), at 87:13-88:9).

1601.  DCF has developed a Continuous Quality Improvement Program Guidance Manual, which acknowledges that, "the Federal Social Security Act (Section 471A-22) requires child welfare agencies to develop and implement standards to ensure that children in foster care placement in public or private agencies are provided quality services that protect their health and safety."  (Trial Exhibit 44, Massachusetts Department of Social Services, Continuous Quality Improvement Program, Guidance Manual, July 2008, at DCF000508649).  In

addition, states are required to "[o]perate an identifiable program that evaluates the quality of services, identifies strengths and needs of the service delivery system, provides relevant reports and evaluates program improvement measures implemented." (*Id.*).

1602.   In a May 11, 2010 email, Commissioner Angelo McClain states that "the solution to improving child welfare systems" includes "effective quality improvement processes." (Contested Exhibit FT, Email exchange between Julie Caliwan and Angelo McClain re: Heard About Children's Rights, May 11, 2010, at DEF000226568).

1603.   Plaintiffs' expert Cathy Crabtree identified accountability, including Quality Assurance, as one of the "building blocks" that must be in place for a child welfare agency to function properly.  (Trial Tr., Feb. 28, 2013 (Crabtree), at 29:16-20; Trial Tr., Mar. 1, 2013 (Crabtree), at 85:9-24).  Similarly, Plaintiffs' expert Arburta Jones identified accountability as one of the four "hinge pins" critical to a strong safety net for children in foster care. (Trial Tr., Feb. 7, 2013 (Jones), at 44:21-24).

1604.   Former Commissioner McClain similarly testified that another key part of the safety net is quality assurance and being able to manage with data and generate competent, valid systemic data so that trends can be found and corrective actions made where necessary. (Trial Tr. May 3, 2013 (McClain), at 107:22-108:4). Former Commissioner McClain testified that as he came into the Department, his "mantra was you can only manage what you can measure." (Trial Tr., April 30, 2013 (McClain), at 58:10-12).

## 2.    DCF's Failure to Implement Adequate CQI Structures

1605.   Prior to the arrival of the Patrick Administration in 2007 (and the appointment of Angelo McClain to replace Harry Spence as DCF Commissioner), DCF undertook steps to install CQI mechanisms within the agency.  For example, Area Office CQI Teams and Core Action Teams ("CAT") had been established to perform reviews of identified practice and performance issues, and the Central Office had developed and distributed a CQI Data Book providing Area, Regional, and Statewide data on approximately 30 indicators. The CQI Data Book was produced by Mr. Ferreira, using data Ms. Walter provided, for the CQI teams in the area offices to compare their performance to other area offices. (Trial Exhibit 233, CQI Data Book; Trial Exhibit 528, Department of Social Services Continuous Quality Improvement Documents, Feb. 25, 2004; Trial Exhibit 529, CQI Insight, Vol. 1, No. 2, July 2003; Trial Exhibit 530, CQI Update re: Continuous Quality Improvement Teams, at DCF000166142; Contested Exhibit FU, DSS CQI Statewide Core Action Team, Aug. 22, 2004; Trial Exhibit 699, Worcester Area Office Continuous Quality Improvement Work Summary, Feb. – Sept. 2003; Trial Exhibit 531, Northeast Region Continuous Quality Improvement; Trial Exhibit 532, Western Region Continuous Quality Improvement, Jan. 2004; Trial Exhibit 716, Continuous Quality Improvement Summary of Area Office Action Plans, June 2004; Trial Exhibit 717, Department of Social Services Southeast Region Regional CQI Team, June 14, 2004; Trial Exhibit 718, Email from Paul G Fitzsimons to Susan Getman re: CQI and Cat team progress, Aug. 25, 2004; Trial Exhibit 719, CQI Overview; Trial Exhibit 720, CQI Team and CAT Roles and Responsibilities, May 15, 2003; Trial Exhibit 721, Worcester Area CQI Initiative; Trial Exhibit 57, Massachusetts Child and Family Services Review Statewide Assessment May 2007, at DCF008446532-33).

1606.   The above pre-2007 CQI efforts within DCF included case record reviews and targeted assessments focusing on the agency's performance in relation to the rate of maltreatment in foster care.  (*See, e.g.*, Trial Exhibit 209, Massachusetts Department of Social Services CQI Child Maltreatment in Care Case Reviews; Trial Exhibit 446, Massachusetts Department of Social Services CQI Child Maltreatment in Care Records Review, Sept. 22, 2004; Trial Exhibit 498, Maltreatment in Placement, 1999-2003).  Defendants have produced no post-2007 case record review regarding the incidence or causes of maltreatment in foster care completed under Commissioner McClain.

1607.   In the July 2008 CQI Guidance Manual, DCF charted the organizational structure of the CQI system to be operated within the agency.  This CQI structure included Area CQI Teams, Regional CQI Teams, as well as a Central Office CQI Steering Committee.  (Trial Exhibit 44, Massachusetts Department of Social Services, Continuous Quality Improvement Program, Guidance Manual, July 2008, at DCF000508656-57, DCF000508660).  The structure further contemplated CQI interaction between Family Networks Regional Resource Centers and DCF Regional Offices as well as between Family Networks Area Lead Agencies and DCF Area Offices.  (*Id.* at DCF000508658-59).  The CQI structures described in the Guidance Manual have not been implemented within DCF at present. (Deposition of Jan Nisenbaum, DCF's Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 226:24-230:22; *see also* Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF's Deputy Commissioner for Clinical Practice and Program Operations, re: Program Improvement Plan, Apr. 4, 2012, at 76:15-77:12) Former Commissioner McClain testified that as of August 15, 2012, the Department's focus was on implementing the new practice model and thus "we had implementation teams in place and they essentially were. . .in place of a CQI team." They were "repurposed and reconfigured" to assist in the implementation of the integrated case practice model. (Trial Tr. May 6, 2013 (McClain), at 100:20-102:3).

1608.   Ms. Nisenbaum testified that DCF undertook ten "CQI Round Tables" in 2008 or 2009 in ten identified key areas of practice reflected in fatality and critical incident reports. (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 21:19-23:17).  Since then, CQI Round Tables have been undertaken only on an ad hoc basis at the area office level at the initiative of the area office management.  These area office round tables do not result in any formal report.  (*Id.* at 23:18-25:21).

1609.   DCF listed "Strengthen CQI Structures and Processes" in its fiscal years 2010-2014 Child and Family Services Plan as an agency action step:

> Continuous quality improvement structures and processes are fundamental to the Department's ongoing monitoring of our performance and outcomes.  The Department recently conducted an assessment of CQI teams in each Area Office and the results showed significant variability in the presence and vitality of those teams.    During the coming year, DCF will: 1. Establish standardized expectations for Area, Regional and Central CQI Teams membership, roles and responsibilities; 2. Establish roles and functions for Regional Quality Assurance staff; 3. Develop and

disseminate a CQI Guidance Manual; 4. Establish the structures for quality service review processes; 5. Strengthen performance and outcome reporting.

(Trial Exhibit 94, Child and Family Services Plan FY2010-FY2014, at DCF007054460). These same CQI action steps were included by DCF in its Second Round CFSR Program Improvement Plan and in its April 2009 "Strategic Plan for Action." (Trial Exhibit 33, DCF Massachusetts Child and Family Services Review, Program Improvement Plan, Oct. 5, 2009, pp. 10-11; Trial Exhibit 1127, "Strengthening the Safety Net: DCF's Strategic Plan for Action," at DCF7605104). These action steps have not been undertaken. DCF has again included a goal to "Strengthen CQI Structures / Processes" in its 2012-2015 Strategic Plan. (Trial Exhibit 7, Department of Children and Families 2012-2015 Strategic Plan, Aug. 2012, at CSF-000006351-52).

1610.  DCF has acknowledged the important role of case record reviews in determining and assessing case practice within the department and formulating and implementing targeted CQI responses.  The agency has not, however, integrated this mechanism into its CQI structure.  A June 2009 DCF internal memorandum states "Case Record Reviews . . . will further enhance our capacity to focus on specific casework practices that have been identified as priority areas for improvement."  (Trial Exhibit 29, DCF Case Record Reviews, Continuous Quality Improvement Reviews, at DCF004333538).  This memorandum continues, "[a]dditional reductions in the Department's administration account for state fiscal year 2011 will significantly limit [its] capacity to assign DCF staff to a case record review process." (*Id.*).

1611.  DCF also acknowledged in its 2009 CFSR Program Improvement Plan that:

> Continuous quality improvement structures and processes are fundamental to the Department's ongoing monitoring of the PIP and achievement of CFSR outcomes. The Department recently conducted an assessment of CQI teams in each Area Office and the results showed significant variability in the presence and vitality of those teams.
>
> During the coming year DCF will:
> 1) Establish standardized expectations for Area, Regional    and Central CQI Teams membership, roles and   responsibilities
> 2) Establish roles and functions for Regional Quality Assurance staff
> 3) Develop and disseminate a CQI Guidance Manual.

(Trial Exhibit 33, Massachusetts Child and Family Services Review, Program Improvement Plan, Oct. 5, 2009, p. 11).

1612.  Ms. Nisenbaum testified that some area offices did not have CQI teams, while some other area offices technically had CQI teams that were not meeting regularly. (Rule 30(b)(6)

Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: the Program Improvement Plan, Apr. 4, 2012, at 70:16-71:16).

1613. The efforts to build CQI capacity within DCF stalled due to lack of staffing and resources. In an internal memorandum, DCF explicitly identified the lack of adequate CQI capacity within the Department as a barrier to performance improvement. The memorandum states: "The Quality Improvement Unit has a major role to play in advancing [DCF] as a learning organization, and improving child welfare practice and outcomes, yet of all the Central Office units, it is the most poorly staffed." (Trial Exhibit 305, Resources Needed to Support the Division of Quality Improvement and Professional Development, at DCF004126102). In January 2010, Ruben Ferreira reported that production of the CQI Data Book was stalled due to "diminished resources," despite requests from the Child Advocate for some form of statewide data. (Trial Exhibit 722, Email from Ruben A. Ferreira to Gail Garinger re: OCA Comprehensive Plan, Jan. 13, 2010, at DCF000753912; *see also* Deposition of Rosalind Walter, DCF Director of Data Management, Jan. 4, 2012, at 208:18-210:8; Trial Exhibit 233, CQI Data Book, Statewide, Quarter 3, FY-07).

1614. DCF intended to disseminate a CQI Guidance Manual within the first year of the 2009 PIP implementation. (Trial Exhibit 33, Massachusetts Child and Family Services Review, Program Improvement Plan, Oct. 5, 2009, p. 11; Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: the Program Improvement Plan, Apr. 4, 2012, at 73:5-14). Ms. Nisenbaum testified that DCF has not disseminated a CQI Guidance Manual. (Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: the Program Improvement Plan, Apr. 4, 2012, at 75:4-6). Ms. Nisenbaum testified that this is due to budget cuts, which prevented DCF from establishing the CQI teams as envisioned. (*Id*. at 75:7-15).

1615. DCF further intended to create regional quality assurance coordinators for each DCF region who would be devoted to CQI as a full-time responsibility, but this has not occurred in practice due to resource limitations. (*Id.* at 77:12-23). Ms. Nisenbaum testified that DCF has failed to establish the roles and functions for Regional Quality Assurance staff, as set forth in the PIP, because of budget cuts. (*Id.* at 79:5-14; *see also* Trial Exhibit 33, Massachusetts Child and Family Services Review, Program Improvement Plan, Oct. 5, 2009, p. 11).

1616. Given the lack of adequate internal staff to conduct case record reviews, DCF had to engage a private consultant, the Center for the Support of Families ("CSF"), to conduct the case record reviews undertaken as part of DCF's implementation and scoring of its Program Improvement Plan for the Second Round CFSR. (Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: the Program Improvement Plan, Apr. 4, 2012, at 41:10-22). DCF has not integrated the CSF case reads into the department's overall CQI activities, but has instead limited the standard distribution of CSF's case record review reports to five DCF managers (Jan Nisenbaum, Ruben Ferriera, Ros Walter, Virginia Peel and Liz Skinner-Reilly). (*Id*. at 43:6-17). Ms. Nisenbaum testified that DCF did not validate the data or analysis of CSF's case record reviews, as DCF did not have staff capacity. (*Id*. at 229:13-23, 230:14-231:2).

1617.   On April 24, 2010, Jan Nisenbaum, responding to an email from Commissioner Angelo
McClain regarding "IFC Recent Referral Patterns," inquired, "Would it be helpful to do
some case record reviews of children in IFC?"  (Trial Exhibit 450, Email exchange between
Angelo McClain and Jan Nisenbaum re: Heads Up- Concerns Regarding IFC Recent Referral
Patterns, Apr. 24, 2010, at DCF005178346).  Commissioner McClain answered, "That's a
good idea for collecting qualitative information. Please meet with Ruben and Mary to
determine what quantitative information is available."  (*Id.*).  Nearly one year later,
"quantitative" information was made available in the form of an IFC Placement Stability
Report prepared by Ruben Ferreira.  (*See* Trial Exhibit 38, Department of Children and
Families, Intensive Foster Care Placement Stability, Prior and Next Placement, Calendar
Years 2007-2010, Mar. 2011).  The targeted case record review proposed by Ms. Nisenbaum
was never undertaken.  (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012,
at 220:4-223:13; *see also* Trial Exhibit 450, Email exchange between Angelo McClain and
Jan Nisenbaum re: Heads Up- Concerns Regarding IFC Recent Referral Patterns, Apr. 24,
2010, at DCF005178346).

1618.   Qualitative and quantitative performance data within DCF is often stove-piped and
inaccessible. An internal DCF document addressing priorities for the Assistant
Commissioner of CQI identified as one priority, "SIU/CIU and Foster Care Review and
[Office of Management Planning and Analysis ("OMPA")] data should be collated and
synthesized with the overarching goal of informing and driving toward: Safety, Permanency,
Well-being, Community Connected Practice, and Effective Leadership." (Trial Exhibit 534,
Assistant Commissioner, Continuous Quality Improvement, at DCF001386644).

1619.   On July 22, 2011, Deputy Commissioner Jan Nisenbaum sent to Commissioner Angelo
McClain and Chief of Staff Patricia Mackin a grid of "Casework Practice Topics Identified
as Priority Areas of Focus." (Trial Exhibit 41, Email from Jan Nisenbaum to Angelo
McClain and Patricia Mackin, re: Priority Practice Areas of Focus, July 22, 2011,  and
attached Casework Practice Topics Identified as Priority Areas of Focus, at
DCF0077385000-05).  Ms. Nisenbaum stated, "[t]he purpose of the grid is to pull together in
one place the action steps that have been identified in our strategic plan, fatality reports, as
well as conversations we've had in group supervision." (*Id.* at DCF0077384999).  The grid
lists several items under the heading "Strengthen CQI Structures and Processes" including:
"Establish consistent CQI structures/processes," "Strengthen Data Quality/Integrity," and
"Develop recommendations for refocusing FCRU [Foster Care Review Unit] to a broader
QA approach." (*Id.* at DCF0077385004).  One item acknowledges that the Foster Care
Review Unit needs to be "refocused."  (*Id.*).

1620.   On April 4, 2012, Ms. Nisenbaum testified that DCF still has not developed the CQI
staffing and structures described in the Guidance Manual.  She testified that the Guidance
Manual, though written, has not been disseminated within the agency. Ms. Nisenbaum stated:

> The original version was that there would be within each area
> office a staff person who would take on the responsibility for
> coordinating the continuous quality improvement team for that
> area. And the vision was that there would be folks from the
> community, as well as staff from within the office, who would

> participate on that team, and then the regional quality assurance coordinator, I think they're called -- quality assurance coordinators would help support each of those CQI teams in the area offices. . . . There's some area offices that have not had staff that they could free up to coordinate those teams who will coordinate the logistics of the teams, identify agendas and do all of the coordination of it. In addition, the quality assurance coordinators in the regional office have been assigned a multitude of other activities. So they are not focusing full-time on quality assurance.

(Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: the Program Improvement Plan, Apr. 4, 2012, at 76:18-77:16).

1621.  Massachusetts law provides that the Office of the Child Advocate ("OCA") shall "formulate a comprehensive plan." (Trial Exhibit 337, Mass. Gen. Laws ch. 18C, § 11(a) (2012)). The comprehensive plan must examine the status of issues including "potential alignment of a internal or external audit unit with the department's continuous quality improvement and quality services review initiatives." (Trial Exhibit 337, Mass. Gen. Laws ch. 18C, § 11(d)(14)(i) (2012); *see also* (Trial Tr. May 6, 2013 (McClain), at 96:11-97:15). The comprehensive plan must be filed annually with the Governor.  (Trial Exhibit 337, Mass. Gen. Laws ch. 18C, § 11(c) (2012)).  Pursuant to House No. 4905: An Act Protecting Children in the Care of the Commonwealth, the first comprehensive plan filed by the child advocate was due on June 30, 2010.  (Trial Exhibit 338, 2008 Mass. Acts No. 4905, § 134). To date, the comprehensive plan described in Mass. Gen. Laws ch. 18C, § 11 has not been submitted to the Office of the Governor and the General Court.  The OCA's annual report for fiscal year 2011 states that the office's ability to formulate a comprehensive plan was "restricted by [its] current fiscal and staffing resources."  (Trial Exhibit 339, Office of the Child Advocate Annual Report, Fiscal Year 2011, p. 6).

a)    *DCF's CFSR Scorecard*

1622.  DCF's performance with respect to quality assurance in the area of maltreatment in care deviates from standards of care by providing a "false sense of excellence."  (Trial Tr. Feb. 7, 2013 (Jones), at 48:17-49:18; *see generally id.* at 44:21-49:18).

1623.  DCF publishes a periodic Continuous Quality Improvement ("CQI") management report, commonly known as the "CFSR Scorecard," which reflects agency performance in relation to the six CFSR statewide data indicators and composites, including the measure for the rate of substantiated maltreatment in foster care.  (*See*, *e.g.*, Trial Exhibit 964-I, CFSR Measures – 12-Month Period Ending: 09/30/2012).  Mr. Ferreira testified that the "CFSR Measures - Targeted CQI" page of the CFSR scorecard (which is only included in some iterations) is intended to allow regional directors and directors of areas to quickly identify practice areas where they need to target their efforts.  (Deposition of Ruben Ferreira, DCF Assistant Commissioner for Continuous Quality Improvement, Feb. 2, 2012, at 158:8-16; *see also* Trial Exhibit 964, CFSR Measures – 12-Month Period: 04/01/2010 to 03/31/2011, p. 8).

1624.   Between 2010 and 2011, the scorecard underwent a number of revisions, evolving from a
system of arrows to a system of letter grades.  The initial version of the CFSR Scorecard used
a binary set of signals to express agency performance: an upward facing arrow indicated
conformity with the CFSR national standard for a particular statewide data indicator, while a
downward facing arrow indicated non-conformity.  (*See, e.g.*, Trial Exhibit 964, CFSR
Measures - 12-Month Period: 10/01/2008 to 09/30/2009; *see also* Deposition of Patricia
Mackin, DCF Chief of Staff, Mar. 1, 2012, at 97:9-20).  A subsequent version of the CFSR
Scorecard implemented a five-tier set of signals to describe agency performance: an upward
facing arrow to communicate conformity with the CFSR national standard (characterized as
the "Optimal Performance Level" by DCF), a downward facing arrow to communicate
"Action Warranted," and three intermediate arrows (positioned at two o'clock, three o'clock,
and four o'clock) to communicate mid-range levels of performance ranging from "National
Practice Standard Met" to "Watch-list" to "Opportunity for Improvement."  (*See, e.g.*, Trial
Exhibit 964, CFSR Measures – 12-Month Period: 04/01/2010 to 3/31/2011, p. 1).  A final
iteration of the CFSR Scorecard, introduced in 2011, replaced the arrow signals with a letter
grade system, with grades ranging from a high of "A+" to a low of "F."  (*See, e.g.*, Trial
Exhibit 964, CFSR Measures – 12-Month Period: 07/01/2010 to 6/30/2011).

1625.   These revisions to the CFSR Scorecard lowered expectations regarding performance on
the statewide data indicator for the rate of substantiated maltreatment in foster care.  In the
earliest version of the Scorecard, performance of 99.3% on the CFSR measure: "absence of
maltreatment in foster care" was given a downward facing red arrow.  (Trial Exhibit 964,
CFSR Measures - 12-Month Period: 10/01/2008 to 09/30/2009).  The downward facing red
arrow, and a label of "action warranted" were later applied to a worsened performance of
99.1%.  (Trial Exhibit 964K, CFSR Measures – 12-Month Period: 04/01/2010 to 3/31/2011,
p. 1).  Yet, in a subsequent iteration utilizing the letter grade system approved by
Commissioner McClain, the same performance level of 99.1% was given a grade of "A."
(Trial Exhibit 1107, Email from Ruben Ferreira to Jan Nisenbaum re: Draft CFSR Scorecard,
July 21, 2011, and attached CFSR Measures – 12-Month Period, 04/01/2010 to 03/31/2011,
at DCF006141942).  In a final modification, a performance level of 99.1% is given a grade of
"A+," which Commissioner McClain testified was intended to communicate to management
staff that this was an area where performance was "pretty good."  (Trial Exhibit 964L, CFSR
Measures – 12-Month Period: 07/01/2010 to 6/30/2011, p. 1; Deposition of Angelo McClain,
DCF Commissioner, May 25, 2012, at 62:4-63:1).  Upon viewing this version of the
scorecard, Ros Walter responded to Ruben Ferreira, "Love the way what the feds call a
failure turns into an A+!!"  (Trial Exhibit 1017, Email from Ros Walter to Ruben Ferreira re:
CFSR Scorecard for 12-Month period ending Sept. 2011).

1626.   Commissioner McClain admitted that DCF's absence of maltreatment in foster care rate
for the period from April 1, 2010 to March 3, 2011 was 99.1, which was .58 below the
national standard.  (Trial Tr. May 3, 2013 (McClain), at 91:17-92:6).  He testified that DCF's
CFSR scorecard for this period gave this measure a grade of a downward facing red arrow,
which is the lowest of five scores used by that version of the scorecard.  (*Id.* at 92:14-94:23;
Trial Exhibit 964K, CFSR Measures – 12 Month Period: 04/01/2010-03/31/2010, p. 1).
Commissioner McClain admitted that DCF's CFSR scorecard for the period from July 1,
2010 through June 30, 2011 represented the same score of 99.1 on absence of maltreatment

in foster care with an A plus. (Trial Tr. May 3, 2013 (McClain), at 96:7-97:19; Trial Exhibit 964L¸ CFSR Measures – 12-Month Period: 07/01/2010 to 6/30/2011, p. 1).

1627.  Emails among DCF managers reflect a desire to modify the Scorecard so as to more positively present the data within. In one such email, Ruben Ferreira described an email he received from DCF General Counsel Virginia Peel, saying that:

> Virginia sent out an email several weeks ago wherein she commented that the new CFSR Scorecard did not really help present our case more positively/accurately than the earlier versions. In thinking about what she wrote… and utilizing the Commissioner's "percent of the standard met" … I came up with the attached.

(Trial Exhibit 1107, Email from Ruben Ferreira to Jan Nisenbaum re: Draft CFSR Scorecard, July 21, 2011, and attached CFSR Measures – 12-Month Period, 04/01/2010 to 03/31/2011, at DCF006141940).[6]

1628.  The attachment to Mr. Ferreira's email included two different versions of the scorecard, one in which performance of 99.1% on the measure of maltreatment in care received a downward facing arrow, and a revised version, utilizing Commissioner McClain's idea to measure performance as a percentage of the federal measure, where the same level of performance now received an A. (*Id.* at DCF006141941-42; s*ee also* Trial Exhibit 535, Email from Jan Nisenbaum to Ruben Ferreira re: CFSR Scorecards, May 22, 2010; Trial Exhibit 536, Email exchange between Angelo McClain, Ruben Ferreira and Jan Nisenbaum re: Latest CFSR Scorecard, May 24, 2010; Trial Exhibit 537, Email exchange between Angelo McClain and Ruben Ferreira re: CFSR Scorecard Draft for your review, June 29, 2010; Trial Exhibit 538, Email from Ruben Ferreira to Angelo McClain and Jan Nisenbaum, Oct. 29, 2010, with attached CFSR Scorecard Icon Set Samples; Trial Exhibit 540, Email from Ruben Ferreira to Angelo McClain and Patricia Mackin re: CFSR Scorecard, Dec. 15, 2010, with attached  CFSR Measures - Scale Guide; Trial Exhibit 541, Email exchange between Ruben Ferreira, Angelo McClain, and Patricia Mackin re: CFSR Scorecard, Dec. 16, 2010; Trial Exhibit 543, Email from Angelo McClain to Ruben Ferreira, Jan Nisenbaum, and Patricia Mackin, Jan. 26, 2011; Trial Exhibit 331, Email exchange between Patricia Mackin, Ruben Ferreira, and Jan Nisenbaum re: CFSR Scorecard Language…, Jan. 26, 2011; Trial Exhibit 307, Email exchange between Ruben Ferreira, Angelo McClain, and Jan Nisenbaum, et al. re: CFSR Scorecard Language, Jan. 31, 2011, at DCF004940379-88).

1629.  The decision to use letter grades and measure performance as a percentage of the federal target was made by Commissioner McClain. (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 116:17-119:17, 126:11-21; *see also* Deposition of Patricia Mackin, DCF Chief of Staff, Mar. 1, 2012, at 99:17-21; Deposition of Ruben Ferreira, DCF Assistant Commissioner for

---

[6] Although Trial Exhibit 1107 is in evidence, Plaintiffs note the Court's ruling that the deposition testimony of DCF General Counsel Virginia Peel discussing the contents of this email are privileged.

Continuous Quality Improvement, Feb. 2, 2012, at 175:1-6, 176:17-24). The decision was not based on any research concerning whether the system would be effective in raising performance. (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 116:17-119:17).

1630.   DCF management consistently testified that the letter-grade format of the CFSR scorecard was intended to enable managers to more easily identify areas in need of improvement, and to demonstrate where Massachusetts performance fell in relation to other states.   (*Id.* at 114:1-116:16, 119:18-120:8, 120:22-121:10; Deposition of Patricia Mackin, DCF Chief of Staff, Mar. 1, 2012, at 98:22-99:4, 125:9-18; Deposition of Virginia Peel, DCF General Counsel, Feb. 8, 2012, at 24:3-28:24).  As Commissioner McClain testified:

> We tried different iterations, and probably about a year ago we landed on a letter grade system, which seemed to resonate with people. . . when they saw an F on placement stability or timeliness to adoption or something like that, it immediately resonated with them, I've got to work on this and improve this.

(Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 42:20-43:9; *see also id.* at 46:19-47:2).  Likewise, Commissioner McClain said he did not expect management to place increased or enhanced focus on measures receiving an A-plus on the scorecard.  (*Id.* at 62:11-63:6).

1631.   Mr. Ferreira testified that under DCF's new version of the CFSR scorecard, a particular measure can receive an A-plus grade even if DCF's performance does not meet the 75th percentile of national performance.  (Deposition of Ruben Ferreira, DCF Assistant Commissioner for Continuous Quality Improvement, Feb. 2, 2012, at 171:14-22).   The section of the Federal Register setting forth the federal regulations in relation to CFSR Plan Reviews states that:

> The national standard for each statewide data indicator identified above will be based on the 75th percentile of all states' performance for that data indicator, as reported in AFCARS and NCANDS.   We considered using the 90th percentile and the median to establish the national standard and rejected both because these standards, respectively, were deemed either too high or too low.

(Trial Exhibit 469, Federal Register, Vol. 65, No. 16,  45 C.F.R. § 1355, 1356, 1357, p. 4024).  Commissioner McClain acknowledged that he had not reviewed this section of the Code of Federal Regulations when designing the CFSR scorecard or otherwise.  (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 85:17-86:8, 86:17-87:7; (Trial Exhibit 469, Federal Register, Vol. 65, No. 16,  45 C.F.R. § 1355, 1356, 1357, p. 4024).

1632.   Applying the same letter grade criteria utilized by DCF in its latest iteration of the CFSR Scorecard, each and every reporting state shown on Child Maltreatment 2010, Table 3-20

would receive the top score of "A+" even though 25 of the 47 reporting states failed to meet the CFSR national standard. (Trial Exhibit 471, U.S. Department of Health and Human Services, Administration for Children and Families, Children's Bureau, Child Maltreatment 2010, Table 3-20; Trial Exhibit 964, CFSR Measures - 12 Month Period: 07/01/2010 to 6/30/2011). Commissioner McClain testified that even if this were true, it would "not necessarily" cause him to question the methodology used. (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 109:22-110:21). Ms. Nisenbaum was unaware that the methodology used to determine DCF's letter grade in the new CFSR Scorecard format would result in even the worst-performing state in the nation receiving an A-plus. (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 130:9-130:22).

1633.   Ms. Nisenbaum testified that it was appropriate for the CFSR Scorecard to display a letter grade of "A+" on the outcome measure "Safety Outcome: Absence of Maltreatment in Foster Care," notwithstanding that the earlier format had assigned a downward arrow indicating "action warranted," because DCF's performance of 99.1% "means that [DCF is] 99.4 percent of the way to achieving a hundred percent of the national standard" of 99.7%. (*Id.* at 121:11-125:21). Ms. Nisenbaum further testified to her belief that the national standard is an "aspirational goal . . . ." (*Id.* at 125:22-126:10).

1634.   Former Commissioner McClain acknowledged that the CFSR scorecards used during 2011 and 2012 reflect DCF performance as compared to the 2004 medians of state performance, despite the fact that more recent medians were available to DCF. (Trial Tr. May 2, 2013 (McClain), at, 19:11-18; Trial Exhibit 964H, CFSR Measures – 12 Month Period Ending: 06/30/2012; Trial Exhibit 964G, CFSR Measures – 12 Month Period Ending: 09/30/2012; Trial Exhibit 468, Massachusetts Child and Family Services Review Data Profile, June 14, 2011, at DCF005504994; Trial Exhibit 1086, U.S. Department of Health and Human Services, Administration for Children and Families, Children's Bureau, Child Welfare Outcomrs 2007-2010, p. vi).

1635.   When comparing its performance to the 2004 state medians for the federal measure of rate of re-entry into foster care during fiscal year 2011, DCF gave itself a grade of A-plus as compared to other states. However, former Commissioner McClain acknowledged that he was aware that in 2011 Massachusetts was 43rd worst among 52 reporting jurisdictions in the federal measure of rate of re-entry into foster care. He further acknowledged that Massachusetts' position has remained roughly the same over a number of years, and that he recognized that this was an issue. (Trial Tr. May 2, 2013 (McClain), at 24:12-29:19; Trial Exhibit 1085, Summaries of state-by-state performance data and rankings from Child Welfare Outcomes 2008 – 2011, Prepared by Elissa Glucksman, p. 7; Trial Exhibit 964G, CFSR Measures – 12 Month Period: 07/01/2010 to 09/30/2011).

1636.   Similarly, when comparing its performance to the 2004 state medians for the federal measure for Outcome 2.2 (of all children discharged from foster care to a finalized adoption during the year, what was the median length of stay in care (in months) from the date of latest removal from the home to the date of discharge to adoption?) during fiscal year 2011, DCF gave itself a grade of A. However, former Commissioner McClain acknowledged that

in 2011 Massachusetts ranked 44th worst out of 52 jurisdictions in the federal measure for Outcome 2.2, and said that he understood that this was an area in which DCF needed to make significant improvement. (Trial Tr. May 2, 2013 (McClain), at 32:10-33:10; Trial Exhibit 1085, Summaries of state-by-state performance data and rankings from Child Welfare Outcomes 2008 – 2011, Prepared by Elissa Glucksman, p. 9; Trial Exhibit 964G, CFSR Measures – 12 Month Period: 07/01/2010 to 09/30/2011).

1637.   Former Commissioner McClain testified that as of January 23, 2012, the compilation of state-by-state child welfare outcomes produced by the federal government was available at least through federal fiscal year 2009. (Trial Tr. May 7, 2013 (McClain), at 5:24-8:20). McClain further testified that he was aware of this through an email sent to him from The Children's Bureau directing him to the new data. (*Id.*). McClain agreed that it was therefore possible to make a comparison between the 2004 medians and the DCF scorecard and the medians published by the federal government at least for 2009 as of January 2012. (*Id.*). Former Commissioner McClain also agreed that state child welfare outcomes performance data is customarily made available on the ACF website in advance of its formal publication in a bound volume. (*Id.*).

1638.   Commissioner McClain acknowledged that there may be a "methodology flaw" in the way performance measures on DCF's CFSR scorecard are calculated. (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 82:12-23, 109:1-18; *see also* Trial Exhibit 964, CFSR Measures – 12-Month Period: 07/01/2010 to 6/30/2011). However, the most recent CFSR scorecard utilizes the same grading system and calculations. (Trial Exhibit 964, CFSR Measures – 12-Month Period Ending: 09/30/2012).

1639.   The evolution of the Scorecard has resulted in further inconsistencies. In an earlier iteration of the report, performance of 99.1% regarding the absence of maltreatment in care is given a downward facing red arrow, and a label of "action warranted," on the first page of the document. (Trial Exhibit 964, CFSR Measures – 12-Month Period: 04/01/2010 to 3/31/2011, p. 1).   Regarding the "Action Warranted" performance level, Ms. Mackin testified that such a score was intended to communicate to DCF managers that "there needs to be an improvement within that area." (Deposition of Patricia Mackin, DCF Chief of Staff, Mar. 1, 2012, at 106:11-18; Trial Exhibit 964, CFSR Measures - 12 Month Period: 04/01/2010 to 3/31/2011). Similarly, Mr. Ferreira testified that a score of "Action Warranted" was intended to communicate the need for immediate action. (Deposition of Ruben Ferreira, DCF Assistant Commissioner for Continuous Quality Improvement, Feb. 2, 2012, at 142:14-19). However, on page eight of the same document, the measure of absence of maltreatment in foster care was not included under the "Action Warranted" level, but was instead included in the "National Practice Standard" level. (Trial Exhibit 964, CFSR Measures – 12-Month Period: 04/01/2010 to 3/31/2011, p. 8). Upon noticing this for the first time, Ms. Mackin testified that the report was "inconsistent." (Deposition of Patricia Mackin, DCF Chief of Staff, Mar. 1, 2012, at 122:11-123:1). Mr. Ferreira testified that he has not provided Ms. Roche or field staff with instructions to explain how to interpret items that fall within multiple categories in different parts of the CFSR scorecard. (Deposition of Ruben Ferreira, DCF Assistant Commissioner for Continuous Quality Improvement, Feb. 2, 2012, at 163:18-23, 166:5-13).

1640.  Another modification to the CFSR scorecard approved by Commissioner McClain involved replacing the term "national standard" with "optimal performance level set by ACF."  (*Id.* at 191:14-19; 197:15-23; *Compare* Trial Exhibit 964, CFSR Measures – 12-Month Period 10/01/2008 to 09/30/2009, *with* Trial Exhibit 964, CFSR Measures – 12-Month Period: 04/01/2010 to 3/31/2011, *and* Trial Exhibit 964, CFSR Measures – 12-Month Period: 07/01/2010 to 06/30/2011).   This newer iteration of the CFSR Scorecard includes a quote describing the performance levels set by ACF as "aspirational goals." (Trial Exhibit 964, CFSR Measures – 12-Month Period: 04/01/2010 to 3/31/2011, p. 8).  Commissioner McClain testified to his belief that the national standards set by ACF for performance measures in the CFSR are "aspirational goal[s]" which have "been intentionally set high." (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 50:16-51:3; *see also* Trial Exhibit 964, CFSR Measures – 12-Month Period: 10/01/2008 to 09/30/2009, p. 1). With respect to how these standards were set, Commissioner McClain testified that conversations with his peers across the country informed him that for "some of these standards, no state hits the national standard."  (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 51:4-13).   Commissioner McClain acknowledged that the standards are "valid."  (*Id.* at 53:11-54:2). The use of this language referring to the "Optimal Performance Level set by ACF" on the Scorecard was:

> [T]o say that there's an optimal performance level that's aspirational that's the national standard.  Then there's the national practice standard, which is a comparison to our peers.   Then anything below the sort of national practice standard would be areas where we would need to watch our performance and improve our performance or there would need to be an action plan warranted.

(*Id.* at 54:8-55:5).

1641.  However, a Federal Register Announcement regarding the federal regulations in relation to CFSR Plan Reviews states that:

> By setting the standard at the 75th percentile (as adjusted for sampling error and for normality of distribution), we believe that the goals represented by the standards are realistic and attainable and that, by establishing standards, ACF is promulgating the expectation that States make concerted efforts to achieve these goals.

(Trial Exhibit 47, U.S. Department of Health and Human Services, Administration for Children & Families, Corrected Federal Register Announcement, p. 6).  Commissioner McClain acknowledged that he had not read this document and did not direct any of his staff to read the document when designing the CFSR scorecards.  (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 87:8-20, 90:12-91:12).

1642.   Ms. Mackin said that the decision to make this change reflected that this was "the optimal performance level that the Federal Government was looking for in that particular measure.  It wasn't what the states were doing."  (Deposition of Patricia Mackin, DCF Chief of Staff, Mar. 1, 2012, at 100:2-101:2; *see also id.* at 101:18-22).  However, Ms. Mackin acknowledged that in 2009, 23 of the 49 states met the national standard for absence of maltreatment in care. (*Id.* at 111:9-113:4; *see also* Trial Exhibit 1088, U.S. Department of Health and Human Services, Administration for Children and Families, Children's Bureau, Child Maltreatment 2010, p. 57 (Table 3-20 CFSR: Absence of Maltreatment in Foster Care, 2006-2010)).

1643.   Despite the description of the national standards in the CFSR scorecard ending June 30, 2e011 as "optimal performance level set by ACF," which Commissioner McClain testified he was involved in creating, Commissioner McClain testified that he has always communicated to his staff that the national standards set forth in the CFSR are "realistic, they are attainable."  (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 82:12-23, 91:15-92:8; *see also* Trial Exhibit 964, CFSR Measures – 12-Month Period: 07/01/2010 to 06/30/2011, p. 1).

1644.   Mr. Ferreira testified that his office reports on maltreatment in foster care in order to make the field aware that maltreatment in care is an area of concern.  (Deposition of Ruben Ferreira, DCF Assistant Commissioner for Continuous Quality Improvement, Feb. 2, 2012, at 272:19-273:5).  He testified that there are reports other than the CFSR scorecard and the EHS Dashboard report that show that DCF is "at the bottom of the nation in terms of safety." (*Id.* at 274:8-275:17).  Mr. Ferreira testified that he disseminates these reports to the field and that they are aware of DCF's performance in this area. (*Id.*).  Mr. Ferreira believes that all of DCF management is aware that the department performs poorly on safety measures relative to other child welfare agencies. (*Id.* at 277:20-24).  Mr. Ferreira testified that DCF management does not consider its current performance in relation to maltreatment of children in foster care to be adequate. (*Id.* at 278:1-6).  Yet, despite testifying that DCF management recognizes that DCF "need[s] to do better," (*Id.* at 209:21-210:20), Mr. Ferreira confirmed that DCF is currently receiving an A or A-minus for its performance on the absence of maltreatment in foster care measure on the new format of the CFSR scorecard report. (*Id.* at 209:14-20).

1645.   Additionally, DCF regional and area office managers as well as field staff demonstrate little understanding of or use for the scorecard reports, and little understanding of the Federal measures depicted.  (*See* Deposition of Joseph Collins, DCF Area Director for Franklin and Hampshire, Jan. 25, 2012, at 200:9-204:20; Deposition of Raymond Burke, DCF Area Director for Pioneer Valley, Jan. 19, 2012, at 222:15-227:10).  Ms. Roche, when asked if she knew how the CFSR Scorecard's optimal performance levels are derived, testified: "I will not be able to answer that question, no." (Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 128:5-14).  Mr. Scholefield, DCF's 30(b)(6) designee with respect to abuse or neglect in foster care, testified that he did not have an understanding of what a CFSR measure was, or how they were promulgated.  He testified that he had never been provided training on CFSR measures. (Rule 30(b)(6) Deposition of

Scott Scholefield, DCF Director of Case and Special Investigations, re: Abuse or Neglect in Foster Care, Nov. 16, 2011, at 160:13-163:9).

1646.   Ms. Nisenbaum testified that the national standards are optimal performance targets established by ACF, but that they are "in reality . . . probably not an achievable goal for many states." (Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: Program Improvement Plan, Apr. 4, 2012, at 118:18-119:24, 120:6-21). Ms. Nisenbaum testified that she does not know whether the national standards have an empirical basis. (*Id*. at 120:22-121:1). Ms. Nisenbaum testified that she does not believe that any jurisdiction receiving Title IV-E funds met any of the national standards applied during the second round CFSR. (*Id*. at 121:11-19).

1647.   In DCF's fiscal year 2013 budget presentation, a slide captioned "DCF Results on Key Federal Measures" displays the letter grade format of the DCF CFSR Scorecard and answers the question, "How [DCF] compare[s] to the 50 other states," with the response, "Mostly A's and B's (within the top 25% of states)." (Trial Exhibit 544, Joint Hearing of the House and Senate Committees on Ways and Means FY13 Budget Testimony, Feb. 2012, at EOHHS001940028). This presentation of the agency's comparative performance on federal measures is misleading. In 2011, while awarding itself a grade of A+, DCF ranked in the bottom quartile of states in absence of maltreatment in foster care. (*See* Trial Exhibit 1161, U.S. Department of Health & Human Services, Administration for Children and Families, Children's Bureau, Child Maltreatment 2011, p. 55; Trial Exhibit 964, CFSR Measures – 12-Month Period Ending: 09/30/2012).

b)   *DCF's Current Staffing Level is Insufficient to Conduct Adequate CQI*

1648.   Currently, there is only one DCF manager whose day-to-day responsibilities are devoted primarily to CQI: Assistant Commissioner for Continuous Quality Improvement Ruben Ferreira. (Deposition of Ruben Ferreira, DCF Assistant Commissioner for Continuous Quality Improvement, Feb. 2, 2012, at 14:24-15:14). Mr. Ferreira does not have any staff at the DCF central office designated to engage in continuous quality improvement. (*Id.*). There had previously been a CQI manager, but DCF did not fill that position when the previous CQI manager left. (*Id*. at 15:7-14). There had also been a CQI coordinator position at the central office, but this position no longer exists. (*Id.* at 28:5-15). As of August 23, 2011, the position of director of Continuous Quality Improvement at DCF was not filled and there was a budgeting restriction that prevented filling that position. (Rule 30(b)(6) Deposition of Ruben Ferreira, DCF Assistant Commissioner for Continuous Quality Improvement, re: Data Collection and Retention, Aug. 23, 2011, at 19:5-15).

1649.   Mr. Ferreira would like to have more staff to perform the CQI function. (Deposition of Ruben Ferreira, DCF Assistant Commissioner for Continuous Quality Improvement, Feb. 2, 2012, at 32:23-33:3). He testified that there is a need for more data analysts and a CQI coordinator at the central office. (*Id*. at 33:13-24). He has spoken with Ms. Nisenbaum and Commissioner McClain regarding the need for more staff. (*Id*. at 34:1-11). He is not aware, however, of any further action that has been taken to obtain additional CQI positions. (*Id*. at 34:15-23, 35:21-24). Ms. Nisenbaum confirmed that she has indicated in conversations the

need for additional staff for the CQI unit.  (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 14:18-15:15).

1650.  Ms. Nisenbaum testified that, as of May 2012, she did not know if a formal budget request had been made to fill the long-vacant position of Director of OMPA.  (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 15:6-16:16; *see also* Deposition of Ruben Ferreira, DCF Assistant Commissioner for Continuous Quality Improvement, Feb. 2, 2012, at 13:16-14:1).  Mr. Ferreira testified that this position would involve work concerning continuous quality improvement.  (*Id*. at 14:19-23).  Because of this vacancy, Mr. Ferreira currently directly supervises an OMPA staff-person.  (*Id*. at 16:22-17:4).

1651.  The quality manager in the Continuous Quality Improvement unit at DCF previously went out to area and regional offices to lead and train CQI teams, but that function has since been delegated to the area and regional offices.  (Rule 30(b)(6) Deposition of Ruben Ferreira, DCF assistant Commissioner for Continuous Quality Improvement, re: Data Collection and Retention, Aug. 23, 2011, at 21:11-22:8).

1652.  Mr. Ferreira agreed to surrender a second management planning analyst position due to budget cuts.  (Deposition of Ruben Ferreira, DCF Assistant Commissioner for Continuous Quality Improvement, Feb. 2, 2012, at 21:18-22:8, 23:3-9).

1653.  DCF previously had a pilot project through which it was conducting quality service reviews, and it was recommended that DCF hire six quality service review coordinators.  (Deposition of Ruben Ferreira, DCF Assistant Commissioner for Continuous Quality Improvement, Feb. 2, 2012, at 24:18-25:9; *see also* Trial Exhibit 305, Resources Needed to Support the Division of Quality Improvement and Professional Development, at DCF004126103).  Those positions were not filled.  (Deposition of Ruben Ferreira, DCF Assistant Commissioner for Continuous Quality Improvement, Feb. 2, 2012, at 25:9-10).

1654.  Mr. Ferreira has no CQI staff reporting to him from within the regional offices of DCF.  (*Id.* at 37:13-16).  At the regional level, Mr. Ferreira testified that he does not believe there is a dedicated CQI position within each DCF region.  (*Id.* at 37:9-12).  Rather, each regional office has a "CQI manager" who also functions as a "regional facilitator" in connection with the newly Integrated Case Practice Model.  (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 24:22-26:23).  The role of regional facilitator takes up between a quarter and a half of the CQI managers' time.  (*Id.* at 26:24-29:21).  Each regional office independently decided what functions its regional CQI manager will perform, and as a result, each regional CQI Manager has a different function.  (*Id.* at 26:24-27:4).

1655.  The Robert Van Wart and Springfield offices do not have any dedicated CQI or quality assurance staff.  (*See* Deposition of Raymond Burke, DCF Director of Areas for the Pioneer Valley, Jan. 19, 2012, at 79:17-20).

1656.  DCF Foster Care Manager Susan Tucke, who is responsible for overseeing and supporting departmental foster care, does not have any support staff in the central, regional,

or area offices. (Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 19:6-20:5).

c) <em>As a result, DCF fails to conduct a number of key CQI functions</em>

1657.  The Child Protection Act of 2008, Ch. 119, 51B(r) requires: "There shall be a review by a regional clinical review team when three or more 51A reports involving separate incidents have been filed on any child in a family within 3 months and a review by an area clinical review team when three or more 51A reports involving separate incidents have been filed on any child in a family within 1 year."  Mass. Gen. Laws ch. 119, § 51B(r) (2013).  (*See also* Trial Exhibit 723, Review of Multiple Reports of Abuse and Neglect Draft, Oct. 1, 2008). DCF's 2009 Strategic Plan for Action had also identified a need to "develop practice expectations for review of cases with 3 or more 51As."  (Trial Exhibit 1127, Strengthening the Safety Net: DCF's Strategic Plan for Action, April 2009, at DCF7605112). Yet, due to a lack of "capacity," DCF has not fully implemented these mandatory reviews and has likewise not met its obligation to submit to law enforcement the reviews, nor the reports they are used to generate.  (Trial Exhibit 316, Email exchange between Virginia Peel, David Murphy, and Olga Roche re: Multiple 51A Reports, Jan. 13, 2011; *see also* Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, Mar. 5, 2012, at 17:4-19:1; Rule 30(b)(6) Deposition of Scott Scholefield, DCF Director of Case and Special Investigations, re: Abuse or Neglect in Foster Care, Nov. 16, 2011, at 187:7-189:11). Despite that fact, DCF touts its "enhanced processes for review of cases in which there had been three or more reports of child abuse or neglect within [a] twelve month period" in its DCF Program Improvement Plan Final Report.  (Trial Exhibit 760, DCF PIP Final Report Oct. 2009 - Sept. 2011, Quarter Eight Report, July - Sept. 2011, at CSF-000005395).

1658.  Ms. Nisenbaum testified that the Critical Incident Committee does not issue findings concerning each review it performs.  (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 178:23-179:22).  Further, the Committee does not receive referrals of institutional abuse 51A reports unless there is a serious physical injury to a child.  (*Id.* at 179:23-180:14, 187:11-22).

1659.  Paul Fitzsimons, DCF Regional Director for the Western Region, testified that while DCF occasionally performs quality assurance evaluations on critical incident reports, DCF has no systematic process for conducting case reviews.  (Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, Mar. 5, 2012, at 12:12-13:6).

1660.  Terrence Flynn, DCF Regional Director for the Southern Region, testified that DCF line staff were surprised and shocked to learn, four years after issuance of a Child and Family Services Review (CFSR) report in 2007, that Massachusetts performed so poorly on a particular measurement because particular offices do not get information "broken down in a way [that is] comprehensive and . . . concrete" if those particular offices were never the subject of the study.  (Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, Jan. 26, 2012, at 152:10-153:19)

1661.  Since he became Director of Areas for Franklin and Hampshire in October 2010, Joseph Collins had not, at the time of his deposition, set priorities or goals in writing for either of the

319

Greenfield or Holyoke offices.  (Deposition of Joseph Collins, DCF Area Director for Franklin and Hampshire, Jan. 25, 2012, at 89:16-19).

1662.  Mr. Ferreira was unable to describe any process of corrective action reporting done in relation to area office aggregate performance on specific child outcomes or practice areas and was unable to identify any corrective action report used by the DCF central office to move regional or area office performance into conformance with the targets set forth in the MOSt reports or to move statewide, regional, or area performance into conformance with CFSR data elements.  (Rule 30(b)(6) Deposition of Ruben Ferreira, DCF Assistant Commissioner for Continuous Quality Improvement, re: Data Collection and Retention, Aug. 23, 2011, at 135:24-137:17).  Mr. Ferreira had similarly not seen corrective action reports generated within DCF's central office as a result of information reported in the DCF quarterly reports.  (*Id.* at 139:11-17).

1663.  Despite all of the above, DCF's 2012-2015 Strategic Plan reports that:

> [T]he Department has historically embraced the notion of continuous quality improvement and continuous learning. As the field of child protective services has evolved nationally, DCF has sought to be on the cutting edge of implementing recognized best practice and the latest emerging innovations. Additionally, the Department has understood the critical importance of managing with data and can proudly boost [sic] of its *FamilyNet* information system that has proven to be a great source of improvement data and information.

(Trial Exhibit 7, 2012-2015 DCF Strategic Plan, Aug. 2012, at CSF-000006351).

### B.    Contract Monitoring

#### 1.    Professional Standards

1664.  Each fiscal year, the Administration for Children and Families (ACF) reimburses money to states that serve children in the federal Title IV-E foster care program.  Most states pay some portion of their federal foster care grant to subgrantees to provide core program services, such as child placement and residential care. (Trial Exhibit 218, Department of Health and Human Services Office of Inspector General, States' Monitoring of Subgrantees in the Foster Care Program: A Description of Six States' Systems, Dec. 2004, p. *ii*).

1665.  The United States Department of Health and Human Services ("HHS") has noted that "[p]rivatizing a child welfare service does not relieve the public child welfare agency of its responsibilities to ensure that children and families are well served and that tax dollars are effectively spent."  (Trial Exhibit 835, U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation, Topical Paper No. 6: Ensuring Quality in Contracted Child Welfare Services (2008), p. 1). HHS identified four elements of contract monitoring used by child welfare agencies: (1) compliance monitoring to ensure compliance with contract terms as well as state and federal requirements; (2) fiscal

monitoring to "ensur[e] that contract dollars are spent appropriately"; (3) case decision-making monitoring; and (4) performance monitoring." (*Id.* at pp. 11-12; *see also* Trial Tr., Mar. 1, 2013 (Crabtree), at 66:21-68:3).

1666.   Federal grants management requirements require states to oversee subgrantees to ensure that they comply with Federal fiscal and program regulations, use funds for authorized purposes, and achieve performance goals.  Specifically, "[r]ecipients are responsible for managing and monitoring each project, program, subaward, function or activity supported by the award" and must "[m]onitor the activities of subrecipients as necessary to ensure that Federal awards are used for authorized purposes in compliance with laws, regulations, and the provisions of contracts or grant agreements and that performance goals are achieved." 45 C.F.R. § 74.51(a); 45 C.F.R. § 74.26; Circular No. A-133 (O.M.B.), §___.400(d)(3), 2007 WL 7141954, 22.  (*See also* Trial Tr., Mar. 1, 2013 (Crabtree), at 64:25-65:15).  "States must have at least: one fiscal monitoring mechanism, and one program monitoring mechanism. Each mechanism must be used to collect and review information on subgrantees, and must include follow up on identified problems."  (Trial Exhibit 217, Department of Health and Human Services Office of Inspector General, Oversight of States' Subgrantee Monitoring in the Foster Care Program, Dec. 2004, p. 8; *see also* Trial Tr., Mar. 1, 2013 (Crabtree), at 65:16-66:20).

1667.   Further, Massachusetts law and regulation require that DCF "conduct periodic evaluations of all community residential care providers under contract with the Department . . . The Department's evaluation shall include a site visit to the provider. The Department shall maintain records of the evaluations it conducts. A copy of the written evaluation shall be provided to the director of each facility evaluated . . . ." (Trial Exhibit 69, 110 Mass. Code Regs. 7.120(6) (2012); *see also* Trial Tr., Mar. 1, 2013 (Crabtree), at 68:25-69:19).

1668.   The Council on Accreditation standards provide that "[t]he agency routinely monitors contractor progress toward fulfilling the terms of the contract."  (Contested Exhibit RW, Council on Accreditation, Risk Prevention and Management, § 10.02).  In addition, these standards provide that "[c]ontracts for social and human services include: (a) service quality, client satisfaction, and outcomes that accord with the agency's expectations; (b) criteria for evaluating vendor performance; and (c) protocols for routine communication of related data." (Contested Exhibit RW, Council on Accreditation, Risk Prevention and Management, § 10.03; *see also* Trial Tr., Mar. 1, 2013 (Crabtree), at 68:8-24).

## 2.    DCF Places Many Children in Privately Provided Placements

1669.   According to recent data, roughly 38 percent of children in placement are in a privately provided placement.  About half of these children (18.94% of all children in placement) are in a Congregate Care placement. The other half (19.4% of all children in placement) are in IFC foster homes.  (Trial Exhibit 955, Department of Children and Families Quarterly Report: Fiscal Year 2012, 4th Quarter, pp. 45-47, Tables 17A-17C).

1670.   Congregate Care placements are out-of-home group placements including foster care group homes, independent living programs, Behavioral Treatment Residences ("BTR"), Chapter 766 residential schools, and Short Term Stabilization and Rapid Reintegration

("STARR") programs.  (Deposition of Frances Carbone, DCF Director of Program Operations, Apr. 19, 2012, at 11:1-16, 76:1-24).

1671.  IFC placements provide therapeutic services and supports in a family-based placement setting to children for whom a traditional foster care environment will not be sufficiently supportive, children transitioning from a residential or group home level of care, and children discharging from a hospital setting. (Trial Exhibit 385, Letter to Angelo McClain re: Intensive Foster Care Scope of Services, Dep. Ex. 288, at DCF000465967).

### 3.    DCF Has Failed to Build Sufficient Contract Oversight Capacity

#### a)    *DCF Has Long Acknowledged Shortcomings in its Existing Accountability System*

1672.  As early as the fall of 2002, former DCF Commissioner Harry Spence convened a Procurement Review Workgroup to "[t]arget performance improvement to key areas including out-of-home placement, reentry rates, and permanency," and "[c]larify decision-making roles and responsibilities between [DCF] and its lead agencies so that accountability, responsibility, and authority are aligned."  (Trial Exhibit 503, Department of Social Services Integrated Services Procurement, July 6, 2004, at DCF008464530).

1673.  According to a January 2004 DCF report regarding the "System of Care Procurement of Department Services," DCF acknowledged that "[a]ccountability in the service system today tends to be more reactive than proactive.  We respond to crises, complaints, and incidents." The report went on to state that "[DCF] staff strongly advocated for a more robust accountability system that was proactive and focused on quality.  They believe that the Department does not set expectations for providers clearly enough or high enough. [Members of the provider community have said the same.]  There are a number of beneficiaries to a system of clear, consistent expectations: families, [DCF] staff, providers, judges, schools, etc."  (Trial Exhibit 502, System of Care Procurement of Department Services, Report from Interviews and Debriefings, Final Debriefing Report, Jan. 2004, at DCF008683959).

1674.  The same January 2004 report includes "Notes from Individual Debriefing Sessions," which identify: "[l]ack of consistency in standards and practice, both [DCF's] own internally and providers, undermines our ability to hold providers accountable;" "[o]ur desperate need for a placement often means that we 'forgive' weak quality or address it later when it is harder for both parties to respond effectively;"  and "[d]ocumentation lacking to measure and look at outcomes throughout the system."  (Trial Exhibit 502, System of Care Procurement of Department Services, Report from Interviews and Debriefings, Jan. 2004, at DCF008683996).

1675.  Further, in a July 2004 report, DCF acknowledged the importance of managing the agency's contracted child welfare service providers by "[m]easuring performance, enforcing accountability and ensuring evolution based on learning." The report identified these factors, among others, as part of DCF's "Working Hypothesis" for the design of a procurement system that will "[e]nsure the safety of children in a manner that holds the best hope of

nurturing a sustained, resilient network of relationships to support a child's growth and development into adulthood." (Trial Exhibit 503, Department of Social Services Integrated Services Procurement, July 6, 2004, at DCF008464532).

1676. In December 2004, the Office of Inspector General ("OIG") of HHS released a report regarding the effectiveness of oversight systems used by state child welfare agencies to monitor the performance of contracted private providers delivering foster care services. HHS determined that "In State D [Massachusetts], all subgrantees receive one licensing visit every other year and no program site visit. Program monitoring staff in this State rely heavily on a network of State and local oversight entities to provide referrals for any programmatic problems, rather than establishing regular program site visits." (Trial Exhibit 218, States' Monitoring of Subgrantees in the Foster Care Program: A Description of Six States' Systems, Office of Inspector General, Dec. 2004, p. 7; *see also* Trial Exhibit 944, Defendants' Responses and Objections to Plaintiffs' 2nd Set of Interrogatories, and all supporting exhibits and underlying documentation, Apr. 24, 2012, p. 11 (response to Interrogatory No. 13)). HHS further determined that Massachusetts had not fully implemented a performance based contracting system to monitor private agency outcomes: "State D uses performance-based contracting for some subgrantees and has started to collect outcomes for all others, but does not plan to use them until the next contract cycle." (Trial Exhibit 218, States' Monitoring of Subgrantees in the Foster Care Program: A Description of Six States' Systems, Office of Inspector General, Dec. 2004, p. 9). The OIG concluded that "[w]ithout quality monitoring, States and ACF have no assurance that subgrantees are providing appropriate, quality services to children in a fiscally responsible manner." (*Id.* at p. 16; *see also id.* at p. 24; Trial Exhibit 217, Oversight of States' Subgrantee Monitoring in the Foster Care Program, Office of the Inspector General, Dec. 2004, p. iv).

> b)    *In Designing a New Purchased Services System, Called Family Networks, DCF Committed to Enhancing its Accountability System*

1677. Thereafter, DCF began designing a new system for procuring and providing foster care services called Family Networks, "an integrated system of both [DCF]-purchased services (support and stabilization services, intensive foster care, and congregate care) and non-purchased supports," (Trial Exhibit 440, Family Networks Network Services RFR Summary, at DCF007223243), which emphasized the importance of evaluating purchased services as part of the Department's Continuous Quality Improvement program. (*Id.* at DCF007223258-59, C.1 Continuous Learning and Quality Improvement).

1678. The Family Networks design and initial implementation included changes in contract monitoring roles and responsibilities within DCF. These changes flowed, in part, from "the intention to manage contracts more proactively than we've been able to in the past . . . ." (Trial Exhibit 27, Family Networks Contract Management Roles, at DCF003411425).

1679. The design established "lead agencies," the Department's "local partner charged with helping manage the DCF *purchase of service* (POS) system," (Trial Exhibit 507, Lead Agency Briefing Document, Apr. 15, 2008, at DCF000188726), responsible for engaging families in clinical assessments of child needs, matching children to appropriate private providers, and developing private placements within the area. (*Id.* at DCF000188733; *see*

*also* Deposition of Frances Carbone, DCF Director of Program Operations, Apr. 19, 2012, at 70:4-74:9). Each lead agency was to "work in partnership with one of [DCF's] 29 Area Offices and its communities" and serve as "the hub for coordinating purchased services and non-paid community supports." (Trial Exhibit 440, Family Networks Network Services RFR Summary, at DCF007223242).

1680.　In addition, "regional resource centers" ("RRC") were developed to support the lead agencies by "coordinating access to the residential placement system." (Trial Exhibit 440, Family Networks Network Services RFR Summary, at DCF007223245-46; *see also* Deposition of Frances Carbone, DCF Director of Program Operations, Apr. 19, 2012, at 78:10-13). They were also intended "to play a significant role in program quality assurance" with regard to residential schools and group homes. (Trial Exhibit 27, DCF Family Networks, Contract Management Roles, at DCF003411427; Deposition of Robert Scherer, DCF Director of Procurement, Jan. 27, 2012 at 196:3-197:11). Specifically, the RRCs were to develop an expertise in the residential schools and help DCF "develop, design and implement a program monitoring system" that would involve "[a] site review evaluation process for all . . . programs." In addition to monitoring a particular program's performance and contract compliance, they were to work individually and as a group, under supervision from DCF's Central Office, to assess larger trends among private providers' programs statewide. (Deposition of Frances Carbone, DCF Director of Program Operations, Apr. 19, 2012, at 78:14-80:11).

1681.　DCF's Integrated Services Unit in the Central Office, which is responsible for managing congregate care placements, was staffed with six "residential planners," each assigned to one region, to monitor congregate care provider performance. (Trial Exhibit 27, Family Networks Contract Management Roles, at DCF003411426; Trial Exhibit 28, Family Networks Contract Management Roles, at DCF004305753; Deposition of Frances Carbone, DCF Director of Program Operations, Apr. 19, 2012, at 10:23-12:8). The residential planners were to act as liaisons with their counterparts in the private provider programs. (Deposition of Frances Carbone, DCF Director of Program Operations, Apr. 19, 2012, at 11:21-12:8). DCF also planned to utilize Program Evaluation Teams comprised of eight staff: one drawn from the DCF Central Office, one from a DCF Regional Office, three from DCF Area Offices, one from a lead agency and two from a regional resource center. These Teams were to undertake comprehensive program reviews of congregate care providers including a desk audit and at least two site visits. The final report of the review was to become part of the provider's contract file. (Trial Exhibit 386, Program Evaluation Team, Proposed Process for Contract Monitoring, Sept. 6, 2007, at DCF000081104-05; *see also* Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 126:23-127:19).

1682.　DCF's Foster Care Support Services Unit in the Central Office, which performs contract oversight in relation to Intensive Foster Care ("IFC") provider performance, was to be staffed with IFC Program Planners (also called Coordinators) responsible for monitoring IFC provider performance and assuring that they are meeting their contractual obligations. (Deposition of Frances Carbone, DCF Director of Program Operations, Apr. 19, 2012, at 83:2-5; Trial Exhibit 27, Family Networks Contract Management Roles, at DCF003411425-27; Trial Exhibit 28, Family Networks Contract Management Roles, at DCF004305752-54;

Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 20:6-21:8).

1683.  The functions of the Planning and Program Development Unit ("PPD") included: "[e]stablish[ing] outcomes, indicators and measures" and performing quality assurance oversight of providers. The PPD "[m]onitors compliance with all programmatic requirements; [m]onitors quality of service provision; [m]onitors achievement of programmatic contract outcomes; [m]anages programmatic Corrective Action Plans; [o]versees gap analysis and program development." (Trial Exhibit 303, Interactions between the Planning and Program Development Unit ("PPD") and the Procurement Unit, Budget and Bill Paying Units, at DCF003243874-75).

1684.  The Family Networks model also embraced a commitment to the evaluation of purchased services through outcome and performance measures.  On April 5, 2005, DCF disseminated a Request for Information ("RFI") announcing that it was "redesigning" and "reprocuring" privately provided foster care services and seeking feedback from potential contract providers and stakeholders.  (Trial Exhibit 439, Family Network Services Request for Information, Apr. 5, 2005, at DCF007155752).  The RFI identified a number of "Design Principles," including the principal that "[s]ervices must be evaluated for outcomes continually and modified to improve outcomes for families."  DCF further stated that "[o]utcomes and performance measures should be clearly articulated in all service contracts" and that "[t]he evaluation of purchased services and their outcomes should be conducted as part of the Department's continuous quality improvement program."  (Trial Exhibit 439, Family Network Services Request for Information, Apr. 5, 2005, at DCF007155762).  In opening the Family Networks integrated service system for bids in 2006, DCF explicitly acknowledged the importance of committing the agency and its vendors to a performance management framework and continuous quality improvement ("CQI") approach to the delivery of contracted foster care services.  (Trial Exhibit 440, Family Networks Network Services RFR, at DCF007223258-59, C.1 Continuous Learning and Quality Improvement).

1685.  In designing Family Networks, DCF prepared a "Statement of Principles and Intent" that provided: "[a]mong the key strategies is a commitment to performance management through performance-based contracts with area lead agencies, regional resource centers, and network providers. The caseflow contracting model that the Department will implement is designed to promote continuous, incremental improvement over current performance." (Trial Exhibit 26, Family Networks Performance & Quality Improvement, at DCF005686542).  In this same document, DCF stated its intent to develop and implement lead agency and regional resource center performance report cards and outlined outcomes to be measured. (*Id.* at DCF0005686544).

1686.  In addition, DCF placed emphasis on its "Performance Management and Accountability System" in its HHS-approved Program Improvement Plan.  DCF "incorporated into [its] PIP . . . [a] DCF performance and accountability system . . . for monitoring Area Office performance and managing Lead Agencies to support achievement of optimal performance levels," "[p]erformance specifications which clearly articulate Departmental expectations for Lead Agencies and Regional Resource Centers, especially regarding clarification of roles and responsibilities," and:

"Score Cards" . . . to develop Area Office and provider agency profiles that measure performance . . . The "score cards" incorporate CFSR outcomes and DCF agency commitments of safety, permanency, well-being, family and community-connected care, and effective leadership. Indicators and targets have been established for Area Offices and a monthly management report is used to monitor performance. Similar "score cards" will be utilized to support profiling of provider performance. Indicators are being developed to reflect the contribution Lead Agencies, congregate care, Intensive Foster Care, and Support and Stabilization providers each make to the safety, permanency, and well-being of children and families.

(Trial Exhibit 33, Massachusetts Child and Family Services Review Program Improvement Plan, Oct. 5, 2009, p. 12). DCF also stated its intention to implement provider scorecards during calendar year 2009 in its "2009 Strategic Plan for Action." (Trial Exhibit 1127, Strengthening the Safety Net: DCF's Strategic Plan for Action, April 2009, at DCF7605097, DCF7605105).

1687. Specifically, with regard to lead agencies, the DCF Family Networks contract provides with respect to "Performance Outcomes and Reports" that "the Department will develop performance objectives for Area Lead Agencies that will provide measurable indicators of their contribution to overall Department goals of safety, permanency, well-being, family and community-connected care, and leadership for operational effectiveness. Periodic reports will be provided to each Department contract manager and Area Lead Agency program director." (Trial Exhibit 40, Addendum to Area Lead Agency Contract (FY12-FY13 Renewal Addendum), at DCF007263607; Trial Exhibit 404, Addendum to Area Lead Agency Contract (FY10 Renewal Addendum Amendment No. 1), at DCF007078513).

1688. In July and August 2008, DCF convened Statewide lead agency/RRC Meetings at least in part to address the development of lead agency performance outcomes in relation to safety, permanency and well-being. DCF explicitly acknowledged that "[t]here are two parts to performance contracting, contract obligation and compliance and measuring contribution towards the outcomes of children and families." (Trial Exhibit 304, DCF Statewide Lead Agency/RRC Meeting Minutes, July 9, 2008, at DCF004227605).

1689. DCF has emphasized the vital importance of building and sustaining adequate lead agency capacity coupled with regional resource center support. A DCF Systems Mapping Working Group, convened to identify the causal factors that affect the utilization of long-term residential settings and to assess the impact of programs and policies designed to reduce this utilization and to maintain more children in their communities, identified the "key role" to be played by the lead agencies and regional resource centers in making the system of care operate as intended. (Trial Exhibit 504, Systems Mapping of Residential Care, at DCF00090185, DCF000990189). The Working Group determined that:

Lead agencies must have the capacity (and funding) to develop necessary services initially in advance of demand for those

326

> services and to continue service development over time as their
> caseload grows.  Lack of adequate capacity may cause service
> development to compete with case management responsibilities
> and cause one or the other to suffer.  Regional Resource Centers
> can help with service development if they can effectively mesh
> their work with that of the lead agencies.

(Trial Exhibit 504, Systems Mapping of Residential Care, at DCF000990188).  The Working
Group continued:

> Lead agencies will have a key role in identifying alternatives to
> residential care for these high risk kids.  Their ability to do so will
> depend on having the necessary capacity to spend the time required
> to understand the needs of each child and explore the range of
> alternatives to residential care.  As the caseload of the lead
> agencies increases over time, the demands of ongoing case
> management will compete with finding alternatives for children
> new to the program.  A lack of sufficient capacity may limit the
> ability to accommodate new children or reduce the effectiveness of
> ongoing case and service management and result in longer than
> necessary times to complete the alternative programs.

(*Id.* at DCF000990189).  The Working Group further concluded:

> Lead agencies can play an active role in accelerating return to the
> community or to independent living.  However, they need to have
> sufficient capacity to both pursue opportunities for early return of
> children to the community and manage the cases of children in
> alternative settings who were diverted from residential programs or
> discharged early.  They also need additional capacity to develop
> needed programs on their own and in concert with the regional
> resource centers.

(*Id.* at DCF000990191).

1690.  A DCF Lead Agency Briefing Document dated April 15, 2008 stated: "DCF knows from
experience that we will have an extremely difficult time managing our purchase of service
system without the help of our private partners . . . Providing eight major functions, Lead
Agencies are the hub of the purchased services system, contributing to improved services and
reduced service cost."  (Trial Exhibit 507, DCF Lead Agency Briefing Document, at
DCF000188726).  The briefing paper also stated: "Opposition to the Lead Agencies comes
from some providers who believe that elimination of the model would result in more referrals
and less accountability and from some social workers who believe that savings from Lead
Agencies would result in reducing caseloads. . . ." (*Id.*).

c)    *DCF Reduced its Privately Provided Contract Monitoring Capacity, Diluting Lead Agency Functions and Dismantling the Regional Resources Centers*

1691.  In a February 7, 2006 letter, Commissioner Harry Spence addressed a number of questions and concerns that had arisen in developing the new system of care.  One such question regarded the adequacy of funding to support the new model.  Commissioner Spence assured that "the FY 2006 [DCF] budget is sufficient to support the following allocation to each Area or Regional Office: Enough dollars to support all administrative costs of the Area Lead Agency or Regional Resource Center. . . ."  (Trial Exhibit 441, Letter from Lewis H. Spence, Feb. 7, 2006, at DCF008009947).

1692.  However, DCF has not maintained lead agency and regional resource center capacity as emphasized by the Systems Mapping Working Group and as contemplated in the Contract Management Roles and Contract Monitoring design papers.  As part of budget reductions required under Mass. Gen. Laws ch. 29, § 9C in 2008, regional resource center contracts were defunded and suspended, and funding for lead agencies was significantly reduced. (Deposition of Robert Scherer, DCF Director of Procurement, Jan. 27, 2012, at 168:20-169:2, 169:11-17; Contested Exhibit DS, Notice of Contract Suspension, Feb. 4, 2009; Trial Exhibit 508, Revised Notice of Contract Suspension, Oct. 2008, at DCF001046994; Trial Exhibit 509, Implementation for 9C Budget Cuts: Presentation to DCF Interested Parties, Oct. 22, 2008, at DCF000247228; *see also id.* at DCF000247222-3, DCF000247226).

1693.  The initial Family Networks Regional Administration account in DCF's annual budget funded the 29 lead agencies at $21 million.  It was thereafter reduced by over 50% down to $10.3 million.  (Trial Exhibit 506, Testimony of Angelo McClain, Joint Hearing of the House and Senate Committees on Ways and Means, Feb. 27, 2012, at EOHHS001194402).

1694.  The significant reductions prompted DCF to reassess the functions lead agencies would be able to fulfill under the Family Networks Model. (Deposition of Frances Carbone, DCF Director of Program Operations, Apr. 19, 2012, at 185:20-24).

1695.  Lead agencies employ "Service Coordinators" responsible for organizing and facilitating family team meetings—intended to lead to a clinical assessment decision regarding placement and services—and implementing the assessment decision. They assist the DCF caseworker in accessing those services, authorizing service referrals, and reviewing the progress of a child's treatment and services plan to determine whether the plan is meeting its goals, how long the service should last, and what should happen next.  (Deposition of Frances Carbone, DCF Director of Program Operations, Apr. 19, 2012, at 187:18-190:2). Under initial lead agency contracts, a lead agency Service Coordinator could be assigned 60 cases.  As a result of the budget cuts, the number of funded full time lead agency staff was reduced, and caseloads increased to 75 to 90 cases per coordinator.  (Deposition of Robert Scherer, DCF Director of Procurement, Jan. 27, 2012, at 172:4-174:4; Deposition of Frances Carbone, DCF Director of Program Operations, Apr. 19, 2012, at 187-190; 190:3-16).

1696.  In written guidance dated October 27, 2009, DCF outlined diluted performance expectations of the Family Networks lead agencies given the 50% reduction in their budgets

and the resulting increase of their Service Coordination caseload from 1:60 to 1:75/1:90 in the fiscal year 2010 lead agency contracts.  DCF authorized reduced documentation in lead agency case files, reduced in-person lead agency presence at IEP and other such case management meetings and reduced convening of Family Team Meetings.  (Trial Exhibit 299, Statewide Guidance for Refining Expectations of Lead Agencies, Oct. 27, 2009, at DCF002350880, DCF002350881; *see also* Deposition of Robert Scherer, DCF Director of Procurement, Jan. 27, 2012, at 177:5-20).

1697.   The suspension of the regional resource center ("RRC") contracts also halted plans for more proactive monitoring of congregate care programs. While the Integrated Services Unit within the Central Office had always conducted "response monitoring" of congregate care programs—addressing problems or issues such as abuse and neglect reports as they arose— DCF had planned for regional resource centers to physically visit each program, conduct baseline assessments, and create a set of best practices.  (Deposition of Frances Carbone, DCF Director of Program Operations, Apr. 19, 2012, at 86:1-87:3, 89:18-90:4).  Following the suspension of the RRC contracts, the program monitoring function was transferred to Frances Carbone's Integrated Services Unit within the Central Office.  (*Id*. at 85:21-24).  However, the Integrated Services Unit did not receive any additional staff (*id*. at 87:4-13), and Ms. Cochran's unit was not able to "go out and do as comprehensive a look through with all of our programs" (*id*. at 86:18-87:3).

> d)    *DCF Does Not Have Sufficient Staffing Resources Dedicated to the Review of Private Agencies*

1698.   Following the suspension of the RRC contracts, the six residential planners assigned to monitor congregate care performance were reassigned from the Integrated Services Unit within the Central Office to DCF's four regional offices.  (Deposition of Frances Carbone, DCF Director of Program Operations, Apr. 19, 2012, at 14:15-16:2; Trial Exhibit 302, Memorandum from Bob Wentworth to Regional Directors re: Job Description for Planners, Jan. 30, 2009, at DCF002302693).  The residential planners, now called "regional residential planners," assumed some of the monitoring responsibilities that were to be held by regional resource centers, including physically visiting the programs and non-reactive monitoring.  However, this only occurs on a limited basis.  (Deposition of Frances Carbone, DCF Director of Program Operations, Apr. 19, 2012, at 40:16-41:2, 93:3-22, 155:2-7).

1699.   Moreover, the regional planners had full time job responsibilities prior to the suspension of the regional resource center contracts. Despite the added responsibilities, DCF did not hire additional planners or request new planners in the DCF budget, and Ms. Carbone is not aware of any additional regional office staff positions that were created.  (Deposition of Frances Carbone, DCF Director of Program Operations, Apr. 19, 2012, at 94:4-14, 96:18-21).  DCF did not perform a workload analysis of the six regional planners to determine their capacity to take on regional resource center functions.  (*Id*. at 94:15-19).  Rather, "the reality is that the bulk of the work that the regional resource centers were going to take on didn't end up happening."  (*Id*. at 95:1-14).

1700.   Similarly, the staffing level within the Foster Care Support Services unit is not commensurate with its duties and responsibilities.  This Central Office unit is assigned a

broad array of responsibilities and functions, including oversight of the agency's Intensive Foster Care ("IFC") contracts. (*See* Trial Exhibit 185, DCF Organizational Chart; Trial Exhibit 400, Foster Care Support Unit Projects; Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 252:7-256:8). DCF data, submitted to Commissioner McClain by Mary Gambon on June 11, 2010, indicated that DCF contracted with some twenty-six IFC Agencies providing 2083 approved IFC foster homes. (Trial Exhibit 425, Email from Mary Gambon to Angelo McClain, June 11, 2010, with attached Letter to Angelo McClain re: Info on IFC, at DCF004976825-26).

1701.   Joy Cochran, Director of Foster Care Support Services, testified that one individual, IFC Coordinator Mary Blake, is responsible for overseeing all current contracts between IFC providers and DCF. No area or regional support staff members assist Ms. Blake in fulfilling this function. (Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 23:16-24:12). While there were once two IFC Coordinator positions within Ms. Cochran's unit, as of April 2012, the second position had been vacant for at least two years due to a hiring freeze. (*Id.* at 20:6-22:14; *see also* Rule 30(b)(6) Deposition of Robert Wentworth, DCF Assistant Commissioner for Planing and Program Development, re: Purchased Services Licensing, Delivery, and Oversight, Dec. 29, 2011, at 65:7-66:14 (noting DCF has only a director and one staff member to evaluate all IFC providers)).

1702.   Ms. Cochran has advocated for the 'unfreezing' of the IFC Coordinator position because "there are a number of intensive foster care contracts and the amount of work it takes to support those agencies and assure quality is not a one-person task." This justification was provided to Mary Gambon, Olga Roche, and Ellen Finnegan via email. (Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 21:9-24:12). Ms. Cochran acknowledged at her deposition that resources have been finite during recent budget cycles, and that she would not ask for additional staff unless she thought she could truly justify it. (*Id.* at 44:19-45:1).

1703.   Further, several years ago, Ms. Cochran prepared an outline for Mary Gambon, DCF's Assistant Commissioner for Adoption, Foster Care and Adolescent Services, identifying the ideal staffing level for the IFC unit and what DCF would be able to accomplish at that level. However, no action resulted from that outline due to state budget constraints. (Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 130:4-21).

1704.   Moreover, because the last two budget cycles did not allow for an increase in the administrative budget, Ms. Cochran testified that she did not seek additional resources for the development of performance specifications and standards because "[i]t would have been an effort in futility. . . . I've stressed that we need the staff, but there is no budget." (Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 130:22-131:21).

1705.   Plaintiffs' expert Cathy Crabtree found that relying on the understaffed foster care support services unit to conduct performance monitoring activities for twenty-six child placing agencies across the state creates "a workload issue for the department," and will prevent the department from conducting effective performance monitoring. (Trial Tr., Mar. 1, 2013 (Crabtree), at 77:19-78:20).

1706.    Some three years after release of the Family Networks RFR, DCF Commissioner Angelo
McClain acknowledged in a 2010 letter to the Joint Committee on Children and Families that
"staffing resources at DCF that are dedicated to the review of private agencies' practices,
compliance with regulations, programmatic quality assurance review, etc. are not at a level
one would expect for a state agency with a purchase of service budget in excess of $350
million.  DCF and its service network could benefit from additional financial resources to
strengthen this work."  (Trial Exhibit 387, Letter from Angelo McClain to Joint Committee
on Children and Families, Mar. 8, 2010, at DCF000543377-78; Trial Tr. May 3, 2013
(McClain), at 75:10-18).  Both Joy Cochran, DCF's Director of Foster Care Support
Services, and Frances Carbone, DCF's Director of Program Operations, testified that they
agree with this statement. (Deposition of Joy Cochran, DCF Director of Foster Care Support
Services, Apr. 13, 2012, at128:5-129:11; Deposition of Frances Carbone, DCF Director of
Program Operations, Apr. 19, 2012, at 172:3-17). In addition, the former Commissioner
admitted that this was still his understanding as of August 15, 2012 with respect to the
contract monitoring capacity of DCF, and agreed that the agency needs deeper contract
monitoring capacity.  (Trial Tr. May 3, 2013 (McClain), at 75:22-76:4).  He further testified
that DCF reduced its contract monitoring capacity over the last five years.  (*Id.* at 76:5-12).

e)    *DCF Failed to Utilize Performance-Based Contracts with Lead
Agencies, Regional Resource Centers, and Network Providers*

1707.    Despite DCF's plan to create scorecards to monitor private providers' performance, as set
forth in the PIP, to ensure that providers were focusing on children's permanency, safety, and
well-being, DCF has not created those scorecards, and scorecards are not currently utilized
with private providers.  (Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy
Commissioner for Clinical Practice and Program Operations, re: Program Improvement Plan,
Apr. 4, 2012, at 90:5-91:4, 91:17-21, 205:18-206:4; DCF Massachusetts Child and Family
Services Review, Program Improvement Plan, Oct. 5, 2009, at 12; *see also* Deposition of
Robert Scherer, DCF Director of Procurement, Jan. 27, 2012, at 209:22-210:16).  There is no
timetable by which DCF plans to develop and implement scorecards for private providers.
(Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical
Practice and Program Operations, re: Program Improvement Plan, Apr. 4, 2012, at 94:4-9).

1708.    In the same 2010 letter to the Joint Committee on Children and Families referenced
above, Commissioner McClain acknowledged that:

> Resources    are    needed    for    development    of    performance
> specifications and standards, provider management and quality
> assurance and improvement activities and reports.  For instance,
> we had planned in the fall of 2008 to take the scorecards we have
> developed to monitor our area and regional progress, and roll it out
> to our lead agencies and provider agencies to document their
> performance with actual data.  Due to budget cuts, we needed to
> reduce DCF's data positions placing these scorecards on hold.

(Trial Exhibit 387, Letter from Angelo McClain to Joint Committee on Children and
Families, Mar. 8, 2010, at DCF000543377-78; Trial Tr. May 3, 2013 (McClain), at 80:1-14).

331

Both Joy Cochran, DCF's Director of Foster Care Support Services, and Frances Carbone, DCF's Director of Program Operations, testified that they agree with this statement. (Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 130:22-131:21; Deposition of Frances Carbone, DCF Director of Program Operations, Apr. 19, 2012, at 173:2-6). Moreover, the former Commissioner admitted that as of August 15, 2012 the same statement would still hold true. (Trial Tr. May 3, 2013 (McClain), at 80:15-17). DCF still has not implemented a private provider scorecard. (Trial Tr. May 6, 2013 (McClain), at 6:21-24). He testified that while DCF had wanted to use these scorecards at the central office level, "given budget issues we weren't able to do that on a routine basis." (*Id.* at 6:24-7:5).

1709.    Moreover, the performance-based contracting contemplated by the Family Networks model has not been implemented. (Deposition of Robert Scherer, DCF Director of Procurement, Jan. 27, 2012, at 182:19-183:23). Performance based contracting is "a method of contracting where the provider is held to certain performance indicators and outcomes, and that may be a condition of payment. . . . [A] provider may suffer sanctions as a result of not meeting performance measures. They may also be rewarded when they either meet or exceed those performance measures." (Rule 30(b)(6) Deposition of Robert Wentworth, DCF Assistant Commissioner for Planning and Program Development, re: Purchased Services Licensing, Delivery, and Oversight, Dec. 29, 2011, at 58:16-59:10). However, private provider rates are based on daily utilization. There is no financial incentive or penalty for performance. (*Id.* at 59:16-61:14). DCF does not use performance-based contracts with lead agencies, IFC providers, or congregate care providers such as STARR providers, Behavioral Treatment Residences, or group homes. (Deposition of Robert Scherer, DCF Director of Procurement, Jan. 27, 2012, at 57:18-58:14, 66:8-16, 75:10-18).

### 4.    Lead Agency Oversight

1710.    Despite the intent to develop performance outcomes and reports for Lead Agencies, as reflected in lead agency contract forms, this part of the Family Networks design was never implemented. (Trial Tr. May 6, 2013 (McClain), at 91:19-93:17; s*ee also* Trial Tr., Mar. 1, 2013 (Crabtree), at 73:21-74:5).

1711.    DCF has not yet developed performance objectives or measurable indicators. Lead agencies are not required to submit periodic management to DCF, and neither the Integrated Services Unit nor the Procuring and Program Development Division produces periodic management reports regarding lead agency performance for purposes of contract monitoring, (Deposition of Frances Carbone, DCF Director of Program Operations, Apr. 19, 2012, at 177:23-178:8, 194:5-10, 194:20-195:6).

1712.    Ms. Carbone testified that in the thirty-six months preceding her deposition, DCF has not subjected any lead agency to a corrective action plan, placed any lead agency under a moratorium of new referrals, or terminated a lead agency's contract. (Deposition of Frances Carbone, DCF Director of Program Operations, Apr. 19, 2012, at 200:16-201:3).

1713.    In addition, the lead agencies are the "holders of the information" on the performance of any particular provider. (Rule 30(b)(6) Deposition of Robert Wentworth, DCF Assistant

Commissioner for Planning and Program Development, re: Purchased Services Licensing, Delivery, and Oversight, Dec. 29, 2011, at 171:8-23). However, they are not bound to conduct formal contract monitoring over the group facilities within their area (*id*. at 183:12-16), nor do they submit written reports to DCF setting forth data and observations with respect to the performance of group facilities. If that information is conveyed, it is "just word of mouth." (*Id*. at 185:4-11).

### 5.    Congregate Care Oversight

1714.   DCF contracts with congregate care providers are monitored and managed at the regional level.  (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 257:15-258:4; Deposition of Frances Carbone, DCF Director of Program Operations, Apr. 19, 2012, at 156:16-162:5).

1715.   In its May 2007 Child and Family Services Review Statewide Assessment, DCF described its oversight of congregate care programs as including an introductory site visit and subsequent desk audits, issue specific follow-up and site evaluations.  DCF stated that approximately one-third of the 280 congregate care sites under contract with the Department received one or more forms of these oversight reviews each year, with 5-10% of the providers receiving a full site evaluation. (Trial Exhibit 57, 2007 Child and Family Services Review Statewide Assessment, at CSF-000000590-591).

1716.   Currently, there is no uniform method for monitoring contracts with congregate care providers. As contract monitoring was decentralized, the regions were given full autonomy to decide whether or not they would continue to use the Central Office's tools and processes. While DCF had developed a "robust" and "extensive" site visit plan involving teams with a residential planner, area resource coordinator, and regional administrative manager, this process could not be implemented fully due to inadequate staffing. (Rule 30(b)(6) Deposition of Robert Wentworth, DCF Assistant Commissioner for Planning and Program Development, re: Purchased Services Licensing, Delivery, and Oversight, Dec. 29, 2011, at 95:11-96:23).

1717.   Former Commissioner McClain testified that DCF did not develop a statewide protocol or policy setting forth minimal requirements for contract monitoring after the residential planners were moved to the regional offices. (Trial Tr. May 6, 2013 (McClain), at 83:18-84:24; *see also* Deposition of Robert Scherer, DCF Director of Procurement, Jan. 27, 2012, at 198:2-6, 201:19-202:2 (noting there is no written document setting out the procedure by which regions are to fulfill quality assurance responsibilities with regard to congregate care facilities)).

1718.   For example, in relation to 766 residential schools, some regions conduct "proactive" site visits while others conduct site visits only in "response to a situation that has occurred" at the provider.  (Rule 30(b)(6) Deposition of Robert Wentworth, DCF Assistant Commissioner for Planning and Program Development, re: Purchased Services Licensing, Delivery, and Oversight, Dec. 29, 2011, at 95:3-10). The frequency with which a region might make on-site visits to 766 residential schools can also vary.  (*Id.* at 122:18-123:2). Thus, a school signing a three-year contract could provide services for three years without a contract monitoring visit from DCF.  (*Id.* at 123:3-124:6). Moreover, DCF does not regularly utilize performance

reports from residential schools as part of the contract renewal process (Deposition of Robert Scherer, DCF Director of Procurement, Jan. 27, 2012, at 208:22-209:14), and Ms. Carbone does not require any form of periodic reporting from the regions regarding the performance of 766 providers. (Rule 30(b)(6) Deposition of Robert Wentworth, DCF Assistant Commissioner for Planning and Program Development, re: Purchased Services Licensing, Delivery, and Oversight, Dec. 29, 2011, at 103:18-104:1).

1719.   Similarly, there is no mandated frequency for BTR site visits.  (Rule 30(b)(6) Deposition of Robert Wentworth, DCF Assistant Commissioner for Planning and Program Development, re: Purchased Services Licensing, Delivery, and Oversight, Dec. 29, 2011, at 181:1-5). Moreover, while proactive—as opposed to reactive visits—"can occur," it is "really up to the regions to decide when that's appropriate, when they can do it, when they want to do it." (*Id.* at 181:20-182:4). The Central Office's oversight over BTR contracts and utilization consists wholly of seeing the degree to which referrals continue to happen and word of mouth anecdotal evidence.  (*Id.* at 169:21-170:7).

1720.   Responsibility for overseeing STARR programs has been delegated to area and regional offices. (Deposition of Robert Scherer, DCF Director of Procurement, Jan. 27, 2012, at 203:20-204:1). Performance issues such as staff-to-resident ratios at STARR facilities are monitored locally, (*Id.* at 137:13-138:3) and Mr. Wentworth testified that there is "no established periodic schedule for visiting STARRs that I'm aware of that's been implemented in any region."  (Rule 30(b)(6) Deposition of Robert Wentworth, DCF Assistant Commissioner for Planning and Program Development, re: Purchased Services Licensing, Delivery, and Oversight, Dec. 29, 2011, at 138:21-139:3).

1721.   With regard to site visits, DCF does not have a formal centralized system for conducting periodic visits to congregate care providers.  (Deposition of Robert Scherer, DCF Director of Procurement, Jan. 27, 2012, at 121:11-14, 122:20-123:4). Instead, DCF field staff may visit a site if a child is placed there or if there is a reported incident, and afterwards they might share information as to the quality of the program.  (Deposition of Robert Scherer, DCF Director of Procurement, Jan. 27, 2012, at 121:21-123:4).  DCF's Director of Procurement Robert Scherer testified that he is not aware of any regularly scheduled monitoring of contractor operations by DCF when there has not been an event triggering a visit by DCF field staff. (*Id*. at 125:3-17).  In fact, "there could be" congregate care providers under contract with DCF who have not had a DCF site visit for two or three years or more.  (Deposition of Frances Carbone, DCF Director of Program Operations, Apr. 19, 2012, at 159:12-15).

1722.   While DCF once engaged in a "pilot program" that involved periodic on-site inspections of certain group homes, that project ended approximately two years before Mr. Scherer's deposition "due to staff limitations."  (Deposition of Robert Scherer, DCF Director of Procurement, Jan. 27, 2012, at 119:12-20, 125:18-126:17).

1723.   With regard to desk audits, Ms. Carbone, DCF's Director of Program Operations, testified that the desk audit described in Trial Exhibit 386, (*see supra* ¶ 1681) "is probably not happening all that often."  (Deposition of Frances Carbone, DCF Director of Program Operations, Apr. 19, 2012, at 147:1-7).   For example, the desk audit contemplated involved

phone interviews of social workers, family members, and other contacts. Ms. Carbone testified that the desk audits conducted "usually do not" involve such calls. (*Id.* at 149:7-19).

1724. DCF does not have policies or guidelines in place that direct the frequency within which desk audits are to be conducted, and does not require periodic desk audits in relation to each of the providers under contract with DCF, (Deposition of Frances Carbone, DCF Director of Program Operations, Apr. 19, 2012, at 147:13-20).

1725. While Ms. Carbone expects desk audits of providers to be completed a "couple of times a year," she does not take any actions to ensure that these audits take place, (Deposition of Frances Carbone, DCF Director of Program Operations, Apr. 19, 2012, at 148:24-149:7), and she does not know if desk audits are actually being conducted at least twice a year in relation to each provider under contract with DCF. (*Id.* at 149:8-11).

Further, although DCF requires its congregate care providers to conduct internal CQI annually, it does not require them to furnish DCF with the annual CQI report on a regular basis. (Deposition of Frances Carbone, DCF Director of Program Operations, Apr. 19, 2012, at 170:1-8). Unless DCF visits a provider for response monitoring and looks at its annual CQI report, DCF does not regularly pull CQI reports to ensure that the contractually mandated CQI processes are indeed fulfilled by its congregate care providers. (*Id.* at 170:21-171:2).

### a)     *Corrective Actions Regarding Congregate Care Providers*

1726. In response to an interrogatory requesting the identity of those placement agencies—IFC and congregate care providers—against which DCF had taken corrective action; the date(s), categories, and outcomes of each corrective action; and each document constituting or concerning such corrective action for the period from July 1, 2009 through April 24, 2012 (the date the interrogatories were served and answered), Defendants provided a matrix reflecting 64 congregate care incidents. Supporting documentation reflects a consistent, continuing pattern of reactive oversight after a licensing violation, an allegation of maltreatment in care or a critical incident has already become known. (Trial Exhibit 944, Defendants' Responses and Objections to Plaintiffs' Second Set of Interrogatories, and all supporting exhibits and underlying documentation, Apr. 24, 2012, pp. 4-5 (Response to Interrogatory No. 4); *id.* at 17-31, Exhibit A; together with accompanying document production; *see also* Rule 30(b)(6) Deposition of Robert Wentworth, DCF Assistant Commissioner for Planning and Program Development, re: Purchased Services Licensing, Delivery, and Oversight, Dec. 29, 2011, at 55:10-56:6).

1727. If DCF receives a 51A relating to a congregate care provider, substantiated by the Special Investigations Unit, a regional planner reviews the determination but is not required to consult with DCF's central office in determining what action to take in relation to the congregate care provider. (Deposition of Frances Carbone, DCF Director of Program Operations, Apr. 19, 2012, at 202:19-203:10).

1728. However, issues identified at the regional level must be brought to Ms. Carbone's attention in order to institute a contract response. (Deposition of Jan Nisenbaum, DCF

Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at
258:5-21). Ms. Carbone has the authority to direct a private provider to prepare a corrective
action plan to address contract performance issues. This is usually done in consultation with
Robert Wentworth and the Department of Early Education and Care. (*Id.* at 256:10-257:14;
*see also* Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and
Program Operations, May 18, 2012, at 257:15-258:4, 260:3-19 (DCF no longer undertakes to
suspend referrals to congregate care providers; only DEEC makes that determination, in
conjunction with DCF)).

1729.  Mr. Wentworth testified that there is no required procedure for notifying central office
whenever a corrective action plan is imposed. (Rule 30(b)(6) Deposition of Robert
Wentworth, DCF Assistant Commissioner for Planning and Program Development, re:
Purchased Services Licensing, Delivery, and Oversight, Dec. 29, 2011, at 119:23-120:7). In
addition, there are no written procedures in place that require other visiting agencies to
forward their site visit reports to DCF. (*Id.* at 124:7-14).

1730.  Ms. Carbone testified that she was not aware of any instance in the last thirty-six months
in which DEEC had revoked or suspended the license of a congregate care provider under
contract with DCF. (Deposition of Frances Carbone, DCF Director of Program Operations,
Apr. 19, 2012, at 201:7-19). She further testified that to her knowledge, there has not been a
contract termination recommendation made to DCF's CFO, Ellen Finnegan, in relation to a
congregate care provider in the last thirty-six months (*id.* at 196:8-24) and that to her
knowledge, DCF has not terminated a contract with any congregate care provider within that
timeframe (*id.* at 197:1-6).

1731.  Ms. Carbone testified that she agreed a standardized system of contract monitoring across
DCF would enhance DCF's ability to ensure that things are "not falling through the cracks."
(Deposition of Frances Carbone, DCF Director of Program Operations, Apr. 19, 2012, at
167:1-11).

## 6.    Intensive Foster Care Oversight

1732.  DCF oversight over Intensive Foster Care ("IFC") providers is performed by Joy
Cochran's Foster Care Support Services Unit in the Central Office. (Deposition of Frances
Carbone, DCF Director of Program Operations, Apr. 19, 2012, at 83:2-5). IFC homes are
recruited and supported by licensed child placing agencies. (Deposition of Robert Scherer,
DCF Director of Procurement, Jan. 27, 2012, at 121:1-4). DCF does not visit individual IFC
homes as part of the process of conducting audits of IFC providers. (Rule 30(b)(6)
Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and
Adolescent Services, re: compliance monitoring and contract enforcement of private
providers, Apr. 24, 2012, at 464:22-465:2, 467:5-7).

1733.  Moreover, DCF relies on a single person, IFC Coordinator Mary Blake, to visit all child
placing agencies and monitor their compliance with DEEC and DCF policies and regulations.
(*Id.* at 454:18-456:4). Ms. Blake is to visit the staff of child placing agencies "at a minimum
once a year." (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for
Adoption, Foster Care and Adolescent Services, re: compliance monitoring and contract

enforcement of private providers, Apr. 24, 2012, at 454:18-24).  However, there is no report that tracks whether she successfully visits and reviews each IFC provider within a year of the prior assessment. (*Id*. at 461:9-17).

1734.  Joy Cochran, to whom Ms. Blake reports, testified that DCF has no protocol for making on-site visits to IFC provider locations for purposes of contract monitoring and does not conduct on-site audits or desk reviews of IFC providers.  (Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 111:16-112:10).  (*See also* Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: compliance monitoring and contract enforcement of private providers, Apr. 24, 2012, at 471:6-15) (testifying that she could not say "as a matter of fact" that Ms. Blake had conducted a site visit of each IFC provider once per year for the past two years); Rule 30(b)(6) Deposition of Robert Wentworth, DCF Assistant Commissioner for Planning and Program Development, re: Purchased Services Licensing, Delivery, and Oversight, Dec. 29, 2011, at 54:8-13 (testifying that DCF staff makes periodic site visits to child placing agencies providing IFC services only "[t]o the extent that they are able").

1735.  Former Commissioner McClain testified that "our expectation . . . was to visit our IFC providers and all our providers on a frequent basis."  However, he did not know whether DCF has a protocol requiring such visits based on certain intervals. (Trial Tr. May 6, 2013 (McClain), at 10:5-20)  He further testified that it could have been possible for an IFC provider to go two or three years – or an entire contract cycle – without having an on-site visit.  (*Id.* at 10:21-11:2).

1736.  Mary Blake is also responsible for conducting "desk audits" of IFC providers' files.  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: compliance monitoring and contract enforcement of private providers, Apr. 24, 2012, at 454:18-456:13; , 456: 8-15). The desk audit involves examining information that the agencies input through i-FamilyNet. There is no process by which DCF audits the accuracy of that information. Rather, it is the responsibility of the IFC providers to monitor the accuracy of information input by their staff.  (*Id.* at 463:10-12, 464:22-465:11). Further, there is no standard form that Ms. Blake uses to audit IFC agencies, and she does not generate a report related to her audits or reviews of IFC providers.  (*Id.* at 463:19-22, 465:17-19).

1737.  Moreover, DCF has not established performance benchmarks with respect to IFC providers.  (Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 120:12-17).  DCF does not use a provider scorecard to assess IFC providers' performance, nor are providers required to submit periodic performance reports.  (Rule 30(b)(6) Deposition of Robert Wentworth, DCF Assistant Commissioner for Planning and Program Development, re: Purchased Services Licensing, Delivery, and Oversight, Dec. 29, 2011, at 64:16-23; Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 126:9-19; Deposition of Robert Scherer, DCF Director of Procurement, Jan. 27, 2012, at 68:18-69:10).

1738.   DCF does not monitor IFC providers in terms of compliance with foster home visitation requirements. (Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 122:23-123:3 (private providers do not provider Ms. Cochran's unit with aggregate data related to IFC caseworker visitation of children); Rule 30(b)(6) Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, re: Visitation and Permanency Planning, Sept. 28, 2011, at 158:2-160:9 (visitation by IFC workers is not monitored in FamilyNet)).

1739.   DCF does not track the caseloads actually carried by IFC provider caseworkers, nor does DCF require any related reporting from IFC providers to Ms. Cochran's knowledge. (Deposition of Joy Cochran, Apr. 13, 2012, at 142:11-143:18).

1740.   Olga Roche, Deputy Commissioner for Field Operations and 30(b)(6) designee regarding staffing, caseloads, and training, testified that DCF relies on the child placing agencies to adhere to their contractual agreements. Ms. Roche does not monitor agency staff's workload directly and is not familiar with any monitoring scheme on the part of DCF to assure itself that its expectations of intensive foster care providers in relation to caseworker caseloads are being met.  (Rule 30(b)(6) Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, re: Staffing, Caseloads, and Training, Jan. 20, 2012, at 100:10-24, 101:5-10).

1741.   Further, Ms. Cochran testified that to her knowledge, DCF does not track the rate at which IFC caseworkers and supervisors attend training courses.  (Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 140:21-24).  When asked how DCF assures itself that a private provider's IFC caseworker staff is competent to undertake their job responsibilities, Ms. Cochran testified that that is the responsibility of the IFC agency.  (*Id.* at 141:4-18).

1742.   Similarly, Ms. Cochran's unit does not track whether IFC providers meet contractually required supervisor-to-caseworker ratios, and she does not know of any steps taken by DCF to assure itself that such ratios are met. (Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 144:8-23).

1743.   With regard to IFC providers' placement matching decisions, DCF does not have a formal system in place to: (1) monitor whether or not providers are making placement matches consistent with the provisions set forth in the Family Networks RFR; (2) determine whether a given IFC provider is performing better in terms of placement matching than some other IFC provider; or (3) identify poor performers within the IFC provider community in relation to placement matching. (Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 79:2-22, 80:4-12).  Ms. Cochran also testified that she does not receive reports that show the frequency at which children are placed in IFC homes outside of their area office or region, (*Id.* at 106:12-16), nor does she track the geographical location of children placed in IFC homes.  She further testified that there is no set percentage of kids placed out of area or region that would trigger concern regarding that region or area office's need to develop deeper IFC foster home capacity. (*Id.* at 109:23-110:15).

1744.   DCF primarily determines how well an IFC provider is doing in meeting its safety responsibilities across all children in its care by "the absence of supported 51A reports of

abuse or neglect." (Rule 30(b)(6) Deposition of Robert Wentworth, DCF Assistant Commissioner for Planning and Program Development, re: Purchased Services Licensing, Delivery, and Oversight, Dec. 29, 2011, at 63:17-64:8). However, Former Commissioner McClain testified that from 2007, when he took the post of Commissioner, through August 15th, 2012, he did not seek any way to track the frequency with which IFC provider agencies, or the homes they furnished, became subject to supported 51As. (Trial Tr. May 6, 2013 (McClain), at 16:13-18).

1745.   On May 25, 2012, Commissioner McClain testified that he did not "know the specifics" of how intensive foster care contracts with child placing agencies were monitored by DCF. (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 158:1-6). When asked whether he had satisfied himself that DCF currently has adequate staff to conduct reasonably adequate monitoring of its IFC providers, Commissioner McClain replied that this was one of the areas he really wanted to "dig into" going forward. (*Id.* at 159:6-13, 159:20-21). Almost a year later, the former Commissioner testified that he did not know if Joy Cochran has any staff to assist her in managing IFC providers. (Trial Tr. May 3, 2013 (McClain), at 46:12-47:3; *see also* Trial Tr. May 6, 2013 (McClain), at 47:16-48:6). However, he agreed that, given the fact that the Commissioner is going to delegate certain responsibilities, it is important that the staff beneath the Commissioner has sufficient capacity. (Trial Tr. May 6, 2013 (McClain), at 48:7-49:9).

> a)      *Corrective Actions Regarding Intensive Foster Care Providers*

1746.   Former Commissioner McClain testified that if DCF identified a performance deficiency within one or more private providers, DCF would determine whether a corrective action or quality improvement plan is warranted. In addition, DCF could impose sanctions such as halting referrals, closing a program, or suspending or discontinuing a contract. (Trial Tr. May 6, 2013 (McClain), at 11:3-21).

1747.   Ms. Gambon testified that she was not familiar with any instances in the last three years in which an IFC contract was vacated, placed on a moratorium, put on a corrective action plan, or denied the ability to re-procure with DCF as a result of performance. (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: compliance monitoring and contract enforcement of private providers, Apr. 24, 2012, at 467:8-468:2, 470:22-471:2; *see also* Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 257:13-258:16 (Ms. Cochran could not identify a single IFC a provider that has been placed on a corrective action plan by her unit for any reason in the last three years); Deposition of Robert Scherer, DCF Director of Procurement, Jan. 27, 2012, at 69:11-15 (Mr. Scherer was not aware of any IFC provider that has been denied the renewal of a contract with DCF as a result of past performance in the last three years)).

1748.   In response to an interrogatory requesting the identity of those placement agencies—IFC and congregate care providers—against which DCF had taken corrective action; the date(s), categories, and outcomes of each corrective action; and each document constituting or concerning such corrective action for the period from July 1, 2009 through April 24, 2012 (the date the interrogatories were served and answered), Defendants did not identify a single

corrective action regarding an IFC provider. (Trial Exhibit 944, Defendants' Responses and Objections to Plaintiffs' Second Set of Interrogatories, and all supporting exhibits and underlying documentation, Apr. 24, 2012, pp. 4-5 (Response to Interrogatory No. 4); *id.* at 17-31, Exhibit A; together with accompanying document production).

1749.   Moreover, Robert Wentworth, DCF's 30(b)(6) designee regarding Purchased Services Licensing, Delivery, and Oversight, testified that he is not aware of a standard formula used by DCF to assess past performance at the time of IFC contract renewal or re-procurement. There is no maximum number of licensing violations for which a provider of IFC services can be cited within a three-year contract term that would bar it from rebidding in the next cycle.  (Rule 30(b)(6) Deposition of Robert Wentworth, DCF Assistant Commissioner for Planning and Program Development, re: Purchased Services Licensing, Delivery, and Oversight, Dec. 29, 2011, at 47:8-48:8).

1750.   The procurement unit does not receive performance data at the time of contract renewals for IFC provider contracts nor utilize such performance data to make an individual assessment about whether or not to renew an individual IFC provider's contract.  (Deposition of Robert Scherer, DCF Director of Procurement, Jan. 27, 2012, at 68:18-69:10; Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 124:11-21).

1751.   DCF's limited contract oversight over IFC providers is illustrated by the Foster Care Support Services Unit's response to perceived "churning" in IFC placements.  (*See, supra* ¶¶ 749, 754).  Ms. Cochran testified that following Mr. Ferreira's findings regarding the increase in lateral moves within IFC placements, "Mary Gambon, Olga Roche, Mary Blake and myself met with the IFC executive directors and presented this information to them, and made a request that they begin very carefully watching matching within their agency and lateral moves within their agency."  (Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 53:3-18). DCF designated a discrete time period of approximately one month to six weeks, during which IFC providers were directed to fill out a critical incident report each time an IFC lateral move took place. No report was generated based upon an assessment of those critical incident reports, and no formal assessment of that information was conducted.  Rather, DCF hoped to energize thinking on placement moves within the IFC provider community itself. "The hope was that the agencies would self-monitor . . . ."  IFC providers are no longer required to submit critical incident reports in the event of a lateral move.  (*Id.* at 53:19-57:12).

b)    *Mentor*

1752.   DCF contracts with approximately 26 Intensive Foster Care Agencies, which provide over 2,000 homes. Massachusetts Mentor ("Mentor"), one of the two largest agencies, runs eight different sites across the state and provides approximately 500 IFC homes.  On average, 50 new children are placed in a Mentor IFC home each month.  (Trial Exhibit 425, DCF Email from Mary Gambon to Angelo McClain re: Report on IFC, June 11, 2010, and attached Letter to Angelo McClain re: Info on IFC, June 2010, at DCF004976825-26; Trial Exhibit 979, Email exchange between Terry Flynn and Timothy Haley re: Mentor IFC, May 23, 2012, at DCF011142366).  Former Commissioner McClain testified that from the time he became commissioner in 2007 up through August 15, 2012, Mentor was generally the largest

or among the two or three largest providers of IFC homes. (Trial Tr. May 3, 2013 (McClain), at 41:12-17; *see also id.* at 40:15-41:11).

1753.  Over the course of a twelve-month reporting period between April 1, 2011 and March 31, 2012, there were sixteen substantiated reports of abuse or neglect involving foster homes provided through Mentor. (Trial Exhibit 953, Maltreatment in Placement, year ending 3/31/12).

1754.  In one such report it was disclosed that, while in a respite placement, a 16 year-old child with the initials K.F. broke into the bathroom and forced a 12 year-old child, A.D., to perform oral sex. A safety plan was in place that indicated that K.F. should not be left unsupervised with children under 14. However, it was reported by both children that the foster parents allowed K.F. to go upstairs with A.D. This decision was found to be inappropriate and against the plan in place. The foster parents also allowed the children to room share, which was against IFC policy and the safety plan in place. The incident resulted in a substantiated finding of neglect by the Mentor foster parents. (Trial Exhibit 953, Maltreatment in Placement, year ending 3/31/12, at row 11; Trial Exhibit 1165, Email from Alison Bonita to Mary Blake, Mary Gambon, Joy Cochran, et al., July 25, 2011; *see also* Trial Tr. May 6, 2013 (McClain), at 24:7-29:14;  *see also id.* at 29:7-14 (testifying that it "would be a matter of concern" if a child in DCF foster care custody was placed into an intensive foster care home in which a safety plan was put in place because another child in the home might act out sexually or otherwise, and the safety plan was not followed)).

1755.  Another report involved an incident in which a child nearly drowned in a Mentor foster mother's pool. (Trial Exhibit 953, Maltreatment in Placement, year ending 3/31/12, at row 16; Trial Exhibit 1166, Email from Rosana DeSimone to Lisa Leite, Scott Scholefield, and Mary Gambon, et al., Sept. 16, 2011). The foster mother reported that she found the child floating face down in the pool, and that the child was "non coherent" and was not breathing. (Trial Exhibit 1166, Email from Rosana DeSimone to Lisa Leite, Scott Scholefield, and Mary Gambon, et al., Sept. 16, 2011, at DCF011150879). Three prior Mentor safety assessments revealed that the foster parent's pool alarm was not activated. On April 16, 2009, Mentor documented that the pool alarm was not activated, but would be activated once the child began crawling. On July 14, 2010 and May 3, 2011, Mentor again documented that the pool alarm was not activated. However, "there was never any follow through by the agency or [the foster mother] in order to ensure that the pool area was safe for the reported child per Mentor and the DCF Safety Assessment Guideline." The incident resulted in a substantiated finding of neglect by the foster mother. (*Id.* at DCF011150880; *See also* Trial Tr. May 6, 2013 (McClain), at 29:15-31:21).

1756.  Another report involved an incident in which a two-year-old child and a four-year-old child were found wandering a busy street and attempting to go into neighbors' cars. The investigator identified "programmatic concerns," noting that the Mentor Supervisor who placed the children in the home did not ensure that the home met the safety requirements. The incident resulted in a substantiated finding of neglect. (Trial Exhibit 953, Maltreatment in Placement, year ending 3/31/12, at rows 61 and 124; Trial Exhibit 1167, Email from Mary Gambon to Joy Cochran, July 26, 2011; *see also* Trial Tr. May 6, 2013 (McClain), at 31:10-34:9).

1757.   Former Commissioner McClain testified that he did not recall these three incidents. (Trial Tr. May 6, 2013 (McClain), at 24:7-34:9). He further testified that he was not aware that there were 16 instances of supported abuse or neglect in Mentor IFC homes from April 1, 2011 through March 21, 2012.  (Trial Tr. May 6, 2013 (McClain), at 21:18-22:1).  During the period covered by this report, he "may have had one or two discussions" regarding the instances of supported abuse and neglect occurring within Mentor IFC homes, but "[m]y involvement was pretty indirect there . . . it was not an in depth discussion that involved me." (Trial Tr. May 6, 2013 (McClain), at 20:4-17).

1758.   During this same time period, on January 21, 2012, a two-month-old girl with the initials L.M. died in a Mentor foster home. The child had been placed in the home on January 13, 2012, and it was reported that "a Mentor home was used because placement was needed within days of the case being transferred to the Lynn office, and Lynn did not have any other available resources." (Trial Exhibit 1170, DCF Child Fatality Report, at DCF011184865). Upon reviewing the Child Fatality Report, Former Commissioner McClain testified that "[t]his is an instance where from reading this she could have gone to a departmental foster home that wasn't available, so she went to an IFC home."  (Trial Tr. May 6, 2013 (McClain), at 72:5-8).  He acknowledged that in such a circumstance, the state and the taxpayer pay extra money for a degree of services or a level of services that are not clinically found to be necessary. (*Id.* at 72:5-11).

1759.   DCF concluded that "it is likely [L.M.'s] death was related to the unsafe sleeping conditions."  (Trial Exhibit 1168, Email from Alison Bonita to Mary Gambon, Mary Blake, and Joy Cochran re: Mentor SUPPORT (death/neglect), DCF011150913; Contested Exhibit QC, Child Abuse/Neglect Non-Emergency Investigation, Apr. 9, 2012, at DCF011187084). The child was dressed in "fleece pajamas, over a 'Onesie,' swaddled in a receiving blanket, placed on her side in a port-a-crib, with a crocheted blanket on top of her and a blanket rolled up on each side to prevent the child from moving. The foster mother found the child sweating, and not breathing."  (Contested Exhibit UE, Letter from Kelly Buckley to Paul Cataldo re: Intake Number 4904129, May 10, 2012, with attached Investigation Report, May 10, 2012, at DCF101961097).

1760.   DCF substantiated the allegation of neglect and death against the foster father, who "created an unsafe sleeping situation for [L.M.]." (Trial Exhibit 1168, Email from Alison Bonita to Mary Gambon, Mary Blake, and Joy Cochran re: Mentor SUPPORT (death/neglect), at DCF011150913; *see also* Trial Exhibit 1102, Maltreatment in Placement Report for the year ending 9/30/12, at row 101).  DCF further found that "the management staff at Mentor hold some degree of responsibility for failing to train their foster parents around what constitutes a safe sleep environment," and that "[m]anagement staff themselves had no knowledge of what a safe sleeping environment entailed. . ." (Trial Exhibit 1168, Email from Alison Bonita to Mary Gambon, Mary Blake, and Joy Cochran re: Mentor SUPPORT (death/neglect), at DCF011150913).  "Mentor also failed to follow their own regulations about seeing a child within a week of placing them in a foster home. [L.M.] was placed in 1/13/12 and was not seen again by Mentor staff prior to her death, on 1/21/12." (*Id.*).  Further, the Department failed to obtain any medical documentation about L.M. from her prior placement or the pediatrician who saw L.M. at her previous foster home.  (*Id.*; *see also* Trial Exhibit 1170, DCF Child Fatality Report, at DCF011184867; Contested Exhibit

QC, Child Abuse/Neglect Non-Emergency Investigation, Mentor FH, Apr. 9, 2012 at DCF011187092; Contested Exhibit QC, Child Abuse/Neglect Non-Emergency Investigation, Apr. 9, 2012, at DCF011187084, DCF011187092; Contested Exhibit UE, Letter from Kelly Buckley to Paul Cataldo re: Intake Number 4904129, May 10, 2012, with attached Investigation Report, May 10, 2012, at DCF010961099, DCF010961101).

1761.   The Department of Early Education and Care ("DEEC") also conducted an investigation of the incident.  The Investigation Report indicates that although the DEEC investigator and the Mentor program manager discussed the need to immediately inform foster parents of safe sleep practices, twelve days after the child's death a worker responsible for supervising the caseworkers still "did not have knowledge of safe sleep practices."  (Contested Exhibit UE, Letter from Kelly Buckley to Paul Cataldo re: Intake Number 4904129, May 10, 2012, with attached Investigation Report, May 10, 2012, at DCF010961097-98).  It was also revealed that Mentor caseworkers, called "coordinators," are not reading the foster parents' records, and that Mentor did not "have procedures to ensure communication between previous coordinators assigned to the home and a new coordinator assigned to the home.  (Contested Exhibit UE, Letter from Kelly Buckley to Paul Cataldo re: Intake Number 4904129, May 10, 2012, with attached Investigation Report, May 10, 2012, at DCF010961098).

1762.   DEEC issued a formal Statement of Outstanding Compliance Issues, noting several compliance issues including the licensee's "fail[ure] to ensure that the foster care program is operated in an administratively sound manner" because "[a]t the time of this investigation, the social workers and supervisors did not read the foster parents' records, . . . a worker failed to read or obtain a significant correspondence related to the health of an infant," and a social worker was not aware that she was assigned" to the infant until seven days after she was placed in the home.  (Contested Exhibit UE, Letter from Kelly Buckley to Paul Cataldo re: Intake Number 4904129, May 10, 2012, with attached Investigation Report, May 10, 2012, at DCF010961096, DCF010961106).  Further, "[a]lthough the licensee requires weekly visits to the foster home, a visit did not occur after a child's initial placement on January 13, 2012.  The child died on January 21, 2012.  The program failed to notify DCF that a weekly visit was not made, as required by the licensee's procedures."  (*Id.* at DCF101961108).  In total, DEEC identified seventeen regulations with which Mentor did not comply.  (*Id.* at DCF101961106-09).

1763.   In an email exchange that was subsequently forwarded to Commissioner McClain, Ms. Gambon referred to the recent death of an infant and noted that the 51B investigation "identified several programmatic issues that reflect slippage from the agency oversight[s] that were put in place after the death of Dontel Jeffers."  (Trial Exhibit 979, Email exchange between Terry Flynn and Timothy Haley re: Mentor IFC, May 23, 2012, at DCF011142365).  Former Commissioner McClain testified that Dontel Jeffers was beaten to death in 2004, a few days after being placed into a Mentor foster home.  (Trial Tr. May 7, 2013 (McClain), at 12:10-14:8).  He further testified that after Dontel Jeffers's death, the "department took a pretty thorough examination of how children were, were placed into foster care" in order to "make sure that there were protocols in place to make sure that as a child was placed into foster care that that was done correctly, and within that first period of time that there be visits to the home to make sure that the child was settling in."  (*Id.* at 12:13-15).  He testified that

"things were put in place to assure that we had good placements and a thorough review of the foster families." (*Id*. at 13:17-22).

1764.    In identifying "slippage," Ms. Gambon referred to the following agency oversights that were put in place after Dontel Jeffers's death: "Immediate assignment of worker at acceptance of referral; Visit to the home within 48 hours of placement; Documentation in foster parent record of training; [and] Mentor coordinators were to constantly inquire about home composition and frequent visits."  (Trial Exhibit 979, Email exchange between Terry Flynn and Timothy Haley re: Mentor IFC, May 23, 2012, at DCF011142365).

1765.    According to that same email, DCF "reviewed new entries for a three month period" and determined that "the offices who would suffer the largest impact would be the Cape and Boston Region/emergency shelter program."  (*Id.* at DCF011142366).  Former Commissioner McClain explained that if DCF were to close referrals to Mentor, the Cape and Boston regions would feel the impact the most, "particularly in light of the fact that Mentor provides an emergency shelter program where they have IFC homes they're identifying to take children in emergencies."  (Trial Tr. May 7, 2013 (McClain), at 10:24-11:12).  Because of this, "[i]f referrals were cut off," DCF would be faced with a decision as to whether referrals would be halted "across the board," or whether there "would there be some exceptions." (*Id.*).

1766.    Ms. Gambon went on to note that following four meetings between Mentor managers and DCF staff, Mentor appeared to give "little attention. . . to the recommendations made by DCF."  Due to continuing concerns, DCF's IFC coordinator completed a desk review of three to four cases per Mentor office.   (Trial Exhibit 979, Email exchange between Terry Flynn and Timothy Haley re: Mentor IFC, May 23, 2012, DCF011142364-65).

1767.    IFC Coordinator Mary Blake emailed Joy Cochran a summary of findings from the Mentor case record review on April 29, 2012. Ms. Blake referred to "[o]ngoing concerns addressed with Mentor over the past year (2011-present)."  Concerns discussed included: "Current structure, no assigned staff for foster parent creating at the very least miscommunications/ no communications; Oversight of programs/ lack of follow through; Inability to reach staff when calling individual sites (trail of voice mails no live person); Lack of documentation in the Family Resource record; Training hours not completed; Lack of compliance; [and] "Not following Family Resource Policy."  (Trial Exhibit 1169, Email from Mary Blake to Joy Cochran re: Mentor, Apr. 29, 2012, with attached Document re: mentor record review, Apr. 29, 2012, and MENTOR Record Review, Apr. 2012 at DCF011287780).

1768.    The record review covered "a random sample of 3 or 4 resources" in each of Mentor's eight programs. The review revealed that: "Dictation does not reflect what is happening [with the exception of one office]; Current training not documented for any of the resources; Family Resource Policy not being followed . . . ; Lack of communication between Resource and Mentor."  (*Id.*).  In addition, Ms. Blake noted that "Investigations reflect [the] IFC Unit's ongoing concerns with the overall oversight of the Mentor Program's [sic]," specifically: Lack of training; Follow up; Communication on all levels; Family Resource Policy."  (*Id.* at DCF011287780-81).  The review also revealed a failure to reevaluate family resource homes after a supported 51A or 51B report, and that "[a]nnual re-evals/relicensing studies often

state no significant changes during the past year while dictation indicates significant change."
(Trial Exhibit 979, Email exchange between Terry Flynn and Timothy Haley re: Mentor IFC,
May 23, 2012, at DCF011142365).  *See also* M.G.L.A. 119, §§ 51A, 51B (The term "51A"
refers to a report of suspected abuse and neglect, and the term "51B" refers to investigations
of reported abuse and neglect filed under Sec. 51A).

1769.   On May 19, 2012, Ms. Roche sent Commissioner McClain a May 17, 2012 email from
Mary Gambon, which summarizes the concerns identified in Ms. Blake's review. Ms.
Gambon also stated that "The follow-up on supported 51Bs is concerning. None of the
required limited re-evals were found in the family resource record. Since May of 2011, [ten]
51Bs have been supported. Additionally, there were 18 unsupports and 37 screen outs." Ms.
Gambon further noted that the Office of the Child Advocate had identified concerns
regarding "the number of 51As filed on Mentor homes."   (Trial Exhibit 979, Email exchange
between Terry Flynn and Timothy Haley re: Mentor IFC, May 23, 2012, at DCF011142365).

1770.   DCF developed a "Regulatory Compliance Plan," dated May 29, 2012, which addresses
ten identified issues related to Mentor practices. The plan identifies the corrective measure
that must be taken regarding each issue, and either a 0-1 month, 0-3 month or 0-6 month time
frame fame for completing each measure. (Trial Exhibit 1162, Email from Mary Gambon to
Olga Roche, Joy Cochran, Mary Blake re: Mentor Follow Up, June 1, 2012, and attached
DCF Compliance Plan, DCF011326192-93; Trial Tr. May 6, 2013 (McClain), at 44:18-
46:16).

1771.   One of the corrective measures identified in the Compliance Plan pertains to training for
Mentor staff on standards, policy, and procedures of Intensive Foster Care. DCF's means of
evaluating compliance with this measure would involve a review of attendance records.
(Trial Exhibit 1162, Email from Mary Gambon to Olga Roche, Joy Cochran, Mary Blake re:
Mentor Follow Up, June 1, 2012, and attached DCF Compliance Plan, p. 3, Item 2).  Former
Commissioner McClain acknowledged that training among intensive foster care providers is
very important.  (Trial Tr. May 6, 2013 (McClain), at 50:15-17).  However, he testified that
DCF has not introduced a periodic, aggregate management report documenting either the
percentage of DCF's own caseworkers that complete in-service trainings, or the hours
completed. (Trial Tr. May 6, 2013 (McClain), at 54:9-23). He further acknowledged that
according to data from the third Quarter of Fiscal Year 2007, the rate of participation in in-
service training statewide was 16 percent.  (Trial Tr. May 6, 2013 (McClain), at 54:24-58:1;
Trial Exhibit 233, CQI Data Book, Statewide, Quarter 3, FY'07, p. 32).  However, under the
Regulatory Compliance Plan, one hundred percent of Mentor staff members are expected to
receive training.  (Trial Tr. May 6, 2013 (McClain), at 58:17-22).

1772.   Another corrective measure provided that dictation be entered timely within one week of
the family resource contact.  (Trial Exhibit 1162, Email from Mary Gambon to Olga Roche,
Joy Cochran, Mary Blake re: Mentor Follow Up, June 1, 2012, and attached DCF
Compliance Plan, p. 3, Item 4).  Former Commissioner McClain acknowledged that timely
entries into a child's case file are very important in conducting sound child welfare social
work practice, and that this is a key piece of "managing with data." He further acknowledged
that in building appropriate caseloads, it is important to assure that there is enough time for
the caseworkers to timely record activities into dictation.  (Trial Tr. May 6, 2013 (McClain),

at 60:6-61:4). He also acknowledged that while the Compliance Plan requires Mentor staff to enter dictation within one week, DCF workers are allotted 30 days. (Trial Tr. May 6, 2013 (McClain), at 61:5-12). In addition, he testified that with regard to 7 and 30 day medical visits, "[w]e don't have full compliance with folks actually . . . entering it into the system." He acknowledged that for several reporting periods, DCF performance on 7 and 30 day medical examinations has routinely been in the low teens or low twenties. (Trial Tr. May 6, 2013 (McClain), at 61:15-63:1).

1773.   Another measure required that all active IFC foster homes have complete License Studies and Annual Re-assessment/License Renewals. (Trial Exhibit 1162, Email from Mary Gambon to Olga Roche, Joy Cochran, Mary Blake re: Mentor Follow Up, June 1, 2012, and attached DCF Compliance Plan, p. 3, Item 7). Former Commissioner McClain acknowledged that there are legal mandates regarding licensing timeframes, and that this is a fundamental practice area. (Trial Tr. May 6, 2013 (McClain), at 64:12-65:1). While he did not know how often DCF's own family resource workers conduct timely licensing, he agreed that 82 or 83 percent compliance "would be and is unacceptable." (*Id.* at 66:2-67:3).

1774.   Former Commissioner McClain testified that more severe contract responses—over and above the Compliance Plan in place—were considered, and that he would assume Mentor had input regarding the content of the plan. He also testified that referrals to particular offices were restricted for a time—perhaps 60 or 90 days. (Trial Tr. May 6, 2013 (McClain), at 65:2-20).

1775.   For all but one of the ten items, the Compliance Plan indicates that the IFC Unit in the Central Office is responsible for all means of evaluation.  Specifically, the evaluation activities involve a record review by the IFC Unit and a monthly progress report submitted to DCF's IFC coordinator, Mary Blake. (Trial Exhibit 1162, Email from Mary Gambon to Olga Roche, Joy Cochran, Mary Blake re: Mentor Follow Up, June 1, 2012, and attached DCF Compliance Plan; *see also* Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 20:6-24:12 (Mary Blake is DCF's sole IFC Coordinator and is responsible for overseeing all contracts with IFC providers)).

1776.   Former Commissioner McClain testified that he does not believe he played a role in the development of the Regulatory Compliance Plan.  (Trial Tr. May 6, 2013 (McClain), at 46:15-20).

1777.   In a two and a half month period following the May 29, 2012 Regulatory Compliance Plan (June 1, 2012 to August 15, 2012), DCF substantiated four more reports of abuse or neglect regarding a Mentor foster home. (Trial Exhibit 1102, Maltreatment in Placement Report for the year ending 9/30/12, at rows 26, 43, 77, 133).

1778.   When asked about three of these incidents (all of which were reported between June 18 and July 6, 2012), Former Commissioner McClain testified that he was not aware that there were three more supported claims of abuse and neglect in Mentor homes within two months of the Compliance Plan. (*Id.* at rows 26, 43, 77; Trial Tr. May 6, 2013 (McClain), at 73:9-75:11; 75:12-18). He further testified that he would "not necessarily" expect these events to be brought to his attention, (*Id.* at 76:1-8) and that while "[t]here should have been"

adjustments were made to the compliance regulatory plan as a result of these additional events, he did not know whether any adjustments were made." (*Id.* at 76:9-20).

1779.   In the two and a half month period following the Mentor Compliance Plan, the Central Office's IFC Unit did not gain any additional staff. (*Id.* at 77:9-14).

### C.     DEEC Licensing and Oversight

1780.   Massachusetts law and regulation provides in relation to a license to operate a foster care placement agency or adoption agency that "a provisional license or approval shall remain in effect for six months from the date of issuance and may be renewed once for no more than six months" and that "a regular license or approval shall remain in effect for two years from the date of issuance."  No provision or regulation creates an "enhanced" license or approval three years in duration.  (Trial Exhibit 428, 102 Mass. Code Regs. 5.03(4)(a)-(b)).

1781.   The licensing public approval process with respect to DCF is administered by the department's regulator, the Department of Early Education and Care ("DEEC").  Mass. Gen. Laws ch. 15D, §§ 6, 7, 9 (2013)).

1782.   On January 29, 2004, the Office of Child Care Services issued a "Regular License to Operate an Adoption Placement Agency" and a "Regular License to Operate Foster Care Placement Agency" to DCF.  These "regular" licenses were two years in duration and each carried a January 28, 2006 expiration date.  (Trial Exhibit 1157, Documents re: Foster Care and Adoption Licenses, 2004-2006, at DCF002307488-89).

1783.   Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, was involved in the three most recent DCF relicensing processes undertaken by DEEC, and was the "point person" for DEEC with respect to most subject areas during the most recent relicensing undertaken in 2011.  (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 231:21-232:7, 244:10-245:7).

1784.   Ms. Gambon testified that DCF's 2004 two-year license was not renewed until 2008 because of delays in addressing "a number of issues that were identified by EEC." (*Id.* at 234:22-236:12).  These delays occurred because DCF "took a fairly long period of time to respond" to the issues, and DEEC "took a fairly long period of time to respond back." (*Id.*).  Both DCF and DEEC (as Ms. Gambon understood it) operated under the belief that, pursuant to the regulations, the lapsed license remained in effect indefinitely until the new license was issued.  (*Id.*).

1785.   In a June 20, 2006 email, Ms. Gambon notified DCF managers that "[w]e have heard from DEEC regarding the offices that will be reviewed during the foster care/adoption licensing public approval process."  DEEC planned to visit five of the 29 Area Offices including Van Wart, Worcester West, Cape Ann, Framingham, and Attleboro.  DEEC additionally planned to visit two Regional Offices including Northeast and West.  Ms. Gambon further wrote that "DEEC is reserving their option to select a seventh site." (Trial

Exhibit 513, Email exchange between Faye Drain and Ellen Patashnick re: DEEC Public Approval Process, June 20, 2006).

1786.  DEEC subsequently added an additional Area Office to the 2006 public approval process site visit list: the Park Street Area Office.  DEEC planned to visit one Area Office per DCF region.  (Trial Exhibit 514, DEEC Public Approval Licensing Process Overview 2006, at DCF000065565; Trial Exhibit 515, DEEC Public Licensing Approval Process Update 2006, at DCF000110157).

1787.  Ms. Gambon testified that in the 1980s and for part of the 1990s, DEEC studied every DCF area office as part of the relicensing process.  (Deposition of Mary Gambon, DCF's Assistant Commissioner, for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 245:19-246:2).  Ms. Gambon testified that in the 2006-2008 relicensing, DEEC studied six area offices.  (*Id*. at 245:13-16).

1788.  On January 8, 2008, Ms. Gambon wrote in an email to DCF General Counsel Virginia Peel that "DEEC is coming at me again for closure on our public approval process.  I need your written response of the Family resource application issue ASAP."  (Trial Exhibit 516, Email from Mary Gambon to Virginia Peel re: DEEC public approval process, Jan. 8, 2008; Trial Exhibit 517, Email exchange between Mary Gambon and Virginia Peel re: DEEC public approval process, Jan. 18, 2008).

1789.  On April 23, 2008, Ms. Gambon wrote to DEEC Deputy Commissioner David McGrath, and acknowledged that DCF's several month delay in addressing open issues in relation to the DCF public approval process commenced in 2006.  She wrote, "[f]irst, let me apologize for the delay in our full response to the licensing approval process.  As you are aware, many changes have taken place at the Department in the past year that impacted on the information needed for completion of our response."  (Trial Exhibit 886, Letter from Mary Gambon to David E. McGrath re: Licensing of the Department of Social Services, Apr. 23, 2008, DCF004704213-15; s*ee also* Trial Exhibit 693, Email exchange between Pat Autori, Mary Gambon, and Virginia Peel re: DEEC License, Oct. 23, 2007).

1790.  On June 6, 2008, Tom Marino of DEEC transmitted to Pat Autori of DCF copies of the "Second Provisional Approval to Operate Foster Care Placement Agency" and "Second Provisional Approval to Operate an Adoption Agency" issued to DCF by the Department of Early Education & Care on May 25, 2006.  These "second" provisional approvals were six months in duration and each carried an expiration date of November 24, 2006.  (Trial Exhibit 518, Documents re: Foster Care and Adoption Placement Licenses, June 6, 2008).

1791.  On July 29, 2008, Ms. Gambon circulated DEEC Licenses for DCF to operate foster care and adoption programs to DCF Regional and Area Directors.  These licenses included an "Enhanced Regular License to Operate a Foster Care Placement Agency" and an "Enhanced Regular License to Operate an Adoption Agency."  (Trial Exhibit 520, DEEC Licenses, DCF004704201-02).  These "enhanced" licenses, issued by DEEC on July 25, 2008, were three years in duration and each carried an expiration date of July 24, 2011.  (*Id.*).

1792.  Ms. Gambon testified that when DEEC requested to expand DCF's licensing term from the two years specified by law to a three-year cycle, DCF was asked if it had any objection, and DCF indicated that it did not.  (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 232:8-233:4).  Ms. Gambon testified that she was unfamiliar with any provision of law that would permit DEEC to expand the license term from two to three years.  (*Id.* at 233:5-234:21).

1793.  On April 14, 2011, Ms. Gambon advised DCF management via email that the Department's licenses (approvals) to operate a Foster Care Placement Agency and an Adoption Agency were due to expire on July 24, 2011.  (Trial Exhibit 521, Email from Mary Gambon to Angelo McClain et al., Apr. 14, 2011).

1794.  On April 14, 2011, Ms. Gambon further advised via email: "Selection of Area and Regional Offices to be reviewed.  DEEC will select 5-6 area offices, 2-4 region offices. They have agreed to some input regarding selection from DCF.  We are hoping to narrow the reviews to 2 regional offices and 5 area offices."  (Trial Exhibit 521, Email from Mary Gambon to Angelo McClain, et al., Apr. 14, 2011).  Ms. Gambon testified that DEEC told DCF that "if there were [area] offices that we thought we wanted them to look at or not to look at, that there was some openness to that conversation."  (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 246:11-248:3.)

1795.  Ms. Gambon testified that DEEC then decided to review only three DCF area offices. (*Id.* at 248:3-249:17; Trial Exhibit 521, Email from Mary Gambon to Angelo McClain, et al., Apr. 14, 2011).  Ms. Gambon was unaware of the reason for this decision.  (*Id.*).

1796.  As a result of DEEC's invitation to provide input on the offices that should be studied, Ms. Gambon discussed the selection of offices with the four regional directors and Olga Roche, DCF Deputy Commissioner for Field Operations.  Both Ms. Roche and Raymond Pillidge, the Regional Director for the Northern Region, suggested that the Lowell office not be studied.  When DEEC selected Lowell as one of three area offices to be studied, Ms. Gambon then asked DEEC to substitute the Cambridge office for the Lowell office.  Mr. Pillidge had suggested the Cambridge office to Ms. Gambon because it had been newly assigned to him in the 2010 reorganization and he was unfamiliar with it.  (Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 253:5-257:6).

1797.  DCF also did not want DEEC to study the Lowell office because "there were personnel changes going on in the office" and because "as a result of the adoption reviews that [DCF] had done, [DCF was] also doing a more indepth [sic] review of that office's adoption work," particularly related to "timeliness of adoption" and "some of the clinical decisions relative to cases as they came into adoption."  (*Id.* at 255:12-21, 257:9-259:20).  As a result, DCF felt that Lowell "wasn't representative of the work of the agency."  (*Id.* at 257:9-259:20). Similarly, when asked about DEEC's initial selection of the Lowell office during the public approval process and the reason for the subsequent switch to the Cambridge office, Joy Cochran, DCF Director of Foster Care Support Services, testified that "Lowell was going through some significant management changes and was fairly unstable, and I don't think [it]

was thought to be representative of the region." (Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 149:21-150:4, 180:2-21). Deputy Commissioner Olga Roche testified that she rejected the Lowell office because "Lowell had gone through completely a change [sic] on the operational system of adoption in foster care" that resulted in the need for a new adoption supervisor, and because of performance problems with a worker and the departure of a family resources supervisor. (Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 108:15-109:19). Ms. Roche proposed to DEEC that instead, DCF would do its own internal review of the Lowell office. (*Id*. at 109:20-110:9). Notably, DCF did conduct such a review in August 2011, which concluded that "some practices in the Lowell Area Office . . . raised serious concerns about safety, permanency and the well being of the children," noting that "[i]nformation about sexual abuse was not adequately addressed . . . DA referrals were initiated but there was little or no follow up by DCF staff. Reports of neglect on open cases were not fully explored and no 51-A reports were made." (Trial Exhibit 1005, Document re: Central Office Review of Lowell Area Office, at DCF011131313).

1798.   Handwritten notes dated May 17, 2011 in relation to "Mtg. with DEEC" identify three Regional Offices, West, Southern and Northern, and three Area Offices, Cape Cod, Springfield and Cambridge, to be visited by DEEC in the 2011 public approval process. These notes further indicate that Cambridge was substituted for the Lowell Area Office. Thus, DEEC planned to visit just 3 of 29 Area offices. (Trial Exhibit 522, Documents re: DCF Public Approval, at DCF004704032). Deputy Commissioner Roche testified that the Cambridge office was "a good performance office" that is "small" and has a "small workload." (Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 110:20-111:17). Ms. Roche testified that the three offices reviewed did not have "severe" performance issues. (*Id*. at 111:1-9).

1799.   On May 31, 2011, Joy Cochran of DCF prepared a memorandum outlining the 2011 public approval process to be administered by DEEC. The "overview of the process" portion of the memorandum included: "Selection of Area and Regional Offices to be reviewed. DEEC will select 5-6 area offices, 2-4 region offices." (Trial Exhibit 39, Email from Joy Cochran to Faye Drain, May 31, 2011, and attached DEEC Public Approval for Adoption and Foster Care, at DCF005477733; *see also* Trial Exhibit 694, Email from Faye Drain to Raymond Burke, et al., June 24, 2011).

1800.   In response to written discovery, Defendants have stated that:

> [T]here was no public approval process conducted subsequent to the public approval process conducted in 2006 and prior to the public approval process DEEC conducted in 2011 for purposes of renewing the Enhanced Regular License to Operate a Foster Care Placement Agency issued on July 25, 2008. As such, there were no public approval site visits or case file reviews during such time.

(Trial Exhibit 945, Defs.' Supplemental Resps. to Pls.' Second Set of Interrogs. and all supporting exhibits and underlying documentation, May 7, 2012, p. 2).

1801.  In response to written discovery, Defendants have stated that "prior to the time period identified in this interrogatory, DCF, and its area offices, were granted a provisional license to Operate Foster Care Placement Agency that was in effect until November 24, 2006. EEC then never issued a new license to DCF, as they were waiting for DCF to make certain changes, but DEEC did inform DCF via email that DCF and its area offices could continue to operate under the provisional license, a copy of which is attached hereto as Exhibit C. On July 25, 2008, EEC issued to DCF and its area offices an Enhanced, 3-year License to Operate Foster Care Placement Agency, copies of which are attached hereto as Exhibit D." (Trial Exhibit 944, Defs.' Resps. and Objections to Pls.' Second Set of Interrogs. and all supporting exhibits and underlying documentation, Apr. 24, 2012, p. 12, Response to Interrogatory No. 14).

1802.  According to Ms. Cochran, as of April 13, 2012, DCF was still operating under the DEEC licenses that expired in July 2011.  (Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 159:12-15).  However, Deputy Commissioner Jan Nisenbaum reported that DEEC relicensed DCF in the spring of 2012. (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 180:15-23).

1803.  Although, as stated above, DEEC is authorized to enforce compliance with licensing regulations pursuant to 102 Mass. Code Regs. 1.00, §§ 1.07 through 1.09, Deputy Commissioner Nisenbaum was unaware of any instance in which DEEC had issued a notice to a DCF area office of a licensing violation.  (*Id.* at 175:5-10).

1804.  According to the website of the Executive Office of Education, "[p]lacement agencies must submit to EEC electronically An Agency Summary Report of Investigation Conclusions" on a quarterly basis.  (Trial Exhibit 501, Executive Office of Education, Reviewing Complaints and Incidents in Foster Care and Adoption Placement Agencies, Residential and Placement Licensing Policy Statement No: P-R&P-11, Sept. 25, 2008). However, when asked by Plaintiffs' counsel for this report, DCF responded that "DCF does not produce such a report.  EEC only requires private providers to produce that quarterly report."  (Contested Exhibit FQ, Email from Stephen Joseph to Laurence Borten re: Document Supplementation, Aug. 8, 2012, pp. 1, 6).

### D.    EOHHS Oversight

1805.  The Massachusetts Executive Office of Health and Human Services ("EOHHS") Secretary JudyAnn Bigby expressed her awareness of the need for effective performance management in statements published in a 2010 case study.

> I found there was a need for our priorities, budget decisions and program initiatives to be guided by data. . . . Our goal in launching a public-facing EHSResults Web site is to make the work of state government more transparent, so that consumers, stakeholders, legislators and policymakers have access to concrete data about our work. . . . As Secretary of Health and Human Services, I use the EHSResults performance management system regularly in my

> meetings with agency leaders to help guide their priorities, policies
> and programs.

(Trial Exhibit 834, Accenture & EHS Results, It's All About Results: Developing a government business culture based on performance management (2010), at 2-3).

1806.  EOHHS maintains a management reporting system known as "EHSResults."  This system tracks performance on individual outcome measures established for each EOHHS cluster agency, including DCF.  EOHHS publishes a periodic "Dashboard Detail Report" reflecting the status of agency performance on each assigned outcome measure.  EHSResults includes the following outcome measure for DCF, among others: "% of children living in foster care and residential placement kept safe from abuse or neglect by their caretakers." (*See, e.g.*, Trial Exhibit 963, EOHHS Dashboard Detail Report, Oct. 11, 2012, at DCF011421732).  Though the CFSR national standard on this safety outcome is 0.32% or lower, EOHHS has set and maintained a target for DCF of 1.2% with an additional 10% tolerance value.  (*Compare id.*, *with* Trial Exhibit 964, CFSR Measures – 12-Month Period Ending: 09/30/2012, p. 1).

1807.  The Dashboard Detail Report assigns one of three status indicators to an outcome measure to reflect current agency performance: a green circle if performance meets or exceeds the target, a yellow diamond if performance is within the 10% tolerance value, and a red square if performance falls outside the 10% tolerance value.  (Trial Exhibit 963, EOHHS Dashboard Detail Report, Oct. 11, 2012, at DCF011421720).  DCF has been assigned a green circle on the maltreatment in foster care outcome measure for every quarter from quarter four of 2008 through quarter four of 2012.  (*Id.* at DCF011421732; Trial Exhibit 963, EOHHS Dashboard Detail Report, Oct. 20, 2010 at DCF000790606).  Yet throughout this period, DCF performed within the bottom quartile of states on this principal Child and Family Services Review (CFSR) safety outcome.  (Trial Exhibit 1161, U.S. Department of Health & Human Services, Administration for Children and Families, Children's Bureau, Child Maltreatment 2011, p. 55).

1808.  In an October 21, 2009 email, DCF Commissioner McClain encouraged use of tolerance values in the EOHHS Dashboard Detail Reports.  Commissioner McClain stated: "If current performance is within 95% of the target, I think the dashboard should reflect that this level of performance is good. I think the calibration is too tight if a 'current value' that is only percentage points away from the target gets a down arrow."  Commissioner McClain went on to say: "These are minor issues, but I think the Secretariat should look to give itself 'full credit' for the excellent work that the agencies are doing."  (Trial Exhibit 335, Email from Angelo McClain to Melissa Pullin re: EHSResults: Monthly Dashboard Report, Oct. 22, 2009, and attached Dashboard Summary Report, Oct. 17, 2009; *see also* Trial Exhibit 499, Email from Melissa Pullin to Angelo McClain re: EHSResults: Monthly Dashboard Report, Oct. 23, 2009; Trial Exhibit 336, Email exchange between Melissa Pullin, Ruben Ferreira, and Angelo McClain, et al. re: EHSResults: Monthly Dashboard Report, Jan. 6, 2010, and attached Documents re: Agency Measures, Education and Support Services Eligibility Chart, and Department of Children and Families Educational and Vocational Support Services).

1809.  Upon receipt of the federal government's Child Maltreatment 2010 data, Secretary Bigby emailed Commissioner McClain the following: "I am very pleased that you are able to demonstrate meaningful progress in these indicators.  I thank you and your team for implementing this practice model and sticking through all the bumps in the road.  We are fortunate to have you as Commissioner."  (Trial Exhibit 1160, Email from Angelo McClain to DCF Senior Staff re: ACF/CB's Child Maltreatment 2010 is now available for public distribution, Dec. 16, 2011).  The performance Secretary Bigby referred to placed Massachusetts eighth worst out of forty-seven reporting jurisdictions with respect to the absence of maltreatment in foster care, with a rate of 0.78%.  (Trial Exhibit 1088, U.S. Department of Health & Human Services, Administration for Children and Families, Children's Bureau, Child Maltreatment 2010, at Table 3-20).

1810.  Secretary Bigby has delegated oversight of DCF to EOHHS Assistant Secretary for Children, Youth and Families Marilyn Chase.  Commissioner McClain was a direct report to Ms. Chase, and the two conducted bi-weekly meetings to make sure Ms. Chase is up to date on "key issues, initiatives within the agency . . . any problems that are occurring within the agency; to share information or have a dialogue regarding any pending policy discussions, budgetary issues . . . ."  (Deposition of Marilyn Chase, Assistant Secretary of EOHHS' Office of Children, Youth, and Families, May 21, 2012, at 24:18- 31:14).

1811.  Assistant Secretary Chase has not remained up-to-date on DCF's performance as reflected in the Dashboard Detail Report.  On May 21, 2012, Ms. Chase identified adoption as an area of strength for DCF.  (*Id.* at 135:21-136:22).  However, the contemporaneous Dashboard Detail Report revealed that the percent of all children in DCF custody with an identified goal of adoption who were adopted within 24 months from the time they last entered out-of-home care had trended downward, declining from 32.5% in the third quarter of 2009 to 22.3% in the second quarter of 2012.  (Trial Exhibit 963, Dashboard Detail Report, Apr. 20, 2012, at DCF010994676).

1812.   Ms. Chase does not receive any reports indicating the percentage of caseworker staff that has completed its mandatory training requirements.  She assumes DCF has ongoing in-service training that is mandatory for caseworkers, but she does not know if the collective bargaining agreement between DCF and SEIU 509 permits such training.  (Deposition of Marilyn Chase, Assistant Secretary of EOHHS' Office of Children, Youth, and Families, May 21, 2012, at 70:14-71:20).

1813.  Ms. Chase was not aware of negotiations between DCF management and the union regarding a proposed permanency policy.  She did not know that a draft policy had been in discussion for several years.  (*Id.* at 85:16-24).

1814.  Ms. Chase testified that the biggest action step DCF has undertaken to reduce the number of placement moves was to "place more emphasis on kinship care."  However, she stated that she is "[o]nly vaguely" familiar with the Kinship First initiative.  (*Id.* at 121:19-124:1).  She did not recall seeing any reports or data addressing the moves experienced by children in privately provided foster care.  (*Id.* at 125:23-126:10).

### E.    Management Performance Reviews

1815.   The Council on Accreditation standards provide that "[t]he agency holds both supervisors and supervised personnel accountable for performance and facilitates open, two-way communication as a means to encourage performance improvement." (Contested Exhibit QR, Council on Accreditation, Human Resources Management, § 6).

1816.   The Council on Accreditation standards further provide that that

> The performance review process assesses job performance, recognizes accomplishments, provides constructive feedback, and emphasizes self-development and professional growth, in relation to:
> a.  specific expectations defined in the job description;
> b.  agency-wide expectations for personnel;
> c.  objectives established in the most recent review, accomplishments and challenges since the last review period, and objectives for future performance;
> d.  developmental and professional objectives;
> e.  recommendations for further training, skill building, and other resources that may contribute to improved job performance; and
> f.  knowledge and competence related to the characteristics and needs of service recipients, if applicable.

(Contested Exhibit QR, Council on Accreditation, Human Resources Management, § 6.02).

1817.   Executive branch agencies within Massachusetts, including DCF, have utilized a statewide system called the Achievement and Competency Enhancement System ("ACES") to conduct performance reviews on individual managers.  Under the ACES system, there is to be an annual review of each manager as well as a six-month interim review, which are then both to be input into the ACES system.  (Deposition of Patricia Mackin, DCF Chief of Staff, Mar. 1, 2012, at 14:11-14; 15:18-16:5).

1818.   While the employee performance evaluation system ACES is available and expected to be completed across all agencies of state government, DCF Central Office management consistently testified that ACES reviews had not been conducted on them or their subordinates in the past year, and in some cases in more than two or three years.  (Deposition of Marilyn Chase, Assistant Secretary of EOHHS' Office of Children, Youth & Families, May 21, 2012, at 64:3-65:24; Deposition of Patricia Mackin, DCF Chief of Staff, Mar. 1, 2012, at 14:11-14; Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 8:17-9:23; Deposition of Olga Roche, DCF Deputy Commissioner for Field Operations, May 23, 2012, at 216:14-217:18; Deposition of Frances Carbone, DCF Director of Program Operations, Apr. 19, 2012, at 232:16-233:5; Deposition of Ruben Ferreira, Assistant Commissioner for Continuous Quality Improvement, Feb. 2, 2012, at 230:6-15, 232:1-4; Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 15:12-18:2).

1819.   Ms. Chase had not used the ACES system to review Commissioner McClain, or any management-level individual, in the last three or four years.  Ms. Chase stated the reason she

had not completed these reviews "is because they are a pain in the ass . . . I think it is a worthy, worthwhile, necessary, but super-cumbersome and trying process." (Deposition of Marilyn Chase, Assistant Secretary of EOHHS' Office of Children, Youth & Families, May 21, 2012, at 64:3-65:24).

1820. Patricia Mackin, DCF Chief of Staff, testified that although the Commonwealth has a system for conducting annual performance reviews, DCF "[does not] consistently do them well." (Deposition of Patricia Mackin, DCF Chief of Staff, Mar. 1, 2012, at 14:11-14). Ms. Mackin elaborated that "[w]e do not necessarily document them . . . documentation in the State form we're weak on." (*Id.* at 14:18-21). When asked why she had not completed an annual performance review for employees who directly reported to her since 2010, Ms. Mackin said she "just never did it. There's no forethought." (*Id.* at 16:12-18).

1821. Management at the regional and area office level also testified to not having been reviewed by their supervisors, and likewise have not utilized the ACES system to review their direct reports. (Deposition of Raymond Pillidge, DCF Regional Director for the Northern Region, Mar. 7, 2012, at 87:11-88:3, 88:21-23; Deposition of Raymond Burke, DCF Director of Areas for the Pioneer Valley, Jan. 19, 2012, at 125:22-126:1, 126:7-12, 127:1-128:8; Deposition of Joseph Collins, DCF Area Director for Franklin and Hampshire, Jan. 25, 2012, at 108:18-110:8; Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, Jan. 26, 2012, at 90:23-93:13; Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, Mar. 5, 2012, at 180:11-24, 181:13-182:5, 182:17-24).

1822. Joseph Collins, DCF Area Director for Franklin and Hampshire, testified that the performance criteria within DCF's supervisor evaluation program, have not kept up with changes in DCF, and as a result is "outdated and could be improved." (Deposition of Joseph Collins, DCF Area Director for Franklin and Hampshire, Jan. 25, 2012, at 114:13-116:9, 117:19-118:3). Mr. Collins further stated that, to his knowledge, the EPRS performance criteria had not changed in the past several years or in response to the implementation of the integrated case practice model system. (*Id.* at 116:19-117:5).

1823. Mr. Collins testified that some of his workers are consistently below DCF's state benchmarks for performance indicators and need aggressive follow-up. (*Id.* at 112:17-23). Mr. Collins has not considered implementing any written performance evaluation tool for area program managers and area clinical managers because "honestly I have enough things to attend to." (*Id.* at 116:10-18).

## F.    Office of the Child Advocate Oversight and 5-year Plan

1824. The Massachusetts Legislature, through a bipartisan Special Committee, published a report, "First, Do No Harm," on March 28, 2007. In this investigative report, the Special Committee found in relation to the DCF child welfare safety net: "A series of high profile cases in Massachusetts received national and international attention and serves as a constant reminder that the safety net has holes and the dragnet has flaws." (Trial Exhibit 500, First, Do No Harm: A Report of the House Committee on Child Abuse and Neglect, Mar. 28, 2007, at DCF006980235; *see also* Trial Tr., May 1, 2013 (McClain), at 119:6-120:2). The Special

Committee further made a "first and overarching recommendation" to appoint a secretary of child welfare whose "job description is to keep the spotlight on and focused on the child at risk and to check regularly on the safety net and dragnet to make sure they are both functioning properly." (Trial Exhibit 500, First, Do No Harm: A Report of the House Committee on Child Abuse and Neglect, Mar. 28, 2007, at DCF006980229-30). In addition, the Special Committee recommended that the secretary be charged with developing a five-year comprehensive plan, with periodic benchmarks, for a coordinated, system-wide response to child abuse and neglect. (*Id*. at DCF006980230-31).

1825.   In 2007, Governor Patrick established the Office of the Child Advocate ("OCA") through Executive Order 494. (Trial Exhibit 821, Executive Order No. 494 Establishing the Office of the Child Advocate; *see also* Trial Tr., Feb. 15, 2013 (Garinger), at 88:21-89:3). Subsequently, the Massachusetts General Court and Governor acted in July 2008 to enact Chapter 18C of the Massachusetts Code, an "Act Protecting Children in the Care of the Commonwealth." (Trial Exhibit 338, 2008 Mass. Acts No. 4905, § 46; *see also* Trial Tr., Feb. 15, 2013 (Garinger), at 90:24-91:2). This public law created the Office of the Child Advocate to serve the functions of the "secretary of child welfare" recommended by the Special Committee in "First, Do No Harm," including the development of a 5-year "comprehensive plan, with periodic benchmarks and cost estimates, to recommend a coordinated, system-wide response to child abuse and neglect, including related mental health, substance abuse and domestic violence issues." (Trial Exhibit 337, Mass. Gen. Laws ch. 18C, § 11(a) (2012)). The Office of the Child Advocate is also charged with critical incident review, annual reporting, and an advisory board role. (Trial Tr., Feb. 15, 2013 (Garinger), at 91:7-12; Mass. Gen. Laws ch. 18C, §§ 4, 5, 10 (2013)).

1826.   Former Commissioner McClain testified that in drafting the Child Welfare Protection Act of 2008, legislators sought guidance from him because they "didn't want to pass legislation that wouldn't ultimately get implemented" and that they "wanted to challenge the agency, but they didn't want to sort of overburden the agency." (Trial Tr., May 1, 2013 (McClain), at 119:19-121:3).

1827.   The OCA was established as an independent office that reports directly to the Governor. Mass. Gen. Laws ch. 18C, §§ 2, 3.

1828.   Gail Garinger currently serves as the Child Advocate in Massachusetts. She was previously a juvenile court judge for thirteen years, leaving the bench to take the position of Child Advocate in 2008. (Trial Tr., Feb. 15, 2013 (Garinger), at 84:17-85:3)

1829.   Ms. Garinger is the first Child Advocate to be appointed. (Trial Tr., Feb. 15, 2013 (Garinger), at 88:15-18).

1830.   The OCA is staffed by Ms. Garinger and three additional full-time employees, including a deputy director, clinical specialist, and program assistant. (Trial Tr., Feb. 15, 2013 (Garinger), at 92:11-23).

1831.   The OCA has a "very modest" appropriation. (Trial Tr., Feb. 15, 2013 (Garinger), at 93:12-13). The original budget for the office was $300,000. However, that was quickly

reduced by budget cuts to less than $244,000 in September 2008. The appropriation was just recently restored to $300,000 for fiscal year 2013. (*Id.* at 93:13-16).

1832.   The entire OCA budget is devoted to salaries. (Trial Tr., Feb. 15, 2013 (Garinger), at 94:19-22).

1833.   The Governor's office takes care of many of the OCA's "human resource functions." OCA also received a "very modest grant from the [] court improvement program for a particular project." No other supplemental funding is provided to OCA. (Trial Tr., Feb. 15, 2013 (Garinger), at 94:11-18).

1834.   Despite these constraints, Ms. Garinger testified that her office is consistently communicating what they learn from the myriad meetings they attend and reports they review from help line calls or other contacts. (Trial Tr., Feb. 15, 2013 (Garinger), at 104:5-19). The "specific information informs recommendations for policy. Our policy work informs the information we're able to give callers who might call in on our help line." (*Id.* at 104:20-23). "[G]enerally [the OCA is] trying to learn as much as we can to communicate that information to people in a way that we think might lead to policy changes to changes in regulations or changes in statutes." (*Id.* at 104:24-105:2).

### 1.      Comprehensive plan

1835.   The OCA is required to formulate a comprehensive plan "to recommend a coordinated, system-wide response to child abuse and neglect, including related mental health, substance abuse and domestic violence issues." (Trial Exhibit 337, Mass. Gen. Laws ch. 18C, § 11(a) (2012)).

1836.   The comprehensive plan must "look forward 5 years or more, shall be updated annually to plan for the ensuing 5-year period, shall assess previous efforts and, if appropriate, shall include legislative and regulatory recommendations, such as changes to the issues itemized in the comprehensive plan."  (Trial Exhibit 337, Mass. Gen. Laws ch. 18C, § 11(a) (2012)). The comprehensive plan must be filed annually. (Trial Exhibit 337, Mass. Gen. Laws ch. 18C, § 11(c) (2012)).

1837.   The comprehensive plan covers twenty-four items, with subparts. (Trial Tr., Feb. 15, 2013 (Garinger), at 113:3-7; *see also* Trial Exhibit 337, Mass. Gen. Laws ch. 18C, § 11 (2012)).

1838.   The comprehensive plan must examine the status of and address several issues, including:

a.   "the process of adopting children in foster care," and "recommend streamlined procedures to reduce the time required to complete the adoption process" (Trial Exhibit 337, Mass. Gen. Laws ch. 18C, § 11(d)(19) (2012)).

b.   "social worker caseloads," including "a potential multi-year plan to reduce caseloads" (Trial Exhibit 337, Mass. Gen. Laws ch. 18C, § 11(d)(8) (2012));

c.  "criminal offender record information reviews," including "the use of these reviews" in kinship placements and "areas for improved efficiency and equality" (Trial Exhibit 337, Mass. Gen. Laws ch. 18C, § 11(d)(15) (2012));

d.  "permanency planning for those who, due to their age, are transitioning out of the child welfare system to assist with health care, housing, higher education, long-term interpersonal connections and other needs for independent living"  (Trial Exhibit 337, Mass. Gen. Laws ch. 18C, § 11(d)(16) (2012));

e.  "oversight and peer review of the safety and effectiveness of the use of psychotropic drugs by children involved with executive agencies," (Trial Exhibit 337, Mass. Gen. Laws ch. 18C, § 11(d)(13)(iv) (2012)) and "the impact on child welfare efforts of the early and periodic screening, diagnostic and treatment services provision and reasonable promptness provision of the federal Medicaid law" (Trial Exhibit 337, Mass. Gen. Laws ch. 18C, § 11(d)(20) (2012));

f.  "social worker qualifications, including the infrastructure needed to support a more qualified workforce, such as full implementation of proposed programs at the child welfare institute and the transferability of certificate coursework to degree-granting programs" (Trial Exhibit 337, Mass. Gen. Laws ch. 18C, § 11(d)(11) (2012));

g.  "an estimate of the expenditure necessary to implement an annual adjustment to the daily rate for maintenance payments to foster care, adoptive and guardianship families, to provide care so as to meet the rate recommended periodically by the United States Department of Agriculture" (Trial Exhibit 337, Mass. Gen. Laws ch. 18C, § 11(d)(23) (2012));

h.  "critiques of the department," including "potential alignment of a [sic] internal or external audit unit with the department's continuous quality improvement and quality service review initiatives" and "dissemination of the findings of these critiques to policy makers within and outside of the department" (Trial Exhibit 337, Mass. Gen. Laws ch. 18C, § 11(d)(14) (2012));

i.  "examine the frequency of transitions in the treatment plans and living placements of foster children" (Trial Exhibit 337, Mass. Gen. Laws ch. 18C, § 11(d)(17) (2012));

j.  "federal funding available for child welfare purposes and factors affecting that finding," including "the Title IV-E saturation rate for foster children" and "expedited judicial determinations made within the required time frames" (Trial Exhibit 337, Mass. Gen. Laws ch. 18C, § 11(d)(22) (2012));

k.  and the status of issues including "delays in the fair hearing process"  (Trial Exhibit 337, Mass. Gen. Laws ch. 18C, § 11(d)(7)(iv) (2012)).

1839.  Pursuant to House No. 4905: An Act Protecting Children in the Care of the Commonwealth, the first comprehensive plan filed by the child advocate was due on June 30,

2010. (Trial Exhibit 338, 2008 Mass. Acts No. 4905, § 134; Trial Tr., Feb. 15, 2013 (Garinger), at 112:2-8).

1840.  Garinger testified that the comprehensive plan is "something that I have attempted to work on throughout my tenure as Child Advocate." (Trial Tr., Feb. 15, 2013 (Garinger), at 92:4-9). However, no plan has been filed with the Governor and limited progress has been made. (*Id*. at 112:9-21).

1841.  For example, although the OCA's prior clinical specialist, a part-time employee, researched caseloads for the comprehensive plan and educated the OCA about best practices with regard to ratios, there has not been any work since that employee left because the office had to "reassess our priorities and that was one that for the time we put aside." (Trial Tr., Feb. 15, 2013 (Garinger), at 96:7-98:5; *see also* Trial Exhibit 337, Mass. Gen. Laws ch. 18C, § 11(d)(8) (2012)).

1842.  Also as part of the comprehensive plan, the OCA must also examine CORI and background checks. (Trial Exhibit 337, Mass. Gen. Laws ch. 18C, § 11(d)(15) (2012); *see also* Trial Tr., Feb. 15, 2013 (Garinger), at 101:23-102:7). Garinger testified that area is "not a high priority with the office right now," although the office is "concerned about" the issue. (Trial Tr., Feb. 15, 2013 (Garinger), at 101:23-102:7).

1843.  Also, the OCA is charged with examining "social worker qualifications, including the infrastructure needed to support a more qualified work force." (Trial Exhibit 337, Mass. Gen. Laws ch. 18C, § 11(d)(11) (2012); *see also* Trial Tr., Feb. 15, 2013 (Garinger), at 98:7-12). Although the OCA's "prior clinical specialist had a strong link about the Child Welfare Institute, . . . that part of the work again ceased when she left." (Trial Tr., Feb. 15, 2013 (Garinger), at 98:13-18). The OCA has also "made some inquiry" about the curriculum for various schools of social work to see where Massachusetts might be able to add additional training to social worker education. (*Id*. at 98:20-24). Specifically, the OCA "has been very involved with trying to add better curricula around trauma informed care to social workers' curriculum." (*Id*. at 98:24-99:1). The "qualified work force issue across DCF" is something that OCA "has been attempting to work on and address." (*Id*. at 99:2-8). She testified that her office "feels very strongly that trauma informed care needs to be introduced at every level of education and training for agencies and personnel dealing with children." (*Id*. at 99:8-11). This recommendation would be in a comprehensive plan if it ever was filed. (*Id*. at 99:12-24).

1844.  Former Commissioner McClain testified that he would attend some of the OCA advisory board meetings and "provide input on the issues that were being discussed," but that the OCA did most of the work in between meetings. (Trial Tr. May 1, 2013 (McClain), at 124:18-125:12).

1845.  A DCF document titled "Office of the Child Advocate Comprehensive Plan" reflects that assignments were made to DCF officials to address particular areas for inclusion in the Comprehensive Plan.  (Contested Exhibit CS, Office of the Child Advocate Comprehensive Plan; *see also* Deposition of Patricia Mackin, DCF Chief of Staff, Mar. 1, 2012, at 181:8-18).

1846.   However, to date, the comprehensive plan described in Mass. Gen. Laws ch. 18C, § 11 (Trial Exhibit 337) has not been submitted. (Trial Tr., Feb. 15, 2013 (Garinger), at 111:9-21). According to the Office of the Child Advocate's Report, Fiscal Year 2011, the office's ability to formulate a comprehensive plan was "restricted by [its] current fiscal and staffing resources." (Trial Exhibit 339, Office of the Child Advocate Annual Report, Fiscal Year 2011, p. 6). In the fiscal year 2012 Annual Report of the OCA, the comprehensive plan is not mentioned nor its progress addressed. (*See* Trial Exhibit 691, Office of the Child Advocate Annual Report Fiscal Year 2012; *see also* Trial Tr., Feb. 15, 2013 (Garinger), at 112:12-21).

1847.   DCF's General Counsel, Virginia Peel, testified that she has not seen the OCA's comprehensive plan but "know[s] that she had some additional resource issues to comply with the five-year plan, so I don't even know whether she has or has not been able to submit that." (Deposition of Virginia Peel, DCF General Counsel, Feb. 8, 2012, at 64:10-17).

1848.   Ms. Nisenbaum also testified that she participated in providing information and specific language for inclusion in the draft OCA comprehensive plan.  (Deposition of Jan Nisenbaum, DCF's Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 47:7-48:15).  She could not, however, recall any specific information she provided concerning the required section of the Plan, assigned to her, Ruben Ferreira, and Commissioner McClain, devoted to "Critiques of the Department," other than "[putting] together a narrative that described what the department was doing in terms of aligning the internal and external audits, and that would have described some of the types of quality improvement activities that the department was undertaking."  (*Id*. at 48:16-52:12; Contested Exhibit CS, Office of the Child Advocate Comprehensive Plan, at DCF008644223).

1849.   Following what was then the two most recent quarterly advisory board meetings, Commissioner McClain did not discuss any actions being taken to formulate the comprehensive plan with DCF Chief of Staff Patricia Mackin, who served as a liaison between OCA and DCF, or task her with anything in relation to the formulation of the plan. (Deposition of Patricia Mackin, DCF Chief of Staff, Mar. 1, 2012, at 186:13-24).

1850.   Ms. Garinger testified that "[g]iven the other core responsibilities of the office and given the limited resources we have, I have not been able to produce that plan." (Trial Tr., Feb. 15, 2013 (Garinger), at 112:17-21).

1851.   Garinger testified that she did not believe, at this point, that OCA could publish a comprehensive plan to "satisfy the requirement in the legislation." (Trial Tr., Feb. 15, 2013 (Garinger), at 113:23-114:1; *see also* Trial Tr., May 1, 2013 (McClain), at 125:17-126:25, 128:8-12). Although she believes some of the issue areas identified for examination in the comprehensive plan have been discussed in some annual reports or on the website, she could not publish any of those subparts to satisfy the requirement of the legislation at this time. (Trial Tr., Feb. 15, 2013 (Garinger), at 113:23-114:17).

1852.   Garinger "remain[s] optimistic that at some point in time there may be a comprehensive plan." (Trial Tr., Feb. 15, 2013 (Garinger), at 114:18-25).

### 2.    Critical Incidents

1853.   DCF is required to "inform the child advocate when a critical incident has occurred." The child advocate may then conduct an investigation or review the agency's investigation of the critical incident. Mass. Gen. Laws ch. 18C, § 5(a) (2013).  (*See also* Deposition of Virginia Peel, DCF General Counsel, Feb. 8, 2012, at 136:21-139:10).

1854.   OCA takes the critical incident reports and 51B reports "very seriously" and reviews each report. (Trial Tr., Feb. 15, 2013 (Garinger), at 104:14-19).

1855.   However, DCF has repeatedly failed to provide the OCA with information about child fatalities and critical incidents. (Email exchange between Marilyn Chase and Patricia Mackin re: receipt of reports from EHS, Mar. 11, 2010; Trial Exhibit 688, Email exchange among Marilyn Chase, Angelo McClain, and Stacey Monahan re: Case Investigation Unit - Fatality Reports, Oct. 19, 2011; Trial Exhibit 689, Email exchange among Marilyn Chase, Gail Garinger, and Stacey Monahan re: Critical Incident Reports, Jan. 13, 2012).

1856.   In March 2011, the Child Advocate asked for access to DCF's FamilyNet database, but DCF's General Counsel, Virginia Peel, expressed her opinion that the Child Advocate was "overreaching in her role."  (Trial Exhibit 690, Email Exchange between Virginia Peel and Maureen McGee re: Draft OCA meeting agenda, Mar. 8, 2011, at DEF000269314).  To the contrary, Mass. Gen. Laws Ch. 18C had recently been amended, effective July 1, 2011, to grant the Child Advocate access to DCF's electronic records system.  (Trial Exhibit 691, Office of the Child Advocate, Annual Report Fiscal Year 2012, p. 6).

1857.   Several years after the creation of the OCA to serve as an overseer, DCF Chief of Staff Patricia Mackin wrote in relation to OCA oversight: "I think the entire process gets me worried. [DCF doesn't] review any [institutional abuse cases forwarded to the OCA] and [the OCA goes] over them with a fine tooth comb."  (Trial Exhibit 442, Email exchange among Patricia Mackin, Jan Nisenbaum, and Virginia Peel, re: Institutional Abuse Claims, Apr. 13, 2011).  DCF Assistant Commissioner Jan Nisenbaum responded:

> If we're sending them to the OCA, I'll set up a process with Scott [Scholefield] to review them before they go. Angelo [McClain] asked recently that we no longer include any recommendations in the reports, but I'm concerned that Gail [Garinger] will want to know why we're not doing that anymore. Maybe we should sit down and review with Scott what types of things the OCA is raising.

(*Id*.).

1858.   When provided with the required reports, the OCA has been able to gain some critical insight into DCF procedures. For example, in its fiscal year 2011 Annual Report, the OCA described a DCF institutional abuse and neglect investigation involving two boys placed by DCF with a private child placing agency. The boys were not being adequately fed by their foster mother, and the younger boy was observed not to be gaining weight. These conditions

were only discovered after the foster mother assaulted another adult with one of the boys present, and law enforcement responded to the home and conducted interviews.  As a result, the OCA raised concerns regarding DCF's monitoring of contracting agencies. (Trial Exhibit 339, Office of the Child Advocate Annual Report, Fiscal Year 2011, p. 5; *see also supra* VIII.B).

1859.  Garinger testified that "if the state chooses to intervene in any way," it has an obligation to do everything they can "to improve the situation for kids and families." (Trial Tr., Feb. 15, 2013 (Garinger), at 110:17-20).

### 3.      Psychotropic Medications

1860.  Massachusetts Child Advocate Gail Garinger formed and convened the *Rogers* Working Group ("RWG"), a group formed to "take a look at [the *Rogers* process] and to see if we felt that it was serving its purpose and to . . . decide whether we felt that we would recommend changing that process in some way." (Trial Tr., Feb. 15, 2013 (Garinger), at 115:17-116:5). RWG included representatives from DCF, OCA, and others involved with the issue of psychotropic medication for foster youth. (*Id*. at 116:13-20; *see supra* § VII.B.4 (¶¶ 1350-1369)).

1861.  According to the minutes of the June 10, 2009 *Rogers* Process Working Group, there was a concern reflected at the meeting that "the *Rogers* process may not achieve its intended purpose of assuring appropriate use of antipsychotic medications for children in DCF custody."  (Trial Exhibit 630, *Rogers* Process Working Group Minutes, June 10, 2009, at DCF004956552; *see supra* § VII.B.4 (¶¶ 1350-1369)).

1862.  Ms. Garinger testified to the failures of the *Rogers* process, including the inadequacy of training for judges who are making decisions about antipsychotic medication, particularly in light of the variable quality of the guardians ad litem who were making recommendations to the court a narrow focus on only antipsychotic medication.  (Trial Tr., Feb. 15, 2013 (Garinger), at 118:14-21).  Ms. Garinger further testified that the process is cumbersome and as a result "sometimes led to delays in treatment of children with appropriate medications, or it led perhaps to physicians changing their opinion about what would be the best medications to avoid the *Rogers* process, or it led to a focus on a narrow class of medications as opposed to looking at the full picture of what medications the child was receiving in the context of a comprehensive behavioral health treatment plan."  (*Id*. at 118:14-119:11).

1863.  Plaintiffs' expert, Dr. Bellonci, agreed that DCF does not have the capacity to know whether the *Rogers* process is being adhered to or whether there is active authorization for antipsychotic medications that have been prescribed to children.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 89:17-21, 90:6-12).

1864.  Ms. Garinger testified that "it felt at times like we have this very, sort of on paper great process for looking at a particular class of medications for kids, but we were missing the child, we were missing the behavior."  (Trial Tr., Feb. 15, 2013 (Garinger), at 119:12-21). She further testified that "it was time to take a look at it given that there's been a proliferation of psychotropic medication usage, and this only dealt with the antipsychotics." (*Id*.).

1865.  To Dr. Bellonci's knowledge, no recommendations that came out of the *Rogers* Working Group are being implemented.  (Trial Tr., Jan. 24, 2013 (Bellonci), at 35:23-36:1).

## IX.    Family Association

### A.    Professional Standards

1866.  Under federal and state law, Massachusetts regulation, and DCF policy, DCF is required to place siblings together in foster care unless such placement would be contrary to the children's safety or well-being.  42 U.S.C. § 671(a)(31) (2010).  (Trial Exhibit 164, Mass. Gen. Laws ch. 119, § 23(c) (2009); Trial Exhibit 69, 110 Mass. Code Regs. 7.101(4) (2013); Trial Exhibit 1, Placement Prevention and Placement Policy, DSS Policy No. 90-004(R), Feb. 10, 1998, DCF Case Practice Policy and Procedures Manual, at DCF POL (7/08) 170; s*ee also* Trial Tr., Feb. 28, 2013 (Crabtree), at 75:15-76:22; *see supra* § III.A.1).

1867.  When placement together is contrary to the siblings' safety or well-being, DCF is required under federal law to arrange frequent visitation.  42 U.S.C. § 671(a)(31) (2010).  (S*ee also* Trial Tr., Feb. 28, 2013 (Crabtree), at 75:21-76:16).

1868.  Similarly, under state law, DCF is required:

> [W[henever reasonable and practical and based upon a determination of the best interests of the child, [to] ensure that children placed in foster care shall have access to and visitation with siblings in other foster or pre-adoptive homes or in the homes of parents or extended family members throughout the period of placement in the care and custody of the department, or after such placements, if the children or their siblings are separated through adoption or long-term or short-term placements in foster care.

(Trial Exhibit 180, Mass. Gen. Laws ch. 119 § 26B(b); *see also* Trial Tr., Feb. 28, 2013 (Crabtree), at 76:17-77:5; Trial Exhibit 1038, Sibling Bill of Rights Presentation, May 24, 2012, at DCF011325252).

1869.  DCF policy and regulation also require that children in care who are not placed with their siblings have the opportunity for contact with their siblings where possible and appropriate. Reasonable efforts must be made to provide for visitation with siblings, unless such visitation would be harmful to the child or sibling.  (Trial Exhibit 1, Ongoing Casework and Documentation Policy, DSS Policy No. 86-011, Feb. 10, 1998, DCF Case Practice Policy and Procedures Manual, at DCF POL (7/08) 139-140; Trial Exhibit 69, 110 Mass. Code Regs. 7.101(4) (2013)).

1870.  At the time of initial placement, DCF or the court must ensure that sibling visitation is "implemented through a schedule of visitations or supervised visitations."  (Trial Exhibit 180, Mass. Gen. Laws ch. 119, § 26B(b) (2008)).  DCF policy requires DCF to establish a child-family visitation schedule which should include contact with the child's sibling(s) if possible and appropriate.  (Trial Exhibit 1, Ongoing Casework and Documentation Policy,

DSS Policy No. 86-011, Feb. 10, 1998, DCF Case Policy Practice and Procedures Manual, at DCF POL (7/08) 140).

1871.   On May 24, 2012, Commissioner McClain, Youth and Representatives of the Massachusetts Department of Children and Families signed a Sibling Bill of Rights that recognizes the importance and value of sibling relationships.  (Trial Exhibit 731, Department of Children and Families, Sibling Bill of Rights, May 24, 2012).  The Bill states that every foster child shall be placed in close proximity to their siblings if placement in the same setting is not possible, and that every foster child shall have consistent, predictable, and regular contact with siblings.  In addition, it states that every foster child "[s]hall be afforded contact with siblings regardless of geographic barriers."  (*Id.*; *see also* Trial Exhibit 1038, Sibling Bill of Rights Presentation, May 24, 2012, at DCF011325257).

1872.   DCF Policy also requires that DCF provide children the opportunity for contact with their parents at least once per month.  In most cases, contact should occur as frequently as once per week or once every other week.  (Trial Exhibit 1, Ongoing Casework and Documentation Policy, DSS Policy No. 86-011, Feb. 10, 1998, DCF Case Practice Policy and Procedures Manual, at DCF POL (7/08) 140).

1873.   Professional organizations emphasize the importance of preserving sibling and parent relationships.  The Council on Accreditation standards provide that "[a] placement that can meet the child's needs is selected in accordance with the following priorities: a. with siblings; b. with kin; or c. with a family that resides within reasonable proximity to the child's family and home community."  (Contested Exhibit RQ, Council on Accreditation, Foster Care Services Standards, § 6.03).

1874.   The Child Welfare League of America standards provide that foster care agencies "should recognize the right of siblings to be placed together while in family foster care." (Contested Exhibit QY, Child Welfare League of America, Standards of Excellence for Family Foster Care Services, § 2.30; *see also* Trial Tr., Feb. 28, 2013 (Crabtree), at 78:5-19). "If siblings must be placed with separate foster families, frequent and regular ongoing contact between the children should be maintained."  (Contested Exhibit QY, Child Welfare League of America, Standards of Excellence for Family Foster Care Services, § 2.30).

1875.   The Council on Accreditation standards provide that "[u]nless contraindicated, regular visits and ongoing contact occur between the child, parents, and siblings, and support is provided to help the child maintain positive relationships with: a. extended family; b. individuals with whom the child had a prior relationship; and c. members of the child's faith community or tribe."  (Contested Exhibit RR, Council on Accreditation, Foster Care Services Standards, § 7.01; *see also* Trial Tr., Feb. 28, 2013 (Crabtree), at 77:12-78:4, 82:5-17).

B.    **Depriving Children of Their Family Connections Causes Harm and Risk of Harm**

1876.   The failure to place children with their siblings in foster care can cause them harm. Plaintiffs incorporate herein *supra* § III.A.2.

1877.   The disruption of the relationship between siblings who have been maltreated may create even more severe trauma for children than the stress of home removal and separation from their parents.  (*See supra* ¶¶ 331-32).

1878.   Plaintiffs' expert Cathy Crabtree testified that when children are removed from home and placed in foster care, being placed separately from their siblings "compounds the trauma." Thus, visitation among siblings is "extremely important."  It allows siblings to maintain "emotional ties" and can provide a sense of security for children while they are away from home.  (Trial Tr., Feb. 28, 2013 (Crabtree), at 75:5-14).

1879.   Dr. Azzi-Lessing testified that "[s]iblings who enter care due to parental abuse or neglect often cope by [forming] healthy and meaningful relationships with each other, the disruption of [which] may cause even more severe trauma than the stress of separation from their parents."  (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 27:14-18; *see also* Trial Exhibit 1073, Sharon Connor, National Resource Center for Family-Centered Practice and Permanency Planning, Information Packet:  Siblings in Out-of-Home Care (2005), p. 3).

1880.   The maintenance of sibling relationships:

> [C]an nurture a sense of stability and continuity in the lives of foster youth.  Oftentimes, children who are abused or neglected by their caregivers have especially strong ties to one another and separating them may cause additional trauma.   Moreover, the emotional support of the sibling bond can provide a sense of safety as children enter foster care.

(Trial Exhibit 1094, Michelle Cohn, Sibling Placement: The Importance of the Sibling Relationship for Children in Foster Care (2012), p. 2 (internal citations and quotations omitted); *see also* Trial Tr., Feb. 28, 2013 (Crabtree), at 103:8-104:8).

1881.   DCF's Sibling Bill of Rights recognizes that "sibling relationships provide needed continuity and stability" for children in foster care and that sibling separation is "a significant and distinct loss that must be repaired by frequent and regular contact."  (Trial Exhibit 731, Department of Children and Families Sibling Bill of Rights, May 24, 2012, p. 1).

1882.   The Sibling Bill of Rights additionally recognizes that "every foster child deserves the right to know and be actively involved in his/her siblings' lives absent extraordinary circumstances."  (*Id.*).

1883.   According to a document prepared by AdoptUsKids: "Preserving the bond between brothers and sisters is an essential part of their long-term emotional well-being.  Placing siblings together, or enabling them to maintain contact when they are separated, preserves their connections with one another and to their family.  This results in improving long-term safety, well-being and permanency."  (Trial Exhibit 729, Sibling Group Considerations at Every Step for the Recruitment and Retention of Kinship, Foster and Adoptive Families, at DCF009019218).

1884.   The Council on Accreditation standards for child welfare agencies relating to "Foster Care Services" provide that "positive, frequent parent-child visitation: enhances the well-being and positive development of the child; promotes placement stability; increases the likelihood of reunification; and facilitates the timely achievement of permanency goals." (Contested Exhibit RR, Council on Accreditation, Foster Care Services Standards, § 7.01).

1885.   Similarly, Child Welfare League of America standards provide that "[v]isits help children to sustain an emotional connection to their families."  (Contested Exhibit QZ, Child Welfare League of America, Standards of Excellence for Family Foster Care Services, § 2.42; Trial Tr., Feb. 28, 2013 (Crabtree), at 82:18-83:4).

1886.   DCF has acknowledged that a child's well-being is enhanced when a positive and ongoing connection with fathers is maintained.  (Trial Exhibit 94, Child and Family Services Plan FY2010-FY2014, at DCF007054454).

1887.   DCF policy states that child visitation with his or her family is vital to the process of identifying and implementing a permanent plan for the child. (Trial Exhibit 1, Ongoing Casework and Documentation Policy, DSS Policy No. 86-011, Feb. 10, 1998, DCF Case Practice Policy and Procedures Manual, at DCF POL (7/08) 139; see also Trial Exhibit 57, Child and Family Services Review Statewide Assessment, May 2007, at CSF-000000663).

1888.   DCF's Child and Family Services Plan for fiscal years 2010-2014 states that "[m]aintaining a close connection through phone calls and regular visits with parents and siblings during the time a child is in an out of home placement is important to achieving timely reunification."  (Trial Exhibit 94, Child and Family Services Plan FY2010-FY2014, at DCF007054451; see also Rule 30(b)(6) Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, re: Visitation and Permanency Planning, Sept. 28, 2011, at 99:23-100:14).  DCF has acknowledged that "research shows that supervised visits of high quality result in earlier reunifications."  (Trial Exhibit 57, Massachusetts Child and Family Services Review Statewide Assessment, May 2007, at CSF-000000633).

### C.    DCF Fails to Consistently Place Siblings Together or to Provide Regular Sibling Visitation

1889.   DCF fails to consistently place children together with their siblings in foster care when such placement would be safe and in the children's best interests.  Plaintiffs incorporate herein supra § III.A.3.

1890.   In addition, DCF fails to ensure that children who are not placed together with their siblings in foster care have regular visits.  The review of case files conducted by Plaintiffs' expert the Children's Research Center revealed that more than half (56.4%) of the 110 children in the entry cohort who had siblings in foster care and were not placed with all of their siblings had no sibling visits recorded during the period under review.  (Trial Exhibit 1071, Alternate View Table 16, Memorandum from Kristen Johnson to Larry Borten, Sara Bartosz, and Children's Rights re: Additional Analyses of Sample Child Placement and Contact with Siblings, Oct. 18, 2012; see also Trial Tr., Jan. 31, 2013 (Johnson), at 112:12-113:10).  In fact, just 13.6% of children in the entry cohort had visits with siblings in separate

foster care placements every month during the period under review, and more than 75% had sibling visits during fewer than half of all months in the review period.  (Trial Exhibit 1071, Alternate View: Table 16, Memorandum from Kristen Johnson to Larry Borten, Sara Bartosz, and Children's Rights re: Additional Analyses of Sample Child Placement and Contact with Siblings, Oct. 18, 2012).  This data was based on a sample size of 110 children for whom this measure was applicable, and the inter-rater reliability for this measure exceeded 80%.  (*Id.*; *see supra* ¶ 80; Trial Exhibit 1069, Table 3, Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC) and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowsky, October 19, 2012, Nov. 19, 2012).

1891.  Sibling visits occurred even less frequently for children in the two-year cohort.  CRC found that 61.7% of children in the two-year cohort had no visits with siblings in separate foster care placements recorded during the period under review.  (Trial Exhibit 1071, Alternative View Table 43B, Memorandum from Kristen Johnson to Larry Borten, Sara Bartosz, and Children's Rights re: Additional Analyses of Sample Child Placement and Contact with Siblings, Oct. 18, 2012; *see also* Trial Tr., Jan. 31, 2013 (Johnson), at 112:12-113:10).  Less than one percent of children in the two-year cohort had visits with siblings in separate foster care placements every month during the period under review, and only 5% had visits in at least half of all months.  (Trial Exhibit 1071, Alternative View Table 43B, Memorandum from Kristen Johnson to Larry Borten, Sara Bartosz, and Children's Rights re: Additional Analyses of Sample Child Placement and Contact with Siblings, Oct. 18, 2012).  This data was based on a sample size of 162 children for whom this measure was applicable, and the inter-rater reliability for this measure exceeded 80%.  (*Id.*; *see supra* ¶ 80; Trial Exhibit 1069, Table 3, Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC) and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowsky, October 19, 2012, Nov. 19, 2012).

1892.  DCF officials are aware of cases where less-than-monthly sibling visitation has been approved.  (Rule 30(b)(6) Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, re: Visitation and Permanency Planning, Sept. 28, 2011, at 103:7-17).  In addition, Mr. Fitzsimons testified that he assumed there were cases where sibling visitation does not occur when a child is in a pre-adoptive home separated from siblings.  (*Id.* at 109:16-21).

1893.  DCF has acknowledged that "[s]ibling connections are not supported when the sibling group is separated, nor there is [sic] a plan developed to maintain these connections.  Siblings are likely to see each other only when a supervised visit with both or one biological parent occurs."  (Trial Exhibit 1039, Document re: WAO Siblings in Placements, at DCF011069834).

### 1.    Named Plaintiffs and Individual Children

1894.  DCF failed to place the Named Plaintiffs and Lauren James with their siblings when it was safe and appropriate.  (*See supra* § III.A.3).

1895.  Ms. Sullivan testified that the children for whom she advocates often discuss with her how they would like to visit with their siblings. (Trial Tr., Feb. 6, 2013 (Sullivan), at 99:7-24).

1896.  Ms. James was not given many opportunities to visit with her siblings.  (Trial Tr., Jan. 22, 2013 (James), at 59:10-14).  The visits she did have were "infrequent" and, for the most part, held in the DCF offices for an hour or two.  (*Id.* at 59:14-61:12).  Ms. James testified that "[i]n a good year [visits with her siblings] could have been once or twice, maybe up to three or four times."  It was not a "constant visitation schedule."  (*Id*. at 59:14-18).  Ms. James asked DCF to visit with her siblings more frequently, in particular after discovering that her brothers were visiting each other without her.  (*Id.* at 61:1-8).  Ms. James further testified that it was "extremely painful" to see her brothers for such a short amount of time.  (*Id.* at 61:10-12).

1897.  Ms. James testified that it is difficult still to get in touch with her brothers and she does not know where all of them are.  (*Id.* at 61:13-62:7).

1898.  DCF did not conform with Massachusetts regulation and DCF policy in its care of Named Plaintiff Adam S.; he was rarely provided with sibling visitation.  (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 21:8-22:3, 22:17-24:18, 71:16-72:2; Trial Exhibit 69, 110 Mass. Code Regs. 7.101 (2013); Trial Exhibit 1, DCF Case Practice Policy and Procedures Manual, at DCF POL (7/08) 139-40; Trial Exhibit 1182, DCF Case File: Adam S., at DCF010806064, DCF010177599, DCF003634886, DCF010177497).  Dr. Azzi-Lessing testified that the lack of contact between Adam and his sisters was "obviously of concern" because he had "so little stability in his life" and because his parents and grandfather were "out of the picture."  (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 21:24-22:3).

1899.  DCF also failed to provide sufficient sibling contact for Named Plaintiff Camila R.  (Trial Tr., Feb. 5, 2013 (Lessing), at 72:3-15; Trial Exhibit 1184, DCF Case File: Camila R., at DCF010199825-39, DCF010199847-51, DCF010199861, DCF010200570-73, DCF010199959-200087; Contested Exhibit NY, DCF Case File: Camila R., at DCF000006336-38).

### D.    DCF Fails to Consistently Provide Regular Child-Parent Visitation

1900.  DCF fails to ensure that children have regular visitation with their parents whose parental rights have not been terminated.  CRC found that only 37.6% of children in the entry cohort had monthly visits with their parents during each month of the period under review, as required by DCF policy.  (Trial Exhibit 1066, Table 16, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; *see also* Trial Tr., Jan. 30, 2013 (Freitag), at 87:6-88:18).  13.4% of the children in the entry cohort had no visits with their parents during the entire period under review, and 22.1% had visits during fewer than half of those months.  (Trial Exhibit 1066, Table 16, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012).  This data was based on a sample size of 194 children for whom this measure was applicable, and the inter-

rater reliability for this measure exceeded 80%. (*Id.*; *see supra* ¶ 80; Trial Exhibit 1069, Table 3, Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC) and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowsky, October 19, 2012, Nov. 19, 2012).

1901.   In September of 2010, Patricia Mackin forwarded to DCF Commissioner Angelo McClain and EOHHS Deputy Secretary Marilyn Chase an email from Jennifer Kirsch, an attorney representing parents involved in Care & Protection Proceedings in the Pittsfield and North Adams Juvenile Court. Ms. Kirsch stated that "[b]ecause of serious cutbacks to the DCF budget, many of my client's visits with their children[] have been cut back." (Trial Exhibit 728, Email from Patricia Mackin to Angelo McClain, Marilyn Chase, and Andrea Dodge re: DCF - North Adams Office, Sept. 28, 2010, at DCF005173072).

### E.    DCF's Historic Failures to Ensure That Family Relationships Are Maintained

1902.   DCF has historically failed to place children together with their siblings in foster care. Plaintiffs hereby incorporate *supra* § III.A.4. DCF does not track the rate at which siblings are placed together, and has failed to take action to increase sibling placements when in the children's best interests. (*See supra* § III.A.4).

1903.   In the second round of the CFSR, child visits with parents and siblings was identified as an area needing improvement. The federal government determined that DCF had "made concerted efforts to ensure that [child-parent and sibling] visitation was of sufficient frequency to meet the needs of the family" in only 76% of cases. This performance was below the federal benchmark of 90% for this outcome measure. In 47% of applicable cases reviewed, children in foster care visited with siblings less frequently than once per month. (Trial Exhibit 58, Massachusetts Child and Family Services Review Final Report, Feb. 21, 2008, at CSF-000000784-85).

1904.   Further, in 39% of applicable cases reviewed, children in foster care had no visitation whatsoever with their fathers, and in 34% of applicable cases reviewed, children in foster care visited with their mothers less frequently than once per month. (*Id.*).

1905.   Visitation with parents and siblings in foster care were also identified as key issues for development in DCF's Program Improvement Plan ("PIP"). (Trial Exhibit 34, MA CFSR 2007: Summary of Key Issues for PIP Development, at DCF008117148; Trial Exhibit 33, Massachusetts Child and Family Services Review Program Improvement Plan, Oct. 5, 2009, p. 7). However, the PIP Quarterly Reports, which reflect DCF's progress on action steps and benchmarks identified in the PIP, do not report on DCF's performance with regard to either sibling or parent contact. (*See* Trial Exhibits 587-592, 373, and 760, DCF PIP Quarterly Reports for Quarters One through Eight).

1906.   Moreover, the only identified action step in DCF's PIP which directly related to sibling or parent visitation was to strengthen data collection and reporting, and to enhance the case review process to include placement with siblings and sibling and parent contact. The goal of refining the case review process was determined to be complete in Quarter Four, after the

Children's Bureau approved a time-limited case review process involving a small sample of cases. (Trial Exhibit 590, DCF PIP Quarterly Report, Quarter Four, at DCF000871713).

1907.  In a 2011 DCF document, the Department acknowledged the need to determine how to best document reasonable efforts to provide frequent visitation between siblings, or exceptions where it is determined that visitation is contrary to a sibling's safety or well-being. (Trial Exhibit 196, Implementation Plan for the Fostering Connections to Success and Increasing Adoptions Act, pp. 6-7).

1908.  As of 2012, DCF still does not track the rate at which siblings placed separately in DCF foster care are provided visitation with one another.  (Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, Mar. 5, 2012, at 261:1-4; Deposition of Raymond Burke, DCF Director of Areas for the Pioneer Valley, Jan. 19, 2012, at 238:6-239:15).

1909.  Former Commissioner McClain testified that DCF has no management report to track sibling visitation when siblings are separated in foster care.  (Trial Tr., May 6, 2013 (McClain), at 107:16-22).  He testified that DCF did not consider including a measure for sibling visitation on DCF's CFSR Scorecard.  (*Id*. at 106:12-15).

1910.  DCF's regularly produced management reports do not include data about sibling visits. (Trial Tr., May 6, 2013 (McClain), at 107:3-22; *see also* Trial Exhibit 954, Monthly Operations Statistical Report, May 2012; Trial Exhibit 220, Report Schedule).  DCF does not maintain or distribute any aggregate data or periodic report concerning the frequency of visitation between children in placement and their siblings who have been placed separately. (Rule 30(b)(6) Deposition of Ruben Ferreira, DCF Assistant Commissioner for Continuous Quality Improvement, re: Data Collection and Retention, Aug. 23, 2011, at 125:1-17; Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, re: Fostering Connections to Success and Increasing Adoptions Act, Apr. 24, 2012, at 521:3-11; Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, Mar. 5, 2012, at 261:1-4; Deposition of Raymond Burke, DCF Director of Areas for Pioneer Valley, Jan. 19, 2012, at 238:6-19; *see also* Deposition of Virginia Peel, DCF General Counsel, Feb. 8, 2012, at 84:13-23).

1911.  DCF's upgraded i-FamilyNet 2.0 data management system cannot report data regarding the frequency of sibling visitation.  (Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: the Program Improvement Plan, Apr. 4, 2012, at 113:17-22).  A case read would be necessary in order to capture aggregate data regarding sibling visitation.  (*Id*. at 114:6-9).

1912.  FamilyNet has the capacity to provide workers with prompts or "ticklers" to perform tasks that are due, but no prompt or "tickler" has been implemented with respect to sibling visits.  (Deposition of Rosalind Walter, DCF Director of Data Management, Jan. 4, 2012, at 81:12-83:1).

1913.  DCF officials have acknowledged that they are unaware of a typical schedule of sibling visits that would be in a child's Service Plan.  (Rule 30(b)(6) Deposition of Paul Fitzsimons,

DCF Regional Director for the Western Region, re: Visitation and Permanency Planning, Sept. 28, 2011, at 83:6-15).

1914.   DCF policy does not provide any guidance about what constitutes frequent sibling visitation, and DCF does not provide a minimum expectation for the frequency of visitation among siblings. (Trial Exhibit 1, Ongoing Casework and Documentation Policy, DSS Policy No. 86-011, Feb. 10, 1998, DCF Case Practice Policy and Procedures Manual, at DCF POL (7/08) 139-142; Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, re: Fostering Connections to Success and Increasing Adoptions Act, Apr. 24, 2012, at 520:21-521:2; Rule 30(b)(6) Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, re: Visitation and Permanency Planning, Sept. 28, 2011, at 83:6-15, 103:2-5).

1915.   DCF has done nothing beyond basic casework assessment to ensure that sibling visitation continues to take place after siblings have been placed in separate adoptive homes, which is required by statute.  (Rule 30(b)(6) Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, re: Visitation and Permanency Planning, Sept. 28, 2011, at 107:17-109:10).

1916.   A DCF Area Director testified that he does not know whether individual workers in his areas always provide sibling visitation.  (Deposition of Joseph Collins, DCF Director of Areas for Franklin and Hampshire, Jan. 25, 2012, at 221:14-222:1).

1917.   Dr. Azzi-Lessing testified that a common theme that she found in her review of the Named Plaintiffs' files was "DCF's failure to support and maintain the important sibling relations, relationships between children in custody and their siblings."  (Trial Tr., Feb. 5, 2013 (Azzi-Lessing), at 71:17-19).

1918.   DCF is not managing sibling visitation in conformance with accepted professional judgment.  (Trial Tr., Feb. 28, 2013 (Crabtree), at 81:13-21; *see generally id.* at 74:25-81:21, 103:5-104:8).

1919.   Mr. Fitzsimons does not believe that DCF tracks the frequency of visitation between children in placement and their biological parents, and Mr. Collins does not track parent-child visitation for the area offices he oversees.  (Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, Mar. 5, 2012, at 260:15-24; Deposition of Joseph Collins, DCF Director of Areas for Franklin and Hampshire, Jan. 25, 2012, at 219:7-9).

1920.   DCF has yet to develop a regular management report that tracks the frequency of child-family visitation on an aggregate basis.  (*See, e.g.*, Trial Exhibit 155, Department of Children and Families Monthly Operations Statistical Report, Trends Fiscal Year 2009 through 2010, p. 2; Trial Exhibit 954, all Monthly Operations Statistical Reports; Trial Exhibit 220, Report Schedule; Rule 30(b)(6) Deposition of Ruben Ferreira, DCF Assistant Commissioner for Continuous Quality Improvement, re: Data Collection and Retention, Aug. 23, 2011, at 125:1-17; Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, Jan. 26, 2012, at 264:18-266:2).  Further, to the knowledge of one of DCF's directors of areas, there is no DCF report that documents parent-child visits that do not occur.

(Deposition of Joseph Collins, DCF Director of Areas for Franklin and Hampshire, Jan. 25, 2012, at 220:2-18).

1921.   FamilyNet has the capacity to provide workers with prompts or "ticklers" to perform tasks that are due, but no prompt or "tickler" has been implemented with respect to parent visits.  (Deposition of Rosalind Walter, DCF Director of Data Management, Jan. 4, 2012, at 81:12-82:9, 82:23-83:1).

1922.   Mr. Fitzsimons is not aware of any current data that DCF maintains regarding the number of children whose service plans call for weekly versus biweekly or monthly visitation with parents.  (Rule 30(b)(6) Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, re: Visitation and Permanency Planning, Sept. 28, 2011, at 105:13-17).

1923.   Mr. Fitzsimons testified that though he has an "expectation" that a parent-child visit should occur once a week for a child in foster care, he is unaware of any minimum requirement for such visits.  (*Id.* at 81:1-14).  Similarly, Mr. Flynn testified that "parents and children should have regular contact" but that he was "unfamiliar with anything in policies or regs" that set forth the required frequency of family visitation.  (Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, Jan. 26, 2012, at 264:18-266:2).

1924.   DCF does not monitor whether the monthly visitation between parents and children in care actually takes place, as recommended by DCF's "Ongoing Caseworker Policies, Procedures and Documentation."  (Rule 30(b)(6) Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, re: Visitation and Permanency Planning, Sept. 28, 2011, at 100:15-102:3).

1925.   Terrence Flynn, DCF's Regional Director for the Southern Region, testified that he does not conduct any occasional or regular review to determine whether family visitation is taking place according to the service plan, other than in specific cases in which concerns were brought to his attention.  (Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, Jan. 26, 2012, at 266:3-267:1).

1926.   Mr. Fitzsimons testified that he would expect supervisors to discuss parent-child visitation with social workers during regular supervision, but that DCF does not have any "formal process" to verify that this level of supervision ensures that monthly parent-child visits occur.  (Rule 30(b)(6) Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, re: Visitation and Permanency Planning, Sept. 28, 2011, at 102:4-103:1).

1927.   DCF is not managing parent-child visitation in conformance with accepted professional judgment.  (Trial Tr., Feb. 28, 2013 (Crabtree), at 88:25-89:5; *see generally, id.* at 81:22-89:5).

## X.    Procedural Due Process

### A.    State-Law Entitlement

### 1.    Kin Placement

1928.  By statute, whenever a child is taken into foster care, DCF is required to immediately commence a search for a relative or other adult with a significant role in the child's life in order to locate possible kin caregivers.  Mass. Gen. Laws ch. 119 § 23(c) (2013).  This requirement is also codified in Massachusetts regulation.  (Trial Exhibit 69, 110 Mass. Code Regs. 7.101(3) (2013)).

1929.  Massachusetts regulations and policy also require that DCF give first consideration to placement with a relative or member of the child's extended family, consistent with the child's best interests, and state that DCF recognizes kinship care as the priority placement.  (Trial Exhibit 69, 110 Mass. Code Regs. 7.101(2) (2013); *see also* Trial Exhibit 1, DCF Case Practice Policy & Procedures Manual, DSS Policy No. 90-004(R): Placement Prevention and Placement Policy, Feb. 10, 1998, at DCF POL (7/08) 169-70; *id.*, DSS Policy No. 2006-01: Family Resource Policy, Feb. 6, 2006, at DCF POL (7/08) 179; Trial Exhibit 408, Email from Mary Gambon to Jan Nisenbaum re: Info for Steering Committee, Feb. 14, 2011, and attached Draft Intake Foster Homes Rationale, Feb. 14, 2011, p. 4; Trial Exhibit 94, Child and Family Services Plan, FY 2010-FY2014, at DCF007054452).  Regulations also require that DCF ask the child's parents for the names of relatives or other adults who might serve as kin caregivers.  (Trial Exhibit 69, 110 Mass. Code Regs. 7.101(3) (2013)).

1930.  The Fostering Connections to Success and Increasing Adoptions Act of 2008 requires that states identify and notify potential relative caregivers within 30 days of the child's removal from home and placement into foster care.  (42 U.S.C. § 671(a)(29); s*ee also* Contested Exhibit FD, Moving Kinship Care Forward in Massachusetts, at EOHHS002156051).  DCF has acknowledged its obligation to ensure timely relative notification in its Implementation Plan for the Fostering Connections to Success and Increasing Adoptions Act.  (Trial Exhibit 196, Implementation Plan for the Fostering Connections to Success and Increasing Adoptions Act, p. 2).

### 2.    Medical Passports

1931.  Plaintiffs incorporate herein *supra* ¶ 1155.

### 3.    EPSDT Screenings

1932.  Plaintiffs incorporate herein *supra* ¶¶ 1143-45.

### 4.    Sibling Visits

1933.  Plaintiffs incorporate herein *supra* ¶¶ 1867-71.

### B.    Denials of entitlements:

1.    **Kin Placement**

a)    *Denial of Entitlement*

1934.    DCF has acknowledged that 50% of all initial placements should be with kin or with a child-specific family.  (Trial Exhibit 408, Email from Mary Gambon to Jan Nisenbaum re: Info for Steering Committee, Feb. 14, 2011, and attached Draft Intake Foster Homes Rationale, p. 4).

1935.    Research shows that for every 100 children in need of out-of-home placement, 80 children should be able to be placed with kin.  (Trial Exhibit 463, Email from Terry Flynn to Jan Nisenbaum re: Staff Meeting Feedback, July 6, 2011, and attached Placement Stability, Area Feedback, at DCF005627619).

1936.    However, DCF fails to place substantial numbers of children with kin relatives as their initial placement, although further search reveals these kin caregivers.  The review of case files conducted by Plaintiffs' expert, the Children's Research Center, revealed that only 15.3% of the 242 children in the entry cohort were initially placed in a relative foster home and only 2.9% were initially placed in a non-relative child-specific foster home.  (Trial Exhibit 1066, Tables 2 & 4, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; *see also* Trial Tr., Jan. 30, 2013 (Freitag), at 58:10-60:24).  The inter-rater reliability for this measure exceeded 80% (*supra* ¶ 80; Trial Exhibit 1069, Table 3 to Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC) and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowsky, October 19, 2012, Nov. 19, 2012).  These results were consistent with the proportion of the full population of children in DCF foster care, 16.1% of whom were first placed in child-specific foster homes.  (Trial Exhibit 1066, Table 2, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012).

1937.    During state fiscal year 2011, only 19.0% to 25.5% of children statewide who entered foster care and were initially placed in a DCF foster home had their first placement in a kinship foster home.  (Trial Exhibit 956, Foster Care Quarterly Report: Fiscal Year 2011, Quarter 1, p. 6; *id.*, Foster Care Quarterly Report: Fiscal Year 2011, Quarter 2, p. 6; *id.*, Foster Care Quarterly Report: Fiscal Year 2011, Quarter 3, p. 6; *id.*, Foster Care Quarterly Report: Fiscal Year 2011, Quarter 4, p. 6 (Item: Percent of Initial Restricted Placements)).

1938.    In total, just under 80 percent of all initial placements into DCF foster homes for state fiscal year 2011 were into unrestricted homes, and not into kinship foster homes.  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, re: Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 74:2-75:4; Trial Exhibit 198, Excerpt of Foster Care Quarterly Report: Fiscal Year 2011, 4th Quarter, p. 1).

1939.  By contrast, during that same period, the number of children in kinship care statewide as a percentage of all children in DCF foster home placements ranged from 46% to 48%.  (Trial Exhibit 954, Monthly Operations Statistical Reports, June 2010 - June 2011 (Item: Kinship Care as a Percent of DFC)).

1940.  This trend continued in 2012.  As of the first quarter of state fiscal year 2013 (July - September 2012), only 26.8% of children entering foster care who were initially placed in a DCF foster home had their first placement in a kinship foster home.  (Trial Exhibit 956, Foster Care Quarterly Report: Fiscal Year 2013, Quarter 1, p. 6 (Item: Percent of Initial Restricted Placements)).  Yet during July and August 2012, almost 52% of children in DCF foster homes statewide were in kinship foster homes.  (Trial Exhibit 954, Monthly Operations Statistical Report: July 2012, p. 1; *id.*, Monthly Operations Statistical Report: Aug. 2012, p. 1 (Item: Kinship Care as a Percent of DFC)).

1941.  According to Mr. Flynn, the fact that approximately twice as many children end up in restricted homes as are initially placed there indicates that DCF should achieve better kin placement as a first placement for children.  (Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, Jan. 26, 2012, at 138:4-15).

1942.  A PowerPoint noted that identifying and searching for relatives as early as possible is an area where DCF can improve.  (Trial Exhibit 1041, Document re: Adoption Reviews, at DCF011385931).

1943.  An April 2011 document from the Framingham area office concerning kinship plans noted that while that office has a significant number of kinship foster homes, those homes are often not the child's first placement.  (Trial Exhibit 669, Documents re: Kinship Plans, at DCF008434722).

1944.  An email from an April 2012 meeting noted that DCF staff are not consistently searching for kin or documenting kin in the record.  (Trial Exhibit 1040, Email from Renee Zalesky to Paul Fitzsimons, Lian Hogan, and Jaime Caron, et al. re: Foster Care Review & QA meeting follow-up, Apr. 6, 2012, at DCF011135712).

1945.  DCF acknowledges that there are cases where DCF "lose[s] focus on what we should be doing" and therefore no search for kin is performed.  (Rule 30(b)(6) Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, re: Placement Array, Assignment of Placements, and Placement Moves, Sept. 20, 2011, at 99:24-100:5).

1946.  DCF has identified the need to improve practice in searching for paternal relatives and noted staff confusion about where to document information about possible kin resources.  (Trial Exhibit 988, Email exchange between Jan Nisenbaum, Paul Fitzsimons, and Olga Roche re: Kinship and Placement Stability PP - Staff Presentation, Aug. 2, 2011, at DCF010990674).

1947.  There is variability on how area offices handle kinship and child-specific initial placements.  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, re. Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 78:20-23).

1948.   DCF's initial placement of children in kinship care is inconsistent across different geographic areas.  DCF's performance ranged from just 2.4% of children in the Springfield area office who experienced kin placements as their initial foster home placement, compared to 75% of children in the Haverhill area office.  (Trial Exhibit 956, Foster Care Quarterly Report: Fiscal Year 2013, Quarter 1, pp. 2-5 (Item: Percent of Initial Restricted Placements); *see also* Deposition of Raymond Pillidge, DCF Regional Director for the Northern Region, Mar. 7, 2012, at 50:23-51:19).

1949.   An analysis of kinship placements in the Boston Region noted that very few children were initially placed with kin.  As of the second quarter of fiscal year 2011, just 7.3% of children experienced kin placements for their initial foster home placement.  In fact, two area offices, Dimock Street and Hyde Park, placed no children with kin as their initial placement during the second quarter of fiscal year 2011.  (Trial Exhibit 668, Initial and Current Kinship Placements, Fiscal Year 2010 1st Quarter through Fiscal Year 2011 2nd Quarter, at DCF000765574-75, DCF000765577; Trial Exhibit 956, Foster Care Quarterly Report: Fiscal Year 2011, Quarter 2, at 4).

1950.   Terrence Flynn testified that despite seemingly positive statistics regarding the percentage of kinship homes for particular offices, a cohort analysis of children entering care for the first time revealed that the number of children that were actually placed in a kinship home "dropped dramatically."  (Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, Jan. 26, 2012, at 155:11-21).

1951.   This is not a new problem.  The first round Child and Family Services Review (CFSR) noted that a number of children experienced multiple placements before being moved to a kinship foster home.  (Trial Exhibit 56, Massachusetts Child and Family Services Review, Final Assessment, July 2001, at CSF-000000309).  In addition, according to the 2001 CFSR, stakeholders felt that DCF could do more to identify and engage relatives earlier in the life of a case.  (*Id.* at CSF-000000334).

1952.   Similarly, the second round CFSR found that DCF did not search for both maternal and paternal relatives in 23% of cases (Trial Exhibit 34, MA CFSR 2007: Summary of Key Issues for PIP Development, at DCF008117148; Trial Exhibit 58, Final Report, Massachusetts Child and Family Services Review, Feb. 21, 2008, at CSF-000000788), and that relative placement was an area needing improvement.  (Trial Exhibit 58, Final Report, Massachusetts Child and Family Services Review, Feb. 21, 2008, at CSF-000000788-90).  However, DCF did not include a specific requirement to increase the percentage of children placed with relatives in the Item-Specific and Quantitative Measurement Plan of its Program Improvement Plan.  (Trial Exhibit 33, Massachusetts Child and Family Services Review, Program Improvement Plan, Oct. 5, 2009, pp. 7, 57-61).

1953.   During federal fiscal year 2009, only 13% of children entering foster care were placed with relatives as their first placement.  (Trial Exhibit 54, Placement Stability in Massachusetts, Penelope (Penny) L. Maza, Ph.D., Consultant, National Resource Center for Child Welfare Data and Technology, Jan. 20, 2011, p. 34).

1954.   According to Adoption and Foster Care Analysis and Reporting System (ACFARS) data from federal fiscal year 2009, children in DCF foster care were "27% LESS likely to be placed with KIN, than their counterparts across the USA."  (Trial Exhibit 25, DCF Kinship First, Placement Stability presentation, June, 2011 (including Program Support, Training and Evaluation Budget, July 1, 2011 - June 30, 2012 & Joseph M. Lonergan award letters to Angelo McClain, Apr. 5, 2011 and May 24, 2011), at DCF003245926, DCF003245928).  The report further found that a black child in DCF foster care is 42% less likely, a Hispanic child is 50% less likely, and a white child is 14% less likely to be placed with kin than their counterparts in other states.  (*Id.* at DCF003245929).

1955.   A PowerPoint noted that DCF planned to improve case practice by documenting search efforts for kin in dictation and ensuring that there is a consistent way in i-FamilyNet to identify kin and document contacts with them.  (Trial Exhibit 1041, Document re: Adoption Reviews, at DCF011385936).

1956.   Commissioner McClain testified that he had directed Deputy Commissioner Olga Roche to focus on improving DCF's performance with respect to kinship placements.  (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 38:21-39:18).  According to Ms. Gambon, for the fiscal year 2012, Ms. Roche stated that DCF needed to enhance its ability to do kinship as a first placement.  (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, re. Recruitment and Retention of Foster Homes, Oct. 18, 2011, at 83:18-84:24).

> b)   *Failure to Place Children with Kin when a Willing and Appropriate Kin Caregiver could be found through a Diligent Search Causes Harm and the Risk of Harm*

1957.   The benefits of kinship care include "facilitating secure emotional attachments, reducing children's trauma from being placed with strangers, reinforcing children's sense of identity and self-esteem, and maintaining connections with their family culture and with siblings." (Contested Exhibit FD, Moving Kinship Care Forward in Massachusetts, at EOHHS002156042).

1958.   Children placed with kin have a stronger emotional connection with their caretakers and "feel like they 'belong'."  (Trial Exhibit 463, Email from Terry Flynn to Jan Nisenbaum re: Staff Meeting Feedback, July 6, 2011, and attached Placement Stability, Area Feedback, at DCF005627619; *see also* Trial Exhibit 669, Documents re: Kinship Plans, at DCF008434724, 29); Trial Exhibit 988, Email exchange among Jan Nisenbaum, Paul Fitzsimons, and Olga Roche re: Kinship and Placement Stability PP - Staff Presentation, Aug. 2, 2011, at DCF010990674.

1959.   DCF's own practice guidance states that placement with kin and with siblings helps to mitigate the impact of children's trauma.  (Trial Exhibit 552, DCF Integrated Casework Practice Model: Practice Point No. 1: Trauma-Informed Casework Practice, at DCF000245355).

1960.   Kinship placements are more likely to result in siblings being able to remain together in foster care.  (Trial Exhibit 57, Massachusetts Child and Family Services Review Statewide Assessment May 2007, at CSF-000000663).

1961.   Placement with relatives is desirable for children.  (Trial Tr., Jan. 30, 2013 (Freitag), at 57:25-58:6).

1962.   DCF has long acknowledged that utilizing kin as caregivers would be a more appropriate and stable placement option for many children, especially adolescents, than non-kinship care.  (Trial Exhibit 55, Massachusetts Statewide Assessment, Child and Family Services Review, July 2001, at CSF-000000445; *see also* Trial Exhibit 25, Kinship First: Placement Stability presentation, June 2011, at DCF003245926).

1963.   Children in kinship placements experience greater stability, including educational stability and treatment stability.  (Trial Exhibit 463, Email from Terry Flynn to Jan Nisenbaum re: Staff Meeting Feedback, July 6, 2011, and attached Placement Stability, Area Feedback, at DCF005627619; *see also* Trial Exhibit 669, Documents re: Kinship Plans, at DCF008434724, 29).

1964.   Data indicates that children placed with kin experience fewer placement moves.  Nationwide data from the first round CFSRs revealed that placement with relatives had among the "strongest associations with placement stability."  (Trial Exhibit 671, Administration for Children and Families, U.S Department of Health and Human Services, Findings From the Initial Child and Family Services Reviews, 2001-2004, p. 21).  The 2001 CFSR noted that during the period under review, children in Massachusetts in relative placements experienced more stability and maintained more connections than children in non-relative foster placements.  (Trial Exhibit 56, Massachusetts Child and Family Services Review Final Assessment, July 2001, at CSF-000000308-09).

1965.   In addition, data indicates that children whose first placement is with kin experience greater placement stability than children in other placements.  A study by the National Resource Center for Child Welfare Data and Technology ("NRC-CWDT") found that in federal fiscal year 2009, children in DCF foster care experienced the most placement stability when their first placement was in a relative foster home compared to other foster care placements.  (Trial Exhibit 54, Placement Stability in Massachusetts, Penelope (Penny) L. Maza, National Resource Center for Child Welfare Data and Technology, Jan. 20, 2011, pp. 3, 15-16; *see also* Trial Exhibit 25, Kinship First: Placement Stability, June 2011, at DCF003245928).  Of children whose first placement in DCF foster care was in a relative foster home, 94% of those in foster care for less than 12 months had two placements or less, 84% of those in foster care from 12 months to 24 months had two placements or less, and 49% of those in foster care for more than 24 months had two placements or less.  (Trial Exhibit 54, Placement Stability in Massachusetts, Penelope (Penny) L. Maza, National Resource Center for Child Welfare Data and Technology, Jan. 20, 2011, pp. 15-16).  By contrast, during that same year, of children whose first placement in DCF foster care was in an unrelated foster home, 76% of those in foster care for less than 12 months had two placements or less, 58% of those in foster care from 12 months to 24 months had two

placements or less, and 28% of those in foster care for more than 24 months had two placements or less.  (*Id.*).

1967.   The NRC-CWDT study found that 61% of children in DCF foster care in federal fiscal year 2009 experienced no placement moves where their first placement in foster care was a relative foster home.  (Trial Exhibit 54, Placement Stability in Massachusetts, p. 38).  By contrast, in federal fiscal year 2009, 25% of children whose first placement was an unrelated foster home, 32% of children whose first placement was a specialized foster home, and 35% of children whose first placement was group or residential care experienced no placement moves.  (*Id.* pp. 36, 39, 40).

1968.   Joy Cochran, DCF Director of Foster Care Support Services, and Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, testified that initial placement with kin is a factor that leads to placement stability.  (Deposition of Joy Cochran, DCF Director of Foster Care Support Services, Apr. 13, 2012, at 177:9-178:5; Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care, and Adolescent Services, May 14, 2012, at 35:15-37:12, 39:7-40:6).

1969.   Placement moves cause multiple harms to children.  (*See supra* § IV.B).

1970.   Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations and Rule 30(b)(6) designee with respect to Staffing, Caseloads, Training, and the Program Improvement Plan, testified that DCF decided to prioritize placement with kin as a child's first placement in its Program Improvement Plan because data demonstrates that children placed first with kin have greater stability.  (Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: Program Improvement Plan, Apr. 4, 2012, at 191:24-192:6).

1971.   Paul Fitzsimons, DCF Regional Director for the Western Region, testified that locating kin placements, and the timely placement of children with those kin, would reduce multiple placements, improve placement stability, and ultimately improve outcomes for those children.  (Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, Mar. 5, 2012, at 196:14-23).

1972.   Raymond Pillidge, DCF Regional Director for the Northern Region, testified that he would like to increase the use of kinship care because "it improves long-term outcomes for most kids."  (Deposition of Raymond Pillidge, DCF Regional Director for the Northern Region, Mar. 7, 2012, at 47:19-48:11).

1973.   Joseph Collins, DCF Area Director for Franklin and Hampshire, testified that it is DCF's preference to place children with kin.  (Deposition of Joseph Collins, DCF Area Director for Franklin and Hampshire, Jan. 25, 2012, at 43:1-15).

1974.   Terrence Flynn, DCF Regional Director for the Southern Region, testified that use of kinship care should be increased.  (Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, Jan. 26, 2012, at 123:5-124:1).

### 2.      Medical Passports

1975.  Plaintiffs incorporate herein *supra* § VI.2-5.

### 3.      EPSDT Screenings

1976.  Plaintiffs incorporate herein *supra* § VI.2-5.

### 4.      Sibling Visits

1977.  Plaintiffs incorporate herein *infra* § IX.C.

## C.      Inadequate Notice and Process

### 1.      Pre-deprivation Notice and Process

1978.  DCF regulations provide for fourteen-day advance written notice "if the Department intends to deny, reduce, or terminate services . . . ."  (Trial Exhibit 69, 110 Mass. Code Regs. 8.01(1) (2013)).  By regulation, DCF "shall" provide written notice to the child containing, among other things, the intended action, the reasons for the action, the date on which the action becomes effective, and an explanation of the child's right to request a Fair Hearing. (*Id.*).  The written notice must be mailed or hand-delivered to the child at least 14 days prior to the date of the intended action.  (Trial Exhibit 69, 110 Mass. Code Regs. 8.01(2) (2013)). Only under specific circumstances defined by regulation may DCF dispense with the requirement to provide pre-deprivation written notice.  (Trial Exhibit 69, 110 Mass. Code Regs. 8.01(3) (2013)).

1979.  The Medical Passport is a defined "service" under 110 Code of Massachusetts Regulations 7.124 and, therefore, subject to the notice requirements of 110 Code of Massachusetts Regulations 8.01.  (Trial Exhibit 69, 110 Mass. Code Regs. 7.124, 8.01 (2013)).

1980.  Sibling visitation is a defined "service" under 110 Code of Massachusetts Regulations 7.101(4) and, therefore, subject to the notice requirements of 110 Code of Massachusetts Regulations 8.01.  (Trial Exhibit 69, 110 Mass. Code Regs. 7.101(4), 8.01 (2013)).

1981.  Diligent search for kin is a defined "service" under 110 Code of Massachusetts Regulations 7.101(5) and 7.101(8) and, therefore, subject to the notice requirements of 110 Code of Massachusetts Regulations 8.01.  (Trial Exhibit 69, 110 Mass. Code Regs. 7.101(5), 7.101(8), 8.01 (2013)).

1982.  Medical screenings are a defined "service" under 110 Code of Massachusetts Regulations 7.121 and 7.126 and, therefore, subject to the notice requirements of 110 Code of Massachusetts Regulations 8.01.  (Trial Exhibit 69, 110 Mass. Code Regs. 7.121, 7.126, 8.01 (2013)).

1983.  Despite this requirement, notice with respect to the deprivation of the child's medical passport is not provided to the child or to the child's attorney because "there has to be a

conscious decision not to provide it to provide notice, and there is not a conscious decision to not provide it." (Deposition of Virginia Peel, DCF General Counsel, Feb. 8, 2012, at 86:9-88:3).

1984.  Virginia Peel, DCF General Counsel, testified that she does not know whether DCF in all instances provides notice to the child's lawyer when required sibling visits do not take place and that the child's lawyer generally may obtain this information by affirmatively inquiring about sibling visitation at a Juvenile Court hearing or in the course of direct client communications with the child. (Deposition of Virginia Peel, DCF General Counsel, Feb. 8, 2012, at 83:2-86:8).

1985.  The "Performance Standards Governing the Representation of Children and Parents in Child Welfare Cases," promulgated by the Committee for Public Counsel Services in the Commonwealth of Massachusetts, provide that an attorney appointed to represent a child in DCF foster care custody should minimally meet with the child-client on a quarterly basis. (Contested Exhibit LI, Committee for Public Counsel Services, Performance Standards Governing the Representation of Children and Parents in Child Welfare Cases (2003) at DCF007576004-05).

1986.  Terrence Flynn, DCF Regional Director for the Southern Region and Rule 30(b)(6) designee with respect to placement array, assignment of placements, and placement moves, stated that there is no policy or consistent practice of providing formal notice to the child or the child's attorney when DCF has failed to do a kin search. (Rule 30(b)(6) Deposition of Terrence Flynn, DCF Regional Director for the Southern Region, re: Placement Array, Assignment of Placements, and Placement Moves, at 100:6-101:24).

1987.  In some cases, a child's attorney is not aware that he or she is going to be placed in a Short Term Stabilization and Rapid Reentry (STARR) program, and that there is no mechanism by which the child or the child's attorney is notified in advance that a child is not going to be placed with a private family. (Deposition of Virginia Peel, DCF General Counsel, Feb. 8, 2012, at 78:13-79:14).

1988.  Ms. Peel did not know if, in every case, a child's attorney is provided notice when a child will not receive visitation. (*Id.* at 84:24-86:8).

1989.  Other than six-week reviews and foster care reviews, DCF does not have any automated process for determining to extent to which notice is provided to a child's relatives within 30 days of his or her entry into foster care. (Rule 30(b)(6) Deposition of Mary Gambon, DCF Assistant Commissioner for Adoption, Foster Care and Adolescent Services, re: Implementation of Provisions of the Fostering Connections Act, Apr. 24, 2012, at 496:7-20).

## 2.    Fair Hearings

1990.  Upon receiving notice of DCF's intent to deny, reduce or terminate a service, a child in DCF foster care may pursue administrative review through the Fair Hearing process, as defined in Massachusetts regulations. (Trial Exhibit 69, 110 Mass. Code Regs. 10.00 (2013)).

1991.  The Fair Hearing process is intended to

> [E]nable a client who is dissatisfied with certain actions or inactions by the Department or a provider under contract with the Department, to present his or her position in an informal hearing and to receive a just and fair decision from an impartial hearing officer based on the facts and applicable regulations.

(Trial Exhibit 69, 110 Mass. Code Regs. 10.01 (2013)).

1992.  Massachusetts regulations provide that the child's filing of a request for a Fair Hearing shall not "stay" the challenged decision "except as provided in 110 CMR 10.09." (Trial Exhibit 69, 110 Mass. Code Regs. 10.09(1) (2013)).  110 Code of Massachusetts Regulations 10.09 provides that "a decision to deny services or reduce the quantity of services shall stay the effect of the challenged decision until after the final decision is made pursuant to 110 CMR 10.00 . . . ."  (Trial Exhibit 69, 110 Mass. Code Regs. 10.09(2) (2013)).

1993.  Massachusetts regulations provide that a Fair Hearing "shall be scheduled to be held within 90 calendar days from receipt of a request . . . ."  (Trial Exhibit 69, 110 Mass. Code Regs. 10.10(2) (2013)).

1994.  The grievance process is not available for any complaint that could appropriately be the subject of a Fair Hearing.  (Trial Exhibit 69, 110 Mass. Code Regs. 10.38 (2013)).  The allowable grounds for appeal via a Fair Hearing are contained in 110 C.M.R. 10.06 and include the "suspension, reduction or termination of a service," which encompasses sibling visitation, medical screenings and passports, and a diligent search for kin.

1995.  DCF has accumulated a substantial backlog of Fair Hearing requests for which hearings have not been scheduled to be held within the ninety-day period.  The barrier to providing timely Fair Hearings has been a lack of resources, including the need for an adequate number of hearing officers, and, at present, Fair Hearings generally are being scheduled to be held on dates falling within three to six months from receipt of the request for hearing.  (Deposition of Virginia Peel, DCF General Counsel, Feb. 8, 2012, at 29:1-37:24).

1996.  In response to Plaintiffs' Second Set of Interrogatories, Defendants admitted that of the 1220 Fair Hearings requested in calendar year 2011, only 133 were held within the ninety-day timeframe required by 110 Mass. Code Regs. 10.10.  In 2010, only seventy-one of 1399 requested Fair Hearings were completed within the ninety-day timeframe.  In 2009, only seventy-six of 1900 Fair Hearing requests were completed within the ninety-day timeframe. (Trial Exhibit 452, Defendants' Responses and Objections to Plaintiffs' Second Set of Interrogatories, *Connor B. v. Patrick*, Apr. 24, 2012, pp. 12-13).

1997.  DCF officials are well aware of the agency's failure to meet timetables for fair hearings. Commissioner Angelo McClain testified that in prioritizing items to include in DCF's budget submission for state fiscal year 2013, he identified DCF's Fair Hearing office because of the "embarrassing large backlog" of requests.  (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 146:15-147:23).  Similarly, DCF Chief of Staff Patricia

Mackin testified that, at the time of her deposition, DCF was not meeting the required timetables for fair hearings.  (Deposition of Patricia Mackin, DCF Chief of Staff, Mar. 1, 2012, at 34:6-11).  Ms. Mackin did not know how far behind DCF fell in meeting those timetables, but knew that "there are some that have been outstanding for a while."  (*Id.* at 37:22-38:6).

1998.   Of 627 requests for a Fair Hearing received between January 5, 2010 and June 30, 2010, 531 had not been scheduled for a hearing as of January 3, 2011.  (Trial Exhibit 920, Document re: Over 6 months old, Jan. 3, 2011).

1999.   The backlog in fair hearings dates back to as early as 2004.  The Auditor of the Commonwealth of Massachusetts found in an April 14, 2005 Official Audit Report that

> A review of the [DCF] open fair appeal hearing requests of department decisions noted that 3,637 of 4,817 open requests for a hearing received from 1995 to 2004 (as of August 17, 2004) had not been scheduled for a fair hearing by the Legal Department within the 90 calendar days required by the [DCF] regulations-110 CMR. In addition, 19 cases had data errors, including 8 cases with the same scheduled hearing dates as the hearing request received date, and 11 cases had scheduled hearing dates prior to the hearing request date. [DCF] personnel stated that the reduction of hearing officers in recent years from five to three has resulted in a backlog of unscheduled hearings. As a result, [DCF] is not in compliance with its legal requirements for conducting an appeals process.

(Contested Exhibit DT, Independent State Auditor's Report on Certain Activities of the Department of Social Services, Report No. 2005-1058-165, Apr. 14, 2005, at DCF000764523).

2000.   The Auditor of the Commonwealth of Massachusetts found in a March 30, 2006 Official Audit Report that

> A review of the Department open fair appeal hearing requests of department decisions noted that 3,910 of 5,009 open requests for a hearing received from 1998 to 2005 (as of June 22, 2005) had not been scheduled for a fair hearing by the Legal Department within the 90 calendar days required by Department regulation-110 CMR. In addition, 4 cases had data errors with the scheduled hearing dates the same as the hearing request received date, and 4 cases had scheduled hearing dates prior to the hearing request date. The Department personnel stated that the reduction of hearing officers in recent years from five to three has resulted in a backlog of unscheduled hearings. As a result, the Department is not in compliance with its legal requirements for conducting an appeals process.

(Contested Exhibit DW, Independent State Auditor's Report on Certain Activities of the Department of Social Services, Report No.2006-1058-16S, Mar. 30, 2006, at DCF004350668).

2001.   A November 2009 "Transition Memo to Mo Cowan," then acting as Counsel to the Governor, stated of the Fair Hearing Office, "This unit has been understaffed for a [sic] least a decade and was greatly impacted during the budget crisis of 2001. In fiscal year 2006 money was specifically appropriated to hire more hearing offices [sic], however there continues to be a large backlog of cases the unit is working to reduce."  (Trial Exhibit 921, Text of Transition Memo to Mo Cowan, Nov. 2009, DEF000276002.)

2002.   Massachusetts law provides that the Office of the Child Advocate ("OCA") shall "formulate a comprehensive plan."  (Trial Exhibit 337, Mass. Gen. Laws ch. 18C, § 11(a) (2012)).  The comprehensive plan must examine the status of issues including "delays in the fair hearing process."  (Trial Exhibit 337, Mass. Gen. Laws ch. 18C, § 11(d)(7)(iv) (2012)).  The comprehensive plan must be filed annually with the Governor.  (Trial Exhibit 337, Mass. Gen. Laws ch. 18C, § 11(c) (2012)).  Pursuant to House No. 4905: An Act Protecting Children in the Care of the Commonwealth, the first comprehensive plan filed by the child advocate was due on June 30, 2010.  (Trial Exhibit 338, 2008 Mass. Acts No. 4905, § 134)  To date, the comprehensive plan described in Mass. Gen. Laws ch. 18C, § 11 has not been submitted to the Office of the Governor and the General Court.  The OCA's annual report for fiscal year 2011 states that the office's ability to formulate a comprehensive plan was "restricted by [its] current fiscal and staffing resources."  (Trial Exhibit 339, Office of the Child Advocate Annual Report, Fiscal Year 2011, p. 6).

2003.   DCF is required to submit a report to the legislature regarding the fair hearing process.  Ms. Mackin acknowledged in a February 19, 2012 email that DCF had "been delayed in production of this report," which was due on October 1, 2011.  (Trial Exhibit 987, Email from Patricia Mackin to Jay Youmans re: Required Legislative Report, Feb. 19, 2012, with attached Department of Children and Families, Legislative Report on Backlog of Administrative Hearings, and Cover Sheet for Submitted Agency Reports for Review by EOHHS, Feb. 19, 2012, at EOHHS002506063).  The report had still not been submitted as of Ms. Mackin's deposition on March 1, 2012, when she described it as "past due."  (Deposition of Patricia Mackin, DCF Chief of Staff, Mar. 1, 2012, at 38:12-39:8).  A February 15, 2012 draft of the report includes a "Cover Sheet for Submitted Agency Reports for Review by EOHHS."  (Trial Exhibit 987, Email from Patricia Mackin to Jay Youmans re: Required Legislative Report, Feb. 19, 2012, with attached Department of Children and Families, Legislative Report on Backlog of Administrative Hearings, and Cover Sheet for Submitted Agency Reports for Review by EOHHS, Feb. 19, 2012, at EOHHS002506068-69).  The Cover Sheet refers to the "unacceptable backlog" in the process of fair hearing requests, notes that there are still 2000 requests pending review, and expresses the concerns of the Massachusetts Law Reform [Institute] regarding the "perceived, or lack thereof, independence of the fair hearing officers since they report up to the DCF General Counsel."  (*Id.* at EOHHS002506069).

2004.   The report was circulated to the legislature on June 12, 2012 by Commissioner McClain.  While noting that there had been some improvement, Commissioner McClain acknowledged

in his cover email that "we know that we have to do much better." (Trial Exhibit 986, Email from Angelo McClain to Michael J, Rodrigues and Kay Khan re: fair hearing report, June 12, 2012, with attached Department of Children and Families, Legislative Report on Backlog of Administrative Hearings, at DCF011189325).

### 3.   Foster care reviews

2005.  Massachusetts regulations provide for Foster Care Reviews to be held within six months after a child is removed into DCF custody and every six months thereafter. (Trial Exhibit 69, 110 Mass. Code Regs. 6.10(1) (2013)). The Foster Care Review Panel is to discuss and determine, among other items, "the extent of the parties' compliance with the written service plan and the actions which must be undertaken within specified time limits by all parties to achieve identified service goals . . . ." (Trial Exhibit 69, 110 Mass. Code Regs. 6.10(10)(b) (2013).

2006.  The status of medical screenings is to be reviewed during the six-month foster care review. (Trial Exhibit 69, 110 Mass. Code Regs. 6.10(2)(h) (2013)).

2007.  The Children's Research Center ("CRC"), through its review of DCF case records, found that in 41.7% of cases reviewed in the entry cohort, children received less than the expected number of Foster Care Reviews. (Trial Exhibit 1066, Table 20b, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; *see also* Trial Tr., Jan. 30, 2013 (Freitag), at 121:20-122:16). This data was based on a sample size of 242 children for whom this measure was applicable, and the inter-rater reliability for this measure exceeded 80%. (*Id.* at 121:9-11; *supra* ¶ 80; Trial Exhibit 1069, Table 3 to Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC) and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowsky, Oct. 19, 2012, Nov. 19, 2012). Similarly, for the cases reviewed in the two-year cohort, CRC found that in 29.4% of the cases reviewed, children received less than the expected number of Foster Care Reviews. (Trial Exhibit 1066, Table 47b, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012). This data was based on a sample size of 242 children for whom this measure was applicable, and the inter-rater reliability for this measure exceeded 80%. (*Id.*; *supra* ¶ 80; Trial Exhibit 1069, Table 3 to Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC) and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowsky, Oct. 19, 2012, Nov. 19, 2012).

2008.  Paul Fitzsimons, DCF Regional Director for the Western Region and Rule 30(b)(6) designee with respect to visitation and permanency planning, testified that the term "six-week placement review" has "not always meant the same thing to people" throughout DCF, and neither he nor DCF tracks whether they occur because they are not a formal DCF requirement. (Rule 30(b)(6) Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, re: Visitation and Permanency Planning, Sept. 28, 2011, at 168:16-169: 20).

2009.  Mr. Fitzsimons further testified that he is not aware of any DCF reporting or monitoring system for overdue Foster Care Reviews.  (*Id.* at 173:13-19).

2010.  An August 2011 review of cases in the Lowell Area Office indicated that even when Foster Care Reviews are held, "the recommendations were often ignored by the Area staff." (Trial Exhibit 1005, Document re: central Office review of Lowell area offices, at DCF011131313).  The review recommended that "[t]imeliness of responses to information and input from Foster Care Reviews should be monitored."  (*Id.* at DCF011131314).  Yet two years earlier, DCF's 2009 Strategic Plan for Action identified a need for information from Foster Care Reviews to be "integrated into continuous quality improvement processes," and a need to "develop [a] model for strengthened Foster Care Review processes." (Trial Exhibit 1127, Strengthening the Safety Net: DCF's Strategic Plan for Action, April 2009, at DCF7605103, DCF7605112).

2011.  Mass. Gen. Laws ch. 18B, § 6A requires that:

> The director of the unit shall submit an annual report to the governor, the child advocate and the joint committee on children, families and persons with disabilities on the performance of the unit. The report shall contain: an analysis and evaluation of the foster care review system and recommendations, if any, for its improvement; the total number of children in the care of the department or its agents during the previous fiscal year; the number of children who were in its care for more than 6 months; the number of reviews conducted; the number of children returned to their parents or guardian; the number of children for whom guardians, other than the department or its agent, were appointed; the number of children released for adoption; and the number of children adopted.

(Trial Exhibit 319, Mass. Gen. Laws ch. 18B, § 6A (2009)).  DCF admitted by email to Plaintiffs on January 14, 2013 that DCF has not submitted the required Foster Care Review Unit annual report since January 2008.  (Contested Exhibit PA, Email exchange between Robert Higgins and Rachel Brodin Nili re: Missing Documents, Jan. 14, 2013, p. 2).

### 4.     Juvenile Court

2012.  Massachusetts law provides that a Permanency Hearing is to be held by the Juvenile Court within one year after a child is removed into DCF custody and annually thereafter.  *See* Mass. Gen. Laws ch. 119, § 29B (2013).  The Permanency Hearing focuses solely on the child's permanency plan.  Massachusetts law specifically provides that "the department shall file a permanency plan prior to the permanency hearing," which shall address:

> [W]hether and, if applicable, when: (i) the child will be returned to the parent; (ii) the child will be placed for adoption and the steps the department will take to free the child for adoption; (iii) the child will be referred for legal guardianship; (iv) the child will be

> placed in permanent care with relatives; or (v) the child will be
> placed in another permanent planned living arrangement.

*Id.* § 29B(a).  The statute does not require the submission by DCF of the child's service plan prior to the annual permanency hearing.  (*Id.*).

2013.  Massachusetts law provides for a "72-hour hearing" upon entry of an emergency order transferring custody of a child to DCF.  Mass. Gen. Laws ch. 119, § 24 (2013).  Upon entry of the order:

> [T]he court shall determine whether temporary custody shall
> continue beyond 72 hours until a hearing on the merits of the
> petition for care and protection is concluded before the court. The
> court shall also consider the provisions of section 29C and shall
> make the written certification and determinations required by said
> section 29C.

(*Id.*).  The findings required under Mass. Gen. Laws ch. 119, § 29C include a determination of whether the:

> [c]ontinuation of the child in his home is contrary to his best
> interests and shall determine whether the department or its agent,
> as appropriate, has made reasonable efforts prior to the placement
> of a child with the department to prevent or eliminate the need for
> removal from the home . . . .

(Mass. Gen. Laws ch. 119, § 29C (2013)). The applicable statutes do not require review of a child's service plan as part of the 72-hour hearing.  (*Id.*).

2014.  A child's service plan is not required to be completed at the time of the 72-hour hearing. Massachusetts regulations provide that a service plan for children subject to placement in DCF custody on an emergency basis shall be "completed within 30 working days after the placement."  (Trial Exhibit 69, 110 Mass. Code Regs. 6.05(1)(b) (2013).  For children subject to placement in DCF custody on a non-emergency basis, the service plan must be completed within 55 working days after the opening of the DCF case.  (*Id.* at § (1)(a)).

2015.  Ms. Peel testified that a child's attorney "would be aware" of whether or not the Department has explored potential kinship placements at the 72-hour hearing conducted by the Juvenile Court.  In identifying how DCF provides notice to a child's attorney when a search for kin is not commenced at the time of placement, as required by Massachusetts law, Ms. Peel made no reference to written notice under 110 Mass. Code Regs. 8.01.  (Deposition of Virginia Peel, DCF General Counsel, Feb. 8, 2012, at 81:10-83:1).

## XI.    Statutory Claims

### A.    Foster Care Maintenance Rates

1. Under the Adoption Assistance and Child Welfare Act ("AACWA"), states that accept federal funds for their foster care systems must make foster care maintenance ("FCM") payments to foster parents that cover:

> [T]he cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, reasonable travel to the child's home for visitation, and reasonable travel for the child to remain in the school in which the child is enrolled at the time of placement.

42 U.S.C. § 671(a)(1) (2012).  (Trial Exhibit 476, 42 U.S.C.A. § 675(4)(a) (2011); *see also* Trial Tr., Mar. 1, 2013 (Crabtree), at 18:5-19:4).

2016.  AACWA further provides that a state must develop a plan for child welfare services that "provides for periodic review of the standards referred to in the preceding paragraph and amounts paid as foster care maintenance payments and adoption assistance to assure their continuing appropriateness."  42 U.S.C. § 671(a)(11) (2012).

2017.  From state fiscal year 2004 until March 2012, the Massachusetts Department of Children and Families ("DCF") paid the following daily FCM payment rates: $17.10 for children zero to five years old; $17.96 for children six to twelve; and $18.59 for children thirteen and over. (Trial Exhibit 187, Historical FC and Subsidy Rates).  Prior to state fiscal year 2004, DCF had maintained the same levels of FCM payments since state fiscal year 1997.  (*Id.*).

2018.  In 2008, the Massachusetts Legislature passed the Act Protecting Children in the Care of the Commonwealth, requiring that DCF "shall, subject to appropriation, provide assistance to foster care families which includes maintenance payments at the daily rate recommended and periodically adjusted by the United States Department of Agriculture" ("USDA") and that DCF "shall periodically review the level of assistance including maintenance payments provided to adoptive and guardianship families and may, subject to appropriation, and consistent with federal law and policy, adjust such assistance as warranted by the financial circumstances of the family, the needs of the child or the rate of inflation."  (Trial Exhibit 164, Mass. Gen. Laws ch. 119, § 23(h) (2009)).

2019.  The Office of the Governor has not required submission of the Comprehensive Plan set forth in Mass. Gen. Laws ch. 18C, § 11(d)(3), providing for an estimate of the expenditure necessary to implement an annual adjustment to the FCM payments, so as to meet the USDA rate, by June 30, 2010 and annual updates thereafter.  (*See supra* § VIII.F.2 (¶¶ 1835-52).

2020.  DCF acknowledged in 2009 and 2010 that its FCM rates were from 17% to 24% below the USDA's 2008 rates for middle income families in the urban Northeast for food, shelter, and transportation, and that DCF foster parents go unreimbursed for the costs in excess of those rates.  (Trial Exhibit 190, Email from David O'Callaghan to Angelo McClain, Ellen Finnegan, and Patricia Mackin re: Updated Charts/Analysis, Oct. 29, 2009, and attached Calculation of DSS FC Rates Using USDA 2008 Data for Urban NE, at DCF003575327; Trial Exhibit 11, Letter from Angelo McClain to Mike Esmond, Sept. 28, 2010, at DCF000827080)..

2021.  Ellen Finnegan, DCF's CFO and 30(b)(6) designee with respect to foster care maintenance payments, testified that the foster care per diem rates in effect in 2011 were set in July 2004 and had not been raised since then and that no cost of living adjustment was applied to these rates.  (Rule 30(b)(6) Deposition of Ellen Finnegan, DCF Chief Financial Officer, re: Foster Care Maintenance Payment Rates, Oct. 5, 2011, at 55:21-57:4).

2022.  Four times during fiscal years 2010 and 2011, DCF offered retroactive recompense payments to foster parents in the amount of $5.00/day per child for a period of six months that had already passed.  (Trial Exhibit 13, Letter from Angelo McClain re: Foster Care Recompense Payment, Feb. 23, 2010; Rule 30(b)(6) Deposition of Ellen Finnegan, DCF Chief Financial Officer, re: Foster Care Maintenance Payment Rates, Oct. 5, 2011, at 163:14-164:1).  DCF stated in providing these payments that the foster care reimbursement rates were not being increased and that the payments were time limited.  (Trial Exhibit 13, Letter from Angelo McClain re: Foster Care Maintenance Payment Rates, Feb. 23, 2010).  In addition, the recompense payments did not provide sufficient reimbursement to foster parents because the children for whom the payments were made were potentially no longer in the home of the foster parents.  (Trial Tr., Mar. 1, 2013 (Crabtree), at 20:8-18).  Ms. Crabtree testified that the recompense payments were not "intended to be ongoing and continuing based on a review of what the necessary cost of raising those children in the state of Massachusetts would be."  (*Id.* at 20:21-21:1).

### 1.    March 2012 Rate Increase

2023.  Commissioner McClain testified in his deposition on May 25, 2012 that DCF implemented a FCM rate increase that was effective March 1, 2012.  (Deposition of Angelo McClain, DCF Commissioner, May 25, 2012, at 150:15-151:14).  He testified that:

> Basically, based on the governor's budget, and based on where we anticipated the House and Senate would land, we went ahead and took the bold step to increase the rates" and that DCF was able to implement the rate increase based on the senate and house budget for the fiscal year, which "supported the rate increase.

(*Id.*).

2024.  Former Commissioner McClain testified that the increased rates implemented in March 2012 occurred because the "stars aligned and we were able, we got $12 million in the budget last year" in order to raise the rates.  (Trial Tr., May 1, 2013 (McClain), at 106:20-110:22).  Furthermore, Former Commissioner McClain admitted that DCF would need another $2 million to raise the rates for the upcoming fiscal year, and he is currently unsure as to whether DCF's request for this funding will "make its way through the legislative process."  (*Id.* at 110:23-111:5).

2025.  Because the rate was raised through executive action rather than a legislative mandate, the rates are subject to change.  (Trial Tr., Mar. 1, 2013 (Crabtree), at 23:5-24).  Ms. Crabtree testified that in her review of the Massachusetts child welfare system she did not find any indication that DCF "intended to continue doing periodic reviews of the rates" and therefore

in her opinion the foster care maintenance payments are still at risk because of the lack of codification.  (*Id.* at 23:25-24:6).

2026.  The USDA calculates expenditures on children on an annual basis based on seven categories of household expenses:  housing, food, transportation, clothing, health care, child care and education, and miscellaneous.  (Trial Exhibit 914, USDA, Expenditures on Children by Families, 2010, at DOY-000000292).

2027.  According to the USDA, the estimated annual expenditures for a middle income family on a child in the urban northeast for 2010 were as follows, by age in years:  zero to two: $13,670; three to five: $13,650; six to eight: $13,580; nine to eleven: $14,370; twelve to fourteen: $15,330; fifteen to seventeen: $16,410.  (Trial Exhibit 914, USDA, Expenditures on Children by Families, 2010, at DOY-000000292).

2028.  According to the USDA, the estimated annual expenditures on a child for a middle income family in the urban Northeast for 2011 were as follows, by age in years:  zero to two: $14,150; three to five: $14,110; six to eight: $14,050; nine to eleven: $14,880; twelve to fourteen: $15,850; and fifteen to seventeen: $17,010.  (Trial Exhibit 477, USDA, Expenditures on Children by Families, 2011, p. 27).

2029.  DCF calculated its current FCM rates to match the average USDA middle-income estimates for the urban northeast for 2010 for three of the USDA's seven categories of expenses – housing, transportation, and food.  (Trial Exhibit 912, Calculation of DCF FC Rates Using USDA 2010 Data for Urban NE, at DOY-000000335).  DCF calculated its clothing stipend based on the USDA clothing expenses for 2010.  (*See id.*).

2030.  The FCM rates paid by DCF as of March 1, 2012 are $20.79 for children aged zero to five years; $23.40 for children aged six to twelve; and $24.79 for children aged thirteen and over.  (Trial Exhibit 916, DCF Maintenance, Adoption Subsidy, and Guardianship Subsidy Rates).  On an annual basis, these rates add up to $7588.35 for children aged zero to five; $8541 for children aged six to twelve; and $9048.35 for children aged thirteen and over.

## B.    Service Planning

2031.  Under AACWA, states accepting federal funds for their child welfare system must develop written case plans that contain certain statutory requirements, including: a plan for assuring that the services are provided to the child and his or her parents; a written description of independent living services provided to children sixteen and over; documentation of the steps the agency is taking to try to find an adoptive family or other permanent living arrangement for those children whose permanency plan is adoption or placement in another permanent home; and a plan for ensuring the educational stability of the child while in foster care.  42 U.S.C. § 671(a)(16) (2012).  (Trial Exhibit 476, 42 U.S.C.A. § 675(1) (2011)).

2032.  The Children's Research Center found in conducting its review of DCF case records that more than 35% of children in the two-year cohort had no service plan in their file.  (Trial Exhibit 1066, Table 55a, Children's Research Center, Compliance With Foster Care Case

Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; *see also* Trial Tr., Jan. 30, 2013 (Freitag), at 94:5-20, 95:12-96:4, 97:4-97:25, 99:20-22). This data was based on a sample size of 242 children for whom this measure was applicable, and the inter-rater reliability for this measure exceeded 80%. (Trial Exhibit 1066, Table 55a, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; Trial Exhibit 1069, Table 3, Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC) and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowsky, October 19, 2012, Nov. 19, 2012; Trial Tr., Jan. 30, 2013 (Freitag), at 99:15-19; *see also supra* ¶ 80). For the entry cohort, CRC found that 14.6% of children had no service plan in their file. (Trial Exhibit 1066, Table 28a, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; *see also* Trial Tr., Jan. 30, 2013 (Freitag), at ), at 99:23-100:7; Trial Tr., Jan. 31, 2013 (Johnson), at 113:19-115:14). This data was based on a sample size of 199 children for whom this measure was applicable, and the inter-rater reliability for this measure exceeded 80%. (Trial Exhibit 1066, Table 28a, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; Trial Exhibit 1069, Table 3, Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC) and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowsky, October 19, 2012, Nov. 19, 2012; Trial Tr., Jan. 30, 2013 (Freitag), at 100:8-11; *see also supra* ¶ 80).

2033.    The Children's Research Center found that for 34.2% of children in the entry cohort in care for at least thirty-one days, no child service data was found, and for 26.1%, no family service data was found. (Trial Exhibit 1066, Table 29, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; *see also* Trial Tr., Jan. 30, 2013 (Freitag), at 101:7-12). This data was based on a sample size of 199 children for whom this measure was applicable, and the inter-rater reliability for this measure exceeded 80%. (Trial Exhibit 1066, Table 29, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; Trial Exhibit 1069, Table 3, Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC) and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowsky, October 19, 2012, Nov. 19, 2012; *see also supra* ¶ 80).

2034.    The Children's Research Center also found that for 68.2% of children in the two-year cohort, no child service data was found, and for 89.3%, no family service data was found. (Trial Exhibit 1066, Table 56, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012; *see also* Trial Tr., Jan. 30, 2013 (Freitag), at 98:1-99:19, 99:20-22). This data was based on a sample size of 242 children for whom this measure was applicable, and the inter-rater reliability for this measure exceeded 80%. (Trial Exhibit 1066, Table 56, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A

Longitudinal Study of Two Cohorts, Aug. 2012; Trial Exhibit 1069, Table 3, Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC) and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowski, October 19, 2012, Nov. 19, 2012; Trial Tr., Jan. 30, 2013 (Freitag), at 99:15-19; *see also supra* ¶ 80).

2035.  Paul Fitzsimons, DCF's Regional Director for the Western Region and Rule 30(b)(6) designee on the topic of permanency planning, testified that he did not know if it is DCF policy to include the services that are needed to achieve a child's permanency goal in their service plan.  (Rule 30(b)(6) Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, re: Visitation and Permanency Planning, Sept. 28, 2011, at 65:7-14).

2036.  Mr. Fitzsimons testified that DCF does not provide each child with a formal child-specific recruitment plan to find the child an adoptive family and achieve permanency.  (Rule 30(b)(6) Deposition of Paul Fitzsimons, DCF Regional Director for the Western Region, re: Visitation and Permanency Planning, Sept. 28, 2011, at 251:23-252:9).

2037.  At an April 2012 Foster Care Review/Quality Assurance meeting, Foster Care Review staff "noted that writing a good service plan continues to be an issue for staff overall." (Trial Exhibit 1040, Email from Renee Zalesky to Paul Fitzsimons, Lian Hogan, and Jamie Drain, et al. re: Foster Care Review & QA meeting follow-up, Apr. 6, 2012).

2038.  The Children's Research Center found in conducting its review of DCF case records that 37.6% of youth in the two-year cohort ages fourteen and above who did not have a disability that precluded independent living services planning did not have skills of daily living preparation included in their most recent case plan.  (Trial Exhibit 1066, Table 59, Children's Research Center, Compliance With Foster Care Case Practice Standards in the Massachusetts Department of Children and Families: A Longitudinal Study of Two Cohorts, Aug. 2012). This data was based on a sample size of 141 children for whom this measure was applicable, and the inter-rater reliability for this measure exceeded 80%.  (*Id.*; Trial Exhibit 1069, Table 3, Dr. Kristen R. Johnson, Rebuttal Report in Response to the Analysis and Evaluation of the Children's Research Center (CRC) and Dr. Erik Nordheim's Reports Submitted by Dr. Shlomo Sawilowki, October 19, 2012, Nov. 19, 2012; *see also supra* ¶ 80).

2039.  Massachusetts regulations governing DCF service plans do not include any requirement that service plans include a provision for ensuring educational stability of the child while in foster care.  (*See* Trial Exhibit 69, 110 Mass. Code Regs. 6.03 (2013); Trial Exhibit 69, 110 Mass. Code Regs. 6.04 (2013)).

2040.  DCF policy governing the development of service plans for children does not include any requirement that service plans include a plan for ensuring educational stability of the child while in foster care.  (Trial Exhibit 1, Service Planning and Referral Policy, DSS Policy No. 97-003, Sept. 6, 2000, DCF Case Practice Policy & Procedures Manual, at DCF POL (7/08) 109-129).

2041.  DCF measures its performance on timely completion of service plans through its Monthly Operations Statistical ("MOSt") report.  In the MOSt report, DCF tracks the percentage of all

service plans due during the reporting month that were completed on time.  (Trial Exhibit 954, Monthly Operations Statistical Report, Aug. 2012, at DCF_REP_2013- 000000558).

2042.   DCF has set a target of 87.6% for performance on timeliness of service plans.  (Trial Exhibit 954, Monthly Operations Statistical Report, Aug. 2012, at DCF_REP_2013-000000547).  As of the August 2012 MOSt report, the most recent MOSt report produced to Plaintiffs, DCF had failed to meet this target: DCF's state fiscal year 2012 year-to-date average was 83.3%, and its performance ranged across areas from 70.0% to 100.0%.  (*Id.*).

2043.   During previous fiscal years, DCF's performance on timely completion of service plans was also consistently below its target of 87.6%.  DCF reported a year to date performance of 80.8% for state fiscal year 2011 and 78.9% for state fiscal year 2010.  (Trial Exhibit 954, Monthly Operations Statistical Report, June 2011, p. 1; Trial Exhibit 954, Monthly Operations Statistical Report, June 2010, p. 1).

2044.   Patricia Mackin, DCF's chief of staff, testified at her deposition that she has not been present for any discussion by DCF in relation to improving performance on timeliness of service plans, that she is not aware of any efforts by DCF management to seek to explain why agency performance was lagging on this, and other, core practice functions, and that she is not aware of any action steps that DCF is taking in relation to performance on this measure.  (Deposition of Patricia Mackin, DCF Chief of Staff, Mar. 1, 2012, at 77:11-14, 80:14-18, 89:12-15).

2045.   Plaintiffs Incorporate Herein *supra* ¶ 826-30, 858-65.

## XII.    DCF Initiatives

### A.    Caring Together

2046.   DCF's Caring Together initiative, also known as the "joint procurement" refers to an effort to consolidate the residential services offered by DCF and the Department of Mental Health ("DMH"). (Trial Exhibit 143, Caring Together Initiative: Outreach Plan, CSF-000004167-178 at p. 1-2).

2047.   The Caring Together Request For Response ("RFR"), released August 14, 2012, reflects the intention to develop a standard performance and contract monitoring process. (Trial Exhibit 1163, Caring Together Request for Response,  p. 18; Trial Exhibit 1164, Caring Together Request for Response, Appendix A, p. 34-35, Sections 4.25-4.26).  Former Commissioner McClain testified that this intent was "twofold.  One was to work with providers around the performance measures that their performance be held to, and then the other intent was to develop a move towards performance based contracting. . . whether that be in year two, three or four. . ." (Trial Tr. May 6, 2013 (McClain), at 88:19-89:3)

2048.   DCF reiterated these goals in its "2012-2015 Strategic Plan," also published in August 2012. The Plan states that the "[d]evelopment of utilization, monitoring and outcome reporting is essential to the implementation and oversight of Caring Together," and identifies the Department's intention to "establish[]" the structures for monitoring provider

performance, developing tools and processes to be used in assessing provider adherence to contract standards and specifications, and implementation of those structures and processes." (Trial Exhibit 7, 2012-2015 DCF Strategic Plan, Aug. 2012, CSF-000006338-360 at p. 15).

2049.  However, the former Commissioner acknowledged that this process had not been defined at the time of the RFR, and that there are no dates or benchmarks associated with the intentions reflected in Section 4.25(B) of the RFR, which states that "A Contractor is responsible for meeting all applicable service- and youth-level performance measures, including all outcomes. . ." and provides for reviews of these performance measures and targets, once established, every six months at a minimum. (Trial Tr. May 6, 2013 (McClain), at 88:6-14; Trial Exhibit 1164, Caring Together Request for Response, Appendix A, p. 35).

2050.  The joint procurement is limited to congregate care providers, as the Department of Mental Health will not participate in the procurement of intensive foster care homes.  (Trial Tr. May 6, 2013 (McClain), at 91:4-10).

### B.    Massachusetts Child Trauma Project

2051.  DCF's trauma initiative, known as the Massachusetts Child Trauma Project ("MCTP"), was not scheduled to be implemented prior to August 15, 2012.  (Trial Exhibit 788, Integrating Trauma-Informed & Trauma-Focused Practice in CPS Delivery, July 25, 2011, at DCF010304893).

2052.  MCTP focuses its outcomes heavily on training of staff.  (Trial Exhibit 786, Massachusetts Child Trauma Collaborative:  Draft Logic Model).  However, the MCTP does not provide any mechanism for mandating this training or continuing it beyond the term of the five-year grant.  (Id.; Trial Exhibit 788, Integrating Trauma-Informed & Trauma-Focused Practice in CPS Delivery, July 25, 2011, at DCF010304887-96).

### C.    Integrated Case Practice Model

2053.  Former Commissioner McClain testified that DCF's Integrated Case Practice Model ("ICPM") deals mainly with children not in DCF custody. (Trial Tr. May 1, 2013 (McClain), at 130:7-131:9; Trial Exhibit 1127, "Strengthening the Safety Net: DCF's Strategic Plan for Action," at DCF7605092; Trial Exhibit 1129, Implementation of the DCF Integrated Casework Practice Model, Statewide Managers Meeting, February 26, 2009, at CSF-000006070).

2054.  The implementation of ICPM has created additional burdens on ongoing caseworkers, which had not been addressed as of July 2012. See, Exhibit 1155; Trial Exhibit 973, Email from Marcia Roddy to Paul Fitzsimons, re: "Status of STS," April 19, 2013, DCF011140063-4; Trial Exhibit 974, Email from Donna Morin to Olga Roche, re: "FW: STS problems," June 20, 2012, DCF011186907-10; Trial Exhibit 975, Email from Donna Morin to Terry Flynn, re: "FW: STS issues in the SE," June 25, 2012, DCF011317123-4; See also, Trial Tr. May 7, 2013 (McClain), at 36:6-39:25).  DCF has not done a workload study to determine the impact that ICPM is having on ongoing caseworkers.  (Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, May 18, 2012, at 203:6-21).

2055.   DCF does not have a finalized ICPM policy.  Although some aspects of ICPM have been captured in practice guidance, it does not hold the same weight as final policy in terms of holding caseworkers accountable for performance. (Rule 30(b)(6) Deposition of Jan Nisenbaum, DCF Deputy Commissioner for Clinical Practice and Program Operations, re: Program Improvement Plan, Apr. 4, 2012, at, at 60:18-63:9).

**D.    Kinship First and Fatherhood Initiative**

2056.   Plaintiffs incorporate herein *supra* ¶¶ 796-800, 480-97.

DATED: May 16, 2013              Respectfully submitted:

By: */s/ Laurence D. Borten*
    Marcia Robinson Lowry, *admitted pro hac vice*
    Sara Michelle Bartosz, *admitted pro hac vice*
    Laurence D. Borten, *admitted pro hac vice*
    Jessica Polansky, *admitted pro hac vice*
    Rachel Brodin Nili (BBO# 666227)
    Elizabeth Pitman Gretter, *admitted pro hac vice*
    Sarah T. Russo, *admitted pro hac vice*
    CHILDREN'S RIGHTS
    330 Seventh Avenue, Fourth Floor
    New York, New York 10001
    Phone: (212) 683-2210
    Facsimile: (212) 683-4015
    *mlowry@childrensrights.org*
    *sbartosz@childrensrights.org*
    *lborten@childrensrights.org*
    *jpolansky@childrensrights.org*
    *rnili@childrensrights.org*
    *egretter@childrensrights.org*
    *srusso@childrensrights.org*

By: Daniel J. Gleason (BBO# 194900)
    Mary K. Ryan (BBO# 435860)
    Jonathan D. Persky (BBO# 666651)
    Emily J. Grannon (BBO #682267)
    NUTTER MCCLENNEN & FISH, LLP
    Seaport West
    155 Seaport Boulevard
    Boston, MA 02210-2604
    Phone: (617) 439-2000
    Facsimile: (617) 310-9000
    *dgleason@nutter.com*
    *mryan@nutter.com*
    *jpersky@nutter.com*
    *egrannon@nutter.com*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that, on May 16, 2013, this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Laurence D. Borten*
Laurence D. Borten
