<pre>
1                 UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS
2
                                         Civil Action
3                                        No. 10-30073-WGY

4    * * * * * * * * * * * * * * * * * * * * * *
                                                *
5    CONNOR B., by his next friend, ROCHELLE    *
     VIGURS, et al., individually and on behalf *
6    of all others similarly situated,          *
                                                *
7            Plaintiffs,                         *
                                                * BENCH TRIAL
8    v.                                          * (Volume 24)
                                                *
9    DEVAL L. PATRICK, in his official capacity *
     as Governor of the Commonwealth            *
10   of Massachusetts, et al.,                   *
                                                *
11           Defendants.                         *
                                                *
12   * * * * * * * * * * * * * * * * * * * * * *

13           BEFORE:  The Honorable William G. Young,
                          District Judge
14   APPEARANCES:

15           NUTTER, McCLENNEN & FISH, LLP (By Daniel J.
         Gleason, Esq. and Jonathan D. Persky, Esq.), World
16       Trade Center West, 155 Seaport Boulevard, Boston,
         Massachusetts 02210-2699
17           - and -
             CHILDREN'S RIGHTS (By Sara M. Bartosz,
18       Esq., Laurence D. Borten, Esq., Sarah Russo, Esq.
         Rachel Brodin, Nili, Esq. and Jessica E. Polansky,
19       Esq.), 330 Seventh Avenue, Fourth Floor, New York,
         New York 10001, on behalf of the Plaintiffs
20
             OFFICE OF THE MASSACHUSETTS ATTORNEY
21       GENERAL (By Liza Tran, Jason B. Barshak and
         Jeffrey T. Collins, Assistant Attorneys General),
22       One Ashburton Place, Boston, Massachusetts 02108,
         on behalf of the Defendants
23
                                         1 Courthouse Way
24                                       Boston, Massachusetts

25                                       May 14, 2013
</pre>

## I N D E X

**WITNESS:**          **DIRECT**  **CROSS**   **REDIRECT**  **RECROSS**

JAN NISENBAUM, Resumed

    By Mr. Collins    4

1          **THE CLERK:**  All rise.  The United States District

2     Court is now in session, you may be seated.

3          **THE COURT:**  Good morning.

4          **MS. BARTOSZ:**  Good morning, your Honor.

5          **MR. COLLINS:**  Good morning, your Honor.

6          **THE COURT:**  If you would remind the witness.

7          **THE CLERK:**  I would like to remind you that you are

8     still under oath.

9          **THE WITNESS:**  Yes.

10         **THE COURT:**  Mr. Collins, you may continue.

11         **MR. COLLINS:**  Thank you, your Honor.

12               JAN NISENBAUM, Resumed

13         **THE WITNESS:**  Actually before we get started, can I

14    make one correction to my testimony?

15         **THE COURT:**  You may always make a correction, yes.

16         **THE WITNESS:**  Thank you.

17         You had asked about mandatory training for STS

18    workers, and I had responded that we didn't have any

19    mandatory STS training.  I would like to amend that to

20    acknowledge that we did require that STS workers participate

21    in investigators training.  So that every staff person who

22    works in an STS unit must have gone through the seven day

23    investigators training prior to working in an STS unit.  So,

24    just to make that clarification.

25

**DIRECT EXAMINATION** (Cont'd)

**BY  MR. COLLINS**

**Q**    So, that portion of an STS worker's training was mandatory?

A    It was indeed.

**Q**    Yesterday I was asking you a number of structural questions, if you will, about the makeup of the agency, et cetera, and I meant to ask you about what's known as the regional resource centers.

A    Uh-huh.

**Q**    First of all, what is, what was the concept behind the regional resource centers?

A    When the regional resource centers were first developed as part of the Family Networks continuum, the idea was that in addition to the lead agencies at the area office level who assisted in the coordination of services for some of the families that are served by DCF, the regional resource centers were designed to assist in essence a variety of activities related to provider, quality provider program development and really looking at the system as a whole. So, regional resource centers were the entity within the Family Networks system that did most of the quality assurance work, if you will, related to the provider programs.  So they would conduct site visits, assist providers with technical assistance and consultation, and

1    when there was a provider who was needing some additional

2    work on developing their program or their milieu within the

3    program, the regional resource centers would help support

4    that effort.

5    **Q**    Do regional resource centers continue to exist?

6    A    No.

7    **Q**    Up to August of 2012?

8    A    No, they do not.  During one of the budget reductions we

9    were, unfortunately needed to suspend the regional resource

10   center contracts as part of that continuum of Family

11   Networks services.  So we spent a lot of time as we were

12   looking at budget reductions and realizing that that was one

13   of the areas that we were going to need to make some cuts,

14   going through all of the various and sundry responsibilities

15   that the regional resource centers had held and determining

16   who was going to pick up those responsibilities.

17          So that the lead agencies picked up some of those

18   responsibilities.  The residential DCF staff members, the

19   residential planners and regional administrative managers

20   picked up many of the activities related to monitoring of

21   the residential programs that historically the regional

22   resource center had done.  So the functions that the

23   regional resource center performed actually got assumed

24   under a variety of other positions or entities within the

25   department.

1   Q   I'm going to go back now to wrap up the topic of the

2   integrated casework practice model.

3          Have you heard the ICPM criticized for addressing

4   only kids at what's known as the front door and that it

5   doesn't help kids that are currently in foster care?  Have

6   you heard that criticism?

7   A   I've heard folks express that concern.  And I think that

8   the reality is that while we chose to focus on the front

9   door as we looked at the life span, if you will, of the

10   family's involvement with the department, we started with

11   when a family first comes to the attention of the department

12   what our first responses with the family are in setting the

13   groundwork for how the department both from a clinical

14   perspective as well as a family engagement perspective

15   worked with families.  We wanted that to set the foundation.

16          So it was always intended to be a phased in and

17   developmental approach to looking at all of our casework

18   practices across, across all of those junctures in casework.

19   So we did indeed start with the front door and built in the

20   sort of philosophical and value constructs that I had talked

21   about yesterday, made sure staff were trained on those, the

22   safety and risk assessments that we put in at the front of

23   the system.  And as I testified yesterday, I believe that

24   the next phase of the development was to be around our

25   assessment and service planning processes which is something

1    that happens after the initial response.  Whether it be an

2    initial assessment or an investigation, the next phase of

3    casework, if you will, is doing an assessment and a service

4    plan based on the child and family's strengths and needs,

5    what are the services that they need, what are the

6    challenges that are facing that family.  So assessment and

7    service planning is the next phase of development, and we

8    have started that phase of development.

9           One of the other things that's happening in the

10   department and been happening for the last three years that

11   parallels the development of the integrated casework

12   practice model is the development of Caring Together which

13   looks at a significant portion of the children who are in

14   out-of-home placement, specifically those children in

15   residential care, and working toward enhancing the services

16   that are provided in that portion of the continuum.

17          So, there are a number of other activities within

18   the department, including work on the National Youth in

19   Transition, they've ignited efforts that focuses on

20   transition issues, as well as some of the work that Mary

21   Gambon and her staff have been doing on the foster care

22   side.

23          So, ICPM isn't the, the integrated casework

24   practice model isn't the only thing happening in the

25   department related to helping with their services.

1    Q    Let's talk now about the joint procurement, the Caring

2    Together initiative.

3    A    Uh-huh.

4    Q    From your perspective as deputy commissioner for

5    clinical and program services, what is the Caring Together

6    and what's your role in it?

7    A    Okay.  Caring Together is an initiative that is a joint

8    procurement.  And what that means is that the Department of

9    Mental Health, the Executive Office of Health and Human

10   Services, and the Department of Children and Families are

11   working together to contract for out-of-home placement

12   services.  Historically, each agency contracted on its own

13   and separately with providers.  There were many providers

14   that actually served children and adolescents who are

15   primarily DMH clients and also serve DCF children as well.

16   So they, many of them had populations that were served by

17   each agency.

18            And so, one of the things that, as we began talking

19   about what do we need to look at in terms of redesigning and

20   enhancing our out-of-home placement system, how do we more

21   effectively help providers focus on the needs of the kids

22   regardless of which state agency they're primarily

23   responsible for.

24            So, this was a joint effort to really redesign that

25   out-of-home placement system.  And the focus on it has

1    really been to move away from the notion that residential

2    level of care really needs to have placement in a

3    residential program, that in point of fact our capacity to

4    provide services in the community have certainly expanded

5    over the last five or ten years, and we are better able to

6    serve children in their homes in the community so that

7    they're able to remain in their same school system, in their

8    same neighborhoods.  And so, Caring Together is really about

9    making sure that there is continuity between a residential

10   placement if a child needs to be out of the home for a while

11   and that child's transitioning back to home and the

12   community.

13   Q    What was the basis for the determination that this focus

14   on keeping kids in the community and at home versus putting

15   them into some sort of residential services program, what's

16   the basis for the decision that that is somehow a good

17   thing?  I mean, is that --

18   A    A combination of national research in child welfare and

19   emotional well-being of children that clearly demonstrates

20   that stability for a child is what contributes to their

21   academic achievement, to their emotional well-being, and we

22   certainly know that for most children to be able to remain

23   with their family provides a stronger sense of security and

24   emotional security for that child.  So, there's a wealth of

25   national research that really demonstrates the benefits for

1    children if they're able to remain stable with their family

2    and in their community and at their schools.

3    **Q**    What in particular has been your role with the joint

4    procurement?

5    A    I've been on the steering committee for the joint

6    procurement, and Bob Wentworth, who's the assistant

7    commissioner for planning and program development, who is

8    the lead, DCF lead staff person on that reports directly to

9    me.  So, throughout the course of the last three years the

10   department has been working with DHS and DMH on the joint

11   procurement.  I've been involved with, in many of those

12   meetings and also in some of the planning discussions around

13   the clinical approaches that will be used in this new

14   continuum.

15   **Q**    Would you walk us through, please, the implementation

16   phase or phases of the joint procurement recognizing that

17   we'll stop, we'll go from the beginning and stop at the time

18   frame of August 2012.

19   A    Okay, sure.

20         We started planning for the joint procurement

21   probably about three years ago in response to, in part in

22   response to the recognition that both DMH and DCF were at

23   that point in time where they needed to reprocure their

24   services.  The state regulations have a schedule on which

25   contracts are renegotiated and systems are redesigned,

1    reprocured.  And so, DMH and DCF were both reaching

2    that point in time when their out-of-home continuum would

3    need to be reprocured under those contract regulations for

4    the state.

5         And as we began talking about the changes that we

6    wanted to make in our residential continuum of care, and

7    then in some interagency meetings recognized that DMH was in

8    a similar place, decided to pursue together a joint

9    procurement, which is really an innovative strategy because

10   that hasn't happened before in the state.  But the

11   recognition that the clinical approaches that we were

12   looking for providers to build into their milieus, into

13   their programs for specifically more trauma informed

14   approaches, and I mentioned that yesterday in terms of the,

15   one of the clinical approaches for our casework practice

16   model, we wanted to align the work that provider agencies

17   were doing with the same sort of clinical approaches that

18   DCF was going to be using in the casework practice model.

19   And so, started down the path of this joint procurement.

20        The initial process had to do with the design of

21   what would the models look like, would there be new models

22   within the continuum, what changes would we be expecting

23   provider agencies to make.

24        So one of the first activities toward the

25   development of an RFR, request for responses to proposal,

1    was the design process.  And so through that process there

2    were a number of committees that were comprised of DCF staff

3    and DMH staff that worked together to develop a set of draft

4    standards that would guide in essence what the programs

5    would look like, what would be requirements of those

6    programs.

7            Another activity during that design phase was a

8    series of public meetings both with providers and with

9    family members.  Family members who were involved with the

10   Department of Children and Families and family members who

11   had had a child involved with the Department of Mental

12   Health.  And in those public forums in essence staff from

13   DMH and DCF presented ideas about what they were thinking

14   about how to move the system forward, how to enhance care in

15   out-of-home placement for children who had serious emotional

16   disturbance, children from DCF who had had trauma

17   experiences, and so help, you know, provide a framework in

18   essence for folks and then elicited feedback from parents.

19   And also asked a generic question of family members when

20   you've had a child in residential care what have been some

21   of the challenges, what worked well for you, what did you

22   like about the program your child was in, what do we want to

23   make sure it gets built into the system.

24            So there were over, if my memory serves correctly,

25   we had over 300 parents participating in a series of

 1    provider forums, I don't remember exactly how many, but a

 2    series of provider forums to both talk about some of the

 3    ideas that the departments had developed in their design

 4    process and that we were looking for from parents.

 5            The next stage of development was the issuance of

 6    what's called a RFI, a request for information.  That

 7    request for information gets posted on the state website

 8    Comm-Pass where all procurement information gets posted, and

 9    was an opportunity for providers to learn a little bit about

10    what the departments were thinking as they developed this,

11    then to respond to some very specific questions that were

12    included in the RFI.

13            That information gathered through that RFI process

14    came back to the design teams who were working on the actual

15    RFR itself, and they incorporated that into the RFR.  The

16    RFR was actually issued in August last summer.

17    Q    August of 2012?

18    A    Right.

19    Q    Three years ago you said --

20    A    Right.

21    Q    -- this process started, thereabouts?

22    A    Uh-huh.

23    Q    In your experience, is that a long time to be developing

24    something like this?

25            **MS. BARTOSZ:**  Objection; foundation.

1          **THE COURT:**  Well, I think she has sufficient

2     experience, but I'm not clear what long means here.  I'm not

3     sure what the reference points are.  So, I'm going to

4     sustain that.  You may explore the issue, Mr. Collins.

5          **MR. COLLINS:**  Certainly, your Honor.

6     **Q**    In your experience is a three year time frame,

7     thereabouts, that you've described, is that such a length of

8     time that children in the care and custody of the department

9     are being put at an unreasonable risk of harm?

10         **MS. BARTOSZ:**  Objection; leading.

11         **THE COURT:**  Yes, I'm going to sustain it on that

12    basis.  Maybe the way to get at it is this.

13         You said this was an innovative step.

14         **THE WITNESS:**  Uh-huh.

15         **THE COURT:**  But over your experience in the various

16    capacities that you've served in this department, you've

17    been involved in planning for other policy steps?

18         **THE WITNESS:**  Absolutely.

19         **THE COURT:**  Okay.  How did this compare in time?

20    Let's do it that way.

21         **THE WITNESS:**  Okay.  It is on the longer end of the

22    spectrum, if you will, in terms of the amount of planning

23    time.  But the reality is this is one of the biggest systems

24    changes that has happened in the state.  Never before have

25    two state agencies worked together to define what programs

1    were going to look like, what contracts were going to look

2    like, what the rate structures would be.  So, bringing two

3    agencies together, along with the Executive Office of Health

4    and Human Services, and as you might imagine different

5    agencies have different cultures, different language,

6    different ways of conceptualizing the work they do.  So, the

7    beginning stages to some extent was about coming together,

8    coming to consensus and getting on the same page in terms of

9    even the language that we were using.

10        So, for example, permanency is a major area of

11   focus for the Department of Children and Families.

12   Permanency isn't such a big issue for folks in the

13   Department of Mental Health.  So, how do we bring the two

14   state agencies together to think about the importance of

15   permanency related to developing these contracts.

16        **THE COURT:**  How did this planning process compare

17   in length of time, for instance, to the planning that went

18   into the implementation of ICPM which you've talked about.

19        **THE WITNESS:**  ICPM probably took about nine months

20   to a year in terms of the planning process itself.  Family

21   Networks, which was the prior procurement for residential

22   services, the planning for that took about 18 months.

23        **THE COURT:**  All right.  So, we have one that took a

24   year, one that took 18 months, and this is three years.

25        **THE WITNESS:**  That's right.

1          THE COURT:  Go ahead, Mr. Collins.

2          MR. COLLINS:  Thank you, your Honor.

3   Q    Ms. Nisenbaum, what is, what was the IV-E waiver that

4   was associated with the joint procurement?

5   A    Okay.  Joint procurement was, started before the federal

6   government provided the opportunity for states to request a

7   IV-E waiver.  And what a IV-E waiver is all about is that

8   the states actually get revenue from the federal government

9   for children who are in out-of-home placement through the

10  child welfare agency in the state.

11          Now, in many states revenue from that federal

12  revenue goes back specifically to the child welfare agency.

13  Is Massachusetts it actual goes back to the general fund,

14  but clearly helps offset the general budget for the state.

15          When the IV-E waiver, or the opportunity for a IV-E

16  waiver came into being we made the determination that we

17  would apply for a IV-E waiver, and what it was going to be

18  helpful for Massachusetts was through Caring Together we

19  were going to be moving more children into the community,

20  more quickly through the program models and design of Caring

21  Together, and at some level there is a loss of revenue, if

22  you will, to the state as you move children from residential

23  placement or out-of-home placement into the community.  And

24  so, the opportunity for Massachusetts was to be able to

25  through this continuum allow the state to continue receiving

1    those federal dollars as the child transitioned back to the

2    community or to home, even if they weren't sleeping in a

3    bed, if you will, of a residential placement.

4              So we utilized the work that we were doing on

5    Caring Together and building that new system in our proposal

6    for our demonstration project for the IV-E waiver and were

7    one of ten states who were selected in receiving the IV-E

8    waiver demonstration project.

9    Q    And in seeking the waiver that was a process that the

10   department had to go through?

11   A    Yes, it was indeed.  Once the federal government puts

12   out a notice that they are looking for proposals for

13   demonstration projects for the IV-E waiver, you are allowed,

14   I forget the exact amount of time, but it was a fairly short

15   time this time, I think just about six or eight weeks that

16   we had to write a proposal to submit to the federal

17   government for our, defining what our project would be and

18   why we were doing it.

19             Part of the process of that proposal is you have to

20   develop a logic model and a theory of change as well as a

21   description of what the program is going to be.  So, we were

22   incorporating the work that we were doing on Caring Together

23   into that, into that proposal and it was ultimately selected

24   to receive demonstration project --

25   Q    It was approved by the federal government?

1    A    It was, indeed.

2    Q    Procedurally with the Caring Together initiative, what

3    are the expectations going forward for the implementation of

4    the joint procurement Caring Together initiative?

5              MS. BARTOSZ:   Objection, your Honor, on the basis

6    of the fact cutoff date, August 15, 2012.

7              THE COURT:   No, she's being asked her expectations

8    as of that date.   I'm going to allow that.

9    A    The procedure or process for going through a procurement

10   is pretty well defined in the state.   So that even at the

11   outset of the process there are clear benchmarks, there are

12   clear steps, if you will, milestones along the process

13   before you actually get to program implementation.   Those

14   steps include the issuance of an RFR, which I talked about a

15   minute ago.   That for Caring Together came out in August of

16   last year.   After the RFR came out several of the provider

17   associations felt like there was some questions that they

18   wanted answered before they submitted their response to the

19   proposed, submitted their proposals.   And so there was

20   actually a Q and A that was developed and posted on

21   Comm-Pass which is the state website related with

22   procurement, and was sometime the end of September.   There

23   were over 300 questions that had been submitted by

24   providers.   Those were answered and posted on Comm-Pass so

25   providers would have greater clarity about what they needed

1    to incorporate into their proposal responses.

2           Providers then spent the fall writing their

3    responses to proposals, submitted those on December 6th of

4    2012, and actually started over the holidays and then on

5    through January there were a series of teams that had been

6    set up across the state comprised of DCF staff, DMH staff

7    and family members and some youth who were given the

8    responsibility of reviewing all of the proposals that had

9    been submitted for each level of care within the Caring

10   Together system.  And they made their recommendations to the

11   commissioners of DCF and DMH in late January, I believe, and

12   in February the commissioners made their decisions about

13   accepting or not the recommendation from those teams.

14          And just to put a finer point on the teams.  We

15   spent a lot of time during December training the teams, each

16   of the review teams, on the standards that had been

17   developed for Caring Together, what their responsibilities

18   were in terms of assessing and how do they go about

19   assessing proposals.  So there was a lot of effort put in to

20   making sure that the teams were on the same page, if you

21   will, in terms of their review of those proposals.  And this

22   spring the Executive Office of Health and Human Services and

23   DCF and DMH have been working on preparing an outreach and

24   implementation plan to let providers know who have been

25   selected in the process and who were not selected, which

1    providers were not selected in the process.  And it is our

2    anticipation that some of those contracts will start

3    July 1st and some of the competitive bids will probably not

4    start until October 1st.  But they're scheduled to start

5    October 1st.

6         **MS. BARTOSZ:**  Your Honor, plaintiffs would move to

7    strike the response insofar as it didn't state expectations

8    but rather it was --

9         **THE COURT:**  So much of the answer as detailed times

10   for execution, that's stricken.

11   **Q**   Imagine yourself back in time in August of 2012, what

12   was your expectation at that point for the, for this model,

13   for the Caring Together model to be up and running in full

14   speed, full implementation mode?

15        **THE COURT:**  You just asked her that.  You've asked

16   her that question and she's answered.

17        **MR. COLLINS:**  Okay.

18        **THE COURT:**  And I've made my ruling.  Let's go on

19   to something else.

20   **Q**   Ms. Nisenbaum, I want to turn now to the subject of

21   investigations at the department.  As the deputy

22   commissioner you have oversight of the investigations

23   departments?

24   **A**   I have oversight of the special investigations and

25   critical investigations unit.

1    **Q**    SIU and CIU?

2    A    Correct.

3    **Q**    If we use those two terms, can we have an understanding

4    we're talking about the special investigations unit and the

5    critical investigations unit?

6    A    Correct.  Those units are responsible for, and they're

7    both headed up by the same director, but SIU, special

8    investigations unit, is the unit that's responsible for

9    reviewing and investigating 51A's that come into the

10   department that have been filed related to a child who is in

11   a program.

12            So, for example, if the child's in one of our

13   residential programs or in departmental foster care or

14   intensive foster care, SIU investigates those, investigates

15   those rather than the local area offices investigating

16   those.

17            Another example is SIU would investigate

18   allegations of abuse or neglect for children who were in a

19   daycare setting that's licensed by EEC.  So that's another

20   example.

21            CIU is the smaller of the two units.  There are

22   three staff in CIU, and the focus for CIU is on doing

23   fatality reports, investigating fatalities that, for

24   children who are current, either currently open with the

25   department or whose family has been open with the department

1    during the prior six months.  That unit also from time to

2    time, if there is a high profile case of some sort that's

3    getting a lot of media attention, that unit would be

4    responsible for looking at casework practice related to

5    those cases.  They're some of our best investigators in the

6    department, and so we really have those folks separate from

7    the area offices do those kinds of investigations.

8    **Q**    And you mentioned that those two units are overseen

9    directly by?

10   A    Scott Scholefield, who's the director.

11   **Q**    And Mr. Scholefield reports directly to you?

12   A    He does, indeed.

13   **Q**    Just going back for a minute to the CIU and the fatality

14   reports that they, the fatality reviews that they conduct.

15          What percentage, if you know, of fatalities that

16   are reviewed by this unit are as a result of abuse and

17   neglect versus some other reason?  And let me give you a

18   time frame on that.  Let's say from 2007 to 2012.

19   A    I don't remember the exact number of children, but on

20   average there's one or two children per year who have died

21   as a result of abuse or neglect.  CIU does approximately 70

22   to 75 fatality reports during the year.  One to two of those

23   are the direct result of abuse or neglect.

24          **THE COURT:**  And so of the, and I have the figure,

25   but it's in the thousands of children, in DCF custody, 75

1   die per year?

2         THE WITNESS:  They're not all in DCF custody, sir.

3   They may be involved in open cases, but the children may

4   still be living at home with their families.

5         THE COURT:  All right.

6         THE WITNESS:  So, for example, if a child, an

7   adolescent is killed in an automobile accident and yet their

8   family's open with the department, we would still do a

9   fatality report.

10        THE COURT:  You would count it.

11        THE WITNESS:  Absolutely.

12        THE COURT:  All right.  I appreciate the -- so one

13  or two children in custody --

14        THE WITNESS:  Correct.

15        THE COURT:  -- die from abuse or neglect --

16        THE WITNESS:  Correct.

17        THE COURT:  -- per year.

18        THE WITNESS:  Correct.

19        THE COURT:  Seventy-five within the ambit of the

20  department's care and concern die over the course of an

21  average year.

22        THE WITNESS:  Right.

23        THE COURT:  What are major causes of death?

24        THE WITNESS:  The key one ones -- well, for

25  example, in 2011, we had nine children, adolescents

1    primarily, who committed suicide.  There were, I think three

2    or four drownings during the summer where children had gone

3    with their families or in their family swimming pool had

4    drowned.  We have a significant number of children who die

5    from medical, chronic medical conditions.  I think in 2011,

6    I believe it was 18, although I don't, I don't remember

7    exactly.  So, a combination of accidental deaths related to

8    chronic medical conditions.

9         We've had in the last few years some gang related

10   homicides, a couple or three adolescents who were shot

11   related to gang activity.

12        So there's a full gamut, if you will, of reason.

13        **THE COURT:**  Well, actually let me press a little

14   bit.

15        I guess I'm somewhat startled by that figure simply

16   believing that kids in Massachusetts have a pretty good

17   chance of surviving --

18        **THE WITNESS:**  Absolutely.

19        **THE COURT:**  -- to adulthood.

20        **THE WITNESS:**  Absolutely.

21        **THE COURT:**  And I appreciate how precise you can be

22   with the figures.  So, in the time you're talking about,

23   within the ambit of DCF's care and concern there were how

24   many children, roughly, 5,000, 4,000?

25        **THE WITNESS:**  Just to clarify, sir, when you say

1    the ambit of our care and concern, you aren't speaking

2    specifically of children in custody but any child in an open

3    case?

4        THE COURT:  Right.  That's how you've defined it

5    and that's what I mean, right.

6        THE WITNESS:  Okay.

7        THE COURT:  Kids with an open case, I think is

8    within the ambit --

9        THE WITNESS:  Okay.

10       THE COURT:  -- of the department's professional

11   concern.

12       THE WITNESS:  Okay.  So, about, we serve about,

13   between 35 and 40,000 children a year.

14       THE COURT:  Yes.  So custody is the 4,800.

15       THE WITNESS:  Exactly.

16       THE COURT:  Sometimes more.  But open files is 35

17   to 40,000.

18       THE WITNESS:  Correct.

19       THE COURT:  And how does the death rate of people

20   within that larger, I'll say care and concern, relate to the

21   child death rate in Massachusetts generally?

22       THE WITNESS:  I'm sorry, but I don't really know

23   the answer to that.  We -- all of the deaths that are

24   reviewed by the department are also reviewed by, there's a

25   child fatality review team, there's a statewide team, and

1    then local level teams that, the district attorney, the

2    medical examiner sits on that team, as well as the

3    Departments of Public Health and the Office of Child

4    Advocate.

5            THE COURT:  To whom do these child fatality teams

6    report?

7            THE WITNESS:  They were organized legislatively,

8    but I don't know that there's a specific person that they

9    report to.  So they review all of the deaths regardless if

10   they're DCF kids or not.

11           THE COURT:  So, when we have a death we have a

12   death certificate, for an adult death without exceptional

13   circumstances, it's just part of the vital statistics --

14           THE WITNESS:  Right.

15           THE COURT:  -- of our life and inevitable death.

16   But when a child dies, that means a person under the age of

17   18 --

18           THE WITNESS:  Uh-huh.

19           THE COURT:   -- under Massachusetts legislation is

20   at least is run through this team which --

21           THE WITNESS:  Right.

22           THE COURT:  -- as a law enforcement officer and --

23           THE WITNESS:  Correct.

24           THE COURT:  -- who else?

25           THE WITNESS:  The Department of Public Health.

1            THE COURT:  Right.

2            THE WITNESS:  The Office of the Child Advocate.

3    And one of the purposes of that statewide child fatality

4    review team is to really look at are there emerging areas of

5    concern related to child fatalities in the state.

6            THE COURT:  Infant mortality, for example.

7            THE WITNESS:  Exactly.

8            THE COURT:  I hear from time to time how at least

9    the United States ranks in infant mortality compared to that

10    of other country, and you think, well, what is our health

11    care like --

12            THE WITNESS:  Exactly.

13            THE COURT:  -- if we have X rate of infant

14    mortality.

15            THE WITNESS:  Exactly.

16            So, one of the things, just to give you really a

17    concrete example, one of the things that has come out over

18    the last two or three years was the number of infants who

19    were dying related to unsafe sleep environments.  So, the

20    bumpers families put around the crib and keeping cribs

21    stuffed with lots of stuffed animals, wrapping kids too

22    tight in blankets.  So, there were a number of children

23    infants who were dying as a result of what those unsafe

24    sleeping environments were.  So the child, the statewide

25    child fatality review team worked with the Departments of

1      Public Health and with DCF to develop a public policy

2      statement or public health statement that spoke to what are

3      the risk factors in unsafe sleeping environments or

4      co-sleeping, which is another example of an unsafe sleeping

5      environment.  And then there were some public service

6      announcements related to that.  So, that's the --

7                THE COURT:  Co-sleeping is sleeping with a parent?

8                THE WITNESS:  Exactly.

9                THE COURT:  Or usually.

10               THE WITNESS:  Right.

11               THE COURT:  And again just to finish up my interest

12     in this.  So here is a public health issue and the public

13     health authorities within our Commonwealth put out

14     recommendations --

15               THE WITNESS:  Uh-huh.

16               THE COURT:  -- for the care of infants generally.

17               THE WITNESS:  Right.

18               THE COURT:  And then, necessarily, DCF, who has the

19     custody of a certain number of children of those, that age,

20     they conform or they --

21               THE WITNESS:  Exactly.

22               THE COURT:  -- they seek to conform in a

23     bureaucratic way, by putting out the same information to

24     foster homes --

25               THE WITNESS:  Exactly.

1          THE COURT:  -- and parents and the like.

2          THE WITNESS:  Exactly.

3          So, there are a variety of resource materials that

4    we've developed over the years related to window safety.  So

5    that families who live on the second floor want to make sure

6    their windows are shut tight, that there's a lock on the

7    screens.  Safe sleeping.  Shaken babies, another area that

8    we provide resources to our birth parents and to foster

9    parents about keeping kids safe in those ways.

10   BY  MR. COLLINS

11   Q   Ms. Nisenbaum, I want to talk about the work of these

12   two units, SIU/CIU, and I want to start with the CIU.

13   A   Okay.

14   Q   Can you describe sort of the functions of the CIU, what

15   it does and ultimately what product it puts out?

16   A   Sure.  As I said, CIU is responsible for investigating

17   fatalities, reports of fatalities that come to the attention

18   of the department if the case is currently open or if the

19   case has been opened at any point during the prior six

20   months is when we do an investigation.

21          The department actually has taken, over the last

22   seven years, six, seven years, the opportunity to focus

23   those reports or those investigations not simply on the

24   death of the child but really using it as a quality

25   improvement opportunity to look at casework practice over

1       the time that the family was involved with the department.

2       So the investigation that's done is not specifically

3       exclusively related to the death of the child, but really

4       looking at what was our practice, casework practice

5       throughout the time that the family might have been involved

6       with the department.  So, to that extent we use it as a

7       quality assurance activity.

8              So, the staff in the CIU unit who do these

9       investigations, basically go through the child and family's

10      case records, so they look at Family Net, all of the

11      supporting documentation in the client's case record, they

12      interview social workers or supervisors or managers who were

13      involved with the family throughout the time.  And the

14      family may have had episodic involvement over a number of

15      years.  So the reports can end up being quite extensive

16      because they may go back ten, twelve years in terms of their

17      involvement, their first involvement with the department.

18             So, for each time that the case was open, the CIU

19      investigator spends time talking with staff who were

20      involved with the family, reviewing case records, looking at

21      reports from collaterals, and then they write a report that

22      provides a chronology of the department's involvement with

23      that family and what our areas of focus were with the

24      family.  And the reports can be pretty specific in terms of

25      capturing dictation from the case records, and they include

1    that to the extent that it helps illuminate particular

2    strengths in case practice or particular problems in case

3    practice.

4              At the end of their investigation they then write a

5    report, fatality report, that speaks to the case practice

6    over the course of our involvement with that family.  And at

7    the end of that fatality report there's a section, it's

8    called observations on this review, and there are three

9    specific sections, sections that are included in that part

10   of the report.  The first is that they highlight where there

11   were, where there was effective case practice.  So that if

12   there had been particularly good investigations previously,

13   or if the social worker had done a really effective job with

14   engaging with the family, or the family had been hooked up

15   to very appropriate services, at any point in the life of

16   the case with, involvement with DCF, those would get

17   highlighted in a section called effective case practice.

18             The next section is titled opportunities for

19   improvement.  And so, again, there is, they highlight in

20   that section those places where the CIU staff felt like

21   there were in their objective opinion opportunities where we

22   could have done a better job.

23             So, for example, if, if they felt that the focus of

24   the case was a bit narrower than it might have been.  So,

25   for example, the family may have had some substance abuse

1     issues, some mental health issues or domestic violence

2     issues that were present in the family, and they felt that

3     the casework may have been too narrowly focused on just one

4     of those rather than forming a whole clinical formulation of

5     the family.  They would highlight that they felt the focus

6     was too directed to one particular area.  Or if they felt

7     that the social workers had not gotten the type of

8     consultation to support their more effective case practice

9     with the family, they would highlight that kind of thing.

10         And then the process review of those fatality

11    reports is that the reports go to our risk management

12    committee.  They then -- for discussion.  They then come to

13    me.  And then they would go to the commissioner.  And the

14    commissioner and I would together develop the last section

15    of the report which in essence was directives from the

16    commissioner, if there were any specific action steps that

17    needed to be taken related to that case.

18         Sometimes there were case specific but more often

19    they were looking at systemic issues.  So, if the

20    commissioner and I had noticed that over the course of

21    several fatality reports there might have been a particular

22    issue highlighted where it was clear that staff would

23    benefit from additional training on something, we might

24    provide, the commissioner would provide me with a directive

25    to either develop practice guidance or arrange for that kind

1    of training.

2    Q    How is that information, if at all, that is contained

3    within the report you just talked about communicated back to

4    the field?

5    A    It goes back to the field after risk management and,

6    actually after the commissioner provides his commentary, the

7    report, a copy of the report goes to the director of areas

8    and to the regional director, and occasionally I know that

9    Olga would have conversations in review.  I honestly don't

10   know if she does that on every single one, but I know that

11   there were times when she did have those discussions.  So

12   that's one way.

13         The other way is that through the risk management

14   committee, again, part of the responsibility for the risk

15   management committee is to look at general themes in terms

16   of practice and to highlight where there are again

17   opportunities for improvement.

18         So, one of the things that the risk management

19   committee that just, that we've done in the past is they may

20   recommend a series of quality improvement round tables on a

21   particular topic.  And so those round tables will help

22   provide opportunities to think about what's our current

23   practice, what are best practices, on particular topic area.

24   Q    Flipping over to now the SIU side of the investigative

25   house.  If you would, just briefly describe, we've had some

1    testimony on this so we don't want to belabor the point, but

2    if you could briefly describe the process for investigations

3    in the SIU?

4    A    From the SIU side.  Okay.

5         We have about 14 SIU investigators across the

6    state.  And those investigators are, spend virtually all of

7    their time out in the field in the area offices or in the

8    regional offices, although they report in to central office.

9    And as I noted before, they're always investigating

10   allegations of 51A's related to children in placement,

11   foster care, daycare.  And so, the process for those

12   investigations is not dissimilar to what we do in one of our

13   regular investigations of the family, but it's much more

14   comprehensive because, as you can imagine if you're doing an

15   investigation in a program.  So, for example, if you've

16   gotten a 51A that a child has perhaps been hurt during a

17   restraint in a residential program, the investigator would

18   need to go out to the program.  There's a lot of

19   documentation to review when you're at a program, much more

20   so than with a family obviously because families don't keep

21   documentation.  So, programs have daily logs, they have

22   treatment plans, they have all kinds of documentation.  So

23   the investigator would review that.  They would interview

24   the multiple staff who were on duty at the time of the

25   incident.  They would review, interview management staff,

1    program directors, et cetera, to look at the policies and

2    procedures that are in place related to whatever the

3    particular incident was.  So, there's a pretty comprehensive

4    investigation process for those 51A's.

5    **Q**    What does it mean to complete an investigation?

6    A    Okay.  I think the reality is different people probably

7    have different definitions for that word.  For SIU

8    investigations to complete one of those investigations would

9    be at the point that the 51B response has been completed and

10    entered into Family Net.  So, that's the official

11    completion, if you will, of an SIU investigation.

12    **Q**    So, when DCF is measuring the timely completion of

13    investigations, how is it making that measure?

14    A    Okay, the way that that measure occurs is from the point

15    that the 51A was entered into Family Net, the date which

16    that was entered, when the original complaint comes in, to

17    the point at which the 51B response is approved and entered

18    into the system, the date that that's entered.

19    **Q**    Physically entered --

20    A    Physically entered.

21    **Q**    -- administratively into the system?

22    A    Absolutely.

23    **Q**    In your experience, since 2008, in your oversight of

24    these investigative units, are investigations, these 51A

25    investigations, are they ever delayed on the front end of

1    the investigation?

2         **MS. BARTOSZ:**  Objection; lack of foundation.

3         **THE COURT:**  Do you know the answer to that

4    question?

5    A    I would first need some clarification on what you mean

6    by front end, just so I'm sure that we're on the same page.

7    Q    Certainly.

8         What's the first thing when an allegation of abuse

9    or neglect comes into the SIU, what's the first thing that

10   an investigator does to initiate the process?

11   A    Actually the investigator is not the first person who

12   touches a report that's made, it's the screener.

13   Q    Okay.

14   A    So, there are screeners for SIU and the same thing,

15   there are screeners in the area offices.  And so the

16   screener really is the first, first place an allegation

17   would go.  And the screeners for SIU have the same sort of

18   general guideline around when they have to process a

19   screening.  They usually do that within 24 hours.

20   Occasionally, but less often for SIU than for the area

21   offices, because we didn't really implement that extended

22   screening in SIU the same way that we did within the area

23   offices for screening allegations related to family members.

24   So, SIU virtually always processes that screening and makes

25   that screening decision, whether to screen in or screen out

1    a report, within 24 hours.  So the investigator would then

2    get assigned generally within 24 hours of when that report

3    comes in.

4    Q    From that point, let's assume that an investigation has

5    been screened in, what happens -- at what point does the

6    investigator get involved?

7    A    Immediately.

8    Q    Okay.

9    A    As soon as they're assigned a case their responsibility

10    starts the minute it goes on their tab, if you will, in

11    Family Net.

12         The, the process that an investigator uses varies a

13    little bit depending upon the allegation.  Sometimes they

14    might start with a review of the records, and other times

15    they might start with interviewing staff in the program, so

16    that there's not too long a time frame that would go by that

17    would change staff memories about what happened or they lose

18    some of the details.  So, generally investigators try to get

19    out very quickly and interview staff who were involved in

20    the incident.

21    Q    In your experience have you ever seen a delay at that

22    stage?  And by that stage, I mean what you just described

23    which is the investigator getting out the door when he or

24    she needs to go and interview a child, or someone else?

25         **MS. BARTOSZ:**  Objection; lack of foundation.

1              THE COURT:  No, I think she has the experience.  If

2       you know of your own knowledge.  Do you know?  You may

3       testify so.

4       A    Thank you.

5              Less often is a delay on the SIU side in reality.

6       Often on the CIU side, when there are reports of fatalities

7       that we're investigating, there are very intentional times

8       that we delay, for example, going out and interviewing a

9       family just out of respect for the fact what they've had a

10      child just die.  So we may make a phone call, find out what

11      support a family might need, how we can provide support, but

12      we may not actually interview the family for a few days in

13      that kind of scenario.

14      Q    I want to focus on SIU investigations for a moment.

15      A    Okay.

16      Q    And when we're talking about untimely investigations, I

17      want to understand what your understanding is in terms of

18      where the delay is occurring such that an investigation can

19      be deemed untimely.

20              Do you understand the question?

21      A    I do understand the question.

22      Q    Okay.

23      A    With respect to your conclusion question, the reality is

24      that none of the investigations are delayed at the outset on

25      the SIU side.  So, as I said, investigators who are assigned

1    are immediately responsible for initiating that

2    investigation, whether that's interviewing staff or

3    reviewing records or whatever.

4            Some of the SIU investigations are not completed in

5    a timely manner.  The 51B response and all of the write-ups

6    and the reports that are done may not be completed, for

7    exactly the reasons I testified to a few minutes ago in

8    terms of the breadth and scope of the information that they

9    need to look at as compared to another type of

10   investigation.

11           So, program investigations take longer just by

12   virtue of the fact there's infinitely more material you need

13   to look at to make a determination.

14   Q   Are investigators in the SIU -- let's start with the

15   SIU.  Are they required to complete certain trainings?

16   A   Are they required?

17   Q   To complete certain training.

18   A   Absolutely.  They are required to complete the

19   investigators training that any hotline worker or all

20   investigators in the department complete, and that's a seven

21   day training.  Actually I think it may have gotten up to

22   eight days recently.  But it has historically been a seven

23   day training, most of which is conducted by a police officer

24   that is contracted with the department to do that training.

25           The investigators in SIU are generally

1    investigators who have years of experience in the department

2    doing regular investigations and then would come to SIU.

3    So, there are not any staff in SIU who are newly hired to

4    the department or new in child welfare.

5    **Q**   If you know, what is the average number of years of

6    experience of the investigators in the SIU?

7    A   I honestly don't know for certain what the average

8    number is.  But I do know that there are a number of staff

9    who have well over 15 years of experience.  But what the

10   average is across all of the investigators, I'm not sure.

11   **Q**   The investigators for the SIU are physically located

12   where?

13   A   They're physically located out in the field.  They're

14   located in the regional offices or area offices.  And part

15   of the reason for that is it goes back to your question

16   before about the timeliness with which they can start an

17   investigation.  So that we have SIU investigators within

18   each of the regions, and that makes it much more efficient

19   in terms of their being able to get out there quickly to, to

20   respond when an investigation is needed.

21   **Q**   I'm going to turn now to the subject of training.  You

22   have as deputy commissioner some responsibilities that are

23   associated with the training of the staff at the department?

24   A   I do, indeed.  The Child Welfare Institute, which is the

25   primary unit responsible for training for the department, is

1   currently within the responsibility of Amy Kershaw who is

2   the assistant commissioner for policy and practice, and the

3   Child Welfare Institute falls within her scope of authority

4   and Amy reports to me.

5   **Q**   At a macro level, would you describe the training

6   program at the Department of Children and Families?

7   A   Sure.  The first training that staff are involved in

8   historically was known as core training.  Some states call

9   it pre-service training.  We recently revamped that to new

10  worker professional development program, but historically

11  core training.  And that training was, is about four weeks

12  in duration with a series of follow-up topic specific

13  training that comes after that initial four weeks.

14          And during that initial four weeks staff who are

15  joining the department as a social worker are introduced to

16  all of the basic regulations and policies of the department.

17  They're introduced to child welfare concepts, some basic

18  trauma concepts, what's the, what are the legal criteria and

19  the clinical ramifications for removing a child from home.

20  So, just the full gamut of concepts that they need to know

21  in order to assume their responsibility as a social worker

22  within DCF.

23          The other training, there are additional trainings

24  that the department offers.  Any time we promote a social

25  worker to the role of supervisor there is a new supervisor

1    training that is required.  Similarly, when staff go from a

2    supervisor to being an area program manager there's training

3    for new area program managers.

4         And in addition to that, there are, the Child

5    Welfare Institute provides throughout the year a variety of

6    workshops and in-service training that are available to

7    staff on topics that are relevant to their, to their jobs.

8         So, we offer training related to trauma, trauma

9    work.  We offer training related to mental health and

10   substance abuse.  So there are a series of workshops that

11   folks can take advantage of.  Effective supervision is

12   another one.

13        And in addition to the in-service training that's

14   offered, those workshops, the Child Welfare Institute also

15   purchases slots at conferences so that staff can pick and

16   choose when they would like to go to a conference on a

17   particular topic.  So they have that option as well.

18        In addition to those trainings, the Child Welfare

19   Institute also works with universities and colleges around

20   the area.  We have a fellowship program that helps support

21   staff within the department getting their master's degree,

22   for example, in social work.  And so we basically split the

23   tuition between the university, the department, and the

24   student, as a one-third, one-third, one-third sort of

25   example, for providing an opportunity for folks to further

1      their education and get their master's degree.

2              We also provide postgraduate degrees.  For example,

3      at Simmons College we worked out a program for advanced, a

4      certificate of advanced graduate studies, the C.A.G.S.

5      program.  And that was a trauma certificate and that's

6      through the Simmons Graduate School of Social Work.  And

7      we've had, just as an example, over a hundred staff who have

8      participated in that C.A.G.S. program and now have their

9      advanced certificate in that area.

10     **Q**    What, what guides the department in developing its

11     overall training curriculum?

12     A    There are a number of things that drive our overall

13     training curriculum.  One is -- and it's been modified.  We

14     regularly update that curriculum based on advances in

15     knowledge in the child welfare industry as a whole.

16             Susan Spurlock, who's the director of that program,

17     as well as two or three of those staff managers in that

18     program, are very involved in the NTSBTA, the national

19     training -- there's a national training association.  I'm

20     forgetting the exact title of it.  But they're very involved

21     in that.  So they keep abreast of what's happening

22     nationally, both on the child welfare front as well as on

23     the training front.  So, that information helps in guide of

24     that, changes that we might make in our curriculum.

25             The other thing that clearly guides it is the

1    changes that we're making in our own policies.  So, for

2    example, when we implemented the integrated casework

3    practice model, we made some fundamental changes both in our

4    core training, that pre-service training, as well as some of

5    the additional, added some additional types of workshops,

6    some additional types of training.  And we had a series for

7    the integrated casework practice model, not only the initial

8    orientation, also training on the completion of the

9    standardized risk assessment tool that we put in place, and

10   there were a series of ten modules that were offered to

11   staff by the coaches that we had talked a bit about

12   yesterday.  Those ten modules included everything from

13   specific focus on interviewing children to engaging families

14   to thinking about tools and techniques that staff might use

15   in terms of more effective interviewing of family members as

16   well.

17          So, there are a whole range of topics that got

18   incorporated into that training but was specific to ICPM.

19   Q    Susan Spurlock is the director of the Child Welfare

20   Institute?

21   A    Correct.

22   Q    How, if at all, does the COA and the CWLA, the guidance

23   that they put out, influence the training curriculum at the

24   department?

25   A    In the same way that a lot of the professional

1    organizations across the country have a wealth of

2    information on their websites.  They periodically provide

3    information on what's new in emerging best practices in

4    child welfare, and in the areas of child and family

5    emotional well-being.

6            The Child Welfare Institute utilizes those

7    resources as well as the resources from the national

8    resource centers that I mentioned yesterday to incorporate

9    that knowledge into the training that we're offering the

10    staff.

11   Q    How does federal law, federal regulations guide the

12    development of the training curriculum at the department?

13   A    There really aren't any specific federal regulations

14    that provide guidance or requirements for the training of

15    our child welfare staff.  The one exception to that has been

16    with the trauma grant that we recently received.  And we

17    spent a significant amount of time in the development of our

18    implementation plan with the Children's Bureau where they

19    were very, very interested in exactly what it was we were

20    going to be training staff on.  So that's the only time

21    where the federal government, the Children's Bureau, has

22    been involved in defining or having input into training.

23   Q    As part of the, as part of ACF requirements in the CFSR,

24    is DCF required to produce what's known as a training plan?

25   A    Yes, we do.  On a regular basis we produce that and it

1    sets forth exactly what our, the scope of the training

2    that's offered within the department.  And so that gets

3    included in the training plan that's produced.

4         We also included a description of that with our

5    annual review.  We're required to submit to the federal

6    government on an annual basis a summary of what's been

7    happening and it's called an APSR report.  And it's due

8    every year June 30th.  And within that as well we submit

9    information about our training.

10        We also included some, some information about

11   training within our CFSR and our PIP.

12   Q   I'm going to show you what's been marked as Exhibit 94

13   in this case and just first ask you to just take a look at

14   it and if you could just identify the document generally?

15   A   This is the, what's known as the child and family

16   services plan, and this particular document covers the years

17   2010 to 2014.

18   Q   And would you turn to Bates labeled number at the bottom

19   DCF7054636.

20   A   Okay, I am there.

21   Q   What is it that we're seeing here as part of the child

22   and family services plan starting at that page?

23   A   This section of the report basically speaks to the

24   Department of Children and Families Child Welfare Institute

25   training plan.  So, this is what we submit that

1    characterizes what are the different types of training that

2    the department offers, and generally how many days the

3    training takes to, you know, we have some training that's

4    one day or two days or half a day, so it really describes in

5    detail where the training takes place, the duration of the

6    training, a general description of the training, and who

7    it's intended for.

8    **Q**    And how often is this plan developed?

9    A    I believe it's developed once every five years.

10   **Q**    And you mentioned something about the --

11        **THE COURT:**  Help me out again, it's my fault, where

12   in this larger document are you speaking from?

13        **THE WITNESS:**  It's DCF7054636.

14        **THE COURT:**  Thank you very much.

15   **Q**    I believe you just said that this particular plan

16   through this document, child family services plan, is

17   developed once every five years.  Yes?

18   A    Correct.

19   **Q**    You mentioned earlier that there is an APSR that is

20   produced as well.  How often is the APSR produced?

21   A    The APSR is produced every year.  It's due to the feds

22   on June 30th of each year.  And there is a training

23   description component of that report that speaks to training

24   as well.

25   **Q**    Each year?

1    A    Each year.  Correct.

2    Q    Who within the department develops both the training

3    plan that's contained here in the CFSP and the annual

4    training plan that's developed in the APSR?

5    A    Liz Skinner-Reilly is our federal liaison who actually

6    submits these reports.  But both this report and the APSR is

7    a compilation of staff who are involved in writing sections

8    that they're familiar with.  Both of these documents cover a

9    wide array of topics, and so multiple staff within the

10   department contribute to the authorship of the final report.

11   And the Child Welfare Institute staff obviously writes the

12   section on the training.

13   Q    What happens once the report is submitted to the federal

14   government, is there an expectation that the department will

15   get feedback from the federal government?

16   A    There's very rarely feedback given.  Occasionally they

17   will ask a question or, you know, ask for further

18   clarification.  But in reality, we get very little feedback

19   despite the fact that it's a tremendous amount of work to

20   produce these documents.

21   Q    But this has to be approved by the federal government?

22   A    It has to be approved.  It absolutely has to be

23   approved.  And if you get no questions from them it is an

24   indication of approval for the document.  And they do review

25   it because we do get questions from time to time asking for

1   further clarification on the document.

2   Q    In your time with the department has a training plan

3   ever been rejected?

4   A    Never.  In fact, we've gotten compliments on our

5   training plan.  During the CFSR review of 2007, one of the

6   review indications was that they were very satisfied with

7   the training efforts within the department.

8           MS. BARTOSZ:  Your Honor, I move to strike that

9   last piece of testimony as hearsay.

10          THE COURT:  I will strike it.

11  Q    Let's talk about the Round 2 CFSR.

12  A    Uh-huh.

13  Q    How many systemic factors does the Commission on

14  Children and Families review of the department as part of

15  its CFSR review?

16  A    There's seven systemic factors.

17  Q    Is the department's training one of those systemic

18  factors that's reviewed?

19          THE COURT:  Is the department's training?

20          MR. COLLINS:  Correct, your Honor.

21          THE COURT:  All right.

22  A    Training is a component of what they look at as part of

23  the review process, yes.

24  Q    As part of the CFSR review?

25  A    Yes.

1    Q    And if you recall, what did the federal government rate

2    DCF's training, provision of training in its Round 1 CFSR

3    review?

4    A    In Round 1, in all honesty, I don't remember.

5    Q    If you recall, what was the rating that the federal

6    government gave the department for its training in Round 2

7    of the CFSR?

8    A    It was an area of strength.

9            THE COURT:  It was, say again?

10           THE WITNESS:  An area of strength.

11           THE COURT:  Yes.

12   Q    In fact, the department can receive a rating of either

13   in substantial conformity or an area needing improvement,

14   right?

15   A    Correct.  And this one was an area of substantial

16   conformity.

17   Q    I want to talk to you about mandatory training versus

18   non-mandatory training in the department.

19           First of all, is there any, is there any training

20   that is mandated by the department?

21   A    There are two types of training that are mandated by the

22   department.  The first of those is the staff who are taking

23   a position within the department as a social worker

24   participate in what I was talking about a few minutes ago,

25   core training, or new worker professional development

1    training as it is now known.  So that's mandatory.

2         The other training that's mandatory is for folks

3    who are working on the hotline or folks who are going to be

4    an investigator or folks who are going to be a short-term

5    stabilization worker, they must participate in and take the

6    investigators training.

7    Q   We talked again at the beginning of the day today with

8    your correction about STS worker --

9    A   Yes.

10   Q   -- training.  There's a portion of that that's

11   mandatory?

12   A   The investigators training, exactly.

13   Q   And what is the MAPP training certification that family

14   resource workers undergo?

15   A   Family resource workers must understand the requirements

16   related to folks becoming a foster parent.  I'm not familiar

17   with the specifics of that curriculum, but I do know that

18   family resource workers are required to go through a

19   training that gives them what the expectations are not only

20   for their role in supporting foster families but also what

21   the expectations are of foster families.

22   Q   And that's required?

23   A   It is.

24   Q   You mentioned that caseworkers must complete the

25   pre-service training before taking on a caseload which is

```
 1   now known as the new worker --

 2   A    PDP.  Professional Development Program.

 3   Q    -- the Professional Development Program, formerly the

 4   core training?

 5   A    Right.

 6   Q    Just briefly, what, what is this training and what is it

 7   comprised of?

 8   A    The training as I said earlier was about, is four weeks

 9   in length with a series of follow-up, either half day or day

10   long sessions on specific topics.  And during that four

11   weeks staff are in a classroom setting three days a week and

12   are out in the field at their area office where they're

13   going to become a social worker two days a week.  And the

14   fundamental curriculum covers what are the expectations of a

15   DCF social worker, what are the legislative and legal

16   mandates that the department must adhere to.  There's a

17   review of the regulations.  There is information provided

18   about mental health substance abuse, domestic violence, and

19   how social workers, where they might access additional

20   resources for support.  So, it really covers a gamut of

21   information about being a social worker within DCF.

22   Q    I want to talk to you now about in-service training.

23   A    Uh-huh.

24   Q    That, of course, is not made mandatory by the

25   department?
```

1    A    No, it is not.

2    **Q**    And why is that?

3    A    Because the contract that the Department of Children and

4    Families has with SEIU, Local 509, which was negotiated 25

5    or 30 years ago, it's specified in that contract that

6    training beyond core training or the training you mentioned

7    for family resource workers or investigation is not

8    mandatory, and that the department cannot make training for

9    its staff mandatory.  So we find a variety of other

10    strategies to encourage staff to participate in those

11    trainings.

12    **Q**    And does the department encourage its staff to undergo

13    in-service training?

14    A    Absolutely.  There is not only just encouragement from

15    front line managers, including your area program managers or

16    directors of areas, to participate in specific training,

17    managers can also say to a social worker, and clearly

18    managers have the responsibility for prioritizing the

19    activities of their workers who work during the day, so a

20    manager can say I'm prioritizing that you go to this

21    training on this date.  Not making it mandatory, but it is a

22    way of strongly encouraging folks to do that.  And the

23    reality is that we have significant -- when we're starting a

24    new initiative or a new way of doing business within the

25    department, or a new approach that we're wanting to

1    emphasize, in general staff are eager to learn more about it

2    because by and large most folks want to do a good job at

3    what they do, and they know that in order to do a good job

4    at what they do they need the training to do it; to have a

5    sense of mastery and feel comfortable going out working with

6    families, you need to have the skills, the tools, the

7    resources to do it.  So, most staff do participate in the

8    training even though we can't officially say it's mandatory.

9         **MS. BARTOSZ:**  I move to strike the latter portion

10   of that response for lack of foundation.

11        **THE COURT:**  No, in the exercise of discretion that

12   may stand.

13   **Q**   You testified that staff are strongly encouraged to

14   attend in-service training and that encouragement comes at

15   all levels.  How do you know that?

16   A   Because -- well, two or three reasons.  One of which is

17   that I provide some of that encouragement myself directly

18   through the statewide managers meetings that we have and

19   where I share information with managers about what training

20   is coming up and why it's important for folks to participate

21   in that.

22        I've also participated in conversations at our

23   monthly deputies meeting with regional directors to talk

24   about specific ways to encourage staff or the need for staff

25   to participate in a particular training.

1          The other thing that we often do when we're rolling

2     out a new initiative, so, for example, for the ICPM and for

3     when we implemented the rollout of IFamilyNet, our web based

4     system, 2.0, when we implemented the rollout for that, we

5     engaged managers and often supervisors and social workers in

6     a conversation about how to structure the training for that,

7     what's going to make it the easiest for them.  Do we try and

8     do those at the local area office in order for them not to

9     have to leave the office to go to training.  So, we talk

10    with them about what's going to make it most doable to do

11    that training.  So, we have those conversations directly in

12    advance of developing the training, the specific training

13    plan for an activity.

14    Q    As a licensed social worker are you required to complete

15    a certain amount of trainings or, trainings or educational

16    courses to maintain your license?

17    A    There are requirements in each state related to that.

18    And depending upon the type of license you have, there are

19    certainly requirements.  And so many, though not all, of our

20    trainings do offer CEU's for social workers.  It is not in

21    Massachusetts, if you work for the state, there is an

22    exemption for the number of hours that you need to have to

23    maintain your license within, within Massachusetts.

24    Q    CEU's, what is that?

25    A    Continuing education units.

1    Q    And those are offered by the department to its workers?

2    A    For some of our trainings, absolutely.

3    Q    And in your experience have staff taken advantage of

4    those offerings and participated in those trainings?

5              MS. BARTOSZ:  Objection; lack of foundation.

6              THE COURT:  No, given her position, if she knows

7    she may answer.

8    A    Staff appreciate the opportunity to get CEU's, so that

9    that is often a draw for participation in training.  If we

10   can't offer CEU's, there is a process for application of

11   CEU's --

12             THE COURT:  Well, let me interrupt because there

13   was an objection here and I overruled it.  But then you

14   started out, your very first words were staff appreciate.

15   So, technically that's hearsay, you can't testify to what's

16   in their minds.

17             THE WITNESS:  I'm sorry.

18             THE COURT:  So, I'm going to strike that answer

19   out.  Here's the question I allow you to answer.

20             THE WITNESS:  Okay.

21             THE COURT:  I thought he was asking about

22   frequency, about what, do you know --

23             THE WITNESS:  Oh.

24             THE COURT:  -- the percentage of participation, how

25   wide it is, the types of DCF officers that participate, your

1    knowledge of the actual usage of the training.

2             **THE WITNESS:**  Okay.

3             **THE COURT:**  That, if you know of your own

4    knowledge, I'll let you answer.

5             **THE WITNESS:**  Okay.

6             **THE COURT:**  Go ahead.

7             **THE WITNESS:**  All I can speak to is the process

8    that we use within the state for identifying the number of

9    people who participate in training.  There is an automated

10   system in state government called PACE, and I don't remember

11   what it stands for, but it's put in place by the human

12   resources division within the state, that is an electronic

13   system where folks, state employees go on to register for

14   specific classes, for specific workshops, for specific

15   training opportunities, and so that gets aggregated and is

16   kept in the state system.

17            **THE COURT:**  So there's a process, a routine process

18   and it records it, and I suppose it records it in such a way

19   that if we looked at it one could tell how many DCF

20   employees participated and over what period.

21            **THE WITNESS:**  You could.  You would be able to get

22   reports out of that.  I honestly don't know off the top of

23   my head, sir, what the percentage is.

24            **THE COURT:**  So, that's your answer.  It's there,

25   and the state cares enough to --

1          **THE WITNESS:**  Track it.

2          **THE COURT:**  -- check it -- track it, rather.

3          **THE WITNESS:**  Yes.

4          **THE COURT:**  Go ahead, Mr. Collins.

5          **MR. COLLINS:**  Thank you, your Honor.

6    **Q**    What are training transcripts?

7    **A**    Training transcripts are one of the things that you can

8    get out of PACE so that for every employee who registers for

9    training can go print out for themselves what are the

10   various and sundry training activities that they

11   participated in in the state because it's loaded in to PACE,

12   they load it into PACE if they've registered for those

13   classes.  And staff, the notion when PACE was initially

14   developed was that every state employee would have this sort

15   of personal transcript that they could make available at the

16   time that they were seeking promotions or looking for a new

17   job or even during the course of a supervision, had the

18   opportunity to talk about what kinds of training they have

19   been to.

20   **Q**    The new worker, PDP, the new worker training.

21   **A**    Uh-huh.

22   **Q**    You mentioned that that was recently revamped.

23   **A**    It was, just this year.  And folks have been working on

24   updating for training, training for staff coming into the

25   department.

1          One of the changes that we made was that it had

2     been a real challenge for staff to take in or integrate

3     information that they were getting in a classroom setting

4     when they were, had not yet been in an area office, had not

5     yet had the experience of working with a family.  So, one of

6     the things that we are trying to do with a lot of our

7     trainings, and specifically with new worker PDP, is make

8     that link between the theoretical constructs, the concrete

9     objective information more real as it relates to day-to-day

10    casework practice.

11         So, the training was actually extended and there's

12    more time in the field and more time in the classroom that

13    are sequenced in a way that allows staff to really get that

14    experience in the field and their area office and benefit

15    more from the, from the training that's provided in the

16    classroom now.

17    **Q**   What is coaching?

18    A   Coaching is one of the processes that we put in place

19    with the integrated casework practice model and we

20    established in July of 2009 as part of the implementation

21    infrastructure for ICPM regional coaches.  And what a

22    regional coach is all about is a staff person who is, is a

23    trainer.  Most of them, most of the folks who were coaches

24    have had actual experience working within the department as

25    supervisors and social workers previously, or had been

1    consulting to the department doing training for DCF and were

2    really familiar with child welfare.

3         In essence, what we did was say that the coaches

4    would be out in the area offices at least 20 hours a week,

5    rotating from office to office, each of the area offices,

6    and be available to provide either sort of formal training

7    at a staff meeting in an area office or participate in

8    meetings that happened regularly during the course of the

9    day anyway.

10        So, for example, a case conference or a family team

11   meeting or a unit meeting, coaches would participate in

12   those meetings, and using whatever the topic was for that

13   day for that particular meeting.  So, for example, if there

14   was a family case conference or team meeting about a family,

15   the coach would be there and use that real life situation as

16   a way of teaching concepts that we were really trying to

17   promote as part of the integrated casework practice model.

18        So, for example, safety mapping, which is one of

19   the tools that staff had been using in the integrated

20   casework practice model, rather than just showing a Power

21   Point or giving people something to read that would teach

22   them how to safety map, the coach is there and doing it with

23   the family that that unit was discussing or that team was

24   discussing at that particular moment.

25   Q   And have the regional coaches been maintained and

1    continue to perform this function through August of 2012?

2    A    Absolutely.  We had started out thinking that coaches

3    were going to need to be there to get the practice model off

4    the ground about six or nine months.  But in point of fact

5    we've kept them on, they were kept on because we just found

6    it such an effective way to, to promote ideas and train

7    staff.

8    **Q**    What is MAPP training?

9    A    Safety mapping training?

10   **Q**    M A P P.

11   A    Oh.

12   **Q**    The acronym MAPP.

13   A    MAPP training is for foster and resource parents that

14   gives them information about who DCF kids are, what they can

15   expect if they're taking care of kids, and what the

16   expectations are for foster, for resource parents.

17   **Q**    And how, how is this available?  How often is it

18   provided?

19   A    It is provided not through the Child Welfare Institute,

20   it's provided through our foster care and adoption unit and

21   through staff in the regional and area offices.  Folks sign

22   up to be MAPP trainers, they get trained on being a MAPP

23   trainer, and then can offer that training out in the area

24   offices.  And in all honesty, I'm not sure how often it is

25   offered.

1    **Q**   How does supervision play a role, if at all, in training

2    DCF staff?

3    A   I think supervision is a fundamental piece of how staff

4    develop their skills and in fact feel like it's so important

5    that we, three years ago, entered into a partnership with

6    the Northeast Caribbean Implementation Center to

7    specifically design a curriculum that would be directed to

8    supervisors across the state as we implemented the

9    integrated casework practice model.

10        So we developed a whole model of whether the six

11    core competencies of supervisors, ranging from how do they

12    as a supervisor be an effective coach for their social

13    workers, how do they adapt their supervision style depending

14    upon the learning styles, if you will, of the workers who

15    are in their units, how do they hold staff accountable.

16        So, supervisors play a really key role, I think not

17    only, not necessarily in formal training but in more of a

18    coaching sort of model, if you will, they end up being a

19    kind of coach for staff within the agency.

20    **Q**   What are the requirements to be a supervisor in a DCF

21    area office?

22    A   The requirements to be a supervisor in an area office

23    are that you have a master's degree and that you have had

24    prior experience, and I don't remember the specific number

25    of years, but that you have prior experience as a DCF social

1    worker.

2    Q    You may have mentioned this, and I apologize if you did.

3    Has DCF, to your knowledge, ever worked with the national

4    resource centers on training?

5    A    We've worked with the national resource centers,

6    specifically two related to training.  One of those was that

7    Northeast Caribbean Implementation Center I just mentioned.

8    They're a type of resource center.  They're an

9    implementation center and in essence funded by the federal

10   government to help support and provide technical assistance

11   to states that function in sort of the same way.

12         So, Northeast Caribbean Implementation Center was

13   one of those.  The other we worked with was the National

14   Resource Center on Differential Response.  When we were

15   first developing the training materials for our integrated

16   casework practice model, where we were implementing

17   differential response, we worked with the NRC on

18   Differential Response to gather some information from them

19   about how best to provide the tools and resource system

20   concepts for training on that.

21   Q    I want to turn now to a different topic, the topic of

22   what's known as placement and educational stability.

23   A    Uh-huh.

24   Q    And just ask you at the outset as deputy commissioner,

25   to your mind, what is placement and educational stability

1    when we talk about that?  What is that?

2    A    Well, placement and educational stability, and we'll

3    start with placement stability, when a child needs to be

4    removed from their home because their parents are not able

5    to effectively parent them, then we need to be mindful of

6    where that child is placed, whether they're placed in the

7    most appropriate setting, first and foremost, and

8    secondarily, that they have as stable as possible an

9    experience in their placement, out-of-home placement.  And

10   there are several reasons for this.  One of which is

11   children don't do well when they're being bounced around in

12   their living environments.  They suffer from all kinds of

13   emotional distress as a result of not knowing where they're

14   going to be.  And so, it is in the child's and our best

15   interest to promote the child's well-being, to keep them as

16   stable as possible in that placement setting.  And

17   preferably with kin, that would be the ideal placement if

18   they aren't able to stay with their parents.

19          So, looking at placement stability is critical for

20   a child's well-being.  It's also one of the measures that

21   the federal government uses as part of the CFSR, one of the

22   key outcomes the Children's Bureau looks at in assessing the

23   effectiveness of a child welfare system.  So, we look at it

24   not only from the standpoint that it's just so important for

25   an individual child, but it's also important for the agency

1      in terms of achievement of outcomes.

2              Educational stability, similarly.  The children,

3      obviously if they're having to change schools regularly,

4      aren't able to stay in the school where their friends are

5      where they know the teachers and their local neighborhood,

6      it makes it tougher to pay attention during the day, and

7      it's harder to focus on what you need to learn to do in

8      school, it's harder to make friends.  So, being able to stay

9      within the same school system really both promotes emotional

10     stability but also academic achievement if kids are able to

11     stay with family.

12     Q    You testified that, I believe you used the words kids

13     bouncing around, moving around a lot.  It's not good for

14     kids.

15     A    It's not at all.

16     Q    Is a placement move always negative for a child?

17     A    No, it's not always negative.  And when I say that it's

18     not good for kids to bounce around, I'm primarily speaking

19     about bouncing around within the same level of care.  There

20     are certainly times that kids move to where it is because

21     they've gained new skills, they're better able to manage

22     their behavior, they may not be having as many emotional

23     problems as they had when they first came into the

24     department and so don't need as restrictive a setting.

25             So, one of the other things that we look at is

1    placing children in the least restrictive setting possible.

2    We don't want kids to be in a highly structured, highly

3    programmed residential treatment program if they can

4    function well in a family setting.  So, there are times when

5    a child may have come into the department with a lot of

6    behavioral problems, a lot of emotional problems, spent some

7    time in a residential setting and was able through the

8    therapeutic interventions offered at that residential

9    setting actually have made a lot of, a lot of growth,

10   emotionally and behaviorally, and are able to function in a

11   less restrictive setting and therefore would then be moved

12   to a less restrictive setting, perhaps a family setting or

13   perhaps back home.

14           So there are times when it's in the child's best

15   interest to actually make the move.  We just don't want kids

16   being bounced around when they're in the, in the same level

17   of care, if you will.

18   Q   I want to talk now about the decision-making process --

19   A   Uh-huh.

20   Q   -- that occurs at the department with respect, generally

21   speaking, procedurally with respect to the decision to make

22   a placement move for a child.

23   A   Okay.

24   Q   Can you walk through for us, generally speaking, what

25   that decision-making process looks like?

1        **MS. BARTOSZ:**  Objection, your Honor.

2  **Q**   How those decisions are made.

3        **MS. BARTOSZ:**  Objection; lack of foundation.

4        **THE COURT:**  No.

5        **MS. BARTOSZ:**  Hearsay.

6        **THE COURT:**  No, I think she can.  But we're up to

7  the break, so she can hone her answer during the break so it

8  doesn't run on.

9        I take it a break is in order, Mr. Collins, you're

10  not about done?

11        **MR. COLLINS:**  That's correct, your Honor.

12        **THE COURT:**  We'll take a recess for one-half hour.

13  We'll recess until 11:15.  We'll recess.

14        **THE CLERK:**  All rise.

15        (Recess.)

16        **THE CLERK:**  All rise.  Court is back in session,

17  you may be seated.

18        **THE COURT:**  Proceed, Mr. Collins.

19        **MR. COLLINS:**  Thank you, your Honor.

20              **DIRECT EXAMINATION** (Cont'd)

21  **BY MR. COLLINS**

22  **Q**   Ms. Nisenbaum, when we left off, I had asked you to walk

23  through the decision-making process that goes on when DCF

24  engages in making decisions about placement moves.

25  **A**   Okay.  When a child has been removed from their family

1    at the outset the first question is whether or not there are

2    kin that the child might be placed with, whether a

3    grandmother, aunt, uncle, or someone else close to the

4    family.  So that's the first consideration, and the

5    department's increasingly focusing on whether or not we can

6    find a kin placement for the child.

7         The next consideration really has to do with what

8    are the needs of the child in terms of their particular

9    emotional vulnerability at the time that they're being

10   removed from their parents, or at the time that we're

11   looking for placement.  So, what level of structure, what

12   level of support, what level of supervision does that child

13   need.  Does the child need to be in a family setting, and if

14   so, is it okay for there to be other kids around, how many

15   children is it okay for this particular child to be placed

16   with.

17        So, those kinds of considerations would be made

18   between the social worker and their supervisor, sometimes

19   the manager would be involved in that decision as well, but

20   generally between a social worker and the supervisor as to

21   what level of care, what level of service that the child

22   would need to be placed in.

23        If there is a feeling that the child needs to go

24   into a residential level of care rather than a foster care

25   or family setting, most of the area offices have a more

1    involved process for making the decision about a child going

2    into residential level of care.  And that would include a

3    clinical team meeting or a consultation, conference with the

4    area clinical manager, and then looking at what sort of

5    residential placement, what sort of residential program

6    would meet the needs of that particular child.

7    **Q**    How does a particular child's schooling or educational

8    needs factor into the placement decision?

9    A    Right.  If, if there is not kin within the neighborhood

10   close that the child could be placed in, obviously the

11   priority is to be able to keep the child in their school

12   setting.  I think I talked a few minutes ago about why that

13   was important for a child.  But I think that first is

14   looking at a kinship placement because having family around

15   really helps promote stability.  But obviously to the extent

16   that we can keep a child within the school that they've been

17   attending, the better for the child.  And so, in looking for

18   a foster care placement, if kin are not available, looking

19   for foster care placement ideally, we would be able to find

20   a foster care family within the school district where that

21   child is currently residing.

22   **Q**    Ms. Nisenbaum, I want to show you what's been marked as

23   Exhibit 944 in this case and ask you to turn to the very

24   last page of the exhibit.

25          Do you recognize this chart?

1    A    In essence, this is a report that looks back at 2011 and

2    then through January, February and March of 2012 that looks

3    at the number of children that are placed out of their

4    region, the number of children placed in their area of

5    origin, number of children placed in region of origin but

6    not the area of origin, and then it goes on, there's a

7    number of other categories.  In essence looking at children

8    who are placed within their local area and within their

9    local region.

10   Q    Or not within their local area?

11   A    Or not, exactly.

12   Q    When this chart -- looking at the, under the column

13   3-31-2012, do you see that?

14   A    I do.

15   Q    And do you see the two middle columns within that,

16   number of children placed in region of origin, not area of

17   origin?

18   A    I do.

19   Q    Number of children placed out of region --

20   A    I do.

21   Q    -- of origin?

22   A    Yes.

23   Q    When this is talking about areas of origin and regions

24   of origin, what areas or regions are being identified here?

25   A    Okay.  The Department of Children and Families is

1    divided up into 29 area offices or service areas, if you

2    will, and each service area, each of those 29 covers a

3    defined geographic area, a set of neighborhoods in Boston.

4    So, for example, there are four area offices in Boston.  The

5    City of Boston has been divided into four.  So depending

6    upon which street, which neighborhood you live in, you'll be

7    served by one area office or another.

8             At the next level up, the department is defined by

9    regions.  We currently have four regions across the state

10   and each region is comprised of a number of, defined number

11   of area offices.  So when this chart is referencing children

12   not placed in the area of origin or not placed in the region

13   of origin, what this is referencing is that children are

14   placed outside of that catchment area where they're served,

15   or that DCF area office.

16   **Q**   And those areas and those regions, those are

17   geographical boundaries that are established by the

18   department, right?

19   A    Correct.

20   **Q**   Does being moved out of a region or an area of origin

21   necessarily mean that the child is getting moved away from

22   his school, his or her school or his or her family?

23   A    No, our boundaries don't necessarily, don't match up

24   with school district boundaries.  And so, the --

25             **THE COURT:**  Respectfully, and forgive my

1    interruption, but we are in the 24th day of trial.  I've

2    heard this before.  This has been testified to and not

3    questioned.  So, I accept that.

4              Let's ask another question.

5    Q    What are some of the reasons why children are moved

6    outside of a particular area or region?

7              MS. BARTOSZ:  Your Honor, objection; hearsay,

8    foundation.

9              THE COURT:  No, she's a top administrator in this

10   agency.  If she knows of her own knowledge, or has a belief

11   as to why things are done, she may testify to that.

12             Why?

13   A    The reasons that children might be placed outside of

14   their area office are primarily clinical reasons.  So, for

15   example, if a child was gang involved in a particular area

16   in which they lived, in which their family lived, and they

17   needed to be removed from their family, it may be determined

18   that it was actually in the child's best interest not to be

19   in a neighborhood where those gangs, where they were

20   involved with a gang.  So, that's one example of a reason.

21             It might be that kin live across, on the other side

22   of the city, which is a different area office for DCF, but

23   it will have a priority for the child to be placed with kin.

24   So, that's a second kind of reason that might be.

25             It's also the case that depending on the behavioral

1   needs or the emotional needs of the child.  So, for example,

2   kids who are going into residential care, the type of

3   residential program that would best provide for the

4   treatment needs of that child might be someplace else in a

5   different region or area.

6        THE COURT:  You know, I cut you off as you were

7   giving your earlier question, and I guess I apologize, but I

8   had heard it.  But now thinking about it, I do have this

9   question.

10       Recognizing that the barriers are not the same as

11  the school district barriers or a geographical -- barriers

12  is not the right word.

13       THE WITNESS:  Boundaries.

14       THE COURT:  -- boundaries of your offices, the

15  simple fact is, while your answer and previous testimony has

16  said you can't tell simply because it's out of region that

17  it's out of the school district --

18       THE WITNESS:  Right.  Right.

19       THE COURT:  -- for example.  This report, however,

20  doesn't give you any feel for how many of them out of region

21  are also out of district, or the converse?

22       THE WITNESS:  Right, you're absolutely right, your

23  Honor.  This only speaks to placement setting.

24       THE COURT:  All right.  Go ahead, Mr. Collins.

25       MR. COLLINS:  Thank you, your Honor.

1    Q    Ms. Nisenbaum, have you had an opportunity to look at

2    data that speaks to DCF's performance in the area of

3    placement stability over the last few years?

4    A    I have that opportunity every single month for several

5    years now because placement stability is one of those

6    factors that we look at both on a quarterly basis on our

7    CFSR, but as we review our program improvement plan that we

8    had filed with the Children's Bureau, placement stability

9    was addressed in that so that I was regularly looking at the

10   strategies that we were putting in place to improve our

11   placement stability.  So, yes.

12   Q    Let me just back up for a second from there.

13            Over the last few years, before we get to some of

14   the data, over the last few years what has DCF done to

15   address the issue of placement stability in its performance

16   in that area?

17   A    That's actually been a major area of focus since our

18   2007 CFSR review.  And the first activity that the

19   department did was to engage the National Resource Center

20   for Child Welfare Data and Technology and to ask them to

21   help us understand better what were contributing factors to

22   placement instability.  Was it older children or younger

23   children, still looking at the ages of the child, what level

24   of care were children experiencing the most placement

25   instability, and what were some strategies that we could do

1    to improve placement stability.

2    Q    Who initiated those conversations?

3    A    The commissioner requested that the department undertake

4    that effort, and I believe Ruben Ferreira or Ros Walter was

5    the one who made the initial call to the national resource

6    center.

7    Q    Okay.  And did the department work with the national

8    resource center?

9    A    We did, indeed.  Penny Maza was the person from the

10   national resource center who was assigned to work with

11   Massachusetts.  We sent to Ms. Maza a data file that

12   included lots and lots of information about kids who had

13   been in placement over the period of a year.  I believe she

14   looked at 2009 data and analyzed that data and prepared a

15   report for us that she presented back to the department

16   outlining her findings from the analysis of that data.

17   Q    I show you what's been marked as Exhibit 54 in this case

18   and ask you to identify this document?

19   A    This is in essence the report that Ms. Maza gave back to

20   the department that summarizes her findings from the

21   analysis of the data that I was just talking about.  We also

22   used this -- she came to present this, this data, her

23   findings, and engaged in a discussion first with senior

24   staff and then the report was presented to our statewide

25   managers to review.

1    **Q**    What is the Kinship First initiative and what, how does

2    the implementation of that initiative address the issue of

3    placement stability, if at all?

4    A    One of the things, one of the findings that Ms. Maza had

5    made in her analysis was that children who are placed with

6    kin have a significantly greater rate of stability than

7    children who are not placed with kin, and that greater

8    period of stability obviously would improve our placement

9    stability outcome measures.

10    We also know from national research that children

11    who are placed with extended family in point of fact have a

12    greater sense of security and emotional well-being, and so

13    the combination of the findings that Penny outlined in her

14    report about that greater stability when kids are placed

15    with kin, combined with we know that it's better for a

16    child's emotional well-being, led the department to put real

17    emphasis and real focus on trying to identify kin who could

18    serve as possible placement resources for children earlier

19    on in our involvement with the family so if at a future time

20    placement became necessary we would already have had the

21    conversation with family who might be kin who might be

22    appropriate to serve as a placement resource.

23    But the Kinship First initiative that you mentioned

24    really was a variety of strategies, a variety of efforts to

25    increase the number of children who are placed with kin as

1      their first placement.

2      **Q**    Placement with kin is already part of the law and

3      regulation and DCF policy here in Massachusetts, isn't it?

4      A    It is.  And there have been efforts over the years to,

5      to make sure that we're trying to identify kids, and to some

6      extent that had been, there had been managers within the

7      state who really took that to heart years ago and have

8      really made an effort to do that.

9              The department as a whole hadn't put system-wide

10     emphasis on that as a strategy for specifically improving

11     placement stability, or linking placement with kin with that

12     idea and placement stability until part of our strategic

13     plan and our efforts to improve that specific outcome really

14     undertook a series of strategies, not only identification of

15     kin earlier, but having conversations at statewide managers

16     and area offices to talk with staff about what were the

17     barriers to placing with kin as a first placement, and so

18     really identified some specific systemic barriers that were

19     then addressed to help promote placement with kin.

20     **Q**    You testified earlier about the trauma grant that the

21     department had received back in 2011.  Yes?

22     A    Uh-huh.

23     **Q**    How, if at all, has trauma informed practice been used

24     to address the issue of placement stability?

25     A    Trauma informed practice includes understanding the

1    impact of trauma and what are traumatic experiences for

2    children.  So, as we're doing the basic training that's

3    supported through the trauma grant for staff and all of the

4    area offices, one of the key areas of discussion there

5    really speaks to what are the types of events that can

6    create a trauma for a child, and certainly removal from

7    their family is one of those events that is traumatic for a

8    child.

9           So, by helping folks understand the level of trauma

10   that's created when you remove a child from their home and

11   understand the implications that trauma experiences have

12   both on brain development and emotional development, it

13   helps staff understand better the importance of what aspect

14   trauma plays in the need for keeping children stable in

15   their living situation and placement setting.

16   Q    What is Race to the Top?

17   A    Race to the Top is an effort that is coupled with the

18   early learning challenge grant and is a grant, a federal

19   grant that was received by the Department of Early Education

20   and Care, and that federal emphasis along with an emphasis

21   here in Massachusetts that Governor Patrick has placed on

22   really recognizing the importance of early childhood

23   development to performance and emotional stability for kids

24   as they get older into school.  So really emphasizing the

25   need to be attentive to the needs of really young children,

1   and making sure that they have the appropriate stimulation

2   and nurtured environment which they can be more ready to

3   participate in school fully later.

4           So, the department is working with, the department

5   of, the Department of Children and Families is working with

6   the Department of Early Education and Care through this

7   federal grant to really promote understanding by our social

8   workers about early childhood development and working with

9   them to make sure that children are in appropriate child

10  care settings.

11  **Q**   And what is supportive child care?

12  A   Supportive child care is one of the types of child care

13  that's offered through EEC.  They provide licensed both home

14  based and center based child care.  And for the department

15  making sure that children who are involved with the

16  department, and particularly children who are involved into

17  foster care and into kinship placement have access to that

18  supportive child care, and has been a priority emphasis for

19  DCF in our collaboration with the EEC over the last couple

20  of years.

21  **Q**   I want to move on to the topic now of services.  How

22  does DCF go about determining the appropriate services that

23  are necessary for a particular family or child, and then how

24  does DCF go about providing those services?

25  A    Okay.  The way DCF goes about providing, or assessing

1    what kinds of services a family needs is through our

2    assessment and service planning process, really taking a

3    look at, through both conversations and dialogue with the

4    family and with parents, with children, as well as with

5    other folks who may be working with the child already.  For

6    example, if some of the children in the family are in

7    school, we would talk with school teachers about what their

8    perspectives are about the needs of the child and family.

9    Contact local pediatricians that are seeing the child to

10   understand their perception about the family.

11        But most of the information from the assessment

12   really comes from our dialogue with the family, to really

13   identify what are their strengths, what are the things that

14   they're doing okay within the family, how are they making

15   sure the child is adequately fed and clothed and gets to

16   school.  They're making sure the child has adequate medical

17   care.  Do they appropriately discipline the child.  Are they

18   making sure that the child doesn't have specific emotional

19   or behavioral needs.

20        So, through that assessment of the effectiveness of

21   parenting capacity, we identify what are specific needs of

22   the family.  Those needs can be either emotional in the

23   sense of somebody in the family maybe having some mental

24   health or substance abuse problems, or they can be very

25   concrete needs, the family needs food stamps.  So, over the

1    course of the assessment we can identify what are the needs

2    the family has.  I look to those concrete needs or, or

3    services to meet emotional or behavioral or substance abuse

4    needs.

5            In identifying what services, our workers know what

6    is available that's in the local area and they either

7    contract with purchased services, and we have through our

8    support and stabilization network a variety of services that

9    are available for folks or the area offices to purchase, or

10   through the child or families health insurance they might be

11   able to access or would be able to access another array of

12   services.

13   Q    Just going back for a second.  Practically speaking, the

14   assessment process, I mean, can you just discuss, is that a

15   particular process that takes place over a period of time?

16   A    Historically, it absolutely has.  It was done by

17   assessment workers within the department and our regulations

18   called for a 45 day assessment period.  And I believe I

19   testified that we are working toward integrating our

20   assessment/service planning process and have been working on

21   that over the last year and-a-half or so to really be more

22   focused in the types of information that we are looking for

23   and capturing about the parenting capacities and needs of

24   the family, and are looking to combine that with the service

25   plan so that the time frame in the future might change.  But

1    historically it's been 45 days for the assessment.

2    **Q**    Are there times that an assessment will go beyond the 45

3    day period?

4    A    There are certainly times that might happen.  If we

5    didn't feel, the social worker didn't feel that they had

6    been able to have conversations with the array of folks who

7    knew the family well to contribute to our understanding what

8    the family's needs were that would go beyond the time frame.

9        **MS. BARTOSZ:**  Your Honor, move to strike that last

10    response as hearsay and lacking foundation.

11        **THE COURT:**  Motion to strike's denied in the

12    exercise of discretion.

13    **Q**    You started to talk about what you called a service plan

14    and how those two are being integrated.  Let's just back up

15    a step, and what exactly is a service plan?

16    A    A service plan is in essence just what the name says.

17    It's a plan that describes what are the services or

18    intervention that a family is going to receive.

19    Historically, that's been developed within 60 days after the

20    family's been open for case management services and is

21    entered into Family Net.  The social worker, the process for

22    developing that is that, the ideal process is the social

23    worker sits down with the family, talks about what they've

24    learned during the assessment process and says here's some

25    areas that we have identified as things that you as parents

1    need to work on or as a family are need areas for your

2    child, and here are the services that we think would help

3    either address those need areas or support you getting the

4    kinds of services that you need.

5         The family then signs off on the service plan

6    saying that they'll agree to work on the particular need

7    areas that are identified or participate in the services

8    that have been listed as what we would make available to the

9    family.

10        Service plans have very specific tasks in them.  So

11   each parent would have some specific tasks, identified areas

12   that they need to work on, things they need to do, mom needs

13   to go to therapy, dad agrees to participate in substance

14   abuse counseling, whatever, whatever the particular area is,

15   they're identified tasks.  And then every six months the

16   service plan is updated and changed to reflect what changes

17   happened in the family.

18        We have a process called a foster peer review

19   process that, for kids who are in out-of-home placement.  A

20   foster care review team, foster care reviewers, one of the

21   things that they look at is the service plan for the family.

22   And so for every child in placement once every six months

23   this group of reviewers looks at the service plan to

24   determine whether the goal established for the child is the

25   correct goal, whether they're in the appropriate placement

1    that they should be in, and whether the parents, child and

2    social worker have complied with the activities that were

3    set out in the service plan.  So, that's part of that foster

4    care review.

5    Q    And I want to ask you about the foster care review unit

6    in a second.  Before I do, what level of staff is involved

7    in developing this service plan?

8    A    It's the social worker that does that with the family,

9    gets the family to sign off on it.  But in most cases the

10   social worker, that's something they would review with their

11   supervisor during the course of normal supervision.

12   Q    The foster care review unit --

13   A    Uh-huh.

14   Q    -- can you describe the structure of that unit?

15   A    It is a unit that is underneath in the organizational

16   chart.  The director of foster care review reports to the

17   assistant commissioner for quality improvement, Ruben

18   Ferreira.  The director is Vivian Davidovich.  And there are

19   approximately 30, give or take, reviewers across the state

20   and they're organized roughly geographically, and spend most

21   of their time out at the area offices conducting those,

22   those reviews.

23   Q    Every child --

24   A    Every child.

25   Q    -- that is in foster care undergoes a review during what

1    time frame?

2    A    The, the foster care reviewers do in fact review every

3    single child that's in foster care.  Historically, that was

4    kids up to the age of 18, but recently with the federal

5    legislation that's now been expanded to include children in

6    placement over the age of 18.  Those reviews are conducted

7    once every six months after the child has been placed into

8    an out-of-home setting.

9         **MS. BARTOSZ:**  Your Honor, I'm late in my objection.

10   I didn't want to talk over Ms. Nisenbaum's response.  But my

11   objection was going to be to the form of the question as to

12   whether it was directed toward policy or practice.

13        **THE COURT:**  Well, your objection, and you're

14   speaking it, carries the seeds of the ruling.  It was late.

15   It may stand.

16   Q    What happens after the foster care review unit goes

17   through one of its reviews of a foster child's file, case

18   file?

19   A    Okay.

20        **MS. BARTOSZ:**  Your Honor, I'm going to timely

21   interpose my objection now, is this about policy or actual

22   practice.  Objection to form.

23        **THE COURT:**  Well --

24        **MR. COLLINS:**  I can --

25        **THE COURT:**  Do you want to rephrase the question,

1    or do you press it?

2            MR. COLLINS:  I don't want to rephrase the

3    question, your Honor.

4            THE COURT:  All right.  Well, I'll ask it then.  It

5    may be asked.

6            So far as you know, what is the practice in that

7    regard?

8    A    The practice in regard to -- let me just get -- I've

9    lost track of your question, so I want to make sure I

10   understand your question in terms of what's the process for

11   a foster care review and what happens, specifically what

12   happens after that?

13   Q    That's, that's correct.

14   A    Okay.  The foster care reviewers meet --

15           THE COURT:  Let me be more specific in light of Ms.

16   Barotsz's objection.

17           THE WITNESS:  Okay.

18           THE COURT:  As to what's helpful to me.

19           One of the things that they squabble about here,

20   and I have to take very seriously, is plaintiffs say, oh,

21   there's these great plans and a great theory, practice is

22   far different.  And I think her objection goes to that

23   tension.

24           Now, I have no doubt that you know the routine --

25           THE WITNESS:  Uh-huh.

1        **THE COURT:**   -- that's the plan, but I've narrowed

2    his question to how it works.

3        I was once taught when I learned trial practice

4    from a very fine teacher, who later became a judge, and he

5    said that what you want to do is understand these two

6    postulates.  Every organization, the army, the government,

7    religious organizations, marriages, they all have routines

8    about how things are done.

9        **THE WITNESS:**  Uh-huh.

10       **THE COURT:**  Loan officers.  The second postulate is

11   nobody follows those routines.  And therefore as a way to

12   cross-examine witnesses, he urged that you find out the

13   organization's routines because inevitably in every

14   organization they would be weak, because they don't always

15   do it.

16       Now, I've overspoken.  I've narrowed Mr. Collins'

17   question.  I don't mind hearing what you think should be

18   done, or how it, what the routine is.  But I want to know

19   what, and I really do want to know, how you think it

20   actually is done.  And candidly I would be helped where

21   there are glitches or inadequacies, if you would tell me.

22       Now, with all of that, can you answer the question?

23       **THE WITNESS:**  I hope so.

24       What does happen in the largest percentage of cases

25   is that after the foster care review meeting there is a

1    document that's prepared that summarizes in essence the

2    answer to the four key questions that are asked during a

3    foster care review.  And those are the things that I

4    highlighted a minute ago, whether the kid was in the

5    appropriate placement, do they need to be in placement, and

6    related to the service plan tasks being complied with.

7         Those reports are entered into Family Net and staff

8    are consistent about documenting the results of that

9    meeting.

10         One of the other activities that happens after

11    foster care review is if there is a concern highlighted

12    during that review, either about the placement that the

13    child's in, primarily about whether the child, the placement

14    that the child is in, although the second area that may be

15    problematic is if the foster care review team does not

16    believe that the right service plan goal has been set for a

17    child.  So, for example, if the current goal is

18    reunification and the foster care review team believes that

19    that goal ought to be switched to adoption because there's

20    not been sufficient progress demonstrated by the parents

21    that they will effectively be able to parent their child,

22    they send a notification or an alert to the area office to

23    let them know their findings of the review.  That's the,

24    that's the practice.

25    **Q**   And then what -- my questions with respect to the foster

1    care review process are all directed at what actually

2    happens based on your knowledge as the deputy commissioner.

3          What then happens with that information that's sent

4    out?

5    A    The -- let me speak to what's supposed to happen first.

6          What's supposed to happen is that when those

7    e-mails or that information gets sent to the area director,

8    to the social worker, and to the social worker, that there

9    was concern raised within the foster care review, there's to

10   be a follow-up conversation with the social worker as to

11   whether or not the concerns of the foster care review are

12   warranted and therefore perhaps need to change the goal or

13   that, look into an alternative placement for the child, if

14   the concern was that that wasn't specifically the right

15   placement for the child.

16         So that conversation would happen between the

17   social worker, supervisor and management staff in the area

18   office.  And they would either make a decision that, yes, we

19   need to move in that direction, agree with the team, foster

20   care review team, or not, and ideally, although I don't know

21   that it consistently happens, the results of that

22   conversation would be documented in the client's, in the

23   child's case record.

24   Q    And then in your experience is there something that

25   actually occurs at the local level in terms of adjustments

1    made for the case plan for the child?

2    A    They may in fact rewrite the service plan after, after

3    the foster care review.  And depending on how close the new

4    service plan -- remember I said service plans get done every

5    six months -- depending upon how close or how far away the

6    next service plan is due, they may do it immediately or they

7    may, if it's six weeks away they may wait until the, until

8    the new time for the service plan and would make the

9    adjustments then.

10   Q    And I just want to be clear, Ms. Nisenbaum.  A short

11   time ago when we were talking about the assessments, the 45

12   day assessment period and the service plans, was your

13   testimony with respect to what should happen or what in your

14   experience does happen at the department when you were

15   testifying about those two topics?

16   A    Both.  It is, it is the -- there is policy and

17   regulation related to assessment and service plan that sets

18   forth the outline as I have talked about, and it also does

19   describe the practice.

20         There are -- you know, we monitor on a regular

21   basis the timeliness with which assessment and service plans

22   are done and the extent to which those are completed, i.e.,

23   approved in Family Net, on a regular, on a monthly basis as

24   part of the MOSt report, so we keep track of that.

25   Q    You said we monitor when they are completed, i.e.,

1    approved in Family Net.  What did you mean by that?

2    A    What that means is that they are counted as completed

3    for the purposes of data collection only when the approval

4    box has been checked by a supervisor in our electronic case

5    record.  So that absent a social worker forwarding that on

6    to the supervisor for approval or absent the supervisors

7    going in and checking the box that it has been reviewed and

8    approved, it would not be considered technically completed

9    even though the family may have actually developed a service

10   plan with the social worker.

11   Q    I want to talk to you about, in particular now medical

12   services.

13        What is DCF's role with respect to the provision of

14   medical services for children in foster care?

15   A    We don't actually provide medical services for children

16   in foster care.  We have -- other than Linda Sagor, who's

17   our 20 hour-a-week consultant, pediatric consultant, we

18   don't have physicians or pediatricians on staff at the

19   department.  So, children receive their medical care in the

20   community from local pediatricians or local clinics.

21        The role of the department really is to ensure that

22   children are accessing medical services, go get their

23   regularly scheduled medical appointments, and secondarily,

24   pediatricians are one of the key collaterals that we contact

25   on a regular basis to get information about whether the

1    child is getting the medical care they need on a regular

2    basis, have they received immunizations.  So we may collect

3    health care information, for example, when a child's being

4    enrolled in school to provide that information to a school

5    system, but also to provide to a foster family.  So, our

6    role isn't the provision of medical services but assisting

7    and facilitating in children accessing those health care

8    services.

9    Q    And let's drill down now a little more to the micro

10   level, and I'll ask you who in particular at the department

11   is responsible for assuring that children get the medical

12   services that they're entitled to?

13   A    For children who are at home, still living at home, so

14   families who are still living together, if they have an open

15   case with the department it's the parents who are

16   responsible for ensuring that the child goes regularly to

17   the pediatricians.  For those children who are in

18   out-of-home placement who are in the custody of the

19   department, the social worker is the one that is responsible

20   for monitoring that for making sure that the child has been

21   taken in general.  It is the foster parents, for children

22   who are in foster care it's the foster parents who actually

23   take the child to the pediatrician.

24   Q    And how is it that social workers are monitoring that?

25   A    There are encounter forms that are within the DCF system

1    that are required to be filled out by DCF policy by a

2    pediatrician when a child comes to see them.  The social

3    worker provides that form either directly to the

4    pediatrician if they've taken the child to the pediatrician,

5    or to the foster parents who may pass that along to the

6    pediatrician.

7            That form in essence is an affirmation that the

8    child has been to the pediatrician and there's a place where

9    the pediatrician can fill out some really basic information

10   about that child's visit.

11   Q    Back to the question from earlier.  With respect to the

12   encounter forms, are you speaking about what should happen

13   by way of DCF policy or regulation, or what is actually

14   happening in the field?

15   A    That actually happens.  The social workers or foster

16   families do pass those along to pediatricians and they,

17   sometimes pediatricans are really good at filling those out

18   and other times--

19           **MS. BARTOSZ:**  Objection.

20           **THE COURT:**  Wait.

21           **MS. BARTOSZ:**  Make an objection here to lack of

22   foundation and hearsay.

23           **THE COURT:**  The objection is overruled; she may

24   finish her answer.

25   A    We have variable response rates in all honesty from the

1    pediatricians about the extent to which they complete those

2    or complete those in a timely manner.  But when we do get

3    them back those are filed in the case record for the child.

4         The second part of monitoring whether a child has

5    received that medical care is the social worker.  It's

6    supposed to go into Family Net, our electronic case record

7    system, and enter the date on which the child received their

8    annual physical or their 7 or 30 day medical reviews.

9         And, truthfully, our social workers are not as

10   diligent as I would like in completing that data.

11   Q    The data entry?

12   A    Right.

13   Q    Do children in foster care, DCF custody, get Medicaid

14   cards?

15   A    They do.  All children who are in foster care have

16   access to MassHealth aid, and so they do get a Medicaid

17   card.

18   Q    How, practically speaking, how are these provided to the

19   children?

20   A    DCF social workers are able to go in and request

21   Medicaid for a child who's come into foster care.  And so we

22   work with the Mass. Health Department to have those cards

23   developed and sent out to the child.  And the social workers

24   update those, there's a regular time frame for which they

25   update the request, I don't remember whether that's

1    semiannually or annually, but there's something they have to

2    do to trigger the child's continuation on MassHealth.

3    Q    Does Massachusetts have to certify to anyone that it's

4    providing these services?

5    A    Absolutely.  A couple of ways in which we do that.  One

6    of which is that's an area that through the child and family

7    services review, medical services for children along with

8    other array of services, but medical services in particular

9    are specifically reviewed as part of the child and family

10   services review.  So that's one way.

11          Also through the EPSDT, early periodic diagnostic

12   screening, I'm forgetting what EPSDT stands for, but it is a

13   Medicaid requirement that requires that there are specific

14   screens that are done for children who are on MassHealth,

15   and those include not only medical screens but developmental

16   screens and behavioral and health screens as well.

17   Q    I want to talk to you now briefly about 7 day medical

18   appointment, 7 day medical assessment and the 30 day

19   comprehensive exam --

20   A    Uh-huh.

21   Q    -- that each child is required to undergo.

22          First of all, where does that requirement come

23   from?

24   A    The requirement comes from the DCF policy and regulation

25   and it says that in essence any child who comes into care is

1   required to receive a medical exam within 7 days of their

2   placement as a screening to look at basic health and medical

3   care needs of the child, and then a more comprehensive

4   evaluation or assessment within 30 days.

5   **Q**   And what is the process at DCF for getting these

6   appointments?

7   A   The process and the practice is that social workers

8   will, at the point that a child's taken into care, we make a

9   determination about whether the child has a pediatrician

10  that they have been seeing consistently, and the social

11  worker in conjunction with the foster care will make an

12  appointment with that pediatrician to see the child.

13          There are times when a child is taken into care on

14  an emergency situation and we may not know who that child's

15  pediatrician is at the moment that they come into care and

16  so there are times for that, particularly for that initial 7

17  day screening we will have, the social worker will take the

18  child to an emergency room to have that initial screening

19  done.

20          In central Mass. there's actually a specific clinic

21  called the FaCES clinic that's set up to do those screenings

22  as well as the 30 day appointment for all children who come

23  into foster care in the Worcester area.  So, it varies a bit

24  to bit depending on the circumstances under which the child

25  comes into care, what our knowledge is about the child's

1    access to medical care in the past and what's available in

2    that particular area.

3    **Q**    How are these 7 day/30 day examinations tracked by DCF?

4    **A**    The social worker is supposed to enter data into Family

5    Net that affirms, and there's a specific screen within

6    Family Net where they are to identify that the child has had

7    that 7 day appointment, that 30 day appointment, as well as

8    their annual, annual physicals, annual reviews.  And as I

9    said before, social workers aren't as diligent as I might

10   like them to be in completing that, so our compliance rate

11   on 7 and 30 days isn't where I would really like it to be.

12   We have been emphasizing the importance of entering that

13   data, and that's actually one of the things that Linda Sagor

14   is talking with area offices about when she goes out to meet

15   with the area offices.

16          The other thing we've done is work with MassHealth

17   to be able to access MassHealth data because they, in order

18   for the pediatricians to get reimbursed for a visit they

19   have to claim through Medicaid.  So, they submit a claim.

20   So, we've been working with MassHealth to get data from

21   MassHealth that shows which of our kids have had those

22   appointments and on what date.

23   **Q**    And the 7 and the 30 day examinations, of course, are

24   tracked in the department's MOSt report?

25   **A**    They are, indeed.

1    Q    You said that the compliance rate for social workers of

2    the data entry function for when these examinations actually

3    do occur is not where you would like it to be.

4    A    No, it's not.

5    Q    How does that affect the reporting numbers for timely

6    completion of the examinations that's reflected in the MOSt

7    report?

8    A    It would make the numbers be lower than the percentages

9    of children who should have had a 7 or 30 day appointment

10   appear lower than what is the reality in terms of the kids'

11   actual access to those appointments.  So, that on the MOSt

12   report it, it looks like there are fewer kids getting those

13   7 and 30 day appointments than what is the reality simply

14   because social workers are negligent about entering that

15   data.

16   Q    I'm going to show you, Ms. Nisenbaum, what has been

17   marked as Exhibit 1 in this case.  And I would just ask if

18   you can -- well, simultaneously holding the place of the

19   page, can you identify this document?

20   A    That is the DCF case practice, policy and procedures

21   manual.

22   Q    And I've turned now to DCFPOL 283.  What's represented

23   here on this page?

24   A    That's the DCF policy related to medical exams for

25   children entering DCF placement or custody.  And this is the

1    policy that was put in place back in 2010, I believe.  Let's

2    see, effective date, February 1st, 2010.  And speaks to when

3    and the rationale for why children need to receive those,

4    the medical screens and assessment appointments that we were

5    talking about.

6    Q    And you've answered my next question which was this was

7    effective and established in 2010.

8    A    Correct.

9    Q    Are there obstacles on the provider side to getting

10   examinations for children within 7 and 30 days?

11   A    When --

12             **MS. BARTOSZ:**  Objection; foundation, hearsay.

13             **THE COURT:**  Do you know?

14             **THE WITNESS:**  I believe I do.

15             **THE COURT:**  How?

16             **THE WITNESS:**  Because one of my jobs is to pay

17   attention to what are the challenges and barriers to kids

18   getting the kinds of services they need through our CFSR

19   process.  I have to pay attention to that.  Also because we

20   have been developing, three years ago developed a medical

21   services strategic plan, so had a group of people who

22   participated in the focus group that spoke to what were some

23   of the challenges in getting medical services for DCF kids.

24             **THE COURT:**  Well, even without your testimony, I

25   would infer that the challenges are not unlike the

1    challenges that a parent faces, specifically the locations

2    of physicians, especially pediatricians, and specialists --

3         THE WITNESS:  Uh-huh.

4         THE COURT:  -- that might be necessary; the

5    willingness of medical professionals to accept Medicaid

6    patients.  So if we start with that as a base line that all

7    parents face, what else?

8         THE WITNESS:  Some of the additional ones for our

9    kids and for our foster parents are making sure that the

10   pediatrician, finding a pediatrician who really understands

11   the specialized needs of kids in DCF foster care.

12        THE COURT:  Well, every parent wants that.

13        THE WITNESS:  Wants quality.  But it's really

14   important I think for pediatricians who are seeing DCF kids

15   to understand some of the history that these kids have gone

16   through and the implications that that may have for their

17   overall health and particularly for their emotional health.

18   So as they're assessing them it's helpful for them to have

19   that understanding.

20        THE COURT:  Are there pediatricians in your

21   experience who as a significant part of their practice deal

22   with children in foster care?

23        THE WITNESS:  There are, indeed.  There are

24   clusters of pediatricians and there are clinics like the

25   FaCES clinic I just mentioned.

1          THE COURT:  Yes, and I didn't catch the -- FaCES is

2     F A S?

3          THE WITNESS:  F A C E S.  FaCES.

4          THE COURT:  FaCES.  F A C E S.  Thank you.

5          THE WITNESS:  And it is a clinical -- a clinic at

6     UMASS Medical Center that was set up specifically for DCF

7     foster children.  And the pediatricians who work there not

8     only see a lot of DCF kids, they develop relationships with

9     the social workers and many of the foster parents who live

10    and work in that particular area, and they really understand

11    the complexity of the history and the needs of DCF children.

12         It's also one of the reasons, I believe yesterday

13    it was when I was testifying about Linda Sagor coming to

14    work for the department and building that resource tool kit

15    for pediatricians that we're working on right now to help

16    them understand the unique needs of kids in DCF foster care

17    so that we can begin to start working with and training

18    other groups of pediatricians who see a large percentage of

19    our kids.

20         THE COURT:  Again, not focusing on children in DCF

21    care, but just generally, I infer that pediatricians are not

22    evenly spread throughout the Commonwealth and that they are

23    more likely to be found in the affluent suburbs around

24    Boston because, one, they're affluent suburbs and have lots

25    of young people, and two, they're close to the great

1    teaching hospitals which professionally the pediatricians

2    might seek to be associated with.  And conversely, I imagine

3    that in the four western counties and maybe in southeastern

4    Massachusetts they're more thinly spread.

5              Is that a reasonable inference?

6              **THE WITNESS:**  Absolutely true.  Absolutely true.

7              **THE COURT:**  Go ahead, Mr. Collins.

8              **MR. COLLINS:**  Thank you, your Honor.

9    **Q**   Ms. Nisenbaum, I want to show you now what has been

10   marked as Exhibit 69 in this case and ask you to again

11   please identify this document?

12   A    This is the Massachusetts regulations.

13   **Q**   Oh, I'm sorry.  Go ahead.

14   A    No, that's fine.  That's fine.

15   **Q**   And I'm just, I'm going to ask you to turn to --

16   A    I've never seen it in this format before which is why --

17   **Q**   Fair enough.

18             I'm going to ask you to turn to, unfortunately, we

19   don't have page numbers in this compilation that we've

20   created for this case, but I'll ask you to turn to 110 CMR

21   7.124.

22   A    Uh-huh.

23   **Q**   And ask you if you -- well, what is that?

24   A    This is the DCF regulation related to the development of

25   the medical passport for all children in substitute care.

1    And in essence what a medical passport is is a document that

2    is to capture current medical conditions, any, for example,

3    any known allergies that a child may have.  It's really

4    information about the child's health.

5    Q   And in looking at the regulation, what is DCF's

6    responsibility with respect to keeping medical information

7    on children in its care with the medical passport?

8    A   The regulation speaks to the fact that DCF social

9    workers, medical providers shall each complete relevant

10   portions of the passport and that the passport should be

11   held by the substitute care provider, which would be the

12   foster parent or residential placement, and shall remain

13   with the child for the duration of that placement.

14          So, it means that the foster parent is the one that

15   holds, holds that information, or holds the passport.

16   Q   All right.  And I want to, I want to break that down.

17          **MR. COLLINS:**  May I approach, your Honor?

18          **THE COURT:**  You may.

19   Q   Ms. Nisenbaum, it starts out by saying DCF shall

20   implement a program of utilization of a medical passport.

21          Let's just start with that.  Has DCF done such a

22   thing?

23   A   DCF has had for a number of years a medical passport

24   that social workers years and years ago were required to

25   fill out on paper.  Once we developed our Family Net, our

1    electronic case records system, that was built into Family

2    Net.

3    Q    And the regulation as you just read goes on to talk

4    about both responsibility of the DCF social worker as well

5    as --

6    A    The medical provider.  And the idea here was that the

7    medical passport would be updated by the child's

8    pediatrician.  There are sections there that we wanted the

9    medical provider to fill out as they did their exams,

10   routine exams, or the 7 and 30 day medical exams of the

11   child.

12   Q    And you went on to read there, who's responsible for

13   holding the medical passport?

14   A    Wherever the child is living is the holder of the

15   passport.  So if the child's in foster care, the foster

16   parents would be the holder of that, of that medical

17   information.

18   Q    And the regulation uses the term substitute care

19   provider.  What do you understand that to be?

20   A    I understand substitute care provider to be anyone other

21   than the parents of the child.  So, it could be a foster

22   parent, it could be an intensive foster care provider, it

23   could be a residential provider, anybody who is substituting

24   for the parent.

25   Q    Has DCF satisfied itself that it is meeting its

1    responsibilities with respect to completing the medical

2    passports?

3              **MS. BARTOSZ:**  Objection; lack of foundation.

4              **THE COURT:**  Yes, I'm more concerned with the form

5    of that question.  So, I'll sustain it and let him try

6    again.

7    **Q**   How has DCF satisfied itself that it is fulfilling its

8    responsibility as laid out in regulation that the medical

9    passports are being completed and utilized?

10   **A**   When the, it's one of the things, medical care is one of

11   the things that's looked at in the course of this CFSR

12   review, and it is also one of the things that we have

13   undertaken a special review of when we developed our medical

14   services strategic plan a few years ago, and so through both

15   of those mechanisms look at the quality of documentation

16   related to medical services.  We don't have a specific

17   management report or outcome report, if you will, like the

18   MOSt or others that speaks to the medical passport.  But

19   those are looked at through case record review processes.

20   **Q**   Aside from the medical passport are there other medical

21   records that are kept on children in care?

22   **A**   There are other records that are kept on children in

23   care.  Not all of those records are kept electronically.

24   Folks think about our Family Net system as being the primary

25   case record, if you will, for a child and family, but

1    in point of fact there's a significant amount of paper

2    records or paper documentation that's maintained in the area

3    offices for each child and family.

4           Often when an outside evaluation or assessment is

5    done, whether that is for medical purposes or mental health

6    evaluation, or some other kind of evaluation done by an

7    outside entity, they don't have access to our electronic

8    record and so they submit the reports for their evaluation

9    in writing, and those are mailed or faxed to the area office

10   to the social worker and kept in essence in a paper record

11   that parallels the electronic record.

12   Q    How, if at all, is that information then relayed or

13   communicated to foster parents?

14   A    It's the responsibility of the social worker to make

15   sure that at the time a child is placed the foster parents

16   have the information they need to effectively take care of

17   that child.  And that would include, if the child has an

18   identified pediatrician, who that pediatrician is, or if

19   that child has any specialized medical needs what those

20   needs might be.  It's the social worker's responsibility to

21   relay that information to the foster parent.

22   Q    And in your experience is that happening at the

23   department?

24   A    It is happening at the department, but I will add a

25   caveat to that which is that there are times that when kids

1    come into care, particularly the beginning, that we may not

2    actually have that information.  So when a child is first

3    placed a foster parent may not get that information.

4    Q    How was the hiring of Dr. Sagor, if at all, intended to

5    address these issues of indication of medical information?

6    A    That was one of the key areas we wanted Dr. Sagor to

7    focus on and one of the primary reasons that we specifically

8    brought her other than some other pediatrician in as a

9    consultant for the department.  Dr. Sagor was the director

10   at the FaCES clinic that I mentioned just a few minutes ago

11   and had in the development of that clinic given a tremendous

12   amount of thought to what was needed in terms of quality

13   health care for children in DCF foster care.

14           I think I may have also mentioned that she's on the

15   foster care committee of the American Academy of Pediatrics.

16   So, it's an area of particular expertise and interest for

17   her.  So we specifically brought her in as a consultant to

18   help us work with the medical community at large to, A,

19   provide them some training about what the specialized needs

20   of DCF foster care kids are, as well as think about what are

21   strategies for improving that communication.

22   Q    And Dr. Sagor is a direct report of yours.  Yes?

23   A    She is, yes.

24   Q    Have you seen any results from the intended use of Dr.

25   Sagor?

1    A    There are --

2              MS. BARTOSZ:  Objection; hearsay.

3              THE COURT:  Yes, I'm -- I don't know that we've

4    laid a foundation for that.  I'm going to sustain that.

5    Q    Dr. Sagor reports directly to you.  Yes?

6    A    She does report directly to me, so I am aware not only

7    of the activities and the way she spends her time as a

8    consultant for the department and what she does during the

9    hours that she is paid for as a consultant, but also have

10   attended meetings with her as we began to move forward on

11   the activities that we had outlined as expectations as part

12   of the scope of her responsibility.

13   Q    And you and Dr. Sagor at times meet to discuss, in a

14   review fashion to discuss how she's performing her job

15   duties?

16   A    Absolutely.  We meet regularly and have phone calls,

17   probably a phone call at least once a week and we meet every

18   other week.

19   Q    Do you meet in those meetings to discuss the goals and

20   objectives that you laid out or that the department laid out

21   for her prior to her hire?

22   A    We not only talk about the goals and objectives, but

23   more specifically, we talk about how, what are the specific

24   action steps that need to be taken to move forward and make

25   progress on those goals and objectives.  So, we have, in the

1    arena of medical passports, just to use this as an example,

2    in the arena of medical passports, Dr. Sagor's been very

3    interested in the department trying to --

4         **MS. BARTOSZ:**  Your Honor, I object.  I think we're

5    starting to move into hearsay.

6         **THE COURT:**  We are when she starts saying that Dr.

7    Sagor has been interested.  So we'll stop it at that point.

8    **Q**   Ms. Nisenbaum, how is it that as Dr. Sagor's boss you

9    have satisfied yourself that she's performing the functions

10   for which DCF intended her hire?

11   A   There are two ways concretely that I do that.  One of

12   which I've participated in many of the meetings that have

13   been organized specifically to move forward on the

14   activities that we set out for Dr. Sagor to undertake when

15   we hired her as a consultant.  So, I have been personally

16   present at those meetings, for example, with the Mass.

17   Behavioral Health Partnership where we are looking at their

18   web based system that they have for medical passports.  I

19   have been a participant in meetings with Dr. Sagor where we

20   have explored and talked about what are the specific

21   resources, what are the specific tools, what's the specific

22   information that we want to put together in a resource tool

23   kit to provide training for pediatricians across the state.

24   **Q**   And have you been satisfied with those results?

25        **MS. BARTOSZ:**  Objection, your Honor; lack of

1    foundation, hearsay.

2            THE COURT:  No, no.  He may ask that.

3    A    I'm excited about the results.  Because I think that we

4    have an opportunity that we haven't had for several years to

5    really be able to work more closely with the medical

6    community to improve the quality of health care,

7    specifically for kids in foster care within DCF.  So, I'm

8    very excited about having this opportunity.

9    Q    I want to switch gears now and talk to you about the

10   issue of psychotropic medications.

11   A    Uh-huh.

12   Q    You are aware of the 2011 GAO report that came out.

13   Yes?

14   A    I am, indeed.

15   Q    What is, what is your familiarity with that report?

16   A    My familiarity with it is twofold.  When the GAO was

17   originally doing their work to compile information for that

18   report, a few staff at the department, including two of my

19   staff, Dr. Russ Livington and Mary Lutz, were involved in

20   meetings with staff from the GAO to talk about and review

21   the cases that they were looking at as part of, part of that

22   process that they undertook to develop the report.  And then

23   secondarily, when the report came out, the commissioner

24   distributed copies of the report to all of senior staff and

25   we reviewed the report and then discussed it in a subsequent

1    senior staff meeting.

2    Q    And what was your personal reaction to what was being

3    reported by the -- when I say personal reaction I mean as

4    the deputy commissioner for clinical and program services.

5    What was your reaction to what was being reported by the

6    federal government in that GAO report?

7    A    My reaction as deputy commissioner for the Department of

8    Children and Families was twofold.  One, serious concern

9    because Massachusetts was specifically highlighted as one of

10   the, one of the states that they had done a more in depth

11   look, and secondarily, a recognition that it was an area

12   that the department needed to partner with other state

13   agencies because of being very cognizant that our social

14   workers don't have the background or the specific training

15   to really effectively monitor the psychotropic medications

16   that our kids are on.  They're primarily social workers,

17   they're not primarily folks who have that knowledge base.

18        So, my second concern was how do we, who do we

19   partner with, how do we partner with other agencies to make

20   sure that we can attend to the concerns that were raised in

21   the GAO report.

22   Q    And let's just rewind a second.  I want to ask you what

23   role does DCF play with respect to the administering of

24   psychotropic medications.

25   A    DCF doesn't really have a role in terms of the

1    administration of psychiatric medication except within a

2    very narrow boundary, which is those children who are in the

3    care and custody of the department for whom there is going

4    to be prescribed an antipsychotic medication, the department

5    is a participant in going to court to get what's known as a

6    Rogers decision which is court approval for a child in DCF

7    care and custody to be put on an antipsychotic medication.

8    But in general, across the broader class of medications, DCF

9    does not have a specific role in the administering of those

10   medications.

11   Q    DCF does, though, have a role in what's known as the

12   informed consent process?

13   A    Exactly.

14   Q    What, what is DCF's role in the informed consent

15   process?

16   A    For children who are in the care or custody of the

17   department in essence providing informed consent to allow a

18   child who's in the care and custody to receive or be

19   prescribed medication, because in essence we serve de facto

20   as the child's parents.

21   Q    And can you describe that process from the perspective

22   of DCF or DCF social worker, how does that process play out?

23   A    When a child --

24        **MS. BARTOSZ:**  Objection to form.  And just a

25   clarification, are we talking about policy or practice here?

1              **THE COURT:**  Practice.

2      **Q**   In practice, Ms. Nisenbaum?

3      A    When a child is seeing a psychiatrist or someone who

4      might be prescribing a psychotropic medication for them and

5      the psychiatrist is interested in either changing a

6      prescription or writing, prescribing for the child a

7      psychotropic medication there is a conversation between the

8      social worker or the foster care parent.  Often foster

9      parents are the ones who are taking the child to a

10     psychiatric appointment, for example, so this conversation

11     might take place between the foster parent and the

12     prescriber.  But the prescriber has an obligation to let

13     either the social worker or foster parent know what the

14     medication is that they are wanting to prescribe to the

15     child, what the specific behavior or symptoms that they're

16     trying to address through that prescription, and what the

17     potential side-effects are for that particular medication.

18     And that responsibility is the prescriber's responsibility

19     as a medical professional to relay that information, provide

20     that information to either the social worker or the foster

21     parent.

22     **Q**   Does DCF monitor the administering of psychotropic

23     medications to children in its care?

24     A    Historically, we have not.  When the GAO, GAO report

25     came out in December, early December of 2011, we immediately

1    put together a steering committee that included, that was

2    co-chaired by the Commissioner for DCF as well as the Child

3    Advocate.   The Commissioner and the Child Advocate

4    co-chaired the steering committee to look at the monitoring

5    of psychotropic medications.

6            I served on that steering committee.  Staff from

7    the Executive Office of Health and Human Services, from the

8    Department of Mental Health, and the department of, and

9    folks from MassHealth also served on that steering

10   committee.   And that committee was charged by the Secretary

11   of Human Services to develop a plan for DCF to monitor

12   psychotropic medications for children in foster care and

13   that, that plan was developed by the steering committee and

14   has been implemented.

15   Q   Can you talk about, if you would, some of the steps that

16   were taken to develop that plan?

17   A    Sure.

18           The first thing that we did was we had actually

19   attended a summit that was held by, I think it was convened

20   by the Administration for Children and Families and several

21   members of the steering committee attended that summit in

22   Washington, D.C. that was specifically targeted to and the

23   agenda on that was related to psychotropic medications for

24   children in foster care.  So, five of us had attended that

25   conference, myself included.  That gave us an opportunity to

1    hear not only from the Commissioner for the Administration

2    for Children and Families, but also from other states what

3    they had in place in terms of their monitoring procedures

4    for psychotropic medications.  So that was the first step.

5            The second step was to --

6        MS. BARTOSZ:  Your Honor, at this point plaintiffs

7    object without a time frame; when in 2012 are we talking

8    about.

9            THE COURT:  You may inquire.  She knows the cutoff.

10           Go ahead.

11   A    Right.  The steering committee was convened in January

12   of 2012 after the GAO report.  In all honesty, I forget when

13   the summit was in Washington, D.C.  I don't remember, it was

14   during the summertime, but I don't remember when that

15   occurred that we all went down to D.C.

16           The next step which also occurred, did occur before

17   August of 2012, August 15th of 2012, was that the steering

18   committee had made the decision that we would do some in

19   depth conversations with ten other states as to what they

20   currently had in place.  So we identified ten states, some

21   of which had a prospective review, in essence, a

22   pre-authorization when kids in foster care were going to be

23   prescribed psychotropics, and several of the states had a

24   retrospective review or monitoring system after those

25   prescriptions had been filled.

1          So, we wanted to find out what other states were

2     doing, what their processes were, and then determine what

3     would work best for Massachusetts.  So, those calls were

4     made by folks on the steering committee.

5          The other thing we did was to work with MassHealth

6     to gather data from MassHealth as to what prescriptions were

7     being provided for DCF kids.  We don't have, DCF does not

8     have data related to prescriptions that are filled on all

9     kids in foster care.  So that data at an aggregate level can

10    come from MassHealth.  So we worked with them to develop a

11    report, a database that shows for every child in DCF foster

12    care what medications they're currently receiving, what that

13    dosage is, and who the prescriber is.

14         So, MassHealth began producing that report for us.

15    The first one of those we got end of June, beginning of July

16    last summer.  And the plan that we had set forth, that the

17    steering committee had developed, was that as the data

18    became available that we would contact the prescriber for

19    those children who fell into any of four problematic,

20    potentially problematic prescribing practices, and that DCF

21    would contact the prescriber to inquire of the prescriber

22    whether or not they felt that there were additional services

23    that might help the child not need the level of medication

24    that they were on, were they aware that their current

25    medication regimen kind of fell within one of these sort of

1    problematic areas, and to have a conversation much the same

2    as parents might have that conversation.  And so we were

3    doing that on behalf of the child.  So that the DCF

4    psychiatrist, the regional mental health specialist and the

5    nurses were given the responsibility of making those calls

6    to the prescriber based on the data that we received from

7    MassHealth.

8    Q    These are the four regional nurses and the four or five

9    mental health specialists that you talked about yesterday?

10   A    Correct.

11           **MS. BARTOSZ:**  Objection; leading.

12           **THE COURT:**  It is.  Sustained.  The answer is

13   stricken.  I drew the inference.

14           Go ahead.

15   Q    How does Dr. Livingston factor into the equation during

16   these processes that you've described?

17   A    The steering --

18           **MS. BARTOSZ:**  Objection; form.

19           **THE COURT:**  No, overruled.

20   A    The steering committee as part of the plan that was

21   developed for DCF to monitor the psychotropic medications,

22   Dr. Livingston played a key role in that monitoring process,

23   in two ways.  One of which was that he was going to be one

24   of the primary folks contacting the prescribers, and we had

25   set it out that those psychiatrists who had the greatest

1    number of children who fell outside or fell into one of the

2    categories of problematic prescribing practices, that Dr.

3    Livingston would be the one to contact those psychiatrists.

4         The second way he was going to be involved was that

5    as the regional mental health specialists or the nurses, as

6    they made their calls to prescribers, if there was a

7    situation that was particularly concerning to them they were

8    to bump it up to Dr. Livingston so that he could have a

9    follow-up conversation with the prescriber.

10   Q    Why is it important for Dr. Livingston to be the one to

11   make that call?

12   A    At a really basic level, doctors respond to other

13   doctors better than they respond to a social worker or a

14   mental health specialist making the call.  And we honestly

15   felt that having that doc to doc conversation would be more

16   persuasive or gather more information as it was needed.

17   Q    In practice, in reality, if you will, what you've just

18   described, has that gotten under way at the department, has

19   it been implemented?

20   A    That --

21        **MS. BARTOSZ:**  Time frame, your Honor.

22        **THE COURT:**  No, she understands the time frame.

23   A    The reality is that we got the first round of data from

24   MassHealth in June or July of last year.  We did an analysis

25   of that data, made some requests for the data to be changed,

1    got a new report in September, and those calls started at

2    that point.

3    **Q**   At the time that the department was planning these

4    efforts --

5    A    Uh-huh.

6    **Q**   -- surrounding the monitoring of psychotropic

7    medications, what other steps did it envision and plan for

8    to occur beyond the August 15th, 2012 date?

9    A    The plan that was --

10        **MS. BARTOSZ:**  Objection, your Honor; lack of

11   foundation.

12        **THE COURT:**  No, overruled.  She may answer.

13   A    The plan that was developed by the steering committee

14   called for in essence a four phased development plan.  We

15   knew that we wanted to get something instituted really

16   quickly so we needed to utilize the resources that we had

17   available within the department.  But one of the things that

18   we had learned from other states was that they had put in

19   place systems that involved a significant number of staff in

20   some, in some states.  For example, in Illinois they have

21   five psychiatrists, a team of five psychiatrists and a team

22   of five nurses.  We knew that at the outset we didn't have

23   the resources to begin that last fiscal year and we wanted

24   to get something started.

25        So we started with our internal resources and then

1    the next phase of the plan was to submit a request to the

2    legislature for a team of folks who would actually take

3    responsibility for this monitoring but would do that as a

4    dedicated resource within DCF.

5            And then the next stage of the plan was to begin to

6    look at how would we change the pre-authorization process.

7    So, could we work with MassHealth, for example, to put a

8    flag on their system that in instances DCF kids are

9    receiving Medicaid those prescriptions would need to go

10   through MassHealth.  So, was there a way we could put a flag

11   on the MassHealth system that would in essence serve as a

12   pre-authorization trigger.

13           And then the fourth stage of the plan that the

14   steering committee developed specifically was related to the

15   Rogers process that we have here in Massachusetts and

16   whether or not there ought to, to look for what

17   modifications or adaptations or changes ought to be made in

18   that Rogers process.  So that was developmentally, a

19   sequenced developmental plan developed by the steering

20   committee.

21           **THE COURT:**  As we, as we, I don't mean to do

22   violence to this cutoff date, but as we sit here today there

23   have been no changes to the Rogers process, have there?

24           **THE WITNESS:**  No.  No, sir.

25           **THE COURT:**  That's the law in Massachusetts?

1           **THE WITNESS:**  Correct.

2     **Q**   As of August 15th, 2012, was this plan as you've

3     described it, this four stage plan, on track?

4     **A**   As of August 15th, 2012 it absolutely was on track and

5     had been approved at that point by the Secretary of Human

6     Services, had been reviewed and approved by the Secretary of

7     Human Services, yes.

8     **Q**   What role, if any, does Dr. Sagor have in this process?

9     **A**   The role that Dr. Sagor has is not specifically in the

10    monitoring procedures that we've put in place.  However, we

11    are going to be including in that resource tool kit that I

12    mentioned a few minutes that Dr. Sagor is working on

13    developing, information about psychotropic medications so

14    that information will be available to the pediatricians as

15    we begin working with and training pediatricians around the

16    needs of DCF foster children.

17           Also, I should say Dr. Sagor did sit on the

18    steering committee.  Even though she didn't have any

19    particular role in making the calls to the prescribers, but

20    she was a participant on the steering committee.

21    **Q**   And the steering committee was co-chaired by who?

22    **A**   The steering committee was co-chaired by Commissioner

23    McClain and the Child Advocate, Gail Garinger.

24    **Q**   I want to turn now to the subject of permanency in child

25    welfare, and start by asking you what is the process that is

1    known as permanency planning?

2    A    Okay.  Permanency planning actually is something that we

3    within the Department of Children and Families want to make

4    sure that our social workers are conscious of, mindful of,

5    intentional about from day one that we are involved with the

6    family.

7         So, for even in those situations where the child

8    remains at home with the family and is not removed, our

9    emphasis is how we can make that family stable so that the

10   child doesn't ever have to move.  So, what do we need to do

11   to increase parenting capacities, what do we need to do to

12   make that a safe and nurturing environment for the child.

13        When it becomes clear that we do need to remove a

14   child, that they aren't able to be taken care of by their

15   family, then when a child goes into placement the first step

16   in that permanency planning process is a meeting called the

17   six week placement review.  At that meeting there is a

18   conversation about what are we going to do to as quickly as

19   possible move toward a permanent, permanent situation for

20   that child, most likely reunification at that, at that

21   initial stage.

22        If the child stays in place for longer there is

23   then a permanency, permanency hearing that happens after the

24   child's been in placement for about nine months and we look

25   to ideally have the child returned or in, returned to family

1    or in a permanent setting within 24 months of their removal

2    from the family.

3    Q    What is the child specific assessment?

4    A    A child specific assessment?

5    Q    With respect -- in the permanency planning process --

6    A    Uh-huh.

7    Q    -- is there something that's known as a child specific

8    assessment?

9    A    There is, and in truth I'm not familiar with the details

10   on what all is included in that process.  That's -- Mary

11   Gambon and the assistant commissioner for foster care and

12   adoption have much greater familiarity with that than I do.

13   Q    What is concurrent planning?

14   A    Concurrent planning is a common child welfare term that

15   refers to the fact that because we are working with human

16   beings you cannot always a hundred percent assess or

17   guarantee that you know exactly what's going to happen in a

18   family's life and a parent's life.  So, you may

19   concurrently, or at the same time, be working on

20   reunification at the same time that you're paying attention

21   to, if it doesn't work out for these parents, if they aren't

22   able to gain the skills necessary to take care of their

23   child, we need to be looking at an alternative.  So you're

24   in essence concurrently looking at an alternative permanent

25   placement at the same time you might be working on

1    reunification.

2    Q    What is the permanency planning policy at DCF?

3    A    Permanency planning policy is a policy that the

4    department has been actually working on for a very long time

5    and is a policy that describes throughout every juncture of

6    our casework practice how we can be focusing on permanency

7    for a child.  It establishes specific time frames for

8    meetings that address the permanency of the child.  It

9    speaks to the ways in which we need to make sure that we are

10   attending to ensuring the timely permanency for a child.  It

11   also specifically looks at children who are transition age,

12   those children who are 18 and as children approach young

13   adulthood, what are the levels of involvement and how is DCF

14   going to continue to support those youth as they age into

15   young adulthood.

16   Q    You just mentioned that the department has been working

17   on the permanency planning policy for a long time.  Was that

18   your testimony?

19   A    That is correct.

20   Q    Why is that?

21   A    The primary, the bulk of that work has been in the

22   negotiation about policy with SEIU Local 509.  Every policy

23   that the department writes needs to be negotiated, bargained

24   with our union.  And that policy has taken an incredibly

25   long time to come to agreement with 509 around the specific

1    language that is incorporated in the policy that speaks to

2    what are the expectations for social workers related to

3    permanency.

4    Q    And what has been the effect of those lengthy

5    negotiations of the permanency planning policy on practice,

6    permanency planning practice at the department during that

7    time?

8    A    I think the reality is, we've always had, there's been

9    permanency policies that address permanency that have been

10   negotiated and have in fact highlighted for staff how

11   they're to focus on achieving permanency.  We talked a lot

12   about permanency as we changed service plan goals a few

13   years ago in response to a change of the federal, federal

14   guidelines around that.  So we have continued to talk about

15   permanency and the importance of permanency in the absence

16   of a negotiated policy.

17          However, what the policy does allow us to do as we

18   move forward, once the negotiations have been finalized and

19   we are able to begin training, which is now scheduled on

20   that policy, as we begin training on the policy it allows us

21   to be much clearer and much more specific about the

22   expectations of social workers in support of permanency.

23   Q    Have you, whether directly or through your direct

24   reports, received feedback from the field that somehow these

25   long negotiations of the permanency planning policy have

1    presented, presented obstacles or difficulties in permanency

2    planning practice at DCF?

3               MS. BARTOSZ:  Objection; hearsay.

4               THE COURT:  Sustained.

5    Q    Has the length of time of negotiations over the

6    permanency planning policy caused you as deputy commissioner

7    to have to address permanency planning, permanency planning

8    practice in the field?

9    A    We, as we developed the integrated casework practice

10   model and envisioned what that casework practice model was

11   going to cover, permanency -- permanency is such a core

12   concept in child welfare that we absolutely incorporate that

13   into our way of thinking about the way we're going to

14   structure our casework practice model.  So, we knew that as

15   we moved forward in more clearly defining casework practice

16   relative to the casework practice model that permanency was

17   going to be an integral part of that.  And to the extent

18   that you have a policy that's negotiated it absolutely makes

19   life easier, it makes it much easier to be able to be clear

20   with staff about what the expectations are for their role in

21   that, no question about that.

22               THE COURT:  All right, it's one o'clock.  You may

23   step down, ma'am.

24               We'll adjourn in this case until 2:30 on Tuesday

25   afternoon, the 21st of May, at which time we'll entertain

1        the defense motion for finding in its favor.

2                You may step down.

3                (Whereupon the witness stepped down.)

4            **THE COURT:**  After 24 days of trial, total elapsed

5        time stands, plaintiff, ten days, two hours, 50 minutes;

6        defense, 13 days, 40 minutes.

7                We'll recess.

8            **MS. BARTOSZ:**  Your Honor, may I inquire on the

9        motion process, on two matters?

10            **THE COURT:**  Go ahead.

11            **MS. BARTOSZ:**  One, your Honor, plaintiffs had

12        proffered a contested exhibit list for ruling that laid out

13        in matrix form the documents that we would, we had proffered

14        in our case in chief, any objections raised by the

15        defendants.  We've -- some of those exhibits during the

16        course of the defense case have now been admitted and we've

17        reworked the matrix and put in yellow those exhibits to make

18        that clear.

19                I could proffer this matrix to the Court and one to

20        the defense counsel.

21            **THE COURT:**  That's helpful.  I will tell you that I

22        do not presently contemplate holding some separate hearing.

23        I have those documents.  I've tried to be very careful as to

24        what's in the record.  Now, if the plaintiffs want to depend

25        on a document as to which, as to which it's contested you

1     should argue that.  Or, you know, you don't have to give up

2     on it because I haven't ruled on it.  But all parties are

3     assured that what I've said is in the record is in the

4     record.  If you want to go further than that then that may

5     become an issue.  If that's significant, we'll see.

6              MS. BARTOSZ:  Thank you, Judge.  And a second

7     question, if I may quickly, your Honor had indicated that

8     for purposes of briefing and hearing on the motion that your

9     Honor would consider evidence heard in this trial proceeding

10    up through today I believe was the --

11             THE COURT:  Correct.

12             MS. BARTOSZ:  -- Court's guidance.

13             THE COURT:  Correct.

14             MS. BARTOSZ:  And so, plaintiffs in briefing and

15    arguing would appropriately consider the testimony of Ms.

16    Nisenbaum notwithstanding the absence of cross which we'll

17    certainly conduct.

18             THE COURT:  Correct.

19             MS. BARTOSZ:  Okay.

20             THE COURT:  Correct.  All right.  And again,

21    because I'm hearing a motion, I'll have an hour hearing,

22    half an hour a side, defense will go first, it's their

23    motion, plaintiffs will argue second.

24             We'll recess until that time.  We'll recess.

25             MS. BARTOSZ:  Thank you, your Honor.

1          **THE CLERK:**  All rise.

2          (Adjournment.)

3

4

5                  C E R T I F I C A T E

6

7

8          I, Donald E. Womack, Official Court Reporter for

9     the United States District Court for the District of

10    Massachusetts, do hereby certify that the foregoing pages

11    are a true and accurate transcription of my shorthand notes

12    taken in the aforementioned matter to the best of my skill

13    and ability.

14

15

16

17

18          /S/ DONALD E. WOMACK 5-16-2013
           _____
19              DONALD E. WOMACK
             Official Court Reporter
20               P.O. Box 51062
           Boston, Massachusetts 02205-1062
21              womack@megatran.com

22

23

24

25