UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

| | |
|---|---|
| CONNOR B., by his next friend, Rochelle Vigurs, ADAM S., by his next friend, Denise Sullivan, CAMILA R., by her next friend, Bryan Clauson, ANDRE S., by his next friend, Julia Pearson, SETH T., by his next friend, Susan Kramer, and RAKEEM D., by his next friend, Bryan Clauson, individually and on behalf of all others similarly situated, | CIVIL ACTION NO. 10-30073-WGY |
| Plaintiffs, | |
| v. | |
| DEVAL L. PATRICK, Governor of the Commonwealth of Massachusetts, JOHN POLANOWICZ, Secretary of the Massachusetts Executive Office of Health and Human Services, and OLGA I. ROCHE, Acting Commissioner of the Massachusetts Department of Children and Families, in their official capacities, | |
| Defendants. | |

---

FINDINGS AND RULINGS

YOUNG, D.J.                                    November 22, 2013

## I.   INTRODUCTION

Anonymized minors acting on behalf of a class of

approximately 8500 children (collectively, the "Plaintiffs")

who, after being removed from their family homes due to abuse or

neglect, have suffered harm or are exposed to harm[1] in the custody of the Massachusetts Department of Children and Families ("DCF" or the "Department"), bring this suit under 42 U.S.C. section 1983 against high-level officials in the Commonwealth's administrative bureaucracy (collectively, the "Defendants") for allegedly circumscribing the myriad constitutional and statutory rights of the class members.  Specifically, the Plaintiffs contend that the Defendants violated (1) class members' right to substantive due process; (2) class members' constitutionally guaranteed liberty, privacy, and associational interests, particularly the right to familial association; (3) certain provisions of the Adoption Assistance and Child Welfare Act of 1980 ("AACWA"), 42 U.S.C. §§ 670-676, specifically those pertaining to foster care maintenance payments and individualized case plans; and (4) class members' right to procedural due process.  The sheer number and breadth of allegations raised by the Plaintiffs in this case effectively amount to an all-out assault on the Massachusetts foster care system, in which the Plaintiffs request all manner of declaratory and injunctive relief.  The Defendants, for their part, have moved for judgment on the record.

---

[1] August 15, 2012, was set as the fact cutoff date for liability purposes.  Elec. Order, May 17, 2012.

A.    **Procedural Posture**[2]

On April 15, 2010, lead plaintiffs Connor B.,[3] Adam S.,
Camila R., Andre S., Seth T., and Rakeem D. (collectively, the
"Named Plaintiffs"), by their next friends and on behalf of all
others similarly situated, filed a complaint in this district
against Massachusetts Governor Deval Patrick and the heads of
the Massachusetts Executive Office of Health & Human Services
and DCF.  Compl., ECF No. 1.  That same day, the Plaintiffs
filed a motion to certify a class and appoint class counsel.
Pls.' Mot. Class Certification & Appointment Class Counsel, ECF
No. 2.  The Defendants moved to dismiss the complaint on August
20, 2010, Mot. Hon. Deval L. Patrick Dismiss Compl. Against Him
Pursuant Fed. R. Civ. P. 12(b)(1) & 12(b)(6), ECF No. 17; Defs.'
Mot. Dismiss Compl. Pursuant Fed. R. Civ. P. 12(b)(1) &
12(b)(6), ECF No. 18, and subsequently filed an opposition to
the Plaintiffs' motion for class certification, Defs.' Opp'n
Pls.' Mot. Class Certification, ECF No. 32.

---

[2] Children's Rights, one of the Plaintiffs' counsel in this
matter, have secured settlements with over a dozen other states
in similar foster care management disputes.  See Susan Ferriss,
Class-Action Suit Challenges Massachusetts Foster Care System,
Center for Pub. Integrity (Jan. 23, 2013, 6:00 AM), http://www.
publicintegrity.org/2013/01/23/12062/class-action-suit-
challenges-massachusetts-foster-care-system.  Massachusetts is
the first to take up the gauntlet and accept the Plaintiffs'
challenge in court.  Id.

[3] Pursuant to Local Rule 5.3(a), pseudonyms have been used
to protect the identities of the children who are parties to
this class action.

Following additional filings by both parties, Judge Michael
Ponsor issued a memorandum and order on January 4, 2011, denying
the Defendants' motions to dismiss and leaving for later
resolution the Plaintiffs' motion for class certification.
Connor B. ex rel. Vigurs v. Patrick, 771 F. Supp. 2d 142 (D.
Mass. 2011) (Ponsor, J.).  Nearly two months later, Judge Ponsor
revisited the remaining motion, granting the Plaintiffs class
certification and referring the case to Magistrate Judge Kenneth
Neiman for further adjudication.[4]  Mem. & Order Regarding Pls.'
Mot. Certify Class & Appoint Class Counsel, ECF No. 49; Elec.
Order, Feb. 28, 2011.  The case was eventually reassigned to
this Court on November 19, 2012.  Elec. Notice, Nov. 19, 2012,
ECF No. 203.

On December 3, 2012, the Defendants moved for partial
summary judgment on the Plaintiffs' substantive due process
count and for full summary judgment on all of the remaining
counts in the Plaintiffs' complaint.  Defs.' Mot. Partial Summ.
J., ECF No. 209.  At a motion hearing held on January 10, 2013,
the Court denied the Defendants' motion as matter of judicial
economy.  Elec. Clerk's Notes, Jan. 10, 2013, ECF No. 272.  The
case proceeded to trial on January 22, 2013.  Elec. Clerk's
Notes, Jan. 22, 2013, ECF No. 291.

---

[4] The Defendants' attempt to decertify the newly constituted
class proved equally futile.  See Connor B. ex rel. Vigurs v.
Patrick, 278 F.R.D. 30 (D. Mass. 2011) (Ponsor, J.).

On April 30, 2013, following the close of the Plaintiffs'
case-in-chief, the Defendants filed a motion for judgment on the
record and appended to their motion a memorandum of law in
support.  Defs.' Mot. J. R., ECF No. 316; Mem. Law Supp. Defs.'
Mot. J. R. ("Defs.' Mem."), ECF No. 317.  The Plaintiffs
submitted a brief in opposition to the Defendants' motion on May
16, 2013.  Pls.' Mem. Law Opp'n Defs.' Mot. J. R. ("Pls.'
Opp'n"), ECF No. 356.  The motion was heard on May 21, 2013, but
the Court declined to rule on it at the hearing, deciding
instead to take the matter under advisement and adjourn the case
without day.  Mot. Hr'g Tr. 37:17-18, May 21, 2013, ECF No. 364.

### B.   Child Welfare Regulatory Framework

Under Title IV-E of the Social Security Act,[5] 42 U.S.C.
§§ 670-676, the Children's Bureau of the Administration for
Children and Families ("ACF"), which sits within the U.S.
Department of Health & Human Services ("HHS"), allots federal
funds to states to assist in their provision of foster care
services.  See Title IV-E Foster Care, Children's Bureau (May
17, 2012), http://www.acf.hhs.gov/programs/cb/resource/title-
ive-foster-care.  In order to qualify for Title VI-E funds,
state foster care agencies must meet a long list of federal
requirements.  See 42 U.S.C. § 671(a).

---

[5] Title IV-E is also known as the Adoption Assistance and
Child Welfare Act of 1980.  Henry A. v. Willden, 678 F.3d 991,
1007 n.9 (9th Cir. 2012).

The receipt of said funds is additionally conditioned upon participation in and the successful completion of Child and Family Services Reviews ("CFSRs"). Trial Ex. 808, Children's Bureau Child & Family Servs. Reviews Fact Sheet ("CFSR Overview") 1. HHS has established seven outcome measures spread across three categories to grade a state agency's performance:

> (1) A title IV-E agency's substantial conformity will be determined by its ability to substantially achieve the following child and family service outcomes:
>
> (i) In the area of child safety:
>
>> (A) Children are, first and foremost, protected from abuse and neglect; and,
>> (B) Children are safely maintained in their own homes whenever possible and appropriate;
>
> (ii) In the area of permanency for children:
>
>> (A) Children have permanency and stability in their living situations; and
>> (B) The continuity of family relationships and connections is preserved for children; and
>
> (iii) In the area of child and family well-being:
>
>> (A) Families have enhanced capacity to provide for their children's needs;
>> (B) Children receive appropriate services to meet their educational needs; and
>> (C) Children receive adequate services to meet their physical and mental health needs.

45 C.F.R. § 1355.34(b)(1). In addition to these seven outcome measures, HHS has adopted six statewide data indicators to assist in determinations of whether a state is in substantial conformity with Title IV-E: (1) the recurrence of maltreatment;

(2) the incidence of child abuse and/or neglect in foster care;[6]

(3) the number of re-entries into the foster care system; (4)

the length of time to achieve reunification; (5) the length of

time to achieve adoption; and (6) the stability of foster care

placement.[7]  See Title IV-E Foster Care Eligibility Reviews and

Child and Family Services State Plan Reviews, 65 Fed. Reg. 4020,

4024 (Jan. 25, 2000) (codified at 45 C.F.R. pts. 1355-1357); see

also Admin. Children & Families, U.S. Dep't Health & Human

Servs., Background Paper: Child and Family Services Reviews

National Standards 1 (2012), available at http://www.acf.hhs.

gov/sites/default/files/cb/cfsr_background_paper.pdf.

States that fail to meet the requirements of a CFSR must

draft and implement a Program Improvement Plan ("PIP") that

establishes performance improvement goals in the areas in which

the states are not in substantial conformity with federal

standards.  See CFSR Overview 2.  There is great incentive to

---

[6] This indicator has since changed to refer to the absence
of maltreatment of children in foster care.  See infra Part
II.A.

[7] The first two statewide indicators pertain to the first
safety outcome -- namely, that "[c]hildren are, first and
foremost, protected from abuse and neglect," 45 C.F.R. §
1355.34(b)(1)(i)(A) -- whereas the last four statewide data
indicators pertain to the first permanency outcome -- namely,
that "[c]hildren have permanency and stability in their living
situations," 45 C.F.R. § 1355.34(b)(1)(ii)(A).  See Title IV-E
Foster Care Eligibility Reviews and Child and Family Services
State Plan Reviews, 65 Fed. Reg. 4020, 4024 (Jan. 25, 2000)
(codified at 45 C.F.R. pts. 1355-1357).

keep pace with the goals set forth in the PIPs, as states that fail to do so are assessed penalties as punishment for their noncompliance.  See id.

### C.  Child Welfare Standards

National child welfare standards established by the Council on Accreditation ("COA") and the Child Welfare League of America ("CWLA") provide the normative backdrop against which DCF's challenged practices and policies must be cast.[8]

COA is an accrediting organization that performs research on best practices in child welfare and sets professional standards for child welfare agencies.  See Trial Tr. vol. 11, 33:5-9, 33:23-34:1, Feb. 28, 2013, ECF No. 335.  COA standards are derived both from the opinions of independent panels (comprised of experts drawn from across the social services spectrum) and from the relevant academic literature.  Rule 30(b)(6) Dep. Council Accreditation, Richard Klarberg 37:19-20, 41:20-42:4, Aug. 9, 2012, ECF No. 226-1.  Standards that have been transcribed in draft form are then disseminated for comment to individuals who have expertise in the applicable field.  Id.

---

[8] Admittedly, neither COA nor CWLA standards impose upon child welfare agencies obligations that have the force of law. See Trial Tr. vol. 19, 73:20-75:18, 87:12-25, May 7, 2013, ECF No. 347 (noting that COA and CWLA standards are intended to be viewed aspirationally).  Nevertheless, given the standards' widespread usage, this Court elevates them as reflective of the bar to which child welfare agencies are generally expected to measure up.

at 41:14-19, 46:17-22.  The comments received are customarily incorporated into existing standard statements and reviewed again by the independent panelists, id. at 47:7-12, making the process of COA standard-setting rather iterative and dynamic.

CWLA is a public, non-profit agency that, like COA, conducts best-practices research and sets industry standards for child welfare services.  Trial Tr. vol. 11, 33:15-21.  CWLA standards are set by a process similar to the one used for the development of COA standards.  Rule 30(b)(6) Dep. Child Welfare League Am., Linda Spears 77:12-78-24, Aug. 14, 2012, ECF No. 226-1.

**D.   Expert Witness Testimony**

Over the course of the bench trial, seven expert witnesses (all for the plaintiff) were called to the stand to testify. The Court takes the time here to provide a brief biography of the witnesses and explain their particular relevance or contribution to the matter under review.

**1.   Named Plaintiff Case File Review**

Dr. Lenette Azzi-Lessing ("Dr. Azzi-Lessing") is a tenured associate professor of social work at Wheelock College, located in Boston, Massachusetts.  Trial Tr. vol. 3, 103:3-18, Jan. 25, 2013, ECF No. 327.  Dr. Azzi-Lessing conducted a review of five of the Named Plaintiffs' DCF case files, which date from the children's entry into the foster care system through early 2012.

Trial Tr. vol. 6, 76:5-7, 79:3-10, Feb. 4, 2013, ECF No. 330.
The aim of Dr. Azzi-Lessing's case file review was to assess
DCF's effectiveness in providing the five Named Plaintiffs with
"safety, permanency and well-being." Id. at 71:14.  In reaching
her conclusions, Dr. Azzi-Lessing drew upon COA and CWLA
standards, academic literature, federal welfare regulations,
internal DCF policies, and her own teaching experiences.  See
id. at 71:9-14, 73:14-74:2.

## 2.   Children's Research Center Case File Study

The Children's Research Center ("CRC"), a division within
the National Council on Crime & Delinquency, was retained by the
Plaintiffs to perform a study of DCF case files to determine
whether and the extent to which DCF met prevailing standards of
case practice in foster care.  See Trial Tr. vol. 4, 4:8-16,
20:15-20, Jan. 30, 2013, ECF No. 328.  Dr. Raelene Freitag ("Dr.
Freitag"), the director of CRC, managed the study and was a co-
author of the report that contained CRC's findings.  Id. at
4:12-13, 30:7-15.  Dr. Kristen Johnson ("Dr. Johnson"), a senior
researcher at NCCD, assisted Dr. Freitag at all stages of the
study, performing study and research design, establishing data
collection protocols, training case readers, conducting data
cleaning and analysis, and co-authoring the CRC report.  See id.
at 22:25-23:2; Trial Tr. vol. 5, 67:22-68:3, 78:1-15, Jan. 31,
2013, ECF No. 329.  Dr. Erik Nordheim ("Dr. Nordheim"), a

statistics professor at the University of Wisconsin-Madison in Madison, Wisconsin, served as Dr. Johnson's consultant and advised CRC on its study's sample design.  See Trial Tr. vol. 4, 31:14-32:2; Trial Tr. vol. 6, 33:19-21, 36:5-14.

CRC conducted a longitudinal study that involved an examination of a random and representative sample of 484 DCF case files, equally divided into two cohorts of foster children who were followed for a period of thirty months.[9]  See Trial Ex. 1066, Compliance Foster Care Case Practice Standards Mass. Dep't Children & Families: Longitudinal Study Two Cohorts ("CRC Study"); Trial Ex. 1065, Compliance Foster Care Case Practice Standards Mass. Dep't Children & Families: Longitudinal Study Two Cohorts app.C ("CRC Study Appendix C"); see also Trial Tr. vol. 4, 24:24-25:2, 27:2-4, 31:6-13, 32:12-22; Trial Tr. vol. 5, 84:6-9.  The first cohort, labeled the "entry cohort," was comprised of children who had entered the Massachusetts foster care system during the twelve-month window between July 1, 2009, and June 30, 2010.  See Trial Tr. vol. 4, 25:6-9.  This particular group of foster children was selected for the purpose of assessing current DCF practice for children just entering foster care.  Id. at 25:9-13.  The second cohort, labeled the "two-year cohort," gave CRC a picture of long-term DCF practice,

---

[9] None of the Named Plaintiffs' case files were among those sampled in the CRC study.  Trial Tr. vol. 4, 28:8-10.

as the cohort consisted of children who had been in foster care for two or more years as of July 1, 2009.  See id. at 25:14-20, 55:11-12.  The CRC study covered a wide range of "key points" in foster care practice, touching upon reunification, permanency, placement stability, maltreatment in care, and family visitation, among other subjects.  Trial Tr. vol. 5, 77:13-22.

### 3.   Psychotropic Medication Review

Dr. Christopher Bellonci ("Dr. Bellonci") is a board-certified adult and child psychiatrist who presently works as an assistant professor at Tufts University School of Medicine and as an attending psychiatrist at Tufts Medical Center, both of which are located in Boston, Massachusetts.  See Trial Tr. vol. 1, 111:24-112:3, 119:24-120:3, Jan. 22, 2013, ECF No. 325.  The Plaintiffs retained Dr. Bellonci in March 2012 to review three of the Named Plaintiffs' case files and produce a report speaking to the degree to which DCF met the standards governing child welfare practices concerning the administration of psychotropic medication and mental health services.  Trial Tr. vol. 2, 36:2-6, 36:21-37:10, 114:13-19, Jan. 24, 2013, ECF No. 326.  He paid particular attention to whether DCF obtained informed consent from the relevant parties to whom they were responsible, provided adequate oversight of the psychotropic drug administration process, and had in place an adequate monitoring system.  See id. at 116:21-117:2.  To support his

findings, Dr. Bellonci relied upon his personal experience working with the foster care population and knowledge of other states' foster care systems, academic literature, federal guidelines, and standards set forth by the American Academy of Child and Adolescent Psychiatry ("AACAP").  See id. at 38:3-10, 43:11-16, 43:25-44:10, 77:4-13.

### 4.   Management Reviews

Catherine Crabtree ("Crabtree") is a senior project leader at the Center for Government and Public Affairs at Auburn University at Montgomery in Montgomery, Alabama, where she consults with public agencies and non-profit institutions on questions concerning organizational reform and performance management.  Trial Tr. vol. 11, 7:19-22, 8:5-12.  Crabtree also has an extensive background in child welfare, mental health, and other social services work in Tennessee and Alabama.  See id. at 10:6-13:1, 14:25-16:7, 16:19-18:15.  In the spring of 2012, the Plaintiffs contacted Crabtree to do a management review of the Massachusetts foster care system.  See id. at 24:3-14.  The management review focused on "four critical building blocks" of child welfare agency practice, id. at 29:18-19: (1) the number of skilled and trained DCF personnel; (2) the balance of foster care placements and services; (3) the presence of quality assurance systems; and (4) the existence of accountable and stable leadership.  See id. at 29:15-31:2.  In the course of her

review, Crabtree turned to a variety of sources, including state and federal regulations, national professional standards, DCF's internal policies and communications, and deposition testimony. See id. at 25:14-26:3.

Arburta Jones ("Jones") boasts a long work history in various positions in the child and social welfare systems in New Jersey. See Trial Tr. vol. 8, 115:6-135:1, Feb. 6, 2013, ECF No. 332. The Plaintiffs retained Jones in May 2012 to study issues related to the safety of children in DCF custody who are situated in out-of-home placements. Id. at 135:4-14. Jones's review focused on the quality of four "hinge pins" of child welfare, id. at 141:16: (1) family visitation; (2) foster home licensing; (3) foster care investigations; and (4) internal and external accountability systems. Id. at 141:13-142:1. Jones's analysis depended largely upon the depositions of DCF staff and executives; DCF's internal data, reports, and communications; CWLA and COA standards; data produced by the Massachusetts Office of the Child Advocate (the "OCA"); and state and federal regulations. Id. at 135:24-136:11, 138:11-20.

## II.  FINDINGS OF FACT[10]

The amount of material that this Court has been called upon to review to inform its findings is, quite frankly, voluminous: over the course of the last nine months, the Court has scrutinized numerous depositions and party filings, heard twenty-four days of trial testimony,[11] read nearly 3000 pages of trial transcript, and studied just under 1200 trial exhibits (which themselves collectively comprised tens of thousands of

---

[10] A motion for judgment on the record, like a motion for judgment on partial pleadings made under Federal Rule of Civil Procedure 52(c) ("Rule 52(c)"), grants a district court occasion to enter judgment for a party prior to the conclusion of a jury-waived trial "[i]f a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue."  Fed. R. Civ. P. 52(c).  Rule 52(c), however, states that "[a] judgment on partial findings must be supported by findings of fact and conclusions of law."  Id. (emphasis added).  The Court bristles at this requirement, as it effectively gives short shrift to the party that has yet to put on all of its evidence.  (Indeed, the Defendants were able to present only two of the fifteen witnesses that they expected to call, so the trial record is likely incomplete.  See Joint Pretrial Mem., App. B, Defs.' Witness List 2, ECF No. 277-2.)  Nevertheless, this Court is hamstrung by its obligation to obey Rule 52(c)'s commandment.  It must be understood, then, that these findings may overstate matters in the Plaintiffs' favor even though ultimately they have fallen short.

[11] Fifty days -- twenty for the Plaintiffs' case-in-chief and up to thirty for the Defendants' -- had originally been allotted for this trial.  Elec. Clerk's Notes, Jan. 16, 2013, ECF No. 278.  The Defendants' motion for judgment on the record, however, gave the Court appropriate reason to suspend the proceedings.  Defs.' Mot. Directed Verdict, ECF No. 316.

pages of documents).[12]  Obviously, it would be near impossible to

take into consideration every last shred of evidence on every

topic broached in this case.  Naturally, then, the Court

necessarily is selective in its reproduction of the record,

condensing the most salient kernels of information and

deemphasizing (or altogether omitting) those facts that are not

as germane to this Court's conclusions.

### A.    Maltreatment in Foster Care

HHS has conducted two rounds of CFSRs, the first spanning

the years from 2000 to 2004 and the second spanning the years

from 2007 to 2010.  See Nat'l Conference of State Legislatures,

State Progress Toward Child Welfare Improvement 2 (2010),

available at http://www.ncsl.org/documents/cyf/progress_cw_

improvement.pdf.  For the first-round CFSRs, HHS set the

national standard for the acceptable incidence of child abuse or

neglect in foster care at 0.57%, meaning that a 0.57% rate of

substantiated maltreatment would constitute the seventy-fifth

percentile of all states' performance on this statewide data

indicator.[13]  See Trial Ex. 488, Background Paper: Child & Family

---

[12] The Plaintiffs' proposed findings of facts alone,
submitted in conjunction with their opposition to the
Defendants' motion, measures a prolix 396 pages in length.  See
Pls.' Mem. Law. Opp'n Defs.' Mot. J. Record, Ex. A, Pls.'
Proposed Findings Fact, ECF No. 356-1.

[13] The CFSR implementing regulations set the 75th percentile
of the states' performance as "[t]he national standard for each

Servs. Reviews Nat'l Standards 2-3.   The first-round CFSR for

Massachusetts, completed in 2001, found a 0.85% incidence of

child abuse or neglect in 1997 and a 0.94% incidence of child

abuse or neglect in 1999, rates that were 0.28 and 0.37

percentage points above the national standard, respectively.[14]

Trial Ex. 55, Mass. Statewide Assessment: Mass. Child & Family

Servs. Review ("First-Round CFSR Statewide Assessment") CSF-

000000425.   For the second-round CFSRs, HHS reframed this

statewide data indicator as the <u>absence</u> of maltreatment of

children in foster care by foster parents or facility staff and

pegged the national standard for this new metric at 99.68%[15]

(effectively tightening the old standard from 0.57% to 0.32%).

<u>See</u> The Data Measures, Data Composites, and National Standards

to be Used in the Child and Family Services Reviews, Notice, 71

---

statewide data indicator."   Title IV-E Foster Care Eligibility
Reviews and Child and Family Services State Plan Reviews, 65
Fed. Reg. 4020, 4024 (Jan. 25, 2000) (codified at 45 C.F.R. pts.
1355-1357).

   [14] Data for 1998 is unavailable because, during that year,
the Department was in the process of converting its management
information system.   <u>See</u> Trial Ex. 56, Child & Family Servs.
Review: Final Assessment CSF-000000319.

   [15] The second-round CFSR national standard was originally
set at 99.67%.   The Data Measures, Data Composites, and National
Standards to be Used in the Child and Family Services Reviews,
Notice, 71 Fed. Reg. 32,969, 32,980 tbl.1 (June 7, 2006).   The
standard was raised to its present level after HHS undertook a
revision of CFSR standards to bring these measures in line with
new data.   The Data Measures, Data Composites, and National
Standards to be Used in the Child and Family Services Reviews;
Corrections, Notice, 72 Fed. Reg. 2881, 2881 (Jan. 23, 2007).

Fed. Reg. 32,969, 32,973 (June 7, 2006); The Data Measures, Data Composites, and National Standards to be Used in the Child and Family Services Reviews; Corrections, Notice, 72 Fed. Reg. 2881, 2886 tbl.A (Jan. 23, 2007).  In other words, if 99.68% or more of foster children statewide were not victims of a substantiated or indicated maltreatment, that state would be deemed to have met the national standard.  The second-round CFSR for Massachusetts, completed in 2007 and relying in part upon state child welfare data from 2004, 2005, and the first three months of 2006, found a 98.72% absence of child abuse or neglect in the Commonwealth during the time period, 0.37 percentage points below the national standard and marking a decline in performance from the first-round CFSR.  See Trial Ex. 58, Final Report: Mass. Child & Family Servs. Review ("Second-Round CFSR Final Report") CSF-000000747, CSF-000000750.

Due to its poor performance in the second-round CFSR, Massachusetts submitted a PIP for approval by HHS.  See generally Trial Ex. 33, Mass. Child & Family Servs. Review Program Improvement Plan.  The Department agreed to achieve an improvement goal of 99.03%, see id. at 54, but later negotiated a lower improvement goal of 98.8%, Trial Ex. 587, DCF PIP Quarterly Report: Quarter One DCF000063281.  DCF met the latter negotiated improvement goal.  Trial Ex. 588, DCF PIP Quarterly Report: Quarter Two DCF000554885.

A third-round CFSR, though widely expected, has not yet
taken place.  <u>See</u> Children's Bureau, U.S. Dep't of Health and
Human Servs., <u>Child and Family Services Review: Technical
Bulletin #6</u> (Feb. 4, 2013), <u>available at</u> http://www.acf.hhs.gov/
sites/default/files/cb/cfsr_tb6.pdf.  That said, HHS's annual
publication reporting child maltreatment data serves to fill the
gaps for more recent years.  This publication provides state-by-
state data with respect to the absence of maltreatment in foster
care for a given federal fiscal year.  <u>See, e.g.</u>, Trial Ex.
1088, Child Maltreatment 2010; Trial Ex. 1161, Child
Maltreatment 2011.  From 2006 to 2011, Massachusetts reported
absence of maltreatment rates of 99.05%, 99.14%, 98.93%, 99.16%,
99.22%, and 99.30%, respectively.  <u>See</u> Child Maltreatment 2010,
at 57 tbl.3-20; Child Maltreatment 2011, at 55 tbl.3-15.  These
results, when compared to those of other states, placed the
Commonwealth fourth worst out of forty-six reporting states in
2006, the seventh worst out of forty-six reporting states in
2007, the fourth worst out of forty-eight states in 2008, the
seventh worst out of forty-nine states in 2009, the eighth worst
out of forty-seven states in 2010, and the seventh worst out of
forty-nine states in 2011.[16]  <u>See</u> Child Maltreatment 2010, at 57
tbl.3-20; Child Maltreatment 2011, at 55 tbl.3-15.

_____

[16] DCF's own internal data shows that the agency's
performance in the area of child maltreatment has slipped since

The CRC longitudinal study also documented rates of alleged abuse or neglect committed against children in the study's entry and two-year cohorts.  Among 242 children in the entry cohort, forty-four allegations of abuse or neglect during the DCF observation period were reported.  See CRC Study tbl.18.  Twelve of these allegations were substantiated, causing children to be removed from their environments in eleven cases.[17]  Id.  This means that roughly 5% of the children in the entry cohort sample population were victims of substantiated abuse or neglect, and that approximately 91.6% of these children were removed from their environments.

The CRC study reported comparable incidence rates for the two-year cohort.  Among 242 children in the two-year cohort, fifty-six allegations of abuse or neglect during the DCF observation period were reported.  Id. tbl.45.  Ten allegations were substantiated, and children were removed from their

---

2011.  See Trial Ex. 964, Child & Family Servs. Review Measures DCF011097888, DCF011421629 (reporting a 99.2% statewide rate of absence of maltreatment in foster care for the twelve-month periods ending March 31, 2012, and June 30, 2012).

[17] Two of these twelve substantiated allegations fall into a subcategory of allegations made specifically against an individual in the foster home.  See CRC Study tbl.18.  But the data shows that five children in this subcategory were removed from their environments.  See id.  The Court admits its uncertainty as to why more children were removed from their placements than made substantiated allegations in this subcategory, but has no cause to inquire further into this matter.

environment in eight of these cases.[18]   Id.   This means that roughly 4.1% of the children in the two-year cohort sample population were victims of substantiated abuse or neglect during the observation period, and that approximately 80% of these children were removed from their environments.

Statistics on the two-year cohort prior to the observation period are striking.  Of 240 children in the two-year cohort, forty-three children were victims of substantiated maltreatment prior to July 2009.  See CRC Study Appendix C tbl.C59.  This means that at the start of the observation period, 17.9% of children in the two-year cohort had already experienced substantiated maltreatment while in DCF custody.  In roughly 37.2% of these cases, the children had been substantiated victims between two and nine times.  See id.

The five Named Plaintiff case files reviewed by Dr. Azzi-Lessing documented egregious instances of maltreatment.  For example, at the age of six, Connor B. was placed in a foster home for four to six weeks with a teenager known to be at risk for sexually abusing younger children.  See Trial Tr. vol. 6, 83:12-22, 84:10-23.  He reportedly raped Connor B. repeatedly during the course of his stay.  See id. at 85:15-23.  The

---

[18] Once again, the Court expresses confusion regarding the reported statistics, this time because the number of sample children removed from their parental homes is greater than the number of substantiated incidents of abuse or neglect in those settings.  See CRC Study tbl. 45.

teenager was subsequently removed from the foster home, and DCF
revoked the foster home's license to host foster children.  Id.
at 115:24-116:13.  In the case of Adam S., DCF initially
screened out complaints of abuse or neglect that allegedly took
place in Adam S.'s adoptive home, which included instances of
corporal punishment and force-feeding.  Id. at 117:9-19.
Eventually, a DCF investigator initiated a review of the foster
home, which resulted in the removal of certain foster children
from the home.  Id. at 118:18-22.  But because the investigator
did not provide the remaining children with protective services,
Adam S. and his sisters suffered brutal beatings by their
adoptive parents until they were ultimately removed from the
adoptive home as well.  See id. at 118:18-120:6.  Andre S. and
his sister, both under the age of four, resided in an
overcrowded foster home with seven other children for over two
years.  See Trial Tr. vol. 7, 28:1-4, 28:13-21, Feb. 5, 2013,
ECF No. 331.  At a later preadoptive foster placement at their
cousin's home, Andre S. and his sister were reportedly prompted
to engage in sexual acts with one another and to watch the
cousin and her boyfriend have sex and take drugs together.  See
id. at 35:14-19, 38:14-22.  Andre S.'s sister also reported
being raped by the cousin's boyfriend on numerous occasions.
Id. at 38:23-39:1.  The children were eventually removed, and

DCF later investigated and substantiated the majority of the reported events.  See id. at 39:2-9.

Sworn trial testimony provided by Lauren James ("James"), a former ward of DCF custody, also speaks to maltreatment in care. See Trial Tr. vol. 1, 28:24-25, 29:25:30-2.  James attested to a wide range of negative experiences in foster care, including, among other things, sharing beds with other foster children, id. at 32:24-33:1, performing excessive amounts of housework, id. at 35:11-36:12, having inadequate food, id. at 36:13-37:15, having strained contact with family members, id. at 39:17-24, and taking prescribed psychotropic medications beginning at age six or seven, id. at 62:8-24.

**B.   Family Visits and Placements**

The maintenance of family relationships is an issue of key concern for foster care agencies.  According to DCF policy, foster children must be given the opportunity to receive their parents and siblings on visits at least once per month.  Trial Ex. 1, DCF Case Practice Policy & Procedures Manual DCF POL (7/08) 140.  Children taken into foster care custody are also expected to be relocated to a foster home or other placement with or in close proximity to their siblings and other family members, unless the placement would endanger a child's safety. See 42 U.S.C. § 671(a)(31)(A); Mass. Gen. Laws ch. 119, § 23(c); 110 Mass. Code Regs. 7.101(1)(b), (e).  By natural extension,

then, Massachusetts regulations express an unambiguous
preference for placements with relatives, known as "kinship
placements," and placements of children into homes in which
there are no other foster children, known as "child-specific
placements," over other potential arrangements.  See 110 Mass.
Code Regs. 7.101(2)(a)-(b) (listing "placement with a kinship
family" and "placement with a child-specific family" atop the
hierarchy of possible placement resources).  DCF must screen
kinship placements and child-specific placements before a foster
child is relocated, however, and the Department is statutorily
obliged to reassess these placements on an annual basis.  110
Mass. Code Regs. 7.108(1)-(2), 7.113(1).

     In its first-round CFSR, Massachusetts's performance in
achieving continuity in family and area relationships was found
to be in substantial conformity with federal law.  Trial Ex. 56,
Child & Family Servs. Review: Final Assessment ("First-Round
CFSR Final Assessment") CSF-000000331; see also id. at CSF-
000000331-34 (dubbing as "strengths" Massachusetts's efforts to
ensure that children in out-of-home placements remained in close
proximity to their former communities, maintained relationships
with their families, and were placed in safe homes with
relatives).  The Commonwealth did not achieve these results in
the second round, however.  See Second-Round CFSR Final Report
CSF-000000780-91 (labeling Massachusetts's performance with

respect to placements with siblings, kinship placements, and preserving family connections as areas needing improvement). If one were to extrapolate from the results of the CRC study, it would appear that child-family visits are a relatively rare occurrence: only 20.9% and 37.6% of children in the entry cohort received consistent monthly visits from siblings and parents, respectively, for the entirety of the thirty-month review period.[19] CRC Study tbl.16.

Nor does Massachusetts boast a sterling record with respect to the suitability of placements. Roughly 31.9% of children in DCF custody have been placed outside of their local home area, and some 18.6% of children were placed altogether outside their region of origin,[20] see Trial Ex. 418, Proximity Placement Tables 12, which makes visits with family members and caseworkers, commuting to and from school, and attending doctor's appointments more difficult, see Trial Tr. vol. 11, 118:2-20. The CRC study found that with respect to sibling placement, 69% of children in the entry cohort with siblings also in foster care were placed with at least one sibling for at least part of

---

[19] In fact, only 40.2% of children in the entry cohort were visited by any kin whatsoever in the thirty-month window. CRC Study tbl.16. This memorandum omits reference to parallel data for the two-year cohort, as certain omissions made the information unhelpful for analytical purposes. See id. tbl.43b.

[20] These figures are accurate as of March 31, 2012, the latest date for which data has been provided. See Trial Ex. 418, Proximity Placement Tables 12.

their time in care, and 49.5% of children in the entry cohort were placed with all of their siblings for at least part of their time in foster care.  See CRC Study tbl.8.  The rate of sibling placement for children in the two-year cohort was markedly worse: only 43.9% of children were placed with at least one sibling, and a mere 18.7% of children were placed with all of their siblings.  See id. tbl.37.  Reasons for the lapses in sibling placements were documented in only 53.8% of cases in the entry cohort and 38.4% of cases in the two-year cohort.  CRC Study Appendix C tbl.C28.  In addition, children are sometimes removed to kinship and child-specific placements that have not yet received formal authority to operate.  See Trial Ex. 512, Unapproved Homes Active Placements (reporting the list of unapproved kinship and child-specific homes in the Boston, Northern, and Southern regions with active placements).

    **C.   Placement Stability**

Placement stability is another goal that often proves elusive in Massachusetts.  DCF regularly makes use of a variety of short-term placements.  See, e.g., Dep. Joy E. Cochran ("Cochran Dep.") 159:22-160:23, Apr. 13, 2012 (describing DCF's use of night-to-night placements, where foster children are placed for periods of about a week or less and then moved to other locations); Dep. Raymond W. Pillidge ("Pillidge Dep.") 184:17-185:15, Mar. 7, 2012 (describing DCF's use of hotline

homes, where foster children may be placed for a few days or a weekend in the event that there is a lack of available foster homes).  These short-term placements disrupt the lives of children in care and are often used for purposes other than those for which they were designed.  See, e.g., Pls.' Designations Fact Dep. Mary Gambon ("Gambon May Dep.") 165:24-167:17, May 14, 2012, ECF No. 226-1 (confirming former DCF Commissioner Angelo McClain's[21] ("McClain") belief that hotline homes and night-to-night placements are "not good for kids," id. at 166:6-7, and agreeing that multiple placements are harmful to foster children, id. at 167:13-15); Pillidge Dep. 184:17-185:1 (agreeing that hotline homes are to be used only for emergency placements after the close of regular business hours); see also 110 Mass. Code Regs. 7.101(2)(e) (positioning "placement in a shelter/short term program or group home" on a lower rung of a prioritized list of placement options).

Additional problems are posed by DCF's reliance on Stabilization, Assessment and Rapid Reintegration ("STARR") facilities and Intensive Foster Care ("IFC") placements.  STARR facilities are intended to be used as "up-to-45-day placement[s] for children or youth who may be coming into the department's care or custody . . . [and who may warrant] a period of more

---

[21] Commissioner McClain succeeded Commissioner Harry Spence, presently the Administrator of the Massachusetts Trial Court.

intensive assessment and stabilization before determining the next appropriate level of care." Pls.' Designations Rule 30(b)(6) Dep. Robert E. Wentworth, Jr. Re: Purchased Servs. Licensing, Delivery, & Oversight 13:2-8, Dec. 29, 2011, ECF No. 226-1. Likewise, IFC programs "provide therapeutic services and supports in a family-based placement setting to children and youth [who] . . . are transitioning from a residential/group home level of care . . . or discharging from a hospital setting." Trial Ex. 385, Intensive Foster Care Scope Serv. DCF000465967. Due to a lack of available foster homes, however, foster children are frequently moved into STARR facilities and IFC placements even when they do not meet the eligibility criteria for entering such placements. See Trial Ex. 407, Email Frances Carbone to Perry Trilling & Amy Kershaw DCF003355182 (conveying a DCF's employee stated reasons for using STARR facilities, including "provid[ing] quick family treatment sometimes to diffuse the situation so that the child can return home"); Gambon May Dep. 213:9-17 (describing DCF's practice of "hoteling," which refers to the assignment of a foster child to an IFC placement even if the child does not exhibit the requisite behavior or medical conditions that would qualify her for the placement). In certain instances, children remain in these facilities for longer than is recommended. See, e.g., Trial Ex. 673, N. Regional Office - Apr. 2011, at 1 (revealing

that twenty-one children in DCF's Northern Region remained in a
STARR facility for longer than the prescribed forty-five-day
period).

These persistent placement problems can primarily be traced
to a single root cause: there is a severe shortage in the number
of foster homes in Massachusetts.  DCF's general goal is to
maintain a pool of around 4000 unrestricted homes for foster
care placements, see Pls.' Designations Rule 30(b)(6) Dep. Mary
Gambon Re: Recruitment & Retention Foster Homes ("Gambon Oct.
Dep.") 94:12-95:12, Oct. 18, 2011, ECF No. 226-1, but the
Department has fallen short of that target since the late 1990s,
Trial Ex. 955, DCF Quarterly Reports, 2008-2012, Tab Q3 2012, at
62 fig.28.  Staffing shortfalls contribute substantially to the
drag in foster home recruitment.  See, e.g., Gambon Oct. Dep.
50:9-51:7 (explaining that four additional statewide recruiters
would be necessary in order to fulfill DCF's recruitment
objectives); cf., e.g., id. at 17:14-18 (certifying that DCF's
central office in Boston has only four employees dedicated, and
only in part, to the recruitment of foster homes).

What's more, neither bolstering the administrative ranks
nor obtaining the requisite number of foster homes will resolve
the ongoing placement challenges related to ensuring a child's
unique fit with a prospective placement, a consideration which
rightly figures prominently in placement decisions.  See Gambon

Oct. Dep. 96:20-97:14 ("At any point in time, when you look at
the number of homes that [DCF] ha[s] . . . you'll have sometimes
upwards of 1,000, 1,500 homes without placements. . . . [I]t's
all about matching the right home. . . . [W]e're looking at are
we able to bring in homes that can take sibling groups, are we
able to bring in homes that can take certain types of behavior?
Are we able to bring in homes that can work more closely with
families?  Are we able to bring in homes that can commit to a
family over time as opposed to taking a child for three to five
days until we can find another home?  So a lot of it is not just
based on numbers but also the type of homes you look at."); cf.
Trial Ex. 671, Findings Initial Child & Family Service Reviews:
2001-2004, at 22 (including "[m]ismatching placements to
children's needs" among common concerns regarding placement
stability).

   **D.  Permanency**

   Because substitute care is a less-than-optimal outcome for
children, achieving permanency for children in foster care is
among DCF's highest-priority objectives.  See 110 Mass. Code
Regs. 1.02(3)-(4).  To this end, DCF is called upon to "direct
[its] efforts toward reunification of child(ren) and parent(s),"
and "[a]s soon as it is determined that reunification is not
feasible, the Department [is instructed to] take swift action to
implement another permanent plan, such as adoption or

30

guardianship." 110 Mass. Code Regs. 1.02(4). Massachusetts regulations mandate that DCF provide to every family receiving foster care services a service plan that lays out the conditions necessary to achieve one of three goals, the two most relevant being (1) the reunification of a foster child with her family, or (2) the provision of an alternative permanent home for a foster child. 110 Mass. Code Regs. 6.01(1)(b)-(c), 6.02.

One of the principal ways to gauge success in this area is to appraise the rate at which foster children who have exited the foster care system reenter it. See Trial Tr. vol. 19, 16:4-17:1, May 7, 2013, ECF No. 347. In the first-round CFSR, Massachusetts's rate of reentry was 22.3%, more than two-and-a-half times greater than the national standard of 8.6% during the 2000-2001 review period. First-Round CFSR Final Assessment CSF-000000306. By the second-round CFSR, only 15.7% of children leaving the Massachusetts foster care system reentered it, a figure still above the national median performance of 15% during the 2006-2007 review period. Second-Round CFSR Final Report CSF-000000765. In federal fiscal year 2010, 15.3% of Massachusetts foster children who were discharged on the basis of reunification reentered foster care within twelve months from the date of discharge, Children's Bureau, U.S. Dep't of Health & Human Servs., Child Welfare Outcomes 2008-2011: Report to Congress 178 (2012), available at

http://www.acf.hhs.gov/sites/default/files/cb/cwo08_11.pdf

[hereinafter Child Welfare Outcomes 2008-2011],[22] which placed

the Commonwealth forty-first among fifty-two reporting

jurisdictions, Trial Ex. 1084, Table Summaries Child Welfare

Outcomes Data 2010 ("Child Welfare Outcomes Tables 2010") 6.[23]

The next year, the rate of reentry crept up to 15.6%, Child

Welfare Outcomes 2008-2011, at 178, and Massachusetts's national

rank fell to forty-third, Trial Ex. 1085, Table Summaries Child

Welfare Outcomes 2008-2011: Report Congress ("Child Welfare

Outcomes Tables 2008-2011") 7.  Although the reported rates of

---

[22] Technically, the Children's Bureau report on child
welfare outcomes publicizing statistics from federal fiscal
years 2008 to 2011 is not in evidence.  See Parties' Am.
Uncontested Ex. List., Ex. A, Joint Uncontested Exs., ECF No.
367-1.  The Court did, however, admit in evidence under Federal
Rule of Evidence 1006 a series of tables prepared by Elissa
Glucksman Hyne ("Hyne"), a senior policy analyst at Children's
Rights, the national watchdog organization that spearheaded this
action against the Defendants on behalf of the Plaintiffs.  See
Trial Tr. vol. 8, 52:6-11, 53:7-20, 57:19-20; Trial Ex. 1084,
Table Summaries Child Welfare Outcomes Data 2010; Trial Ex.
1085, Table Summaries Child Welfare Outcomes 2008-2011: Report
Congress.  Hyne's tables reproduce data found in the Children's
Bureau report.  See Trial Tr. vol. 8, 69:7-9.  Consequently, the
Court cites to the online-accessible version of the report.

[23] In addition to summarizing federal child welfare outcome
data, Hynes's tables assigned rankings to each state, the
District of Columbia, and Puerto Rico on the basis of their
performance on various child welfare outcome measures.  See
Trial Tr. vol. 8, 56:4-15.  The Court declined to admit the
rankings, given that they were the product of "simple
arithmetic."  Id. at 57:22; see id. at 57:19-23.  The Court has
since independently verified Hyne's calculations and thus gives
credence to her ranked orderings as a reflection of the Court's
own arithmetic computation.

reentry from federal fiscal years 2010 and 2011 marked
improvements over those seen in the prior decade, they
nevertheless deviated fairly significantly from the national
medians at that time.  See Child Welfare Outcomes 2008-2011, at
viii tbl.2 (showing median rates of 12.6% and 11.8% for 2010 and
2011, respectively).

Where reunification is impossible or impracticable, the
timeliness of adoptions serves instead as a bellwether of
progress in permanency.  See Trial Tr. vol. 19, 17:13-18:6.
According to results from the first-round CFSR for federal
fiscal year 1999, the median length of time for foster children
in Massachusetts to achieve adoption was 49.28 months.  First-
Round CFSR Statewide Assessment CSF-000000428-30.  During
federal fiscal year 2010, Massachusetts achieved a composite
score[24] of 83.7 in timeliness of adoptions, Child Welfare

---

[24] The composite score reflects an aggregate appraisal of
five individual measures related to the timeliness of adoptions:
(1) the percentage of children discharged from foster care to a
finalized adoption less than twenty-four months from the date of
the last removal from home; (2) the median length of stay in
care, from the date of the last removal to the date of adoption,
of all children in foster care who were discharged to a
finalized adoption; (3) the percentage of children in foster
care who were in care for seventeen or more continuous months as
of the first day of the year and who were discharged to a
finalized adoption by the final day of the year; (4) the
percentage of children who were in care for seventeen or more
continuous months and not legally free for adoption as of the
first day of the year, who then became legally free for adoption
during the first half of the year; and (5) the percentage of

Outcomes 2008-2011, at 178, which represents forty-seventh place
among fifty-two reporting jurisdictions, Child Welfare Outcomes
Tables 2010, at 7.  For fiscal year 2011, Massachusetts obtained
a composite score of 76.2, Child Welfare Outcomes 2008-2011, at
178, which caused it to drop two places to forty-ninth place,
Child Welfare Outcomes Tables 2008-2011, at 8.  On a micro
level, Dr. Azzi-Lessing's case file review squared with the
national results. She found that DCF had failed to achieve
permanent placements for all five Named Plaintiffs. See Trial
Tr. vol. 7, 73:3-77:15. What's more, DCF's efforts in this
regard were plagued by inconsistency and "inertia," Trial Tr.
vol. 7, 75:21, causing the Named Plaintiffs to "languish" in
foster care for years, id. at 73:8, without clear prospects for
permanency.

     E.   Case Worker Visitation

     Federal law requires that caseworkers visit the children in
foster care to whom they are assigned on a monthly basis.  42
U.S.C. § 624(f)(1)(A).  Research shows that a correlation exists
between the frequency of caseworker visits and favorable foster
care outcomes.  Trial Tr. vol. 17, 107:20-21, May 3, 2013, ECF
No. 342.

---

children discharged to a finalized adoption less than twelve
months after becoming legally free for adoption.  Child Welfare
Outcomes 2008-2011, at 178 & n.16.

From 2008 to 2011, between 43% and 50% of children received monthly visits from the caseworkers, Child Welfare Outcomes 2008-2011, at 173, which fell far below the 90% benchmark set for this metric during that time period, Trial Ex. 153, Monthly Caseworker Visits Data Fiscal Year (FY) 2007, at 3.  CRC's review indicated that only 12.9% of children in the two-year cohort received consistent monthly contact from their caseworker throughout the two-year review period.  CRC Study tbl.41.  The study also found that 16.1% of children in the entry cohort received no contact at all from their caseworker during their first month in DCF's care.  CRC Study tbl.12.

**F.   Services**

**1.   Preparing Foster Children for Adulthood**

The provision of life skills to foster children is a core responsibility of child welfare agencies.  See, e.g., Trial Ex. 2, Case Practice Policy & Procedures Manual DCF POL 201 ("It is critical that youth served by [DCF] be systematically and comprehensively prepared for independent living to enable them to function as productive members of society.").  To this end, 42 U.S.C. section 675(5)(H) provides, in relevant part:

> [D]uring the 90-day period immediately prior to the date on which [a foster] child will attain 18 years of age, . . . a caseworker on the staff of the State agency, and, as appropriate, other representatives of the child [must] provide the child with assistance and support in developing a transition plan that is personalized at the direction of the child, [which]

includes specific options on housing, health
insurance, education, local opportunities for mentors
and continuing support services, and work force
supports and employment services, . . . information
about the importance of designating another individual
to make health care treatment decisions on behalf of
the child if the child becomes unable to participate
in such decisions and the child does not have, or does
not want, a relative who would otherwise be authorized
under State law to make such decisions, and provides
the child with the option to execute a health care
power of attorney, health care proxy, or other similar
document recognized under State law, and is as
detailed as the child may elect . . . .

42 U.S.C. § 675(5)(H).

Many children, however, "age out" of foster care without
ever having learned the necessary life skills to succeed outside
the walls of a foster placement.  In both the first- and second-
round CFSRs, the provision of independent living services was
deemed an area needing improvement.  See First-Round CFSR Final
Assessment CSF-000000327; Second-Round CFSR Final Report CSF-
000000777.  Indeed, in the third quarter of state fiscal year
2012, nearly as many children left their placements at the age
of eighteen as were adopted.  DCF Quarterly Reports, 2008-2012,
Tab Q3 2012, at 60 tbl.21.

## 2.  Medical Services

Every child, upon entry into the Massachusetts foster care
system, must be "screened and evaluated under the early and
periodic screening, diagnostic and treatment [("EPSDT")]
standards established by Title XIX of the Social Security Act."

36

Mass. Gen. Laws ch. 119, § 32. EPSDT services are manifold:
among others, they include regular pediatric preventive
healthcare visits, physical and nutritional assessments, and
developmental and behavioral screening. See Trial Ex. 621,
Early & Periodic Screening, Diagnosis, & Treatment (EPSDT) Med.
Protocol & Periodicity Schedule (Med. Schedule) & EPSDT Dental
Protocol & Periodicity Schedule (Dental Schedule) DCF006427603-
10. "Medical passports" are documents prescribed by
Massachusetts regulations for use in the foster care system to
keep track of a child's medical, dental, mental health, and
developmental history for the length of the child's stay in
foster care. 110 Mass. Code Regs. 7.124. DCF personnel are
required to maintain medical passports for each child in its
care, id., and are expected regularly to update the passports
with relevant information regarding each child's responses to
medication and treatment interventions, see Trial Tr. vol. 2,
60:13-61:3, 63:7-15.

Evidence in the record suggests that foster children in
Massachusetts commonly receive medical screenings in an untimely
fashion, if at all. In 2011, just 12.1% of foster children
received on-time, seven-day medical visits; 7.1% received on-
time, thirty-day medical visits; and 18.2% completed a medical
visit. Trial Ex. 610, Monthly Compliance Medical Screenings Due
2011, at 1.

It is also rare to have medical information that is fully
complete.  The CRC researchers found that only 52.1% and 73.7%
of children in the entry cohort and children in the two-year
cohort were provided medical passports at their scheduled time.
CRC Study Appendix C tbl.C37.  Dr. Bellonci opined that he
rarely sees medical passports when meeting with patients, which
reflects something akin to the rule rather than the exception.
Trial Tr. vol. 2, 62:1-17 ("In my 20 years of working with this
population, I saw medical passport approximately three or four
times.  And that's not an unusual experience."  Id. at 62:5-7).

### 3.    Psychotropic Medication

Children in foster care often enter the system with a
history of biological and psychological problems, due in no
small part to abuse, neglect and frequent environmental changes.
See Trial Ex. 17, AACAP Position Statement Oversight
Psychotropic Medication Use Children State Custody: Best
Principles Guideline ("AACAP Guidelines") 1.  As a result,
foster children are often prescribed psychotropic drugs to treat
persistent behavioral and emotional issues.  See id.

National data suggests that foster children in
Massachusetts are prescribed psychotropic drugs at rates
exceeding those in other states.  A report published by the U.S.
Government Accountability Office (the "GAO") in 2011, reviewing
psychotropic drug prescription rates and oversight practices in

five states (including Massachusetts) in 2008, found that

Massachusetts had the highest percentage of children prescribed

psychotropic medication among the states considered in the

report.[25]  Compare Trial Ex. 16, Foster Children: HHS Guidance

Could Help States Improve Oversight Psychotropic Prescriptions

("GAO Report") 102 app.XVII (noting that 39.1% of foster

children in Massachusetts are prescribed psychotropic drugs),

with id. at 101 app.XVII (noting that 22.0% of foster children

in Florida are prescribed psychotropic drugs), id. at 103

app.XVII (noting that 21.0% of foster children in Michigan are

prescribed psychotropic drugs), id. at 104 app.XVII (noting that

19.7% of foster children in Oregon are prescribed psychotropic

drugs), and id. at 105 app.XVII (noting that 32.2% of foster

children in Texas are prescribed psychotropic drugs).  More

particularly, 4.9% of children between the ages of zero and

five, 44.8% of children between the ages of six and twelve, and

53.4% of children between the ages of thirteen and seventeen had

been prescribed psychotropic drugs, which exceeded the

prescription percentages for nonfoster children in each

demographic band by between two and four times.  Id. at 102

app.XVII.  Overall, foster children in Massachusetts were also

---

[25] Results derived from the CRC's more targeted population
study support those announced by the GAO.  See CRC Study
Appendix C tbl.C46 (finding that in the CRC study, 16.5% of the
children in the entry cohort and 52.1% of the children in the
two-year cohort were given psychotropic medication).

3.8 times more likely to be prescribed psychotropic drugs than children outside of foster care in the Commonwealth, see id., which sat squarely in the middle range among the five states,[26] see id. at 101 app.XVII, 103-05 app.XVII.

There are numerous side effects associated with taking psychotropic medications, including hallucinations, mania, paranoia, headaches, nausea, sexual and menstrual problems, rashes, suicidal thoughts, and pancreatic and liver damage, see id. at 41-44 app.II, and additional indicia point to the potential for other health risks.  Research suggests that the concomitant use of five or more psychotropic drugs by children holds no medical benefits, that higher doses of psychotropic drugs may prove less effective than the recommended dose, and that no medical evidence supports the use of psychotropic drugs in children under the age of one.  See id. at 14-15.  The GAO report found that 1.33% of foster children in Massachusetts are prescribed five or more psychotropic medications concomitantly, id. at 107 app.XVIII, which exceeds the percentage of children prescribed five or more medications in all four of the other surveyed states, see id. at 106 app.XVIII, 108-10 app.XVIII.

---

[26] The Court acknowledges, however, the danger in drawing conclusive inferences from comparisons between children in and outside of foster care, as the children who enter foster care may, given their often severe physical and emotional issues and troubling life experiences, need medical intervention more than the average child.

Moreover, 2.21% of foster children in Massachusetts were given dosages of psychotropic medications exceeding the maximum amounts cited on FDA-approved drug labels, id. at 107 app.XVIII, a percentage that dwarfed those found in three of the four other states, see id. at 106 app.XVIII, 108-10 app.XVIII.

The administration of psychotropic drugs is only one piece of the puzzle, however: informed consent, clinical oversight, and monitoring systems are required to have a fully functioning medical apparatus in the foster care system. Psychotropic drugs cannot be prescribed without the informed consent of either a child's parent or guardian or the state, standing in loco parentis, see Trial Tr. vol. 2, 9:20-10:3; AACAP Guidelines 2, and according to AACAP guidelines, the assent[27] of the child herself also ought be obtained, AACAP Guidelines 2. Clinical oversight and documentation -- manifested in the form of medical passports -- are particularly helpful, given the frequent movement of foster children from one placement to the next. Cf. Trial Tr. vol. 2, 64:24-65:12 (explaining that medical treatment of children who experience multiple placement moves is

---

[27] "Consent" refers to the approval of medical treatment given by an individual who is legally empowered to give such approval; "assent," on the other hand, refers to the approval of medical treatment given by one who is legally unable to give her consent, like a child. See Jessica Setless, Note, The Crisis of Over-Medicating Children in Foster Care: Legal Reform Recommendations for New York, 19 Cardozo J.L. & Gender 609, 623 n.140 (2013).

challenging because of the multiplicity of sources a medical provider must canvas to collect a patient's complete medical history). Further, federal law calls for the deployment of comprehensive monitoring systems, 42 U.S.C. § 622(b)(15)(A) (mandating that child welfare services plans contain, <u>inter alia</u>, "a plan for the ongoing oversight and coordination of health care services for any child in a foster care placement"), which aim to moderate the risks associated with psychotropic medications, <u>see</u> AACAP Guidelines 2 (noting that child welfare agencies should, at a minimum, "[e]stablish guidelines for the use of psychotropic medications for youth in state custody"[28]).

Proof of unauthorized or excessive psychotropic prescriptions were rampant in the three Named Plaintiffs' case files reviewed by Dr. Bellonci. <u>See</u> Trial Tr. vol. 2, 80:5-82:19. Similarly, medical files reviewed in the CRC study rarely included critical information such as when a child had first been prescribed a medication or even whether a child was being treated with medication at all. <u>See</u> Trial Tr. vol. 4, 50:1-9.

---

[28] AACAP lists the establishment of child welfare training requirements, the creation of programs for the oversight of medication utilization, the maintenance of certain medical records information, and the design of a psychiatric consultation program as recommended or ideal action. <u>See</u> AACAP Guidelines 2-3.

Massachusetts has a mechanism for overseeing the administration of certain psychotropic drugs, however.  Pursuant to the Rogers process,[29] courts are formally required to authorize the prescription of antipsychotic medications -- a subclass of drugs within the family of psychotropic medications, Trial Tr. vol. 1, 126:20-25 -- to children in DCF custody. Trial Tr. vol. 10, 116:1-5, Feb. 15, 2013, ECF No. 334.  In 2009, a working group comprised of representatives from Massachusetts health and welfare agencies and university researchers, the Massachusetts Department of Mental Health, the OCA, and DCF was convened to address issues related to the process of obtaining consent for the prescription of psychotropic medications to children.  See Trial Tr. vol. 2, 31:16-17; Trial Tr. vol. 10, 116:6-9, 116:13-20; Trial Ex. 630, Rogers Process Working Grp. Minutes DCF004956552.  A study commissioned by the OCA in service of the Rogers working group identified a host of benefits of the Rogers process -- namely, secondary review of antipsychotic prescriptions prior to treatment, the appointment of guardians ad litem, and dedicated

---

[29] The Rogers process takes its name from Rogers v. Commissioner of Dep't of Mental Health, 390 Mass. 489 (1983), in which the Massachusetts Supreme Judicial Court held that an incompetent patient may be compelled to undergo nonemergency, antipsychotic drug therapy only after a judicial determination is made to that effect.  See id. at 500-02.  The court's reasoning was later adopted in regulations by DCF's predecessor agency.  Trial Ex. 1090, Examination Rogers Process Youth Custody Mass. Dep't Children & Families 2.

resource allocation.  Trial Ex. 1090, Examination Rogers Process
Youth Custody Mass. Dep't Children & Families ("Rogers Report")
8.  A number of challenges were also brought to the fore: the
Rogers process was without adequate standardization,
coordination, and quality assurances; was slow-going; failed to
take proper account of medical expertise; and featured
inadequate systemic oversight of antipsychotic medication
administration.  Id. at 9-10.  Perhaps most troubling, drugs
that are not listed as Rogers-process eligible -- namely, non-
antipsychotic psychotropic medications, of which there are
numerous kinds -- are prescribed without the consent of a court
or of DCF.  Pls.' Designations Fact Dep. Jan Nisenbaum 194:1-8,
May 18, 2012, ECF No. 226-1.  The study offered a number of
recommendations that might resolve these issues, see Rogers
Report 13-16, but it is unclear whether any of the
recommendations that emerged out of the Rogers working group
were ever implemented, see Trial Tr. vol. 2, 35:23-36:1.

    **G.  Caseloads**

Massachusetts General Laws chapter 18B, section 7 empowers
the Commissioner of DCF with the authority to "establish
reasonable caseload rates."  Mass. Gen. Laws ch. 18B, § 7(a).
The term "caseload" refers to the number of children for which
an individual caseworker is responsible at a given time.  Trial
Tr. vol. 11, 31:25-32:1.  Because the mere number of children

per caseworker fails fully to capture the actual burden that
caseworkers must shoulder, however, "workload" is the more
favored metric to use to analyze the reasonability of caseloads.
See id. at 32:9-12.  A caseworker's workload comprises a
"multitude of tasks related to the actual caseload of one
child," id. at 32:22-23, including traveling to and from the
child's home to facilitate sibling visits, scheduling
appointments, composing permanency requirements, and performing
data entry, see id. at 32:12-21.  For a workload to be deemed
manageable, national standards dictate that caseworkers "simply
have to have enough time to meet their practice requirements
based on how their state is organized, or how their agency is
organized," id. at 35:12-18, taking into consideration
caseworkers' qualifications and subject-matter competencies, id.
at 35:18-20.  Generally speaking, a workload study must be
undertaken to gauge the appropriateness of caseworker caseloads.
Id. at 36:20-22.  Nevertheless, national standards suggest that,
even in the absence of a workload study, caseloads of between
twelve and eighteen children represent the maximum that a
caseworker can carry while still satisfying her job
requirements.  See id. at 36:22-25 (noting that CWLA recommends
caseload ratios of between twelve and fifteen children per
caseworker); id. at 37:16-18 (noting that COA recommends

caseload ratios of between twelve and eighteen children per
caseworker).

DCF employs individuals known in internal agency parlance
as "ongoing" caseworkers who provide continuous services to
children in the foster care system.  See id. at 38:8-17.  Unlike
their equivalents in most other states' child welfare agencies,
DCF's ongoing caseworkers carry "mixed" caseloads, meaning that
they are responsible for providing services to children placed
both in their family home or in a foster home.  See id. at
40:23-41:3; Trial Ex. 642, Dep't Children & Families Proposal
Reducing Ongoing Caseloads ("15 Families Initiative
Presentation") DCF010275221.  DCF has not conducted or
commissioned its own workload study, nor has it adapted those
performed by other child welfare agencies.  See Trial Tr. vol.
11, 45:19-24; Trial Tr. vol. 16, 92:11-15.  Instead, DCF's
current caseload standards -- which derive from a collective
bargaining agreement originally struck in the mid-1980s between
the Commonwealth and the union representing the interests of DCF
caseworkers, see Trial Ex. 641, Dep't Children & Families
Rationale for Reducing Ongoing Caseloads DCF010278533 --
prescribe that ongoing caseworkers be assigned eighteen cases

per month.[30]  Trial Ex. 21, Collective Bargaining Agreement 121.

In 2005, the two contracting parties agreed in a memorandum of

understanding to assign weights to caseloads to account more

accurately for caseworkers' actual workload.  Trial Ex. 647,

Mem. Understanding Between Dep't Soc. Servs. & DSS Chapter SEIU

Local 509 Concerning Family Res. Workers DCF003540781

(weighting, for example, 0.6 points per active foster home, 0.9

points per foster home undergoing licensure, 0.75 points per

licensed foster home on probation, and 0.4 points per out-of-

state foster home).

     Since at least 2008, scores of DCF caseworkers have carried

caseloads in excess of the agreed-upon eighteen cases.  See,

e.g., Trial Ex. 957, Workers Weighted Caseloads Greater 18

Reports, 2008-2012 ("Caseloads Reports"), Tab June 2008, at 57

(reporting that as of June 30, 2008, 1034 social workers across

six regional offices and a special investigations unit had

weighted workloads of over eighteen cases); id. Tab June 2009,

at 48 (reporting that as of June 30, 2009, 836 social workers

across six regional offices and a special investigations unit

had weighted workloads of over eighteen cases); id. Tab June

2010, at 24 (reporting that, as of June 30, 2010, 777 social

---

     [30] This 18:1 caseload ratio applies regardless of whether a
child is in an in-home or out-of-home placement.  See Tr. vol.
11, 43:14-18.

workers across six regional offices had weighted workloads of over eighteen cases); id. Tab June 2011, at 15 (reporting that, as of June 30, 2011, 492 social workers across four regional offices had weighted workloads of over eighteen cases).[31] Indeed, as of August 2012 (the last month from which the parties could gather facts in this case), 390 caseworkers had weighted workloads of greater than eighteen cases.  Id. Tab August 2012, at 11.

Observing that the 18:1 caseload ratio established in the 1980s collective bargaining agreement was "[r]apidly [b]ecoming [o]bsolete," 15 Families Initiative Presentation DCF010275219, DCF launched a campaign known as the "15 Families Initiative," with the aim of reducing caseload ratios to 15:1, see Pls.' Designations Fact Dep. Angelo McClain DCF's Chief Staff ("McClain Dep.") 132:1-23, May 25, 2012, ECF No. 226-1.  DCF acknowledged that such a reduction would bring the Commonwealth in line with national trends and standards.  15 Families Initiative Presentation DCF010275220-21.  In order to achieve this goal, however, DCF estimated that it would need nearly two hundred additional ongoing caseworkers at an approximate annual cost of about $10,100,000.  Id. at DCF010275224.

---

[31] The statistics cited here, which come from DCF's own caseload reports, include data for assessment unit, adolescent unit, and intake/investigations unit caseworkers, as well as ongoing caseworkers.  See Caseloads Reports.

## H.   Qualifications and Training

Optimally, child welfare agencies should implement social worker training development programs that feature, among other elements, new-hire curricula, on-the-job and supervised training, performance evaluations, continuing in-service training, channels for feedback, and plans for routine reviews and updates of training practices.  See Trial Tr. vol. 11, 93:6-21.  See generally Trial Ex. 1092, Building Effective Training Sys. Child Welfare Agencies.

DCF regularly hires ongoing caseworkers through a competitive, Department-sponsored internship program.  Pls.' Designations Rule 30(b)(6) Dep. Olga I. Roche Re: Staffing, Caseloads, & Training 146:1-147:1, Jan. 20, 2012, ECF No. 226-1. Candidates are often recent college graduates holding a bachelor's degree or an associate's degree paired with relevant work experience.  Id.  In either case, caseworkers typically arrive at DCF full-time with a fair degree of prior experience. See id.

New recruits must participate in a competency training program, held monthly, where incoming caseworkers are trained in areas ranging from child development and diversity to deescalation and safety techniques.  Trial Ex. 374, Annual Progress & Servs. Report: Fed. FY2012 ("DCF FY2012 Progress Report") DCF007413805.  Funding cuts, however, have led to a

reduction in the number of training programs, see id. at

DCF007413695 (recounting a cut of $200,000 from the budget for

the Child Welfare Training Institute since fiscal year 2011),

and due to heavy workloads, existing training opportunities

frequently go underutilized, see First-Round CFSR Final

Assessment CSF-000000356.

### I.   Accountability Systems

To maintain eligibility for funding under Title IV-B of the

Social Security Act, states must prepare and submit a five-year

Child and Family Services Plan ("CFSP").   State & Tribal Child &

Family Services Plan, Children's Bureau, http://www.acf.hhs.gov/

programs/cb/programs/state-tribal-cfsp (last visited November

20, 2013).   The CFSP is a document that describes foster care

services offered by the state.   45 C.F.R. § 1357.10(c).   Among a

host of other requirements, the CFSP must include "a description

of the quality assurance system [the state] will use to

regularly assess the quality of services under the CFSP and

assure that there will be measures to address identified

problems."   45 C.F.R. § 1357.15(u).   There is at present a

dearth of staff members whose roles are dedicated to managing

continuous quality improvement.   See Pls.' Designations Fact

Dep. Ruben Ferreira 13:16-15:14, Feb 2, 2012, ECF No. 226-1.

DCF's internal review system is driven in part by a

periodic publication known as the Continuous Quality Improvement

management report, commonly referred to as a scorecard.  See
Trial Ex. 964, CFSR Measures Reports 2008-2012 ("CFSR
Scorecards"); Trial Tr. vol. 14, 59:24-25, Apr. 30, 2013, ECF
No. 339.  Each quarter, the CFSR scorecard documents the
agency's twelve-month performance on seventeen measures tracked
nationally by ACF, such as "Absence of Maltreatment Recurrence,"
"Median Time to Reunification," and "Percent [of Children
Exiting to Adoption] Who Exit In Less Than 24 Months."  See
Trial Tr. vol. 14, 59:24-25, 60:2-8, 60:22-23.  For each
measure, the scorecard compares the state's overall performance
and the performance of individual regions and cities to a target
benchmark based on nationwide performance.  See CFSR Scorecards.
The results are distributed to DCF management staff throughout
the state.  See Trial Tr. vol. 14, 60:8-11.

        To bolster internal agency morale and to help managers
quickly identify areas in the most need of improvement, the
presentation of information on the scorecards has changed over
the years.  Id. at 74:7-19; 76:23-25, 76:1-12.  The first
scorecards issued in 2008 labeled data with green and red arrows
to identify whether DCF performed at a level above or below the
national standard.  See, e.g., CFSR Scorecards, Tab December 31,
2008.  In 2011, the scorecard design began to use letter grades
and a new grading method, based on how close DCF's performance
came to meeting the target benchmark and the national median.

See CFSR Scorecards, Tab June 30, 2011.  For example, the
scorecard issued on December 31, 2011 shows that in the
preceding twelve months, there was "Absence of Maltreatment
Recurrence" in 92.3% of DCF cases statewide.  See CFSR
Scorecards, Tab December 31, 2011, at DCF011158648.  The target
performance level for this measure is 94.6%,[32] and the national
median is 93.3%.  Id.  Whereas previous scorecards would have
used a red arrow to highlight that DCF fell short of the
benchmark that year, under the new grading method the state was
assigned A+ letter grades for its performance relative to the
target benchmark and the national median.[33]  This means that an
A+ letter grade can correspond to performance at a level just
below the national median.  See Trial Tr. vol. 14, 78:19-23.
Under this grading method, the same scorecard assigned to DCF an
A- and an A+ grade in another area where the agency
underperformed the twenty-fifth percentile of the national
standard.  See CFSR Scorecards, Tab December 31, 2011, at
DCF011158648 (awarding, on the measure "C1.2: Median Time to
Reunification," an A- for the state's performance relative to

---

[32] Target performance levels for all measures did not change
from 2008 through September 2012, the date of the last scorecard
submitted in evidence.  See CFSR Scorecards.

[33] This grade is determined by calculating the ratio between
DCF's performance and the national standard.  In other words,
DCF achieved 97.5% of the national standard because the state-
to-national ratio of 92.3 to 94.6 is 97.5%, a percentage
corresponding to an A+ grade.

the twenty-fifth percentile and an A+ for the state's

performance relative to the median).

### J.   Foster Care Maintenance Payments

The AACWA designates certain federal funds to be allocated

to states to assist with their administration of foster care

services.   To remain eligible to receive federal funds under the

AACWA, states must, <u>inter alia</u>, issue per diem allowances --

known more commonly as "foster care maintenance payments" -- to

foster parents for the costs associated with raising children

removed from their familial homes.[34]   <u>See</u> 42 U.S.C. § 672(a)(1).

The daily rates at which these foster care maintenance payments

ought be disbursed are set by the U.S. Department of Agriculture

("USDA").   <u>See</u> Mass. Gen. Laws ch. 119, § 23(h).   Massachusetts

law requires DCF to make foster care maintenance payments at the

USDA-recommended levels and periodically to adjust the amount of

these payments in accordance with "the financial circumstances

of the family, the needs of the child or the rate of inflation."

<u>Id.</u>

From 2004 until March 2012, DCF's foster care maintenance

rates stagnated, lingering at $17.10 per day for children

---

[34] These include costs associated with "food, clothing,
shelter, daily supervision, school supplies, a child's personal
incidentals, liability insurance with respect to a child,
reasonable travel to the child's home for visitation, and
reasonable travel for the child to remain in the school in which
the child is enrolled at the time of placement."   42 U.S.C. §
675(4)(A).

between the ages of zero and five, $17.96 per day for children
between the ages of six and twelve, and $18.59 per day for
children ages thirteen and over.  Trial Ex. 187, Historical FC
Rates (listing historical foster care maintenance and other
allotment rates from before fiscal year 1997 to the present).
Although the Court does not have before it the USDA rates for
the entirety of that time period, the USDA rates established in
2008 (and apparently in effect until at least 2010) were set at
$20.60, $23.14, and $24.52 per day for each of the three
respective demographic groups in the Urban Northeast region.
Trial Ex. 11, Sept. 28, 2010 Letter Angelo McClain Re: FY12
Maintenance Request ("Sept. 28 McClain Letter") DCF000827080.
DCF's rates over four years, therefore, consistently fell
between 17% and 24% below the 2008 USDA rates.  Id.

    In fiscal years 2010 and 2011, DCF issued foster care
recompense payments of $5 per day, per child for expenses
incurred over the course of two six-month periods during those
years in an effort to reimburse foster parents retroactively for
the outlays they had made while receiving below-USDA-level
foster care maintenance payments.  Pls.' Designations 30(b)(6)
Dep. Ellen Finnegan Re: Foster Care Maintenance Payment Rates
163:14-164:1, Oct. 5, 2011, ECF No. 226-1.  These catch-up
payments, however, were regarded only as temporary expenditures;
the official foster care maintenance rate schedule did not see

54

any upward adjustment.  See Trial Tr. vol. 12, 20:21-21:1; see
also Trial Ex. 13, Feb. 23, 2010 Letter Angelo McClain Re:
Foster Care Recompense Payment DCF003570659.  Moreover, in
certain instances, the payments proved fruitless by the time
they were disbursed, as the children the payments were intended
to benefit no longer resided with the foster parents receiving
the recompense.  See Trial Tr. vol. 12, 20:14-18.

On March 1, 2012, thanks to a $12,000,000 set-aside in the
state budget, DCF finally brought its foster care maintenance
rates up to USDA levels.  McClain Dep. 150:18-151:9.  At trial,
however, McClain recounted the rather unexpected nature of the
rate increase, Trial Tr. vol. 15, 110:20-22, May 1, 2013, ECF
No. 340 ("The stars aligned and we were able, we got $12 million
in the budget last year and we were able to raise the rates."),
and expressed a degree of uncertainty as to how the Department
would be able to obtain the funds necessary to raise rates in
the upcoming fiscal year, id. at 110:23-111:5 ("We calculated
[the foster care maintenance payment rate] for this year
starting July 1st, and we would need another $2 million to raise
the rates again. . . . [A plan to seek that money from the state
legislature] was in the governor's budget, and we're hoping it
will make its way through the legislative process.").  Crabtree
also testified to the fact that although DCF managed to raise
its rates, "[the raise] was not legislatively part of the

code[,] [so] with a new commissioner . . . that could change."
Trial Tr. vol. 12, 23:15-17; see also id. at 23:10-21.

### K.   Case Plans

States accepting federal funds for the administration of
child welfare systems are also required under the AACWA to
"develop[] . . . a case plan . . . for each child receiving
foster care maintenance payments."  42 U.S.C. § 671(a)(16).  A
case plan must include a broad swath of information pertaining
to a foster child, such as the appropriateness of the child's
prospective placement, details on the services that the child is
expected to receive, the child's health and education records,
and plans certifying the steps taken towards ensuring permanency
and educational stability.  42 U.S.C. § 675(1)(A)-(G).

In the CRC study, 14.6% of children in the entry cohort and
35.1% of children in the two-year cohort were missing case plans
in their case files.[35]  CRC Study tbls.28a & 55a.  Of the entry
cohort case files containing case plans for children who had
been in DCF for thirty-one or more days, many of them were
incomplete: only 65.8% of the case plans contained child service
data, and 73.9% of the case plans contained family service data.
Id. tbl.29.  The case plans for children in the two-year cohort
featured even greater lacunae.  See id. tbl.56 (reporting that

---

[35] The CRC researchers referred to "service plans" in their
study.  That term is synonymous with "case plans," however.

only 31.8% of two-year cohort case plans contained child service data and that a mere 10.7% of two-year cohort case plans contained any family service data).

**L.   Notice and Process**

DCF must conduct a review of foster care services and goals within six months of a child's removal from her family home and, thereafter, every six months.  See 110 Mass. Code Regs. 6.10(1). A hearing setting out permanency goals must be held within a year of a child's removal from her home.  Mass. Gen. Laws ch. 119, § 29B(a).  Massachusetts regulations provide that DCF "shall give written notice to a client[36] if the Department intends to deny, reduce, or terminate [foster care] services, or increase the cost thereof."[37]  110 Mass. Code Regs. 8.01(1).  The notice must include, inter alia, "a statement of what action the Department intends to take," "the reasons for the action," and "the date on which the action shall become effective," 110 Mass. Code Regs. 8.01(1)(a)-(c), and must be memorialized in writing and delivered to the foster child or family no less than

---

[36] Massachusetts regulations define a client as "[a]n applicant for or recipient of Department services," 110 Mass. Code. Regs. 10.02.  For the purposes of Fair Hearings and other grievances, "[f]oster parents, pre-adoptive parents or adoptive parents in their status as such [are] considered clients."  Id.

[37] In certain instances -- none of which apply here -- advance notice need not be given. See 110 Mass. Code Regs. 8.01(3).

fourteen days before the date of the intended action.  110 Mass.
Code Regs. 8.01(2).  The suspension of services may be appealed
through an administrative review known as a "Fair Hearing," 110
Mass. Code Regs. 10.10, which must be held within sixty-five
business days of the appeal's initiation, 110 Mass. Code Regs.
10.10(1).  It is unclear whether notice of suspended services is
provided in every instance.  See, e.g., Pls.' Designations Fact
Dep. Virginia Peel ("Peel Dep.") 84:24-85:22, Feb. 8, 2012, ECF
No. 226-1.  Budget cuts have led to significant backlogs in fair
hearings.  McClain Dep. 147:17-148:1.

    In the CRC study, 11.6% of children in the entry cohort had
received a foster care review within six months of entering DCF
custody, and 57.5% of such children had attended a permanency
hearing.  CRC Study tbl.20a.  In the two-year cohort, 26.9% of
children had had a foster care review within six months of
entry, while 61.6% of said children had attended a permanency
hearing.  CRC Study tbl.47a.  Comparative statistics regarding
other states' performance in providing notice and process to
children in foster care are not available for cross-reference,
however.

## III. RULINGS OF LAW

### A.   Standard of Review

    Federal Rule of Civil Procedure 52(c) ("Rule 52(c)")
provides the standard that governs motions for judgment on the

record[38] proffered to a court during the course of a jury-waived

trial.  See Federal Ins. Co. v. HPSC, Inc., 480 F.3d 26, 32 (1st

Cir. 2007).  A court must grant a motion for judgment on the

record "where the plaintiff fails to make out a prima facie

case, or despite a prima facie case, the court determines that

the preponderance of evidence goes against the plaintiff's

claim."  In re Stewart, No. MB 12-017, 2012 WL 5189048, at *7

(B.A.P. 1st Cir. Oct. 18 2012) (quoting In re Giza, 458 B.R. 16,

24 (Bankr. D. Mass. 2011)) (internal quotation marks omitted);

see also Morales Feliciano v. Rullán, 378 F.3d 42, 59 (1st Cir.

2004) ("When a party has finished presenting evidence and that

evidence is deemed by the trier insufficient to sustain the

party's position, the court need not waste time, but, rather,

may call a halt to the proceedings and enter judgment

accordingly.").  Unlike a motion for summary judgment, a court

reviewing a motion for judgment on the record is not obligated

to indulge all inferences in favor of the nonmoving party.  See

Stewart, 2012 WL 5189048, at *7.

   B.   Institutional Reform Litigation

   As a general matter, institutional reform litigation is a

creature poorly suited for the courts, as the role of the

---

   [38] A motion for judgment on the record is synonymous with
one for judgment as a matter of law made during the course of a
bench trial, which receives treatment equivalent to a motion for
judgment on partial findings under Rule 52(c).  See Federal Ins.
Co. v. HPSC, Inc., 480 F.3d 26, 32 (1st Cir. 2007).

workaday trial judge in such litigation is often rather
precarious at best and downright ineffectual at worst.[39]  Not
insignificantly, an award of the injunctive and declaratory
relief sought by the Plaintiffs here would encroach upon terrain
that is rightfully the province of the legislature, see Horne v.
Flores, 557 U.S. 433, 448 (2009) ("[I]nstitutional reform
injunctions often raise sensitive federalism concerns.  Such
litigation commonly involves areas of core state responsibility

---

[39] The late Judge Robert Keeton, a consummate jurist and
erstwhile colleague, entertained a similar challenge to the
Massachusetts foster care system more than three decades ago,
which ultimately resulted in the ordering of a wide array of
institutional reforms.  See Lynch v. King, 550 F. Supp. 325 (D.
Mass. 1982) (Keeton, J.).  Yet the fact that the Plaintiffs have
revived many of the same claims in this instant action proves
the limited utility that judicial orders have in effecting
large-scale, structural change.  Indeed, in the lead-in to his
opinion, Judge Keeton presciently penned:

> [H]owever sufficient the plaintiffs' proof and the
> court's jurisdiction may appear, the stark reality is
> that judicial power to give effect to rights created
> by Congress is meager.  No doubt a primary factor in
> the failure of protection of victimized children has
> been limited resources.  And yet, ironically, the only
> relief the court can award is an order compelling
> state officials to give up some of those resources --
> funds appropriated by Congress -- if federal
> requirements are not met.  Thus, it may be that the
> only remedy the court can provide is a remedy that we
> shall later know to have been worse than none, and yet
> a remedy the court must grant when sought by persons
> legitimately entitled to demand it.

Id. at 327.

. . . ."),[40] and would commit this Court to the near-perpetual

oversight of an already-complex child-welfare regime, cf.

Abraham Chayes, The Role of the Judge in Public Law Litigation,

89 Harv. L. Rev. 1281, 1284 (1976) (noting that in institutional

reform litigation "the trial judge has increasingly become the

creator and manager of complex forms of ongoing relief, which

have widespread effects on persons not before the court and

require the judge's continuing involvement in administration and

implementation").  What is more, the redistribution of scarce

governmental resources would no doubt produce certain negative

externalities, not the least of which include the deprivation of

other state agencies of the means needed to perform their

functions fully.  Horne, 557 U.S. at 448 ("When a federal court

orders that money be appropriated for one program, the effect is

often to take funds away from other important programs.").

    The Court's primary role, however, is to adjudicate the

claims before it, such external considerations notwithstanding.

---

    [40]  See also John Choon Yoo, Who Measures the Chancellor's
Foot? The Inherent Remedial Authority of the Federal Courts, 84
Calif. L. Rev. 1121, 1123-24 (1996) ("[T]he Constitution does
not permit the federal courts to exercise their remedial powers
to engage in the structural reform of local institutions and
local government.  If the remedies needed to correct a
constitutional violation lie outside a court's traditional
remedial powers, then separation of powers principles require
that the answer come from the political branches, which are far
better equipped to manage the structural reform of state and
local institutions.").  The Court cites this article to note
this restrictive point of view, not to endorse it.

See Watson v. City of Memphis, 373 U.S. 526, 537 (1963) ("[I]t is obvious that vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them.").  The Court thus turns to the deprivation of constitutional rights claimed here.

###    C.    Substantive Due Process

To prevail on a claim of deprivation of substantive due process under the Due Process Clause of the Fourteenth Amendment, "a plaintiff must . . . show a deprivation of life, liberty, or property."  Connor B., 771 F. Supp. 2d at 159-60 (citing DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 196 (1989)).  The Supreme Court has on numerous occasions held that the Due Process Clause "generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." DeShaney, 489 U.S. at 196; see also Lyng v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW, 485 U.S. 360, 369 (1988); Harris v. McRae, 448 U.S. 297, 317-18 (1980); Lindsey v. Normet, 405 U.S. 56, 74 (1972).  "[I]n situations where a state creates a 'special relationship' because of the limitation which [the state] has imposed on [an individual's] freedom to act on his own behalf," however, "its subsequent failure to protect an individual may amount to a

substantive due process violation." J.R. v. Gloria, 593 F.3d 73, 79 (1st Cir. 2010) (second and third alterations in original) (quoting Rivera v. Rhode Island, 402 F.3d 27, 34 (1st Cir. 2005)) (internal quotation marks omitted).  Numerous courts of appeals have held that a special relationship exists between state foster care agencies and the children held in their charge, see, e.g., Norfleet ex rel. Norfleet v. Ark. Dep't of Human Servs., 989 F.2d 289, 291–93 (8th Cir. 1993); Yvonne L. ex rel. Lewis v. N.M. Dep't of Human Servs., 959 F.2d 883, 892–94 (10th Cir. 1992); K.H. ex rel. Murphy v. Morgan, 914 F.2d 846, 851–52 (7th Cir. 1990); Taylor ex rel. Walker v. Ledbetter, 818 F.2d 791, 795 (11th Cir. 1987), and the First Circuit has assumed as much arguendo, J.R., 593 F.3d at 80.

The Supreme Court has confirmed, and the Defendants themselves acknowledge, that individuals consigned to the state's care have a constitutionally guaranteed right to "basic human needs [such as] food, clothing, shelter, medical care, and reasonable safety." DeShaney, 489 U.S. at 200; see also Defs.' Mem. 6.  Nevertheless, the Defendants challenge the premise advanced by the Plaintiffs that foster children enjoy any of the additional rights claimed in the complaint, Defs.' Mem. 6 & n.9 -- namely, those to (1) "a living environment that protects foster children's physical, mental and emotional safety and well-being"; (2) "services necessary to prevent foster children

from deteriorating or being harmed physically, psychologically,
or otherwise while in government custody"; (3) "treatment and
care consistent with the purpose of the assumption of custody by
DCF"; (4) "be maintained in custody [no] longer than is
necessary"; (5) "receive care, treatment and services determined
and provided through the exercise of accepted professional
judgment"; and (6) "be placed in the least restrictive placement
according to a foster child's needs," Compl. ¶ 303(b)-(g).

     This Court adheres to the reasoning first advanced in this
case by Judge Ponsor at the motion-to-dismiss stage, that the
Supreme Court's decision in Youngberg v. Romeo, 457 U.S. 307
(1982), contemplates the first three putative rights as
protected by the Constitution and that, by logical extension
(particularly when viewed in light of the institutional failings
discussed in Part II of this opinion), the last three items
manifest the right to "reasonable care and safety," and thus are
protections to which the Plaintiffs are equally entitled.  See
Connor B., 771 F. Supp. 2d at 161; cf. Youngberg, 457 U.S. at
324 (noting that, in addition to providing basic necessities,
"the State is under a duty to provide [the involuntarily
committed] with . . . conditions of reasonable care and safety,
reasonably nonrestrictive confinement conditions, and such
training as may be required by these interests").

Merely establishing that foster children may demand from
the state the expansive rights that inhere in personhood,
however, is insufficient to demonstrate a violation of due
process.  The conduct of the state with respect to individuals
in its care must additionally shock the conscience of the Court.
See Rivera, 402 F.3d at 35; see also Martínez v. Cui, 608 F.3d
54, 64 (1st Cir. 2010) ("[T]he shocks-the-conscience test . . .
governs all substantive due process claims based on executive,
as opposed to legislative, action.") (citations omitted).  There
appears to be little consensus on the proper standard one ought
apply in the deployment of the shocks-the-conscience test.
Indeed, at least three different interpretations of the test
have emerged out of the fray.  The first standard, announced by
the Supreme Court in Estelle v. Gamble, 429 U.S. 97 (1976),
requires a showing of "deliberate indifference" on the part of
state officials to the needs of those for whom they are
responsible.  Id. at 104-05.  Six years later, in Youngberg v.
Romeo, 457 U.S. at 307, the Supreme Court held that decisions
made by a professional regarding those who have been
involuntarily committed to state custody are to be regarded
"presumptively valid" and that "liability may be imposed only
when the decision by the professional is such a substantial
departure from accepted professional judgment, practice, or
standards as to demonstrate that the person responsible actually

did not base the decision on such a judgment." Id. at 323.
Most recently, in County of Sacramento v. Lewis, 523 U.S. 833
(1998), the Supreme Court ruled that "in a due process challenge
to executive action, the threshold question is whether the
behavior of the governmental officer is so egregious, so
outrageous, that it may fairly be said to shock the contemporary
conscience." Id. at 847 n.8.

On the motions to dismiss, Judge Ponsor reviewed the merits
of all three of the aforementioned tests but ultimately declined
to adopt any of them, at least not in their independent forms.[41]
See Connor B., 771 F. Supp. 2d at 162-63. Instead, he devised a
new, two-pronged approach that he deemed more suitable in the
foster care context: "[T]o establish a substantive due process
claim, Plaintiffs must show that Defendants' conduct represented
a substantial departure from accepted professional judgment,
which deprived them of conditions of reasonable care and safety,
and that such conduct shocks the conscience." Id. at 163.
Because no First Circuit authority explicitly prescribes the

---

[41] Judge Ponsor noted that "Youngberg and Lewis are not
mutually exclusive," Connor B., 771 F. Supp. 2d at 162, and
regarded Estelle as inapposite because that case pertained only
to incarcerated prisoners, whose more limited rights are
justified given that the "conditions of [their] confinement are
designed to punish," id. (quoting Youngberg, 457 U.S. at 321-22)
(internal quotation marks omitted).

engagement of any particular standard,[42] and because inquiries
into substantive due process are inherently context-dependent,
cf. Lewis, 523 U.S. at 850 ("Rules of due process are not,
however, subject to mechanical application in unfamiliar
territory. . . . [O]ur concern with preserving the
constitutional proportions of substantive due process demands an
exact analysis of circumstances before any abuse of power is
condemned as conscience shocking."), this Court treats Judge
Ponsor's construction of the shocks-the-conscience test as law
of the case and turns now to applying it.

     After reviewing the extensive record set before this Court,
it is apparent that the Defendants, in their administration of
state-run foster care services, did not substantially depart
from widely accepted professional judgment.  True, the laundry
list of problems plaguing DCF is well documented: whether the
relevant metric is performance in minimizing maltreatment in
care, facilitating appropriate placements and ensuring placement
stability, achieving permanency in placement outcomes, providing
educational and medical services, administering caseload
management and training, or guaranteeing accountability, DCF has

---

[42] Technically, the First Circuit did apply the deliberate
indifference standard in the foster care context in J.R. v.
Gloria, 593 F.3d at 80-81.  Judge Ponsor, however, convincingly
articulated various reasons why that case is sufficiently
distinguishable from the one at bar.  See Connor B., 771 F.
Supp. 2d at 162 n.5.

failed not only to comport with national standards of care and state and federal requirements but also to comply with its own internal policies.

Yet "substantial departure," as articulated in the case law, requires more than mere deviance from professional norms; contrary to intuition, courts have construed this standard to require the most wanton abandonment of caretaking responsibilities.  See Yvonne L., 959 F.2d at 894 ("As applied to a foster care setting we doubt there is much difference in the [deliberate-indifference and substantial-departure] standards.  'Failure to exercise professional judgment' does not mean mere negligence as we understand Youngberg; while it does not require actual knowledge the children will be harmed, it implies abdication of the duty to act professionally in making the placements."); Connor B., 771 F. Supp. 2d at 162 n.4 ("It is far from obvious . . . that the professional judgment standard creates an appreciably lower hurdle for plaintiffs [than the deliberate indifference standard].").

With this is mind, it is not clear that the Defendants' behavior has sunk to a level warranting injunctive relief.  For example, when it comes to the rate of maltreatment in foster care, it is true that the Commonwealth lays claim to myriad dubious distinctions.  See, e.g., Child Maltreatment 2010, at 57 tbl.3-20; Child Maltreatment 2011, at 55 tbl.3-15 (reporting

that Massachusetts is consistently in the bottom quartile of all
states in its performance on the metric of absence of
maltreatment in foster care).  These data do not reveal the
entire picture, however.  In 2008 -- the year in which
Massachusetts garnered its lowest percentage absence of
maltreatment, 98.93% -- the Commonwealth missed the 99.68%
national standard by just three-quarters of a percent, and in
recent years, the Commonwealth has been within half of a
percentage point of the benchmark.  See Child Maltreatment 2010,
at 57 tbl.3-20; Child Maltreatment 2011, at 55 tbl.3-15.  What
is more, since at least 2006, less than 50% of all reporting
states have made the cut, and most of Massachusetts's higher-
ranked peers beat out the Commonwealth by mere fractions of a
percent.  See Child Maltreatment 2010, at 57 tbl.3-20; Child
Maltreatment 2011, at 55 tbl.3-15.  Such slight differences in
position, in conjunction with the fact that the majority of
states fail to meet the national standard, do not sufficiently
serve to indict the Massachusetts foster care system.  Moreover,
although DCF was not able to prevent maltreatment from
occurring, it acted reasonably when such events took place by
removing the foster child from the harmful environment.  See,
e.g., CRC Study tbl.18 (noting that roughly 5% of the children
in the entry cohort sample population experienced substantiated
instances of abuse or neglect and that approximately 91.6% of

69

such children were removed); id. tbl.45 (noting that roughly 4.1% of the children in the two-year cohort sample population experienced substantiated instances of abuse or neglect and that 80% of said children were removed).

These considerations must be taken into account in the course of determining whether the Commonwealth's subpar performance violates substantive due process, but the Defendants ought not view this opinion as encouragement to take excessive pride in the Department's performance relative to the national standard or other state foster care systems.  The Court is particularly troubled by the way DCF manipulates and presents relative performance data in its internally distributed CFSR scorecards.  See, e.g., CFSR Scorecards, Tab September 30, 2012; see also Trial Tr. vol. 14, 77:21-80:11 (clarifying the Department's method of determining grades); discussion supra Part II.I (discussing the CFSR scorecards in the context of DCF's accountability systems).  In the most recent iteration of the scorecards submitted in evidence, CFSR Scorecards, Tab September 30, 2012, the grading system employed is misleading, to say the least.  The scorecards use letter grades to evaluate DCF's performance on various metrics, presumably because letter grades are recognizable and easily understood signifiers of performance.  But a system that awards an A+ letter grade to a level of performance falling just short of the national median,

70

see, e.g., CFSR Scorecards, Tab December 31, 2011, at
DCF011158648 (awarding, on the measure "C1.2: Median Time to
Reunification," an A+ for the state's performance relative to
the median), does not line up with any conventional
understanding of the letter grading system or what an A+
typically signifies.  While it is understandable that the
Department strives to present performance data in a way that is
not unduly discouraging and that makes it easy to identify areas
in the most need of improvement, see Trial Tr. vol. 14, 74:7-19,
76:23-77:12, the current scorecards accomplish these goals at
the expense of clarity and honesty.  The potential for such a
grading system to breed complacency in the Department is not a
constitutional violation, nor does it shock the conscience, but
it very poorly serves the foster children under the
Commonwealth's care.

        In truth, financial and administrative constraints -- not
the alleged mismanagement by DCF officials -- pose the greatest
threat to children in the Massachusetts foster care system
today.  In the face of budget cuts for the 2011 fiscal year, DCF
reduced the number of its regional offices, and reduced the
number of management teams for the existing 29 area offices.
See McClain Dep. 146:1-23.  This has led to a scarcity of
available foster care placements, compare Gambon Oct. Dep.
94:12-95:12 (indicating that DCF's general goal is to maintain a

pool of around 4000 unrestricted homes for foster care placements), with DCF Quarterly Reports, 2008-2012, Tab Q3 2012, at 62 fig.28 (showing that since 1998, the pool of unrestricted homes has consistently fallen short of 4000), staffing deficits, see, e.g., Gambon Oct. Dep. 50:9-51:7, limited training, see, e.g., DCF FY2012 Progress Report DCF007413695, and delay in achieving longstanding objectives, see, e.g., 15 Families Initiative Presentation DCF010275220-21, DCF010275224.

Notwithstanding these challenges, certain areas have been improving.  For example, DCF records show that although caseload ratios continue to exceed 18:1, steady progress has been made over the past five years, even after the reduction in regional offices from six to four.  Compare Caseloads Reports, Tab June 2008, at 57 (reporting that as of June 30, 2008, 1034 social workers across six regional offices and a special investigations unit had weighted workloads of over eighteen cases), with id. Tab August 2012, at 11 (reporting that as of August 31, 2012, 390 social workers across four regional offices had weighted workloads of over eighteen cases).

Upon this mixed record, this Court respectfully declines to substitute its judgment for that of duly elected Massachusetts lawmakers, who properly are endowed with the power to direct the reserves of the Commonwealth's coffers to whatever issue of public import that they see fit.  Alas, the Plaintiffs

must face the sobering reality that in this particular instance,
the pen is not quite as mighty as the purse.

The "shocks the conscience" prong of the test proves
equally unavailing to the Plaintiffs; even if this Court were to
have concluded that DCF practice did indeed substantially depart
from professional judgment, there is little in the present
record that could be said to have shocked the impressionable
conscience of the Court.  "The burden to show state conduct that
'shocks the conscience' is extremely high, requiring 'stunning'
evidence of 'arbitrariness and caprice' that extends beyond
'[m]ere violations of state law, even violations resulting from
bad faith' to 'something more egregious and more extreme.'"
J.R., 593 F.3d at 80 (alteration in original) (quoting DePoutot
v. Raffaelly, 424 F.3d 112, 119 (1st Cir. 2005)).  While the
actions (or inaction) of some resident bad actors reflects
poorly on DCF, clear institutional failings at the Department
have not yet been proven.  Cf., e.g., id. at 80-81 (holding that
two social workers' failure to perform background checks on men
living in a foster home who allegedly sexually abused the
plaintiffs, while perhaps a violation of state law, "d[id] not
amount to inherently egregious conduct," id. at 81); K.H., 914
F.2d at 853 (concluding that "a general practice of shuttling
children among foster parents" was not enough to assign

liability for a violation of substantive due process, id. (emphasis omitted)).

To be sure, DCF's management of foster care has been less than stellar, and some of the circumstances in which children in DCF's custody have been placed give the Court considerable pause.  Of particular note are the harrowing accounts of the Named Plaintiffs and others in this case.  But the Plaintiffs have not succeeded in showing that the deprivations complained of were felt class-wide.  See, e.g., Trial Tr. vol. 2, 115:13-15 (revealing that Dr. Bellonci had reviewed only three case files in consideration of his expert report); Trial Tr. vol. 7, 84:23-85:1 (revealing that Dr. Azzi-Lessing had reviewed only five case files before drafting her expert report).  DCF may have failed the Named Plaintiffs, but without more, their accounts do not support a ruling that DCF's system-wide practices shock the conscience.

### D.   Familial Association

The Supreme Court has held that the First Amendment's right to association, the Ninth Amendment's reservation of unenumerated rights to the people, and the Fourteenth Amendment's rights to due process and equal protection imply a concomitant right to familial association.  See, e.g., Roberts v. U.S. Jaycees, 468 U.S. 609, 618-20 (1984) (First Amendment); Stanley v. Illinois, 405 U.S. 645, 651 (1972) (Ninth and

Fourteenth Amendments).   Nevertheless, "[w]hile the Supreme
Court has recognized an abstract fundamental liberty interest in
'family integrity,' the Court has never found that interest to
be absolute or unqualified."  Watterson v. Page, 987 F.2d 1, 8
(1st Cir. 1993) (citing Frazier v. Bailey, 957 F.2d 920, 929-30
(1st Cir. 1992)).   A precise elaboration of the contours of this
right in the foster case context has eluded many judges and led
to a confused jurisprudence among the federal district circuits.
Connor B., 771 F. Supp. 2d at 164 (collecting cases).   That
said, the leading inquiry centers on whether the children are
provided "any meaningful contact with family members."   Id.
(citing Kenny A. ex rel. Winn v. Perdue, 218 F.R.D. 277, 296
(N.D. Ga. 2003)).

The Defendants maintain that the Plaintiffs have failed to
prove that "the actions of DCF's leadership are directly aimed at
their [familial] relationships, with knowledge that the conduct
will adversely affect those relationships."  Defs.' Mem. 10.   To
support this proposition, the Defendants favorably cite Cortes-
Quinones v. Jimenez-Nettleship, 842 F.2d 556, 563 (1st Cir.
1988), and D.G. v. Yarbrough, No. 08-CV-074-GKF-FHM, 2011 WL
6009628, at *16 (N.D. Okla. Dec. 1, 2011).   See Defs.' Mem. 10-
11.  Neither of these two cases is particularly apposite,
however, because their underlying rationales stem from actions
that ultimately sought damages.  See Cortes-Quinones, 842 F.2d at

563-64; D.G., 2011 WL 6009628, at *16 (relying for its foundation on Griffin v. Strong, 983 F.2d 1544, 1548-49 (10th Cir. 1993), in which the plaintiffs sought damages, including punitive damages, id. at 1545).  Courts have wider latitude to impose a remedy when asked to enter only injunctive relief.  See K.H., 914 F.2d at 854 (surmising that "there might . . . be broader liability in an injunctive suit against [state] officials").

Still, one must view the Plaintiffs' familial association claim through the lens of substantive due process, as the former is derived in whole or in part from the latter.  See Gonzalez v. City of Anaheim, 715 F.3d 766, 772 (9th Cir. 2013) (treating an action for familial association as a substantive due process claim requiring proof of conscience-shocking behavior); P.J. ex rel. Jensen v. Wagner, 603 F.3d 1182, 1198 (10th Cir. 2010) (exercising the court's authority to resolve "claims regarding [the] substantive due process right to familial association").  To be sure, Massachusetts's performance with respect to familial visitation and placement is far from excellent.  See, e.g., CRC Study tbl.16 (observing that just 20.9% and 37.6% of children in the entry cohort received monthly visits from siblings and parents, respectively, for the entirety of the thirty-month review period).  Compare First-Round CFSR Final Assessment CSF-000000331-34 (finding Massachusetts's efforts in kinship placements and familial connections to be in substantial

76

conformity with federal law during the first-round CFSR), <u>with</u>
Second-Round CFSR Final Report CSF-000000780-91 (finding
performance on said measures to be out of step with federal
mandates).  Yet in light of this Court's earlier discussion of
substantive due process, <u>see</u> <u>supra</u> Part III.C, one must take into
account the extenuating circumstances (i.e. budgetary
constraints) that bear on DCF's capacity to deliver high-quality
care in order to determine whether the children in foster care
were deprived of meaningful opportunities to see their family
members.  Here the Plaintiffs fail to prove there is such class-
wide institutional deprivation.

**E.   Procedural Due Process**

In evaluating claims for violations of procedural due
process, courts are instructed to engage in a two-step analysis
that requires a determination of (1) "whether there exists a
liberty or property interest which has been interfered with by
the State," and if so, (2) "whether the procedures attendant
upon that deprivation were constitutionally sufficient."
<u>González-Fuentes</u> v. <u>Molina</u>, 607 F.3d 864, 886 (1st Cir. 2010)
(quoting <u>Kentucky Dep't of Corrections</u> v. <u>Thompson</u>, 490 U.S.
454, 460 (1989)) (internal quotation marks omitted).

The Plaintiffs, in their complaint, claim entitlements
under state law to the following four putative rights:

a. The rights in relation to "placement of children in private families; early and periodic screening, diagnostic and treatment standards; individualized health care plan" . . .;

b. The right to a "medical passport" . . .;

c. The rights to sibling visitation . . .; and

d. The right to be considered for placement with relatives, other adult persons who have played significant positive roles in the child's life, and any minor siblings or half-siblings . . . .

Compl. ¶ 309(a)-(d) (internal citations omitted); see also Pls.' Opp'n 17. The Defendants deny that the Plaintiffs can enjoy such rights. Defs.' Mem. 13. For the reasons stated with respect to the Plaintiffs' other putative rights, see supra Part III.C, this Court endorses the Plaintiffs' view.

Notwithstanding the acknowledgement of constitutionally protected interests, the Plaintiffs have failed to establish that the Defendants acted in a constitutionally deficient manner. It may be unclear whether notice of suspended services is always provided, see, e.g., Peel Dep. 84:24-85:22, but one cannot prove the negative from an empty inference. Furthermore, once again, limited resources appear to be the properly attributable culprit, as former Commissioner McClain noted in his deposition that budget cuts contributed to overwhelming backlogs in the scheduling of fair hearings. See McClain Dep. 146:7-148:14. Finally, the data drawn from the CRC study on foster care reviews and permanency plan hearings, CRC Study

tbls.20a & 47a, are not especially helpful because there is no comparative data available to the Court to contextualize CRC's findings.  Accordingly, the Plaintiffs have not demonstrated that a constitutional deprivation deserving redress exists.

### F.    Statutory Claims under the AACWA

#### 1.    Foster Care Maintenance Payments

The Plaintiffs seek relief for DCF's failure to distribute foster care maintenance payments at USDA-recommended levels as prescribed by law.  See Compl. ¶ 307; see also 42 U.S.C. § 672(a)(1); Mass. Gen. Laws ch. 119, § 23(h).  Since March 2012, however, DCF's foster care maintenance rates have been commensurate with those set by the USDA.  See McClain Dep. 150:18-151:3.  The Plaintiffs contend that this fact alone does not effectively moot their claim.  For support, the Plaintiffs point to the Department's long history of providing insufficient foster care maintenance payments.  See Pls.' Opp'n 15-16; see also Sept. 28 McClain Letter DCF000827080 (reporting that, for some number of years, DCF rates ranged between 17% and 24% below the USDA rates).

Generally speaking, in order to remain eligible to receive federal funds under the AACWA, a state must comply strictly with conditions attached to the receipt of those funds.  California Alliance of Child & Family Servs. v. Allenby, 589 F.3d 1017, 1022 (9th Cir. 2009).  Substantial compliance with said

conditions, however, is acceptable in certain instances
prescribed by federal regulation.  Id. at 1022-23 (citing, e.g.,
45 C.F.R. §§ 1355.39, 1356.71(c)(5)).

DCF's past performance with respect to foster care
maintenance payments failed strictly (or even substantially) to
comply with the AACWA.  See id. at 1021 (holding that the
payment of 80% of foster care costs "runs afoul of the [AACWA's]
mandate").  The problem here, however, is that the Plaintiffs
seek only prospective injunctive relief.  The Court acknowledges
the cash flow challenges facing foster parents and recognizes
that foster care recompense payments, while providing money
downstream, does little for the children who are in need of that
money now.  The fact remains, however, that as of March 2012,
foster care maintenance rates satisfy USDA requirements.  See
McClain Dep. 150:18-151:9.

Notwithstanding the prospective relief sought, the
Plaintiffs claim that the Department's recent fix is inadequate,
given its less-than-assured commitment to sustain foster
maintenance rates at USDA levels going forward.  See Pls.' Opp'n
16; Trial Tr. vol. 15, 110:20-111:5; Trial Tr. vol. 12, 23:15-
17.  Once again, however, the Plaintiffs fall victim to blaming
the wrong party for their plight.  Although DCF is statutorily
obligated to set the rates for foster care maintenance payments
at levels prescribed by the USDA, see Mass. Gen. Laws ch. 119, §

80

23(h), the Massachusetts legislature is ultimately responsible for appropriating the funds needed to ensure that DCF is able to reach these goals, Trial Tr. vol. 15, 107:17-108:3.  The serendipitous nature of DCF's receipt of $12,000,000 from the state government to raise its foster care maintenance rates in line with those set forth by the USDA is of no moment in this case.  It is not for this Court to speculatively cast aspersions on the present or future intentions of state bureaucrats.

This holding ought not be read to give the Defendants a free pass to make an end run around the requirements set forth in the AACWA, however.  Should foster care maintenance rates fall substantially below USDA guidelines in the coming months or years, the Plaintiffs are free to resume the pursuit of what will be deemed by this Court to be a revived and actionable claim.  See, e.g., Conservation Law Found. v. Patrick, 767 F. Supp. 2d 260, 261 (D. Mass. 2011).

### 2. Case Plans

The Plaintiffs argue that the Defendants are neither fully nor substantially in compliance with the case-planning requirements established by the AACWA.  Pls.' Opp'n 16.

The results from the CRC study suggest that case plans are generally not well maintained and, in some cases, are entirely unavailable for review.  See CRC Study tbls.28a & 55a (reporting that 14.6% of children in the entry cohort and 35.1% of children

in the two-year cohort were missing case plans in their case files); id. tbl.29 (reporting, with respect to the entry cohort, that 65.8% of the case plans contained child service data and that 73.9% of the case plans contained family service data); id. tbl.56 (reporting, with respect to the two-year cohort, that 31.8% of the case plans contained child service data and that 10.7% of the case plans contained family service data).  Without more, however, mere gaps in record keeping hardly constitute grave statutory error, cf. Bailey v. Pacheco, 108 F. Supp. 2d 1214, 1223 (D.N.M. 2000) (observing, inter alia, that "[s]loppy record keeping skills" did not cause social worker to relinquish the trappings of presumptively valid professional judgments), particularly when viewed in the context of the financial and administrative hardships that have been discussed above, see supra Part III.C.  Accordingly, the Plaintiffs' AACWA claims founded upon DCF's lackluster maintenance of case plans cannot survive.

IV.   **CONCLUSION**

For the foregoing reasons, on September 30, 2013, this Court GRANTED the Defendants' motion for judgment on the record, ECF No. 316.

This is a dispiriting opinion to write.  In alleging violations of substantive due process, the Plaintiffs set themselves to climb a virtually unscalable peak.  They have failed in the ascent.  Nothing is really resolved.  The state defendants today avoid the litigation bullet but the stage is set for further costly litigation as all attempts at settlement have failed.

In the process, the Court may have done a disservice to the hundreds of overworked, underpaid, and underappreciated case workers and foster home providers whose dedication has never been questioned here.  There is, of course, a certain aridity in marshalling the statistics necessary to sustain or refute the class-wide institutional claims made in this case.

Yet this is not a case about statistics but about children -- our children -- and this much is clear, the flaws noted herein are more about budgetary shortfalls than management myopia.  We are all complicit in this financial failure.

When next you bemoan your tax burden, remember that, at that moment, somewhere in Massachusetts there is a youngster who

has just been taken from her parents' home.[43]   She is confused,

inexpressibly lonely, homesick, and desperately afraid.   Because

of Massachusetts' penury, her future is murkier than in most

places in America.

      Do you care?


                        /s/ William G. Young
                        _____
                        WILLIAM G. YOUNG
                        DISTRICT JUDGE

---

[43] There is no suggestion in this record that Massachusetts overreacts in taking children into foster care.